**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ENTERASYS NETWORKS, INC,

        Plaintiff,

    v.

FOUNDRY NETWORKS, INC. and
EXTREME NETWORKS, INC.,

        Defendants.

Civil Action No. 05-CV-11298 (DPW)

**DEFENDANT FOUNDRY NETWORKS, INC.'S OPPOSITION TO**
**PLAINTIFF'S MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS**

## TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................................1

II.    BACKGROUND ...........................................................................................................2

III.   ARGUMENT ...............................................................................................................3

       A.    The Court Should Deny Enterasys' Motion Because Enterasys Refuses To
             Provide Any Information About Its Infringement Theory To Foundry..................3

             1.    Foundry Has Already Produced Tens of Thousands of Pages of
                   Highly Technical Information Relating to Foundry Products ...................3

             2.    Without Enterasys' Theory of Infringement, Foundry Should Not
                   Be Compelled to Produce Thousands of Documents That Are
                   Irrelevant ........................................................................................4

             3.    Enterasys Improperly Objects to Providing Its Theory of
                   Infringement Based on Privilege ................................................6

             4.    Enterasys Was Obligated to Determine its Theory of Infringement
                   Prior to Filing Suit ........................................................................7

             5.    Foundry Has Complied With and Continues to Comply With Its
                   Discovery Obligations ................................................................7

       B.    The Court Should Deny Production of Foundry's Unpublished Patent
             Applications Because The Information Is Irrelevant and the Parties Are
             Direct Competitors Which Weighs Against Disclosure (Request No. 98).............9

       C.    The Court Should Deny Enterasys' Request for Foundry's Customer
             Information Because It Is Premature (Request No. 102).......................................10

       D.    The Court Should Deny Enterasys' Request for Documents Sufficient to
             Determine First and Last Sales Dates Because It Is Premature In Phase I
             (Request No. 103) ...............................................................................................11

       E.    Foundry's Objections Based on Relevance Are Proper.......................................12

IV.    CONCLUSION.............................................................................................................14

Defendant Foundry Networks, Inc. ("Foundry") submits this Opposition to Enterasys Networks, Inc.'s ("Enterasys") motion to compel the production of documents.

## I.    <u>INTRODUCTION</u>

Plaintiff's motion should be denied.  One major problem with plaintiff's motion is that it seeks to compel the production of extensive documentation from Foundry, while at the same time refusing to provide any information about its infringement theory or how it reads its patents to cover Foundry's products.  Enterasys has alleged infringement of six patents, with over 100 claims in those patents combined.  Enterasys has accused nearly every Foundry product family of infringement and served Foundry with grossly overbroad document requests, which on their face would potentially require the production of every single document at Foundry.  Without any specificity provided by Enterasys as to its infringement allegations, a search of Foundry's internal files and electronic records (involving an enormous amount of data) is not practicable, extraordinarily burdensome, and can only be meant to drive up Foundry's litigation costs.  Indeed, many of Foundry's confidential documents will likely be irrelevant and non-responsive to Enterasys' document requests when taken in view of its infringement theory.  Enterasys should focus the case by identifying the specific features of the accused products it alleges infringe its patents, so that discovery can be properly limited.

Notwithstanding the total failure of Enterasys to identify its infringement theory with specificity, Foundry has produced over 57,000 pages of product and company information including detailed operation guides, hardware specifications, and software specifications for the Foundry accused products, and potential prior art relating to the patents-in-suit.  Foundry continues to search for and produce documents that are responsive to Enterasys' document requests.

As to the remaining issues raised by Enterasys, its motion should be denied because:

1)      The secrecy of Foundry's unpublished patent applications should be preserved because the parties are direct competitors and Foundry's confidential patent applications are irrelevant to this case (Request No. 98);

2)      Foundry should not be required to provide any customer information until Phase II discovery relating to damages (Request No. 102);

3)      Information relating to the first and last sales dates for Foundry's accused products is irrelevant to Phase I of discovery (Request No. 103); and

4)      Foundry's objections based on relevancy are proper, since Rule 26(b)(1) only allows Enterasys to seek relevant documents from Foundry.

Enterasys' abusive discovery tactics in this case should not be rewarded. Foundry respectfully requests that Enterasys' motion to compel be denied in its entirety.

## II.    **BACKGROUND**

This is a patent case that Enterasys filed against two independent defendants, Foundry and Extreme Networks, Inc., almost one year ago, on June 21, 2005. (Docket No. 1). (Foundry and Extreme have no relation, except that they are both competitors of Enterasys.)

This case is currently in "Phase I" of discovery, which has been limited by the Court to the liability issues of infringement, invalidity, and unenforceability. (Docket Nos. 28, 31). All remaining issues, such as damages and willfulness, are reserved for "Phase II" of discovery.

On March 3, 2006, Foundry and Enterasys exchanged their first sets of document requests. In response to Enterasys document requests, Foundry produced nearly 57,000 pages of documents which included documents describing Foundry's extensive product offerings.

Foundry also served a number of interrogatories. Some of the interrogatories sought to have Enterasys identify its infringement theory. Enterasys refused to identify its infringement theory. The interrogatories seeking Enterasys identification of its infringement theory are the subject of a current motion to compel. (*See* Docket No. 36).

-2-

III.     **ARGUMENT**

A.     **The Court Should Deny Enterasys' Motion Because Enterasys Refuses To Provide Any Information About Its Infringement Theory To Foundry.**

1.     **Foundry Has Already Produced Tens of Thousands of Pages of Highly Technical Information Relating to Foundry Products.**

Enterasys incorrectly claims that Foundry has not produced sufficient documentation related to the technical features of Foundry's products.  To the contrary, Foundry has complied with its discovery obligations and has agreed to produce both public and confidential responsive documents (that are not privileged or attorney work product) when Enterasys properly sets forth its infringement theory.  As of the date Enterasys filed its motion to compel, Foundry has produced over 57,000 pages of information, including highly technical information that describes the operation of the Foundry accused devices.  Enterasys incorrectly argues that Foundry failed to produce any of the key technical documents.  (Pl.'s Mot. at 1.)  In fact, Foundry has produced the following technical information on the products families that Enterasys has accused of infringement, which represents only a sampling of what Foundry has produced:

1)     hardware specifications (*e.g.,* OC-48c/STM-1 16 Pack over SONET - Network Processor Architecture (NPA) Module (Bates Nos. FN_E 00003093-9), ServerIronSA Web Accelerator - Installation and Administration Guide - Software Release 2.0.3 (Bates Nos. FN_E 00001314-1529), Foundry Serverlron Chassis Hardware Installation Guide (Bates Nos. FN_E 00005076-5078));

2)     software specifications (*e.g.,* Foundry Management Information - Base Reference (Bates Nos. FN_E 00000404-921), ServerIronXL - L4-7 Software Configuration Guide (Bates Nos. FN_E 00002238-2915), Serverlron Chassis L4-7 Software Configuration Guide (Bates Nos. FN_E 00010923-10952));

3)     configuration guides (*e.g.,* Foundry AR-Series Router Configurations Guide For AR1202, AR1204, AR1208, AR1216, AR3201-CH/CL, and AR3202-CH/CL Routers (Bates Nos. FN_E 00000083-294), Foundry IPv6 - Configuration Guide (Bates Nos. FN_E 00001078-1313), Foundry Enterprise Configuration and Management Guide (Bates Nos. FN_E 00007211-7311)); and

4)     installation guides (*e.g.,* Foundry AR1204 Installation Guide (Bates Nos. FN_E 00000322-337), Foundry AR-Series AR1202 - Installation Guide (Bates Nos. FN_E 00000001-56, Foundry Networks - Edgelron Switch - Installation Guide -

Software Release 1.3.7 (Bates Nos. FN_E 00000298-391), Foundry Edgelron 24G-A and 24G - Installation Guide (Bates Nos. FN_E 00001022-1077)).

Although these documents are publicly available, they provide a tremendous amount of technical information.  Enterasys fails to identify what specifically it needs that is not already contained in Foundry's production.

2.    **Without Enterasys' Theory of Infringement, Foundry Should Not Be Compelled to Produce Thousands of Documents That Are Irrelevant.**

The real issue exists with Foundry's highly sensitive documents that are confidential. Enterasys has alleged infringement of six patents, with over 100 claims in those patents.  Many of Foundry's confidential documents may be completely irrelevant and non-responsive to Enterasys' document requests when taken in view of its infringement theory.  Determining the relevance and responsiveness of these documents is closely tied to Enterasys' articulation of its infringement theory.  Enterasys has neither identified the specific features of the accused Foundry products, nor the basis for its infringement allegations.  Without any specificity provided by Enterasys as to its infringement allegations, a search of Foundry's internal records (involving a very vast amount of data) is not practicable.  It is for this reason that further discovery on Foundry's products should not occur until Enterasys has put forth its infringement theory.  *See, e.g., Network Caching Techs., L.L.C. v. Novell Inc.*, 67 U.S.P.Q.2d 1034 (N.D. Cal. 2002) (staying all discovery until the plaintiff had adequately identified their infringement contentions in that case).

As one illustration of Enterasys' grossly overbroad requests, Enterasys' Request No. 65 calls for the production of all documents "establishing whether or how any of the Foundry Products support, enable, or implement the MPLS Standards, or whether or how they can be configured to do so."  (*See* Docket No. 46, Ex. 2, at 25.)  Enterasys, however, has not explained

its basis for asserting that its patents read on MPLS standards, especially when MPLS appears

nowhere in its patents.

Moreover, Enterasys broadly defines "MPLS Standards" as follows:

MPLS Standards are memorialized in at least the following documents:  RFC 2205; RFC 2370; RFC 2702; RFC 3031; RFC 3032; RFC 3036; RFC 3037; RFC 2209; RFC 3209; RFC 3270; Draft-ietf-mpls-rsvp-lsp-tunnel-08.txt; Draft-ietf-mpls-icmp-02.txt; Draft-katz-yeung-ospf-traffic-04.txt; Draft-martini-l2circuit-encap-mpls-04.txt; Draft-martini-l2circuit-trans-mpls-08.txt.

(*See* Docket No. 46, Ex. 2, at 9-10.)  According to Enterasys' definition of MPLS Standards,

these standards encompass *hundreds* of pages.  For example:

| Document | Title | No. of Pages |
|----------|-------|--------------|
| RFC 2205 | "Resource ReSerVation Protocol (RSVP) - Version 1 Functional Specification" | 112 |
| RFC 2209 | "Resource ReSerVation Protocol (RSVP) - Version 1 Message Processing Rules" | 25 |
| RFC 2370 | "The OSPF Opaque LSA Option" | 15 |
| RFC 2702 | "Requirements for Traffic Engineering Over MPLS" | 29 |
| RFC 3031 | "Multiprotocol Label Switching Architecture" | 61 |
| RFC 3032 | "MPLS Label Stack Encoding" | 23 |
| RFC 3036 | "LDP Specification" | 132 |
| RFC 3037 | "LDP Applicability" | 7 |
| RFC 3209 | "RSVP-TE: Extensions to RSVP for LSP Tunnels" | 61 |
| RFC 3270 | "Multi-Protocol Label Switching (MPLS) Support of Differentiated Services" | 64 |

Enterasys has done nothing, however, to shed light on *why* it believes its patents cover

the MPLS standards (or some portion of the hundreds of pages relating to those standards), or

*why* these standards as implemented by Foundry infringe the asserted claims of the Enterasys

Patents.  Enterasys has only stated that "asserted claims of the '205 patent read on Multi-Protocol

-5-

Label Switching ("MPLS") features as that term is used in Foundry's own technical and marketing literature."  (*See* Docket No. 36, Ex. B at 6.)

 Enterasys has similar grossly overbroad document requests relating to "VLAN Standards" and "IGMP Standards."   Like the MPLS standards, the VLAN and IGMP standards are set forth in *hundreds* of pages of documentation.  Again, Enterasys has done nothing to tell Foundry *why* it believes its patents cover the VLAN standards or IGMP standards (or some portion thereof), or why these standards as implemented by Foundry infringe the asserted claims of the Enterasys Patents.

Because Enterasys refuses to tell Foundry anything about its infringement theories in this case, as it was obligated to do by Foundry's interrogatories, it is impossible for Foundry to assess the relevancy of Enterasys' demand that Foundry produce documents related to the MPLS, VLAN, and IGMP standards.  Accordingly, Enterasys' motion to compel should be denied as overly broad and unduly burdensome, since Enterasys' refuses to properly frame the issues.

### 3.    Enterasys Improperly Objects to Providing Its Theory of Infringement Based on Privilege.

The statement of an infringement theory is not privileged subject matter, as Enterasys attempts to argue.  Enterasys incorrectly relies on *Phillips Elecs. N. Am. Corp. v. Universal Elecs. Inc.,* 892 F. Supp. 108 (D. Del. 1995) to support its position.  *Phillips* states "[h]owever, as is the case with documents and communications protected by the attorney-client privilege, plaintiff may not rely on Rule 26(b)(3) or claims of work product as a basis for refusing to respond to discovery requests seeking the disclosure of non-privileged facts."  *Phillips,* 892 F. Supp. at 110.  Enterasys cannot claim work product over its infringement theory that it admits it will have to disclose at some point in this case.

**4.    Enterasys Was Obligated to Determine its Theory of Infringement Prior to Filing Suit.**

Prior to filing suit, Enterasys was obligated under Rule 11 to have thoroughly investigated the issue of infringement against Foundry.  Interestingly, counsel for Enterasys recently explained in an article:

> Usually with the assistance of outside counsel, a pre-litigation infringement analysis involves the preparation of a detailed claim construction chart.  First, the meaning of the patent claim must be construed, principally in light of the claim language, the written description of the invention (*i.e.*, the patent specification), the prosecution history, and relevant dictionary definitions.

> Second, the accused product, if obtainable, should be inspected, reverse-engineered and/or tested.  At the end of counsel's investigation, **a chart should be created comparing the patent claim as construed with the accused product to verify that each and every claim element is present.**

(Ex. A, Marc N. Henschke & David E. Marder, *Deciding on Filing a Patent Infringement Claim Requires a Thorough Up-Front Analysis*, New England In-House, January 2004, available at http://www.newenglandinhouse.com/gateway.cfm?id=142) (emphasis added).

Assuming that such an analysis was performed prior to filing suit, Enterasys should be able to identify for Foundry the specific features of the accused products, and its basis for its infringement allegations on an element-by-element basis.  Unless Enterasys provides this information, Foundry should not be required to search for and produce extremely sensitive non-public information, that may not have any relevance to Enterasys' case.  Furthermore, since Enterasys' theory of infringement should have been established prior to bringing suit -- there should be no difficulty for Enterasys to provide responses to Foundry's interrogatories.

**5.    Foundry Has Complied With and Continues to Comply With Its Discovery Obligations.**

Enterasys is wrong when it says that "Foundry has systematically thwarted Enterasys from obtaining the *essential evidence* required to perform a comprehensive infringement analysis

and to ultimately prove its infringement allegations." (Pl.'s Mot. at 1.) (emphasis added). Enterasys has never indicated what "essential evidence" is missing from the thousands of pages that Foundry already produced. Moreover, the fact of whether the documents Foundry produced are public or confidential has no bearing on whether Enterasys can ultimately prove its infringement allegations.

Enterasys is also wrong when it argues that Foundry must know the scope of responsive documents because Foundry: (a) sent Cisco a subpoena, (b) produced public documents, (c) asserted affirmative defenses, and (d) produced prior art. (Pl.'s Mot. at 2-3.) As a plaintiff, it is Enterasys' burden to clearly set forth the basis for its infringement claims.

The public documents produced by Foundry represent Foundry's best efforts in complying with its discovery obligations, without having Enterasys' infringement theory. Foundry's affirmative defenses are premised on Foundry's good faith belief as to issues related to the some or all of the claims of some or all of the patents-in-suit. None of these assertions require a detailed understanding of each of plaintiff's allegations of infringement. Rather, they require a good faith understanding with respect to one or more of the claims of one or more of the patents-in-suit.

Finally, the prior art production once again reflects Foundry's best efforts of determining potential prior art that may ultimately be relevant to establish invalidity. Invalidity and infringement are separate issues with separate factual inquiries. These actions represent Foundry's best efforts to comply with its discovery obligations, and prepare for upcoming deadlines by anticipating what Enterasys' infringement theory might be -- but they do not excuse Enterasys' burden to be a well-prepared plaintiff. For the same reason, the information sought from Cisco is likely relevant to the validity of at least some of the claims in the case.

If Enterasys would frame the case by providing its infringement theory, these issues

would not exist, and Foundry could properly determine the scope of documents responsive to

Enterasys' requests as they pertain to its highly sensitive non-public documents.

**B.** **The Court Should Deny Production of Foundry's Unpublished Patent Applications Because The Information Is Irrelevant and the Parties Are Direct Competitors Which Weighs Against Disclosure (Request No. 98).**

Enterasys' Request No. 98 is unduly burdensome, and harassing, as it requests:

> [all] documents and tangible things in your possession, custody, or
> control that constitute any unpublished patent applications
> assigned to Foundry, and/or portions of their prosecution histories,
> that reference or cite to any of the Enterasys Patents.

Foundry's unpublished patent applications are highly confidential, and contain trade

secret information. Additionally, responding to Enterasys' request would require Foundry's

numerous outside patent counsel all over the world to review all unpublished patent applications

(both pending and abandoned). Furthermore, the technical information within the unpublished

patent applications is not relevant to the lawsuit and is not likely to lead to admissible evidence.

The secrecy of pending and abandoned U.S. patent applications should be preserved

whenever possible. *Fischer Imaging Corp. v. Lorad Corp.*, 148 F.R.D. 273, 274 (D. Colo. 1993)

(denying production of patent applications). Courts apply a balancing test to determine whether

patent applications should be disclosed in litigation. Courts will deny disclosure "if the need to

examine the file wrapper is less than the interest served in protecting secrecy, or if confidentiality

could not be effectively protected by some other means." *Ideal Toy Corp. v. Tyco Indus., Inc.*,

478 F. Supp. 1191, 1193 (D. Del. 1979) (denying production of patent applications).

The fact that the parties are competitors is a matter which weighs heavily against

disclosure. *Fischer Imaging*, 148 F.R.D. at 274. Enterasys and Foundry are in direct

competition. Under similar fact scenarios, several courts have denied access to patent

applications. *See, e.g.*, *Fischer Imaging*, 148 F.R.D. at 274; *Ideal Toy*, 478 F.Supp. at 1193. On the other hand, Enterasys has simply presented generalized arguments that the patent applications may contain information which may be probative on the questions of Foundry's knowledge of the existence of the Enterasys patents, an issue solely relevant, if at all, to Phase II of this case. (Pl.'s Mot. at 9.) Enterasys has not established the direct relevance of these documents, and since the parties are direct competitors, the unpublished patent applications should not be produced.

### C.    The Court Should Deny Enterasys' Request for Foundry's Customer Information Because It Is Premature (Request No. 102).

Once again, Enterasys attempts to shift its burden to prove its allegations onto Foundry by demanding customer information prematurely. Enterasys has not provided its infringement theory, and accordingly, Foundry has no idea which asserted claims would require extremely confidential information that identifies its customers. Enterasys has alleged that for "certain of its patent claims in this matter, Foundry is liable for indirect infringement (*i.e.*, inducement of infringement or contributory infringement)." (Pl.'s Mot. at 7.) Nowhere does Enterasys identify which claims are indirectly infringed, or the basis for alleging indirect infringement. Enterasys must know about at least one instance of direct infringement in order to proceed with its claim. Enterasys is not permitted to use this case as a subterfuge to search for claims against others, such as Foundry customers. *See Micro Motion, Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318 (Fed. Cir. 1990) (denying third party subpoena to prove infringing or non-infringing uses because "Rule 26(g) requires a party to make a 'reasonable inquiry' before seeking discovery, and parallels the thrust of Rule 11 with respect to making allegations in a complaint.").

To prove its case under these theories of liability, Enterasys must show that direct infringement has been committed by Foundry's customers. (Pl.'s Mot. at 7.) As explained

above, Enterasys was required to perform a pre-filing investigation that would have compared the patent claims as construed with the accused products to verify that each and every claim element was present.  In order to allege indirect infringement, Enterasys must have performed this investigation and determined at least one Foundry customer that was a direct infringer.

Upon receiving Foundry's confidential customer list, Enterasys' is likely to send those customers numerous subpoenas.  Enterasys' request is a litigation tactic to pressure Foundry through its customers.  Assuming that Enterasys' pre-filing investigation has revealed at least one Foundry customer who is a direct infringer, Foundry should not be required to provide any additional customer information until Phase II discovery that relates to damages.

> **D.**     **The Court Should Deny Enterasys' Request for Documents Sufficient to Determine First and Last Sales Dates Because It Is Premature In Phase I (Request No. 103).**

Enterasys has once again mischaracterized Foundry's position regarding the first and last sales dates of its accused products by stating Foundry "refused to produce documents evidencing the dates of sale of its accused products." (Pl.'s Mot. at 19.)  Foundry will provide Enterasys with the first and last sales dates of any of the accused products that were sold as of and after June 21, 2005 and will further provide this information in response to Enterasys' Interrogatory No. 2 that are not due until June 19, 2006.  Enterasys has not waited to evaluate Foundry's production or its response to its Interrogatory request to determine if it is adequate, but instead prematurely filed this motion.

Nevertheless, the information Enterasys seeks is not relevant to Phase I of discovery, which has been limited to the liability issues of infringement, invalidity, and unenforceability. (*See* Docket Nos. 28, 31.)  Enterasys argues that "this is not only a damages issues [sic], but also a liability issue as it will dictate which products are in play for purposes of proving infringement

by way of claim charts and infringement analysis." (Pl.'s Mot. at 10.) Enterasys does not need the first and last sales dates of the accused products to prove liability issues. As discussed above, if Enterasys performed an adequate pre-filing investigation, it investigated whether the Foundry products it accused were on sale during the six year statutory damages period. Enterasys' motion provides an inference that it did not perform an adequate pre-filing investigation, and is abusing the discovery process to complete an investigation it did not adequately perform prior to filing suit against Foundry.

Enterasys is wrong when it argues that information relating to sales is highly relevant to Foundry's laches defense. (Pl.'s Mot. at 19.) The Federal Circuit held that where laches is established no claim for damages exists prior to the filing of the lawsuit. *A.C. Aukerman Co. v. R.L. Chaides Construction Co.,* 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc). Where a patentee delays bringing a lawsuit for six years laches is presumed, but before six years there is no presumption. *Id.* A presumption of laches only forces the patentee to come forward with some evidence showing he did not unreasonably delay a claim for relief. The defendant still has the burden of persuasion for the affirmative defense. *Id.* Enterasys' argument that it is entitled to discovery for a damages issue during Phase I discovery is incorrect.

## E.      Foundry's Objections Based on Relevance Are Proper.

Foundry is only obligated to produce relevant, non-privileged documents that are responsive to Enterasys' document requests, subject to any objections made by Foundry. Indeed, Federal Rule 26(b)(1) only allows Enterasys to seek relevant documents from Foundry: "Parties may obtain discovery regarding any matter, not privileged, which is *relevant* to the subject matter involved in the pending action . . . ". Fed. R. Civ. P 26(b)(1) (emphasis added). Enterasys did not provide any authority to support its improper demand that Foundry must

provide any document that might somehow be responsive to a Enterasys request, whether the document is relevant or not.  To show how untenable Enterasys' position is here, under Enterasys' Request No. 1, which asks for Foundry to produce "[a]ll documents and tangible things in your possession, custody, or control that concern, or refer or relate to, Enterasys,"  if Foundry had a copy of a telephone book that listed Enterasys, Foundry would be required to produce that telephone book.  The Federal Rules only allow Enterasys to seek relevant documents from Foundry.

Foundry also objects to producing documents that are not relevant to Phase I discovery. Foundry states in its responses that it will produce "relevant, non-privileged documents" and further clarifies its position by further stating it will produce those documents "that refer or relate to any claim or defense asserted by a party in this case that are relevant to Phase I discovery." (Pl.'s Mot. at 20.)  This response clearly states Foundry's basis for determining relevance and is not "virtually unintelligible" as argued by Enterasys.  (Pl.'s Mot. at 20.)

It is equally distressing that Enterasys did not seek clarification from Foundry of the particular supplemental responses that it quotes in its motion, but instead ran to Court to file its motion.  Enterasys does not allege that it sought clarification of these supplemental responses that it took issue with.

Furthermore, Enterasys' reliance on *Ares-Serano, Inc. v. Organon Int'l B.V.*, 151 F.R.D 215 (D. Mass. 1993) is misguided.  The facts of *Ares-Serano* are inapplicable to this case.  In *Ares-Serano*, the parties were not subject to multiple phases of discovery.  In addition, in *Ares-Serano,* the plaintiff was given access to eight boxes of defendant's documents for inspection, but the defendant never produced the documents that the plaintiff requested after inspecting the boxes.  In this case, the parties are subject to a court order that creates two distinct and clear

phases of discovery.  Foundry's position is in compliance with the guidelines set out by the Court.  Accordingly, the phases of discovery do not permit either party to have a unilateral ability to decide the scope of discovery, as argued by Enterasys.

## IV.    CONCLUSION

For the reasons set forth above, Foundry respectfully requests that Enterasys' motion to compel production of documents be denied in its entirety.

Dated:  June 15, 2006

Respectfully Submitted,

DEFENDANT FOUNDRY NETWORKS, INC.

By Its Attorneys,

*/s/ Jeremy P. Oczek*

Steven M. Bauer (BBO #542531)
Jeremy P. Oczek (BBO #647509)
PROSKAUER ROSE LLP
One International Place
Boston, MA  02110-2600
Telephone:  (617) 526-9600
Facsimile:   (617) 526-9899
sbauer@proskauer.com
joczek@proskauer.com

William L. Anthony, Jr. (admitted pro hac vice)
I. Neel Chatterjee (admitted pro hac vice)
Michael F. Heafey (BBO # 556931)
Sanjeet K. Dutta (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 614-7400
Facsimile:   (650) 614-7401
wanthony@orrick.com
nchatterjee@orrick.com
mheafey@orrick.com
sdutta@orrick.com

## <u>Certificate of Service</u>

The undersigned hereby certifies that this document was filed through the ECF system on June 15, 2006 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Jeremy P. Oczek*
_____
Jeremy P. Oczek

# EXHIBIT A

Do you know someone who would like this article?
**Click here** to send this article to a colleague.

# Deciding Whether To Pull The Trigger On Patent Infringement Litigation Requires Thorough Up-Front Analysis

*By Marc N. Henschke and David E. Marder*

Whether to file a patent infringement lawsuit is ultimately a business decision of company management. When performing the required cost-benefit analysis, management often will rely heavily upon strategic input from in-house counsel.

Recent media reports about enormous jury verdicts often make patent infringement litigation sound like a Wild West free-for-all. But unlike the gunslingers of old, in-house counsel's approach to these cases must be the very antithesis of shooting first and asking questions later. Fair or unfair, management will expect in-house counsel to accurately handicap the company's chances of winning, and to forecast the expenses likely to be incurred along the way.

In-house counsel can excel in this role only by recognizing that much of the work in a patent case needs to be performed up front, long before a lawsuit ever is filed.

Answers are required at the very outset to a series of fundamental questions that loom large in predicting the potential outcomes and burdens of patent infringement litigation. Before encouraging their companies to become patent plaintiffs, experienced in-house counsel will oversee a thorough vetting of their cases.

This article briefly describes some of the more important issues that in-house counsel should address on a pre-litigation basis. With large patent cases filed in the Northeast now carrying a median price tag of over $4 million through trial, the prospect of postponing the investigation of these issues until discovery has become far too risky.

## How Strong Is Your Infringement Case?

The fact that someone in the marketing department swears that a competitor's product works just like yours is hardly a sufficient basis for filing a lawsuit. Patent infringement rests not upon similarities between products, but rather upon a comparison between potentially infringing products and the claims language of the patent. There can be no infringement unless every element of an issued patent claim is shown to be present in the accused product.

Usually with the assistance of outside counsel, a pre-litigation infringement analysis involves the preparation of a detailed claim construction chart. First, the meaning of the patent claim must be construed, principally in light of the claim language, the written description of the invention (i.e., the patent specification), the prosecution history, and relevant dictionary definitions.

Second, the accused product, if obtainable, should be inspected, reverse-engineered and/or tested. At the end of counsel's investigation, a chart should be created comparing the patent claim as construed with the accused product to verify that each and every claim element is present.

Not all types of infringement are created equal. The patent plaintiff will typically have a much stronger case where literal infringement can be established – where each claim element can be literally found in the accused product.

Absent literal infringement, a more murky and uncertain approach is to try to prove infringement under the doctrine of equivalents. That doctrine requires that only "insubstantial differences" exist between the patent claim and the accused product, which often requires proof that the accused product "performs substantially the same function in substantially the same way to obtain the same result" as the patented invention.

Nor are all patent claims created equal. In-house counsel should be especially wary of bringing a plaintiff's case based only upon older style patent claims using so-called "means-plus-function" language. The courts will interpret such language narrowly so as to limit the patent's scope to just the embodiments shown in the patent specification.

Finally, not to be underestimated is the potential impact of the patent's prosecution history – the written record of the application process conducted before the Patent and Trademark Office (the "PTO"). Patent holders may be stuck with the claim construction arguments they made to the PTO as applicants, and be estopped from asserting infringement against subject matter they earlier had disclaimed when trying to get the patent issued.

### How Strong Is Your Patent?

To assess potential challenges to a patent's validity, outside counsel should be directed at the outset to undertake an independent "prior art search." The goal is to locate any prior art not previously cited to the PTO which arguably might anticipate, or render obvious, the patented invention. Such invalidating prior art could include, for example, other foreign or domestic patents or printed publications, as well as domestic public uses or commercial sales, that predate the application date for the patent-in-suit.

Even a valid patent can be held legally unenforceable if the patent applicant engaged in inequitable conduct in its dealings with the PTO. Consequently, prior to bringing suit, the prosecution history must be scoured for any potential misrepresentations made by the applicant, and counsel should verify that the applicant never knowingly withheld material prior art references from the PTO.

### What Are Your Damages?

In cases where your company is pursuing a monetary recovery rather than injunctive relief, an early assessment of potential damages is critical. At least two traps for the unwary can eliminate all past infringement damages. First, under federal statutory law, no pre-suit damages are recoverable unless and until your company began marking its own patented products with the number of the patent-in-suit.

Second, the laches doctrine bars recovery of all pre-suit damages where a patent holder has slept too long on its rights. Where a patent holder has failed to sue, a statutory presumption of laches arises six years after it knew, or reasonably should have known, that a competitor was infringing its patent.

All other things being equal, larger damages awards are usually recoverable in cases where the patent holder is selling products in competition with the accused infringer such that "lost profits" damages can be established. A patent holder active in the marketplace is entitled to the lost profits it theoretically would have made on its market share percentage of the accused infringer's actual sales.

Where infringing sales exist for which no lost profits can be proven, the patent holder is entitled merely to "reasonable royalty" damages. Based on the conservative estimate that reasonable royalties on a patented feature might fall in the 1 percent to 5 percent range, a case involving only reasonable royalty damages might require infringing sales of hundreds of millions of dollars before it becomes economically justified to pursue.

### Do The Intangibles Favor Your Case?

Moving beyond the technicalities of patent law, experience also teaches that certain important intangible factors should be assessed on a pre-litigation basis. As a practical consideration, are the personnel that you will need to rely upon as witnesses – the inventor and other key employees from the engineering, marketing, sales, and production departments – still with the company and friendly to your cause? Will they make sympathetic and articulate trial witnesses?

More generally, what kind of jury appeal is your case likely to have? Research has shown that jurors frequently are swayed by legally irrelevant considerations rooted in their emotions and preconceived notions about right and wrong.

At least on paper, a jury's ideal patent plaintiff would be a small company (or individual inventor) that has invested a great deal of time and effort in developing its own groundbreaking invention which has become both scientifically important and commercially successful. A jury's least favorite defendant would be a large multinational corporation – especially one lacking its own patents and history of independent development efforts – that was unsuccessful in the marketplace until the day it first copied the plaintiff's invention. The farther your case departs from this ideal fact pattern, the harder it may sometimes be to prevail.

### What Are Your Costs Of Suit?

Any decision to file suit should be preceded by working out a detailed budget with outside counsel addressing the overall costs of litigation. As previously noted, large patent cases in the Northeast now have a median price tag of over $4 million through trial. How your case will compare with this median figure often depends upon the anticipated extent of discovery, the types of consulting and testifying experts that will be required, and the question of whether your targeted defendant has a patent portfolio of its own to throw back at your company by way of counterclaims.

As a cost savings strategy, patent plaintiffs are increasingly turning to contingency fee arrangements where the high risks and potentially huge payoffs of infringement cases are shared with their attorneys. The possible permutations of these arrangements – including hybrid combinations of hourly rate fees and contingency fees – are as limitless as the parties' imaginations. But even where the patent plaintiff is getting a free ride on its attorneys' fees, the substantial human costs of litigation will still remain, since the need for cooperation and extensive involvement from company employees and executives is unavoidable.

Marc Henscke and David Marder are attorneys in the Boston office of Robins, Kaplan, Miller & Ciresi LLP with 25 years experience litigating IP and other complex business cases. In addition to their standard hourly rate work, Messrs. Henschke and Marder frequently handle high-stakes damages cases on a contingency or alternative fee basis.