**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| ENTERASYS NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 05-CV-11298 |
| (DPW) | | |
| v. | ) | |
| | ) | |
| FOUNDRY NETWORKS, INC., and | ) | **ORAL ARGUMENT** |
| EXTREME NETWORKS, INC. | ) | **REQUESTED** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT EXTREME'S EXPEDITED MOTION TO REDUCE TO A MANAGEABLE NUMBER THE PATENT CLAIMS AT ISSUE IN THIS CASE

Defendant Extreme Networks, Inc. ("Extreme") moves the Court to order plaintiff Enterasys, Inc. ("Enterasys") to immediately reduce to a reasonable number the patent claims to be construed, and eventually tried, in this action – no more than two to three claims per patent. As grounds, Extreme states:

1.     Enterasys currently asserts every single claim of all six patents, totaling 129 patent claims. Despite this Court's admonition more than a year ago that Extreme would ultimately need to limit the number of claims asserted, and despite numerous attempts to reach an agreed resolution on this issue, Extreme refuses to either limit its claims in advance of the Defendants' submission of invalidity charts on April 16th, or to commit to a date on which it will limit its claims.

2.     Courts faced with a proliferation of patent claims routinely order that the plaintiff limit the number of claims to be tried. *Auto Wax Co. Inc. v. Mark V Products, Inc.*, 2001 WL 300554 (N.D. Tex. 2001) (limiting total claims in action to 19); *Fenster Family Patent Holdings,*

*Inc. v. Siemens*, 2005 WL 2304190 (D. Del. 2005) (J. Farnan) (limiting case to 10 claims against 5 products).

3.      This is a complex case, involving six patents relating to the field of computer networking.  Both the Court and the parties would be unduly burdened if faced with the task of litigation 129 such claims and every product in three Extreme product lines.

4.      Extreme is filing this motion on an expedited basis in light of fast approaching deadlines for Extreme to serve its patent invalidity and noninfringement contentions with respect to the 129 asserted claims – on April 16 and April 30, respectively – and claim construction briefing in June.  Accordingly, Extreme respectfully requests that the Court set an expedited briefing and hearing schedule on this Motion, so that it can be resolved in advance of the April 16 deadline.

For all of the foregoing reasons, and for the reasons set forth in the accompanying Memorandum of Law, defendant Extreme respectfully moves that the Court order plaintiff Enterasys to select three or fewer claims per patent prior to April 16, 2007.

<u>REQUEST FOR ORAL ARGUMENT</u>

Extreme requests that a hearing be set for the purposes of oral argument regarding this motion.

Dated: March 30, 2007                    EXTREME NETWORKS, INC.


                                         ___/s/ Emily Smith-Lee_____
                                         Emily Smith-Lee, Esq. BBO No. 634223
                                         MCDERMOTT, WILL & EMERY LLP
                                         28 State Street
                                         Boston, Massachusetts 02109-1775
                                         Tel. (617) 535-4000

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| ENTERASYS NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 05-CV-11298 (DPW) |
| v. | ) | |
| | ) | |
| FOUNDRY NETWORKS, INC., and | ) | |
| EXTREME NETWORKS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER GRANTING DEFENDANT EXTREME'S EXPEDITED**
**MOTION TO REDUCE TO A MANAGEABLE NUMBER THE PATENT CLAIMS AT**
**ISSUE IN THIS CASE**

This matter is before the Court on defendant Extreme's Motion To Reduce To A Manageable Number The Patent Claims At Issue In This Case. Based on the evidence of record, the motion papers submitted, and the arguments of counsel,

**IT IS HEREBY ORDERED:**

Plaintiff Enterasys shall immediately reduce to a reasonable number the patent claims to be construed, and eventually tried, in this action – no more than 2 to 3 claims per patent. Plaintiff shall notify defendant Extreme of said claims well in advance of the April 16, 2007, deadline for Extreme to serve invalidity contentions.

Dated:_____                    _____
                                                Hon. Douglas P. Woodlock

MPK 124456-1.065994.0016

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

**EASTERN DIVISION**

| | |
|---|---|
| ENTERASYS NETWORKS, INC., | ) |
| | ) |
| Plaintiff, | ) Civil Action No: 05-CV-11298 (DPW) |
| v. | ) |
| | ) |
| FOUNDRY NETWORKS, INC., and | ) |
| EXTREME NETWORKS, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF STEVEN WALKER IN SUPPORT OF DEFENDANT EXTREME'S EXPEDITED MOTION TO REDUCE TO A MANAGEABLE NUMBER THE PATENT CLAIMS AT ISSUE IN THIS CASE**

**I.    INTRODUCTION**

I, Steven L. Walker, declare:

1.    I am an attorney licensed to practice before all the Courts of the State of California, as well as the United States District Court for the Northern District of California. I am a partner with the law firm of McDermott Will & Emery LLP, counsel defendant Extreme Networks, Inc. ("Extreme"). I make this declaration of my own personal knowledge and/or based on my review of the records in this matter. If called as a witness, I could and would competently testify as to each stated fact. This declaration is submitted in support of Defendant Extreme's Expedited Motion To Reduce To A Manageable Number The Patent Claims At Issue In This Case**.**

2.    On June 21, 2005, Plaintiff Enterasys Networks, Inc. ("Enterasys") sued defendants Extreme Networks, Inc. ("Extreme") and Foundry Networks, Inc. ("Foundry") for patent infringement. Enterasys seeks a judgment of infringement, willful infringement, plus damages and injunctive relief. Enterasys asserts every claim of six patents against Extreme and

Foundry, and totaling 129 different patent claims. Here is a chart of asserted claims:

| Patent No. | Number of Asserted Claims |
|:---:|:---:|
| 6,560,236 | 18 |
| 6,147,995 | 35 |
| 6,128,665 | 8 |
| 6,539,022 | 20 |
| 5,390,173 | 24 |
| 5,251,205 | 24 |
| **Total Claims** | **129** |

3.       The technology at issue, dating back to the early 1990s, generally relates to complex computer networking technology.   For example, the `236 patent entitled "Virtual LANS," purportedly claims a method and device for interconnecting computer networks.  A copy of the `236 patent is attached hereto as Exhibit A.  Another patent at issue, the `995 patent, is entitled, "Method For Establishing Restricted Broadcast Groups In A Switched Network," and allegedly claims a method and apparatus for establishing restricted broadcast groups in a switched  network.

4.       At least two of the patents, the `665 and `022, include several means-plus-function claim elements.

5.       The six patents relate to the field of computer networking.  Enterasys has informed the parties that it plans to use no less than six technical expert witnesses or consultants to prove its case – including professors from Harvard University and Carnegie Mellon University in the fields of Computer Science and Electrical Engineering.  Extreme and Foundry likely will have at least two technical experts each – bringing the total number of technical experts or consultants for all the parties to *over ten*.  There are also 16 inventors spanning across the various patents, and a damages case to be presented at trial.

6.      Plaintiff Enterasys, a private company based in Andover, Massachusetts, is a provider of network solutions for enterprise-class companies.  Defendant Extreme of Santa Clara, California, is a publicly listed company that offers Ethernet switching and routing equipment.

7.      On December 19, 2006, the Court granted the parties' Joint Motion To Modify The Scheduling Order and adopted new deadlines.  These deadlines include:

- *April 16, 2007* - Defendants are to serve invalidity contentions identifying each asserted item of prior art and the basis on which it anticipates or renders obvious each asserted patent claim.

- *April 30, 2007* - Defendants are to serve their responsive claim construction charts identifying which claim elements they admit are present in any accused products, and as to all other claim elements their basis for denying that said elements are present.

- *May 14, 2007 -* The parties are to simultaneously exchange preliminary proposed claim constructions.

- *June 7, 2007* – The parties are to file a joint claim construction statement.

- *June 27, 2007 -* Opening claim construction briefs are due.

- *July 24, 2007* – Reply claim construction briefs are due.

- *October 15, 16, and 17, 2007* – Markman hearing.  A trial date is not yet scheduled.

8.      Enterasys has accused a vast number of Extreme products of infringing the six patents in suit.  In its interrogatory responses, Enterasys has accused "*every* product sold or licensed during the relevant damages period" in three Extreme product lines.  This constitutes more than *100 accused products* across Extreme's Summit, Black Diamond and Alpine product families in addition to software.

9.      Enterasys' sole basis for refusing to limit the number of asserted claims to a manageable number is that discovery is not complete.  Enterasys insists that Extreme must serve its invalidity contentions and noninfringement contentions on all 129 claims so that Enterasys may assess the strengths and weaknesses of its case and select the best claims to try. During the meet and confer conferences, Enterasys rejected Extreme's request to limit the number of asserted claims to 2 -3 claims per patent with the right to substitute until late April

1   2007 after receiving Extreme's invalidity and noninfringement contentions, a limited number of

2   claims. Enterasys instead proposed to limit the number of asserted claims to a total of 30 claims

3   with the right to add up to three dependent claims per patent (a total of 18 potentially new

4   claims) after reviewing the defendants' invalidity and noninfringement contentions. Enterasys

5   would not commit to a date when it would identify with finality the claims it truly intends to try.

6   Enterasys said it needed to conduct further depositions. The following table lists the number of

7   independent claims per patent:

| Patent No. | Number of Independent Claims |
|---|---|
| 6,560,236 | 5 |
| 6,147,995 | 2 |
| 6,128,665 | 4 |
| 6,539,022 | 4 |
| 5,390,173 | 8 |
| 5,251,205 | 5 |
| **Total** | **28** |

10.     Enterasys has had months of discovery and has received hundreds of thousands of pages of core technical documents, including technical and user manuals and other documentation on the structure, function and operation of the accused products. Enterasys is aware of Extreme's prior art, which was identified in initial, and later supplemental, responses to Enterasys' Interrogatory No. 11.

11.     Extreme met and conferred with Enterasys several times regarding the number of asserted claims, most recently on March 27, 2007 without success. Attached hereto as Exhibit B is a 3/29/07 meet and confer letter from S. Walker to M. Henschke. Attached hereto as Exhibit C is a 3/27/07 letter from M. Henschke to S. Walker.

12.     Attached hereto as Exhibit D is selected portions of the 11/3/05 Hearing Transcript.

13.     Attached hereto as Exhibit E is a copy *Silconix Inc. v. Alpha and Omega Semiconductor Inc.*, No. C-03-04803 (N.D. Cal. 2004) (limiting the parties to six phrases to be construed at *Markman*); Exh. F is a copy of *Affymetrix, Inc. v. Multilyte Ltd.*, No. C-03-03779 (N.D. Cal. Dec. 12, 2003) (limiting the parties to eight phrases), Exh. G is a copy of *Keytrak, Inc. v. Key Register, L.L.C.*, No. C-03-00870 (N.D. Ca. June 2, 2003) (limiting the parties to six phrases).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  This declaration was executed on March 30, 2007, at Palo Alto, California.

/s/  Steven L. Walker

# EXHIBIT "A"

US006560236B1

(12) **United States Patent**
Varghese et al.

(10) Patent No.: **US 6,560,236 B1**
(45) Date of Patent: **May 6, 2003**

(54) **VIRTUAL LANS**

(75) Inventors: **George Varghese**, Bradford, MA (US);
**John Bassett**, Reading (GB); **Robert Eugene Thomas**, Hudson, MA (US);
**Peter Higginson**, Herts (GB); **Graham Cobb**, Farnham (GB); **Barry A. Spinney**, Wayland, MA (US); **Robert Simcoe**, Westboro, MA (US)

(73) Assignee: **Enterasys Networks, Inc.**, Rochester, NH (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/411,773**

(22) Filed: **Oct. 4, 1999**

**Related U.S. Application Data**

(63) Continuation of application No. 08/731,905, filed on Oct. 22, 1996, now Pat. No. 5,963,556, which is a continuation of application No. 08/081,622, filed on Jun. 23, 1993, now abandoned.

(51) Int. Cl.[7] .......................... H04L 12/28; H04L 12/56
(52) U.S. Cl. ...................................... **370/401**; 370/432
(58) Field of Search ................................ 370/254, 259, 370/260, 261, 262, 263, 264, 265, 270, 351, 389, 390, 431, 432, 908, 911, 912, 312, 401; 379/156, 157, 158, 202.01, 221.15, 901

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,460,807 A  *  7/1984  Kerr et al. .............. 179/18 BC

| | | | |
|---|---|---|---|
| 4,713,806 A | | 12/1987 | Oberlander et al. |
| 4,893,307 A | | 1/1990 | McKay et al. |
| 4,937,856 A | * | 6/1990 | Natarajan .................... 379/158 |
| 5,311,593 A | | 5/1994 | Carmi |
| 5,313,465 A | | 5/1994 | Perlman et al. |
| 5,341,372 A | | 8/1994 | Kirkham |
| 5,343,471 A | | 8/1994 | Cardagnol |
| 5,361,256 A | | 11/1994 | Doeringer et al. |
| 5,371,852 A | · | 12/1994 | Attanasio et al. |
| 5,379,296 A | | 1/1995 | Johnson et al. |
| 5,430,726 A | | 7/1995 | Moorwood et al. |
| 5,483,587 A | * | 1/1996 | Hogan et al. ............... 379/202 |
| 5,638,434 A | * | 6/1997 | Gottlieb et al. ............. 379/203 |
| 5,850,606 A | * | 12/1998 | Bedingfield, Sr. et al. .. 455/439 |
| 5,991,385 A | * | 11/1999 | Dunn et al. ................... 379/202 |
| 6,163,692 A | * | 12/2000 | Chakrabarti et al. ........ 455/416 |
| 6,219,412 B1 | * | 4/2001 | Wellner et al. ............. 379/202 |
| 6,236,644 B1 | * | 5/2001 | Shuman et al. ............. 370/261 |

* cited by examiner

*Primary Examiner*—Ajit Patel
(74) *Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

(57) **ABSTRACT**

A network device for interconnecting computer networks, the device including a bridge having a plurality of ports through which network communications pass to and from the bridge, the bridge also including a first interface enabling a user to partition the plurality of bridge ports into a plurality of groups, wherein each group represents a different virtual network, wherein the bridge treats all ports within a given group as part of the virtual network corresponding to that group and the bridge isolates the virtual networks from each other, whereby any communications received at a first port of the bridge are directly sent by the bridge to another bridge port only if the other bridge port and the first bridge port are part of the same group.

**18 Claims, 6 Drawing Sheets**





*Figure 1*



*Figure 2*

**U.S. Patent**     May 6, 2003     Sheet 2 of 6     US 6,560,236 B1

130—CREATE VLAN
    Name: VLAN 1
    VlanId: 1
    VlanLinks: 8, 12
    Type: Integrated Routing

132—CREATE VML CLIENTS
    Links: 6, 17

134—CREATE VML SERVER
    Name: VlanServer 1
    Links: 19, 23

136—CREATE VLAN
    Name: VLAN FOO
    VlanId: 1
    Server: VlanServer 1
    Type: Integrated Routing

138—CREATE VML CIRCUIT (. . . , VLAN FOO, . .)

# Figure 3



*Figure 4*



*Figure 5*



*Figure 6*



*Figure b*

VML SERVER CONNECTION STATE MACHINE

*Figure 7a*

VML CLIENT CONNECTION STATE MACHINE

US 6,560,236 B1

1

## VIRTUAL LANS

This application is a continuation application of prior application Ser. No. of prior application Ser. No. 08/731,905 filed Oct. 22, 1996 which issued as U.S. Pat. No. 5,963,556 on Oct. 5, 1999; which claimed priority and is a continuation to application Ser. No. 08/081,622, filed Jun. 23, 1993, now abandoned.

## BACKGROUND OF THE INVENTION

The invention relates to Local Area Networks (LANs) and to bridges and routers that are used on such networks.

Bridges are devices that connect local area networks (LANs) together to form what are referred to as Extended LANs. Large Extended LANs have proven to be difficult to manage because of fault-isolation and addressing problems. The present invention enables a LAN manager to divide a large Extended LAN into smaller virtual LANs that have less overhead and are easier to manage. It further allows the LAN manager to interconnect the virtual LANs with a router.

The recent emergence of large multiport bridges, such as GIGAswitch from Digital Equipment Corporation, which can bridge up to 22 FDDI LANs, enable users to create a large extended LAN. That is, logically it appears that all stations that are bridged together by the switch are on a single LAN. This large configuration is reasonable if the bridge is at the periphery of the extended network and is responsible for bridging together a small number (say 100–250) of stations. However, there are two disadvantages if the bridge is used as the backbone of a large extended LAN. First, implementation and addressing limitations may limit the number of stations that can be present on a single Extended LAN. For example, it is well-known that broadcast traffic used in a LAN does not scale well as the number of LAN stations increases. The second problem is the lack of "firewalls" between the individual LANs that are bridged together by the bridge. An error on one LAN caused by a particular protocol failure can cause all other protocols on the LAN to fail. For example, if a set of stations on a particular LAN get stuck in a loop where they keep generating broadcast traffic, then the entire Extended LAN can fail. Thus some users choose to use a device called a router (as opposed to a bridge) to interconnect LANs.

There are several well-known differences between bridges and routers which make interconnecting LANs with routers more flexible and easier to manage. Routers allow users to construct extremely large and yet manageable networks. Some reasons for this are as follows. First, routers typically do not allow broadcast traffic; if they do, the broadcast traffic can be carefully controlled. By contrast, bridges must allow broadcast to allow LAN protocols to work correctly. Second, routers can be used to break up networks into a hierarchy of manageable subnetworks; bridges cannot. Third, routers have access to more information fields in messages than do bridges; this allows routers to have more discrimination in enforcing security and performance policies.

## SUMMARY OF THE INVENTION

This invention provides a way of dividing a large Extended LAN up into multiple "Virtual" LANs (Vlans), which are interconnected by routers. The division is flexible and can be controlled by the manager. The division of the bridge ports into virtual LANs can also be done differently for different protocols.

2

In general, in one aspect, the invention features a a network device for interconnecting computer networks. The network device includes a bridge having a plurality of ports through which network communications pass to and from said bridge, and it also includes a first interface enabling a user to partition the plurality of bridge ports into a plurality of groups, wherein each group represents a different virtual network. The bridge treats all ports within a given group as part of the virtual network corresponding to that group and the bridge isolates the virtual networks from each other, whereby any communications received at a first bridge port are directly sent by the bridge to another bridge port only if the other bridge port and the first bridge port are part of the same group.

Preferred embodiments include the following features. The bridge also includes a second interface for enabling the user to designate one or more of the plurality of bridge ports as client ports, wherein the bridge sends to the client ports communications that are received from a station on one of said virtual networks and ultimately destined for a station on another of said virtual networks. The network device also includes a router connected to the bridge through the one or more client ports. The router includes a plurality of ports through which network communications pass to and from the router. The router includes an interface enabling the user to designate which one or more of the router ports are connected to the bridge. The router also includes a source table that contains a mapping of source addresses to the virtual networks, the source addresses representing locations of stations that are connected to the virtual networks and that send communications to the bridge. Upon receiving a unicast packet from the bridge, the router uses the source table to identify the virtual network from which the unicast packet came.

Alternatively, in preferred embodiments, the router is assigned a different router address for each of the virtual networks. The router includes a table assigning a different router address to the router for each of the virtual networks. When a unicast packet is sent from a first station on a first virtual network and destined for a second station on a second virtual network, it contains the router address corresponding to the first virtual network. The router identifies the virtual network from which the unicast packet originated by detecting the router address in the unicast packet and through the table determining that the router address corresponds to the first virtual network.

Also in preferred embodiments, the router includes a database identifying each of the virtual networks by a different network identifier. When the router sends to the bridge a multicast packet that is intended for one of the virtual networks, the router adds a network identifier to the multicast packet, the added network identifier being obtained from the database and identifying the virtual network for which the multicast packet is intended. The bridge, upon receipt of the multicast packet sent, removes the network identifier from the multicast packet and then forwards the modified multicast packet to the virtual network identified by the network identifier. The bridge also includes a database mapping the bridge ports to the virtual networks and the bridge uses that database to identify the bridge ports to which the bridge forwards the modified multicast packet. Upon receipt of a multicast packet from any of the virtual networks, the bridge adds source information to the received multicast packet and forwards the resulting multicast packet through one of the client ports to the router. The bridge uses the database to obtain the source information that is added to the multicast packet and it identifies the virtual network from which the multicast packet received.

US 6,560,236 B1

3

Preferred embodiments also include the following additional features. The bridge includes a forwarding table which maps addresses of stations to bridge ports. Upon receipt at the bridge of a unicast packet sent by the router and having a destination address located on one of the virtual networks, the bridge determines from the forwarding table through which bridge port that destination address is reachable and then forwards the unicast packet through the identified bridge port. The router includes a memory storing a server record that identifies the bridge to the router, that identifies the one or more designated router ports, and that identifies which of the one or more designated router ports is operational. The router memory also stores a virtual network record for each of the virtual networks. Each of the virtual network records identifies the virtual network with which it is associated and it also identifies a particular one of the one or more designated router ports as the port through which the router sends communications to the virtual network associated with that virtual network record. The bridge also includes a memory storing a virtual network record for each of the virtual networks. Each of the virtual network records in bridge memory identifies the virtual network with which it is associated and it identifies a particular one of the one or more client ports as the client port through which the bridge sends communications to the virtual network associated with that virtual network record.

The invention enables the manager to reconfigure Vlans easily as the needs of the network changes. Reconfiguration of the network is done by setting parameters and not by redeploying cables or boxes. It is also possible to set up Vlans differently for different protocols, thus creating multiple logical networks from the same physical network.

The invention does not rely on any special features of particular implementations though some hardware support can improve efficiency. Thus, the invention can be used with any router and bridge; and it can also be retrofitted into existing routers and bridges, thus preserving user investment.

The bridge forwarding code for unicast packets is not affected by adding Vlan support; whereas the multicast code is increased only slightly to add and remove VlanIds. The router forwarding code for sending packets is only marginally impacted (to add VlanIds for multicast packets). The router forwarding code for receiving packets is only marginally impacted under one approach. Under an alternative approach, a source lookup must be added to the code path, but this can be done efficiently with simple hardware support of the kind used in bridges.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a router and a bridge which implement virtual LANs;

FIG. 2 is a block diagram of the invention showing port identification numbers on the router and the bridge;

FIG. 3 shows the interfaces for setting up a virtual LAN in the configuration illustrated by FIG. 2;

FIG. 4 shows a bridge/router configuration that is used to illustrate alternative methods of addressing;

FIG. 5 is a model of a virtual LAN multiplexing protocol;

FIG. 6 shows the data structures at the server and at the client; and

FIGS. 7a and 7b show the client and server state machines, respectively;

The appendices at the end of the specification include the following:

4

Appendix I contains a formal description of the data structures that are stored at a client;

Appendix II contains a formal description of the data structures that are stored at a server;

Appendix III lists the basic data types that are used;

Appendix IV presents a logical view of the protocol messaging formats;

Appendix V describes the timers and macros that are used for the transport protocol at the server;

Appendix VI describes the macros that are used to assign Vlans and addresses at the server;

Appendix VII describes the server protocol actions to send and receive hellos;

Appendix VIII describes the client macros for setting up Vlans and transport connections;

Appendix IX describes the client protocol code used to set up Vlans and transport connections;

Appendix X describes the server protocol actions to send updates and receive acks;

Appendix XI describes the code to receive updates and send acks at the client;

Appendix XII describes the server macros for forwarding packets to and from Vlans;

Appendix XIII describes server code for forwarding multicast and unknown destination packets to and from Vlans;

Appendix XIV describes the macros used by the client for forwarding packets to and from Vlans; and

Appendix XV describes the client protocol actions for forwarding packets to and from Vlans.

DESCRIPTION OF THE PREFERRED
EMBODIMENTS

In FIG. 1 a router 100 and a bridge 102 are used to create four virtual LANS (identified as Vlan1 through Vlan4) from 12 individual LANS, each represented by a single line on the right of the figure. Router 100 is referred to herein as a VML client and bridge 102 is referred to as a VML server. Bridge 102 is a large switch, such as DEC's GIGAswitch, which has been modified to appear as four virtual bridges 104(1) through 104(4). Virtual bridges 104(1)–104(4) communicate with each other through router 100. In the described embodiment, the packets sent to router 100 by virtual bridges 104(1)–104(4) are multiplexed over a single line 106 that connects router 100 to bridge 102.

Filters internal to bridge 102 are used to make the bridge appear as a plurality of virtual bridges. And the multiplexing of packet traffic over the single line connecting bridge 102 to router 100 is accomplished by an extra protocol between a VML client layer at router 100 and a VML server layer at bridge 102. The following describes both the required bridge filters and the protocol between VML clients and servers in greater detail.

I. Setting up Vlans

The configuration in FIG. 2 of a router 110 and a bridge 112 connected by two links 114(1) and 114(2) will be used to illustrate the interfaces that are used to set up a virtual LAN. In that configuration two Vlans are shown, namely Vlan 1 and Vlan 2. The interfaces used to set up these Vlans are shown in FIG. 3.

A Vlan is set up using five steps. First, the user uses a management interface at bridge 112 to create Vlan 1 by declaring which bridge ports belong to this Vlan (i.e., ports

US 6,560,236 B1

5

8 and 12 in the FIGURE) and giving the Vlan a name, which has purely local significance (step 130). During this first step, the manager also gives the Vlan a VlanId (which in this case is 1). The VlanId is used to coordinate Vlan set up at router 110 and bridge 112. A similar procedure is used to set up Vlan 2 at the bridge.

Also note that each Vlan is given a type which represents the protocols that this Vlan serves. In other words, bridge 112 can appear to be divided into different Vlans for different protocol types. This allows protocols that cannot be connected through a router to be set up so that such protocols "see" bridge 112 as a single LAN. However, any two Vlans with the same type cannot have a common bridge port.

In the next step, the manager specifies the bridge ports that are connected to VML clients (i.e., routers) (step 132). In the illustrated example, bridge ports 17 and 6 are connected to a client router. Note that the manager does not specify which client ports are connected to the same router. The protocol figures this out by receiving "hellos" (to be described later) from client routers.

After the clients have been defined, the next few steps occur at the router. The user creates a VML Server at router 110 by specifying which router ports are connected to the same bridge (in this case, ports 23 and 19) (step 134). If router 110 was connected to another bridge, then the manager would create another VML server for the second bridge. The server is also given a local name.

Next, the user creates Vlans at router 110 by specifying the local name of the server, the routing type, and the VlanId used to identify the Vlan at the server end (step 136). FIG. 3 shows the creation of a Vlan locally called "FOO" at the router and which corresponds to Vlan 1 at bridge 112. The correspondence is made because they both use a common VlanId of 1. The user creates a second Vlan at router 110 corresponding to Vlan 2 at bridge 112.

Finally, for each routing type that is supported, the user creates a circuit corresponding to each Vlan. Thus, for example, a circuit is created corresponding to Vlan 1 and a second circuit can be created corresponding to Vlan 2. The net result is that the router has circuits for each Vlan.

Creating Vlans at both bridge 112 and router 110 is necessary because current router interfaces require all router circuits to be declared in advance (although their status can change to reflect whether the circuit is up or down). Also, an alternative would have been to put all the details of creating a Vlan (i.e., which server, which VlanId etc.) in the circuit creation call at router 110. However, it seemed more desirable to provide a routing layer with a clean abstraction (i.e. a Vlan) that looks very much like a LAN. It also seemed desirable that the routing layer interfaces required to create a Vlan circuit be similar to the interfaces needed to create a LAN circuit. The details of mapping Vlans are present in the VML layer.

## II. Multiplexing and Demultiplexing Vlans

When packets arrive at the router from the bridge, the router must be able to tell which Vlan the packet was sent on. Similarly when packets are sent by the router to the bridge on a specific Vlan, the bridge must be able to tell which Vlan the packet was sent on. These capabilities are provided through a mechanism by which information about a Vlan (specifically the VlanId described in the previous section) is embedded in a packet. First, the mechanism will be described and then the manner by which the mechanism is used to provide the capabilities will be described.

6

A. Encoding a VlanId Field in a Packet:

Consider a data packet P. The system provides a function that adds to P some information (e.g. the VlanId of the Vlan) that describes the Vlan on which P was sent. The system also provides a second function that removes the VlanId field from P.

There are two simple methods by which the VlanId can be added to packet P. The simplest method is to embed P in another packet Q and to add a specially created VlanId field to the header of packet Q. To remove the VlanId field, the system simply extracts P from Q. Another method is to use a redundant field in P. If there is some field in P that contains redundant information that can be derived from other fields in P, then that field can be used to encode the VlanId. For example, there is a redundant field called the SSAP field in the Data Link Headers of most data packets on a LAN. This field is almost always equal to another field called the DSAP field. Thus, to add the VlanId, the SSAP can be set equal to the VlanId; and to remove the VlanId, the SSAP field can be set equal to the DSAP field.

The first method is more general but the second is more efficient as it does not require the addition of headers to the original packet P.

B. Distinguishing Packets Sent from Router to Bridge:

Referring to FIG. 2, consider a packet P sent from router 110 to bridge 112 on Vlan 1. Two cases must be distinguished, namely, P is either (1) a multicast packet or a unicast packet destined to another router or (2) a unicast packet other than one destined to another router. A multicast packet is defined as a message that is sent on a LAN to a group of stations. The destination address in a multicast packet is a group or multicast address. A unicast packet is a message sent on a LAN to a single station. The destination address in a unicast packet is an individual address.

If P is a multicast packet, P has a destination address that is a group address which identifies a set of stations. In this case, it is crucial that P be sent only to bridge ports corresponding to Vlan 1. Failure to do so can cause routing protocols to break because they use multicast packets to determine which stations are present on a LAN. Thus, multicast packet P sent by router 110 must carry some information so that the bridge can identify which Vlan packet P is to be sent on. Router 110 supplies this information by adding a VlanId field to multicast packets which it sends. The VlanId field identifies the Vlan, in this case Vlan 1.

In a previous section, two options were described for adding a VlanId field to a packet. Both options for adding a VlanId require changing the normal forwarding process of a bridge. However, most bridges process multicast packets in software; thus, the required changes to the forwarding process can easily be made in software.

When bridge 112 receives multicast packet P, it reads the VlanId field in P to find which Vlan P is to be sent on. It then sends P to only the bridge ports corresponding to Vlan 1. Thus in FIG. 2, P is only sent on ports 8 and 12. P is not sent on ports 9 and 15 as these correspond to Vlan 2. However, before bridge 112 sends P on ports 8 and 12, it removes the VlanId field because LAN stations may detect an error if they receive a packet with a VlanId field.

If P is a unicast packet destined for another router 111 (also desingated R2 in FIG. 2), then the VlanId field is added to P before it is sent to the router. Once again, although this is a non-standard packet format, the router is able to receive such packets with an encoded VlanId.

If P is a unicast packet, P has a destination address that is an individual address which identifies a single station.

US 6,560,236 B1

7

Router 110 could add a VlanId field to P as was done for multicast packets. However, many bridges forward unicast packets in hardware. Thus, it is hard to add the changes required for VlanId processing without redesigning the hardware. Another solution is to send a unicast packet P from the router without a VlanId field. When the packet P arrives at the bridge there are two possibilities. If the Destination Address DA in packet P is known to the bridge, packet P is sent to the bridge port corresponding to DA. If the Destination Address DA in P is unknown to the bridge, the packet P is sent on all bridge ports. For example, if packet P was destined to a Station A on Vlan 1, but the address of Station A has not been "learned" by bridge 112, then P will be sent on all ports, including that of Vlan 2. Since Station A is only on one bridge port, the other copies will be ignored. Thus, until bridge 112 learns of Station A, packets sent from router 110 to Station A will cause redundant copies to be sent on all ports. This is much the same as normal bridge operation.

C. Distinguishing Packets Sent from Bridge to Router:

Referring again to FIG. 2, suppose Station A on Vlan 1 sends a packet P that is destined to router 110. Bridge 112 forwards packet P to router 110. When packet P arrives at router 110, router 110 determines which Vlan the packet was sent on. Again, the two cases can be distinguished, one involving the handling of multicast packets, and the other involving the handling of unicast packets. If the packet is a multicast packet, as noted above, bridge 112 adds a VlanId field before forwarding the packet. Thus, when router 110 receives the packet, it decodes the VlanId field to yield the Vlan the packet was sent on. If the packet is a unicast packet sent by a bridge, it will not carry a VlanId. Thus, a different approach is necessary. There are at least two different solutions, which shall be referred to as method 1 and method 2.

According to method 1, the router uses distinct source addresses for each Vlan. The router is assigned a unique source address for each Vlan it connects to. Thus, for example, referring to FIG. 4, if a router 140 has two Vlans, Vlan 1 and Vlan 2, the router is assigned an address X for Vlan 1 and an address Y for Vlan 2. When router 140 sends any packet P on Vlan 1 to bridge 142, it uses X as the source address (in the Data Link header of packet P). Similarly, when router 140 sends any packet Q on Vlan 2 to bridge 142 it uses Y as the source address. A station such Station A on Vlan 1 learns the address of router 140 from the source address of packets sent by router 140 to Station A. Thus, stations on Vlan 1, like Station A and Station B, will learn the router's address as being X. Similarly, stations on Vlan 2, like Station C and Station D, will learn the router's address as being Y. All unicast packets sent from Vlan 1 to router 140 will be sent to X; similarly all unicast packets sent from Vlan 2 to router 140 will be sent to Y. Router 140 is thus able to distinguish the Vlan on which a packet is sent by looking at the destination address. In the example, packets sent to X are for Vlan 1, while packets sent to Y are for Vlan 2.

Method 1 is elegant but has two drawbacks. First, some routing protocols insist that the router uses the same source address on all LANs that the router connects to, making this method inapplicable for such protocols. Second, this method requires that there be multiple addresses for each Vlan. This may be a problem for some implementations.

Method 2 avoids these drawbacks. Referring again to FIG. 4, according to method 2 the router keeps a Source Vlan Table 144 that associates 48-bit source addresses with Vlans. Received packets are distinguished by finding the

8

Vlan associated with the Source Address of a received packet. For example, the router's table maps the address of Station A to Vlan 1 and the address of Station C to Vlan 2. Thus, any packet with source address of Station A that is received at the router is assumed to have been sent on Vlan 1.

Source Vlan Table 144 at router 140 is updated by bridge 142 using the following mechanism. Bridge 142 eventually learns the bridge port corresponding to each source address and enters this information into its forwarding database 146. Thus, bridge 142 will learn that Station A belongs to bridge port 8 and Station C belongs to bridge port 9. Whenever there is a change to forwarding database 146, e.g. either a new entry is learned or a "timed out" entry is deleted, bridge 142 sends this information to router 140 using a reliable transport protocol. Each update sent to router 140 also carries the mapping of ports to Vlans, i.e., bridge 142 also indicates that bridge ports 8 and 12 belong to Vlan 1, while bridge ports 9 and 15 belong to Vlan 2. On receiving such an update, router 140 has enough information to update its Source Vlan Table 144.

Method 2 is general but it requires extra processing for look-up in the Source Vlan table and for updating this table. However, most routers today are brouters, i.e., they implement the bridge forwarding algorithm as well as the normal forwarding code. Since a lookup of the source address is part of the bridge forwarding algorithm, the router often has hardware support for this operation, which makes the operation quite inexpensive. In sum, Method 2 works for all routing protocols and can be efficient with a small amount of hardware support.

D. Other Functions of VML Protocol:

In the description thus far, only LANs have been connected to the bridge. However, there could also be wide area links connected to the bridge. The VML layer makes it appear that the wide-area link is directly connected to one particular router. In other words, if the router does not have an ATM or SONET interface but the bridge does, then the VML layer can provide a LAN "pipe" between the ATM line on the bridge and the router. Conceptually, this is no different from providing virtual LANs except that these lines are typically point-to-point wide area links running protocols like HDLC and SMDS (as opposed to a LAN which has multiple stations whose addresses are unknown). The Source Vlan table required for this kind of "Vlan" is quite small and static, and hence can even be updated manually.

III. The Model of a Virtual LAN Multiplexing Protocol

A model implementation is shown in FIG. 5. A client 150 (i.e., a router) and a server 152 (i.e., a bridge) are each connected to a link 154 through respective Data Link layers 157 and 159. In the figure, the solid lines denote the flow of packets (data flow) and the dotted lines denote the major control flow. Thus, an arrow from a process to a database indicates that the process writes the database; an arrow from the database to the process indicates that the process reads the database.

A. Clients

Each client has a single Client Vlan Multiplexing Layer (VML Client Layer) 156 which is responsible for multiplexing Vlans on to physical links to servers. The multiplexing at the client is controlled by two data structures, namely, a ServerList 158 and a VlanList 160, that are set up by management. Briefly, ServerList 158 contains an entry for every server the client is connected to, and lists the router links that are physically connected to the server. VlanList 160

US 6,560,236 B1

9

contains an entry for every Vlan that the client wishes to connect to and lists information like the server on which this Vlan belongs and the VlanId which helps identify the Vlan at the server.

Client VML layer 156 reads ServerList 158 and VlanList 160 and uses this and other state information to multiplex and demultiplex packets. Client VML Layer 156 offers the illusion of multiple Vlans to routing protocols. The routing protocols interface to the Vlans exactly as they do to LANS, i.e., they begin by opening a port, identifying which protocol types they wish to receive, and finally sending and receiving packets on the opened port.

A routing protocol can also (optionally) open a port on what is referred to as an "unknown" Vlan. Suppose a packet is received by Client VML Layer 156 with a protocol type specified by the routing protocol. Suppose also that Client VML layer 156 is unable to decide which Vlan the packet arrived on. Then, Client VML Layer 156 queues the packet on the unknown Vlan port. The routing protocol can then optionally decide to forward or discard the packet. Forwarding packets received on unknown Vlans can help data packets to be forwarded even during periods when Client VML Layer 156 is still learning the information needed to demultiplex packets. Opening a port to the "unknown" Vlan is just a way to model this mechanism.

B. Servers

At the server end, there is a corresponding VML Server Layer 164. Unlike VML Client Layer 156 at client 150, VML Server Layer 164 is only involved in setting up Vlans at the server and not in the actual forwarding of data packets. All packets received by Data Link 159 are handed to a Bridge Forwarding Layer 166. Bridge Forwarding Layer 166 forwards unicast packets to known destinations much as they would be handled in a normal bridge; however, the handling of multicast and unicast packets to an unknown destination is quite different. Bridge Forwarding Layer 166 consults a VlanList 168 at server 152 which contains a record for every Vlan declared at the server. VlanList 168 is used to forward multicast packets received on a Vlan only to the bridge ports corresponding to that Vlan. VlanList 168 is written by management, represented in FIG. 5 by management interface 170.

VML Server Layer 164 sends Hello messages on every link that is declared to be a link to a client/router. The hellos sent on a link 154 are used to set up a transport connection to the VML Client Layer at the other end of link 154. If VML Client Layer 156 replies, a transport connection is set up. VML Server Layer 164 then begins to send updates reliably to VML Client Layer 156 on link 154.

As indicated in FIG. 5, Bridge Forwarding Layer 166 consults a Forwarding Database 172, which models the standard forwarding database on a bridge. The learning process in the bridge is modelled by a Learning Process 174 which writes information to Forwarding Database 172. There is also an interface between Learning Process 14 and VML Server Layer 164.

Learning Process 174 sends to all VML Clients all updates that it has used to update Bridge Forwarding Database 172. When a new line to a VML Client comes up, VML Server 164 informs Learning Process 174. Learning Process 174 then begins sending learning updates (corresponding to the current state of Forwarding Database 172) to VML Server 164. VML Server 164 packages this information and sends it to VML client 156. Finally, VML Client 156 uses the updates to build a Source Vlan Table. Recall that the Source Vlan Table, described in connection with FIG. 4, is used by VML Client Layer 156 to demultiplex received packets.

10

As Learning Process 174 gets new information it does not send a complete copy of the new database; instead it only sends incremental updates. Thus, a complete set of updates is only sent when a line to a VML Client first comes up. Later changes are sent as incremental updates. However, the use of incremental updates requires a reliable transport protocol between the server and client on each line. The transport protocol is responsible for retransmitting each update until an ACK is received from the client.

C. Relationship to Bridge Architecture

For the described embodiment, it is assumed that all VML servers are IEEE 802.1 compliant spanning tree bridges. Thus, there are two ways the Spanning Tree protocol can interact with the VML protocol. VML server 164 can implement a single spanning tree for all Vlans or a separate spanning tree for each Vlan.

In the described embodiment, every VML server 164 implements a single spanning tree protocol for all Vlans. In other words, each VML server implements the spanning tree protocol on all its links. Once the spanning tree has stabilized, the Vlan ports specified by management will define the breakup of the Extended LAN into Vlans. Similarly, VML server 164 builds a single learning database for the entire bridge and not a separate learning database for each Vlan. As in the bridge architecture, the station addresses are unique over the entire Extended LAN (as opposed to only requiring unique addresses for each Vlan).

IV. A More Detailed Protocol Specification

A. The Client Data Structures

The principle data structures stored in memory at both client and server are shown in FIG. 6. Considering first the data structures at the client end, there is a VlanRecord 200 for each Vlan declared at the client and there is a Server-Record 202 for each server that the client knows about. Each VlanRecord 200 points to the Server Record 202 corresponding to the server on which this Vlan belongs. Each ServerRecord 202 points to a set of physical link interfaces that connect the client to the server. Each such link interface has a LinkRecord 204 which contains variables required to implement a reliable transport protocol. The transport protocol is used to send information (from the server to the client) that maps source addresses to Vlans. This mapping information is stored in a SourceVlanTable 206 at the client end. There is one SourceVlanTable 206 per link at the client and it is pointed to by the corresponding LinkRecord 204.

Note that one may use multiple links between the router and the bridge as described in the U.S. Patent Application entitled "SYSTEM FOR ACHIEVING SCALABLE ROUTER PERFORMANCE", by George Varghese, David R. Oran, and Robert E. Thomas, filed on an even date herewith, and which issued as U.S. Pat. No. 5,905,723 on May 18, 1999 and incorporated herein by reference. In that case, there would be multiple LinkRecords.

VlanRecords 200 are linked together in a VlanList. ServerRecords 202 are linked together in a ServerList. And LinkRecords 204 are stored in an array indexed by the link number.

Each of the three records will now be described in greater detail.

1. VlanRecord

Each VlanRecord 200 contains a VlanId 200(1), which identifies the corresponding Vlan at the server; a Name 200(2), which only has local significance and is set according to the manager's convenience; a type 200(3), which identifies the routing type of the Vlan; and a ServerName 200(4), which identifies the name of the server on which this Vlan belongs. These variables are set by management. Each

US 6,560,236 B1

**11**

VlanRecord **200** also has two other variables, both of which are set by the protocol, namely, a Status variable **200**(5) and an As signedLink variable **200**(6).

Status variable **200**(5) indicates if the Vlan is correctly set up and if not, gives an indication of the type of error. The three possible errors are TypeMismatch, if the Vlan type at the client does not match the Vlan type of the corresponding Vlan at the server; IdMismatch, if there is no Vlan at the server with a VlanId equal to that declared at the client end; and ServerFailure, if none of the links to the server are considered operational. AssignedLink variable **200**(6) describes the physical interface assigned to this Vlan at the client.

2. ServerRecord

ServerRecord **202** contains two variables that are set by management. The first is a Name variable **202**(1) that is a local name assigned by management to this server. A Vlan-Record V is made to point to a ServerRecord S by setting V.ServerName=S.Name. The second variable set by management is Links **202**(2), a variable that identifies the set of physical interfaces that connect the client to this particular server. FIG. 6 shows two links between the client and the server. Thus, ServerRecord **202** at the client points to the two corresponding link records.

ServerRecord **202** also contains two other variables that are set by the protocol. First, there is a LiveLinks variable **202**(3) which is the subset of physical links declared in Links that are operational. The traffic from the client to the server must only be split among the set of LiveLinks. As links fail and recover LiveLinks is updated by the protocol. Finally, there is a State variable **202**(4) which describes error conditions. The two possible errors are MultipleServers, if any two links in Links are connected to two distinct servers, and Broadcast, if any link to Links is not a point-to-point link to the server.

3. LinkRecord

Each LinkRecord **204** contains variables required to implement a reliable transport connection with a corresponding link at the server end. Note that if there are multiple links between a client and a server, separate transport connections on each link are set up. ServerId **204**(1) is a 48-bit unique Id of the remote server and ConnectId **204**(2) is a 32 bit connection identifier. State **204**(3) is the state of the connection; the link is considered to be operational when the connection state is ON. SequenceNumber **204**(4) is the number of the last update successfully received from the server. Each LinkRecord contains a pointer to a SourceVlanTable **206** that is used to map source addresses of received unicast packets to the Vlan on which the packet was sent. Finally, a ClientAddresses variable **204**(6) is a list of addresses used by all VML clients on the same server, as reported by the server.

A more comprehensive description of the client data structures can be found in the pseudocode that is presented in Appendix I, attached hereto. The description uses the simple data types that are described Appendix III, also attached hereto.

B. Server Data Structures

As at the client, the server keeps a VlanRecord **210** for every Vlan declared at the server. The server also has a variable called ClientLinks **212** that lists the set of server links that are connected to clients. For each such link, the server keeps a LinkRecord **214** that has more fields than the corresponding LinkRecord **204** kept at the client. Finally, just as the client keeps a ServerRecord **202** for each server, the server keeps a ClientRecord **209** for each client it knows about. The ClientRecord information is useful in implement-

**12**

ing hunt groups at the server. For further discussion of hunt groups as they apply to the bridge see U.S. patent application Ser. No. 07/542,856, entitled Fast Arbiter Having Easy Scaling for Large Numbers of Requesters, Large Numbers of Resource Types with Multiple Instances of Each Type, and Selectable Queuing Disciplines, incorporated herein by reference).

These data structures will now be described in greater detail.

1. VlanRecord:

VlanRecord **210** includes VlanId, Name, and Type fields **210**(1), **210**(2), and **210**(3) the contents of which are declared by management just as at the client end. However, at the server end, management also specifies VlanLinks **210**(4) which is the set of bridge links that belong to this Vlan. There are also two variables set by the protocol, namely, a ClientLinks variable **210**(5) and a Status variable **210**(6). ClientLinks **210**(5) is a subset of the server variable ClientLinks that represents the client links to which this Vlan has been assigned. If there are multiple links between a server and a client, the client assigns each Vlan to exactly one operational link. Each client reports the link to which it assigns Vlan V to the server, and the server stores the set of assigned links to ClientLinks **210**(5). Status variable **210**(6) is identical to Status variable **200**(5) found in a client VlanRecord **200**.

2. LinkRecord

LinkRecord **214** includes a ClientId variable **214**(1), a ConnectId variable **214**(2), a State variable **214**(3), a SequenceNumber variable **214**(4), all corresponding to previously described similar variables in the client LinkRecord. Server LinkRecord **214** also includes additional variables. First, there is a Buffer variable **214**(5) which is a buffer that stores the current update being transmitted on the link to the server. There is a Retransmits variable **214**(6) that counts the number of times the update stored in Buffer variable **214**(5) has been retransmitted to the client without receiving an acknowledgement. There is an Other Info field **214**(7) that contains various 48-bit addresses that are used by the client. Finally, there is a Vlans variable **214**(8) that identifies the Vlans that are assigned to the link.

3. ClientRecord

Just as in a ServerRecord at the client, each ClientRecord **209** stores a ClientId and a LiveLinks variable which represents the set of links to this client that are considered to be operational.

A formal description of the server data structures can be found in Appendix II, attached hereto.

C. Message Formats

There are four basic types of messages used by the VML protocol. First, servers send ServerHello messages and clients respond with ClientHello messages. These messages are used to set up the transport connections on links and also to coordinate Vlan information between client and server. Next, servers send Update messages to clients containing mapping information that is used by clients to update information in the SourceVlanTable of each link. Each Update message is numbered with a sequence number and clients respond to Updates by sending an ACK.

The relevant fields in each message are shown in Appendix IV, which presents only a logical view of the message formats. For example, in order to encode a variable length sequence (such as a set of VlanRecords), a length field is also needed.

For the most part, the fields of the messages shown in Appendix IV correspond to fields of similar names in the link records at client and server. The relevant state variables

US 6,560,236 B1

**13**

are copied into fields of the same name in the protocol message. Thus, all fields in the client hello (except the PhaseIV Address in the case of the DECnet Phase IV communication protocol) are copied from fields of the same name in the corresponding link record at the client. The PhaseIV Address is copied from a global client variable that represents the 48-bit address corresponding to the PhaseIV address of the client (i.e., Phase IV address prefixed by HI-ORD). If the client has no Phase IV address, this field is set to all 0's.

Similarly, all fields except ClientAddresses in the server hello are copied from fields of the same name in the corresponding link record at the client. The ClientAddresses field is copied from a global server variable that represents all the 48-bit addresses reported by clients.

Each update carries the Server Id, the connection identifier, a sequence number and the actual data. The ACK has the same fields except for the data field.

## V. A Protocol for Controlling Vlans

A. Setting Up Transport Protocol Connections Using Hellos

The state machine used for the transport protocol is shown in FIGS. 7a–b. State machines attempt to set up a transport connection on each link between a client and a server. Once management declares a ClientLink at the server, the server creates a LinkRecord for the link. On creation and on power up or reset of the link, the LinkRecord is reset by setting the State of the link to INIT **300**. The INIT state causes a wait for a timeout period that is sufficiently long such that by the time the server link exits INIT state: (1) all old control messages sent by the server and the client on this link will have disappeared (any control messages received by the server on a link in INIT state are ignored); and (2) the client will have timed out all old state information it had.

Thus, the timer in INIT state (called ConnectTimer) is set to be large enough to "flush" all old messages and state information. On expiry of the ConnectTimer, the server sets the state of the link to REQ **302** (i.e., requesting a connection) and sends a server hello periodically to the client. All hellos sent by the server list the Vlan Id and type of all Vlans known to the server. All hellos (sent by either the client or server) carry the state of the sender; a Hello with state REQ is called a RequestHello; a Hello with state ON is called an OnHello.

If the client receives a RequestHello while in REQ state, the client transitions to an ON state **304** and sends back an OnHello. While the server periodically sends hellos in the REQ and ON state, the client only sends hellos in response to server hellos. The client is responsible for distributing the Vlans heard from a server among the multiple lines going to the server that are ON. It is also useful for deciding which links multicast traffic for a Vlan will flow on. The client distributes Vlans by setting the variable AssignedLink in a VlanRecord to point to the assigned link. A simple policy would be to distribute the Vlans in roughly equal fashion among all links to the server that are ON.

Having distributed the Vlans among links to the server, the client sends back a hello to the server on the link it received a hello. The client hello lists all Vlans assigned by the client to this link. Notice that the server lists all its Vlans in its hellos, while the client lists the Vlans assigned to the line on which the hello is sent.

Suppose an OnHello comes back on link L to the server. Suppose the hello is received while the server link record is in REQ state and the connection Id in the hello matches the server connectionId. Then the two way handshake to set up the connection is considered to be complete, and the server changes the state of the link to ON state **304**. Also if a Vlan

**14**

V is mentioned in the hello sent by the client, then the server updates the VlanRecord for V to include L in its list of ClientLinks. The ClientLinks for a Vlan is a subset of the ClientLinks of the server. Basically, when a server has multiple links to a client, the server selects exactly one of these links for each Vlan based on hellos sent by the client. The selected link is used by the server to send multicast traffic for the Vlan to the client.

In normal operation, once both client and server have turned a link ON, the server periodically sends hellos to the client and the client responds with a hello. However, if the client does not hear a hello from the server for a timeout period, the client transitions to REQ state **310**. The default value of the timer in INIT state at the server is chosen to be three times as large as the client timeout.

Besides the normal operation, there are two other interesting cases. First, if the client receives a Hello from the server with a new connection Id or server Id (i.e., if the old server is disconnected and a new server plugged in) while in ON state, the client remains in ON state but essentially starts a new connection. If the client crashes and comes up, the client starts the link in REQ state. However, the client will not leave REQ state until the server sends an OnHello to the client and the client responds with a RequestHello. Receipt of the RequestHello causes the server to go into REQ state and restart the connection. This is important because when the client crashed it may have lost all previous updates; thus it must force the server to send it all updates by restarting the connection.

B. Mapping Client 48-bit Addresses

The hellos sent by the client also lists the 48-bit addresses used by the client on the link, including any address derived from the client address. When the server gets the hello it sets up all bridge forwarding Databases such that the address listed in the hello point to the link the hello was received on.

The VMLServer also builds up a list of all client addresses (using a variable ClientAddresses) that it reports back to clients in its server hellos. Note that if a client R sends a packet to another VML Client router S, client R then includes a VlanId in the packet. Client R can distinguish packets sent to other VML Clients by consulting a list of client addresses sent to R by the server.

C. Consistency Checking

Recall that the manager enters information at both client and server to set up Vlans. The code has a few consistency checks on this information.

Recall that the server sends a list of all its Vlans in its hellos with VlanId and Type. Consider a Vlan V declared at the client with VlanId=I. The client will not assign Vlan V to a line unless it finds that the server reports some Vlan with VlanId=I in its hello. Thus, if the manager incorrectly enters the VlanId field for a Vlan at the server and client, the client will not "bring up" the Vlan. Instead the State of Vlan V is reported as IdMismatch.

Suppose by accident, the manager connects a client to two different servers using links L1 and L2 but declares L1 and L2 to be part of one server record at the client. The client will detect this since it receives hellos with two different Server Ids on both links. The State of the corresponding server record is set to MultipleServers and all Vlans that belong to this server have their State changed to ServerFailure.

If the State of a Vlan is anything other than ON, the client will not send any traffic on this Vlan and will not assign this Vlan to any link.

D. Formal Code for Controlling Vlans at Server

The formal code used by the server to control Vlans is presented in Appendices V, VI, and VII. Appendix V shows

US 6,560,236 B1

**15**

the timers, constants, and macros used by the server transport protocol on each link. The code describes the timers as constants.

When a client hello is received on a link, the information in the link record for that link may change and the macros shown in Appendix VI are used to update information about Vlans, Clients, and addresses. The first macro UpdateClientList keeps track of the client links associated with each distinct client (some clients may be connected to the server with multiple links); if hunt groups are implemented, this information is used to create a single hunt group for all the ON links connected to each client. UpdateVlanStatus is used to choose at most one assigned link per client for each Vlan; the assigned link is the link on which the client reports the Vlan. This information is gathered into a set of client links for each Vlan that is used to forward multicast traffic. (Exactly one copy of a multicast packet sent on a Vlan is sent to each client by sending the packet to the assigned link for that client.)

Finally, UpdateAddresses (in Appendix VI) updates the set of 48-bit addresses reported by clients. It also makes forwarding database entries for these addresses.

In the formal code for the server transport protocol (Appendix VII), when some action on a link L is executed, it typically begins by obtaining the LinkRecord by looking up LinkArray[L]. It is, of course, assumed that there is a check as to whether L is a ClientPort and if L is not, the routine is not executed.

The server code describes actions taken when a hello is received and transport timers expire. It follows the state transitions described earlier.

E. Formal Code for Controlling Vlans at Client

The client code to control Vlans is described in Appendices VIII and IX. Appendix VIII contains a set of useful macros that are called by the client transport protocol. InitializeConnection is called when a connection first begins at a client and initializes transport variables. UpdateServerRecord and UpdateVlanStatus are called whenever the client receives a new server hello.

UpdateServerRecord checks for server errors (such as being connected to two different servers on two links that were declared to be part of one server record) and updates the concerned server record. UpdateVlanStatus similarly checks for Vlan errors (i.e., a Vlan declared at the client does not have a matching Vlan at the server) and also distributes client Vlans among all the ON lines that connect the client and the server.

Finally, the main client code is described in Appendix IX. It has routines to process a received server hello and for handling transport timer expiry. It follows the state machine described earlier.

F. Sending Updates Reliably Over Transport Connections

This section describes how the forwarding tables at the server are sent reliably to the client using the transport connections set up on links.

As was previously described, when the server turns a link ON, the server initializes the SequenceNumber field (for the link) to 1. Similarly when the client starts a connection, the client initializes the SequenceNumber field to 0. The client also initializes its SourceVlanTable to be empty.

In normal operation, the server will send its forwarding table suitable encoded to the client on each line. The client will send ACKs backs separately on each line. This is redundant because if a client has multiple lines to the server it really only needs one copy of the Forwarding table. However, by sending multiple copies parallel processing is possible.

**16**

When a connection starts at the server, the server informs the Update Process using a routine called InformUpdateProcess together with a status variable that is set to "new". It is assumed that the Update Process keeps track of the outstanding updates on each client link. When the Update Process gets a status of new for a line, it begins to send the entire Forwarding Database to the client as a sequence of updates. However, the update process sends only one update at a time. Each update is numbered with the server sequence number; when the client receives the update, the client incrementally updates its SourceVlanTable using the update and sends back an ACK. When the ACK is received at the server, the server informs the Update Process using the routine InformUpdateProcess together with a status variable that is set to free. When this happens the Update Process sends the next outstanding update. If the forwarding database changes while the client is being loaded, the UpdateProcess must keep track of the outstanding updates for each client link.

The current update being sent to a client is stored in a variable called Buffer. If an ACK is not received before a RetransmitTimer expires, the update is retransmitted from Buffer. If more than a certain number of retransmissions takes place, the server starts a new connection by going into REQ state and incrementing the connection identifier.

The net result is that on each line, the client will build up a SourceVlanTable that maps source 48-bit addresses to Vlans.

1. Code for Sending Updates Reliably at the Server

The server code for sending updates reliably is described in Appendix X. It uses a macro that is an interface to the update process. It has routines to send a new update, to retransmit an update, and to receive an ACK from the server.

2. Code for Sending Updates Reliably at the Client

The client code for receiving updates reliably and sending updates is described in Appendix XI. It uses a macro that encapsulates the implementation method used to update the SourceVlanTable when a new update arrives. The code has only one routine, a routine that receives an update, checks whether it is a duplicate, and sends an ACK back to the server.

G. Forwarding Packets Between Vlans

1. Client Forwarding

Normally the interface to a Data Link is via a port. According to a simplified view of a port interface, a client opens a port and is given a descriptor (much like a Unix file descriptor). The client then enables a certain protocol specifier (includes options on SAPs, Protocol Types, multicast etc.) on the port. The specifier describes the kinds of packets the client wants to receive. Finally, clients can transmit packets to the port; these packets are then sent out on the link. Also received packets of the specified type are queued to the port.

The actual DNA Data Link specifications are slightly different; for instance, the client does not give the port a single protocol specifier but instead separately enables each SAP, protocol type, etc. Also, the interface to receive a packet is typically a polling interface. However, these are just details.

One object is to make a Vlan look just like a LAN to clients and a similar port interface is offered to Vlans except that the ports on a Vlan are called VlanPorts to avoid confusion. Thus a routing protocol (e.g. Phase V DECNET) begins by opening a virtual port on a specified Vlan. Then the routing protocol enables a single protocol specifier on the virtual port which describes all the kinds of packets that the routing protocol wishes to receive. Finally, the routing

US 6,560,236 B1

**17**

protocol transmits to the VlanPort and received packets are queued to the VlanPort.

When a virtual port is opened and given a protocol specifier, the VML layer at the client attempts to open up corresponding ports on all the physical links associated with this Vlan. Thus each Vlan has a server and each server has a set of physical links. The Client VML Layer opens up Data Link ports on each such link and enables each such Data Link port with the specifier of the VlanPort. The client stores the mapping between VlanPorts and Data Link ports in the PortMappingList. This list consists of a record for each association between a VlanPort and a Data Link port. Thus each VlanPort has multiple records in the PortMappingList, one for each Data Link port it is associated with.

The routing protocol can choose to open a port to the unknown Vlan. In this case, the client opens associated physical ports on all server links.

When forwarding a packet sent on VlanPort VP on Vlan V, the client first picks a link L among all the "live" links associated with Vlan V. These are the links associated with V's server that are in ON state. Next, the client searches the PortMapping list to find the Data Link port LP associated with L. If the packet is multicast or is destined to another VML client, a VlanId field is added to the packet. Finally the packet is queued to Data link port LP.

When a packet is received on link L with protocol specifier S, the client attempts to find the Vlan V the packet was sent on by first looking for a VlanId field (if it exists) and then consulting the SourceVlanTable (if packet is unicast). If such a V is found, the client searches the PortMappingList to find the VlanPort VP associated with Vlan V and specifier S; the client then queues the packet to VP. If no such V is found, the client searches the PortMappingList to find the VlanPort VP associated with the "unknown" Vlan and specifier S. If such a port exists, the client queues the packet to VP.

2. Server Forwarding

The server forwarding algorithm is essentially the bridge forwarding algorithm except for small changes to the way a server forwards: a) multicast packets and b) packets sent to an unknown destination address.

The Vlan associated with a received multicast packet P is determined by the type of link P was received on. If P was received on a client link, the Vlan is determined from the VlanId field in P. If P was received on a client link, the Vlan is determined from the VlanId field in P. If P was received on a Vlan link L, the Vlan is determined from the Vlan that link L has been declared to be part of.

Multicast packets sent on a Vlan V are forwarded only to Vlan links associated with V and to client links that report Vlan V in their client hellos. Before a multicast packet is sent on a client link, a VlanId field is added; similarly when a multicast packet is received from a client link, the VlanId field is removed before the packet is sent to Vlan links.

Packets with unknown destination address that are received on client links are sent to all Vlan links that are turned on in the spanning tree. Packets with unknown destination address that are received on a Vlan link are sent only on the Vlan associated with that link. Packets with unknown destination address are never sent on client links. This is because client hellos list all addresses of clients; hence client destination addresses should be unknown only during the (hopefully brief) period when the protocol initializes.

**18**

3. Server Code for Forwarding

The server code for forwarding packets is formally described in Appendices XII and XIII. The main server forwarding routines are in Appendix XIII. The two main routines are MULTICAST_FORWARD (which describes how multicast packets are forwarded) and UNKNOWN_FORWARD (which describes how packets with unknown destination addresses are forwarded). Appendix XII describes the macros used by the main code in Appendix XIII. The macros are mostly used to find the links associated with Vlans and to add and remove the VlanId field in the packet.

4. Client Forwarding Protocol

The formal code for the client forwarding protocol is described in Appendices XIV and XV. The major routines in Appendix XV are the TRANSMIT routine (to transmit packets on a Vlan, possibly adding a VlanId to a packet) and the RECEIVE routine (to demultiplex a received Data Link packet using either a VlanId field or the source mapping table). Appendix XIV describes the macros used by the main code in Appendix XV. The macros are mostly used to search the PortMappingList for mappings between virtual ports, link ports, and protocol specifiers.

The SourceLookup macro finds the Vlan associated with a source address. It uses two architectural constants, UnknownVlanId (VlanId of the unknown Vlan) and VML-RouterId (a second VlanId reserved to denote that this Source Address is a VML Router).

The RECEIVE macro finds the Vlan associated with a packet as follows:

If the packet is multicast, obtain Vlan from the VlanId field in packet.

If not multicast:

Look up the source address in SourceVlanTable.

If the result indicates the packet is from a VML Router then find the Vlan from the VlanId field in the packet.

Otherwise use the Vlan returned by the source lookup.

Other embodiments are within the following claims.

What is claimed is:

1. A method of operating a network bridge having a first plurality of ports through which network communications pass to and from the bridge, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

receiving a communication on a first port of the bridge; and

if the first port is one of the first plurality of ports and the communication is a multicast packet having a multicast destination address, sending the communication out of the bridge on all other ports of the first plurality of ports having the same assigned group identifier as the first port.

2. The method of claim 1, further comprising:

identifying a source of the communication received on the first port of the bridge.

3. The method of claim 2, further comprising:

identifying a destination of the communication;

determining a group identifier assigned to the destination; and

if the group identifier assigned to the destination and the group identifier assigned to the source are different, sending the communication out a client port not within the first plurality of ports.

US 6,560,236 B1

**19**

4. The method of claim 1, wherein the bridge includes a client port not included within the first plurality of ports and the communication is a multicast packet, the method comprising:

receiving the multicast packet on the client port;

identifying a group identifier within the multicast packet; and

sending the multicast packet out on those ports having the same group identifier as the group identifier within the received multicast packet.

5. The method of claim 4, wherein:

the group identifier is removed from the multicast packet before sending the multicast packet out from the bridge.

6. The method of claim 1, further comprising:

assigning a protocol type to each group identifier;

wherein, for each port of first plurality of ports, the protocol type identifies a communication protocol used by a station connected to the port.

7. The method of claim 6, wherein no two distinct group identifiers having a same protocol type are assigned to a same port.

8. The method of claim 1, wherein a port may have more than one group identifier assigned to it.

9. A method of operating a network bridge having a first plurality of ports through which network communications pass to and from the bridge, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

receiving a communication on a first port of the bridge;

if the first port is one of the first plurality of ports, sending the communication out of the bridge on all other ports of the first plurality of ports having the same assigned group identifier as the first port;

identifying a source of the communication received on the first port of the bridge;

identifying a destination of the communication;

determining a group identifier assigned to the destination; and

if the group identifier assigned to the destination and the group identifier assigned to the source are different, sending the communication out a client port not included within the first plurality of ports and indicating the group identifier assigned to the first port within the communication sent out the client port.

10. The method of claim 9, wherein the step of indicating the group identifier comprises:

replacing a redundant field within the communication with the group identifier.

11. A method of operating a network bridge having a first plurality of ports through which network communications pass to and from the bridge, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

connecting a router to a client port of the bridge not within the first plurality of ports;

identifying the ports on the router connected to the network bridge;

defining, on the router, a correspondence between the identified ports connected to the network bridge and each distinct group identifier;

receiving a communication on a first port of the bridge;

**20**

if the first port is one of the first plurality of ports, sending the communication out of the bridge on all other ports of the bridge having the same assigned group identifier as the first port;

identifying a source of the communication received on the first port of the bridge;

identifying a destination of the communication;

determining a group identifier assigned to the destination; and

if the group identifier assigned to the destination and the group identifier assigned to the source are different, sending the communication out the client port.

12. The method of claim 11, further comprising:

receiving a second communication from the bridge at the router; and

determining a group identifier of the second communication.

13. The method of claim 11, further comprising:

sending a second communication from the router to the bridge,

wherein the second communication comprises a first group identifier, and

wherein the second communication comprises a source address of the router assigned to the first group identifier.

14. The method of claim 11, further comprising:

maintaining, at the router, a record of a source address of each communication from the bridge and a respective group identifier.

15. A computer program product for use with a network device having a computer and a first plurality of ports on which network communications pass to and from the network device, wherein the network device includes a client port not within the first plurality of ports, and the computer program product comprises computer program instructions that when executed by the computer direct the computer to perform a method of directing the network communications, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

receiving a communication on a first port of the network device;

if the first port is one of the first plurality of ports, sending the communication out of the network device on all other ports of the first plurality of ports having the same assigned group identifier as the first port;

receiving a multicast packet having a multicast destination address on the client port;

identifying a group identifier within the multicast packet; and

sending the multicast packet out on those ports having the same group identifier as the group identifier within the received multicast packet,

wherein the group identifier is removed from the multicast packet before sending the multicast packet out from the network device.

16. The computer program product of claim 15, wherein the method further comprises:

identifying a source of the communication received on the first port.

17. The computer program product of claim 16, wherein the method further comprises:

identifying a destination of the communication;

US 6,560,236 B1

21

determining a group identifier assigned to the destination; and

if the group identifier assigned to the destination and a group identifier assigned to the source are different, sending the communication out a client port not within the first plurality of ports.

18. A computer program product for use with a network device having a computer and a first plurality of ports on which network communications pass to and from the network device, the computer program product comprising computer program instructions that when executed by the computer direct the computer to perform a method of directing the network communications, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

receiving a communication on a first port of the network device;

22

if the first port is one of the first plurality of ports, sending the communication out of the network device on all of the ports of the first plurality of ports having the same assigned group identifier as the first port;

identifying a source of the communication received on the first port;

identifying a destination of the communication;

determining a group identifier assigned to the destination; and

if the group identifier assigns to the destination and the group identifier assigned to the source are different, sending the communication out a client port not within the first plurality of ports, indicating the group identifier of the first port within the communication sent out the client port and replacing a redundant field within the communication with the group identifier.

* * * * *

# EXHIBIT "B"

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Düsseldorf  London  Los Angeles  Miami  Munich
New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Firasat Ali
Attorney at Law
Fali@mwe.com
650.813.5012

March 30, 2007

BY E-MAIL

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
Prudential Tower
800 Boylston Street, 25th Floor
Boston, MA 02199
mnhenschke@rkmc.com

Re:    *Enterasys Networks v. Extreme Networks*, Civil Action No. 05-12235 (D. Mass.)

Dear Marc:

We are writing to follow up our meet and confer of March 27, 2007 and your recent letters of March 23 and 27, regarding Extreme's request that Enterasys reduce to a manageable number the patent claims at issue in this case. As you know, there are six patents at issue, numerous asserted products, and over 120 different patent claims asserted. This is far too many claims to reasonably litigate in one case. We asked Enterasys to identify the patent claims that it truly intends to pursue in this case.

To briefly recap, we initially met and conferred with you on February 21, 2007. However, in our conversation, Enterasys refused to limit the number of patent claims until Extreme provides its invalidity and noninfringement contentions in April 2007. We told you that Enterasys' position is simply not workable as it imposes an undue burden on Extreme to provide invalidity and noninfringement contentions on an unwieldy number of asserted claims in April 2007, followed by claim construction briefing in June 2007.

After an exchange of additional correspondence, we held a final meet and confer in an effort to narrow the areas of disagreement to the greatest extent possible. During the conference, Extreme proposed the following solution, which Extreme viewed as more than reasonable:

1.    Enterasys may assert a maximum of 2-3 claims per patent and must identify those claims within the next few days;

2.    Extreme agrees that Enterasys may reserve the right to swap out a limited number of claims after receiving Extreme's invalidity and noninfringement contentions in April 2007, so long as the total number of asserted claims remains unchanged;

3.    Enterasys must identify the new claims by April 23, 2007; and

MPK 124241-1 065994 0016

Marc N. Henschke
March 30, 2007
Page 2


4.     Extreme will serve invalidity and non-infringement contentions with respect to the new claims by May 7, 2007.

Unfortunately, Enterasys rejected Extreme's solution and suggested the following unworkable proposal:

1.     Enterasys will assert a total of *30 claims* for all six patents and will identify the asserted claims by March 29;

2.     Enterasys has the right to *add three dependent claims* per patent in late April 2007 after reviewing Extreme's invalidity and noninfringement contentions in April 2007;

3.     Extreme may supplement its invalidity and noninfringement contentions in May 2007 with respect to the newly asserted claims.

Enterasys' proposal is substantially no different than the status quo. In addition to being a moving target with respect to which claims are truly at issue, the proposal is simply a disguised effort to play "wait and see" with respect to identifying the claims at issue without regard to the undue burden and expense imposed on Extreme and the Court. Enterasys, as the plaintiff, should be in a position to identify the claims that it truly intends to litigate in this case.

After the meet and confer, you sent us a letter dated March 27, 2004, essentially demanding invalidity and noninfringement contentions on all 129 asserted claims in April 2007. We view your letter as nothing short of a disguised effort to *force* Extreme to take Enterasys' unworkable proposal – hardly a good faith move on your part. We reserve the right to seek the Court's intervention on this issue.

Sincerely,

Steven L. Walker


cc:     Alan E. McKenna, Esq.  (By Email)
        Mathew H. Poppe, Esq. (By Email)

# EXHIBIT "C"

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

March 27, 2007

*VIA E-MAIL (PDF ATTACHMENT)*

Steven L. Walker, Esq.
McDermott Will & Emery LLP
3150 Porter Drive
Palo Alto, CA  94303-1212

Re:  *Enterasys Networks v. Foundry Networks and Extreme Networks*
*Civ. Act. No. 05-11298-DPW (D. Mass)*
**Our File No.:  070610.0001**

Dear Steve:

We are writing to confirm our understanding that, pursuant to the Court's Scheduling Order, Extreme will be serving Enterasys with its invalidity contentions on or before April 16, 2007 in the form of a chart that describes in detail on an element-by-element basis how each asserted prior art reference (or combination of references) purportedly anticipates or renders obvious an asserted patent claim, including citations to specific column and line numbers of those prior art references where applicable.

The Court's Scheduling Order clearly calls for a chart of this type given its directive that Extreme "identify[] each asserted item of prior art and the basis on which it anticipates or renders obvious each asserted patent claim." Moreover, as grounds for refusing to substantively respond for the past ten months to Enterasys' Interrogatory No. 11, Extreme has previously agreed in writing that it *would* in fact provide a chart containing all of this information by the April 16th deadline for serving invalidity contentions established by the Scheduling Order. See, e.g., (Firasat Ali's letter to me dated September 13, 2006).

Please contact us immediately if Extreme disagrees in any respect with our understanding as outlined above.

Sincerely,

Marc N. Henschke

MNH:nah
cc:   Vera M. Elson, Esq. (*VIA EMAIL*)
      David L. Larson, Esq. (*VIA EMAIL*)
      Christopher D. Bright, Esq. (*VIA EMAIL*)
      Emily E. Smith-Lee, Esq. (*VIA EMAIL*)
      David H. Dolkas, Esq. (*VIA EMAIL*)
      Firasat M. Ali, Esq. (*VIA EMAIL*)
      Richard Cheng (*VIA EMAIL*)
      Sabrina M. Johnson (*VIA E-MAIL*)
      T. Nation (*VIA E-MAIL*)
35038446

# EXHIBIT "D"

2005-11-3 Hearing Transcript - Highlights re Patent Claims.txt

12

1           MR. SULLIVAN:  Yes.

2           THE COURT:  -- or this sequence.

3           MR. SULLIVAN:  I think the parties have agreed

4    to virtually all of the dates.  There is really only --

5    in terms of scheduling, the only issue is whether or not

6    the plaintiffs should be limited to four claims from

7    each patent and have to declare that without the ability

8    to change.  We don't think that there's any basis for

9    that.  And then we think that we should submit our claim

10   construction charts on the 17th of July and that a few

11   weeks later the defendants should serve their invalidity

12   contentions and then --

13          THE COURT:  No.  I have that in front of me.

14   So, maybe I ought to back up a bit with this.  I mean, I

15   share the view generally that there are never more than

16   four good claims.  There rarely are more than five

17   documents worth looking at in a case although you don't

18   learn until trial what they are.  But what makes you

19   think you're going to have more than four?

20          MR. SULLIVAN:  I don't know, Your Honor.  And

21   I think that this -- if we're talking about this six

22   months from now or nine months from now, I would think

23   that would be a lot more appropriate.  The problem I

24   have is without having taken any discovery, just

25   standing here at the start of the case, to say that we

13

Page 1

2005-11-3 Hearing Transcript - Highlights re Patent Claims.txt

1    are going to agree that we'll be limited to four claims

2    and that we can never change what those claims are

3    before we have taken any discovery and before we've seen

4    what the contentions are, before we have any indication

5    from the Court as to what the claim construction is

6    going to be --

7           THE COURT:  Well, you don't get that until

8    afterwards, anyway.

9           MR. SULLIVAN:  I understand.  But I think it's

10   -- my answer is, Your Honor, I think it's way premature

11   to force us into that.  As a plaintiff, we need to try a

12   coherent case.  We know that.  And there's no way --

13          THE COURT:  Well, no.  I'm less concerned with

14   generalities than the specifics of this case.  You must

15   know enough about the case to know what your likely

16   claims are going to be --

17          MR. SULLIVAN:  We do.

18          THE COURT:   -- and highly proliferated beyond

19   four?

20          MR. SULLIVAN:  Your Honor, it's the artificial

21   nature of saying four per patent.

22          THE COURT:  But just give me -- I mean, should

23   I be staying up late at night worrying about 75 claims

24   for each of the patents?

25          MR. SULLIVAN:  No.  I don't think so, Your

14

1    Honor.

Page 2

2005-11-3 Hearing Transcript - Highlights re Patent Claims.txt

2      THE COURT:  How about six?

3      MR. SULLIVAN:  How about seven.

4      THE COURT:  All right.  I really want to get

5   an idea of whether or not this is going to be --

6      MR. SULLIVAN:  I would suspect, Your Honor, by

7   the time we get to trial, that we'll probably be putting

8   forth three or four.

9      THE COURT:  Of more concern to me is by the

10  time you get to the Markman hearing, what do you think?

11     MR. SULLIVAN:  I think it will probably be in

12  the area of probably no more than seven.  But part of

13  the issue here is that the way the defendants have

14  phrased it is we can never raise these again.  It may

15  be that after claim construction, the way the Court

16  construes the patent, you know, there could be very

17  valid claims and we're now barred from bringing those

18  claims because we had to make an election before the

19  Court gave us claim construction.

20     THE COURT:  Well, I guess I flock with you at

21  least now on this.  I mean, you may rue the day.  And

22  the day apparently has --

23     MR. BAUER:  Your Honor, may I make a comment

24  on that?

25     THE COURT:  January 10th, 2007.



15

1      MR. BAUER:  Your Honor, I think you put your

2   finger directly on the issue.  And the reason this

3   calendar is so long is because they don't want to

Page 3

2005-11-3 Hearing Transcript - Highlights re Patent Claims.txt

    4    identify.  There's right now 125 claims, six patents,
    5    and they don't want to identify or narrow the claims at
    6    all until July 2006.  We all believe that we've spoken,
    7    that if there was some preliminary narrowing -- and we
    8    don't say in here that they can never change it.  We
    9    simply say if you can change the number later, just have
   10    a reason, good cause.  But if there was preliminary
   11    narrowing now --
   12                THE COURT:  No.  It says "except by agreement
   13    of all parties or by showing good cause."  Who gets to
   14    determine good cause?
   15                MR. BAUER:  I think you do, Your Honor.
   16                THE COURT:  Okay.  So, what's the difference?
   17                MR. BAUER:  That's what I'm saying.  We're not
   18    saying that they are bound for all time if there is
   19    any --
   20                THE COURT:  Well, then it becomes a little bit
   21    like Scherazade.  You know, each time they start to
   22    unfold another one.  Why not get -- you know, when you
   23    use a sieve, you start with the top and it kind of works
   24    its way through.  What's it to you?
   25                MR. BAUER:  Well, it's only that if we're

                                                              16

    1    interested in trying to get this thing done sooner than
    2    two or two-and-a-half years from now, right now, we have
    3    no narrowing of the claims at all, which is why the
    4    calendar is as long as it is.  And where I hear from

                              Page 4

2005-11-3 Hearing Transcript - Highlights re Patent Claims.txt

```
 5    counsel today that they do have some narrowing, they had
 6    to do some sort of Rule 11 analysis, they must have
 7    some narrowing of claims, some identification of
 8    products that we could all focus on.  And if we had
 9    that, perhaps we could get to a Markman hearing sooner.
10    Perhaps we could have a quicker calender.  But if we
11    leave the date to July for the scope of this case with
12    all the depositions and everything --
13             THE COURT:  well, but, you see, the incentive
14    structure here is to encourage the plaintiff to move
15    more promptly.  So, the plaintiff says that this is what
16    they are prepared to do.  They know that they'll have a
17    very unhappy Judge if they have to present or attempt to
18    present a multiplicity.  But the earlier discussion, it
19    seems to me, might be useful, might be fruitful.
20             MS. ELSON:  Your Honor, may Exetreme weigh in
21    on this one?
22             THE COURT:  Sure.
23             MS. ELSON:  In my experience, we just did a
24    trial in Denver where we, as the plaintiff, voluntarily
25    narrowed it to five claims per patent well before a
```

17

```
 1    Markman.  At that point where you've done enough
 2    discovery and you've seen the other side's documents,
 3    you've taken their engineer's deposition, you know you're
 4    pretty much down to four or five claims per patent which
 5    are your best claims.  Judge Alsop in the Northern
 6    District limits plaintiffs to two claims per patent,
```

Page 5

2005-11-3 Hearing Transcript - Highlights re Patent Claims.txt

     7    sometimes four.  But he outright limits that.

     8              THE COURT:  Well --

     9              MS. ELSON:  And what that saves is the --

    10              THE COURT:  -- for a variety of reasons, this

    11    is not San Francisco.

    12              MS. ELSON:  I understand, Your Honor.  I'm

    13    just saying that what that saves the defendants is having

    14    to do all the discovery and the validity discovery on

    15    covering 125 claims because that is so unwieldy and

    16    expensive for our clients.  And for trial, I would

    17    suspect they won't even take four claims per patent to

    18    trial.  That is also unwieldy.  We took ultimately one

    19    claim per patent to trial.  So, they have a range.

    20    And we can make it five.  But they have a range of

    21    claims that they can choose from for trial.

    22              THE COURT:  Well, I guess what I'm going to do

    23    is leave it for the claim construction chart basis.  I

    24    understand what you have to say.  On the other hand, if

    25    on July 17th, it seems absurd, you can make some kind of

                                                            18

     1    motion --

     2              MS. ELSON:  Thank you, Your Honor.

     3              THE COURT:  -- to come back here.  It won't be

     4    a happy day for all of us if that happens.

     5              MR. SULLIVAN:  Well, it wouldn't be so for me,

     6    Your Honor.

     7              THE COURT:  I think you've identified who

                              Page 6

2005-11-3 Hearing Transcript - Highlights re Patent Claims.txt
```
  8      would be least happy in court.
  9              So, now --
 10              MS. ELSON:  We also have a concern, Your
 11      Honor, with some of the deadlines the plaintiff is
 12      proposing.  This starts with the July 17, 2006 date that
 13      Enterasys is proposing on page three of the joint
 14      schedule.  Those next three entries, we believe, can
 15      simply be dealt with through interrogatories.  Because
 16      what this does is permit them to go longer even if they
 17      know their preliminary contentions without telling us.
 18              THE COURT:  I don't understand what you mean
 19      by that.
 20              MS. ELSON:  Simply that we would like to know
 21      what the --
 22              THE COURT:  Why aren't the claim construction --
 23      why aren't the claim constructions the functional
 24      equivalent of interrogatories, anyway?
 25              MS. ELSON:  Well, that comes much later.
```

                                                        19

```
  1      We need to know their theories of infringement much
  2      earlier than that.  And, so, we'd like to simply serve
  3      interrogatories asking those questions and they can tell
  4      us what their contentions are, their theories of
  5      infringement.
  6              THE COURT:  What prevents you from doing that
  7      here?
  8              MS. ELSON:  Well, if we can do that as well,
  9      then that's fine, Your Honor.  My only concern --
```
                        Page 7

2005-11-3 Hearing Transcript - Highlights re Patent Claims.txt

10          THE COURT:  I'm not going to -- I won't get

11     into the specifics, I don't think, of the way in which

12     you conduct your discovery with the exception of the

13     claim construction charts which I think are, on balance,

14     a pretty good idea.  If you want to propound

15     interrogatories during that time period, go ahead.  I

16     don't see that as a problem.

17          MS. ELSON:  The one concern here is the

18     deadline for us to serve invalidity contentions.  We

19     will certainly do our best to provide all our best

20     contentions at the time.  But given the lateness with

21     which we will be seeing narrowing of the claims, there

22     may turn out to be some piece of prior art we find later

23     we'd simply like to be able to supplement at that time

24     and not necessarily have to be a drop-dead deadline.  If

25     there's good cause, if we found the art later, we'd like

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SILICONIX INCORPORATED, a Delaware
corporation,

        Plaintiff,

v.

ALPHA AND OMEGA SEMICONDUCTOR
INCORPORATED, a California corporation,

        Defendant.

No. C 03-04803 WHA

**CASE MANAGEMENT ORDER
FOR PATENT CASE AND
REFERENCE TO MAGISTRATE
JUDGE FOR SETTLEMENT/
MEDIATION**

After a case management conference, the Court enters the following order pursuant to Rule 16 of the Federal Rules of Civil Procedure ("FRCP") and Civil Local Rule 16-10:

1.    Leave to add any new parties or pleading amendments must be sought by **MARCH 11, 2004.**

2.    All initial disclosures under FRCP 26 must be completed by **MARCH 11, 2004,** on pain of preclusion.

3.    As agreed by counsel, each side shall have **FIFTY** requests for admissions and unlimited requests for admission on authentication. Each side shall have up to **FIFTEEN** fact depositions.

4.    The claim-construction hearing will be held on **AUGUST 4, 2004,** at **2:00 P.M.** Counsel shall meet and confer and propose a briefing schedule leading up to the hearing. This

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1   must be filed by MARCH 11, 2004, and entitled "PROPOSED ORDER RE SCHEDULE FOR

2   CLAIM CONSTRUCTION" and send it by email to whapo@cand.uscourts.gov.

3   5.   For the claim-construction hearing, the parties must isolate no more than SIX PHRASES

4        in all claims at issue and limit the hearing to those phrases. All other phrases in dispute

5        will be determined at trial absent further order. In the Court's experience, most patent

6        cases turn on the meaning of only a few phrases. Once defined, the case will usually

7        resolve by motion or settlement. If it does not, then the Court will construe any

8        remaining phrases at issue before the jury is instructed. Counsel must conduct the

9        presentations at the claim-construction hearing. Expert testimony will normally not be

10       needed but all sides may have an expert present to address points outside the intrinsic

11       record should they arise. A tutorial for the Court (to be conducted by counsel only, not

12       experts) shall be set on JUNE 30, 2004, at 2:00 P.M.

13   6.   The non-expert discovery cut-off date shall be NOVEMBER 5, 2004.

14   7.   The deadline for producing opinions of counsel under Patent Local Rule 3-8 shall be

15       28 CALENDAR DAYS before the non-expert discovery cut-off, irrespective of the

16       timeline in said rule.

17   8.   The last date for designation of expert testimony and disclosure of full expert reports

18       under FRCP 26(a)(2) as to any issue on which a party has the burden of proof

19       ("opening reports") shall be NOVEMBER 5, 2004. WITHIN FOURTEEN CALENDAR DAYS

20       thereafter, all other parties may disclose responsive expert testimony with full expert

21       reports responsive to opening reports ("opposition reports"). Within

22       SEVEN CALENDAR DAYS thereafter, the opening parties may disclose any reply reports

23       limited solely to rebutting specific material in opposition reports. Reply reports must

24       be limited to true rebuttal and should be very brief. They should not add new material

25       that should have been placed in the opening report. The cutoff for all expert discovery

26       shall be FOURTEEN CALENDAR DAYS after the deadline for reply reports. In aid of

27       preparing an opposition or reply report, a responding party may depose the adverse

28       expert sufficiently before the deadline for the opposition or reply report so as to use the

2

1    testimony in preparing the response.  Experts must make themselves readily available

2    for such depositions.  Alternatively, the responding party can elect to depose the expert

3    later in the expert-discovery period.  An expert, however, may be deposed only once

4    unless the expert is used for different opening and/or opposition reports, in which case

5    the expert may be deposed independently on the subject matter of each report.  At least

6    28 CALENDAR DAYS before the due date for opening reports, each party shall serve a

7    list of issues on which it will offer any expert testimony in its case-in-chief (including

8    from non-retained experts).  This is so that all parties will be timely able to obtain

9    counter-experts on the listed issues and to facilitate the timely completeness of all

10    expert reports.  Failure to so disclose may result in preclusion.

11  9.    As to damages studies, the cut-off date for *past damages* will be as of the expert report

12    (or such earlier date as the expert may select).  In addition, the experts may try to

13    project *future damages* (*i.e.*, after the cut-off date) if the substantive standards for

14    future damages can be met.  With timely leave of Court or by written stipulation, the

15    experts may update their reports (with supplemental reports) to a date closer to the time

16    of trial.

17  10.    At trial, the direct testimony of experts will be limited to the matters disclosed in their

18    reports.  Omitted material may not ordinarily be added on direct examination.  This

19    means the reports must be complete and sufficiently detailed.  Illustrative animations,

20    diagrams, charts and models may be used on direct examination only if they were part

21    of the expert's report, with the exception of simple drawings and tabulations that

22    plainly illustrate what is already in the report, which can be drawn by the witness at

23    trial or otherwise shown to the jury.  If cross-examination fairly opens the door,

24    however, an expert may go beyond the written report on cross-examination and/or

25    redirect examination.  By written stipulation, of course, all sides may relax these

26    requirements.

27  11.    The last date to file dispositive motions shall be DECEMBER 23, 2004.  No dispositive

28    motions shall be heard more than 35 days *after* this deadline, *i.e.*, if any party waits

United States District Court
For the Northern District of California

3

1      until the last day to file, then the parties must adhere to the 35-day track in order to

2      avoid pressure on the trial date.

3  12.    The FINAL PRETRIAL CONFERENCE shall be at 2:00 P.M. on FEBRUARY 28, 2005. For

4      the form of submissions for the final pretrial conference and trial, please see paragraph

5      number 17 of this order.

6  13.    A JURY TRIAL shall begin on MARCH 14, 2005, at 8:00 A.M., in Courtroom 9,

7      19th Floor, 450 Golden Gate Avenue, San Francisco, California, 94102. The estimated

8      trial length is TEN DAYS. The trial schedule and time limits shall be set at the final

9      pretrial conference.

10  14.    Counsel may not stipulate around the foregoing dates without Court approval.

11  15.    While the Court encourages the parties to engage in settlement discussions, please do

12      not ask for any extensions on the ground of settlement discussions or on the ground that

13      the parties experienced delays in scheduling settlement conferences, mediation or ENE.

14      The parties should proceed to prepare their cases for trial. No continuance (even if

15      stipulated) shall be granted on the ground of incomplete preparation without competent

16      and detailed declarations setting forth good cause.

17  16.    To avoid any misunderstanding with respect to the final pretrial conference and trial,

18      the Court wishes to emphasize that all filings and appearances must be made — on pain

19      of dismissal, default or other sanction — unless and until a dismissal fully resolving the

20      case is received. It will not be enough to inform the clerk that a settlement in principle

21      has been reached or to lodge a partially executed settlement agreement or to lodge a

22      fully executed agreement (or dismissal) that resolves less than the entire case. Where,

23      however, a fully-executed settlement agreement clearly and fully disposing of the entire

24      case is lodged reasonably in advance of the pretrial conference or trial and only a

25      ministerial act remains, the Court will arrange a telephone conference to work out an

26      alternate procedure pending a formal dismissal.

27  17.    If you have not already done so, please read and follow the "Standing Order for Civil

28      Cases Assigned to the Honorable William Alsup" and other orders issued by the

United States District Court
For the Northern District of California

4

1     Clerk's office when this action was commenced. Among other things, the "Standing

2     Order" explains when submissions are to go to the Clerk's Office (the general rule)

3     versus when submissions may go directly to chambers (rarely). With respect to the

4     final pretrial conference and trial, please read and follow the "Guidelines For Trial and

5     Final Pretrial Conference in Civil Jury Cases Before The Honorable William Alsup."

6     All orders and guidelines referenced in the paragraph are available on the district

7     court's website at http://www.cand.uscourts.gov. The website also includes other

8     guidelines for attorney's fees motions and the necessary form of attorney time records

9     for cases before Judge Alsup. If you do not have access to the Internet, you may

10     contact Deputy Clerk Dawn K. Toland at (415) 522-2020 to learn how to pick up a hard

11     copy.

12   18.   This matter is hereby **REFERRED** to **MAGISTRATE JUDGE JOSEPH C. SPERO** for

13     **SETTLEMENT/MEDIATION**, the Court believing that such a conference would be more

14     effective in settling the present case than any other avenue.

15   19.   All pretrial disclosures under FRCP 26(a)(3) and objections required by FRCP 26(a)(3)

16     must be made on the schedule established by said rule.

17

18     **IT IS SO ORDERED.**

19

20   Dated: February 26, 2004.

                              s/ WILLIAM ALSUP

21                                   WILLIAM ALSUP

                                  UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

*United States District Court*
*For the Northern District of California*

# EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

AFFYMETRIX, INC., a Delaware corporation,

       Plaintiff and
       Counterdefendant,

v.

MULTILYTE LTD., a British corporation,

       Defendant and
       Counterclaimant.
_____/

No. C 03-03779 WHA

CASE MANAGEMENT ORDER
FOR PATENT CASE, REFERENCE
TO MAGISTRATE JUDGE FOR
SETTLEMENT/MEDIATION,
AND FURTHER REFERENCE
TO MAGISTRATE JUDGE FOR
DISCOVERY SUPERVISION

After a case management conference, the Court enters the following order pursuant to Rule 16 of the Federal Rules of Civil Procedure ("FRCP") and Local Rule 16-10:

1.    Leave to add any new parties or pleading amendments must be sought by JANUARY 16, 2004.

2.    All initial disclosures under FRCP 26 must be completed by JANUARY 16, 2004, on pain of preclusion.

3.    Each side may take TEN DEPOSITIONS plus A DEPOSITION OF EACH OPPOSING EXPERT.

4.    The claim-construction hearing will be held on MAY 26, 2004, at 1:00 P.M. Counsel shall meet and confer and propose a briefing schedule leading up to the hearing. This must be filed by DECEMBER 29, 2003, and entitled "PROPOSED ORDER RE SCHEDULE FOR CLAIM CONSTRUCTION" and send it by email to whapo@cand.uscourts.gov.

5.    For the claim-construction hearing, the parties must isolate no more than EIGHT PHRASES in all claims at issue and limit the hearing to those phrases. All other

United States District Court
For the Northern District of California

phrases in dispute will be determined at trial absent further order. In the Court's

experience, most patent cases turn on the meaning of only a few phrases. Once

defined, the case will usually resolve by motion or settlement. If it does not, then the

Court will construe any remaining phrases at issue before the jury is instructed.

Counsel must conduct the presentations at the claim-construction hearing.

Expert testimony will normally not be needed but all sides may have an expert present

to address points outside the intrinsic record should they arise. A tutorial for the Court

(to be conducted by counsel only, not experts) shall be set on MAY 12, 2004, at 1:00

P.M.

6.    The non-expert discovery cut-off date shall be SEPTEMBER 17, 2004.

7.    The deadline for producing opinions of counsel under Local Rule 3-8 shall be

28 CALENDAR DAYS before the non-expert discovery cut-off, irrespective of the

timeline in said rule.

8.    The last date for designation of expert testimony and disclosure of full expert reports

under FRCP 26(a)(2) as to any issue on which a party has the burden of proof

("opening reports") shall be SEPTEMBER 17, 2004. WITHIN

FOURTEEN CALENDAR DAYS thereafter, all other parties may disclose responsive expert

testimony with full expert reports responsive to opening reports ("opposition reports").

Within SEVEN CALENDAR DAYS thereafter, the opening parties may disclose any reply

reports limited solely to rebutting specific material in opposition reports. Reply reports

must be limited to true rebuttal and should be very brief. They should not add new

material that should have been placed in the opening report. The cutoff for all expert

discovery shall be FOURTEEN CALENDAR DAYS after the deadline for reply reports. In

aid of preparing an opposition or reply report, a responding party may depose the

adverse expert sufficiently before the deadline for the opposition or reply report so as to

use the testimony in preparing the response. Experts must make themselves readily

available for such depositions. Alternatively, the responding party can elect to depose

the expert later in the expert-discovery period. An expert, however, may be deposed

2

only once unless the expert is used for different opening and/or opposition reports, in

which case the expert may be deposed independently on the subject matter of each

report. At least 28 CALENDAR DAYS before the due date for opening reports, each party

shall serve a list of issues on which it will offer any expert testimony in its case-in-chief

(including from non-retained experts). This is so that all parties will be timely able to

obtain counter-experts on the listed issues and to facilitate the timely completeness of

all expert reports. Failure to so disclose may result in preclusion.

9.    As to damages studies, the cut-off date for *past damages* will be as of the expert report

(or such earlier date as the expert may select). In addition, the experts may try to

project *future damages* (*i.e.*, after the cut-off date) if the substantive standards for

future damages can be met. With timely leave of Court or by written stipulation, the

experts may update their reports (with supplemental reports) to a date closer to the time

of trial.

10.   At trial, the direct testimony of experts will be limited to the matters disclosed in their

reports. Omitted material may not ordinarily be added on direct examination. This

means the reports must be complete and sufficiently detailed. Illustrative animations,

diagrams, charts and models may be used on direct examination only if they were part

of the expert's report, with the exception of simple drawings and tabulations that

plainly illustrate what is already in the report, which can be drawn by the witness at

trial or otherwise shown to the jury. If cross-examination fairly opens the door,

however, an expert may go beyond the written report on cross-examination and/or

redirect examination. By written stipulation, of course, all sides may relax these

requirements.

11.   The last date to file dispositive motions shall be NOVEMBER 4, 2004. No dispositive

motions shall be heard more than 35 days *after* this deadline, *i.e.*, if any party waits

until the last day to file, then the parties must adhere to the 35-day track in order to

avoid pressure on the trial date.

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

12.   The FINAL PRETRIAL CONFERENCE shall be at 2:00 P.M. on JANUARY 10, 2005. For the form of submissions for the final pretrial conference and trial, please see the last paragraph of this order.

13.   A JURY TRIAL shall begin on JANUARY 24, 2005, at 8:00 A.M., in Courtroom 9, 19th Floor, 450 Golden Gate Avenue, San Francisco, California, 94102. The estimated trial length is TWELVE DAYS. The trial schedule and time limits shall be set at the final pretrial conference.

14.   Counsel may not stipulate around the foregoing dates without Court approval.

15.   While the Court encourages the parties to engage in settlement discussions, please do not ask for any extensions on the ground of settlement discussions or on the ground that the parties experienced delays in scheduling settlement conferences, mediation or ENE. The parties should proceed to prepare their cases for trial. No continuance (even if stipulated) shall be granted on the ground of incomplete preparation without competent and detailed declarations setting forth good cause.

16.   To avoid any misunderstanding with respect to the final pretrial conference and trial, the Court wishes to emphasize that all filings and appearances must be made — on pain of dismissal, default or other sanction — unless and until a dismissal fully resolving the case is received. It will not be enough to inform the clerk that a settlement in principle has been reached or to lodge a partially executed settlement agreement or to lodge a fully executed agreement (or dismissal) that resolves less than the entire case. Where, however, a fully-executed settlement agreement clearly and fully disposing of the entire case is lodged reasonably in advance of the pretrial conference or trial and only a ministerial act remains, the Court will arrange a telephone conference to work out an alternate procedure pending a formal dismissal.

17.   If you have not already done so, please read and follow the "Standing Order for Civil Cases Assigned to the Honorable William Alsup" and other orders issued by the Clerk's office when this action was commenced. Among other things, the "Standing Order" explains when submissions are to go to the Clerk's Office (the general rule)

4

1    versus when submissions may go directly to chambers (rarely).  With respect to the

2    final pretrial conference and trial, please read and follow the "Guidelines For Trial and

3    Final Pretrial Conference in Civil Jury Cases Before The Honorable William Alsup."

4    All orders and guidelines referenced in the paragraph are available on the district

5    court's website at http://www.cand.uscourts.gov.  The website also includes other

6    guidelines for attorney's fees motions and the necessary form of attorney time records

7    for cases before Judge Alsup.  If you do not have access to the Internet, you may

8    contact Deputy Clerk Dawn K. Toland at (415) 522-2020 to learn how to pick up a hard

9    copy.

10   18.   This matter is hereby REFERRED to MAGISTRATE JUDGE JOSEPH C. SPERO  for

11        SETTLEMENT/MEDIATION, the Court believing that such a conference would be more

12        effective in settling the present case than any other avenue.

13   19.   This case is REFERRED to a MAGISTRATE JUDGE to be assigned for resolution of all

14        discovery motions.  The deadline for bringing all discovery motions or extension

15        motions based on discovery violations will be 45 CALENDAR DAYS prior to the fact

16        discovery cutoff (for fact discovery) and TEN CALENDAR DAYS prior to the expert

17        discovery cutoff (for expert discovery).  The purpose of these lead times is to allow

18        briefing, resolution and follow-up, to the extent practical, before the discovery cutoffs.

19

20        **IT IS SO ORDERED.**

21

22   Dated: December 12, 2003.                         s/ WILLIAM ALSUP

23                                                     WILLIAM ALSUP
                                                       UNITED STATES DISTRICT JUDGE

24

25

26

27

28

5

# EXHIBIT "G"

Martin C. Fliesler (State Bar No.: 073768)
Larry T. Harris (State Bar No.: 209044)
Michael L. Robbins (State Bar No.: 224087)
FLIESLER DUBB MEYER & LOVEJOY LLP
Four Embarcadero Center
Fourth Floor
San Francisco, California 94111
Telephone: (415) 362-3800
Facsimile: (415) 362-2928

**E-filing**

Kirk W. Watkins (*pro hac vice*)
Michael A. Cicero (*pro hac vice*)
Ana C. Davis (*pro hac vice*)
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
One Atlantic Center, FR-IWA 500
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 872-7000
Facsimile: (404) 870-4836

Attorneys for Plaintiff KEY TRAK, INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| KEYTRAK, INC.,<br><br>  Plaintiff,<br><br>v.<br><br>KEY REGISTER, L.L.C., KEY REGISTER SYSTEMS, INC., and KEY MANAGEMENT, INC., | Civil Action No.: C-03-00870 WHA<br><br>**JOINT** ~~PROPOSED~~ **PATENT CLAIM CONSTRUCTION BRIEFING SCHEDULE** |

Case 3:03-cv-00870-WHA    Document 110    Filed 06/12/2003    Page 2 of 7

Pursuant to Paragraph 4 of the Case Management Order entered on May 1, 2003, Plaintiff, KeyTrak, Inc. ("KeyTrak"), Defendants Key Register, L.L.C. and Key Register Systems, Inc. (collectively, "Key Register"), and Defendant Key Management, Inc. ("KMI") have agreed to a proposed patent claim construction briefing schedule in the above-identified litigation. The parties have stipulated to, and jointly propose, the claim construction briefing schedule recited below.

**May 16, 2003** – Parties simultaneously exchange a list of claim terms that each party contends should be construed by the Court.

**May 23, 2003** – Parties finalize list of terms to be construed, to include a joint list of no more than six (6) terms to be presented for construction at the patent claim construction hearing scheduled for July 16, 2003, pursuant to ¶ 5 of the Case Management Order. *See generally* Patent L.R. 4-1.

**May 30, 2003** – In accordance with Patent L.R. 4-2, parties simultaneously exchange a preliminary proposed construction of each term listed on May 23, as well as a preliminary identification of extrinsic evidence.

**June 3, 2003** – Parties file Joint Claim Construction and Prehearing Statement in accordance with Patent L.R. 4-3.

**June 13, 2003** – KeyTrak files its Opening Claim Construction Brief in accordance with Patent L.R. 4-5(a).

**June 23, 2003** - Key Register and KMI file their Responsive Claim Construction Briefs in accordance with Patent L.R. 4-5(b).

- 2 -

**June 30, 2003** – KeyTrak files its Claim Construction Reply Brief in accordance with Patent L.R. 4-5(c).

To facilitate the parties' prompt consideration of briefs, the parties agree to transmit, to each opposing counsel via facsimile, a courtesy copy of each claim construction brief on the date the brief is filed.

To effect the simultaneous exchanges required on May 16, 2003 and on May 30, 2003, on each of those dates, KeyTrak shall electronically transmit, and send via facsimile, to each of Defendants' counsel, the respective items associated with those deadlines at 5:00 p.m. EST. On May 16, 2003, and on May 30, 2003, Defendants shall electronically transmit, and send via facsimile, to each of KeyTrak's counsel, the respective items associated with those deadlines at 3:00 p.m. Mountain Time.

Finally, KMI's assent to this stipulation, which is indicated in the attached copy of an e-mail message from KMI's counsel, is made without prejudice to KeyTrak's pending motion for entry of default.

So stipulated this 16th day of May, 2003.

FLIESLER DUBB MEYER & LOVEJOY LLP

_/s/ Martin C. Fliesler_
Martin C. Fliesler (State Bar No.: 073768)
Larry T. Harris (State Bar No.: 209044)
Michael Robbins (State Bar No.: 224087)
Four Embarcadero Center
Fourth Floor
San Francisco, California 94111
Telephone: (415) 362-3800
Facsimile: (415) 362-2928

- 3 -

WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
Kirk Watkins (*pro hac vice*)
Michael A. Cicero (*pro hac vice*)
Ana C. Davis (*pro hac vice*)
One Atlantic Center, Suite 3500
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 872-7000
Facsimile: (404) 870-4836

Attorneys for Plaintiff, KEY TRAK, INC.

SHUGHART THOMSON & KILROY, P.C.


____/s/ Michael L. Glaser____
Michael L. Glaser (*pro hac vice*)
Michael D. Murphy (*pro hac vice*)
1050 17th Street, Suite 2300
Denver, Colorado 80202
Telephone: (303) 572-9300
Facsimile: (303) 572-7883

PICK & BOYDSTON, LLP
Brian D. Boydston (State Bar No.: 155614)
523 West Sixth Street, Suite 1134
Los Angeles, California 90014
Telephone: (213) 624-1996
Facsimile: (213) 624-9073

Attorneys for Defendants KEY REGISTER, L.L.C.
and KEY REGISTER SYSTEMS, INC.


PURSUANT TO STIPULATION, IT IS SO ORDERED,

              2      June
This _____ day of May, 2003.


                                    _____
                                    HONORABLE WILLIAM H. ALSUP
                                    UNITED STATES DISTRICT JUDGE


- 4 -

## Cicero, Michael

| | |
|---|---|
| From: | Jhopelaw@aol.com |
| Sent: | Thursday, May 15, 2003 6:29 PM |
| To: | MCicero@wcsr.com; mglaser@stklaw.com; KWatkins@wcsr.com |
| Subject: | Re: Joint Proposed Claim Construction Briefing Schedule |

In a message dated 5/15/2003 2:21:46 PM Pacific Standard Time, MCicero@wcsr.com writes:

> John, if KMI also agrees to the wording of the Joint Proposed Claim
> Construction Briefing Schedule, I would appreciate your letting us know and
> also advising whether we have your express permission to sign your name on
> your behalf.

*Dear Mr. Cicero:*
  *After reviewing the document I have no objection to the wording. However, I will not allow anyone to*
*sign my name to this or any other document. In my personal opinion that would not be in the best interest*
*of my client.*
*John Hope*

Case 3:03-cv-00870-WHA    Document 110    Filed 06/12/2003    Page 6 of 7

1

## CERTIFICATE OF SERVICE

2    I, Joel S. White, declare:

3    I am over the age of 18 years, am not a party to this Action, and a employed in the County of San

4    Francisco. My business address is Fliesler Dubb Meyer & Lovejoy, LLP, Four Embarcadero Center, Fourth

5    Floor, San Francisco, California 94111.

6    On May 16, 2003, I caused to be served the following attached documents:

7    **JOINT PROPOSED PATENT CLAIM CONSTRUCTION BRIEFING SCHEDULE**

8    on the following individuals and entities, as addressed below, by the means indicated below:

9

10    _X_    **BY FEDERAL EXPRESS.** I caused above-identified document(s) to be placed in a sealed Federal
Express envelope(s) with delivery fees fully prepaid, for delivery to addressee(s) on the next business
11    day.

12    _X_    **BY FACSIMILE.** I caused the above-identified document(s) to be sent by facsimile transmission to
the party(ies) listed below at the facsimile number(s) shown.

13

14    John C. Hope, Jr., Esq.
888 West Second Street, #300
Reno, Nevada 89507
15    Telephone: (775) 786-2919
Facsimile: (775) 786-2600
16

17

I declare under penalty of perjury that the following is true and correct. Executed at San Francisco,
18    California on May 16, 2003.

19

20                                        /s/ Joel S. White
                                          Joel S. White
21

22

23

24

25

26

27    Certofservice.wpd

28

FLIESLER
DUBB
MEYER &
LOVEJOY LLP

KEYTRAK, INC'S. CERTIFICATE OF SERVICE
Action No. C-03-00870 WHA

<u>CERTIFICATE OF SERVICE</u>

1

2    I certify that on May 16, 2003, using the Northern District of California Electronic Case Filing System,

3    with the ECF ID registered to Martin C. Fliesler, I filed the following document:

4    JOINT PROPOSED PATENT CLAIM CONSTRUCTION BRIEFING SCHEDULE

5    The ECF system is designed to send an e-mail message to all parties in the case, which constitutes

6    service. According to the ECF/PACER system, for this case, the parties served are as follows:

7

8    Michael L. Glaser                          Counsel for Defendant Key Register LLC and Key Register
9    Michael D. Murphy                          Systems, Inc.
     mglaser@stklaw.com
10   SHUGART THOMSON & KILROY P.C.
     1050 17th Street
11   Suite 2300
     Denver, CO 80265

12

13   Brian D. Boydston                          Counsel for Defendant Key Register LLC and Key Register
     Sridavi Ganesan                            Systems, Inc.
14   brianb@ixnetcom.com
     sganesan@earthlink.net
15   PICK & BOYDSTON LLP
     523 W. Sixth Street, Suite 1134
16   Los Angeles, CA 90014

17

18   I further certify that a copy of the above document was served on each person listed above, by placing

19   the document(s) described above in an envelope addressed as indicated above which I sealed. I placed the

20   envelope(s) for collection and mailing with the Untied States Postal Service on this day, following ordinary

21   business practices at Fliesler Dubb Meyer & Lovejoy, LLP.

22

23   Dated: May 16, 2003                        /s/    Joel S. White
                                                       Joel S. White
24

25

26

27   ECF certofservice.wpd

28

FIESLER
DUBB
MEYER &
LOVEJOY LLP

PLAINTIFF'S COMBINED MOTION TO STRIKE KMI'S ANSWER AND AFFIRMATIVE DEFENSES (CORRECTED)
Action No. C-03-00870 WHA

1
2

**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

3
4
5
6
7
8
9

| | |
|---|---|
| ENTERASYS NETWORKS, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No: 05-CV-11298 (DPW) |
| v. ) | |
| ) | |
| FOUNDRY NETWORKS, INC., and ) | |
| EXTREME NETWORKS, INC. ) | |
| ) | |
| Defendants. ) | |
| _____) | |

10
11

**<u>CERTIFICATE OF SERVICE</u>**

12

I, Emily E. Smith-Lee, declare as follows:

13

I am employed in the County of Suffolk, State of Massachusetts.  I am over the age of

14

eighteen years and am not a party to this action.  I am a partner at the law firm of McDermott,

15

Will & Emery.  My business address is 28 State Street, Boston Massachusetts 02109-1775, in

16

said County and State.  On March 30, 2007, I caused to be served the following documents:

17
18

- Defendant Extreme's Expedited Motion To Reduce To A Manageable Number The Patent Claims At Issue In This Case

19
20

- Memorandum In Support Of Defendant Extreme's Expedited Motion To Reduce To A Manageable Number The Patent Claims At Issue In This Case

20
21

- Declaration Of Steven Walker In Support Of Defendant Extreme's Expedited Motion To Reduce To A Manageable Number The Patent Claims At Issue In This Case

22
23

- [Proposed] Order Granting Defendant Extreme's Expedited Motion To Reduce To A Manageable Number The Patent Claims At Issue In This Case

24
25
26
27
28

1

I caused the above-stated documents to be served on the following individuals:

2

3

**Enterasys Networks, Inc**

**Foundry Networks, Inc.**

cpsullivan@rkmc.com

nchatterjee@orrick.com

4

mnhenschke@rkmc.com

joczek@proskauer.com

5

aemckenna@rkmc.com

kmudurian@orrick.com

6

jcmcdiarmid@rkmc.com

ysteinberg@orrick.com

7

8

9

Dated: March 30, 2007

EXTREME NETWORKS, INC.

10

11

/s/ Emily Smith-Lee

Emily Smith-Lee, Esq. BBO No. 634223

MCDERMOTT, WILL & EMERY LLP

12

28 State Street

Boston, Massachusetts  02109-1775

13

Tel. (617) 535-4000

14

15

16

MPK 115744-1.074272.0011

17

18

19

20

21

22

23

24

25

26

27

28