## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

_____

ENTERASYS NETWORKS, INC.,         )        Civil Action No: 05-CV-11298 (DPW)

Plaintiff,

v.

FOUNDRY NETWORKS, INC. AND
EXTREME NETWORKS, INC.,

Defendants.

_____

### DECLARATION OF MARLA R. BUTLER IN RESPONSE AND OPPOSITION TO DEFENDANT EXTREME NETWORKS, INC.'S EXPEDITED MOTION TO REDUCE TO A MANAGEABLE NUMBER THE CLAIMS AT ISSUE IN THIS CASE

**I, MARLA R. BUTLER**, declare as follows:

1.      I am a partner with the law firm of Robins, Kaplan, Miller & Ciresi L.L.P., counsel of record for the named Plaintiff Enterasys Networks, Inc. ("Enterasys") in the above-referenced action. I submit this Declaration in response and opposition to Defendant Extreme Networks, Inc.'s Expedited Motion To Reduce To A Manageable Number The Claims At Issue In This Case (Docket Entry No. 86). I have personal knowledge of the facts stated herein and, if sworn as a witness, I could and would testify competently thereto.

2.      On March 6, 2007, counsel for Enterasys and counsel for Extreme met and conferred on the issue of when and to what extent Enterasys would limit the number of patent claims it would ultimately assert at the trial of this matter. Prior to this meet and confer, Enterasys had indicated to Extreme during unrelated discussions that Enterasys planned to reduce the number of asserted claims upon receipt and review of Extreme's invalidity contentions. Nonetheless, in this March 6, 2007, telephone conference, Enterasys offered to –

within a week – drop all but 30 of the 126 asserted claims of the patents-in-suit with the right to reinstate no more than three dependent claims per patent after Extreme finally serves its invalidity contentions on April 16, 2007.

3.    Following the March 6th meet-and-confer and a subsequent March 7th letter from counsel confirming Enterasys' claims reduction offer, more than two weeks passed without any response from Extreme's counsel.

4.    Ultimately, a second meet-and-confer was conducted on March 27, 2007 during which Extreme presented an ultimatum: unless Enterasys irrevocably and immediately limited its asserted claims to 2-3 claims per patent (without knowing Extreme's invalidity positions), Extreme would file a motion asking this Court to force Enterasys to do so.

5.    In February 2007, four months after rejecting a proposal from Enterasys' counsel to streamline the case by focusing on representative accused products, Extreme indicated in a telephone conference that it might now consider Enterasys' proposal.  However, despite the fact that Extreme has the best knowledge of how its products work, Extreme indicated that it would not identify what those representative products should be; rather, Extreme insisted that Enterasys must attempt to identify the representative products.

6.    Attached hereto as Exhibit 1 is a true and correct copy of letter from counsel for Enterasys, Marc N. Henschke, to counsel for Extreme, Steven L. Walker, dated March 7, 2007.

7.    Attached hereto as Exhibit 2 is a true and correct copy of letter from counsel for Extreme, Firasat M. Ali, to counsel for Enterasys, Marc N. Henschke, dated March 22, 2007.

8.    Attached hereto as Exhibit 3 is a true and correct copy of letter from counsel for Enterasys, Alan E. McKenna, to counsel for Extreme, Firasat M. Ali, dated March 23, 2007.

9.      Attached hereto as Exhibit 4 is a true and correct copy of letter from counsel for Enterasys, Marc N. Henschke, to counsel for Extreme, Steven L. Walker, dated April 4, 2007.

10.     Attached hereto as Exhibit 5 is a true and correct copy of asserted claims excerpted from issued U.S. Patent No. 6,539,022 entitled "Network Device With Multicast Forwarding Data."

11.     Attached hereto as Exhibit 6 is a true and correct copy of asserted claims excerpted from issued U.S. Patent No. 5,390,173 entitled "Packet Format In Hub For Packet Data Communications System."

12.     Attached hereto as Exhibit 7 is a true and correct copy of asserted claims excerpted from issued U.S. Patent No. 5,251,205 entitled "Multiple Protocol Routing."

13.     Attached hereto as Exhibit 8 is a true and correct copy of asserted claims excerpted from issued U.S. Patent No. 6,560,236 entitled "Virtual LANs."

14.     Attached hereto as Exhibit 9 is a true and correct copy of asserted claims excerpted from issued U.S. Patent No. 6,128,665 entitled "System For Broadcasting Messages To Each Of Default VLAN Ports In Subset Of Ports Defined As VLAN Ports."

15.     Attached hereto as Exhibit 10 is a true and correct copy of asserted claims excerpted from issued U.S. Patent No. 6,147,995 entitled "Method For Establishing Restricted Broadcast Groups In A Switched Network."

16.     Attached hereto as Exhibit 11 is a true and correct copy of letter from counsel for Enterasys, Marc N. Henschke, to counsel for Foundry, Steven M. Bauer, dated August 2, 2006, which was also copied to various counsel of record for Extreme.

17.     Attached hereto as Exhibit 12 is a true and correct copy of letter from counsel for Extreme, Emily E. Smith-Lee, to counsel for Enterasys, Marc N. Henschke, dated October 12, 2006.

18.     Attached hereto as Exhibit 13 is a true and correct copy of Enterasys' First Set Of Interrogatories directed to Extreme and served on May 19, 2006.

19.     Attached hereto as Exhibit 14 is a true and correct copy of Enterasys' First Set Of Requests For The Production Of Documents And Tangible Things directed to Extreme and served on March 3, 2006.

20.     Attached hereto as Exhibit 15 is a true and correct copy of letter from counsel for Enterasys, Marc N. Henschke, to counsel for Extreme, Firasat M. Ali, dated February 12, 2007.

21.     Attached hereto as Exhibit 16 is a true and correct copy of letter from counsel for Extreme, Firasat M. Ali, to counsel for Enterasys, Marc N. Henschke, dated March 1, 2007.

22.     Attached hereto as Exhibit 17 is a true and correct copy of relevant excerpts from Extreme's responses to Enterasys' First Set Of Interrogatories served on June 19, 2006.


I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed on this 9th day of April, 2007 at Atlanta, Georgia.

                                        /s/ Marla R. Butler
                                        MARLA R. BUTLER

BN1:35038687

4

## CERTIFICATE OF SERVICE

I, Marc N. Henschke, hereby certify that on April 9, 2007, I caused a true and correct copy of the attached *Declaration of Marla R. Butler In Response And Opposition To Defendant Extreme Networks, Inc.'s Expedited Motion To Reduce To A Manageable Number The Claims At Issue In This Case* to be served electronically pursuant to the Court's CM/ECF electronic filing system upon Defendants' respective counsel of record as indicated below:

**Counsel for Defendant Foundry Networks, Inc.**

William L. Anthony, Jr., Esq.
I. Neel Chatterjee, Esq.
Michael F. Heafey, Esq.
Sanjeet K. Dutta, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Steven M. Bauer, Esq.
Jeremy P. Oczek, Esq.
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110-2600

**Counsel for Defendant Extreme Networks, Inc.**

Terrence P. McMahon, Esq.
Vera M. Elson, Esq.
David H. Dolkas, Esq.
McDERMOTT, WILL & EMERY LLP
3150 Porter Drive
Palo Alto, CA 94303-1212

Emily E. Smith-Lee, Esq.
Peter L. Resnik, Esq.
McDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775

Christopher D. Bright, Esq.
McDERMOTT, WILL & EMERY LLP
18191 Von Karman Avenue, Suite 400
Irvine, CA 92612-7107

Dated: April 9, 2007              /s/ Marc N. Henschke
                                  MARC N. HENSCHKE

# Exhibit 1

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

March 7, 2007

*VIA EMAIL (PDF ATTACHMENT)*

Steven L. Walker, Esq.
McDermott Will & Emery LLP
3150 Porter Drive
Palo Alto, CA  94303-1212

Re: ***Enterasys Networks v. Foundry Networks and Extreme Networks***
　　**Civ. Act. No. 05-11298-DPW (D. Mass)**
　　**Our File No.:  070610.0001**

Dear Steve:

We write to express our disappointment at the unreasonable and inflexible position that you asserted on behalf of Extreme yesterday during our telephonic meet-and-confer concerning the timing and logistics of how best to narrow the number of patent claims being asserted in this case. Indeed, you rejected out of hand every constructive proposal advanced by Enterasys, including Enterasys' extraordinary offer to try to significantly streamline the litigation by dropping nearly 80% of its asserted claims on an expedited basis. Rather than seeking any compromise, you issued an *ultimatum* that Extreme would file a motion with the Court unless Enterasys immediately agreed to an artificial (and highly prejudicial) limitation of being able to assert no more than three claims per patent, and to relinquish all of its remaining legal rights.

By way of background, you contacted us last week to express Extreme's view that it was too "unwieldy" for Enterasys to be asserting 129 patent claims under the six patents-in-suit, irrespective of the merits of whether Extreme was infringing those claims. We agreed that a future narrowing of the case may be appropriate, and confirmed Enterasys' intention to drop a significant number of its asserted claims well before any *Markman* hearing or trial. However, we clearly explained to you that it would be impossible for Enterasys to make any informed decisions about which claims to drop at this premature stage of the case when Extreme has not yet disclosed any of its invalidity or non-infringement contentions, and has not even completed its productions of key technical documents.

Many of the patent claims that Enterasys has asserted in this case are *dependent* claims. As you are aware, a patentee's principal reason for asserting dependent patent claims is to protect itself against an accused infringer's invalidity contentions. Thus, once we have had the opportunity to assess Extreme's invalidity contentions, Enterasys will be in a position to make informed decisions about which dependent patent claims are necessary and which can be dropped. But here Enterasys is not yet in that position because of Extreme's ongoing refusal to disclose its invalidity contentions, despite Enterasys' service of interrogatories calling for such disclosures *nearly ten months ago*. In fact, you have indicated that Extreme is unwilling to disclose its invalidity contentions until the very last day permitted by the Court on April 16, 2007.

Steven L. Walker, Esq.
March 7, 2007
Page 2

Moreover, Enterasys also plans to drop *any* patent claims -- whether dependent or independent -- in circumstances where the evidence demonstrates that no good faith basis exists for asserting infringement thereunder. But here again, Enterasys is not yet in a position to assess whether these circumstances exist because Extreme has failed to disclose any of its non-infringement contentions, and apparently refuses to do so until the very last day permitted by the Court on April 30, 2007. In addition, now more than a year after Enterasys' service of document requests, Extreme still has not completed its responsive productions of the key technical documents that Enterasys needs in order to fully assess its infringement positions.

In sum, it is fundamentally unfair and prejudicial for Extreme to issue an ultimatum demanding that Enterasys drop all but a handful of its asserted patent claims while simultaneously hiding the ball with respect to disclosing the very information required by Enterasys to make informed decisions in this regard. Nevertheless, in our meet-and-confers Enterasys bent over backwards to try to find a compromise solution. As noted above, our final proposal was that within a week Enterasys would drop all but 30 of the 129 claims currently being asserted, thereby reducing the number of asserted claims from an average of 21 claims per patent to an average of just 5 claims per patent. Our only caveat was that following Extreme's disclosure of its invalidity contentions on April 16th, Enterasys would have the right to reinstate no more than three dependent claims per patent if necessary to counteract any situation where it had inadvertently dropped critical claims while operating on an uninformed basis. Unfortunately, Extreme summarily rejected that proposal and every other.

Despite our lack of success so far, we continue to believe that a reasonable solution to these issues can be reached without the need for rigid ultimatums or Court intervention. Please contact us at your soonest convenience so that we can continue our discussions.

Sincerely,

Marc N. Henschke

MNH:nah

cc:    Vera M. Elson, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
       David H. Dolkas, Esq. (*VIA EMAIL*)
       David L. Larson, Esq. (*VIA E-MAIL*)
       Christopher D. Bright, Esq. (*VIA EMAIL*)
       Emily E. Smith-Lee, Esq. (*VIA EMAIL*)
       Firasat M. Ali, Esq. (*VIA EMAIL*)
       Richard Cheng  (*VIA EMAIL*)
       Sabrina Johnson (*VIA EMAIL*)
       T. Nation (*VIA EMAIL*)

35038089

# Exhibit 2

# McDermott
# Will&Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D.C.

Firasat Ali
Attorney at Law
Fali@mwe.com
650.813.5012

March 22, 2007

BY E-MAIL

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
Prudential Tower
800 Boylston Street, 25th Floor
Boston, MA 02199
mnhenschke@rkmc.com

Re:     *Enterasys Networks v. Extreme Networks*, Civil Action No. 05-12235 (D. Mass.)

Dear Marc:

I write in reference to your discussions with Steve Walker during the recent meet-and-confers and your letter dated March 7, 2007 regarding narrowing of claims. During the meet-and-confers and in your March 7, 2007 letter, Enterasys offered to "drop all but 30 of the 129 claims currently being asserted, thereby reducing the number of asserted claims from an average of 21 claims per patent to an average of just 5 claims per patent."

Although we continue to disagree with your wish to add claims back after you have narrowed them, we look forward to your narrowing the completely unwieldy number of claims (129) Plaintiff now asserts. Please let us know by tomorrow, March 23, 2007, whether and when Plaintiff will notify Extreme of its more narrowly selected claims.

Sincerely,

*Firasat Ali*

Firasat M. Ali

cc:     Alan E. McKenna, Esq.  (By Email)
        Neel I. Chatterjee, Esq. (By Email)
        Jeremy P. Oczek, Esq. (By Email)
        Sanjeet K. Dutta, Esq. (By Email)

MPK 124067-1.065994.0016

**Exhibit 3**

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

**ALAN E. MCKENNA**
617-859-2719
aemckenna@rkmc.com

March 23, 2007

***VIA E-MAIL (PDF ATTACHMENT)***
Firasat M. Ali, Esq.
McDermott Will & Emery LLP
3150 Porter Drive
Palo Alto, CA  94303-1212

Re: ***Enterasys Networks v. Foundry Networks and Extreme Networks***
***Civ. Act. No. 05-11298-DPW (D. Mass)***

Dear Firasat:

I am in receipt of your March 22, 2007 letter regarding the prior discussions between Marc Henschke and Steve Walker concerning the narrowing of claims in this matter.

As you know, we have been trying for weeks to reach a resolution to this issue and made a proposal to Extreme in early March.  We did not hear back from Extreme until your letter last night.

Your letter does not accept or reject the proposal previously made by Enterasys in Marc Henschke's March 7, 2007 letter.  In that proposal, Enterasys offered to drop 99 out of the 129 claims of the asserted patents with the caveat that Enterasys have the right to reinstate no more than three dependent claims per patent if necessary.   I also note that your letter does not provide any counterproposal from Extreme.   Is it Extreme's position that Enterasys should unilaterally narrow its claims and irrevocably drop claims at this point without knowing Extreme's preliminary non-infringement or invalidity contentions?  Or, is Extreme willing to accept Enterasys' proposal (as set forth in Marc's March 7, 2007 letter)?  Please clarify Extreme's position.

We welcome the opportunity to further discuss this issue with you and hope we can reach an amicable resolution.  If you wish to discuss this issue, please provide us with times that you are available either Monday afternoon or anytime on Tuesday.

BN1 35038384.1

ATLANTA · BOSTON · LOS ANGELES · MINNEAPOLIS · NAPLES · SAINT PAUL · WASHINGTON, D.C.

Firasat M. Ali, Esq.
March 23, 2007
Page 2


We look forward to hearing from you.

Very truly yours,

Alan E. McKenna

cc:     Vera M. Elson, Esq. (*VIA FIRST CLASS MAIL & E-MAIL - PDF ATTACHMENT*)
        David H. Dolkas, Esq. (*VIA E-MAIL - PDF ATTACHMENT*)
        Christopher D. Bright, Esq. (*VIA E-MAIL - PDF ATTACHMENT*)
        T. Nation (*VIA E-MAIL - PDF ATTACHMENT*)
        Marc N. Henschke, Esq.

BN1 35038384.1

# Exhibit 4

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

April 4, 2007

***VIA E-MAIL (PDF ATTACHMENT)***

Steven L. Walker, Esq.
McDermott Will & Emery LLP
3150 Porter Drive
Palo Alto, CA  94303-1212

Re:   ***Enterasys Networks v. Foundry Networks and Extreme Networks***
      ***Civ. Act. No. 05-11298-DPW (D. Mass)***
      **Our File No.:  070610.0001**

Dear Steve:

As you are aware, beginning on March 6, 2007, Enterasys made a standing offer to Extreme for significantly streamlining this case by agreeing to drop nearly 80% of its asserted patent claims on an expedited basis, thereby reducing the number of claims presently at issue from 129 down to just 30. Given the fact that Enterasys has strong evidence demonstrating Extreme's infringement of all the claims subject to being dropped, this is truly an extraordinary offer that places paramount importance on judicial efficiency concerns above all others.

In keeping with its standing offer, Enterasys hereby identifies its list of the 30 remaining claims as follows:

(i)     '173 patent: Claims 1, 3, and 5;
(ii)    '205 patent: Claims 1, 3, 5, 7, 18, and 21;
(iii)   '236 patent: Claims 1, 2, 6, and 8;
(iv)    '022 patent: Claims 1, 3, 5, 6, 12, and 20;
(v)     '665 patent: Claims 1, 4, 5, 6, and 7; and
(vi)    '995 patent: Claims 1, 14, 19, 25, 32, and 33.

At potential great prejudice to itself, Enterasys has been forced to undertake this claims reduction exercise while "operating in the dark" due to Extreme's ongoing failure to have disclosed the very types of information that Enterasys requires in order to make informed and intelligent decisions about which claims to drop. Indeed, to date Extreme has failed to disclose its invalidity contentions, failed to disclose its non-infringement contentions, failed to complete its production of key technical documents, and failed to identify witnesses or confirm dates for the Rule 30(b)(6) deposition notice directed to Extreme's product engineers that Enterasys served back in February.

Steven L. Walker, Esq.
April 4, 2007
Page 2

     Accordingly, in order to afford itself the most basic modicum of protection against the danger of dropping key patent claims on an uninformed basis, Enterasys is providing the list of 30 claims set forth above subject to a reservation of its rights to add back into the case no more than three additional dependent claims per patent, if necessary, after having had the opportunity to examine Extreme's invalidity contentions due to be served on April 16, 2007. Consistent with what has been discussed at our meet-and-confers, Enterasys proposes to identify any claims to be added back on or before April 30, 2007, and agrees to allow Extreme until May 14, 2007 to serve its invalidity and non-infringement responses to any such reinstituted claims.

     In the meantime, we look forward to receiving Extreme's invalidity contentions on April 16, 2007 that are required to be provided in the form of a chart that describes in detail on an element-by-element basis how each asserted prior art reference (or combination of references) purportedly anticipates or renders obvious each of Enterasys' 30 asserted claims, including citations to specified column and line numbers of those prior art references where applicable.

     Sincerely,

     Marc N. Henschke

MNH:nah

cc:    Vera M. Elson, Esq. (*VIA US MAIL & EMAIL*)
      David H. Dolkas, Esq. (*VIA EMAIL*)
      David L. Larson, Esq. (*VIA EMAIL*)
      Christopher D. Bright, Esq. (*VIA EMAIL*)
      Emily E. Smith-Lee, Esq. (*VIA EMAIL*)
      Firasat M. Ali, Esq. (*VIA EMAIL*)
      Richard Cheng (*VIA EMAIL*)
      Sabrina M. Johnson (*VIA E-MAIL*)
      T. Nation (*VIA E-MAIL*)

35038592

# Exhibit 5

6,539,022

1. A network bridge for reducing multicast communications in a network, the network bridge including at least two I/O interfaces to each receive and transmit data packets and also including multicast forwarding data, the device comprising: means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge; means for identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge; and means for updating the multicast forwarding data according to the identified multicast group and the data in the first portion of the first packet.

3. The network bridge as recited in claim 1, further comprising: means for identifying a source of the first data packet, wherein the updating means include means for cross-referencing the identified source to the identified multicast group in the multicast forwarding data.

5. The network bridge as recited in claim 1, further comprising: means for determining, when the first packet is not a control packet, whether the first packet is a message packet having a multicast group as a destination address; and means for identifying, when the first packet is determined to be a multicast message packet, the destination multicast group; the destination multicast group identifying means further comprising: means for retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface; and means for sending the multicast message packet out each at least one cross-referenced I/O interface in the first data other than the identified I/O interface.

6. A method of reducing multicast communications in a network, the network including a network device having multicast communications forwarding data and at least two I/O interfaces to each receive and transmit data packets, the method comprising: determining an I/O interface on which a first packet arrived; determining, by examining data in a first portion of the first packet, whether the first packet is a multicast control packet addressed to a device other than the network device; when the first packet is determined to be a multicast control packet addressed to a device other than the network device: determining a multicast group from the first portion of the multicast control packet; and updating the multicast forwarding data as a function of data in the first portion of the multicast control packet.

12. The method as recited in claim 6, wherein the control packet is defined according to an Internet Group Management Protocol (IGMP) standard.

20. A method of conserving bandwidth in a communications network by reducing transmission of unneeded multicast messages, the method comprising: monitoring, at a first location, multicast control packets destined for a location other than the first location; from each monitored multicast control packet, identifying a multicast group, a source of the monitored multicast control packet and an interface on which the monitored multicast control packet arrived; maintaining an association of the identified multicast group with the identified interface; and for any multicast message received at the first location and

destined for the identified multicast group, transmitting the received multicast message on any interface associated with the multicast group identified in the multicast message.

# Exhibit 6

5,390,173

1. A packet data communications network comprising:

    a first network segment having a plurality of stations, one of said stations sending a message packet onto said first network segment of a first format; said first format including a first header and a data field with network destination address in said communications network;

    a first network transfer device having an input connected to said first network segment to receive said message packet and having an output; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header further including local status information and a plurality of status fields to indicate a message packet servicing;

    a switching device having a plurality of ports, a first of said ports being connected to said output of said first network transfer device; the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and the plurality of status fields;

    a second network transfer device having an input connected to said second of said ports of said switching device and having an output connected to a second network segment, the second network transfer device receiving said message packet via said switching device to forward to said second network segment; the second network transfer device removing said second header from said message packet.

3. A network according to claim 1 wherein said destination address contains N bits, and said switch address contains M bits, where N and M are integers and N >>M.

5. A network according to claim 4 wherein said switching device is a crossbar switch.

# Exhibit 7

5,251,205

1. A method of calculating routes for sending user data packets via information handling devices which forward data packets through a communications network, comprising

    including in at least a first and a second user data packet, destination address information conforming to two or more different addressing conventions of two or more different independent protocol suites,

    determining routes for said first and said second user data packets using a route calculation algorithm corresponding to a single routing protocol, chosen from an arbitrary protocol suite, regardless of the addressing convention to which the destination address information in said user data packet conforms,

    said route being determined using the destination address information in said user data packets without converting said destination address information from the addressing convention to which it forms to another addressing convention.

3. The method of claim 1 or 2 further comprising

    sending to said information handling devices link state packets conforming to said routing protocol, and

    calculating said route based on information contained in said link state packets.

5. A method for calculating routes for sending user data packets via information handling devices which forward data packets through a communications network, said information handling devices including (a) single-protocol information handling devices capable of recognizing and forwardly only user data packets which conform to a single protocol suite, and (b) multi-protocol information handling devices capable of recognizing and forwarding user data packets which conform to any one of two or more protocol suites, comprising

    using a routing protocol to automatically predetermine whether to encapsulate a packet, at which information handling devices to encapsulate and to decapsulate said packet, and which protocol to use to encapsulate said packet, wherein

    said information handling devices are organized in areas and all of said information handling devices within a single said area are at least capable of recognizing and forwarding user data packets which conform to the same one of said protocol suites.

7. A method for calculating routes for sending user data packets via information handling devices which forward data packets through a communications network, said information handling devices including (a) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a single protocol suite, and (b) multi-protocol information handling devices capable of recognizing and

forwarding user data packets which conform to any one of two or more protocol suites, comprising

using a routing protocol to automatically predetermine whether to encapsulate a packet, at which information handling devices to encapsulate and to decapsulate said packet, and which protocol to use to encapsulate said packet, wherein

said network includes (a) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a first protocol suite, (b) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a second different protocol suite, and (c) at least one multi-protocol information handling device capable of recognizing and forwarding user data packets which conform to at least said first and second protocol suites.

18. The method of claim 5, 6, 7 or 8 further comprising

sending to said information handling devices, link state packets conforming to said one of said routing protocols, and

calculating said route based on information contained in said link state packets.

21. A network of information handling devices which forward user data packets through communications links each said packet including an address indicating the packet's destination, said network comprising

a first information handling device capable of interpreting addresses formatted in accordance with a first addressing scheme, said first addressing scheme defining one or more address fields that are assigned values to form an address,

a second information handling device capable of interpreting addresses formatted in accordance with a second addressing scheme, said second addressing scheme defining different address fields than said first addressing scheme, wherein

at least one address formatted in accordance with said first addressing scheme dose not identify the same destination as any address formatted in accordance with said second addressing scheme, and

said first and second devices exchange control packets which specify:

the links connected to the device which originates the control packet,

the addresses, formatted in accordance with said first addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said first addressing scheme, and

the addresses, formatted in accordance with said second addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said second addressing scheme.

# Exhibit 8

6,560,236

1. A method of operating a network bridge having a first plurality of ports through which
    network communications pass to and from the bridge, the method comprising: assigning
    a group identifier to each port of the first plurality of ports, wherein all ports with a same
    assigned group identifier are in a same group; receiving a communication on a first port
    of the bridge; and if the first port is one of the first plurality of ports and the
    communication is a multicast packet having a multicast destination address, sending the
    communication out of the bridge on all other ports of the first plurality of ports having the
    same assigned group identifier as the first port.

2. The method of claim 1, further comprising: identifying a source of the communication
    received on the first port of the bridge.

6. The method of claim 1, further comprising: assigning a protocol type to each group identifier;
    wherein, for each port of first plurality of ports, the protocol type identifies a
    communication protocol used by a station connected to the port.

8. The method of claim 1, wherein a port may have more than one group identifier assigned to it.

# Exhibit 9

6,128,665

1. A port based default VLAN formed on one or more interconnected networking switches, each
switch having one or more switch ports, all of the switch ports collectively being a
plurality of switch ports, the default VLAN being defined by one or more of the plurality
of switch ports, the one or more of the plurality of switch ports being default VLAN
ports, at least one of the plurality of switch ports defining a second VLAN, the default
VLAN comprising:

means for receiving a data packet through one of the default VLAN ports;

means for ascertaining a destination port from the data packet, the destination port being
one of the plurality of switch ports;

means for determining whether the destination port is one of the default VLAN ports;

first means, responsive to the determining means, for transmitting the data packet to the
destination port if the determining means determines that the destination port is
one of the default VLAN ports; and

second means, responsive to the determining means, for transmitting the data packet to
each of the default VLAN ports if the determining means determines that the
destination port is not one of the default VLAN ports,

the at least one switch port defining the second VLAN being free from transmission,
from the default VLAN, of the data packet.

4. A method of limiting broadcast messages from a port based default VLAN, the default VLAN
formed on one or more interconnected networking switches, each switch having one or
more switch ports, all of the switch ports collectively being a plurality of switch ports, the
default VLAN being defined by one or more of the plurality of switch ports, the one or
more of the plurality of switch ports being default VLAN ports, at least one of the
plurality of switch ports defining a second VLAN, the method comprising the steps of:

A. receiving a data packet through one of the default VLAN ports;

B. ascertaining a destination port from the data packet, the destination port being one of
the plurality of switch ports;

C. determining whether the destination port is one of the default VLAN ports;

D. transmitting the data packet to the destination port if the destination port is one of the
default VLAN ports;

E. transmitting the data packet to each of the default VLAN ports if the destination port is
not one of the default VLAN ports; and

F. preventing transmission, from the default VLAN, of the data packet to the at least one switch port defining the second VLAN.

5. The method as defined by claim 4 further including the step of:

G. tagging the data packet.

6. A computer program product for use with a switching device, the computer program product limiting broadcast messages from a port based default VLAN, the default VLAN formed on one or more interconnected networking switches, each switch having one or more switch ports, all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by one or more of the plurality of switch ports, the one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports defining a second VLAN, the computer program product comprising a computer usable medium having computer readable program code thereon, including:

program code for receiving a data packet through one of the default VLAN ports;

program code for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

program code for determining whether the destination port is one of the default VLAN ports;

program code for transmitting the data packet to the destination port if the program code for determining determines that the destination port is one of the default VLAN ports; and

program code for transmitting the data packet to each of the default VLAN ports if the destination port is not one of the default VLAN ports,

program code for preventing transmission, from the default VLAN, of the data packet to the at least one switch port defining the second VLAN.

7. The computer program product as defined by claim 6 further including program code for tagging the data packet.

# Exhibit 10

6,147,995

1. A computer-readable storage medium comprising program instructions for restricting flooding of a data packet, of one of a broadcast, multicast and unknown destination type, in a switched data communications network, the network including a plurality of end systems and switches connected by links, the switches having access ports connected to end systems and network ports connected to other switches, the program instructions causing the network to:

    a. assign at least one identifier to a respective subset of end systems;

    b. map the at least one assigned identifier to an access port attached to at least one end system in the respective subset of end systems; and

    c. when the data packet is received from a source end system at a receiving access port of a first switch:

        i) determine one or more identifiers associated with the source end system;

        ii) encapsulate the data packet by adding a header with the one or more determined identifiers;

        iii) forward the encapsulated data packet to all or a subset of other switches in the network; and

        iv) determine if at least one access port other than the receiving access port on the first switch is associated with the one or more determined identifiers and forward the data packet out the at least one determined access port.

14. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

    prior to assigning an identifier to a specific end system or access port, maintain a default identifier for that specific end system or access port which maps to predetermined access ports.

19. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

    maintain at least one mapping table at each switch for performing the mapping step.

25. A computer-readable storage medium comprising program instructions for restricting flooding of a data packet, of one of a broadcast, multicast and unknown destination type, in a switch to be used in a switched data communications network, the network to include end systems and switches connected by links, the switches having access ports connected to end systems and network ports connected to other switches, the program instructions causing the switch to:

a. assign at least one identifier to a respective subset of end systems;

b. map the at least one assigned identifier to an access port attached to at least one end system in the respective subset of end systems; and

c. when the data packet is received from a source end system at a receiving access port of the switch:

      i) determine one or more identifiers associated with the source end system;

      ii) encapsulate the data packet by adding a header with the one or more determined identifiers;

      iii) forward the encapsulated data packet to all or a subset of other switches in the network; and

      iv) determine if at least one access port other than the receiving access port on the switch is associated with the one or more determined identifiers and forward the data packet out the at least one determined access port.

32. The computer-readable storage medium as recited in claim 25, further comprising instructions to cause the switch to:

    prior to assigning an identifier to a specific end system or access port, maintain a default identifier for that specific end system or access port which maps to predetermined access ports.

33. The computer-readable storage medium as recited in claim 25, further comprising instructions to cause the switch to:

    maintain a Management Information Base (MIB) interface.

# Exhibit 11

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199-7610
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW
MARC N. HENSCHKE
617-859-2784
mnhenschke@rkmc.com

August 2, 2006

*VIA E-MAIL (PDF ATTACHMENT)*

Steven M. Bauer, Esq.
Proskauer Rose, LLP
One International Place
Boston, MA 02110

Re: *Enterasys Networks v. Foundry Networks and Foundry Networks*
    *Civ. Act. No. 05-11298-DPW (D. Mass)*
    **Our File No.:  070610.0001**

Dear Steve:

We write pursuant to the agreement reached between Enterasys and Foundry at our July 26, 2006 in-person meet-and-confer to mutually exchange letters today setting forth what actions our respective clients are willing to take on a going forward basis to potentially resolve the outstanding discovery disputes that exist between them. We are copying Extreme's legal counsel on this letter given that Enterasys is willing to extend this same offer of compromise to Extreme.

At our meet-and-confer, Foundry's complaints about Enterasys' discovery responses were directed principally (if not exclusively) at the issue of Enterasys' Phase I document production obligations relative to pre-1997 DEC and Cabletron products, including documents reflective of the first public sales, uses, or disclosures of such products or their relevant technologies. Accordingly, Enterasys' offer of compromise as set forth below is largely designed to address this issue.

**Products Associated With Named Inventors**

You indicated that it would be helpful to Foundry's discovery efforts to be apprised of which DEC or Cabletron products the named inventors were working on at or about the time that they were conceiving of the patented inventions. Our best current understanding of the answers to this question are set forth below. However, please understand that this information must not be regarded as a representation or acknowledgement by Enterasys that the patented inventions wound up being incorporated into any of these products, whether in their initial versions or in any subsequent versions.

BN1 35033085.1

A T L A N T A · BOSTON · L O S   A N G E L E S · M I N N E A P O L I S · N A P L E S · S A I N T   P A U L · W A S H I N G T O N , D . C .

Steven M. Bauer, Esq.
August 2, 2006
Page 2

**'205 Patent**.  The named inventors are believed to have been broader network architects whose work was not undertaken in connection with any specific DEC products.  At the time of the invention, DEC's GigaSwitch (later known as GigaSwitch FDDI) and DECNIS 500 and 600 routers may have been in the early stages of development by others at the company.

**'173 Patent**.  The named inventors are believed to have been working on DEC's GigaSwitch (later known as GigaSwitch FDDI) product.

**'665 Patent**.  The named inventor is believed to have been working on DEC's VNswitch.

**'995 Patent**.  The named inventors were working on Cabletron's SecureFast Virtual Networking software.

**'022 Patent**.  We presently have no information to provide.  At the time of the invention, the inventor was working for Standard Microsystems, Corp. ("SMS").  After Cabletron acquired SMS in or around January of 1996, the inventor joined Cabletron for only a few months before a parting of ways.

**'236 Patent**.  The named inventors are believed to have been working on DEC's GigaSwitch (later known as GigaSwitch FDDI) product and/or on its DECNIS 500 and 600 routers products.

## Mutual Exchange Of Document Warehouse Indexes

Enterasys is willing to engage in a mutual exchange of the parties' respective indexes that list the boxes of documents housed in their off-site storage warehouses by next Wednesday, August 9, 2006.  However, this exchange offer is subject to one significant caveat.  In short, because Enterasys' document warehouse index constitutes protected attorney work product, Enterasys will not disclose it absent an acknowledgement from Defendants that such disclosure will constitute only a limited waiver that does not extend beyond the index itself, and that the information contained on Enterasys' index will be used for no other purpose than to assist in locating other potentially responsive discovery.  Please confirm.

Note that the version of its document warehouse index that Enterasys is willing to provide will be complete except for the removal of entries relating to boxes that were sent to off-site storage by Cabletron's or Enterasys' in-house legal departments.  This is designed to avoid attorney-client privilege and work product waiver issues.  It is our understanding that all documents originating from these legal departments of potential relevance to this case have already been located and either produced or set aside for future production.  For example, Enterasys has previously produced all legal department files relating to the patents-in-suit or to relevant corporate transactions.  Moreover, all legal department files relating to relevant patent licensing and litigation efforts have been located and set aside for Phase II discovery production.

Steven M. Bauer, Esq.
August 2, 2006
Page 3

## Access To Iron Mountain Warehouse

So long as they are not clearly irrelevant to Phase I discovery issues relating to pre-1997 DEC or Cabletron products, Enterasys will make available for inspection and copying by Foundry's and Extreme's attorneys any boxes of interest that they identify from Enterasys' document warehouse index. Foundry and Extreme are expected to coordinate their document review efforts such that these boxes of interest need only be inspected and copied once.

In terms of logistics, Enterasys will make a room available to Foundry's and Extreme's attorneys at its Iron Mountain off-site storage warehouse facility for purposes of document review. Defendants must identify in advance which boxes they want to review, and during their subsequent review process shall mark those documents that they want to have copied. Defendants' attorneys will not be allowed to take notes. Enterasys will copy and produce the marked documents except insofar as they are subject to attorney-client or work product protections. In those instances, withheld documents will be appropriately listed by Enterasys on a privilege log. Enterasys will produce documents in such a manner that it will be possible to discern from which boxes they originated.

## Electronic Searches Of Online Computer Systems

As indicated in my letters of March 27, 2006 to Neel Chaterjee and Vera Elson, Enterasys has two principal online computer systems containing electronic documentation dating back to the early to mid 1990s. To the extent that Foundry's and Extreme's attorneys coordinate with each other to produce a list of search terms that are reasonable in scope and not clearly irrelevant to Phase I discovery issues relating to pre-1997 DEC or Cabletron products, Enterasys will run the requested searches and provide Defendants with the results thereof. Once Defendants have reviewed the results and indicated which documents they want to have copied, Enterasys will copy and produce the indicated documents except insofar as they are subject to attorney-client or work product protections. In those instances, withheld documents will be appropriately listed by Enterasys on a privilege log. If feasible, Enterasys will produce documents in such a manner that it will be possible to discern from which computer files they originated.

## Rule 30(b)(6) Keeper Of Records Deposition

Should Defendants so desire, Enterasys will make witnesses available in the near future for a Rule 30(b)(6) keeper of records deposition who are knowledgeable about its off-site document storage index and warehouse, and also about its online computer systems. Please advise.

## Offer To Accept Stipulations From Defendants

As I explained at our meet-and-confer, Enterasys is potentially willing to accept satisfactory stipulations from Defendants that could serve to reduce the scope of necessary discovery in this case. These envisioned stipulations fall into two categories:

Steven M. Bauer, Esq.
August 2, 2006
Page 4


    (1)    If Defendants would be willing to stipulate that a certain product model is representative of how an accused feature operates across an entire product family, and/or across earlier versions of that same product model, Enterasys may be willing and able to forego discovery relating to these other similar products.

    (2)    If Defendants would be willing to stipulate that their customers would be *direct* infringers in instances where Defendants are proven guilty of *indirect* infringement, Enterasys may be willing and able to forego third-party discovery of Defendants' customers. Alternatively, if Defendants would be willing to stipulate that some subset of their customers are representative of their remaining customers for purposes of assessing direct infringement allegations, Enterasys may be willing and able to forego discovery relating to those remaining customers.

    Please let us know whether you have any interest in attempting to craft stipulations along these lines.

    We look forward to receiving sometime later today the reciprocal letter that you have promised us on behalf of Foundry. We are available later this week to discuss any of the issues raised by our respective clients' letters.


                Sincerely,

                Marc N. Henschke

MNH:gpf

cc:    I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
       Jeremy P. Oczek, Esq. (*VIA EMAIL*)
       K. Mudurian (*VIA EMAIL*)
       Y. Steinberg (*VIA EMAIL*)
       Vera M. Elson, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
       David H. Dolkas, Esq. (*VIA EMAIL*)
       Firasat M. Ali, Esq. (*VIA EMAIL*)
       Christopher D. Bright, Esq. (*VIA EMAIL*)
       George Huggins (*VIA EMAIL*)
       Tamara Nation (*VIA EMAIL*)

# Exhibit 12

# McDermott
# Will & Emery

Boston Brussels Chicago Düsseldorf London Los Angeles Miami Munich
New York Orange County Rome San Diego Silicon Valley Washington, D C

Emily E Smith-Lee
Attorney at Law
esmith-lee@mwe com
617 535 4057

October 12, 2006

VIA E-MAIL MNHENSHCKE@RKMC.COM

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi, L.L.P.
Prudential Tower
800 Boylston Street, 25th Floor
Boston, MA  02199

Re:    Enterasys Networks v. Extreme Networks, Civil Action No. 05-12235 (D. Mass)
        Client-Matter No. 065994-0016

Dear Marc:

I write in response to your letter dated October 10 proposing certain stipulations from Extreme. Specifically, you have indicated that Enterasys may be willing to forego certain discovery if Extreme agreed to stipulate that (i) identified product models are representative of how an accused feature operates across an entire product family; and (ii) Extreme's customers would be direct infringers in instances where Extreme is found to have indirectly infringed.

We cannot agree to these stipulations at this time, for the simple reason that we still do not have sufficient information about the specific nature of your infringement allegations. In your most recent supplemental interrogatory responses, you indicate that Enterasys is now asserting virtually all of the 120 claims of the six patents, against a list of products that effectively encompasses all of Extreme's products. We still do not have any information about what aspects of each product you contend infringe each claim and why.

Without this information, we cannot even assess whether there is uniformity in how an "accused feature operates across an entire product family," as you have suggested. Similarly, without more specificity with respect to what Enterasys is accusing and why, we cannot assess whether our customers are using accused features, and therefore cannot stipulate that some or all of these customers would be direct infringers if Extreme were found to be an indirect infringer.

Please feel free to contact me if you would like to discuss this further.

Sincerely,

*Emily E Smith-Lee/cs*

Emily E. Smith-Lee

# Exhibit 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ENTERASYS NETWORKS, INC., | ) | Civil Action No: 05-CV-11298 (DPW) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| FOUNDRY NETWORKS, INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

## PLAINTIFF ENTERASYS NETWORKS, INC.'S FIRST SET OF INTERROGATORIES TO DEFENDANT EXTREME NETWORKS, INC.

Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Enterasys Networks, Inc. ("Enterasys" or "Plaintiff") hereby requests that Defendant Extreme Networks, Inc. ("Defendant" or "Extreme") answer each of the following interrogatories separately and in writing not later than thirty (30) days after the service of these requests.

## I. INSTRUCTIONS

1.    You are requested to respond to these interrogatories by drawing upon all information that is in your corporate knowledge or possession, as well as all information that you can procure or obtain from other sources by exercising due diligence. These sources include, but are not limited to, your employees, agents, managing agents, attorneys, accountants, consultants, advisors, officers, directors, or representatives of any type whatsoever.

2.    If, after exercising due diligence, you are unable to answer any interrogatory in full, you nevertheless still must: (i) answer said interrogatory to the fullest extent possible; (ii)

explain your inability to answer the remainder of the interrogatory; (iii) state the nature of all efforts you made to do so, including identification of all persons of whom inquiry was made and whether each such person was unwilling or unable to furnish such information; (iv) and provide whatever information, if any, is known or available to you concerning the unanswered portion of said interrogatory.

      3.      In the event that you file a proper and timely objection to any portion of an interrogatory propounded herein, you are required to respond to all other portions of that interrogatory which do not fall within the ambit of your objection.

      4.      These interrogatories pose a continuing request for information. Thus, if after making your initial responses, you become aware of additional information or of the availability of additional information, that would supplement, modify, or change responses that you have provided, you are required without further request to provide that information to Plaintiff.

## II. DEFINITIONS

      1.      The terms "documents" and "tangible things" as used herein shall mean each non-identical copy of any of the types of materials referenced in Local Rule 26.5(c)(2) and Fed. R. Civ. P. 34(a), and shall specifically include emails, voice mails, instant messages, and computer data, and any electronic, magnetic, or digital media on which information can be stored, including but not limited to tapes, hard drives, discs, and any other form of computer memory.

      2.      The term "non-identical copy" as used herein shall mean any document or tangible thing that, but-for markings, additions, deletions, signatures, modifications of any kind (including, but not limited to, notations on the backs or margins of pages thereof, blind carbon copy notations, attachments, alterations, amendments, or mark-ups) would otherwise be identical to other documents or tangible things responsive to any production request herein. Each non-

2

identical copy constitutes a distinct document or tangible thing and must be produced in response hereto.

3.    The term "meeting(s)" as used herein shall mean any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged, or scheduled in advance, whether or not occurring face-to-face or by other means including, without limitation, by telephone, videoconference or instant messaging, and whether or not the meeting was informal or formal or occurred in connection with some other activity.

4.    The term "agreement" as used herein shall mean any contract, transaction, or other arrangement of any kind, whether conditional, executed, executory, express, or implied, and whether oral or written, in which rights are granted or obligations assumed.  The term "agreement" shall apply to completed, actual, contemplated, or attempted agreements or renewals of agreements.

5.    The term "negotiate" or any variant thereof as used herein shall mean, without limitation, any deliberations, discussions, conferences, bargaining or trading between parties or their agents, representatives, counsel, or any other persons as herein defined.

6.    The term "any" shall mean "any and all."  The term "all" as used herein also shall mean "any and all."

7.    The terms "and" and "or" as used herein shall be construed conjunctively or disjunctively to bring within the scope of these production requests any and all information which might otherwise be construed as outside their scope.

8.    The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun so used, and vice versa; the use of the masculine

form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and vice versa; and the use of any tense of any verb includes also within its meaning all other tenses of the verb so used.

9.     The term "communication" as used herein shall mean the transmittal of information in the form of facts, ideas, inquiries or otherwise.

10.     The term "person" as used herein shall mean any natural person or any business, legal, or governmental entity or association.

11.     The term "concerning" as used herein shall mean referring to, describing, evidencing, or constituting.

12.     The term "identify" as used herein with respect to a person shall mean to state the person's full name, present or last known home address, and present or last known place of employment.

13.     The term "identify" as used herein with respect to a company, firm, business trust, partnership, incorporated or unincorporated association, or other legal or commercial entity shall mean to state:

     a.  its name;

     b.  its nature, *e.g.*, firm, partnership, profit making corporation, fraternal association, etc.;

     c.  its present or last known address and telephone number;

     d.  if incorporated, licensed, or otherwise registered as required by law, the place of incorporation, licensing, or other registration, *e.g.*, city, state, province, etc.; and

     e.  its present or last known principal place of business.

14.     The term "state the basis" as used herein with reference to a particular claim, assertion, allegation, or contention shall mean:

    a.   identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

    b.   identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

    c.   state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and

    d.   state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

15.     All entities referred to herein shall be deemed to include their parent companies, subsidiaries, affiliates, directors, officers, employees, agents, successors, assigns, and representatives thereof, including attorneys, consultants, accountants, and investment bankers.

16.     The terms "Extreme," "Defendant," "you," "your," or "yours" as used herein shall each mean, unless otherwise specified in a particular request, Extreme Networks, Inc.

17.     The term "Cabletron" as used herein shall mean Cabletron Systems, Inc.

18.     The term "DEC" as used herein shall mean Digital Equipment Corporation.

19.     The term "Complaint" shall mean, collectively, the Complaint And Jury Demand filed in this action on June 21, 2005, and the second Complaint filed on November 4, 2005.

20.     The term "Answer" as used herein shall mean Extreme Networks, Inc.'s Answer And Counterclaim filed in this action on our about December 9, 2005.

21.     The term "Enterasys Patents" as used herein shall mean, collectively, the patents-in-suit which consist of the following six issued United States patents:  **(i)** No. 5,251,205 (the "'205 patent"); **(ii)** No. 5,390,173 (the "'173 patent"); **(iii)** No. 6,128,665 (the "'665 patent"); **(iv)** No. 6,147,995 (the "'995 patent"); **(v)** No. 6,539,022 (the "'022 patent"); **(vi)** No. 6,560,236 (the "'236 patent").

22.     The term "Damages Period" as used herein shall mean the time period beginning on June 21, 1999 and ending on the date upon which this action is fully resolved by way of settlement or final unappealable judgment.

23.     The term "Accused Extreme Products" as used herein shall mean any products sold or licensed by Extreme at any time during the Damages Period that belong to any of the following product families:  (i) Summit; (ii) BlackDiamond; (iii) Alpine; and any software used in connection with any Accused Features contained in any of these Accused Extreme Products including, but not limited to, ExtremeWare software and ISM software.

24.     The term "Accused Features" as used herein shall mean:

   a.   VLAN features, including IEEE 802.1Q VLANs, port-based VLANs, protocol-based VLANs, MAC-based VLANs, subnet-based VLANs, and default VLANs as those terms are used in Extreme's own technical and marketing literature;

    b.  IGMP snooping features, including RFC 1112 IGMP features, RFC 2236 IGMP

         features, and RFC 3376 IGMP features as those terms are used in Extreme's own

         technical and marketing literature;

    c.  Multi-Protocol Label Switching ("MPLS") features as that term is used in

         Extreme's own technical and marketing literature;

    d.  features involving any algorithm that can be used to calculate packet routes for all

         received packets regardless of the multiple different routing protocol suites (e.g.,

         the TCP/IP protocol suite; the OSI protocol suite; etc.) to which such packets may

         conform, and without the need to convert the destination address of any packet to

         an addressing convention associated with a routing protocol suite different from

         the one to which that packet conforms; and

    e.  features that add a second internal header to a data packet that consists of a field

         or fields that contain local source and/or destination addresses that have been

         translated or derived from the typically unique network source and/or destination

         addresses (e.g., MAC addresses) contained in a first header.

    25.    The term "Extreme Technical Documents" as used herein shall mean any type of

technical document that identifies, describes, explains, and/or shows the architecture,

functionality, performance characteristics, and/or configurability of any of the Extreme Products

potentially including, but not limited to, the following categories of documents: functional

specifications; hardware or software specifications; architecture specifications; systems

specifications; chip or chipset specifications; hardware schematics; user guides; installation

guides or notes; hardware guides; software guides; software command reference guides;

architecture guides or briefs; reference, quick reference, or base reference guides; configuration

guides; management guides; concept guides; design guides; command line interface reference guides; product guides or briefs; diagnostic guides; "getting started" guides; training guides, presentations or manuals; technical briefs; solutions briefs; white papers; technology primers; technical presentations; packet walk-throughs; product data sheets; product specification sheets; product bulletins; release notes; and application notes.

26.    The term "VLAN" as used herein shall mean a virtual local area network wherein groups of hosts and/or end stations are defined by their logical relationship rather than by their physical connectivity such that they can communicate as though they were on the same wire even though they may reside on physically different segments.

27.    The term "Default VLAN" as used herein shall mean a VLAN which has been initially defined during manufacture and prior to configuration.

28.    The term "VLAN-ID" as used herein shall mean a designation that identifies the VLAN with which a host, end station, and/or packet is associated.

29.    The term "VLAN Tagging" as used herein shall mean the process of inserting a field into a packet, or using a preexisting field, to provide an explicit identifier of the VLAN association for that packet (*e.g.*, a VLAN-ID).

30.    The term "Hub" as used herein shall mean a network device that joins communication lines at a central location so as to provide a common connection to all devices on a network.

31.    The term "Multicast Control Packet" as used herein shall mean the various types of IP datagrams described in the IGMP Standards, including host membership query packets, host membership report packets, join host group packets, and leave host group packets.

32.     The term "First Header" as used herein shall mean a protocol-specific field or fields that precede the encapsulated data of a packet and contain unique network source and/or destination addresses (*e.g.*, MAC addresses).

33.     The term "Second Internal Header" as used herein shall mean a field or fields used in conjunction with the encapsulated data of a packet that contain local source and/or destination addresses of typically shorter length that have been translated or derived from the unique addresses contained in the First Header.

34.     The term "Routing Algorithm" as used herein shall mean the process by which a router or switch computes effective routes through the network along which to forward a packet.

35.     The term "Routing Protocol" as used herein shall mean a protocol reflecting at least a standards-based network address allocation scheme, along with any associated scheme for formatting packets that is used in conjunction therewith.

36.     The term "Routing Protocol Suite" as used herein shall mean a comprehensive set of protocols, including a Routing Protocol, that are designed to work together to coherently provide complete communication capabilities in a network (*e.g.*, the TCP/IP protocol suite; the OSI protocol suite).

37.     The term "Link State Packet" as used herein shall mean a control packet into which a source router or switch places information about what hosts are attached to it, what links to other routers or switches are available, what the states of those links are, and/or what the identities are of the routers or switches on the other end of those links.

38.     The term "MPLS Encapsulation" as used herein shall mean a process whereby a data packet conforming to a particular Routing Protocol is placed within the data area associated with a new and additional header that conforms to a different Routing Protocol.

9

39.     The term "VLAN Standards" as used herein shall mean the standards promulgated by the Institute of Electrical and Electronics Engineers, Inc. ( the "IEEE") that define an architecture for virtual bridged local area networks, the services provided in such networks, and the protocols and algorithms involved in the provision of those services. Specifically, these VLAN Standards are memorialized in IEEE Standard 802.1Q (2003 ed.); IEEE Standard 802.1Q (1998 ed.); IEEE Standard 802.1u (2001 ed.); IEEE Standard 801.1v (2001 ed.); and/or IEEE Standard 802.1s (2002 ed.).

40.     The term "IGMP Standards" as used herein shall mean the protocols promulgated by The Internet Society's Internet Engineering Task Force (the "IETF") that define the internet group management protocol used by IP hosts to report their IP multicast group memberships to neighboring multicast routers.  Specifically, these IGMP Standards are memorialized in RFC 3376 (v.3 2002 ed.); RFC 2236 (v.2 1997 ed.); and/or RFC 1112 (v.1 1989 ed.).

41.     The term "MPLS Standards" as used herein shall mean the protocols promulgated by the IETF that define the architecture and/or protocols used for multiprotocol label switching. Specifically, these MPLS Standards are memorialized in at least the following documents:  RFC 2205; RFC 2370; RFC 2702; RFC 3031; RFC 3032; RFC 3036; RFC 3037; RFC 2209; RFC 3209; RFC 3270; Draft-ietf-mpls-rsvp-lsp-tunnel-08.txt; Draft-ietf-mpls-icmp-02.txt; Draft-katz-yeung-ospf-traffic-04.txt; Draft-martini-12circuit-encap-mpls-04.txt; Draft-martini-12circuit-trans-mpls-08.txt.

42.     The term "VLAN Standards Activities" as used herein shall mean any activities undertaken in connection with the development, approval, and/or issuance of the VLAN Standards.

43.    The term "IGMP Standards Activities" as used herein shall mean any activities undertaken in connection with the development, approval, and/or issuance of the IGMP Standards.

44.    The term "MPLS Standards Activities" as used herein shall mean any activities undertaken in connection with the development, approval, and/or issuance of the MPLS Standards.

## III.  INTERROGATORIES

The following specific interrogatories are subject to the "INSTRUCTIONS" and "DEFINITIONS" set forth above.

### INTERROGATORY NO. 1:

Describe in detail when, how, and through whom Extreme first became aware of the existence of each of the Enterasys Patents.

### INTERROGATORY NO. 2:

Separately identify by name, model and/or version number, and first and last sales date each and every type of Accused Extreme Product that Extreme has sold or licensed at any time during the Damages Period.

### INTERROGATORY NO. 3:

Separately for each and every type of Accused Extreme Product identified in your response to Interrogatory No. 2 above, state whether Extreme contends that it contains VLAN features that comply with any of the VLAN Standards, and if so identify which of these VLAN Standards said features purportedly comply with.

### INTERROGATORY NO. 4:

Separately for each and every type of Accused Extreme Product identified in your response to Interrogatory No. 2 above, state whether Extreme contends that it contains IGMP

features that comply with any of the IGMP Standards, and if so identify which of these IGMP

Standards said features purportedly comply with.

**INTERROGATORY NO. 5:**

Separately for each and every type of Accused Extreme Product identified in your

response to Interrogatory No. 2 above, state whether Extreme contends that it contains MPLS

features that comply with any of the MPLS Standards, and if so identify which of these MPLS

Standards said features purportedly comply with.

**INTERROGATORY NO. 6:**

Separately for each and every type of Accused Extreme Product identified in your

response to Interrogatory No.2 above, identify by name, manufacturer, and model number the

chips and/or chipsets contained in such products that perform switching and/or routing

functions such as packet classification, filtering, encapsulation, and/or forwarding.

**INTERROGATORY NO. 7:**

Separately for each and every type of Accused Extreme Product identified in your

response to Interrogatory No.2 above, identify by name and version number the operating

system software that runs in such products.

**INTERROGATORY NO. 8:**

With respect to the prosecution of any patent application (domestic or foreign) in which

Extreme has at any time held an interest, identify and describe each and every instance in

which the Enterasys Patents, or any patents bearing a familial relationship to the Enterasys

Patents, have been cited by the applicant or the examiner, and/or have been remarked upon by

the applicant.

**INTERROGATORY NO. 9:**

Describe in detail all efforts made by you, or by anyone acting on your behalf, to design

around any of the Enterasys Patents including, but not limited to, an identification of when

such efforts have taken place, the persons involved in such efforts and the nature of such efforts.

**INTERROGATORY NO. 10:**

State whether you have conducted, caused to be conducted, or received any information regarding any search, study, evaluation, investigation, opinion, advice, or assessment of the infringement, validity or enforceability of any of the Enterasys Patents. If the answer is affirmative, with respect to each, identify: the date it was requested, the person who requested it, the date on which it was received, the person who provided it, all persons who received it, all persons who performed the study, the form in which it was received (*e.g.*, oral or written; draft or final), any documents that set forth its result, any prior art located or discussed in it, and whether you intend to rely upon it as a defense to Enterasys' claim of willful infringement.

**INTERROGATORY NO. 11:**

Identify each and every prior art reference upon which Extreme bases in whole or in part its affirmative defense of patent invalidity, and as for each prior art reference so identified:

(a)    state which claim(s) of the Enterasys Patents the prior art reference allegedly anticipates;

(b)    state which combinations of prior art references allegedly render obvious which claim(s) of the Enterasys Patents;

(c)    for each claim that a prior art reference allegedly anticipates, describe in detail on an element-by-element base how the prior art reference anticipates the claim, including citations to specific column and line numbers of the prior art reference if applicable; and

(d)    for each claim that a combination of prior art references allegedly renders obvious, describe in detail on an element-by-element basis how the combination

renders the claim obvious, including citations to specific column and line numbers of the prior art references if applicable, and a detailed description of where there is a teaching, suggestion, and/or motivation to combine the prior art references.

Dated:  May 19, 2006

Respectfully served,

ENTERASYS NETWORKS, INC.

By its attorneys,

_____
Christopher P. Sullivan, Esq. (BBO No.485120)
Marc N. Henschke, Esq. (BBO No. 636146)
Alan E. McKenna (BBO No. 644556)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 Boylston Street, 25th Floor
Boston, MA 02199
Tel. (617) 267-2300

Of Counsel:
A. James Anderson, Esq. *(pro hac vice)*
Marla R. Butler, Esq. *(pro hac vice)*
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2600 One Atlanta Plaza
Atlanta, GA 30326-1386
Tel. (404) 760-4300

Robert A. Auchter, Esq. *(pro hac vice)*
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
1801 K Street, N.W.
Washington, DC  20006
Tel. (202) 775-0725

35031220

## CERTIFICATE OF SERVICE

I, Marc N. Henschke, hereby certify that on May 19, 2006, I caused the attached *Plaintiff Enterasys Networks, Inc.'s First Set Of Interrogatories To Defendant Extreme Networks, Inc.* to be served as indicated below by first class mail and/or by e-mail (PDF attachment) upon Defendant's counsel of record at the following addresses:

### By First Class Mail & E-Mail (PDF Attachment)

Vera M. Elson, Esq.
McDermott, Will & Emery LLP
3150 Porter Drive
Palo Alto, CA  93404-1212
<velson@mwe.com>

### By E-Mail (PDF Attachment)

David H. Dolkas, Esq.
<ddolkas@mwe.com>

Christopher D. Bright, Esq.
<cbright@mwe.com>

T. Nation
<tnation@mwe.com>

Dated:  May 19, 2006

_____
Marc N. Henschke

# Exhibit 14

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ENTERASYS NETWORKS, INC., | ) | Civil Action No: 05-CV-11298 (DPW) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FOUNDRY NETWORKS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF ENTERASYS NETWORKS, INC.'S FIRST SET OF REQUESTS**
**FOR THE PRODUCTION OF DOCUMENTS AND TANGIBLE THINGS**
**TO DEFENDANT EXTREME NETWORKS, INC.**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiff Enterasys Networks,

Inc. ("Enterasys" or "Plaintiff") hereby requests that Defendant Extreme Networks, Inc.

("Defendant" or "Extreme") provide written responses to these requests, and produce all

responsive documents and tangible things, within thirty (30) days of service of these requests.

## I. INSTRUCTIONS

1.      Defendant is required to respond to this request for production of documents and

tangible things by drawing upon all materials in its possession, ownership, custody, or control,

actual or constructive, including materials that Defendant has a right or ability to secure from

any other source. These sources include, but are not limited to, Defendant's employees,

agents, managing agents, attorneys, accountants, investment bankers, consultants, advisers,

officers, directors, or representatives of any type whatsoever. These sources further include,

but are not limited to, Defendant's predecessors, successors, parents, subsidiaries, affiliates,

divisions, and their respective employees, agents, managing agents, attorneys, accountants,

investment bankers, consultants, advisers, officers, directors, or representatives of any type whatsoever.

2.     If any document or tangible thing herein requested was, but no longer is, in Defendant's possession or subject to its control, whether actual or constructive, state what disposition was made of the document or tangible thing, why such disposition was made, to whom the document or tangible thing was transferred or delivered if applicable, where the document or tangible thing presently is located, and the date or dates (or approximate date or dates) on which such disposition was made.

3.     In the event that Defendant files a proper and timely objection to any portion of any individual request for the production of documents and tangible things presented herein, Defendant is required to respond to all other portions of that request that do not fall within the ambit of its objection.

4.     If any portion of any document or tangible thing is responsive to any production request herein, then the entire document or tangible thing must be produced.  If any requested document or tangible thing cannot be produced in full, then Defendant must produce that document or tangible thing to the greatest extent possible.  Whenever a document or tangible thing is not produced in full, or is produced in redacted form, Defendant must indicate that fact on the document or tangible thing produced.

5.     If any document or tangible thing responsive to a production request herein is withheld in whole or in part, for any reason whatsoever, including, but not limited to, any claim of privilege, work product, confidentiality, or trade secret, then Defendant must promptly provide a privilege log which states with respect to each such document, tangible thing, or withheld portion thereof: (a) the privilege or ground under which it is being withheld; (b) the

type of document or tangible thing (*e.g.*, memo, letter, e-mail); (c) a description of the subject matter thereof; (d) the identity of its author or creator; (e) the identity of all persons to whom it is addressed and all persons to whom copies thereof ever have been furnished; (f) the date thereof; and (g) the present custodian and location thereof.

6.    If there do not exist documents or tangible things responsive to a specific production request herein, then Defendant must indicate that fact in its written response hereto.

7.    The documents or tangible things produced in response hereto shall be segregated and clearly marked or labeled so as to correspond to the specific production requests to which such documents or tangible things are responsive and are being produced.  Alternatively, such documents or tangible things shall be produced as they are kept in the usual course of business, including the production of the files and file labels from which such documents or tangible things are taken.

8.    All documents or tangible things produced pursuant hereto are to be delivered to Marc N. Henschke, Esq. at the offices of Robins, Kaplan, Miller & Ciresi L.L.P., 800 Boylston Street, 25th Floor, Boston, Massachusetts 02199.

9.    This is a continuing request for the production of documents and tangible things. Thus, if after making its initial production(s), Defendant becomes aware of any additional responsive documents or tangible things in its possession, ownership, custody or control (actual or constructive), including materials which it has a right to secure from any other source, Defendant is required without further request to produce, or to make available for inspection and copying, such additional documents or tangible things.

## II. **DEFINITIONS**

1.    The terms "documents" and "tangible things" as used herein shall mean each non-identical copy of any of the types of materials referenced in Local Rule 26.5(c)(2) and Fed. R. Civ. P. 34(a), and shall specifically include emails, voice mails, instant messages, and computer data, and any electronic, magnetic, or digital media on which information can be stored, including but not limited to tapes, hard drives, discs, and any other form of computer memory.

2.    The term "non-identical copy" as used herein shall mean any document or tangible thing that, but-for markings, additions, deletions, signatures, modifications of any kind (including, but not limited to, notations on the backs or margins of pages thereof, blind carbon copy notations, attachments, alterations, amendments, or mark-ups) would otherwise be identical to other documents or tangible things responsive to any production request herein.  Each non-identical copy constitutes a distinct document or tangible thing and must be produced in response hereto.

3.    The term "meeting(s)" as used herein shall mean any assembly, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged, or scheduled in advance, whether or not occurring face-to-face or by other means including, without limitation, by telephone, videoconference or instant messaging, and whether or not the meeting was informal or formal or occurred in connection with some other activity.

4.    The term "agreement" as used herein shall mean any contract, transaction, or other arrangement of any kind, whether conditional, executed, executory, express, or implied, and whether oral or written, in which rights are granted or obligations assumed.  The term "agreement" shall apply to completed, actual, contemplated, or attempted agreements or renewals of agreements.

5.      The term "negotiate" or any variant thereof as used herein shall mean, without limitation, any deliberations, discussions, conferences, bargaining or trading between parties or their agents, representatives, counsel, or any other persons as herein defined.

6.      The term "any" shall mean "any and all." The term "all" as used herein also shall mean "any and all."

7.      The terms "and" and "or" as used herein shall be construed conjunctively or disjunctively to bring within the scope of these production requests any and all information which might otherwise be construed as outside their scope.

8.      The singular form of a noun or pronoun shall be considered to include within its meaning the plural form of the noun or pronoun so used, and vice versa; the use of the masculine form of a pronoun also includes within its meaning the feminine form of the pronoun so used, and vice versa; and the use of any tense of any verb includes also within its meaning all other tenses of the verb so used.

9.      The term "communication" as used herein shall mean the transmittal of information in the form of facts, ideas, inquiries or otherwise.

10.      The term "person" as used herein shall mean any natural person or any business, legal, or governmental entity or association.

11.      The term "concerning" as used herein shall mean referring to, describing, evidencing, or constituting.

12.      All entities referred to herein shall be deemed to include their parent companies, subsidiaries, affiliates, directors, officers, employees, agents, successors, assigns, and representatives thereof, including attorneys, consultants, accountants, and investment bankers.

13.     The terms "Extreme," "Defendant," "you," "your," or "yours" as used herein shall each mean, unless otherwise specified in a particular request, Extreme Networks, Inc.

14.     The term "Cabletron" as used herein shall mean Cabletron Systems, Inc.

15.     The term "DEC" as used herein shall mean Digital Equipment Corporation.

16.     The term "Complaint" shall mean, collectively, the Complaint And Jury Demand filed in this action on June 21, 2005, and the second Complaint filed on November 4, 2005.

17.     The term "Answer" as used herein shall mean Extreme Networks, Inc.'s Answer And Counterclaim filed in this action on our about December 9, 2005.

18.     The term "Enterasys Patents" as used herein shall mean, collectively, the patents-in-suit which consist of the following six issued United States patents:  **(i)** No. 5,251,205 (the "'205 patent"); **(ii)** No. 5,390,173 (the "'173 patent"); **(iii)** No. 6,128,665 (the "'665 patent"); **(iv)** No. 6,147,995 (the "'995 patent"); **(v)** No. 6,539,022 (the "'022 patent"); **(vi)** No. 6,560,236 (the "'236 patent").

19.     The term "Damages Period" as used herein shall mean the time period beginning on June 21, 1999 and ending on the date upon which this action is fully resolved by way of settlement or final unappealable judgment.

20.     The term "Extreme Products" as used herein shall mean any products sold or licensed by Extreme at any time during the Damages Period including, but not limited to, products belonging to any of the following product families:  ExtremeWare; Summit; BlackDiamond; Alpine; and ISM software.

21.     The term "Extreme Technical Documents" as used herein shall mean any type of technical document that identifies, describes, explains, and/or shows the architecture, functionality, performance characteristics, and/or configurability of any of the Extreme Products

potentially including, but not limited to, the following categories of documents: functional specifications; hardware or software specifications; architecture specifications; systems specifications; chip or chipset specifications; hardware schematics; user guides; installation guides or notes; hardware guides; software guides; software command reference guides; architecture guides or briefs; reference, quick reference, or base reference guides; configuration guides; management guides; concept guides; design guides; command line interface reference guides; product guides or briefs; diagnostic guides; "getting started" guides; training guides, presentations or manuals; technical briefs; solutions briefs; white papers; technology primers; technical presentations; packet walk-throughs; product data sheets; product specification sheets; product bulletins; release notes; and application notes.

22.     The term "VLAN" as used herein shall mean a virtual local area network wherein groups of hosts and/or end stations are defined by their logical relationship rather than by their physical connectivity such that they can communicate as though they were on the same wire even though they may reside on physically different segments.

23.     The term "Default VLAN" as used herein shall mean a VLAN which has been initially defined during manufacture and prior to configuration.

24.     The term "VLAN-ID" as used herein shall mean a designation that identifies the VLAN with which a host, end station, and/or packet is associated.

25.     The term "VLAN Tagging" as used herein shall mean the process of inserting a field into a packet, or using a preexisting field, to provide an explicit identifier of the VLAN association for that packet (*e.g.*, a VLAN-ID).

26.     The term "Hub" as used herein shall mean a network device that joins communication lines at a central location so as to provide a common connection to all devices on a network.

27.     The term "Multicast Control Packet" as used herein shall mean the various types of IP datagrams described in the IGMP Standards, including host membership query packets, host membership report packets, join host group packets, and leave host group packets.

28.     The term "First Header" as used herein shall mean a protocol-specific field or fields that precede the encapsulated data of a packet and contain unique network source and/or destination addresses (*e.g.*, MAC addresses).

29.     The term "Second Internal Header" as used herein shall mean a field or fields used in conjunction with the encapsulated data of a packet that contain local source and/or destination addresses of typically shorter length that have been translated or derived from the unique addresses contained in the First Header.

30.     The term "Routing Algorithm" as used herein shall mean the process by which a router or switch computes effective routes through the network along which to forward a packet.

31.     The term "Routing Protocol" as used herein shall mean a protocol reflecting at least a standards-based network address allocation scheme, along with any associated scheme for formatting packets that is used in conjunction therewith.

32.     The term "Routing Protocol Suite" as used herein shall mean a comprehensive set of protocols, including a Routing Protocol, that are designed to work together to coherently provide complete communication capabilities in a network (*e.g.*, the TCP/IP protocol suite; the OSI protocol suite).

33.    The term "Link State Packet" as used herein shall mean a control packet into which a source router or switch places information about what hosts are attached to it, what links to other routers or switches are available, what the states of those links are, and/or what the identities are of the routers or switches on the other end of those links.

34.    The term "MPLS Encapsulation" as used herein shall mean a process whereby a data packet conforming to a particular Routing Protocol is placed within the data area associated with a new and additional header that conforms to a different Routing Protocol.

35.    The term "VLAN Standards" as used herein shall mean the standards promulgated by the Institute of Electrical and Electronics Engineers, Inc. ( the "IEEE") that define an architecture for virtual bridged local area networks, the services provided in such networks, and the protocols and algorithms involved in the provision of those services. Specifically, these VLAN Standards are memorialized in IEEE Standard 802.1Q (2003 ed.); IEEE Standard 802.1Q (1998 ed.); IEEE Standard 802.1u (2001 ed.); IEEE Standard 801.1v (2001 ed.); and/or IEEE Standard 802.1s (2002 ed.).

36.    The term "IGMP Standards" as used herein shall mean the protocols promulgated by The Internet Society's Internet Engineering Task Force (the "IETF") that define the internet group management protocol used by IP hosts to report their IP multicast group memberships to neighboring multicast routers.  Specifically, these IGMP Standards are memorialized in RFC 3376 (v.3 2002 ed.); RFC 2236 (v.2 1997 ed.); and/or RFC 1112 (v.1 1989 ed.).

37.    The term "MPLS Standards" as used herein shall mean the protocols promulgated by the IETF that define the architecture and/or protocols used for multiprotocol label switching. Specifically, these MPLS Standards are memorialized in at least the following documents:  RFC 2205; RFC 2370; RFC 2702; RFC 3031; RFC 3032; RFC 3036; RFC 3037; RFC 2209; RFC

3209; RFC 3270; Draft-ietf-mpls-rsvp-lsp-tunnel-08.txt; Draft-ietf-mpls-icmp-02.txt; Draft-katz-yeung-ospf-traffic-04.txt; Draft-martini-12circuit-encap-mpls-04.txt; Draft-martini-12circuit-trans-mpls-08.txt.

38.    The term "VLAN Standards Activities" as used herein shall mean any activities undertaken in connection with the development, approval, and/or issuance of the VLAN Standards.

39.    The term "IGMP Standards Activities" as used herein shall mean any activities undertaken in connection with the development, approval, and/or issuance of the IGMP Standards.

40.    The term "MPLS Standards Activities" as used herein shall mean any activities undertaken in connection with the development, approval, and/or issuance of the MPLS Standards.

## III.  REQUESTED DOCUMENTS AND TANGIBLE THINGS

The following specific requests for the production of documents and tangible things are subject to the "INSTRUCTIONS" and "DEFINITIONS" set forth above.

**REQUEST FOR PRODUCTION NO. 1:**

All documents and tangible things in your possession, custody, or control that concern, or refer or relate to, Enterasys.

**REQUEST FOR PRODUCTION NO. 2:**

All documents and tangible things in your possession, custody, or control that concern, or refer or relate to, any of the Enterasys Patents, or any aspects of their respective prosecution histories.

**REQUEST FOR PRODUCTION NO. 3:**

All documents and tangible things in your possession, custody, or control that concern, or refer or relate to, any of the named inventors of any of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 4:**

All documents and tangible things in your possession, custody, or control that concern, or refer or relate to, the existence or subject matter of the present action.

**REQUEST FOR PRODUCTION NO. 5:**

All documents and tangible things in your possession, custody, or control that constitute Board of Director meeting minutes, or materials provided to any Director, that pertain to Enterasys, the Enterasys Patents, or the existence or subject matter of the present action.

**REQUEST FOR PRODUCTION NO. 6:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any communications between Extreme on the one hand, and Enterasys, Cabletron, or DEC on the other hand.

**REQUEST FOR PRODUCTION NO. 7:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to communications between Extreme on the one hand, and Extreme Networks, Inc. on the other hand, that pertain to Enterasys, the Enterasys Patents, the prosecution histories or inventors of the Enterasys Patents, or the existence or subject matter of the present action.

**REQUEST FOR PRODUCTION NO. 8:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any actual or contemplated joint defense agreement between Extreme and Extreme Networks, Inc. pertaining to the present action.

11

**REQUEST FOR PRODUCTION NO. 9:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to communications between Extreme on the one hand, and any other person or entity on the other hand, that pertain to Enterasys, the Enterasys Patents, the prosecution histories or inventors of the Enterasys Patents, or the existence or subject matter of the present action.

**REQUEST FOR PRODUCTION NO. 10:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that concern, or refer or relate to, establishing whether or how any of the Extreme Products support, enable, or implement the VLAN Standards, or whether or how they can be configured to do so.

**REQUEST FOR PRODUCTION NO. 11:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the handling of, and/or the forwarding or filtering decisions made relative to, any data packet received through one of the port based Default VLAN ports contained in any of the Extreme Products, including in circumstances where any destination port for that data packet is either determined or not determined to be a Default VLAN port.

**REQUEST FOR PRODUCTION NO. 12:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to efforts to filter or otherwise prevent any data packet received through one of the port based Default VLAN ports contained in any of the Extreme Products from being transmitted to any destination port associated with a VLAN other than the Default VLAN.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how VLAN Tagging occurs or may occur in any of the Extreme Products in relation to any data packet received through one of the port based Default VLAN ports.

**REQUEST FOR PRODUCTION NO. 14:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the handling of, and/or the forwarding or filtering decisions made relative to, any broadcast message received through one of the port based Default VLAN ports contained in any of the Extreme Products, including in circumstances where any destination port for that broadcast message is either determined or not determined to be a Default VLAN port.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to efforts to filter, discard, or otherwise prevent any broadcast message received through one of the port based Default VLAN ports contained in any of the Extreme Products from being transmitted to any destination port associated with a VLAN other than the Default VLAN.

**REQUEST FOR PRODUCTION NO. 16:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that concern, or refer or relate to, establishing whether or how any of the Extreme Products allow for, or can be configured to allow for, a port based Default VLAN to be formed on a Hub.

**REQUEST FOR PRODUCTION NO. 17:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how VLAN-IDs are or can be used in any of the Extreme Products in relation to any port based VLAN ports, and/or in relation to any data packets received on such ports.

**REQUEST FOR PRODUCTION NO. 18:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the handling of, and/or the forwarding or filtering decisions made relative to, any multicast or other data packet received through one of the port based VLAN ports contained in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 19:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any multicast or other data packet received through one of the port based VLAN ports contained in any of the Extreme Products is flooded to all other ports assigned with the same VLAN-ID as the receiving port.

**REQUEST FOR PRODUCTION NO. 20:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how determinations are made as to the source and/or destination of any data packet received through one of the port based VLAN ports contained in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 21:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the handling of, and/or the forwarding or filtering decisions made relative to, a data packet received through

one of the port based VLAN ports contained in any of the Extreme Products in circumstances where the VLAN-ID associated with the source host and/or end station of that packet is determined to be different from the VLAN-ID associated with the destination of that packet.

**REQUEST FOR PRODUCTION NO. 22:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any tagged multicast packet received through a port other than one of the port based VLAN ports contained in any of the Extreme Products is flooded to all other ports assigned with the same VLAN-ID as the VLAN-ID contained in that tagged packet.

**REQUEST FOR PRODUCTION NO. 23:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any tagged multicast packet received through a port other than one of the port based VLAN ports contained in any of the Extreme Products gets untagged.

**REQUEST FOR PRODUCTION NO. 24:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how protocol identifiers are or can be assigned to any of the port based VLAN-IDs used in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 25:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how VLAN Tagging occurs or may occur in any of the Extreme Products in relation to any data packet received through one of the port based VLAN ports.

**REQUEST FOR PRODUCTION NO. 26:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any tagged multicast packet received through one of the port based VLAN ports contained in any of the Extreme Products is flooded to all other ports assigned with the same VLAN-ID as the VLAN-ID contained in the tagged packet.

**REQUEST FOR PRODUCTION NO. 27:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any of the Extreme Products perform VLAN Tagging by replacing a redundant information field contained within a data packet with a VLAN-ID.

**REQUEST FOR PRODUCTION NO. 28:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how determinations are made in any of the Extreme Products as to what VLAN-ID is associated with a particular data packet and/or with the source host and/or end station of that data packet.

**REQUEST FOR PRODUCTION NO. 29:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how in any of the Extreme Products a determination as to the VLAN-ID associated with the source host of a broadcast, multicast, or destination unknown data packet affects, impacts, or relates to the handling of, and/or the forwarding or filtering decisions made relative to, such a data packet.

**REQUEST FOR PRODUCTION NO. 30:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the content, nature, population, location, programming interface, or use of any tables or other data structures contained in any of the Extreme Products involved in the mapping of VLAN-IDs to associated hosts, end stations, and/or to associated ports.

**REQUEST FOR PRODUCTION NO. 31:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how VLAN Tagging occurs or may occur in any of the Extreme Products in relation to broadcast, multicast, or destination unknown data packets.

**REQUEST FOR PRODUCTION NO. 32:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any tagged broadcast, multicast, or destination unknown data packet in any of the Extreme Products gets untagged.

**REQUEST FOR PRODUCTION NO. 33:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to efforts to filter, discard, or otherwise prevent transmission of any broadcast, multicast, or destination unknown packet received in any of the Extreme Products in circumstances where none of its potential destination ports are determined to be associated with the same VLAN-ID that is associated with its source host and/or end station.

**REQUEST FOR PRODUCTION NO. 34:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the handling of, and/or the forwarding or filtering decisions made relative to, a broadcast, multicast, or destination unknown data packet in any of the Extreme Products in circumstances where that packet is of a protocol not supported by the switch that receives it.

**REQUEST FOR PRODUCTION NO. 35:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any of the Extreme Products are or can be used in conjunction with a logical multicast channel formed by physical links for carrying multicast traffic that establish point-to-point connections between switches.

**REQUEST FOR PRODUCTION NO. 36:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to identifying or explaining the criteria or bases on which VLAN-IDs are assigned in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 37:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any of the Extreme Products maintain status tables or other status data structures reflecting whether ports associated with a particular VLAN are in a state of enablement or disablement.

**REQUEST FOR PRODUCTION NO. 38:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any of the Extreme Products use Simple Network Management Protocol ("SNMP") messages to maintain any VLAN mapping tables or other mapping data structures.

**REQUEST FOR PRODUCTION NO. 39:**

All documents and tangible things in your possession, custody, or control that reflect, concern, or refer or relate to establishing whether or how any of the Extreme Products support, enable, or implement the IGMP Standards, or whether or how they can be configured to do so.

**REQUEST FOR PRODUCTION NO. 40:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how determinations are made in any of the Extreme Products as to whether a received packet is a Multicast Control Packet.

**REQUEST FOR PRODUCTION NO. 41:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how determinations are made in any of the Extreme Products as to the intended destination for any received Multicast Control Packet.

**REQUEST FOR PRODUCTION NO. 42:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any of the Extreme Products use Multicast Control Packets to identify or determine the multicast group memberships of any hosts, end stations, and/or ports.

**REQUEST FOR PRODUCTION NO. 43:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the content, nature, population, programming interface, or use of any multicast forwarding tables or other multicast forwarding data structures contained in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 44:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any of the Extreme Products use information learned or determined from received Multicast Control Packets to populate, de-populate, and/or update any multicast forwarding tables or other multicast forwarding data structures.

**REQUEST FOR PRODUCTION NO. 45:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any multicast forwarding tables or other multicast forwarding data structures contained in any of the Extreme Products correlate, cross-reference, or associate the port on which a Multicast Control Packet is received with any identified multicast group, and/or with any host and/or end station that is a member of such a group.

**REQUEST FOR PRODUCTION NO. 46:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how determinations are made in any of the Extreme Products as to the source host and/or end station of any received Multicast Control Packet.

**REQUEST FOR PRODUCTION NO. 47:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any multicast forwarding tables or other multicast forwarding data structures contained in any of the Extreme Products correlate, cross-reference, or associate the source host and/or end station of any received Multicast Control Packet with any identified multicast group, and/or with any port associated with such a group.

**REQUEST FOR PRODUCTION NO. 48:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how determinations are made in any of the Extreme Products as to whether a received data packet has a multicast group as a destination address.

**REQUEST FOR PRODUCTION NO. 49:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any of the Extreme Products use data contained in any multicast forwarding tables or other multicast forwarding data structures to make determinations as to the handling of, and/or the forwarding or filtering of, any received data packet that has a multicast group as a destination address.

**REQUEST FOR PRODUCTION NO. 50:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the handling of, and/or the forwarding or filtering decisions made relative to, any data packet with a multicast group destination address in circumstances where any multicast forwarding tables or other

multicast forwarding data structures contained in any of the Extreme Products lack any data associated with that multicast group.

**REQUEST FOR PRODUCTION NO. 51:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how the enablement or disablement of IGMP features in any of the Extreme Products affects whether received data packets with multicast group destination addresses will be flooded within a VLAN or on a network-wide basis.

**REQUEST FOR PRODUCTION NO. 52:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how a Second Internal Header is applied to any data packet in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 53:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to identifying the content of any Second Internal Header that gets applied to any data packet in any of the Extreme Products including, but not limited to, a specific identification of the types of information and/or fields that are contained in any such Second Internal Header.

**REQUEST FOR PRODUCTION NO. 54:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to identifying the physical location within any of the Extreme Products where any Second Internal Header gets applied to any data packet including, but not limited to, a specific identification of any chips within which such a process occurs.

**REQUEST FOR PRODUCTION NO. 55:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any local source and/or destination addresses contained in any Second Internal Header applied to any data packet in any of the Extreme Products are translated or derived from the unique source and/or destination addresses contained in the First Header of any such packet.

**REQUEST FOR PRODUCTION NO. 56:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to the handling of, and/or the forwarding or filtering decisions made relative to, any data packet in any of the Extreme Products based upon the content of its Second Internal Header.

**REQUEST FOR PRODUCTION NO. 57:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how a Second Internal Header get removed from any data packet in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 58:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to identifying the physical location within any of the Extreme Products where any Second Internal Header gets removed from any data packet including, but not limited to, a specific identification of any chips within which such a process occurs.

**REQUEST FOR PRODUCTION NO. 59:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or

how any Second Internal Header applied to any data packet in any of the Extreme Products

contains link numbers which serve to locally identify or name any network segments or links.

**REQUEST FOR PRODUCTION NO. 60:**

    All documents and tangible things in your possession, custody, or control (including

Extreme Technical Documents) sufficient to identify the number of binary digits (*i.e.*, bits) that

comprise any local source and/or destination addresses contained in any Second Internal

Header applied to any data packet in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 61:**

    All documents and tangible things in your possession, custody, or control (including

Extreme Technical Documents) sufficient to establish whether any of the Extreme Products are

capable of handling Fiber Distributed Data Interface ("FDDI") links.

**REQUEST FOR PRODUCTION NO. 62:**

    All documents and tangible things in your possession, custody, or control (including

Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or

how any Second Internal Header applied to any data packet in any of the Extreme Products

contains a field or fields that specify a service class or queue number for that data packet.

**REQUEST FOR PRODUCTION NO. 63:**

    All documents and tangible things in your possession, custody, or control (including

Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or

how any Second Internal Header applied to any data packet in any of the Extreme Products

contains a field or fields that specify a protocol class for that data packet.

**REQUEST FOR PRODUCTION NO. 64:**

    All documents and tangible things in your possession, custody, or control (including

Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or

how any Second Internal Header applied to any data packet in any of the Extreme Products contains a field or fields that indicate the status of local network congestion.

**REQUEST FOR PRODUCTION NO. 65:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to establishing whether or how any of the Extreme Products support, enable, or implement the MPLS Standards, or whether or how they can be configured to do so.

**REQUEST FOR PRODUCTION NO. 66:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any Routing Algorithm employed by any of the Extreme Products can be used to calculate packet routes for all received packets regardless of the multiple different Routing Protocol Suites to which such packets may conform.

**REQUEST FOR PRODUCTION NO. 67:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any Routing Algorithm employed by any of the Extreme Products can be used to calculate packet routes for all received packets without the need to convert the destination address of any packet to an addressing convention associated with a Routing Protocol Suite different from the one to which that packet conforms.

**REQUEST FOR PRODUCTION NO. 68:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how any Routing Algorithm employed by any of the Extreme Products that supports multiple

Routing Protocols can make use of information contained in any Link State Packets in performing its calculations of packet routes.

**REQUEST FOR PRODUCTION NO. 69:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, where, or how determinations are made in any of the Extreme Products to perform an MPLS Encapsulation on a data packet.

**REQUEST FOR PRODUCTION NO. 70:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, where, or how determinations are made in any of the Extreme Products to remove a data packet from an MPLS Encapsulation.

**REQUEST FOR PRODUCTION NO. 71:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to how it is determined in any of the Extreme Products which Routing Protocol to use when performing an MPLS Encapsulation on a data packet.

**REQUEST FOR PRODUCTION NO. 72:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to identifying which Routing Protocol Suites any of the Extreme Products are capable of supporting.

**REQUEST FOR PRODUCTION NO. 73:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or

how any Routing Protocol can be used in any of the Extreme Products to determine if an

MPLS Encapsulation should be performed on a data packet.

**REQUEST FOR PRODUCTION NO. 74:**

All documents and tangible things in your possession, custody, or control (including

Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or

how any Routing Protocol can be used in any of the Extreme Products to determine multiple

routes along which a data packet can be sent.

**REQUEST FOR PRODUCTION NO. 75:**

All documents and tangible things in your possession, custody, or control (including

Extreme Technical Documents) that reflect, concern, or refer or relate to the functionality,

architecture, and/or configurability of Extreme's ExtremeWare XOS MPLS Application

Module.

**REQUEST FOR PRODUCTION NO. 76:**

All documents and tangible things in your possession, custody, or control (including

Extreme Technical Documents) sufficient to identify by name and model number the chips

and/or chipsets used in each of the Extreme Products including, but not limited to, a specific

identification of the chips that perform switching and/or routing functions such as packet

classification, filtering, encapsulation, and/or forwarding.

**REQUEST FOR PRODUCTION NO. 77:**

All documents and tangible things in your possession, custody, or control that

constitute functional, hardware, and/or architectural specifications for any of the chips that

perform switching and/or routing functions in any of the Extreme Products such as packet

classification, filtering, encapsulation, and/or forwarding.

**REQUEST FOR PRODUCTION NO. 78:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to any comparisons or contrasts drawn between the functionality, architectures, and/or configurability of Extreme's "i" series chipset and any other chipsets used in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 79:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect the architecture and/or functional design of any of the chips and/or chipsets used in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 80:**

All documents and tangible things in your possession, custody, or control that constitute or reflect any indemnifications that Extreme has been provided by any supplier of chips used in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 81:**

All documents and tangible things in your possession, custody, or control that constitute or reflect any non-disclosure agreements that Extreme has entered into with any supplier of chips used in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 82:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) sufficient to identify by name and version number the operating system software that has run in each of the Extreme Products at any and all times during the Damages Period.

**REQUEST FOR PRODUCTION NO. 83:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) sufficient to identify where within each of the Extreme Products its operating system software physically resides.

**REQUEST FOR PRODUCTION NO. 84:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) sufficient to identify what memory devices are contained in each of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 85:**

All documents and tangible things in your possession, custody, or control (including Extreme Technical Documents) that reflect, concern, or refer or relate to whether, when, or how Extreme's network management software -- including its EPICenter Network Management Software and/or ExtremeWare Vista -- can be used to configure VLAN, IGMP snooping, and/or MPLS features contained in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 86:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any constructions or interpretations of any claim(s) of any of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 87:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any communications, statements, or opinions of your officers, directors, employees, or consultants concerning the actual or potential infringement or non-infringement; validity or invalidity; or enforceability or unenforceability of any claim(s) of any of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 88:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any communications, statements, or opinions of any third parties concerning the actual or potential infringement or non-infringement, validity or invalidity; or enforceability or unenforceability of any claim(s) of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 89:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any legal opinion (including opinion letters or memoranda) concerning the actual or potential infringement or non-infringement; validity or invalidity; or enforceability or unenforceability of any claim(s) of any of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 90:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to comparisons or contrasts drawn between the VLAN Standards, the IGMP Standards, or the MPLS Standards on the one hand, and the scope of any claim(s) of any of the Enterasys Patents on the other hand.

**REQUEST FOR PRODUCTION NO. 91:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to claim constructions that Extreme has served or filed in any other patent infringement litigations to which it has been a party that involve patents covering networking-related devices or methods.

**REQUEST FOR PRODUCTION NO. 92:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any inventive activity, public knowledge or use, patent, printed publication, or other prior art reference that you contend invalidates -- whether

standing alone or in combination with any other reference -- any claim(s) of any of the Enterasys Patents within the meaning of 35 U.S.C. §§ 102 or 103.

**REQUEST FOR PRODUCTION NO. 93:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any patentability or state of the art search, literature search, patentability or state of the art opinion, validity search, validity opinion, enforceability opinion, and/or infringement opinion related to the alleged inventions described in the Enterasys Patents or any counterparts or continuations thereof, including, but not limited to, all search reports and opinions, and all patents, publications, and other references identified in such searches and opinions.

**REQUEST FOR PRODUCTION NO. 94:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to references cited by or to the USPTO or any foreign patent office during the prosecution of any of the Enterasys Patents or any counterparts or continuations thereof.

**REQUEST FOR PRODUCTION NO. 95:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any secondary consideration of non-obviousness (including, but not limited to, commercial success, long felt need, and industry acquiescence) of the subject matter of any claim(s) of any of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 96:**

All documents and tangible things in your possession, custody, or control upon which Defendant intends to rely to establish the level of ordinary skill in the art to which any of the Enterasys Patents pertain.

**REQUEST FOR PRODUCTION NO. 97:**

All documents and tangible things in your possession, custody, or control sufficient to establish when and how Extreme first became aware of the existence of each of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 98:**

All documents and tangible things in your possession, custody, or control that constitute any unpublished patent applications assigned to Extreme, and/or portions of their prosecution histories, that reference or cite to any of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 99:**

All documents and tangible things in your possession, custody, or control that constitute or reflect any explanations, instructions, directions, or training that Extreme has provided or made available to any of its customers pertaining to how to install, use, configure, and/or repair any of the VLAN, IGMP snooping, and/or MPLS features contained in any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 100:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any information known to Extreme concerning how in practice any of its customers have used or configured any of the VLAN, IGMP snooping, and/or MPLS features contained in any of the Extreme Products that such customers have purchased or licensed.

**REQUEST FOR PRODUCTION NO. 101:**

All documents and tangible things in your possession, custody, or control that constitute or reflect indemnifications provided by Extreme to any of its customers against potential patent infringement claims brought by third parties targeting the use of any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 102:**

All documents and tangible things in your possession, custody, or control sufficient to identify each of Extreme's customers and which of the Extreme Products that each such customer has purchased or licensed.

**REQUEST FOR PRODUCTION NO. 103:**

All documents and tangible things in your possession, custody, or control sufficient to identify the first date of sale (and if applicable the last date of sale) of each of the Extreme Products that have been sold or licensed at any or all times during the Damages Period.

**REQUEST FOR PRODUCTION NO. 104:**

All documents and tangible things in your possession, custody, or control that constitute or reflect any standard or extended hardware warranties and/or software warranties that Extreme has provided to its customers that cover any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 105:**

All documents and tangible things in your possession, custody, or control that constitute any standard or extended service contracts that Extreme has provided to its customers that cover any of the Extreme Products.

**REQUEST FOR PRODUCTION NO. 106:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any tests or customer demonstrations undertaken by Extreme in which the VLAN, IGMP snooping, and/or MPLS features contained in any of the Extreme Products have been used within a network environment.

**REQUEST FOR PRODUCTION NO. 107:**

All documents and tangible things in your possession, custody, or control sufficient to identify which of the Extreme Products that Extreme itself has used in the networks employed at any of its own facilities.

**REQUEST FOR PRODUCTION NO. 108:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any VLAN Standards Activities undertaken by representatives of DEC, Cabletron, Enterasys, or Extreme.

**REQUEST FOR PRODUCTION NO. 109:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any IGMP Standards Activities undertaken by representatives of DEC, Cabletron, Enterasys, or Extreme.

**REQUEST FOR PRODUCTION NO. 110:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any MPLS Standards Activities undertaken by representatives of DEC, Cabletron, Enterasys, or Extreme.

**REQUEST FOR PRODUCTION NO. 111:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to any actual or potential efforts to design-around any claim(s) of any of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 112:**

All documents and tangible things in your possession, custody, or control that constitute insurance policies that actually or potentially provide coverage to Extreme for any of the liabilities, costs, or expenses arising from this action.

**REQUEST FOR PRODUCTION NO. 113:**

All documents and tangible things in your possession, custody, or control that constitute, reflect, concern, or refer or relate to Extreme's policies or practices with respect to the retention, destruction, and/or disposition of documents and tangible things (including electronic data) at any time during the Damages Period.

**REQUEST FOR PRODUCTION NO. 114:**

All documents and tangible things in your possession, custody, or control that constitute organizational charts or other documents from which it is possible to ascertain the identities, titles, and reporting relationships of all officers, directors, and engineering employees of Extreme at any and all times during the Damages Period.

**REQUEST FOR PRODUCTION NO. 115:**

All documents and tangible things in your possession, custody, or control relevant to proving or disproving the affirmative defense asserted in your Answer that one or more claims of the Enterasys Patents are invalid.

**REQUEST FOR PRODUCTION NO. 116:**

All documents and tangible things in your possession, custody, or control relevant to proving or disproving the affirmative defense asserted in your Answer that Enterasys is stopped from asserting certain of its claim constructions in this action as the result of any disclaimers or surrenders of subject matter made by the patentees when prosecuting any of the Enterasys Patents.

**REQUEST FOR PRODUCTION NO. 117:**

All documents and tangible things in your possession, custody, or control relevant to proving or disproving the affirmative defense asserted in your Answer that Extreme cannot be liable for infringement under 35 U.S.C. §§ 271(b) or (c) on grounds that some or all of the Extreme Products are capable of substantial non-infringing uses.

**REQUEST FOR PRODUCTION NO. 118:**

All documents and tangible things in your possession, custody, or control relevant to proving or disproving the counterclaim asserted in your Answer that one or more claims of the Enterasys Patents are non-infringed by any of the Extreme Products.

Dated: March 3, 2006

Respectfully served,

ENTERASYS NETWORKS, INC.

By its attorneys,

_____

Christopher P. Sullivan, Esq. (BBO No.485120)
Marc N. Henschke, Esq. (BBO No. 636146)
Alan E. McKenna (BBO No. 644556)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 Boylston Street, 25th Floor
Boston, MA 02199
Tel. (617) 267-2300

Of Counsel:
A. James Anderson, Esq. *(pro hac vice)*
Marla R. Butler, Esq. *(pro hac vice)*
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2600 One Atlanta Plaza
Atlanta, GA 30326-1386
Tel. (404) 760-4300

Robert A. Auchter, Esq. *(pro hac vice)*
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
1801 K Street, N.W.
Washington, DC  20006
Tel. (202) 775-0725

35029741

36

## CERTIFICATE OF SERVICE

I, Marc N. Henschke, hereby certify that on March 3, 2006, I caused the attached *Plaintiff Enterasys Networks, Inc.'s First Set Of Requests For The Production Of Documents And Tangible Things To Defendant Extreme Networks, Inc.* to be served as indicated below by hand delivery or overnight Federal Express upon Defendant's counsel of record at the following addresses:

**By Hand Delivery**

Peter L. Resnik, Esq.*
Benjamin A. Goldberger, Esq.
McDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA  02109-1775

**By Federal Express**

Terrence P. McMahon, Esq.
Vera M. Elson, Esq.*
Behrooz Shariati, Esq.
McDERMOTT, WILL & EMERY LLP
3150 Porter Drive
Palo Alto, CA  93404-1212


Dated:  March 3, 2006

_____
Marc N. Henschke

# Exhibit 15

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

February 12, 2007

***VIA E-MAIL (PDF ATTACHMENT)***

Firasat M. Ali, Esq.
McDermott Will & Emery LLP
3150 Porter Drive
Palo Alto, CA  94303-1212

Re: ***Enterasys Networks v. Foundry Networks and Extreme Networks***
***Civ. Act. No. 05-11298-DPW (D. Mass)***
**Our File No.:  070610.0001**

Dear Firasat:

Nearly a year after the service of Enterasys' document requests, Extreme still has failed to produce several categories of key technical documents and information necessary for showing precisely how its accused product features operate. We have raised the issue with Extreme on multiple occasions, including most recently in my letters to you and Emily Smith-Lee in October and November.

Among the important technical documents and information still owed by Extreme is the following:

(1)     Detailed hardware specification documents relating to the Inferno and Triumph switching and routing chipsets used in certain of Extreme's accused products. The documents you cited in your previous letter to me dated November 2, 2006 come nowhere near to qualifying as the type of detailed hardware specification documents that we require. As we have previously explained, we need Inferno and Triumph documents that are on par in terms of their technical level of detail with what Extreme has already produced relative to its Genesis chipsets. See, e.g., (EXT00071635-72082; EXT00072123-208; EXT00066758-791).

(2)     Certain highly relevant and responsive technical documents that are cross-referenced in other materials produced by Extreme:

- ExtremeWare 7.0 Functional Specification by Dee Vig et al., Oct. 2002

- Aspen Diagnostics Functional Specification by K. Frick, Oct. 2004

- Jaguar L3 Design Specification by Tae-eun Kim, Jun-2005

- Hardware L3 Implementation, by K. Heron, July 2005

Firasat M. Ali, Esq.
February 12, 2007
Page 2

- ACL System Architecture by A. Oumanski, July 2005

- Mariner Theory of Operations, May, 2002

- Triumph Specification by Aaron et al., Nov. 2002

- Spurr I/O Module Functional Specification by Leath and Abourjeily, Jan. 2003

- Douglas I/O Module Functional Specification by Rubi et al., Jan. 2003

- Genesis Secret Decoder

(3)    Supplemental responses to Enterasys' Interrogatory Nos. 6 and 7 -- as required under FRCP 26(e)(2) -- that will disclose which chipsets and operating system software are contained in Extreme's accused Summit 1, 2, 3, 4, 24e2, 24e3, and PX1 products.

We remain unclear as to why the above materials have not been produced. Is Extreme somehow claiming that they don't exist? Is Extreme simply refusing to search for and provide them? If not, by what date certain can Enterasys expect to receive these critical items?

We look forward to hearing from you.

Sincerely,

Marc N. Henschke

MNH:nah
cc:    Vera M. Elson, Esq. (*VIA FIRST CLASS MAIL & E-MAIL*)
    David H. Dolkas, Esq. (*VIA E-MAIL*)
    Emily E. Smith-Lee, Esq. (*VIA E-MAIL*)
    Christopher D. Bright, Esq. (*VIA E-MAIL*)
    Sabrina M. Johnson (*VIA E-MAIL*)
    T. Nation (*VIA E-MAIL*)

35037554

# Exhibit 16

# McDermott
# Will & Emery

Boston  Brussels  Chicago  Düsseldorf  London  Los Angeles  Miami  Munich
New York  Orange County  Rome  San Diego  Silicon Valley  Washington, D.C.

Firasat Ali
Attorney at Law
Fali@mwe.com
650.813.5012

March 1, 2007

BY E-MAIL

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
Prudential Tower
800 Boylston Street, 25th Floor
Boston, MA 02199
mnhenschke@rkmc.com

Re:    *Enterasys Networks v. Extreme Networks*, Civil Action No. 05-12235 (D. Mass.)

Dear Marc:

This letter responds to your letter to me dated February 12, 2007 regarding Extreme's technical documents.  In your letter you indicate that Extreme has failed to produce key technical documents and information necessary for showing precisely how the products operate.  We disagree.  Extreme has produced numerous technical documents which include both hardware and software details that describe in detail how the products operate.  I had provided several examples of such documents in my letter to you dates October 16, 2006.

Further, you also indicated in your letter that technical documents relating to Extreme's chipset, specifically Inferno and Triumph, were not produced.  We disagree.  Extreme has produced many documents; here are a few examples:

| | | |
|---|---|---|
| EXT00067638-97 | EXT00178148-51 | EXT00139739-50 |
| EXT00195370-90 | EXT00186415-40 | EXT00150237-70 |
| EXT00351930-31 | EXT00195370-90 | |

Nevertheless, in light of your request, we are currently searching for additional Inferno and Triumph documents as specified in your letter.  If found, Extreme will produce relevant, responsive non-privileged documents relating to Inferno and Triumph as soon as possible.

You also identified specific documents that you say were cross-referenced in other materials produced by Extreme.  We have located copies of all these documents and will produce them by Tuesday, March 6, 2007.

MPK 122531-1.065994.0016

Marc N. Henschke
March 1, 2007
Page 2


Sincerely,

*Firasat Ali*

Firasat M. Ali

cc:    Alan E. McKenna, Esq.  (By Email)

**Exhibit 17**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ENTERASYS NETWORKS, INC., | ) | Civil Action No: 05-CV-11298 (DPW) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| FOUNDRY NETWORKS, INC., and | ) | |
| EXTREME NETWORKS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANT EXTREME NETWORKS, INC.'S
RESPONSES TO PLAINTIFF ENTERASYS NETWORKS, INC.'S
FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("FRCP"),

Defendant Extreme Network, Inc. ("Extreme") objects, in part, and answers, in part, Plaintiff

Enterasys Systems, Inc. ("Enterasys") First Set of Interrogatories (Nos. 1-11).

GENERAL RESPONSE

1.    Extreme's responses to Enterasys's First Set of Interrogatories are made to the

best of Extreme's present knowledge, information and belief. Extreme's responses are subject to

amendment and supplementation should future investigation indicate that amendment or

supplementation is necessary. Extreme undertakes no obligation, however, to supplement or

amend these responses other than as required by the Federal Rules of Civil Procedure or the

Local Rules of the United States District Court for the District of Massachusetts.

2.    Extreme's responses to Enterasys's First Set of Interrogatories are made

and how Enterasys formed the belief that the Accused Products infringe the Enterasys Patents (as requested by Extreme in Interrogatory No. 9), and how industry standards allegedly practice the claims of the patents in suit (as requested by Extreme in Amended Interrogatory No. 12).

**INTERROGATORY NO. 11:**

Identify each and every prior art reference upon which Extreme bases in whole or in part its affirmative defense of patent invalidity, and as for each prior art reference so identified:

(a)    state which claim(s) of the Enterasys Patents the prior art reference allegedly anticipates;

(b)    state which combinations of prior art references allegedly render obvious which claim(s) of the Enterasys Patents;

(c)    for each claim that a prior art reference allegedly anticipates, describe in detail on an element-by-element base how the prior art reference anticipates the claim, including citations to specific column and line numbers of the prior art reference if applicable; and

(d)    For each claim that a combination of prior art references allegedly renders obvious, describe in detail on an element-by-element basis how the combination renders the claim obvious, including citations to specific column and line; numbers of the prior art references if applicable, and a detailed description of where there is a teaching, suggestion, and/or motivation to combine the prior art references.

**RESPONSE TO INTERROGATORY NO. 11:**

Without waiver of the objections set forth below and all other General Objections, Extreme responds as follows:  Attachment 2 sets forth a full description of all information

obtained by Extreme as a result of its investigation conducted to date, which relates and/or may possibly relate to the invalidity or unenforceability of the Enterasys Patents. All of the information referenced in Attachment 2 has been or will be produced to Enterasys in response to Enterasys' request for production of documents which request such information.

Extreme objects to this interrogatory in its entirety on the basis of attorney-client privilege and attorney work product.

Further Extreme asserts that its investigation has been hampered and substantially limited by Enterasys' refusal to provide adequate responses to Extreme's interrogatories, such as interrogatory nos. 1, 2, 3, 9 and 12. Consequently, Extreme has not been apprised by Enterasys as to the specific basis for its claims of infringement (as requested by Extreme in Interrogatory No. 1), the date of conception and reduction to practice of the inventions described in the Enterasys Patents (as requested by Extreme in Interrogatory No. 2), the first embodiment and first offer for sale (and other information as requested by Extreme in Interrogatory No. 3), when and how Enterasys formed the belief that the Accused Products infringe the Enterasys Patents (as requested by Extreme in Interrogatory No. 9), and how industry standards allegedly practice the claims of the patents in suit (as requested by Extreme in Amended Interrogatory No. 12).

Dated: June 19, 2006                                EXTREME NETWORKS, INC.

Terrence P. McMahon, Esq.                           Christopher D. Bright, Esq.
Vera M. Elson, Esq.                                 MCDERMOTT, WILL & EMERY LLP
David H. Dolkas, Esq.                               18191 Von Kaman Avenue
MCDERMOTT, WILL & EMERY LLP                         Suite 400
3150 Porter Drive                                   Irvine, CA 92612-7107
Palo Alto, CA 94303-1212                            Tel. (949) 851-0633
Tel. (650) 813-5000

Peter L. Resnik, Esq. (BBO 417180)
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775
Tel. (617) 535-4000
ORC 390886-1.065994.0016

## Certificate of Service

    I hereby certify that the foregoing document and its attachments were served by email to Enterasys' counsel in accordance with the parties' service agreement in this case.

Dated: June 19, 2006

EXTREME NETWORKS, INC.

_____

Christopher D. Bright, Esq.
MCDERMOTT, WILL & EMERY LLP
18191 Von Kaman Avenue
Suite 400
Irvine, CA 92612-7107
Tel. (949) 851-0633

- 18 -