**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____
                                                    )
ENTERASYS NETWORKS, INC.,              )          Civil Action No: 05-CV-11298 (DPW)
                                                    )
            Plaintiff,                          )
                                                    )
v.                                                  )
                                                    )
FOUNDRY NETWORKS, INC. AND          )
EXTREME NETWORKS, INC.,                 )
                                                    )
            Defendants.                       )
_____)


**PLAINTIFF ENTERASYS NETWORKS, INC.'S**
**MEMORANDUM IN SUPPORT OF MOTION FOR AN ORDER**
**PRECLUDING DEFENDANT FOUNDRY NETWORKS, INC.**
**FROM OBTAINING OR USING THE AFFIRMATIVE ASSISTANCE**
**OF KENNETH VIRGILE IN ITS DEFENSE AGAINST THE '022 PATENT IN SUIT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

      A.    Mr. Virgile Signed Contractual Agreements With Enterasys' Predecessors
           That Created Continuing Obligations Upon Mr. Virgile To Assist
           Enterasys In Enforcing The '022 Patent ................................................................. 3

      B.    Mr. Virgile Has A Consulting Relationship With Foundry, Which Foundry
           Failed To Disclose Despite Enterasys' Attempts To Raise Ethical, Legal
           And Contractual Concerns Regarding Such A Relationship ................................. 5

ARGUMENT ..................................................................................................................... 10

I.     Mr. Virgile Is Contractually Obligated To Assist Enterasys In Enforcing The '022
      Patent, And Any Affirmative Assistance By Mr. Virgile With Foundry's Non-
      Infringement, Invalidity, And/Or Unenforceability Positions Relative To The '022
      Patent, Or Assistance With Foundry In The Reexamination Request For The '022
      Patent, Constitutes A Breach Of The Assignment Agreement ........................................ 10

II.    Orrick's Relationship With Mr. Virgile And Foundry's Use Of Mr. Virgile As A
      Consultant Implicate Serious Ethical Concerns Which Further Warrant A Cease
      Of All Affirmative Assistance ......................................................................................... 15

III.   The Doctrine Of Assignor Estoppel Also Precludes Mr. Virgile From Working
      With Foundry To Invalidate The '022 Patent ................................................................. 16

      A.    Privity Exists Between Mr. Virgile And Foundry ................................................. 17

      B.    Application Of The Assignor Estoppel Doctrine Is Proper As A Matter Of
           Equity To Prevent Injustice And Unfairness To Enterasys ................................. 18

CONCLUSION ................................................................................................................. 19

## PRELIMINARY STATEMENT

Plaintiff Enterasys Networks, Inc. hereby submits this Memorandum in Support of its Motion for an Order Precluding Defendant Foundry Networks, Inc. from Obtaining Or Using The Affirmative Assistance Of Kenneth Virgile In Its Defense Against The '022 Patent In Suit.

Kenneth Virgile ("Mr. Virgile") is the sole inventor of U.S. Patent No. 6,539,022 ("the '022 patent"), one of the patents owned by Plaintiff Enterasys Networks, Inc. ("Enterasys") and asserted against Defendant Foundry Networks, Inc. ("Foundry") in this lawsuit. By virtue of his contractual relationship with Enterasys, Mr. Virgile is required to assist Enterasys in its enforcement of the '022 patent and is precluded from disclosing any confidential information belonging to Cabletron Systems, Inc. ("Cabletron"), Enterasys' predecessor and Mr. Virgile's former employer. In addition, by virtue of the equitable doctrine of assignor estoppel, Mr. Virgile is precluded from assisting in any effort to invalidate his own '022 patent – a patent which sets forth an invention that Mr. Virgile swore under oath was novel and eligible for patenting.

In violation of his contractual obligations and the assignor estoppel doctrine, Mr. Virgile has been working with Foundry as a paid consultant to actively thwart Enterasys' efforts to enforce its patent. This relationship was confirmed when, after months of exchanging letters on the subject, Foundry recently admitted it has a consulting agreement with Mr. Virgile. Foundry's counsel admitted that Mr. Virgile "has agreed to assist Foundry with its defense."[1] While counsel for Foundry has continually refused to identify the exact nature or scope of the relationship between Foundry and Mr. Virgile, Mr. Virgile's contractual and legal obligations to Enterasys preclude him for assisting Foundry in any capacity relating to the '022 patent, including defending against infringement, attempting to invalidate the '022 patent, or engaging

---

[1] *See* letter from Steven M. Bauer, Esq. to Marc N. Henschke, Esq. dated April 18, 2007 (Ex. 10 to Hensch. Decl.).

in any other activity that is inconsistent with his obligation to assist Enterasys in the enforcement of the patent.[2]

Mr. Virgile's legal obligations are – and have been for some time – well known to Foundry. Early in the litigation, Enterasys produced Mr. Virgile's Assignment Agreement, which was also publicly available from the PTO as part of the '022 patent prosecution history file. Also, on July 10, 2006, Enterasys produced a nondisclosure agreement ("NDA") signed by Mr. Virgile which precludes him from disclosing Cabletron's confidential information. In addition, since learning on November 17, 2006 of a potential relationship between Foundry and Mr. Virgile, Enterasys has continuously reminded Foundry, in both letters and teleconferences, of its concerns regarding contractual breaches, disclosure of confidential and/or privileged information, and the applicability of the assignor estoppel doctrine. Foundry's response has been to ignore Enterasys' letters for months, and then claim that Enterasys is transgressing an ethical rule by telling Mr. Virgile that he is violating his contractual obligations to Enterasys by working with Foundry and its counsel.

Despite its denial of responsibility, Foundry and its counsel are legally and ethically barred from facilitating Mr. Virgile's violation of his legal obligations to Enterasys. Therefore, Enterasys requests that this Court issue an order requiring Foundry and/or Foundry's counsel to cease using Mr. Virgile's affirmative assistance with respect to any matter related to the '022 patent. Moreover, Enterasys requests that the Court order Foundry to identify and disclose the work product provided by Mr. Virgile to Foundry with respect to matters related to the '022 patent, and prohibit Foundry from using such work product, or work product produced by Foundry or its counsel that is based in whole or in part on the work product from Mr. Virgile,

---

[2]  In addition, Enterasys believes that Mr. Virgile may have assisted Foundry in its current attempts to have the '022 patent re-examined by the U.S. Patent and Trademark Office ("PTO").

including any analysis generated by Mr. Virgile, as such work product or analysis has resulted directly from Mr. Virgile's violation of his contractual and legal obligations to Enterasys concerning the '022 patent. Enterasys also requests the Court order Foundry to identify and disclose all attorney client information belonging to Enterasys that it may have received from Mr. Virgile, and that Foundry be prohibited from using or relying upon any such privileged information. In addition, Enterasys requests the Court order Foundry to identify and disclose all confidential information that it may have received from Mr. Virgile in violation of his NDA, and prohibit Foundry from using or relying upon any such information. Finally, pursuant to the doctrine of assignor estoppel, Enterasys seeks an order prohibiting Foundry from utilizing the testimony of Mr. Virgile to attempt to invalidate the '022 patent.

**FACTUAL BACKGROUND**

**A.**      **Mr. Virgile Signed Contractual Agreements With Enterasys' Predecessors That Created Continuing Obligations Upon Mr. Virgile To Assist Enterasys In Enforcing The '022 Patent**

As the Court is aware, Enterasys is asserting six patents relating to networking switch and router products. One of the six patents-in-suit, the '022 patent, is a member of a family of patents that originated at Standard Microsystems Corporation ("SMC")[3]. As Mr. Virgile is the sole inventor on all three patents in this patent family, all pertinent inventive activities took place at SMC and were performed by Mr. Virgile. *See* (Hensch. Decl., ¶ 2). On May 31, 1995, for valuable consideration, Mr. Virgile assigned all inventive rights and improvements to SMC "and to [SMC's] successors, assigns and legal representatives."[4] *See* (Exh. 1 to Hensch. Decl.) (hereinafter "Assignment Agreement"). Mr. Virgile specifically agreed:

---

[3]  As discussed *infra*, SMC was later purchased by Enterasys' successor Cabletron.

[4]  The Assignment Agreement does not indicate what law governs the terms of the contract. However, the Assignment Agreement was signed and executed in New York, and SMC is incorporated under Delaware law.

> when requested, without further charge to Assignee [or its
> successors or assigns] but at its expense, **to communicate to
> Assignee** or its representatives **all facts known** to the undersigned
> **regarding the aforesaid inventions and improvements, testify
> in any legal proceeding, sign all papers,** make all rightful oaths
> and declarations, execute all divisional, continuing, re-examination
> and reissue applications **and generally perform all acts, which
> may be necessary, desirable or convenient, to aid Assignee in
> securing, maintaining and enforcing patents for** the aforesaid
> inventions and improvements in the aforesaid countries, and for
> vesting title thereto in Assignee

*Id.* (emphasis added).

In early 1996, Enterasys' predecessor, Cabletron, acquired SMC's Enterprise Networks Business Unit, including all rights to the underlying patent application previously filed by SMC.[5] *See* (Hensch. Decl., ¶ 3, Exh. 2). In conjunction with this acquisition, Mr. Virgile, came to work for Cabletron, eventually leaving in May 1996. *Id.* During Mr. Virgile's employment at Cabletron, he also signed an NDA. *Id.* The NDA required that:

> [a]t all times during and subsequent to Mr. Virgile's employment,
> [Mr. Virgile will] keep in strictest confidence and trust Cabletron's
> Confidential Information that is disclosed to [him] or to which [he
> has] access. [Mr. Virgile] will not use or disclose such Company's
> Confidential Information without the written consent of Cabletron,
> except as may be necessary in the ordinary curse of performing
> [his] duties for Cabletron.

*See* (Exh. 3 to Hensch. Decl.).

Enterasys was formerly a wholly-owned operating subsidiary of Cabletron which was responsible for the data communications networking segment of Cabletron's business. *See* (Hensch. Decl., ¶ 4). In or around 2000, Cabletron spun-out or sold its three other lines of business and retained only Enterasys. *Id.* As part of this acquisition, Enterasys acquired all rights to the '022 patent family, including the assignment by Mr. Virgile and all obligations related

---

[5] The underlying patent application No. 08/428,403, ('403 application) became U.S. Patent No. 5,608,726. Two subsequent patent applications germinated from the '403 application, including application No. 09/299,970, which eventually became the '022 patent.

thereto. *See* (Exh. 19 to Hensch. Decl.). Thereafter, in 2001, Enterasys merged into Cabletron, and the newly formed company did business under the "Enterasys" name. *See* (Exh. 20 to Hensch. Decl.). In addition, Enterasys acquired all rights to enforce the NDA signed by Mr. Virgile during his employment at Cabletron. *See* (Exh. 2, 20 to Hensch. Decl.).

**B.**    **Mr. Virgile Has A Consulting Relationship With Foundry, Which Foundry Failed To Disclose Despite Enterasys' Attempts To Raise Ethical, Legal And Contractual Concerns Regarding Such A Relationship**

After Enterasys filed the instant litigation, counsel for Enterasys attempted to contact all inventors of the patents-in-suit, including Mr. Virgile. *See* (Hensch. Decl., ¶ 5). Despite leaving several messages for Mr. Virgile as early as November 2005, he never returned any phone calls. *Id*. Finally, on October 30, 2006, counsel for Enterasys spoke with Mr. Virgile. *Id*. However, Mr. Virgile abruptly ended the phone conversation by stating that he was not available to help Enterasys in this case. *Id*. In light of his uncooperative position, Enterasys subpoenaed Mr. Virgile on November 9, 2006 (the "Virgile Subpoena") for all known records or documents pertaining to the '022 patent. *See* (Hensch. Decl., ¶ 6).

Shortly thereafter, Enterasys first learned that there was a relationship between Mr. Virgile and Foundry's counsel of record in this case. Indeed, on November 17, 2006, Orrick, Herrington & Sutcliffe LLP ("Orrick"), counsel for Foundry, responded to the Virgile Subpoena. *See* (Exh. 4 to Hensch. Decl.). Orrick stated only that they represented Mr. Virgile "for purposes of the subpoena," and proceeded to claim that Mr. Virgile had no responsive documents. *Id*. It was also around this time that Enterasys learned that Evan Kahn and Ken Rubenstein, the attorneys who prosecuted U.S. Patent No. 5,608,726 -- the "grandparent" of the '022 patent -- are in fact partners at Proskauer Rose LLP ("Proskauer Rose"), the other co-counsel of record for Foundry in this case. *See* (Hensch. Decl., ¶ 7).

After receiving Orrick's letter, Enterasys consistently voiced concerns over any potential relationship between Mr. Virgile and Foundry or its counsel. On January 9, 2007, Enterasys sent a letter to Orrick detailing several issues regarding actual or potential breaches of attorney-client privilege, as well as the possible transgression of the assignor estoppel doctrine. *See* (Exh. 5 to Hensch. Decl.). With respect to attorney-client privilege, Enterasys reminded Orrick that, as the sole inventor of the '022 patent, Mr. Virgile has extensive knowledge concerning privileged communications and requested an explanation as to how Orrick could represent Mr. Virgile without improperly and unethically eliciting information that would constitute actual or potential breaches of that privilege. *Id.* Moreover, Enterasys expressed additional ethical concerns because Proskauer Rose, Orrick's co-counsel, employs as partners the very same prosecuting attorneys who represented Mr. Virgile and SMC, Enterasys' predecessor, for purposes of drafting and filing the underlying patent application that gave rise to the '022 patent.[6] *Id.*

Despite the serious concerns raised by Enterasys, Orrick ignored Enterasys' repeated requests for information. The entire month of January passed without any reply from Orrick. Enterasys sent second letter, dated February 6, 2007, seeking a response to the January 9, 2007 letter, and again Orrick ignored these requests. *See* (Exh. 6 to Hensch. Decl.). Enterasys sent a third letter, dated March 1, 2007, informing Orrick that Enterasys will notice the deposition of an Orrick attorney regarding the firm's relationship with Mr. Virgile if no response was received within 5 days. *See* (Exh. 7 to Hensch. Decl.).

---

[6] On January 3 and 19, 2007, Enterasys called Proskauer Rose regarding Mr. Kahn and Mr. Rubenstein. In response to the conversation, Foundry agreed to screen-off Mr. Kahn and Mr. Rubenstein from any participation in the litigation. *See* (Exh. 13 to Hensch. Decl.).

Orrick finally responded on March 2, 2007. *See* (Exh. 8 to Hensch. Decl.). Unfortunately, the eight sentence letter never clarified Foundry's association with Mr. Virgile.[7] *Id*. Rather, the letter merely stated that assignor estoppel was inapplicable because Mr. Virgile was not "in privity with" Foundry because Mr. Virgile was not involved with its business affairs or equipment production. *Id*. Moreover, the letter stated that Orrick will not seek to elicit attorney-client privileged information, but it did not state whether Mr. Virgile volunteered such privileged or confidential information, or whether Orrick obtained privileged information from Mr. Virgile in any form. *Id*.

On April 11, 2007, Enterasys sent separate letters to both Mr. Virgile and Orrick.[8] *See* (Exh. 9,12 to Hensch. Decl.). The letters reminded Mr. Virgile and Orrick that Mr. Virgile executed an Assignment Agreement (which Enterasys produced to Orrick as early as May 2006) that imposed continuing obligations upon Mr. Virgile to aid Enterasys in enforcing the '022 patent, and that his affirmative assistance to Foundry in its efforts to defeat Enterasys' infringement claims constitutes a breach of the Assignment Agreement. *Id*. In addition, the letters informed Mr. Virgile and Orrick that the assignor estoppel doctrine precludes Mr. Virgile from actively engaging in efforts to invalidate his own patent. The letters also reminded Mr. Virgile and Orrick of the ethical concerns regarding the solicitation of attorney-client privilege, as well as Mr. Virgile's responsibilities under the NDA. *Id*. Enterasys informed both Orrick and

---

[7] In addition, Enterasys sought to obtain information from co-counsel Proskauer Rose as to the nature of the relationship between Foundry and Mr. Virgile. On both January 3 and January 19, 2007, Proskauer Rose indicated that the extent of the relationship was merely that Mr. Virgile retained Orrick solely for the purpose of responding to the subpoena. *See* (Hensch. Decl., ¶ 8).

[8] Enterasys notes that, at the time these letters were sent, Enterasys had been informed by Orrick that Orrick only represented Mr. Virgile for purposes of responding to the subpoena issued in November 2006 and which, at the time of the letter, had been responded to. Therefore, at the time of the letter from Enterasys' counsel to Mr. Virgile, Orrick's "representation" of Mr. Virgile had presumably concluded.

Mr. Virgile that any relationship between the two in providing affirmative assistance in defending against the '022 patent was improper and should cease. *Id*.

Foundry's response was astounding. First, co-counsel Proskauer Rose, *not Orrick*, responded to Enterasys' letter. *See* (Exh. 10 to Hensch. Decl.). Proskauer Rose revealed for the first time that Foundry had a "contractual consulting relationship with Mr. Virgile." *Id*. The letter also stated that Mr. Virgile "had agreed to assist Foundry with its defense." *Id*. The letter wrongly claimed Enterasys had somehow always known of the contractual relationship between Foundry and Mr. Virgile. The letter also accused Enterasys of interfering with their contractual consulting relationship, despite the fact that Mr. Virgile's contract with Enterasys and its predecessors pre-dated this consulting work by ten years. *Id*. The Proskauer letter then threatened to bring to this Court a motion for sanctions for alleged violations of Massachusetts ethical rules for allegedly intimidating a witness (Mr. Virgile), unless Enterasys withdrew its request that Mr. Virgile stop working with Orrick and Foundry. *Id*. Lastly, Proskauer stated that Mr. Virgile would satisfy his affirmative obligation to help Enterasys enforce the '022 patent merely by being "available for a deposition". *Id.*

The significance of Proskauer Rose responding to a letter sent to Orrick should not be taken lightly. The April 18, 2007 letter from Proskauer Rose made the following statement: "to our [Proskauer Rose's] knowledge, Orrick has not obtained any attorney-client privileged information from Mr. Virgile, and that Orrick has not asked Mr. Virgile to refrain from 'aiding' Enterasys in the enforcement of its patents … ." *Id*. However, Orrick, the counsel in direct contact with both Mr. Virgile and Foundry, and the counsel who has actual knowledge of the relevant information, has never responded to the question of whether they have <u>obtained</u> attorney-client privileged information from Mr. Virgile. In fact, Enterasys believes this may be

the reason why Proskauer Rose, and not Orrick, responded to the April 11, 2007 letter directed to Orrick.

Enterasys responded to Proskauer Rose's letter on April 20, 2007, and sought to correct several misstatements raised in Proskauer Rose's April 18, 2007 letter. *See* (Exh. 11 to Hensch. Decl.). First, the April 20, 2007 letter noted that Enterasys first received concrete knowledge of an actual consulting agreement between Mr. Virgile and Foundry from the April 18, 2007 letter itself, and that every prior representation by Orrick and Proskauer Rose was that the relationship between Mr. Virgile and Orrick was solely for the purposes of responding to the Virgile Subpoena. *Id.* Second, the letter noted that since learning of Orrick's representation of Mr. Virgile for purposes of the subpoena, Enterasys has continually sought to raise ethical and contractual concerns, and that Orrick continues to be evasive as to the actual nature of the relationship, which prompted Enterasys to send its April 11, 2007 letter requesting that Orrick cease and desist any contractual relationship with Mr. Virgile for purposes of assisting Foundry with its defense against the '022 patent. *Id.* Lastly, the letter noted that such a cease and desist of a contractual relationship does not preclude Orrick from obtaining relevant factual information, not privileged, from Mr. Virgile, but that any affirmative efforts by Mr. Virgile to assist others in preventing the enforcement of the '022 patent breaches Mr. Virgile's contractual obligations to Enterasys.[9] *Id.*

While Orrick and Proskauer Rose continued to avoid Enterasys' attempts to learn about the actual nature and scope of the relationship between Foundry and Mr. Virgile, it appears that Foundry used Mr. Virgile's assistance to attack the '022 patent on multiple fronts. On March 23,

---

[9]  Mr. Virgile also responded to Enterasys' April 11, 2007 letter sent directly to him. Mr. Virgile sought clarifications as to his obligations under the Assignment Agreement. *See* (Exh. 14 to Hensch. Decl.). Enterasys responded to Mr. Virgile's letter on May 2, 2007, further explaining Mr. Virgile's continuing responsibilities under the Assignment Agreement. *See* (Exh. 15 to Hensch. Decl.).

2007, Foundry submitted to the PTO a request for reexamination of the '022 patent. *See* (Hensch. Decl., ¶ 9). It is presumed that Mr. Virgile assisted Foundry in compiling the information and/or analysis to make such a request. Moreover, on April 16, 2007, Foundry served Enterasys with its invalidity contentions for the '022 patent, also presumably assisted by Mr. Virgile. *See* (Hensch. Decl., ¶ 10). Lastly, on April 30, 2007, Foundry served its non-infringement contentions with respect to the '022 patent. *See* (Hensch. Decl., ¶ 11). Again, Enterasys believes that Mr. Virgile assisted in analyzing the '022 patent for purposes of non-infringement.

The parties conducted a meet-and-confer with respect to Mr. Virgile on Tuesday, May 15, 2007. *See* (Hensch. Decl., ¶ 33). Counsel for Foundry admitted that Foundry and/or its counsel pays Mr. Virgile for his time spent assisting Foundry in defending against Enterasys' assertion of the '022 patent in this case. *Id.* Moreover, counsel for Foundry stated that Foundry had every right to continue using Mr. Virgile's assistance in this manner, and refused to identify or produce any work product received from Mr. Virgile relating to the '022 patent. *Id.* Foundry's counsel also stated that it was appropriate for Foundry to solicit, obtain and pay for Mr. Virgile's analysis and opinions regarding prior art of record for purposes of assisting in Foundry's efforts to invalidate the '022 patent. *Id.* The instant motion followed.

## ARGUMENT

**I.**    **Mr. Virgile Is Contractually Obligated To Assist Enterasys In Enforcing The '022 Patent, And Any Affirmative Assistance By Mr. Virgile With Foundry's Non-Infringement, Invalidity, And/Or Unenforceability Positions Relative To The '022 Patent, Or Assistance With Foundry In The Reexamination Request For The '022 Patent, Constitutes A Breach Of The Assignment Agreement**

At the outset, it should be noted that Enterasys believes Mr. Virgile can and should be able to testify as a fact witness in this litigation, whether at trial or by deposition. *See, e.g., Earth Resources Corp. v. United States*, 44 Fed. Cl. 274, 287-88 (Fed. Cl. 1999); *Wang Laboratories, Inc. v. CFR Assoc., Inc.*, 125 F.R.D. 10, 13-14 (D. Mass. 1989). Enterasys contends, however,

that Mr. Virgile's statements that he is unable to assist Enterasys in the enforcement of the '022 patent constitutes an breach of the Assignment Agreement. In addition, Mr. Virgile's affirmative assistance of Foundry[10] in contesting the enforcement of the '022 patent constitutes a breach of Mr. Virgile's obligations of good faith and fair dealing under that agreement. Moreover, Foundry should not benefit from Mr. Virgile's breach of the Assignment Agreement, especially in light of Foundry's actual knowledge of said agreement, and therefore should be barred from utilizing any work product or analysis generated by Mr. Virgile in this litigation with respect to the '022 patent. Such a request is well within the power of this Court. *See CFR Assoc.*, 125 F.R.D. at 12-13 (noting that a district court has the authority to issue orders to prohibit or remedy abusive or unethical practices, including restraining contacts with experts) (*citing Rigaku Corp. v. Ferrofluidics Corp.*, 800 F.2d 1115, 1118 (Fed. Cir. 1986)).

As the basic tenets of contract law apply to patent assignments, it is axiomatic that an assignor must be held to the obligations he agreed to perform when assigning a patent.[11] *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 263 (1945) ("[T]he principle whereby an assignor is held to his bargain with the assignee has been part of the texture of our patent law throughout history.") (Frankfurter, J., dissenting). For example, in *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978 (Fed. Cir. 1989), *overruled on other grounds* by *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020 (Fed.Cir. 1992), *and abrogated on other grounds* by *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 234 F.3d 558 (Fed. Cir. 2000), the plaintiff hired a consulting firm to help develop patentable inventions to be

---

[10]   During the May 15, 2007 meet-and-confer between Enterasys and Foundry, counsel for Foundry admitted that Foundry and/or its counsel pays Mr. Virgile for his time spent assisting Foundry. *See* (Hensch. Decl., ¶ 33).

[11]   Such obligations are still enforceable even where the assignor is no longer employed by the assignee. *See e.g., University of West Virginia v. VanVoorhies*, 278 F.3d 1288 (C.A. Fed. 2002) (requiring a former employee to assign all continuation-in-part patent applications).

assigned to the plaintiff. A clause within the assignment agreement specifically stated that the consulting firm "shall assist in every lawful way … in protecting or enforcing [Plaintiff's] rights [to any resulting patents], and in prosecuting and defending appeals, interferences, infringement suits, and controversies relating hereto." *Id*. at 980. After completing its work for the plaintiff, the consulting firm began working for competitors. The plaintiff sued the consulting firm, and the consulting firm challenged the validity of the plaintiff's patents. The plaintiff argued that the consulting firm breached its contractual obligation to assist in enforcing the patents by challenging the patents' validity. *Id*. at 991. In agreeing with the plaintiff, the Federal Circuit noted that "[w]e do not deem [the consulting firm's] promise to protect, preserve and defend any patents resulting from the consulting contract to be against public policy. The development of the technology was the core promise of the contract, and the preservation of such invention was a legitimate concern of the contracting parties." *Id*. at 992; *see also Regents of the University of New Mexico v. Knight*, 321, F.3d 1111, 1120 (Fed. Cir. 2003) (holding that the inventor assignment agreement imposed a "continuing duty to cooperate" with the assignor in prosecuting all patent applications relating to the inventor's work); *University of West Virginia v. VanVoorhies*, 278 F.3d 1288 (Fed. Cir. 2002) (finding that a former employee violated his continuing obligation under an assignment clause by refusing to assign all continuation-in-part patent applications). Similarly, Mr. Virgile's promise to aid SMC and its successors and assigns, which includes Enterasys, was a legitimate interest of the parties and should be enforced.

Enterasys also believes that Mr. Virgile's assistance of Foundry, as well as Orrick's representation of Mr. Virgile, frustrate the intent and purpose of the Assignment Agreement, and violate the good faith and fair dealing requirement imposed on every contract executed in New York or Delaware. *See, e.g., In re Schick*, 235 B.R. 318, 327 (S.D.N.Y. 1999) (citing New York precedent supporting the good faith and fair dealing doctrine); *Dunlap v. State Farm Fire and*

*Casualty Co.*, 878 A.2d 434, 440-42 (Del. 2005). "'Good faith performances or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with justified expectations of the other party.' Evasions or subterfuges violate the covenant even though the obligor believes himself to be acting within his rights." *In re Schick*, 235 B.R. at 327 (*quoting* Restatement (Second) of Contracts § 205 cmt. a (1981)).

At bar, Mr. Virgile was obligated to assist Enterasys with the enforcement of the '022 patent, and his failure to do so constituted a breach of the Assignment Agreement. The purpose of the assignment was to ensure that every effort be made by Enterasys, its predecessors, and Mr. Virgile to get Mr. Virgile's invention patented, and then to enforce those patents. It is also expressly stated within the Assignment Agreement that Mr. Virgile would assist in the above objectives. Accordingly, any efforts by Mr. Virgile to circumvent those responsibilities and work for Foundry in its attempts to avoid patent enforcement (via invalidity and non-infringement contentions), frustrates the expectations articulated in the Assignment Agreement.

The Court should not permit Foundry to benefit from Mr. Virgile's avoidance of his obligations by claiming that his responsibilities are met merely by being available for depositions and/or to produce documents. Such limited obligations do not even require a contract. Indeed, when Mr. Virgile refused to assist Enterasys with the enforcement of the contract, Enterasys merely subpoenaed him for all documents in his possession. Moreover, Foundry and Mr. Virgile cannot contend that forcing Enterasys to, among other things, go through the rigors of serving subpoenas for documents, allowing defendant's counsel to review all correspondence with Enterasys, or requiring Enterasys to file motions to get privileged information belonging to Enterasys, is "desirable or convenient" for Enterasys. In fact, nothing about working through defendant's counsel is desirable or convenient to enforcing the '022 patent, as Foundry is making

every effort to prevent Enterasys from enforcing its patent rights.[12] Mr. Virgile's obligations under the Assignment Agreement necessitated that he assist Enterasys in enforcing the '022 patent. By helping Foundry defend itself against Enterasys' patent infringement claims, Mr. Virgile committed a clear breach of his legal obligations.

The Court should find that Mr. Virgile's assistance of Foundry's defense against Enterasys' '022 patent infringement claim breaches Mr. Virgile's obligations under the Assignment Agreement. Like the assignment in *Sun Studs*, the Assignment Agreement at bar expressly requires Mr. Virgile "generally perform all acts, which may be necessary, desirable or convenient, to aid [Enterasys] in … enforcing patents … ." *See* (Exh. 1 to Hensch. Decl.). Moreover, as in *Sun Studs*, Mr. Virgile's decision to assist Foundry in its defense against the '022 patent constitutes a breach of Mr. Virgile's obligation to help Enterasys enforce its patent rights.

Lastly, the close relationship between Foundry and Mr. Virgile creates the potential for the disclosure of confidential information protected by the NDA signed by Mr. Virgile, which required that:

> [a]t all times during and subsequent to Mr. Virgile's employment, [Mr. Virgile] keep in strictest confidence and trust Cabletron's Confidential Information that is disclosed to [him] or to which [he has] access. [Mr. Virgile] will not use or disclose such Company's Confidential Information with the written consent of Cabletron, except as may be necessary in the ordinary curse of performing [his] duties for Cabletron.

*See* (Exh. 3 to Hensch. Decl.). To the extent such confidential information has already been disclosed, Foundry has facilitated a breach of the NDA by Mr. Virgile. To the extent such

---

[12]  Furthermore, Mr. Virgile cannot claim that he is assisting Enterasys in maintaining and enforcing the '022 patent, obligations he has under the Assignment Agreement, when he is affirmatively assisting Foundry with its requests to have the patent re-examined and invalidated. His assisting Foundry is in direct contradiction with his obligations to assist Enterasys.

confidential information has not yet been disclosed, the relationship between Foundry and Mr.

Virgile should cease in order to preclude such a breach.

**II.      Orrick's Relationship With Mr. Virgile And Foundry's Use Of Mr. Virgile As A
           Consultant Implicate Serious Ethical Concerns Which Further Warrant A Cease Of
           All Affirmative Assistance**

Further exacerbating the problems involved with Mr. Virgile's consultation with Foundry

is that, as the sole inventor of the '022 patent, Mr. Virgile possesses unique information

pertaining to attorney-client communications[13] that occurred during the prosecution of the

grandfather patent application that ultimately led to the issuance of the '022 patent. As noted

above, the rights to those privileged communications belong to Enterasys. *See Soverian Software

LLC v. The GAP, Inc., et al.,* 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004). However, Foundry's

counsel represents Mr. Virgile and they suggested in their April 18, 2007 letter that Enterasys

can obtain information from Mr. Virgile via a deposition. Thus, because of the relationship

between Mr. Virgile and Foundry and/or its counsel, Enterasys must either forego access to

privileged communications to which it owns all rights, or effectively waive the privilege by

obtaining such information at a deposition in which Foundry and its counsel shall be present.

Proskauer's own actions with respect to the attorneys who prosecuted the grandfather

application to the '022 patent are clear evidence of the precarious position they have taken with

representing Mr. Virgile. Proskauer Rose screened-off two of its partners, Mr. Kahn and Mr.

Rubenstein, who participated in the prosecution of the grandfather application to the '022 patent,

because they recognized that they possessed potential attorney-client information. Yet, while

agreeing to completely screen-off the two prosecuting attorneys -- who are privy to Enterasys'

---

[13] Enterasys is unable to communicate with the prosecuting attorneys of the grandfather application to the '022
patent as they work for Proskauer Rose. Thus, Enterasys is left with communicating with Mr. Virgile.

privileged information -- Proskauer Rose and Orrick are actively working with Mr. Virgile, who presumably has the very same privileged information that the ethical wall was intended to protect. Such contrary positions make absolutely no sense because Mr. Virgile is more likely to divulge privileged information than the two Proskauer Rose partners. Indeed, in light of Mr. Virgile's lack of legal training, such a possibility of privileged disclosure is comparatively much greater.

The Court should preclude Foundry from using Mr. Virgile for any further consultation or assistance, and prohibit Foundry from using Mr. Virgile's work product or analysis.

### III.    The Doctrine Of Assignor Estoppel Also Precludes Mr. Virgile From Working With Foundry To Invalidate The '022 Patent

An assignor's ability to challenge the validity of their own patent has been prohibited in this Court for literally over a century under the doctrine of assignor estoppel. *See Mellor v. Carrol,* 141 F. 992, 993-94 (C.C.D. Mass. 1905). As routinely applied by both the Federal Circuit and approved by the Supreme Court:

> assignor estoppel prevents a party that assigns a patent to another from later challenging the validity of the assigned patent. Parties in privity with the assignor are also barred from challenging validity. Privity may be established where there is a close relationship among the relevant parties, such as where the ultimate infringer availed itself of the inventor's knowledge and assistance to conduct infringement. **The doctrine prevents the unfairness and injustice of permitting a party to sell something and later to assert that what was sold is worthless**. Application of the doctrine is a matter requiring a balancing of the equities and is within the sound discretion the trial court.

*Checkpoint Systems, Inc. v. All-Tag Security, et al.,* 412 F.3d 1331, 1336-37 (Fed. Cir. 2005) (emphasis added; citations omitted; internal quotation marks omitted); *see also Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.,* 266 U.S. 342, 349 (1924); *Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220, 1226 (Fed. Cir. 1988).

"Whether two parties are in privity depends on the nature of their relationship in light of the alleged infringement. The closer that relationship, the more the equities will favor applying the doctrine of assignor estoppel. Assessing a relationship for privity involves evaluation of all direct and indirect contacts." *See Mentor Graphics Corp., et al., v. Quickturn Design Systems, Inc.,* 150 F.3d 1374 (Fed. Cir. 1998) (citations omitted; internal quotation marks omitted); *see also Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.,* 15 F.3d 1573, 1580 - 81 (Fed. Cir. 1993), *overruled on other grounds* by *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1968 (Fed. Cir. 1998); *Shamrock Technologies v. Medical Sterilization, et al.,* 903 F.2d 789, 793-94 (Fed. Cir. 1990). Moreover, "[t]he four most frequently mentioned justifications for applying assignor estoppel are . . . (1) to prevent unfairness and injustice; (2) to prevent one from benefiting from his own wrong; (3) by analogy to estoppel by deed in real estate; and (4) by analogy to a landlord-tenant relationship." (citation omitted; internal quotation marks omitted). *Diamond Scientific Co. v. Ambico, Inc., et al.,* 848 F.2d 1220, 1225 (Fed. Cir. 1988).

## A.  Privity Exists Between Mr. Virgile And Foundry

The Federal Circuit recently affirmed a district court decision holding that, as a matter of law, a defendant is foreclosed from challenging the validity of a patent-in-suit by using the inventor as an employee or consultant to aid with its invalidity contentions against the patent-in-suit. *See Pandrol, et al., v. Airboss Railway, et al.,* No. 99-0182-CV-W-SOW, 2003 U.S. Dist. LEXIS 26993, * 10-11 (W.D. MI. Oct. 15, 2003) (attached hereto as Exh. 16 of Henschke Decl.), *aff'd*, 424 F.3d 1161, 1166-67 (Fed. Cir. 2005). In *Pandrol,* the inventor of the patent-in-suit participated in the patent's prosecution, and also signed a declaration attesting to the patent's validity. *See Pandrol,* 2003 U.S. Dist. LEXIS 26993, * 10-11. During the ensuing, protracted infringement litigation, the inventor was either an "employee or consultant" to the defendant. *See*

*id.; see also* (Exh. 17 to Hensch. Decl., pp.10-11). Attempting to invalidate the patent-in-suit, the defendant sought to benefit from this relationship, and offered a declaration of the inventor as expert testimony to challenge the patent's validity. *See* (Exh. 18 to Hensch. Decl.). The plaintiff moved to exclude this testimony, arguing that the assignor estoppel doctrine prohibited such assistance from the inventor. The court agreed with the plaintiff, and concluded that assignor estoppel effectively precluded the defendant from using any of the inventor's testimony to challenge the validity of the patent-in-suit. *See Pandrol,* 2003 U.S. Dist. LEXIS 26993, * 10-11. The Federal Circuit affirmed the well-reasoned conclusion reached by the district court, and further dispensed with the defendant's appeal on the issue by noting that "assignor estoppel prevents an assignor from asserting that its own patent … is invalid and worthless. The district court *properly* excluded Mr. Young's testimony on this basis." *Pandrol,* 424 F.3d at 1166-67 (emphasis added).

Analysis of all direct and indirect contacts proves that privity exist between Mr. Virgile and Foundry. Here, after much delay, Foundry partially disclosed its relationship with Mr. Virgile by admitting that Mr. Virgile is actually a consultant, arguing that "Mr. Virgile's assignment agreement does not prohibit him from consulting with Foundry," and disclosing that Mr. Virgile is assisting Foundry with its "defense" in this litigation. That Orrick acted as counsel for Mr. Virgile with respect to the Virgile Subpoena is further evidence as to the close nature of the consultancy relationship between Foundry and Mr. Virgile.

**B.      Application Of The Assignor Estoppel Doctrine Is Proper As A Matter Of Equity To Prevent Injustice And Unfairness To Enterasys**

Application of the assignor estoppel doctrine to Foundry is warranted. As the sole inventor of the '022 patent, Mr. Virgile assigned the rights to the inventions disclosed in his

original patent application filed with the PTO[14] to Enterasys' predecessors-in-interests. In that

assignment, Mr. Virgile signed a declaration under oath attesting to the validity of the inventions

disclosed in that patent application before the PTO. *See Carrol Touch,* 15 F.3d at 1580-81. He

also has "special knowledge" about the intricacies in the advanced technology found in the '022

patent, which is undoubtedly why Foundry hired him as a consultant notwithstanding the

Assignment Agreement and the NDA. *See Id.* Allowing Foundry to benefit from Mr. Virgile's

breach of his contractual obligation with Enterasys blatantly deprives Enterasys of the benefit of

the bargain pertaining to its contracts. *See VanVoorhies,* 278 F.3d at 1292 (privity not at issue;

inventor compelled to assign two patents consistent with the terms of assignee's policies).

Permitting Foundry to assert invalidity by using Mr. Virgile's assistance will most assuredly

work an injustice and unfairness against Enterasys as the assignee of a valid patent. Therefore,

application of the assignor estoppel doctrine is appropriate.

## <u>CONCLUSION</u>

For the foregoing reasons, Enterasys respectfully requests that the issue an order

requiring Foundry and/or Foundry's counsel to cease using Mr. Virgile's affirmative assistance

with respect to any matter related to the '022 patent. Moreover, Enterasys requests that the Court

order Foundry to identify and disclose the work product provided by Mr. Virgile to Foundry with

respect to matters related to the '022 patent, and prohibit Foundry from using such work product,

or work product produced by Foundry or its counsel that is based in whole or in part on the work

product from Mr. Virgile, including any analysis generated by Mr. Virgile, as such work product

or analysis has resulted directly from Mr. Virgile's violation of his contractual and legal

obligations to Enterasys concerning the '022 patent. Enterasys also requests the Court order

---

[14] U.S. Patent Application No. 08/428,403.

Foundry to identify and disclose all attorney client information belonging to Enterasys that it may have received from Mr. Virgile, and that Foundry be prohibited from using or relying upon any such privileged information. In addition, Enterasys requests the Court order Foundry to identify and disclose all confidential information that it may have received from Mr. Virgile in violation of his NDA, and prohibit Foundry from using or relying upon any such information. Finally, pursuant to the doctrine of assignor estoppel, Enterasys seeks an order prohibiting Foundry from utilizing the testimony of Mr. Virgile to attempt to invalidate the '022 patent.

Dated:  May 16, 2007                    Respectfully submitted,

                                        ENTERASYS NETWORKS, INC.

                                        By its attorneys,

                                        /s/ Christopher P. Sullivan
                                        Christopher P. Sullivan, Esq. (BBO No. 485120)
                                        Marc N. Henschke, Esq. (BBO No. 636146)
                                        Alan E. McKenna (BBO No. 644556)
                                        William J. Rocha (BBO No. 657924)
                                        Robins, Kaplan, Miller & Ciresi L.L.P.
                                        800 Boylston Street, 25th Floor
                                        Boston, MA 02199
                                        Tel. (617) 267-2300

Of Counsel:

A. James Anderson, Esq. *(pro hac vice)*
Marla R. Butler, Esq. *(pro hac vice)*
Robins, Kaplan, Miller & Ciresi L.L.P.
2600 One Atlanta Plaza
Atlanta, GA 30326-1386
Tel. (404) 760-4300

Robert A. Auchter, Esq. *(pro hac vice)*
Robins, Kaplan, Miller & Ciresi L.L.P.
1801 K Street, N.W.
Washington, DC  20006
Tel. (202) 775-0725

BN1 35039041.4

<u>**CERTIFICATE OF SERVICE**</u>

I, William J. Rocha, hereby certify that on May 16, 2007, I caused the attached *Plaintiff Enterasys Networks, Inc.'s Memorandum In Support Of Motion For An Order Precluding Defendant Foundry Networks, Inc. From Obtaining Or Using The Affirmative Assistance Of Kenneth Virgile In Its Defense Against The '022 Patent* to be served electronically pursuant to the Court's CM/ECF electronic filing system upon Defendants' respective counsel of record as indicated by asterisks below:

**Counsel for Defendant Extreme Networks, Inc.:**

William L. Anthony, Jr., Esq.*
I. Neel Chatterjee, Esq.*
Michael F. Heafey, Esq.
Sanjeet K. Dutta, Esq.
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Steven M. Bauer, Esq.*
Jeremy P. Oczek, Esq.*
Proskauer Rose LLP
One International Place
Boston, MA 02110-2600

**Counsel for Defendant Extreme Networks, Inc.:**

Terrence P. McMahon, Esq.*
Vera M. Elson, Esq.*
McDermott, Will & Emery LLP
3150 Porter Drive
Palo Alto, CA 94303-1212

Peter L. Resnik, Esq.*
McDermott, Will & Emery LLP
28 State Street
Boston, MA 02109-1775

Christopher D. Bright, Esq.
McDermott, Will & Emery LLP
18191 Von Karman Avenue, Suite 400
Irvine, CA 92612-7107

Dated: May 16, 2007            /s/ William J. Rocha
                               William J. Rocha