**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____

| | |
|---|---|
| ENTERASYS NETWORKS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FOUNDRY NETWORKS, INC. AND | ) |
| EXTREME NETWORKS, INC., | ) |
| | ) |
| Defendants. | ) |

Civil Action No: 05-CV-11298 (DPW)

_____

**DECLARATION OF MARC N. HENSCHKE IN SUPPORT OF**
**PLAINTIFF ENTERASYS NETWORKS, INC.'S MOTION FOR**
**AN ORDER PRECLUDING DEFENDANT FOUNDRY NETWORKS, INC.**
**FROM OBTAINING OR USING THE AFFIRMATIVE ASSISTANCE OF**
**KENNETH VIRGILE IN ITS DEFENSE AGAINST THE '022 PATENT IN SUIT**

**I, MARC N. HENSCHKE**, declare as follows:

1.      I am an attorney with the law firm of Robins, Kaplan, Miller & Ciresi L.L.P., counsel of record for the named Plaintiff Enterasys Networks, Inc. ("Enterasys") in the above-referenced action. I submit this Declaration in support of Enterasys' Motion For An Order Precluding Defendant Foundry Networks, Inc. From Obtaining Or Using The Affirmative Assistance Of Kenneth Virgile In Its Defense Against The '022 Patent In Suit, filed concurrently herewith under separate cover. I have personal knowledge of the facts stated herein and, if sworn as a witness, I could and would testify competently thereto.

2.      The inventions disclosed in U.S. Patent No. 6,539,022 (the "'022 patent"), and in its related family of patents, all originated in a patent application filed by Standard Microsystems Corporation ("SMC"). The sole named inventor on this family of patents is Kenneth Virgile

("Virgile"), and all of his inventive activities were undertaken during the time he was employed at SMC.

3.    In early 1996, Enterasys' predecessor, Cabletron Systems, Inc. ("Cabletron"), acquired SMC's Enterprise Networks Business Unit, including all rights to the underlying patent application previously filed by SMC disclosing the '022 inventions. In conjunction with this acquisition, Virgile began to work for Cabletron for a five-month period before leaving in May of 1996. During Mr. Virgile's employment at Cabletron, he signed a Confidentiality/Non-Disclosure Agreement ("NDA").

4.    Enterasys was formerly a wholly-owned operating subsidiary of Cabletron which was responsible for the data communications networking segment of Cabletron's business. In or around 2000, Cabletron spun-out or sold its three other lines of business and retained only Enterasys. Thereafter, in 2001, Enterasys merged into Cabletron, and the newly formed company went public under the "Enterasys" name.

5.    Alan E. McKenna, an attorney at Robins, Kaplan, Miller & Ciresi L.L.P., counsel of record for Enterasys, attempted to contact Mr. Virgile on several occasions beginning in November of 2005. Mr. Virgile never returned any phone calls. On October 30, 2006, Attorney McKenna finally spoke directly with Mr. Virgile. During this conversation, Mr. Virgile responded to inquiries from Attorney McKenna by stating that he was not available to help Enterasys in this case, and then abruptly ended the conversation.

6.    In November of 2006, Enterasys subpoenaed Mr. Virgile for all inventive records relating to the '022 family of patents.

7.    Evan Kahn and Ken Rubenstein, the attorneys who prosecuted the underlying SMC patent application that gave rise to the '022 patent, are now partners at Proskauer Rose

LLP ("Proskauer Rose"), co-counsel for Defendant Foundry Networks, Inc. ("Foundry") in this case.

8.    On both January 3 and January 19, 2007, Steven M. Bauer of Proskauer Rose indicated to me during phone calls in which I specifically asked him for information about the extent of the relationship that existed between Mr. Virgile and Foundry (or its attorneys) that this relationship was confined to the fact that Mr. Virgile had retained the Orrick, Herrington & Sutcliffe LLP law firm ("Orrick") solely for the purpose of responding to the Enterasys subpoena.

9.    On March 23, 2007, Foundry submitted to the U.S. Patent and Trademark Office an *ex parte* request for re-examination of the '022 patent.

10.    On April 16, 2007, Foundry served Enterasys with its invalidity contentions for the '022 patent.

11.    On April 30, 2007, Foundry served Enterasys with its non-infringement contentions with respect to the '022 patent.

12.    Attached hereto as Exhibit 1 is a true and correct copy of Mr. Virgile's Assignment to SMC of Patent Application 08/428,403, dated May 31, 1995 (hereinafter "Assignment agreement").

13.    Under the Assignment agreement, Enterasys would have been obligated to pay Mr. Virgile for any expenses incurred by Mr. Virgile for fulfilling his obligations under the Assignment agreement. Enterasys was ready and willing to pay for all such expenses.

14.    Attached hereto as Exhibit 2 is a true and correct copy of SMC's Assignment to Cabletron of Patent Application 08/428,403, dated January 12, 1996.

15.     Attached hereto as Exhibit 3 is a true and correct copy of the Confidential/Non-Disclosure Agreement, dated January 15, 1996, executed by Mr. Virgile with Cabletron.

16.     Attached hereto as Exhibit 4 is a true and correct copy of a Sanjeet Dutta letter to Alan E. McKenna dated November 17, 2006.

17.     Attached hereto as Exhibit 5 is a true and correct copy of my letter to Sanjeet Dutta dated January 9, 2007.

18.     Attached hereto as Exhibit 6 is a true and correct copy of my letter to Sanjeet Dutta dated February 6, 2007.

19.     Attached hereto as Exhibit 7 is a true and correct copy of my letter to Sanjeet Dutta dated March 1, 2007.

20.     Attached hereto as Exhibit 8 is a true and correct copy of a Sanjeet Dutta letter to me dated March 2, 2007.

21.     Attached hereto as Exhibit 9 is a true and correct copy of my letter to Sanjeet Dutta dated April 11, 2007.

22.     Attached hereto as Exhibit 10 is a true and correct copy of a Steven M. Bauer letter to me dated April 18, 2007.

23.     Attached hereto as Exhibit 11 is a true and correct copy of my letter to Steven M. Bauer dated April 20, 2007.

24.     Attached hereto as Exhibit 12 is a true and correct copy of my letter to Kenneth E. Virgile dated April 11, 2007.

25.     Attached hereto as Exhibit 13 is a true and correct copy of a Steven M. Bauer letter to me dated January 23, 2007.

26.     Attached hereto as Exhibit 14 is a true and correct copy of a Kenneth E. Virgile letter to me dated April 24, 2007.

27.     Attached hereto as Exhibit 15 is a true and correct copy of my letter to Kenneth E. Virgile dated May 2, 2007.

28.     Attached hereto as Exhibit 16 is a true and correct copy of *Pandrol, et al., v. Airboss Railway, et al.,* No. 99-0182-CV-W-SOW, 2003 U.S. Dist. LEXIS 26993, (W.D. MI. Oct. 15, 2003).

29.     Attached hereto as Exhibit 17 is a true and correct copy of Plaintiffs' [Pandrol USA, LP, and Pandrol Ltd.] Reply Suggestions in Support of their Motion for Summary Judgment and for Preliminary Injunction, in Opposition to Defendants' Cross Motion for Summary Judgment and in Support of Plaintiffs' Motion to Preclude Evidence, dated May 30, 2003.

30.     Attached hereto as Exhibit 18 is a true and correct copy of the Affidavit of Hartley F. Young, dated May 14, 2003.

31.     Attached hereto as Exhibit 19 is a true and correct copy of selected portions of the June 3, 2000 transformation agreement through which Enterasys acquired from Cabletron all rights in and to the family of patents to which the '022 patent belongs.

32.     Attached hereto as Exhibit 20 is a true and correct copy of selected portions of the June 3, 2000 transformation agreement through which Enterasys acquired from Cabletron all rights pertaining to the enforcement of Mr. Virgile's NDA.

33.     The parties conducted a meet-and-confer with respect to Mr. Virgile on Tuesday, May 15, 2007. Counsel for Foundry admitted that Foundry and/or its counsel pays Mr. Virgile for his time spent assisting Foundry in defending against Enterasys' assertion of the '022 patent

in this case. Moreover, counsel for Foundry stated that Foundry had every right to continue using Mr. Virgile's assistance in this manner, and refused to identify or produce any work product received from Mr. Virgile relating to the '022 patent. Foundry's counsel also stated that it was appropriate for Foundry to solicit, obtain and pay for Mr. Virgile's analysis and opinions regarding prior art of record for purposes of assisting in Foundry's efforts to invalidate the '022 patent.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed on this 16th day of May, 2007 at Boston, Massachusetts.

/s/ Marc N. Henschke
MARC N. HENSCHKE

35039112

6

## CERTIFICATE OF SERVICE

I, William J. Rocha, hereby certify that on May 16, 2007, I caused a true and correct copy of the attached *Declaration of Marc N. Henschke In Support of Plaintiff Enterasys Networks, Inc.'s Motion For An Order Precluding Defendant Foundry Networks, Inc. From Obtaining Or Using The Affirmative Assistance Of Kenneth Virgile In Its Defense Against The '022 Patent In Suit* to be served electronically pursuant to the Court's CM/ECF electronic filing system upon Defendants' respective counsel of record as indicated by asterisks below:

**Counsel for Defendant Extreme Networks, Inc.:**
William L. Anthony, Jr., Esq.*
I. Neel Chatterjee, Esq.*
Sanjeet K. Dutta, Esq.*
Matthew H. Poppe, Esq.*
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA  94025

Steven M. Bauer, Esq.*
Jeremy P. Oczek, Esq.*
John W. Pint, Esq.*
Proskauer Rose LLP
One International Place
Boston, MA 02110-2600

**Counsel for Defendant Extreme Networks, Inc.:**
Terrence P. McMahon, Esq.*
Vera M. Elson, Esq.*
McDermott, Will & Emery LLP
3150 Porter Drive
Palo Alto, CA  94303-1212

Emily E. Smith-Lee, Esq.*
Peter L. Resnik, Esq.*
McDermott, Will & Emery LLP
28 State Street
Boston, MA  02109-1775

Christopher D. Bright, Esq.
McDermott, Will & Emery LLP
18191 Von Karman Avenue, Suite 400
Irvine, CA  92612-7107

Dated:  May 16, 2007                    /s/ William J. Rocha
                                        William J. Rocha

# EXHIBIT 1

Attorney Docket No.: 5035-10

# ASSIGNMENT OF PATENT APPLICATION

For value received, the undersigned sell(s), assign(s) and transfer(s) to:

**Standard Microsystems Corporation**

a corporation organized under the laws of: **Delaware**

and having a place of business at: **80 Arkay Drive**

**Hauppauge, New York 11788**

and to Assignee's successors, assigns and legal representatives or nominees as it may designate (collectively, hereinafter, "Assignee"), the entire right, title and interest, for:

_x_    The United States of America and Its      _x_    All countries throughout
       Territories and Commonwealth and Possessions        the world

in and to all inventions and improvements disclosed in an application for United States Patent entitled:

## MULTIMEDIA BANDWIDTH ACCELERATOR

The above-entitled United States Patent application was:

_      executed by the undersigned on:_____

_x_    filed in the United States Patent and Trademark Office on: _April 25, 1995_
       and assigned serial number: _08/428,403_
       filed as PCT International Application No.:_____
       on:_____

The undersigned assign(s) the rights for all patents, divisions, reissues, reexamination certificates, continuing applications and extensions thereof, together with the right of priority of any earlier corresponding patent application filed by the undersigned in the United States or elsewhere.

The undersigned covenant(s) that the rights and property conveyed by this Assignment are free and clear of any encumbrance, and that the undersigned have (has) full right to convey the rights and property as expressed herein.

The undersigned authorize(s) and request(s) that any and all patents on the aforesaid inventions be issued to Assignee.

The undersigned agree(s), when requested, without further charge to Assignee but at its expense, to communicate to Assignee or its representatives all facts known to the undersigned regarding the aforesaid inventions and improvements, testify in any legal proceeding, sign all papers, make all rightful oaths or declarations, execute all divisional, continuing, re-examination and reissue applications and generally perform all acts, which may be necessary, desirable or convenient, to aid Assignee in securing, maintaining and enforcing patents for the aforesaid inventions and improvements in the aforesaid countries, and for vesting title thereto in Assignee.

Date: _May 31, 1995_

VIRGILE, Kenneth

ETS0000153

State of _Massachusetts_

County of _Essex_ ) ss.:

   This _31ST_ day of _May_ , 1995, before me
personally came the above-named Kenneth Virgile to me personally
known as the individual who executed the foregoing assignment, who
has acknowledged to me that he executed the same of his own free
will for the purposes therein set forth.

_Carole Cassidy Danner_
Notary Public

**CAROLE CASSIDY DANNER**
NOTARY PUBLIC
My Commission Expires March 29, 2002

# EXHIBIT 2

ASSET PURCHASE AGREEMENT

AMONG

CABLETRON SYSTEMS, INC.,

CABLETRON SYSTEMS ACQUISITION, INC.,

SMC ENTERPRISE NETWORKS, INC.

AND

STANDARD MICROSYSTEMS CORPORATION

JANUARY 9, 1996

J094454.09 (1/10/96)

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                    ETS0062245

## ASSIGNMENT OF PATENT APPLICATION

THIS ASSIGNMENT OF PATENT APPLICATION is made as of January 12, 1996 by and between Cabletron Systems Acquisition, Inc. ("Acquisition"), a Delaware corporation and a wholly-owned subsidiary of Cabletron Systems, Inc., a Delaware corporation, Standard Microsystems Corporation, a Delaware corporation, ("SMC") and SMC Enterprise Networks, Inc., a Delaware corporation and a wholly-owned subsidiary of SMC, ("Subsidiary") (SMC and Subsidiary are collectively referred to herein as the "Sellers"). Acquisition and the Sellers are referred to collectively herein as the "Parties."

### WITNESSETH:

WHEREAS, Acquisition, Cabletron Systems, Inc. and the Sellers are parties to an Asset Purchase Agreement dated January 9, 1996 (the "Agreement") pursuant to which the Sellers agreed to sell, and Acquisition agreed to purchase, certain assets described therein in Section 2.1 as the Acquired Assets (such initially capitalized terms and, except as defined herein, all other initially capitalized terms used herein shall have the same meanings ascribed to them in the Agreement); and

WHEREAS, it is the Parties' intention to reflect the transfer of title over the Acquired Assets by the execution and delivery of the following documents of even date herewith at the Closing: (i) the Bill of Sale and Conveyance by the Sellers to Acquisition; (ii) the Assignment and Assumption Agreement between the Sellers and Acquisition; and (iii) this Assignment of Patent Application between the Sellers and Acquisition.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by SMC, SMC hereby sells, conveys, assigns, transfers and delivers to Acquisition, its successors and assigns, all of its right, title and interest throughout the world in, to and under the Patent Application listed on Schedule 1 hereto, and the underlying inventions described therein, and all divisions, renewals, continuations and continuations-in-part thereof, and all Letters Patent of the United States which

3100583.01

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

ETS0062651

may be granted thereon and all reissues thereof, together with the right to sue and recover damages for future infringements thereof and to fully and entirely stand in the place of SMC in all matters related thereto. SMC agrees to take such further action and to execute such additional documents as may be necessary to perfect Cabletron's title in and to the Patent Application.

IN WITNESS WHEREOF, the parties hereto have caused this Assignment of Patents to be executed as of the day and year first written above.

CABLETRON SYSTEMS ACQUISITION, INC.

By: _____
Name: Craig R. Benson
Title: Treasurer

STANDARD MICROSYSTEMS CORPORATION

By: _____
Name: Paul Richman
Title: Chairman and Chief Executive Officer

SMC ENTERPRISE NETWORKS, INC.

By: _____
Name: Paul Richman
Title: President

3100180.03                     -2-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

STATE OF MASSACHUSETTS )
                       )    ss.    SUFFOLK
COUNTY OF SUFFOLK      )

On January 12, 1996, before me, the undersigned, a Notary Public in and for said State, personally appeared Craig R. Benson, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as the Treasurer of CABLETRON ACQUISITION SYSTEMS, INC. and acknowledged to me that such corporation executed the within instrument pursuant to its bylaws or a resolution of its Board of Directors.

WITNESS my hand and official seal.

[SEAL]

My Commission Expires 9-22-00

STATE OF MASSACHUSETTS )
                       )    ss.
COUNTY OF SUFFOLK      )

On January 12, 1996, before me, the undersigned, a Notary Public in and for said State, personally appeared Paul Richmond, personally known to me or proved to me on the basis of satisfactory evidence to be the person who executed the within instrument as the Chairman Cork Executive of STANDARD MICROSYSTEMS CORPORATION, and acknowledged to me that such corporation executed the within instrument pursuant to its bylaws or a resolution of its Board of Directors.

WITNESS my hand and official seal.

[SEAL]

My Commission Expires 9-22-00

3100180.03                                  -3-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY                          ETS0062653

SCHEDULE 1
TO
ASSIGNMENTS OF PATENTS
BY
STANDARD MICROSYSTEMS CORPORATION
TO
CABLETRON SYSTEMS, INC.

| Country | Application Serial Number | Title |
|---------|---------------------------|-------|
| USA | 08/428,403 | Multimedia Bandwidth Accelerator |

3100180.03                              -4-

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

ETS0062654

EXHIBIT 3



# Confidential/Non-Disclosure
# Agreement

**THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS WHICH ARE BINDING. PLEASE READ IT IN FULL BEFORE YOU SIGN IT.**

I recognize that Cabletron Systems Inc., with an address of 35 Industrial Way, Rochester, New Hampshire, 03867, and subsidiaries ("Cabletron") are engaged in a continuous program of research, development, production and distribution of computer related products, and that it is part of my responsibility as an employee to assist Cabletron in such endeavors.

I recognize the importance of protecting Cabletron's rights to inventions, discoveries, ideas and confidential information, and any similar or related rights.

Therefore, in consideration of my employment by Cabletron and the compensation received by me from Cabletron from time to time, I agree to the following terms:

**1. Definitions.**
      For purposes of this Agreement:
(a) **Company's or Cabletron's Confidential Information** includes any of the following: (i) any and all versions of Cabletron's proprietary computer software, firmware, hardware and documentation; (ii) other proprietary software, firmware, hardware and documentation and information previously, now or later created, developed, produced or distributed by Cabletron (including, without limiting the generality of the foregoing, any such software, firmware, hardware and documentation and information created, developed or produced by me or distributed or made known to me during the period of or arising out of my service to Cabletron); (iii) Cabletron's business methods and practices; (iv) compilations of data or information concerning Cabletron's business; (v) the name of Cabletron's suppliers and customers and the nature of Cabletron's relationships with these suppliers or customers; (vi) the business of Cabletron's customers; (vii) confidential, proprietary or trade secret information submitted by Cabletron's suppliers, employees, consultants to or co-venturers with Cabletron for study, evaluation or use; and (viii) any other information not generally known to the public (including information about Cabletron's operations, personnel, products or services) which if misused or disclosed, could have a reasonable possibility of adversely affecting the business of Cabletron.

(b) **Inventions** means all discoveries, developments, designs, improvements, inventions, formulae, processes, techniques, computer programs, object codes, source codes, strategies, specific computer-related know-how and data, whether or not patentable or registerable under patent, copyright or similar statutes, generated or conceived or reduced to practice or learned by me, either alone or jointly with others, that are related to or useful in the business of Cabletron, or result from tasks assigned to me by Cabletron, or result from the use of premises or property (including equipment, software, firmware, hardware, supplies, facilities or Cabletron's Confidential Information) owned, leased, licensed or contracted for by Cabletron.

**2. Non-Disclosure of Information.**

At all times during and subsequent to my employment, I agree to keep in strictest confidence and trust Cabletron's Confidential Information that is disclosed to me or to which I have access. I will not use or disclose such Company's Confidential Information without the written consent of Cabletron, except as may be necessary in the ordinary course of performing my duties for Cabletron. However, I shall not be required to treat as confidential any of Cabletron's Confidential Information which: (i) was in my possession or was known to me prior to receipt from Cabletron, or (ii) is or becomes public knowledge without my fault, or (iii) is or becomes lawfully available to me from a source other than Cabletron.

**3. Surrender and Assignment of Rights of Confidential Information.**

I hereby assign to Cabletron any rights I now have or may hereafter acquire in Cabletron's Confidential Information. Upon termination of my employment with Cabletron, for whatever reason, I will promptly surrender to Cabletron all copies, in whatever form, of Cabletron's Confidential Information in my possession, custody or control, and I will not take with me any of Cabletron's Confidential Information that is embodied in a tangible medium of expression.

ETS00034106

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**4.     Disclosure and Assignment of Inventions.** *KEV*

During my service as an employee of Cabletron ~~and for a period of six (6) months thereafter~~, I will promptly and fully disclose to Cabletron (and to any persons designated by it) all Inventions generated, conceived or reduced to practice or learned by me, either alone or jointly with others, which in any way relate to the business of Cabletron during such period, including, without limiting the generality of the foregoing, computer software, firmware and hardware techniques, and document coding techniques. I agree that any Inventions resulting from my services on behalf of Cabletron are works made for hire and all of the above described Inventions shall be the sole property of Cabletron and its assigns, and Cabletron and its assigns shall be the sole owner of all patents, copyrights, trademark, trade secrets, and other rights and protections in connection therewith. I hereby assign to Cabletron any and all rights I now have or may hereafter acquire to such Inventions.

**5.     Non-Competition.**

I agree that while I am employed by Cabletron, I will not without Cabletron's express written consent, engage in any consulting, employment or business that is competitive with the business of Cabletron. ~~I agree that for a period of one (1) year after my employment is terminated by Cabletron or by me for any reason, (i) I will not, in the territories of directly or indirectly engage in the sale of any products for any firm or corporation or institution which are competitive with products sold by Cabletron, (ii) I will not recruit or hire any employee of Cabletron or otherwise induce any employee to leave the employment of Cabletron to become an employee of or otherwise be associated with me or any company or business which I may become associated, and (iii) I will not solicit business from any customer of Cabletron made known to me by Cabletron during my employment with Cabletron or contacted by me during my employment with Cabletron.~~

**6.     Employment.**

I understand that nothing contained in this Agreement shall be construed as constituting a commitment, guaranty, agreement or understanding of any kind or nature that I shall continue to be an employee of Cabletron, nor shall this Confidential/Non-Disclosure Agreement affect in any way the right of Cabletron to terminate my employment at any time or for any reason whatsoever. By my execution of this Agreement, I acknowledge and agree that my employment is "at will". No change in my duties as an employee shall be deemed to be a modification of the terms of this Agreement.

**7.     Enforcement.**

I agree that in the event of a breach or threatened breach of the provisions of this Agreement, Cabletron's remedies at law would be inadequate, and Cabletron shall be entitled to an injunction to enforce such provisions (without any bond or other security being required), but nothing herein shall be construed to preclude Cabletron from pursuing any remedy at law or in equity for any breach or threatened breach.

**8.     Miscellaneous.**

**(a) Successors.** The rights and obligations under this Agreement shall survive the termination of my service to Cabletron in any capacity and shall inure to the benefit of and shall be binding upon: (i) my heirs and personal representatives, and (ii) the successors and assigns of Cabletron.

**(b) Governing Law.** The laws of the State of New Hampshire shall govern all questions relative to interpretation and construction of this Agreement and to its performance.

**(c) Severability.** If any provision of this Agreement is wholly or partially unenforceable for any reason, such unenforceability shall not affect the enforceability of the balance of this Agreement, and all provisions of this Agreement shall, if alternative interpretations are applicable, be construed so as to preserve the enforceability hereof. To the extent that any provisions hereof are found to be unenforceable by reason of an excessive scope or duration, then they shall be so construed as calling for the maximum scope and/or duration, as the case may be, as may be permitted by law.

**(d) Waiver.** Cabletron's waiver of any default by me shall not constitute waiver of its rights under this Agreement with respect to any subsequent default by me.

**I HAVE READ THIS AGREEMENT, UNDERSTAND IT, AND AGREE TO ITS TERMS.**

*1/5/96*
_____
**Date**

_____
**Employee Signature**

*Kenneth E Virgile*
_____
**Print Name**

Revised 8/94

ETS00034107

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

# EXHIBIT 4



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
tel 650-614-7400
fax 650-614-7401
WWW.ORRICK.COM

November 17, 2006

Sanjeet Kumar Dutta
(650) 614-7647
sdutta@orrick.com

Via Facsimile and U.S.Mail
(617) 267-8288

Alan E. McKenna, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA 02199

     Re:    Enterasys Networks, Inc. v. Foundry Networks, Inc. *et al.*
              Civil Action No. 05-11298-DPW

Dear Alan:

We received your November 9, 2006 subpoena requesting documents from Kenneth Virgile. Mr. Virgile has asked Orrick to represent him for purposes of the subpoena. We have confirmed with Mr. Virgile that he does not have any documents in his possession, custody or control that are responsive to your subpoena.

If you have any questions, please do not hesitate to contact me.

Best regards,

Sanjeet Dutta

OHS West:260128802.1

EXHIBIT 5

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

January 9, 2007

*VIA E-MAIL (PDF ATTACHMENT)*

Sanjeet K. Dutta, Esq.
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re: *Enterasys Networks v. Foundry Networks and Extreme Networks*
   *Civ. Act. No. 05-11298-DPW (D. Mass)*
   **Our File No.: 070610.0001**

Dear Sanjeet:

   We believe that some potentially serious red flags are raised by your letter to me dated November 17, 2006 indicating that your law firm Orrick -- which serves as outside litigation counsel for Defendant Foundry Networks in the above-referenced patent infringement case -- is simultaneously representing Kenneth Virgile who is the sole named inventor on the '022 patent-in-suit being asserted *against* Foundry by Plaintiff Enterasys Networks.

   In particular, we have significant concerns with respect to the following two general areas:

## Actual Or Potential Breaches Of Attorney-Client Privilege

   By way of background, at the time he conceived of the underlying '022 invention in or around 1994, Mr. Virgile was working for Standard Microsystems which commissioned the filing of a grandfather patent application by its outside patent prosecution firm, Meltzer Lippe. Subsequently, in January of 1996, Cabletron acquired Standard Microsystems' networking products business division, including the then pending grandfather patent application and Mr. Virgile himself as an employee. Cabletron directed the pending grandfather patent application to be transferred from Meltzer Lippe to its own outside patent prosecution firm, Wolf Greenfield.

   As the sole named inventor, it is clear that Mr. Virgile has extensive knowledge concerning some or all of the following categories of privileged attorney-client communications relating to the underlying '022 invention and/or to its grandfather patent application: **(i)** communications between himself and either Meltzer Lippe or in-house counsel for Standard Microsystems; **(ii)** communications between Meltzer Lippe and in-house counsel for Standard Microsystems; **(iii)** communications between himself and either Wolf Greenfield or in-house counsel for Cabletron; **(iv)** communications between Wolf Greenfield and in-house counsel for

Sanjeet K. Dutta, Esq.
January 9, 2007
Page 2

Cabletron; and/or **(v)** communications between himself and any other person or entity that were made at the direction of any of the attorneys listed above.

Note that under the "Acquisition of Assets" Agreement executed between Cabletron and Standard Microsystems dated January 12, 1996, ownership of the pre-acquisition attorney-client privilege attaching to communications relating to the underlying '022 invention and/or to its grandfather patent application was transferred from Standard Microsystems to Cabletron. <u>See</u> (ETS0062235ff.). Indeed, Cabletron was expressly granted all rights in, to, and under said invention and application, including all rights to the protection of any and all interests existing therein. (<u>Id.</u>). In turn, as the later assignee of Cabletron's relevant IP rights, Enterasys is the current owner of both the pre- and post-acquisition attorney-client privilege as it relates to the underlying '022 invention and its grandfather patent application.

We find it difficult to imagine how Orrick could possibly represent Mr. Virgile for purposes of the present case without improperly eliciting information from him that would constitute actual or potential breaches of the attorney-client privilege owned by Enterasys.[1] If anything, it appears that Orrick would have a strong incentive to elicit such privileged information from Mr. Virgile given its likely relevance to any invalidity or unenforceability defenses that Orrick is asserting in this case on behalf of its principal client, Foundry. Moreover, the danger of improper disclosure of privileged information is greatly exacerbated by the fact that Orrick's co-counsel in this case, Proskauer Rose, employs as partners in its law firm the very same prosecuting attorneys who directly interfaced with Mr. Virgile for purposes of drafting and filing the underlying '022 grandfather patent application at the time when they previously worked at Meltzer Lippe.

In light of the above, we request that you explain in writing to us as soon as possible whether and to what extent Orrick or its representatives have thus far obtained attorney-client privileged information relating to the underlying '022 invention or to its grandfather patent application. Moreover, we ask that you further explain in writing how and in what manner Orrick can possibly continue to represent Mr. Virgile on a going forward basis in this case consistent with its ethical obligation not to suborn breaches of the attorney-client privilege.

## Transgression Of The Assignor Estoppel Doctrine

Under the well-established doctrine of assignor estoppel, it would be inequitable and improper for Foundry to rely upon information or testimony procured from Mr. Virgile to bolster its attempts to invalidate or render unenforceable the '022 patent-in-suit. Nevertheless, we suspect that this may well be precisely Foundry's intention given its apparent efforts to arrange for its own outside litigation counsel, Orrick, to jointly represent Mr. Virgile in the present case. Accordingly, we feel compelled to request that you confirm in writing to us as soon as possible that Foundry has no intention of acting in disregard of the assignor estoppel doctrine by

---

[1] Even if Foundry disputes that Enterasys is currently the owner of the pre-acquisition '022 related attorney-client privilege, the problem would remain the same. Indeed, it is beyond dispute that neither Foundry, Orrick, nor Mr. Virgile are the owners of that privilege, and accordingly it would be improper for Orrick to in any way encourage or induce Mr. Virgile to breach that privilege.

Sanjeet K. Dutta, Esq.
January 9, 2007
Page 3


procuring and using information or testimony from Mr. Virgile for purposes of invalidating or rendering unenforceable the '022 patent on which Mr. Virgile is the sole named inventor.

   We look forward to hearing from you.

        Sincerely,

        Marc N. Henschke

MNH:nah

cc:  I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
   Jeremy P. Oczek, Esq. (*VIA EMAIL*)
   K. Mudurian (*VIA EMAIL*)
   Y. Steinberg (*VIA EMAIL*)

35036635

EXHIBIT 6

# ROBINS, KAPLAN, MILLER & CIRESI LLP

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

February 6, 2007

*VIA E-MAIL (PDF ATTACHMENT)*

Sanjeet K. Dutta, Esq.
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re: ***Enterasys Networks v. Foundry Networks and Extreme Networks***
***Civ. Act. No. 05-11298-DPW (D. Mass)***
**Our File No.:  070610.0001**

Dear Sanjeet:

It has now been four weeks since my letter to you dated January 9, 2007 raising potential ethical issues concerning Orrick's representation of inventor Kenneth Virgile in the above-referenced matter.

Given the sensitivity and importance of the issues we raised, we are surprised to still have received no response to my letter from either you or your colleagues.  When might we expect to hear from you?

Thanks in advance.

Sincerely,

Marc N. Henschke

MNH:nah

cc:    I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
       Jeremy P. Oczek, Esq. (*VIA EMAIL*)
       K. Mudurian (*VIA EMAIL*)
       Y. Steinberg (*VIA EMAIL*)

35037389

EXHIBIT 7

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

March 1, 2007

*VIA E-MAIL (PDF ATTACHMENT)*

Sanjeet K. Dutta, Esq.
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re: *Enterasys Networks v. Foundry Networks and Extreme Networks*
*Civ. Act. No. 05-11298-DPW (D. Mass)*
Our File No.: 070610.0001

Dear Sanjeet:

We have now reached the point where Orrick's failures to have responded to my previous letters to you of January 9 and February 6, 2007 concerning the nature of the relationship and interactions between your law firm and inventor Kenneth Virgile can only be interpreted as a refusal by Orrick to voluntarily provide the information and assurances that we have requested.

Accordingly, Enterasys appears to have no alternative left other than to notice the deposition of the Orrick attorney most knowledgeable about your firm's relationship with Mr. Virgile. Should we assume that *you* are that attorney given that it was your letter to me that initially disclosed Orrick's representation of Mr. Virgile? If not, which attorney at your firm would be a more appropriate deponent?

Please be advised that if we have not received a response to this letter -- as well as a *substantive response* to my underlying letter of January 9th -- by the close of business next Monday, March 5th, we will undertake to serve either a Rule 30(b)(6) deposition subpoena directed to Orrick or an individual deposition subpoena directed to you.

We look forward to hearing from you.

Sincerely,

Marc N. Henschke

MNH:nah
cc:    I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
       Jeremy P. Oczek, Esq. (*VIA EMAIL*)
       K. Mudurian (*VIA EMAIL*)
       Y. Steinberg (*VIA EMAIL*)

35037996

# EXHIBIT 8



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
tel 650 614-7400
fax 650 614-7401
WWW.ORRICK.COM

March 2, 2007

Sanjeet K. Dutta
(650) 614-7647
sdutta@orrick.com

**Via U.S. Mail and Facsimile**

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA 02199

Re:    **Enterasys Networks, Inc. v. Foundry Networks, Inc. et al.**
       **Civil Action No. 05-11298-DPW**

Dear Marc:

I am in receipt of your letters of January 9, 2007, February 6, 2007, and March 1, 2007 regarding Orrick's representation of Mr. Virgile for the purposes of the subpoena Enterasys served on Mr. Virgile on November 9, 2006. In your letter you express concern as to breaches of the attorney-client privilege, and the potential violation of the assignor estoppel doctrine.

I disagree with your contention that it is improper for Orrick to represent Mr. Virgile in this matter. Regardless, I can confirm that Orrick has not, and will not, seek to elicit attorney-client privileged information from Mr. Virgile, even though Enterasys has failed to demonstrate that it has standing to assert any such privilege.

Furthermore, your assertions regarding assignor estoppel are not applicable in this instance. Mr. Virgile has never participated in any product development for Foundry, and he is not involved in any of Foundry's business or technical affairs. Foundry therefore is not, and has never been, in privity with Mr. Virgile.

If you have any questions, please do not hesitate to contact me.

Best regards,

Sanjeet Dutta
Sanjeet Dutta

OHS West:260165988.1

PAGE 2/2 * RCVD AT 3/2/2007 6:15:45 PM [Central Standard Time] * SVR:MP-RIGHTFAX/6 * DNIS:612 * CSID: * DURATION (mm-ss):01-24



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CALIFORNIA 94025
TEL 650-614-7400
FAX 650-614-7401
WWW.ORRICK.COM

## FAX TRANSMISSION

DATE   3/2/2007

NO. OF PAGES
(INCLUDING COVER SHEET)    2

**FROM**

| name | tel |
| --- | --- |
| Sanjeet K. Dutta | (650) 614-7647 |

**TO**

| name | company/firm | tel | fax |
| --- | --- | --- | --- |
| Marc N. Henschke, Esq. | Robins, Kaplan, Miller & Ciresi LLP | 617 267-2300 | **617 267-8288** |

RE    *Enterasys Networks, Inc. v. Foundry Networks, Inc.*

MESSAGE

Please see attached correspondence dated March 2, 2007.

C-M-A    15903-6  7399

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL RITA HERNANDEZ AT 650.614.7334 AS SOON AS POSSIBLE.

*notice to recipient*
THE INFORMATION CONTAINED IN THIS FACSIMILE TRANSMISSION IS INTENDED TO BE SENT ONLY TO THE STATED ADDRESSEE OF THE TRANSMISSION.  IT MAY BE PROTECTED FROM UNAUTHORIZED USE OR DISSEMINATION BY THE ATTORNEY-CLIENT PRIVILEGE, THE ATTORNEY WORK-PRODUCT DOCTRINE, OR ANY OTHER APPLICABLE PRIVILEGE.  IF YOU ARE NOT THE STATED ADDRESSEE, YOUR RECEIPT OF THIS TRANSMISSION WAS UNINTENDED AND INADVERTENT, AND YOU ARE HEREBY NOTIFIED THAT ANY REVIEW, USE, DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  YOU ARE ALSO ASKED TO NOTIFY US IMMEDIATELY BY TELEPHONE AND TO RETURN THE ORIGINAL DOCUMENT TO US IMMEDIATELY BY MAIL AT THE ADDRESS ABOVE.  THANK YOU IN ADVANCE FOR YOUR COOPERATION.
OHS WEST:260131291.1

# EXHIBIT 9

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

April 11, 2007

*VIA E-MAIL (PDF ATTACHMENT)*

Sanjeet K. Dutta, Esq.
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re: *Enterasys Networks v. Foundry Networks and Extreme Networks*
*Civ. Act. No. 05-11298-DPW (D. Mass)*
Our File No.: 070610.0001

Dear Sanjeet:

I write in follow-up to our prior correspondence concerning the nature of the relationship and interactions between your law firm and inventor Kenneth Virgile.

At the outset, I note that your March 2, 2007 letter to me simply states that your law firm "has not, and will not, seek to elicit" attorney-client privileged information from Mr. Virgile. We appreciate your confirmation that you will not "seek to elicit" this protected information, but your confirmation of this fact does not answer the question that we previously posed to you in writing as to whether Orrick or its representatives have thus far *obtained* attorney-client privileged information relating to the underlying '022 invention or to its grandfather patent application, irrespective of whether you actively "elicited" it. Please confirm to us in writing that you have not obtained attorney-client privileged information from Mr. Virgile or others relating to the underlying '022 invention, or to its grandfather patent application or its progeny.

Placing aside your failure to have thus far answered our questions regarding disclosure of privilege communications, we also wish to bring to your attention the fact that Mr. Virgile has a contractual obligation to assist Enterasys (as assignee of and successor to Standard Microsystems Corporation and Cabletron) in "securing, maintaining and enforcing" the '022 patent in this matter. We are greatly troubled by the fact that your law firm and Foundry have known about Mr. Virgile's contractual obligations since at least May 2006 when Enterasys first produced the "Assignment of Patent Application" executed by Mr. Virgile on May 31, 1995 [document ETS 0000153, part of Enterasys' May 11, 2006 production]. Enterasys again produced this same document on January 3, 2007 when it produced documents obtained from Standard Microsystems Corporation in response to the third-party subpoena served by Enterasys [document SMSC-000280]. As set forth in this document, Mr. Virgile specifically agreed:

Sanjeet K. Dutta, Esq.
April 11, 2007
Page 2

> when requested, without further charge to Assignee [SMC and its
> successors and assigns] but at its expense, to communicate to
> Assignee or its representatives all facts known to the undersigned
> regarding the aforesaid inventions and improvements, testify in
> any legal proceeding, sign all papers, make all rightful oaths and
> declarations, execute all divisional, continuing, re-examination and
> reissue applications and **generally perform all acts, which may**
> **be necessary, desirable or convenient, to aid Assignee in**
> **securing, maintaining and enforcing patents** for the aforesaid
> inventions and improvements in the aforesaid countries, and for
> vesting title thereto in Assignee.

By working with Foundry and/or your firm as its counsel in an apparent attempt to
undermine Enterasys' efforts to enforce its rights under the '022 patent, Mr. Virgile is breaching
his contractual obligation to <u>aid Enterasys</u> in enforcing its patent rights.

In addition to the Assignment of Patent Application document described above, we also
wish to remind you that Mr. Virgile also signed a Confidential/Non-Disclosure Agreement of
which you are aware [ETS00034106] during his tenure at Cabletron, which obligates Mr. Virgile
further and states, in part: "[a]t all times during and subsequent to my employment, I agree to
keep in strictest confidence and trust Cabletron's Confidential Information that is disclosed to me
or to which I have access."

Please note that we are simultaneously sending a letter to Mr. Virgile reminding him of
his contractual obligations as set forth in the Assignment of Patent Application and in the
Confidential/Non-Disclosure Agreement he executed while employed at Cabletron. Although
we understand from your earlier correspondence that Orrick may represent Mr. Virgile generally
only for purposes of responding to Enterasys' previously-served November 9, 2006 subpoena, as
a courtesy, we are nevertheless providing you with a copy of our correspondence to Mr. Virgile.

In light of the fact that your firm and Foundry are aware of Mr. Virgile's contractual
obligations, we believe it is improper both from a legal and ethical standpoint for Foundry and/or
your law firm to induce and/or encourage Mr. Virgile to breach his contractual obligations to
Enterasys, or to knowingly benefit from any such breach by Mr. Virgile. While we will continue
to investigate and seek to discover additional facts regarding your prior interactions with Mr.
Virgile in connection with this matter, we request that you immediately cease and desist from
interacting with Mr. Virgile in connection with this matter or the '022 inventions in any way.
We request that you kindly confirm, in writing, that both your law firm and Foundry will cease
and desist from further interaction with Mr. Virgile in this regard.

If, for some reason, your law firm and Foundry will not agree to cease interacting with
Mr. Virgile, please let me know your availability for an immediate meet and confer on this issue.

Sanjeet K. Dutta, Esq.
April 11, 2007
Page 3


      Please further note that Enterasys reserves all of its rights to hold your firm and/or
Foundry responsible for any interference with Mr. Virgile's contractual obligations owed to
Enterasys.

      We look forward to hearing from you.

                    Sincerely,

                    Marc N. Henschke

MNH:nah
cc:    I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
      Matthew. H. Poppe, Esq. (*VIA EMAIL*)
      Jeremy P. Oczek, Esq. (*VIA EMAIL*)
      K. Mudurian (*VIA EMAIL*)
      Y. Steinberg (*VIA EMAIL*)

35037996

EXHIBIT 10

One International Place
Boston, MA 02110-2600
Telephone 617.526.9600
Fax 617.526.9899

NEW YORK
LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

# PROSKAUER ROSE LLP

**Steven M. Bauer**
Member of the Firm

Direct Dial 617.526.9700
sbauer@proskauer.com

April 18, 2007

<u>**Via E-Mail**</u>

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA  02199

Re:    <u>Enterasys Networks, Inc. v. Foundry Networks, Inc. et al</u>

Dear Marc:

I am responding to your letter to Sanjeet Dutta dated April 11, 2007 regarding Orrick's interactions with Kenneth Virgile.

We believe your letter, as well as the separate letter from you to Mr. Virgile also dated April 11, 2007, is in violation of Rule 3.4(f) of the Massachusetts Rules of Professional Conduct, which provides that "A lawyer shall not ... request a person other than a client to refrain from voluntarily giving relevant information to another party unless (1) the person is a relative or an employee or other agent of a client; and (2) the lawyer reasonably believes that the person's interests will not be adversely affected by refraining from giving such information." Because Mr. Virgile is not a relative, employee, or agent of Enterasys, the rules prohibit you from asking him to refrain from voluntarily giving us relevant information.

Your letters also appear to be an attempt to intentionally interfere with Foundry's contractual consulting relationship with Mr. Virgile, which constitutes a tort. *See, e.g., Blackstone v. Cashman*, 448 Mass. 255, 860 N.E.2d 7 (2007).

I trust, being in Boston, that you are aware of the motion for sanctions currently pending before Judge Stearns in the District of Massachusetts based on defense counsel's intimidation of a witness who was cooperating with the plaintiff. Responding to facts similar to your conduct here, Judge Stearns stated in an order (copy attached) that "the court is of the tentative view that the allegations of ethical misconduct are extremely serious and that the conduct of defendant's counsel may have prejudiced the ability of [the plaintiff] to fully litigate its Complaint. The court is inclined to believe, on the basis of the materials submitted, that sanctions if imposed might

# PROSKAUER ROSE LLP

Marc N. Henschke, Esq.
April 18, 2007
Page 2

include the disqualification of the law firm presently representing [the defendant] from further participation in the case."

Mr. Virgile's assignment agreement does not prohibit him from consulting with Foundry. The provision requiring that he "aid Assignee in ... enforcing patents" does not prohibit contacts between Mr. Virgile and others, even relating to the patent. It also does not require that he take sides in litigation. At most, it may require that Mr. Virgile provide testimony at Enterasys' request. Your construction of the assignment agreement would render it unenforceable as an illegal attempt to supersede Rule 3.4(f) of the Massachusetts Rules of Professional Conduct, discussed above.

Assuming, solely for purposes of this letter, that Mr. Virgile's duty to "aid Assignee in ... enforcing patents" is enforceable by Enterasys,[1] Mr. Virgile is available for a deposition on similar terms as Carol Iturralde and Eric Rosen, who have been represented by separate counsel and who we believe have not been asked to provide other "assistance" to Enterasys in this action other than appearing for deposition. Enterasys apparently has not sent similar "demand" letters to Ms. Iturralde or Mr. Rosen regarding their discussions with their counsel.

It appears that Enterasys is singling Mr. Virgile out for discriminatory treatment solely because he has agreed to assist Foundry with its defense. Yet, Enterasys' current position is inconsistent even with Enterasys' past course of conduct when, earlier in the case, Enterasys served a subpoena duces tecum upon Mr. Virgile seeking the production of documents and dealt with him at arm's length rather than taking the position that he was required to provide Enterasys with some sort of extraordinary "assistance." The fact that Enterasys has known about Orrick's representation of Mr. Virgile since November 17, 2006, and did not raise the issue until your most recent letters of April 11, 2007, also suggests improper motive. In three prior letters dated January 9, 2007, February 6, 2007, and March 1, 2007, you stated that your concerns related solely to the attorney-client privilege and the assignor estoppel doctrine.

To remedy your standing violation of Rule 3.4(f) of the Massachusetts Rules of Professional Conduct, we request that you immediately withdraw your demand that Mr. Virgile stop working with Foundry and Orrick and renounce your position that doing so constitutes a violation of his assignment agreement.

To assist you in your evaluation of the situation, we can confirm that, to our knowledge, Orrick has not obtained any attorney-client privileged information from Mr. Virgile and that Orrick has not asked Mr. Virgile to refrain from "aiding" Enterasys in the enforcement of its patents within the meaning of the assignment agreement.

---

[1] It is not clear that Enterasys can enforce the provision. Unlike certain other provisions of the assignment agreement, it is not explicitly assignable by SMC.

**PROSKAUER ROSE** LLP

Marc N. Henschke, Esq.
April 18, 2007
Page 3

Very truly yours,

Steven M. Bauer

Attachment

cc:    Matthew H. Poppe, Esq. (via email w/ attachment)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-10884-RGS

MASSACHUSETTS INSTITUTE OF TECHNOLOGY, et al.

v.

IMCLONE SYSTEMS, INC.

MEMORANDUM AND ORDER ON
MOTION FOR SANCTIONS

July 24, 2006

STEARNS, D.J.

On March 16, 2006, the Massachusetts Institute of Technology (MIT) filed a motion requesting that the court impose sanctions on Imclone's counsel for alleged witness intimidation. On May 5, 2006, the court heard oral argument on the motion. After review of the pleadings, including those filed at or after the hearing, and after consideration of argument of counsel, the court is of the tentative view that the allegations of ethical misconduct are extremely serious and that the conduct of defendant's counsel may have prejudiced the ability of MIT to fully litigate its Complaint. The court is inclined to believe, on the basis of the materials submitted, that sanctions if imposed might include the disqualification of the law firm presently representing Imclone from further participation in the case. The court will, however, consistent with its prior assurances, give counsel the opportunity to show cause why sanctions should not be imposed, or if imposed, why a lesser penalty than disqualification might be adequate.[1]

_____

[1]On May 10, 2006, defendant filed a motion asking the court to review the videotape of the deposition in which the intimidation allegedly occurred. The motion will be

The court will convene a hearing at 10:30 a.m. on August 25, 2006, to hear further argument and to receive such evidence as counsel deems necessary.  If counsel wishes to file further briefing, such will be due on or before August 18, 2006.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

---

ALLOWED to the extent that counsel is free to show the relevant portions of the deposition as part of its presentation of evidence at the scheduled hearing.

EXHIBIT 11

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

April 20, 2007

_VIA E-MAIL (PDF ATTACHMENT)_

Steven M. Bauer, Esq.
Proskauer Rose, LLP
One International Place
Boston, MA 02110

Re: _Enterasys Networks v. Foundry Networks and Foundry Networks_
_Civ. Act. No. 05-11298-DPW (D. Mass)_
Our File No.: 070610.0001

Dear Steve:

We are in receipt of your letter to me dated April 18, 2007 concerning the relationship that apparently exists between Foundry and its attorneys on the one hand, and the sole named inventor on the '022 patent-in-suit, Kenneth Virgile, on the other hand.

As an initial matter, your suggestion that Enterasys has known about the true nature of this relationship "since November 17, 2006" is completely inaccurate. To the contrary, your April 18th letter represents the _very first time_ that Enterasys has ever been informed that a "contractual consulting relationship" exists between Mr. Virgile and Foundry, and that pursuant to this consultancy Mr. Virgile "has agreed to assist Foundry with its defense" against his own '022 patent being asserted by Enterasys in the above-referenced case.

Until two days ago, Enterasys had actually been led to believe a far different story. Indeed, by letter to me dated November 17, 2006, Sanjeet Dutta had acknowledged _only_ that the Orrick law firm was representing Mr. Virgile for the limited purpose of responding to a document subpoena served by Enterasys. There was no disclosure about the existence of my direct relationship between Foundry and Mr. Virgile at all, much less a disclosure that their was a professional consulting arrangement in place. Moreover, in subsequent telephone calls between you and me that took place on January 3 and January 19, 2007, we had lengthy conversations about Mr. Virgile in which I pressed you for a fuller understanding as to the nature of his relationship with Foundry and/or its attorneys. You indicated that the extent of the relationship was merely that Mr. Virgile had retained the Orrick law firm to assist him in responding to Enterasys' subpoena. In retrospect, it now appears that at best your statements to me were less than forthcoming, and at worst they were outright misleading.

The further suggestion in your April 18th letter that Enterasys has somehow not been diligent in raising any issues about Mr. Virgile is likewise inaccurate. In reality, even on the basis of the partial and selective information provided by you and Sanjeet Dutta, Enterasys took

Steven M. Bauer, Esq.
April 20, 2007
Page 2

prompt action by sending a letter to the Orrick law firm on January 9, 2006 detailing many of its concerns about the Virgile situation. Orrick elected not to respond to this letter, thereby requiring Enterasys to send two additional follow-up letters on February 6 and March 1, 2007. Finally, on March 2, 2007, Sanjeet Dutta sent a terse response which once again failed to disclose the existence or nature of the relationship between Foundry and Mr. Virgile, and which evaded answering many of the key questions that had been posed in Enterasys' January 9th letter.

Based in large part on Orrick's evasiveness, Enterasys became suspicious that there might be far more to the Virgile relationship than Foundry and its attorneys had been acknowledging. Prompted by these suspicions, Enterasys sent my additional letters dated April 11, 2007 to both Mr. Virgile and to Orrick. Your responsive letter of April 18th now confirms that Enterasys' suspicions were well-founded, while at the same time serving to mischaracterize the cease-and-desist request made by Enterasys in my April 11th letters. Enterasys is *not,* as you suggest, seeking to prevent Mr. Virgile from providing relevant factual information to the parties in this case. Any such efforts would be futile given that all of the parties herein have the right to depose Mr. Virgile and obtain every fact within his knowledge. Rather, consistent with Mr. Virgile's contractual obligations under the "Assignment of Patent Application," Enterasys is requesting that Mr. Virgile cease-and-desist from acting against Enterasys' efforts to enforce the '022 patent-in-suit by affirmatively "assist[ing] Foundry with its defense" in this case, whether for pay pursuant to a consulting agreement or otherwise.

Please feel free to contact us with any questions or concerns.

Sincerely,

Marc N. Henschke

MNH:nah
cc:   I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
      Sanjeet K. Dutta, Esq. (*VIA EMAIL*)
      Jeremy P. Oczek, Esq. (*VIA EMAIL*)
      K. Mudurian (*VIA EMAIL*)
      Y. Steinberg (*VIA EMAIL*)

35038856

# EXHIBIT 12

ROBINS, KAPLAN, MILLER & CIRESI L.L.P

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

| ATTORNEYS AT LAW | MARC N. HENSCHKE |
|---|---|
| | mnhenschke@rkmc.com |
| | 617-859-2784 |

April 11, 2007

***VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
& U.S. MAIL***

Mr. Kenneth E. Virgile
91 Hill Street
Lexington, MA 02421

      Re:   *Enterasys Networks v. Foundry Networks and Extreme Networks*

Dear Mr. Virgile:

      As you know, this office represents Enterasys Networks (formerly a wholly-owned subsidiary of Cabletron Systems, Inc.) in the above-referenced patent infringement litigation, currently pending in the U.S. District Court in Boston. I write in follow-up to your telephone call with Alan McKenna of my office on October 30, 2006, and as a result of the fact that our office has been informed by Sanjeet Dutta of the law firm Orrick, Herrington & Sutcliffe LLP that you have retained that firm to represent you in connection with the subpoena we served on you on November 9, 2006.

      You will recall that one of the patents at issue in the lawsuit is U.S. Patent No. 6,539,022 (the "'022 Patent"), on which you are the sole named inventor and which matured from the underlying grandfather patent application No. 08/428,403 that you assigned to Standard Microsystems Corporation ("SMC") at the time you worked there. Subsequently, in January of 1996, Cabletron acquired SMC's networking products division, including the then pending grandfather patent application No. 08/428,403 and full rights to all of its progeny. Later, Enterasys acquired certain Cabletron assets, including these same rights to the grandfather patent application No. 08/428,403 and its progeny.

      Notably, we bring to your attention the fact that on May 3, 1995, you executed the attached Assignment of Patent Application wherein you assigned and transferred to SMC your rights to the inventions disclosed in patent application No. 08/428,403. Your obligations under the Assignment of Patent Application (as outlined below) extend to SMC and all of its "successors, assigns and legal representatives or nominees," which includes Cabletron and Enterasys. Specifically, as you will see from the attached Assignment of Patent Application, you agreed:

> when requested, without further charge to Assignee [SMC and its successors and assigns] but at its expense, to communicate to Assignee or its representatives all facts known to the undersigned regarding the aforesaid inventions and improvements, testify in

Mr. Kenneth E. Virgile
April 11, 2007
Page 2

> any legal proceeding, sign all papers, make all rightful oaths and
> declarations, execute all divisional, continuing, re-examination and
> reissue applications and **generally perform all acts, which may**
> **be necessary, desirable or convenient, to aid Assignee in**
> **securing, maintaining and enforcing patents** for the aforesaid
> inventions and improvements in the aforesaid countries, and for
> vesting title thereto in Assignee.

It appears that you are not acting in compliance with your obligations under the
Assignment of Patent Application in at least two respects. First, your statement to Alan
McKenna of our office on October 30, 2006 that you were "not available to help [Enterasys]
with this case" indicates your unwillingness to "aid [Enterasys] in securing, maintaining and
enforcing" the '022 patent. Second, and perhaps of greater concern, is the fact that Attorney
Dutta of Orrick, Herrington & Sutcliffe LLP has informed us that you have retained his law
firm—which also represents defendant Foundry Networks in this matter—and you apparently
have entered into a working relationship with Orrick and/or its client, Foundry. This is
especially troubling since Orrick, on behalf of Foundry, is actively attempting to prevent
Enterasys from enforcing its rights under the '022 patent in this case. In particular, Orrick and
Foundry have asserted that the patent is invalid and that Foundry does not infringe the '022
patent, and may likely challenge the enforceability of the '022 patent as well. Therefore, by
working with Orrick and/or Foundry under these circumstances, you are actively attempting to
prevent Enterasys from enforcing its rights under the '022 patent, rather than aiding Enterasys in
enforcing these rights as your Assignment agreement requires.

In light of these facts it appears that you are in breach of your obligations under the
Assignment of Patent Application. Accordingly, Enterasys demands that you immediately cease
and desist from any further voluntary interactions or working relationship with Orrick,
Herrington & Sutcliffe LLP and/or Foundry Networks in connection with this litigation, and/or
with any other person or entity that would interfere with, impair, or in any way act against
Enterasys' attempt to enforce its rights to the inventions of the '022 Patent.

In addition, Enterasys believes your interactions and conversations with Foundry's
attorneys at Orrick could result in actual or potential breaches of the attorney-client privilege as
it relates to the prosecution of patent application No. 08/428,403 and its progeny, which privilege
is now owned by Enterasys as a result of the fact that Cabletron acquired those rights from SMC
and in turn assigned them to Enterasys. As the sole named inventor, Enterasys is concerned that
any conversations you have or may have already had with Orrick and/or Foundry may result in
your disclosing privileged communications that took place before, during and after the
prosecution of patent application No. 08/428,403. Any such disclosure is improper.

We also note that you executed the attached Confidentiality/Non-Disclosure Agreement
when you worked at Cabletron, and wish to remind you that you remain bound by that
Agreement, which states, in part: "[a]t all times during and subsequent to my employment, I
agree to keep in strictest confidence and trust Cabletron's Confidential Information that is
disclosed to me or to which I have access."

Mr. Kenneth E. Virgile
April 11, 2007
Page 3

Please note that we have also requested by a separate letter that Orrick, Herrington & Sutcliffe LLP and Foundry Networks likewise cease and desist from interacting with you in connection with this matter, or to otherwise encourage or induce you to breach (or further breach) your contractual obligations to Enterasys (as successor and assign of SMC). Please further note that Enterasys reserves all of its rights to enforce your contractual obligations under the Assignment of Patent Application and/or the Confidential/Non-Disclosure Agreement.

In light of the above, we ask that you kindly acknowledge and confirm in writing that you will immediately cease and desist from any further voluntary interactions or working relationship with Orrick, Herrington & Sutcliffe LLP and/or Foundry Networks in connection with this litigation, and/or with any other person or entity that would interfere with, impair, or in any way act against Enterasys' attempt to enforce its rights to the inventions of the '022 Patent.

If you should have any questions or concerns, please do not hesitate to contact me. In the meantime, we look forwarding to receiving your written confirmation.

Sincerely,

Marc N. Henschke

MNH:nah
cc:    Sanjeet K. Dutta, Esq. (*VIA EMAIL*)
       I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
       Matthew. H. Poppe, Esq. (*VIA EMAIL*)
       Jeremy P. Oczek, Esq. (*VIA EMAIL*)
       K. Mudurian (*VIA EMAIL*)
       Y. Steinberg (*VIA EMAIL*)

35038700

Attorney Docket No.: 5635-16

# ASSIGNMENT OF PATENT APPLICATION

For value received, the undersigned sell(s), assign(s) and transfer(s) to:

**Standard Microsystems Corporation**

a corporation organized under the laws of:      **Delaware**
and having a place of business at:      **80 Arkay Drive**
      **Hauppauge, New York 11788**

and to Assignee's successors, assigns and legal representatives or nominees as it may designate (collectively, hereinafter, "Assignee"), the entire right, title and interest, for:

<u>x</u>    The United States of America and Its           <u>x</u>    All countries throughout
    Territories and Commonwealth and Possessions          the world

in and to all inventions and improvements disclosed in an application for United States Patent entitled:

## MULTIMEDIA BANDWIDTH ACCELERATOR

The above-entitled United States Patent application was:

__      executed by the undersigned on:_____

<u>x</u>    filed in the United States Patent and Trademark Office on:_April 25, 1995_____
    and assigned serial number:_08/428,403_____
    filed as PCT International Application No.:_____
    on:_____

    The undersigned assign(s) the rights for all patents, divisions, reissues, reexamination certificates, continuing applications and extensions thereof, together with the right of priority of any earlier corresponding patent application filed by the undersigned in the United States or elsewhere.

    The undersigned covenant(s) that the rights and property conveyed by this Assignment are free and clear of any encumbrance, and that the undersigned have (has) full right to convey the rights and property as expressed herein.

    The undersigned authorize(s) and request(s) that any and all patents on the aforesaid inventions be issued to Assignee.

    The undersigned agree(s), when requested, without further charge to Assignee but at its expense, to communicate to Assignee or its representatives all facts known to the undersigned regarding the aforesaid inventions and improvements, testify in any legal proceeding, sign all papers, make all rightful oaths or declarations, execute all divisional, continuing, re-examination and reissue applications and generally perform all acts, which may be necessary, desirable or convenient, to aid Assignee in securing, maintaining and enforcing patents for the aforesaid inventions and improvements in the aforesaid countries, and for vesting title thereto in Assignee.

Date: _May 31, 1995_____            _Kenneth Virgile_____
                                    VIRGILE, Kenneth

ETS0000153

State of _Massachusetts_
                        ) ss.:
County of _Essex_       )

    This _31st_ day of _May_        , 1995, before me
personally came the above-named Kenneth Virgile to me personally
known as the individual who executed the foregoing assignment, who
has acknowledged to me that he executed the same of his own free
will for the purposes therein set forth.

                              _Carole Cassidy Danner_
                              Notary Public

                              CAROLE CASSIDY DANNER
                              NOTARY PUBLIC
                              My Commission Expires March 29, 2002

ETS0000154



**Confidential/Non-Disclosure Agreement**

**THIS AGREEMENT CREATES IMPORTANT OBLIGATIONS WHICH ARE BINDING. PLEASE READ IT IN FULL BEFORE YOU SIGN IT.**

I recognize that Cabletron Systems Inc., with an address of 35 Industrial Way, Rochester, New Hampshire, 03867, and subsidiaries ("Cabletron") are engaged in a continuous program of research, development, production and distribution of computer related products, and that it is part of my responsibility as an employee to assist Cabletron in such endeavors.

I recognize the importance of protecting Cabletron's rights to inventions, discoveries, ideas and confidential information, and any similar or related rights.

Therefore, in consideration of my employment by Cabletron and the compensation received by me from Cabletron from time to time, I agree to the following terms:

1. **Definitions.**
     For purposes of this Agreement:
(a) **Company's or Cabletron's Confidential Information** includes any of the following: (i) any and all versions of Cabletron's proprietary computer software, firmware, hardware and documentation; (ii) other proprietary software, firmware, hardware and documentation and information previously, now or later created, developed, produced or distributed by Cabletron (including, without limiting the generality of the foregoing, any such software, firmware, hardware and documentation and information created, developed or produced by me or distributed or made known to me during the period of or arising out of my service to Cabletron); (iii) Cabletron's business methods and practices; (iv) compilations of data or information concerning Cabletron's business; (v) the name of Cabletron's suppliers and customers and the nature of Cabletron's relationships with these suppliers or customers; (vi) the business of Cabletron's customers; (vii) confidential, proprietary or trade secret information submitted by Cabletron's suppliers, employees, consultants to or co-venturers with Cabletron for study, evaluation or use; and (viii) any other information not generally known to the public (including information about Cabletron's operations, personnel, products or services) which if misused or disclosed, could have a reasonable possibility of adversely affecting the business of Cabletron.

(b) **Inventions** means all discoveries, developments, designs, improvements, inventions, formulae, processes, techniques, computer programs, object codes, source codes, strategies, specific computer-related know-how and data, whether or not patentable or registerable under patent, copyright or similar statutes, generated or conceived or reduced to practice or learned by me, either alone or jointly with others, that are related to or useful in the business of Cabletron, or result from tasks assigned to me by Cabletron, or result from the use of premises or property (including equipment, software, firmware, hardware, supplies, facilities or Cabletron's Confidential Information) owned, leased, licensed or contracted for by Cabletron.

2. **Non-Disclosure of Information.**

At all times during and subsequent to my employment, I agree to keep in strictest confidence and trust Cabletron's Confidential Information that is disclosed to me or to which I have access. I will not use or disclose such Company's Confidential Information without the written consent of Cabletron, except as may be necessary in the ordinary course of performing my duties for Cabletron. However, I shall not be required to treat as confidential any of Cabletron's Confidential Information which: (i) was in my possession or was known to me prior to receipt from Cabletron, or (ii) is or becomes public knowledge without my fault, or (iii) is or becomes lawfully available to me from a source other than Cabletron.

3. **Surrender and Assignment of Rights of Confidential Information.**

I hereby assign to Cabletron any rights I now have or may hereafter acquire in Cabletron's Confidential Information. Upon termination of my employment with Cabletron, for whatever reason, I will promptly surrender to Cabletron all copies, in whatever form, of Cabletron's Confidential Information in my possession, custody or control, and I will not take with me any of Cabletron's Confidential Information that is embodied in a tangible medium of expression.

ETS00034106

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**4.   Disclosure and Assignment of Inventions.**  *KEV*

During my service as an employee of Cabletron ~~and for a period of six (6) months thereafter~~, I will promptly and fully disclose to Cabletron (and to any persons designated by it) all Inventions generated, conceived or reduced to practice or learned by me, either alone or jointly with others, which in any way relate to the business of Cabletron during such period, including, without limiting the generality of the foregoing, computer software, firmware and hardware techniques, and document coding techniques. I agree that any Inventions resulting from my services on behalf of Cabletron are works made for hire and all of the above described Inventions shall be the sole property of Cabletron and its assigns, and Cabletron and its assigns shall be the sole owner of all patents, copyrights, trademark, trade secrets, and other rights and protections in connection therewith. I hereby assign to Cabletron any and all rights I now have or may hereafter acquire to such Inventions.

**5.   Non-Competition.**

I agree that while I am employed by Cabletron, I will not without Cabletron's express written consent, engage in any consulting, employment or business that is competitive with the business of Cabletron. ~~I agree that for a period of one (1) year after my employment is terminated by Cabletron or by me for any reason, (ii) I will not, in the territories of directly or indirectly engage in the sale of any products for any firm or corporation or institution which are competitive with products sold by Cabletron, (ii) I will not recruit or hire any employee of Cabletron or otherwise induce any employee to leave the employment of Cabletron to become an employee of or otherwise be associated with me or any company or business which I may become associated, and (iii) I will not solicit business from any customer of Cabletron made known to me by Cabletron during my employment or contacted by me during my employment with Cabletron.~~

**6.   Employment.**

I understand that nothing contained in this Agreement shall be construed as constituting a commitment, guaranty, agreement or understanding of any kind or nature that I shall continue to be an employee of Cabletron, nor shall this Confidential/Non-Disclosure Agreement affect in any way the right of Cabletron to terminate my employment at any time or for any reason whatsoever. By my execution of this Agreement, I acknowledge and agree that my employment is "at will". No change in my duties as an employee shall be deemed to be a modification of the terms of this Agreement.

**7.   Enforcement.**

I agree that in the event of a breach or threatened breach of the provisions of this Agreement, Cabletron's remedies at law would be inadequate, and Cabletron shall be entitled to an injunction to enforce such provisions (without any bond or other security being required), but nothing herein shall be construed to preclude Cabletron from pursuing any remedy at law or in equity for any breach or threatened breach.

**8.   Miscellaneous.**

(a) **Successors.**  The rights and obligations under this Agreement shall survive the termination of my service to Cabletron in any capacity and shall inure to the benefit of and shall be binding upon: (i) my heirs and personal representatives, and (ii) the successors and assigns of Cabletron.

(b) **Governing Law.**  The laws of the State of New Hampshire shall govern all questions relative to interpretation and construction of this Agreement and to its performance.

(c) **Severability.**  If any provision of this Agreement is wholly or partially unenforceable for any reason, such unenforceability shall not affect the enforceability of the balance of this Agreement, and all provisions of this Agreement shall, if alternative interpretations are applicable, be construed so as to preserve the enforceability hereof. To the extent that any provisions hereof are found to be unenforceable by reason of an excessive scope or duration, then they shall be so construed as calling for the maximum scope and/or duration, as the case may be, as may be permitted by law.

(d) **Waiver.**  Cabletron's waiver of any default by me shall not constitute waiver of its rights under this Agreement with respect to any subsequent default by me.

**I HAVE READ THIS AGREEMENT, UNDERSTAND IT, AND AGREE TO ITS TERMS.**

*1/5/96*
_____
Date

*Kenneth E. Virgile*
_____
Employee Signature

*Kenneth E Virgile*
_____
Print Name

Revised 8/94

ETS00034107

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

EXHIBIT 13

# PROSKAUER ROSE LLP

One International Place
Boston, MA  02110-2600
Telephone 617.526.9600
Fax 617.526.9899

NEW YORK
LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

**Steven M. Bauer**
Member of the Firm

Direct Dial 617.526.9700
sbauer@proskauer.com

January 23, 2007

*Via E-Mail*

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi LLP
25th Floor, Prudential Tower
800 Boylston Street
Boston, MA 02199

      Re:    Enterasys Networks, Inc. v. Foundry Networks, Inc. *et al.*
              Civil Action No. 05-11928-DPW

Dear Marc:

    Following up on our call on Friday, this letter is to confirm the following:

1.  No one working on the Foundry/Enterasys litigation has had any discussions with Ken Rubenstein or Evan Kahn regarding their substantive involvement (if any) relating to any patent application related to any matter in this case.

2.  In the course of the Foundry/Enterasys litigation, neither Mr. Rubenstein nor Mr. Kahn have done any work for Foundry and neither has reached out to, assisted or otherwise communicated with any investors of any Enterasys-owned patents, nor have they been asked to do so.

3.  Our firm does not now have any prosecution related files relating to the Enterasys-owned patents in this litigation.  My understanding is that those files were transferred out several years ago.

4.  We have put in place an ethical wall to assure that no one working on the Enterasys litigation will discuss the litigation or other related matters with either Mr. Rubenstein or Mr. Kahn.

PROSKAUER ROSE LLP

Marc Henschke
January 23, 2007
Page 2

I trust that this gives you the assurances you need that the Foundry legal team at Proskauer has not made improper use of any confidential or privileged information (if my partners even have any such information) regarding the patent application now owned by your client.

Very truly yours,

Steven M. Bauer

EXHIBIT 14

April 24, 2007

91 Hill Street
Lexington, MA  02421

Mr. Marc N. Henschke
Robins, Kaplan, Miller & Ciresi, L.L.P.
800 Boylston Street, 25th floor
Boston, MA  02199

   Re: Enterasys Networks v. Foundry Networks and Extreme Networks

Dear Mr. Henschke:

   I am writing in follow up to your letter dated April 11, 2007, concerning your request for me to cease and desist my relationship with Orrick, Herrington & Sutcliffe LLP and/or Foundry Networks. Your assertions are illogical and your allegations of breach of contract are blatantly false. Your demands are ambiguous and not clear to me. I am requesting clarification of all of the above.

   You have mentioned patent application '403 and the continuation patent '022. The Assignment of Patent Application uses the phrase "inventions and improvements" to refer to the '403 patent application. You cite from the Assignment of Patent Application that the undersigned agrees to "... execute ... continuing ... applications", but the clause calling for aid for patent enforcement does not mention patent continuations, but rather explicitly states just the original application, i.e., "enforcing patents for the aforesaid inventions and improvements". Then you state how "in light of these facts" I am in breach of my obligations. You are not claiming that I am failing to aid the patent enforcement of the '403 patent. You are claiming that I am failing to aid the patent enforcement of the '022 continuation patent, yet the Assignment of Patent Application clearly omits continuation patents from requiring my aid to such patent enforcement. Thus your assertion is illogical.

   Regardless of the above, even if I were to accept your illogical conclusion that the Assignment of Patent Application applies to the '022 patent, you make two statements that I am not acting in compliance, but they are both blatantly false. You state that first, my expressed unwillingness to help Enterasys is a breach of my obligations. However, the Assignment of Patent Application does not mention "willingness" or "unwillingness", but uses the phrase "when requested ... to aid Assignee". As you well know, there has been just one request by your office for my assistance since I have stated my unwillingness. That request was for documentation production, and I fully complied with that request. Thus you are fully aware that what you have stated as your first argument is blatantly false.

   You state as "second and perhaps of greater concern" that by working with Orrick and/or Foundry I am attempting to prevent Enterasys's patent enforcement. Yet you are well aware of the fact that Orrick on behalf of Foundry is not currently contesting the enforceability of the patent. Thus, your second argument is blatantly false.

   You state that more than one patent is involved in this litigation, so I do not understand your cease and desist demands. Are you demanding me to not assist with any of the patents, or just with the '022 patent? You mention that the defense has asserted

patent invalidity and non-infringement, but not unenforceability. However, your arguments in the cease and desist letter only refer to enforceability. Are you demanding that I do not assist with patent invalidity? Are you demanding that I do not assist with non-infringement? Are you demanding that I do not assist with unenforceability?

I also understand there to be several issues with regard to your letter that I have not presented here. However, at this time, I am only requesting clarification of the issues that I have raised.

Sincerely,

Kenneth Virgile

cc:    Sanjeet K. Dutta, Esq.
       Orrick, Herrington & Sutcliffe LLP
       1000 Marsh Road
       Menlo Park, CA  94025-1015

# EXHIBIT 15

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2734

May 2, 2007

*VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED*
*& U.S. MAIL*

Mr. Kenneth E. Virgile
91 Hill Street
Lexington, MA 02421

Re: *Enterasys Networks v. Foundry Networks and Extreme Networks*
    *Civ. Act. No. 05-11298-DPW (D. Mass)*
    Our File No.: 070610.0001

Dear Mr. Virgile:

This will respond to your letter to me dated April 24, 2007 that purports to seek clarification as to the nature of the cease and desist demand that Enterasys has made of you relative to your interactions with Foundry and its representatives in the above-referenced case.

As an initial matter, please allow us to correct certain misunderstandings reflected in your April 24th letter. First, you are clearly mistaken in suggesting that your contractual obligation under the Assignment of Patent Application "to aid … [Enterasys in] … enforcing patents for the aforesaid inventions" applies only to the underlying 08/428,403 grandfather patent application, and does *not* apply to the '022 patent-in-suit. Indeed, you appear not to appreciate the fact that because the '022 patent is a continuation patent that shares the same specification as its grandparent, by definition the inventions disclosed in the '022 patent are one and the same as those disclosed in the underlying 08/428,403 application.

Second, you are likewise clearly mistaken in suggesting that the word "enforcing" as used in the Assignment of Patent Application is somehow a reference to the technical legal doctrine of "unenforceability" recognized under patent law. To the contrary, the word "enforcing" is being used in accordance with its common and ordinary meaning -- *viz.*, "compelling observance of or obedience to" a particular set of rights. Thus, as applied here, Enterasys is "enforcing" its rights in and to the '022 patent by bringing the present lawsuit against Foundry in which it is seeking to enjoin future infringements and to obtain compensatory damages for past infringements. Your contractual obligations are to assist Enterasys in these efforts in accordance with the terms of your executed Assignment, and you are concomitantly prohibited from acting so as to frustrate Enterasys in carrying out these efforts.

As to clarifying the nature of Enterasys' cease and desist demand, we have now learned subsequent to sending my previous letter to you dated April 11, 2007 that you in fact are

Mr. Kenneth E. Virgile
May 2, 2007
Page 2

involved in a "contractual consulting relationship" with Foundry pursuant to which you have "agreed to assist Foundry with its defense" in this case against Enterasys' assertion of the '022 patent on which you are the sole named inventor. This is precisely the type of activity that we are demanding that you cease and desist from engaging in because it is wholly irreconcilable with, and in breach of, your contractual obligations to assist Enterasys in enforcing the '022 patent.

To frame the matter precisely, Enterasys is demanding that you cease and desist from affirmatively assisting Foundry or its representative in this case with Foundry's defense against Enterasys' allegations of infringement under the '022 patent. Thus, Enterasys is instructing that you *not*, for example, provide affirmative assistance with respect to Foundry's non-infringement, invalidity, and/or unenforceability positions relative to the '022 patent, whether for pay pursuant to a consulting contract or otherwise. By contrast, Enterasys does not, and cannot, seek to preclude you from providing all relevant facts within your knowledge on an uninterested third party basis in the event that your deposition is ultimately taken.

We ask that you promptly acknowledge and confirm in writing that you intend to comply with the cease and desist demand as outlined above. In the meantime, please feel free to contact us with any questions or concerns.

Sincerely,

Marc N. Henschke

MNH:nah
cc:     Sanjeet K. Dutta, Esq. (*VIA EMAIL*)
        I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & EMAIL*)
        Matthew. H. Poppe, Esq. (*VIA EMAIL*)
        Jeremy P. Oczek, Esq. (*VIA EMAIL*)
        K. Mudurian (*VIA EMAIL*)
        Y. Steinberg (*VIA EMAIL*)

35039033

# EXHIBIT 16

LEXSEE 2003 US DIST LEXIS 26993



Positive
As of: May 15, 2007

**PANDROL USA, LP, et al., Plaintiffs, vs. AIRBOSS RAILWAY PRODUCTS, INC.,
et al., Defendants.**

**No. 99-0182-CV-W-SOW**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
MISSOURI, WESTERN DIVISION**

*2003 U.S. Dist. LEXIS 26993*

**October 15, 2003, Decided**

**SUBSEQUENT HISTORY:** Affirmed by *Pandrol USA,
LP v. Airboss Ry. Prods., 424 F.3d 1161, 2005 U.S. App.
LEXIS 20054 (Fed. Cir., 2005)*

**PRIOR HISTORY:** *Pandrol United States, LP v.
Airboss Ry. Prods., 1999 U.S. Dist. LEXIS 22847 (W.D.
Mo., Dec. 3, 1999)*

**COUNSEL:** [*1] For Pandrol USA LP, Plaintiff: Allen
I. Rubenstein, Gottlieb, Rackman & Reisman, P.C., New
York, NY; Tammy L. Horn, Brous, Horn, LLC, Overland
Park, KS.

For Pandrol Limited, a company registered in England,
Plaintiff: Allen I. Rubenstein, Norbert P. Holler, Gottlieb,
Rackman & Reisman, P.C., New York, NY; Tammy L.
Horn, Brous, Horn, LLC, Overland Park, KS.

For Airboss Railway Products, Inc., Airboss of America
Corp., a company registered in Canada, Robert M
Magnuson, Jose R Mediavilla, Defendants: Barry A.
Cooper, Gottlieb, Rackman & Reisman, P.C., New York,
NY; Richard R. Johnson, Blackwell, Sanders, Peper,
Martin, LLP, Kansas City, MO.

For Airboss Railway Products, Inc., Airboss of America
Corp., Robert M Magnuson, Counter Claimants: Richard
R. Johnson, Blackwell, Sanders, Peper, Martin, Kansas

City, MO.

For Airboss of America Corp., Counter Claimant: James
H. Marsh, Jr., Stinson, Morrison & Hecker, LLP, Kansas
City, MO; John C. Dods, III, Shook Hardy & Bacon
LLP-Grand, Kansas City, MO.

**JUDGES:** SCOTT O. WRIGHT, Senior United States
District Judge.

**OPINION BY:** SCOTT O. WRIGHT

**OPINION:**

ORDER

Before the Court are plaintiffs' Motion for Summary
Judgment and for a Preliminary [*2] Injunction (Doc. #
232), defendants' Motion for Summary Judgment (Doc. #
237), and plaintiffs' Motion to Strike or Preclude
Evidence Proffered in Support of Defendants' Cross
Motion for Summary Judgment (Doc. # 241). All of these
motions have been fully briefed and are ripe for review.
For the reasons stated below, plaintiffs' Motion for
Summary Judgment is granted, defendants' Motion for
Summary Judgment is denied, and plaintiffs' Motion to
Strike is granted.

I. Background

Case 1:05-cv-11298-DPW    Document 100-17    Filed 05/16/2007    Page 3 of 6

Page 2
2003 U.S. Dist. LEXIS 26993, *2

This case has been remanded to this Court following an appeal to the Federal Circuit. The only issue on remand is the validity of plaintiffs' patent as challenged by defendants as an affirmative defense. *See, Pandrol USA, LP v. Airboss Railway Products, Inc., 320 F.3d 1354, 1366 (Fed. Cir. 2003).*

Plaintiffs Pandrol USA, LP and Pandrol Limited ("Pandrol") have moved for summary judgment on the issue of validity as to all claims of *U.S. Patent No. 5,110,046* ("the *'046 patent"). Pandrol also requests that a permanent injunction be issued and the monetary judgment previously entered against defendants be restored. At the same time, defendants AirBoss Railway Products, Inc., AirBoss of America [*3] Corp., Robert M. Magnuson, and Jose R. Mediavilla ("AirBoss") have moved for summary judgment arguing that the patent in suit is invalid.

The undisputed material facts relevant to the pending motions for summary judgment are as follows: AirBoss' Answer to Pandrol's Complaint alleges that the *'046 patent* is invalid. The only evidence proffered by AirBoss discussing the issue of validity is a report from Frank Scott. Defendants attempt to controvert this statement by relying on the declaration of Hartley Young. Plaintiffs have filed a separate motion seeking to preclude defendants from relying on the Young declaration.

In the Narrative of Expected Testimony of Frank Scott, Airboss states that there was new subject matter added to the specification by an Amendment submitted on March 13, 1991, when the words "layer 12 of" were added and the word "is" was deleted. Plaintiff Pandrol notes that the Federal Circuit specifically considered the materiality of all the changes to the specification relied upon by AirBoss and concluded:

> the patentee amended the specification to refer to the new drawings, by adding "layer 12 of" between "by" and "adhesives" and deleting the word "is" between [*4] "plate 10" and "fitted" . . . . The addition of the phrase "layer 12 of" and the deletion of the word "is" are without significance.

*Pandrol v. AirBoss, 320 F.3d at 1364.*

Defendants claim that the following undisputed material facts support their own motion for summary judgment in which they claim that the patent is invalid because the written description is inadequate: (1) that the original application for the *'046 patent* lacks a description of a gasket that constitutes "a layer of adhering material . . . for adhering said plate to said tie . . ." as required by all claims of the *'046 patent* and (2) that the original application for the *'046 patent* lacks a description of a gasket constituting "a layer of adhering material" that is the "sole means for adhering said plate to said tie . . ." as required by all claims of the *'046 patent.* Again, both of these allegedly undisputed material facts rely on the declaration of Hartley Young that plaintiffs have moved to exclude. In addition, plaintiffs controvert defendants statements of fact by pointing out that the description of the gasket is found in the *'046 patent* at column 2, lines 7-10 and 37-42. The Federal Circuit [*5] has determined that such a gasket is described in the patent. Pandrol v. AirBoss, Appeal No. 00-1161, unpublished slip opinion at 11.

## II. Standard

A motion for summary judgment should be granted if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c); Rafos v. Outboard Marine Corp., 1 F.3d 707, 708 (8th Cir. 1993)* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).* The movant bears the initial burden of making a prima facie showing of the absence of a genuine issue of material facts and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* In so doing, a movant who will not bear the burden of persuasion at trial need not negate the non-movant's claim, but may make its prima facie showing simply by pointing out the lack of evidence on an essential element of the non-movant's claim. *See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664 (10th Cir. 1998)*(citing [*6] *Celotex, 477 U.S. at 325).*

## III. Discussion

The key issue before this Court is the validity of the *'046 patent.* Under the patent statutes, a patent enjoys a heavy presumption of validity. *See 35 U.S.C. § 282.* This presumption can be overcome only through clear and convincing evidence. *United States Surgical Corp. v.*

Case 1:05-cv-11298-DPW    Document 100-17    Filed 05/16/2007    Page 4 of 6

Page 3
2003 U.S. Dist. LEXIS 26993, *6

*Ethicon, Inc., 103 F.3d 1554, 1563 (Fed. Cir. 1997).* If Pandrol can show that AirBoss has failed to produce clear and convincing evidence on an essential element of their defense of validity, then Pandrol is entitled to summary judgment. *See Eli Lilly & Co. v. Barr Laboratories, Inc., 251 F.3d 955, 962 (Fed. Cir. 2001)*(en banc). The Federal Circuit has upheld the entry of summary judgment based upon validity where the defense of invalidity was premised on alleged defects of the patent specification to adequately describe the invention. Id.

The burden of establishing invalidity of the *'046 patent* is on AirBoss. *35 U.S.C. § 282.* AirBoss has had an opportunity to conduct discovery and produce evidence and experts to support defendants' allegations of invalidity. [*7] Plaintiffs argue that the only evidence proffered by AirBoss discussing any issue of validity is the single report of alleged expert Frank Scott. In the Narrative of Expected Testimony of Frank Scott, defendants state:

> Mr. Scott's expected testimony is that a reading of the patent specification and prosecution history and various statements made by application/patentee therein make it clear that the layer of adhering material must bond the plate to the tie in the manner of the epoxy adhesive which is the only adhesive material disclosed in the patent.

> Mr. Scott is also expected to testify that there was new subject matter added to the specification by an Amendment submitted on March 13, 1991 when the words "layer 12 of" were added and the word "is" was deleted. These changes amount to changing the content and meaning of the disclosure.

Plaintiff suggests that given the Scott report, the only invalidity defense being asserted by AirBoss is a new matter defense. In order to prove such a defense, AirBoss must demonstrate that an amendment added new matter. *See Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1574 (Fed. Cir. 1992);* [*8] *35 U.S.C. § 132.*

An amendment to a specification does not violate the new matter rule if it merely clarifies or completes the

original disclosure. *Hobbs v. Beach, 180 U.S. 383, 21 S. Ct. 409, 45 L. Ed. 586, 1901 Dec. Comm'r Pat. 311 (1901).* Similarly, amendment of the specification and drawings to conform to each other does not constitute new matter. *In re Heinle, 342 F.2d 1001, 1007, 52 C.C.P.A. 1164, 1965 Dec. Comm'r Pat. 406 (CCPA 1965).* The examiner's allowance of an amendment to the specification during prosecution of the patent before the U.S. Patent and Trademark Office carries an "especially weighty presumption of correctness" in support of validity. *See Brooktree Corp., 977 F.2d at 1574-75.*

In this case, where the claims were amended to include elements disclosed in the specification of the patent, but not shown in the drawings, the patent examiner may require the applicant to amend the drawings. Similarly, an applicant may amend the language of the specification provided that the changes are not so substantial as to amount to the introduction of new matter into the application. It is one of the responsibilities of the examiner to determine whether such changes constitute new matter. Here, the patent [*9] examiner allowed the amendment and the Federal Circuit has already ruled that the change to the specification did not effect any significant change.

Plaintiff argues that based upon the patent examiner's decision to permit the amendments and the Federal Circuit's finding that the amendments were without significance, it is impossible for AirBoss to prove its defense of invalidity based on the amendments. In opposing plaintiffs' Motion for Summary Judgment, AirBoss relies on the declaration of Hartley Young as well as new prior art. Plaintiffs have filed a motion to preclude the consideration of such evidence. Pandrol states that the new prior art was withheld during discovery, trial preparation, and the appeal. In addition, Pandrol argues that Young's proposed testimony is barred by the doctrine of assignor estoppel.

A. AirBoss' Purported Evidence of Invalidity

1. Prior Art

AirBoss relies on a patent and several publications in attempting to demonstrate that the patented invention was obvious when the patent application was filed. The Hixson patent was not disclosed in AirBoss's identification of prior art prior to trial. Similarly, AirBoss's exhibits 4, 5, 8A, 9A, [*10] 9B, 9C, 9D and 9E were not disclosed in the identification of prior art.

These items were not disclosed to Pandrol until AirBoss filed its cross-motion for summary judgment and suggestions in opposition to Pandrol's motion for summary judgment.

Prior to trial in this matter, AirBoss did not propose any jury instructions on the issue of obviousness and explicitly opposed any instruction on that point. Instead, AirBoss informed the Court that it was not alleging invalidity based on obviousness. As a result, the Court will not allow AirBoss to come forward at this late date and proffer evidence that the claims are invalid in view of prior art. *See Wanda Lee Sturm v. Clark Equipment Co., 547 F. Supp. 144, 146 (W.D. Mo. 1982)*.

2. Young Testimony

Pursuant to the doctrine of assignor estoppel, one who has assigned the rights to a patent cannot later contend that what was assigned was a nullity. *Diamond Scientific Co. v. Ambico, Inc., 848 F.2d 1220, 1224 (Fed. Cir.)*, cert. denied, *487 U.S. 1265, 109 S. Ct. 28, 101 L. Ed. 2d 978 (1998)*. In this case, Young signed a declaration attesting to his belief in the validity of the invention of the *'046 patent* and participated [*11] in the prosecution of the patent. Young is now an employee or consultant to AirBoss. To the extent that he is attacking the validity of his invention, that he assigned to Pandrol, his testimony is precluded as a matter of law. *Diamond Scientific Co., 848 F.2d at 1226*.

In addition, Young's declaration sets forth his opinions on the interpretation of the patent specification and these opinions are offered as expert testimony under *Federal Rule of Evidence 702*. These opinions are excluded from consideration by Court as AirBoss did not produce an expert report by Young prior to trial.

In sum, the Court will not consider Young's declaration.

B. AirBoss Has Not Proved Invalidity By Clear and Convincing Evidence

AirBoss has failed to produce any admissible evidence to support its argument that the *'046 patent* is invalid. The patent as originally filed does disclose the claimed invention of a layer of adhering material that is the sole means for adhering, including either an epoxy adhesive or an HDPE gasket. The specification expressly discloses that the invention is preferred to adhere. Two alternatives are then disclosed for [*12] achieving this invention: either the use of the plate with epoxy or with an HDPE closed cell foam gasket.

The statements in the *'046 patent* are more than adequate to satisfy the written description requirement of *35 U.S.C. § 112*. Claim 1 is disclosed in the original application. As to claim 2, AirBoss simply argues that it incorporates the alleged undisclosed language of claim 1. This argument fails as a matter of law since claim 1 is valid. Claim 3 is also disclosed in the original application. AirBoss has no evidence from which a reasonable juror could find in its favor on a defense of inadequate written description under *35 U.S.C. § 112*.

Similarly, AirBoss has insufficient evidence to prove the validity defense of obviousness.

IV. Conclusion

For the reasons stated above, it is hereby

ORDERED that plaintiffs' Motion for Summary Judgment (Doc. # 232) is granted. It is further

ORDERED that defendants' Motion for Summary Judgment (Doc. # 237) is denied. It is further

ORDERED that plaintiffs' Motion to Strike or Preclude Evidence Proffered in Support of Defendants' Cross Motion for Summary Judgment (Doc. # 241) is granted. It is [*13] further

ORDERED that the permanent injunction is reinstated. It is further

ORDERED that the previous award of damages to Pandrol for AirBoss's infringement is reinstated.

SCOTT O. WRIGHT

Senior United States District Judge

Dated: 10/15/2003

**JUDGMENT IN A CIVIL CASE**

**Decision by Court.** This action has come before the Court as a briefed matter and a decision has been rendered.

ORDERED that plaintiffs' Motion for Summary

Judgment (Doc. # 232) is granted. It is further

ORDERED that defendants' Motion for Summary Judgment (Doc. # 237) is denied. It is further

ORDERED that plaintiffs' Motion to Strike or Preclude Evidence Proffered in Support of Defendants' Cross Motion for Summary Judgment (Doc. # 241) is granted. It is further

ORDERED that the permanent injunction is reinstated. It is further

ORDERED that the previous award of damages to Pandrol for AirBoss's infringement is reinstated.

Monetary damages restored.

October 16, 2003

Date

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| PANDROL USA, LP, and<br>PANDROL LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 99-0182-CF-W-SOW |
| | ) | |
| AIRBOSS RAILWAY PRODUCTS, INC.,<br>AIRBOSS OF AMERICA CORP.,<br>ROBERT M. MAGNUSON, and<br>JOSE R. MEDIAVILLA, | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFFS' MOTION TO PRECLUDE EVIDENCE PROFFERED IN SUPPORT OF
DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT

In support of their cross motion for summary judgment, defendants rely
upon two categories of inadmissible evidence, which should be precluded by the Court.
First, they rely on new prior art that was withheld during discovery, trial preparation and
the appeal as well as from the required statutory disclosure. Withholding of that alleged
prior art until now is prejudicial to plaintiffs if the Court considers the new evidence
when ruling on defendants' pending dispositive motion. Second, defendants rely on new
testimony from Hartley Young, the inventor of the '046 patent, against the patent rights
he assigned. Young's testimony is barred by the doctrine of assignor estoppel.

For the reasons set forth in Plaintiffs' Reply Suggestions in Support of
Their Motion for Summary Judgment and for a Preliminary Injunction, in Opposition to
Defendants' Cross Motion for Summary Judgment and in Support of Plaintiffs' Motion to
Preclude Evidence, which are being filed contemporaneously with this motion, both
categories of inadmissible evidence should be precluded from the Court's consideration

of defendants' pending cross motion for summary judgment.

Respectfully submitted,

BROUS HORN LLC

/s/ Tammy L. Horn
Tammy L. Horn MO #39012
10313 West 140th Street
The Carriage House
Overland Park, KS 66221
(913) 897-7877

Allen I. Rubenstein
Raymond B. Churchill
Gottlieb, Rackman & Reisman, P.C.
270 Madison Avenue
New York, NY 10016
(212) 684-3900

Certificate of Service

I certify that on this 30th day of May, 2003, a copy of the foregoing was filed

electronically pursuant to the Electronic Case Filing rules of the Western District of

Missouri and e-served on:

> Richard R. Johnson
> Shook, Hardy & Bacon, L.L.P.
> One Kansas City Place
> 1200 Main Street
> Kansas City, MO 64105-2088
> rjohnson@shb.com
> COUNSEL FOR DEFENDANTS

/s/ Tammy L. Horn
Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| PANDROL USA, LP, and<br>PANDROL LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 99-0182-CF-W-SOW |
| | ) | |
| AIRBOSS RAILWAY PRODUCTS, INC.,<br>AIRBOSS OF AMERICA CORP.,<br>ROBERT M. MAGNUSON, and<br>JOSE R. MEDIAVILLA, | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFFS' REPLY SUGGESTIONS IN SUPPORT OF THEIR MOTION
FOR SUMMARY JUDGMENT AND FOR A PRELIMINARY INJUNCTION, IN
OPPOSITION TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF PLAINTIFFS' MOTION TO PRECLUDE EVIDENCE[1]

Respectfully submitted,

BROUS HORN LLC
Tammy L. Horn MO #39012
10313 West 140th Street
The Carriage House
Overland Park, KS 66221
(913) 897-7877

GOTTLIEB, RACKMAN & REISMAN, P.C.
Allen I. Rubenstein
Raymond B. Churchill
270 Madison Avenue
New York, NY 10016
(212) 684-3900
ATTORNEYS FOR PLAINTIFFS

---

[1] In the interests of efficiency and brevity, plaintiffs are combining in one brief – rather than filing three separate briefs – their reply brief in support of their motion for summary judgment, their brief in opposition to defendants' cross motion for summary judgment and their brief in support of their motion to preclude evidence proffered by defendants in support of their cross motion for summary judgment.

Table of Contents

Table of Authorities   ...…………………………………………………………………………………iv

Plaintiffs' Reply to AirBoss's Response to Plaintiffs'
Statement of Uncontroverted Material Facts ……………...…………………………………………1

Plaintiffs' Response to AirBoss's Statement of Uncontroverted Facts………………………….2

PRELIMINARY STATEMENT     …………………………………………………………… 3

LEGAL ARGUMENT     …………………………………………………………… 4

   A. AirBoss's motion is inappropriately based on undisclosed and
      inadmissible evidence.     …………………………………………………………… 4

      1.  Prior art not previously disclosed cannot be used for this motion…………………….4

         a. The prior art now deemed critical was withheld from discovery…………………5

         b. The prior art now deemed critical was withheld during
            trial preparation.     ………………………………………………………….. 6

         c. The prior art now deemed critical was withheld during appeal…………………7

         d. The prior art now deemed critical was withheld from the
            required statutory disclosure………………………………………………..…...8

         e. Withholding of alleged prior art until now is prejudicial
            to Pandrol.     …………………………………………………………… 8

         f.  New argument based on new evidence should be
            precluded without reopening discovery.     ………………………………… 9

      2.  The inventor/assignor Young cannot testify as to the
         invalidity the '046 patent he assigned………………………………………..……..10

   B. As a matter of law AirBoss's contentions do not satisfy its burden
      of proving invalidity by clear and convincing evidence…………………………..     12

      1.  AirBoss cannot prove invalidity based on insufficient written
         description because the '046 specification sufficiently discloses
         the invention of the claims……………………………………………………..     12

ii

       a.  Properly construed as a matter of law claim 1 is disclosed
          in the original application.   …………………………………………………… 14

       b.  Properly construed as a matter of law claim 2 is disclosed
          in the original application.   …………………………………………………… 17

       c.  Properly construed as a matter of law claim 3 is disclosed
          in the original application.   …………………………………………………… 17

    2.  AirBoss cannot prove invalidity based on obviousness because
       the '046 patent claims subject matter not disclosed or suggested
       by the prior art.  ………………………………………………………………… 21

       a. No material issue is raised concerning the obviousness of claim 1……. 22

       b. No material issue is raised concerning the obviousness of claim 2…….. 25

       c. No material issue is raised concerning the obviousness of claim 3…….. 26

       d.  Secondary considerations support a conclusion of
          non-obviousness.   …………………………………………………… 27

C.  A preliminary injunction to enjoin AirBoss's continued infringement
    may be entered.   …………………………………………………………….. 28

CONCLUSION    ………………………………………………………………… 29

Table of Authorities

CASES

A.J. by L.B. v. Kierst, 56 F.3d 849 (8th Cir. 1995) ............................................................ 7, 11, 23

Carroll Touch, Inc. v. Electro Mechanical Systems, Inc., 15 F.3d 1573 (Fed. Cir. 1993) ........... 10

Diamond Rubber Co., v. Consolidated Rubber Tire Co., 220 U.S. 428 (1911) .......................... 20

Diamond Scientific Co. v. Ambico, Inc., 848 F.2d 1220 (Fed. Cir.)...................................... 10, 11

Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) ........................... 21

Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322 (8th Cir. 1985)............................................ 9

Howes v. Medical Components, Inc., 814 F.2d 638 (Fed. Cir. 1987) ......................................... 15

In re Kotzab, 217 F.3d 1365, 1370 (Fed. Cir. 2000)..................................................................... 23

In re Merck & Co., Inc., 800 F.2d 1091 (Fed. Cir. 1986)............................................................ 21

In re Mills, 916 F.2d 680, 682 (Fed. Cir. 1990)........................................................................... 23

In re Preda, 401 F.2d 825, 826 (CCPA 1968)............................................................................. 23

In re Rouffet, 149 F.3d 1350 (Fed. Cir. 1998) ............................................................................. 21

In re Royka, 490 F.2d 981 (C.C.P.A. 1974) ................................................................................ 21

In re Vaeck, 947 F.2d 488 (Fed. Cir. 1991)................................................................................. 23

In re Woodruff, 919 F.2d 1575 (Fed. Cir. 1990) ......................................................................... 25

Intervet Am., Inc. v. Kee-Vet Labs., Inc.,  887 F.2d 1050 (Fed. Cir. 1989)................................. 16

Markman v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995)..................................... 15

Mentor Graphics Corp. v. Quickturn Design Systems, Inc., 150 F.3d 1374 (Fed, Cir. 1998) ..... 10

Moba B.V. v. Diamond Automation Inc., 325 F.3d 1306, 2003 U.S. App. LEXIS 6285 (Fed. Cir.

    2003)...................................................................................................................................... 12

Newell Cos., Inc. v. Kenney Mfg. Co., 864 F.2d 757 (Fed. Cir. 1988)........................................ 22

Pandrol v. AirBoss, 320 F.3d 1354 (Fed. Cir. 2003) ................................................................... 17

Pandrol v. AirBoss, Appeal No. 00-1161, slip opinion ............................................................... 17

Panduit Corp. v. Dennison Mfg. Co., 810 F.2d 1561 (Fed. Cir. 1987) ........................................ 22

PPG Industries Inc. v. Guardian Industries Corp., 75 F.3d 1558 (Fed. Cir. 1986)...................... 28

Q.G. Products, Inc. v. Shorty, Inc., 992 F.2d 1211 (Fed. Cir. 1993)............................................ 10

iv

Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243 (Fed. Cir. 1998) ....................... 15

Ruiz v. A.B. Chance Co., 234 F.3d 654, 662 (Fed. Cir. 2000).............................................. 21, 26

Shamrock Technologies, Inc. v. Medical Sterilization, Inc., 903 F.2d 789 (Fed. Cir. 1990)....... 10

Simplex Piston Ring Co. v. Horton-Gallo-Creamer Co., 61 F.2d 748, 750 (2d Cir. 1932) ......... 20

Stratoflex, Inc. v. Aeroqiup Corp., 713 F.2d 1530, 1538 (Fed.Cir.1983)..................................... 27

Struthers Scientific & Int. Corp. v. General Foods Corp., 314 F.Supp. 313, 315 (D. Del. 1970) 22

Thermo King Corp. v. White's Trucking Service Inc., 292 F.2d 668, 673-676  (5th Cir. 1961).... 9

Union Oil Co. of Cal. v. Atlantic Richfield Co., 208 F.3d 989, 997, 54 USPQ2d 1227, 1232 (Fed.

    Cir. 2000)..................................................................................................................................... 18

Wanda Lee Sturm v. Clark Equipment Company, 547 F.Supp. 144 (W.D.Mo. 1982) .............. 7, 9

Westmorland Specialty Co. v. Hogan, 167 F. 327 (3d Cir. 1909)................................................ 20

## STATUTES

35 U.S.C. § 103 .............................................................................................................. 6, 10, 20

35 U.S.C. § 112....................................................................................... 8, 12, 14, 18, 21

35 U.S.C. § 282......................................................................................................................... 8, 9

## RULES

Federal Rule of Civil Procedure 26 ...................................................................................... 6, 7, 9

v

Plaintiffs' Reply to AirBoss's Response to Plaintiffs' Statement of Uncontroverted Material
Facts in Support of Its Motion for Summary Judgment[2]

1-4.    AirBoss does not respond to ¶¶ 1-4 of Pandrol's Statement of Uncontroverted
Material Facts ("Pandrol's SOF").  Under Local Rule 56.1, ¶¶ 1-4 must be deemed admitted.

5.    AirBoss purports to controvert ¶ 5 of Pandrol's SOF by citing to the newly
offered Young Declaration.  While Young attempts to offer an expert opinion on the issue of
validity, his report should be precluded as argued at pages 10-12 infra.  Pandrol further states that
the description of the gasket is found in the '046 patent at column 2, lines 7-10 and 37-42.  The
Federal Circuit determined that such a gasket is described in the patent.  See Pandrol v. AirBoss,
Appeal No. 00-1161, unpublished slip opinion at 11 (Exhibit 12).  Therefore, ¶ 5 should be
deemed admitted.

6.    AirBoss purports to controvert ¶ 6 of Pandrol's SOF by again citing to the newly
offered Young Declaration, which should be precluded.  See pages 10-12 infra.  Moreover,
Pandrol's SOF ¶ 6 simply stated what is included in the expert report of Frank Scott offered by
AirBoss, which AirBoss does not attempt to controvert. And, again, the description of the gasket
is found in the '046 patent at column 2, lines 7-10 and 37-42.  The Federal Circuit determined
that such a gasket is described in the patent.  See Pandrol v. AirBoss, Appeal No. 00-1161,
unpublished slip opinion at 11 (Exhibit 12).  Therefore, ¶ 6 should be deemed admitted.

---

[2] AirBoss captioned its response to Pandrol's statement of Uncontroverted facts as "Material
Facts as to Which a Genuine Issue Exists Defeating Plaintiffs' Motion."  Four of that section's
six numbered paragraphs purport to controvert three of Pandrol's fact paragraphs in its Statement
of Uncontroverted Facts.  Two of AirBoss's numbered paragraphs in this section do not purport
to controvert any of Pandrol's fact paragraphs but instead offer additional facts that do not
controvert any facts offered by Pandrol in its Motion.

1

7.    AirBoss offers additional facts in its paragraphs 1, 2, 4 and 5 in an attempt to controvert ¶ 7 of Pandrol's SOF, which simply quoted from the Federal Circuit's opinion in Pandrol USA, LP v. AirBoss Ry. Prods., Inc., 320 F.3d 1354, 65 USPQ2d 1985 (Fed. Cir. 2003). These additional facts offered by AirBoss do not controvert that Court's opinion. Furthermore, in response to AirBoss's paragraph 4, Pandrol notes that the Federal Circuit determined the scope of the claims by reference to the specification, and it made a factual determination that is applicable in all circumstances, namely that the difference relied upon by AirBoss is immaterial. See Pandrol v. AirBoss, 320 F.3d 1354 (Fed. Cir. 2003). In response to AirBoss's paragraph 5, Pandrol states that the Federal Circuit's factual determination of insignificance applies equally whether the issue is infringement of the claims or support for the validity of the claims. See Intervet Am., Inc. v. Kee-Vet Labs., Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989).

The third and sixth paragraphs of AirBoss's "Material Facts as to Which a Genuine Issue Exists Defeating Plaintiffs' Motion" do not purport to controvert any of Pandrol's SOF. In response to AirBoss's paragraph 3, Pandrol states that the elastic rail clip serves a clamping function not an adhering function as defined in the patent at column 1, lines 66-67. In response to AirBoss's paragraph 6, Pandrol states that obviousness is not an issue in this litigation in view of AirBoss's court representations, compliance with the discovery rules, the notice provision of 35 U.S.C. § 103 and the pre-trial order of this Court eliminating that as an issue. See Pandrol Exs. 4, 5, 6, 7 and 10; Orders of J. Wright dated May 10, 2001 and March 20, 1999.

<u>Pandrol's Response to AirBoss's "Statement of Uncontroverted Material Facts in Support of Defendants' Motion for Summary Judgment</u>

1.    Denied. The description of the gasket is found in the '046 patent at column 2,

2

lines 7-10 and 37-42.  The Federal Circuit has determined that such a gasket is described in the patent. See Pandrol v. AirBoss, Appeal No. 00-1161, unpublished slip opinion at 11 (Pandrol Ex. 12).

    2.       Denied.  The description of the gasket is found in the patent at column 2, lines 7-10 and 37-42.  The Federal Circuit has determined that such a gasket is described in the patent. See Pandrol v. AirBoss, Appeal No. 00-1161, unpublished slip opinion at 11 (Pandrol Ex. 12).

PRELIMINARY STATEMENT

Due to the jury verdict and the decisions of the Federal Circuit, AirBoss is relegated to invalidity as its last ditch defense against liability for its infringement of the Pandrol patent.  As an adjudicated infringer of all of the claims of the Pandrol patent, AirBoss needs an invalidity defense against each and every claim of the patent to ward off the damages judgment. Infringement of any one claim carries the full weight of the damages judgment.  AirBoss's desperate situation however is no justification for entirely frivolous arguments.

In this regard, AirBoss offers arguments based on: (a) the file history of the Pandrol patent, (b) new prior art and (c) new testimony of the inventor, Hartley Young. Regarding the new prior art and new testimony, AirBoss's arguments are not based on admissible evidence because the new "prior art" was withheld from discovery and withheld during trial preparation and the new testimony is barred by assignor estoppel.[3]  Even if all three were considered, they are legally insufficient to raise any genuine issue to overcome the statutory presumption of patent validity.

By proffering inadmissible evidence, AirBoss has attempted to inject complexity

---

[3] Assignor estoppel bars an inventor from asserting that a patent is invalid after assigning the invention to another.

3

into a simple situation, necessitating a thorough and lengthy response. Indeed, some of the

attempts of AirBoss are patently ludicrous. For example, many of its exhibits that supposedly

represent prior art are on their face dated 2003, long after the priority filing date of Pandrol's

patent. See AirBoss's exhibits 4, 5, 9A, 9B, 9C, 9D and 9E. AirBoss even resorts to taking

positions that conflict with the prior rulings of the Federal Circuit and this Court's previous

orders. Only desperation could lead to such facile arguments.

      As the following will demonstrate, Pandrol is entitled to judgment of validity as a

matter of law.

LEGAL ARGUMENT

    A.    AirBoss's motion is inappropriately based on undisclosed and
           inadmissible evidence.

      In their latest papers, the AirBoss defendants rely upon prior art withheld

during discovery and trial preparation and first disclosed in cross motion, as well as

testimony from the inventor of the '046 patent against the patent rights he assigned.

AirBoss belatedly attempts to concoct clear and convincing evidence to prove that the

claims of the patent they infringe are invalid. For the reasons established below, this

evidence is inadmissible for purposes of challenging the validity of the '046 patent.

          1.    Prior art not previously disclosed cannot be used for this motion.

      AirBoss offers a patent and several publications in an effort to demonstrate that

the patented invention was obvious when the application for patent was filed. See AirBoss's

Suggestions in Opposition at 11 (citing US Patent No. 3858,804 to Hixson - AirBoss Ex. 7, a

1961 publication entitled "Epoxies" - AirBoss Ex. 8A and additional AirBoss Ex. 4, 5, 9A, 9B,

9C, 9D and 9E). With regard to these references, the Hixson patent is not disclosed in AirBoss's

4

identification of prior art that it stated it intends to rely upon at trial. <u>See</u> Pandrol Ex. 4. (attached to Declaration of Allen Rubenstein). Neither are AirBoss Exhibits 4, 5, 8A, 9A, 9B, 9C, 9D and 9E disclosed in the identification of prior art. <u>See</u> Pandrol Ex. 4.

          a.    <u>The prior art now deemed critical was withheld from discovery.</u>

The Hixson patent and the other alleged prior art exhibits just mentioned were not disclosed during the discovery period despite requests calling for them by Pandrol -- indeed they were not mentioned until responding to Pandrol's motion for summary judgment. Pandrol served document requests expressly calling for the production of all relevant prior art and none of those items were produced; in fact it was denied that they existed. <u>See</u> Pandrol Ex. 5. AirBoss's discovery responses on prior art are the following. From Defendants' Responses to Plaintiffs' First Set of Requests for Production, served July 6, 1999:

> Request No. 19: Produce all documents concerning challenging, invalidating, or rendering void or unenforceable the patent(s) in suit.
>
> Response: None
> ...
> Request No. 27: Produce all documents concerning any prior art known to defendants which may affect the validity, enforceability of scope of the claims of the patent(s) in suit or any foreign corresponding patent or application, including without limitation all documents relating to any search for prior art.
>
> Response: The references cited in connection with the prosecution of the patents in suit, plus U.S. Pat. No. 4,39,521, Australian applications PD 9465 and 54004/79 and PCT application PCT/Au/00028, all of which plaintiffs have. If additional prior art that is relevant is located during discovery, this response will be supplemented as appropriate.

From Defendants' Responses to Plaintiffs' First Set of Interrogatories, served July 6, 1999:

> Interrogatory No. 8: Identify all prior art, including without limitation all public uses, relevant to the validity of the patent in suit of which the defendant was aware before the filing date of this lawsuit.

5

Answer:  The references cited in connection with the prosecution of the patents in suit.

Interrogatory No. 9:  For each item of prior art whose identity is sought, state which portions are relevant to the validity of the patent-in-suit.

Answer:  The portions cited by the PTO.

Pandrol Ex. 5.

AirBoss clearly represented that it had no knowledge of prior art relevant to the issue of obviousness other than the prior art cited by the PTO (the Patent and Trademark Office).  The cited prior art is listed on the first page of the published patent and does not include any of the newly alleged prior art.[4]  Furthermore, during the deposition of AirBoss's expert on the existence of prior art, he did not identify any such art.  See Pandrol Ex. 6.  AirBoss never amended the quoted responses to include the references now relied upon, "seasonably" or otherwise as required by Federal Rule of Civil Procedure 26(e).

> b.    The prior art now deemed critical was withheld during trial preparation.

This Court's pretrial scheduling order required that AirBoss provide all exhibits on which it would rely at trial and to provide jury instructions with regard to any triable issues.  See Order of J. Wright dated May 10, 2001.  The exhibits provided by AirBoss did not include the newly alleged prior art references.  AirBoss also provided no proposed jury instruction on the issue of obviousness, and explicitly opposed any instruction on that point.  In Defendants' Objections to Plaintiffs' Proposed Jury Instructions, AirBoss objected to any instructions to the

---

[4] The only reference now relied upon by AirBoss that is not new is the 1962 article entitled "Epoxies" disclosed in AirBoss Ex. 8B.  However, this reference was disclosed to the patent office, cited in the official patent document and considered by the examiner as information that would not prevent the issuance of the claims of the '046 patent.  AirBoss cannot overcome the

6

jury on the issue of obviousness.  AirBoss advised the Court that:

> Basis for Objection: Unnecessary and irrelevant.  AirBoss does not allege
> invalidity based on obviousness

Pandrol Ex. 10.

AirBoss expressly denied that it had any obviousness defense.  AirBoss had not

included that defense in Defendants' Proposed Jury Instructions With Authorities filed

November 13, 2001, nor in Defendants' Proposed Special Verdict Forms filed the same date.

The failure to disclose prior art critical to its burden of proof not only violates this Court's

pretrial scheduling order dated May 10, 2001, in which the deadlines for discovery and trial

submissions were set, but also violates the requirements of Rule 26 of the Federal Rules of Civil

Procedure, which requires seasonable amendments to discovery responses.  In fact, the time for

designating experts to testify based on such theories ended on July 1, 1999, as set in the Court's

March 30, 1999 Order.   For these reasons the Court should disregard AirBoss's untimely

contentions that the claims are invalid in view of the prior art.  See Wanda Lee Sturm v. Clark

Equipment Co., 547 F. Supp. 144, 146 (W.D. Mo. 1982) (failure to seasonably disclose new

expert arguments under Fed. R. Civ. P. 26(e) barred admission of evidence where arguments

materially changed issues in case); A.J. by L.B. v. Kierst, 56 F.3d 849, 860 (8th Cir. 1995)

(failure to provide expert report by ordered deadline justified exclusion of expert opinion

testimony).

        c.      The prior art now deemed critical was withheld during appeal.

AirBoss even hid the existence of alleged invalidating prior art from the Federal

---

presumption of validity by merely citing this reference.

7

Circuit during argument on the most recent appeal when it specifically asked by the Court to

identify all of his validity defenses.

> The Court:  What are your invalidity arguments?
> Mr. Johnson: There are several of them, [35 U.S.C.] Section 112, a new matter insertion
> …
> …
> The Court:  Well what are the other invalidity arguments?
> Mr. Johnson: There's a bunch of 112 issues…
> …
> The Court:  Anything else besides those two? The new matter and the indefiniteness.
> Mr. Johnson:  There -- none come to mind…

Pandrol Ex. 7.  AirBoss never mentioned any obviousness defense under 35 U.S.C. § 103.

> d.    The prior art now deemed critical was withheld from the required
>       statutory disclosure.

Patent law in addition requires that in order to rely upon a patent reference or

publication to invalidate a patent, that reference must be disclosed in writing to the patentee more

than 30 days before the trial.  See 35 U.S.C. § 282.  The statute provides in pertinent part:

> [T]he party asserting invalidity … shall give notice … in writing to the
> adverse party at least thirty days before the trial, of the country, number, date and
> name of the patentee of any patent, the title, date and page numbers of any
> publication to be relied upon as anticipation of the patent in suite or … as
> showing the state of the art…  In the absence of such notice proof of the said
> matters may not be made at the trial except on such terms as the court requires.

35 U.S.C. § 282.  As the Court is aware, the trial in this matter was held on November 27-28,

2001.  AirBoss served its notice but it did not give notice of the newly alleged prior art.

> e.    Withholding of alleged prior art until now is prejudicial to Pandrol.

A party should not be permitted to litigate a case for several years through the

close of discovery, trial and various appeals, represent the nature of those defenses to the Court

and then surprise its adversary with undisclosed evidence and new arguments long after the

8

information was asked for and required to be disclosed under the rules and the Court's orders.
See Thermo King Corp. v. White's Trucking Service Inc., 292 F.2d 668, 673-676 (5th Cir.
1961) (failure to comply with 30-day notice requirement precludes use of undisclosed prior art);
see also Wanda Lee Sturm, 547 F. Supp. at 146 (failure to seasonably disclose new evidence
under Fed. R. Civ. P. 26(e) barred admission where arguments materially changed issues in
case). It is well established that a party may not offer evidence and advance theories that violate
the terms of a pretrial order. See Hale v. Firestone Tire & Rubber Co., 756 F.2d 1322, 1335 (8th
Cir. 1985) (finding it was reversible error to admit evidence inconsistent with pretrial order).

Indeed, if AirBoss's alleged prior art defense was truly of a sufficient evidentiary
character to invalidate the '046 patent, AirBoss would have disclosed it when it should have
rather than resorting to surprise. AirBoss's current attempt to bolster the import of the
undisclosed evidence by depriving Pandrol of a fair opportunity to more fully expose its
inadequacy by extensive discovery is the very situation with which the notice provision of 35
U.S.C. § 282 and preclusion sanctions associated with the discovery rules and pretrial orders
were intended to prevent.

> f.    New argument based on new evidence should be precluded
>       without reopening discovery.

AirBoss's dilatory conduct should not now justify the reopening of discovery to
start the case over. Such a delay would burden Pandrol with unnecessary and expensive
litigation costs that would require retaining additional expert services to prepare further reports
to address the new arguments on which the new evidence is based. New rounds of depositions
would also be required. The purpose of a scheduling order and the statutory notice provision is
to avoid such expensive tactical delays. See Thermo King Corp., 292 F.2d at 674. Such

9

additional delay would reward AirBoss for its dilatory conduct by unjustly permitting it to continue its infringement, further eroding Pandrol's patent rights. If would also delay Pandrol's receipt of its damage award necessary to compensate it for the loss of income due to AirBoss's many years of infringement. A litigant is entitled to a just and efficient proceeding, not a costly extended litigation artificially protracted by dilatory tactics.

The Federal Circuit's remand on validity requires this Court only to address the existing questions of validity that were disclosed in discovery and prepared for trial before the November 2001 trial date. The Federal Circuit's decision to remand does not require or authorize a starting of the litigation anew to address new or concealed defenses that were never previously disclosed or to enlarge the scope of existing defenses.

2.    The inventor/assignor Young cannot testify as to the invalidity the '046 patent he assigned.

The doctrine of assignor estoppel is an equitable remedy that "... prevents one who has assigned the rights to a patent (or a patent application) from later contending that what was assigned is a nullity." Diamond Scientific Co. v. Ambico, Inc., 848 F.2d 1220, 1224 (Fed. Cir.), cert. denied, 487 U.S. 1265 (1998). Accord Mentor Graphics Corp. v. Quickturn Design Systems, Inc., 150 F.3d 1374, 1377 (Fed. Cir. 1998) ("Assignor estoppel prevents a party who assigns a patent to another from later challenging the validity of the assigned patent"); Carroll Touch, Inc. v. Electro Mechanical Systems, Inc., 15 F.3d 1573, 1581 (Fed. Cir. 1993); Q.G. Products, Inc. v. Shorty, Inc., 992 F.2d 1211, 1212 (Fed. Cir. 1993); Shamrock Technologies, Inc. v. Medical Sterilization, Inc., 903 F.2d 789, 793 (Fed. Cir. 1990).

The doctrine does not require the inventor/assignor to be a party to the litigation. Indeed, the doctrine has been used to prevent those in privity with the assignor from contesting

10

the validity of the assigned patent. For example, in <u>Diamond Scientific</u>, the doctrine prevented

the defendant, a company formed in part by the inventor, from challenging the validity of the

patent, where the inventor had assigned his patent application to the plaintiff. The court noted

that it would be unfair for the inventor to now challenge the validity of the issued patent.

<u>Diamond Scientific Co.</u>, 848 F.2d at 1225. As the court went on to say:

> When the inventor-assignor has signed the Oath, Power of Attorney and Petition,
> which attests to his belief in the validity of the patents, and has assigned the patent
> rights to another for valuable consideration, he should be estopped from
> defending patent infringement claims by proving that what he assigned was
> worthless.

848 F.2d at 1226.

In the present matter, Young signed such a declaration attesting to his

belief in the validity of the invention of the '046 patent and participated in the

prosecution of the patent. <u>See</u> AirBoss Ex. 2, PU00061-63. Young is now either an

employee or consultant to AirBoss. <u>See</u> Young Declaration ¶ 2. To the extent that he is

attacking the validity of his invention that he assigned to Pandrol, his testimony must be

precluded in toto as a matter of law. Thus, paragraphs 5, 7, 9,10 12, 13, 14, 15, 16, 17,

18, 19 and 20 of his Declaration must be precluded, which relate to his subjective

understanding of his thoughts about the patent disclosure (which in any event are

irrelevant) and his gratuitous characterization of his understanding of the patent

specification.

Furthermore, Young's declaration gives his opinions on the interpretation

of the patent specification that are offered as expert opinion testimony under Federal Rule

of Evidence 702. <u>See</u> Young Declaration at ¶¶ 5, 7, 9,10 12, 13, 14, 15, 16, 17, 18, 19

11

and 20. These opinions must be excluded because AirBoss has never produced anyone's

expert report identifying such opinions as required by Federal Rule of Civil Procedure

26(a)(2) in time for the Court-ordered deadline of July 1, 1999 contained in the Court's

March 30, 1999 Order. See A.J. by L.B., 56 F.3d at 860 (failure to provide expert report

by ordered deadline justifies exclusion of expert opinion testimony). It would also

contravene this Court's pretrial order which closed discovery on July 1, 2001.

Accordingly, there is nothing of evidentiary value in the Declaration.

      B.     As a matter of law, AirBoss's contentions do not satisfy its burden of
proving invalidity by clear and convincing evidence.

      Assuming arguendo that the positions espoused by AirBoss may be considered

without any supporting testimony, they are not sufficient as a matter of law to support a holding

of invalidity of the '046 patent. In this regard, AirBoss contends that claims 1 to 3 of the '046

patent are invalid because of an insufficient written disclosure under 35 U.S.C. § 112 concerning

the nature of the adhering layer. AirBoss further argues that claims 1 to 3 are obvious under 35

U.S.C. § 103. For the following reasons, AirBoss's contentions are insufficient as a matter of

law to invalidate claims 1 to 3 under 35 U.S.C. § 112 and claims 1 to 3 under 35 U.S.C. § 103.

      1.     AirBoss cannot prove invalidity based on insufficient written description
because the '046 specification sufficiently discloses the invention of the
claims.

      The Federal Circuit has most recently reiterated the requisites for satisfying the

written description requirement of 35 U.S.C. § 112. In Moba B.V. v. Diamond Automation Inc.,

325 F.3d 1306, 2003 U.S. App. LEXIS 6285 (Fed. Cir. 2003), the Federal Circuit stated:

> The test for compliance with '112 has always required sufficient information in
> the original disclosure to show that the inventor possessed the invention at the
> time of the original filing. See [Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1561]
> ("Adequate description of the invention guards against the inventor's

12

overreaching by insisting that he recount his invention in such detail that his
future claims can be determined to be encompassed within his original creation.").
The possession test requires assessment from the viewpoint of one of skill in the
art. Id. at 1563-64 ("the applicant must ... convey with reasonable clarity to those
skilled in the art that, as of the filing date sought, he or she was in possession of
the invention") (emphasis in original); Union Oil Co. of Cal. v. Atlantic Richfield
Co., 208 F.3d 989, 997, 54 USPQ2d 1227, 1232 (Fed. Cir. 2000) ("The written
description requirement does not require the applicant 'to describe exactly the
subject matter claimed, [instead] the description must clearly allow persons of
ordinary skill in the art to recognize that [he or she] invented what is claimed'")
(citation omitted).

Moba B.V., 325 F.3d at ___; 2003 U.S. App. LEXIS 6285 at *32 (emphasis added).

Utilizing this test, it is apparent as a matter of law, that the patent as originally

filed does disclose the claimed invention of a layer of adhering material that is the sole means for

adhering, including either an epoxy adhesive or an HDPE gasket. To this end, the specification

expressly discloses that the invention is preferred to adhere. The original specification describes:

> Preferably the abrasion plate may be adhered to the surface of the concrete tie to
> ensure that ingress of abrasive particles and water on the surface of the rail tie is
> avoided.

'046 patent, col. 2, lines 6-10. Two alternatives are then disclosed for achieving this

invention. Either the use of the plate with epoxy or with an HDPE closed cell foam

gasket. The original abstract states:

> The plate may be bonded to the rail tie or a resilient gasket can be interposed
> between the rail tie and the plate.

'046 patent, abstract; see also col. 2, lines 37-41. The original specification repeats:

> The plate 10 may be bonded by adhesive (epoxy resin adhesives are preferred) to
> the tie 1 or an HDPE closed cell foam or 1.5 mm thickness of the same size and
> shape 10 is fitted between plate 10 and tie 1.

For the following reasons, these statements are more than adequate to suggest to one

skilled in the art that the patentee was in possession of all of the physical or structural

13

elements of the inventions of claims 1 to 3 at the time the application was filed.

        a.     Properly construed as a matter of law claim 1 is disclosed
in the original application.

With regard to claim 1, it is uncontested that the original application disclosed an epoxy for bonding the plate to the tie. No person can question that epoxy bonding the plate to the tie would be a "layer of adhering material." Both AirBoss's expert (Scott) and Pandrol's expert (Zarembski) agree that an epoxy layer of adhering material is disclosed. See Pandrol Ex. 2 at 2 and Pandrol Ex. 11 at 165-66. Indeed, AirBoss never argues and submits no evidence to show that epoxy is not a layer of adhering material. This reference to epoxy alone is sufficient written description support for the claimed "layer of adhering material" in the specification to satisfy the requirements of 35 U.S.C. § 112. Thus, AirBoss alleged invalidity defense as to claim 1 must be rejected as a matter of law.

AirBoss also argues that the language of claim 1 relating to a "sole means of adhering" is not disclosed in the specification because elastic rail clips and other elements of the rail system are disclosed in the patent and these additional elements are means for adhering. See AirBoss's Suggestions in Opposition at 7-9. AirBoss's assertion is based on an incorrect construction of the phrase "sole means of adhering" that requires the claim to be self-contradictory. AirBoss improperly requires the phrase "means for adhering" to include rail support elements recited in the claim itself in addition to the layer of adhering material. Clearly, language which excludes a means can not rationally be read to exclude other elements recited in the same claim. To the contrary, as used in the '046 patent, as a matter of law the phrase cannot include the elastic rail clips and other elements of the rail system recited in the claim.[5]

---

[5] In any event, as detailed at 13-14 infra, the issue of claim interpretation has been decided in the

14

The original patent application supports this undeniable conclusion. The original patent application does not describe the elastic rail clips as serving the function of adhering the plate to the tie. Rather, the application describes the function of the rail clips as serving a clamping function. See AirBoss Ex. 2, PU00058 ("However, once in this position [the plate] should not move significantly due to the clamping force of the rail clips."). Similarly, the elastic rail clips are not described as alternatives to the epoxy or the HDPE gasket. See AirBoss Ex. 2, PU00058. Since claims must be read in view of the specification of which they are a part, Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), the fact that the elastic rail clips are described as serving a different function and the fact that they are not disclosed as an alternative to the adhering materials that were disclosed precludes their inclusion as a means for adhering. Construction of a claim in a manner inconsistent with the specification is error. See Howes v. Medical Components, Inc., 814 F.2d 638, 643 (Fed. Cir. 1987). The patent examiner, an individual skilled in the art, recognized this when he allowed the "sole means for adhering" language in an application that identified the elastic rail clips as serving the clamping function. "[T]he patent disclosure serves to point away from the improper meanings and toward the proper meaning." Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

This exclusion of the elastic rail clips as a "means for adhering" is also consistent with the language of claim 1 which defines the existence of both the elastic rail clips and the sole means adhering material. In this regard, the claim language clearly expresses that the elastic rail clips are not a means for adhering because the adhering layer is defined as a sole means. A claim construction that stays true to the claim language and aligns with the patent's description

opinions on infringement.

15

will be the correct construction. <u>See Renishaw PLC</u>, 158 F.3d at 1250

   This view of the claims was essentially the implicit holding of the Federal Circuit in affirming the finding that AirBoss's infringement of the "sole means for adhering" language of claim 1 based on the AirBoss use of a sole HDPE gasket in a system <u>with</u> elastic rail clips. In this regard, the question of an additional means for adhering has already been litigated as an Infringement defense. As the Court is aware, AirBoss had previously vigorously argued that it did not infringe the "sole means for adhering" language. That issue has been decided and it is the law of the case as affirmed on appeal. <u>See</u> Order of J. Wright dated Nov. 11, 2001 at 6. AirBoss cannot revive it from a different angle in a way that contradicts the prior determination. Claims cannot be construed one way for infringement and another way for validity. <u>See Intervet Am., Inc. v. Kee-Vet Labs., Inc.,</u> 887 F.2d at 1053. To this end, if the claims were now interpreted such that the clips and the HDPE gasket were both means for adhering as AirBoss now argues, AirBoss could not previously have been found to be an infringer because it would not have a sole means for adhering in its system but rather a dual means for adhering. Thus, the claimed layer of adhering material that is the sole means for adhering which AirBoss infringes <u>cannot</u> now be interpreted to include rail clips or any other structure of the rail system recited in the claims as a matter of law.

   In this light, the fact that the specification does disclose other rail elements such as the elastic rail clip does nothing to prove that a sole means for adhering as claimed is not disclosed in the written specification. To the contrary, given (a) the presumption of validity, (b) the fact that the patent examiner with the U.S. Patent and Trademark Office approved the "sole means" language even in the presence of the rail clips, (c) the fact that the Federal Circuit has

16

affirmed this Court's interpretation of the sole means language of claim 3 and that interpretation does not include an elastic rail clip, (d) the fact that the rail clip is not disclosed in the application as an adhering means, and (d) the fact that <u>either</u> an HDPE gasket without epoxy or epoxy alone <u>are disclosed</u> in the original specification as adhering materials between the plate and tie, AirBoss's attempted twist of logic based on its mischaracterization of the claims is meritless. As a matter of law, AirBoss has no convincing evidence, clear or otherwise to satisfy its burden of proving a written description defense.

> b.     <u>Properly construed as a matter of law, claim 2 is disclosed in the original application.</u>

With regard to claim 2, AirBoss's argument of invalidity is only that claim 2 incorporates the alleged undisclosed language of claim 1. Since claim 1 is valid as previously stated, AirBoss alleged invalidity defense as to claim 2 must also be rejected as a matter of law.

> c.     <u>Properly construed as a matter of law, claim 3 is disclosed in the original application.</u>

With regard to claim 3, the original application does disclose a layer of adhering material that is a closed cell foam gasket. As previously demonstrated, the original application discloses as an alternative to epoxy an HDPE closed cell foam gasket. By its reference as an <u>alternative</u> to epoxy and given the statement in the application that the invention is preferred to adhere, it is clear that the original application <u>discloses</u> an HDPE gasket that adheres and the gasket being interposed without epoxy is the sole means for adhering. These statements alone are sufficient to defeat all of

17

AirBoss's § 112 invalidity arguments on all three claims of the '046 patent.[6]

To be sure, the Federal Circuit has already held that the patent does disclose as a preferred embodiment a gasket that adheres. In the first appeal in determining that the definition of adhering material must include the HDPE gasket, the Federal Circuit expressly found that the application disclosed it. See Pandrol v. AirBoss, Appeal No. 00-1161, slip opinion at 11 (Pandrol Ex. 12) ("Given that the district court's definition of 'adhering material' would exclude an HDPE closed cell foam, claim 3 of the '046 patent would no longer cover what was disclosed in one of its preferred embodiments.") (emphasis added). AirBoss is bound by this determination.

Although AirBoss attempts to make much ado about the differences between the original application and the amended application of the issued patent with the disingenuous hope of wiggling free of the Federal Circuit's determination, as previously demonstrated the Federal Circuit also held that the amendments were without significance. See Pandrol's Suggestions in Support at 8. It is extraordinary for AirBoss to now imply that the Federal Circuit decision was only concerned with the issued patent and not with the original application since the Federal Circuit's opinion discusses at length the difference between the two. See Pandrol v. AirBoss, 320 F.3d at 1364. In order to reach its unambiguous determination that the difference between the application as filed and the specification as contained in the issued patent was immaterial the Federal Circuit had to consider both disclosures and did so. See id., 320 F.3d at 1364. Accordingly, it cannot be disputed that the Federal Circuit determined that an HDPE closed cell foam gasket that is a layer of adhering material was disclosed in the original patent application.

---

[6] A finding of adequate disclosure for claim 3 is necessarily a finding of adequate disclosure for claim 1 since the terms of claim 1 must also be interpreted to include the language of dependent

18

The issue has been litigated. AirBoss put in its evidence on the point and the issue was decided against it.

Even assuming that such a finding did not exist, contrary to what AirBoss now implies, the specification does not need to literally state that "the HDPE gasket adheres" the plate to the tie. See Union Oil Co. of Cal. v. Atlantic Richfield Co., 208 F.3d 989, 997, 54 USPQ2d 1227, 1232 (Fed. Cir. 2000) ("The written description requirement does not require the applicant to describe exactly the subject matter claimed."). To the contrary, it is only necessary that it be shown that a reading of the specification would conclude that the inventor had possession of the invention. To this end, given the now judicially established fact that the HDPE gasket does adhere, the complete disclosure of the HDPE gasket in the rail fastening system that results in adhering is sufficient in and of itself to prove possession of the invention.[7]

Ignoring this principle of patent law, AirBoss unnecessarily resorts to a somewhat unfortunate use of inventor Young, taking advantage of him in his state of dissatisfaction with Pandrol. See Pandrol Ex. 8. For purposes of challenging claim 3, AirBoss offers the testimony of inventor Young to try to convince the Court that Young did not himself perceive that an HDPE gasket would adhere when he wrote the original application and thus did not invent or disclose such a device. However, as the cases cited above demonstrate, what Young believes is not the test for determining compliance with the written description requirement. Rather, the test is to determine what the inventor possessed as this would be understood by reading the application, not by hiring the inventor. To this end, even Young at his deposition when

---

claim 3.
[7] Amazingly, AirBoss continues to argue that the HDPE gasket does not adhere. See AirBoss Suggestions in Opposition at 5. This issue has been conclusively determined against AirBoss in the infringement finding of this Court and affirmed on appeal. AirBoss's over zealousness

19

questioned <u>by AirBoss</u> conceded that the HDPE gasket would be something that would be "a layer of adhesive material" because it possessed that characteristic under certain circumstances. <u>See</u> Pandrol Ex. 9. ("Q. Does [AirBoss's closed cell foam gasket] represent a layer of adhesive material? A. When used in certain circumstances, yes."). Thus, it is disingenuous for AirBoss to offer Young to demonstrate that the written description requirement has not been satisfied since even Young at least previously recognized that the closed cell foam gasket would be considered a layer of adhering material.

With regard to Young's asserted lack of perception of the adhering principle, it has long been established by the Supreme Court that the inventor does not need to understand or be able to state all of the principles underlying his invention. <u>See</u> <u>Diamond Rubber Co. v. Consolidated Rubber Tire Co.</u>, 220 U.S. 428, 435-436 (1911) ("[An inventor] must, indeed, make such disclosure and description of his invention that it may be put into practice."). The mere failure of the patentee to realize all of the benefits and possibilities of a disclosed apparatus is not fatal. <u>See</u> <u>Westmorland Specialty Co. v. Hogan</u>, 167 F. 327, 328 (3d Cir. 1909). On this point of law, the eminent Judge Learned Hand has stated that a patentee may invoke in support of his invention advantages that he was not aware of so long as the disclosed structure of the invention inherently possesses those advantages. <u>See</u> <u>Simplex Piston Ring Co. v. Horton-Gallo-Creamer Co.</u>, 61 F.2d 748, 750 (2d Cir. 1932).

In this light, it is of no moment that inventor Young did or did not subjectively perceive that the HDPE gasket serves the function of adhering at the time he filed his application. Under the proper test, all of the physical structure that is used to practice the invention of claim 3 is fully disclosed and the disclosed structure will serve the inherent function

---

should be disregarded.

20

of adhering. That the disclosed HDPE gasket possesses the inherent property of adhering <u>when used in the disclosed and claimed rail fastening structure and subjected to rail traffic</u> is not only suggested by Young's own aforementioned deposition testimony but also confirmed by this Court and the Federal Circuit's infringement conclusion. The evidence of the effects of rail traffic was litigated in the previous infringement motions. Thus, Young's declaration provides no material information for purposes of invalidating claim 3. Pandrol as patentee may properly invoke this adhering advantage. Under these circumstances AirBoss cannot contend that the written description is insufficient to enable them to practice the invention given the written disclosure. AirBoss's proffer of evidence is insufficient to create a genuine issue of material fact.

In sum, AirBoss has no evidence with which a reasonable juror could return a verdict in its favor on any defense of inadequate written description under 35 U.S.C. § 112. Rather, as a matter of law, all claims of '046 patent have ample support in the specification as originally filed.

        2.    <u>AirBoss cannot prove invalidity based on obviousness because the '046 patent claims subject matter not disclosed or suggested by the prior art.</u>

A claimed invention is obvious if the differences between it and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art. <u>See</u> 35 U.S.C. § 103(a); <u>Ruiz v. A.B. Chance Co.</u>, 234 F.3d 654, 662 (Fed. Cir. 2000). In order to determine obviousness as a legal matter, four factual inquiries must be made involving: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations of non-obviousness, which in the case law is often said to

21

include commercial success, long-felt but unresolved need, failure of others, copying and

unexpected results.  See Ruiz, 234 F.3d at 662-663 (citing Graham v. John Deere Co., 383 U.S.

1, 17-18 (1966)).  The purpose of these factual inquiries is to decide if there exists:

> (1)   a teaching of all the elements of a claim in the prior art references, In re Royka, 490 F.2d 981, 984 (C.C.P.A. 1974);
> (2)   a suggestion or motivation to modify or combine the references from the prior art references or a general knowledge in the field, In re Rouffet, 149 F.3d 1350, 1355-1356 (Fed. Cir. 1998); and
> (3)   a reasonable expectation of success in doing so, In re Merck & Co., Inc., 800 F.2d 1091, 1097 (Fed. Cir. 1986).

To succeed on such a defense of obviousness, AirBoss must prove these factual predicates by

clear and convincing evidence.  See Newell Cos. v. Kenney Mfg. Co., 864 F.2d 757, 767 (Fed.

Cir. 1988), cert. denied, 493 U.S. 814 (1989).  The determination of whether the claims of a

patent are obvious is a question of law for the Court based upon the facts presented.  See Panduit

Corp. v. Dennison Mfg. Co., 810 F.2d 1561, 1568 (Fed. Cir. 1987).  It is not necessary for the

Court to declare the patent valid; it need only decide whether the patent challenger has carried its

burden.  See id. at 1569.

> a.   No material issue is raised concerning the obviousness of claim 1.

With respect to claim 1, which does not refer to a gasket, AirBoss suggests

without any affidavit or other expert support that the claimed invention is obvious in view of the

Hixson patent 3,858,804 and "epoxy articles."  AirBoss offers no testimonial evidence, affidavit

or declaration by one skilled in the art to suggest that a person of ordinary skill in the field would

find the invention obvious or to explain any other fact pertinent to that inquiry given the newly

alleged prior art references.  The only submitted declaration, that of the inventor Hartley Young,

says nothing about them - not a word - and not a word about the obviousness of the invention

22

claimed in claim 1.

As such, AirBoss now improperly asks the Court to rule on a legal question requiring a factual understanding of prior art in a specialized technical field without any guidance from those with the specialized skill in the art to support the defense. See, e.g., Struthers Scientific & Int. Corp. v. General Foods Corp., 314 F. Supp. 313, 315 (D. Del. 1970) (understanding of prior art to address question of obviousness required expert testimony). AirBoss's own argument concedes that a high level of technical expertise is required. See AirBoss's Suggestions in Opposition at 13. For this reason alone AirBoss's unsupported obviousness arguments must be rejected for the sham that they are.[8]

On the unsupported question of obviousness as presently briefed by AirBoss, AirBoss admits that the Hixson patent lacks a layer of adhering material for adhering a plate to a tie. Thus, in order for this reference to be considered combinable with the "epoxy articles," there must be a suggestion to do so in the prior art. The simple fact that an apparatus is capable of being modified to perform a claimed feature is insufficient as a basis for a nonobvious rejection without some suggestion to do so. See In re Mills, 916 F.2d 680, 682 (Fed. Cir. 1990). Statements in the prior art as well as the inferences that those skilled in the art would be reasonably expected to draw may form the basis of such suggestions. See In re Preda, 401 F.2d 825, 826 (CCPA 1968). The teaching or suggestion cannot be taken from the applicant's disclosure. See In re Vaeck, 947 F.2d 488, 493 (Fed. Cir. 1991). Indeed, broad conclusory

---

[8] As previously noted at 5-8 supra, it is too late in the litigation for AirBoss to designate new technical experts provide testimonial support for new theories since the July 1, 1999 deadline for expert designations and reports as set in the Court's March 30, 1999 Order is long past and discovery long closed. See A.J. by L.B. v. Kierst, 56 F.3d 849, 860 (8th Cir. 1995) (failure to provide expert report by ordered deadline justified exclusion of expert opinion testimony).

23

statements standing alone are not evidence of a motivation or suggestion. See In re Kotzab, 217 F.3d 1365, 1370 (Fed. Cir. 2000). On this issue AirBoss submits nothing to support a finding that a person of ordinary skill would have a reason to combine the "epoxy articles" into the embodiment with the Hixson patent to supply the admitted missing element or why Hixson would want or need to do so. Absent expert support along these lines, AirBoss defense must fail as a matter of law.

Furthermore, there are other glaring omissions for which there is no evidence proffered. AirBoss in its argument does not accuse what it alleges to be the "elastic rail clips" in the Hixson patent as an adhering means. Rather, AirBoss designates the bolts (which are not claim elements of the Pandrol patent) of the Hixson system as adhering means. ("The plate 20 is adhered to the tie 16 by anchor bolts 18 and nuts 40.") See AirBoss's Suggestions in Opposition at 11. If then, as AirBoss contends with no expert assistance, a layer of epoxy is added with the particular adhering bolts of Hixson then there would be two means for adhering, i.e., the bolts and the epoxy. As AirBoss argues, the resulting modified product would not have a layer of adhering material that is a sole means of adhering. In other words, according to AirBoss the added layer of epoxy or the HDPE would no longer be the sole means for adhering because the bolts would also be adhering the plate to the tie. As such, all of the elements of the claims of the '046 patent are not shown in the proposed modification of the Hixson patent and, therefore, it does not constitute a showing that the claimed invention is obvious. AirBoss provides no expert testimony to explain this fatal inconsistency with its own hypothetical obviousness arguments.

Moreover, there is nothing to show that a person of ordinary skill would see the Hixson patent, which relates to low weight commuting trains, as contributing to the problem of

24

rail seat abrasion that is only experienced with heavy freight as this relates to the problem that was actually solved by the invention of the '046 patent. Again AirBoss's lack of expert support leaves such questions unanswered, failing to raise a genuine issue of material fact to overcome the presumption of validity. The presumption of validity protects patentees from such spurious defenses.

> b.   No material issue is raised concerning the obviousness of claim 2.

Turning to claim 2 for the added element of plate thickness, in addition to the problems described above for all the elements of claim 1 incorporated into claim 2, AirBoss provides no evidence that the prior art taught the additional element. AirBoss says that this element should just be passed over because Pandrol did not fight hard enough for it during patent prosecution. AirBoss simply ignores the fact that Pandrol fought hard enough to have it successfully allowed in the claims and it was an important enough element for AirBoss to infringe.

Regarding the significance of the metal thickness of claim 2, it is hardly a cosmetic choice. Young submitted a declaration to the patent office, which is found in the file history at AirBoss Exhibit 2, page PU000090-91. Its purpose was to distinguish the claimed invention from the apparatus disclosed in the Buekett prior art patent. What Young said about Buekett follows:

> Plate is normally about 3 mm thick and cannot be significantly less without the danger of a blow on the surface causing a local concrete bond failure by plate buckling which would then spread progressively. This 3 mm plate could not be used on top of a standard rail seat since the normal clips could not accept the extra displacement.

This is what Young said about his invention:

> Plate is about 1 mm thick and is really a shim. This enables the plate to be used

25

> on a standard rail seat and cause about 1 mm extra static clip deflection being
> about the practical limit for most clips.

Thus, during prosecution it was explained why the thickness of the plate was important, a point

that refutes AirBoss's facile argument. See In re Woodruff, 919 F.2d 1575, 1578 (Fed. Cir.

1990).

Nevertheless, AirBoss again provides no evidence, expert or otherwise, to show

that the plate thickness is not a significant aspect of the invention. Their failure to do so on an

element of their defense on which they bear the burden is fatal to such a defense. AirBoss fails

to raise genuine issues of material fact to overcome their burden.

c.    No material issue is raised concerning the obviousness of claim 3.

Turning to claim 3 and the added element of the HDPE gasket, in addition to the

problems described above for all the elements of claim 1 and 2 incorporated into claim 3,

AirBoss provides no evidence that the prior art taught the additional element or how one in the

art would be motivated to combine such a reference. Yet again there is no evidence, expert or

otherwise, from AirBoss with regard to yet another significant aspect of the claimed invention,

an element of a defense on which they bear the burden. The prior art must show the element of

the HDPE closed cell foam and the prior art must suggest that an individual reading the Hixson

patent would want to combine it with an adhering HDPE gasket. The egregiously frivolous

nature of AirBoss's position on these points is perhaps most flagrantly evident by virtue of the

fact that AirBoss attempts to rely on exhibits as prior art that are dated May 5, 2003, long after

the 1989 priority filing date of the '046 patent. See AirBoss Exs. 9A-9E; AirBoss's Suggestions

in Opposition at 12. AirBoss has no evidence expert or otherwise to prove this defense.

Strangely, AirBoss also argues that the prior art does not disclose HDPE as an

26

adhering material (see AirBoss's Suggestions in Opposition at 4), a position that also flatly

contradicts the obviousness requirement in which AirBoss must prove that the HDPE gasket was

a layer of adhering material as claimed in claim 3. AirBoss's defense is seriously flawed as a

matter of law and must be denied.

                d.   Secondary considerations support a conclusion of non-obviousness.

            Finally, with regard to all of the claims, AirBoss wholly ignores the objective

evidence of secondary considerations which amply dispel AirBoss's unsupported allegations of

obviousness. Such factors are required to be considered. See Ruiz, 234 F.3d at 664-65.

"[Secondary considerations] may often establish that an invention appearing to have been

obvious in light of the prior art was not." Stratoflex, Inc. v. Aeroqiup Corp., 713 F.2d 1530,

1538 (Fed.Cir.1983); see also Ruiz, 234 F.3d at 667 (finding that it may be legal error to

presuppose that all evidence relating to secondary considerations cannot be sufficient to elevate

the subject matter of a claimed invention to the level of patentable invention).

            Here, secondary considerations including the fact of the commercial success of

the invention and the fact that AirBoss copied Pandrol's invention all indicate that the invention

is not obvious. As the Court is aware, the Federal Circuit affirmed the trial verdict with a multi-

million dollar award covering with lost profits for sales of the patented item. See Order of J.

Wright dated March 28, 2002 at 1. This multi-million dollar lost profit verdict is extensive

evidence of commercial success that does not even include the profits Pandrol earned even

before or after AirBoss wrongfully started copying Pandrol's invention. Such evidence of

commercial success amply indicates that the invention was not obvious. There can be no

question that the commercial success is attributable to the patented features of the invention

27

because it is the whole system that is patented and AirBoss's unlawful copy has been determined by this Court and the Federal Circuit to have infringed the entire claimed system in claim 3 of the '046 patent. The evidence adduced at trial previously demonstrated that AirBoss produced a virtually identical copy of Pandrol's product. See Order of J. Wright dated March 28, 2002 at 4.

For all of the aforementioned reasons, as a matter of law, AirBoss has insufficient evidence to meet its burden to prove the validity defense of obviousness by clear and convincing evidence. Accordingly, Pandrol is entitled to judgment of validity.

C.    A preliminary injunction to enjoin AirBoss's continued infringement should be entered.

Based on the aforementioned showing concerning the likelihood of Pandrol's success on the validity issues and AirBoss's insufficient arguments, as previously suggested by the Federal Circuit, it would be appropriate for the Court to enter a preliminary injunction in the unlikely event that the Court finds that some issues do remain on any single claim after the current motion. A finding of a likelihood of success with regard to the validity of any claim of the '046 patent is sufficient to support the entry of an injunction against AirBoss.

While AirBoss argues that there is no evidence of imminent harm or that AirBoss intends to further infringe, this argument ignores that fact that AirBoss has wrongfully copied Pandrol's product previously and had only stopped as a result of the entry of the former injunction. Thus, the evidence only suggests that AirBoss would continue to infringe and trample on Pandrol's patent rights unless it is enjoined by court order. Indeed, AirBoss offers no evidence or other statement identifying that AirBoss is not currently selling the infringing product.

AirBoss also argues that there is an adverse public interest in having a patent

28

monopoly. That is an attack on the patent system, not the facts of this case. AirBoss presents

absolutely no evidence to support their denigration of the patent system. To the contrary,

patents, and enforcing them serve vital public interests. The Federal Circuit has consistently

recognized the "strong public policy favoring the enforcement of patent rights." PPG Industries

Inc. v. Guardian Industries Corp., 75 F.3d 1558, 1567 (Fed. Cir. 1986).

CONCLUSION

For the aforementioned reasons, Pandrol requests that the Court preclude

AirBoss's attempt to submit new prior art and arguments and bar the offer of testimony of the

inventor proffered against the validity of the '046 patent. Furthermore, Pandrol requests

judgment against AirBoss, dismissing all of AirBoss's alleged defenses of invalidity. AirBoss's

arguments fail to raise any genuine issue of material fact on necessary elements of its alleged

invalidity defenses, all of which AirBoss bears the burden of making a clear and convincing

showing. Pandrol's previous injunction against AirBoss and Pandrol's jury award should be

reinstated.

Respectfully submitted,

BROUS HORN LLC

/s/ Tammy L. Horn
Tammy L. Horn MO #39012
10313 West 140th Street
The Carriage House
Overland Park, KS 66221
(913) 897-7877

Allen I. Rubenstein
Raymond B. Churchill
Gottlieb, Rackman & Reisman, P.C.
270 Madison Avenue
New York, NY 10016

29

(212) 684-3900

Certificate of Service

I certify that on this 30th day of May, 2003, a copy of the foregoing was filed

electronically pursuant to the Electronic Case Filing rules of the Western District of

Missouri and e-served on:

> Richard R. Johnson
> Shook, Hardy & Bacon, L.L.P.
> One Kansas City Place
> 1200 Main Street
> Kansas City, MO  64105-2088
> rjohnson@shb.com
> COUNSEL FOR DEFENDANTS

> /s/ Tammy L. Horn
> Attorney for Plaintiffs

30

# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

PANDROL USA, LP and )
PANDROL LIMITED, )
 )
        Plaintiffs, )
 )
v. )        Case No. 99-0182-CV-W-SOW
 )
AIRBOSS RAILWAY PRODUCTS, INC., )
AIRBOSS OF AMERICA CORP., )
ROBERT M. MAGNUSON, and )
JOSE R. MEDIAVILLA, )
 )
        Defendants. )

## DECLARATION OF HARTLEY F. YOUNG

I, Hartley F. Young declare as follows:

1.      I am the inventor named in U.S. Patent No. 5,110,046 ("'046 patent") and am in fact the inventor.

2.      I have done work under contract for both parties to this action.

3.      When I made the invention of the '046 patent, I envisioned two different ways of dealing with the problem of rail seat abrasion.

4.      One way involved adhering an abrasion plate to the rail tie by bonding them together with epoxy or a similar adhesive material.

5.      The other way involved placing a loose gasket between the abrasion plate and the rail tie without adhesively or otherwise adhering the plate to the tie. The gasket is solely to provide a water tight seal. Rather than adhering the plate to the tie by adherence as in the case of an adhesive material, the embodiment using a gasket relies on rail clips providing a

- 1 -

1242369v1



mechanical clamping force that holds the abrasion plate in place on the tie. The same mechanical clamping force elastically compresses the gasket between the plate and tie where it provides a water tight seal.

6.     The gasket may preferably be an HDPE closed cell foam because such foam has the attributes necessary to serve as a water tight seal.

7.     The gasket was never intended to constitute an adhering material and was never intended to function in a manner to adhere the abrasion plate to the rail tie. The gasket does not serve as an adhering material but instead functions as a water tight seal.

8.     I have reviewed the '046 patent and the application as originally filed in the United States.

9.     The application for the '046 patent as signed by me as the inventor and as originally filed in the United States does not disclose a gasket that is an adhering material or a gasket that adheres the plate to the tie.

10.     In the application as filed, the gasket is referred to in the Abstract as follows: "a resilient gasket can be interposed between the rail tie and the plate." That means only that the gasket is simply placed ("interposed") between the tie and plate and in no way implies that the gasket is an adhering material or serves to adhere the plate to the tie.

11.     In the application as originally filed, the gasket is referred to in the specification as follows: "an HDPE closed cell foam of 1.5 mm thickness of the same size and shape as plate 10 is fitted between plate 10 and tie 1." That means only that the gasket is simply placed ("fitted") between the plate and tie and in no way implies that the gasket is an adhering material or functions to adhere the plate to the tie.

1242369v1

- 2 -

12.    In the application as originally filed, the gasket is referred to in original claim 4 as follows: "a closed cell foam pad of one to two millimeters in thickness and of similar shape to said plate is interposed between the plate and the rail tie." That again means only that the gasket is simply placed ("interposed") between the plate and tie and in no way implies that the gasket is an adhering material or serves to adhere the plate to the tie.

13.    The only references in the original application to the gasket are those quoted in paragraphs 10-12 above. The drawings as originally filed do not show the gasket or adhesive or any "layer" between the plate and tie. The application as originally filed makes no reference to any "layer" between the plate and tie.

14.    There is nothing inherently contained in the application as originally filed disclosing the foam gasket as an adhering material or as a material that adheres the plate to the tie. On the contrary, the material of which the gasket is preferably constructed, HDPE, is well known as having non stick properties.

15.    The application as originally filed claims the invention in the two different ways described in paragraphs 4 and 5 above. Original claim 3 states that "said plate is adhered to the rail tie." That reference to "adhered" pertains to the embodiment that adhesively adheres the plate to the tie by epoxy. Original claim 4 is an alternative to claim 3 and describes the gasket as being a closed cell foam pad that is simply "interposed" between the plate and tie without any adhering. Original claims 3 and 4 both reference claim 2 and are thus clearly alternatives. Original claim 4 directed to the closed cell foam does not refer to claim 3 as it would if the foam were an adhering material.

16.    When I signed the original application, it was not my intention to describe the foam gasket as an adhering material or as a material that adheres the plate to the tie. Such a

description would have been inaccurate because the gasket does not adhere the plate to the tie. My intention was only to describe the foam gasket as an alternative to the epoxy. The gasket only provides a sealing function, whereas the epoxy provides an adhering function.

17. The application as originally filed contains no disclosure, explicit or inherent, that the gasket is an adhering material or serves to adhere the plate to the tie. I did not make an invention that includes a gasket that is an adhering material for adhering the plate to the tie.

18. After I signed the original application, it was changed without my knowledge and without my approval to indicate that the gasket is an adhering material. That change misstates what I invented and is inaccurate as to the nature of the gasket.

19. The application as originally filed contains no disclosure that the gasket is the sole means for adhering the plate to the tie. On the contrary, the plate is mechanically held in place on the tie by a clamping system that includes a clamp support 5, rail clamp 6 and insulator 7 all described and depicted in the application as originally filed.

20. Because the mechanical clamp system referenced in paragraph 18 above holds the plate to the tie, claim 1 of the '046 patent is inaccurate in stating that there is an adhering material that is the sole means for adhering the plate to the tie.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _4_ day of ___May___, 2003 at ___Melton___.

_Hartley F. Young_
Hartley F. Young

- 4 -

1242369v1

EXHIBIT 19

## ASSET CONTRIBUTION AGREEMENT

THIS ASSET CONTRIBUTION AGREEMENT (this "Agreement") is entered into and is effective as of June 3, 2000 (the "Effective Date") by and between CABLETRON SYSTEMS, INC., a Delaware corporation ("CSI"), and ENTERASYS NETWORKS, INC., a Delaware corporation and a wholly owned subsidiary of CSI (the "Company").

### RECITALS

WHEREAS, the parties desire to enter into this Agreement in order to cause the transfer of certain assets related to the Company Business (as defined herein) to the Company and the assumption by the Company of certain liabilities including those related to the Company Business on the Transformation Date (as defined herein), giving effect to such transfer and assumption as of the Effective Date;

WHEREAS, CSI and the Company are entering into this Agreement pursuant to that certain Transformation Agreement (the "Transformation Agreement") dated as of the date hereof by and among CSI, the Company and the other Newcos (as defined herein);

WHEREAS, CSI and the Company desire such transfer of assets and liabilities to qualify as a tax free contribution under Section 351 of the Internal Revenue Code of 1986, as amended.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements, provisions and covenants contained herein, and for other good and valuable consideration, the receipt and legal sufficiency whereof are hereby acknowledged, the parties hereto further agree as follows:

1.     Definitions. For the purposes of this Agreement, the following terms shall have the following meanings:

      1.1.    "Action" shall mean any claim, action, cause of action or suit by or before any Governmental Authority.

      1.2.    "Agreement" has the meaning assigned to such term in the preamble.

      1.3.    "Ancillary Agreements" has the meaning assigned to such term in the Transformation Agreement.

ETS00033039

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1.4.   "Aprisma" means Aprisma Management Technologies, Inc.

1.5.   "Assignment and Assumption Agreement" has the meaning assigned to such term in Section 6.3.

1.6.   "Assumed Liabilities" has the meaning assigned to such term in Section 4.

1.7.   "Bill of Sale" has the meaning assigned to such term in Section 6.3.

1.8.   "Closing" has the meaning assigned to such term in the Transformation Agreement.

1.9.   "Company" has the meaning assigned to such term in the preamble.

1.10.   "Company Business" means the business described on Exhibit A hereto.

1.11.   "Company Transferred Subsidiaries" means each of the subsidiaries of CSI listed on Schedule 2.3 hereto and each direct and indirect subsidiary of such entities.

1.12.   "Contracts" means any contract, agreement, lease, license, sales order, purchase order, instrument or other commitment.

1.13.   "Contributed Assets" has the meaning assigned to such term in Section 2.

1.14.   "Contributed Contracts" has the meaning assigned to such term in Section 2.9.

1.15.   "Contributed Intellectual Property" means, collectively, Contributed Registered Intellectual Property, Contributed Other Intellectual Property, and Contributed Third Party Tools.

1.16.   "Contributed Other Intellectual Property" has the meaning assigned to such term in Section 2.7.1.

1.17.   "Contributed Registered Intellectual Property" has the meaning assigned to such term in Section 2.8.1.

1.18.   "Contributed Registered SSR Intellectual Property" has the meaning assigned to such term in Section 2.8.2.

1.19.   "Contributed Third Party Tools" has the meaning assigned to such term in Section 2.6.

ETS00033040
HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

The parties understand and acknowledge that except for rights with respect to Intellectual Property to be contributed to both the Company and Riverstone as contemplated by Sections 2.7.2 and 2.8.2, where an asset is specifically identified in another Contribution Agreement (or the schedules thereto) as an asset to be transferred to another Newco, such asset is not primarily related to the Company Business and shall be transferred to such other Newco and not the Company.

3.2.    Real Property.  Other than as expressly set forth in the Shared Services Agreement all rights in respect of real property, including without limitation all leases with respect to real property, all improvements, fixtures and fittings on real property, and easements, rights-of way, and other rights appurtenant to real property.

3.3.    Cash and Securities. Other than as expressly set forth in Section 2.3 and Section 2.4 hereof, all cash, cash equivalents and securities of CSI (to the extent not held by a Company Transferred Subsidiary).

3.4.    Third Party Tools.  Any Third Party Tools used by a Newco other than the Company as of the Transformation Date, including without limitation those Third Party Tools set forth on Schedule 3.4.

3.5.    Intellectual Property Rights.  Any rights in respect of Intellectual Property that is not Contributed Intellectual Property, including without limitation any rights in respect of registered Intellectual Property and applications therefor that is not Contributed Registered Intellectual Property.

3.6.    Confidentiality and Non-Competition Agreements.  Except as otherwise provided in the Transformation Agreement, all rights under confidentiality agreements, non-competition, non-disclosure and other similar agreements with employees.

3.7.    Assets Retained by CSI.  Any assets to be retained by CSI pursuant to the Transformation Agreement.

4.    Assumption of Liabilities.  On the terms and subject to the conditions set forth herein, and except as provided in Sections 5, 8.3 and 8.4 hereof, from and after the Closing, the Company will assume and satisfy or perform when due all Liabilities of CSI and its direct and indirect subsidiaries, to the extent not discharged prior to the Transformation Date, which relate primarily to the Company Business and/or the Contributed Assets (collectively, the "Assumed Liabilities") to the extent not already assumed by the Company, including without limitation the following Liabilities:

Enterasys Asset Contribution Agreement.DOC              9

ETS00033047
HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

**Schedule 2.8(a) – Enterasys**
**Contributed Registered Intellectual Property**

Please see the attached listing of Trademarks.

Please see the attached listing of Patents.

Please see the attached listing of Copyrights.

8258094

ETS00033077
HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

July 19, 2000

## Enterasys Patent Portfolio

| Case No. | Title | Country | Application Number | Filing Date | Patent Number | Date Issued | Expiration Date | Status |
|---|---|---|---|---|---|---|---|---|
| | shared resource among competing devices | | | | | | | |
| 7034 | Method for establishing restricted broadcast groups in a switched network | U.S. | 08/559,738 | 11/15/1995 | 5,684,800 | 11/4/1997 | 11/15/2015 | Issued |
| 7034-AU | Method for establishing restricted broadcast groups in a switched network | Australia | 10539/97 | 11/15/1996 | 697935 | 2/4/1999 | 11/15/2016 | Issued |
| 7034-DE | Method for establishing restricted broadcast groups in a switched network | Germany | 96941377.2 | 11/15/1996 | 69608300.0 | 5/10/2000 | 11/15/2016 | Issued |
| 7034-FR | Method for establishing restricted broadcast groups in a switched network | France | 96941377.2 | 11/15/1996 | 0861544 | 5/10/2000 | 11/15/2016 | Issued |
| 7034-GB | Method for establishing restricted broadcast groups in a switched network | Great Britain | 96941377.2 | 11/15/1996 | 0861544 | 5/10/2000 | 11/15/2016 | Issued |
| 7039 | Internet protocol (IP) work group routing | U.S. | 08/501,324 | 7/12/1995 | 5,751,971 | 5/12/1998 | 7/12/2015 | Issued |
| 7050 | Method and apparatus for network access control with implicit ranging and dynamically assigned time slots | U.S. | 08/545,501 | 10/19/1995 | 5,802,061 | 9/1/1998 | 10/19/2015 | Issued |
| 7060 | Method of transmitting data packets in a packet switched communications network | U.S. | 08/567,008 | 12/4/1995 | 5,790,546 | 8/4/1998 | 1/28/2014 | Issued |
| 7061 | Distributed connection-oriented services for switched communications networks | U.S. | 08/626,596 | 4/2/1996 | 5,825,772 | 10/20/1998 | 11/15/2015 | Issued |
| 7061-AU | Distributed connection-oriented services for switched communications networks | Australia | 697850 | 11/15/1996 | 697850 | 1/28/1999 | 11/15/2016 | Issued |
| 7061-EPO | Distributed connection-oriented services for switched communications networks | EPO | 96945175.6 | 11/15/1996 | | | | Pending |
| 7067 | Secure fast packet switch having improved memory utilization | U.S. | 08/720,090 | 9/27/1996 | | | | Pending |
| 7079 | Network bridge with multicast forwarding table | U.S. | 08/428,403 | 4/25/1995 | 5,608,726 | 3/4/1997 | 4/25/2015 | Issued |

Page 2

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

ETS00033083

July 19, 2000

## Enterasys Patent Portfolio

| Case No. | Title | Country | Application Number | Filing Date | Patent Number | Date Issued | Expiration Date | Status |
|---|---|---|---|---|---|---|---|---|
| 7110-EPO | tap-point in a switched network using self-configuring switches having distributed configuration capabilities Method and apparatus to establish a tap-point in a switched network using self-configuring switches having distributed configuration capabilities | EPO | 98903419.4 | 1/12/1998 | 0954919 | | | Pending |
| 7111 | Network bridge with multicast forwarding table | U.S. | 08/766,784 | 12/13/1996 | 5,898,686 | 4/27/1999 | 4/25/2015 | Issued |
| 7114 | Multicast switching | U.S. | 08/852,188 | 5/6/1997 | | | | Pending |
| 7114-AU | Multicast switching | Australia | 69737/98 | 4/14/1998 | 720817 | | | Pending |
| 7114-CA | Multicast switching | Canada | | 4/14/1998 | | | | Pending |
| 7114-EP | Multicast switching | EPO | 98915597.3 | 4/14/1998 | 0980608 | | | Pending |
| 7115 | Method and apparatus for isolating component leads | U.S. | 08/812,841 | 3/6/1997 | 5,901,045 | 5/4/1999 | 3/6/2017 | Issued |
| 7117 | Network address resolve blocker | U.S. | 08/960,010 | 10/29/1997 | | | | Pending |
| 7119 | Multi-protocol packet translator | U.S. | 08/974,632 | 11/19/1997 | | | | Pending |
| 7119-AU | Multi-protocol packet translator | Australia | 14060/99 | 11/13/1998 | | | | Pending |
| 7119-CA | Multi-protocol packet translator | Canada | | 11/13/1998 | | | | Pending |
| 7119-EPO | Multi-protocol packet translator | EPO | 98957918.0 | 11/13/1998 | | | | Pending |
| 7120 | Method for establishing restricted broadcast groups in a switched network | U.S. | 08/960,919 | 10/30/1997 | 5,946,308 | 8/31/1999 | 11/15/2015 | Issued |
| 7129 | Network having secure fast packet switching and guaranteed quality of service | U.S. | 08/970,714 | 11/14/1997 | | | | Pending |
| 7131 | Distributed chassis agent for network management system | U.S. | 09/130,234 | 8/6/1998 | | | | Pending |

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

ETS00033086

# EXHIBIT 20

CERTIFICATE OF OWNERSHIP AND MERGER
MERGING
ENTERASYS NETWORKS, INC.
INTO
CABLETRON SYSTEMS, INC.

Cabletron Systems, Inc., a Delaware corporation (the "Corporation"), does hereby certify:

FIRST:      That the Corporation is incorporated pursuant to the General Corporation Law of the State of Delaware.

SECOND;     That the Corporation owns all of the outstanding shares of each class of the capital stock of Enterasys Networks, Inc., a Delaware corporation ("Enterasys").

THIRD:      That the Corporation, by the following resolutions of its Board of Directors, duly adopted on the 12th day of July, 2001, determined to merge Enterasys into itself on the conditions set forth in such resolutions:

RESOLVED: That, effective August 6, 2001 at 12:01 a.m. the Corporation merge (the "Merger") into itself its subsidiary, Enterasys; that the Corporation be the surviving corporation in the merger; that all of the estate, property rights, privileges, powers and franchises of Enterasys be vested in and held and enjoyed by the Corporation as fully and entirely and without change or diminution as the same were before held and enjoyed by Enterasys in its own name; and that the Corporation shall assume all of the liabilities and obligations of Enterasys.

RESOLVED: That, upon the effectiveness of the Merger, the Corporation's name shall be changed to "Enterasys Networks, Inc.";

RESOLVED: That the officers of the Corporation be and they hereby are directed to make, execute and acknowledge a certificate of ownership and merger setting forth a copy of the resolutions to merge said Enterasys into this Corporation and to assume Enterasys' liabilities and obligations and the date of adoption thereof and to file the same in the office of the Secretary of State of Delaware; and that the officers of the Corporation be and they hereby are authorized to execute, deliver, acknowledge and file any other documents necessary or desirable for the consummation of the Merger.

FOURTH:     That this Certificate of Ownership and Merger shall become effective on August 6, 2001 at 12:01 a.m.

*[Remainder of Page Intentionally Left Blank]*

Short Form Certificate of Ownership and Merger

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 08/02/2001
010377881 - 2182956

IN WITNESS WHEREOF, Cabletron Systems, Inc. has caused this certificate to be signed by its duly authorized officer, this _7_ day of _August_, 2001.

CABLETRON SYSTEMS, INC.

By: _____

Name: _Piyush Patel_

Title: _President, CEO_

Short Form Certificate of Ownership and Merger

ETS0000225