**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ENTERASYS NETWORKS, INC,<br><br>           Plaintiff,<br><br>    v.<br><br>FOUNDRY NETWORKS, INC. and<br>EXTREME NETWORKS, INC.,<br>           Defendants. | Civil Action No. 05-CV-11298 (DPW) |

**FOUNDRY NETWORKS, INC.'S MOTION TO**
**COMPEL THE PRODUCTION OF PATENT**
**INVENTION RECORDS FROM ENTERASYS NETWORKS, INC.**

I.    **INTRODUCTION.**

      Defendant Foundry Networks, Inc. ("Foundry") brings the present motion to compel plaintiff Enterasys Networks, Inc. ("Enterasys") to produce the invention records in its possession which are relevant to the invention dates of two of the patents-in-suit, U.S. Patent Nos. 5,251,205 and 5,390,173 ("the '205 patent" and " the '173 patent," respectively).

      Previously, Foundry's co-defendant, Extreme Networks, Inc. ("Extreme"), filed a motion to compel Enterasys' invention records. (Docket No. 64). When Enterasys opposed the motion on the grounds that it did not yet know what position it was planning to take regarding conception dates, the Court ordered Enterasys to provide an updated response to the Defendants' interrogatories *and* to submit a declaration describing the efforts taken by Enterasys' counsel to obtain evidence relevant to the conception and reduction to practice of the patents-in-suit. (Ex. A, Oct. 26, 2006 Tr. At 11).

Enterasys' counsel now takes the position that the Court's requirement for a declaration from counsel explaining what efforts counsel had taken to get the information from third parties fully resolved the matter and absolved Enterasys from needing to produce the documents it has relating to the conception dates -- even as it continues to assert it may rely on these documents at trial. Enterasys therefore continues to refuse to produce the underlying documents, maintaining that the documents are, *for now*, attorney-client privileged.

Foundry does not believe that these documents are privileged. But, even if these documents are privileged on their face, Enterasys waived this privilege when it provided a detailed description of their contents in an interrogatory response. Enterasys cannot have it both ways -- relying (or reserving the right to rely) on the documents to establish critical dates, but refusing to produce them during discovery so that Foundry cannot use them during depositions of the inventors or to verify the accuracy of Enterasys' contentions.

Since the filing of Extreme's motion in docket no. 64, Enterasys has now had over six months in which to gather third party information concerning the invention dates of its patents. Foundry is entitled to the production of the invention records for the '205 and '173 patents. It is time for Enterasys to produce the records.

## II.    **BRIEF BACKGROUND.**

Foundry has alleged that others invented the subject matter of the invention before the inventors of the patents-in-suit. Consequently, an important issue in dispute is the date of conception and reduction to practice of each of the patents asserted by Enterasys.

Foundry served its Interrogatory No. 5, which required that Enterasys "describe the circumstances surrounding the alleged invention" of each of the patents-in-suit. Foundry also

served its Request For Production No. 7, which required Enterasys to produce all documents "relating to or evidencing the conception, design, development, reduction to practice or diligence in the reduction to practice of each alleged invention of each patent-in-suit." (Ex. F, Foundry's Request For Production No. 7).

In response to the interrogatory, Enterasys identified invention records for the '205 and '173 patent, and selectively disclosed the contents of these records. Enterasys refuses, however, produce the documents themselves.

For example, Enterasys describes in detail the invention records submitted by the '205 inventors on September 25, 1989:

> *In these invention records*, ['205 inventor] Callon indicates that initial discussions and conception of a general approach for the '205 inventions took place in April and May of 1989. Callon further indicates that main options were identified on an overall level for the '205 inventions (not including all details) in June and July of 1989. According to Callon, in meetings held at ['205 patent assignee] Digital's King Street campus on July 18 and 19, 1989, a general approach for the '205 inventions was adopted including some but not all of the details. This selected approach was written up in greater detail in July and August of 1989, and general (2 page) and detailed (about 15 page) descriptions were distributed to select DEC personnel between August 12 and 31, 1989. Callon states that on September 12, 1989, he presented this selected approach at an internal "Megameeting" held at Digital's King Street campus. Callon anticipated having a concepts paper addressing the '205 inventions completed by mid-October, 1989, and holding a concepts review in late October. Callon also makes reference to having 17 pages of detailed notes (date unknown) upon which he intended to base this concepts paper. No additional information concerning conception and reduction to practice dates is disclosed in the '205 invention records.

(Ex. B, P. 11)(emphasis added).

In this answer, Enterasys made clear that it was basing its answer on these invention records: "Based upon the foregoing, Enterasys contends that the actual date of conception for

the '205 inventions may have been as early as April of 1989, and was very likely no later than July of 1989." (Ex. B, P. 12).

But, rather than turn the documents over, Enterasys' response reserves the right to produce these documents at a later, unspecified, point in time:  "Enterasys is withholding these invention records from production on grounds of attorney-client privilege, and does not *presently intend* to rely upon them as direct evidence for establishing pre-application dates of conception or reduction to practice for the '205 inventions."   (Ex. B, P. 11) (emphasis added).[1] Significantly, Foundry has been unable to find mention of these documents on Enterasys' privilege log, and therefore, does not have the details regarding these documents and Enterasys' claim that they are privileged.

Enterasys' refusal to produce these documents, except on its own terms, raises all sorts of red flags. Enterasys cannot unilaterally decide to dole out documents, on a schedule that meets its whim.  Enterasys *has* produced some invention records for another of the patents-in-suit, U.S. Patent No. 6,560,236 ("the '236 patent"), saying that "Enterasys has now elected to produce these privileged invention records because it intends to rely upon them as direct evidence for establishing actual pre-application dates of conception and/or reduction to practice for the '236 inventions," stating its intention that this production be a "limited waiver," whatever that means.

For the '205 and '173 patents, though, Enterasys will not commit to not using the information in the documents, and it will not commit to producing them.  The parties have met and conferred in an attempt to resolve this dispute, but have been unable to resolve the issue. (See, Exs. C, D, and E, Correspondence Between Foundry and Enterasys).

---

[1]    Enterasys provides a similar answer with respect to the '173 patent, confirming that it has invention records submitted by the inventors to patent assignee Digital Equipment Corporation ("Digital"). (Ex. B, P. 14). Enterasys' response for the '173 patent again reserves the right to produce these documents should *Enterasys* later decide to rely upon them. "Enterasys is withholding these invention records from production on grounds of attorney-client privilege, and does not *presently intend* to rely upon them as direct evidence for establishing pre-application dates of conception or reduction to practice for the '173 inventions." *Id.* (emphasis added).

Foundry now brings the present motion, seeking the production of the invention records of the '205 and '173 patents.

## III.  ARGUMENT.

With respect to invention disclosures, "[w]hether the attorney-client privilege applies should be determined on a case-by-case basis." *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000).  "[T]he central inquiry is whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice or services."  *Id.* *Enterasys* has the burden of proof with respect to whether the documents in its possession are protected from disclosure by the attorney-client privilege.  *See, e.g., Automed Technologies, Inc. v. Knapp Logistics & Automation, Inc.*, 382 F. Supp. 2d 1372, 1375-76 (N.D. Ga. 2005) (holding that invention disclosure was not privileged); *W. R. Grace & Co.-Conn. v. Viskase Corp.*, 1991 WL 141131 (N.D. Ill. July 23, 1991) (same).

Enterasys has not met its burden of proving that the invention records are protected by the attorney-client privilege.

### A.    Foundry Is Entitled To The Production Of The Invention Disclosure Documents For the '205 Patent.

Enterasys' interrogatory response states that inventor Ross Callon drafted "invention records" that contain information about the development of the alleged invention of the '205 patent.  Although Enterasys' response states that the invention records were submitted to the in-house legal department of Digital, the basis for that statement is not identified and the response contains insufficient information to support the privilege.

Importantly, these invention disclosure documents appear to be the only documentary evidence that Enterasys has in support of its assertion that the conception of the '205 patent took place in April of 1989, and that the reduction to practice occurred as early as July of 1989.  (The

'205 patent was filed on September 4, 1990.)

Thus, Enterasys appears to be concealing the very evidence that it asserts establishes its invention date.

### 1.    Enterasys Has Waived Any Potential Privilege Concerning The Invention Records For the '205 Patent.

If Enterasys truly thought it had a valid privilege with respect to these invention records, it should have, by now, stated the factual/evidentiary basis for its claim of privilege.  But, it has yet to provide details such as the date(s) of the submission(s), the name(s) of the in-house counsel to whom the submission(s) were made, the purpose of the submission(s), and whether the invention records were submitted or disclosed to anyone other than Digital's in-house counsel.  Of course, if the invention disclosure was prepared and/or used for other purposes in addition to receiving legal advice, then the fact that the document was also provided to counsel cannot be used to shield it from discovery.

Moreover, even if the '205 invention records were once privileged, Enterasys has waived the privilege by describing the contents of the invention records in detail in its interrogatory response.  Enterasys' interrogatory answer provides details about meetings, documents, and dates associated with the development of the invention, details for which the invention records apparently are the only source of information.   Apparently, Enterasys has based its contention about the dates of conception and reduction to practice *solely* on these invention records.

Under these circumstances, Enterasys has waived the attorney-client privilege (assuming it applied in the first place) with respect to the invention records.  Describing the contents of allegedly privileged documents in an interrogatory response can constitute a waiver.  *See, e.g., Malco Mfg. Co. v. Elco Corp.*, 307 F. Supp. 1177, 1178-79 (E.D. Pa. 1969) (finding subject matter waiver in patent case based on interrogatory response that "revealed the gist of certain communications and, thereby, effected a partial disclosure of the contents").  A waiver may

occur where, as here, the contents of allegedly privileged documents are summarized rather than quoted. *See, e.g., United States ex rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1250 (D. Md. 1995); *Chubb Integrated Sys. Ltd. v. National Bank of Wash.*, 103 F.R.D. 52, 63 (D.D.C. 1984) ("We will deem a document 'disclosed' where defendant has learned the 'gist' of the document's contents"); *Brackett v. Providian Ins. Group, Inc.*, 1996 WL 785739, *1 (E.D. Tenn. Nov. 19, 1996) ("[D]efendant has revealed the substance of the communications . . . . By revealing to plaintiff a summary of the communications . . ., defendant waived the attorney-client privilege."). A partial disclosure of a document or related series of documents waives the privilege with respect to the remainder. *See, e.g., Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454, 457-58 (N.D. Ill. 1974) ("[W]hen a party's conduct reaches a certain point of disclosure fairness requires that the privilege should cease whether the party intended that result or not. A party cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final.") (citing 8 *Wigmore on Evidence* § 2327 (McNaughton rev. ed. 1961)).

The details in Enterasys' response about meetings, locations, and most importantly, dates, provide Foundry with far more than the "gist" of the content of the invention records. Foundry is entitled to the production of these documents.

### B.    Enterasys Has Failed To Establish That The Invention Records For the '173 Patent are Privileged.

A similar argument applies to the '173 invention disclosure records. Enterasys has disclosed that '173 patent inventor Barry Spinney drafted invention records for the '173 patent. Enterasys' interrogatory response states that those records were submitted to Digital's in-house legal department, but the basis for that statement is not identified nor does the response contain insufficient information to support the privilege. On the present record, Enterasys' claim of privilege has no evidentiary basis.

Unfortunately here, because Enterasys has not revealed the detailed substance of these records to the same level of detail it did for the '205 patent, Foundry is left with less information regarding these documents, and therefore can only speculate as to what they say. The Court can infer, however, that these records contradict the statements made by Enterasys in the body of its interrogatory answer, because if they were consistent, one would expect Enterasys to be quick to produce them.

The fact that Enterasys reserves the right to use these records at a later date, if it, in its sole discretion, chooses to do so, is bothersome. There is no basis for selective "waiver" of these records -- Enterasys seems to believe it can waive for some, but not for all, and that it can simply make the decision to do so whenever it wants.

## IV.    <u>CONCLUSION.</u>

For the foregoing reasons, Foundry respectfully requests that this Court compel Enterasys to immediately produce the invention records it refers to in its amended response to Foundry's Interrogatory No. 5 for the '205 and '173 patents.

Dated:  May 25, 2007

Respectfully Submitted,

DEFENDANT FOUNDRY NETWORKS, INC.

By Its Attorneys,

*/s/ Steven M. Bauer*
Steven M. Bauer (BBO #542531)
Jeremy P. Oczek (BBO #647509)
John W. Pint (BBO #660548)
PROSKAUER ROSE LLP
One International Place
Boston, MA  02110-2600
Telephone:  (617) 526-9600
Facsimile:   (617) 526-9899
sbauer@proskauer.com
joczek@proskauer.com
jpint@proskauer.com

William L. Anthony, Jr. (admitted pro hac vice)
I. Neel Chatterjee (admitted pro hac vice)
Fabio E. Marino (admitted pro hac vice)
Matthew H. Poppe (admitted pro hac vice)
Michael F. Heafey (BBO # 556931)
Sanjeet K. Dutta (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 614-7400
Facsimile:   (650) 614-7401
wanthony@orrick.com
nchatterjee@orrick.com
fmarino@orrick.com
mpoppe@orrick.com
mheafey@orrick.com
sdutta@orrick.com

## Certificate Pursuant To Rule 7.1

The undersigned counsel certifies that, before filing this present motion, the parties' counsel conferred via telephone regarding the subject of this motion.  Counsel for Enterasys has advised Foundry that it would not assent to the filing of this motion.

*/s/ Steven M. Bauer*
Steven M. Bauer

## Certificate of Service

The undersigned hereby certifies that this document was filed through the ECF system on May 25, 2007 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Steven M. Bauer*
Steven M. Bauer

EXHIBIT A

```
 1                      UNITED STATES DISTRICT COURT
 2                      DISTRICT OF MASSACHUSETTS
 3          * * * * * * * * * * * * * * * *
 4          ENTERASYS NETWORKS, INC.
                              Plaintiff
 5
            VERSUS                         CA-05-11298-DPW
 6
            FOUNDRY NETWORKS, INC.
 7          EXTREME NETWORKS, INC.
 8                              Defendants
 9          * * * * * * * * * * * * * * * *
10
                 BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
11
12
                 UNITED STATES DISTRICT COURT JUDGE
13
14
                              MOTION HEARING
15
16
                           OCTOBER 26, 2006
17
18
            APPEARANCES:
19
            MARC N. HENSCHKE, ESQ. AND WILLIAM J. ROCHA, ESQ., Robins,
20          Kaplan, Miller & Ciresi, LLP, 800 Boylston Street, 25th
            Floor, Boston, Massachusetts  02199-7080, on behalf of
21          the Plaintiff
22          EMILY E. SMITH-LEE, ESQ., McDermott, Will & Emery, LLP,
            28 State Street, Boston, Massachusetts  02109, on behalf
23          of the Plaintiff
24          STEVEN M. BAUER, ESQ. AND JEREMY P. OCZEK, ESQ., Proskauer,
            Rose, LLP, One International Place, Boston, Massachusetts
25          02110, on behalf of the Defendants
```

1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                                          Courtroom No. 1 - 3rd Floor

                                            1 Courthouse Way

20                                          Boston, Massachusetts  02210

                                            10:05 A.M. - 10:30 A.M.

21

22

23                      Pamela R. Owens - Official Court Reporter

                     John Joseph Moakley District Courthouse

24                          1 Courthouse Way - Suite 3200

                          Boston, Massachusetts  02210

25

1              THE COURT:  Well, I brought this case in because I

2    was concerned that you've got some bad attitudes about

3    discovery and I didn't want to inflict it on Judge Collings

4    again.

5              So, let me pursue it in kind of a reverse order of

6    Extreme's Motion to Compel and start with interrogatory number

7    two.  Why can't you fix the date?

8              MR. HENSCHKE:  Excuse me?

9              THE COURT:  Why can't you fix the date?

10             MR. HENSCHKE:  We're at a point, Your Honor, where

11   we have --

12             THE COURT:  You don't know what your patents are?

13   You don't know what the dates are for conception?

14             MR. HENSCHKE:  No, we don't.  What we know --

15             THE COURT:  You don't?  You filed a lawsuit, but

16   you don't know the dates?

17             MR. HENSCHKE:  Well, let me explain.  What we know

18   are the application filing dates.  Those, of course, we do

19   know.  But what we're talking about here is the possibility of

20   swearing behind those dates with earlier conception or

21   reduction to practice dates.  And now in some cases, it might

22   be --

23             THE COURT:  You don't know at this stage in the

24   litigation?

25             MR. HENSCHKE:  No.

1          THE COURT:  Then you better find out fast.

2          MR. HENSCHKE:  We're attempting to.

3          THE COURT:  Well, I'm going to set a date for you

4    to do it because I'm not going to indulge this kind of

5    rope-a-doke strategy with respect to discovery.

6          MR. HENSCHKE:  What Your Honor, I hope, will

7    understand is we're talking about patents that are 10 or 15

8    years old here.

9          THE COURT:  What I hope you will understand is you

10   brought a lawsuit on the basis of patent infringement and

11   presumably you did some sort of investigation before you did

12   it.

13         MR. HENSCHKE:  Yes, sir.  But conception and

14   reduction to practice dates are not something I need to bring

15   in an infringement lawsuit.  And we're always entitled to rely

16   upon the application filing dates.  The only reason we might

17   need earlier dates is to try to swear behind a particular piece

18   of prior art.

19         THE COURT:  Right.  So you wait and see what the

20   particular piece of prior art is and then you come up a prior

21   date?

22         MR. HENSCHKE:  That's not what we've been trying to

23   do.

24         THE COURT:  Okay.  Why can't you do it in one

25   month?

4

1           MR. HENSCHKE:  Well, there are two reasons:  (a)

2    Because we have outstanding discovery to third parties who are

3    in possession of all of these underlying --

4           THE COURT:  When did you make that discovery?

5           MR. HENSCHKE:  The subpoenas were issued within the

6    last three weeks or so.

7           THE COURT:  When did you file the lawsuit?

8           MR. HENSCHKE:  We filed it in the summer of '05, I

9    believe.

10          THE COURT:  All right.  And when was this issue

11   raised with respect to interrogatories?

12          MR. HENSCHKE:  Perhaps in late spring.

13          THE COURT:  The interrogatories were filed in late

14   spring?

15          MR. HENSCHKE:  I think so.

16          THE COURT:  And, so, you got around to doing your

17   third-party discovery three weeks ago?

18          MR. HENSCHKE:  No.  There was a -- you have to

19   understand this is not a questionable act of diligence or

20   sloppiness.  This is a question of you're talking about patents

21   that are 10 to 15 years old.  They were owned by Digital

22   Equipment Corporation.  This is a company that several years

23   ago dissolved and blew up.  Pieces of it were sent to all kinds

24   of different companies, different places in the country.

25          THE COURT:  And, so, you began your third-party

5

1    discovery three weeks ago?

2            MR. HENSCHKE:  No.  We served the subpoenas three

3    weeks ago.  There has been a long process of interviewing

4    former employees of these companies, going through our own

5    files in warehouses and electronic records to try to find this

6    stuff.  And there has been a diligent pursuit of this stuff all

7    along the way.  And it's recently through interviews of former

8    employees and the like that we have been able to pinpoint that

9    the place these documents are, in all likelihood, is in a

10   warehouse in Houston owned by Hewlett-Packard Company or up in

11   New Hampshire at a company called DNPG LLC on some old computer

12   systems.  These are the places that Digital Equipment

13   Corporation, when it imploded, has been dispersed to.

14           THE COURT:  And the discovery that the defendants

15   did with respect to this indicating that nobody really knows

16   where this stuff is?

17           MR. HENSCHKE:  Are you saying nobody knows?  Right

18   now we're in negotiations with both Hewlett-Packard and with

19   DNPG.

20           THE COURT:  Why weren't you in negotiations before?

21           MR. HENSCHKE:  Because we were investigating where

22   this stuff was.  For quite a while, we believed it may be in

23   the possession of Enterasys.  That proved not to be true.  We

24   went back and interviewed old employees that worked for DEC 10

25   years ago to try to find out where this stuff was.

6

1                    THE COURT:  When did you do this?

2                    MR. HENSCHKE:  In the spring and summer.

3                    THE COURT:  Okay.  Well, I guess I want an

4     affidavit with respect to your due diligence in pursuing these

5     matters.

6                    MR. HENSCHKE:  In pursuing inventive records?

7                    THE COURT:  Yes.

8                    MR. HENSCHKE:  Okay.

9                    THE COURT:  Because you're stone-walling on the

10    interrogatory answer.

11                   MR. HENSCHKE:  I'm not trying to.  This is

12    information that I don't have --

13                   THE COURT:  Well, you're succeeding at it.  Whether

14    you're trying to or not, you're succeeding at it.

15                   MR. HENSCHKE:  Well, it's hard to turn over

16    information I don't have.

17                   And the other aspect of this is to the extent there

18    is other information about this, it's likely in the possession

19    of these individual inventors.  There's a total of 16 of them.

20    None of them are under our control.  These are all people who

21    the defendants are going to be deposing in this case.  And, so,

22    it seems that we have something set in place for this

23    information to be coming out if, in fact, it exists.

24                   THE COURT:  You have an obligation to answer the

25    interrogatories.

**10/26/2006  2006.10.26 Hearing Transcript**

1            MR. HENSCHKE:  And I have answered them with the

2     best information in my possession.

3            THE COURT:  I don't believe that that's the case.

4     I don't consider that to be the case at this point.  My own

5     view is that you have been dilatory and that you have chosen to

6     develop a series of excuses not to address a fundamentally

7     important issue.  And I'm not going to stand for it.  I want

8     you to understand that as clearly as I can express it.  I'm not

9     going to stand for it.

10            MR. HENSCHKE:  I'm sorry you feel that way, Your

11     Honor, and I will be happy to lay out what's been done on these

12     issues.

13            THE COURT:  Well, that will be helpful, and also to

14     change your practice would also be helpful.

15            MR. HENSCHKE:  And what exactly should I take away

16     from that?  What do you mean specifically?

17            THE COURT:  I mean that you attend to this in a

18     diligent fashion, promptly responding to materials that are

19     asked for -- that's what I mean -- not waiting until you have

20     to see two Judges before you come up with some sorts of

21     answers.

22            MR. HENSCHKE:  We have answered all these

23     interrogatories in a timely fashion and given all the

24     information that we had.  I can't answer questions about

25     information in the possession of third parties that I don't

1    know.  I'm not hiding information I have.  I'm giving you --
2    I'm doing the best I can.

3              THE COURT:  But you're not seeking it as promptly
4    as you should.  And you're in the position of the party that
5    has the obligation to answer this fully.  So, I stand by the
6    one month.  You must answer within one month with respect to
7    the dates.

8              MR. HENSCHKE:  And if Hewlett-Packard or DNPG LLC
9    or these inventors aren't able to come forward on that time
10   frame, then are you saying that there's not going to be
11   evidence in the case about these dates?

12             THE COURT:  I haven't said that yet.  I have said
13   that you have one month in which to answer this with specific
14   dates.  Now, you have the inventors' records, too, don't you?

15             MR. HENSCHKE:  I have inventors' records for three
16   of the six patents.

17             THE COURT:  And with respect to those three of the
18   six patents, is it helpful to you to identify them?

19             MR. HENSCHKE:  It's always a mixed bag when you're
20   waiving attorney/client privilege on documents like that.

21             THE COURT:  Not a matter of waiving attorney/client
22   privilege.

23             MR. HENSCHKE:  Well, theoretically, Your Honor --

24             THE COURT:  You mean it's a matter of
25   attorney/client privilege where the date of conception is and

9

1    when it was reduced to practice?

2              MR. HENSCHKE:  It's a matter of attorney/client

3    privilege that the entirety of the invention records are

4    protected.

5              THE COURT:  We haven't asked that yet.

6              MR. HENSCHKE:  We have given them the facts as to

7    the dates of conception and reduction to practice that are in

8    those invention records.

9              THE COURT:  Meaning no later than the date of the

10   filing of the patent?

11             MR. HENSCHKE:  You're referring now to the ones

12   where we don't have invention records.  With the ones where we

13   do have invention records, we have answered the interrogatory

14   disclosing the facts of what those invention records say on

15   reduction and conception of practice.  You might be under the

16   misimpression that we said we have these invention records, but

17   we're not going to tell you anything that they say.  To the

18   contrary, we took the facts that they say about reduction to

19   practice and conception dates and put those in our

20   interrogatory response.

21             THE COURT:  And you're stuck with those facts,

22   right?  Those are the dates that you're relying upon?

23             MR. HENSCHKE:  I'm not relying upon those at this

24   point.  I'm trying to find evidence to corroborate them.

25             THE COURT:  Okay.  Well, it seems to me that you

1    are going to have this by one month.  So, the specific answers

2    as to the dates will be provided by November 30th.

3              MR. HENSCHKE:  We will do that.  I will supplement

4    an interrogatory by November 30.  But I am very much afraid

5    that we're not going to get to the depositions of these

6    certainly 16 inventors in that time frame.  We may not get

7    cooperative response from Hewlett-Packard and DNPG in that time

8    frame.  And if so, the question is if third parties are

9    withholding evidence or it can't be gotten to within that time

10   frame, why would that possibly result in penalizing us about

11   developing evidence in the future?

12             THE COURT:  We haven't gotten to penalty yet, but

13   we may.  Because on November 30, you are also going to file

14   affidavits indicating your due diligence in pursuing this

15   information, setting forth specifically dates and times in

16   which you contacted people as fully as possible.

17             MR. HENSCHKE:  Okay.

18             THE COURT:  And I encourage you to be as full as

19   possible.  Because to the degree that there is some lack of

20   effort here, I'm not going to permit you to say "gee, we need

21   more time, but we didn't use our previous time effectively."

22   So, an affidavit with respect to that.

23             Now, with respect to inventors' records, when are

24   you going to make the choice with respect to inventors'

25   records?

11

**10/26/2006  2006.10.26 Hearing Transcript**

1           MR. HENSCHKE:  The idea is that if this evidence

2     can be acquired from the third parties, that would obviate the

3     need to have to waive attorney/client privilege and rely on

4     these invention records.  So we're hopeful that we can get the

5     evidence from another source and not have to give up a

6     privilege.  Also, as we pointed out in the papers, there is

7     only a very narrow circumstance in which we'd ever need to try

8     to swear to these earlier dates.  And that's the situation

9     where the defendants have an invalidity position based on a

10    particular species of prior art and exactly at a particular

11    time frame that we might be able to swear behind.  At this

12    point in time, we know nothing about defendants' invalidity

13    positions.  We served an interrogatory on them saying "Tell us

14    what your invalidity theory is, tell us" --

15           THE COURT:  Is there a motion to compel with

16    respect to that interrogatory?

17           MR. HENSCHKE:  No.  I'm simply giving you the

18    background.

19           THE COURT:  All right.  So I'm dealing with yours.

20    You don't get away with it by saying, "well, they haven't done

21    it either."  If they haven't done it, they are in for an

22    unpleasant hearing, also.

23           MR. HENSCHKE:  Understood.  I'm not here to accuse

24    them of discovery violations.  I'm here to explain to you that

25    because of the situation --

1              THE COURT:  Look, your date of reduction to

2      practice, your date of conception are matters that you alone or

3      your predecessors have control over.  This is not an Alphonse-

4      and-Gaston.  You provide that date.  It's not you provide that

5      date as a way of figuring out what you have to swear behind,

6      which is actually a rather vivid use of language to describe

7      what appears to be going on.

8              MR. HENSCHKE:  I agree with Your Honor that in a

9      normal situation with a normal company, this would be evidence

10     that would be in that company's possession.  It would be

11     evidence in their own engineers and engineering notebooks and

12     it's something they would have and readily be able to

13     provide.

14             THE COURT:  And you should have gotten it by now.

15     You should have been out there getting it by now.

16             MR. HENSCHKE:  We've been trying to get it, then

17     track it down and find out what it is.

18             THE COURT:  No doubt I'll get an opportunity to

19     review that in the affidavit to see just how diligent you have

20     been with respect to it.

21             So, both of those will be due -- that is, the

22     affidavit and a firm answer -- by November 30th.

23             MR. HENSCHKE:  We will do our best to complete

24     that.

25             THE COURT:  Okay.  Now, with respect to this answer

1    to -- or response to Judge Collings, what have you done other

2    than cut and paste and add products?

3              MR. HENSCHKE:  Well, let's look at the chart.  It's

4    Exhibit F to --

5              THE COURT:  I have got it.

6              MR. HENSCHKE:  First of all, I would say we have

7    done everything and more that Judge Collings required us to do.

8              THE COURT:  Well, let me put it a different way:

9    Why isn't it I shouldn't just say, "All right, your claim chart

10   is due a month from now?"

11             MR. HENSCHKE:  You've set a date of December 15th

12   for when our claim chart is due.

13             THE COURT:  I have.  And it seems to me that what's

14   happened is that you played two Judges off against each other

15   in this and hoped that what you'd get a chance to do is to come

16   back here at a later point at the time that we're getting close

17   to the claim construction chart.  What you have done is

18   essentially listed every product and listed the basic materials

19   from the patent.

20             MR. HENSCHKE:  We've listed every product that's

21   infringing, Your Honor, that's accused.  These are all products

22   that are infringing our patents.  I haven't put in any product

23   that is not infringing the patents.  The fact of the matter is

24   these defendants are infringing our patents in a widespread

25   manner across nearly the entirety of their product line.

1    That's why those products are listed.

2              THE COURT:  Okay.  But now you're going to get to

3    do it in detail.  So, the short of it is your claim chart is

4    due on November 30th.

5              MR. HENSCHKE:  Your Honor, let me -- may I

6    inquire?  What additional detail could we provide that has not

7    been provided in this chart short of either the detailed

8    evidentiary basis for our contentions or actual claim

9    construction?  What more could we give that isn't here?

10             THE COURT:  Is this going to be your claim chart?

11             MR HENSCHKE:  No.

12             THE COURT:  What's your claim chart going to be?

13             MR. HENSCHKE:  The claim chart that's due on

14   December 15th is a document which is going to set out the

15   detailed evidentiary basis of the contentions.  You're going to

16   have two columns.  One column is going to be a list of elements

17   of the patent.  The other column is going to be a list of the

18   evidentiary support where there is detailed citations to pages

19   and lines of documents that show that that claim element is in

20   that product.

21             THE COURT:  All right.  It will be due November

22   30th.  That's the way I'm going to respond to this.  You bought

23   yourself some time in response to the interrogatories -- some

24   time, not a lot.

25             MR. HENSCHKE:  With all due respect, Your Honor, it

15

**10/26/2006  2006.10.26 Hearing Transcript**

1    feels as though I have lost time because the date that was

2    established here was December 15th.  These defendants came in

3    here on a motion to compel three or four months ago at a point

4    where neither of them had produced a single relevant

5    confidential technical document whatsoever and tried to demand

6    that we give the detailed evidentiary basis supporting our

7    infringement contentions at a point in time where they hadn't

8    produced a single useful engineering document.

9                THE COURT:  All right.

10               MR. HENSCHKE:  It's only been the latter part of

11   August now for the first time that this defendant, Extreme, has

12   started to produce useful documents.  We've just gotten these

13   useful documents and started going through them for the first

14   time in September.  So, we are on pace to provide the detailed

15   evidentiary support for December 15th just like you set out.

16   And we have not been able to do it sooner because they had

17   refused to give the documents to us.

18               THE COURT:  Right.

19               MR. HENSCHKE:  We have our own motion to compel on

20   the documents.

21               THE COURT:  That's not before me, is it?

22               MR. HENSCHKE:  Well, it was put on reserve by Judge

23   Collings to see how they responded.  And it can be reactivated.

24   So, is it before you today?  No.  But it's a question of just

25   providing it.

1          THE COURT:  All right.  So, why can't you have the

2   claim chart on November 30th?

3          MR. HENSCHKE:  I can have the claim chart on

4   November 30th the best that we can do.

5          THE COURT:  The claim chart.

6          MR. HENSCHKE:  Well, because, Your Honor, we still

7   don't have many of the key technical documents we have asked

8   for from these defendants that would allow us to fully detail

9   all of these things.  I can give you the best claim chart

10  possible with the evidence they have produced, but you're

11  talking about a defendant that still to this date has not

12  produced the key hardware specifications that are the real core

13  of showing the infringing activity here.  So, I'll give you a

14  claim chart.  It will be the best we have.  But it's going to

15  have to have a few footnotes reserving our rights because we

16  still don't have all the key documents.

17          THE COURT:  All right.  Well, we'll accept that

18  because now we're going to start to move a little bit faster on

19  this.  If the parties want to plow their own nest and

20  periodically dump it in the Court, they are going to have to

21  accept responsibility for what's going to happen.  And what's

22  going to happen is that there will be some scheduling

23  adjustments to make this move along.

24          Now, what's the story with the documents?

25          MS. SMITH-LEE:  Your Honor, first of all, just a

17

**10/26/2006  2006.10.26 Hearing Transcript**

1    point of clarification.  I believe that the motion to compel

2    counsel is referring to is a motion to compel that was pending

3    against Foundry, not my client.  We have produced almost

4    140,000 pages of documents.

5                 THE COURT:  Don't tell me about the number of

6    pages.  What else?

7                 MS. SMITH-LEE:  We have produced our key technical

8    documents.

9                 THE COURT:  What else?  What else is necessary?

10   Have you produced everything that's called for?

11                MS. SMITH-LEE:  We have produced -- we are in the

12   process of producing everything called for.

13                THE COURT:  When are you going to complete

14   production of everything that's called for?

15                MS. SMITH-LEE:  It was supposed to go out today,

16   but they are fixing some formatting on the disks.

17                THE COURT:  So it will being completed by this

18   weekend -- by Monday.

19                MS. SMITH-LEE:  That is -- I think Monday would

20   be --

21                THE COURT:  That's going to be your entire

22   production responsive to their request?

23                MS. SMITH-LEE:  I believe that's the case.   I

24   believe that is the case.

25                THE COURT:  Well, you say you believe.  It sounds

```
1     to me like you have some question.

2              MS. SMITH-LEE:  I simply don't want to make a

3     representation to the Court.

4              THE COURT:  I wouldn't.

5              MS. SMITH-LEE:  Because I came here without a

6     motion to compel our documents pending --

7              THE COURT:  No.  But you came here with some

8     knowledge of the case presumably?

9              MS. SMITH-LEE:  Yes.  It is my understanding that

10    the next round should be the entirety of it, but I need to

11    check with the people who are --

12             THE COURT:  And you told me about the 140,000

13    documents that you delivered to date.  How many are included,

14    do you believe, in this now computer-challenged production of

15    the most recent ones?

16             MS. SMITH-LEE:  Oh, no, no, Your Honor.  The

17    139,000 documents have already been produced.

18             THE COURT:  I understand that.  What is it that's

19    coming now?  How much?

20             MS. SMITH-LEE:  About 200,000 more pages.

21             THE COURT:  200,000?

22             MS. SMITH-LEE:  Yes.

23             THE COURT:  Why is that?  Why did it take so long?

24             MS. SMITH-LEE:  I don't actually know the answer to

25    that, Your Honor.  I know that we've been working on the
```

1    document production on a rolling basis as, by the way, has

2    Enterasys.  We have gotten some third of the amount of

3    documents.

4              THE COURT:  Oh, no.  I understand.  This is like

5    the Old Thomas cartoon in which the members of the tweed ring

6    stand in a circle and point to each other all the way around

7    the circle.  This circle is going to be broken.  I'm tired of

8    this.  You have got this case that has morphed into 120

9    products, that has a list of cut-and-paste that's -- well, I

10   can't even do the arithmetic sitting here.  But no more fooling

11   around.  When this kind of case gets brought, you're going to

12   attend to it.

13             So, they will file their claim chart on November

14   30th that will have footnotes in it that will tell me about

15   things that they can't reach in a timely fashion perhaps and

16   I'll decide whether or not that's meaningful here.  Do you

17   understand?

18             MS. SMITH-LEE:  Understood, Your Honor.  We will

19   continue diligently.

20             THE COURT:  What about Foundry?

21             MR. BAUER:  Your Honor, I don't believe that there

22   are any outstanding documents from us to them.  We had the

23   motion to compel with Judge Collings.  At my suggestion,

24   because there was so many "who's done what," we suggested that

25   the court order Mr. Henschke to meet with us to go through it.

1    We had that meeting.  We -- I believe with Mr. Henschke --

2    resolved the issues and have produced the documents.  And there

3    is -- as far as I know -- no outstanding requests for

4    Mr. Henschke from Foundry right now to produce more technical

5    documents.

6              On the other hand, they have 11,000 boxes of

7    documents that they have yet to let us get in to look at and we

8    hope to get that going very quickly after this hearing.

9              THE COURT:  Is there anything more outstanding from

10   Foundry?

11             MR. HENSCHKE:  I believe so, Your Honor.

12             THE COURT:  What?

13             MR. HENSCHKE:  I've been told by the people

14   reviewing the documents that, while Foundry has done a better

15   job than Extreme in producing their key technical documents,

16   that there are several categories of things that still aren't

17   there.

18             THE COURT:  What?

19             MR. HENSCHKE:  I can't specifically name you the

20   documents, but that's what I'm told by our technical people

21   that have been doing the review and are doing it right now.

22   You see, look, I'm a plaintiff in this case.  It's in my best

23   interest to move this case along quickly.  I would have loved

24   to have had these technical documents that I needed a long time

25   ago and been done with the analysis and been able to move

1    forward.  You're getting now a better feel for what the

2    situation is.

3              THE COURT:  No.  I've had a pretty good feel from

4    the papers themselves of what's going on here.  I have some

5    idea of what the incentive structure is in litigation.  And it

6    doesn't just rest on "I'm the plaintiff and I'd like to move

7    faster."  it has a variety of other factors involved, including

8    efforts to spend a good deal of time arguing over discovery

9    that shouldn't be argued over.

10             So, the short of it is now we're squeezing the time

11   a little bit to move this along.  I encourage the parties to

12   get this resolved outside of court.  Because inside court will

13   not be as comfortable an experience as being outside the court

14   apparently has.

15             So, is there anything else that we need to talk

16   about at this point?

17             MR. HENSCHKE:  I don't think so, only to say that I

18   have not found this to be comfortable.  I have found it to be

19   very distressing and I've tried very hard to get this stuff and

20   move forward.  And now we're going to get 200,000 pages

21   suddenly a month before the claim charts are due.  So --

22             THE COURT:  So, it would have been 45 days before

23   the claim charts were due.

24             MR. HENSCHKE:  Neither situation would have been

25   very attractive.

22

```
1              THE COURT:  Okay.  Well, it seems to me that what

2   you've got to do now is develop the claim charts.  You've

3   bought time with this.  But the cost now, I think, is clear,

4   that this faux compliance with court orders has its cost.  And

5   one of the costs is 14 days in the schedule.

6              All right.  If there's nothing futher, then we'll

7   be in recess.

8                    RECESSED AT 10:30 A.M.

9

10                      CERTIFICATION

11             I certify that the foregoing is a correct

12   transcript of the record of proceedings in the above-entitled

13   matter to the best of my skill and ability.

14

15   _____    _____

16   Pamela R. Owens                     Date

17   Official Court Reporter

18

19

20

21

22

23

24

25
```

EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ENTERASYS NETWORKS, INC., | ) | Civil Action No: 05-CV-11298 (DPW) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| FOUNDRY NETWORKS, INC., | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## PLAINTIFF ENTERASYS NETWORKS, INC.'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT FOUNDRY NETWORKS, INC.'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Enterasys Networks, Inc. ("Enterasys" or "Plaintiff") hereby supplements and corrects its previous responses and objections to the First Set Of Interrogatories served by Defendant Foundry Networks, Inc. ("Foundry" or "Defendant") on or about March 14, 2006.

### GENERAL RESPONSE

Enterasys, based upon its current knowledge, understanding, and belief concerning the information available to it as of the date on which these Responses are made, responds and objects as set forth below to Foundry's First Set of Interrogatories. These Responses, while based on diligent investigation by Enterasys and its counsel, reflect only the current state of Enterasys' knowledge, understanding, and belief respecting the matters about which inquiry was made. Enterasys has not completed its investigation of the facts relating to this case, its discovery in this action, nor its preparation for trial. As this action proceeds, Enterasys anticipates that further facts may be discovered, and without in any way obligating itself to do so, Enterasys reserves the right to modify or supplement its Responses with such pertinent

neither relevant to a claim or defense of a party nor reasonably calculated to lead to the discovery of admissible evidence; and that it seeks knowledge concerning Foundry products that is already uniquely within Foundry's own possession, custody, or control.

Subject to and without waiving its objections, Enterasys states that Mark Hurley ("Hurley") and Carl Piper ("Piper") of their Product Management group have a general familiarity with certain Foundry products as the result of working on competitive product comparisons for use by Enterasys' sales force. Neither Hurley nor Piper have a detailed technical understanding of Foundry products of the type that could be expected of an engineer.

Vala Afshar has tested certain Foundry products for purposes of assessing their interoperability with Enterasys products within a network environment.

Enterasys will supplement or correct its response to this Interrogatory, if necessary, at an appropriate interval of this case in a manner consistent with the requirements of Federal Rule of Civil Procedure 26(e).

## INTERROGATORY NO. 5:

For each asserted claim of the PATENTS-IN-SUIT identified in response to Interrogatory No. 1, describe the circumstances surrounding the alleged invention of the claim, including but not limited to, the identity of ALL PERSONS involved in the conception of the alleged invention; the precise date of conception of the alleged invention; where the conception took place; the date of the first written description of the alleged invention; the date of first disclosure of the alleged invention to a PERSON other than the named inventor(s); the date of first testing of the alleged invention; the date of first actual reduction to practice of the alleged invention; where the first actual reduction to practice took place; ALL corroborating witnesses; the steps constituting diligence from conception to actual or constructive reduction to practice; the identify

of each first product which incorporated any invention claimed in the patent; the date of first use

of the alleged invention by a PERSON other than by a named inventor; the date of first

advertisement or promotion of the alleged invention; the date of first sale or offer for sale of the

alleged invention; and ALL project names, numbers, codes, descriptions, or other identifiers,

whether external or internal, used by ENTERASYS and/or any prior owners of the PATENTS-

IN-SUIT (including DEC or CABLETRON) relating to development of the subject matter of

each of the PATENTS-IN-SUIT.

**RESPONSE TO INTERROGATORY NO. 5:**

      Enterasys objects to this Interrogatory on grounds that it calls for information that is

protected from disclosure by the attorney-client privilege and/or by the work product doctrine;

that it is overly broad, unduly burdensome, vague, and ambiguous; and that it seeks information

neither relevant to a claim or defense of a party nor reasonably calculated to lead to the discovery

of admissible evidence.

      Enterasys further objects to this Interrogatory pursuant to Federal Rule of Civil Procedure

33(a) and Local Rule 26.1(C) of the United States District Court for the District of Massachusetts

as presenting multiple separate discovery requests in that it contains discrete subparts relating to

issues such as: **(i)** first public sale and use, and/or **(ii)** Enterasys, Cabletron, and DEC products,

that are not logical extensions of the basic underlying request for information pertaining to

*inventive activities* relevant to the subject matter of the patents-in-suit.

      Subject to and without waiving its objections, Enterasys provides the following

information concerning the dates of invention for the patents-in-suit:

**U.S. Patent No. 5,251,205 (the "'205 patent")**

On September 25, 1989, the '205 inventors submitted invention records believed to be

drafted principally or entirely by inventor Ross Callon ("Callon") to Digital Equipment Corporation's ("Digital's") in-house legal department. Enterasys is withholding these invention records from production on grounds of attorney-client privilege, and does not presently intend to rely upon them as direct evidence for establishing pre-application dates of conception or reduction to practice for the '205 inventions.

In these invention records, Callon indicates that initial discussions and conception of a general approach for the '205 inventions took place in April and May of 1989. Callon further indicates that main options were identified on an overall level for the '205 inventions (not including all details) in June and July of 1989. According to Callon, in meetings held at Digital's King Street campus on July 18 and 19, 1989, a general approach for the '205 inventions was adopted including some but not all of the details. This selected approach was written up in greater detail in July and August of 1989, and general (2 page) and detailed (about 15 page) descriptions were distributed to select DEC personnel between August 12 and 31, 1989. Callon states that on September 12, 1989, he presented this selected approach at an internal "Megameeting" held at Digital's King Street campus. Callon anticipated having a concepts paper addressing the '205 inventions completed by mid-October, 1989, and holding a concepts review in late October. Callon also makes reference to having 17 pages of detailed notes (date unknown) upon which he intended to base this concepts paper. No additional information concerning conception and reduction to practice dates is disclosed in the '205 invention records.

Despite extensive searches of its records, to date Enterasys has been unable to locate any of the underlying writings or presentations described above, and believes that it may never have been in possession of any such writings or presentations. Enterasys expects to complete all searches of its records in December of 2006. To the best of Enterasys' present knowledge, to the extent that these writings or presentations still exist, they are most likely in the possession of

11

third party DNPG LLP ("DNPG") which is the current owner of assets formerly belonging to

Digital's Networking Products Group business division, or third party Hewlett-Packard

Corporation ("Hewlett-Packard") which is the current owner of most of the remainder of assets

formerly belonging to Digital. It is also possible that copies of these writings or presentations

could be in the possession of one or more of the named inventors on the '205 patent, or in the

possession of other former Digital employees.

Based upon the foregoing, Enterasys contends that the actual date of conception for the

'205 inventions may have been as early as April of 1989, and was very likely no later than July

of 1989. Enterasys further contends that, depending upon the level of detail disclosed in the

writings and presentations referenced by Callon, the actual date for reduction to practice of the

'205 inventions may have been as early as July of 1989, and in any event was very likely to have

occurred prior to the September 4, 1990 application filing date for the '205 patent. To the extent

that Enterasys is unable to obtain direct evidence to corroborate these actual conception and/or

reduction to practice dates for the '205 inventions, Enterasys will rely upon the September 4,

1990 application filing date to establish a constructive conception and reduction to practice date

for the '205 inventions.

### U.S. Patent No. 5,390,173 (the "'173 patent")

The inventions of the '173 patent were embodied in and practiced by the packet format

used in Digital's FDDI-to-GigaNet Controller chip (the "FGC chip"). This FGC chip was

contained in Digital's GigaSwitch FDDI product first shipped to customers in June of 1993, and

was also contained in Digital's later shipped DECNIS 500 and/or DECNIS 600 router products.

Inventor Barry Spinney ("Spinney") authored a detailed 15 page document dated July 19,

1991 describing the packet format for the FGC chip entitled "GigaSwitch Packet Format - Rev.

1.0." See (ETS0046327-41). It is Spinney's belief that he also would have authored several

other less detailed versions of this document in preceding months. Indeed, Spinney's third party

document production indicates that schematics for the FGC chip already existed as early as

March of 1991 (SPINNEY000047), that Digital had presented detailed layout information for the

FGC chip to its supplier LSI Logic prior to May of 1991 (SPINNEY0000300), and that the

specification for the FGC chip was closed as of June 20, 1991 (SPINNEY0000300).

    Digital's supplier, LSI Logic, built prototype parts for the FGC chip in the first half of

May of 1991. (SPINNEY0000300). In the second half of December of 1991, Digital's supplier,

Toshiba, built prototype FGC chips. (SPINNEY0000278-79). On July 17, 1992, Digital

engineers performed testing in which they were able to successfully transfer data packets through

a crossbar switch from one FGC chip to another FGC chip on the same FGL2 linecard.

(SPINNEY0000299). It is Spinney's belief that he may currently be in possession of prototype

FGC chips and prototype FGL2 linecards that pre-date the application filing date for the '173

patent.

    Despite extensive searches of its records, to date Enterasys has been unable to locate any

of the documents or prototypes described above except those cited, and believes that it may

never have been in possession of any such documents or prototypes. Enterasys expects to

complete all searches of its records in December of 2006. To the best of Enterasys' present

knowledge, to the extent that these documents or prototypes still exist, they are most likely to be

in the possession of third parties DNPG or Hewlett-Packard. It is also possible that copies of

these documents or prototypes could be in the possession of one or more of the named inventors

on the '173 patent, or in the possession of other former Digital employees.

    Based upon the foregoing, Enterasys contends that the actual date of conception for the

'173 inventions may have been prior to March of 1991, but in no event was later than July 19,

1991. Enterasys further contends that the actual date for reduction to practice of the '173

inventions may have been prior to May of 1991, but in no event was later than late December of 1991. Spinney's anticipated deposition testimony is expected to give greater precision to these dates of actual conception and reduction to practice. To the extent that Enterasys is unable to sufficiently corroborate these actual conception and/or reduction to practice dates for the '173 inventions, Enterasys will rely upon the October 22, 1992 application filing date to establish a constructive conception and reduction to practice date for the '173 inventions.

As a final note, on July 8, 1992, the '173 inventors submitted invention records to Digital's in-house legal department believed to be drafted principally or entirely by Spinney. Enterasys is withholding these invention records from production on grounds of attorney-client privilege, and does not presently intend to rely upon them as direct evidence for establishing pre-application dates of conception or reduction to practice for the '173 inventions.

### U.S. Patent No. 6,128,665 (the "'665 patent")

Despite extensive searches of its records, to date Enterasys has been unable to locate any direct evidence for establishing actual pre-application conception and/or reduction to practice dates for the '665 inventions, and believes that it may never have been in possession of any such evidence. Enterasys expects to complete all searches of its records in December of 2006. To the best of Enterasys' present knowledge, to the extent that such evidence still exists, it is most likely in the possession of third parties DNPG or Hewlett-Packard. It is also possible that such evidence could be in the possession of the named inventor on the '665 patent, or in the possession of other former Digital employees.

Based upon the foregoing, Enterasys is presently unaware of any information relevant to establishing actual conception and/or reduction to practice dates for the '665 inventions. To the extent that Enterasys is ultimately unable to obtain direct evidence of actual conception and/or reduction to practice dates for the '665 inventions through discovery in this case, Enterasys will

14

rely upon the December 30, 1996 application filing date to establish a constructive conception and reduction to practice date for the '665 inventions.

### U.S. Patent No. 6,147,995 (the "'995 patent")

Inventor Kurt Dobbins ("Dobbins") authored a detailed 7 page document dated November 13, 1994 describing a potential future implementation of the '995 VLAN tagging inventions entitled "Virtual LANS with SFPS Switches." See (ETS0020097-103). This implementation was to be contained in Cabletron Systems, Inc.'s ("Cabletron's") SecureFast Packet Switch ("SFPS") products. Dobbins also authored additional documents dated May 3, 1995 describing how the '995 VLAN tagging inventions were intended to operate in Cabletron's SFPS switches entitled "VBUS Operational Model for FCS" and "VBUS Flooding with LAN Bridges" respectively (ETS0046370-76; ETS0020117-18). Finally, Dobbins authored a similar document dated June 1, 1995 entitled "Virtual LAN Switching." (ETS0020087-96).

Despite extensive searches of its records, to date Enterasys has been unable to locate any direct evidence for establishing actual pre-application conception and/or reduction to practice dates for the '995 inventions other than the documents cited above. Enterasys expects to complete all searches of its records in December of 2006. To the best of Enterasys' present knowledge, to the extent that such evidence still exists, it could possibly be in the possession of the named inventor on the '995 patent, or in the possession of other former Cabletron employees.

Based upon the foregoing, Enterasys contends that the actual date of conception for the '995 inventions may have been prior to November of 1994, but in no event was later than November 13, 1994. If the "Virtual LANS with SFPS Switches" document cited above is ultimately held by the Court to constitute insufficient corroborating evidence of an actual conception date, then Enterasys will contend that the actual date of conception was not later than May 3 of 1995 or June 1, 1995 based upon the "VBUS Operational Model for FCS," "VBUS

Flooding with LAN Bridges," and "Virtual LAN Switching" documents cited above. Enterasys is presently unaware of any information relevant to establishing actual reduction to practice dates for the '995 inventions, but believes it highly likely that prototype SFPS products embodying and/or practicing the '995 inventions would have been built in advance of the priority application filing date. To the extent that Enterasys is unable to sufficiently corroborate actual conception and/or reduction to practice dates of the '995 inventions, Enterasys will rely upon the November 15, 1995 priority application filing date to establish a constructive conception and reduction to practice date for the '995 inventions.

### U.S. Patent No. 6,539,022 (the "'022 patent")

Despite extensive searches of its records, to date Enterasys has been unable to locate any direct evidence for establishing actual pre-application conception and/or reduction to practice dates for the '022 inventions, and believes that it may never have been in possession of any such evidence. Enterasys expects to complete all searches of its records in December of 2006. To the best of Enterasys' present knowledge, to the extent that such evidence still exists, it may be in the possession of third party Standard Microsystems Corporation ("SMC") which is where all inventive activities relating to the '022 inventions took place. It is also possible that such evidence could be in the possession of the named inventor for the '022 patent, or in the possession of other former employees of SMC or Cabletron.

Based upon the foregoing, Enterasys is presently unaware of any information relevant to establishing actual conception and/or reduction to practice dates for the '022 inventions. To the extent that Enterasys is ultimately unable to obtain direct evidence of actual conception and/or reduction to practice dates for the '022 inventions through discovery in this case, Enterasys will rely upon the April 25, 1995 priority application filing date to establish a constructive conception and reduction to practice date for the '022 inventions.

16

## U.S. Patent No. 6,560,236 (the "'236 patent")

On January 14, 1993, the '236 inventors submitted invention records entitled "Patent Disclosure Form (PD93-0184)" to Digital's in-house legal department that are believed to be authored principally or entirely by inventor George Varghese ("Varghese"). See (ETS0046342-58). These invention records contain detailed descriptions of the '236 VLAN inventions. Moreover, in these records Varghese indicates that the '236 inventions were first conceived in March of 1992, and that earlier draft writeups of the "Patent Disclosure Form" had been prepared in November of 1992. Enterasys has now elected to produce these privileged invention records because it intends to rely upon them as direct evidence for establishing actual pre-application dates of conception and/or reduction to practice for the '236 inventions. However, in making this production Enterasys intends to effect only a limited waiver of attorney-client privilege extending only to the content of these invention records themselves, and *not* extending to the content of any other documents or communications among or between any combination of the '236 inventors, in-house counsel for Digital, or the outside prosecuting patent attorneys for Digital.

Despite extensive searches of its records, to date Enterasys has been unable to locate any direct evidence for establishing actual pre-application conception and/or reduction to practice dates for the '236 inventions other than the document cited above, and believes that it may never have been in possession of any such evidence. Enterasys expects to complete all searches of its records in December of 2006. To the best of Enterasys' present knowledge, to the extent that such additional evidence still exists, it is most likely in the possession of third parties DNPG or Hewlett-Packard. It is also possible that such evidence could be in the possession of the named inventors on the '236 patent, or in the possession of other former Digital employees.

Based upon the foregoing, Enterasys contends that the actual date of conception for the

17

'236 inventions is likely to have been in March of 1992, but in no event was later than January 14, 1993. Enterasys is presently unaware of any information relevant to establishing actual reduction to practice dates for the '236 inventions. To the extent that Enterasys is unable to sufficiently corroborate actual conception and/or reduction to practice dates for the '236 inventions, Enterasys will rely upon the June 23, 1993 priority application filing date to establish a constructive conception and reduction to practice date for the '236 inventions.

Enterasys is presently unaware of any persons other than the named inventors for each of the respective patents-in-suit as having been involved in relevant inventive activities, or as being able to serve as corroborating witnesses. These issues remain under investigation by Enterasys, and Enterasys expects that the parties will obtain additional information about these issues from third party discovery in this case.

Enterasys will supplement or correct its response to this Interrogatory, if necessary, at an appropriate interval of this case in a manner consistent with the requirements of Federal Rule of Civil Procedure 26(e).

## INTERROGATORY NO. 6:

Identify ALL articles, systems, products, components and/or devices ever sold by ENTERASYS and/or any prior owners of the PATENTS-IN-SUIT (including DEC or CABLETRON) which use an invention claimed in any of the PATENTS-IN-SUIT, and for each such article, system, product, component or device, state which PATENTS-IN-SUIT covers that article, system, product, component or device, its date of commercial sale (beginning and end), and the PERSONS at ENTERASYS most knowledgeable about the design, development, testing, manufacture, marketing, sale, and licensing of each such article, system, product, component or device.

Subject to and without waiving its objections, Enterasys states that it will identify the documents and witnesses that it intends to rely upon at trial in a manner, and at a time, consistent with the requirements of Federal Rule of Civil Procedure 26 and whatever Pre-trial Order is ultimately entered by the Court in this case.

Dated:  November 30, 2006

Respectfully served,

ENTERASYS NETWORKS, INC.

As to responses:

By its Vice President and Associate General Counsel,

Thomas A. Loureiro

As to objections:

By its attorneys,

Christopher P. Sullivan, Esq. (BBO No.485120)
Marc N. Henschke, Esq. (BBO No. 636146)
Alan E. McKenna (BBO No. 644556)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 Boylston Street, 25th Floor
Boston, MA 02199
Tel. (617) 267-2300

Of Counsel:
A. James Anderson, Esq. *(pro hac vice)*
Marla R. Butler, Esq. *(pro hac vice)*
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2600 One Atlanta Plaza
Atlanta, GA 30326-1386
Tel. (404) 760-4300

Robert A. Auchter, Esq. *(pro hac vice)*
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
1875 Eye Street, N.W., Suite 300
Washington, DC 20006
Tel. (202) 775-0725

35035661

32

## CERTIFICATE OF SERVICE

I, Marc N. Henschke, hereby certify that on November 30, 2006, I caused the attached *Plaintiff Enterasys Networks, Inc.'s Third Supplemental Responses And Objections To Defendant Foundry Networks, Inc.'s First Set Of Interrogatories* to be served as indicated below via hand delivery, first class mail, and/or by e-mail (PDF attachment) upon Defendant's counsel of record at the following addresses:

### VIA HAND DELIVERY

Jeremy P. Oczek, Esq.
Proskauer Rose, LLP
One International Place
Boston, MA 02110

### VIA FIRST CLASS MAIL & E-MAIL (PDF ATTACHMENT)

I. Neel Chatterjee, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
<nchatterjee@orrick.com>

### VIA E-MAIL (PDF ATTACHMENT)

K. Mudurian
<kmudurian@orrick.com>

Y. Steinberg
<ysteinberg@orrick.com>

Dated:  November 30, 2006

_____
Marc N. Henschke

EXHIBIT C



ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025

tel 650-614-7400
fax 650-614-7401

WWW.ORRICK.COM

March 27, 2007

Matthew H. Poppe
(650) 614-7431
mpoppe@orrick.com

*VIA E-MAIL*

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA  02199

Re:    Enterasys Networks, Inc. v. Foundry Networks, Inc., et al.

Dear Marc:

Enterasys' response to Foundry's Interrogatory No. 5 identifies invention disclosures and related documents with respect to the '205, '173, and '236 patents that Enterasys has withheld from production on the grounds of attorney-client privilege.  Foundry hereby demands immediate production of those documents.

With respect to invention disclosures, "[w]hether the attorney-client privilege applies should be determined on a case-by-case basis."  *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 805 (Fed. Cir. 2000).  "[T]he central inquiry is whether the communication is one that was made by a client to an attorney for the purpose of obtaining legal advice or services."  *Id.*  Enterasys has the burden of proof with respect to whether the documents in its possession are protected from disclosure by the attorney-client privilege.  *See, e.g., Automed Technologies, Inc. v. Knapp Logistics & Automation, Inc.*, 382 F. Supp. 2d 1372, 1375-76 (N.D. Ga. 2005) (holding that invention disclosure was not privileged); *W. R. Grace & Co.-Conn. v. Viskase Corp.*, 1991 WL 141131 (N.D. Ill. July 23, 1991) (same).

'205 Patent

Enterasys' interrogatory response states that inventor Ross Callon drafted "invention records" that contain information about the development of the alleged invention of the '205 patent.  Although Enterasys' interrogatory response states that the invention records were submitted to the in-house legal department of Digital Equipment Corp., the basis for that statement is not identified and the response contains insufficient information to support the privilege.  If Enterasys intends to assert the privilege with respect to these invention records, it should state the factual/evidentiary basis for its statement that the invention records were submitted to Digital's in-house counsel and provide details such as the date(s) of the submission(s), the name(s) of the in-house counsel to whom the submission(s) were made, the purpose of the submission(s), and whether the invention records were submitted or disclosed to anyone other than Digital's in-house counsel.



**ORRICK**

Marc N. Henschke
March 27, 2007
Page 2

Even if the '205 invention records were once privileged, Enterasys has waived the privilege by describing the contents of the invention records in its interrogatory response. The description is the subject of a full paragraph that fills a half-page of the response. It includes details about meetings, documents, and dates associated with the development of the invention, for which the invention records apparently are the only source of information. Furthermore, Enterasys has based its contention about the actual dates of conception and reduction to practice of the alleged invention of the '205 patent on information gleaned solely from the invention records.

Under these circumstances, Enterasys has waived the attorney-client privilege (assuming it applied in the first place) with respect to the invention records. Describing the contents of allegedly privileged documents in an interrogatory response can constitute a waiver. *See, e.g., Malco Mfg. Co. v. Elco Corp.*, 307 F. Supp. 1177, 1178-79 (E.D. Pa. 1969) (finding subject matter waiver in patent case based on interrogatory response that "revealed the gist of certain communications and, thereby, effected a partial disclosure of the contents"). A waiver may occur where, as here, the contents of allegedly privileged documents are summarized rather than quoted. *See, e.g., United States ex rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1250 (D. Md. 1995); *Chubb Integrated Sys. Ltd. v. National Bank of Wash.*, 103 F.R.D. 52, 63 (D.D.C. 1984) ("We will deem a document 'disclosed' where defendant has learned the 'gist' of the document's contents"); *Brackett v. Providian Ins. Group, Inc.*, 1996 WL 785739, *1 (E.D. Tenn. Nov. 19, 1996) ("[D]efendant has revealed the substance of the communications . . . . By revealing to plaintiff a summary of the communications . . ., defendant waived the attorney-client privilege."). A partial disclosure of a document or related series of documents waives the privilege with respect to the remainder. *See, e.g., Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.*, 62 F.R.D. 454, 457-58 (N.D. Ill. 1974) ("[W]hen a party's conduct reaches a certain point of disclosure fairness requires that the privilege should cease whether the party intended that result or not. A party cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final.") (citing 8 *Wigmore on Evidence* § 2327 (McNaughton rev. ed. 1961)).

'173 Patent

Enterasys also disclosed that inventor Barry Spinney drafted invention records for the '173 patent. Enterasys' interrogatory response states again that those records were submitted to Digital's in-house legal department, but the basis for that statement is not identified and the response contains insufficient information to support the privilege. If Enterasys intends to assert the privilege with respect to these invention records, it should provide the same type of additional information that is described above with respect to the '205 patent.



ORRICK

Marc N. Henschke
March 27, 2007
Page 3


<u>'236 Patent</u>

Enterasys has produced invention records drafted by inventor George Varghese for the '236 patent, according to Enterasys' interrogatory response. (*See* ETS0046342-58.)  Enterasys' response asserts that the invention records were privileged but that Enterasys has elected to produce them and thereby waive the privilege.  Enterasys claims that it "intends to effect only a limited waiver" of the privilege that does not extend "to the content of any other documents or communications among or between any combination of the '236 inventors, in-house counsel for Digital, or the outside prosecuting patent attorneys for Digital."  However, Enterasys cannot have it both ways:

> [S]elective waiver of the privilege may lead to the inequitable result that the waiving party could waive its privilege for favorable advice while asserting its privilege on unfavorable advice.  In such a case, the party uses the attorney-client privilege as both a sword and a shield.  To prevent such abuses, we recognize that when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege as to all such communications regarding the same subject matter.

*In re EchoStar Communications Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (citations omitted).  Thus, Enterasys must produce all other documents and communications related to the conception, development, or reduction to practice of the invention of the '236 patent, whether or not such documents and communications would otherwise have been subject to the attorney-client privilege and/or work product doctrine.  At a minimum, as an initial matter, Enterasys must identify all such documents and communications so that the parties can conduct a thorough meet-and-confer discussion regarding them.

Please let me know your availability to discuss these matters.

Very truly yours,

Matthew H. Poppe

cc:     Jeremy P. Oczek, Esq. (via email)
        Steven L. Walker, Esq. (via email)

EXHIBIT D

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

| ATTORNEYS AT LAW |
|---|

MARC N. HENSCHKE
mnhenschke@rkmc.com
617-859-2784

April 12, 2007

*VIA E-MAIL (PDF ATTACHMENT)*

Matthew H. Poppe, Esq.
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re: ***Enterasys Networks v. Foundry Networks and Extreme Networks***
      ***Civ. Act. No. 05-11298-DPW (D. Mass)***
      **Our File No.:  070610.0001**

Dear Matt:

We are in receipt of your letter to me dated March 27, 2007 containing a renewed demand by Foundry that Enterasys immediately produce invention records relating to certain of the patents-in-suit, irrespective of the facts that these records are clearly protected by attorney-client privilege and that Enterasys is not presently relying upon the contents of these records for any purpose in the above-referenced case.

As an initial matter, because you are relatively new to this case, we assume that you are unaware of the fact that the issue you now are raising have previously been briefed and argued to the Court.  Indeed, in a motion to compel filed by Foundry's co-defendant on September 22, 2006, Extreme specifically requested that Enterasys be compelled to produce any and all withheld invention records. After considering a full set of briefing and oral argument, the Court declined to grant any such requested relief. Accordingly, this issue has already been resolved and you are re-treading on old ground.

Nevertheless, as a courtesy to Foundry, we will attempt to parallel the organizational structure of your letter below and more fully respond to the contentions that you have made:

**'205 Patent**

We disagree with your contention that Enterasys has disclosed "insufficient information to support the privilege" being asserted relative to the '205 invention records. To the contrary, my Declaration filed with the Court on October 13, 2006, as well as Enterasys' supplemental interrogatory responses served on November 30, 2006, provided more than adequate information in this regard.

Matthew H. Poppe, Esq.
April 12, 2007
Page 2

To reiterate and amplify, it is clear from the face of the '205 invention records that: (i) on September 25, 1989, these records were submitted to Sue Goldman and Bob Stern who worked in conjunction with DEC's in-house Legal Department and its Distributed Systems Intellectual Property Committee; (ii) these records are accordingly stamped at the top of the first page with the legend "Received Law Dept."; and (iii) these records were submitted for the purposes of obtaining legal advice as to whether the claimed '205 inventions were in fact patentable, and to facilitate any efforts that DEC might undertake in terms of preparing and filing patent applications.

Your suggestion that Enterasys' interrogatory responses have somehow served to waive the attorney-client privilege by divulging "the gist" of the '205 invention records is frivolous. These invention records are comprised of a detailed disclosure concerning the subject matter of what later became the claimed '205 inventions. By contrast, Enterasys' interrogatory responses do not contain *any information whatsoever* pertaining to the content or nature of the disclosed subject matter. Rather, Enterasys has merely revealed a few facts concerning dates of possible inventive activities -- and nothing more -- which it was required to do by virtue of Foundry's interrogatories.

Finally, your assertion that Enterasys is "bas[ing] its contention[s] about the actual dates of conception and reduction to practice of the alleged invention[s]" on the '205 invention records is without merit. In its interrogatory responses, Enterasys expressly represents that it "does not presently intend to rely upon" these records "as direct evidence for establishing pre-application dates of conception or reduction to practice of the '205 inventions." As Enterasys further explains, unless it is able to obtain other "direct evidence to corroborate these actual conception and/or reduction to practice dates for the '205 inventions," it will rely upon the "application filing date to establish a constructive conception and reduction to practice date for the '205 inventions."

## '173 Patent

To reiterate and amplify what Enterasys has already disclosed in its supplemental interrogatory responses and my aforementioned Declaration, it is clear from the face of the '173 invention records that: (i) on July 8, 1992, these invention records were submitted to Deirdre Tyman and Sid Johnston who worked in conjunction with DEC's in-house Legal Department and its Distributed Systems Intellectual Property Committee; (ii) these records are accordingly stamped at the top of the first page with the legend "Received Law Dept."; and (iii) these records were submitted for the purposes of obtaining legal advice as to whether the claimed '173 inventions were in fact patentable, and to facilitate any efforts that DEC might undertake in terms of preparing and filing patent applications.

## '236 Patent

We strongly disagree with your assertions as to the purported scope of Enterasys' attorney-client waiver occasioned by producing the '236 invention records, which apparently are premised upon a misplaced reliance upon the EcoStar case that dealt with the use of opinions of counsel to defeat willfulness allegations, and which have no application here. In any event,

Matthew H. Poppe, Esq.
April 12, 2007
Page 3

however, for present purposes your assertions are moot because Enterasys is not known to be in possession, custody, or control of any other "documents and communications related to the conception, development, or reduction to practice of the invention[s] of the '236 patent."

Please feel free to contact us with any further questions or concerns.

Sincerely,

Marc N. Henschke

MNH:nah
cc:    I. Neel Chatterjee, Esq. (*VIA U.S. MAIL & EMAIL*)
        Jeremy P. Oczek, Esq. (*VIA EMAIL*)
        K. Mudurian (*VIA EMAIL*)
        Y. Steinberg (*VIA EMAIL*)

35038736

EXHIBIT E



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
*tel 650-614-7400*
*fax 650-614-7401*
WWW.ORRICK.COM

May 3, 2007

Matthew H. Poppe
(650) 614-7431
mpoppe@orrick.com

*VIA E-MAIL*

Marc N. Henschke, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA  02199

Re:     Enterasys Networks, Inc. v. Foundry Networks, Inc., et al.

Dear Marc:

I am responding to your letter dated April 12, 2007 regarding Enterasys' failure to produce invention disclosures and related documents.

First, you claim that the Court "declined to grant" Extreme's prior request for production of the withheld invention records, and therefore the issue has been resolved once and for all.  This is incorrect for several reasons:

- Having reviewed the transcript of the October 26, 2006 hearing, a more accurate description of the outcome is that the Court declined to rule one way or the other on Extreme's motion and implicitly deferred a decision to a later date.  Accordingly, it is entirely appropriate for Foundry to raise the issue now.

- Enterasys opposed Extreme's motion in part on the grounds that it was premature to order Enterasys to decide whether or not to rely on the invention disclosures because it did not yet have the defendants' invalidity contentions.  To the extent that argument previously had any merit, it no longer applies because invalidity contentions have been served.

- Extreme did not make one of Foundry's arguments, which is that the extent of the disclosure in Enterasys' interrogatory responses supports a finding that Enterasys has waived any privilege that may previously have applied to the invention disclosures.  Thus, the Court has not had the opportunity to consider that argument.  Furthermore, after the hearing, Enterasys supplemented its response to Interrogatory No. 5 to add more information about the contents of the invention disclosures.  You also filed a declaration containing information about the contents of the invention disclosures. The supplemental interrogatory response and the declaration constitute new waivers of privilege that the Court has not considered.



ORRICK

Marc N. Henschke
May 3, 2007
Page 2

Having reviewed the October 26, 2006 hearing transcript, it is also now apparent that Enterasys failed to comply with the Court's order giving Enterasys one month to amend its interrogatory responses to provide "specific dates" of conception and reduction to practice for each of the patents-in-suit. Enterasys did not provide specific dates. Instead, Enterasys provided ranges of dates and left it open whether Enterasys would rely on dates within those ranges or simply rely on the filing dates of the patent applications. Accordingly, Enterasys is in violation of the Court's order. To eliminate any prejudice to Foundry resulting from this violation, please confirm that Enterasys will not seek to prove any date of conception or reduction to practice of the inventions of any of the patents-in-suit prior to the filing dates of the corresponding patent applications. Should Enterasys not provide such confirmation, we intend to bring the matter to the Court's attention.

'205 Patent

Your letter states in conclusory fashion that the invention disclosures related to the '205 patent were submitted to Digital's in-house legal department for the purpose of obtaining legal advice and to facilitate the preparation of patent applications. However, you identify no evidence to support this conclusion. Furthermore, if the invention disclosure was prepared and/or used for other purposes in addition to receiving legal advice, then the fact that the document was also provided to counsel cannot be used to shield it from discovery. Without evidence on these points, Enterasys' claim of privilege will not be upheld.

In addition, your argument that no waiver has occurred is unpersuasive. You say that Enterasys did nothing more than disclose information called for by an interrogatory response. However, if a response to an interrogatory "reveal[s] the gist of certain [privileged] communications," it waives the privilege with respect to those communications. *See, e.g., Malco Mfg. Co. v. Elco Corp.*, 307 F. Supp. 1177, 1178-79 (E.D. Pa. 1969). That is what Enterasys has done here.

'173 Patent

As with the '205 invention records, Enterasys has identified no evidence to support its conclusory statement that the invention records were submitted for the purpose of obtaining legal advice. Thus, Enterasys' claim of privilege has no evidentiary basis.

'236 Patent

Based on your representation that Enterasys is not in possession, custody, or control of any other documents or communications related to the conception, development, or reduction to practice of the inventions of the '236 patent, Foundry will not pursue this issue further with respect to the '236 patent.



Marc N. Henschke
May 3, 2007
Page 3

Please let me know your availability to discuss these matters so we can complete the meet-and-confer process and move forward with a motion to compel if necessary.

Very truly yours,

Matthew H. Poppe

cc:    Jeremy P. Oczek, Esq. (via email)
       Steven L. Walker, Esq. (via email)

EXHIBIT F
PART 1 OF 2

One International Place
Boston, MA 02110-2600
Telephone 617.526.9600
Fax 617.526.9899

NEW YORK
LOS ANGELES
WASHINGTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

# PROSKAUER ROSE LLP

**Jeremy P. Oczek**
Attorney at Law

Direct Dial 617-526-9651
joczek@proskauer.com

March 3, 2006

**<u>Via Hand Delivery</u>**

Christopher P. Sullivan, Esq.
Marc N. Henschke, Esq.
Alan E. McKenna, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA 02199

**Re:    Enterasys Networks, Inc. v. Foundry Networks, Inc.** *et al.*
          **Civil Action No. 05-11928-DPW**

Dear Counsel:

Enclosed is a service copy of Foundry Networks, Inc.'s First Request for Production of Documents and Things to Plaintiff Enterasys Networks, Inc.

Very truly yours,

*Jeremy P. Oczek*

Jeremy P. Oczek

Enclosure

cc:    Counsel of Record for Plaintiff (via e-mail)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

ENTERASYS NETWORKS, INC,

        Plaintiff,

     v.

FOUNDRY NETWORKS, INC. and
EXTREME NETWORKS, INC.,

        Defendants.

Civil Action No. 05-CV-11298 (DPW)

## FOUNDRY NETWORKS, INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS AND THINGS TO PLAINTIFF ENTERASYS NETWORKS, INC.

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, defendant Foundry Networks, Inc. hereby requests that plaintiff Enterasys Networks, Inc. produce and allow copying of the DOCUMENTS and things requested herein at the offices of Proskauer Rose LLP, One International Place, Boston, MA 02110 within thirty days after service of these requests. These requests are intended to be continuing in nature as to require the addition of supplemental information under the terms and conditions set forth in Federal Rule of Civil Procedure 26(e).

## DEFINITIONS

A.    "ACCUSED FOUNDRY PRODUCTS" refers to any and all products accused of infringement by ENTERASYS. If this term is used in connection with a specific patent or patents, then it refers to any and all products accused by ENTERASYS of infringing the specified patent or patents.

B.    "ALL" shall be understood to include and encompass "ANY." As used herein, the singular shall always include the plural and the present tense also shall include the past tense. The words "AND" as well as "OR" shall be construed disjunctively or conjunctively as necessary to bring within the scope of this request ALL DOCUMENTS or things that might otherwise be construed to be outside its scope.

C.     "COMMUNICATION" means ANY contact, oral or documentary, formal or informal, at ANY time or place and under ANY circumstances whatsoever whereby information of ANY nature is transmitted or transferred, including but not limited to electronic COMMUNICATIONS.

D.     The term "COMPLAINT" refers to the COMPLAINT for Patent INFRINGEMENT filed by Enterasys against FOUNDRY on or about June 21, 2005.

E.     "DOCUMENTS" means the originals, and ANY and ALL non-identical copies and drafts of ANY and ALL writings, as defined by Federal Rule of EVIDENCE 1001 to mean anything consisting "of letters, words, or numbers, or their equivalent, set down by handwriting, typewriting, printing, Photostatting, photographing, magnetic impulse, mechanical or electronic recording, or other form of data compilation," and including, but not limited to, ALL contracts, policy statements, manuals, telephone messages, checks, correspondence, letters, telegrams, notes, mailgrams, minutes of ANY meetings, agendas, memoranda, interoffice COMMUNICATIONS, reports, studies, forecasts, working papers, charts, expense account reports, ledgers, journals, financial statements, statements of account, calendars, appointment books, diaries, drawings, diagrams, graphs, schematics, specifications, blueprints, layouts, mask sets, photographs, sound recordings, video recordings, computer DOCUMENTS, computer disks, materials on a computer hard drive, electronic mail, PDA records, records created or maintained in other electronic devices, or ANY other tangible things.  The term "DOCUMENT" also means originals, copies and drafts of ALL of the above upon which notations in writing, print, or otherwise have been made that do not appear on the originals.

F.     The term "DATE" means the day, month, and year, if ascertainable and if not, the best approximation thereof including in relation to other events.

G.     "DUE DILIGENCE" means ANY efforts, conversations, reviews of documentation or investigations of ANY kind into the title, utility, validity, value, strategic value or commercial usefulness of patents, applications for patents, or other assets prior to the acquisition of those patents, applications, or assets.

H.      The term "EVIDENCE" or ANY variant thereof, including but not limited to "EVIDENCING," when used in connection with ANY DOCUMENT, shall be understood to apply if the DOCUMENT directly or indirectly mentions, discusses, constitutes, concerns, supports, contradicts, relates to, refers to, or in ANY other way deals with the subject matter described in the request in which the term appears.

I.      "FILING DATE" refers to the filing DATE on which a patent application is filed with the U.S. Patent and Trademark Office.

J.      "FOUNDRY" means defendant Foundry Networks, Inc., its officers, directors, attorneys and employees, and ALL other PERSONS representing it or acting on its behalf.

K.      "INFRINGE" or ANY variant thereof, including but not limited to "INFRINGING" and "INFRINGEMENT," refers to ANY infringement pursuant to 35 U.S.C. § 271 whether direct, indirect, contributory or by inducement.

L.      The term "CABLETRON" refers to and includes Cabletron Systems, Inc., and ANY past or present divisions, affiliates, predecessors, successors, assigns, officers, directors, parents, subsidiaries, agents, servants, employees, investigators, attorneys and ALL other PERSONS acting or purporting to act for ANY of them or on their behalf.

M.      The terms "DIGITAL EQUIPMENT CORPORATION", and "DEC" refer to and include Digital Equipment Corporation of Maynard, Massachusetts, and ANY past or present divisions, affiliates, predecessors, successors, assigns, officers, directors, parents, subsidiaries, agents, servants, employees, investigators, attorneys and ALL other PERSONs and entities acting or purporting to act for ANY of them or on their behalf.

N.      The term "RIVERSTONE NETWORKS" refers to and includes Riverstone Networks of Santa Clara, California, and ANY past or present divisions, affiliates, predecessors, successors, assigns, officers, directors, parents, subsidiaries, agents, servants, employees, investigators, attorneys and ALL other PERSONS acting or purporting to act for ANY of them or on their behalf.

O.    The terms "ENTERASYS," "PLAINTIFF," "YOU," and "YOUR" refer to and include Enterasys Networks, Inc., and ANY past or present divisions, affiliates, predecessors, successors, assigns, officers, directors, parents, subsidiaries, agents, servants, employees, investigators, attorneys and ALL other PERSONS acting or purporting to act for ANY of them or on their behalf.

P.    The terms "CISCO", and "CISCO SYSTEMS" refer to and include Cisco Systems, Inc. of 170 West Tasman Drive, San Jose, California, and ANY past or present divisions, affiliates, predecessors, successors, assigns, officers, directors, parents, subsidiaries, agents, servants, employees, investigators, attorneys and ALL other PERSONS acting or purporting to act for ANY of them or on their behalf.

Q.    The term "PATENTS-IN-SUIT" refers to U.S. Patent Nos. 5,251,205 ("the '205 patent"), 5,390,173 ("the '173 patent"), 6,128,665 ("the '665 patent"), 6,147,995 ("the '995 patent"), 6,539,022 ("the '022 patent"), and 6,560,236 ("the '236 patent").

R.    The term "ENTERASYS PATENTS" refers to the PATENTS-IN-SUIT as well as ALL patents, patent applications, continuation applications, continuation in part applications, and divisional applications, whether published or unpublished, U.S. or foreign, that cite the PATENTS-IN-SUIT, incorporate them by reference or otherwise, claim priority to these patent applications or are used as a basis for the priority date for these patent applications.

S.    "ENTERASYS PRODUCTS" means ANY product, apparatus, device, system, technology, prototype, method, or service (whether experimental or not, or whether reduced to practice or not) used, manufactured, tested, offered for sale, sold, or licensed by or for ENTERASYS.

T.    "DIGITAL EQUIPMENT CORPORATION PRODUCTS" means ANY product, apparatus, device, system, technology, prototype, method, or service (whether experimental or not, or whether reduced to practice or not) used, manufactured, tested, offered for sale, sold, or licensed by or for ENTERASYS.

U.    "CABLETRON PRODUCTS" means ANY product, apparatus, device, system, technology, prototype, method, or service (whether experimental or not, or whether reduced to practice or not) used, manufactured, tested, offered for sale, sold, or licensed by or for ENTERASYS.

V.    The term "PERSON" means ANY individual, corporation, partnership, joint venture, firm, association, group, organization, proprietorship, governmental body, or ANY other entity of ANY nature.

W.    The term "PRIOR ART" refers, by way of example and without limitation, to the subject matter described in 35 U.S.C. §§ 102 and 103, including without limitation, publications, physical products, devices, prototypes, uses, sales, and offers for sale and ANY DOCUMENT or thing EVIDENCING ANY of the foregoing.

X.    The term "RELATE" or ANY variant thereof, including but not limited to "RELATING" and "RELATING TO," when used in connection with ANY DOCUMENT, shall be understood to apply if the DOCUMENT directly or indirectly evidences, mentions, discusses, constitutes, concerns, supports, contradicts, refers to, or in ANY other way deals with the subject matter described in the request in which the term "RELATE," or ANY variant thereof, appears.

Y.    The term "PATENTS-IN-SUIT" refers collectively to the '205 patent, the '173 patent, the '665 patent, the '995 patent, the '022 patent and the '236 patent.

Z.    The term "INDUSTRY STANDARD" means any standard or RFC associated with data networking technology, including but not limited to IEEE and IETF standards.

## DOCUMENT REQUESTS

1.    ALL DOCUMENTS identified in ENTERASYS' Federal Rule 26 Disclosures.

2.    ALL DOCUMENTS relied upon or referred to in preparing the COMPLAINT in this action.

3.    ALL DOCUMENTS RELATING TO FOUNDRY.

4.    ALL DOCUMENTS RELATING TO ACCUSED FOUNDRY PRODUCTS.

5.     ALL DOCUMENTS RELATING TO the ENTERASYS PATENTS, including but not limited to, all file histories or related patents and foreign counterparts.

6.     ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ENTERASYS' use of each of the alleged inventions described in each claim of each PATENT-IN-SUIT.

7.     ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING the conception, design, development, reduction to practice or diligence in the reduction to practice of each alleged invention of each PATENT-IN-SUIT, including without limitation, the first drawing or sketch of each such alleged invention, the first written description of each such alleged invention, ANY discussion by ANY ENTERASYS committee, or PERSON on the need or acceptability of patenting the alleged invention, and the first disclosure of each such alleged invention to ANY PERSON other than an alleged inventor thereof, also including but not limited to, ALL DOCUMENTS concerning inventorship of the subject matter of each claim of each PATENT-IN-SUIT.

8.     ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING the corroboration of the conception, design, development, reduction to practice or diligence in the reduction to practice of each alleged invention of each PATENT-IN-SUIT.

9.     For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO each and every claim that ENTERASYS contends is infringed by ACCUSED FOUNDRY PRODUCTS.

10.     For each asserted claim in each of the PATENTS-IN-SUIT, ALL DOCUMENTS and things that EVIDENCE, refer or RELATE TO each ACCUSED FOUNDRY PRODUCT that ENTERASYS contends INFRINGES on the claim.

11.     For each asserted claim in each of the PATENTS-IN-SUIT, ALL DOCUMENTS and things that EVIDENCE, refer or RELATE TO ANY and ALL ENTERASYS PRODUCTS that use, in whole or in part, the alleged invention.

12.    ALL DOCUMENTS that EVIDENCE, refer or RELATE TO the DATES of the conception and actual reduction to practice for each of the claims in each of the PATENTS-IN-SUIT.

13.    ALL DOCUMENTS that EVIDENCE, refer or RELATE TO the inventor(s) for each of the claims in each of the PATENTS-IN-SUIT.

14.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ANY embodiments of the alleged invention of ANY of the PATENTS-IN-SUIT that were not disclosed to the U.S. Patent and Trademark Office, including but not limited to ANY drawings, schematics, illustrations, writings, specifications, data sheets, and technical manuals.

15.    ALL DOCUMENTS and things referring or RELATING TO knowledge by ENTERASYS of the alleged INFRINGEMENT by FOUNDRY of one or more claims of ANY of the PATENTS-IN-SUIT, including but not limited to, DOCUMENTS constituting, RELATING TO or EVIDENCING the acquisition of ANY ACCUSED FOUNDRY PRODUCTS, also including but not limited to, DOCUMENTS constituting, RELATING TO or EVIDENCING ENTERASYS' knowledge or acquisition of knowledge, suspicion, investigation, or conclusion that FOUNDRY used, manufactured, sold, or offered for sale ANY products that ENTERASYS contends employs ANY alleged invention of ANY claim of the PATENTS-IN-SUIT.

16.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ANY notices, warnings or charges of INFRINGEMENT considered by or made by ENTERASYS to FOUNDRY in connection with ANY of the ENTERASYS PATENTS.

17.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ANY COMMUNICATIONS, oral or in writing, between ENTERASYS and FOUNDRY.

18.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING the alleged INFRINGEMENT by FOUNDRY of one or more claims in ANY of the ENTERASYS PATENTS.

19.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING information ENTERASYS possessed prior to the filing of the COMPLAINT with respect to the construction or operation of ACCUSED FOUNDRY PRODUCTS, including without limitation, ANY information which ENTERASYS contends provided a basis for making such a charge of INFRINGEMENT.

20.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ANY comparison of the structure, function, or operation of ENTERASYS PRODUCTS that use ANY alleged invention within the scope of ANY of the claims in ENTERASYS PATENTS on the one hand and on the other, ACCUSED FOUNDRY PRODUCTS or ANY standard that such ACCUSED FOUNDRY PRODUCTS allegedly implement.

21.    ALL DOCUMENTS constituting, EVIDENCING or RELATING TO the invention, design, engineering, development, testing or operation of ANY ENTERASYS PRODUCT that implements any invention within the scope of ANY of the claims in the ENTERASYS PATENTS.

22.    ALL DOCUMENTS constituting, EVIDENCING or RELATING TO the invention, design, engineering, development, testing or operation of ANY DIGITAL EQUIPMENT CORPORATION PRODUCT that is allegedly within the scope of ANY of the claims in the ENTERASYS PATENTS.

23.    ALL DOCUMENTS constituting, EVIDENCING or RELATING TO the invention, design, engineering, development, testing or operation of ANY CABLETRON PRODUCT that is allegedly within the scope of ANY of the claims in the ENTERASYS PATENTS.

24.    ALL DOCUMENTS RELATING TO all instructional materials, operator manuals, datasheets and other materials prepared for distribution or actually distributed to customers with or RELATING TO ANY ENTERASYS PRODUCT that implements any invention within the scope of ANY of the claims in the ENTERASYS PATENTS, including but not limited to, all draft versions of the same.

25.     ALL DOCUMENTS RELATING TO all instructional materials, operator manuals, datasheets and other materials prepared for distribution or actually distributed to customers with or RELATING TO ANY DIGITAL EQUIPMENT CORPORATION PRODUCT that implements any invention within the scope of ANY of the claims in the ENTERASYS PATENTS, including but not limited to, all draft versions of the same.

26.     ALL DOCUMENTS RELATING TO all instructional materials, operator manuals, datasheets and other materials prepared for distribution or actually distributed to customers with or RELATING TO ANY CABLETRON PRODUCT that implements any invention within the scope of ANY of the claims in the ENTERASYS PATENTS, including but not limited to, all draft versions of the same.

27.     All DOCUMENTS and things RELATING TO ANY ENTERASYS PRODUCT that uses ANY alleged invention within the scope of ANY of the claims in the ENTERASYS PATENTS, including but not limited to, schematics, specification sheets, technical specifications, data sheets, software and price lists.

28.     All DOCUMENTS and things RELATING TO ANY DIGITAL EQUIPMENT CORPORATION PRODUCT that uses ANY alleged invention within the scope of ANY of the claims in the ENTERASYS PATENTS, including but not limited to, schematics, specification sheets, technical specifications, data sheets, software and price lists.

29.     All DOCUMENTS and things RELATING TO ANY CABLETRON PRODUCT that uses ANY alleged invention within the scope of ANY of the claims in the ENTERASYS PATENTS, including but not limited to, schematics, specification sheets, technical specifications, data sheets, software and price lists.

30.     Three (3) operative exemplars of each version of ANY ENTERASYS PRODUCTS that use ANY alleged invention within the scope of ANY of the claims in the ENTERASYS PATENTS.

31.     ALL DOCUMENTS that concern, RELATE TO, EVIDENCE or describe ANY term used in ANY claim of the PATENTS-IN-SUIT.

32.    ALL DOCUMENTS RELATING TO the interpretation, scope or construction of each term within ANY of the claims in the PATENTS-IN-SUIT.

33.    ALL DOCUMENTS RELATING TO ANY study, evaluation or analysis by or on behalf of ENTERASYS that ANY FOUNDRY PRODUCT might INFRINGE ANY ENTERASYS PATENT, regardless of the results of such evaluation or analysis.

34.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ANY study, evaluation, or analysis by or on behalf of ENTERASYS that ANY PRODUCT of ANY PERSON other than FOUNDRY might INFRINGE ANY ENTERASYS PATENT, including without limitation, ANY notice, warnings or charge of INFRINGEMENT to ANY such PERSON.

35.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ANY lawsuit, or the decision to bring such lawsuit, alleging INFRINGEMENT by ANY PERSON other than FOUNDRY of one or more claims of ANY of the ENTERASYS PATENTS.

36.    ALL DOCUMENTS and things produced by or to ENTERASYS or that will be produced by or to ENTERASYS in ANY civil action other than this action alleging INFRINGEMENT or involving a declaratory judgment of non-INFRINGEMENT, invalidity or unenforceability concerning one or more claims of ANY of the ENTERASYS PATENTS, including without limitation, deposition transcripts, motions for summary judgment and supporting and opposing memoranda and proofs (affidavits, declarations, exhibits, and the like).

37.    For each of the ENTERASYS PATENTS, ALL DOCUMENTS constituting or RELATING TO ANY charge of INFRINGEMENT made by ENTERASYS to ANY other PERSON and ALL DOCUMENTS RELATING TO ANY subsequent negotiations or COMMUNICATIONS RELATING TO ANY such charge.

38.    For each of the ENTERASYS PATENTS, ALL DOCUMENTS constituting or RELATING TO ANY charge of INFRINGEMENT made by DIGITAL EQUIPMENT

CORPORATION to ANY other PERSON and ALL DOCUMENTS RELATING TO ANY subsequent negotiations or COMMUNICATIONS RELATING TO ANY such charge.

39.    For each of the ENTERASYS PATENTS, ALL DOCUMENTS constituting or RELATING TO ANY charge of INFRINGEMENT made by CABLETRON to ANY other PERSON and ALL DOCUMENTS RELATING TO ANY subsequent negotiations or COMMUNICATIONS RELATING TO ANY such charge.

40.    For each of the ENTERASYS PATENTS, ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING the scope, validity or invalidity, INFRINGEMENT or noninfringement, or enforceability or unenforceability of each such patent, and ANY study, search, investigation, or opinion RELATING TO such topics.

41.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ANY lawsuit, arbitration or other legal proceeding involving ANY foreign patent corresponding or related to, in whole or in part, ANY of the ENTERASYS PATENTS.

42.    ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ENTERASYS' first awareness of ANY alleged INFRINGEMENT or potential alleged INFRINGEMENT by FOUNDRY of each of the PATENTS-IN-SUIT.

43.    ALL technical articles, publications, presentations, and the like, authored, presented by, or in the possession of ANY inventor of ANY of the PATENTS-IN-SUIT.

44.    ALL textbooks, articles, journals, or other publications of ANY kind RELATING in ANY way to each of the alleged inventions described in each claim of each ENTERASYS PATENT.

45.    For each of the ENTERASYS PATENTS, ALL printed publications RELATING TO the ENTERASYS PATENT and predate the FILING DATE of such patent.

46.    For each of the ENTERASYS PATENTS, ALL DOCUMENTS RELATING TO the first offer for sale of ANY ENTERASYS PRODUCT, implementing or embodying, in whole or in part, the alleged invention of any claim of such ENTERASYS PATENT, and ALL other such offers within the following year.

47.    For each of the ENTERASYS PATENTS, ALL DOCUMENTS RELATING TO the first offer for sale of ANY DIGITAL EQUIPMENT CORPORATION PRODUCT, implementing or embodying, in whole or in part, the alleged invention of any claim of such ENTERASYS PATENT, and ALL other such offers within the following year.

48.    For each of the ENTERASYS PATENTS, ALL DOCUMENTS RELATING TO the first offer for sale of ANY CABLETRON PRODUCT, implementing or embodying, in whole or in part, the alleged invention of any claim of such ENTERASYS PATENT, and ALL other such offers within the following year.

49.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO the first actual sale of ANY ENTERASYS PRODUCT implementing or embodying, in whole or in part, the alleged invention of any claim of such PATENT-IN-SUIT and ALL other such sales within the following year.

50.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO the first actual sale of ANY DIGITAL EQUIPMENT CORPORATION PRODUCT implementing or embodying, in whole or in part, the alleged invention of any claim of such PATENT-IN-SUIT and ALL other such sales within the following year.

51.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO the first actual sale of ANY CABLETRON PRODUCT implementing or embodying, in whole or in part, the alleged invention of any claim of such PATENT-IN-SUIT and ALL other such sales within the following year.

52.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO the first use, disclosure, display, demonstration, preview, or exhibit of ANY ENTERASYS PRODUCT that uses or has ever used, in whole or in part, the alleged invention of any claim of such PATENT-IN-SUIT.

53.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO the first use, disclosure, display, demonstration, preview, or exhibit of ANY DIGITAL

EQUIPMENT CORPORATION PRODUCT that uses or has ever used, in whole or in part, the alleged invention of any claim of such PATENT-IN-SUIT.

54.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO the first use, disclosure, display, demonstration, preview, or exhibit of ANY CABLETRON PRODUCT that uses or has ever used, in whole or in part, the alleged invention of any claim of such PATENT-IN-SUIT.

55.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING testing, developmental, experimental or research activities with respect to each alleged invention of each PATENT-IN-SUIT, including without limitation, such activities RELATING TO the design, construction, and operation of the first device, apparatus, product, model, system, method, or prototype to operate for the intended purpose of each such alleged invention and to ANY antecedent device, apparatus, product, model, system, method, or prototype thereof.

56.    DOCUMENTS sufficient to identify ALL PERSONS who participated in the design, development, implementation, debugging, testing, or evaluation of ANY ENTERASYS PRODUCT, implementing or embodying, in whole or in part, the alleged invention of any claim of the PATENTS-IN-SUIT.

57.    DOCUMENTS sufficient to identify ALL PERSONS who participated in the design, development, implementation, debugging, testing, or evaluation of ANY DIGITAL EQUIPMENT CORPORATION PRODUCT, implementing or embodying, in whole or in part, the alleged invention of any claim of the PATENTS-IN-SUIT.

58.    DOCUMENTS sufficient to identify ALL PERSONS who participated in the design, development, implementation, debugging, testing, or evaluation of ANY CABLETRON PRODUCT, implementing or embodying, in whole or in part, the alleged invention of any claim of the PATENTS-IN-SUIT.

59.    ALL DOCUMENTS RELATING TO the earliest description, in whole or in part, of the alleged invention of each claim of each of the PATENTS-IN-SUIT.

60.    For each inventor named on each of the PATENTS-IN-SUIT, ALL lab notebooks, notes, experimentation documentation, results and other writings of such inventor.

61.    ALL DOCUMENTS RELATING TO the functions, methods of operation and results of the alleged invention of ANY claim of the PATENTS-IN-SUIT.

62.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO COMMUNICATIONS between ENTERASYS and ANY purchaser, user, developer, or licensee (as to each, both potential and actual) of ANY product, implementing or embodying, in whole or in part, ANY alleged invention of ANY of the claims of the PATENTS-IN-SUIT.

63.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO COMMUNICATIONS between DIGITAL EQUIPMENT CORPORATION and ANY purchaser, user, developer, or licensee (as to each, both potential and actual) of ANY product, implementing or embodying, in whole or in part, ANY alleged invention of ANY of the claims of the PATENTS-IN-SUIT.

64.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO COMMUNICATIONS between CABLETRON and ANY purchaser, user, developer, or licensee (as to each, both potential and actual) of ANY product, implementing or embodying, in whole or in part, ANY alleged invention of ANY of the claims of the PATENTS-IN-SUIT.

65.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO the design or development of ANY ENTERASYS product, implementing or embodying, in whole or in part, ANY alleged invention of ANY of the claims of ANY of the PATENTS-IN-SUIT.

66.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO the design or development of ANY DIGITAL EQUIPMENT CORPORATION PRODUCT, implementing or embodying, in whole or in part, ANY alleged invention of ANY of the claims of ANY of the PATENTS-IN-SUIT.

67.     For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO the design or development of ANY CABLETRON PRODUCT, implementing or embodying, in whole or in part, ANY alleged invention of ANY of the claims of ANY of the PATENTS-IN-SUIT.

68.     For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO promotional literature or other materials prepared or disseminated for ENTERASYS products that incorporate any of the alleged inventions of ANY of the claims of ANY of the PATENTS-IN-SUIT prior to its FILING DATE, including but not limited to, announcements, leaflets, pamphlets, PRODUCT specification sheets, PRODUCT brochures, PRODUCT manuals, and advertising, and ALL drafts and ALL other DOCUMENTS RELATING TO the preparation of ANY of the foregoing.

69.     For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO promotional literature or other materials prepared or disseminated for DIGITAL EQUIPMENT CORPORATION PRODUCTS that incorporate any of the alleged inventions of ANY of the claims of ANY of the PATENTS-IN-SUIT prior to its FILING DATE, including but not limited to, announcements, leaflets, pamphlets, PRODUCT specification sheets, PRODUCT brochures, PRODUCT manuals, and advertising, and ALL drafts and ALL other DOCUMENTS RELATING TO the preparation of ANY of the foregoing.

70.     For each of the PATENTS-IN-SUIT, ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO promotional literature or other materials prepared or disseminated for CABLETRON PRODUCTS that incorporate any of the alleged inventions of ANY of the claims of ANY of the PATENTS-IN-SUIT prior to its FILING DATE, including but not limited to, announcements, leaflets, pamphlets, PRODUCT specification sheets, PRODUCT brochures, PRODUCT manuals, and advertising, and ALL drafts and ALL other DOCUMENTS RELATING TO the preparation of ANY of the foregoing.

71.     For each of the PATENTS-IN-SUIT, ALL publications, technical DOCUMENTS, promotional literature, announcements, or other materials that RELATE TO

-15-

ANY ENTERASYS PRODUCT, that embodies or implements, in whole or in part, ANY of the alleged inventions of ANY of the claims of ANY of the PATENTS-IN-SUIT.

72.    For each of the PATENTS-IN-SUIT, ALL publications, technical DOCUMENTS, promotional literature, announcements, or other materials that RELATE TO ANY DIGITAL EQUIPMENT CORPORATION PRODUCT, that embodies or implements, in whole or in part, ANY of the alleged inventions of ANY of the claims of ANY of the PATENTS-IN-SUIT.

73.    For each of the PATENTS-IN-SUIT, ALL publications, technical DOCUMENTS, promotional literature, announcements, or other materials that RELATE TO ANY CABLETRON PRODUCT, that embodies or implements, in whole or in part, ANY of the alleged inventions of ANY of the claims of ANY of the PATENTS-IN-SUIT.

74.    For each of the inventors of each of the ENTERASYS PATENTS, ALL DOCUMENTS sufficient to show or identify the period of employment, affiliation, or association with ENTERASYS, including the DATES of hire and termination of such employment, affiliation, or association, and ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO the employment files of each such inventor.

75.    For each of the inventors of each of the ENTERASYS PATENTS, ALL DOCUMENTS sufficient to show or identify the period of employment, affiliation, or association with DIGITAL EQUIPMENT CORPORATION PRODUCT, including the DATES of hire and termination of such employment, affiliation, or association, and ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO the employment files of each such inventor.

76.    For each of the inventors of each of the ENTERASYS PATENTS, ALL DOCUMENTS sufficient to show or identify the period of employment, affiliation, or association with CABLETRON, including the DATES of hire and termination of such employment, affiliation, or association, and ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO the employment files of each such inventor.

77.    For each of the inventors of each of the ENTERASYS PATENTS, DOCUMENTS sufficient to show current residence address of each such inventor.

78.    For each of the inventors of each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO the inventor's involvement or contributions to conception and actual reduction to practice, in whole or in part, of the alleged invention described or claimed in his or her patent(s).

79.    For each of the inventors of each of the ENTERASYS PATENTS, ALL DOCUMENTS that RELATE TO the DATES of the inventor's involvement or contributions from conception to actual reduction to practice of the alleged invention described or claimed in his or her patent(s).

80.    ALL DOCUMENTS RELATING TO ENTERASYS' diligence or lack thereof in its alleged reduction to practice of the alleged invention of each claim of each of the PATENTS-IN-SUIT.

81.    ALL DOCUMENTS RELATING TO DIGITAL EQUIPMENT CORPORATION'S diligence or lack thereof in its alleged reduction to practice of the alleged invention of each claim of each of the PATENTS-IN-SUIT.

82.    ALL DOCUMENTS RELATING TO CABLETRON 'S diligence or lack thereof in its alleged reduction to practice of the alleged invention of each claim of each of the PATENTS-IN-SUIT.

83.    ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO COMMUNICATIONS between DIGITAL EQUIPMENT CORPORATION and ANY PERSON RELATING TO the GIGAswitch product.

84.    ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO ANY sales, offers for sale, sales inquiries, or purchase inquiries of the GIGAswitch of DIGITAL EQUIPMENT CORPORATION before October 22, 1992.

85.     ALL DOCUMENTS that EVIDENCE, refer or RELATE TO ANY and ALL PERSONs or customers who purchased the GIGAswitch, either directly or indirectly, from DIGITAL EQUIPMENT CORPORATION before October 22, 1992.

86.     ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO COMMUNICATIONS between DIGITAL EQUIPMENT CORPORATION and ANY PERSON RELATING TO the DEChub Multiswitch 900 product.

87.     ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO ANY sales, offers for sale, sales inquiries, or purchase inquiries of the DEChub Multiswitch 900 of DIGITAL EQUIPMENT CORPORATION before April 26, 1999.

88.     ALL DOCUMENTS that EVIDENCE, refer or RELATE TO ANY and ALL PERSONS or customers who purchased the DEChub Multiswitch 900, either directly or indirectly, from DIGITAL EQUIPMENT CORPORATION before April 26, 1999.

89.     ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO COMMUNICATIONS between CISCO SYSTEMS and ANY PERSON RELATING TO the Cisco Catalyst 5000 Modular Multilayer-Capable Switching System product.

90.     ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO ANY sales, offers for sale, sales inquiries, or purchase inquiries of the Cisco Catalyst 5000 Modular Multilayer-Capable Switching System of CISCO SYSTEMS before April 26, 1999.

91.     ALL DOCUMENTS that EVIDENCE, refer or RELATE TO ANY and ALL PERSONS or customers who purchased the Cisco Catalyst 5000 Modular Multilayer-Capable Switching System, either directly or indirectly, from Cisco Systems, Inc. before April 26, 1998.

92.     ALL DOCUMENTS RELATING TO the GIGAswitch of DIGITAL EQUIPMENT CORPORATION.

93.     ALL DOCUMENTS RELATING TO the DEChub Multiswitch 900 product of DIGITAL EQUIPMENT CORPORATION.

94.     ALL DOCUMENTS RELATING TO the Cisco Catalyst 5000 Modular Multilayer-Capable Switching System product of CISCO SYSTEMS.

-18-

95. ALL DOCUMENTS RELATING TO or EVIDENCING the U.S. applications for the PATENTS-IN-SUIT, including ANY requests for reexamination and reissue, including without limitation, ALL drafts of such applications or requests, the complete prosecution file for each such application, and ALL applications from which ANY PATENT-IN-SUIT may claim priority, ALL DOCUMENTS considered in connection with the preparation and prosecution of such applications or requests, and ALL DOCUMENTS that passed in either direction between ANY of ENTERASYS' outside counsel, personnel or inventors, including without limitation, to or from the patentees, and to or from each patent attorney or agent in connection with or concerning the applications, prosecution of the applications, or statements made to the U.S. Patent and Trademark Office.

96. ALL DOCUMENTS RELATING TO ANY patent application filed by ENTERASYS anywhere in the world RELATING TO ANY claim of the PATENTS-IN-SUIT.

97. ALL DOCUMENTS RELATING TO ANY patent application filed by DIGITAL EQUIPMENT CORPORATIONanywhere in the world RELATING TO ANY claim of the PATENTS-IN-SUIT.

98. ALL DOCUMENTS RELATING TO ANY patent application filed by CABLETRON anywhere in the world RELATING TO ANY claim of the PATENTS-IN-SUIT.

99. ALL DOCUMENTS RELATING TO or EVIDENCING the preparation or prosecution of each foreign patent application corresponding, in whole or in part, to the U.S. applications, including requests for reexamination and reissue, for each PATENT-IN-SUIT, including without limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference, opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for each such foreign application.

100.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY decision or COMMUNICATION to bring or not to bring ANY information or material to the attention of the U.S. Patent and Trademark Office, either prior to, during or after the prosecution of the applications, including requests for reexamination or reissue, for each of the PATENTS-IN-SUIT.

101.    ALL DOCUMENTS RELATING TO (a) PRIOR ART or potential PRIOR ART to the PATENTS-IN-SUIT; (b) pre-existing PRODUCTS, systems, methods, or descriptions that RELATE TO the subjects of the alleged inventions of the PATENTS-IN-SUIT; and (c) PRIOR ART or patent search results that RELATE TO the subject matter of the alleged inventions of the PATENTS-IN-SUIT.

102.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING ANY consideration, evaluation, study, or analysis given as to whether or not an application for, an application for reissue of, or a request for reexamination of, ANY of the PATENTS-IN-SUIT (including continuation, continuation-in-part, or divisional applications thereof or based thereon) should be prepared or filed.

103.    ALL DOCUMENTS that EVIDENCE or RELATE TO ANY actual or potential license agreement, including without limitation, cross-licenses, agreements of non-assertion, covenants not to sue, acquisition agreements, and other types of agreements and/or negotiation for such that relates to or involves ANY ENTERASYS PATENTS, including without limitation, ALL DOCUMENTS RELATING TO COMMUNICATIONS concerning ANY such license agreement or negotiation.

104.    ALL DOCUMENTS that EVIDENCE or RELATE TO ANY actual or potential license agreement, including without limitation, cross-licenses, agreements of non-assertion, covenants not to sue, acquisition agreements and other types of agreements, and/or negotiation for such that relates to or involves ANY patents of ENTERASYS, including without limitation, ALL DOCUMENTS RELATING TO COMMUNICATIONS concerning ANY such license agreement or negotiation.

105.    ALL DOCUMENTS distributed by or on behalf of ENTERASYS to investors, insurers, or potential investors or insurers or other potential sources of funding that directly or indirectly RELATE TO ANY of the ENTERASYS PATENTS or the alleged inventions thereof, or the development, manufacture and/or sale of ANY product incorporating ANY of the alleged inventions of ANY claim of the PATENTS-IN-SUIT.

106.    ALL DOCUMENTS that EVIDENCE or RELATE TO ANY differences or similarities between the scope and content of the subject matter of the PATENTS-IN-SUIT or the subject matter of ANY claims of the PATENTS-IN-SUIT and one or more items of actual or potential PRIOR ART or one or more pre-existing products.

107.    ALL organizational charts of DIGITAL EQUIPMENT CORPORATION from the earliest FILING DATE of the PATENTS-IN-SUIT to the present.

108.    ALL organizational charts of CABLETRON from the earliest FILING DATE of the PATENTS-IN-SUIT to the present.

109.    ALL organizational charts of ENTERASYS from the earliest FILING DATE of the PATENTS-IN-SUIT to the present.

110.    DOCUMENTS including organizational charts sufficient to identify the names, job titles, and duties of ENTERASYS' directors, officers, employees, contractors, and any third parties involved in the creation, design, development, testing, evaluation, operation, public relations, sales, or marketing of ENTERASYS PRODUCTS, embodying or implementing, in whole or in part, ANY of the alleged inventions within the scope of ANY claim of ANY of the PATENTS-IN-SUIT.

111.    ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO ENTERASYS' acquisition of ANY of the PATENTS-IN-SUIT and ANY negotiations related thereto.

112.    ALL DOCUMENTS that constitute, EVIDENCE or RELATE TO ANY license agreement, including without limitation, cross-licenses, agreements of non-assertion, covenants not to sue, acquisition agreement and ANY other types of agreements, and/or negotiation for such that RELATES TO ANY prior owner or assignee of ANY of the PATENTS-IN-SUIT.

-21-

113.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO the transfer of ownership rights from inventor(s) of each patent to ENTERASYS, including but not limited to, contracts, license agreements, assignments, and ANY other DOCUMENTS related to or tending to show chain of ownership from the inventor(s) of each of the patent to ENTERASYS.

114.    ALL DOCUMENTS RELATING TO ENTERASYS' acquisition of ANY of the PATENTS-IN-SUIT.

115.    ALL DOCUMENTS RELATING TO ENTERASYS' DUE DILIGENCE efforts in the acquisition of ANY of the PATENTS-IN-SUIT.

116.    ALL DOCUMENTS that describe the value of ANY of the PATENTS-IN-SUIT acquired by ENTERASYS.

117.    ALL DOCUMENTS RELATING TO COMMUNICATIONS between ENTERASYS and ANY PERSON RELATING TO the acquisition of ANY of the PATENTS-IN-SUIT, including without limitation, COMMUNICATIONS RELATED TO ENTERASYS' DUE DILIGENCE efforts regarding the acquisition.

118.    ALL DOCUMENTS RELATING TO COMMUNICATIONS between CABLETRON and ANY PERSONS RELATING TO the acquisition of ANY of the PATENTS-IN-SUIT, including without limitation, COMMUNICATIONS RELATED TO CABLETRON's DUE DILIGENCE efforts regarding the acquisition.

119.    ALL DOCUMENTS RELATING TO COMMUNICATIONS between DIGITAL EQUIPMENT CORPORATION and ANY PERSONS RELATING TO the acquisition of ANY of the PATENTS-IN-SUIT, including without limitation, COMMUNICATIONS RELATED TO DIGITAL EQUIPMENT CORPORATION's DUE DILIGENCE efforts regarding the acquisition.

120.    ALL DOCUMENTS RELATING TO financial analyses RELATING TO ANY of the ENTERASYS PRODUCTS that incorporate the alleged invention of any claim of the

PATENTS-IN-SUIT, including but not limited to, market shares, sales projections, demand analyses, cost of components or materials, cost of labors, and profit margins.

121.   ALL DOCUMENTS RELATING TO ANY ENTERASYS policy, strategy, plan, or practice, whether formal or informal, stated or unstated, regarding patents, including but not limited to, filing and prosecution of ALL forms of patent applications (including but not limited to original applications, continuation applications, divisional applications, reissues, reexaminations, and divisional applications), acquiring patents or patent applications from other persons, exploiting patents or patented technology, charging other persons with patent INFRINGEMENT, enforcing patents, licensing patents or patented technology, or cross-licensing patents or patented technology.

122.   ALL DOCUMENTS RELATING TO ANY ENTERASYS policy, instruction, or set of instructions, policy statement, study, or COMMUNICATION RELATING TO the destruction or retention of DOCUMENTS or records.

123.   ALL DOCUMENTS RELATING TO ANY DIGITAL EQUIPMENT CORPORATION policy, instruction, or set of instructions, policy statement, study, or COMMUNICATION RELATING TO the destruction or retention of DOCUMENTS or records.

124.   ALL DOCUMENTS RELATING TO ANY CABLETRON policy, instruction, or set of instructions, policy statement, study, or COMMUNICATION RELATING TO the destruction or retention of DOCUMENTS or records.

125.   ALL DOCUMENTS RELATING TO comparison of the design, structure, function, or operation of ACCUSED FOUNDRY PRODUCTS against the specification or ANY claim of the PATENTS-IN-SUIT.

126.   ALL DOCUMENTS RELATING TO ANY COMMUNICATION or decision regarding whether or not to assign, sell, transfer, license, or offer to assign, sell, transfer, or license to ANY PERSON ANY interest in the PATENTS-IN-SUIT.

127.   ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY long-felt need that has been filled by ENTERASYS PRODUCTS implementing or embodying

EXHIBIT F
PART 2 OF 2

the alleged invention of ANY of the claims of the PATENTS-IN-SUIT, including but not limited to, ALL such DOCUMENTS and things which tend in ANY way to support or negate a contention of long-felt need.

128.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY commercial success achieved by ANY product using the alleged invention of ANY of the PATENTS-IN-SUIT, including without limitation, ALL such DOCUMENTS and things which tend in ANY way to support or negate a contention of commercial success, including ANY DOCUMENTS supporting a nexus between ANY alleged invention of the PATENTS-IN-SUIT and the commercial success of such ENTERASYS PRODUCTS.

129.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY alleged failure by those skilled in the art to appreciate ANY problem alleged to have been solved by ANY alleged invention of ANY claim of ANY of the PATENTS-IN-SUIT.

130.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS discussing, EVIDENCING or RELATING TO the marketability of, market demand for, or consumer acceptance of ANY commercial embodiment of the alleged invention.

131.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING non-INFRINGING alternatives or acceptable substitutes, if ANY, or the lack thereof, for ANY alleged invention described in ANY specification or ANY claim or claims of the PATENTS-IN-SUIT.

132.    ALL DOCUMENTS and things constituting, RELATING TO or EVIDENCING complaints or problems with the performance of each ENTERASYS PRODUCT which uses alleged invention of ANY claim of ANY of the PATENTS-IN-SUIT.

133.    ALL DOCUMENTS RELATING TO ANY secondary considerations that ANY invention described in ANY specification or ANY claim or claims of the PATENTS-IN-SUIT is not obvious.

134.    ALL DOCUMENTS RELATING TO patent marking, failure to mark, or other notice with respect to the PATENTS-IN-SUIT.

135.    ALL DOCUMENTS RELATING TO or EVIDENCING the DATES on which the circumstances under which ENTERASYS and the inventors of the PATENTS-IN-SUIT first learned of the PRIOR ART identified to the United States Patent and Trademark Office during the prosecution of the PATENTS-IN-SUIT.

136.    ALL DOCUMENTS RELATING TO or EVIDENCING the DATES on which and the circumstances under which DIGITAL EQUIPMENT CORPORATION first learned of the PRIOR ART identified to the United States Patent and Trademark Office during the prosecution of the PATENTS-IN-SUIT.

137.    ALL DOCUMENTS RELATING TO or EVIDENCING the DATES on which and the circumstances under which CABLETRON first learned of the PRIOR ART identified to the United States Patent and Trademark Office during the prosecution of the PATENTS-IN-SUIT.

138.    ALL agreements, settlements and licenses entered into by ENTERASYS referring or RELATING in whole or in part in ANY way to one or more of the PATENTS-IN-SUIT.

139.    ALL agreements, settlements and licenses entered into by DIGITAL EQUIPMENT CORPORATION referring or RELATING TO ANY of the PATENTS-IN-SUIT.

140.    ALL agreements, settlements and licenses entered into by CABLETRON referring or RELATING in whole or in part in ANY way to one or more of the PATENTS-IN-SUIT.

141.    ALL DOCUMENTS that EVIDENCE or RELATE TO COMMUNICATIONS with ANY PERSON, including but not limited to the inventors of the PATENTS-IN-SUIT, that RELATE TO actual or potential PRIOR ART for ANY of the PATENTS-IN-SUIT, irrespective of whether or not the PRIOR ART has been cited to the United States Patent and Trademark Office.

142.    ALL DOCUMENTS EVIDENCING or RELATING TO ANY analyses of the claims of the PATENTS-IN-SUIT, including but not limited to, claim charts, summaries, and INFRINGEMENT analyses.

-25-

143.    ALL technical DOCUMENTS RELATING TO ANY ENTERASYS PRODUCT RELATED to ANY of the ENTERASYS PATENTS, or the alleged inventions therof, that ENTERASYS has designed, made, produced, marketed, or intends to make or market, including but not limited to, software or hardware block diagrams, descriptions of structures or functions, user manuals, electronic circuit diagrams, notebooks, and test results.

144.    ALL technical DOCUMENTS RELATING TO ANY DIGITAL EQUIPMENT CORPORATION PRODUCT RELATED to ANY of the ENTERASYS PATENTS, or the alleged inventions therof, that ENTERASYS has designed, made, produced, marketed, or intends to make or market, including but not limited to, software or hardware block diagrams, descriptions of structures or functions, user manuals, electronic circuit diagrams, notebooks, and test results.

145.    ALL technical DOCUMENTS RELATING TO ANY CABLETRON PRODUCT RELATED to ANY of the ENTERASYS PATENTS, or the alleged inventions therof, that ENTERASYS has designed, made, produced, marketed, or intends to make or market, including but not limited to, software or hardware block diagrams, descriptions of structures or functions, user manuals, electronic circuit diagrams, notebooks, and test results.

146.    ALL DOCUMENTS EVIDENCING or RELATING TO ENTERASYS' lost profits, both past and future, allegedly resulting from FOUNDRY's alleged INFRINGEMENT of ANY of the PATENTS-IN-SUIT, including but not limited to, sales reports, marketing reports, sales revenues, sales volumes, sales prices, and costs incurred for ENTERASYS PRODUCTS.

147.    ALL DOCUMENTS RELATING TO manufacturing capability to make and marketing capability to sell ENTERASYS PRODUCTS with respect to which ENTERASYS seeks lost profits.

148.    ALL DOCUMENTS that EVIDENCE or RELATE TO ENTERASYS' costs for the manufacture and sale of ANY ENTERASYS PRODUCT that includes ANY alleged invention of any claim of the PATENTS-IN-SUIT.

149.    ALL DOCUMENTS that EVIDENCE or RELATE TO ENTERASYS' costs for the manufacture and sale of ANY components, peripherals and/or related products RELATED TO ANY ENTERASYS PRODUCT with respect to which ENTERASYS seeks lost profits.

150.    ALL DOCUMENTS RELATING TO advertising, sales, and promotion of each of ENTERASYS PRODUCT that embodies or incorporates the invention of ANY claim of ANY of the PATENTS-IN-SUIT.

151.    ALL DOCUMENTS RELATING TO the effect of selling the ENTERASYS PRODUCTS with respect to which ENTERASYS seeks lost profits in promoting sales of other products of ENTERASYS, including convoyed sales and collateral sales.

152.    ALL financial statements and reports of ENTERASYS from the year ENTERASYS first sold ANY product that embodies, implements or uses, in whole or in part, ANY of the inventions described in ANY claim of ANY of the PATENTS-IN-SUIT.

153.    ALL DOCUMENTS RELATING TO price lists, pricing memorandums, and pricing strategies for ENTERASYS PRODUCT that embodies, implements or uses, in whole or in part, ANY of the inventions described in ANY claim of ANY of the PATENTS-IN-SUIT.

154.    ALL DOCUMENTS RELATING TO market segmentation, market approach, pricing, sales, and business plans for ENTERASYS PRODUCT that embodies, implements or uses, in whole or in part, ANY of the inventions described in ANY claim of ANY of the PATENTS-IN-SUIT.

155.    ALL DOCUMENTS RELATING TO account representative(s) sales reports, status reports, call reports (weekly, monthly, bi-monthly, and yearly), and customer reports for ENTERASYS PRODUCT that embodies, implements or uses, in whole or in part, ANY of the inventions described in ANY claim of ANY of the PATENTS-IN-SUIT.

156.    ALL DOCUMENTS RELATING TO sales reports of ENTERASYS, including monthly, quarterly, and annual sales of ENTERASYS PRODUCTS that embody, implement, or use ANY alleged invention of ANY claim of ANY of the PATENTS-IN-SUIT.

157.    ALL DOCUMENTS RELATING TO sales information, sales DATES, customer names, product names, product numbers, quantity, material cost, wholesale cost, and retail price of ALL ENTERASYS PRODUCTS with respect to which ENTERASYS seeks lost profits.

158.    ALL DOCUMENTS RELATING TO sales information, sales DATES, customer names, PRODUCT names, PRODUCT numbers, quantity, material cost, wholesale cost, and retail price of ALL components, peripherals, or products RELATED TO ENTERASYS PRODUCTS with respect to which ENTERASYS seeks lost profits.

159.    ALL DOCUMENTS and things constituting, EVIDENCING or RELATING TO the identification of ANY patent markings applied to ANY of ENTERASYS' PRODUCTS.

160.    For ALL ENTERASYS PRODUCTS that embody or implement ANY alleged invention of ANY claim of ANY of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO sales contracts, invoices, purchase orders, promotions, profitability margins, quantities sold, and PRODUCT lifetimes for ALL wholesale and retail distribution channels.

161.    ALL DOCUMENTS sufficient to identify ENTERASYS' accounting practices and methods, including but not limited to, practices and methods for determining costs and profits.

162.    ALL DOCUMENTS RELATING TO or EVIDENCING tax returns starting from 1999 to the present.

163.    ALL DOCUMENTS RELATING TO or EVIDENCING communications between DIGITAL EQUIPMENT CORPORATION and tax authorities regarding the value of any intellectual property, including but not limited to, the PATENTS-IN-SUIT.

164.    ALL DOCUMENTS RELATING TO or EVIDENCING communications between CABLETRON and tax authorities regarding the value of any intellectual property, including but not limited to, the PATENTS-IN-SUIT.

165.    ALL DOCUMENTS RELATING TO or EVIDENCING communications between ENTERASYS and tax authorities regarding the value of any intellectual property, including but not limited to, the PATENTS-IN-SUIT.

166.    ALL DOCUMENTS RELATING TO or EVIDENCING communications with investment bankers, auditors, accountants, investors, and their agents, employees, and officers regarding the value of the PATENTS-IN-SUIT, including without limitation, statements made during a discussion of a sale, proposed sale, leveraged buyout, or potential leveraged buyout of ENTERASYS.

167.    ALL DOCUMENTS RELATING TO or EVIDENCING communications with investment bankers, auditors, accountants, investors, and their agents, employees, and officers regarding this litigation, including without limitation, statements made during a discussion of a sale, potential sale, leveraged buyout, or potential leveraged buyout, of ENTERASYS.

168.    ALL DOCUMENTS RELATING TO or EVIDENCING communications with investment bankers, auditors, accountants, investors, and their agents, employees, and officers regarding FOUNDRY, including without limitation, statements made during a discussion of a sale, potential sale, leveraged buyout, or potential leveraged buyout, of ENTERASYS.

169.    ALL DOCUMENTS RELATING TO or EVIDENCING communications with ANY third party regarding the value of the PATENTS-IN-SUIT, including without limitation, statements made during a discussion of a sale, proposed sale, leveraged buyout, or potential leveraged buyout of ENTERASYS.

170.    ALL DOCUMENTS RELATING TO or EVIDENCING communications with ANY third party regarding this litigation, including without limitation, statements made during a discussion of a sale, potential sale, leveraged buyout, or potential leveraged buyout, of ENTERASYS.

171.    ALL DOCUMENTS RELATING TO or EVIDENCING communications with ANY third party regarding FOUNDRY, including without limitation, statements made during a discussion of a sale, potential sale, leveraged buyout, or potential leveraged buyout, of ENTERASYS.

172.    ALL DOCUMENTS RELATING TO or EVIDENCING identities of investment bankers, auditors, accountants, investors, and their agents, employees, and officers regarding a sale, potential sale, leveraged buyout, or potential leveraged buyout, of ENTERASYS.

173.    ALL DOCUMENTS RELATING TO or EVIDENCING identities of parties, and their agents, employees, and officers regarding a sale, potential sale, leveraged buyout, or potential leveraged buyout, of ENTERASYS.

174.    ALL DOCUMENTS RELATING TO or EVIDENCING the acquisition of ENTERASYS by The Gores Group and Tennenbaum Capital Partners.

175.    ALL DOCUMENTS RELATING TO merger discussions between ENTERASYS and Extreme Networks.

176.    ALL DOCUMENTS RELATING TO the sale of ENTERASYS in 2005.

177.    ALL DOCUMENTS RELATING TO the formation of ENTERASYS.

178.    ALL DOCUMENTS RELATING TO corporate transactions between DIGITAL EQUIPMENT CORPORATION and CABLETRON, including without limitation, ALL DOCUMENTS RELATING TO COMMUNICATIONS concerning ANY such transaction.

179.    ALL DOCUMENTS RELATING TO agreements between DIGITAL EQUIPMENT CORPORATION and CABLETRON regarding intellectual property rights, including without limitation, ALL DOCUMENTS RELATING TO COMMUNICATIONS and negotiations concerning ANY such agreement.

180.    ALL DOCUMENTS RELATING TO the sale of assets or corporate stock between DIGITAL EQUIPMENT CORPORATION and CABLETRON.

181.    ALL DOCUMENTS RELATING TO corporate transactions between CABLETRON and ENTERASYS, including without limitation, ALL DOCUMENTS RELATING TO COMMUNICATIONS concerning ANY such transaction.

182.    ALL DOCUMENTS RELATING TO agreements between CABLETRON and ENTERASYS regarding intellectual property rights, including without limitation, ALL

DOCUMENTS RELATING TO COMMUNICATIONS and negotiations concerning ANY such agreement.

183.    ALL DOCUMENTS RELATING TO CABLETRON'S sale of assets or corporate stock to ENTERASYS.

184.    ALL DOCUMENTS RELATING TO agreements between ENTERASYS and RIVERSTONE NETWORKS.

185.    ALL DOCUMENTS RELATING TO agreements between RIVERSTONE NETWORKS and CABLETRON regarding the ENTERASYS PATENTS.

186.    ALL DOCUMENTS RELATING TO ANY actual or potential license agreement with RIVERSTONE NETWORKS RELATING TO the ENTERASYS PATENTS, including without limitation, cross-licenses, agreements of non-assertion, covenants not to sue, acquisition agreements and other types of agreements, and/or negotiation for such agreements, including without limitation, ALL DOCUMENTS RELATING TO COMMUNICATIONS concerning ANY such license agreement or negotiation.

187.    ALL DOCUMENTS RELATING TO ANY requirements that ANY licensee(s) of ANY of the PATENTS-IN-SUIT must follow regarding patent markings.

188.    For each of the PATENTS-IN-SUIT, ALL DOCUMENTS RELATING TO sales of ANY ENTERASYS PRODUCTS that embody or implement the invention of ANY claim of ANY of the PATENTS-IN-SUIT that were not marked with or otherwise identified with the patent numbers of ANY of the PATENTS-IN-SUIT associated with such ENTERASYS PRODUCTS.

189.    ALL DOCUMENTS RELATING TO ENTERASYS' market share for each of the ENTERASYS PRODUCTS for which ENTERASYS seeks lost profits.

190.    ALL DOCUMENTS RELATING TO ANY license payments, royalties, or other consideration ENTERASYS has received or expects to receive for licenses or other rights under the PATENTS-IN-SUIT.

191.    ALL DOCUMENTS RELATING TO or tending to show portions of profits or selling prices of ENTERASYS PRODUCTS that are attributable to the value of the inventions claimed in the PATENTS-IN-SUIT.

192.    ALL DOCUMENTS RELATING TO or tending to show a reasonable royalty for each of the PATENTS-IN-SUIT.

193.    ALL DOCUMENTS RELATING TO or tending to show royalty rates received by ENTERASYS for licensing other patents that are directed to network products, systems, methods, or services.

194.    ALL DOCUMENTS RELATING TO or tending to show a reasonable profit for selling ENTERASYS PRODUCTS.

195.    ALL DOCUMENTS RELATING TO or tending to show replacement of PRIOR ART products, systems, methods, services, devices, and apparatus by ENTERASYS PRODUCTS that embody or implement the invention of ANY claim of ANY of the PATENTS-IN-SUIT, for reasons relating to the alleged value or usefulness of such invention(s).

196.    ALL DOCUMENTS RELATING TO ANY PERSON copying the alleged inventions in the PATENTS-IN-SUIT.

197.    ALL DOCUMENTS RELATING TO the creation, development, modification, adoption, or application of any INDUSTRY STANDARD, including but not limited to, ENTERASYS' involvement in such activities.

198.    ALL DOCUMENTS that EVIDENCE, refer or RELATE TO ENTERASYS' participation in any standards organization, or committee thereof, responsible for any of the INDUSTRY STANDARDS.

199.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY COMMUNICATIONS between ENTERASYS and ANY member of ANY standards organization or committee thereof responsible for ANY of the INDUSTRY STANDARDS, RELATING TO ANY of the INDUSTRY STANDARDS.

-32-

200.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY
COMMUNICATIONS between ENTERASYS and ANY member of ANY standards
organization or committee thereof responsible for ANY of the INDUSTRY STANDARDS,
RELATING TO ANY of the ENTERASYS PATENTS.

201.    ALL DOCUMENTS RELATING TO or EVIDENCING COMMUNICATIONS
between ENTERASYS and any standards organization or committee thereof responsible for
ANY of the INDUSTRY STANDARDS.

202.    ALL DOCUMENTS RELATING TO ANY COMMUNICATIONS between
ENTERASYS and ANY PERSON RELATING TO ANY of the INDUSTRY STANDARDS.

203.    ALL DOCUMENTS RELATING TO the creation, development, modification,
adoption, or application of any INDUSTRY STANDARD, including but not limited to,
CABLETRON'S involvement in such activities.

204.    ALL DOCUMENTS that EVIDENCE, refer or RELATE TO CABLETRON'S
participation in any standards organization, or committee thereof, responsible for any of the
INDUSTRY STANDARDS.

205.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY
COMMUNICATIONS between CABLETRON and ANY member of ANY standards
organization or committee thereof responsible for ANY of the INDUSTRY STANDARDS,
RELATING TO ANY of the INDUSTRY STANDARDS.

206.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY
COMMUNICATIONS between CABLETRON and ANY member of ANY standards
organization or committee thereof responsible for ANY of the INDUSTRY STANDARDS,
RELATING TO ANY of the ENTERASYS PATENTS.

207.    ALL DOCUMENTS RELATING TO or EVIDENCING COMMUNICATIONS
between CABLETRON and any standards organization or committee thereof responsible for
ANY of the INDUSTRY STANDARDS.

208.    ALL DOCUMENTS RELATING TO ANY COMMUNICATIONS between CABLETRON and ANY PERSON RELATING TO ANY of the INDUSTRY STANDARDS.

209.    ALL DOCUMENTS RELATING TO the creation, development, modification, adoption, or application of any INDUSTRY STANDARD, including but not limited to, DIGITAL EQUIPMENT CORPORATION'S involvement in such activities.

210.    ALL DOCUMENTS that EVIDENCE, refer or RELATE TO DIGITAL EQUIPMENT CORPORATION'S participation in any standards organization, or committee thereof, responsible for any of the INDUSTRY STANDARDS.

211.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY COMMUNICATIONS between DIGITAL EQUIPMENT CORPORATION and ANY member of ANY standards organization or committee thereof responsible for ANY of the INDUSTRY STANDARDS, RELATING TO ANY of the INDUSTRY STANDARDS.

212.    ALL DOCUMENTS RELATING TO or EVIDENCING ANY COMMUNICATIONS between DIGITAL EQUIPMENT CORPORATION and ANY member of ANY standards organization or committee thereof responsible for ANY of the INDUSTRY STANDARDS, RELATING TO ANY of the ENTERASYS PATENTS.

213.    ALL DOCUMENTS RELATING TO or EVIDENCING COMMUNICATIONS between DIGITAL EQUIPMENT CORPORATION and any standards organization or committee thereof responsible for ANY of the INDUSTRY STANDARDS.

214.    ALL DOCUMENTS RELATING TO ANY COMMUNICATIONS between DIGITAL EQUIPMENT CORPORATION and ANY PERSON RELATING TO ANY of the INDUSTRY STANDARDS.

215.    ALL DOCUMENTS that RELATE TO disclosure of patents by ANY person to any standards organization or committee thereof responsible for ANY off the INDUSTRY STANDARDS, including without limitation, the disclosure of ANY of the ENTERASYS PATENTS.

216.    ALL DOCUMENTS that RELATE TO analysis of the proper value of a
reasonable and nondiscriminatory royalty under any standards body's operating rules.

217.    ALL of ENTERASYS' accounting documents RELATING TO the ENTERASYS
PRODUCTS that embody or implement the invention of ANY claim of ANY of the PATENTS-
IN-SUIT including but not limited to, ENTERASYS' chart of accounts, accounting policies and
procedures manuals, detailed year-end ledgers for the years 1996 through the present, detailed
year-end general ledgers for the years 1996 to present, Federal Income Tax returns for the years
1996 through the present, audited financial statements for the years 1996 through the present,
and unaudited financial statements for the years 1996 to the present.

218.    ALL DOCUMENTS RELATED TO the structure and operation of "Autonet,"
a product manufactured by DIGITAL EQUIPMENT CORPORATION.

219.    ALL DOCUMENTS RELATED TO the first commercial sale of "Autonet."

220.    ALL DOCUMENTS RELATED TO the first public use of "Autonet."

221.    ALL DOCUMENTS RELATED TO "Autonet."

222.    ALL DOCUMENTS RELATED TO Ser. No. 07/964,791, filed with the
U.S. Patent and Trademark Office on October 22, 1992, including ANY applications or requests
for reexamination and reissue, including without limitation, ALL drafts of such applications or
requests, the complete prosecution file for each such application or request, and ALL
applications from which ANY such application or request may claim priority, ALL
DOCUMENTS considered in connection with the preparation and prosecution of such
applications or requests, and ALL DOCUMENTS that passed in either direction between ANY
counsel, personnel or inventors, including without limitation, to or from the patentees, and to or
from each patent attorney or agent in connection with or concerning the applications, prosecution
of the applications, or statements made to the U.S. Patent and Trademark Office concerning
ANY of the PATENTS-IN-SUIT.

223.    ALL DOCUMENTS RELATED TO Ser. No. 07/964,791, filed with the
U.S. Patent and Trademark Office on October 22, 1992, the preparation or prosecution of each

foreign patent application corresponding, in whole or in part, to the U.S. applications, including requests for reexamination and reissue, for each PATENT-IN-SUIT, including without limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference, opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for each such foreign application.

224.    ALL DOCUMENTS RELATED TO Ser. No. 08/081,622, filed with the U.S. Patent and Trademark Office on October 22, 1992, including ANY requests for reexamination and reissue, including without limitation ALL drafts of such applications or requests, the complete prosecution file for each such application, and ALL applications from which ANY may claim priority, ALL DOCUMENTS considered in connection with the preparation and prosecution of such applications or requests, and ALL DOCUMENTS that passed in either direction between ANY counsel, personnel or inventors, including without limitation to, or from the patentees, and to or from each patent attorney or agent in connection with or concerning the applications, prosecution of the applications, or statements made to the U.S. Patent and Trademark Office concerning ANY of the PATENTS-IN-SUIT.

225.    ALL DOCUMENTS RELATED TO Ser. No. 08/081,622, filed with the U.S. Patent and Trademark Office on October 22, 1992, the preparation or prosecution of each foreign patent application corresponding, in whole or in part, to the U.S. applications, including requests for reexamination and reissue, for each PATENT-IN-SUIT, including without limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference, opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign

applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for each such foreign application.

226.    ALL DOCUMENTS RELATED TO Ser. No. 07/964,792, filed with the U.S. Patent and Trademark Office on October 22, 1992, including ANY requests for reexamination and reissue, including without limitation, ALL drafts of such applications or requests, the complete prosecution file for each such application, and ALL applications from which ANY may claim priority, ALL DOCUMENTS considered in connection with the preparation and prosecution of such applications or requests, and ALL DOCUMENTS that passed in either direction between ANY counsel, personnel or inventors, including without limitation to, or from the patentees, and to or from each patent attorney or agent in connection with or concerning the applications, prosecution of the applications, or statements made to the U.S. Patent and Trademark Office concerning ANY of the PATENTS-IN-SUIT.

227.    ALL DOCUMENTS RELATED TO Ser. No. 07/964,792, filed with the U.S. Patent and Trademark Office on October 22, 1992, the preparation or prosecution of each foreign patent application corresponding, in whole or in part, to the U.S. applications, including requests for reexamination and reissue, for each PATENT-IN-SUIT, including without limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference, opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for each such foreign application.

228.    ALL DOCUMENTS RELATED TO Ser. No. 07/964,738, filed with the U.S. Patent and Trademark Office on October 22, 1992, including ANY requests for reexamination and reissue, including without limitation, ALL drafts of such applications or requests, the complete prosecution file for each such application, and ALL applications from which ANY may claim priority, ALL DOCUMENTS considered in connection with the

preparation and prosecution of such applications or requests, and ALL DOCUMENTS that
passed in either direction between ANY counsel, personnel or inventors, including without
limitation to, or from the patentees, and to or from each patent attorney or agent in connection
with or concerning the applications, prosecution of the applications, or statements made to the
U.S. Patent and Trademark Office concerning ANY of the PATENTS-IN-SUIT.

229.    ALL DOCUMENTS RELATED TO Ser. No. 07/964,738, filed with the
U.S. Patent and Trademark Office on October 22, 1992, the preparation or prosecution of each
foreign patent application corresponding, in whole or in part, to the U.S. applications, including
requests for reexamination and reissue, for each PATENT-IN-SUIT, including without
limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR
ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the
patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference,
opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign
applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for
each such foreign application.

230.    ALL DOCUMENTS RELATED TO Ser. No. 07/965,121, filed with the
U.S. Patent and Trademark Office on October 22, 1992, including ANY requests for
reexamination and reissue, including without limitation, ALL drafts of such applications or
requests, the complete prosecution file for each such application, and ALL applications from
which ANY may claim priority, ALL DOCUMENTS considered in connection with the
preparation and prosecution of such applications or requests, and ALL DOCUMENTS that
passed in either direction between ANY counsel, personnel or inventors, including without
limitation to, or from the patentees, and to or from each patent attorney or agent in connection
with or concerning the applications, prosecution of the applications, or statements made to the
U.S. Patent and Trademark Office concerning ANY of the PATENTS-IN-SUIT.

231.    ALL DOCUMENTS RELATED TO Ser. No. 07/965,121, filed with the
U.S. Patent and Trademark Office on October 22, 1992, the preparation or prosecution of each

foreign patent application corresponding, in whole or in part, to the U.S. applications, including

requests for reexamination and reissue, for each PATENT-IN-SUIT, including without

limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR

ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the

patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference,

opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign

applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for

each such foreign application.

232.    ALL DOCUMENTS RELATED TO Ser. No. 08/188,238, filed with the

U.S. Patent and Trademark Office on January 28, 1994, including ANY requests for

reexamination and reissue, including without limitation, ALL drafts of such applications or

requests, the complete prosecution file for each such application, and ALL applications from

which ANY may claim priority, ALL DOCUMENTS considered in connection with the

preparation and prosecution of such applications or requests, and ALL DOCUMENTS that

passed in either direction between ANY counsel, personnel or inventors, including without

limitation to, or from the patentees, and to or from each patent attorney or agent in connection

with or concerning the applications, prosecution of the applications, or statements made to the

U.S. Patent and Trademark Office concerning ANY of the PATENTS-IN-SUIT.

233.    ALL DOCUMENTS RELATED TO Ser. No. 08/188,238, filed with the

U.S. Patent and Trademark Office on January 28, 1994, the preparation or prosecution of each

foreign patent application corresponding, in whole or in part, to the U.S. applications, including

requests for reexamination and reissue, for each PATENT-IN-SUIT, including without

limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR

ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the

patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference,

opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign

applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for each such foreign application.

234.    ALL DOCUMENTS RELATED TO Ser. No. 08/187,856, filed with the U.S. Patent and Trademark Office on January 28, 1994, including ANY requests for reexamination and reissue, including without limitation, ALL drafts of such applications or requests, the complete prosecution file for each such application, and ALL applications from which ANY may claim priority, ALL DOCUMENTS considered in connection with the preparation and prosecution of such applications or requests, and ALL DOCUMENTS that passed in either direction between ANY counsel, personnel or inventors, including without limitation to, or from the patentees, and to or from each patent attorney or agent in connection with or concerning the applications, prosecution of the applications, or statements made to the U.S. Patent and Trademark Office concerning ANY of the PATENTS-IN-SUIT.

235.    ALL DOCUMENTS RELATED TO Ser. No. 08/187,856, filed with the U.S. Patent and Trademark Office on January 28, 1994, the preparation or prosecution of each foreign patent application corresponding, in whole or in part, to the U.S. applications, including requests for reexamination and reissue, for each PATENT-IN-SUIT, including without limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference, opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for each such foreign application.

236.    ALL DOCUMENTS RELATED TO Ser. No. 073,217, filed with the U.S. Patent and Trademark Office on June 4, 1993, including ANY requests for reexamination and reissue, including without limitation, ALL drafts of such applications or requests, the complete prosecution file for each such application, and ALL applications from which ANY may claim priority, ALL DOCUMENTS considered in connection with the preparation and prosecution of

-40-

such applications or requests, and ALL DOCUMENTS that passed in either direction between ANY counsel, personnel or inventors, including without limitation to, or from the patentees, and to or from each patent attorney or agent in connection with or concerning the applications, prosecution of the applications, or statements made to the U.S. Patent and Trademark Office concerning ANY of the PATENTS-IN-SUIT.

237.    ALL DOCUMENTS RELATED TO Ser. No. 073,217, filed with the U.S. Patent and Trademark Office on June 4, 1993, the preparation or prosecution of each foreign patent application corresponding, in whole or in part, to the U.S. applications, including requests for reexamination and reissue, for each PATENT-IN-SUIT, including without limitation, ALL DOCUMENTS constituting, RELATING TO or EVIDENCING ANY PRIOR ART cited or considered by ENTERASYS, the patentees, the inventors, the patent applicant, the patent applicant's attorney or agent or ANY patent examiner, and ANY conflict, interference, opposition, INFRINGEMENT, nullity, revocation or other proceeding involving such foreign applications or ANY patent issuing thereon, and ENTERASYS' complete prosecution file for each such foreign application.

238.    ALL DOCUMENTS RELATING TO ANY instance where a third party has been accused of infringing ANY claim of the PATENTS-IN-SUIT, including, but not limited to, the name and address of each third party, the circumstances surrounding the accusation, their response, and the resolution of the accusation (including the identification of any resultant litigation, arbitration, mediation, or other enforcement proceeding), if any.

239.    ALL DOCUMENTS RELATING TO the decision to bring this lawsuit.

240.    ALL DOCUMENTS RELATING TO any licensing negotiations for ANY of the PATENTS-IN-SUIT.

241.    ALL DOCUMENTS cited in the ENTERASYS PATENTS.

242.    ALL prior art for the ENTERASYS PATENTS.

243.    ALL DOCUMENTS RELATING TO prior art for the ENTERASYS PATENTS.

244.    ALL DOCUMENTS RELATING TO best mode for the PATENTS-IN-SUIT.

-41-

245.    ALL DOCUMENTS RELATING TO any alleged infringement of the PATENTS-IN-SUIT by FOUNDRY.

246.    ALL DOCUMENTS RELATING TO each individual associated with the ENTERASYS PATENTS.

247.    ALL DOCUMENTS RELATING TO each inventor associated with the ENTERASYS PATENTS.

248.    ALL DOCUMENTS RELATING TO INDUSTRY STANDARDS that are RELATED TO the ENTERASYS PATENTS.

249.    For each inventor associated with the ENTERASYS PATENTS, ALL DOCUMENTS RELATING to the inventor's participation in INDUSTRY STANDARDS.

250.    ALL DOCUMENTS RELATED TO Michael J. Seaman's participation in ANY INDUSTRY STANDARD RELATED TO ANY of the ENTERASYS PATENTS.

251.    ALL DOCUMENTS RELATING TO the file histories of the ENTERASYS PATENTS.

252.    ANY DOCUMENTS RELATING TO inventor's beliefs for proof of embodiment and best mode for ANY alleged invention within the scope of ANY of the claims in the ENTERASYS PATENTS.

253.    ANY DOCUMENTS that support ENTERASYS' claim for willful infringement.

254.    ANY DOCUMENTS that support ENTERASYS' claim that this is an exceptional case.

255.    For each affirmative defense asserted by FOUNDRY, ALL DOCUMENTS that ENTERASYS alleges support its contention that each such affirmative defense does not bar ENTERASYS' cause of action.

256.    To the extent ENTERASYS intends to rely on the Doctrine of Equivalents, ALL DOCUMENTS supporting ENTERASYS' allegations that ANY ACCUSED FOUNDRY PRODUCT allegedly infringe ANY alleged invention within the scope of ANY of the claims in ENTERASYS PATENTS under the Doctrine of Equivalents.

257.    ALL DOCUMENTS RELATING TO ANY invention disclosures prepared by ANY of the inventors of ANY of the ENTERASYS PATENTS.

258.    ALL DOCUMENTS that ENTERASYS alleges support its contention that the PATENTS-IN-SUIT are valid.

259.    ALL DOCUMENTS RELATING TO communications between ENTERASYS and ANY third party regarding the PATENTS-IN-SUIT, including all analyses, claim charts, and patents and publications RELATED TO ANY of the PATENTS-IN-SUIT.

260.    ALL DOCUMENTS RELATING TO opinion letters for the PATENTS-IN-SUIT.

261.    ALL DOCUMENTS RELATING TO ANY communication between ENTERASYS and ENTERASYS' counsel RELATING TO ANY communications between ENTERASYS and ANY third party regarding the PATENTS-IN-SUIT, including all analyses, claim charts, and patents and publications RELATED TO ANY of the PATENTS-IN-SUIT.

262.    ALL DOCUMENTS in the possession of ENTERASYS RELATING TO the prosecution of each of the ENTERASYS PATENTS, including but not limited to, invention disclosures, draft patent applications, communications, and drafts of communications related to the prosecution of the ENTERASYS PATENTS.

263.    ALL DOCUMENTS in the possession of ENTERASYS' patent prosecution attorney(s) RELATING TO the prosecution of each of the ENTERASYS PATENTS, including but not limited to, invention disclosures, draft patent applications, communications, and drafts of communications related to the prosecution of the ENTERASYS PATENTS.

264.    ALL DOCUMENTS RELATED TO communications between any patent prosecution attorney and ANY ENTERASYS representative regarding the prosecution of the ENTERASYS PATENTS.

265.    ALL DOCUMENTS RELATED TO communications between ANY patent prosecution attorney and ANY ENTERASYS representative regarding the prosecution of the ENTERASYS PATENTS.

266.    ALL DOCUMENTS RELATING TO communications between CABLETRON and ANY third party regarding the PATENTS-IN-SUIT, including all analyses, claim charts, and patents and publications RELATED TO ANY of the PATENTS-IN-SUIT.

267.    ALL DOCUMENTS RELATING TO ANY communication between CABLETRON and CABLETRON'S counsel RELATING TO ANY communications between CABLETRON and ANY third party regarding the PATENTS-IN-SUIT, including all analyses, claim charts, and patents and publications RELATED TO ANY of the PATENTS-IN-SUIT.

268.    ALL DOCUMENTS in the possession of CABLETRON RELATING TO the prosecution of each of the ENTERASYS PATENTS, including but not limited to, invention disclosures, draft patent applications, communications, and drafts of communications related to the prosecution of the ENTERASYS PATENTS.

269.    ALL DOCUMENTS in the possession of CABLETRON'S patent prosecution attorney(s) RELATING TO the prosecution of each of the ENTERASYS PATENTS, including but not limited to, invention disclosures, draft patent applications, communications, and drafts of communications related to the prosecution of the ENTERASYS PATENTS.

270.    ALL DOCUMENTS RELATED TO communications between any patent prosecution attorney and ANY CABLETRON representative regarding the prosecution of the ENTERASYS PATENTS.

271.    ALL DOCUMENTS RELATED TO communications between ANY patent prosecution attorney and ANY CABLETRON representative regarding the prosecution of the ENTERASYS PATENTS.

272.    ALL DOCUMENTS RELATING TO communications between DEC and ANY third party regarding the PATENTS-IN-SUIT, including all analyses, claim charts, and patents and publications RELATED TO ANY of the PATENTS-IN-SUIT.

273.    ALL DOCUMENTS RELATING TO ANY communication between DEC and DEC'S counsel RELATING TO ANY communications between DEC and ANY third party

regarding the PATENTS-IN-SUIT, including all analyses, claim charts, and patents and publications RELATED TO ANY of the PATENTS-IN-SUIT.

274.    ALL DOCUMENTS in the possession of DEC RELATING TO the prosecution of each of the ENTERASYS PATENTS, including but not limited to, invention disclosures, draft patent applications, communications, and drafts of communications related to the prosecution of the ENTERASYS PATENTS.

275.    ALL DOCUMENTS in the possession of DEC'S patent prosecution attorney(s) RELATING TO the prosecution of each of the ENTERASYS PATENTS, including but not limited to, invention disclosures, draft patent applications, communications, and drafts of communications related to the prosecution of the ENTERASYS PATENTS.

276.    ALL DOCUMENTS RELATED TO communications between any patent prosecution attorney and ANY DEC representative regarding the prosecution of the ENTERASYS PATENTS.

277.    ALL DOCUMENTS RELATED TO communications between ANY patent prosecution attorney and ANY DEC representative regarding the prosecution of the ENTERASYS PATENTS.

278.    ALL DOCUMENTS RELATING TO ANY requirements that ENTERASYS' licensee(s) of ANY of the PATENTS-IN-SUIT must follow regarding patent markings in accordance with 35 U.S.C § 287.

279.    ALL DOCUMENTS RELATED TO ENTERASYS' compliance with 35 U.S.C. §287 RELATING TO the PATENTS-IN-SUIT.

280.    ALL DOCUMENTS RELATING TO ANY requirements that CABLETRON'S licensee(s) of ANY of the PATENTS-IN-SUIT comply with 35 U.S.C § 287.

281.    ALL DOCUMENTS RELATED TO CABLETRON'S compliance with 35 U.S.C. §287 RELATING TO the PATENTS-IN-SUIT.

282.   ALL DOCUMENTS RELATING TO ANY requirements that DIGITAL EQUIPMENT CORPORATION'S licensee(s) of ANY of the PATENTS-IN-SUIT comply with 35 U.S.C § 287.

283.   ALL DOCUMENTS RELATED TO DIGITAL EQUIPMENT CORPORATIONS'S compliance with 35 U.S.C. §287 RELATING TO the PATENTS-IN-SUIT.

284.   ALL DOCUMENTS RELATED TO ANY third party's compliance with 35 U.S.C. §287 RELATING TO the PATENTS-IN-SUIT.

285.   ALL DOCUMENTS RELATED TO ANY prior art search for the ENTERASYS PATENTS.

286.   ALL DOCUMENTS resulting from a prior art search RELATING TO the ENTERASYS PATENTS.

287.   ALL DOCUMENTS and things that constitute prior art for the ENTERASYS PATENTS.

288.   ALL DOCUMENTS that ENTERASYS contends supports its allegations in the COMPLAINT.

289.   ALL DOCUMENTS that ENTERASYS intends to rely on at trial.

290.   ALL DOCUMENTS RELATED TO the PATENTS-IN-SUIT.

291.   ALL DOCUMENTS and things RELATED TO ANY ENTERASYS PRODUCT implementing or embodying, in whole or in part, ANY alleged invention of ANY of the claims of ANY of the PATENTS-IN-SUIT.

292.   ALL DOCUMENTS identified in response to any of ENTERASYS' responses to interrogatories propounded by FOUNDRY in this case.

Dated: March 3, 2006

DEFENDANT FOUNDRY NETWORKS, INC.

By Their Attorneys,

Steven M. Bauer
Jeremy P. Oczek
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110-2600
Telephone: (617) 526-9600
Facsimile: (617) 526-9899

William L. Anthony, Jr.
I. Neel Chatterjee
Michael F. Heafey
Sanjeet K. Dutta
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 614-7400
Facsimile: (650) 614-7401

## CERTIFICATE OF SERVICE

I, Jeremy P. Oczek, hereby certify that on March 3, 2006, I caused the attached Foundry Networks, Inc.'s First Request for Production of Documents and Things to Plaintiff Enterasys Networks, Inc. to be served by upon counsel of record for Enterasys Networks, Inc.'s by the following methods:

*Via Hand Delivery and E-Mail:*

Christopher P. Sullivan, Esq.
Marc N. Henschke, Esq.
Alan E. McKenna, Esq.
Robins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA  02199
E-mail:  cpsullivan@rkmc.com
E-mail:  mnhenschke@rkmc.com
E-mail:  aemckenna@rkmc.com

*Via E-mail Only:*

A. James Anderson, Esq.
Marla R. Butler, Esq.
Robins, Kaplan, Miller & Ciresi LLP
2600 One Atlanta Plaza
950 East Paces Ferry Road, N.E.
Atlanta, GA  30326-1386
E-mail:  ajanderson@rkmc.com
E-mail:  mrbutler@rkmc.com

*Via E-mail Only:*

Robert A. Auchter, Esq.
Suite 1200
1801 K Street, N.W.
Washington, D.C. 20006
E-mail: rauchter@rkmc.com

Jeremy P. Oczek