### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| ENTERASYS NETWORKS, INC., | ) | Civil Action No: 05-CV-11298 (DPW) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| FOUNDRY NETWORKS, INC. AND | ) | **ORAL ARGUMENT REQUESTED** |
| EXTREME NETWORKS, INC., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

### DECLARATION OF REBECCA A. MACDOWELL IN SUPPORT OF PLAINTIFF ENTERASYS NETWORKS, INC.'S MOTION FOR PROTECTIVE ORDER

**I, REBECCA A. MACDOWELL**, declare as follows:

1.    I am an attorney with the law firm of Robins, Kaplan, Miller & Ciresi L.L.P., counsel of record for the named Plaintiff Enterasys Networks, Inc. ("Enterasys") in the above-referenced action. I submit this Declaration in support of Enterasys' Motion For Protective Order. I have personal knowledge of the facts stated herein and, if sworn as a witness, I could and would testify competently thereto.

2.    On the afternoon of Friday, August 3, 2007, I spoke by telephone with Attorney Brian VanderZanden of Orrick, Herrington & Sutcliffe LLP, counsel for Foundry Networks, Inc. ("Foundry") in this case.

3.    During that phone conversation, Attorney VanderZanden confirmed that Mr. Floyd Ross was under a consulting agreement with Foundry, and Mr. Peter Newman was being compensated for the time he spent on the *Enterasys Networks, Inc. v. Foundry Networks, Inc. & Extreme Networks, Inc.* case. Attorney VanderZanden also submitted that Foundry would not

attempt to prevent Enterasys from subpoenaing either Mr. Newman or Mr. Ross for additional depositions should Enterasys be unable to attend the depositions as Foundry had scheduled them, they could not guarantee that the witnesses would not "on their own" move to quash such a subpoena.

4.      During that same phone conversation, Attorney VanderZanden indicated that Mr. Newman had selected his deposition date, but that was not to say that Mr. Newman would not have additional availability if asked.

5.      Attorney VanderZanden also maintained during that call that Mr. Ross' deposition could be rescheduled for August 23, 2007 if Enterasys covered the cost of changing his non-refundable plane ticket.

6.      During that phone call, I informed Attorney VanderZanden that Enterasys would likely feel compelled to move for a protective order, and he responded that Enterasys should first offer alternative dates for depositions of Mr. Ross and Mr. Newman.

7.      Enterasys proposed alternative dates for the depositions by letter dated August 6, 2007 and sent via email. When Foundry did not respond by the requested deadline of close of business on August 6, 2007, Alan E. McKenna, an attorney at Robins, Kaplan, Miller & Ciresi L.L.P., attempted to contact Attorney VanderZanden by phone on the afternoon of August 7, 2007. He left a message.

8.      Attached hereto as Exhibit 1 is a true and correct copy of the Rule 16 Supplemental Scheduling Order Re: Deposition Limits and Joint Depositions filed February 17, 2006.

9.      Attached hereto as Exhibit 2 is a true and correct copy of the Notice of Deposition and Subpoena served by Foundry Networks, Inc. upon Mr. Floyd E. Ross.

2

10.    Attached hereto as Exhibit 3 is a true and correct copy of the Notice of Deposition and Subpoena served by Foundry Networks, Inc. upon Mr. Peter Newman.

11.    Attached hereto as Exhibit 4 is a true and correct copy of an Alan E. McKenna email to Brian VanderZanden dated August 1, 2007.

12.    Attached hereto as Exhibit 5 is a true and correct copy of a transcribed voice-mail message from Brian VanderZanden to Alan McKenna dated July 31, 2007.

13.    Attached hereto as Exhibit 6 is a true and correct copy of a transcribed voice-mail message from Brian VanderZanden to Alan McKenna dated August 1, 2007.

14.    Attached hereto as Exhibit 7 is a true and correct copy of United States Patent No. 6,128,665.

15.    Attached hereto as Exhibit 8 is a true and correct copy of United States Patent No. 6,147,995.

16.    Attached hereto as Exhibit 9 is a true and correct copy of the Subpoena served by Foundry Networks, Inc. upon Ostroff & Associates.

17.    Attached hereto as Exhibit 10 is a true and correct copy an Alan McKenna letter to Brian VanderZanden dated August 1, 2007.

18.    Attached hereto as Exhibit 11 is a true and correct copy a Brian VanderZanden letter to Alan McKenna dated August 3, 2007.

19.    Attached hereto as Exhibit 12 is a true and correct copy an Alan McKenna letter to Brian VanderZanden dated August 6, 2007.

20.    Attached hereto as Exhibit 13 is a true and correct copy a Brian VanderZanden letter to Alan McKenna dated August 7, 2007.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration is executed on this 10th day of August, 2007 at Boston, Massachusetts.

/s/ Rebecca A. MacDowell
REBECCA A. MACDOWELL

35039112

## CERTIFICATE OF SERVICE

I, Marc N. Henschke, hereby certify that on August 10, 2007, I caused a true and correct copy of the attached *Declaration of Rebecca A. MacDowell In Support of Plaintiff Enterasys Networks, Inc.'s Motion For Protective Order* to be served electronically pursuant to the Court's CM/ECF electronic filing system upon Defendants' respective counsel of record as indicated by asterisks below:

**Counsel for Defendant Extreme Networks, Inc.:**
William L. Anthony, Jr., Esq.*
I. Neel Chatterjee, Esq.*
Sanjeet K. Dutta, Esq.*
Matthew H. Poppe, Esq.*
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA  94025

Steven M. Bauer, Esq.*
Jeremy P. Oczek, Esq.*
John W. Pint, Esq.*
Proskauer Rose LLP
One International Place
Boston, MA 02110-2600

**Counsel for Defendant Extreme Networks, Inc.:**
Terrence P. McMahon, Esq.*
Vera M. Elson, Esq.*
McDermott, Will & Emery LLP
3150 Porter Drive
Palo Alto, CA  94303-1212

Emily E. Smith-Lee, Esq.*
Peter L. Resnik, Esq.*
McDermott, Will & Emery LLP
28 State Street
Boston, MA  02109-1775

Christopher D. Bright, Esq.
McDermott, Will & Emery LLP
18191 Von Karman Avenue, Suite 400
Irvine, CA  92612-7107

Dated: August 10, 2007          /s/ Marc N. Henschke_____
                                Marc N. Henschke

EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| ENTERASYS NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-11298-DPW |
| v. | ) | |
| | ) | |
| FOUNDRY NETWORKS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| ENTERASYS NETWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-12235-DPW |
| | ) | |
| EXTREME NETWORKS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## RULE 16 SUPPLEMENTAL SCHEDULING ORDER
## RE: DEPOSITION LIMITS AND JOINT DEPOSITIONS

Having conducted a scheduling conference with the parties pursuant to Fed. R. Civ. P. 16 and Local Rule 16.1,

IT IS ORDERED that depositions of fact witnesses in the above-captioned cases be consolidated and conducted as follows:

1. Plaintiff, Enterasys Networks, Inc., will be entitled to take a total of up to **200** hours of depositions of both Foundry Networks, Inc. and Extreme Networks, Inc. (collectively "Defendants"), excluding expert depositions.

2.     The Defendants will jointly be entitled to take a total of **364** hours of depositions, excluding expert depositions. The Defendants shall decide between themselves how to allocate these 364 hours of depositions.

3.     Notwithstanding Rule 26(d)(2) of the Federal Rules of Civil Procedure, only the actual on-the-record time used in any deposition will be charged against the party taking the deposition and counted against that party's total hours. The parties will work together in good faith to agree on the appropriate amount of time for each deposition on a deposition-by-deposition basis and to avoid unreasonably burdening third-party deponents or repetitive depositions of party witnesses.

4.     The deposition discovery in these actions will be coordinated/consolidated as follows:

a) Generally, witnesses associated with the plaintiff or witnesses whose expected testimony relates to issues of validity, enforceability or equitable defenses will be jointly deposed by the Defendants (*e.g.*, inventors of the patents-in-suit, prosecuting attorneys, prior art witnesses, *etc.*).

b) Absent agreement to the contrary, witnesses associated with only one defendant will not be taken on a consolidated basis.

c) The parties will meet and confer to determine the most effective approach to any exceptions to these general categories.

d) The parties will work together to schedule each joint deposition so that it proceeds consecutively from day to day until completed. Both Defendants will cooperate in the scheduling and taking of joint depositions.

e) At any joint deposition, each Defendant may have its attorneys present during the deposition. In general the Defendants will by agreement select which Defendant begins the questioning at a joint deposition. In the absence of an agreement, the Defendant noticing the deposition first will be the first to question the deponent. The other Defendant will commence questioning of the deponent after the first Defendant has

completed its questioning. To the extent possible, the Defendants will not ask duplicative questions. Plaintiff will commence any cross-examination only after both Defendants have completed questioning.

f) Absent agreement between the Defendants to the contrary, each Defendant's counsel will not be permitted to attend depositions of the other defendant or third party witnesses whose testimony relates to infringement by the other defendant, damages allegedly due to the plaintiff, or which otherwise involve confidential business or technical information of the other defendant.

g) All joint depositions will be deemed taken in the cases involving the parties that attend that deposition without regard to which party was questioning the witness at the time the testimony was given. Depositions that are not jointly noticed or attended will not be deemed taken in the case involving the non noticing or non attending party.

IT IS SO ORDERED,

_February 17, 2006_
DATE

_Hugh C. Woodley_
UNITED STATES DISTRICT JUDGE

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENTERASYS NETWORKS, INC, | Civil Action No. 05-11298 DPW |
| Plaintiff, | |
| v. | |
| FOUNDRY NETWORKS, INC. and EXTREME NETWORKS, INC., . | |
| Defendants. | |

## FOUNDRY NETWORKS, INC.'S
## NOTICE OF DEPOSITION OF FLOYD E. ROSS

TO PLAINTIFF ENTERASYS NETWORKS, INC., AND DEFENDANT

EXTREME NETWORKS, INC., AND THEIR RESPECTIVE COUNSEL OF RECORD

IN THIS ACTION:

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil

Procedure, defendant and counterclaimant Foundry Networks, Inc. will take the

deposition of Floyd E. Ross, 2020 Greyhorse Drive, Warrington, PA 18976, at the offices

of Orrick Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025,

commencing at 9:30 a.m. on August 15th, 2007.

The deposition will be taken upon oral examination before an officer authorized

by law to administer oaths, and will continue from day to day thereafter, excluding

weekends and holidays, until it is completed. Pursuant to Federal Rule of Civil

Procedure 30(b)(2), the testimony may be recorded by sound, visual, or other electronic

means in addition to stenographic means. Attorneys may also use equipment providing

for simultaneous stenography.

Dated: July 26, 2007

Respectfully submitted,

FOUNDRY NETWORKS, INC.

By Their Attorneys,

*B. VanderZanden*

William Anthony, Jr.*
Fabio E. Marino*
I. Neel Chatterjee*
Michael F. Heafey*
Brian H. VanderZanden*
Sanjeet K. Dutta*
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401

Steve M. Bauer (BBO# 542531)
Jeremy P. Oczek (BBO# 647509)
John W. Pint (BBO# 660548)
PROSKAUER ROSE, LLP
One International Plaza, 14th Floor
Boston, MA 02110-2600
Telephone:  (617) 526-9600
Facsimile:  (617)526-9899

* Admitted *Pro Hac Vice*

ATTORNEYS FOR DEFENDANT AND
COUNTERCLAIMANT
FOUNDRY NETWORKS, INC.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENTERASYS NETWORKS, INC, | Civil Action No. 05-11298 DPW |
| Plaintiff, | |
| v. | |
| FOUNDRY NETWORKS, INC. and EXTREME NETWORKS, INC., | |
| Defendants. | |

## NOTICE OF SERVICE OF SUBPOENA

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 45, a subpoena, attached hereto as Exhibit 1, will be served on Floyd E. Ross, 2020 Greyhorse Drive, Warrington, PA 18976.

Dated July 26, 2007

Respectfully submitted,

*B. VanderZanden*

William Anthony, Jr.*
Fabio E. Marino*
I. Neel Chatterjee*
Michael F. Heafey*
Brian H. VanderZanden*
Sanjeet K. Dutta*
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 614-7400
Facsimile: (650) 614-7401

Steve M. Bauer (BBO# 542531)
Jeremy P. Oczek (BBO# 647509)
John W. Pint (BBO# 660548)
PROSKAUER ROSE, LLP
One International Plaza, 14th Floor
Boston, MA 02110-2600
Telephone: (617) 526-9600
Facsimile: (617)526-9899

* Admitted *Pro Hac Vice*

ATTORNEYS FOR DEFENDANT AND
COUNTERCLAIMANT
FOUNDRY NETWORKS, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was served on July 26, 2007 to the counsel of record for Plaintiff Enterasys Networks, Inc. and Defendant Extreme Networks, Inc. via e-mail in accordance with the parties' service agreement:

*B. VanderZanden*

Brain H. VanderZanden

OHS West:260275624.1

# EXHIBIT 1

AO88 (Rev. 1/94) Subpoena in a Civil Case

# Issued by the
# UNITED STATES DISTRICT COURT

EASTERN    DISTRICT OF    PENNSYLVANIA

Enterasys Networks, Inc.

v.

Foundry Networks, Inc. and Extreme Networks, Inc.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-CV-11298 (DPW)
U.S.D.C. District of Massachusetts

TO:    **Floyd Ross**
**2020 Greyhorse Dr.**
**Warrington, PA 18976**

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025 | August 15, 2007, 9:30a.m. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
|  |  |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *B. VanderZanden*    Attorney for Foundry | July 26, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Brian H. VanderZanden, Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road, Menlo Park, CA 94025-1015, Phone Number: (650) 614-7629

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | | TIME |
|---|---|---|---|
| SERVED | | | |

| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
|---|---|---|

| SERVED BY (PRINT NAME) | | TITLE |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                         DATE

SIGNATURE OF SERVER _____

ADDRESS OF SERVER _____

_____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except

that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENTERASYS NETWORKS, INC, | Civil Action No. 05-11298 DPW |
| Plaintiff, | |
| v. | |
| FOUNDRY NETWORKS, INC. and EXTREME NETWORKS, INC., | |
| Defendants. | |

**FOUNDRY NETWORKS, INC.'S**
**NOTICE OF DEPOSITION OF PETER NEWMAN**

TO PLAINTIFF ENTERASYS NETWORKS, INC., AND DEFENDANT

EXTREME NETWORKS, INC., AND THEIR RESPECTIVE COUNSEL OF RECORD

IN THIS ACTION:

PLEASE TAKE NOTICE that, pursuant to Rule 45 of the Federal Rules of Civil

Procedure, defendant and counterclaimant Foundry Networks, Inc. will take the

deposition of Peter Newman, c/o Nuova Systems, 3 West Plumeria Drive, San Jose, CA

95134, at the offices of Orrick Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo

Park, CA 94025, commencing at 10:00 a.m. on August 21st, 2007.

The deposition will be taken upon oral examination before an officer authorized

by law to administer oaths, and will continue from day to day thereafter, excluding

weekends and holidays, until it is completed. Pursuant to Federal Rule of Civil

Procedure 30(b)(2), the testimony may be recorded by sound, visual, or other electronic

means in addition to stenographic means. Attorneys may also use equipment providing

for simultaneous stenography.

Dated: July 26, 2007

Respectfully submitted,

FOUNDRY NETWORKS, INC.

By Their Attorneys,

*B. Vander Zanden*

William Anthony, Jr.*
Fabio E. Marino*
I. Neel Chatterjee*
Michael F. Heafey*
Brian H. VanderZanden*
Sanjeet K. Dutta*
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401

Steve M. Bauer (BBO# 542531)
Jeremy P. Oczek (BBO# 647509)
John W. Pint (BBO# 660548)
PROSKAUER ROSE, LLP
One International Plaza, 14th Floor
Boston, MA 02110-2600
Telephone:  (617) 526-9600
Facsimile:  (617)526-9899

* Admitted *Pro Hac Vice*

ATTORNEYS FOR DEFENDANT AND
COUNTERCLAIMANT
FOUNDRY NETWORKS, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ENTERASYS NETWORKS, INC, | Civil Action No. 05-11298 DPW |
| Plaintiff, | |
| v. | |
| FOUNDRY NETWORKS, INC. and EXTREME NETWORKS, INC., | |
| Defendants. | |

## NOTICE OF SERVICE OF SUBPOENA

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Civil Procedure 45, a subpoena, attached hereto Exhibit 1, was served on Peter Newman, c/o Nuova Systems, 3 West Plumeria Drive, San Jose, CA 95134.

Dated July 26, 2007

Respectfully submitted,

*B. VanderZanden*

William Anthony, Jr.*
Fabio E. Marino*
I. Neel Chatterjee*
Michael F. Heafey*
Brian H. VanderZanden*
Sanjeet K. Dutta*
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401

Steve M. Bauer (BBO# 542531)
Jeremy P. Oczek (BBO# 647509)
John W. Pint (BBO# 660548)
PROSKAUER ROSE, LLP
One International Plaza, 14th Floor
Boston, MA 02110-2600
Telephone:  (617) 526-9600
Facsimile:  (617)526-9899

* Admitted *Pro Hac Vice*

ATTORNEYS FOR DEFENDANT AND
COUNTERCLAIMANT
FOUNDRY NETWORKS, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing document was served on July 26, 2007 to the counsel of record for Plaintiff Enterasys Networks, Inc. and Defendant Extreme Networks, Inc. via e-mail in accordance with the parties' service agreement:

*Ying Lin Steinberg*

Ying Lin Steinberg

OHS West:260275737.1

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

NORTHERN _____    DISTRICT OF _____    CALIFORNIA _____

Enterasys Networks, Inc.

**SUBPOENA IN A CIVIL CASE**

v.

Case Number:[1] 05-CV-11298 (DPW)
U.S.D.C. District of Massachusetts

Foundry Networks, Inc. and Extreme Networks, Inc.

**TO:    Peter Newman**
**Nuova Systems**
**3 West Plumeria Drive**
**San Jose, CA 95134**

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025 | August 21, 2007, 10:00a.m. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *B. VanderZanden*                    Attorney for Foundry | July 13, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Brian H. VanderZanden, Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road, Menlo Park, CA 94025-1015, Phone Number: (650) 614-7629

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | TIME |
|---|---|---|
| **SERVED** | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

_____

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except

that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

| NORTHERN | DISTRICT OF | CALIFORNIA |
|---|---|---|

Enterasys Networks, Inc.

**SUBPOENA IN A CIVIL CASE**

v.

Case Number:[1] 05-CV-11298 (DPW)
U.S.D.C. District of Massachusetts

Foundry Networks, Inc. and Extreme Networks, Inc.

**TO:**  **Peter Newman**
**Nuova Systems**
**3 West Plumeria Drive**
**San Jose, CA 95134**

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025 | August 21, 2007, 10:00a.m. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
|  |  |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *B. VanderZanden*            Attorney for Foundry | July 13, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Brian H. VanderZanden, Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road, Menlo Park, CA 94025-1015, Phone Number: (650) 614-7629

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | | TIME |
|---|---|---|---|
| SERVED | | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____         _____
                    DATE                                    SIGNATURE OF SERVER

                                             _____
                                             ADDRESS OF SERVER

                                             _____

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except

that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ENTERASYS NETWORKS, INC, | Civil Action No. 05-11298 DPW |
| Plaintiff, | |
| v. | |
| FOUNDRY NETWORKS, INC. and EXTREME NETWORKS, INC., | |
| Defendants. | |

## AFFIDAVIT OF SERVICE VIA EMAIL

I am more than eighteen years old and not a party to this action. My place of employment and business address is 1000 Marsh Road, Menlo Park, CA 94025.

On July 13, 2007, I emailed to the below listed individuals the following documents:

**SUBPOENA TO PETER NEWMAN**

| | |
|---|---|
| ☒ | By transmitting via email the document(s) listed above to the email address(es) set forth below on July 13, 2007. |
| ☐ | By placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Menlo Park, California addressed as set forth below on July 13, 2007. |
| ☐ | By causing personal delivery by MESSENGER of the document(s) listed above to the person(s) at the address(es) set forth below. |
| ☐ | By personally delivering the document(s) listed above to the person(s) at the address(es) set forth below. |
| ☐ | By placing a true and correct copy of the document(s) in a Federal Express envelope addressed as set forth below and then sealing the envelope, affixing a pre-paid Federal Express air bill, and causing the envelope to be delivered to a Federal Express agent for delivery. |

AFFIDAVIT OF SERVICE

Marc N. Henschke (mhenschke@rkmc.com)
Christopher P. Sullivan (cpsullivan@rkmc.com)
**ROBINS, KAPLAN, MILLER & CIRESI, LLP**
800 Boylston Street, 25th Floor
Boston, MA 02199
Telephone:   (617) 267-2300
Facsimile:    (617) 267-8288

Attorneys For Plaintiff
ENTERASYS NETWORKS, INC.

Christopher Bright (cbright@mwe.com)
Firasat M. Ali (fali@mwe.com)
Steven L. Walker (swalker@mwe.com)
David L. Larson (dlarson@mwe.com)
**McDermott, Will & Emery, LLP**
28 State Street
Boston, MA 02110199
Telephone:   (617) 535-4000
Facsimile:    (617) 535-3800

Attorneys For Defendants
EXTREME NETWORKS, INC.

Executed on July 13, 2007, at Menlo Park, California.  I declare under penalty of perjury

that the foregoing is true and correct.


_____
                                    Melanie Arlantico

OHS West:260212795.1

# EXHIBIT 4

## McKenna, Alan E.

| | |
|---|---|
| **From:** | McKenna, Alan E. |
| **Sent:** | Wednesday, August 01, 2007 5:33 PM |
| **To:** | 'VanderZanden, Brian' |
| **Subject:** | Enterasys v. Foundry |

Brian:

Just wanted to follow-up on the 2nd voice-mail I left for you yesterday.  Are either Floyd Ross or Peter Newman represented by counsel?  If so, who?

Also, have either of them responded to the subpoena and committed to appearing on the noticed dates (August 15  for Ross and August 21 for Newman)?

I look forward to hearing from you with this information.

Thanks,
Alan

Alan E. McKenna, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
Prudential Tower
800 Boylston Street, 25th Floor
Boston, MA 02199
aemckenna@rkmc.com
Direct: 617.859.2719
Main: 617.267.2300
Fax: 617.267.8288
www.rkmc.com

# EXHIBIT 5

**Voice-mail message from Brian VanderZanden on July 31, 2007 at 12:50pm**

Hi, Alan,

This is Brian VanderZanden of Orrick Herrington and Sutcliffe returning your call today. At this point, those dates are firm for both the Ross deposition and Newman deposition. We have every expectation that they will go forward on the dates noticed.  If we do hear anything, if they do change, we'll certainly let you know, but at this point we feel pretty good that those are the dates that they'll take place and, of course, they'll be out here at our offices in Menlo Park

If you have any other questions regarding either deposition, please feel free to give me a ring

BN1 35040576.1

# EXHIBIT 6

**Voice-mail message from Brian VanderZanden on August 1, 2007 at 5:36pm**

**Alan,**

      This is Brian VanderZanden, from Orrick Herrington and Sutcliffe, returning your second phone call from yesterday and getting back to you regarding the email it looks like you just sent me here. As far as I know they do hot have, neither Floyd Ross nor Peter Newman are represented by counsel, and although I probably should let you know that we have a consulting arrangement with both individuals, so in the event that you do try to contact either one, I just advise that Enterasys should not try to seek any information relating to our conversations with Mr. Ross or Mr. Newman that could be privileged. Let's see what else, yeah, both have committed to appearing on those dates.

      So, if you have any other questions, give me a ring or send me an email

**LIS**

EXHIBIT 7



US006128665A

# United States Patent [19]

## Iturralde

| [11] | Patent Number: | 6,128,665 |
| --- | --- | --- |
| [45] | Date of Patent: | Oct. 3, 2000 |

[54] **SYSTEM FOR BROADCASTING MESSAGES TO EACH OF DEFAULT VLAN PORTS IN SUBSET OF PORTS DEFINED AS VLAN PORTS**

[75] Inventor: **Carol E. Iturralde**, Framingham, Mass.

[73] Assignee: **Cabletron Systems, Inc.**, Rochester, N.H.

[21] Appl. No.: **08/774,541**

[22] Filed: **Dec. 30, 1996**

[51] Int. Cl.⁷ ................................................. G06F 13/00
[52] U.S. Cl. ............................ 709/238; 709/242; 709/244
[58] Field of Search .................................... 370/401, 402; 395/500, 200.68, 200.72, 200.74

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| 4,823,338 | 4/1989 | Chan et al. . | |
| --- | --- | --- | --- |
| 5,394,402 | 2/1995 | Ross | 370/402 |
| 5,613,069 | 3/1997 | Walker | 395/200.68 |
| 5,684,800 | 11/1997 | Dobbins et al. | 370/401 |
| 5,734,865 | 3/1998 | Yu | 395/500 |
| 5,740,171 | 4/1998 | Mazzola et al. | 370/401 |
| 5,742,604 | 4/1998 | Edsall et al. | 370/401 |
| 5,752,003 | 5/1998 | Hart | 395/500 |

### OTHER PUBLICATIONS

Saunders, S., "Building Virtual LANS on a Real–World Budget Lanart's Segway Works with Ethernet Switches to Deliver Virtual LANS Powers at a Low Cost", Data Communications, vol. 24, No. 13, Sep. 21, 1995, pp. 39/40 XP000526194.

"Virtual LANS Get Real Ethernet Switch Makers are Taking the Lead in Deploying Virtual LANS Across Campus Networks," Data Communications, vol. 24, No. 3, Mar. 1, 1995.

Anderson, J. K., "Virtual LANS Take Network to Next Level", Computer Technology Review, vol. 16, No. 9, Sep. 1996, pP. 12, 14 XP00042987.

Morency et al., "VLANS: Can LaYer 3 Save the Day", Business Communications Review, vol. 26, No. 12, Dec. 1996, pp. 47–50 XP0020642987.

McGibbon, "Virtual LANS Come of Age" Telecommunications (International Edition), vol. 30, No. 6, Jun. 1996, pp. 48–52, XP002062191.

Networking Solutions Center, The Virtual LAN Technology Report, David Passmore and John Freeman. Dec. 9, 1996.

Strategic Directions, 3Com Transcend VLANS (Leveraging Virtual LAN Technology to Make Networking Easier), VLAN Strategic Directions Paper. Dec. 9, 1996.

Virtual LAN Communications (Statement of Direction: Cisco VLAN Roadmap, White Paper: Cisco IOS VLAN Services, Technology Brief: VLAN Interoperability). Dec. 9, 1996.

Cisco VLAN Roadmap (White Paper: Cisco IOS VLAN Services, White Paper: Virtual LAN Communications, Technology Brief: VLAN Interoperability). Dec. 9, 1996.

VLANs and Routers (Mixing routers, switches and VLANS) Dec. 9, 1996.

White Paper, Switching Paradigms (Everything Has Changed Except the Network) Dec. 9, 1996.

Fundamentals of Switching, Preface, Table of Contents, Chapters 1–5 (12 pages) Dec. 9, 1996.

Cisco Catalyst 5000 Modular Multilayer–Capable Switching System, Product Announcements.

Anderson, J.K. ("Virtual LANs Take To Next Level", Computer technology Review, vol. 16, No. 9, Sep. 1996, pp. 12–14.

*Primary Examiner*—Krisna Lim
*Assistant Examiner*—Philip B. Tran
*Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

[57]                    **ABSTRACT**

A data transmission network having a port–based default VLAN that limits flooding to other VLANs. The default VLAN receives a data packet, ascertains the destination address of the packet, and then determines if the destination port is one of the default VLAN ports. The data packet is transmitted to the destination port if it is one of the default VLAN ports, or to each of the default VLAN ports if the destination port is not one of the default VLAN ports. The data packet is not transmitted to any other non–default VLAN port.

**8 Claims, 4 Drawing Sheets**





*FIG. 1*



*FIG. 2*



**FIG. 3**



**FIG. 4**

6,128,665

**1**

# SYSTEM FOR BROADCASTING MESSAGES TO EACH OF DEFAULT VLAN PORTS IN SUBSET OF PORTS DEFINED AS VLAN PORTS

## FIELD OF THE INVENTION

This invention generally relates to data transmission networks and, more particularly, to virtual local area networks.

## BACKGROUND OF THE INVENTION

A data network typically includes several nodes connected together by a data transport medium. One common method of transmitting data between the nodes is to break the data up into discrete "packets" of data. Packets can be transported over the medium by any one of a variety of transport techniques. In applications utilizing packetized data, data to be transported first is broken up into discrete packets of data, then transmitted through the network medium, and finally reassembled at a destination node. In accordance with current packet protocol, each packet generally comprises a header and an information field. The header contains the information used to transport the cell from one node to the next while the packet data is contained in the information field. Among other information in the header is the destination address of the data packet.

A local area network (i.e., "LAN") is a type of local data network commonly used in a single office or building. LANs are an efficient mechanism for maximizing use of network resources by members of the LAN. Simple LANs typically include two or more nodes (e.g., a server, computer, printer, or other resource) that are interconnected by a common physical connection such as, for example, a hub. Data switches also may be connected to the hub for directing data traffic and for connecting the LAN to other data networks.

LANs can be inconvenient and expensive to maintain. For example, moving a user to another location within a relatively large office building often requires that the LAN be rewired and reconfigured. This can be cumbersome and expensive. The art has responded to this problem by developing virtual local area networks (i.e. "VLANs").

A VLAN is generally defined as a group of nodes interconnected by software to form a single logical broadcast domain. VLANs may be connected to nodes that are members of any number of physical LAN segments. Among many advantages, VLANs enable network administrators to create logical groupings of users and network resources, thereby allowing remote users and resources to appear as if they are members of a single LAN. This enables companies and other organizations to build dynamic, flexible, and distributed LANs, thus simplifying physical moves of a user in a network.

VLANs may be formed by defining logical groups of users within the VLAN. One such VLAN, known as a "port-based" VLAN, defines the VLAN as a collection of switch ports on one or more switches across a hub. Users connected to those defined switch ports therefore are members of the defined VLAN. Broadcast messages directed to that VLAN may be transmitted through the defined switch ports only. Known port-based VLANs typically are implemented on a switch to include a default VLAN, in addition to other VLANs that may be formed on the switch. During manufacture, the default VLAN is defined as every port on a single switch. The number of switch ports defining the default VLAN decreases, however, as ports on the switch are used for defining other VLANs. Accordingly, on an exemplary eight-port switch having a first VLAN defined by ports

**2**

one and two, the default VLAN will be defined by remaining ports three through eight.

Known port-based default VLANs have data leakage problems that can compromise the security of data transmitted across a network. Specifically, port-based default VLANs transmit a data packet to every switch port when that packet is received by the default VLAN and is destined for a port that is not in the default VLAN. Continuing with the above example, a data packet received on a port defining the default VLAN (i.e., one of ports three through eight) and destined for another port also on the default VLAN will be transmitted to the destination port only. In the event that the data packet was destined for a port on the first VLAN (i.e., port one or two), however, the packet would be transmitted to all of the ports on the switch, thus creating the above mentioned security problem.

Accordingly, it would be desirable to provide a port-based default VLAN that prevents such leakage problems between VLANs. It is among the general objects of this invention to provide such a device and method.

## SUMMARY OF THE INVENTION

In accordance with the principles of the invention, a port-based default VLAN is provided that prevents leakage problems across VLANs. To that end, the default VLAN includes means for transmitting data received by the default VLAN to ports defining the default VLAN only. No other ports on the switch will receive a data packet that was received on a port defining the default VLAN.

In accordance with another aspect of the invention, each of the ports on a plurality of switches connected to a hub are configured, during manufacture, to define a default VLAN spanning the plurality of switches. To that end, the default VLAN includes a bus in the hub, an enable switch for electrically connecting each of switches to the bus, and means for defining each of the switch ports as the default VLAN.

It is among the objects of the invention to provide port-based default VLAN and method that prevents leakage across the ports of a switch.

It is another object of the invention to provide a port-based default VLAN that is, configured during manufacture, to span a plurality of switches connected to a hub.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and further advantages of the invention may be better understood by referring to the following description in conjunction with the accompanying drawings and which:

FIG. 1 is a block schematic diagram of a partial data network assembly for implementation of the invention;

FIG. 2 is a block schematic diagram of a switch that forms a port-based, default VLAN;

FIG. 3 is a schematic diagram of a data packet; and

FIG. 4 is a flow chart that specifies the method used for preventing leakage from the default VLAN.

## DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

FIG. 1 shows a partial data network assembly **10** for implementation of the invention, comprising a hub **12** having hub ports **14**, and switches **16** connected to the hub ports **14**. The hub **12** may be a DEChub Multiswitch 900, available from Digital Equipment Corporation of Maynard,

6,128,665

3

Mass. Each of the switches 16 has a plurality of switch ports 18 (e.g., eight) connecting various network resources, such as servers, computers, and printers, to the network. A bus 20 spanning each of the hub ports 14 may be enabled by an enable switch 24 to interconnect each of the switches 16. This consequently interconnects each of the switch ports 18 across each of the interconnected switches 16. In the preferred embodiment, the bus 20 is enabled during manufacture, thus defining the default VLAN as all of the ports of the interconnected switches 16. The enable switch 24 may be implemented as firmware within the hub 12, or as a manually actuated switch on the hub 12.

New port-based VLANs may be formed across one or more of the switches 16 by selecting combinations of interconnected switch ports 18. Selected switch ports 18 for new VLANs consequently are removed from the default VLAN definition, thus reducing the size of the default VLAN. No data packets received on any one of the default VLAN ports may be transmitted to the ports that define other VLANs.

FIG. 2 shows an exemplary eight port switch 16 forming a default VLAN, VLAN 2, and VLAN 3. Ports one and two define the default VLAN, ports three to five define VLAN 2, and ports six to eight define VLAN 3. Data packets received on switch ports one or two may be transmitted to either or both of those switch ports 18 only, thus preventing leakage to VLAN 2 and VLAN 3. For example, a data packet received on port two having a destination address of port four will be transmitted to both ports one and two only. Similarly, a data packet received on port two having a destination address of port one will be transmitted to port one only. VLAN 2 and VLAN 3 limit leakage in like fashion.

FIG. 3 shows a data packet 26, comprising a header 28 and an information field 30. The destination address of the data packet 26 is stored in the header 28 of the data packet 26. The switch port 18 associated with the destination address is ascertained by conventional means within the switch 16 receiving the data packet 26. This information is used by the method shown in FIG. 4.

FIG. 4 shows a flow chart that specifies the method used for preventing leakage from the default VLAN. More particularly, the destination port address is ascertained from the header 28 of a data packet received on one of the default VLAN ports (step 400). At step 402, it is determined if the destination port is one of the default VLAN ports. If the destination port is one of the default VLAN ports, that data packet is transmitted to the destination port only (step 404). If the destination port is not one of the default VLAN ports, the data packet is transmitted to all of the default VLAN ports only (step 406). The data packet is transmitted to no other switch ports 18.

The default VLAN may be assigned a default VLAN tag that is assigned to a data packet when it enters through one of the default VLAN ports. The switch 16 then may be configured to prevent transmission of any data packet, having an associated default VLAN tag, through any of the other, non-default VLAN ports.

The invention may be implemented by means of a programmable logic chip within the one or more switches 16 used for the invention. The invention may also be implemented as firmware stored within those switches 16. Both implementations may be programmed by conventional methods.

In an alternative embodiment, the invention may be implemented as a computer program product for use with a computer system. Such implementation may include a series

4

of computer instructions fixed either on a tangible medium, such as a computer readable media (e.g. diskette, CD-ROM, ROM, or fixed disk) or transmittable to a computer system, via a modem or other interface device, such as communications adapter connected to the network over a medium. The medium may be either a tangible medium (e.g., optical or analog communications lines) or a medium implemented with wireless techniques (e.g., microwave, infrared or other transmission techniques). The series of computer instructions embodies all or part of the functionality previously described herein with respect to the invention. Those skilled in the art should appreciate that such computer instructions can be written in a number of programming languages for use with many computer architectures or operating systems. Furthermore, such instructions may be stored in any memory device, such as semiconductor, magnetic, optical or other memory devices, and may be transmitted using any communications technology, such as optical, infrared, microwave, or other transmission technologies. It is expected that such a computer program product may be distributed as a removable media with accompanying printed or electronic documentation (e.g., shrink wrapped software), preloaded with a computer system (e.g., on system ROM or fixed disk), or distributed from a server or electronic bulletin board over a network (e.g., the Internet or World Wide Web).

The inventive default VLAN thus prevents leakage to other VLANs by transmitting received data packets to default VLAN ports only. Security thus is ensured for data packets transmitted to the default VLAN. Furthermore, the initial size and scope of the default VLAN is increased by enabling the enable switch 24, during manufacture, to interconnect each of the switches 16 connected to the hub 12.

While the invention has been shown and described above with respect to various preferred embodiments, it will apparent that the foregoing and other changes of the form and detail may be made therein by one skilled in the art without departing from the spirit and scope of the invention. These and other obvious modifications are intended to be covered by the following claims.

What is claimed is:

1. A port based default VLAN formed on one or more interconnected networking switches, each switch having one or more switch ports, all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by one or more of the plurality of switch ports, the one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports defining a second VLAN, the default VLAN comprising:

means for receiving a data packet through one of the default VLAN ports;

means for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

means for determining whether the destination port is one of the default VLAN ports;

first means, responsive to the determining means, for transmitting the data packet to the destination port if the determining means determines that the destination port is one of the default VLAN ports; and

second means, responsive to the determining means, for transmitting the data packet to each of the default VLAN ports if the determining means determines that the destination port is not one of the default VLAN ports,

the at least one switch port defining the second VLAN being free from transmission, from the default VLAN, of the data packet.

6,128,665

**5**

2. The default VLAN as defined by claim **1** wherein the data packet includes a header and the ascertaining means ascertains the destination port from the packet header.

3. The default VLAN as defined by claim **1** further including means for tagging the data packet.

4. A method of limiting broadcast messages from a port based default VLAN, the default VLAN formed on one or more interconnected networking switches, each switch having one or more switch ports, all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by one or more of the plurality of switch ports, the one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports defining a second VLAN, the method comprising the steps of:

   A. receiving a data packet through one of the default VLAN ports;

   B. ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

   C. determining whether the destination port is one of the default VLAN ports;

   D. transmitting the data packet to the destination port if the destination port is one of the default VLAN ports;

   E. transmitting the data packet to each of the default VLAN ports if the destination port is not one of the default VLAN ports; and

   F. preventing transmission, from the default VLAN, of the data packet to the at least one switch port defining the second VLAN.

5. The method as defined by claim **4** further including the step of:

   G. tagging the data packet.

6. A computer program product for use with a switching device, the computer program product limiting broadcast messages from a port based default VLAN, the default VLAN formed on one or more interconnected networking switches, each switch having one or more switch ports, all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by one or more of the plurality of switch ports, the one or more of the plurality of

**6**

switch ports being default VLAN ports, at least one of the plurality of switch ports defining a second VLAN, the computer program product comprising a computer usable medium having computer readable program code thereon, including:

   program code for receiving a data packet through one of the default VLAN ports;

   program code for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

   program code for determining whether the destination port is one of the default VLAN ports;

   program code for transmitting the data packet to the destination port if the program code for determining determines that the destination port is one of the default VLAN ports; and

   program code for transmitting the data packet to each of the default VLAN ports if the destination port is not one of the default VLAN ports,

   program code for preventing transmission, from the default VLAN, of the data packet to the at least one switch port defining the second VLAN.

7. The computer program product as defined by claim **6** further including program code for tagging the data packet.

8. A port based default VLAN formed on a hub having at least two networking switches connected thereto, each switch having one or more switch ports, the port based default VLAN comprising:

   a bus in the hub;

   an enable switch for electrically connecting each of the VLAN ports to the bus;

   means for defining a subset of the one or more switch ports of each switch as default VLAN ports;

   means for receiving, at at least one of the default VLAN ports, a packet destined for a port that is not defined as one of the default VLAN ports, including means for broadcasting the received packet to each of the default VLAN ports in the subset of ports defined as default VLAN ports.

\*   \*   \*   \*   \*

EXHIBIT 8



US006147995A

# United States Patent [19]

Dobbins et al.

[11] **Patent Number:** **6,147,995**

[45] **Date of Patent:** **\*Nov. 14, 2000**

[54] **METHOD FOR ESTABLISHING RESTRICTED BROADCAST GROUPS IN A SWITCHED NETWORK**

[75] Inventors: **Kurt Dobbins**, Bedford; **Phil Andlauer**, Londonderry; **Michael Skubisz**, Durham, all of N.H.

[73] Assignee: **Cabletron Systems, Inc.**, Rochester, N.H.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/387,317**

[22] Filed: **Aug. 31, 1999**

**Related U.S. Application Data**

[63] Continuation of application No. 08/960,919, Oct. 30, 1997, Pat. No. 5,946,308, which is a continuation of application No. 08/559,738, Nov. 15, 1995, Pat. No. 5,684,800.

[51] **Int. Cl.**[7] .............................. **H04L 12/28**; H04L 12/56
[52] **U.S. Cl.** ............................................. **370/392**; 370/400
[58] **Field of Search** ................................... 370/392, 390, 370/396, 389, 400, 401, 402, 403, 404, 432, 469, 474, 386, 388, 395, 397, 398, 399, 405, 406, 409, 420, 422, 437

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,823,338 | 4/1989 | Chan et al. | 370/85.1 |
| 5,140,585 | 8/1992 | Tomikawa | 370/60.1 |
| 5,208,811 | 5/1993 | Kashio et al. | 370/94.1 |
| 5,394,402 | 2/1995 | Ross | 370/402 |
| 5,444,702 | 8/1995 | Burnett et al. | 370/254 |
| 5,485,455 | 1/1996 | Dobbins et al. | 370/60 |
| 5,684,800 | 11/1997 | Dobbins et al. | 370/401 |
| 5,740,171 | 4/1998 | Mazzola et al. | 370/401 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

WO 95/01023  5/1995  WIPO .
WO 95/04420  9/1995  WIPO .

OTHER PUBLICATIONS

Cheriton, David R. et al., "Host Groups: A Multicast Extension For Datagram Internetworks", *Computer Systems Laboratory Stanford University* , pp. 172–179, 1985.

Paliwoda, K. "Transactions Involving Multicast", *Computer Communications* , vol. 11, pp. 313–318, Dec. 11, 1988.

Truong, Hong Linh, "LAN Emulation on an ATM Network", *IEEE Communications Magazine* , pp. 70–85, May 1995.

Lin, Tzung–Pao, "A Platform For Seamless Interworking Among Conventional LANs and ATM Networks", *IEEE Communications* , pp. 296–301, Nov. 28, 1994.

Biagioni, Edoardo, "Designing a Practical ATM LAN", *IEEE Network* , pp. 32–39, Mar. 1993.

Catania, Vincenzo et al., "A Routing Strategy For Man Interconnection", *IEEE Communications Magazine* , pp. 608–615, 1991.

Newman, Peter, "ATM Local Area Network", *IEEE Communications Magazine* , pp. 86–98, Mar. 1994.

Asoh, J. et al. "Virtual LAN Realization on an ATM Connectionless Public Network", 2nd Asia Pacific Conference on Communications, vol. 2, pp. 516–520, Jun. 1995.

*Primary Examiner*—Dang Ton
*Assistant Examiner*—Phirin Sam
*Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

[57] **ABSTRACT**

Method and apparatus for establishing restricted broadcast groups in a switched network. The method assigns different virtual LAN identifiers (VLAN-IDs) to different subsets of associated end systems or access ports. Tables are maintained for mapping the VLAN-IDs with associated end systems and access ports. When a broadcast packet is received at a first switch, it is encapsulated with a VLAN header, including the VLAN-IDs, and sent out a multicast channel to all other switches in the network (domain). The original packet is sent out the other access ports of the receiving switch for the designated VLAN-IDs. The switches receiving the VLAN packet remove the header and send the original packet out access ports associated with the VLAN-IDs extracted from the header. The method provides a mechanism for forwarding broadcast packets of a protocol not supported by the switching mechanism, as well as multicast packets and unicast packets from undiscovered end systems.

**35 Claims, 11 Drawing Sheets**



**6,147,995**
Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,742,604 | 4/1998 | Edsall et al. | 370/401 |
| 5,751,967 | 5/1998 | Raab et al. | 709/228 |
| 5,752,003 | 5/1998 | Hart | 709/223 |
| 5,818,842 | 10/1998 | Burwell et al. | 370/397 |
| 5,920,705 | 7/1999 | Lyon et al. | 709/240 |
| 5,963,556 | 10/1999 | Varghese et al. | 370/401 |
| 6,005,864 | 12/1999 | Krause | 370/395 |



**FIG. 1**



## FIG. 2



## FIG. 3



FIG. 4-A



B
IS DA A BROADCAST ?
309
YES
NO
GIVE TO PROTOCOL-SPECIFIC CALL PROCESSOR (TREAT AS BROADCAST)
310
GIVE TO GENERIC CALL PROCESSOR (TREAT AS UNKNOWN SA-DA CONNECTION)
318
DECODE PACKET TO FIND NETWORK SOURCE AND DEST. ADDRESSES
311
NETBIOS
APPLE TALK
IP (ARP)
DISCARD PACKET IF NO PROTOCOL-SPECIFIC CALL PROCESSOR SUPPORTS
321
ASK SCS TO SETUP CONNECTION BETWEEN SA-DA FOR THE INPUT PORT IT ARRIVED ON
319
DISCARD PACKET
320
A
IF ARP REQUEST GET TARGET IP ADDRESS
312
ASK EXTERNAL DIRECTORY FOR MAC ADDRESS OF TARGET IP
313
GET MAC ADDRESS BACK
314
ASK SCS TO SETUP CONNECTION BETWEEN SOURCE AND TARGET MAC
315
FORM AN ARP REPLY WITH TARGET MAC
316
SEND REPLY TO SA
317
A

FIG. 4-B



*FIG. 5*

TABLE 1 : END SYSTEM / VLAN MAPPING FOR SWITCH 11

| ACCESS PORT | END SYSTEMS HEARD | VLAN ID |
|:---:|:---:|:---:|
| 1 | 20A | VLAN 100 |
| 2 | 20B | VLAN 100 |
| | | VLAN 20 |
| 3 | 20C | VLAN 20 |
| • | • | • |
| • | • | • |
| • | • | • |

## FIG. 6

TABLE 2 : VLAN / ACCESS PORT MAPPING FOR SWITCH 11

| VLAN ID | ACCESS PORT |
|:---:|:---:|
| VLAN 100 | 1 |
| | 2 |
| VLAN 20 | 2 |
| | 3 |
| • | • |
| • | • |

## FIG. 7

VLAN PACKET

| VLAN HEADER | BROADCAST PACKET |
|:---:|:---:|

## FIG. 8



FIG. 9



FIG. 10



*FIG. 11*





B

48 — DISCOVER SRC ADDRESS

49 — CREATE SIGNAL ENTRY-LOCAL TBL.

50 — CREATE SIGNAL ENTRY

51 — SEND SIGNAL TO ACMS

52 — FORMAT RESPONSE TO SIGNAL

53 — GET VLAN LIST FROM SIGNAL RSP

54 — GET ALL ACCESS PORTS FOR LIST

55 — SEND ORIGINAL PKT OUT ACCESS PORTS

56 — GET NETWORK PORTS FROM CNX TABLE

57 — ENCAPSULATE PKT

58 — SEND ENCAPSULATED PKT OUT NETWORK PORTS

59 — DELETE SIGNAL ENTRY

60 — RETURN

FIG. 12



FIG. 13

6,147,995

# 1

## METHOD FOR ESTABLISHING RESTRICTED BROADCAST GROUPS IN A SWITCHED NETWORK

This application is a continuation of application Ser. No. 08/960,919 filed on Oct. 30, 1997 which issued as U.S. Pat. No. 5,946,308 on Aug. 31, 1999: which is a continuation of application Ser. No. 08/559,738 filed Nov. 15, 1995 and which issued as U.S. Pat. No. 5,684,800 on Nov. 4, 1997.

### FIELD OF THE INVENTION

This invention relates to packet switched data communications networks, and more particularly to an apparatus and method for establishing restricted broadcast groups known as virtual LANs (VLANS) which provide a simple but robust mechanism that allows broadcast and/or multicast packets to be "flooded" through a switched domain and transmitted only to those users or ports defined for a particular VLAN.

### RELATED APPLICATIONS

The subject matter of the above application may be advantageously combined with the subject matters of the following copending and commonly owned applications, which are hereby incorporated by reference in their entirety:

U.S. Ser. No. 08/188,238 entitled "Network Having Secure Fast Packet Switching And Guaranteed Quality Of Service," filed Jan. 28, 1994 by Kurt Dobbins et al.; and

U.S. Ser. No. 08/187,856 entitled "Distributed Chassis Agent For Network Management," filed Jan. 28, 1994 by Brendan Fee et al.

### BACKGROUND OF THE INVENTION

Most data communications networks today rely heavily on shared medium, packet-based LAN technologies for both access and backbone connections. These networks use bridges and routers to connect multiple LANs into global internets. An internet router must be capable of processing packets based on many different protocols, such as IP, IPX, DECNET, AppleTALK, OSI, SNA and others. The complexities of building networks capable of routing packets on the global internet using different protocols is a challenge for both vendors and users.

In U.S. Ser. No. 08/188,238 to Dobbins (see related applications above), there is described a new secure fast packet switching (SFPS) technology which provides the same or better reliability and security as routers, but with much greater performance and without an increase in cost. The SFPS system avoids the complexities and costs of providing multi-protocol routers. Also, the SFPS system provides capabilities which routers do not, such as the ability to create separate logical work group LANs on the same physical network and the ability to guarantee a quality of service (QOS) by providing dedicated switched paths through the network.

SFPS provides high performance packet switching based on physical layer addresses such as source and destination MAC IDs—the unique medium access control (MAC) address assigned to each end system by the IEEE. End-to-end connections are determined by a network management application that provides security and best path routing determinations based on a number of constraints. By switching packets based only on MAC layer information, network infrastructure remains protocol insensitive.

# 2

More specifically, SFPS uses source and destination MAC addresses which alone, or in combination with an input port on a switch, form a unique "connection identifier" for any communication exchange between designated end systems. As an example:

input port=2

source MAC address=00:00:1D:01:02:03

destination MAC address=00:00:1D:11:22:33

together form a "tuple" bound to a specific unidirectional flow from a source address to a destination address. All packets that have this tuple are automatically switched according to the operation of the SFPS.

Network infrastructures are built around a core switching fabric, which provides the physical paths or routes that allow users to send information to one another. Access to the switching fabric is gained through an access port. Access ports provide several functions—most importantly, they provide security and accounting services. End systems such as personal computers (PCs), workstations and servers connect to an access port using one or more access technologies such as Ethernet, Token Ring, FDDI, or ATM.

In traditional bridge and router devices, each packet is treated as an independent unit of data which is individually processed by application of access and security constraints, as well as path determination. In contrast, with SFPS this processing is done only on initial probe packets which are decoded, and through use of a central directory of end system constraints policy, call attributes, location, paths, quality of service, etc., the connection is either rejected or accepted. If accepted, the path is determined and switches along the path are "programmed" to allow subsequent packets on this "connection" to be switched. In either case, subsequent datagrams are either switched or discarded without having to reapply all of the security and access control and path determination logic.

The SFPS switching technology may be constructed as: software objects which exist in embedded systems as firmware; software objects which are part of an application on a commercial computer system; application specific integrated circuits (ASIC); or functionally equivalent hardware components.

It is common for internetworking devices to "route" the protocols that a device supports, and "bridge" the protocols that are not supported for routing. In addition, some protocol frames (such as DECs LAT) are actually unroutable. In SFPS switches, there are protocol-specific call processors to route protocol-specific broadcast frames (note that unicast frames can be processed by a "generic" call processor that does not decode or translate the frame at all, but instead makes the connection request based on the source and destination unicast MAC addresses in the frame). However, a problem arises in that an SFPS switch has nothing equivalent to bridging of multicast and broadcast packets for non-supported protocols. Thus, until a protocol-specific call processor is implemented in a switch, the switch must discard any broadcast or multicast frames it does not understand.

### SUMMARY OF THE INVENTION

A method and apparatus are provided for establishing restricted broadcast groups within a switching fabric, known as virtual LANs (VLANs). The VLANs provide a simple but robust mechanism for allowing broadcast and multicast packets to be "flooded" through the switching fabric and transmitted only to those users or ports defined for a particular VLAN.

6,147,995

3

More specifically, the switched network includes a plurality of end systems and switches connected by links. The switches have access ports connected to end systems and network ports connected to other switches. Each end system has a unique physical layer address, e.g., MAC address. In accordance with this invention, different virtual LAN identifiers (known as VLAN-IDs) are assigned to different subsets of associated end systems or access ports. Each access switch maintains a first table for mapping VLAN-IDs to associated end systems and/or access ports (the End System/VLAN table). Each access switch also maintains a second table for mapping access ports (of associated end systems) to associated VLAN-IDs (the VLAN/Access Port table).

According to a first embodiment, the restricted V-LAN flooding is used for broadcast packets of a protocol not supported by the switches. When an original broadcast packet (of an unsupported protocol) is received by a first access switch from a first end system, the first switch determines and adds a VLAN header to the original data packet to create a VLAN packet. The VLAN header includes designated VLAN-IDs from the first table. The designated VLAN-IDs are assigned based on the physical source address of the first end system. The first access switch then forwards the VLAN packet to all other switches on a multicast channel of point-to-point connections between the switches. The first switch also forwards the original broadcast packet out the access ports identified in the second table for the designated VLANS (except the originating port).

The other switches receive the VLAN packet and extract the designated VLAN-IDs from the VLAN header and then forward the original packet out the access ports, defined in the other switch's second table, for the designated VLAN-IDs.

Other embodiments include the designation of a default VLAN-ID which maps to all access ports, a reserved VLAN-ID for use with multicast packets, and restricted flooding for packets directed to an undiscovered end system. Still another embodiment provides a single or distributed network server on the multicast channel (between switches) to handle broadcast and multicast packets, which embodiment scales better for larger networks.

More specific methods and a particular apparatus for implementing the present invention are described in the following detailed description and drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic illustration of a network topology built with SFPS switches.

FIG. 2 is a schematic illustration of an SFPS switch.

FIG. 3 is a logical view of an SFPS switch.

FIG. 4, combining FIGS. 4-A and 4-B, is a flowchart showing processing of a data packet by an SFPS switch.

FIG. 5 is a schematic illustration of a network topology including three virtual networks (VLAN 100, VLAN 5, and VLAN 20) according to the present invention.

FIG. 6 shows an end system table for mapping VLAN-IDs to associated end systems.

FIG. 7 shows a port table for mapping access ports (of associated end systems) to associated VLAN-IDs.

FIG. 8 shows one embodiment of a VLAN packet, in which a VLAN header is appended to an original data packet.

FIG. 9 is a schematic illustration of a network topology utilizing a default VLAN according to the present invention.

4

FIG. 10 is a schematic illustration of a network topology utilizing a distributed VBUS server according to an alternative embodiment of the present invention.

FIG. 11 is a flow chart showing the redirected flow of a broadcast or multicast packet to the VBUS service.

FIG. 12 is a flow chart showing the call processing performed by the VBUS service.

FIG. 13 is a flow chart showing the channel listening process of the VBUS service.

DETAIL DESCRIPTION

The SFPS Network—Switching of Unicast Packet with Generic Call Processor and Switching of Protocol-supported Broadcast Packets

According to one embodiment, the establishment of VLANs for transmitting broadcast/multicast packets of non-supported protocols is intended for use in the SFPS switched network described in U.S. Ser. No. 08/188,238. The following is a general description of the operation of switching "unicast" packets on that network, as illustrated in FIGS. 1–4.

FIG. 1 shows a representative network topology built with six secure fast packet switches (SFPS) labeled S1–S6 connected by links L. Each switch has for example four ports; some ports are labeled A for access and some are labeled N for network. The end systems are connected to the access ports by links L and are labeled "M__". One end system is a network management station or server (NMS) M10, which includes a connection server.

FIG. 2 is a schematic illustration of an SFPS switch 91 having a plurality of ports 92. A host port 93 connects the switch to its host CPU 90, which may be an i960 microprocessor sold by Intel Corporation. The host CPU is connected to a system management bus (SMB) for receipt and transmission of discovery and other control messages.

FIG. 3 illustrates the internal operation of the switch. The SFPS switch 86 includes in ports 80, out ports 81, a connection database 82, a look-up engine 83, and a multi-level programmable arbiter MPA 84. The switch 86 sends and receives messages from the host agent 85, which includes a management agent 87, a discovery agent 88, and a call processing agent 89.

The management agent 87 provides external control of the configuration and operation of the SFPS switch, through the network management system.

The discovery agent 88 provides a mapping of end systems to switching ports through a passive listening (snooping) capability and a registering of end system addresses and port locations of the host switch with a common external directory. Adjacent switches are also discovered and mapped, but this may be done with an explicit switch-to-switch protocol (nonpassive).

The call processor 89 provides a means for requesting connections to be established between two end systems. Unicast frames are handled by a "generic" call processor which programs the switches based on the source and destination MAC addresses. In a case where the source and destination MAC addresses are not in the packet frame, i.e., usually in a frame that has a broadcast—all hosts—MAC address, a "protocol-specific" call processor (if available) will decode the packet to find source or destination network addresses and use these to map back to the physical addresses via the external directory. Once the end system MAC addresses are known, the protocol-specific call processor will then request the connection between the end systems. If the broadcast frame was a probe or address resolution packet (i.e., an implied connection request), the

6,147,995

5                                    6

call processor will return a probe reply as a "proxy" which gives the destination end system MAC addresses. Subsequently, the source end system can then send packets directly to the destination based on its MAC address.

FIG. 4 is a flow chart illustrating what happens from the time a data packet is received on an in port of the switch, until it is sent on the correct out port.

Referring to FIG. 4-A, in step 300 the host CPU 90 is initialized. The host programs the connection database 82 to send any "unknown" or "broadcast" connections to the host port (step 301). The switch then waits for a packet to arrive (step 302). Once a packet has arrived (step 303), the switch extracts the source MAC address, destination MAC address, and identifies the inbound port on which the packet was received (step 304). The look-up engine 83 checks to see whether this source-destination pair is already located in the connection database 82 (step 305). If it is not found, the packet is given to the host agent 85 (step 308). The call processor and the host agent determine whether it is a broadcast destination (step 309). If the answer is yes, a protocol-specific call processor (if available) decodes the packet to find the network protocol source and destination addresses (steps 310–311). A different protocol decode logic would be provided for each network protocol. For example, in the IP protocol, if an ARP request is received, the call processor would get the target IP address (step 312). It would then ask the external directory for the MAC address of the destination IP (step 313). In the next step 314, the directory sends the MAC destination address back to the call processor. The call processor 89 then asks the connection server (SCS) to set up a connection between the source MAC and destination MAC (step 315). The call processor 89 forms an ARP reply packet by putting the destination MAC address inside the packet (step 316), and the call processor sends a reply to the source address (step 317). It should be noted that this reply allows the source end system to update its private mapping of the destination IP address to a nonbroadcast MAC address. All subsequent packets to this destination IP address will be properly framed with the source and destination MAC address for which connections will now exist.

Note that if no call processor exists which supports the relevant protocol, the broadcast packet is dropped (step 321). The present invention is a method of handling such packets.

If the packet is not a broadcast packet, it is given to the "generic" call processor (treated as an unknown SA-DA connection—step 318), which asks the connection server to set up a connection and forward the packet (step 319); the call processor then discards the packet (step 320).

Returning to step 305, if the source and destination MAC pair are found in the connection database 82, the data packet is sent to the switch outport(s) 81 defined in the database (step 306). In next step 307, the management agent 87 collects statistics regarding transmissions through the switch and sends them to the SCS (connection server).

Restricted Broadcast Groups for Non-supported Broadcast, MultiCast and Unknown Unicast Packets

FIG. 5 illustrates generally a logical view of the present invention for establishing restricted broadcast groups or virtual LANs (VLANs) within a switched network. The representative network 10 has four SFPS switches 11–14, all of the switches being connected by physical links forming point-to-point connections 15, and which physical connections together form a logical multicast channel 16. The multicast channel 16 connects the network ports of all switches. A plurality of end systems 20A–20L extend from

access ports on the various switches 11–14. The end systems are shown grouped into different subsets known as virtual LANs 17, 18 and 19, which are given VLAN identifiers VLAN 100, VLAN 5, and VLAN 20, respectively. As shown 30 in FIG. 5, "VLAN 20" includes end systems 20B, 20C, 20J and 20K. "VLAN 5" includes end systems 20D, 20G, 20H and 20L. "VLAN 100" includes end systems 20A, 20B, 20D, 20F, 20H and 20I.

During a discovery time, as each switch 11–14 is discovered, it is put in a point-to-point connection that connects all SFPS switches. This forms the multicast channel 16 which all switches use between themselves.

Also during the discovery time, each switch 11–14 discovers its associated end systems (i.e., switch 11 discovers end systems 20A, 20B, 20C) and enters these end systems in a common directory which assigns VLAN-IDs to the end systems. The directory returns a mapping of VLAN-IDs and associated end systems, which mapping each switch uses to build two internal tables: a first table that lists the VLAN-ID for each end system (the End System/VLAN Table—see FIG. 6), and a second table that defines a port mask for each VLAN-ID (the VLAN/Access Port Table—see FIG. 7).

During real time operation of the system, a first switch (for example switch 11) receives a broadcast or multicast packet that it cannot process with a protocol-specific call processor. The switch will encapsulate the original packet and insert a VLAN header containing a list of VLAN-IDs for the source end system (see FIG. 8), before flooding the encapsulated (VLAN) packet out the multicast channel 16 to all other switches. For example, if first switch 11 receives a broadcast packet from first end system 20B, switch 11 returns from its end system table (FIG. 6) that VLAN 100 and VLAN 20 are associated with source end system 20B. First switch 11 will insert VLAN 100 and VLAN 20 into the VLAN header (FIG. 8). In addition, first switch 11 determines the port masks for VLAN 100 and VLAN 20 from its port table (FIG. 7), and then sends the original broadcast packet out all access ports of the first switch in VLAN 100 or VLAN 20 (except for the source port 2); in this case, the original packet is sent out access port 1, which connects to end system 20A, also in VLAN 100, and out access port 3, which connects to end system 20C, also in VLAN 20.

As each of switches 12, 13 and 14 receive the VLAN packet on multicast channel 16, they strip off the encapsulated VLAN header and look up in their respective VLAN/Access Port table for any associate mapping to VLAN 100 and VLAN 20. Switch 12 determines in its port table that it has associated access ports to end systems 20D and 20F designated for VLAN 100. Similarly, switch 13 determines from its port table that it has associated access ports to end systems 20H and 20I for VLAN 100. Switch 14 determines from its port table that it has associated access ports to end systems 20J and 20K for VLAN 20. The original packet is thus transmitted out the access ports to end systems 20D, 20F, 20H, 20I, 20J and 20K.

The following describes the changes and additional functionality required of the SFPS access switches to support the establishment of VLANs for multicast and broadcast packets. Switches with only network ports continue to function as described in prior U.S. Ser. No. 08/188,238 to Dobbins et al.

The Switch-to-switch Multicast Channel

Each SFPS switch supports the multicast channel 16 by having a connection in each switch that connects it to all other switches in the network (or within a subsection of the network, such as a domain). This is in essence a point-to-multipoint connection in each switch. It should be noted that

6,147,995

7

this multipoint connection is only between the switches themselves, which scales better than having a multipoint connection between all users (end systems).

A connection server (i.e., M10 in FIG. 1), which includes a common directory of all switches, has the responsibility to program the multicast channel connection each time a new switch joins or leaves the topology, i.e., such a change may be detected by neighbor advertisement signals sent by the switches.

The End System/VLAN Table (FIG. 6)

Each switch that has an access port maintains a table of end systems heard on each access port, and a list of VLANs to which each end system belongs. An end system can belong to more than one VLAN at any given time.

The assignment of VLAN-IDs may be accomplished in several ways. First, the VLAN-IDs may be maintained by a common directory. For example, as each end system is discovered by an access switch, it is registered with a common directory of end systems for the entire network, and the directory then returns a list of VLAN-IDs to the access switch with the "End System Discovery Message ACK." Alternatively, a management application may administratively assign the VLAN-IDs, and manage the end system and port tables in the switch. As a further alternative, an access switch may send a Resolve signal to a directory, which directory then returns a mapping of VLAN-IDs for an associated end system.

The VLAN/Access Port Table (FIG. 7)

Each switch having an access port maintains a port table which maps VLANs to associated access ports. This table may be filled in dynamically through the implicit mapping of VLANs to end systems. Each time a VLAN is mapped to an end system, it is automatically inserted in a port-mapping entry for the source port on which the end system is located. Ports, like end systems, can belong to more than one VLAN at any given time; the port's VLAN mapping strictly depends upon the VLAN of the end systems on it. The out ports for each VLAN entry in the table essentially define the flood mask for the access ports.

The Default VLAN-ID

A default VLAN-ID (VLAN-ID=1) may be used to map an end system to a VLAN when no VLAN-ID had been administratively assigned. The default VLAN is a special case which maps to all access ports. This allows flooding out all ports when no VLAN is defined. For example, FIG. 9 illustrates a network of four switches 30, 31, 32, 33, connected by multicast channel 35, prior to assignment of any specific VLAN-IDs such that all end systems fall within a default VLAN 36.

The VLAN Call Processor

The VLAN call processor is essentially a default call processor for broadcast/multicast packets for which no protocol-specific call processor exists. For example, an ARP call processor would be able to decode an ARP broadcast message.

The VLAN call processor would take any packet it receives and then encapsulate the broadcast/multicast packet in a header, the header containing a list of VLAN-IDs on which the packet belongs. The VLAN-ID list may be determined by using the source MAC address of the original packet and doing a look-up in the end system table. In this example, VLAN-IDs are determined based on the source rather than the destination. Once this encapsulated packet is formed, it is then forwarded on the multicast channel to all other switches. The original packet would also be given to the local forwarder.

8

The Local Forwarder

Each switch has a process that listens on the multicast channel 16. This process is responsible for processing any encapsulated frames (VLAN packets) sent from other switches. When the VLAN packet is received, it is stripped of its VLAN-ID list in the header. For every entry in the VLAN-ID list, the local port table is searched for a matching entry. The local forwarder then forwards the original data packet out any ports that are mapped to the VLAN-ID. If the VLAN-ID is the default VLAN-ID (=1), then the original packet is flooded out all access ports on the switch. If no VLAN-IDs match, then the packet is discarded.

The Central Connection Server and Common Directory

A central connection server programs the point-to-multipoint connections between all of the SFPS switches, as there is no provision in each switch to do so (see M10 in FIG. 1). Thus, any time the connection server "discovers" a change in a switched topology, it has to reprogram the multicast channel between the switches.

The server accesses a common directory for mapping end systems to VLAN-IDs. A management application may provide this on the front end, and in addition provide for changes to the mapping in the directory itself and in any switches that have been informed of the mapping. Any end system not defined with a VLAN would default to VLAN-1.

If the VLAN assignment is done inside an End System Discovery Message ACK, then a new TLV list is added to the message. This functions similar to an "alias" field in which more than one are allowed since multiple VLANs could be returned. If the VLAN assignment is done with Resolve messages, then only a new TAG type has to be assigned since the message supports returning multiple resolutions. The semantics would be "resolve this end system to its VLAN-IDs." If the assignment was done completely out of band, then no signalling changes would be required.

Reserved VLAN-IDs

In the previous embodiment, broadcast and multicast packets are propagated through the switches based on the VLAN-IDs to which the source belongs. In some cases, mostly with multicast frames, it may be desirable to map a VLAN to the destination, e.g., OSPF packets.

This may be accomplished by allowing the switches to support "well-known" VLANs without any run-time assignment. If a switch receives a packet destined for a reserved VLAN, it would encapsulate it and set the VLAN list without mapping it to the end system table. The packet would then be forwarded on the multicast channel and any switches supporting the reserved VLAN (or having heard a reserved VLAN-type packet), would flood the original packet out.

Unicast Flooding

VLANs may be supported for unicast frames, for example if a call processor has not yet discovered the end system. This works similar to the broadcast/multicast operation except that instead of mapping the outports at each flooding switch, each switch would look up the destination unicast address in the end system table and send the original packet out the port on which the end system belongs.

VBUS Service

Since point-to-point connections between switches does not scale well, in an alternative embodiment each switch has a connection to a single (or distributed) server in the network which will forward broadcast and multicast packets. This service, referred to as the Virtual Broadcast/Unknown Service (VBUS), is distributed into all SFPS switches in a first implementation as illustrated in FIG. 10. Switches 61, 62,

6,147,995

9

63, 64 are connected by multicast channel 66, and each switch includes the distributed VBUS service 65.

FIG. 11 illustrates the redirected flow of data packets for the VBUS service. When a first switch receives a broadcast or multicast packet (step 40), it first determines whether the packet was received on an access port (step 41). If no, the packet is discarded (step 47). If yes, the packet is passed to a redirector queue (step 42), and if a call processor supports the packet type (step 43), the redirector delivers the packet to the protocol-specific call processor (step 44). If not, the packet is passed to the VBUS call processor (step 45). The redirector queue then handles the next packet on the queue (step 46).

FIG. 12 illustrates the operation of the VBUS call processor. Each switch listens for source addresses heard on each access port (step 48). The call processor then updates the End System/VLAN table with the access port and end systems heard (step 49). The call processor then creates a signal entry (step 50) which is sent to the connection server (step 51), which formats a response to the signal (step 52). The connection server returns a signal with the associated VLAN list, which is received by the call processor (step 53). The call processor gets the associated access ports from the VLAN/Access Port Table (step 54) and sends out the original packet on the associated access ports (step 55). The call processor gets the network ports from the switch's connection table (step 56), encapsulates the packet with the VLAN header (step 57), and sends the encapsulated packet out the network ports to the other switches (step 58). The call processor then deletes the signal entry (step 59) and returns to start (step 60).

FIG. 13 illustrates the operation of the VBUS channel listener. When a packet is received on a network port (step 70), it first determines whether there is a known connection in the connection database 82 (step 71), and if so, it forwards the packet out the appropriate outport (step 72). If there is no connection, it determines whether this is a VBUS packet (step 73). If no, it returns to the beginning. If it is a VBUS packet, the packet is handed to a VBUS port (step 74) and the VLAN list is extracted from the header (step 75). The access ports are obtained from the VLAN/Access Port Table (step 76), and the encapsulation header removed from the packet (step 77). The original packet is then sent out the associated access ports defined in the table (step 78).

In one embodiment, the switch provides a MIB interface to allow an external application to assign VLAN-IDs to access ports and/or end systems. The simplest model is to progam VLAN-IDs to the switched ports only; under this model, the administration is simpler and the VLAN assignment to end systems is implied by the switched port to which the end systems are physically connected. A more robust model would map the VLAN-IDs from policy work group definitions.

The application interface may be provided with an SNMP (Simple Network Management Protocol) MIB (management information base) which allows a simple interface to program connections via a single SNMP set message. The MIB interface provides the following semantics:

(map, unmap)[SFPS VLAN-ID][inPort][userMAC] This verb set assigns (and removes) a user MAC address and switch port to (or from) a specific VLAN.

(map-port, unmap-port)[SFPS VLAN-ID][inPort] This verb set assigns (and removes) a switch port to (or from) a specific VLAN. The switches provide managed objects accessible by the MIB which are all accessed with standard SNMP get, get next, and set messages.

In one embodiment, a VLAN status table is provided. This table allows an entire VLAN to be enable or disabled

10

regardless of the number of user or switch ports assigned to the VLAN in the switch. Thus, it is possible to shut off a particular VLAN inside a particular switch without having to administer each individual switch port or end system.

One goal of the VBUS service is to require minimal support from the network server. The only server requirement is providing each switch with a connection to all other switches in the network (domain), which in effect provides the multicast channel for flooding VLAN packets.

While there have been shown and described several embodiments of the present invention, it will be obvious to those skilled in the art that various changes and modifications may be made therein without departing from the scope of the invention as defined by the appending claims.

What is claimed is:

1. A computer-readable storage medium comprising program instructions for restricting flooding of a data packet, of one of a broadcast, multicast and unknown destination type, in a switched data communications network, the network including a plurality of end systems and switches connected by links, the switches having access ports connected to end systems and network ports connected to other switches, the program instructions causing the network to:

a. assign at least one identifier to a respective subset of end systems;

b. map the at least one assigned identifier to an access port attached to at least one end system in the respective subset of end systems; and

c. when the data packet is received from a source end system at a receiving access port of a first switch:
   i) determine one or more identifiers associated with the source end system;
   ii) encapsulate the data packet by adding a header with the one or more determined identifiers;
   iii) forward the encapsulated data packet to all or a subset of other switches in the network; and
   iv) determine if at least one access port other than the receiving access port on the first switch is associated with the one or more determined identifiers and forward the data packet out the at least one determined access port.

2. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

d. when the encapsulated data packet is received at a second switch with access ports:
   i) strip the header from the encapsulated data packet and to determine the one or more encapsulated identifiers in the header of the encapsulated data packet;
   ii) determine if at least one access port of the second switch is associated with the one or more encapsulated identifiers; and
   iii) forward the data packet out the at least one determined access port of the second switch.

3. The computer-readable storage medium as recited in claim 2, further comprising instructions to cause the network to:

listen to end systems heard on respective access ports at each switch and to maintain the end systems heard and their respective access ports in a mapping table at the respective switch; and

upon receipt of a unicast packet for a destination end system unknown to the first switch, complete step c for the unicast packet and then at the next switch review the mapping table for the respective access port for the

6,147,995

<table>
<tr><td>11</td><td>12</td></tr>
</table>

destination end system and forward the packet out the respective access port.

4. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to, if in step c(iv) no other access port is determined, discard the data packet.

5. The computer-readable storage medium as recited in claim 1, further comprising, in step b, instructions to cause the network to:

maintain a first table in each switch to relate the at least one assigned identifier to the end systems or access ports of the respective switch; and

maintain a second table in each switch to relate the access ports of the respective switch to assigned identifiers.

6. The computer-readable storage medium as recited in claim 5, further comprising, in step c.i), instructions to cause the network to:

review the first table for the one or more identifiers associated with the source end system or the receiving access port.

7. The computer-readable storage medium as recited in claim 6, further comprising, in step c.iv), instructions to cause the network to:

review the second table for an access port associated with the one or more determined identifiers.

8. The computer-readable storage medium as recited in claim 7, wherein the assigned identifier is a virtual LAN identifier.

9. The computer-readable storage medium as recited in claim 1, wherein the received data packet is of a protocol not supported by a protocol-specific call processor in the first switch.

10. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

maintain a common registry of assigned identifiers.

11. The computer-readable storage medium as recited in claim 10, further comprising instructions to cause the network to:

register each end system or access port with the common registry, and

return a list of assigned identifiers from the common registry to each switch for the end systems or access ports of the respective switch.

12. The computer-readable storage medium as recited in claim 10, further comprising instructions to cause the network to:

send a signal from the first switch to the common registry to resolve an end system or access port to its assigned identifiers.

13. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

maintain the mapping at each switch for the end system or access ports of the respective switch.

14. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

prior to assigning an identifier to a specific end system or access port, maintain a default identifier for that specific end system or access port which maps to predetermined access ports.

15. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

maintain a multicast channel of connections between all or a subset of switches and wherein step c(iii) comprises forwarding the encapsulated packet on the multicast channel.

16. The computer-readable storage medium as recited in claim 15, wherein the channel includes:

a point-to-multipoint connection from each switch to all other switches in the network.

17. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network, at step c(iii), to provide a distributed service in the switches for forwarding the encapsulated data packet.

18. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to assign the identifier based on a policy work group definition.

19. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

maintain at least one mapping table at each switch for performing the mapping step.

20. The computer-readable storage medium as recited in claim 19, further comprising instructions to cause the network to:

listen to end systems heard on respective access ports at each switch and maintain the end systems heard and their respective access ports in the mapping table at the respective switch.

21. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

assign a reserved identifier without limitation as to end system and access port.

22. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

maintain a Management Information Base (MIB) interface at each switch for programming at least one mapping table, the mapping table being used to perform the mapping step.

23. The computer-readable storage medium as recited in claim 22, further comprising instructions to cause the network to:

use a Simple Network Management Protocol (SNMP) set message to maintain the mapping table at each switch.

24. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

maintain a status table at each switch to enable and disable a respective subset.

25. A computer-readable storage medium comprising program instructions for restricting flooding of a data packet, of one of a broadcast, multicast and unknown destination type, in a switch to be used in a switched data communications network, the network to include end systems and switches connected by links, the switches having access ports connected to end systems and network ports connected to other switches, the program instructions causing the switch to:

a. assign at least one identifier to a respective subset of end systems;

b. map the at least one assigned identifier to an access port attached to at least one end system in the respective subset of end systems; and

c. when the data packet is received from a source end system at a receiving access port of the switch:

6,147,995

13

i) determine one or more identifiers associated with the source end system;

ii) encapsulate the data packet by adding a header with the one or more determined identifiers;

iii) forward the encapsulated data packet to all or a subset of other switches in the network; and

iv) determine if at least one access port other than the receiving access port on the switch is associated with the one or more determined identifiers and forward the data packet out the at least one determined access port.

26. The computer-readable storage medium as recited in claim 25, further comprising instructions to cause the switch to:

d. when an encapsulated data packet is received:

i) strip the header from the encapsulated data packet and determine the one or more encapsulated identifiers in the header of the encapsulated data packet;

ii) determine if at least one access port of the switch is associated with the one or more encapsulated identifiers; and

iii) forward the data packet out the at least one determined access port of the switch.

27. The computer-readable storage medium as recited in claim 26, further comprising instructions to cause the switch to:

listen to end systems heard on the access ports and to maintain the end systems heard and their respective access ports in a mapping table.

28. The computer-readable storage medium as recited in claim 25, further comprising instructions to cause the switch to, if in step c(iv) no other access port is determined, discard the data packet.

29. The computer-readable storage medium as recited in claim 25, further comprising, in step b, instructions to cause the switch to:

maintain a first table to relate the at least one assigned identifier to the end systems or access ports of the switch; and

14

maintain a second table to relate the access ports of the switch to assigned identifiers.

30. The computer-readable storage medium as recited in claim 29, further comprising, in step c.i), instructions to cause the switch to:

review the first table for the one or more identifiers associated with the source end system or the receiving access port.

31. The computer-readable storage medium as recited in claim 30, further comprising, in step c.iv), instructions to cause the switch to:

review the second table for an access port associated with the one or more determined identifiers.

32. The computer-readable storage medium as recited in claim 25, further comprising instructions to cause the switch to:

prior to assigning an identifier to a specific end system or access port, maintain a default identifier for that specific end system or access port which maps to predetermined access ports.

33. The computer-readable storage medium as recited in claim 25, further comprising instructions to cause the switch to:

maintain a Management Information Base (MIB) interface.

34. The computer-readable storage medium as recited in claim 33, further comprising instructions to cause the switch to:

use a Simple Network Management Protocol (SNMP) message to maintain a mapping table.

35. The computer-readable storage medium as recited in claim 25, further comprising instructions to cause the switch to:

maintain a status table to enable and disable a respective subset.

\* \* \* \* \*

# EXHIBIT 9

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF          NEW JERSEY

Enterasys Networks, Inc.

v.

Foundry Networks, Inc. and Extreme Networks, Inc.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 05-CV-11298 (DPW)
U.S.D.C. District of Massachusetts

**TO:**     **Ostroff & Associates**
         **3 Lackawanna Boulevard**
         **Murray Hill, NJ 07974**

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): **SEE ATTACHED EXHIBIT A.**

| PLACE | DATE AND TIME |
|---|---|
| Orrick, Herrington & Sutcliffe LLP. 1000 Marsh Road, Menlo Park, CA 94025-1015 | April 23, 2007 |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Sanjeet Dutta*       Attorney for Foundry | April 9, 2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Sanjeet Dutta, Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road, Menlo Park, CA 94025-1015, Phone Number: (650) 614-7647

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88 (Rev. 1/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | TIME |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____         _____
                        DATE                                  SIGNATURE OF SERVER

                                                    _____
                                                    ADDRESS OF SERVER

                                                    _____

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except

that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

1    **EXHIBIT A**

2    Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant Foundry Networks,

3    Inc. ("Foundry") hereby requests that you produce and allow inspection and copying of the

4    following documents and things requested herein at the offices of Orrick, Herrington & Sutcliffe,

5    1000 Marsh Rd., Menlo Park, CA 94025, at the date and time specified in the attached subpoena,

6    in accordance with the Federal Rules of Civil Procedure (and the following Definitions and

7    Instructions).

8    **DEFINITIONS**

9    A.    "'402 Patent" as used herein refers to United States Patent No. 5,394,402.

10    B.    "You" or "Your" shall mean Ostroff & Associates and all attorneys working for

11    Ostroff & Associates, including without limitation Irwin Ostroff and Robert B. Ardis, listed

12    patent attorneys on the '402 Patent.

13    C.    "Document(s)" as used herein is used in its broadest sense and includes, without

14    limitation, the original and all non-identical copies (including drafts and those with any notations)

15    of all "documents," "writings," "recordings," and "photographs" of the types designated in Rule

16    34(a) of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence,

17    and includes materials in digital forms.  The term "document(s)" includes but is not limited to any

18    book, pamphlet, periodical, letter, memorandum, diary, file, note, calendar, newspaper, magazine,

19    statement, bill, invoice, order, policy, telegram, correspondence, summary, receipt, opinion,

20    investigation statement or report, schedule, manual, financing statement, audit report, tax return,

21    report, record, study, handwritten note, drawing, working paper, chart, index, tape (audio or

22    visual), microfilm, data sheet, e-mail and all other electronic and digital forms of communication,

23    however produced.

24    D.    "Communication" as used herein refers to any contact, oral or documentary,

25    formal or informal, at any place or under any circumstances whatsoever whereby information of

26    any nature is transmitted or transferred, including, without limitation, a single person seeing or

27    hearing any information by any means.

28    E.    "Concerning" as used herein refers to referring to, relating to, pertaining to,

- 1 -

1    relevant to, material to, embodying, evidencing, affecting, comprising, discussing, dealing with,

2    supporting, contradicting or otherwise considering in any manner whatsoever the subject matter

3    of the inquiry.

4          F.     "Any" and "all" as used herein refer to and include the other; the terms "and" and

5    "or" shall each mean and include the other, and the singular form of any word and the plural form

6    of the word shall each mean and include the other.

7          G.     "Including" means including, but not limited to.

8    <div align="center">**DOCUMENTS AND THINGS REQUESTED**</div>

9    1.  All documents concerning the '402 Patent.

10   2.  A copy of the complete prosecution file history for the '402 Patent, including the

11,12        prosecution file history of Ser. No. 79,099, from which the '402 Patent claims priority.

13   3.  All draft applications of the '402 Patent.

14   4.  All documents concerning any communications by and between you and any attorneys

15        (including any agents thereof) prosecuting the '402 Patent and any listed inventors,

16        clients, assignees, patent offices, or third parties, including all correspondence and

17        communications among any attorneys prosecuting the '402 Patent, between any attorneys

18        prosecuting the '402 Patent and any agents thereof, and any memoranda to file or notes.

19   5.  All documents concerning the conception, reduction to practice, diligence in the reduction

20        to practice, sale, offer for sale, public display, public demonstration, and disclosure of the

21        subject matter claimed in the '402 Patent.

22   6.  Copies of all billing records reflecting work performed by you on the '402 Patent, and all

23,24        related applications, including work performed in drafting, revising, and presenting all

25        applications.

26   OHS West:260209372.1

27

28

<div align="center">- 2 -</div>

**Express**

**US Airbill**    FedEx Tracking Number  8525 3280 4381    **Sender's Copy**

Sender's FedEx Account Number    1870-1127-2

1/9/07

B. VanderZanden    Phone (650) 614-7400

ORRICK HERRINGTON SUTCLIFFE

1020 MARSH RD

MENLO PARK    State CA    ZIP 94025-1021

Internal Billing Reference    15903-6    OPTIONAL

Irwin Ostroff    Phone (  )

Ostroff & Associates

3 Lackawanna Blvd.

Murray Hill    State NJ    ZIP 07974

**4a Express Package Service**    *Packages up to 150 lbs.*
- [X] FedEx Priority Overnight
- [ ] FedEx Standard Overnight
- [ ] FedEx First Overnight
- [ ] FedEx 2Day
- [ ] FedEx Express Saver

**4b Express Freight Service**    *Packages over 150 lbs.*
- [ ] FedEx 1Day Freight
- [ ] FedEx 2Day Freight
- [ ] FedEx 3Day Freight

**5 Packaging**
- [X] FedEx Envelope
- [ ] FedEx Pak
- [ ] FedEx Box
- [ ] FedEx Tube
- [ ] Other

**6 Special Handling**
- [ ] SATURDAY Delivery
- [ ] HOLD Weekday at FedEx Location
- [ ] HOLD Saturday at FedEx Location

Does this shipment contain dangerous goods?
- [X] No
- [ ] Yes   As per attached Shipper's Declaration
- [ ] Yes   Shipper's Declaration not required
- [ ] Dry Ice   Dry Ice, 9, UN 1845
- [ ] Cargo Aircraft Only

**7 Payment**   Bill to:
- [X] Sender
- [ ] Recipient
- [ ] Third Party
- [ ] Credit Card
- [ ] Cash/Check

Total Packages    Total Weight    Total Declared Value $        .00

**8 Sign to Authorize Delivery Without a Signature**

466

0317576856

# EXHIBIT 10

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

ALAN E. MCKENNA
617-859-2719
AEMckenna@rkmc.com

August 1, 2007

## VIA E-MAIL (PDF ATTACHMENT)

Brian H. VanderZanden, Esq.
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re: *Enterasys Networks v. Foundry Networks and Extreme Networks*
*Civ. Act. No. 05-11298-DPW (D. Mass)*

Dear Brian:

I received your voicemail this evening regarding the depositions of Peter Newman and Floyd Ross that were recently noticed by Foundry in this matter. I note from your message that both Messrs. Newman and Ross are consultants (presumably paid), and that Foundry intends to proceed with their depositions on the noticed dates of August 15, 2007 and August 21, 2007.

At the outset, your disclosure about the consulting arrangements begs the question as to why you have subpoenaed your own consultants, who are obviously under your control, for depositions? Further, you have chosen to schedule these depositions for the least convenient possible time. As you are aware, the first is set for just two days before the opening Markman briefs are due, and the other immediately after that deadline. We also note that at least one of the subpoenas appears defective on its face in that it attempts to require Mr. Ross, a Pennsylvania resident, to travel to California to give deposition testimony, in contravention of F.R.C.P. 45.

In any event, Enterasys' counsel is not available on the noticed dates for these depositions. We were intending to subpoena and take the depositions of Messrs. Newman and Ross at a time that is more convenient, perhaps at the end of September 2007 (subject to their schedules around that time, of course). Accordingly, and given this scheduling conflict with the dates chosen by Foundry, I write to request that you kindly confirm that you will agree to postpone the depositions until a more mutually convenient time.

Please note that unless Foundry is willing to reschedule these depositions for a more convenient time, we will have no choice but to seek the Court's assistance. We hope to resolve this issue with you amicably without the need to involve the Court. However, unless you are willing to re-schedule these depositions for a more convenient time, we will have no choice but

Brian H. VanderZanden, Esq.
August 1, 2007
Page 2

to seek the Court's intervention.

Please let us know by the close of business on Thursday, August 2, 2007, whether you are amenable to postponing these depositions. I look forward to hearing form you.

Very truly yours,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

Alan E. McKenna

AEM/ram
cc:    I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & E-MAIL - PDF ATTACHMENT*)
       Jeremy P. Oczek, Esq. (*VIA EMAIL*)
       K. Mudurian (*VIA EMAIL*)
       Y. Steinberg  (*VIA EMAIL*)

# EXHIBIT 11



# ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
*tel* 650-614-7400
*fax* 650-614-7401
WWW.ORRICK.COM

August 3, 2007

Brian H. VanderZanden
(650) 614-7625
bvanderzanden@orrick.com

*VIA E-MAIL (PDF ATTACHMENT)*

Alan E. McKenna, Esq.
Robbins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA 02199

Re:     <u>Enterasys Networks, Inc. v. Foundry Networks, Inc., et al.</u>

Dear Alan:

I write in response to your letter of August 1, 2007, concerning the upcoming depositions of Floyd Ross and Peter Newman.

Both Messrs. Ross and Newman are third-party fact witnesses in this matter. Foundry intends to take their depositions as part of its prior art investigation. While Foundry may have agreed to reimburse these witnesses for their time, they remain third-party fact witnesses, not retained expert witnesses. The parties must therefore accommodate these witnesses' availability, not the other way around.

Enterasys has been aware of Floyd Ross's deposition since July 26, 2007. Enterasys, however, made no mention of being unavailable until you sent your letter nearly a week later. As a result of Enterasys' delay, Foundry has already purchased a nonrefundable plane ticket for Mr. Ross's travel.

Nevertheless, out of courtesy, Foundry will agree to reschedule Mr. Ross's deposition, provided that (1) Enterasys agree to reimburse Foundry for the cost of changing Mr. Ross's flight, and (2) Enterasys will agree that Mr. Ross's deposition will go forward on Thursday, August 23, 2007.

Mr. Newman's deposition, however, must proceed on its noticed date of August 21, 2007. Mr. Newman has a full-time job during the week, and has graciously agreed to take time off in order to assist the parties in this matter. The parties need not inconvenience Mr. Newman any more than they have.



**ORRICK**

Alan McKenna
August 3, 2007
Page 2

Enterasys' concern regarding Mr. Newman's deposition is perplexing.  Enterasys has known that Foundry intended to depose Mr. Newman since July 13, yet made no claim of unavailability until August 1st.

As you know, opening Markman briefs are due on August 17th, four days before Mr. Newman's noticed deposition.  This provides the parties with ample time in which to prepare.  I further note that Foundry has worked with several different attorneys from your firm in this matter.  Surely one of them is available to attend the deposition.  If not, then undoubtedly another of the over 250 attorneys from your firm can attend.

I look forward to your response.

Very truly yours,

Brian H. VanderZanden

cc:    Jeremy P. Oczek, Esq. (via email)
       Steven L. Walker, Esq. (via email)

OHS West:260267247.1

EXHIBIT 12

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

ALAN E. MCKENNA
617-859-2719
aemckenna@rkmc.com

August 6, 2007

**VIA E-MAIL (PDF ATTACHMENT)**

Brian H. VanderZanden, Esq.
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025

Re: *Enterasys Networks v. Foundry Networks and Extreme Networks*
    *Civ. Act. No. 05-11298-DPW (D. Mass)*

Dear Brian:

I write in follow-up to our exchange last week regarding the depositions of Messrs. Newman and Ross. On Friday afternoon, you indicated that Mr. Newman's deposition must go forward on August 21, 2007 despite the possibility that he may be available on other dates, and that Mr. Ross' deposition may be rescheduled only on the condition that Enterasys reimburse Foundry for the cost of his non-refundable plane ticket. Foundry's decision to unilaterally contact these third-party witnesses to arrange these depositions without consulting Enterasys as to our availability has led to a serious scheduling conflict in that the same individuals who would be involved in preparing for and attending these depositions are those who are currently working on drafting the Markman briefs, which, as you know, are due on August 17.

In choosing these clearly inconvenient deposition dates surrounding the Markman deadline, Foundry is creating a situation in which these witnesses will have to be deposed on multiple occasions. As you are no doubt aware, the Rule 16 Scheduling Order regarding Joint Depositions in this case requires that the parties "work together in good faith to … avoid unreasonably burdening the third-party deponents." Foundry's independent action in scheduling these depositions is clearly in violation of the Court's Order requiring the parties to work cooperatively to avoid unduly burdening these witnesses. We have brought this issue to your attention with respect to several other witnesses (Dr. Rosen, Mr. Varghese, Ms. Iturralde) and are puzzled as to why Foundry continues to create these conflicts in contravention of the obvious desire of the Court to have the parties work jointly to achieve efficient discovery.

As we have previously informed you, Enterasys' counsel is not available on the noticed dates for these depositions. We ask that you immediately lift the deposition dates of August 15 and August 21, 2007. Enterasys' counsel is available during the third and fourth weeks of

Brian H. VanderZanden, Esq.
August 6, 2007
Page 2


September and would be willing to reschedule the depositions of Messrs. Newman and Ross for that period, on dates that are mutually convenient for the third-party witnesses as well as Foundry.

Please let us know by the close of business today whether you will agree to lift these deposition dates and reschedule them for the proposed timeframe. If we do not hear from you or if Foundry is unwilling to work with Enterasys to reschedule these depositions for a mutually convenient time, we will have no choice but to move for a Protective Order.

We look forward to hearing from you.

Very truly yours,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.



Alan E. McKenna

AEM/ram
cc:    I. Neel Chatterjee, Esq. (*VIA FIRST CLASS MAIL & E-MAIL - PDF ATTACHMENT*)
       Jeremy P. Oczek, Esq. (*VIA EMAIL*)
       K. Mudurian (*VIA EMAIL*)
       Y. Steinberg  (*VIA EMAIL*)

# EXHIBIT 13



ORRICK

ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 MARSH ROAD
MENLO PARK, CA 94025
*tel* 650-614-7400
*fax* 650-614-7401
WWW.ORRICK.COM

August 7, 2007

Brian H. VanderZanden
(650) 614-7625
bvanderzanden@orrick.com

*VIA E-MAIL (PDF ATTACHMENT)*

Alan E. McKenna, Esq.
Robbins, Kaplan, Miller & Ciresi LLP
800 Boylston Street, 25th Floor
Boston, MA 02199

Re:     Enterasys Networks, Inc. v. Foundry Networks, Inc., et al.

Dear Alan:

I write in response to your letter of August 6, 2007, concerning the depositions of Floyd Ross and Peter Newman. Enterasys has yet to provide any reasonable explanation as to why the noticed dates are inconvenient, or as to why the depositions cannot be rescheduled before the end of September. Your letter implies that Enterasys' counsel will be too busy drafting the Markman briefs to prepare for the depositions as currently scheduled, but this does not follow.

Foundry is operating under the same briefing schedule as Enterasys. Any alleged inconvenience caused to Enterasys would apply equally to Foundry. Foundry, however, is able to draft its Markman briefs while simultaneously accommodating the witnesses' schedules in proceeding with the depositions as noticed.

Moreover, Mr. Newman's deposition is scheduled to go forward on August 21, four days after the parties are to exchange opening briefs. We have offered to reschedule Mr. Ross's deposition for August 23, six days after the opening brief. By comparison, Enterasys has proposed dates as early as three days after the rebuttal briefs are due. This would appear to undermine your contention that Enterasys cannot properly prepare for depositions that would occur after a brief is filed.

If there are other reasons why these dates are inconvenient for Enterasys, you have not said what they are. When I asked your colleague Rebecca MacDowell this past Friday why these dates were inconvenient for Enterasys, independent of the Markman briefing, she could not provide me with an answer. Enterasys cannot unilaterally decide that no third-party depositions can go forward simply because the parties are drafting their Markman briefs.



**ORRICK**

Alan McKenna
August 7, 2007
Page 2

Since my conversation with Ms. MacDowell, I learned that Mr. Newman has availability at the end of August and in early September. Foundry would be willing to work with Enterasys to reschedule Mr. Newman's deposition during that time. Furthermore, I would like to restate our offer that Mr. Ross's deposition be moved to August 23, provided that Enterasys reimburse Foundry for the cost in changing Mr. Ross's plane ticket.

I hope that Enterasys will reconsider its position. Please let me know immediately if Enterasys will agree to accept Foundry's proposal, otherwise the depositions will go forward on the dates as currently noticed.

Very truly yours,

Brian H. VanderZanden

cc:   Jeremy P. Oczek, Esq. (via email)
      Steven L. Walker, Esq. (via email)