## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| _____ ) | |
| ENTERASYS NETWORKS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-11298 (DPW) |
| v. ) | |
| ) | |
| FOUNDRY NETWORKS, INC.; and ) | |
| EXTREME NETWORKS, INC., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## OPENING CLAIM CONSTRUCTION BRIEF OF
## PLAINTIFF ENTERASYS NETWORKS, INC.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... iv

I.   INTRODUCTION ............................................................................................................. 1

II.  OVERVIEW OF THE TECHNOLOGY ........................................................................... 4

III. LEGAL ARGUMENT ...................................................................................................... 7

    A.  Enterasys' Proposed Constructions Are Consistent With Well-Established Canons
        Of Claim Construction And Are Supported By The Intrinsic Record ............................... 7

    B.  This Court Should Adopt Enterasys' Proposed Constructions For Each Of The
        Patents-In-Suit ................................................................................................................... 11

        1.  The '205 Patent ........................................................................................................ 11

                a.  "route calculation algorithm" [Claim 1(b)] .................................................... 12

                b.  "determining routes for said first and said second user data packets
                    using a route calculation algorithm corresponding to a single routing
                    protocol, chosen from an arbitrary protocol suite, regardless of the
                    addressing convention to which the destination address information in
                    said user data packet conforms" [Claim 1(b)] ................................................ 16

                c.  "said route being determined using the destination address information
                    in said user data packets without converting said destination address
                    information from the addressing convention to which it forms [sic,
                    conforms] to another addressing convention" [Claim 1(c)] .......................... 19

                d.  "encapsulate" [Claims 5(a), 7(a)] .................................................................. 21

                e.  "a first addressing scheme" and "a second addressing scheme" [Claims
                   21(a), 21(b), 21(c), 21(d)(ii), 21(d)(iii)] ........................................................ 24

                 f.  "said first and second devices exchange control packets which
                   specify" [Claim 21(d)] ................................................................................... 28

        2.  The '173 Patent ........................................................................................................ 30

                 a.  "switching address" [Claim 1(b)] ................................................................... 31

                 b.  "local status information" and "a plurality of status fields to indicate a
                   message packet servicing" [Claim 1(b)] ........................................................ 33

                 c.  "receiving said message packet with said second header and sending
                   said message packet with said second header to a second port as
                   selected by said switching address, and in response to said local status
                   information and the plurality of status fields" [Claim 1(c)] .......................... 36

3. The '665 Patent ........................................................................................ 38

    a. "port based default VLAN" [Claims 1, 4, 6] ................................ 39

    b. "data packet" [Claims 1, 1(a), 4(a), 5, 6(a)].................................. 40

    c. "means for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports" [Claim 1(b)]................................................................................................ 43

    d. "means for determining whether the destination port is one of the default VLAN ports" [Claim 1(c)].................................................. 45

    e. "first means, responsive to the determining means, for transmitting the data packet to the destination port if the determining means determines that the destination port is one of the default VLAN ports" [Claim 1(d)]................................................................................................ 46

    f. "second means, responsive to the determining means, for transmitting the data packet to each of the default VLAN ports if the determining means determines that the destination port is not one of the default VLAN ports" [Claim 1(e)].............................................................. 47

    g. "each of the default VLAN ports" [Claims 1(e), 4(e), 6(e)].......................... 48

4. The '995 Patent ........................................................................................ 50

    a. "access ports" and "network ports" [Claims 1, 1(b), 1(c), 1(c)(iv), 25, 25(b), 25(c), 25(c)(iv)] .................................................. 51

    b. "encapsulate the data packet by adding a header with the one or more determined identifiers" [Claims 1(c)(ii), 25(c)(ii)] ......................... 54

5. The '022 Patent ........................................................................................ 59

    a. "network bridge" [Claim 1] .......................................................... 59

    b. "data packet" [Claims 1, 1(a), 4(a), 5, 6(a)].................................. 61

    c. "multicast forwarding data" [Claims 1, 6, 6(c)(ii)]........................ 64

    d. "means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge" [Claim 1(a)]................................................................ 66

    e. "multicast control packet" [Claims 1(a), 6(b), 20(a)] ..................... 68

    f. "destined for a device other than the network bridge" [Claim 1(a)].............. 70

    g. "means for identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge" [Claim 1(b)].......................... 71

h.  "means for updating the multicast forwarding data according to the identified multicast group and the data in the first portion of the first packet" [Claim 1(c)] ...................................................................... 73

i.  "means for identifying a source of the first data packet" [Claim 3(a)]........... 74

j.  "means for cross-referencing the identified source to the identified multicast group in the multicast forwarding data" [Claim 3(b)].................... 75

k.  "means for determining, when the first packet is not a control packet, whether the first packet is a message packet having a multicast group as a destination address" [Claim 5(a)] ........................................................ 77

l.  "multicast message packet" [Claim 5(b)] ...................................................... 78

m.  "means for identifying, when the first packet is determined to be a multicast message packet, the destination multicast group" [Claim 5(b)]........................................................................................................... 79

n.  "means for retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface" [Claim 5(c)(i)] ........................................................................................................... 80

o.  "means for sending the multicast message packet out each at least one cross-referenced I/O interface in the first data other than the identified I/O interface" [Claim 5(c)(ii)] ......................................................................... 81

p.  "network device" [Claim 6] ........................................................................... 82

q.  "multicast communications forwarding data" [Claim 6] ............................... 83

r.  "addressed to a device other than the network device" [Claim 6(c)] ............. 83

s.  "destined for a location other than the first location" [Claim 20(a)] ............. 84

t.  "any interface associated with the multicast group" [Claim 20(d)]............... 84

6.  The '236 Patent ..................................................................................................... 86

a.  "network bridge" [Claim 1] ........................................................................... 87

b.  "identifying a source of the communication received on the first port of the bridge" [Claim 2] ................................................................................ 87

c.  "protocol type" [Claim 6] .............................................................................. 89

IV. CONCLUSION ..................................................................................................................... 90

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700 (Fed. Cir. 1983) .............................. 60

*Acumed LLC v. Stryker Corp.*, 483 F.3d 800 (Fed. Cir. 2007) ....................................... 9

*ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082 (Fed. Cir. 2003)...............................26-27

*Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308 (Fed. Cir. 1999)................................... 44

*Altiris v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) .....................................17-18

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003). 15, 58

*Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364 (Fed. Cir. 2001)........................ 68, 73

*Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188 (Fed. Cir. 2005).............................. 60

*Beachcombers Int'l, Inc. v. Wildewood Creative Prods., Inc.*, 31 F.3d 1154 (Fed. Cir. 1994) ....................................................................................................... 15

*CCS Fitness, Inc. v. Brunswick*, 288 F.3d 1359 (Fed. Cir. 2002).................................... 9

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303 (Fed. Cir. 1998) ....................................................................................................... 44

*Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998)............................ 15, 58

*Connecticut Valley Enters., Inc. v. U.S.*, 348 F.2d 949 (Ct. Cl. 1965) ........................... 35

*Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006) ...................... 10, 69

*Exxon Research and Eng'g Co., v. U.S.*, 265 F.3d 1371 (Fed. Cir. 2001)............................ 34, 35

*Free Motion Fitness, Inc. v. Cybex, Int'l, Inc.*, 423 F.3d 1343 (Fed. Cir. 2005) ......................... 82

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367 (Fed. Cir. 2004) ....................................................................................................... 9, 71, 86

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ........................................................ 10

*Hoechst Celanese Corp. v. BP Chem. Ltd.*, 78 F.3d 1575 (Fed. Cir. 1996) ..................... 10, 71, 86

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111 (Fed. Cir. 2004) ....................................................................................................... 8, 83

*In re Hayes Microcomputer Prods., Inc. Patent Lit.; Ven-Tel, Inc. v. Hayes Microcomputer Prods., Inc.*, 982 F.2d 1527 (Fed. Cir. 1992) ......................................... *passim*

*Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760 (Fed. Cir. 1983) ................................. 28

*KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351 (Fed. Cir. 2000)........................... 17

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ............................. 7

*Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250 (Fed. Cir. 1999) ......................... 11

*Moba v. Diamond Automation, Inc.*, 325 F.3d 1306 (Fed. Cir. 2003)............................. 34

*Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464 (Fed. Cir. 1993) ..................................... 34

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314-26 (Fed. Cir. 2003) .................................... 10

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ......................................... *passim*

*PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002) ............................................ 55

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001) ................................................ 21

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 112 F.3d 1163 (Fed. Cir. 1997) .................... *passim*

*Salazar v. Procter & Gamble Co.*, 414 F.3d 1342 (Fed. Cir. 2005) ........................................ 35

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006) ............................ 84

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173 (Fed. Cir. 2006) ...................... 40

*Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316 (Fed. Cir. 2001) ......................................... 49

*Vitronics Corp. v. Conceptronic Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .................................. *passim*

*WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999) .................................... 67

## Statutes

35 U.S.C. § 112, ¶ 6 ............................................................................................. *passim*

## Miscellaneous Authorities

Deering, Stephen E., *Multicast Routing in Internetworks and Extended LANs,* ACM
    SIGCOMM (1988) ............................................................................ 63, 65

International Organization for Standardization, "Protocol for Providing Connectionless-
    mode Network Service" (ISO 8473) .......................................................... 25, 32

Internet Engineering Task Force, "Internet Protocol" (RFC 791) ................................ 25

Robert C. Kahrl, *Patent Claim Construction* (Aspen Publishers 2006 ed.) ................................. 28

*Random House Unabridged Dictionary*, Second Edition (1993) ................................. 85

*The American Heritage Dictionary Of The English Language, New College Edition*
    (1976) ........................................................................................... 57

## I.    <u>INTRODUCTION</u>

In the present action, Plaintiff Enterasys Networks, Inc. ("Enterasys") is asserting patent infringement claims against Defendants Foundry Networks, Inc. ("Foundry") and Extreme Networks, Inc. ("Extreme") (collectively, "Defendants") under the following six patents, each of which covers seminal technologies relating to data communications networking:

- U.S. Patent No. 5,251,205, titled "*Multiple Protocol Routing*" (the "'205 Patent") (Exh. 1 to Hensch. Decl.);[1]

- U.S. Patent No. 5,390,173, titled "*Packet Format in Hub for Packet Data Communications System*" (the "'173 Patent") (*Id.* at Exh. 2);

- U.S. Patent No. 6,128,665, titled "System for Broadcasting Messages to Each of Default VLAN Ports in Subset of Ports Defined as VLAN Ports" (the "'665 Patent") (Id. at Exh. 3);

- U.S. Patent No. 6,147,995, titled "Method for Establishing Restricted Broadcast Groups in a Switched Network" (the "'995 Patent") (Id. at Exh. 4);

- U.S. Patent No. 6,539,022, titled "*Network Device with Multicast Forwarding Data*" (the "'022 Patent") (*Id.* at Exh. 5); and

- U.S. Patent No. 6,560,236, titled "*Virtual LANs*" (the "'236 Patent") (*Id.* at Exh. 6).

On August 14, 2007, the parties filed with the Court their Revised Joint Claim Construction Statement (Doc. No. 128). The Revised Joint Statement attaches charts for each of the asserted patent claims that provide helpful side-by-side comparisons of the parties' respective proposed constructions for certain terms/phrases that they have agreed upon, and for others that remain in dispute. Enterasys now submits this Opening Claim Construction Brief to present its

---

[1] As used herein, the term "Hensch. Decl." is a reference to the Declaration Of Marc N. Henschke In Support Of Opening Claim Construction Brief Of Plaintiff Enterasys Networks, Inc., filed concurrently herewith under separate cover.

arguments as to why, with respect to each of the disputed terms/phrases, the Court should adopt Enterasys' proposed constructions in their entirety.

By way of background, Enterasys is in the business of designing, developing, marketing, and supporting a comprehensive line of networking products to meet the needs of local and global enterprises. In support of these efforts, Enterasys currently has more than 700 employees worldwide, maintains a patent portfolio of over 350 issued U.S. patents, and has invested over $1 billion in related research and development. A critical competitive advantage to Enterasys is its freedom to practice the inventions found in its patent portfolio which cover wide-ranging aspects of data communications networking. Notably, as impressive as the sheer volume of this portfolio is its lineage. As the surviving entity of the former Cabletron Systems, Inc. ("Cabletron"), Enterasys has inherited its patent portfolio from a 1980s pioneer in the networking industry. Moreover, before bequeathing this portfolio to Enterasys, Cabletron had itself acquired the patent holdings of another original giant of the networking space, Digital Equipment Corporation ("DEC"). As such, Enterasys is now the owner of scores of networking patents with very early priority dates covering seminal networking technologies that are indispensable in the marketplace.

Foundry and Extreme are both publicly traded companies that compete directly against Enterasys by selling several families of networking products that infringe one or more claims of the patents-in-suit. Despite being relative newcomers to the networking industry -- especially as compared to the early 1980s pioneering efforts of Cabletron and DEC -- neither has taken a license to the core technologies covered by the Enterasys patents that are critical to their market success (and even survival).

Before a jury can compare the claims of the patents-in-suit to Defendants' accused product families, the Court must first undertake to construe such claims. To assist the Court in this endeavor, Enterasys has submitted proposed constructions that comport with well-established canons of claim construction by imparting to each of the disputed terms/phrases their ordinary and customary meaning to a person of ordinary skill in the art as viewed in the context of the surrounding claim language and the remainder of the intrinsic record.

By contrast, however, in an obvious attempt to avoid future findings of infringement, Defendants have repeatedly urged upon the Court a series of legally untenable approaches designed to improperly narrow the scope of the asserted claims. For example, Defendants have frequently sought to read extraneous words and phrases into the claim language that would serve to significantly circumscribe their scope of coverage. Defendants have also proposed numerous constructions that would purport to limit the claims to only the examples (*i.e.*, the "preferred embodiments") provided in the specification. These constructions violate a cardinal rule of claim construction: *viz.*, it is the claims, and *not* the specification, that define the scope of the invention. While the specification must inform the claim construction analysis, a claim should be limited to the examples provided in the specification *only* when the inventor indicates a clear and unequivocal intent to limit his or her invention to those examples. In addition, Defendants have proposed still other constructions that completely ignore the specification -- in effect excluding from the scope of the claims the specific examples provided in the specification -- in a further attempt to avoid having the claims read on the accused products. Because each of these approaches advocated by Defendants violates fundamental principles of claim construction, the Court should decline every invitation to follow them.

## II.    OVERVIEW OF THE TECHNOLOGY[2]

Computer networks consist of end systems, such as computers and printers, interconnected by routers and/or bridges.  '665 Patent at 1:11-23; '205 Patent at 1:7-12; '022 Patent at 1:29-33, 1:52-65, and Fig. 1.[3]  Bridges and routers are sometimes more generally referred to as "switches."  U.S. Patent No. 5,088,091at 5:44-45 ("A 'switch' is a physical device that is used to receive and route packets through the network.").[4]  End systems, bridges and routers are sometimes collectively referred to as nodes.  '665 Patent at 1:12-13.  "One common method of transmitting data between the nodes is to break the data up into discrete 'packets' of data."  *Id.* at 1:12-15.  Packets are transported from one node to another along a transport medium and, once the packets reach their destination, they are reassembled.  *Id.* at 1:17-20.

A packet typically consists of a header and a payload section, also referred to as the "body" or "information field."  *Id.* at 1:19-26; '205 Patent at 1:15-21; '022 Patent at 2:10-14.  "The header contains the information used to transport the [packet] from one node to the next while the packet data is contained in the information field.  Among other information in the header is the destination address of the data packet."  '665 Patent at 1:22-26.  *See also* '205 Patent at 1:15-21 ("For example, when an originating end system wishes to transmit information to a destination end system, it generates a packet header in an appropriate format (this header includes, among other information, the address of the destination end system), and then fills the

---

[2]  Prior to the *Markman* claim construction hearing, Enterasys will provide the Court with a DVD which will contain a tutorial describing key aspects of the relevant technology.

[3]  Throughout this brief, citations to text in the patent specifications will consist of column number followed by a colon and then line number(s), expressed as, *e.g.*, 1:11-23.

[4]  *See* Bates Nos. ETS00413279-340 of the '173 Pros. Hist.  As used herein, the term "Pros. Hist." is a reference to an official prosecution history of a patent-in-suit.  Pursuant to an Electronic Notice Of Filing With The Clerk's Office dated August 17, 2007, Enterasys has filed with the Court velo-bound hard copies of the prosecution histories for each of the patents-in-suit, as well as a CD containing the same.  Here, U.S. Patent No.5,088,091 referenced in the text was cited to by the U.S. Patent and Trademark Office (the "PTO") as part of the prosecution history for the '173 patent.  As such, it is considered intrinsic evidence of relevance to a proper claim construction analysis.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

remainder of the packet with the information to be transmitted."); '022 Patent at 2:12-15 ("A host which desires to communicate writes data in the payload section 24, and an address of the intended recipient host in the header section 22.").

Both bridges and routers serve the function of connecting networks (or segments of networks) together so that packets can be forwarded from an end station on one network to an end station on another network or network segment.  U.S. Patent No. 5,448,565 at 1:30-34 (discussing bridges and routers); U.S. Patent No. 5,481,540 at 1:23-30 (discussing bridges); U.S. Patent No. 5,500,860 at 1:55 - 2:7 (discussing bridges and routers).[5]  However, traditional routers usually have access to more information and are, therefore, capable of making more "intelligent" routing decisions.

In addition, bridges can be distinguished from routers on the basis of what network layer is served by the device.  Those of ordinary skill in the art of computer networks[6] typically recognize a 7-layer model as the basis for networking infrastructure.  U.S. Patent No. 5,428,615[7] at 4:46-50 and Fig. 3.  Data packets are typically created in the higher layers of the infrastructure (*e.g.*, software applications) and passed down to the third layer, which is the network layer.  U.S. Patent No. 5,500,860[8] at 1:42-45.  The network layer (layer 3) attaches the network layer header and passes the packet to the second layer, which is the data link layer.  *Id.* at 1:45-47.  The data link layer (layer 2) attaches a data link header and passes the packet on to the first layer, which is

---

[5]  These patents were cited to and/or considered by the PTO during prosecution of the application that led to the '022 Patent.  *See* Bates Nos. ETS00415125-143, ETS00415144-154 and ETS00415155-173 of '022 Pros. Hist.

[6]  Enterasys submits that one of ordinary skill in the art of computer networking is an individual with (1) an undergraduate degree in computer science or a related field and at least 2-3 years experience in the field of computer network product design, or (2) a masters degree in computer science or a related field, with specific study related to computer network design.

[7]  *See* Bates Nos. ETS00415103-114 of '022 Pros. Hist.

[8]  *See* Bates Nos. ETS00415155-173 of '022 Pros. Hist.

the physical layer. *Id.* at 1:47-50. The physical layer (layer 1) encompasses the physical elements that actually move data through and between networks. *Id.* at 1:49-54.

"Bridging" occurs at the data link layer (layer 2), while "routing" occurs at the "network layer" (layer 3). U.S. Patent No. 5,500,860 at 1:55 - 2:7; U.S. Patent No. 5,517,620[9] at 4:24-26. "Bridges" typically make a determination about where to send a packet based on the data link header, while routers typically make a determination about where to send a packet based on the network layer header. *Id.* at 1:55 - 2:7. However, those of ordinary skill in the art also recognize that a single device can serve both bridging and routing functions. *See, e.g.*, U.S. Patent No. 5,500,860 at 2:51-64 (describing an apparatus that "behaves as a router" as to some packets by forwarding those packets based on information contained in the network layer header and "behaves as a bridge" as to other packets by forwarding those other packets based on information contained in the data link header). "It is common for internetworking devices to 'route' the protocols that a device supports, and 'bridge' the protocols that are not supported for routing." '995 Patent at 2:43-45. *See also* '236 Patent at 8:24-26 ("However, most routers today are brouters, *i.e.*, they implement the bridge forwarding algorithm as well as the normal forwarding code."). In other words, many devices operate at both layer 2 and layer 3. When making forwarding decisions based on layer 2 addresses and other information in a layer 2 header, the device is functioning as a layer 2 device, *i.e.*, a bridge. When making forwarding decisions based on layer 3 addresses and other information in the layer 3 header, the device is functioning as a layer 3 device, *i.e.*, a router.

Networks can be divided into individual segments, sometimes referred to as subnetworks or local area networks ("LANs"). '236 Patent at 1:11-15; '022 Patent at 1:36-38 and 1:50-52.

---

[9] *See* Bates Nos. ETS00415220-228 of '022 Pros. Hist.

The ports on a single switch can be divided into groups, where each group of ports, and the hosts connected thereto, represent a different segment. '236 Patent at 2:2-8 and Fig. 2. Alternatively, a network can be divided into segments defined by the hosts that are members of that segment. '022 Patent at 1:56-58 ("Each network segment L1-L8 comprises one or more interconnected host computers h1-h17.").

III. **LEGAL ARGUMENT**

    A. **Enterasys' Proposed Constructions Are Consistent With Well-Established Canons Of Claim Construction And Are Supported By The Intrinsic Record**

Enterasys' proposed constructions of the disputed claim terms focus on the claim language itself and give those terms their ordinary and customary meaning, supplemented where appropriate by evidence in the specification and prosecution history. Enterasys' constructions follow the canons of claim construction as established by the United States Supreme Court, the Federal Circuit, and as routinely applied by the district courts.

A literal patent infringement inquiry consists of two steps: 1) the proper construction of the asserted claim; and 2) the determination as to whether the accused product or method infringes the asserted claim as properly construed. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). "[T]he Supreme Court has repeatedly held that the construction of a patent claim is a matter of law exclusively for the court." *Id.* at 977 (internal citations omitted).

The claim construction analysis is accomplished by first considering evidence intrinsic to the patent, and, where necessary, evidence extrinsic to the patent. Intrinsic evidence includes the patent claims, the specification, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the

claims, the specification and, if in evidence, the prosecution history.  Such intrinsic evidence is

the most significant source of the legally operative meaning of disputed claim language.").  With

respect to the terms and phrases currently before the Court, proper constructions can be gleaned

from the intrinsic record, with little or no reliance on extrinsic evidence.[10]

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude."  *Innova/Pure Water, Inc. v. Safari Water*

*Filtration Sys., Inc.*, 381 F.3d 1111, 1115-16 (Fed. Cir. 2004).  *Accord Vitronics,* 90 F.3d at 1582

("we look to the words of the claims themselves . . . to define the scope of the patented

invention.").  Because the patentee is expected to define precisely what the invention is in the

claims, it would be unjust to the public, as well as an evasion of law, to construe the claim in a

manner deviating from the plain import of the claim terms.  *Phillips,* 415 F.3d at 1312 (Fed Cir.

2005).  Therefore, it has been frequently asserted that the words of a claim "are generally given

their ordinary and customary meaning."  *Vitronics*, 90 F.3d at 1582.  The Federal Circuit has

made clear "that the ordinary and customary meaning of a claim term is the meaning that the

term would have to a person of ordinary skill in the art in question at the time of the invention."

*Phillips*, 415 F.3d  at 1313.  Therefore, "[t]he inquiry into how a person of ordinary skill in the

art understands a claim term provides an objective baseline from which to begin claim

interpretation."  *Id.  Accord Innova/Pure Water*, 381 F.3d at 1119.

The Federal Circuit noted in *Phillips* that the written specification, which precedes the

claims, is also highly relevant to the claim construction analysis for "'it is the single best guide to

the meaning of a disputed term.'"  *Phillips*, 415 F.3d at 1315 (*quoting Vitronics*, 90 F.3d at

---

[10]  In this brief, Enterasys will cite, on limited occasions, dictionary definitions that support its proposed
constructions.  Dictionaries, which are considered extrinsic evidence, may permissibly be employed to assist the
Court in determining the meaning of certain terminology to persons of skill in the art of the invention.  *Phillips,* 415
F.3d at 1318.  Enterasys is also submitting a single expert witness Declaration explaining how one of ordinary skill
would understand the term "encapsulate" as used in the claims of the '995 Patent.

1582).  However, when looking to the specification, an accused infringer cannot overcome the

heavy presumption that a claim term carries its ordinary meaning "simply by pointing to the

preferred embodiment or other structures or steps disclosed in the specification or prosecution

history." *CCS Fitness, Inc. v. Brunswick*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  The written

part of the specification does not delimit the inventor's right to exclude, because "[t]hat is the

function and purpose of the claims." *Phillips*, 415 F.3d at 1312 (*quoting Markman*, 52 F.3d at

980).

      In this regard, courts should avoid the danger of reading limitations from the specification

into the claim language. *Phillips*, 415 F.3d at 1323.  The Federal Circuit emphasized in *Phillips*

that "although the specification often describes very specific embodiments of the invention, we

have repeatedly warned against confining the claims to those embodiments." *Id.*  The Federal

Circuit has continuously  rejected the notion that if a patent describes only a single embodiment

in its specification, the claims of the patent must be construed as being strictly limited to that

embodiment. *Id.*  "That preferred embodiment cannot be the only product covered by the claims;

if it were, the claims themselves would be unnecessary." *Acumed LLC v. Stryker Corp.*, 483

F.3d 800, 809 (Fed. Cir. 2007).

      While the claims are rarely limited to the embodiments described in the specification, the

claims should not be construed to exclude those embodiments either. *Globetrotter Software, Inc.*

*v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) ("A claim interpretation

that excludes the preferred embodiment from the scope of the claims is rarely, if ever correct.").

This is the case because "it is unlikely that an inventor would define the invention in a way that

excluded the preferred embodiment, or that persons of skill in this field would read the

specification in such a way." *Hoechst Celanese Corp. v. BP Chem. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996).

Courts recognize that one of the best ways for a patentee to teach another person of ordinary skill in the art to make and use the invention is to provide an example of how to practice the invention in a particular case. *Phillips*, 415 F.3d at 1323. Therefore, when construing a claim, a court should evaluate whether the patentee is setting out specific examples of how to practice the invention or whether the patentee instead intends for the "claims and the embodiments in the specification to be strictly coextensive." *Id.* In this regard, "an inventor may use the specification to intentionally disclaim or disavow the broad scope of a claim . . . [However,] this intention must be clear . . ." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1357-58 (Fed. Cir. 2006) (internal citations omitted). *Accord Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324-26 (Fed. Cir. 2003) (disavowal of claim scope in intrinsic record must be "unequivocal" and "both clear and unmistakable."). An inventor may also act as his or her own lexicographer in the specification and give a "special definition … to a claim term … that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. As with an intent to disclaim or disavow claim scope, the adoption of a special definition of a term that is inconsistent with its ordinary meaning must also be clear and unequivocal. *Vitronics*, 90 F.3d at 1582 (special definition of claim term must be "clearly stated in the patent specification or file history.").

In addition to consulting the specification, the court "should also consider the patent's prosecution history, if it is in evidence." *Phillips*, 415 F.3d at 1317. *Accord Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("an invention is construed not only in light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office."). The

prosecution history, which is considered intrinsic evidence, consists of the complete record of the proceedings before the PTO as well as the prior art cited by the inventor during the patent examination. *Phillips*, 415 F.3d at 1317.

There are several means-plus-function claim elements before the Court for construction. Construction of a means-plus-function claim element under 35 U.S.C. § 112, ¶ 6 involves two steps. First, the Court must identify the recited function of the claim element. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). Second, the court must identify the corresponding structure in the specification that is necessary to perform that function. *Id.* The statute does not permit incorporation of structure from the specification into the claim(s) beyond that necessary to perform the claimed function. *Id.*

Lastly, it is not necessary for a court to adhere to a rigid algorithm or sequence of steps during the course of claim construction. *Phillips*, 415 F.3d at 1324. Rather, "what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.* Enterasys respectfully submits that proper claim construction analysis in this case, based upon the claim language itself and the pertinent evidentiary sources, should lead this Court to adopt Enterasys' proposed construction for each of the disputed terms/phrases.

**B.** **This Court Should Adopt Enterasys' Proposed Constructions For Each Of The Patents-In-Suit**

**1.** **The '205 Patent**

Enterasys is currently asserting Claims 1, 3, 5, 7, 18 and 21 of the '205 Patent. The '205 Patent is directed to methods for network routing of user data packets that are formatted in conformance with the different addressing conventions of different network layer protocols and/or protocol suites. In some aspects of the '205 inventions (*e.g.*, Claims 1 and 3), a single

routing protocol and its associated algorithm have been made capable of routing data packets conforming to more than one type of addressing convention. In other aspects of the '205 inventions (*e.g.*, Claims 5, 7 and 18), routers encapsulate data packets in headers conforming to a new and different protocol so as to be able to forward them through other routers not capable of understanding the original native protocol of the unencapsulated packets. In yet another aspect of the '205 inventions (*e.g.*, Claim 21), routers share common control packets containing information relating to different addressing conventions so as to facilitate multi-protocol routing.

As set forth in their Revised Joint Claim Construction Statement, the parties have agreed upon constructions for the following phrases from the '205 Patent: "protocol suites;" "routing protocol;" and "using a routing protocol to automatically predetermine …" For several other terms/phrases, the parties have not reached agreement. Enterasys' arguments as to each of these disputed terms/phrases are set forth below:

### a.    "route calculation algorithm" [Claim 1(b)]

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| A procedure that uses information about the topology or other characteristics of a communications network(s) as a basis for computing effective routes for packets throughout said network(s). | A procedure that computes effective routes through the network using the known locations of the network's end systems (*i.e.*, which routers are responsible for which end systems), the nature of the connections between the routers, and the states (*e.g.*, operative or inoperative) of the links forming those connections. |

The parties are in basic agreement that the term "route calculation algorithm" appearing in claim element 1(b) of the '205 patent should be defined as a procedure for computing effective routes for forwarding user data packets through communications networks. *See* '205 Patent at

1:46-50.[11]  However, Enterasys cannot abide by Defendants' attempts to then undermine and narrow this definition by purporting to require that, when performing its computations, the claimed algorithm must utilize only certain specific types of information found in one particular kind of Link State Packet ("LSP") known in the prior art.  As demonstrated below, reading these further narrowing limitations into the definition of "route calculation algorithm" is contrary to proper claim construction principles.

By way of background, the patent specification teaches that so-called "control packets" -- as opposed to user data packets -- are special packets that routers exchange among themselves to provide the informational inputs needed by their respective "route calculation algorithms."  '205 Patent at 1:28-30; 2:18-22.  These informational inputs apprise the algorithm as to some or all of the "topology of the multi-protocol network."  *Id.* at 7:33-37; 18:67 - 19:3; 19:17-19, 47-51.  In other words, "control packets" provide information for use by algorithms about the layout of the network such as where the various routers are located and how they are configured.  *Id.* at 18:67 - 19:60.  The specification discloses that there are several different types of "control packets" including, for example, "Hello Packets," "Link State Packets," and "Sequence Number Packets." *Id.* at 39:20 - 41:41.  Moreover, even within a single category such as "Link State Packets," the nature of the information that they contain will vary depending upon what type of routing protocol and associated algorithm are being employed.  *Id.* at 41:18-29.[12]

---

[11]  As taught in the specification, "routing protocols" associate themselves with (and specify) "route calculation algorithms," and then use these algorithms to perform the task of computing effective packet routes.  *See* '205 Patent at 2:19-26; 4:33-34; 5:8-10; 51:43-45.

[12]  The preferred embodiment shown in the specification employs a modified version of the IS-IS routing protocol -- with its associated Dijkstra "route calculation algorithm" -- which is an example of an *internal intra-domain* routing protocol.  *See* '205 Patent at 51:40-62; 2:65-67.  However, the specification makes clear that in alternative embodiments where an *external inter-domain* routing protocol is to be used instead, the Link State Packets would need to be modified to include new and different fields of information that are "not used by internal [routing] protocols." *Id.* at 41:24-29.

Enterasys' proposed definition for the term "route calculation algorithm" fully accounts for these varying types and contents of "control packets." Indeed, by construing this term to mean a "procedure that uses information about the topology or other characteristics of a communications network," Enterasys' construction is broad enough to encompass routing algorithms that utilize information obtained from *any* of the disclosed varieties of "control packets."[13] By contrast, however, the construction offered by Defendants would limit the claimed "route calculation algorithm" to *only* those algorithms that rely exclusively upon certain specific types of information found in a particular kind of Link State Packet known in the prior art. Indeed, Defendants have gone to the "Background Of The Invention" section of the patent to borrow a description of the contents of certain prior art Link State Packets, and then have tried to read this description into their definition of "route calculation algorithm" as narrowing limitations. *See* '205 Patent at 1:40-65.[14] But for at least the three reasons that follow, Defendants' approach contravenes well-established canons of claim construction and accordingly must be rejected.

First, Defendants' proposed construction is clearly improper in view of the *claim differentiation doctrine* which, as applied here, holds that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. In the '205 patent, *dependent* Claim 3 adds a new limitation calling for the claimed algorithm to calculate packet routes on the

---

[13] The specification makes clear, for example, that Enterasys' preferred term "topology" is broad enough to encompass the types of information about "links" that Defendants are attempting to read into the claim language as narrowing limitations. *See, e.g.*, '205 Patent at 29:36-41.

[14] Notably, even with respect to these prior art Link State Packets, the specific types of information that Defendants propose reading into the claim language as limitations were never actually *requirements*. To the contrary, the specification makes clear that these Link State Packets only "typically" contained such information, suggesting that they sometimes did not. *See* '205 Patent at 1:41. Defendants now omit this word "typically" from their proposed construction so as to render mandatory what was merely commonplace.

basis of information contained in Link State Packets.  Accordingly, as a matter of law, it must be presumed that there is *not* already a requirement in independent Claim 1 that the recited "route calculation algorithm" must always use information obtained from Link State Packets to determine routes, or otherwise Claim 3 would be rendered superfluous.  *See Beachcombers Int'l, Inc. v. Wildewood Creative Prods., Inc.*, 31 F.3d 1154, 1161 (Fed. Cir. 1994).

Second, the Federal Circuit has consistently held that importing a limitation from a "patent's description of the preferred embodiment" into its claims "is precisely … [the] type of claim construction that our prior case law counsels [against]."  *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).  *Accord Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").  Here, Defendants have disregarded these warnings by improperly arguing that because certain specific embodiments of "route calculation algorithms" known in the prior art utilized a particular set of information contained in a particular type of Link State Packet, the patent claims must be read as *requiring* that the recited routing algorithm must *always* utilize this same exact information.  But no such narrowing limitations are called for by the claim language itself.

Third, under Federal Circuit law "it is axiomatic that a claim construction that excludes a preferred embodiment … 'is rarely, if ever correct and would require highly persuasive evidentiary support'" before it could be adopted.  *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (internal citations omitted).  Here, Defendants have defined the term "route calculation algorithm" so narrowly that they would exclude coverage over every preferred embodiment disclosed in the specification except for those limited instances where the algorithm utilizes particular information obtained from a particular type of

15

Link State Packet.  For example, Defendants' proposed construction would not encompass preferred embodiments where the algorithm instead used information obtained from some other type of "control packet," such as "Hello Packets."  '205 Patent at 39:20 - 40:14.  Nor would Defendants' construction cover situations where the prior art Link State Packets have been modified so as to allow the algorithm to utilize new and different types of informational fields -- such as a "Protocols Supported field" -- which do not correspond to the specific categories of information that Defendants are contending must exclusively be relied upon.  *Id.* at 40:16-26.  Finally, as noted above, Defendants' construction also would improperly exclude preferred embodiments involving algorithms used in conjunction with *external* routing protocols that rely upon other unique types of information "not used by internal [routing] protocols."  *See*, *supra*, p. 13 n.12.

        **b.**      **"determining routes for said first and said second user data packets using a route calculation algorithm corresponding to a single routing protocol, chosen from an arbitrary protocol suite, regardless of the addressing convention to which the destination address information in said user data packet conforms" [Claim 1(b)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Using a route calculation algorithm corresponding to a single routing protocol to determine routes for at least two user data packets, each of which contains destination address information conforming to a different addressing convention than the other.<br><br>A single routing protocol can be chosen from any available protocol suite without regard to which addressing conventions are supported by the protocol suite from which it is chosen. | Determining routes for both the first and second data packets using a single route calculation algorithm corresponding to a routing protocol that is part of a protocol suite that is chosen arbitrarily. |

Claim element 1(b) of the '205 patent boils down to two very simple concepts. First, this element is directed to what is commonly known as an *integrated* routing protocol -- *i.e.*, a routing protocol that has been modified in ways that will enable its associated route calculation algorithm to determine routes for user data packets that conform to two or more different types of addressing conventions. Second, claim element 1(b) indicates that when selecting a routing protocol to be modified in this manner, it does not matter from which underlying protocol suite it is initially chosen. Enterasys' proposed construction consists of two separate sentences that articulate each of these concepts in a clear and unambiguous fashion. By contrast, based upon nothing more than the desire to bolster their future non-infringement arguments, Defendants propose a construction that rearranges certain words and phrases in the claim language so as to alter its plain meaning and otherwise give rise to ambiguity.

First, whereas the claim language itself uses the word "single" to modify the phrase "routing protocol," Defendants propose relocating this word to an earlier place in the sentence such that it would become a modifier for the phrase "route calculation algorithm" instead. The end result is that the original modifier for "route calculation algorithm" -- *i.e.*, the indefinite article "a" -- would now be transformed into the new modifier "a single." But in addition to there simply being no reason or basis for making such a gratuitous change to the claim language, it also would be incorrect to do so as a matter of law where, as here, claim element 1(b) follows a preamble using the word "comprising." Indeed, the Federal Circuit "has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1357 (Fed. Cir. 2000) ("under the general rules of claim construction … the customary meaning of 'a' [is] one or more."). *Accord Altiris v. Symantec*

17

*Corp.*, 318 F.3d 1363, 1373 (Fed. Cir. 2003) (same).  Thus, Defendants' call for injecting the word "single" into claim language otherwise reciting "*a*  route calculation algorithm" would serve to significantly change its meaning from "one or more" to "only one."

Second, Defendants misconstrue what the claim language means when it recites that the routing protocol can be "chosen from an arbitrary protocol suite."  Here, the preferred embodiments shown in the specification are directed to two exemplary protocol suites -- *viz.*, **(i)** the OSI protocol suite compatible with packets conforming to OSI addressing conventions; and **(ii)** the TCP/IP protocol suite compatible with packets conforming to IP addressing conventions. '205 Patent at 2:27 - 3:12.  For purposes of these preferred embodiments, the so-called IS-IS routing protocol is chosen from out of the OSI protocol suite and then converted into an *integrated* routing protocol newly capable of handling IP packets in addition to its native OSI packets.  *Id.* at 51:40-55; 54:38-39; 7:31-32, 57-59.  The phrase "chosen from an arbitrary protocol suite" simply means that the underlying routing protocol need not have been this IS-IS protocol selected from out of the OSI protocol suite; rather, an alternative routing protocol could just as readily have been chosen from out of the TCP/IP protocol suite -- or some other protocol suite entirely -- before undergoing the required modifications.  *Id.* at 7:22-30; 51:35-37.

Defendants' proposed construction fails to capture this simple concept, and instead lends itself to an incorrect reading that the routing protocol is "chosen arbitrarily" rather than that it is chosen from an "arbitrary protocol suite."  There is a subtle but significant distinction between these two concepts.  By analogy, if a customer at a roadside farm stand is presented with four baskets of freshly picked apples, he will choose an apple from an *arbitrary basket*, but the apple he selects will not be *chosen arbitrarily*.  Rather, from within any given basket he will presumably choose the apple that appears most appetizing.  Here, there might well be multiple

routing protocols to choose from within any given protocol suite, some of which would be *preferred* -- rather than merely random -- choices because they may be more suitable than others for conversion into *integrated* routing protocols.[15]

        c.      **"said route being determined using the destination address information in said user data packets without converting said destination address information from the addressing convention to which it forms [sic, conforms] to another addressing convention" [Claim 1(c)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
| --- | --- |
| The route for a user data packet is determined based upon using address information from the addressing convention to which it conforms without converting said information to some other addressing convention. | The routes through the network are determined based on the original destination addresses of the user data packets, without converting any of the destination addresses into a new address. |

Claim element 1(c) of the '205 patent requires the algorithm associated with the *integrated* routing protocol to calculate routes for the first and second user data packets using address information from the different addressing conventions to which they each respectively conform without converting that information to some other addressing convention. For example, the algorithm would need to determine routes for an OSI formatted packet by using its own native OSI addressing information, and for a TCP/IP formatted packet by using its own native IP addressing information. While Enterasys proposes a construction that straightforwardly articulates this concept, Defendants once again improperly seek to read extraneous words and phrases into the claim language which would drastically narrow its scope.

---

[15] Nor can Defendants be heard to argue in the alternative that the claimed "protocol suite" is somehow "chosen arbitrarily." Indeed, the claim language is clear on its face that the object of the verb "chosen" is the phrase "routing protocol," *not* the phrase "protocol suite." In other words, the "routing protocol" is actually what gets "chosen."

First, Defendants try to import into element 1(c) a new requirement that the algorithm must calculate routes based upon the "original destination addresses"[16] of the user data packets. But this construction is incorrect as a matter of law because it would exclude coverage over the multitude of preferred embodiments disclosed in the specification that involve *encapsulation*. As taught by the specification, encapsulation is a technique that a router uses when it needs to forward a data packet along a network route that includes other routers which are not capable of understanding the native addressing conventions of the protocol suite to which the packet conforms. *See* '205 Patent at "Abstract;" 10:3-6; 12:65-67; 13:27-32. By way of encapsulation, the packet is given a new header formatted in conformance with whatever different protocol suite and addressing conventions will be comprehensible to these non-capable routers. *Id.* at 13:25-32; 25:25-32; 47:62 - 48:27. Included in this new encapsulation header is a new destination address which typically corresponds to the location of the last router along the path conversant in the new encapsulating protocol format. *Id.* at 14:54-60; 20:38-55; 22:59 - 23:27; 48:44-46.[17] Thus, "the encapsulation header effectively changes the [destination] address of the user data packet." *Id.* at 35:51-52. *Accord Id.* at 22:46-50; 47:60 - 48:11; 48:44-47. Contrary to Defendants' proposed construction, the claimed algorithm will calculate routes for these encapsulated user data packets based *not* upon their "original destination addresses," but rather upon the new destination addresses contained in their encapsulation headers. *Id.* at 14:16-26.

Second, Defendants also urge the Court to adopt a new limitation that would require the algorithm to calculate routes for the user data packets without converting their destination addresses "into a new address." However, this would radically alter the plain meaning of the

---

[16] Notably, this phrase "original destination addresses" does not appear anywhere in the intrinsic record and has been newly minted by Defendants solely to facilitate their future non-infringement arguments.

[17] This last router along the path that is conversant in the encapsulating protocol is usually the place where decapsulation will be performed. *See, e.g.*, '205 Patent at 20:52-55.

claim language. What element 1(c) instead provides is that routes must be calculated without converting the packets' destination addresses into "another addressing convention" -- *e.g.*, an IP formatted address cannot be converted into an OSI formatted address. By contrast, the claim language would in no way preclude conversion of a destination address into a "new address" that remained within the boundaries of the same addressing convention.[18] Indeed, the specification expressly discloses preferred embodiments in which, for reasons relating to "greater efficiency and scaling," the algorithm will calculate routes based upon shorter abbreviated summary versions of standard IP destination addresses. *See* '205 Patent at 42:55 - 44:2; 47:39-44; 58:7-28. Because Defendants' proposed construction rewrites the claim language so as to exclude coverage over these preferred embodiments, it is incorrect as a matter of law.

### d.    "encapsulate" [Claims 5(a), 7(a)]

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Adding to a packet a new header that does not conform to a protocol-specific header with which said packet had previously been configured. | Generate a protocol B header and place the protocol A user data packet, including the protocol A header, into the data area of the protocol B user data packet. |

The parties appear to be in basic agreement that the term "encapsulate" as used in claim elements 5(a) and 7(a) means adding a new additional header to a preexisting user data packet.[19] Indeed, this is precisely what the specification teaches. *See, e.g.*, '205 Patent at 23:20-23 (router "add[s] a new encapsulation header … [to the] user data packet"); 33:22-36 ("encapsulation header" is "added to the user data packet" by router); 36:26-35, 54-65 (same). Moreover,

---

[18]  By analogy, imagine if a Spaniard were to participate in a language immersion program that required him to use all English all the time. He would be forbidden from converting his name "Peter" back into "Pedro," but nothing would preclude him from calling himself "Pete."

[19]  As a matter of law, the Court should accord this disputed phrase the same meaning in claim elements 5(a) and 7(a). *See, e.g.*, *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent."). Indeed, this principle should apply throughout the remainder of this brief in all instances where the same claim term appears in multiple claims or claim elements.

because the purpose of encapsulation in the '205 patent is "to make the user data packet in one protocol compatible with another protocol," it is clear that the encapsulation header will typically be formatted in accordance with the addressing conventions of a new and different protocol that do not conform to those of the underlying packet's own native protocol. *Id.* at 6:59-60, 64-65. *See also supra*, pp. 20. Here, Enterasys has proposed a claim construction which concisely and accurately conveys these concepts. By contrast, however, for at least the two reasons detailed below, Defendants offer an overly narrow construction of the term "encapsulate" which is incorrect as a matter of law because it would exclude coverage over preferred embodiments disclosed in the specification.

First, Defendants' proposed construction improperly attempts to read into the definition of "encapsulate" as limitations the *implementation details* of one specific technique by which encapsulation headers can be added to preexisting data packets. As the specification explains relative to certain prior art "gateway encapsulation" routers, one approach that a person of ordinary skill could use for adding an encapsulation header would be to place the preexisting data packet inside of a new data packet with a new header -- *i.e.*, the practical equivalent of stuffing an addressed envelope inside of a differently addressed FedEx package. *See* '205 Patent at 3:13-31. Defendants' proposed construction essentially adopts word for word the description of this one particular prior art technique, thereby purporting to require that the claimed "encapsulation" must always be effectuated in precisely this same way. But this reading of the claim language would fail to encompass a variety of preferred embodiments disclosed in the specification where "encapsulation" is accomplished using entirely different techniques. For example, contrary to any notion that the envelope stuffing approach is obligatory, the specification expressly teaches that "encapsulation" can instead be achieved simply by

"prepending"[20] an encapsulation header to the preexisting user data packet. *Id.* at 25:30-32. Similarly, the intrinsic record further discloses that "encapsulation" occurs when a router merely "places an … encapsulation header on top of the … header already present on the user data packet." *Id.* at 25:48-53; 38:65 - 39:1.  In sum, while the claim language requires that a certain type of encapsulation have resulted, it is completely indifferent as to what specific techniques are used to bring it about.

Second, Defendants' use of the artificial terms "protocol A" and "protocol B" pose a significant danger that the claim language could be incorrectly interpreted as being limited to only a two-protocol network.  But as the specification makes clear, the inventions of the '205 patent are equally applicable to preferred embodiments consisting of a "three protocol network" or even a "four-or-more protocol network."  '205 Patent at 29:50ff; 32:11-25.  Enterasys' proposed construction avoids this problem by providing that the encapsulation header "does not conform to a protocol-specific header with which said packet had previously been configured," which leaves open the possibility that it could in fact conform to any number of other non-A protocols such as "protocol C," "protocol D," etc.

---

[20]  The term "prepend" is synonymous with the more proper English word "prefix," which simply means to "attach before or in front of." *See* (Exhs. 7 & 8 to Hensch. Decl.).

e.    **"a first addressing scheme" and "a second addressing scheme" [Claims 21(a), 21(b), 21(c), 21(d)(ii), 21(d)(iii)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| A first set of rules for defining, allocating, and/or formatting packet address information that is used in connection with a particular protocol. | A set of address fields that completely defines the addressing information for all layers of a first independent protocol suite. |
| A second set of rules for defining, allocating, and/or formatting packet address information that is used in connection with a particular protocol, and that is different from the first addressing scheme. | A set of address fields that completely defines the addressing information for all layers of a second independent protocol suite that is different from the first independent protocol suite. |

With respect to claim elements 21(a) and (b) of the '205 Patent, the parties appear to be in agreement that the phrase "addressing scheme" refers to a framework for defining addressing information to be used in data packets. Moreover, the parties also appear to agree that this framework would in part relate to the issue of how packets are to be formatted, which Defendants refer to as packet "address fields." The parties further agree that the "first addressing scheme" of element 21(a) is required to be "different from" the "second addressing scheme" of element 21(b). However, the parties thereafter part company in two very significant respects. First, Enterasys cannot abide by Defendants' improper attempts to read the inexplicable and unsupported phrase "completely defines the addressing information for all layers of a … protocol suite" into the claim language as narrowing limitations. Second, Enterasys is likewise not amenable to Defendants' construction insofar as it suggests that, in order to qualify as "different" from one another, the first and second addressing schemes must originate from out of different

protocol suites.[21] As Enterasys demonstrates below, Defendants are improperly seeking to narrow the claim language in ways that would fundamentally alter its plain meaning.

By way of background, the phrase "addressing scheme" generally refers to a set of conventions for defining and allocating addresses for use by data packets, as well as for formatting the packets in a manner that will accommodate such addresses. *See* '205 Patent at 2:15-41; 7:42-47; 8:63 - 9:1. As expressly taught by the specification, "addressing schemes" are typically promulgated and documented in the form of standard protocols issued by independent standards organizations. *Id.* at 2:8-14. In particular, from among the collection of various protocols that make up a protocol suite, it is the so-called "network layer protocols" that serve to establish the "addressing schemes" applicable to data packets. *Id.* at 2:32-41. For purposes of illustrating its preferred embodiments, the specification incorporates by reference the network layer protocol known as "ISO 8473" to provide the exemplary "addressing scheme" applicable to packets conforming to the OSI protocol suite, and the network layer protocol known as "IP" to provide the exemplary "addressing scheme" applicable to packets conforming to the TCP/IP protocol suite. *Id.* at 2:32 - 3:2.[22] Consistent with this background discussion, Enterasys construes the term "addressing scheme" to mean a "set of rules for defining, allocating, and/or formatting packet address information that is used in connection with a particular protocol."

By contrast, Defendants seek to read into the claim language the extraneous phrase "completely defines the addressing information for all layers of … [an] independent protocol suite" which is at best inexplicable, and at worst directly contradicts the teachings of the

---

[21] In their Revised Joint Claim Construction Statement, the parties have agreed that the term "protocol suite" means a "comprehensive set of protocols that is designed to work together to coherently provide complete communication capabilities."

[22] "ISO 8473" refers to a network layer protocol promulgated by the International Organization for Standardization (the "ISO") formally known as "Protocol for Providing Connectionless-mode Network Service (ISO 8473)." *See* (Exh. 9 to Hensch. Decl.). In turn, "IP" refers to a network layer protocol promulgated by the Internet Engineering Task Force (the "IETF") formally known as "Internet Protocol (RFC 791)." *Id.* at Exh. 10.

specification.  For example, neither Defendants nor the intrinsic record offer any explanation of

what it would mean to "completely define." All that can be surmised is that the word

"completely" is so inherently restrictive that it is doubtless designed to lay the groundwork for

Defendants' future non-infringement arguments, whatever they may be.  Equally indecipherable

is the phrase "all layers of … [an] independent protocol suite." It is entirely unclear what

Defendants would view these "all layers" to consist of, and the specification certainly sheds no

light on this subject.  In any event, irrespective of what Defendants may intend "all layers" to

mean, it clearly would be inconsistent with the intrinsic record which ties "addressing schemes"

to but a *single layer* of a protocol suite -- *viz.*, *the network layer*.  As demonstrated above, the

patent's preferred embodiments show that the claimed "addressing schemes" are established by

"network layer protocols" such as "ISO 8473" and "IP," which are responsible for addressing at

the network layer.  Indeed, throughout the specification, packets are referred to as ISO 8473

packets or IP packets as shorthand for indicating which *network layer* "addressing schemes" they

conform to.  *See*, *e.g.*, '205 Patent at "Abstract;" 7:42-47; 8:1-28; 8:65 - 9:1; 39:28-36; 40:16-68;

42:23 - 44:25; 45:50-56; 47:61 - 49:34; 50:30.

The remainder of Defendants' proposed construction attempts to create a new

requirement pertaining to the manner in which the claimed first and second "addressing

schemes" would purportedly need to be "different from" one another.  According to Defendants,

two addressing schemes can qualify as being different only to the extent that they originate from

out of different protocol suites.  But this construction would clearly be incorrect for at least the

following three reasons.  First, it is a well-established axiom that "the claims themselves provide

substantial guidance as to the meaning of particular claim terms."  *Phillips*, 415 F.3d at 1314

(*citing ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the

surrounding words of the claim also must be considered in determining the ordinary and customary meaning of [disputed claim] terms."). Here, the claim language of element 21(b) already expressly recites the conditions under which the "second addressing scheme" shall be considered to be different from the "first addressing scheme" -- *i.e.*, when it "defin[es] different address fields than said first addressing scheme." Because the claim language explicitly defines what it means for first and second addressing schemes to be "different," Defendants' efforts to substitute a contrary understanding must be rejected.

Second, further contrary to Defendants' proposed construction, the intrinsic record actually makes clear that different "addressing schemes" can potentially originate from out of the *same protocol suite*. Indeed, the specification teaches that "[e]ach of these protocol suites includes one or more network layer protocols which define the format used for control and user data packets that are to be transferred by the network routers." '205 Patent at 2:32-35. Because the function of each of each such network layer protocol is to establish an "addressing scheme," the fact that a protocol suite can permissibly contain one or more different network layer protocols necessarily means that it can likewise contain one or more different associated "addressing scheme."

Third, the fact that different "addressing schemes" need not originate from different protocol suites also becomes apparent from an examination of the language of claim element 1(b). *See Phillips*, 415 F.3d at 1314 ("other claims of the patent, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). Claim element 1(b) calls for data packets to be addressed in conformance with "two or more different

addressing conventions of two or more different independent protocol suites."[23]  If, as

Defendants are advocating, different addressing conventions already by definition must originate

from different protocol suites, it would be redundant and superfluous for this claim element to

expressly recite that these different addressing conventions need to originate from out of "two or

more different independent protocol suites."  Indeed, the inventors clearly drafted this language

in a manner that contemplates the possibility that different addressing conventions can

sometimes originate from the *same protocol suite*.  Moreover, as a well-established canon of

claim construction, the "absence in one claim of a limitation that is present in others suggests

that the inventor intended that claim not be so limited."  Robert C. Kahrl, *Patent Claim

Construction*, § 4.03[A][2], p. 4-24.7 (Aspen Publishers 2006 ed.).  *Cf. Kalman v. Kimberly-

Clark Corp.*, 713 F.2d 760, 770 (Fed. Cir. 1983) ("'Where some claims are broad and others

narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or

to escape infringement.'").  Applying these principles here, the fact that the inventors knew how

to expressly include a "different protocol suites" limitation in Claim 1 -- but chose *not* to include

a similar requirement in Claim 21 -- indicates that they intended Claim 21 to be broader with

respect to this issue and *not* to be subject to any such narrowing limitation.

f.    **"said first and second devices exchange control packets
which specify" [Claim 21(d)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
| --- | --- |
| The first and second devices exchange control packets which collectively specify … | The first and second devices exchange control packets, each control packet including …. |

---

[23]  The parties appear to agree that the phrase "addressing scheme" as used in claim elements 21(a) and (b) is synonymous with the phrase "addressing convention" appearing in claim elements 1(b) and (c) discussed above. Indeed, these two phrases are used interchangeably throughout the intrinsic record, and in their original claim constructions filed with the Court on June 7, 2007 (Doc. No. 110), Defendants expressly defined the phrase "addressing scheme" to mean "addressing convention."

28

The parties do not appear to be in disagreement as to the meaning of the term "control packets" as it is used in claim element 21(d). Indeed, consistent with Enterasys' unrebutted definition, the specification makes clear that "control packets" are special packets exchanged among routers or other information handling devices that contain control information pertaining to the topology or other characteristics of the network. *See* '205 Patent at 1:28-30, 59; 2:18; 7:32-37, 47-49; 18:67 - 19:5; 19:17-19; 39:20 - 41:41.

Where the parties part company, however, is over Defendants' improper attempts to essentially replace the word "which" with the phrase "each" of which because this gratuitous substitution would significantly alter the plain meaning of the claim language. As currently written, claim element 21(d) requires only that the group of "control packets" (plural) exchanged between the first and second information handling devices *collectively* provide all the types of information listed in the remaining claim elements 21(d)(i) through 21(d)(iii). This is consistent with the teachings in the specification that there are several different types of control packets such as "Hello Packets," "Link State Packets," and "Sequence Number Packets" which contain different types of information from one another. *See* '205 Patent at 39:20 - 41:41. The network devices receive the totality of information that they need from the combined offerings of all of these various categories of control packets. *Id.* at 7:31-37 (router becomes aware of full topology of network based upon information received from *both* "Hello Packets" *and* "Link State Packets."). But by reading the phrase "each of which" into the claim language, Defendants would be creating a new requirement that *each individual* control packet must *by itself* contain all of the information required by the network devices. Clearly, no such requirement exists, and accordingly Enterasys proposes adding the word "collectively" into the claim language solely as an effort to counteract Defendants' efforts to misconstrue its plain meaning.

2.     **The '173 Patent**

Enterasys is currently asserting Claims 1, 3 and 5 of the '173 Patent. These claims are directed to a packet data communications network wherein a message packet from one network segment is sent to a second network segment through a switching device. A first network transfer device (*i.e.*, control circuitry), connected to the input port of the switching device, applies a "local" header onto the packet to facilitate movement of the packet through the switching device. This local header includes a local destination address (the "switching address") that is translated from, and as described in Claim 3, is shorter than, the original network destination address that was part of the original header. The local header also includes local status information which the switch considers during transmission of the packet. A second network transfer device (*i.e.*, control circuitry), connected to the output port of the switching device, removes the second header from the packet before it is sent onto the second network segment. In Claim 5, the switching device is a crossbar switch.[24]

As set forth in their Revised Joint Claim Construction Statement, the parties have agreed upon constructions for the following phrases from the '022 patent: "message packet," "network destination address," "switching device," "destination address" and "crossbar switch." For several claim terms/phrases, the parties have not reached agreement. Enterasys' arguments as to each of these disputed terms/phrases are set forth below:

---

[24] The parties have agreed on the following construction of "crossbar switch": A device that makes a direct point-to-point interconnect between one port and another port, so that the crossbar acts as a bridge or router in the network, linking one network segment to another.

a.    **"switching address"**[25] **[Claim 1(b)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| The local address, *i.e.* the identification, of the output port that is the final destination of the packet within the switching device. | A field or fields containing the switch and link number (*i.e.*, local address) of the final destination of the packet. |

Three disputes are apparent from the parties' constructions: (i) whether the switching address identifies a port, or whether it identifies a switch and link number; (ii) whether the switching address is "a field or fields," or whether this address is information contained in a field or fields; and (iii) whether the switching address indicates the overall final destination of the packet, or just the final destination within the switching device.

**(i)    The switching address identifies a port**

Defendants' construction requires that the switching address include a "switch and link number." However, a review of the description in the specification of the information contained in the destination switch field, which is the illustrative field containing the switching address, reveals that the "switch number" in the destination switch field identifies a port. The destination switch field is described as follows:

> The destination switch field 66 is a 12-bit field representing the switch number (*i.e.*, local address) of the final destination of the packet within the net 50.[26] When a packet is received from an FDDI link 11, the IR process 27 performs a lookup operation to derive the destination switch value for the packet. *A 12-bit field allows 4096 ports; a single crossbar 12 has only thirty-six ports in one embodiment, so the need for a 12-bit address is because a number of the crossbars 12 may be within a net 50, and to allow for expansion to larger crossbars and larger nets 50.* Certain switch values are reserved: $02_{hex}$ and $03_{hex}$ indicate that the final destination is unknown to the IR process 29, and $00_{hex}$ and $01_{hex}$ indicate that the final destination address is to be filtered *at this port*. Other

---

[25]  The parties have agreed that the phrase "switch address" of Claim 3 should be given the same construction as "switching address" of Claim 1. The parties disagree as to what that construction should be.

[26]  The net 50 is the "local" switch or switches that benefit from the local addressing and status information. '173 Patent at 7:66-8:12; Fig. 3.

values derived for this field will direct the packet to its destination within the
switch.

'173 Patent at 9:45-60 (emphasis added).  While the specification does not explicitly define
"switch number," the paragraph quoted above indicates that the "switch number" is one of up to
4096 *ports*, one of which is the final destination of the packet within the local net.  Therefore, the
"switching address" is the port to which the packet is directed, *i.e.*, the destination port of the
packet within the switch or switches that comprise the net 50.

**(ii)      The switching address is data contained
in a field; the address is not itself a field**

The Defendants' construction blurs the distinction between fields and data.  The
"switching address" is not a field; rather, it is the information contained in the destination switch
field.  A field is not the information itself, but is instead the location where information is held.
*See id.* at 9:27-33 (describing the 104-bit "field" called the "giga-header" and indicating that this
field "contains information" generated when the packet enters the local network); at 10:45-47
("The translation status field 74 is a 4-bit field which stores the result of the automatic translation
performed on the current packet.").  The switching address is the information contained in the
illustrative destination switch field.  *See id.* at 9:45-50.  Therefore, Defendants' construction,
which wrongly equates a "switching address" with "a field or fields" rather than with data,
should be rejected.

**(iii)      The switching address indicates the
destination of the packet *within the switch*,
not the overall final destination of the
packet**

By construing switching address as associated with the "final destination of the packet,"
Defendants imply that the final, or ultimate, destination of the packet is always to a location
within the switching device.  This is not the case.  Message packets are intended for end systems.

Specifically, the patent contemplates that the packet will be sent to an end system on the second network segment. *See* '173 Patent Claim 1(d) ("the second network transfer device receiving said message packet via said switching device to forward to said second network segment"). Therefore, the final destination of the packet is in the second network segment or beyond. The switching address only indicates the port within the switching device to which the packet is destined on its way to the second network segment.

        b.      **"local status information" and "a plurality of status fields to indicate a message packet servicing" [Claim 1(b)]**

| Claim Terms | Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|---|
| *local status information* | Information that is locally useful, but not part of the packet protocol and not necessary for transmission with the packet throughout the network. | Information, contained in one or more fields, that is locally useful, but not part of the message packet protocol and not necessary for transmission with the packet throughout the network. |
| *a plurality of status fields to indicate message packet servicing* | Fields in the second header that contain local status information that indicate how a message packet is to be handled. | This term cannot be construed as it is indefinite pursuant 35 U.S.C. §112. To the extent that the indefiniteness of this term does not invalidate this claim, Defendants offer the following construction:<br><br>Fields containing status information, other than local status information, that indicates how a message packet is to be handled. |

While the phrases "local status information" and "a plurality of status fields to indicate a message packet servicing" have been presented to the Court in the parties' Revised Joint Claim Construction Statement as separate phrases, these phrases are most efficiently addressed together, as a complete phrase as it appears in Claim 1 of the '173 Patent: "said second header

further including *local status information* and *a plurality of status fields to indicate message packet servicing*."  Enterasys' construction should be adopted by this Court because (1) as with its construction of "switching address," Enterasys' construction properly distinguishes the concepts of fields and information contained in those fields, and (2) Enterasys' construction correctly recognizes that "local status information" is the data *contained in* the "plurality of status fields."

As indicated above in the context of Enterasys' argument regarding "switching address," fields contain information.  Therefore, Defendants' construction which defines "local status information" as *fields* should be rejected.

Defendants contend that the phrase "a plurality of status fields to indicate a message packet servicing" is indefinite under 35 U.S.C. §112.  "Whether a claim is invalid for indefiniteness requires a determination whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993).  However, an indefiniteness defense must be proven by clear and convincing evidence.  *Moba v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319 (Fed. Cir. 2003).  "[C]lose questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee." *Exxon Research and Eng'g Co. v. U.S.*, 265 F.3d 1371, 1380 (Fed. Cir. 2001).  The Federal Circuit has stated, "We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be." *Id.* at 1375.  "If the meaning of the claim is discernable, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, [the Federal Circuit has]

held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Id.* Therefore, the Defendants' indefiniteness defense carries with it a very high burden.

The phrase at issue here is amenable to construction -- the construction proposed by Enterasys. The concept of local status information is first introduced in the "Summary of the Invention" of the '173 Patent: "The added header may also contain other information, such as a local name for the source and destination segment (link), as well as *status inform*ation that is locally useful, but not part of the packet protocol and not necessary for transmission with the packet throughout the network." '173 Patent at 2:20-25 (emphasis added). This *status information* is contained in *status fields*. The language of the claim is clear.

The examiner understood the claim language to mean exactly what Enterasys now proposes. On page 3 of the March 11, 1994 Office Action,[27] the examiner asserted that "adding local status information *through* a plurality of status fields in the header to indicate message packet servicing is well known in the art."[28]  (emphasis added)  "Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005). Where the prosecution history reveals the patent examiner's and the patentee's common understanding of a claim term, "this is the meaning which must be imparted to the term" during the course of claim construction. *Connecticut Valley Enters., Inc. v. U.S.*, 348 F.2d 949, 953-54 (Ct. Cl. 1965). Here, the patent examiner understood that the "local status information" is contained in the "plurality of status fields." Defendants' construction, under which the status fields do not contain this local status information, is inconsistent with the inventors' understanding of this claim language, as well as

---

[27]  The March 11, 1994 Office Action is at Bates Nos. ETS00413130-137 of '173 Pros. Hist.

[28]  In a subsequent Amendment, the inventors successfully argued that their claims were patentably distinct over the prior art, after which the claims were allowed.

the examiners' understanding.  Enterasys' construction should therefore be adopted and the

Defendants' indefiniteness defense must fail.

> c.    **"receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and the plurality of status fields" [Claim 1(c)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Receiving the message packet with said second header and sending it to a second port which is selected by the switching address and, in doing so, factoring in the local status information contained in the plurality of status fields. | Receiving the message packet with said second header and sending it to a port in the switching device selected based on the switching address, the local status information and the status fields in the header. |

The dispute as to this claim language is whether the second port is selected by the

switching address, local status information, and the status fields (as proposed by Defendants) or

whether the second port is selected by the switching address and, in sending the packet to the

second port, the switching device factors in the local status information which is contained in the

plurality of status fields (as proposed by Enterasys).  Because the claim language itself as well as

the specification support Enterasys' construction, it should be adopted by this Court.

Defendants' proposed construction rewrites the language of the claim.  The claim

language indicates that the switching device sends the message packet to the second port "as

selected by said switching address, *and in response to* said local status information and the

plurality of status fields."  Defendants' proposed construction ignores "and in response to" and,

as a result, changes the meaning of the claim.  When this language is properly considered, it

becomes clear that the second port is selected based on the switching address and the packet is

sent to this second port in response to -- or by factoring in -- the local status information.  As

discussed in Section III.B.2.b, *supra*, this local status information is contained in the plurality of status fields.

The specification also supports this construction. The specification provides three examples of local status information: (1) local congestion information, (2) results of address translation," and (3) "end-of-message information." '173 Patent at 2:25-27 ("Local congestion information, results of address translations, and end-of-message information, are examples of such status information."). The switching device factors in this status information when transmitting the packet to the second port.

**Local Congestion Information:** Examples of local congestion information are depicted in Figure 5. Elements 79 and 80 represent outbound congestion information and inbound congestion information, respectively. Information related to congestion can affect the amount of time a packet may have to wait before being sent to the outbound port. *See* U.S. Patent No. 5,088,091, at 1:51 - 2:2.[29]

**Results of Address Translations:** Results of address translation are illustratively depicted in Figure 5 of the '173 Patent also. Element 74, the translation status field, indicates whether the packet is, for example, to be forwarded to its destination or "trapped." '173 Patent at 10:45-50.

**End-of-Message Information:** End-of-message information is also illustratively depicted in Figure 5, at element 76. The information in this field indicates whether the packet is the last of a packet stream or a middle packet in a packet stream. *Id.* at 10:56-60.

Collectively, this congestion, translation and end-of-message information are not simply used to select the port within the switch to which the packet will be directed, as Defendants

---

[29] *See* Bates Nos. ETS00413279-340 of '173 Pros. Hist.

contend.  Instead, this information -- congestion at each port, whether the packet should be

forwarded or trapped, and whether the packet is the last in the packet stream -- is factored into

the process of moving the packet from the first port to the second port.  Therefore, Enterasys'

construction is completely consistent with the language of the claim and the specification and

should be adopted by this Court.

### 3.     The '665 Patent

Enterasys is currently asserting Claims 1, 4, 5, 6 and 7 of the '665 Patent.  These claims

are directed to a port-based default VLAN,[30] and a method and computer program product for

limiting broadcast messages on a port-based default VLAN.  According to the inventions, all of

the ports on a switch are initially considered default VLAN ports.  When a second VLAN is

formed, the ports of the second VLAN are no longer part of the default VLAN.  When a packet

is received through one of the default VLAN ports, the switch determines if the destination port

of the packet is one of the default VLAN ports.  If so, the switch transmits the packet to that

default VLAN port.  If not, the switch transmits the packet to all of the default VLAN ports and

to none of the second VLAN ports.  In the prior art, if the switch determined that the destination

port of the packet was not one of the default VLAN ports, the packet would be transmitted to all

of the ports on the switch.  The goal of the '665 invention was to limit this type of "data leakage"

across VLANs.

As set forth in their Revised Joint Claim Construction Statement, the parties have agreed

upon constructions for the following  phrases from the '665 patent: "switch port," "means for

---

[30]  A VLAN (virtual local area network) is a group of end stations or ports interconnected to form a single logical
broadcast domain.  The grouping is flexible and can be controlled and changed by the network administrator.  It
differs from a LAN in that a VLAN is more dynamic than a LAN, allowing the network administrator to remotely
change the end stations or ports which make up the VLAN, and allowing users who are in different geographic areas
to work as if they are connected to the same switch and on the same LAN.  *See* '236 Patent at 1:62-67; '665 Patent
at 1:42-52.

receiving a data packet through one of the default VLAN ports" and "computer program

product." For several claim terms/phrases, the parties have not reached agreement. Enterasys'

arguments as to each of these disputed terms/phrases are set forth below:

a.    **"port based default VLAN" [Claims 1, 4, 6]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| A virtual local area network defined by the switch ports on a switch that are not associated with other virtual local area networks. | A VLAN that is defined during manufacture as every port on a single switch or a plurality of switches. When a default VLAN is configured during manufacture to span a plurality of switches, the default VLAN includes a bus in a hub and an enable switch that electrically connects each of the switches to the bus. |

Defendants' construction of "port-based default VLAN" represents an improper attempt

to limit this phrase to a single embodiment disclosed in the patent. Specifically, the Defendants'

construction requires inclusion of a bus, hub and enable switch when neither the plain language

of the claim nor the specification indicate that a bus, hub and enable switch must be present.

There is no reference in Claim 1 to a bus, hub or enable switch. In order to read these

limitations into the claim, the specification must indicate that the inventors intended to define

"port based default VLAN" to include these limitations. It does not. The specification describes

the concept of a port-based default VLAN as follows:

> Known port-based VLANs typically are implemented on a switch to include a
> default VLAN, in addition to other VLANs that may be formed on the switch.
> During manufacture, the default VLAN is defined as every port on a single
> switch. The number of switch ports defining the default VLAN decreases,
> however, as ports on the switch are used for defining other VLANs. Accordingly,
> on an exemplary eight-port switch having a first VLAN defined by ports one and
> two, the default VLAN will be defined by remaining ports three through eight.

'665 Patent at 1:60 - 2:2. In other words, initially, all of the ports on a switch are part of the

default VLAN.  However, as new VLANs are defined, the ports of these new VLANs are no longer part of the default VLAN.  Enterasys' construction accurately reflects this concept.

The defendants' construction reflects that of a single embodiment described in the patent:

> In accordance with *another* aspect of the invention, each of the ports on a plurality of switches connected to a hub are configured, during manufacture, to define a default VLAN spanning the plurality of switches.  To that end, the default VLAN includes a bus in the hub, an enable switch for electrically connecting each of switches to the bus, and means for defining each of the switch ports as the default VLAN.

*Id.* at 2:31-38 (emphasis added).  This paragraph in the specification describes one way a default VLAN can be implemented.  However, this implementation is not covered by Claim 1.  Rather, this particular implementation is specifically set forth in Claim 8, which is not being asserted by Enterasys.[31]  The Federal Circuit has recognized that "each claim [in a patent] does not necessarily cover every feature disclosed in the specification.  When the claim addresses only some of the features disclosed in the specification, it is improper to limit the claim to other, unclaimed features."  *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006).  Defendants' construction improperly limits Claim 1 to these unclaimed features and should be rejected.

### b.    "data packet" [Claims 1, 1(a), 4(a), 5, 6(a)]

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| An organized stream of bits, including a header section and a payload section.  The header section includes a destination address for forwarding the packet to the intended recipient. | An organized stream of bits, including a header section and a payload section.  The header section includes address information for forwarding the packet to the intended recipient. |

---

[31]  Claim 8 reads, in pertinent part:

> A port based default VLAN formed on *a hub* having at least two networking switches connected thereto, each switch having one or more switch ports, the port based default VLAN comprising:
>
> a *bus* in the hub;
>
> an *enable switch* for electrically connecting each of the VLAN ports to the bus. . .

The dispute here is whether the header of the claimed "data packet" must include a destination address. The specification of the '665 Patent and the art cited during its prosecution demonstrate that a destination address is an indispensable aspect of a data packet as that phrase is used in the '665 Patent and in the art of computer networking in general. In an apparent attempt to ensnare prior art covering unrelated technologies, Defendants' seek to broaden the claims of the '665 Patent beyond their rational and logical limits. Because Enterasys' construction comports with the ordinary and customary use of the term "data packets," it should be adopted by this Court.

Data packets include destination addresses. The destination address identifies the ultimate destination of the packet. It is the basis upon which the packet is forwarded. The specification describes the use of the destination address in forwarding decisions. '665 Patent Abstract ("The default VLAN receives a data packet, ascertains the destination address of the packet, and then determines if the destination port is one of the default VLAN ports."); 1:24-25 ("Among other information in the header is the destination address of the data packet."); 3:34-38 ("The destination address of the data packet 26 is stored in the header 28 of the data packet 26. The switch port 18 associated with the destination address is ascertained by conventional means within the switch 16 receiving the data packet 26.").

In addition, a review of the patents cited to the PTO during prosecution of the application that led to the '665 Patent reveals that those patents which describe the contents of a data packet header describe it as including a destination addresses:

- U.S. Patent No. 5,394,402, at 7:21-24  (Bates Nos. ETS00413718-732 of '665 Pros. Hist.) ("FIG. 4 illustrates the general sequential format of a typical LAN message, which includes a start field 80, a destination address (DA) field 82 . . .").

- U.S. Patent No. 5,684,800, at 2:39-43  (Bates Nos. ETS00413759-777 of '665 Pros. Hist.) ("note that unicast frames can be processed by a 'generic' call processor that does not decode or translate the frame at all, but instead makes the connection request based on the source and destination unicast MAC addresses in the frame").

- U.S. Patent No. 5,734,865, at 10:51-53  (Bates Nos. ETS00413778-806 of '665 Pros. Hist.) ("Every IP packet contains the source address and destination address as discussed herein so that each packet can be delivered and routed independently.").

- U.S. Patent No. 5,740,171, at 5:11-13  (Bates Nos. ETS00413807-821 of '665 Pros. Hist. ("When received at the port, the frame contains a 48-bit destination address in field 304 that identifies the destination network address of the frame …").

- U.S. Patent No. 5,742,604, at 5:2-4  (Bates Nos. ETS00413822-834 of '665 Pros. Hist.) ("When received at the port, the packet contains a 48-bit destination address (DA) in field 304 that identifies the destination network address of the packet …").

These references to the existence of a destination address in a data packet header are strong evidence that one of ordinary skill in the art would have understood that the header of a data packet includes a destination address.  For a different construction to apply, the inventors would have had to clearly and unequivocally define the phrase differently in the specification.  *Phillips*, 415 F.3d at 1316; *Vitronics*, 90 F.3d at 1582.  They did not.  To the contrary, the inventors repeatedly referenced the existence of a destination address in the data packet header.  Enterasys' construction is the correct construction and should be adopted.

c.    <u>"**means for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports"** [Claim 1(b)]</u>

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6):<br><br>Recited Function: ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports<br><br>Corresponding Structure: Conventional means (*e.g.*, a programmable logic chip or firmware stored within the switch) that ascertains the switch port using information in or known about the data packet. Figure 4, Step 400. The term "conventional means" refers to means that accord with, are sanctioned by, or are based on convention and does not preclude later-developed programming methods or structures. | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by this limitation is "ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports."<br><br>The "structure" recited by the specification for performing this function is "conventional means within the switch receiving the data packet." The destination port is determined directly from information or data in the data packet header. The "conventional means" as described in the specification are "a programmable logic chip within one or more switches" and "firmware stored within those switches" where the programmable logic chip and firmware are "programmed by conventional methods." The use of the word "conventional" expressly limits the structures and programming methods to those in existence at the time of the filing, and no later-arising equivalents. |

The dispute here is whether this Court should construe this means-plus-function clause to exclude programming methods or structures that are equivalent to, but were developed after, the "conventional means" by which the destination port is ascertained in the patent. The relevant law permits the fact finder to look to later-arising equivalents in determining whether a means-plus-function claim element is infringed. Therefore, Defendants' construction, which seeks to exclude later-arising equivalents, must be rejected as legally incorrect.

A means-plus-function claim element "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C

§112, ¶ 6.  In determining whether a structure is equivalent under this statute, the jury may consider any structure in existence at the time of patent issuance, and is not limited to considering only structure in existence at the time of filing.[32]  *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1320 (Fed. Cir. 1999) ("[A] structural equivalent under § 112 must have been available at the time of the issuance of the claim.").  "[A]n equivalent under the doctrine of equivalents may arise after patent issuance and before the time of infringement."[33]  *Id.*

The case law instructs, then, that under a literal infringement analysis under 35 U.S.C. § 112, ¶ 6, the jury can consider structure available up to the time of issuance of the claim. Under a doctrine of equivalents analysis, the jury may consider structure available up to the time of infringement.  Enterasys' construction, which does not preclude these later-developed programming methods and structures permitted under the law, should therefore be adopted.

---

[32]  The proper test [for determining equivalence under § 112, P 6] is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial.  *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998).

[33]  The Federal Circuit has articulated the difference between an analysis of equivalence under § 112, ¶6, and an analysis of equivalence under the doctrine of equivalents as follows:  "[U]nder § 112, P 6, the accused device must perform the identical function as recited in the claim element while the doctrine of equivalents may be satisfied when the function performed by the accused device is only substantially the same."  *Al-Site*, 174 F.3d at 1320-1321.

      d.     **"means for determining whether the destination port is one of the default VLAN ports" [Claim 1(c)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6): | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6. |
| Recited Function: determining whether the destination port is one of the default VLAN ports. | The "function" recited by this limitation is "determining whether the destination port is one of the default VLAN ports." |
| Corresponding Structure: A programmable logic chip within one or more switches or firmware stored within those switches, both of which are programmed by conventional methods. Fig. 4, Step 402. The phrase "conventional methods" refers to methods that accord with, are sanctioned by, or are based on convention and does not preclude later-developed programming methods or structures. | The "structure" recited by the specification for performing this function is a programmable logic chip within one or more switches or firmware stored within those switches, both of which are programmed by conventional methods. The use of the word "conventional" expressly limits the structures and programming methods to those in existence at the time of the filing, and no later-arising equivalents. |

The dispute here is whether this Court should construe this means-plus-function clause to exclude programming methods or structures that are equivalent to, but were developed after, the "conventional means" by which it is determined whether the destination port is one of the default VLAN ports. Because the relevant law permits the fact finder to look to later-arising equivalents in determining whether a means-plus-function claim element is infringed, Enterasys' construction should be adopted by the Court. *See* Enterasys' argument above in support of its construction of "means for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports."

    e.    **"first means, responsive to the determining means, for transmitting the data packet to the destination port if the determining means determines that the destination port is one of the default VLAN ports" [Claim 1(d)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6): <br><br> Recited Function:  transmitting the data packet to the destination port if the determining means determines that the destination port is one of the default VLAN ports <br><br> Corresponding Structure: A programmable logic chip within one or more switches or firmware stored within those switches, both of which are programmed by conventional methods.  Fig. 4, Step 404.  The phrase "conventional methods" refers to methods that accord with, are sanctioned by, or are based on convention and does not preclude later-developed programming methods or structures. | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6. <br><br> The "function" recited by this limitation is "transmitting the data packet to the destination port if the determining means determines that the destination port is one of the default VLAN ports." <br><br> The "structure" recited by the specification for performing this function is a programmable logic chip within one or more switches or firmware stored within those switches, both of which are programmed by conventional methods.  The use of the word "conventional" expressly limits the structures and programming methods to those in existence at the time of the filing, and no later-arising equivalents. |

The dispute here is whether this Court should construe this means-plus-function clause to exclude programming methods or structures that are equivalent to, but were developed after, the "conventional means" by which the data packet is transmitted to the destination port if the determining means determines that the destination port is one of the default VLAN ports. Because the relevant law permits the fact finder to look to later-arising equivalents in determining whether a means-plus-function claim element is infringed, Enterasys' construction should be adopted by the Court.  *See* Enterasys' argument above in support of its construction of "means for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports."

**f.** **"second means, responsive to the determining means, for transmitting the data packet to each of the default VLAN ports if the determining means determines that the destination port is not one of the default VLAN ports" [Claim 1(e)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6): | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6. |
| Recited Function:  transmitting the data packet to each of the default VLAN ports if the determining means determines that the destination port is not one of the default VLAN ports | The "function" recited by this limitation is "transmitting the data packet to each of the default VLAN ports if the determining means determines that the destination port is not one of the default VLAN ports." |
| Corresponding Structure:  A programmable logic chip within one or more switches or firmware stored within those switches, both of which are programmed by conventional methods.  The phrase "conventional methods" refers to methods that accord with, are sanctioned by, or are based on convention and does not preclude later-developed programming methods or structures. | The "structure" recited by the specification for performing this function is a programmable logic chip within one or more switches or firmware stored within those switches, both of which are programmed by conventional methods.  The use of the word "conventional" expressly limits the structures and programming methods to those in existence at the time of the filing, and no later-arising equivalents. |

The dispute here is whether this Court should construe this means-plus-function clause to exclude programming methods or structures that are equivalent to, but were developed after, the "conventional means" by which the data packet is transmitted to each of the default VLAN ports if the determining means determines that the destination port is not one of the default VLAN ports.  Because the relevant law permits the fact finder to look to later-arising equivalents in determining whether a means-plus-function claim element is infringed, Enterasys' construction should be adopted by the Court.  *See* Enterasys' argument above in support of its construction of "means for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports."

g.    **"each of the default VLAN ports" [Claims 1(e), 4(e), 6(e)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| all of the default VLAN ports except the one from which the packet was received – the ports to which the packet would be flooded | All of the default VLAN ports, including the port on which the packet was received. |

This phrase is part of the larger phrase "transmitting the data packet to *each of the default VLAN ports* if the destination port is not one of the default VLAN ports." The dispute here is whether a packet received on a default VLAN port, but with a destination address associated with a port *not* on the default VLAN, is sent out *all* default VLAN ports (Defendants' construction), or just those default VLAN ports other than the one on which it was received (Enterasys' construction). Because those of ordinary skill in the art of the invention -- including the inventors -- understand that a packet is never sent back onto the port on which it was received, Enterasys' construction should be adopted.

Defendants will likely rely on the following language from the specification to support their argument:

> Ports one and two define the default VLAN, ports three to five define VLAN 2, and ports six to eight define VLAN 3. Data packets received on switch ports one or two may be transmitted to either or both of those switch ports 18 only, thus preventing leakage to VLAN 2 and VLAN 3. For example, a data packet received on port two having a destination address of port four will be transmitted to both ports one and two only.

'665 Patent at 3:22-29. This language does indicate that the packet is sent out all the ports of the default VLAN, including the port on which the packet was received. However, one of ordinary skill would understand that the invention would not be implemented in this way.

The prosecution history confirms the common sense understanding that, when a packet is received on a port, it is *not* sent back onto, *i.e.*, received *again* on, that same port. Instead, a

packet received on a default VLAN port, where that packet has a destination address associated with a port *not* on the default VLAN, is sent onto the *other* default VLAN ports.  In a September 21, 1998 Amendment (Bates Nos. ETS00413620-626 of '665 Pros. Hist.), the inventors responded to a § 112 rejection wherein the examiner indicated that it was unclear what was meant by the phrase "transmitting the data packet to each of the default VLAN ports if the destination port is not one of the default VLAN ports."  In explaining what was meant by this phrase, the inventors quoted the language from the specification cited above, including the sentence that reads, "For example, a data packet received on port two having a destination address of port four will be transmitted to both ports one and two only."  In explaining what was meant by this language, the inventors explained:  "[W]hile the destination port of four is known, because it is received on the default VLAN, it is only forwarded to *other* ports on the default VLAN."  September 21, 1998 Amendment, p. 3 (emphasis added).  In other words, a packet received on a port of the default VLAN with a destination port that is not on the default VLAN "is only forwarded to *other* ports on the default VLAN."  *Id.  See also* U.S. Patent No. 5,684,800, Abstract (Bates Nos. ETS00413759-777 of '665 Pros. Hist.) (explaining that when a broadcast packet is received on a port of a first switch, it is encapsulated with a VLAN header and sent to other switches, while the "original packet is sent out the *other* access ports of the receiving switch . . .").

"An asserted error in the prosecution record must be viewed as are errors in documents in general; that is, would it have been apparent to a person experienced in this technology that an error was made, or at least that the information should not be relied upon."  *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1322 (Fed. Cir. 2001).  Language in the specification that implies that a packet would be transmitted onto the very same switch port on which the packet was

received is an error that would have been apparent to one of ordinary skill in the art of computer networking technology. This language from the specification should not be used to construe claim language in a manner inconsistent with how that claim language would have been understood by those of ordinary skill in the art, and inconsistent with a common sense understanding of packet transmission. Enterasys' construction, which represents the understanding of the inventors and those of ordinary skill in the art, should be adopted by this Court.

### 4.    The '995 Patent

Enterasys is currently asserting Claims 1, 14, 19, 25, 32, and 33 of the '995 Patent. The '995 Patent is directed to methods and apparatuses for establishing restricted broadcast groups within a switched network that are known as virtual local area networks ("VLANs"). According to one aspect of the '995 inventions (*e.g.*, Claims 1 and 25), different subsets of end systems on the network are assigned to different VLANs, and data packets originating from end systems within a particular VLAN are encapsulated by adding a new header containing an identifier associated with their source VLAN (*i.e.*, a "VLAN-ID"). In instances where a packet needs to be flooded, such flooding is restricted to only those switch ports that are connected to one or more end systems belonging to the same VLAN indicated by that packet's VLAN-ID. In other aspects of the '995 inventions (*e.g.*, Claims 14 and 32), prior to an end system being assigned a VLAN-ID indicating membership in a particular VLAN, a default VLAN-ID is maintained for that end system. In still other aspects of the '995 inventions (*e.g.*, Claims 19 and 33), VLAN-capable switches maintain certain mapping tables and/or MIB interfaces.

As set forth in their Revised Joint Claim Construction Statement, the parties have agreed upon constructions for the following phrases from the '995 Patent: "computer-readable storage medium;" "end systems;" and "assign at least one identifier to a respective subset of end

systems." For several other terms/phrases, the parties have not reached agreement. Enterasys'

arguments as to each of these disputed terms/phrases are set forth below:

### a.    "access ports" and "network ports" [Claims 1, 1(b), 1(c), 1(c)(iv), 25, 25(b), 25(c), 25(c)(iv)]

| Enterasys Proposed Constructions | Defendants Joint Proposed Constructions |
|---|---|
| An interface through which a switch and an end system communicate. | An interface capable of connecting a switch to an end system, but not another switch. |
| An interface through which a switch communicates with another switch. | An interface capable of connecting a switch to another switch, but not an end system. |

The parties are in agreement that the term switch "ports" as used throughout Claims 1

and 25 of the '995 Patent generally refers to the interfaces through which a switch sends and

receives communications to and from other devices on the network.  However, the parties have

sharply different views about what the claim language requires in order for certain of these

switch "ports" to be characterized more specifically as "access ports" as opposed to "network

ports." As demonstrated below, the intrinsic record strongly supports Enterasys' construction

that "access ports" and "network ports" are simply defined by reference to what a particular

switch port has been connected to.  In other words, where a user has chosen to configure a

particular switch port by connecting it only to end systems -- *e.g.,* personal computers, work

stations, servers -- it is called an "access port." On the other hand, where a user has connected a

particular switch port only to other switches, it is instead referred to as a "network port." By

contrast, Defendants are apparently arguing that *at the time of manufacture*, certain switch ports

are *dedicated* as "access ports" such that they are rendered physically incapable of ever being

connected to other switches, while others are *dedicated* as "network ports" such that they are

rendered physically incapable of ever being connected to end systems.  But because nothing in

the claim language or the remainder of the intrinsic record requires this to be true, Defendants' restrictive construction should be summarily rejected.[34]

As an initial matter, the Federal Circuit has consistently held that "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Accordingly, here the Court need look no further than the express language of Claims 1 and 25 to conclude that Enterasys' proposed construction is correct and that Defendants' is unsustainable. For example, consistent with Enterasys' position, the preambles of each of these claims define "access ports" and "network ports" solely in relation to what types of devices they have been connected to. Indeed, "access ports" are simply described a "ports connected to end systems," while "network ports" are characterized as "ports connected to other switches." Moreover, claim elements 1(b) and 25(b) reiterate this notion by once again describing "access ports" merely as switch ports that are "attached to at least one end system." Perhaps needless to say, the claim language contains absolutely no support for Defendants' contention that "access ports" need to be dedicated to end systems at the time of manufacture so as to become physically incapable of being connected to other switches, or that the opposite needs to occur relative to "network ports" and end systems.

Moving beyond the claim language, the specification likewise confirms that "access ports" and "network ports" are defined solely as a consequence of what the user has connected to an available switch port. Indeed, the "Summary Of The Invention" section of the specification plainly recites that the claimed "switches have access ports connected to end systems and

---

[34] Of all the positions advanced in their opening brief, Defendants' proposed constructions for "access ports" and "network ports" are perhaps their most transparent and heavy-handed attempt to read wishful non-infringement hooks into the claim language. As Defendants are well aware, network switch products -- including their own -- have long been sold with generic all-purpose switch ports (*e.g.*, Ethernet ports) capable of being connected to any other types of network devices. Whether a particular switch port ends up getting connected to end systems or to other switches is simply a configuration decision made by the user based upon the unique needs of his own network.

network ports connected to other switches." '995 Patent at 3:2-5.  Moreover, the drawings in

Figure 3 of the specification are designed to show the internal operation of the claimed switch

prior to the time when a user has made any configuration decisions about which devices to

connect to which ports.  *Id.* at 4:36-42.  At that juncture, all of the switch ports are depicted as an

indistinguishable collection of generic input ports and output ports.  *Id.*  Presumably, if

Defendants were correct in suggesting that "access ports" and "network ports" had already been

dedicated at the time of manufacture so as to have fundamentally different capabilities from one

another, they would be differentiated for purposes of how they are represented in Figure 3.  But

to the contrary, Figure 1 from the specification shows that such differentiation only occurs for

the first time *after* a network has been set up as a resulting consequence of the configuration

decisions made by the user.  *Id.* at 4:22-29.[35]

Other passages from the specification similarly support Enterasys' view that "access

ports" and "network ports" are simply defined in relation to what any given switch port has been

connected to.  With respect to preferred embodiments involving the use of a "VBUS call

processor," for example, when the call processor needs to determine which of the ports on its

own switch are functioning as "network ports," it visits a "connection table" to look up

information indicating which of the switch ports have been connected solely to other switches.

'995 Patent at 9:13-30.  This demonstrates that "network ports" are defined on an after-the-fact

basis as a consequence of user configuration decisions.  If Defendants were correct that "network

ports" must instead be dedicated at the time of manufacture with unique capabilities that

fundamentally distinguish them from "access ports," the call processor would presumably

---

[35] Notably, Figure 1 in the '995 Patent also shows that exactly the same type of links (L) that are used to connect "access ports" (A1) to end systems (M11) are also used to connect "network ports" (N2) to other switches (N1). This directly refutes Defendants' unsupported assertions that "access ports" would somehow be physically incapable of being connected to other switches, or that the opposite would be true for "network ports" relative to end systems.

already know which of its switch ports were "network ports" without the need for verifying from

a "connection table" the nature of their attached devices.[36]

> **b.** **"encapsulate the data packet by adding a header with the one or more determined identifiers" [Claims 1(c)(ii), 25(c)(ii)]**

| Enterasys Proposed Constructions | Defendants Joint Proposed Constructions |
|---|---|
| Adding in or to a data packet a VLAN header that contains at least one VLAN-ID. | Generate a protocol B header with the one or more determined identifiers and place the protocol A user data packet, including the protocol A header, into the data area of the protocol B user data packet. |

The parties are in basic agreement that for purposes of claim elements 1(c)(ii) and

25(c)(ii) of the '995 patent, the term "encapsulate" means adding a new additional header to a

preexisting user data packet that contains one or more "predetermined identifiers" (*i.e.*, VLAN-

IDs). However, whereas Enterasys' proposed construction concisely captures this simple

concept, Defendants' construction improperly seeks to read a series of further narrowing

limitations into the claim language which would severely circumscribe what it means to

"encapsulate."

Most notably, Defendants are attempting to define "encapsulate" in terms of the

*implementation details* of one particular technique for adding an encapsulation header -- *i.e.*, the

so-called envelope stuffing approach where the preexisting user data packet would be placed

inside of a new data packet with a new header. *Cf.*, *supra*, pp. 22-23. If practicing such a

technique were actually made a requirement, the end result would be that encapsulation headers

---

[36] In addition, the Court should also reject Defendants' proposed construction of the phrase "network ports" as being internally inconsistent on its face. Indeed, in their Revised Joint Claim Construction Statement, the parties agreed that the phrase "end systems" should be construed as encompassing any "electronic devices." Accordingly, it makes no sense for Defendants to argue that "network ports" are incapable of being connected to "end systems" while simultaneously acknowledging that they can in fact be connected to switches, which would themselves clearly qualify as a type of "electronic device."

would *always* have to be attached to the front of preexisting user data packets. But as Enterasys demonstrates below, the intrinsic record contains no requirements about using this one specific technique for encapsulating, nor about *where* encapsulation headers can permissibly be placed. Moreover, in addition to intrinsic evidence, Enterasys has also submitted an expert Declaration demonstrating that, to a person of ordinary skill in the art at the time of the '995 inventions, the customary meaning of the term "encapsulate" would have broadly encompassed several different well known implementation techniques in which encapsulation headers could be added *in or to* preexisting data packets *in a variety of different locations.*

As a preliminary matter, Defendants can make no pretense of arguing that the intrinsic record for the '995 Patent somehow teaches the specific envelope stuffing technique that they would read into their definition of "encapsulate." To the contrary, Defendants have gratuitously borrowed this definition from a discussion of prior art references contained in the specification of the *completely unrelated '205 patent-in-suit. See*, *supra*, p. 22. But as the Federal Circuit has repeatedly cautioned, because the "construction of a term in a patent claim is a highly contextual exercise that is dependent upon the content of the particular patent in which the term appears," one cannot simply "apply the construction of a claim term from one patent to an unrelated patent." *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1244 (Fed. Cir. 2002). Indeed, to witness the dangers of such an approach, here the Court need look no further than Defendants' inexplicable suggestion that the encapsulating VLAN header is required to be of a different protocol (Protocol B) than that of the preexisting data packet (Protocol A). Whereas this construction makes perfect sense in the context of the '205 Patent directed to Layer 3 routing in a multi-protocol network, it is completely out of place in the context of the '995 Patent that covers

Layer2 switching based upon MAC addresses in which the "network infrastructure remains protocol insensitive." *Compare* '205 Patent at 6:59-60, 64-65 *with* '995 Patent at 1:65-67.[37]

Turning to a more appropriate analysis of the '995 Patent's own intrinsic record, it is axiomatic that "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. This is particularly true where, as here, claim elements 1(c)(ii) and 25(c)(ii) provide a self-contained definition of what it means to "encapsulate." According to the express claim language which comports with Enterasys' proposed construction, a data packet is encapsulated simply by "adding a header with the one or more determined [VLAN] identifiers." Thus, contrary to Defendants' construction, the concept of encapsulation as presented in the claim language does *not* require any particular implementation technique, does *not* require that the encapsulation header be placed in any particular location relative to the preexisting data packet, and does *not* require that such a header conform to any particular protocol.

As to the '995 specification, for the most part it speaks of encapsulation only in general terms by suggesting that the switch "adds a VLAN header to the original data packet," or "encapsulates the packet with the VLAN header." *See*, *e.g.*, '995 Patent at "Abstract;" 3:19-21; 9:25-27. However, in those few instances where it goes into greater detail, the specification expressly discloses *alternative preferred embodiments* in which encapsulation is performed in a variety of different ways that can result in the encapsulation header being placed in a variety of different locations relative to the preexisting user data packet. On the one hand, for example,

---

[37] Moreover, pursuant to the doctrine of claim differentiation, it is clear that the definition of "encapsulate" for purposes of independent Claims 1 and 25 of the '995 Patent cannot contain a requirement that the encapsulation header must be of a different protocol than the preexisting data packet. As a matter of Federal Circuit law, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. Here, dependent Claim 9 adds a new limitation addressing the situation where an original data packet is given an encapsulation header conforming to a different protocol. Accordingly, a legal presumption exists that no such limitation is already contained in Claims 1 and 25.

Figure 8 of the specification shows an approach not unlike the one advocated by Defendants in which the encapsulation header would end up being attached to the front of the preexisting data packet.  But the text takes pains to emphasize that Figure 8 is only but "one embodiment." *Id.* at 3:63-65.[38]  On the other hand, the specification also discloses a contrasting approach in which the encapsulation header can instead be *inserted into* the preexisting data packet: "The switch will encapsulate the original packet and insert a VLAN header containing a list of VLAN-IDs." *Id.* at 6:26-30.  It is beyond dispute that the ordinary and customary meaning of the word "insert" is as follows: **"1. To put or set into, between, or among another or other things.  2. To introduce into the body or text of something."** *See The American Heritage Dictionary Of The English Language* 679 (1976 ed.) (Exh. 11 to Hensch. Decl.).  Thus, it is clear that under this second approach, the encapsulation header is *not* attached to the front of the preexisting data packet, but rather it is permissibly placed somewhere "in the middle" of the preexisting data packet either within or following that packet's original header.

Enterasys' proposed construction for the term "encapsulate" -- *viz.*, "adding in or to a data packet a VLAN header that contains at least one VLAN-ID" -- appropriately encompasses both of these alternative preferred embodiments disclosed in the specification.  But by contrast, in reading the claim language so narrowly as to cover *only* the envelope stuffing approach which would *always* result in the encapsulation header being attached to the front of the preexisting user data packet, Defendants have violated at least two well-established canons of claim construction.  <u>First</u>, Defendants have improperly imported into the claim language a limitation from the specification that applies to only one particular preferred embodiment in which the

---

[38]  Indeed, the inventors were careful to reiterate this point throughout the specification: "While there have been shown and described several embodiments of the present invention, it will be obvious to those skilled in the art that various changes and modifications may be made thereto without departing from the scope of the invention as defined by the appending claims." '995 Patent at 10:10-14.

encapsulation header gets prepended to the preexisting data packet.  *See*, *supra*, p. 15 (*citing Comark*, 156 F.3d at 1187; *Phillips*, 415 F.3d at 1323.).  <u>Second</u>, Defendants are concomitantly reading the claim language in so restrictive a fashion that it would improperly exclude coverage over other equally permissible preferred embodiments in which the encapsulation header is *inserted into* the preexisting data packet.  *See*, *supra*, p. 15 (*citing Anchor Wall*, 340 F.3d at 1308.).

Finally, although Enterasys believes that the intrinsic record is sufficient for allowing the Court to definitively resolve the parties' dispute over the meaning of "encapsulate," Enterasys has also submitted herewith an expert Declaration from Professor James F. Kurose ("Professor Kurose"), who was a person of more than ordinary skill in the art at the time of the '995 inventions.  *See* (Exh. 12 to Hensch. Decl.).  As Professor Kurose demonstrates, in or around the mid-1990s time frame, a person of ordinary skill would *not* have understood the ordinary and customary meaning of the term "encapsulate" to be restricted to a single envelope stuffing technique in which encapsulation headers would always need to be attached to the front of preexisting user data packets.  *Id.*  To the contrary, Professor Kurose shows that based upon well known networking industry standards and technical literature from that era, a person of ordinary skill would have understood the term "encapsulate" to far more broadly encompass a variety of implementation techniques, including those that placed the encapsulation header either "in the middle of" or "following" the preexisting data packet, or that served to otherwise modify the data being encapsulated.  *Id.* at ¶¶ 6-7, 20, 26, 29-30.  Moreover, Professor Kurose notes in closing that when the networking industry ultimately came around to developing a standard for VLAN tagging in 1998, the VLAN encapsulation headers were designed to be placed "in the middle of" the encapsulated packets.  *Id.* at ¶ 31.

5.    **The '022 Patent**

Enterasys is currently asserting Claims 1, 3, 5, 6, 12 and 20 of the '022 Patent. The '022 Patent claims an apparatus and a method for reducing multicast communications in a network. Multicast communications are communications transferred from a single host to multiple destination hosts. These communications are reduced by use of a network device (which is a bridge in some of the claims) which gathers data from control packets intended for other devices, *i.e.*, "snoops," and uses that data to construct tables in the device that the device uses to filter and forward multicast message packets.

As set forth in the Revised Joint Claim Construction Statement, the parties have agreed upon constructions for the following terms/phrases from the '022 patent: "data in the first portion" and "multicast group." For several claim terms/phrases, the parties have not reached agreement. Enterasys' arguments as to each of these disputed terms/phrases are set forth below:

a.    **"network bridge" [Claim 1]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| A device that includes layer 2 functionality and is capable of connecting two or more network segments, whether or not they have the same protocols, and allowing information to flow between them. | A network device, other than a router or a brouter, that implements the bridge forwarding algorithm. |

Defendants' proposed construction improperly seeks to read into the claim language the extraneous phrase "other than a router or brouter" that would serve to limit the scope of the claim to covering only devices with layer 2 functionality to the exclusion of layer 3 functionality. Nothing in the specification or file history warrants such a limitation. In fact, as reflected in the cited art, those of ordinary skill in the art at the time of the '022 invention recognized that a single device can serve both bridging and routing functions. *See* U.S. Patent No. 5,500,860, at

59

2:51-64 (Bates Nos. ETS00415155-173 of '022 Pros. Hist.) (describing an apparatus that

"behaves as a router" as to some packets by forwarding those packets based on information

contained in the network layer header and "behaves as a bridge" as to other packets by

forwarding those other packets based on information contained in the data link header).

Defendants' argument represents nothing more than an improper attempt to nullify the

legal principle that would otherwise govern in the context of an infringement analysis that an

accused device cannot escape infringement by merely adding features in addition to those

claimed by the patent. "It is fundamental that one cannot avoid infringement merely by adding

elements if each element recited in the claims is found in the accused device. For example, a

pencil structurally infringing a patent claim would not become noninfringing when incorporated

into a complex machine that limits or controls what the pencil can write." *A.B. Dick Co. v.

Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983) (holding that, although the accused device

had additional functionality to that claimed in the patent claims, the defendant could not avoid a

finding of infringement) (internal citation omitted). *Accord Asyst Techs., Inc. v. Emtrak, Inc.*,

402 F.3d 1188, 1197 (Fed. Cir. 2005) (holding that the fact that the accused device employed

additional features did not avoid a finding of infringement if the device also included the accused

feature). In this case, a device that is a network bridge -- because it performs the basic functions

which make a bridge a bridge -- infringes even if that device also performs the additional

functions of a router. Enterasys' construction does not improperly limit this claim language to a

device that only functions at layer 2, to the exclusion of layer 3.

In addition, Enterasys' construction is the construction supported by the specification.

'022 Patent at 2:49-55 ("Such communication may be achieved using the bridges b1-b4. The

bridge enables inter-segment communication while isolating the two network segments so that

60

they operate as independent collision domains.  The bridges b1-b4 also can enable

communication between network segments that communicate according to different protocols.").

Enterasys' construction should be adopted by this Court.

        **b.**        <u>**"data packet" [Claims 1, 1(a), 4(a), 5, 6(a)]**</u>

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| An organized stream of bits, including a header section and a payload section.  The header section includes a destination address for forwarding the packet to the intended recipient. | An organized stream of bits, including a header section and a payload section.  The header section includes address information for forwarding the packet to the intended recipient. |

As with the phrase "data packet" in the '665 Patent, the dispute here is whether the

header of the claimed "data packet" in the '022 Patent must include a destination address.  As

with the '665 Patent, the specification of the '022 Patent and the art cited during its prosecution

demonstrate that a destination address is an indispensable aspect of a data packet as that phrase is

used in the '022 Patent and in the art of computer networking in general.  Defendants'

construction is motivated purely by a desire to invalidate this patent by ensnaring prior art

covering unrelated technologies.  Enterasys' construction, on the other hand, comports with the

ordinary and customary use of the term "data packets" and should be adopted by this Court.

The specification describes the use of the destination address in all aspects of forwarding

decisions.  '022 Patent Fig. 2 (showing the destination address as part of the packet header);

2:24-28 ("Each host then examines the destination address written in the header section 22 of the

packet 20.  If the destination address matches the destination address of the host, the host accepts

the packet 20 and may examine the contents of the payload section 24."); 2:64 - 3:2 ("If the

bridge . . . receives a packet from one network segment . . . containing a destination address of a

host in another network segment, . . . the bridge transmits the packet in another attached network

segment on a route to the network segment that contains the destination host.); 7:40-45

(describing an illustrative forwarding table containing multicast destination addresses which are used by the processor 120 to retrieve multicast forwarding data corresponding to the multicast group).

In addition, a review of the cited prior art reveals that all cited references which describe the contents of a data packet header describe it as including a destination address:

- U.S. Patent No. 4,627,052, Abstract  (Bates Nos. ETS00415006-012 of '022 Pros. Hist.) ("Data is transmitted in the form of packets each containing a source address and a destination address.").

- U.S. Patent No. 5,136,580, Abstract  (Bates Nos. ETS00415013-037 of '022 Pros. Hist.) ("Upon detection of an information packet, the apparatus examines both the source and destination addresses of the packet.").

- U.S. Patent No. 5,331,637, at 2:21-24  (Bates Nos. ETS00415038-055 of '022 Pros. Hist.) ("When a source node transmits a packet to a single destination node, the source node writes the destination address of the packet in a destination address field 43 (FIG. 3) of the header 42.").

- U.S. Patent No. 5,361,256, at 7:37-41  (Bates Nos. ETS00415067-081 of '022 Pros. Hist.) ("The groupid, which is chosen from the normal subnetwork address space, is therefore included as the destination address of a multicast packet so that the proper group of end systems is identified.).

- U.S. Patent No. 5,396,493, at 1:36-43  (Bates Nos. ETS00415082-092 of '022 Pros. Hist.) ("Then, the microprocessor carries out the packet filtering operation by comparing the destination address of each packet transmitted to the LAN controller with the sender addresses registered in its memory, and discarding those packets whose destination addresses coincide with the sender addresses registered in its memory, so as not to relay these packets to the other LANs.").

- U.S. Patent No. 5,400,326, at 2:59-65  (Bates Nos. ETS00415093-102 of '022 Pros. Hist.) ("In the case of the token ring this would be the physical header including the optional routing information field. In those instances where transparent routing is employed sufficient memory need only accommodate destination and/or source address fields which when compared to a stored routing table indicate if and where packets are to be routed.").

- U.S. Patent No. 5,428,615, at 3:16-25  (Bates Nos. ETS00415103-114 of '022 Pros. Hist.) (describing the contents of a data frame according to the invention and noting that "[f]ield 102 is the destination address, referred to hereinafter as the DA field").

62

- U.S. Patent No. 5,434,855, at 2:46-50  (Bates Nos. ETS00415115-124 of '022 Pros. Hist.) ("In order to minimize this delay, some networks apportion each packet into mini-packets called cells. Each cell carries minimal addressing information, with the first cell containing the source and destination addresses . . .").

- U.S. Patent No. 5,448,565, at 2:41-45  (Bates Nos. ETS00415125-143 of '022 Pros. Hist.) ("[T]he source and destination addresses in each frame and address tables in the interconnecting bridge are used to forward the frame from one LAN to another.").

- U.S. Patent No. 5,481,540, Abstract  (Bates Nos. ETS00415144-154 of '022 Pros. Hist.) ("A bridge connected to an FDDI network preprocesses messages each comprising source address (SA), destination address (DA) and data. . .").

- U.S. Patent No. 5,500,860, Abstract  (Bates Nos. ETS00415155-173 of '022 Pros. Hist.) ("The apparatus then decides, responsive to a contents of a data link destination address field in the packet, whether to forward the packet as a bridge or to forward the packet as a router.").

- U.S. Patent No. 5,511,168, at 2:37-40  (Bates Nos. ETS00415174-183 of '022 Pros. Hist.) ("Another known point-to-multipoint communication technique requires each destination node to 'register' with its local switch to receive packets addressed to a particular [destination] multicast address.").

- U.S. Patent No. 5,517,494, Fig. 3B  (Bates Nos. ETS00415184-219 of '022 Pros. Hist.) (showing the contents of a multicast packet header to include a multicast address, which is an address the specifies the multicast group to which the destination nodes belong).

- U.S. Patent No. 5,530,703, at 13:59-62  (Bates Nos. ETS00415229-248 of '022 Pros. Hist.) (claiming an apparatus "wherein the learning logic determines a network protocol of a packet in response to protocol specific information in the packet, and independent of a network destination address of the packet").

- Deering, Stephen E., *Multicast Routing in Internetworks and Extended LANs*, ACM SIGCOMM, (1988), p. 57  (Bates Nos. ETS00415301-310 of '022 Pros. Hist.) ("[T]he destination address of each arriving unicast packet is looked-up in the table to determine an outgoing branch.").

The volume of references acknowledging the existence of a destination address in a data packet header is strong evidence that one of ordinary skill in the art would have understood that the header of a data packet includes a destination address.  Enterasys' construction is the

ordinary and customary meaning of the phrase to those of ordinary skill in the art. For a

different construction to apply, the inventors would have had to clearly and unequivocally define

the phrase differently in the specification. *Phillips*, 415 F.3d at 1316; *Vitronics*, 90 F.3d at 1582.

They did not. To the contrary, the inventors repeatedly referenced the existence of a destination

address in the data packet header. Enterasys' construction is the correct construction and should

be adopted.

c.    **"multicast forwarding data" [Claims 1, 6, 6(c)(ii)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Data corresponding to multicast addresses used to facilitate the forwarding of packets to members of a multicast group. | Data correlating multicast numbers to each intended destination device address. |

Enterasys' proposed construction accurately reflects the meaning of this phrase as one of

ordinary skill would understand it in light of the specification. Defendants' proposed

construction, on the other hand, should be rejected for at least two reasons: First, it uses the

phrase "multicast numbers," the meaning of which is completely unclear. Second, it seems to

require that the multicast forwarding data be tied to host destination addresses, when the claims

require no such correlation.

The specification supports Enterasys' construction:

> According to an embodiment of the present invention, multicast packets received
> at the bridge b100 (from the router r100 or from a host h100-h119 in an attached
> network segment L100, L101 or L102) are only retransmitted onto the network
> segments L100, L101 or L102 that contain destination hosts of the multicast
> packets. Stated another way, the bridge b100 refrains from retransmitting
> multicast packets onto those attached network segments L100, L101 or L102 that
> are devoid of destination hosts of the multicast packets. *To that end, the
> processor 120 maintains a forwarding table with entries corresponding to
> multicast addresses.*

'022 Patent at 7:24-34 (emphasis added). In other words, the multicast forwarding data is data

corresponding to multicast addresses that serves the purpose of facilitating the forwarding of multicast packets from the bridge (in the instance of the discussion quoted above) to members of a multicast group.[39]

Multicast forwarding data is a concept well understood in the art, and Enterasys' construction is consistent with that understanding. One patent considered by the PTO when prosecuting the '022 Patent discusses "the tables that are created for routing multicast packets" and "the procedures for using the created tables to route multicast packets." U.S. Patent No. 5,361,256, at 6:50-56 (Bates Nos. ETS00415067-081 of '022 Pros. Hist.). An article from the file history describes the process of building a table with multicast data and using that data to forward multicast packets. Deering, Stephen E., *Multicast Routing in Internetworks and Extended LANs* (1988) ("When a bridge receives a multicast packet, on the other hand, it forwards the over only those branches that are identified by non-expired table entries.") (Bates Nos. ETS00415301-310 of '022 Pros. Hist.).

Defendants' construction, on the other hand, does not clearly and accurately define this phrase. The phrase "multicast numbers" is not used in the patent and has no clear meaning. It creates more confusion than it resolves. Further, Defendants' construction seems to require that the ambiguous "multicast numbers" be correlated to the destination addresses of individual hosts to which the packets are directed. Claim 1, the claim in which the phrase "multicast forwarding

---

[39] While Claim 1 and the claims that depend from it relate to a network *bridge*, other claims relate to a "network device" or to a "first location." Therefore, the phrase "multicast forwarding data" cannot be limited to the context of a network bridge.

data" first appears, includes no such requirement.  In fact, the only multicast forwarding data

required by Claim 1 is an identification of a multicast group.[40]

One of ordinary skill in the art, as evidenced by the specification and the cited prior art,

would understand that multicast forwarding data is any data corresponding to multicast addresses

used to facilitate the forwarding of packets to members of a multicast group.  Therefore,

Enterasys' construction should be adopted.

> **d.    "means for determining, by examining data in a first
> portion of a first packet received at the network bridge,
> whether the first packet is a multicast control packet
> destined for a device other than the network bridge"
> [Claim 1(a)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6).<br><br>Recited Function:  determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge<br><br>Corresponding Structure:  processor 120 programmed to determine, by examining data in the packet header, including address information, whether the first packet is a multicast control packet destined for a device other than the network bridge | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The recited "function" is determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet and is destined for a device other than the network bridge.<br><br>The "structure" recited in the specification for performing the claimed function is the bus 110, the memory 130, and the processor 120 executing the algorithm of Fig. 5. |

The parties agree that this element is a means-plus-function claim element and is to be

construed in accordance with 35 U.S.C. §112, ¶ 6.  However, Defendants have identified more

structure than is necessary to perform the claimed function.  Processor 120 is the only structure

in the specification necessary to determine, by examining data in a first portion of a first packet

---

[40]  Later claims specifically require that this multicast group be cross-referenced to the I/O interface on which a control packet is received (Claim 2) and cross-referenced to the source of the packet (Claim 3).  However, none of the claims require that the multicast forwarding data include destination addresses of individual hosts to which the packets are directed.

received at the network bridge, whether the first packet is a multicast control packet destined for

a device other than the network bridge.  We know this to be the case because the specification

makes clear that it is processor 120 that examines data in the packet header:

> The processor 120 can access the packets in the memory 130, for example, to read
> or write data in the header portions of the packets for purposes of translating a
> packet from one protocol to another protocol.  The processor 120 can also
> examine the address of the packet header to determine from which I/O interface
> 141-144 the packet should be retransmitted.

'022 Patent at 7:12-18.  By examining data in the packet header, the processor 120 is able to

determine whether the packet is a multicast control packet.  *Id.* at 8:3-9 ("In a first step S1,

processor 120 determines if a received packet is a multicast control packet. . .  Such packets have

a well defined and easily identifiable form.").  By examining data in the header, the processor

also determines the destination address, *see id.* at 7:12-18, and is therefore able to determine

whether the packet is destined for a device other than the network bridge.[41]

In *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999), the

Federal Circuit recognized that a computer or processor programmed to carry out a particular

algorithm creates a new machine -- or special purpose computer.  Therefore, "[i]n a means-plus-

function claim in which the disclosed structure is a computer, or microprocessor, programmed to

carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the

special purpose computer programmed to perform the disclosed algorithm."  *Id.* at 1349.  For this

claim element, the algorithm of processor 120, as described in the specification, is determining,

by examining data in the packet header, including address information, whether the first packet is

---

[41]   One of skill in the art at the time of the '022 invention would have recognized that the function of determining the
destination of a packet is a typical processor function.  *See* U.S. Patent No. 5,396,493, at 1: 14-28  (Bates Nos.
ETS00415082-092 of '022 Pros. Hist.) (describing the process of determining which packets are destined for
another LAN and explaining that "such a conventional LAN bridge apparatus has been realized in a form of a micro-
processor operated by an appropriate control program to carry out the above described packet filtering operation.").

a multicast control packet destined for a device other than the network bridge.  '022 Patent at

7:12-18 and 8:3-9.

In addition, corresponding structure consists only of that which is necessary to perform

the recited function and is clearly linked to that recited function in the specification.  *Asyst*

*Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001).  The specification does not

link bus 110, memory 130 and the entire algorithm of Figure 5 as corresponding structure.[42]  The

specification is clear.  The requisite information is gathered by the processor 120 examining data

in the header.  The processor 120 is the only structure in the specification that performs this

function.

**e.**    **"multicast control packet" [Claims 1(a), 6(b), 20(a)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
| --- | --- |
| A packet in which the data in the payload section comprises control information where said control information is related to facilitating the routing of multicast message packets. | A type of control packet and not necessarily a packet sent by multicasting transmission (*i.e.*, the packet is sent in a unicast or multicast fashion); a packet that is one of a Host Membership Query packet, Host Membership Report packet, Join Host Group packet, or Leave Host Group packet. |

A "control packet" is a packet in which the data in the payload section comprises control

information where, in the context of the '022 Patent, that control information is used for routing.

'022 Patent at 2:59-62 ("The bridges within a subnetwork (*e.g.*, the bridges b1-b2 in the

subnetwork A) pass control packets between each other to determine the best route for reaching

each host in each attached network segment.").  A "multicast control packet" is used for

multicast routing.

---

[42]  Figure 5 is an algorithm of the entire process of constructing and modifying the multicast forwarding table entries.  '022 Patent at 8:1-3.  It performs many functions beyond the claimed function and should not, therefore, be construed as corresponding structure with respect to this claim element.

The Defendants' proposed construction does not define the phrase in issue; rather, it simply imports examples from the specification into the claims as limitations. The Host Membership Query packet, Host Membership Report packet, Join Host Group packet, and Leave Host Group packet are listed as examples. '022 Patent at 8:5-8 ("*Examples* of such packets according to the IGMP protocol are Host Membership Query packets, Host Membership Report packets, Join Host Group packets and Leave Host Group packets.") (emphasis added). A review of the cited art reveals that one of ordinary skill would understand that there are other multicast control packets besides the examples cited in the '022 specification. One cited reference discusses a "create group request packet," a "leave group confirm packet," a "delete group request packet," and "group member confirm packets." U.S. Patent No. 5,517,620 at 10:41 - 12:20 (Bates Nos. ETS00415220-228 of '022 Pros. Hist.). Nothing in the specification communicates an intent by the inventors to limit their claims to include only the multicast control packets provided as examples in the specification. Therefore, this phrase should not be construed to have such a limitation. *Conoco*, 460 F.3d at 1357-58; *Vitronics*, 50 F.3d at 1582.

Moreover, the doctrine of claim differentiation requires that Defendants' construction be rejected. The four types of control packets to which Defendants seek to limit this phrase are those set forth in Claim 13.[43] Claim 13 depends from Claim 12,[44] which depends from independent Claim 6. The phrase at issue, "multicast control packet," is in Claim 6. Under the claim differentiation doctrine, "the presence of a dependent claim that adds a particular limitation

---

[43] Claim 13 reads:

> The method as recited in claim 12, wherein the multicast control packet is one of:
>> a host membership query packet;
>> a host membership report packet;
>> a join host group packet; and
>> a leave host group packet.

[44] Claim 12 reads: "The method as recited in claim 6, wherein the control packet is defined according to an Internet Group Management Protocol (IGMP) standard."

gives rise to a presumption that the limitation in question is not present in the independent

claim." *Phillips*, 415 F.3d at 1315. Here, the limitations of Claim 13 are presumed not to be

present in Claim 6. Defendants' construction would import the limitations of Claim 13 into

Claim 6, making Claim 13 superfluous. For this additional reason, Enterasys' construction -- not

Defendants' -- should be adopted by this Court.

f.    **"destined for a device other than the network bridge"**
        **[Claim 1(a)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Having a destination address that (1) is not the same as the unique address of the network bridge, and (2) does not identify a multicast group of which the network bridge is a part. | Having a unique destination address of a device/location that is not the same as the unique address of the network bridge/network device/first location. |

The dispute here is whether a packet that is destined for a device other than the network

bridge can have a destination address that is not a unique destination address of a *single* device,

as Defendants contend. Because the '022 Patent contemplates control packets destined for

multiple devices, the Defendants' proposed construction is inconsistent with the specification

and should not be adopted. The claim element within which this disputed phrase is placed is as

follows: "means for determining, by examining data in a first portion of a first packet received at

the network bridge, *whether the first packet is a multicast control packet destined for a device*

*other than the network bridge*." The specification gives at least one example of a multicast

control packet destined for a device other than the network bridge that has a destination address

that indicates more than one destination device: the Host Membership Query packet. The Query

packet "contains an instruction from the attached router *to each host h101-h109* to report all of

its current multicast group memberships . . ." '022 Patent at 8:11-17. It has "a destination

address that specifies all of the hosts of the campus network," *id.* at 3:58-60, *i.e.*, a multicast destination address.

The Defendants' construction would exclude this type of control packet, which the specification provides as an example of a packet which might be "snooped" by the patented device. "A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever correct." *Globetrotter Software,* 362 F.3d at 1381. *Accord Vitronics*, 90 F.3d at 1583-84 (holding that an interpretation of a claim that excludes the preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support"). This is the case because "it is unlikely that an inventor would define the invention in a way that excluded the preferred embodiment, or that persons of skill in this field would read the specification in such a way." *Hoechst Celanese*, 78 F.3d at 1581. Therefore, Defendants' construction should be rejected.

g.      **"means for identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge" [Claim 1(b)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6)<br><br>Recited Function:  identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge<br><br>Corresponding Structure:  processor 120 programmed to examine data in the packet header, including address information, to identify the multicast group | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by the claim is "identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge."<br><br>The "structure" for performing this function is not sufficiently disclosed by the specification. However, partial structure for performing the recited function may include the bus 110, the memory 130, and the processor 120 executing the algorithm of Fig. 5. |

The structure that performs the claimed function is sufficiently disclosed in the specification. The processor 120 performs the function of identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge. A multicast packet has a multicast address in the destination address field of the packet header. '022 Patent at 4:1-3 ("When a host, *e.g.*, the host h1, desires to transmit a multicast packet, it writes a multicast address of an appropriate multicast group in the destination field."). The processor reads address information (which would include the multicast address in the destination address field) from the packet header: "The processor 120 can also examine the address of the packet header to determine from which I/O interface 141-144 the packet should be retransmitted." *'Id.* at 7:9-19. The address information read by the processor 120, then, includes the multicast group in the destination address field.

These descriptions in the specification are sufficient for one of ordinary skill in the art to carry out the claimed invention. As the Federal Circuit held in *In re Hayes Microcomputer Prods., Inc. Patent Lit.; Ven-Tel, Inc. v. Hayes Microcomputer Prods., Inc.*:

> One skilled in the art would know how to program a microprocessor to perform the necessary steps described in the specification. Thus, an inventor is not required to describe every detail of his invention. An applicant's disclosure obligation varies according to the art to which the invention pertains. Disclosing a microprocessor capable of performing certain functions is sufficient to satisfy the requirement of section 112, first paragraph, when one skilled in the relevant art would understand what is intended and know how to carry it out.

982 F.2d 1527, 1534 (Fed. Cir. 1992). Here, one skilled in the art would know how to program a microprocessor to identify the multicast group from information in the packet header. *See* U.S. Patent No. 5,396,493, at 1:14-28, discussed at n.41, *supra*; *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 112 F.3d 1163, 1166 (Fed. Cir. 1997) (holding that "it is generally sufficient if the functions of the software are disclosed, it usually being the case that creation of the specific source code is within the skill of the art").

Defendants propose more structure than is necessary to perform the claimed function. The bus 110 and memory 130 are not necessary to perform the function. In addition, Figure 5 is an algorithm of the entire process of constructing and modifying the multicast forwarding table entries. '022 Patent at 8:1-3. It performs many functions beyond the claimed function and should not, therefore, be construed as corresponding structure with respect to this claim element. *See Asyst Techs.*, 268 F.3d at 1370.

> **h.** **"means for updating the multicast forwarding data according to the identified multicast group and the data in the first portion of the first packet" [Claim 1(c)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
| --- | --- |
| This term or element is governed by 35 U.S.C. § 112(6).<br><br>Recited Function: updating the multicast forwarding data according to the identified multicast group and the data in the first portion of the first packet<br><br>Corresponding Structure: processor 120 programmed to construct forwarding table entries corresponding to multicast groups | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by the claim is "updating the multicast forwarding data according to the identified multicast group and the data in the first portion of the first packet."<br><br>The "structure" recited in the specification for performing this function is the bus 110, the memory 130, the processor 120 executing the algorithm of Fig. 5, and the multicast forwarding table 200. |

When the packet is a multicast control packet destined for a device other than the network bridge (as determined by examining data in a first portion of a first packet), the processor 120 updates the multicast forwarding data with information associated with the multicast control group, *i.e.*, according to the identified multicast group and the data in the first portion of the first packet. *See* '022 Patent at 7:33-34 ("[T]he processor 120 maintains a forwarding table with entries corresponding to multicast addresses."); 8:17-23 ("[T]he processor 120 uses such information in the construction of forwarding table entries corresponding to multicast groups."); 8:46 - 9:8 (describing the process by which processor 120 adds and deletes

entries from the multicast forwarding data); Figs. 4 and 5.  There is no disclosure in the

specification of the bus 110, the memory 130, or the multicast forwarding table 200 performing

this updating function.  Moreover, the algorithm of Fig. 5 includes more steps than those

necessary to perform the claimed function.  Therefore, Enterasys' proposed construction should

be adopted.

> **i.**    **"means for identifying a source of the first data packet"**
> **[Claim 3(a)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6)<br><br>Recited Function:  identifying a source of the first data packet<br><br>Corresponding Structure:  processor 120 programmed to examine data in the packet header, including address information, to identify the source of the packet | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by the claim is "identifying a source of the first data packet."<br><br>The "structure" for performing this function is not sufficiently disclosed by the specification. However, partial structure for performing the recited function may include the bus 110, the memory 130, and the processor 120. |

The structure that performs the claimed function is sufficiently disclosed in the

specification.  Just as processor 120 determines if the packet is a multicast control packet and

identifies a multicast group from the packet, processor 120 also identifies the source of the

packet.  It does so by examining the address of the packet header.  '022 Patent at 7:15-18 ("The

processor 120 can also examine the address of the packet header . . ."); 8:17-20 ("If so, then the

processor 120 keeps track of from which router [*i.e.*, the source] and via which I/O interface 141-

144 the packet was received . . ."); 9:48-50 ("In step S14, the processor 120 adds the destination

address of the host which transmitted the control packet to the host list field of the multicast

forwarding table entry.").  Here, one skilled in the art would know how to program a

microprocessor to identify the source of the packet from information in the packet header.  *See*

U.S. Patent No. 5,396,493, at 1:14-28, discussed at n.41, *supra*; *Robotic Vision Sys.*, 112 F.3d at

1166; *In re Hayes*, 982 F.2d at 1534.

Defendants propose more structure than is necessary to perform the claimed function.

The bus 110 and memory 130 are not necessary to perform the function of *identifying* the source.

While this information is ultimately stored in memory 130 ('022 Patent at 8:19-20) and

presumably travels across bus 110 to get to memory, this storage is not part of the function of

identifying the source. Therefore, this structure does not correspond to the function.

> **j.     "means for cross-referencing the identified source to the identified multicast group in the multicast forwarding data" [Claim 3(b)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6).<br><br>Recited Function:  cross-referencing the identified source to the identified multicast group in the multicast forwarding data<br><br>Corresponding Structure:  processor 120 programmed to write the multicast destination address for the multicast group in the multicast forwarding table and add the address of the host which transmitted a control packet to the multicast forwarding table entry corresponding to the appropriate multicast group | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by this limitation is "cross-referencing the identified source to the identified multicast group in the multicast forwarding data."<br><br>The "structure" for performing this function is not sufficiently disclosed by the specification. However, partial structure for performing the recited function may include the bus 110, the memory 130, the processor 120 executing the algorithm of Fig. 5, and the multicast forwarding table 200. |

The structure that performs the claimed function is sufficiently disclosed in the

specification. In the claims of the '022 Patent, the means for cross-referencing is part of the

means for updating. Therefore, "cross-referencing" describes the process of updating the

multicast forwarding data in an associative manner, *e.g.*, cross-referencing the source to the

multicast group. The specification explains that this function is performed by processor 120: "If

no multicast forwarding table entry exists for the multicast group, then the processor 120

generates one in the memory 130. In so doing, the processor 120 writes the multicast destination address for the group in the multicast destination address index field. . . The processor 120 then executes step S14." '022 Patent at 9:29-33 and 46-47. "In step S14, the processor 120 adds the destination address of the host which transmitted the control packet to the host list field of the multicast forwarding table entry." *Id.* at 9:48-50. Here, one skilled in the art would know how to program a microprocessor to write the multicast destination address for the multicast group in the multicast forwarding table and add the address of the host which transmitted a control packet to the multicast forwarding table entry corresponding to the appropriate multicast group. *See Robotic Vision Sys.*, 112 F.3d at 1166; *In re Hayes*, 982 F.2d at 1534.

Defendants propose more structure than is necessary to perform the claimed function. The bus 110, memory 130, multicast forwarding table 200 and all of the algorithm steps of Figure 5 except the updating step of S14, while related to this function, do not perform this function. Updating, or writing, this information in an associative manner is done by processor 120 alone.

      k.    **"means for determining, when the first packet is not a**
           **control packet, whether the first packet is a message**
           **packet having a multicast group as a destination**
           **address" [Claim 5(a)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C § 112(6)<br><br>Recited Function:  determining, when the first packet is not a control packet, whether the first packet is a message packet having a multicast group as a destination address<br><br>Corresponding Structure:  processor 120 programmed to examine a packet to determine if the packet is a multicast message packet | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by this limitation is "determining, when the first packet is not a control packet, whether the first packet is a message packet having a multicast group as a destination address."<br><br>The "structure" for performing this function is not sufficiently disclosed by the specification. However, partial structure related to the recited function may include the bus 110, the memory 130, and the processor 120 executing the algorithms of Figs. 5 and 6. |

The structure that performs the claimed function is sufficiently disclosed in the specification.  The specification clearly indicates that the processor 120 determines whether the first packet is a message packet having a multicast group as a destination address.  It does so by examining the received packet in the memory:  "In step S16, the processor 120 examines the received packet in the memory to determine if it is a multicast message packet (*i.e.*, a packet for delivering data to multiple destinations)."  '022 Patent at 10:33-36.  Here, one skilled in the art would know how to program a microprocessor to examine the packet address information to determine if the packet is a multicast message.  *See* U.S. Patent No. 5,396,493, at 1:14-28, discussed at n.41, *supra*; *Robotic Vision Sys.*, 112 F.3d at 1166; *In re Hayes*, 982 F.2d at 1534.

Defendants' proposed construction includes more structure than is required to perform the claimed function.  It is only the processor 120, not the bus 110 or memory 130, that performs this function of examining the packet to determine if it is a multicast message packet.  Moreover,

77

the algorithms of Figures 4 and 5 involve many more steps than the recited function of this

means-plus-function claim element.

l.    **"multicast message packet" [Claim 5(b)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| A packet for delivering data to multiple destinations in which the data in the payload section comprises user data to be communicated to a host on the system. | A packet for delivering data to multiple destinations. |

Defendants' proposed construction fails to recognize the distinction between a "message

packet" and a "control packet" in the '022 Patent.  Enterasys' proposed construction recognizes

that distinction and better defines the phrase "multicast message packet."  The patent describes

the use of multicast *control* packets to build multicast forwarding data, which is then used to

facilitate the routing of multicast *message* packets.  *See* '022 Patent at 10:32 - 11:53 (describing

the process by which the processor determines whether a packet is a multicast message packet

and, if so, executes various steps to forward the packet using the multicast forwarding data that

was constructed from multicast *control* packets).  *See also* Fig. 6.  So while Defendants'

construction of multicast message packet -- "a packet for delivering data to multiple

destinations" -- is accurate, it is incomplete.  It fails to distinguish between message packets,

which contain user data and are exchanged between hosts on the system, and control packets,

which are exchanged between nodes to facilitate the routing of message packets.  Enterasys'

construction completely and accurately distinguishes these concepts and should be adopted by

this Court.

m.    **"means for identifying, when the first packet is determined to be a multicast message packet, the destination multicast group" [Claim 5(b)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
| --- | --- |
| This term or element is governed by 35 U.S.C. § 112(6)<br><br>Recited Function:  identifying, when the first packet is determined to be a multicast message packet, the destination multicast group<br><br>Corresponding Structure:  processor 120 programmed to examine data in the packet header, including address information, to identify the destination multicast group | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by the claim is "identifying the destination multicast group when the first packet is determined to be a multicast message packet."<br><br>The "structure" for performing this function is not sufficiently disclosed by the specification. However, partial structure for performing the recited function may include the bus 110, the memory 130, and the processor 120 executing the algorithm of Fig. 6. |

The structure that performs the claimed function is sufficiently disclosed in the specification.  The specification explains, "If the packet is a multicast message packet, the processor 120 executes step S18.  In step S18, the processor 120 uses the multicast destination address as an index to retrieve a corresponding entry from the multicast forwarding table 200 (Fig. 4)."  '022 Patent at 10:39-43.  The processor 120 identifies the destination multicast group that is used to retrieve this information from the table by examining the address of the packet header.  '022 Patent at 7:15-16 ("The processor 120 can also examine the address of the packet header . . .").  Here, one skilled in the art would know how to program a microprocessor to examine data in the header, including address information, to identify the destination multicast group.  *See* U.S. Patent No. 5,396,493, at 1:14-28, discussed at n.41, *supra*; *Robotic Vision Sys.*, 112 F.3d at 1166; *In re Hayes*, 982 F.2d at 1534.

Defendants' proposed construction includes more structure than is required to perform the claimed function.  It is only the processor 120, not the bus 110 or memory 130, that performs

this function of identifying the destination multicast group.  Moreover, the algorithm of Figure 6

involves many more steps than the recited function of this means-plus-function claim element.

> **n.      "means for retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface" [Claim 5(c)(i)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6)<br><br>Recited Function:  retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface<br><br>Corresponding Structure:  processor 120 programmed to use the multicast destination address as an index to retrieve a corresponding entry from the multicast forwarding table | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by this sub-means is "retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface."<br><br>The "structure" for performing this function is not sufficiently disclosed by the specification. However, partial structure for performing the recited function may include the bus 110, the memory 130, the processor 120 executing the algorithm of Fig. 6, and the multicast forwarding table 200. |

The structure that performs the claimed function is sufficiently disclosed in the

specification.  The specification explains, "In step S18, the processor 120 uses the multicast

destination address as an index to retrieve a corresponding entry from the multicast forwarding

table 200 (Fig. 4)."  '022 Patent at 10:40-43.  Here, one skilled in the art would know how to

program a microprocessor to use the multicast destination address as an index to retrieve a

corresponding entry from the multicast forwarding table.  *See* U.S. Patent No. 5,396,493, at 1:14-

28, discussed at n.41, *supra*; *Robotic Vision Sys.*, 112 F.3d at 1166; *In re Hayes*, 982 F.2d at

1534.

Defendants' proposed construction includes more structure than is required to perform the claimed function. Bus 110, memory 130 and forwarding table 200 do not perform the claimed function, and the algorithm of Figure 6 involves many more steps than the recited function of this means-plus-function claim element.

      **o.**      **"means for sending the multicast message packet out each at least one cross-referenced I/O interface in the first data other than the identified I/O interface" [Claim 5(c)(ii)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| This term or element is governed by 35 U.S.C. § 112(6)<br><br>Recited Function:  sending the multicast message packet out each at least one cross-referenced I/O interface in the first data other than the identified I/O interface<br><br>Corresponding Structure:  processor 120 programmed to retransmit the received multicast packet only from the I/O interfaces indicated in the I/O interface field except for the I/O interface from which the packet was received | This limitation is written in the means-plus-function format of 35 U.S.C. § 112, ¶ 6.<br><br>The "function" recited by this sub-means is " sending the multicast message packet out each at least one cross-referenced I/O interface in the first data other than the identified I/O interface."<br><br>The "structure" for performing this function is not sufficiently disclosed by the specification. However, partial structure for performing the recited function may include the bus 110, the memory 130, the processor 120 executing the algorithm of Fig. 6, and I/O interfaces 142-144. |

The structure that performs the claimed function is sufficiently disclosed in the specification. The specification explains, "The processor 120 then retransmits the received multicast packet only from the I/O interfaces 141-144 indicated in the I/O interface field except for the I/O interface from which the packet was received."  '022 Patent at 11:6-9.  Here, one skilled in the art would know how to program a microprocessor to send the packet from only those I/O interfaces indicated in the I/O interface field except for the I/O interface from which the packet was received. *See Robotic Vision Sys.*, 112 F.3d at 1166; *In re Hayes*, 982 F.2d at 1534.

Defendants' proposed construction includes more structure than is required to perform the claimed function. Bus 110, memory 130 and I/O interfaces 142-144 do not perform the claimed function, and the algorithm of Figure 6 involves many more steps than the recited function of this means-plus-function claim element.

**p.** **"network device" [Claim 6]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Any device that can receive a network packet. | A network device, other than a router or a brouter, that implements the bridge forwarding algorithm. |

Defendants propose that "network bridge" and "network device" should be construed identically. However, when different words or phrases are used in separate claims, a difference in meaning is presumed. *Free Motion Fitness, Inc. v. Cybex, Int'l, Inc.*, 423 F.3d 1343, 1351 (Fed. Cir. 2005). That presumption is supported here by the language of the claims and the specification. The word "device" is, on its face, broader than the word "bridge." In other words, a "bridge" is a type of "device." The ordinary and customary use of the terms "bridge" and "device" supports Enterasys' construction. The '022 specification supports it also. It indicates that a bridge is an example of an internetworking device: "The invention has been described so far with reference to only a single internetworking device (*e.g.*, bridge) subnetwork." '022 Patent at 11:54-56. Use of the abbreviation "e.g." indicates that what is to follow is an example. http://www.m-w.com/dictionary/e.g. (defining "e.g." as "for example") *See* (Exh. 13 to Hensch. Decl.). If the inventors intended to use "device" and "bridge" synonymously, they would have used the abbreviation "i.e." or similar language. *See* http://www.m-w.com/dictionary/i.e. (defining "i.e." as "that is") (*Id.* at Exh. 14.).

82

In addition, the term "device" should be construed consistently throughout the claims. *See Innova/Pure Water*, 381 F.3d at 1119 ("[W]hen different claims of a patent use the same language, we give that language the same effect in each claim.").  When we look to the claims in their entirety, we see that the word device is used to describe something other than -- and broader than -- a network bridge.  It is used to describe any device that can receive a network packet.  For example, Claim 1 requires that the network bridge include means for determining "whether the first packet is a multicast control packet *destined for a <u>device</u> other than the network bridge*."  The "device" of Claim 1 can include a router or a host.  '022 Patent at 3:56-60 (Host Membership Query packet is an example of a multicast control packet directed to all hosts); *id.* at 3:60-63 (Host Membership Report packet is an example of a multicast control packet directed to a router).  Enterasys' construction accurately reflects this broad use of the word "device" in the patent and should, therefore, be adopted.

q.    **"multicast communications forwarding data" [Claim 6]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| *See* "multicast forwarding data" of Claim 1. | *See* "multicast forwarding data" of Claim 1. |

The parties agree that "multicast communications forwarding data" should be construed identically to "multicast forwarding data."  *See* Enterasys' argument regarding multicast forwarding data in Section III.B.5.c, *supra*.

r.    **"addressed to a device other than the network device" [Claim 6(c)]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Having a destination address that (1) is not the same as the unique address of the network device, and (2) does not identify a multicast group of which the network device is a part. | Having a unique destination address of a device/location that is not the same as the unique address of the network bridge/network device/first location. |

*See* Enterasys' argument regarding the phrase "destined for a device other than the network bridge" in Section III.B.5.f, *supra*.

### s.    "destined for a location other than the first location" [Claim 20(a)]

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Having a destination address that (1) is not the same as the unique address of the first location, and (2) does not identify a multicast group of which the first location is a part. | Having a unique destination address of a device/location that is not the same as the unique address of the network bridge/network device/first location. |

*See* Enterasys' argument regarding the phrase "destined for a device other than the network bridge" in Section III.B.5.f, *supra*.

### t.    "any interface associated with the multicast group" [Claim 20(d)]

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| One or some of the interfaces associated with the multicast group. | All interfaces associated with the multicast group. |

Enterasys' construction is consistent with how one or ordinary skill would understand this phrase. Defendants' construction, on the other hand, would exclude the preferred embodiment. Enterasys' construction should be adopted.

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. *Accord SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1322 (Fed. Cir. 2006) ("All claims are construed in light of the specification: the observer looks to the specification to ascertain what has been invented, and understands the claim accordingly."). With reference to the specification, one of ordinary skill in the art would understand that the phrase "any interface associated with the multicast

group," as used in these claims, would mean "one or some of the interfaces associated with the multicast group."

This phrase is part of the larger phrase "transmitting the received multicast message on *any interface associated with the multicast group* identified in the multicast message." Figure 6 of the patent shows the process by which multicast messages are routed according to the invention. This Figure, and the text from the specification that describes it, indicates that "processor 120 then retransmits the received multicast packet only from the I/O interfaces 141-144 indicated in the I/O interface field except for the I/O interface from which the packet was received." '022 Patent at 11:6-9. In other words, the processor sends the packet from one or some of the interfaces, depending upon how many interfaces there are. If there are two interfaces, the packet is sent out the one interface other than that on which it was received. If there are three or more interfaces, the packet is sent out all interfaces except for the one on which it was received, *i.e.,* some.

At the time of the invention, the word "any" was defined as follows:

> 1. one, a, an, or some; one or more without specification or identification: If you have any witnesses, produce them. Pick out any six you like.
>
> . . .
>
> 4. every; all: Any schoolboy would know that. Read any books you find on the subject.
>
> . . .

*Random House Unabridged Dictionary*, Second Edition (1993) (Exh. 15 to Hensch. Decl.). The first definition -- defining "any" to mean "one" or "some" -- is consistent with the use of "any" in the claim; the second is not. A dictionary definition that contradicts the use of a term in the intrinsic record cannot be relied upon for claim construction. *Vitronics*, 90 F.3d at 1584 n.6.

Enterasys' proposed construction and the first dictionary definition are consistent with the way the invention is described in the specification.

Defendants' construction, which would require that the multicast packet be transmitted to *all* interfaces, would exclude the preferred embodiment described above and should, therefore, be rejected. *Globetrotter Software*, 362 F.3d at 1381; *Vitronics*, 90 F.3d at 1583-84; *Hoechst Celanese*, 78 F.3d at 1581. The specification clearly indicates that the inventor did not intend the term to be understood in this way. Enterasys' construction of this phrase is the correct construction and should be adopted by this Court.

### 6.    The '236 Patent

Enterasys is currently asserting Claims 1, 2, 6 and 8 of the '236 Patent, which addresses the issue of flooding multicast communications within VLANs. According to the invention, a group identifier is assigned to each port of a network bridge, with all ports with the same identifier being part of the same group (or VLAN). When a multicast communication is received on a port on the bridge, it is sent out all ports of the bridge having the same group identifier as the port on which the packet was received (Claim 1). A port may have more than one group identifier assigned to it (Claim 8). A "protocol type" is also assigned to each group to identify the protocol associated with that group (Claim 6).

As set forth in the Revised Joint Claim Construction Statement, the parties have agreed upon a construction for the following term from the '236 Patent: "station." For several claim terms/phrases, the parties have not reached agreement. Enterasys' arguments as to each of these disputed terms/phrases are set forth below:

a.    **"network bridge" [Claim 1]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| A network switching device capable of Layer 2 switching -- includes brouters. | A network device other than a router or a brouter, that implements the bridge forwarding algorithm. |

Defendants' proposed construction improperly seeks to read into the claim language the extraneous phrase "other than a router or brouter" that would serve to exclude coverage over devices that function at level 3, in addition to level 2. Nothing in the '236 specification or file history warrants such a limitation. In fact, the inventors recognized in the specification that many devices are built to perform both bridging and routing functions: "However, most routers today are brouters, *i.e.*, they implement the bridge forwarding algorithm as well as the normal forwarding code." '236 Patent at 8:24-26. As with their construction of "network bridge" in the '022 Patent, Defendants' construction here simply represents an improper attempt to nullify the legal principle that would otherwise govern in the context of an infringement analysis that an accused device cannot escape infringement by merely adding features in addition to those claimed by the patent. *See* Enterasys' argument regarding "network bridge" in Section III.B.5.a, *supra*. Enterasys' construction, which does not improperly limit the phrase "network bridge" to a device which performs only layer 2 functions, to the exclusion of layer 3 functions, should be adopted.

b.    **"identifying a source of the communication received on the first port of the bridge" [Claim 2]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| Identifying the VLAN, broadcast domain, and/or address corresponding to a device that transmitted the communication received on the first port of the bridge. | Identifying the globally unique address corresponding to a device that transmitted the communication received on the first port of the bridge. |

The dispute here is whether, as Defendants' construction suggests, the source information to be identified is limited to the address of the device from which a communication originated. Because the specification describes gathering, identifying and considering additional source information, Defendants' construction is incorrect.

The parties agree that the address of the device from which the communication originated is source information that can be identified in this claim element. *See* '236 Patent at 2:26-30 ("The router also includes a source table that contains a mapping of source addresses to the virtual networks, the source addresses representing locations of stations that are connected to the virtual networks and that send communications to the bridge."). However, the patent also gives examples of identifying the virtual network from which the packet originated -- *i.e.*, the source VLAN: "Upon receiving a unicast packet from the bridge, the router uses the source table to *identify the virtual network from which the unicast packet came*." *Id.* at 2:30-33 (emphasis added). In describing another aspect of the preferred embodiment of the invention, the '236 Patent specification explains:

> Upon receipt of a multicast packet from any of the virtual networks, the bridge adds source information to the received multicast packet and forwards the resulting multicast packet through one of the client ports to the router. The bridge uses the database to obtain the source information that is added to the multicast packet and it *identifies the virtual network from which the multicast packet received*.

*Id.* at 2:61-67 (emphasis added). Where the specification supports this broader use of the term "source" in this claim element to include the VLAN (or broadcast domain) from which a packet originated, there is no justification for limiting the term as Defendants have done in their proposed construction. The proper construction is that proposed by Enterasys.

c.     **"protocol type" [Claim 6]**

| Enterasys' Proposed Construction | Defendants' Joint Proposed Construction |
|---|---|
| A name, identifier or other designation that represents the communication protocol or protocols associated with the group. | Defendants do not offer a construction for this phrase. If required to do so, Defendants construe this phrase as follows: A type of protocol. A protocol is a formal set of conventions governing the format and relative timing of message exchange between two communications terminals. |

With respect to the phrase "protocol type," the inventors have acted as their own lexicographers and have given this phrase a definition that is arguably inconsistent with how one might understand the phrase outside of the context of this patent. A "protocol type" is not a type of protocol, as one might assume, and as Defendants' contend. Rather, the '236 specification uses the phrase "protocol type" to refer to a name, identifier, or other designation that represents the communication protocol or protocols associated with a group (or VLAN).

The specification explains: "Also note that each Vlan is given *a type which represents the protocols that this Vlan serves*. In other words, bridge 112 can appear to be divided into different Vlans for different *protocol types*." '236 Patent at 5:7-10 (emphasis added). Further, "[t]he routing protocols interface to the Vlans exactly as they do to LANS, *i.e.*, they begin by opening a port, *identifying which protocol types they wish to receive*, and finally sending and receiving packets on the opened port." *Id.* at 9:8-12 (emphasis added). The claim itself defines protocol type in a manner consistent with Enterasys' construction. Claim 6 reads:

> The method of Claim 1, further comprising:
>
> assigning a protocol type to each group identifier;
>
> wherein, for each port of first plurality of ports, *the protocol type identifies a communication protocol used by a station connected to the port.*

(Emphasis added). These quotes from the specification and the language of the claim indicate

that the protocol type is not just a type of protocol, but is instead a designation of a specific

protocol or protocols associated with the particular group or VLAN.  Therefore, Enterasys'

construction should be adopted.

## IV.    <u>CONCLUSION</u>

For all the reasons set forth above, Enterasys respectfully requests that this Court adopt

its proposed claim construction for each of the terms/phrases in dispute with respect to the

asserted claims of the patents-in-suit.

Respectfully submitted,

ENTERASYS NETWORKS, INC.

By its attorneys,

Christopher P. Sullivan, Esq. (BBO No.485120)
Marc N. Henschke, Esq. (BBO No. 636146)
Alan E. McKenna (BBO No. 644556)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
800 Boylston Street, 25th Floor
Boston, MA  02199
Tel. (617) 267-2300

/s/ Marla R. Butler
A. James Anderson, Esq. (*pro hac vice*)
Marla R. Butler, Esq. (*pro hac vice*)
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2600 One Atlanta Plaza
Atlanta, GA  30326-1386
Tel. (404) 760-4300

Dated:  August 17, 2007

AT1:30056808

## CERTIFICATE OF SERVICE

I, Marc N. Henschke, hereby certify that on August 17, 2007, I caused a true and correct copy of the attached *Opening Claim Construction Brief of Plaintiff Enterasys Networks, Inc.* to be served electronically pursuant to the Court's CM/ECF electronic filing system upon Defendants' respective counsel of record set forth below:

### Counsel for Defendant Foundry Networks, Inc.

William L. Anthony, Jr., Esq.
I. Neel Chatterjee, Esq.
Sanjeet K. Dutta, Esq.
Raymis H. Kim, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

Steven M. Bauer, Esq.
Jeremy P. Oczek, Esq.
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110-2600

### Counsel for Defendant Extreme Networks, Inc.

Terrence P. McMahon, Esq.
Vera M. Elson, Esq.
MCDERMOTT, WILL & EMERY LLP
3150 Porter Drive
Palo Alto, CA 94303-1212

Peter L. Resnik, Esq.
Emily E. Smith-Lee, Esq.
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775

Christopher D. Bright, Esq.
MCDERMOTT, WILL & EMERY LLP
18191 Von Karman Avenue, Suite 400
Irvine, CA 92612-7107

Dated: August 17, 2007                    /s/ Marc N. Henschke
                                          MARC N. HENSCHKE