## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

ENTERASYS NETWORKS, INC,

       Plaintiff,

    v.

FOUNDRY NETWORKS, INC.

and

EXTREME NETWORKS, INC.,

       Defendants.

Civil Action No. 05-CV-11298 (DPW)

## JOINT OPENING CLAIM CONSTRUCTION BRIEF
## OF DEFENDANT FOUNDRY NETWORKS, INC.
## AND DEFENDANT EXTREME NETWORKS, INC.

## TABLE OF CONTENTS

I. INTRODUCTION. ......................................................................................................1

II. LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION. ...................................2

   A. Ordinary Meaning to One of Skill in the Art. ....................................................3

   B. Intrinsic Evidence. ...........................................................................................4

      1. The Claims. ................................................................................................4

      2. The Specification.........................................................................................4

      3. The Prosecution History. ............................................................................7

   C. Extrinsic Evidence. ...........................................................................................8

   D. Means-Plus-Function Claims. ...........................................................................9

III. THE PROPER CONSTRUCTION OF CLAIM LANGUAGE IN DISPUTE.....................10

   A. The '205 Patent. .............................................................................................10

      1. Background of the '205 Patent......................................................................10

      2. Proper Constructions for the '205 Patent......................................................12

   B. The '236 Patent...............................................................................................27

      1. Background of the '236 Patent......................................................................27

      2. Proper Constructions for the '236 Patent......................................................29

   C. The '995 Patent...............................................................................................34

      1. Background of the '995 Patent......................................................................34

      2. Proper Constructions for the '995 Patent......................................................36

   D. The '665 Patent. .............................................................................................41

      1. Background of the '665 Patent......................................................................41

      2. Proper Constructions for the '665 Patent......................................................44

      3. Means-Plus-Function Limitations. ...............................................................49

   E. The '022 Patent...............................................................................................51

1. Background of the '022 Patent.........................................................................51

2. Proper Constructions for the '022 Patent.....................................................53

F.  The '173 Patent....................................................................................................70

1. Background of the '173 Patent.......................................................................70

2. Proper Constructions for the '173 Patent.....................................................73

IV.  CONCLUSION..........................................................................................................79

OHS West:260282855.11

<u>**TABLE OF CITATIONS**</u>

**Cases**

*Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999) .........................................9

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir. 2003) ...........45, 73

*Bates v. Coe*, 98 U.S. 31, 38 (1878) ...........................................................................................5

*Bell Atlantic Networks Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ...................................................................................................................................5

*Bicon, Inc. & Diro, Inc. v. The Straumann Co. & Institut Straumann AG*, 441 F.3d 945, 950-1 (Fed. Cir. 2006) ..............................................................................................................................4

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 288 F. Supp. 2d 562, 585-586 (S.D.N.Y. 2003) .......................................................................................................................................9

*C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ..........................6, 53

*Cardiac Pacemakers, Inc. et al. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) ...................................................................................................................................................10

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir. 2002 ...............................6

*Chef America, Inc. v. Lamb-Weston, Inc.* ....................................................................................2

*Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ..............................................7

*Comark Commc'n, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) ........................47

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257-58 (Fed. Cir. 1989)..2

*Cortland Line Co. v. Orvis Co., Inc.*, 203 F.3d 1351, 1357 (Fed. Cir. 2000) .............................10

*CSS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ........................3, 30

*Electa Instr. S.A. v. O.U.R. Scientific Intern., Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) ...........7

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp*, 93 F.3d 1572, 1582-83 (Fed. Cir. 1996) ......46

*Gaus v. Conair Corp.*, 363 F.3d 1284, 1290 (Fed. Cir. 2004) .....................................................6

*Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) ........................46

*Gobeli Research Ltd v. Apple Computer, Inc. & Sun Microsystems, Inc.*, 384 F. Supp. 2d 1016, 1023 (E.D. Tex. 2005).............................................................................................................67

*Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005)...........................................67

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000)........47

*Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004) .................6

*Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).......................................................8

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ................................................................................................................2, 3, 5

*Mas-Hamilton Group v. Lagard, Inc.*, 156 F.3d 1206, 1214 (Fed. Cir. 1998)...............................9

*Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003) ..........................5

*Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004)...........................6

*Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995), *cert. denied*, 520 U.S. 1115 (1995) ..........................................................................................................................3

*PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363-64 (Fed. Cir. 2005).....50

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) ......................................................3

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)............3, 5

*ResQnet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1379 (Fed. Cir. 2003)....................................45

*Schoenhaus v. Jenesco, Inc.* 440 F.3d 1354, 1357 (Fed. Cir. 2006)................................................4

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)...............................................................................................................................................7

*Texas Digital Sys. Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).........................3

*The Gentry Gallery, Inc. v. The Berkline Corp.*, 134 F.3d 1473, 1479-80 (Fed. Cir. 1998)..........5

*Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) .............................7

*Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ..............................4

*Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999).........................8

*Watts v. XL Sys., Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000)............................................. 6, 7, 48, 60

*WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1349 (Fed. Cir. 1999)..........................67
**Statutes**
35 U.S.C. § 102(b) ..............................................................................................................69

35 U.S.C. § 112...................................................................................................................5

## TABLE OF EXHIBITS

**Exhibit**                                     **Description**

1.      '205 Patent
2.      '173 Patent
3.      '665 Patent
4.      '995 Patent
5.      '022 Patent
6.      '236 Patent
7.      Excerpts from Perlman, INTERCONNECTIONS: BRIDGES AND ROUTERS (1992)
8.      Excerpts from File History of '205 Patent (February 8, 1992 Office Action) (ETS 0001485-1489)
9.      Excerpts from March 14, 2007 deposition of Eric Rosen
10.     Excerpt from File History of U.S. Patent Application No. 08/081,622 (May 30, 1995 Response to Office Action)
11.     Excerpts from April 13, 2007 deposition of George Varghese
12.     Excerpts from IEEE Dictionary (5th ed. 1993)
13.     Excerpts from Concise Oxford Dictionary 10th (1999).
14.     Excerpts from Encarta World English Dictionary (1999).
15.     Excerpt from File History of European Patent Application No. 97953551.5
16.     Excerpt from File History of Canadian Patent Application No. 2276206
17.     Excerpt from File History of Australian Patent Application No. 57276/98
18.     Excerpt from File History of '665 Patent (September 21, 1998 Office Action)
19.     Excerpt from File History of '665 Patent (December 18, 1998 Response to Office Action)
20.     U.S. Patent No. 5,331,637 to Francis
21.     Deering, *Multicast Routing in Internetworks and Extended LANS*, ACM Symposium on Communication Architectures and Protocols, ACM SIGCOMM (August 1988)
22.     Excerpt from File History of U.S. Patent No. 5,608,726 (September 4, 1996 Amendment and Response) (grandparent patent of '022 Patent)
23.     Excerpt from File History of U.S. Patent No. 5,898,686 (June 24, 1998 Amendment and Response) (parent patent of '022 Patent)
24.     Excerpt from File History of '022 Patent (May 21, 2002 Office Action)
25.     Excerpt from File History of '022 Patent (August 21, 2002 Response to May 21, 2002 Office Action)
26.     Excerpts from February 21, 2007 deposition of Robert Simcoe
27.     Excerpts from File History of '173 Patent (April 6, 1994 Amendment and Response)
28.     Excerpt from File History of U.S. Patent No. 5,946,308 (October 9, 1998 Response) in US Pat. No. Prosecution History
29.     Anderson, *Virtual LANS Take Network to the Next Level*, Computer Technology Review, vol. 16, no. 9 (September 1996).

# I.     **INTRODUCTION.**

Defendants Foundry Networks, Inc. and Extreme Networks, Inc. ("Defendants") jointly submit this opening brief on the proper construction of the asserted claims of the six patents-in-suit:  U.S. Patent No. 5,251,205 (Exh. 1, "the '205 Patent"), U.S. Patent No. 5,390,173 (Exh. 2, "the '173 Patent"), U.S. Patent No. 6,128,665 (Exh. 3, "the '665 Patent"), U.S. Patent No. 6,147,995 (Exh. 4, "the '995 Patent"), U.S. Patent No. 6,539,022 (Exh. 5, "the '022 Patent"); and U.S. Patent No. 6,560,236 (Exh. 6, "the '236 Patent").   As the United States Patent and Trademark Office has recently decided to re-examine the validity of the '205, '236, '995, '022, and '173 Patents, Defendants expect to move for a stay of the present action in the near future.

Enterasys is asserting thirty claims in this lawsuit and 39 terms are presented to the Court for construction at this time.[1]   Given the large number of terms presented, Defendants have chosen to focus their briefing on the key disputed claim terms, *i.e.*, those terms which Defendants believe will allow for summary judgment of non-infringement or invalidity as to one or more asserted claims.  For each patent, Defendants first provide an overview of the relevant technology and then discuss, on a term-by-term basis, the dispute between Defendants' and Plaintiff's proposed constructions.

In most instances, the claim construction does not require extensive technical background.  Instead, the claim constructions set forth by Defendants are straightforward, well-understood definitions that comport with the basic rules of grammar.  In the end, the dispute boils down to Plaintiff's attempt to redraft the claims either by reading words out of the claim language or by redefining terms that have plain, ordinary meanings in the English language such

---

[1]      As the Court has indicated during several case status conferences, Defendants expect the number of asserted claims to be substantially curtailed as the case proceeds towards trial.  As a result, Defendants have presented only key claim terms for construction at this time, but reserve the right to seek construction of additional terms should a need arise later in the case.

1

as "and", "each", and "all." The Federal Circuit recognized in *Chef America, Inc. v. Lamb-Weston, Inc.* that "in accord with our settled practice we construe the claim as written, not as the patentees wish they had written it." 358 F.3d 1371, 1374 (Fed. Cir. 2004). In *Chef America*, the patentee sought to have the Court re-write a claim which required "heating . . . dough *to* a temperature in the range of about 400 degrees F" to read "heating the . . . dough *at* a temperature in the range of about 400 degrees F." *Id.* at 1373. (emphasis added). There, the patentee reasoned that heating dough to the required temperature would "burn it to a crisp" a result at odds with the "dough products suitable for freezing and finish cooking to a light, flaky, crispy texture" described in the specification. *Id.* at 1373-74. The Federal Circuit, however, refused to re-write the claim by changing "to" into "at" because the claim language was unambiguous on its face. *Id.* Likewise, in this case Defendants submit that "and" means "and", "each" means "each", and "all" means "all"; the Court should not heed the Plaintiff's request to re-draft the claims to read as Enterasys would like them to read.

## II.    LEGAL FRAMEWORK FOR CLAIM CONSTRUCTION.

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257-58 (Fed. Cir. 1989). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

Understanding the "invention" is essential to an accurate delineation of a patent holder's right to exclude others from the field of his or her invention:

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most

> naturally aligns with the patent's description of the invention will
> be, in the end, the correct construction.

*Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citation omitted).  The claims must be read in the context of the problems solved, and with a common sense approach to the objectives of the invention.  *See Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995), *cert. denied*, 520 U.S. 1115 (1995).  Courts must "construe the claims as written, not as the patentees wish they had written it."  *Chef America*, 358 F.3d at 1374.

### A.    Ordinary Meaning to One of Skill in the Art.

A claim term is to be given the ordinary and customary meaning that would be attributed to it by one of ordinary skill in the art at the time of the invention, which is the effective filing date of the patent application.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005); *Texas Digital Sys. Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002).  To ascertain this meaning, the court looks to three primary sources:  the claims themselves, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979, *aff'd*, 517 U.S. 370 (1996).  There is a heavy presumption that the ordinary meaning of a claim term, as ascertained from these sources, controls.  *CSS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("[W]e indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").  Only if these intrinsic sources fail to resolve any ambiguities should a court rely on extrinsic evidence, such as dictionaries and expert opinions, to determine the meaning of a claim term.  *Phillips*, 415 F.3d at 1315, 1318 (("the specification 'is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term' …. We have viewed the extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms") quoting *Vitronics*

3

*Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

    **B.**       **Intrinsic Evidence.**

          **1.**     **The Claims.**

       The claims themselves provide "substantial guidance as to the meaning of particular claim terms," and the immediate context of a claim term is instructive in construing it. *Phillips*, 415 F.3d at 1314 (use of term "'steel baffles' … strongly implies that the term "baffles" does not inherently mean objects made of steel"). Simply put, claim terms must make sense in their immediate linguistic setting. *Schoenhaus v. Jenesco, Inc.* 440 F.3d 1354, 1357 (Fed. Cir. 2006). Claims must also be construed to give meaning to every word. *Bicon, Inc. & Diro, Inc. v. The Straumann Co. & Institut Straumann AG*, 441 F.3d 945, 950-1 (Fed. Cir. 2006) (rejecting a claim construction that rendered a claim term "superfluous").

       Although there are some cases in which claim construction merely requires "the application of the widely accepted meaning of commonly understood words," more often, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Phillips*, 415 F.3d at 1314. This requires consideration of the claims in the context of the entire specification.

          **2.**     **The Specification.**

       The primacy of claim terms notwithstanding, the Federal Circuit made clear in *Phillips* that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* While the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d. at 978).

Indeed, *Phillips* emphasizes that the specification is "the primary basis for construing the claims," citing a "long pedigree" of Supreme Court decisions that state this principle. *Id*. (citing, *inter alia*, *Bates v. Coe*, 98 U.S. 31, 38 (1878) ("in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims")). This is consonant with the specification's statutory role of providing a "full and exact description of the claimed invention." *Phillips*, 415 F.3d 1315 (citations, quotations omitted). The Federal Circuit captured the gestalt of claim construction as follows:

> Ultimately the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Id*. at 1316 (quoting *Renishaw*, 158 F.3d at 1250). By the same token, any construction that would result in claim scope different from what the specification discloses must be rejected as it would render the claim invalid for lack of written description. 35 U.S.C. § 112; *The Gentry Gallery, Inc. v. The Berkline Corp*., 134 F.3d 1473, 1479-80 (Fed. Cir. 1998) (claim is invalid if it is broader than the supporting disclosure).

The specification's centrality to claim construction means that "terms in a patent document are construed with the meaning with which they are presented in the patent document." *Phillips*, 415 F.3d at 1315 (quoting *Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)). For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Markman*, 52 F.3d at 979; *Bell Atlantic Networks Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) ("[t]he specification acts as a dictionary 'when it expressly

defines terms used in the claims or when it defines terms by implication.'"). This is certainly true of terms that lack a recognized ordinary meaning. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1303 (Fed. Cir. 2004) (court must look to the specification to construe a claim term that has no ordinary dictionary meaning and is not a term of art). It is also true where the specification reveals that the patentee has given "a special definition … to a claim term … that differs from the meaning it would otherwise possess.    In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir. 2002)).

The specification may also limit the scope of a claim term by characterizing the invention as a whole, as opposed to identifying a particular embodiment. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term."). Statements in the specification noting that a particular feature is present "according to the invention" indicate that feature is required by the claimed invention. *Gaus v. Conair Corp.*, 363 F.3d 1284, 1290 (Fed. Cir. 2004) (description of a protective circuit as "according to the invention" held to "demonstrate[] that the invention itself requires that the user be completely protected from shock"). Similarly, references to a particular feature as part of the "the present invention" limit the claims to structures and methods utilizing that feature. *Watts v. XL Sys., Inc.*, 232 F.3d 877, 883 (Fed. Cir. 2000) ("[T]he specification actually limits the invention to structures that utilize misaligned taper angles, state that '[t]he present invention utilizes [the varying taper angle] feature.'"); *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (particular embodiment defined the invention based on "clear statements in the specification that the invention ('the present system') is

directed to communications 'over a standard telephone line'").

Claim language should also be construed to require features identified as "important" or as distinguishing the invention from the prior art. *Watts*, 232 F.3d at 883 (adopting a narrow construction of a claim term on the basis of patentee's statements distinguishing the prior art); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (limiting claim term based in part on statements in the specification describing a particular structure as important to the invention).

Finally, the patentee may limit the meaning of a claim term in the specification by disclaiming claim scope. *Phillips*, 415 F.3d at 1316. Where that has occurred, "the inventor's intention, as expressed in the specification, is regarded as dispositive." *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)).

### 3.  <u>The Prosecution History.</u>

The prosecution history is also part of the intrinsic record, and plays an important role in claim interpretation, by demonstrating how the inventor understood his invention and how the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Importantly, the prosecution history may compel a narrowing construction of claim language where the inventor disclaimed claim scope before the Patent Office. *Id.* (citing *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution") (citation, quotation omitted)); *Electa Instr. S.A. v. O.U.R. Scientific Intern., Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000) ("[c]laims that have been narrowed in order to obtain issuance over the prior art cannot later be interpreted to cover that which was previously disclaimed during prosecution.").

C.    **Extrinsic Evidence.**

Extrinsic evidence, such as inventor testimony, dictionary definitions, and expert testimony, may be considered by the Court in construing claim language, but it is clearly subordinate to intrinsic evidence as a guide to claim construction.  *Phillips*, 415 F.3d at 1319 ("extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence").

Inventor testimony can be a useful aid in construing claim terms and providing insight into the problems that existed at the time of the invention and the solutions to those problems.

> An inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims. The testimony of the inventor may also provide background information, including explanation of the problems that existed at the time the invention was made and the inventor's solution to these problems.

*Voice Techs. Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999) (reversing the District Court's construction of a claim term by relying upon inventor testimony that the District Court had wrongfully excluded).

A patentee's testimony that runs against his or her own interest is particularly important in construing a claim term.  Inventor testimony can be used to properly construe the scope of a patent claim to what the inventor actually intended to claim.  *Jonsson v. Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).  In *Jonsson*, the Federal Circuit relied upon the patentee's own deposition testimony in restricting the scope of the patent claim:

> Furthermore, [the inventor] Jonsson's January 29, 1986 deposition confirms the need for multiple emitters in the production of "diffuse light."  In his deposition, Jonsson "describe[d] diffuse light as light rays propagating in different directions," and noted that "diffuse light" is produced "from many different sources or many different points."  He stated that "diffuse light" could not derive from a single source.  From the foregoing it is clear that the district court did not err in its determination that Jonsson was

> estopped from asserting that his '912 patent was not limited to
> multiple emitters.

*Id.*; see also *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 288 F. Supp. 2d 562, 585-586

(S.D.N.Y. 2003) ("Testimony against a patentee's own interest, however, is perhaps the 'most

persuasive extrinsic evidence.'")

     While assigning to dictionaries and other extrinsic evidence a role subordinate to the

intrinsic record, the Federal Circuit emphasized that claim construction issues are not resolved by

any magic formula.  There is no rigid sequence of steps for a court to follow when it considers

disputed claim language.  *Phillips*, 415 F.3d at 1324.  Rather, *Phillips* held that a court must

attach the appropriate weight to the intrinsic and extrinsic sources offered in support of a

proposed claim construction, bearing in mind the general rule that the claims measure the scope

of the patent grant.

     **D.**     **Means-Plus-Function Claims.**

     A phrase is presumed to be a means-plus-function term if it employs the word "means,"

unless the claim "recites sufficient structure or material for performing the claimed function." *Al-*

*Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999).  Even where the term "means"

is absent, a limitation may be a means-plus-function element "when it is apparent that the

element invokes purely functional terms, without the additional recital of specific structure or

material for performing that function . . .."  *Id.; see also Mas-Hamilton Group v. Lagard, Inc.*,

156 F.3d 1206, 1214 (Fed. Cir. 1998) (holding that the phrase "lever moving element" is a

means-plus-function phrase because the claim does not recite structure for performing the

identified function).

     With respect to the means-plus-function phrases here at issue, the Court must identify the

claimed function and the corresponding structure in the specification.  *Cardiac Pacemakers, Inc.*

*et al. v. St. Jude Medical, Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002) ("Construction of a means-plus-function limitation involves two steps.  First, the court must identify the claimed function. …. [T]he court must then determine what structure, if any, disclosed in the specification corresponds to the claimed function. … [T]he specification must clearly associate the structure with performance of the function.").  Where the specification discloses only a single structure corresponding to the claimed function, the element is limited to that structure, to the extent it is necessary to fully perform the stated function.  *Cortland Line Co. v. Orvis Co., Inc.*, 203 F.3d 1351, 1357 (Fed. Cir. 2000) ("[b]ecause the specification describes only one structure corresponding to the connecting function, this court limits" the construction to that structure.); *Cardiac Pacemakers,* 296 F.3d at 1119 ("corresponding structure must include all structure that actually performs the recited function").

## III.    THE PROPER CONSTRUCTION OF CLAIM LANGUAGE IN DISPUTE.

### A.    The '205 Patent.

#### 1.    Background of the '205 Patent.

The '205 Patent relates to transmitting data "packets" in a unique environment called a "multiprotocol network environment."

According to the '205 Patent, a network device needs to have a "topology" or map indicating the status and location of other network devices, and a "routing algorithm" to calculate a path for data packets to take through this topology based on particular criteria, such as the quickest path through the network.  '205 Patent, Col. 1:40-50; Col. 1:66 - Col. 2:5.  The '205 Patent teaches that network devices maintain an up-to-date topology through the exchange of routing "control packets," which are originated by network devices and formatted in a particular network language, called a "routing protocol."  Control packets contain the most recent local

topology information detected by the device that transmits them. *Id.* at Col. 1:51-65. Network devices throughout the network exchange these routing "control packets" periodically so that the network topology information can be distributed and later used in making routing decisions. *Id.* at Col. 1:66-Col. 2:5.

A complication arises in "multiprotocol" network environments with respect to routing. Multiprotocol environments are networks that employ devices that communicate in different sets of network "languages" which the patent refers to as "protocol suites." *Id.* at Col. 2:26-40. "Protocol suites" are distinct "comprehensive set[s] of protocols that [are] designed to work together to coherently provide complete communication capabilities,"[2] meaning a self-contained set of network languages that together provide a format for all the information necessary for network communications. *Id.* at Col. 2:26-30.

The '205 Patent addressed the problem of networks employing two particular types of protocol suites: the Open Systems Interconnection (OSI) protocol suite described by the International Organization for Standardization, a networking standards body; and the Transmission Control Protocol/Internetwork Protocol (TCP/IP) protocol suite defined by the Internet Engineering Task Force, another standards body. These protocol suites were developed independently and, as a consequence, are largely incompatible, meaning that a TCP/IP device cannot send packets via OSI devices and vice versa. TCP/IP devices and OSI devices must therefore maintain their own distinct topologies, as they use different routing protocols that cannot be understood by the device using the other protocol suite.

The '205 Patent sought to resolve protocol suite incompatibility by using a specialized *single* routing protocol to *automatically* make all routing decisions for all packets of both

---

[2]    The parties have stipulated as to the meaning of "protocol suite" in the '205 Patent.

protocol suites. The '205 Patent describes a specialized routing protocol, where the routing control packet contains topology information about both TCP/IP and OSI networks, permitting the OSI devices and TCP/IP devices to maintain a single topology and to be aware of each other. This specialized routing protocol was designed such that both TCP/IP and OSI devices could understand it. Using this specialized routing protocol, multiprotocol devices could calculate paths using the entire network. TCP/IP devices could then route packets over OSI-only devices using "encapsulation." *Id.* at Col. 3:3-31. To allow the specialized routing protocol to calculate routes throughout the entire networks, the '205 Patent introduced the concept of control packets modified to include routing information for both the OSI and the TCP/IP networks. *Id.*

    2.    **Proper Constructions for the '205 Patent.**

    a.    **"encapsulate" (Note: this term is also used in the '995 Patent).**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| using a routing protocol to automatically predetermine whether to <u>encapsulate</u> a packet, at which information handling devices to <u>encapsulate</u> and to decapsulate said packet, and which protocol to use to <u>encapsulate</u> said packet, wherein<br><br>'205 Patent (claims 5, 7) | Generate a protocol B header and place the protocol A user data packet, including the protocol A header, into the data area of the protocol B user data packet. | Adding to a packet a new header that does not conform to a protocol-specific header with which said packet had previously been configured. |

Defendants believe that the term "encapsulate" should be afforded its ordinary and customary meaning, a meaning consistently used in both the '205 and '995 Patents. The fundamental dispute between the parties is whether "encapsulate" requires the *entirety* of an original packet to be put in the data section of the new, encapsulating packet. Enterasys wants a definition in which only a portion of the data packet is "encapsulated." The Defendants,

however, believe that the claim term is clear in requiring that the entire "packet" be encapsulated.

The '205 Patent defines "encapsulate" explicitly as follows:

> When a user data packet formatted in protocol A is received, at a gateway router, the gateway router "encapsulates" the user data packet in a protocol B header (*i.e., generates a protocol B header and places the protocol A user data packet, including the protocol A header, into the data area of the protocol B user data packet*).

*Id.* at Col. 3:22-28 (emphasis added). The patent clearly describes encapsulation as completely enveloping one packet into another. The definition offered by Defendants mirrors this important concept.

This concept is graphically depicted in the '995 Patent as explained further in the discussion of "encapsulation" in the '995 Patent section below.

VLAN PACKET

| VLAN HEADER | BROADCAST PACKET |
| --- | --- |

*FIG. 8*

'995 Patent at Fig. 8.

This definition of encapsulation also comports with the ordinary meaning of the term, as defined in a textbook on internetworking written by a named inventor of the '205 Patent, Radia Perlman. *See* Exh. 7, Radia Perlman, INTERCONNECTIONS: BRIDGES AND ROUTERS (May 1992), page 370 (encapsulation means "[h]andling protocol A's packets, complete with A's header information, as data carried by protocol B. Encapsulated protocol A packets have a B header,

followed by an A header, followed by the information that protocol A is carrying as its own data.").

By contrast, Enterasys seeks two different definitions for "encapsulate" for the '205 and '995 Patents. This approach, in addition to causing unnecessary confusion for the jury, is plainly at odds with the guiding principle of claim construction law that claim terms should be construed in accordance to their plain and ordinary meaning. For the '205 Patent, Enterasys argues that "encapsulate" means "[a]dding to a packet a new header that does not conform to a protocol-specific header with which said packet had previously been configured." In addition to simply being confusing, this construction seeks to eliminate from the ordinary meaning of the term set forth in the '205 Patent specification the requirement of placing the entire original packet in the data portion of the new encapsulating packet. In so doing, Enterasys' definition omits an important part of the "encapsulation" concept.

b.    "route calculation algorithm".

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| determining routes for said first and said second user data packets using a route calculation algorithm corresponding to a single routing protocol, chosen from an arbitrary protocol suite, regardless of the addressing convention to which the destination address information in said user data packet conforms  '205 Patent (claim 1) | A procedure that computes effective routes through the network using the known locations of the network's end systems (*i.e.,* which routers are responsible for which end systems), the nature of the connections between the routers, and the states (e.g., operative or inoperative) of the links forming those connections. | A procedure that uses information about the topology or other characteristics of a communications network(s) as a basis for computing effective routes for packets through said network(s). |

The '205 Patent does not use the phrase "route calculation algorithm" anywhere in its specification. Because the term has no standard definition, it needs to be construed with

reference to the patent disclosure itself.   The parties' dispute is over what components of information are to be used to calculate routes for a packet through the network.   Defendants' construction includes the specific types of information that were identified in the specification, whereas Enterasys' definition seeks to sweep in broad categories of unspecified information.

While "route calculation algorithm" is not expressly defined, the specification expressly defines the term "routing algorithm:"

> To determine how user data packets should be forwarded, each router typically knows the locations of the network's end systems (*i.e.*, which routers are responsible for which end systems), the nature of the connections between the routers, and the states (*e.g.*, operative or inoperative) of the links forming those connections. Using this information, each router can compute effective routes through the network and avoid, for example, faulty links or routers. A procedure for performing these tasks is generally known as a "*routing algorithm*".

'205 Patent, Col. 1:40-49 (emphasis added).

This passage makes clear that the term "routing calculation algorithm" in the claims is used synonymously with the term "routing algorithm" defined in the specification.   As a result, Defendants' proposed construction conforms to the definition of "routing algorithm" set forth in the '205 Patent.   Enterasys' definition, by contrast, attempts to broaden the language of the claims far beyond the express definition in the patent specification.   For example, Enterasys seeks to define a "route calculation algorithm" as using "information about the topology or other characteristics of a communications network(s)."   However, the terms "information about the topology" and "other characteristics" are defined nowhere in the specification and do not bring any clarity to Enterasys' proposed construction, thus failing to define the boundaries of the invention in a way that would provide sufficient notice to the public.

c.    <u>"a single routing protocol, chosen from an arbitrary protocol suite".</u>

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| Determining routes for said first and said second user data packets using a route calculation algorithm corresponding to <u>a single routing protocol, chosen from an arbitrary protocol suite</u>, regardless of the addressing convention to which the destination address information in said user data packet conforms,<br><br>'205 Patent (claim 1) | Defendants do not offer a construction for this phrase. If required to do so, Defendants construe this phrase to mean: "a single routing protocol, chosen from an arbitrary protocol suite" | A single routing protocol can be chosen from any available protocol suite without regard to which addressing conventions are supported by the protocol suite from which it is chosen. |

Defendants do not offer a construction for this phrase, as it is subsumed within Defendants' construction of this entire claim element in the section that directly follows. Furthermore, Enterasys' proffered construction is deficient on several counts. First, Enterasys' construction is directly contrary to the express claim language, which requires "an arbitrary protocol suite." Enterasys seeks to read "arbitrary" out of the claim language, by substituting it with the phrase "any available protocol suite." However, "arbitrary" does not mean "any available," and there is nothing in the intrinsic record that supports this broadening of the term "arbitrary." Second, Enterasys' construction raises more questions than it answers, as it is plainly inconsistent with Enterasys' proposed construction of the entire claim element set forth in the following section and would thus create unnecessary confusion for the jury.

d.    **"determining routes for said first and said second user data packets using a route calculation algorithm corresponding to a single routing protocol, chosen from an arbitrary protocol suite, regardless of the addressing convention to which the destination address information in said user data packet conforms".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| Determining routes for said first and said second user data packets using a route calculation algorithm corresponding to a single routing protocol, chosen from an arbitrary protocol suite, regardless of the addressing convention to which the destination address information in said user data packet conforms, <br><br> 205 Patent (claim 1) | Determining routes for both the first and second data packets using a single route calculation algorithm corresponding to a routing protocol that is part of a protocol suite that is chosen arbitrarily. | Using a route calculation algorithm corresponding to a single routing protocol to determine routes for at least two user data packets, each of which contains destination address information conforming to a different addressing convention than the other. |

There are two issues here. The first dispute is whether there is one single "routing protocol" used in the entire network, which informs a single "route calculation algorithm" to calculate routes for *every* packet in the network. The second dispute is whether the "route calculation algorithm" calculates routes for at least two sets of packets, each of which are part of a distinct "protocol suite." Defendants seek a construction such that there is only one "routing protocol" in the network that calculates routes for packets of at least two independent protocol suites. Enterasys' definition, on the other hand, seeks to obfuscate both of these points.

First, the claim language expressly requires a *single* "routing protocol" used throughout the network. The claim language recites that routing decisions are made using "*a* route calculation algorithm" for *both* "the first" and "the second user data packets," *i.e.*, *all* the packets recited in the claim. These routing decisions are made using only "a *single* routing protocol."

Second, the claim language is clear that routing decisions are made for packets belonging to two *distinct* protocol suites. Though the language in this element states that routing decisions are made "<u>regardless of the addressing convention</u>" contained in the data packet, the previous claim element states that these "destination address conventions" are each part of a "different independent protocol suite."

The parties agreed that "independent protocol suite" means that the first and second user data packets are each part of *different independent* "comprehensive set of protocols that is designed to work together to coherently provide complete communication capabilities." Thus, a *single* routing protocol is used to make all route calculations for all user data packets routed through the network, where these user data packets are part of two or more *distinct* and independent "comprehensive sets of protocols."

The fundamental teaching of the '205 Patent specification is the use of a single set of routing protocols that all devices in the network could understand, as an advance over the previous solutions to the problem of incompatible protocol suites (e.g., the TCP/IP protocol suite and the OSI protocol suite):

> To apply the invention to TCP/IP and OSI, these protocols are slightly modified. Primarily, the format of various control packets such as the link state packets and the router to router "hello" packets are normalized so that all of the routers can connect to each other and become aware of the full topology of the multi-protocol network.

'205 Patent, Col. 7:31-37. The resulting control packets were thus part of a *single* "routing protocol":

> In what follows, the term "routing protocol" will be used to describe the combination of an address allocation scheme and a format (or a group of related formats) <u>that describes control packets and other information to be exchanged among routers</u>, and which is used to calculate the paths which the user data packets

will take between routers.

*Id.* at Col. 2:15-22 (emphasis added). Thus, the '205 Patent specification is quite clear on the use of a single routing protocol to calculate the routes of user data packets that are part of two different independent protocol suites.

Enterasys' construction, by contrast, is incorrect. Enterasys seeks to confound the issue of whether a single routing protocol is used for all user data packets in the network, because it states only the use of "a single routing protocol to determine routes <u>for at least two user data packets</u>." This language misleadingly suggests there may be other "user data packets" addressed by the claim, whereas only "the first" and "the second user data packets" are recited in the claim. Furthermore, this construction is contrary to the stated point of novelty in the '205 Patent specification, which was the use of a single routing protocol for *all* user data packets in a multi-protocol network environment.

Moreover, Enterasys simply seeks to read out the word "arbitrary" from its proposed construction. Furthermore, Enterasys' construction is misleading in so far as it ignores the fact that the "*different addressing conventions*" are part of "distinct protocol suites." To the extent Enterasys is seeking to create the impression that "different addressing conventions" of the same protocol suite would satisfy this claim element, such construction would be contrary to the specification and the claim language, as it would fail to address the problem of interconnecting networks using the incompatible TCP/IP and OSI protocol *suites* which is at the heart of what the '205 Patent teaches.

e.    **<u>"said route being determined using the destination address information in said user data packets without converting said destination address information from the addressing convention to which it forms [*sic*] to another addressing convention"</u>.**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| said route being determined using the destination address information in said user data packets without converting said destination address information from the addressing convention to which it forms [*sic*] to another addressing convention<br><br>205 Patent (claim 1) | The routes through the network are determined based on the original *destination* addresses of the user data packets, without converting any of the destination addresses into a new address. | The route for a user data packet is determined based upon using address information from the addressing convention to which it conforms without converting said information to some other addressing convention. |

The fundamental dispute here is whether the original *destination* address is used in determining a route for the packet. Enterasys' construction, in fact, seeks to read out the term "destination" from the express language of the claim.

The '205 Patent specification states that "each of the user data packets includes *destination address information* conforming to an addressing convention of any one of two or more different independent protocol suites..." '205 Patent, Col. 4:15-19 (emphasis added). The specification makes clear that this route is calculated using the original *destination* address without first converting it to another address: "the user data packet's path is mapped in a similar manner; however, the mapping is done *without regard for the protocols supported by the routers on the path*." *Id.* at Col. 13:14-24 (emphasis added).

Similarly, the prosecution history requires Defendants' construction. In a response to the Office Action dated February 18, 1992, the inventors distinguished the '205 Patent over the cited prior art reference that operated "by *converting the addresses* to a different addressing

convention and then forwarding [the packet] based *on the new addresses*." Exh. 8 at 1489 (emphasis added). In other words, this claim element forwards user data packets based only on the *original destination addresses* of the user data packets, without converting any of the destination addresses into a *new address*.

In contrast, Enterasys' proposed construction seeks to erase the word "destination" from the claim language altogether. Further, its construction is merely a circular paraphrase of the claim language that does not offer any better explanation of this claim element. Finally, Enterasys construction ignores the limitation that the "route being determined" is for sending user data packets through an interconnected network, rather than from a router to another router within the calculated path. By not including the concept of the entire route through a network being predetermined, Enterasys tries to rewrite the claim to escape the description of the inventor.

f.    **"said first and second devices exchange control packets which specify".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| said first and second devices exchange control packets which specify:<br><br>the links connected to the device which originates the control packet,<br><br>the addresses, formatted in accordance with said first addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said first addressing scheme, and<br><br>the addresses, formatted in accordance with said second addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said second addressing scheme.<br><br>'205 Patent (claim 21) | the first and second devices exchange control packets, each control packet including: | the first and second devices exchange control packets which collectively specify... |

The dispute here centers on the proper grammatical interpretation of the claim language. Specifically, whether each control packet contains all three of the subsequent limitations in the claim, or whether a single "control packet" need only contain certain kinds of "control information," and not necessarily each of the three limitations. Enterasys' construction ignores the plain grammar of the claim and attempts to rewrite the claim with the term "collectively."

First, the structure of the claim calls for all of the information identified in the three subsequent elements to be contained in "*the* control packet." The reference to a singular "control packet" means that the claim limitation requires that *each* "control packet" specify all of: a) the links connected to the originating device for that packet, b) addresses formatted in accordance with a first addressing scheme, and c) the second addressing scheme that is attached to the originating device for that packet. It is also significant that the second and third limitations are listed in the conjunctive by using the word "and." The use of "and" signifies that all the data covered by the limitation is in a single place, *i.e.*, the control packet. As both addresses formatted in accordance with a first and second addressing scheme are specified by a single "control packet," it follows that each control packet must contain both "addressing schemes," a fact that is made explicit by Defendants' construction.

Furthermore, the specification expressly identifies a single set of control packets that contain information regarding both TCP/IP and OSI protocol suite network topologies, such that "all of the routers can connect to each other and become aware of the full topology of the multi-protocol network." '205 Patent, Col. 7:35-37. The use of a single set of control packets to propagate network topology information about multiple protocol suites was described in the '205 Patent specification as an advance over the prior art approaches. *See Id.* at Col. 3:6 – Col. 4:9 (acknowledging in the patent Background that two separate sets of control packets with different addressing conventions was a problem of the prior art). "[the prior art] requires that two complete sets of control packets be distributed through the two independent networks, which doubles the control traffic overhead over that of a single integrated network." *Id.* at Col. 3:65-68.

Furthermore, the sole disclosed embodiment of the patent teaches that every control packet has fields added to store the additional information from different protocols. *Id.* at Col. 40:16 ("Six additional fields are added to the 10589 link state packet format."); Col. 39:25-28 ("In particular, the formats are substantially similar to 10589 formats currently in use, but additional optional fields are added."). *See generally id.* at 39:20-41:31. The '205 Patent does not teach separate control packets with portions of relevant data.

This feature was also confirmed during the deposition of inventor Eric Rosen, who testified that it was a *requirement* of the '205 Patent for the control packets to be "expandable," meaning that the control packets contained fields for the location of both TCP/IP and OSI protocol suite devices:

> Q.  Is it a requirement for – for this architecture that you … for it to be expandable in order to implement your idea?
>
> A.     Well, yes, if the packet formats are not expandable -- *the whole idea -- the whole notion that it's easy to add a few extra fields really presupposes that the packet's already expandable.*

Exh. 9 at 126:18-25 (emphasis added).  By making clear that each control packet contains network topology information about both network protocol suites, Defendants seek to ensure that the claim is read in the manner intended by the inventors.

Enterasys' construction, by contrast, does not identify what information is contained in each control packet, merely stating that the "control packets" "collectively" specify the following limitations.  "Each" does not mean "collectively" and the Court should decline Plaintiff's invitation to re-write the claim.  *Chef America*, 358 F.3d 1374.

Furthermore, the notion of having multiple separate packets with different addressing conventions was expressly disclaimed by the inventors and considered a disadvantage.  *See* '205 Patent, Col. 3:6-Col. 4:9.  Finally, the specification provides no support for such multi-control

packet architecture.  Instead, the patent teaches away from the above construction offered by

Enterasys.

### g.  "a first addressing scheme" and "a second addressing scheme".

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| a first information handling device capable of interpreting addresses formatted in accordance with <u>a first addressing scheme</u>, said <u>first addressing scheme</u> defining one or more address fields that are assigned values to form an address,<br><br>a second information handling device capable of interpreting addresses formatted in accordance with a *second addressing scheme*, said *second addressing scheme* defining different address fields than said <u>first addressing scheme</u>, wherein<br><br>at least one address formatted in accordance with said <u>first addressing scheme</u> dose not identify the same destination as any address formatted in accordance with said *second addressing scheme*, and<br><br>said first and second devices exchange control packets which specify:<br><br>the links connected to the device which originates the control packet,<br><br>the addresses, formatted in accordance with said <u>first</u> | <u>a first addressing scheme:</u>  a set of address fields that completely defines the addressing information for all layers of a first independent protocol suite<br><br><u>a second addressing scheme</u>:  a set of address fields that completely defines the addressing information for all layers of a second independent protocol suite that is different from the first independent protocol suite. | <u>first addressing scheme:</u> a first set of rules for defining, allocating and/or formatting packet address information that is used in connection with a particular protocol.<br><br><u>second addressing scheme</u>: a second set of rules for defining, allocating and/or formatting packet address information that is used in connection with a particular protocol, and that is different from the first addressing scheme. |

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said first addressing scheme, and<br><br>the addresses, formatted in accordance with said *second addressing scheme*, of those destinations that are attached to the originating device and have an address corresponding to said *second addressing scheme*.<br><br>'205 Patent (claim 21) | | |

The fundamental dispute as to these terms is whether the "addressing schemes" identify the entire *set* of addressing fields necessary to define an address for two different, independent "protocol suites," or whether the first and second addressing schemes merely define addresses for a *single* protocol, as Enterasys contends. The parties have agreed that the term "independent protocol suite" in the '205 Patent means a "comprehensive *set* of protocols that is designed to work together to coherently provide complete communication capabilities." The term "addressing scheme" necessarily refers to multiple addressing fields that are formatted for every protocol in this comprehensive set, as set forth in Defendants' proposed construction.

Defendants' construction is consistent with the language of the specification. First, the concept of a set of addresses is inherent in the term "addressing *scheme*," but is not inherent in the terms "addressing field" or simply "address." The language of Claim 21 defines a "first addressing scheme" as "defining *one or more address fields* that are assigned values to form an address," and the "second addressing scheme" as "defining *different address fields* than said first

addressing scheme." This language, which defines the "addressing schemes" as "one or more fields," indicates that they are sets of addresses, and not just single addresses.

Furthermore, Claim 21 must be read in view of the teachings of the specification, which confirm that addressing schemes are the set of addressing fields corresponding to an entire protocol suite. Claim 21 identifies "control packets" that contain addresses formatted in accordance with the "first addressing scheme" and the "second addressing scheme." The '205 Patent describes an effort to marry the TCP/IP protocol suite with the OSI protocol suite. The entire point of the invention is to facilitate routing between networks with different addressing conventions for different protocol suites. The key point of novelty in this approach was the use of modified routing "control packets" to carry routing information for both OSI and TCP/IP networks. '205 Patent, Col. 7:31-37. Thus, the "addresses formatted in accordance" with the "first addressing scheme" and the "second addressing scheme" contained in the "control packet" are the same expandable routing control packets described in the specification and described by the inventor as the point of novelty of the '205 Patent. *Id.* In light of this evidence, Defendants' construction is proper.

**B.    The '236 Patent.**

**1.    Background of the '236 Patent.**

The '236 Patent relates to computer networking devices known as bridges and routers. These devices assist in transporting digital data between computers, servers, printers, and other "end systems." Bridges and routers may also be used to interconnect two or more networks. At the time the '236 Patent was filed, bridges were simple devices with limited functionality. They connected different local area networks (LANs)[3] together to form larger, "extended" LANs.

---

[3]    A "LAN" is a computer network that covers a relatively small area, such as a single building or group of buildings.

'236 Patent, Col. 1:13-15. For example, a bridge might enable a computer in LAN 1 to communicate with a computer in LAN 2. *Id.* at Col. 1:23-28.

As described in the '236 Patent, routers were used for interconnecting LANs in a different way. Routers kept individual LANs separate by using technology not present in bridges. This was beneficial because overly large LANs could give rise to certain problems. *Id.* at Col. 1:31-44. The inventors of the '236 Patent observed that "[t]here are several well-known differences between bridges and routers which make interconnecting LANs with routers more flexible and easier to manage." *Id.* at Col. 1:46-48. A special type of router identified by the '236 Patent is a "brouter." According to the patent, "most routers [today] are brouters, *i.e.*, they implement the bridge forwarding algorithm as well as the normal forwarding code." *Id.* at Col. 8:24-26. That is, according to the '236 Patent, a brouter is a router that can perform bridging functions, but is not a bridge.

One of the key differences between bridges and routers, as noted in the '236 Patent, relates to the way in which they handle a type of data transmission known as a "broadcast." Broadcast transmissions send the same information to all locations within an Extended LAN. According to the '236 Patent, "bridges must allow broadcast [traffic]" in order for certain standardized processes called "protocols" to work correctly. *Id.* at Col. 1:53-54. By contrast, "routers typically do not allow broadcast traffic; if they do, the broadcast traffic can be carefully controlled." *Id.* at Col. 1:50-52.

The '236 Patent purports to solve problems inherent in bridges by instituting certain router-like traffic control functions for broadcast traffic on a bridge.[4]

---

[4]     In bridges, the terms "broadcast" and "multicast" are used interchangeably since both broadcast and multicast packets must be forwarded to all ports on the bridge, except the receiving port.

2.    **Proper Constructions for the '236 Patent.**

a.    **"network bridge".**

| Term to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| A method of operating a <u>network bridge</u> having a first plurality of ports through which network communications pass to and from the bridge,<br><br>'236 Patent (claim 1) | A network device, other than a router or a brouter, that implements the bridge forwarding algorithm. | A network switching device capable of Layer 2 switching - includes brouter. |

The term "network bridge" is used in claims of both the '236 and the '022 Patents in accordance with its plain and ordinary meaning. Therefore, in order to eliminate jury confusion, it is important to construe "network bridge" identically for both patents.

The fundamental dispute between the parties is whether the term "network bridge" includes brouters (*i.e.*, routers that also implement a bridge forwarding algorithm). According to their plain and ordinary meaning, the terms "bridge", "router" and "brouter" refer to different devices. This understanding is confirmed by the fact that routers, on the one hand, and bridges on the other hand, are described throughout the '236 Patent specification as distinct types of devices. '236 Patent, Col. 1:46-59. The specification explains that "most routers today are brouters, *i.e.*, they implement the bridge forwarding algorithm as well as the normal forwarding code." *Id.* at Col. 8:24-26.

As noted above, the background section of the '236 Patent explains the differences between bridges and routers (of which brouters are a type) in detail. *Id.* at Col. 1:46-59; 8:24-26. Routers have several types of functionality that bridges lack, thus making "interconnecting LANs with routers more flexible and easier to manage." *Id.* at Col. 1:46-48. Because the patent is so careful to distinguish routers from bridges, the term "network bridge" as used in the

asserted claims cannot be read to include routers (and thus brouters).  Indeed, the very purpose of the patented invention was to solve problems inherent in "large multiport *bridges*," *but not present in routers*. *Id.* at Col. 1:23-45 (emphasis added).  In fact, the patent teaches that a known *prior art* solution to these problems was to replace bridges with routers.  *Id.* at Col. 1:44-45.  Thus, including routers or brouters[5] within the definition of "network bridge" would negate the very purpose of the invention claimed in the '236 Patent.

The prosecution history further supports Defendants' proposed claim construction.  During prosecution of one of the applications that lead to the issuance of the '236 Patent, the applicants' patent attorney distinguished bridges from routers as follows:

> In addition, routing limitations in the system described by Doeringer et al. are accomplished by the *routers* not by the bridge. In claim 1, we note that the bridge containing the ports isolates the virtual networks from each; the router (see dependent claim 2) serves a different function.

Exh. 10 at 8 (emphasis added).  In other words, the applicants admitted that a bridge is not a router within the meaning of the claims.  *CCS Fitness*, 288 F.3d at 1366-7.  This, of course, comports with the plain and ordinary meaning of the term "network bridge" as not including a "router."

Indeed, even inventor George Varghese confirmed during his deposition that bridges and routers are distinct devices, and that one could not be substituted for the other:

> Q.    Okay.  And then you also provided a definition of a router.  What is a router?
> A.    A router is a device that interconnects local area networks to form a routing network.  Routers work at the so-called routing LAN.  They use routing addresses like Internet addresses, while bridges tend to use just the Ethernet – the Ethernet addresses.  *So they are very different devices.*  They use different interconnection strategies.
> Q.    Okay.  *And for purposes of your invention, do bridges and routers mean*

---

[5]      Because a brouter is a type of router, it necessarily is not a "network bridge" for the reasons stated above.

> *two different things?*
>   A.   *They do.*
>   Q.   *They were not interchangeable?*
>   A.   *Absolutely not.*

Exh. 11 at 58:24 - 59:14 (emphasis added).

For all of these reasons, Defendants submit that the term "network bridge" be construed as "a network device, other than a router or a brouter, that implements the bridge forwarding algorithm."

**b.**    **"identifying a source of the communication received on the first port of the bridge".**

| Term to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| The method of claim 1, further comprising: <u>identifying a source of the communication received on the first port of the bridge.</u>  '236 Patent (claim 2) | Identifying the globally unique address corresponding to a device that transmitted the communication received on the first port of the bridge. | Identifying the VLAN, broadcast domain, and/or address corresponding to a device that transmitted the communication received on the first port of the bridge. |

The dispute here is what the "source of the communication" can be. The Defendants' proposed definition of this phrase comports with the specification and the commonly understood meaning of the phrase. By contrast, Enterasys proposes an overly expansive definition that ignores the express claim language and attempts to erase the word "source" from the claim.

The phrase "source of the communication" is not explicitly defined in the patent, but the term "source address" is used frequently throughout the patent. The patent explains the meaning of "source address" as follows: "*[T]he source addresses represent[] locations of stations* that are connected to the virtual networks and that send communications to the bridge." *Id.* at Col. 2:26-30 (emphasis added). This usage of "source address" in the patent is consistent with the plain and ordinary meaning of that term with respect to communications in a network. For

example, the patent states that "a lookup of the source address is part of the bridge forwarding algorithm." *Id.* at Col. 8:26-27.

Enterasys, in its proposed construction, seeks to expand the term "source of the communication" to include not only an address of a device, but also a "broadcast domain" or a "VLAN." There is no support in the specification for this expansion. The specification invariably uses the term "source" to refer to the *unique* address of a device such as a router or station. *See, e.g.*, '236 Patent, Col. 2:28-29 ("the source addresses representing locations of stations"); Col. 7:37-38 ("The router is assigned a unique source address"); Col. 8:4 ("any packet with source address of Station A"). Indeed, the terms "domain" and "broadcast domain" are never even used in the '236 Patent. Nor is a VLAN ever referred to in the '236 Patent as the "source" of a communication. As a result, Enterasys has provided no basis to include "domain", "broadcast domain" and/or "VLAN" in the definition of this term.

### c.    "protocol type".

| Term To Be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| assigning a <u>protocol type</u> to each group identifier; wherein, for each port of first plurality of ports, the <u>protocol type</u> identifies a communication protocol used by a station connected to the port.<br><br>'236 Patent (claim 6) | Defendants do not offer a construction for this phrase. If required to do so, Defendants construe this phrase to mean: A type of protocol. A protocol is a formal set of conventions governing the format and relative timing of message exchange between two communications terminals. | A name, identifier or other designation that represents the communication protocol or protocols associated with the group. |

The term "protocol type" should be given its plain and ordinary meaning and needs no construction. However, should the Court decide to construe this term, Defendants submit that the dispute centers on what constitutes a "protocol." The construction offered by the Defendants

explains that a protocol is "a formal set of conventions." It defines with precision that the protocol defines the "format and timing of messages exchanged between two network devices."

The term "protocol type" appears in Claims 6 and 7. Claim 6 states that a protocol type "identifies a communication protocol used by a station connected to the port." '236 Patent at Claim 6. The Defendants' definition is consistent with the usage of "protocol type" in Claim 6. Claim 6, however, does not explicitly state what a "protocol" is.

Protocols are described in the specification in a way that supports the Defendants' construction. The specification states that "FIG. 5 is a model of a virtual LAN multiplexing protocol." *Id.* at Col. 3:61. The appendices to the '236 Patent further describe "protocol actions" for forwarding packets to and from VLANS. *Id.* at Col. 4:1-32. The specification provides examples of protocols including "HDLC and SMDS." *Id.* at Col. 8:40-44. "HDLC" is the High Level Data Link Control and "SMDS" is the Switched Multi-Megabit Data Service. Both of these protocols define the timing of messages between two network devices as well as the format of the messages.

Defendants' construction comports with the 1993 New IEEE Standard Dictionary, which defines "protocol" as "a formal set of conventions governing the format and relative timing of message exchange between two communications terminals." Exh. 12 at 1022.

Enterasys' construction, on the other hand, allows a "protocol type" to represent multiple separate protocols, whereas it is clear from the claim that a "protocol type" represents a single protocol. This is shown, for example, by the claim language "the protocol type identifies *a communication protocol* used by a station" (emphasis added). An additional problem is that Enterasys' definition allows for any arbitrary descriptor to be associated with the protocol, rather

than a descriptor that identifies the actual protocol. Finally, Enterasys' construction gives no guidance to the jury as to what the meaning of "protocol" might be.

C.    **The '995 Patent.**

1.    **Background of the '995 Patent.**

The '995 Patent is similar to the '236 Patent in that it describes VLANs implemented on a bridge (rather than a router), but unlike the '236 Patent, the VLANs are not limited to a single bridge and may span multiple interconnected bridges. *See* '995 Patent, Figure 5. In addition, the '995 Patent explains that packets received on a bridge are associated with a VLAN based on the source MAC address of the originating station, and not on an ingress port on the bridge as taught in the '236 Patent. Like in the '236 Patent, the purpose of the VLANs described in the '995 Patent is to implement traffic control for broadcast and multicast packet communications. '995 Patent, abstract.

Figure 5 of the '995 Patent illustrates its basic architecture. Three different VLANs are illustrated in Figure 5: VLAN 100, VLAN 5, and VLAN 20. A number of end-systems (*e.g.* computers 20A-20L) and switches (*e.g.* 11-14) are interconnected by data links 16. Each switch has "access ports" to connect to the end systems and "network ports" to connect to the other switches.



*FIG. 5*

End systems 20D, 20G, 20H, and 20L are assigned to VLAN 5. The ports on switches 12-14 that are connected to those end systems are also assigned to VLAN 5. To accomplish this, a table is created in each switch that lists each access port on the switch and each end system attached to the switch, along with their associated VLANs. For example, the table in switch 14 would indicate, among other things, that computer 20L and the access port to which it is connected are assigned to VLAN 5. If switch 14 received a packet from computer 20L, it would encapsulate the broadcast packet into a VLAN packet that includes a VLAN header and send the

35

encapsulated packet to switches 11, 12, and 13. '995 Patent, Figure 8. The VLAN header, in this case, would include VLAN identifier 5.

Because none of the other end systems attached to switch 14 belong to VLAN 5, it would not forward the packet to any of its other access ports. Upon receiving the encapsulated packet from switch 14, the other switches would use the VLAN identifier in the VLAN header of the encapsulated packet to consult their tables and determine whether any end systems were associated with VLAN 5. After removing the VLAN header, switch 12 would forward the packet to computer 20D and switch 13 would forward the packet to computers 20G and 20H. Switch 11 would simply discard the packet, because none of the attached end systems are associated with VLAN 5.

### 2.    Proper Constructions for the '995 Patent.

#### a.    "encapsulate the data packet by adding a header with the one or more determined identifiers" (Note: the term "encapsulate" also appears in the '205 Patent).

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| encapsulate the data packet by adding a header with one or more determined identifiers<br><br>'995 Patent (claims 1, 25) | Generate a protocol B header with the one or more determined identifiers and place the protocol A user data packet, including the protocol A header, into the data area of the protocol B user data packet. | Adding in or to a data packet a VLAN header that contains at least one VLAN-ID. |

Because the term "encapsulate" is used in accordance with its ordinary meaning in both the '205 and '995 Patents, Defendants propose the same construction for that term in both patents. Enterasys, in contrast, proposes a completely different construction for "encapsulate" for the '995 Patent than the construction it offered for the '205 Patent. Again, the fundamental

dispute between the constructions is whether "encapsulate" requires the *entirety* of an original packet to be put in the data section of a new packet.

As described above, the ordinary meaning of the term "encapsulate" is explicitly defined in the '205 Patent as follows:

> When a user data packet formatted in protocol A is received, at a gateway router, the gateway router "encapsulates" the user data packet in a protocol B header (i.e., generates a protocol B header and places the protocol A user data packet, including the protocol A header, into the data area of the protocol B user data packet).

'205 Patent, Col. 3:22-28 (emphasis added).

In support for its different constructions of "encapsulate" in the '205 and '995 Patents, Enterasys counsel stated during the meet and confer process that Enterasys believed that the definition of "encapsulate" in the '205 Patent was an instance of the patentee acting as her own lexicographer and did not set forth the ordinary meaning of the term "encapsulate." Such contention is flatly contradicted by the fact that that very definition is also contained in '205 Patent inventor Radia Perlman's textbook, as explained above in reference to the '205 Patent. Further confirmation that the definition of "encapsulate" in both the '205 Patent and Dr. Perlman's textbook sets forth the plain and ordinary meaning of the term "encapsulate" is provided by the fact that Enterasys' patent attorney *cited this very textbook during the prosecution of the '995 Patent as providing the plain and ordinary meaning of another term, multicast, in the same claim of the '995 Patent.* Exh. 28 at 4. Thus, Enterasys' own attorney represented to the Patent Office that the Perlman textbook was an authoritative source as to the plain and ordinary meaning of terms in the claims of the '995 Patent.

To be sure, the '995 Patent uses the term "encapsulation" consistently with its plain ordinary meaning set forth in both the '205 Patent and Dr. Perlman's textbook. *See* Exh. 7 at

370. For example, Figure 8 of the '995 Patent shows how a broadcast data packet received by the switch from an end station becomes an encapsulated "VLAN Packet" by adding a new VLAN header to the entire the broadcast packet. As illustrated in Figure 8 of the '995 Patent and as defined in the '205 Patent and Dr. Perlman's textbook, the header section of the encapsulated VLAN packet is the new VLAN header and the payload section of the encapsulated VLAN packet is the original broadcast packet received by the switch.



*'995 Patent, Figure 8.*

Defendants' construction is also supported by the claim language of the '995 Patent, which defines encapsulation as "adding a header with one or more determined identifiers [to the data packet]" in Claims 1 and 25. Thus, the claim by its terms defines encapsulation as *adding* a header to the data packet, and not *inserting* data within the original packet as Enterasys contends.

Enterasys' definition of "encapsulate" for the '995 Patent is plainly at odds with the plain and ordinary meaning of the term, as it seeks to define "encapsulation" as "[a]dding *in* or *to a* data packet a VLAN header…" Encapsulation and insertion are entirely different concepts, yet Enterasys seeks to blur the difference between the two. In particular, both Figure 8 and the explicit definition of "encapsulate" set forth in the '205 Patent and Dr. Perlman's textbook make clear that the entire original packet is preserved in the payload of the encapsulated packet and the new header becomes the header of the encapsulated packet. Adding a new header in the middle

of an existing packet, as Enterasys' construction would allow, would not constitute an encapsulation within its plain and ordinary meaning.

**b.**     **"access ports" and "network ports".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| The switches having <u>access ports</u> connected to end systems and network ports connected to other switches<br>…<br>map at least one assigned identifier to an <u>access port</u> attached to at least one end system in the respective subset of end systems.<br><br>'995 Patent (claims 1 and 25) | <u>Access port:</u> An interface connecting a switch to an end system, but not another switch. | <u>Access port:</u> An interface through which a switch and an end system communicate. |

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| The switches having access ports connected to end systems and <u>network ports</u> connected to other switches<br><br>'995 Patent (claims 1 and 25) | <u>Network port:</u> An interface connecting a switch to another switch, but not an end system. | <u>Network port:</u> An interface through which a switch communicates with another switch. |

The fundamental dispute in the proposed constructions is whether the adjectives "access" and "network" should be given any meaning. Enterasys proposed definitions, in fact, would effectively read those adjectives out of the claim language, because the entirety of Enterasys' proposed definitions is already recited in the remainder of the claim. Defendants' proposed constructions, on the other hand, give meaning to the words "access" and "network" by clarifying the structure, in addition to the function, that differentiates "access ports" from

"network ports." Defendants' proposed construction captures this distinction by explicitly stating that an "access port" connects "a switch to an end system, *but not another switch*" and that a "network port" connects "a switch to another switch, *but not an end system*."

Indeed, the '995 Patent does not describe a dual function port for connection to both "end systems" and "switches" *anywhere*. Figure 6 illustrates an end system/VLAN mapping table that specifically identifies access ports, indicating that only access ports can be assigned to VLANs.

TABLE 1 : END SYSTEM / VLAN MAPPING FOR SWITCH 11

| ACCESS PORT | END SYSTEMS HEARD | VLAN ID |
|:-----------:|:-----------------:|:-------:|
| 1 | 20A | VLAN 100 |
| 2 | 20B | VLAN 100 |
|   |     | VLAN 20 |
| 3 | 20C | VLAN 20 |
| • | • | • |
| • | • | • |
| • | • | • |

# FIG. 6

'995 Patent, Figure 6.

Similarly, Figure 7 illustrates a VLAN/Access Port mapping table that specifically identifies access ports that are members of a particular VLAN.

40

TABLE 2 : VLAN/ACCESS PORT MAPPING FOR SWITCH 11

| VLAN ID | ACCESS PORT |
|---------|-------------|
| VLAN 100 | 1 |
|  | 2 |
|  |  |
| VLAN 20 | 2 |
|  | 3 |
| • | • |
| • | • |
| • | • |

# FIG. 7

*Id.* at Figure 7.

The specification explains that the "network ports" of the switches are interconnected using a "logical multicast channel 16" gathered from a number of "point-to-point connections 15." *Id.* at Col. 5:65-67. The multicast channel is unique to "network ports" because it provides a "point to multipoint connection in each switch." *Id.* at Col. 6:66-67. By contrast, end systems are connected to switches using the standard network connections available using an "access port." *Id.* at Col. 7:11-13, Col. 6:67-7:3. Accordingly, "network ports" and "access ports" have different connection mediums that would not allow interchangeability between "access ports" and "network ports."

**D.    The '665 Patent.**

**1.    Background of the '665 Patent.**

The '665 Patent, entitled "System for Broadcasting Messages to Each of Default VLAN Ports in Subset of Ports Defined as VLAN Ports," was filed on December 30, 1996, and issued on October 3, 2000. The '665 Patent describes a specific type of switch that purports to limit

flooding of packets from a "default port-based VLAN (virtual local area network)" to other port-based VLANs. '665 Patent, abstract.

The patent purports to solve a "leakage" problem where sometimes packets would "leak" from their intended VLAN into other VLANs. *Id.* at Col. 2:3-8. According to the patent, a problem with known "port-based" default VLANs was that they "transmit[ted] a data packet to every switch port when that packet is received by the default VLAN and is destined for a port that is not in the default VLAN." The '665 Patent solved the problem by limiting flooding of data packets received on a port in the default VLAN and destined for a non-default VLAN switch port to *only* ports in the default VLAN, including the port on which the packet arrived.

The technology for limiting leakage was described in the patent. The patent first discloses establishment of different VLANs. Specifically, Figure 2 (shown below) illustrates an "exemplary eight port switch 16 forming a default VLAN, VLAN 2, and VLAN 3." *Id.* at 3:22-23.



*FIG. 2*

The patent then describes how it sought to restrict leakage from one VLAN to other VLANs: "Data packets received on switch ports one or two may be transmitted to either or both of those switch ports 18 only, thus preventing leakage to VLAN 2 and VLAN 3." *Id.* at Col.

3:24-28. Figure 4 of the '665 Patent (shown below) further "specifies the method used for preventing leakage from the default VLAN." *Id.* at Col. 3:41-42. For example, at step 402, a determination is made whether or not "the destination port is one of the default VLAN ports." *Id.* at Col. 3:45-46. If the destination port is one of the default VLAN ports, the received data packet is "transmitted to the destination port only," otherwise the received data packet is "transmitted to <u>all</u> of the default VLAN ports only." *Id.* at Col. 3:45-50 (emphasis added).



*FIG. 4*

All of the steps are achieved by using computer readable instructions implemented on a computer system or firmware or programmable logic on a switch. *Id.* at Col. 3:59-4:24.

2.    **Proper Constructions for the '665 Patent.**

a.    **"each of the default VLAN ports".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| each of the default VLAN ports<br><br>'665 Patent (claims 1, 4 and 6) | All of the default VLAN ports, including the port on which the packet was received. | All of the default VLAN ports except the one from which the packet was received – the ports to which the packet would be flooded |

The phrase "each of the default VLAN ports" appears in all three of the independent claims of the '665 Patent asserted against Defendants. The fundamental dispute is whether the word "each" in the claim means "every." Enterasys seeks to define "each" as *not* "each," but "all but…." Nothing in the claim language or file history suggests that Enterasys' construction (which excludes one port) should be accepted.

"Each" is an ordinary English word that needs no special construction. It means what it says. According to the dictionary, the plain meaning of the word "each" is "every one of two or more people or things, regarded and identified separately," Exh. 13 at 449, or "every member of a group of people or things, considered individually." Exh. 14 at 561.

Defendants' proposed construction is taken directly from the patent and tracks the exact meaning of the words of the claim. The Federal Circuit has made clear, in case after case, that the specification is usually dispositive for purposes of claim construction and "is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

The only disclosed embodiment in the '665 Patent demonstrates that packets received by a default VLAN port and destined to a port outside the default VLAN are transmitted to _all_ of the ports on the default VLAN. The patent describes for example, that "ports one and two define the default VLAN." '665 Patent, Col. 3:22-23. The patent then states, "a data packet received on

44

port two having a destination address of port four will be transmitted to ports one and two <u>only</u>." *Id.* at Col. 3:26-28 (emphasis added). In this way, <u>all</u> of the default VLAN ports receive the packet and the leakage of the packet to port four is prevented. *See also id.* at Figure 4 and Col. 3:48-52 (("if the destination port is not one of the default VLAN ports, <u>the data packet is transmitted to all of the default VLAN ports only</u> (step 406). <u>The data packet is transmitted to no other switch ports</u>") (emphasis added)).

In a case remarkably similar to the dispute at hand, in *ResQnet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1379 (Fed. Cir. 2003), the Federal Circuit affirmed a district court's construction of the phrase "each field" as "each (and every) field". In *ResQnet.com*, like the case here, the specification only described a single embodiment in which the system performed processing on each (and every) field. The court in *ResQnet.com* found that the specification did not evince a clear, unambiguous, unmistakable disavowal of claim scope using expressions of manifest exclusion or restriction to overcome the plain meaning of the term "each field." *Id.* at 1378.

Enterasys offers no reason to depart from the sound reasoning of *ResQnet.com*. Enterasys seeks to exclude one port, the port of ingress, from the definition of "each." In doing so, Enterasys reads the express descriptions of the only preferred embodiment described in the specification out of the claims. An interpretation that omits the preferred embodiment is "rarely, if ever, correct." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1349 (Fed. Cir. 2003) (internal citation omitted).

Moreover, in case after case, the Federal Circuit has rejected claim constructions that would read out express limitations in claim language, as Enterasys seeks here with the claim phrase "each of the default VLAN ports." *See, e.g., Elekta Instrument*, 214 F.3d at 1307 (construing claim to avoid rendering a claim limitation "superfluous"); *Gen. Am. Transp. Corp.*

*v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting district court's claim construction because it rendered "superfluous" the claim requirement for openings adjacent to the end walls).

Apparently recognizing that "each" means "each" in its U.S. patent claims, Enterasys' counsel proceeded to amend the corresponding foreign claims in Europe, Canada and Australia to exclude the port of ingress by reading "each of the *other* ports," although there is no support anywhere in the specification for this change to the claim. Exh. 15 at 7-8; Exh. 16 at 7-8; Exh. 17 at 3, 3a, and 7-9. It appears that Enterasys was playing fast and loose with the foreign patent offices because Enterasys failed to explain why it was changing the claims from those in the United States. Accordingly, the reason for Enterasys' change was never addressed by the foreign patent offices to determine whether adequate support for the amendments existed (which it did not). Now, Enterasys is trying to amend the literal language of the U.S. claims to match the unsupported claims in the foreign countries, still with no support in the specification, after the U.S. claims have issued. Enterasys does not get a second bite at the apple to change its claims to depart from the only disclosed embodiment in the specification and claims. Having included the language "each of the default VLAN ports" in its U.S. patent claims, Enterasys "must live with the language it has chosen." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp*, 93 F.3d 1572, 1582-83 (Fed. Cir. 1996).

In any event, because Enterasys used different words during its foreign prosecution, "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms." *See Phillips*, 415 F.3d at 1314. As explained by the Federal Circuit: "There is presumed to be a difference in meaning and scope when different words are used in different claims." *Comark Commc'n, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir.

46

1998). The Court should not adopt Enterasys' proposed construction because doing so would amount to a *post hoc* rewriting of the claims, even though the public (including Defendants) has come to rely on the plain meaning of "each." Enterasys is not entitled to a "mulligan that would erase from the prosecution history the inventor's disavowal of a particular aspect of a claim term's meaning" to achieve a strategic objective during litigation. *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000). The Court should deny Enterasys' tactic and adopt Defendants' proposed construction.

### b. "port based default VLAN".

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| "port based default VLAN"<br><br>'665 Patent (claims 1, 4 and 6) | "A VLAN that is defined during manufacture as every port on a single switch or a plurality of switches. When a default VLAN is configured during manufacture to span a plurality of switches, the default VLAN includes a bus in a hub and an enable switch that electrically connects each of the switches to the bus." | "A virtual local area network defined by the switch ports on a switch that are not associated with other virtual local area networks." |

The fundamental difference between the parties with respect to this limitation is (1) whether the default VLAN is established at the time of manufacture, and (2) whether the phrase includes a bus in a hub and an enable switch.

The phrase "port based default VLAN" is a coined term without special meaning to those of skill in the art. The '665 Patent specification defines each part of the phrase "port based default VLAN" and tracks exactly to the Defendants' proposed construction:

> A *VLAN* is generally defined as a group of nodes interconnected by software to form a single logical broadcast domain. '665 Patent, Col. 1:42-44 (emphasis added).

VLANs may be formed by defining logical groups of users within the VLAN. One such VLAN, known as a '*port-based*' VLAN, defines the VLAN as a collection of switch ports on one or more switches across a hub. *Id.* at Col. 1:53-56 (emphasis added).

Known port-based VLANs typically are implemented on a switch to include a *default VLAN*, in addition to other VLANs that may be formed on the switch. *During manufacture, the default VLAN is defined as every port on a single switch.* The number of switch ports defining the default VLAN decreases, however, as ports on the switch are used for defining other VLANs. *Id.* at Col. 1:62-66 (emphasis added).

In accordance with another aspect of the invention, *each of the ports on a plurality of switches connected to a hub are configured, during manufacture, to define a default VLAN spanning the plurality of switches. To that end, the default VLAN includes a bus in the hub, an enable switch for electrically connecting each of the switches to the bus*, and means for defining each of the switch ports as the default VLAN. *Id.* at Col. 2:31-38 (emphasis added).

Under the definitional language of the specification, as well as the description of the "invention," the patentee described precisely what a "port-based default VLAN" is. *See Microsoft.*, 357 F.3d at 1348 (particular embodiment defined the invention based on "clear statements in the specification that the invention ('the present system') is directed to communications 'over a standard telephone line'"); *Watts,* 232 F.3d at 883 ("the specification actually limits the invention to structures that utilize misaligned taper angles, stating that '[t]he present invention utilizes [the varying taper angle] feature.'").

Enterasys' proposed construction is so broad that it ignores the critical word "default." Enterasys' proposed construction attempts to impermissibly broaden the scope of the phrase "port based default VLAN" by not including any concept of a "default." By ignoring the description of the "invention," Enterasys attempts to cover any VLAN.

Enterasys' position is inconsistent with the file history. During prosecution of the '665 Patent, the Patent Examiner rejected the independent claims of the '665 Patent as obvious over

U.S. Patent No. 5,742,604 to Edsall in view of a paper by J.K. Anderson, *Virtual LANs Take Network to the Next Level*.[6]  Exh. 18 at 3-5.  To overcome the rejection, the patentee told the Patent Office:

> *Neither Edsall nor Anderson describe or suggest a default VLAN, to which the claimed invention is directed.*  Rather, Edsall describes only, at column 5, "The VLAN identifier is associated with each port of the switch…"  Similarly, Anderson describes an example wherein each port of a hub is assigned to a particular VLAN (Virtual LAN #1, Virtual LAN #2, or Virtual LAN #3 in Figure on page 1).  *There is no description or suggestion, in either Edsall, Anderson, or the combination thereof, of the operation of a default VLAN.*  Accordingly, because Edsall and Anderson deal only with the transmission of defined VLAN links in a network, as opposed to the default VLAN, the claims are patentably distinct over this combination.

Exh. 19 at 4 (emphasis added).

At the time Enterasys amended its claims, the "default" nature of the port-based VLANs was critical.  Enterasys should not be given a chance to read this critical limitation out of the claim for purposes of this litigation.  Therefore, Defendants' construction should be adopted.

### 3.    **Means-Plus-Function Limitations.**

The '665 Patent recites a number of "means" elements to implement the algorithm of the patent, including "means for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports," "means for determining whether the destination port is one of the default VLAN ports," and "first means, responsive to the determining means, for transmitting the data packet to the destination port if the determining means determines that the destination port is one of the default VLAN ports."  The parties do not dispute the functions of any of the "means" limitations.  The parties also basically agree that the structure for each "means" limitation is a programmable logic chip or firmware stored within the chip with instructions (programmed through conventional techniques) to perform the relevant function

---

[6]      Computer Technology Review, vol. 16, no. 9, Sept. 1996, p. 12-14.  Exh. 29.

depicted in Figure 4 of the '665 Patent. *See* Docket No. 128-4 at 2-5 (Amended Exhibit C to Revised Joint Claim Construction Statement).

The parties disagree, however, as to what, are "conventional techniques." The Defendants' submit that "conventional techniques" are techniques known *at the time* of the patent filing. The Defendants' position follows the rule set by the Federal Circuit in *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363-64 (Fed. Cir. 2005) (holding that "the terms 'normally,' 'conventional,' 'traditionally,' and 'standard' are governed by their ordinary and customary meanings, and that, in view of their implicit time-dependence, the district court did not err in construing the literal scope of the claim limitations qualified by those terms as being limited to technologies existing at the time of the invention"). Enterasys, on the other hand, argues that contrary to this express authority of the Federal Circuit, the term "conventional techniques" are not limited to techniques known at the time of filing, but rather can expand indefinitely to cover any later-developed technology. Of course, what was "conventional" at the time of filing may no longer be standard in the industry. Enterasys' construction would render the patent invalid on its face as non-enabled and would render the term "conventional" meaningless. "Conventional" limits the claim to techniques known to those of ordinary skill in the art at the time the patent was filed. It cannot be construed to cover wherever the technology has moved in the years after the invention, particularly in such a fast moving field as computer networking technology. The proper construction of the "structures" recited by the "means-plus-function" elements turns on resolution of the parties' dispute. Defendants' construction stays true to prevailing Federal Circuit case law and should be adopted as shown in Docket No. 128-4 (Amended Exhibit C to Revised Joint Claim Construction Statement).

E.     **The '022 Patent.**

1.     **Background of the '022 Patent.**

The '022 Patent, entitled "Network Device with Multicast Forwarding Data," was filed on April 26, 1999, and issued on March 25, 2003. The '022 Patent is a continuation of U.S. Patent No. 5,898,686 ("the parent patent"), which is itself a continuation of U.S. Patent No. 5,608,726 ("the grandparent patent"). The filing date of the grandparent patent is April 25, 1995 ("the priority date").

The '022 Patent is concerned with a purported problem related to multicasting between different networks. Specifically, the patentee claimed that "multicast" packets (*i.e.*, packets going to more than one destination) were sometimes distributed to network segments which had no need for them. '022 Patent, Col. 4:42-49 ("In particular, a bridge retransmits a received multicast packet in each attached network segment … even if the network segment does not have any hosts that are members of the multicast group of the multicast packet"). The effect of the problem was that network segments would get congested with needless traffic.

One known solution was already used with routers to "selectively route" multicast packets to their intended destinations by using multicast control packets to "update[] its routing tables accordingly". *Id.* at Cols. 3:56-67, 4:12-22. In contrast to routers, the '022 Patent purported to improve the multicasting congestion problem caused by bridges by allowing for "bridge forwarding tables" to be updated by inspecting certain kinds of packets. These "bridge forwarding tables" restricted transmission of multicast packets to only those attached network segments that included destination devices.

The '022 Patent describes how this technique was implemented. The '022 Patent describes "the present invention" (as shown in Figure 3) as including a subnetwork (100) with a

bridge (b100) connected to three network segments: L100, L101 and L102. *Id.* at Col. 6:44-45. The bridge includes four input/output (I/O) interfaces 141, 142, 143 and 144, which are connected, respectively, to the router (r100), and network segments L100, L101 and L102. Each I/O interface can receive and transmit packets "according to the protocol of the router or network segment to which the I/O interface is attached." *Id.* at Col. 6:66-7:2. The bridge includes a processor (120), which "examine[s] the address of [a received] packet header to determine from which I/O interface 141-144 the packet should be retransmitted." *Id.* at Col. 7:15-18.



*FIG. 3*

Multicast packets received at the bridge are "only retransmitted onto the network segments L100, L101 or L102 that contain destination hosts of the multicast packets." *Id.* at Col. 7:27-29. The processor "maintains a forwarding table with entries corresponding to multicast addresses" illustrated as forwarding table (200) in Figure 4. *Id.* at Col 7:33-37. Bridges and routers that maintained forwarding tables were old and well-known as of the priority date. *See, e.g.,* Exh. 20 at abstract; Exh. 21 at 57.

52

2.     **Proper Constructions for the '022 Patent.**

a.     **"network bridge" (Note: this term is also used in the '236 Patent).**

| Term to be Construed | Defendants' Construction | Enterasys's Construction |
|---|---|---|
| A network bridge for reducing multicast communications in a network, the network bridge including at least two I/O interfaces to each receive and transmit data packets and also including multicast forwarding data,<br><br>'022 Patent (claim 1) | A network device, other than a router or a brouter, that implements the bridge forwarding algorithm. | A device that includes layer 2 functionality and is capable of connecting two or more network segments, whether or not they have the same protocol, and allowing information to flow between them. |

To avoid jury confusion, Defendants request that the Court adopt a single construction of "network bridge" that is consistent with both the '236 and '022 Patents. By contrast, Enterasys provides different and conflicting proposed constructions of the term "network bridge" for the '022 and '236 Patents. The fundamental dispute between the parties is whether a "network bridge" includes or excludes totally different devices, such as brouters and routers.

Like the '236 Patent, the '022 Patent specification draws a clear distinction between routers and bridges. Specifically, in the Background of the Invention, the patentee expressly disclaimed the use of routers and claimed network bridges instead. The patentee stated:

> In the past, the solution to improving network segment performance is to reconfigure the campus network by increasing the number of *routers* and redistributing (i.e. reconnecting) the network segments or hosts amongst the routers. However, *this solution is disadvantageous because routers are relatively expensive and difficult to manage.*

'022 Patent, Col. 4:53-59 (emphasis added). *C.R. Bard*, 388 F.3d at 868 ("whether or not the patent describes pleating as the only way to achieve conformability or pliability is irrelevant

because the patent requires the 'implant' or 'plug' to have a pleated surface."). Like *C.R. Bard*, whether a router or brouter can perform the bridge routing algorithm is irrelevant because the patent claim requires the algorithm to be performed by a "network bridge."

The '022 Patent Background of the Invention further distinguishes the operations of routers and bridges:

> When a host, e.g., the host h1, desires to transmit a multicast packet, it writes a multicast address of an appropriate multicast group in the destination field. The host then transmits the packet to its attached bridge, e.g., the bridge b1 (via the subnetwork L1). The bridge has no way of knowing the location of the destination host. (Because the multicast destination address bears no relationship to the destination address of a single host). Thus, *the bridge retransmits the multicast packet to each attached subnetwork and router*, other than the subnetwork or router from which the packet originated, e.g., the subnetworks L2, L3 and the router r2. The attached router, e.g., the router r2, accesses its routing table using the multicast destination address. However, unlike before, the accessed routing table entry may indicate more than one next router to which the packet must be transmitted, e.g., the router r1 and the router r3. *The router transmits a copy of the packet to each indicated next router. Thus, the packet is selectively routed and replicated in route*.

'022 Patent, Col. 4:1-18 (emphasis added).

In addition, the Detailed Description of the Invention section of the '022 Patent frames the point of novelty as applying specifically to bridges and not routers:

> In any event, it should be noted that the hosts need not transmit special packets *to the bridges. Rather, the bridges b100 according to the present invention "eavesdrop" on the very same packets used to change host membership on the WAN or campus network level* according to, for instance, the IGMP protocol. Thus, network segment bandwidth is conserved since a single multicast control packet serves two purposes. *Moreover, ... routers [are not] specially adapted to implement the invention. Rather, only the bridges need be adapted.*

*Id.* at Col. 10:6-15 (emphasis added).

Enterasys' construction is improper because it allows for routers and brouters to be covered. By using the word "includes," the phrase is not limited in any way and would ignore the express disclaimers of the '022 Patent, which does not cover routers or forms of routers, such as brouters. Enterasys offers no reason to depart from the careful language of the patent of the ordinary and customary meaning of the phrase "network bridge."

### b.    "multicast forwarding data".

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| "multicast forwarding data"<br><br>'022 Patent (claims 1 and 6) | Data correlating multicast numbers to each intended destination device address. | Data corresponding to multicast addresses used to facilitate the forwarding of packets to members of a multicast group. |

The dispute between the parties is whether "multicast forwarding data"[7] must include the address of the destination device. The express language of the claims and the teachings of the patent demonstrate that "multicast forwarding data" must include destination device address information.

The starting point for claim construction is the claim language itself. Claim 6, one of the asserted claims, states that the "multicast forwarding data" is updated "as a function of data in the first portion of the multicast control packet." The data in the "first portion" is network device address information. Specifically, earlier in the claim, the claim states that the method is performed by determining whether the packet is addressed to a device different from the network device. '022 Patent, Col. 13:27-36. According to the language of the claim, the network device address information is in the first portion of the packet.

---

[7] Claim 6 of the '022 Patent uses the phrase "multicast communications forwarding data," and the parties agree that "multicast communications forwarding data" should be given the same construction as "multicast forwarding data" of claim 1. *See* Docket No. 110-6 at 10; Docket No. 128-6 at 10.

The "Summary of the Invention" makes clear that the invention is focused on having the network devices know the location (*i.e.*, the address) of destination devices. While most of the Summary describes the invention in terms of one embodiment, the summary does state that the invention makes sure that "multicast packets originating from, or destined to, outside the subnetwork do not interfere with the network segments that do not contain any hosts that belong to the multicast group of the multicast packets." *Id.* at Col. 6:21-25.

Similarly, Figure 4 of the patent demonstrates an illustrative forwarding table for forwarding multicast packets:

| | INDEX FIELD | | I/O INTERFACE FIELD | | LIST FIELD | |
|---|---|---|---|---|---|---|
| | MULTICAST FORWARDING TABLE | | | | | |
| 210 | A1 | 212 | 142,143,144,141 | 214 | h108,h109,h110 | 216 |
| 220 | A2 | 222 | 144,141 | 224 | h112 | 226 |
| 230 | AV1 | 232 | 143,144,141 | 234 | h109,h114,h117,h119 | 236 |
| 240 | AV2 | 242 | 142,144,141 | 244 | h101,h102,h103,h113,h114 | 246 |
| 250 | V1 | 252 | 142,141 | 254 | h107 | 256 |
| 260 | V2 | 262 | 142,143,141 | 264 | h104,h109 | 266 |
| 270 | V3 | 272 | 143,141 | 274 | h109 | 276 |
| 280 | A3 | 282 | 142,141 | 284 | h100 | 286 |

*FIG. 4*                    200

This table has three fields: an index field, an I/O interface field, and a list field. Notably, the list field is the list of destination device addresses. *Id.* at Col. 7:53-67.

Figure 5 of the '022 Patent describes a process for creating and updating a multicast forwarding table by adding destination addresses. This is important, as the claim describes how "multicast forwarding data" is updated:

> In step S14, the processor 120 adds the destination address of the host which transmitted the control packet to the host list field of the multicast forwarding table entry. Next, in step S15, the processor 120 updates the I/O interface indications in the I/O interface field of the multicast forwarding table entry in accordance with the

56

> *revised host list*. That is, suppose the newly added host is
> connected to the bridge b100 via an I/O interface not already
> indicated in the I/O interface field. Such would be the case if the
> newly added host is the only multicast group member on a
> particular network segment. If such is the case, then an indicator
> for the I/O interface which connects the network segment of the
> newly added host must be added to the I/O interface field of the
> table entry.

*Id.* at Col. 9:15-61 (emphasis added).

Enterasys' construction ignores the clear teachings of the patent that state that the address information of the destination device is a central part of the invention and implementation. Rather, it allows for any type of information which "facilitates" forwarding to a group of devices. Nothing in the proposed construction allows for this level of breadth. In addition, Enterasys' construction creates more questions than it answers. The term "facilitate" is particularly confusing and offers no guidance as to claim scope and meaning. Finally, Enterasys' proposed construction appears to merely be a reorganization of the words by continuing to use the word "forwarding," "multicast" and "data." The re-use of these words does nothing to provide guidance as to the meaning.

c.     **"destined for a device other than the network bridge" (claim 1); "addressed to a device other than the network device" (claim 6); and "destined for a location other than the first location" (claim 20).**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| Claim 1 - "destined for a device other than the network bridge"<br><br>Claim 6 – "addressed to a device other than the network device"<br><br>Claim 20 – "destined for a location other than the first location" | Having a *unique* destination address of a device/location that is not the same as the unique address of the network bridge/network device/first location. | Having a destination address that (1) is not the same as the unique address of the network bridge and (2) does not identify a multicast group of which the network bridge is a part. |

Each of the asserted independent claims includes a phrase specifying an attribute of a multicast control packet, namely, that the packet be "destined for" or "addressed to" somewhere other than the "network bridge," "network device," or "first location."  The parties' proposed constructions are close, but differ in an important way -- the Defendants' proposed construction requires a "unique" destination address on a network.  Enterasys' proposed construction does not.

The phrases "destined to" and "addressed to" refer to sending a data packet to the host computer or router that is the *ultimate* recipient of the data packet.  Each host computer on a network and each router on the network is a device that has a unique destination address, called its Internet Protocol ("IP") address.  '022 Patent, Col. 3:11-14.

The specification also sets forth that a host or a router is the device or location that is the destination of the data packet:[8]

> A host communicates on the medium by transmitting a bitstream organized into packets[.] FIG. 2 illustrates an illustrative packet 20, which comprises a header section 22 and a payload section 24. *A host which desires to communicate writes data in the payload section 24, and an address of the intended recipient host in the header section 22. (Illustratively, all hosts on a network segment are assigned a unique identifier or address).* If the common broadcast medium is not currently being used, then the host transmits its packet 20 from an I/O interface connected to the host onto the common broadcast medium. If the common broadcast medium is currently being used by another host to transmit a packet, then the host waits until the common broadcast medium is available. *The transmitted packet 20 is received at the I/O interface of each other host on the network segment. Each host then examines the destination address written in the header section 22 of the packet 20. If the destination address matches the destination address of the host, the host accepts the packet 20 and may examine the contents of the payload section 24. If the destination address does not match, the host discards the packet 20.*

*Id.* at Col. 2:9-30 (emphasis added).

The patent makes clear that the invention only sends packets to relevant hosts, thus requiring the "destined for" or "addressed to" language to mean a unique device:

> *Note the improvement over the conventional multicast routing system wherein a conventional bridge simply retransmits all received multicast packets over each network segment* (other than the network segment from which the packet was received). In contrast, *according to the present invention*, the received multicast packets are *retransmitted from the bridge onto only those network segments containing hosts that are members of the pertinent multicast group*. This is especially important in the context of multimedia, i.e., audio-video multicast packet communication traffic. Such traffic tends to be continuous rather than bursty and

---

[8]    The phrase "addressed to" did not appear in the original specification of the parent or grandparent patents, and the phrase was added when the prosecuting attorney rewrote the "Summary of Invention" section of the '022 Patent.  As such, there is no guidance from the parent or grandparent patents on the meaning of this term.  The Defendants' believe that "addressed to" should have the same meaning as "destined to" since packets are "destined to" those devices or locations that they are "addressed to."  Furthermore, the header 22, as illustrated in Figure 2, includes the *destination address*, which further implies that "addressed to" is equivalent to "destined to."

tends to require a high bandwidth.

*Id.* at Col. 11:42-53 (emphasis added).

This description of the "invention" is limiting to the claim. *See, e.g, Microsoft*, 357 F.3d at 1348 (Fed. Cir. 2004) (particular embodiment defined the invention based on "clear statements in the specification that the invention ('the present system') is directed to communications 'over a standard telephone line'"); *Watts*, 232 F.3d at 883 (Fed. Cir. 2000) ("the specification actually limits the invention to structures that utilize misaligned taper angles, stating that '[t]he present invention utilizes [the varying taper angle] feature.'").

Enterasys' proposed definition ignores the teaching that the address reviewed is unique. For example, Enterasys' definition reads on packets transmitted in either multicast or broadcast fashion. A multicast transmission specifies a multicast group to whom packets are transmitted rather than listing particular hosts. However, a multicast group address is not a "device" or "location" as those terms are commonly understood: "[e]ach multicast group is assigned a special multicast address *which bears no relation to any single host of the multicast group*." '022 Patent, Col. 3:53-55 (emphasis added). Enterasys' construction is also wrong because it includes multicast groups in its definition. Specifically, claim 6 states that the multicast group is only determined *after* looking at the address information in the packet. In using different words, the patentee was giving "address" and "multicast group" different meanings. Enterasys' construction should be rejected.

d.      **"network device".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| "the network including a network device"<br><br>'022 Patent (claim 6) | A device, other than a router or brouter, that implements the bridge forwarding algorithm. | Any device that can receive a network packet. |

As described above, the patentee expressly disclaimed routers.   Recognizing this disclaimer, the Defendants' propose that the term "network device" is a bridge and not a router, *i.e.*, that the term "network device" is the same as "network bridge," as discussed above.

The file history confirms that the "invention" is limited to bridges.  In order to overcome the Patent Office rejection, the patentee focused on the purported novel properties of a "bridge." In particular, the Patent Office rejected the grandparent patent as originally filed based on certain prior art.  In order to overcome the rejections, the patentee argued:

> Deering suggests that … if multicast group members were to periodically issue packets with their group address as the source, *the bridges* could apply [a] learning algorithm to the multicast group addresses … As discussed in the Background section of the present application, Deering's proposed modification to an established protocol would have the hosts operate in a nonstandard mode.   This would be disadvantageous with regard to implementing devices which adhere to the protocol.  Deering, therefore, does not teach or suggest *a bridge* which complies with the known standard and which would be able to determine the locations of hosts in a particular multicast group.

Exh. 22 at 8 (emphasis added).

Enterasys' proposed construction attempts to broaden the scope of the phrase "network device" to cover devices other than network bridges and recapture distinctions made during prosecution, which would contradict the express statements made to obtain the '022 Patent. The

definition would also cover nearly anything, such as personal computers, printers, fax machines, and even cellular phones.  Such an overreaching construction should be rejected.

e.    **"any interface associated with the multicast group".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| "transmitting the received multicast message on any interface associated with the multicast group"<br><br>'022 Patent (claim 20) | All interfaces associated with the multicast group. | One or some of the interfaces associated with the multicast group. |

The dispute here essentially boils down to the proper construction of the word "any." Specifically, the full limitation states:

> for any multicast message received at the first location and destined for the identified multicast group, *transmitting the received multicast message on any interface associated with the multicast group* identified in the multicast message.

'022 Patent, Col. 16:9-14 (emphasis added).  In context, the claim is making clear that a multicast message is sent to the entirety of the multicast group.  Defendants' interpretation is a plain English reading of the claim language.  Simply put, "any" means "all."

The patent specification confirms that "any" means "all" in this context.  The specification states:

> If...the multicast forwarding table has an entry corresponding to a multicast address of the packet, the processor 120 executes step S20.  In step S20, the processor 120 retrieves the indications of the I/O interfaces stored in the I/O interface field of the retrieved multicast forwarding table entry.  The processor 120 then retransmits the received multicast packet only from the I/O interfaces 141-144 indicated in the I/O interface field except for the I/O interface from which the packet was received.  For example, suppose bridge b100 receives a multicast packet from the router r100 destined to the multicast group V1.  This packet is received via I/O interface 141 and temporarily stored in memory

> 130.  Using V1 as an index, the processor 120 retrieves table entry
> 250 corresponding to the multicast address V1.  *The processor
> then retrieves all of the I/O interface indications from the I/O
> interface field 254.*  The only indicated I/O interfaces are 141 and
> 142.  However, packet was received from the I/O interface 142.
> Thus, the received multicast packet is only retransmitted from I/O
> interface 142."

*Id. at* Col. 11:1-20 (emphasis added).  *See also id.* at Figure 6, character S19 (stating "Discard or

Retransmit from *all* I/O interfaces except from the I/O interface from which the packet was

received" (emphasis added)).  In this description, the patent makes clear that all I/O interfaces

are retrieved from the table.  The packet is then transmitted to all I/O interfaces except for the

I/O interface which originally received the packet.

Enterasys' attempt to construe the term "any" to mean "one or some" ignores the plain

language of the specification and the claims.  The patentee could have used the term "some" or

"one."  It chose not to.  Enterasys seeks here to broaden and to rewrite the language of the

claims.

### f.    "multicast control packet".

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| "means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a <u>multicast control packet</u> destined for a device other than the network bridge"<br><br>'022 Patent (claims 1, 6 and 20) | A type of control packet and not necessarily a packet sent by multicasting transmission (i.e., the packet is sent in a unicast or multicast fashion); a packet that is one of a Host Membership Query packet, Host Membership Report packet, Join Host Group packet, or Leave Host Group packet. | A packet in which the data in the payload section comprises control information where said control information is related to facilitates the routing of multicast message packets |

The parties dispute whether the phrase "multicast control packet" requires the Court's construction at all. Defendants do not believe that "multicast control packet" requires construction because the phrase has a clear and unambiguous ordinary meaning. Enterasys, however, has indicated that it believes that this phrase needs to be construed and has offered an ambiguous definition that does not clarify the meaning of the words and would likely confuse the jury. To the extent that the phrase "multicast control packet" requires construction at all, it should be given its plain and ordinary meaning, which is set forth in the specification and the file history and reflected in Defendants' proposed construction:

> Preliminarily, Applicant would like to reiterate his position discussed in the telephone conversation with the Examiner. *Specifically, a "multicast control packet," as recited in claim 10 is a "type" of control packet and not necessarily a packet sent by multicasting transmission.*

Exh. 23 at 5 (emphasis added);

> In a first step S1, the processor 120 determines if a received packet is a multicast control packet. Examples of such packets according to the IGMP protocol are *Host Membership Query packets, Host Membership Report packets, Join Host Group packets and Leave Host Group packets*.

'022 Patent, Col. 8:3-8 (emphasis added).

Enterasys can point to nothing in the patent itself that recommends a departure from the plain meaning as defined in the '022 Patent, let along anything that supports its vague definition of "multicast control packet." Therefore, Enterasys' construction should be rejected.

g.    **"multicast message packet".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| "means for identifying, when the first packet is determined to be a multicast message packet, the destination multicast group"<br><br>'022 Patent (claim 5) | A packet for delivering data to multiple destinations | A packet for delivering data to multiple destinations in which the data in the payload section comprises user data to be communicated to a host on the system |

The parties dispute whether the phrase "multicast message packet" requires the Court's construction at all. Defendants do not believe that "multicast message packet" requires construction because the phrase has a clear and unambiguous ordinary meaning. Enterasys, on the other hand, contends that this phrase requires the Court's construction and offers an ambiguous definition. To the extent that the term "multicast message packet" requires construction at all, it should be given its plain and ordinary meaning as set forth in the specification and tracked by Defendants' construction:

> [T]he processor 120 examines the received packet in the memory to determine if it is a *multicast message packet (i.e., a packet for delivering data to multiple destinations).*"

'022 Patent, Col. 10:35-36 (emphasis added).

The patentee's use of the shorthand indicator "*i.e.*" indicates that what follows the shorthand indicator *is* the definition of "multicast message packet." Enterasys can point to nothing to support a departure from this definition in the patent, and its proposed construction should be rejected.

**h.** **Means-Plus-Function Limitations**

**(1)** **Software Patents have specific structures in means-plus-function limitations**

The parties agree that claims 1, 3, and 5 of the '022 Patent each include "means-plus-function" claim elements as follows: "means for identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge," "means for updating the multicast forwarding data according to the identified multicast group and the data in the first portion of the first packet," "means for identifying a source of the first data packet," "means for cross-referencing the identified source to the identified multicast group in the multicast forwarding data," "means for determining, when the first packet is not a control packet, whether the first packet is a message packet having a multicast group as a destination address," "means for identifying, when the first packet is determined to be a multicast message packet, the destination multicast group," "means for retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface," and "means for sending the multicast message packet out each at least one cross-referenced I/O interface in the first data other than the identified I/O interface." The parties agree on the "function" recited by each of the "means-plus-function" claim elements, except with respect to the first limitation discussed below. *See* Docket No. 128-6 at 3-9 (Amended Exhibit E to Revised Joint Claim Construction Statement). The parties disagree, however, on the structures recited by the '022 Patent for carrying out the claimed functions.

The dispute over the properly-recited structure, in every instance, boils down to Enterasys' proposal that the only structure recited for carrying out the function is "processor 120" implementing a generalized algorithm. In contrast, the Defendants' identification of the

recited structures properly focuses on the specific algorithms and/or data structures used in performing the claimed function, in addition to the processor.

The Defendants' construction comports with the express teachings of *WMS Gaming Inc. v. Int'l Game Tech.,* 184 F.3d 1339, 1349 (Fed. Cir. 1999), which held that in addition to a general purpose computer, the specific software algorithms disclosed in the specification *must* be identified and incorporated into the claim construction.  *See also Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) ("the court in *WMS Gaming* rejected the argument that the corresponding structure was merely 'an algorithm executed by a computer,' holding instead that it was limited to the specific algorithm disclosed in the specification."); *Gobeli Research Ltd v. Apple Computer, Inc. & Sun Microsystems, Inc.*, 384 F. Supp. 2d 1016, 1023 (E.D. Tex. 2005) (holding claim invalid due to failure to disclose software algorithm in specification).

The proper construction of the "structures" recited by the "means-plus-function" elements turns on resolution of this dispute.  Defendants' construction stays true to prevailing Federal Circuit case law and should be adopted as shown in Docket No. 128-6 (Amended Exhibit E to Revised Joint Claim Construction Statement).

Defendants will now discuss the one disputed function.

      **(2)**     <u>**"means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge"**</u>

| Phrase to be Construed | Defendants' Construction[9] | Enterasys' Construction |
|---|---|---|
| "means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge"<br><br>'022 Patent (claim 1) | *Function*: "Determining, by examining data in a first portion of a first data packet received at the network bridge, whether the first packet is a multicast control packet *and is destined for a device other than the network bridge*."<br><br>*Structure*: "The bus 110, the memory 130, and the processor 120 executing the algorithm of Fig. 5." | *Function*: "Determining, by examining data in a first portion of a first data packet received at the network bridge, <u>whether the first packet is a multicast control packet destined for a device other than the network bridge.</u>"<br><br>*Structure*: "processor 120 programmed to determine, by examining data in the packet header, including address information, whether the first packet is a multicast control packet destined for a device other than the network bridge." |

    The parties' dispute over the "function" recited by this claim element appears narrow but is significant. The parties' dispute is whether the recited "function" includes a determination that the packet is destined for a device other than the network bridge. Fundamentally, Defendants' construction resolves a grammatical ambiguity in the claim. The "destined for" portion of the claim could be construed to apply to the "determining" portion of the claim or to the "multicast control packet" portion of the claim.

---

[9]     The functional limitation here is substantially similar to the functional limitations present in the determining and monitoring steps, respectively, in claims 6 and 20; therefore, the Defendants believe that the proposed two-fold construction should apply equally to claims 1, 6 and 20.

The claim language supports the Defendants' construction that the function includes a determination that the first packet is destined for a device other than the network bridge. The Defendants' construction gives meaning to the phrase "examining data in a first portion of a first data packet received at the network bridge" because the data packet itself identifies whether it is destined for a device other than the network bridge.

The Summary of the Invention supports Defendants' construction for every embodiment described. It states, "[t]he device includes means for determining, by examining data in a first portion of a first packet, whether the first packet is a control packet destined for a device other than the network device…." '022 Patent, Col. 5:32-36. *See also id.* at Cols. 5:47-50, 5:60-63, and 6:4-6.

The file history provides further support for the Defendants' construction. During prosecution of the '022 Patent, the Patent Examiner rejected all of the pending claims under 35 U.S.C. § 102(b) because the claims were not novel over (*i.e.*, "anticipated by") U.S. Patent No. 5,530,703 to Liu. Exh. 24 at 3. The claims were amended in an August 21, 2002 Amendment, which was submitted by Enterasys to overcome the anticipation rejection. Exh. 25 at 6-7.

In the Amendment, Enterasys further described how this claim element was different from the prior art by pointing out to the Examiner that its (now-amended) claims differed from Liu et al. by virtue of a two-step determination process, including a determination that a packet is destined for another device:

69

Claim 1 is not anticipated by Liu because Liu fails to disclose all of the limitations of claim 1. As stated above, although Liu discloses that a remote node supplies multicast addresses to a multicast address table residing on a remote access server, Liu is silent about *how* the remote access server is supplied such addresses by the remote node. Liu does not even disclose the use of multicast control packets, let alone determining whether a multicast control packet is destined for another device on a network. Consequently, Liu clearly does not disclose determining whether a packet received at the remote access server is a multicast control packet destined for a device other than the remote access server, nor identifying a multicast group in the packet when the first packet is a multicast control packet destined for a device other than the network bridge.

Enterasys construction ignores the language of the claim, the embodiments disclosed in the Summary of the Invention and the file history. Indeed, Enterasys' construction creates a grammatical ambiguity by simply mirroring the claim. Such a claim construction runs the risk of creating enormous jury confusion. It should be rejected.

### F.    The '173 Patent.

#### 1.    Background of the '173 Patent.

Unlike the previous patents, the '173 Patent does not deal with VLANs at all, but rather with a method of switching packets within a network device using shorter switching addresses than those contained in the packets themselves. This permits switching to occur more quickly, as less processing is necessary to handle shorter addresses. The system described in the '173 Patent connects two or more areas of a network, termed "network segments" in the patent:



FIG. 1

'173 Patent at Figure 1.

Figure 1 shows a configuration where the system interconnects two packet communication networks, LAN-1 and LAN-2. Packets sent from LAN-1 that identify a destination address within LAN-2 are received by controller 10, and then sent via port 13 through a network of one or more crossbar switches and other controllers 10, exiting via another port 13 to a destination in LAN-2. '173 Patent, Col. 2:62-Col. 3:19; Col. 7:65-Col. 8:21.

The '173 Patent teaches that the system attaches a "second header" to incoming packets to assist in their switching within this network of crossbar switches and controllers. This second header contains information that is useful to the processing of a packet within this network, but does not contain information that is useful to the routing of the packet outside this network. *Id.* at Col. 3:54-Col. 4:32. Thus, the "second header" is added at the first controller 10 in Figure 1 after a packet arrives at the device, and is removed by the last controller, prior to the packet's exiting back on LAN-2. *Id.* at Col. 3:54-Col. 4:32.

The '173 Patent also teaches that "a plurality of status fields to indicate a message packet servicing" and "local status information" are part of the second header. The specification identifies a number of fields within the second header:



FIG. 5

*Id.* at Figure 5.

These fields describe local conditions within the switch and packet characteristics and the switching address translated from the destination address, and are used by the switch in making switching decisions. *Id.* at Col. 9:27-60.

The '173 Patent teaches that all of this information in the second header is used by the crossbar switches and switch controllers in determining where and how to switch the packet through the system. *Id.* at Col. 11:21-Col. 12:31. Once this packet reaches the outgoing controller at the destination switch in the system, the second header is removed, and the packet is forwarded to the second network segment. *Id.* at Col. 3:54-Col. 4:32.

### 2.    Proper Constructions for the '173 Patent.

#### a.    "switching address".

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| said second header including a <u>switching address</u> translated from said destination address, said second header further including local status information and a plurality of status fields to indicate a message packet servicing;<br><br>'173 Patent (claim 1) | A field or fields containing the *switch and link number* (i.e., local address) of the final destination of the packet. | the local address, i.e., the identification, of the output port that is the final destination of the packet within the switching device. |

The parties agree that a "switching address" is a "local address" of the "final destination of the packet." The fundamental dispute, however, is whether the "local address" includes a switch number in addition to a port number. Enterasys' proposed construction that excludes all embodiments disclosed in the specification is "rarely, if ever, correct." *Amgen*, 314 F.3d at 1349 (internal citation omitted).

The term "switching address" is not used anywhere in the specification of the '173 Patent; however the term "local address" – which Enterasys concedes in its constructions defines "switching address" and is synonymous with the "final destination of the packet"– is defined as follows: "destination switch field 66" that contains a "12-bit field representing the switch number (*i.e.*, *local address*) of the final destination of the packet within the net 50." '173 Patent, Col. 9:45-47 (emphasis added). The specification further makes clear that the "final destination of the packet" also includes a 7-bit link number, identifying the destination link on the destination switch: "[t]he destination link 68 is a 7-bit field representing the logical link number *of the final destination of the packet*, except when switch field 66 equals $00_{hex}$, in which case this

73

field 68 is the physical link number of the port that is to receive the message." *Id.* at Col. 9:67-Col. 10:3.

Inventor Robert Simcoe confirmed during his deposition that both switch number and link number were part of the "local address" described in the specification, as the system looked first at the "switch number" to identify the appropriate crossbar switch in the system, and then would identify the output link on that switch based on the "link number:"

> Q.    [W]hich fields, as they are described in the patent, constitute local addresses, as you have used that term before?
>
> [Objection omitted]
>
> A.  [...] The destination link 68 is a 7-bit field representing the logical link number at the final destination of the packet. This looks like it was the link output of the -- from a switch. So as I -- as I remember, you know, what we had and -- and the way things worked for the local address, was there was a portion of it associated with the switch and a portion associated with the port on the final switch that things went out.
>
> And with the gigaswitch FDDI, how things worked were the -- as a packet went through the network, *the switch would first have to only examine the switch number* -- and if it -- if the switch number was different than its own number, then it would have to forward the packet, based only on switch number.
>
> *If the switch number was identical to its own switch number, then it would look at the destination link to indicate a specific link* [...]
>
> So it would appear that the 7-bit destination link represents the output link on the final switch at -- at -- or final destination. *So that would be a -- what would you call a local address.*

Exh. 26 at 136:13-138:20 (emphasis added).

Enterasys, in contrast, agrees that the "switching address" is the "local address" described in the specification, but ignores the teaching of the specification that the "switching address" must include the switch number as well as the output link number. Moreover, Enterasys'

74

construction is vague, as it uses the term "identification," which is found nowhere in the specification, and does not impart any additional meaning to the term "switching address."

**b.** **"local status information" and "a plurality of status fields to indicate a message packet servicing".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| said second header including a switching address translated from said destination address, said second header further including <u>local status information</u> and <u>a plurality of status fields to indicate a message packet servicing</u>;<br><br>'173 Patent (claim 1) | <u>Local status information:</u><br>Information, contained in one or more fields, that is locally useful, but not part of the message packet protocol and not necessary for transmission with the packet throughout the network.<br><br><u>A plurality of status fields to indicate a message packet servicing:</u> This term cannot be construed as it is indefinite pursuant to 35 U.S.C. §112. To the extent that the indefiniteness of this term does not invalidate this claim, Defendants offer the following construction:<br><br>Fields containing status information, other than local status information, that indicate how a message packet is to be handled. | <u>Local status information:</u><br>Information that is locally useful, but not part of the packet protocol and not necessary for transmission with the packet throughout the network.<br><br><u>A plurality of status fields to indicate a message packet servicing:</u><br>Fields in the second header that contain local status information that indicate how a message Packet is to be handled. |

The fundamental dispute here is whether "a plurality of status fields to indicate a message packet servicing" is the same thing as "local status information." Enterasys' construction necessarily equates these two phrases. This construction is unsupportable, as the claim language, specification, the inventor's testimony, and the prosecution history all make clear that "local status information" and "status fields to indicate a message packet servicing" are distinct portions of the second header.

First, the claim itself states that the "said second header further including local status information *and* a plurality of status fields to indicate a message packet servicing" '173 Patent at Claim 1 (emphasis added). The plain language of the claim clearly requires two separate sets of fields to be included in the second header, as the claim uses the word "and" to connect two separate and distinct concepts. *Phillips,* 415 F.3d at 1312-1314. Though Enterasys may argue that "local status information" does not by its terms refer to "fields," Enterasys cannot dispute that information that is stored within data packets are stored in fields. Thus, Enterasys' hyper-technical reading of "information" would effectively remove the separate "local status information" requirement of Claim 1.

Second, the specification supports Defendants' construction. For example, as discussed above, Figure 5 identifies a number of fields contained in the "second header":



FIG. 5

Inventor Robert Simcoe confirmed during his deposition that "local status fields" were distinct from "fields to indicate a message packet servicing." Specifically, Mr. Simcoe identified certain fields as "fields to indicate a message packet servicing" as distinct from fields containing "local status information":

> Q. Okay. Now, in the examples that are given in the patent, what would be the local status information and what would be the plurality of status fields that indicate a message packet servicing?

A.   I have to go back and reference the drawing that had various fields in it. Figure 5.

Q.   Uh-huh.

A.   So an example of local status information might be, say, a time stamp.

Q.   Okay.  Are there any others?

A.   Well, I won't try to go through and identify which of these are -- are or aren't local status.  (Witness reviews document.)  And source -- this s*ource switch and link would be known only locally.  So you could consider that local status being added* in.  The -- the *service class -- well, actually, that might go through.  So that -- that's probably an example of message packet servicing* through the network under the service class [...]

Exh. 26 at 183:14-184:8 (emphasis added).

Defendants' construction is further supported by the prosecution history of the '173 Patent.  In response to a prior art rejection, the applicants' patent attorney argued that the prior art did not suggest nor teach a switching device that sent a message packet in response to local status information *and* the plurality of status fields, confirming, once again, that two different sets of information contained in two sets of fields were *required* by the claim.  Exh. 27 at 12.

Enterasys's construction, therefore, impermissibly seeks to recapture subject matter it surrendered during prosecution by attempting to equate "local status information" with "a plurality of status fields to indicate a message packet servicing."  Moreover, Enterasys' construction is plainly at odds with both the intrinsic and the extrinsic evidence.

c.    **"receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and the plurality of status fields".**

| Phrase to be Construed | Defendants' Construction | Enterasys' Construction |
|---|---|---|
| the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and the plurality of status fields;<br><br>'173 Patent (claim 1) | Receiving the message packet with said second header and sending it to a port in the switching device selected based on the switching address, the local status information and the status fields in the header. | Receiving the message packet with said second header and sending it to a second port which is selected by the switching address and, in doing so, factoring in the local status information contained in the plurality of status fields. |

Here the dispute is whether or not the "switching device" selects an output port based on all of the fields contained in the "second header" added to the packet, as Defendants' propose, or whether this selection is based solely on the switching address as Enterasys contends.

The specification explains that the selection is based on the fields in the second header pertaining to packet servicing:

> The service class field 65 is a four-bit field that specifies the service class for the packet. For the receivers of the controller 10, the service class is used to determine the queue number in memory 21 that a packet is to be placed on by doing a lookup using certain internal registers 41. *On the crossbar 12, the service class is also used for connection queue servicing.*

'173 Patent, Col. 9:38-44 (emphasis added).  Defendants' construction reflects these disclosures in the specification, by making clear that the "switching device" (crossbar switch 12 utilizing controller 38) makes connections for a packet based on the switching address and servicing information stored in the packet's second header.

78

Furthermore, during prosecution of the '173 Patent, the prosecuting attorney emphasized that "switching device" was the active element that received and sent packets based on these fields. Specifically, the applicant's patent attorney stated that:

> [the prior art] neither describes nor suggests *said second header including local status information and a service class field*, a switching device…receiving…and sending said message packet…and i*n response to said local status information and said service class field*, and a second network transfer device.

Exh. 27 at 12 (emphasis added; ellipsis in original). The prosecuting attorney edited the claim limitation describing the "switching device" in such a way as to indicate that the switching device "sent" the message packet "in response to said local status information and service class field." This further corroborates Defendants' construction and is consistent with the claim language and specification.

Enterasys' definition, in contrast, suffer major defects. Enterasys states that the "local status information and the plurality of status fields" contained in the second header of the packet are "factored" into this decision, without describing what the term "factored" means in this context, a construction that is so vague as to provide no guidance to a person of ordinary skill in the art to ascertain the boundaries of the claimed invention.

## IV.    CONCLUSION.

Because Defendants' proposed constructions comport with the plain and ordinary meaning of the terms offered for construction, as set forth in the claim language itself, the specifications and the file histories of the patents-in-suit, and confirmed, where appropriate, by the extrinsic evidence in the form of dictionary definitions and the inventors' own testimony, the Court should adopt Defendants' proposed constructions.

Dated:  August 17, 2007

DEFENDANT FOUNDRY NETWORKS, INC.

By Its Attorneys,

*/s/ Steven M. Bauer*
Steven M. Bauer (BBO #542531)
Jeremy P. Oczek (BBO #647509)
John W. Pint (BBO #660548)
PROSKAUER ROSE LLP
One International Place
Boston, MA  02110-2600
Telephone:      (617) 526-9600
Facsimile:      (617) 526-9899

William L. Anthony, Jr. (admitted pro hac vice)
Fabio E. Marino (admitted pro hac vice)
I. Neel Chatterjee (admitted pro hac vice)
Matthew H. Poppe (admitted pro hac vice)
Michael F. Heafey (BBO # 556931)
Sanjeet K. Dutta (admitted pro hac vice)
Brian H. VanderZanden (admitted pro hac vice)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
Telephone:  (650) 614-7400
Facsimile:   (650) 614-7401

Respectfully Submitted,

DEFENDANT EXTREME NETWORKS, INC.

By Its Attorneys,

*/s/ Steven L. Walker (with permission)*
Peter L. Resnik, Esq. (BBO #417180)
Emily E. Smith-Lee, Esq. (BBO #634223)
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA 02109-1775
Tel. (617) 535-4000

Terrence P. McMahon, Esq. (*pro hac vice*)
Vera M. Elson, Esq. (*pro hac vice*)
David L. Larson, Esq. (*pro hac vice*)
Steven L. Walker, Esq. (*pro hac vice*)
Firasat M. Ali, Esq. (*pro hac vice*)
MCDERMOTT, WILL & EMERY LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone:      (650) 813-5000

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document was filed through the ECF system on August 17, 2007 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Steven M. Bauer*
Steven M. Bauer

# EXHIBIT 1A

US005251205A

# United States Patent [19]

## Callon et al.

[11] Patent Number: 5,251,205

[45] Date of Patent: Oct. 5, 1993

[54] **MULTIPLE PROTOCOL ROUTING**

[75] Inventors: **Ross W. Callon**, Bedford; **Radia J. Perlman**, Acton; **Eric C. Rosen**, Arlington, all of Mass.; **John Harper**, Reading, England

[73] Assignee: **Digital Equipment Corporation**, Maynard, Mass.

[21] Appl. No.: **577,437**

[22] Filed: **Sep. 4, 1990**

[51] Int. Cl.⁵ .......................... H04J 3/26; H04L 12/56

[52] U.S. Cl. .................................... 370/60; 370/94.1; 370/54; 370/79; 370/85.13

[58] Field of Search ................. 370/94.1, 85.13, 85.14, 370/60, 79, 54

[56]             **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,706,081 | 11/1987 | Hart et al. | 370/61 |
| 4,831,620 | 5/1989 | Conway et al. | 340/825.05 |
| 4,893,307 | 1/1990 | McKay et al. | 370/94.1 |
| 5,018,133 | 5/1991 | Tsukakoshi et al. | 370/85.13 |
| 5,031,174 | 7/1991 | Natsume | 370/85.14 |

### OTHER PUBLICATIONS

John M. McQuillan et al.; "The New Routing Algorithm for the ARPANET"; *IEEE;* vol. Com–28, No. 5; May 1980.

E. W. Dijkstra; "A Note on Two Problems in Connexion with Graphs"; *Numerische Mathmatik;* pp. 269–271 1959.

"Protocol for Providing the Connectionless–Mode Network Service"; ISO 8473; Mar. 1987.

"Intermediate system to Intermediate system Intra–Domain routeing exchange protocol for use in Conjunction with the Protocol for providing the Connectionless–mode Network Service"; *ISO* 10589; Oct. 15, 1989.

"Information processing systems–Telecommunications and information exchange between systems–End system to Intermediate system routeing exchange protocol for use in conjunction . . . ;" *ISO* 9542; Mar. 26, 1988.

"Internet Protocol," Darpa Internet Program, Protocol Specification; RFC 791; Sep. 1981.

J. Postel; "Internet Control Message Protocol," Darpa Internet, Program Protocol Specification; RFC 792; Sep. 1981.

R. Braden, J. Postel; "Requirements for Internet Gateways," RFC 1009; Jun. 1987.

J. Moy; "The OSPF Specification," RFC 1131; Oct. 1989.

C. L. Hedrick, L. Bosack; "An Introduction to IGRP," Jul. 26, 1989.

Callon et al., "Routing in an Internetwork Environment," pp. 4–9.

Shoch et al., "Mutual Encapsulation of Internetwork Protocols," IEN 140, Apr. 1980.

*Primary Examiner*—Douglas W. Olms
*Assistant Examiner*—Min Jung
*Attorney, Agent, or Firm*—Fish & Richardson

[57]             **ABSTRACT**

A method for connecting a network so that TCP/IP and OSI 8473 packets may be routed in the same domain. The independence of the addresses is maintained: one device in the network may be assigned only a TCP/IP address, and another device may be assigned only a ISO 8473 address. Furthermore, all of the routers share link state information by using a common link state packet format (such as the ISO 10589 format); thus routes through the network may be computed without regard for the protocols supported by the routers along the route. Where necessary, packets are encapsulated and forwarded through routers which are not capable in the protocol of the packet. In some disclosed embodiments, all of the routers in a given area support a given protocol (or, in fact, have identical capabilities, in which case encapsulation is not required). In these embodiments, the encapsulation is performed by suitable modifications to each router's packet forwarding procedures. In other disclosed embodiments, these topological restrictions are removed, and the network is expanded to support additional protocols. In these embodiments, the Dijkstra algorithm is also modified to generate information on how to encapsulate and forward packets through the network.

**24 Claims, 20 Drawing Sheets**





FIG. 1A



FIG. 1B



FIG. 1C



FIG. 2A



FIG. 2B



FIG. 2C



FIG. 3



FIG. 4A



FIG. 4B



FIG. 5A



FIG. 5B



FIG. 5C



FIG. 6





FIG. 8B



FIG. 8C



FIG. 9



192 —— NAME
194 —— **FIRST NODE**
196 —— STATUS
198 —— **COST**
330 —— OSI FLAG
332 —— IP FLAG
334 —— P3 FLAG
440 —— ES

190
200

# FIG. 10A



FIG. 10B



FIG. 10C



FIG. 11



FIG. 13



FIG. 12

5,251,205

1

## MULTIPLE PROTOCOL ROUTING

### BACKGROUND OF THE INVENTION

This invention relates to routing algorithms which support multiple protocols.

The end systems (e.g., computers or printers) which form a computer network are interconnected by devices known as routers. Each end system is attached to one of the network's routers and each router is responsible for forwarding communications to and from its attached end systems.

The routers transfer information to and from the end systems and among themselves along communications links in formatted packets. For example, when an originating end system wishes to transmit information to a destination end system, it generates a packet header in an appropriate format (this header includes, among other information, the address of the destination end system), and then fills the remainder of the packet with the information to be transmitted. (In the following description, the term "user data packet" will refer to the entire packet, i.e. the formatted header and the information that is to be transmitted from end system to end system.) The completed user data packet is then provided to the router attached to (and responsible for) the originating end system, which forwards it toward the destination end system. Packets transmitted among the routers themselves (which will be referred to as "control packets") are similarly formatted and forwarded.

When a router receives a user data packet, it reads the user data packet's destination address from the user data packet header, and then transmits the user data packet on the link leading most directly to the user data packet's destination. Along the path from source to destination, a user data packet may be transmitted along several links and pass through several routers, each router on the path reading the user data packet header and forwarding the user data packet accordingly.

To determine how user data packets should be forwarded, each router typically knows the locations of the network's end systems (i.e., which routers are responsible for which end systems), the nature of the connections between the routers, and the states (e.g., operative or inoperative) of the links forming those connections. Using this information, each router can compute effective routes through the network and avoid, for example, faulty links or routers. A procedure for performing these tasks is generally known as a "routing algorithm".

In popular routing algorithms such as that described in "The New Routing Algorithm for the ARPANET" by McQuillan et al., IEEE Transactions on Communications, May, 1980, each router determines which end systems are attached to it, what links to other routers are available, the states of those links, and the identities of the routers on the other ends of those links. To initialize the network, each router places this information in a control packet known as a Link State packet (LSP), and transmits this LSP to all of the other routers in the network (i.e., "advertises" its neighbors and end systems to the network). Later, when changes in the network occur (e.g., a link fails), one or more routers may generate new LSPs which supersede previously generated LSPs.

As long as the most recent LSPs are propagated reliably to all of the routers, each router will have complete information about the topology of the network

2

and can generate a routing database describing routes through the network (for example, using the algorithm described in "A Note on Two Problems in Connexion with Graphs" by Edsgar Dijkstra, Numerische Mathematik, Vol. 1, 1959, pages 269–271).

In order for user data packets to be delivered to their destinations, each end system on the network must have an unambiguous address. There are several independent standards organizations which document and promulgate address allocation schemes, as well as control and user data packet formats which may be used for communicating under these schemes. Several networks of routers have been configured according to these addressing schemes and formats.

In what follows, the term "routing protocol" will be used to describe the combination of an address allocation scheme and a format (or a group of related formats) that describes control packets and other information to be exchanged among routers, and which is used to calculate the paths which the user data packets will take between routers. Routing protocols are often associated with their own routing algorithms, each routing algorithm being documented and promulgated by the standards organization responsible for the associated routing protocol.

Further, the term "protocol suite" will be used to describe the comprehensive set of protocols that is designed to work together to coherently provide complete communication capabilities. Two examples of protocol suites are the TCP/IP protocol suite and the OSI protocol suite. Each of these protocol suites includes one or more network layer protocols which define the format used for control and user data packets that are to be transferred by the network routers. For example, the IP protocol of the TCP/IP protocol suite defines the network layer protocol which makes up the format of the user data packets that are forwarded by the IP routers. Similarly, the OSI routers forward user data packets following the ISO 8473 network layer protocol.

The Transmission Control Protocol (TCP) RFC 793, Internetwork Protocol (IP) RFC 791, the Internet Control Message Protocol RFC 792, and the TCP/IP protocol suite which is described in RFC 1122, "Requirements for Internet Hosts—Communication Layers," RFC 1123, "Requirements for Internet Hosts—Application and Support," RFC 1100, "IAB Official Protocol Standards," and RFC 1009, "Requirements for Internet Gateways," and associated other RFCs, all available from SRI International, DDN Network Information Center, Room EJ291, 333 Ravenswood Avenue, Menlo Park, Calif. 94025, have recently been growing in importance as a multi-vendor communications architecture, and many networks are based on them. (TCP/IP terminology refers to routers as "gateways", and end systems as "hosts".) At the same time, however, existing networks also use the Open Systems Interconnection (OSI) protocols such as described in International Organization for Standardization (ISO) 7498, "Information Processing Systems—Open Systems Interconnection—Basic Reference Model," ISO 8473, "Protocol for Providing the Connectionless-mode Network Service," ISO 9542, "End System to Intermediate System Routing Exchange Protocol," and ISO DP 10589 "Intermediate System to Intermediate System Intradomain Routing Exchange Protocol," all available from BSi Standards, 2 Park Street, London England,

5,251,205

**3**

W1A 2BS, and more are expected to be created as OSI is further developed.

Because the several existing protocols (in particular TCP/IP and OSI) have been developed independently, they are largely incompatible.

Networks having incompatible protocols cannot make their links and routers available to each other, which may result in excess redundancy and reduced efficiency. Also, each of the networks must be maintained independently, increasing the total management effort over what would be required by a single, universally compatible network.

One known way to share routing resources among networks having incompatible protocols is known as gateway encapsulation. In gateway encapsulation, a network using protocol A is provided with a path through a second network that uses protocol B. To form the path, two routers are manually configured to provide gateways from protocol A to protocol B, and back.

Each gateway router is configured to be fluent in both protocol A and protocol B. When a user data packet formatted in protocol A is received, at a gateway router, the gateway router "encapsulates" the user data packet in a protocol B header (i.e., generates a protocol B header and places the protocol A user data packet, including the protocol A header, into the data area of the protocol B user data packet). The encapsulated protocol A user data packet is then addressed to the second gateway router, and transmitted through the protocol B network.

When the encapsulated protocol A user data packet is received at the second gateway router, the protocol B encapsulation header is removed, and the protocol A user data packet is forwarded to its destination through the protocol A network.

The routing algorithm used in the protocol A network is suitably modified to make the protocol A routers aware of the gateway, so that user data packets destined to routers at the other end of the gateway are forwarded to one of the gateway routers.

One disadvantage of gateway encapsulation is that the gateway must be manually configured, and thus must also be manually maintained. If a change to the gateway path is desired, or if an additional gateway path is added, the gateway routers must be manually adjusted to effect the desired changes. Furthermore, the gateway path is only available to the protocol A network as long as the gateway routers themselves are operational. If a gateway router fails, the pre-established path through the protocol B network is severed, and communications must be re-routed through the protocol A network.

Another way to route multiple incompatible protocols is known as "ships in the night" (SIN). In the SIN approach, the same physical resources (e.g., routers and links) are used to route completely separate protocols. The shared resources multiplex between the supported protocols, and the protocols themselves operate more or less independently.

With SIN, there is some degree of competition for resources, because implementing two protocols requires additional programming time as well as additional CPU and memory resources in the routers. Furthermore, SIN requires that two complete sets of control packets be distributed through the two independent networks, which doubles the control traffic overhead over that of a single integrated network. Finally, configuring and

**4**

managing multiple independent networks is less efficient than configuring and managing a single integrated network of the same total size: multiple networks must be configured independently, increasing overhead; and multiple networks cannot be managed as efficiently as a single network because the implicit interactions between the networks (such as the shared loads placed on routers and links) cannot be well characterized and controlled.

## SUMMARY OF THE INVENTION

In one aspect, the invention features a method of calculating routes for sending user data packets through an interconnected network of information handling devices. Each of the user data packets includes destination address information conforming to an addressing convention of any one of two or more different independent protocol suites. The routes for user data packets are always calculated using a single route calculation algorithm corresponding to the same routing protocol (which is chosen from an arbitrary protocol suite) regardless of the addressing convention to which the user data packet conforms. This calculation does not involve converting the destination information from one addressing convention to another.

Preferred embodiments of this aspect include the following features.

There are exactly two protocol suites.

Link state packets conforming to the routing protocol used to compute routes are sent to the information handling devices, and routes are calculated based on information contained in the link state packets.

The OSI IS-IS routing protocol is used to compute routes.

In another aspect, the invention features a method for calculating routes for sending user data packets via information handling devices which are interconnected in a communications network. The information handling devices include (a) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a single protocol suite, and (b) multi-protocol information handling devices capable of recognizing and forwarding user data packets which conform to any one of two or more protocol suites. A routing protocol is used to automatically predetermine at which information handling devices to encapsulate and to decapsulate a given packet.

Preferred embodiments of this aspect include the following features.

The information handling devices are organized in areas and all of the information handling devices within a single area are at least capable of recognizing and forwarding user data packets which conform to the same one of the protocol suites. This common protocol suite may be different for different areas.

A given area may include (a) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a first protocol suite, (b) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a second different protocol suite, and (c) at least one multi-protocol information handling device capable of recognizing and forwarding user data packets which conform to the first and second protocol suite (and/or every other protocol suite that is used by any other information handling device in the area).

5,251,205

| 5 | 6 |

There are exactly two protocol suites, one which is the TCP/IP protocol suite and another which is the OSI protocol suite.

Link state packets conforming to the routing protocol used to compute routes are sent to the information handling devices, and routes are calculated based on information contained in the link state packets.

The OSI IS-IS routing protocol is used to compute routes and determine at which information handling devices to encapsulate and to decapsulate.

In another aspect, the invention features a method of enabling user data packets to be forwarded from one local area network to another by a device which is capable of acting as a router to recognize and forward user data packets which conform to a first protocol suite and is capable of acting as a bridge to recognize and forward user data packets which conform to at least a second protocol suite. For a user data packet which conforms to the first protocol suite and is addressed to a single address which is not an address of the device, the devices acts as a bridge rather than as a router.

Other features and advantages of the invention will be apparent from the following description of the preferred embodiments and from the claims.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

We first briefly describe the drawings.

FIG. 1A is a diagram of a dual-protocol network segregated on a per-area basis which does not require encapsulation.

FIG. 1B is a flow diagram of the user data packet receiving algorithm to be followed by the routers of FIG. 1A.

FIG. 1C is a flow diagram of the user data packet forwarding algorithm to be followed by the routers of FIG. 1A.

FIG. 2A is a diagram of a dual-protocol network segregated on a per-area basis which requires encapsulation.

FIG. 2B is a flow diagram of the user data packet receiving algorithm to be followed by the dual-protocol routers of FIG. 2A.

FIG. 2C is a flow diagram of the user data packet forwarding algorithm to be followed by the dual-protocol routers of FIG. 2A.

FIG. 3 is a diagram of a dual-protocol network which is not segregated on a per-area basis.

FIG. 4A is a flow diagram of an algorithm used to build routing trees.

FIG. 4B is a diagram of a routing tree.

FIG. 5A is a diagram of a data structure of the routing tree of FIG. 4B as used in a dual-protocol router of FIG. 3.

FIG. 5B is a flow diagram of an algorithm for initializing the routing trees in the dual-protocol routers of FIG. 3.

FIG. 5C is a flow diagram of an algorithm for building the routing trees in the dual-protocol routers of FIG. 3.

FIG. 6 is a flow diagram of the user data packet forwarding algorithm to be followed by the dual-protocol routers of FIG. 3.

FIG. 7A illustrates a three-protocol network which does not have an all-protocol router.

FIG. 7B illustrates a three-protocol network having an all-protocol router.

FIG. 8A is a diagram of a data structure of the routing tree of FIG. 4B as used in a dual-protocol router of FIG. 7B.

FIG. 8B is a flow diagram of an algorithm for initializing the routing trees in the dual-protocol routers of FIG. 7B.

FIG. 8C is a flow diagram of an algorithm for building the routing trees in the dual-protocol routers of FIG. 7B.

FIG. 9 is a flow diagram of the user data packet forwarding algorithm to be followed by the dual-protocol routers of FIG. 7B.

FIG. 10A is a diagram of a data structure of the routing tree of FIG. 4B as used in the all-protocol router of FIG. 7B.

FIG. 10B is a flow diagram of an algorithm for initializing the routing tree in the all-protocol router of FIG. 7B.

FIG. 10C is a flow diagram of an algorithm for building the routing tree in the all-protocol router of FIG. 7B.

FIG. 11 is a flow diagram of the user data packet forwarding algorithm to be followed by the all-protocol router of FIG. 7B.

FIG. 12 illustrates a common area structure.

FIG. 13 illustrates a brouter.

## GENERAL DESCRIPTION

Before discussing the invention, it will be useful to define some terminology.

A router that is fluent in only one of the protocols supported by the multi-protocol network will be generally referred to as a "single-protocol" router. Where necessary, the protocol supported by a single-protocol router may be indicated by explicit reference to the protocol. For example, a single-protocol router which is fluent in only protocol P1 may be referred to as a "P1-only" router.

Routers that are fluent in more than one of the supported protocols interconnect the dissimilar single-protocol routers. A router that is fluent in more than one of the supported protocols will be generally referred to as a "multi-protocol" router. Routers that are fluent in two protocols will be referred to as "dual-protocol" routers; routers that are fluent in three protocols will be referred to as "three-protocol" routers, and so on. Multi-protocol routers that are fluent in all of the protocols supported by a given network will be referred to as "all-protocol" routers. (Note that where only two protocols are supported, the terms multi-protocol, dual-protocol, and all-protocol are synonymous; however, this synonymity does not apply when more than two protocols are supported.)

There are two types of multi-protocol routers. A "simple multi-protocol router" will route user data packets conforming to two or more protocols. However, a simple multi-protocol router is only able to forward the user data packets; it is not able to perform encapsulation or decapsulation to make user data packets in one protocol compatible with another protocol. An "enhanced multi-protocol router" will not only route user data packets conforming to two or more protocols, but is also able to perform encapsulation or decapsulation to make user data packets in one protocol compatible with another protocol. The extent to which enhanced multi-protocol routers may or may not support complex combinations of the other three types of routers is described in detail below.

5,251,205

| 7 | 8 |

Note that there is a distinction between the capabilities of a particular router, and its operation at any one time. For example, a router may be a multi-protocol router, but may be configured to operate as a single-protocol router. This would allow it to interoperate with other single-protocol routers in a network which only supports one protocol. The term P1-capable will be used to refer to any router which is able to forward user data packets formatted (and addressed) in accordance with protocol P1. Thus the set of P1-capable routers includes P1-only routers and any multi-protocol routers which include P1 among the set of protocols that they are capable of handling.

Also, note that an end system that communicates with routers and other end systems in accordance with a given protocol can only be connected to a router that is capable in that protocol. For example, an end system designed to communicate in protocol P1 can only connect to routers that are P1-capable. This has implications on the network architectures, as will be seen more fully below.

In one particular embodiment, the invention is applied to a dual-protocol network supporting the TCP/IP protocol suite defined by the Internet Engineering Task Force (IETF) as well as the OSI protocol suite defined by ISO. The following discussion will be directed to this particular set of protocols, although the invention is not limited to these protocols, and the inventive concepts set forth below may be applied to other groups of protocols.

To apply the invention to TCP/IP and OSI, these protocols are slightly modified. Primarily, the format of various control packets such as the link state packets and the router to router "hello" packets are normalized so that all of the routers can connect to each other and become aware of the full topology of the multi-protocol network. In one embodiment, the common format comprises the current ISO DP 10589 format, with additional fields appended to the format, as allowed by the current format. In particular, additional optional fields are added to the hello packets, link state packets, and sequence number packets. The other packet formats (in particular user data packet formats defined by ISO 8473 and IP, as well as control packet formats for router to end system communications), and the addressing schemes of the various different protocols, are not modified. ISO 9542 defines the control packet formats that are used for communications between routers and end systems in an OSI environment. Since one particular type of ISO 9542 packet format (the Intermediate System Hello packet) performs "double duty", and is also used for communications between routers over point-to-point links, this packet type will be modified by the addition of information in a manner that routers can interpret correctly, and that standard OSI end systems will ignore.

Particular modifications to the protocols suitable for one embodiment of the invention will be discussed under the heading "Detailed Description", below. The following general discussion of the invention will assume that the modifications described above have been made to the underlying protocols. Therefore, any reference to a particular protocol should be understood as a reference to the protocol as modified to conform with the goals of the preceding paragraph.

In an IP-OSI dual-protocol network, the types of routers discussed above can be further defined as follows:

(1) An "IP-only router" can understand and forward only user data packets conforming to RFC 791. Such a router conforms to the requirements for Internet gateways (as currently defined in RFC 1009, available from SRI International at the above address). However, an IP-only router will not be able to forward 8473 packets, and may operate without regard for ISO packet and addressing standards, except that IP-only routers may use OSI 10589 as their routing protocol.

(2) An "OSI-only" router can understand and forward only user data packets conforming to OSI 8473. Such a router conforms to the other requirements for OSI routers (including the end system-intermediate system protocol, ISO 9542, available from BSI Standards at the above address). However, an OSI-only router will not forward TCP/IP packets, and may operate without regard for IETF packet and addressing standards.

(3) A "simple dual-protocol router" can understand and forward both 8473 and IP user data packets simultaneously. However, a simple dual-protocol router is not able to encapsulate IP user data packets inside OSI user data packets for transmission through an OSI-only router, or alternatively, encapsulate OSI user data packets inside IP user data packets for transmission through an IP-only router.

(4) An "enhanced dual-protocol router" can understand and forward both 8473 and IP user data packets simultaneously. In addition, an enhanced dual-protocol router can encapsulate IP user data packets inside OSI user data packets for transmission through an OSI-only router, and similarly can encapsulate OSI user data packets inside IP user data packets for transmission through an IP-only router. The way in which the encapsulation is performed will be discussed below.

Note that, of the four types of routers described above, types 1, 3, and 4 are all IP-capable. Similarly, types 2, 3, and 4 are all OSI-capable.

Even though dual-protocol routers are more flexible than IP-only or OSI-only routers, some vendors may still wish to implement single-protocol routers. Thus, even in a dual-protocol network, there may be IP-only and OSI-only routers, which will have to connect to and coexist with dual-protocol routers, and with each other. A main issue that must be confronted is how to control this interaction to provide for the correct forwarding of user data packets. Several options are proposed below.

The most direct way to allow interaction between the protocols is on a "per-area" basis. Referring to FIGS. 1A and 2A, large networks are often organized hierarchically; that is, partitioned into smaller networks 90, 92, 94, 137, 139. For the purposes of this discussion, these smaller partitions of the large network will be referred to as "areas"; routing within an area will be referred to as Level-1 routing, and routing between areas will be referred to as Level-2 routing.

TCP/IP routers and OSI routers are arranged into a common area structure. (Maintenance of an independent two level hierarchy for the two protocols is possible, but is complex, and does not benefit from the advantages of a common area structure discussed below.) The detailed description, which follows later, discusses methods for creating a common area structure while allowing independent use of the existing addressing schemes and packet formats, e.g., OSI and TCP/IP addressing schemes and packet formats, without requiring modification of those addressing schemes and

5,251,205

9                                                            10

packet formats. In the following general description, it will be assumed that a suitable method has been employed to create such a common area structure.

In FIGS. 1A and 2A, those routers that are OSI-only, and the end systems designed to communicate with the OSI protocols, are indicated by circles. Those routers that are IP-only, and the end systems designed to communicate with the TCP/IP protocols, are indicated by squares. Those routers that are dual-protocol (either simple dual or enhanced dual) are indicated by circles within squares. The Level-1 routers (which reside within the areas 100) are marked with a "1". The Level-2 routers which connect the areas 100 are marked with a "2". The end systems are marked with an "E".

In a hierarchical network such as in FIGS. 1A and 2A, the Level-1 routers need not share link state information with all of the other Level-1 routers, rather, this information is only shared with those Level-1 routers in the same area. To permit routing of user data packets between areas, end system addresses are assigned such that, by observing an end system address, the routers in an area can determine whether the end system having that address is in the local area. (Typically this observation involves reading the more significant bits of the address and/or applying bit masks to the address). When a user data packet is sent from an end system in a given area to another end system in the same area, the user data packet is forwarded via Level-1 routing. Otherwise, if the user data packet is sent to an end system in another area, Level-1 routers in the originating area forward the user data packet to an appropriate Level-2 router in their area. In the most common embodiment, this involves forwarding to the nearest Level-2 router in their area. Level-2 routers then forward the user data packet to the nearest Level-2 router in the destination area. Then the user data packet again travels via Level-1 routing to the destination end system.

There are several embodiments of the invention which organize the dual-protocol network on a per-area basis. Two of these embodiments are illustrated in FIGS. 1A and 2A.

In the embodiment illustrated in FIG. 1A, the topology of the network is restricted such that no user data packet encapsulation is required. In each area, one of the following is true: (1) every router in the area operates as OSI-only (e.g., the area 90 on the left of FIG. 1A); (2) every router in the area operates as IP-only (e.g., the area in the center of FIG. 1A); or (3) every router in the area operates as dual-protocol (e.g., the area 94 on the right of FIG. 1A). Similarly, the Level-2 backbone operates entirely as IP-only, entirely as OSI-only, or entirely as dual-protocol.

In some embodiments, all areas operate as dual-protocol. In other embodiments, some areas operate as OSI-only, and some as dual-protocol. In other embodiments, some areas operate as IP-only, and others as dual-protocol. As illustrated in FIG. 1A, in some embodiments, some areas operate as IP-only, some areas as OSI-only, and some areas as dual-protocol. Any of these combinations are possible as long as (i) the Level-2 backbone operates in dual-protocol mode (as in FIG. 1A) or (ii) the protocol which is not supported by the Level-2 backbone is prohibited from operating outside of the individual areas.

In the architecture of FIG. 1A, there is no need for encapsulation, and thus all of the dual-protocol routers are "simple dual" routers. It may not be immediately evident that encapsulation is not necessary in the architecture of FIG. 1A; therefore, some discussion will be dedicated to this point.

First, note that encapsulation is only necessary if some of the paths that may be followed by a user data packet pass through routers that are not capable in the protocol of the user data packet. If every router in the path is capable in the protocol of the user data packet, then every router can forward the user data packet in accordance with that protocol, and the user data packet will successfully reach its destination without being encapsulated.

Given the above paragraph, it is clear by inspecting FIG. 1A that any path that may be taken by a TCP/IP user data packet or an OSI user data packet can only pass through IP-capable or OSI-capable routers, respectively. Therefore, there will never be any need to encapsulate user data packets.

To be more rigorous with the above proof (this discussion will be of use in analyzing more complex multi-protocol networks to be presented below) note that, in any dual-protocol network, the first router on any path followed by an OSI-formatted user data packet must be OSI-capable. To prove this assertion, remember that OSI-formatted user data packets can only be generated by OSI end systems or (in some special cases) by OSI-capable routers. Because all OSI end systems must be connected to OSI-capable routers, the first router on any path followed by an OSI-formatted user data packet must be an OSI-capable router. For similar reasons, the last router on any path followed by an OSI-formatted user data packet must be OSI-capable. This is true because an OSI-formatted user data packet must be addressed to an OSI end system or (in some special cases) to an OSI-capable router. (A non-OSI end system or router could not interpret or use the contents of an OSI-formatted user data packet, and even if it could, the address of a non-OSI end system or router would not be an OSI address and could not be placed in an OSI user data packet header). Again, because all OSI end systems must be connected to OSI-capable routers, the last router on a path followed by any OSI-formatted user data packet must be OSI-capable.

For the reasons given above, the first and last routers along any path followed by an OSI-formatted user data packet must be OSI-capable. For similar reasons, the first and last routers along any path followed by an IP-formatted user data packet must be IP-capable.

Now note that, within any given area in FIG. 1A, all of the routers have the same capabilities. As stated above, the first router in the path of a user data packet must be capable in that user data packet's protocol; because all of the routers in an area have the same capabilities, this means that all of the routers in the area originating a user data packet must be capable in that user data packet's protocol. Similarly, the last router in the path of a user data packet must be capable in that user data packet's protocol; because all of the routers in an area have the same capabilities, this means that all of the routers in the area to which a user data packet is addressed must be capable in that user data packet's protocol. Thus all of the routers in the areas where a user data packet starts and ends (which may be the same) are capable in that user data packet's protocol. The only other routers through which the user data packet travels are the Level-2 routers, and the Level-2 routers have sufficient capability to forward any user data packets that may be presented to them: either the Level-2 routers are dual-protocol, or, if they are not

5,251,205

11

dual-protocol, the protocol which is not supported by the Level-2 routers is prohibited from operating outside of the individual areas. Thus, in the FIG. 1A architecture, all of the routers along any user data packet's path must be capable in that user data packet's protocol, and no encapsulation is required.

One algorithm that may be used by the routers of FIG. 1A when receiving user data packets is illustrated in FIG. 1B. Referring to FIG. 1B, when a router of FIG. 1A receives 102 (either from another router or from an attached end system) a user data packet addressed to an end system Z, the receiving router first reviews 104 the LSPs it has stored to determine if there is a router that has "advertised" a connection to end system Z. The router connected to end system Z will be called router A (note that, if end system Z is not in the same area as the receiving router, router A is the nearest level-2 router in the local area). Next, the receiving router checks 106 if router A is itself, i.e., if end system Z is connected to the receiving router. If not, the user data packet is forwarded 108 to the appropriate next router on the path to router A. However, if end system Z is connected to the receiving dual-protocol router, then the receiving dual-protocol router delivers 110 the user data packet to the appropriate end system.

Referring to FIG. 1C, when a dual-protocol router forwards 108 a user data packet toward router A, it determines 111 the first router in the path to router A and then sends 112 the user data packet on the link to that first router.

The operation of the algorithms discussed above can best be shown by example. Two examples of routing in the network of FIG. 1A are provided below. The first example does not involve Level-2 routing; the second example does.

In the first example, OSI end system 101 wishes to send a user data packet to OSI end system 103. To this end, it generates an OSI header addressed to end system 103, and forwards the user data packet to OSI-only router 105. Following the flow charts of FIGS. 1B and 1C, router 105 determines that the user data packet should be forwarded to OSI-only router 107, because router 107 has advertised a connection to end system 103 in its most recent LSP. Therefore, router 105 forwards the user data packet to router 107. Following the flow chart of FIG. 1B, router 107 determines that the user data packet is addressed to one of the end systems connected to it, and thus delivers the user data packet to end system 103.

In the second example, OSI end system 103 wishes to forward a user data packet to OSI end system 109. To this end, end system 103 generates a user data packet in OSI format, which it forwards to OSI-only router 107. Following the flow charts of FIGS. 1B and 1C, router 107 determines that the user data packet is not addressed to an end system in the local area, and thus it determines that the user data packet should be forwarded to dual-protocol router 111, which is the nearest Level-2 router in router 107's local area. Thus, router 107 forwards the user data packet on the link to OSI-only router 105 (which leads most directly to router 111). Following the flow charts of FIGS. 1B and 1C, router 105 then independently determines that the user data packet is not addressed to an end system in the local area, and thus determines that the user data packet should be forwarded to dual-protocol router 111. Thus router 105 forwards the user data packet on the link to router 111. Router 111, following the flow charts of

12

FIGS. 2B and 2C, recognizes that the OSI user data packet should be forwarded toward the area router 115. The user data packet is then forwarded through the Level-2 dual-protocol routers 113 and 115, eventually arriving at dual-protocol router 117. Following the flow charts of FIGS. 1B and 1C, router 117 determines that the user data packet is addressed to an OSI end system which is attached to it. Therefore, it delivers the user data packet to end system 109.

Before discussing other possible embodiments of the invention which involve encapsulation, it is useful to make the following observation: most of the complications associated with single-protocol routers occur when more than one type of single-protocol router appears in the same area. If there is only one type of single-protocol router in an area, all user data packets can be placed in the protocol of the single-protocol routers (by encapsulation if necessary), and then easily routed within the area.

Therefore, referring to FIG. 2A, a second embodiment of the invention explicitly prohibits the use of IP-only and OSI-only routers in the same area. In each area, one of the following is true: (1) the area is an "OSI-preferred area", and every router in the area operates as OSI-only or dual-protocol (e.g., the area 137 on the left of FIG. 2A); or (2) the area is an "IP-preferred area", and every router in the area operates as IP-only or dual-protocol (e.g., the area 139 in the right of FIG. 2A). Although the areas are designated as OSI-preferred or IP-preferred, because both types of areas include dual-protocol routers, there may be an IP end system in an OSI area (e.g., IP end system 135), and vice-versa. As a result, IP user data packets will be transmitted through OSI areas, and vice-versa. These packets may need to be encapsulated to traverse the single-protocol routers within the areas. For this reason, in the embodiment of FIG. 2A, all of the dual-protocol routers are "enhanced dual" routers.

The Level-2 backbone may be composed entirely of dual-protocol routers, as illustrated in FIG. 2A. Alternatively, the Level-2 router in an area may be single-protocol if the protocol not supported by the Level-2 router will be not routed outside the area. One restriction that ensures that this will be the case is as follows: the Level-2 routers for an area must support the protocol used by any end system in the area. For example, for an area to have an IP-only Level-2 router, all of the end systems in that area must be IP. This restriction ensures that the single-protocol Level-2 routers will never be expected to perform Level-2 routing on a user data packet having an incompatible protocol (because all user data packets travelling into or out of an area must be to or from and end system in the area). However, it may be desireable to allow an area to use a protocol which is not supported by its Level-2 router(s), for example if the protocol is still being tested and has not been universally adopted. In the embodiments illustrated in FIG. 2A, there must be one common protocol which is supported by all Level-2 routers. For example, it is not permitted to have an OSI-only Level-2 router and an IP-only Level-2 router in the same routing domain (this topological restriction is removed in other embodiments of the invention).

Encapsulation is necessary within areas of the architecture of FIG. 2A because, within an area, all of the routers do not have the same capabilities. In addition, if there are single-protocol Level-2 routers, encapsulation

5,251,205

13

may also be necessary at Level-2, because not all of the Level-2 routers would have the same capabilities. (Compare this situation to the discussion of FIG. 1A above, where all of the routers within an area and at Level-2 have the same capabilities, and because of this, encapsulation is not required.)

The following discussion of encapsulation will be directed to encapsulation at Level-1. However, for embodiments which have single-protocol routers at Level-2, the same techniques may be used to encapsulate at Level-2. To implement encapsulation, several issues must be confronted. First, there must be a way for routers to decide when encapsulation is necessary.

In known routing algorithms, when a router seeks to forward a user data packet, it consults a network map (generated from the link state packets) to determine the "best" path for the user data packet to follow to its destination. The user data packet is then forwarded on the link connecting to the first router on this path. (Note that the first router on the path must be on the other end of a link connected to the forwarding router.) Here, the user data packet's path is mapped in a similar manner; however, the mapping is done without regard for the protocols supported by the routers on the path.

Once the user data packet's path is chosen, the forwarding router attempts to forward the user data packet to the first router on the path. If the first router on the path does not support the user data packet's protocol, then encapsulation is required, and the forwarding router encloses the user data packet in a suitable encapsulation header before the user data packet is forwarded.

Note that only dual-protocol routers need to perform the analysis of the previous paragraph. The analysis of the previous paragraph is not necessary in single-protocol routers because they cannot encapsulate user data packets. Furthermore, the restrictions on the topology of FIG. 2A prevent any circumstances in which a single-protocol router would need to perform encapsulation (these circumstances can also be prevented in less restricted architectures, as discussed below), as follows: (1) any user data packet being forwarded by a single-protocol router is by definition formatted in the protocol supported by the single protocol router; (2) the topology of FIG. 2A prevents single-protocol routers from being connected to other routers which do not support their protocol. Thus, there are no circumstances in which a single-protocol router would need to encapsulate a user data packet.

Once a dual-protocol router decides that a user data packet needs to be encapsulated, it must have some way to address the encapsulation header so that the user data packet will arrive at the router which is expected to decapsulate the user data packet, and this destination router will know to do so. Such a mechanism prevents the user data packet from being lost in the network, and prevents the destination router from treating an encapsulated user data packet as an ordinary, non-encapsulated user data packet, and accidentally misinterpreting its contents or forwarding it without decapsulating it. To achieve these goals, encapsulated user data packets are uniquely addressed, in a manner consistent with the encapsulating protocol.

One possible way to properly address encapsulated user data packets is to assign a "dummy" end system address to each dual-protocol router (only dual-protocol routers are capable of decapsulating user data packets, therefore, only dual-protocol routers need to

14

have such addresses). The link state packets of the dual-protocol routers "advertise" their dummy end system addresses along with other "real" end system addresses. Thus, within the LSPs, the dummy addresses are treated the same way as the addresses of real end systems connected to the dual-protocol router. When a dual-protocol router wishes to encapsulate a user data packet (only dual-protocol routers encapsulate user data packets) and send it to another dual-protocol router, it generates an encapsulation header, which it addresses to the dummy address for the destination router (the dummy address is placed in a predetermined location in the dual-protocol routers' LSPs, for example, it can be added to the beginning or end of the list of real end system addresses).

Between the encapsulating router and the decapsulating router, the encapsulated user data packet may pass through many other single- or dual-protocol routers. Each of these routers simply reads the user data packet's encapsulation header and, because the LSP of the destination router advertised the dummy address as an end system to which it is connected, the intermediate routers simply forward the encapsulated user data packet toward the destination router, in the same manner that ordinary, unencapsulated user data packets are forwarded.

When the encapsulated user data packet arrives at the destination router, the destination router recognizes the dummy address as indicating that the user data packet is encapsulating another user data packet. The destination router then removes the encapsulation header, and interprets the contents of the user data packet as a newly received user data packet.

Although the above methods determine when to encapsulate, and illustrate how to address user data packets so that they can be recognized and decapsulated, the dual-protocol router encapsulating a user data packet must also know where to send the encapsulated user data packet, i.e., which of the other dual-protocol routers to which the encapsulated user data packet should be addressed. Remember that the encapsulating router maps out the path the user data packet should follow to its destination before it decides if the user data packet should be encapsulated. Once a decision to encapsulate has been made, to minimize the number of encapsulations and decapsulations, the encapsulated user data packet should be addressed so that it passes through as many routers as possible before it needs to be decapsulated. However, the user data packet cannot travel through a router that does not support the encapsulating protocol. Therefore, the user data packet must be encapsulated before the first router on the path which does not support the encapsulating protocol. In the following, the router on the path just prior to the first router which does not support the encapsulating protocol will called the "last capable router on the path" (because this router is the last router in the chain of routers, starting at the router encapsulating the user data packet, which support the encapsulating protocol).

In some architectures (in particular, the architecture of FIG. 2A) the above-described "last capable router along the path" will always be the router to which the destination end system is connected. This is an advantage of the FIG. 2A architecture because, as discussed above, even in known networks which do not support dual-protocol protocols, routers forwarding user data packets must first determine the router to which the

5,251,205

15                                                          16

destination end system is connected. Thus, in the FIG. 2A architecture, this computation not only determines how to forward the user data packet, it also determines how to address the encapsulation header. (In other multi-protocol architectures—see the discussion of FIG. 3 below—the "last capable router along the path" will not always be the router to which the destination end system is connected. In these architectures, extra computation is required to determine how to address the encapsulation header).

Because the single-protocol routers in FIG. 2A do not perform encapsulation and therefore need not determine when to encapsulate, the algorithm used by the routers in FIG. 1A, i.e., that illustrated in FIGS. 1B and 1C, can be used by the single-protocol routers in FIG. 2A.

However, the dual-protocol routers of FIG. 2A must use a more complex algorithm for receiving and forwarding user data packets. Referring to FIG. 2B, when a dual-protocol router of FIG. 2A receives 120 (either from another router or from an attached end system) a user data packet addressed to an end system Z, the receiving dual-protocol router first reviews 122 the LSPs it has stored to determine if there is a router that has "advertised" a connection to end system Z. That router connected to end system Z will be called router A. If end system Z is not in the same area as the receiving dual-protocol router, router A is the nearest Level-2 router in the local area. Next, the receiving dual-protocol router checks 124 if router A is itself, i.e., if end system Z is connected to the receiving dual-protocol router. If not, the user data packet is forwarded 126 to the appropriate next router on the path to router A. However, if end system Z is connected to the receiving dual-protocol router, then the receiving dual-protocol router checks 128 if end system Z is the "dummy" end system, i.e., if the user data packet is an encapsulated user data packet. If not, the user data packet is delivered 132 to the appropriate end system. However, if the user data packet is an encapsulated user data packet, the encapsulation header is removed 130, and the user data packet contained therein is treated as a newly received user data packet by returning to step 120.

Referring to FIG. 2C, when a dual-protocol router forwards 126 a user data packet toward router A, it first determines 133 the first router in the path to router A. The dual-protocol router then checks 134 whether the first router in the path to router A is an OSI router, an IP router, or a dual IP-OSI router.

If the first router is a dual IP-OSI router, the forwarding router directly sends 140 the user data packet on the link to that first router without the need for any encapsulation.

If the first router is IP-only, the forwarding router checks 136 if the user data packet is formatted in IP. (The detailed description below discusses how the user data packet protocols may be properly recognized.) If not, the user data packet is encapsulated 138 in an IP header, which is addressed to router A. Note that, if the destination end system is in the local area, then router A is the "last capable router on the path", as discussed above. However, if the destination end system is not in the local area, then router A is the nearest Level-2 router in the local area, which will decapsulate the user data packet (the Level-2 router must be dual-protocol if OSI and IP traffic is being routed outside the local area) and forward it via Level-2 routing to the correct area

(which may involve additional encapsulations and decapsulation) where the Level-1 routing will deliver the packet (possibly after further encapsulation and decapsulation) to the destination end system. Regardless of whether the user data packet is encapsulated, it is sent 140 on the link to the first router in the path to router A.

Similarly, if the first router is OSI-only, the forwarding router checks 142 if the user data packet is formatted in OSI. If not, the user data packet is encapsulated 144 in an OSI header, which is addressed to router A. Regardless of whether the user data packet is encapsulated, it is sent 140 on the link to the first router in the path to router A.

The use of the above algorithms can be best shown by example. Two examples of routing in this architecture are provided below; the first example does not involve encapsulation, whereas the second requires encapsulation.

In the first example, TCP/IP end system 121 wishes to forward a user data packet to TCP/IP end system 123. To this end, end system 121 forms an IP user data packet addressed to end system 123. This user data packet is forwarded to IP-only router 125. Router 125, following the flow charts of FIGS. 1B and 1C, determines that the user data packet should be forwarded toward dual-protocol router 127. The user data packet is then forwarded to dual-protocol router 129, which is the first router on the path to router 127. Router 129 receives the user data packet, and following the flow charts of FIGS. 2B and 2C, also determines that the user data packet should be forwarded toward dual-protocol router 127, and that it need not be encapsulated because the next route is IP-capable (router 125 did not need to decide whether to encapsulate the user data packet because it is an IP-only router). In this way, the user data packet eventually arrives at dual-protocol router 127. Router 127 then follows the flow chart of FIG. 2B and determines that Ip end system 123 is attached to it, and that the address of end system 123 is not its dummy address. Therefore, it delivers the user data packet to end system 123.

In the second example, TCP/IP end system 135 wishes to forward a user data packet to TCP/IP end system 123. To this end, end system 135 generates a user data packet in IP format, which it forwards to dual-protocol router 131. Following the flow chart of FIG. 2B, dual-protocol router 131 determines that the user data packet is not addressed to an end system in the local area, and thus it determines that the user data packet should be forwarded to dual-protocol router 133, which is the nearest Level-2 router in router 131's local area. Also, router 131 determines that the user data packet should be encapsulated because the next router is OSI-only and the user data packet is formatted for IP. Thus, router 131 generates an encapsulation header addressed to router 133's dummy address, and forwards the user data packet on one of the links leading to router 133. The OSI-only and dual-protocol routers in router 133's area then forward the user data packet as any other OSI user data packet until it reaches dual-protocol router 133. Router 133, following the flow chart of FIG. 2B, determines that the user data packet is addressed to its dummy address, and therefore is an encapsulated user data packet. The encapsulation header is removed, and router 133 analyzes the internal user data packet. Following the flow charts of FIGS. 2B and 2C, router 133 then recognizes that the IP data packet should be forwarded toward the nearest

5,251,205

17

Level-2 router in the destination area (i.e., router 141). The user data packet is then forwarded, without encapsulation, through the Level-2 dual-protocol routers, eventually arriving at router 141 (alternatively, where there are single-protocol routers at Level-2, there may also be encapsulation at Level-2). Following the flow charts of FIGS. 2B and 2C, router 141 determines that the user data packet should be forwarded toward router 127, and that it need not be encapsulated because the next router can understand IP. Therefore, router 141 forwards the user data packet toward router 127. When the user data packet arrives at router 127, it follows the flow chart of FIG. 2B and determines that TCP/IP end system 123 is attached to it, and that the address of end system 123 is not its dummy address. Therefore, it delivers the user data packet to end system 123.

In two simplified forms of the embodiment illustrated in FIG. 2A, either OSI-only or IP-only routers are prohibited from the network. In these embodiments, FIG. 2C can be simplified by simplifying the check at step 134, and removing either steps 142 and 144, or steps 136 and 138. In either embodiment, the Level-2 backbone may operate as all dual-protocol, or may be a mixture of dual-protocol and single-protocol routers, as long as the restriction discussed above is met (i.e., that any protocol not supported by an area's Level-2 router cannot be routed outside that area).

One advantage of the "per-area" embodiments discussed above is that they allow for a graceful evolution of the network from one protocol to another. Currently, TCP/IP is the dominant protocol suite (at least in most environments in the United States). Thus it is likely that, initially, users would choose to implement a network of IP-only and dual-protocol routers. These will operate together in a graceful manner (for example, where necessary, encapsulation will occur automatically). As OSI becomes more important, the IP-only routers would be upgraded to dual-protocol routers, probably eventually resulting in an all-dual routing domain. Assuming that OSI will eventually supersede TCP/IP, then during the last step of migration, users will gracefully replace some of the dual-protocol routers with OSI-only routers, and/or add additional OSI-only routers. All of this will be quite graceful, as long as OSI-only and IP-only routers are never placed in the same area.

The per-area embodiments of the invention described above are quite flexible and have several advantages which have been disclosed. One drawback of these embodiments is that they have topological restrictions, namely, OSI-only and IP-only routers cannot be placed in the same area. However, if there are three types of routers (IP-only, OSI-only, and dual-protocol), some users may desire (and can be expected) to connect the routers together in the same area regardless of the restrictions imposed by the routing algorithm. Therefore, in another embodiment of the invention, these per-area topological restrictions are eliminated.

The embodiment of the invention illustrated in FIG. 3 has fewer topological restrictions than the preceding embodiments, in particular, OSI-only and IP-only routers are allowed to coexist in a given area. The network of FIG. 3 may represent one area of a larger network, or it may represent the Level-2 backbone of a network, where the depicted routers reside in local areas. (Note that if FIG. 3 represents an area, the Level-2 router in the area must be dual-protocol if both OSI and IP traffic is to be routed outside of the local area.)

18

The topology of FIG. 3 is more flexible than the topologies of FIGS. 1A or 2A, but routing user data packets through this topology is more complicated. Specifically, the following complications arise when OSI-only and IP-only routers are mixed within an area.

A first complication is that users may accidentally connect links between routers that do not support a common protocol. There must be a mechanism to ensure that such links are never recognized or used by the routers, because all user data packets sent along such links will be lost. For example, the erroneously connected link between OSI-only router 166 and IP-only router 168 (indicated by a dotted line) must never be used. There are several possible ways to prevent such links from being used.

One solution is to configure the OSI-only and IP-only routers to use different values in the protocol data unit (PDU) type field (see Section 9 of the above-referenced 10589 specification) of their hello packets. Therefore, OSI-only routers would think that the hello packets sent by the IP-only routers are invalid, and vice-versa.

Another solution is to encapsulate the hello packets sent by IP-only routers inside other IP packets, so that they are ignored by OSI-only routers.

A third solution is to alter the sub-network dependent link initialization procedures in IP-only routers or OSI-only routers (or both), so as to prevent the link from becoming valid. It may be more convenient to perform these modifications in the IP-only routers because, currently, the IP specification is less rigid.

A second complication with the FIG. 3 embodiment is that IP-only and OSI-only routers can occur on the same LAN. (Note that if a LAN spans two areas, ISO 10589 ensures that the Level-1 routers from different areas on the LAN will ignore each other. This ensures that this issue does not arise in the previous "per-area" embodiments.) Providing dual protocols on LANs raises several issues that must be confronted.

Each LAN has an elected "designated router". The designated router is responsible for updating the LAN routers about the LAN topology. Although the actual topology is a single link connecting all of the routers, the topology reported by the designated router is a star, where the center of the star is a "pseudonode". (The designated router generates a link state packet for the pseudonode indicating a star connection to all of the other routers on the LAN.) As a result, the first router on the path to the user data packet's destination is always the pseudonode, and the second router on the path is the router to which the user data packet should be directly transmitted. The pseudonode is a notational convention—when transmitting a user data packet over a LAN, the user data packet is typically forwarded to the second router on the path to its destination, rather than to the first router.

The above mechanism works properly when the routers on the LAN all support one of the protocols. For example, if there are no IP-only routers on the LAN, then OSI-only routers may forward user data packets on the LAN in the normal fashion (because any user data packets forwarded by an OSI-only router must be formatted for OSI, and all routers on the LAN support OSI). Also, dual-protocol router may forward user data packets on the LAN in the manner described above (i.e., OSI user data packets are forwarded in the normal fashion, and IP user data packets are encapsulated if the next router is OSI-only). The designated router may be chosen to be an OSI-only or dual-

5,251,205

19 20

protocol router, because either will be able to exchange control packets with the remainder of the routers on the LAN, and thus learn the full topology of the LAN. The situation is similar where there are no OSI-only routers on the LAN.

If there are OSI-only and IP-only routers on the LAN, then several difficulties arise. First, an appropriate "designated router" must be elected for the LAN. IP-only routers cannot correctly interpret fields in control packets exchanged with OSI-only routers (and vice-versa); therefore, the designated router cannot be either IP-only or OSI-only, because neither can correctly learn the entire LAN topology and generate the appropriate link state packet for the pseudonode. There are two possible solutions.

The first solution is to elect a dual-protocol router as the designated router. The dual-protocol router can correctly exchange control packets with all of the other routers, and thus can learn the entire LAN topology. To do this, the dual-protocol designated router send two sets of hello packets, one of which is interpreted by dual-protocol and IP-only routers and one of which is interpreted by dual-protocol and OSI-only routers. Once it has learned the LAN topology, the dual-protocol router then generates a link state packet for the pseudonode, which lists all of the routers on the LAN, regardless of their protocol capabilities. Note that if there are no single-protocol routers on the LAN, the dual-protocol routers send hello packets in a "preferred" format, for example the OSI format, elect one dual-protocol router as designated router, and use the "preferred" format for control and user data packets on the LAN.

The first solution can only be used if there is a dual-protocol router on the LAN. If there are no dual-protocol routers on the LAN, the second solution must be used. In the second solution, two designated routers are elected, one which is IP-capable and one which is OSI-capable. To do this, the IP-capable routers on the LAN exchange control packets with other IP-capable routers, and elect one as an IP-capable designated router, and similarly, the OSI-capable routers exchange control packets with other OSI-capable routers, and elect one as an OSI-capable designated router. (If there is a dual-protocol router on the LAN and the second solution is chosen, then the dual-protocol router may be elected as both pseudonodes.) The IP-capable and OSI-capable pseudonodes then exchange control packets with the other IP-capable or OSI-capable routers, respectively, and learn that portion of the LAN topology which is capable in their protocol. Next, the two pseudonodes generate two link state packets, one for an "IP pseudonode" and one for an "OSI pseudonode". The IP pseudonode link state packet lists only the IP-capable routers on the LAN, and the OSI pseudonode link state packet lists only the OSI-capable routers on the LAN. (If there is one or more dual-protocol router on the LAN and the second solution is chosen, then the dual-protocol router(s) will be listed in both pseudonode link state packets.)

When IP-only and OSI-only routers occur on the same LAN, the forwarding of user data packets on that LAN may also be more complicated.

As discussed above, when forwarding a user data packet on a LAN, typically the user data packet is sent to the second router on the path to its destination (i.e., the packet is sent to the router after the pseudonode). To allow OSI-only and IP-only routers on the same LAN, the following restrictions are added: (i) if the router doing the forwarding is dual-protocol, it first determines whether the user data packet is compatible with the second router—if not, it encapsulates the packet before forwarding it; (ii) if the router doing the forwarding is a single-protocol router, and there are two pseudonodes, then all routers that the single-protocol router is aware of (i.e., those listed in the appropriate pseudonode LSP) will be capable in the protocol of the single-protocol router, and the user data packet can be forwarded in the normal fashion; however (iii) if the router doing the forwarding is a single-protocol router, and there is only one pseudonode, then it is possible that the second router (i.e., the router after the pseudonode) may be a single-protocol router supporting the wrong protocol suite. Therefore, in this case the single-protocol router forwards the user data packet to a dual-protocol router on the LAN (perhaps to the designated router, which must be dual), rather than to the second router. The dual-protocol router can then encapsulate the packet if required.

A third complication with the FIG. 3 embodiment is that encapsulation is more complex. Note that, in the topology of FIG. 3, user data packets may need to be encapsulated to traverse the single-protocol routers within the areas; therefore, all of the dual-protocol routers must be "enhanced dual" routers. For example, consider an OSI user data packet which needs to traverse a path from OSI end system 155 connected to OSI-only router 154 to OSI end system 157 connected to OSI-only router 156. The user data packet (at minimum) must be encapsulated by dual-protocol router 162, so that it can traverse IP-only router 163. Also, the user data packet must be decapsulated by router 164 before it can be sent to router 166, however, it must remain encapsulated if it is to be sent through router 168 and then decapsulated at router 170.

In the above discussion of FIG. 2A, it was asserted that, to minimize the number of encapsulations and decapsulations, an encapsulated user data packet should be addressed so that it passes through as many routers as possible before it needs to be decapsulated, i.e., to the last router along the path that supports the encapsulating protocol. It was also noted that, in more complex architectures, the "last capable router along the path" will not always be the router to which the destination end system is connected. This is clear from the above example, as the "last capable router on the path" may be router 164 (if it is desirable to route through router 166), or it may be router 170 (if it is desirable to route through router 168).

The encapsulation header must be addressed to the "last capable router along the path" for the user data packet to be correctly decapsulated. To allow this, the above-referenced Dijkstra algorithm must be modified so that it not only indicates which neighboring router to forward the user data packet to, but (where necessary) also specifies which destination address needs to be used for the encapsulating header (i.e., which router is the "last capable router along the path").

A routing tree such as illustrated in FIG. 4B is generated by the Dijkstra algorithm of FIG. 4A. Referring to FIGS. 4A and 4B, to initialize the Dijkstra algorithm, the router generating the tree first creates 180 (FIG. 4A) a node 181 (FIG. 4B) representing itself at the root of the tree. Next, node 183 representing the neighbors of the router generating the tree are placed 182 below the root of the tree as "tentative". The relationship of

5,251,205

21                                                        22

node **181** to **183** is a parent-child relationship. In the following, the node further from the root node **181** may be referred to as the "child", and the node closer to the root node **181** may be referred to as the "parent".

When a node representing a router is placed on the tree tentatively, it indicates that one path through the network to the router has been located (namely, the path through the routers represented by the nodes between the tentative node and the root node **181**). As will be seen below, tentative nodes are made permanent once the Dijkstra algorithm verifies that the tentative path to the represented router is the best possible path. To perform this verification, the algorithm performs a loop, locating permanent paths to each router in the network, until paths to all routers have been determined. The routing tree in FIG. **4B** represents a tree in the midst of construction. The nodes in FIG. **4B** with a dark outline are permanent, whereas the nodes in FIG. **4B** with a light outline are tentative—nodes **187** have been added as tentative nodes, and node **189** has been made permanent.

In each pass of the Dijkstra loop, the "closest" tentative node to the root node **181** is located **184** and made permanent (the length, or "cost", of a path from the router represented by the root node to the router represented by another node is calculated using a suitable metric such as link delay times). The closest tentative node may be made permanent because the path from the root to the closest tentative node must be the best path to the router represented by the tentative node; any other possible paths to the represented router would have to pass through one of the other tentative nodes, and thus would by definition be "longer" paths (because links never have negative cost).

Once the closest tentative node is made permanent, the routers which neighbor the router represented by the newly permanent node are added **186** tentatively to the tree as children of the newly permanent node. However, if any of these neighboring routers is already represented by permanent node on the tree, then a tentative node representing the neighboring router is not added to the tree (because a better path to the neighboring router has already been found). Also, if any of the neighboring routers is already represented by a tentative node on the tree, then a comparison is made between the existing path to the neighboring router (i.e., the path represented by the existing tentative node) and the new path to the neighboring router. If the new path is "shorter" (in the sense discussed above) than the existing path, a new tentative node representing the new path is added to the tree, and the existing tentative node is removed. Otherwise, the existing tentative node is retained, and no new tentative node is added.

There is the possibility that two paths to the same router will be equal in "length" or very similar in length. In these cases, it is necessary and/or useful to implement a tie-breaking routine, which breaks such ties or near ties in a well-behaved manner. This can help to share network traffic loads between paths of equal or almost-equal cost.

Finally, **188**, the algorithm checks if there are any tentative nodes left (i.e., if there are any routers to which paths have been established, but to which best paths have yet to be determined). If not, the algorithm ends. Otherwise, the algorithm proceeds to step **184**, and makes another tentative node permanent.

Referring to FIG. **5A**, several fields of data may be contained in each of the node data structures of the tree

of FIG. **4B**. Fields **190** contain general information useful for performing the Dijkstra algorithm.

The name field **192** contains the name of the router which a node represents. The name of the router represented by a node is placed in the name field when the node is first created.

The first hop field **194** contains the name of the first router on the path from the router generating the routing tree to the router which the node represents. This field is used by the router generating the routing tree to determine where (i.e., to which of its neighboring routers) a user data packet should be forwarded. This information is generated as follows: when a node **183** representing a router which directly neighbors the router generating the routing tree (represented by node **181**) is added to the tree (step **182**, FIG. **4A**), the name of the neighboring router (i.e., the router represented by the node **183**) is placed in the name field **192** and in the first hop field **194** of the node **183**. Thereafter, when another tentative node is added to the tree (step **186**, FIG. **4A**) below a parent permanent node, the first hop field **194** in the new node is set to the value of the first hop field **194** in the parent node. In this way, the first hop values are established when the nodes **183** are added to the tree, and these values are maintain throughout the branches of the tree leading from the nodes **183**.

The status field **196** indicates whether the router represented by a node is in operation, and may also represent the level of operability of the router or its links. This information may be used to route user data packets around faulty routers, or to wait for a router to become operable before sending user data packets.

The cost field **198** indicates the total cost of the route from the router represented by the root node **181** to the router represented by the node. This information is used when comparing two tentative nodes to determine which is closer to the root node **181**. The cost information may be derived from one of many well known metrics. The cost is determined by adding the cost of the link from the parent node to a new child node to the cost of the parent node. The cost of the root node **181** is defined to be zero, or another predetermined value.

Fields **190** contain enough information to generate a routing tree from LSPs, and to forward user data packets along a path having the lowest cost according to the selected cost metric. However, as discussed above, the embodiment illustrated in FIG. **3** is complex because, if encapsulation is required, it is necessary for the Dijkstra algorithm also to specify which destination address needs to be used for the encapsulating header.

To this end, additional fields **200** are added to the node data structures. These fields contain information used in encapsulation, and are filled out as described below. Because single-protocol routers in FIG. **3** do not perform encapsulation, the single-protocol routers generate a routing tree having only the fields **190**. However, dual-protocol routers in FIG. **3** also generate fields **200**, because they perform encapsulation.

The encapsulation router (ER) field **202** indicates the name of the last router along the path to the router represented by the node which supports the encapsulating protocol. This is the router to which the encapsulating header should be addressed.

To clarify this idea, refer to the example of FIG. **3**, where an OSI user data packet was being sent from OSI end system **155** to OSI end system **157**. For the purpose of this example, assume that the lowest cost path passes from OSI-only router **154** through routers **162**, **163**, **159**,

5,251,205

23
24

158, 164, 166, 170, and 156. Then dual-protocol router 162 must encapsulate the user data packet in an IP header, and address the IP header to dual-protocol router 164, because dual-protocol router 164 is the last router along the path which supports the IP protocol.

Now assume that the lowest cost path passes from OSI-only 154 through routers 162, 163, 159, 158, 164, 168, 170, and 156. In this case, dual-protocol router 162 must still encapsulate the user data packet in an IP header, but the header must be addressed to dual-protocol router 170, because router 170 is now the last router along the path which supports the IP protocol.

Note that alternative encapsulation methods are possible: for example, user data packets can be encapsulated to the first dual-protocol router along the path to the use data packet's destination. In this case, router 162 would address the IP encapsulation header to dual-protocol router 164. However, if the lowest cost path passed through router 168, router 164 would remove the header, determine that the user data packet should be forwarded through router 168, and then add a new encapsulation header addressed to dual-protocol router 170, and finally forward the user data packet to router 168. This method involves an additional encapsulation and decapsulation, which is avoided by sending the encapsulated user data packet to the "last capable router along the path".

Note that the "last capable router along the path" may simply be the last router along the path. For example, consider a user data packet being sent from OSI end system 155 to OSI end system 169. In this case, when dual-protocol router 162 encapsulates the user data packet in an IP header, the last capable router along the path will be dual-protocol router 164. Therefore, the encapsulation header should be addressed to dual-protocol router 164.

Furthermore, note that a dual-protocol router may not always need to encapsulate a user data packet. For example, consider an OSI user data packet being forwarded from OSI end system 155 to OSI end system 172. In this case, when the user data packet arrives at dual-protocol router 162, there is no need for encapsulation, and it can be simply forwarded in OSI format to router 167. Therefore, for some destination routers, there is no "last capable router along the path", simply because every router along the path is capable.

A value of "?" in the ER field indicates that the value for the "last capable router along the path" is not needed. This may be because, even though encapsulation is required, the last router along the path is the last capable router (as in the embodiment of FIG. 2A), or, alternatively, because encapsulation is not required.

Referring to FIG. 5A, as the routing tree is being generated, two flags are used to determine whether encapsulation is required, and which router "is the last capable router along the path". These flags are referred to as the IP flag 204 (which indicates whether the first router along the path is IP-capable) and the OSI flag 206 (which indicates whether the first router along the path is OSI-capable). These flags are used to determine the value of the ER field as the routing tree is built.

Referring to FIG. 5B, during step 182 of the Dijkstra algorithm, nodes for the routers neighboring the router generating the tree are added to the tree. For dual routers, this step involves updating the ER field and the OSI and IP flags. A loop is initialized 210 at the first neighbor, and for each neighbor, the loop analyzes 212 if the neighbor is already tentative. If there is not an existing tentative node for the neighbor, then a new tentative is added 218 to the tree. If there is a tentative node for the neighbor, then the cost of the known path to the neighbor (as represented by the tentative node) is compared 214 to the cost of the new path to the neighbor. If the new path is shorter, the existing tentative is deleted 216, and a new tentative is added 218 to the tree. If the new path is longer, then the new path is ignored by skipping to step 228. A tie-breaking mechanism is used to choose between paths having equal or near equal cost. (See the discussion of FIG. 5C below for a review of the considerations involved in tiebreakers).

When a node for the new neighbor is added 218 to the tree, the ER field for the new node is set to "?". This is because all of the nodes added to the routing tree in FIG. 5B are the immediate neighbors of the router generating the tree. For these nodes, the ER field will always be set to "?" because immediate neighbors are the only routers along the path to themselves, and thus must be the "last capable router along the path". That is, there is never a need to encapsulate user data packets which are destined to an immediately neighboring router, because the end system to which the user data packet is direct must be capable in the user data packet's protocol, and the neighbor must be capable in the protocol of the end system because the end system is connected to it.

After the ER field is set to "?", the IP and OSI flags are set for future use. If 220 the neighbor supports OSI, the OSI flag is set 221, otherwise the OSI flag is cleared 222. If 224 the neighbor supports IP, the IP flag is set 225, otherwise the IP flag is cleared 226.

After the node is created and the ER field and IP flag are initialized (or after it is determined in step 214 that a known path to the neighbor is shorter than the new path to the neighbor), the algorithm of FIG. 5B checks 228 whether there are additional neighbors that may be added to the tree. If not, the algorithm ends 229, otherwise, the algorithm moves 230 to the next neighbor and returns to step 212.

During each loop of the Dijkstra algorithm, the neighbors of a newly permanent node are added as tentative nodes below the newly permanent node (step 186, FIG. 4A). In the dual-protocol routers of FIG. 3, step 186 also involves manipulating the ER field and the IP flag.

Referring to FIG. 5C, an algorithm for adding new tentative nodes forms a loop similar to that of FIG. 5B. The loop is initialized 240 at the first neighbor. For each neighbor, the loop checks 242 if the neighbor is already permanent on the routing tree. If the neighbor is already permanent on the routing tree, then the shortest path to the neighbor has already been located, and the new path is ignored by skipping to step 264. (Note that the algorithm of FIG. 5B does not check if nodes are already permanent because none could be permanent at that point in the Dijkstra algorithm).

However, if the neighbor is not already permanent, the loop checks 244 if a tentative node for the neighbor already exists. As in FIG. 5B, if no tentative node for the neighbor exists, a new tentative node for the neighbor is added 250. If a tentative node for the neighbor already exists, the loop checks 246 if the new path to the neighbor has a lower cost than the known path to the neighbor. If the known path is shorter, then the new path is ignored by skipping to step 264. Otherwise, the existing tentative is removed 248, and a new tentative is added 250.

5,251,205

25

A tiebreaking mechanism is used in step 246 to choose between paths of equal or near equal cost. However, this tiebreaking mechanism must be carefully selected, to avoid the possibility that routers between the source of an encapsulated user data packet and the destination of the user data packet disagree over the outcome of the tiebreak, and thus route the user data packet in a manner not anticipated by the encapsulating router. If a disagreement occurs, user data packets may accumulate more than one encapsulation header on the way to their destination.

For example, referring to FIG. 3, consider an OSI user data packet that is to be transmitted from OSI-only router 155 to OSI-only router 157. The user data packet is forwarded unencapsulated to dual-protocol router 162, at which point it must be encapsulated to travel through IP-only router 163. There are two paths from IP-only router 163 to dual-protocol router 164. The first path travels through IP-only routers 159 and 158, and the second path through dual-protocol router 174 and OSI-only router 160. Assume that these paths are very close in cost, and that dual-protocol router 162 has performed a tiebreaker to determine that the path through IP-only routers 158 and 159 should be used.

As a result, dual-protocol router 162 generates an IP encapsulation header addressed to dual-protocol router (assume that the shortest path to OSI end system 157 passes through IP-only router 168, and thus dual-protocol router 170 is the last IP-capable router on the path to router 156). This IP header is prepended to the OSI user data packet, and the user data packet is forwarded to IP-only router 163.

On receipt of the IP user data packet addressed to router 170 (i.e., the encapsulated OSI user data packet), IP-only router 163 consults its routing tree. Assume that IP-only router 163 has also performed a tiebreaker to determine which path to use to forward user data packets toward dual-protocol router 164. However, IP-only router 163 has decided that the path through dual-protocol router 174 and OSI-only router 160 should be used. Therefore, on receipt of the IP user data packet addressed to router 170, IP-only router 163 forwards the user data packet to dual-protocol router 174.

Dual-protocol router 174, on receipt of the IP user data packet addressed to router 170, also consults its routing tree. Its routing tree indicates that the best path to router 170 is through OSI-only router 160, dual-protocol router 164, and IP-only router 168. Therefore, not realizing that the received IP user data packet is in fact an encapsulated OSI user data packet, dual-protocol router places an OSI encapsulation header on top of the IP encapsulation header already present on the user data packet. This second encapsulation header is addressed to router 164 because router 164 is the last OSI capable router along the path to router 170. The doubly-encapsulated user data packet is then forwarded to router 160.

OSI-only router 160 then forwards the doubly-encapsulated user data packet to dual-protocol router 164. Dual-protocol router 164, recognizing the user data packet as addressed to its dummy encapsulation address, removes the outer OSI header, and analyzes the inner encapsulation header, which is addressed to router 170. Dual-protocol router 164 then consults its routing tree, and determines that the best route to dual-protocol router 170 is through IP-only router 168. As the user data packet is already formatted in IP, it is forwarded without encapsulation to router 1 68. Router

26

168 then forwards the user data packet to router 170, which removes the IP encapsulation header and forwards the OSI user data packet to router 156 and from there to OSI end system 157.

The difficulty with the above scenario is that the OSI user data packet accumulated two encapsulation headers in the course of its transmission. This increases the overhead at the dual-protocol routers, and also increases the load on the links because the user data packet size is larger. The extra headers were caused by the fact that two of the routers in the network (in particular, routers 162 and 163) disagreed on how to break a tie between equal cost paths. Thus, to prevent extra headers, the tiebreaking algorithm must be consistent, i.e., all of the routers in the network must agree on which path wins a tie. (See the discussion of FIG. 6 below for a description of other ways that tiebreak algorithms that are not consistent can also be used.)

One consistent tiebreaking mechanism breaks ties based on the names of the routers involved in the paths. For example, consider the case where two paths through the network join at router A, and the two paths have equal (or near equal) cost. On the first path, the router just before router A is router B, and on the second path, the router just before router A is router C. This tie is broken by comparing the names of routers B and C, for example, the tie can be broken in favor of the path passing through router B because B is alphabetically prior to C. (Router names may be interpreted as multi-bit characters or as binary strings; in either case the names are unique and can be used to break ties.)

In the algorithm of FIG. 5C, when two paths join, one of the paths is chosen at step 246. For example, consider the following sequence of events: first, a node representing router C is made permanent on the routing tree, and a node representing router A is then added as a tentative node below the node representing router C. Later, a node representing router B is made permanent on the routing tree, and the algorithm of FIG. 5C attempts to add a node representing router A below the node representing router B. The algorithm would then notice (at step 244) that there is already a tentative node for router A, and would compare (at step 246) the cost of the known path to the existing tentative (i.e., the path through C) to the cost of the new path (i.e., the path through B). Noting that these paths are equal (or nearly equal), the algorithm then breaks the tie by comparing the names of two parents. Because the parent of the existing tentative is router C, whereas the parent of the new tentative would be router B, the algorithm breaks the tie in favor of the new path, and continues to step 248.

Note that all of the routers in the network will break ties in the same way if the above mechanism is used, and therefore, assuming that the LSPs are reliably propagated to all routers, all of the routing trees will be consistent. Also, note that this mechanism cannot be used in FIG. 5B because, in FIG. 5B, all of the routers added directly neighbor the router generating the routing tree, and thus the "parents" of the two tentative nodes are the same. However, the tiebreaking mechanism used in FIG. 5B may be selected at will (for example, it may be random) because there are no routers between the source and destination that could disagree over the outcome of the FIG. 5B tiebreakers.

Returning to FIG. 5C, when a new tentative node is added 250, the ER field, IP and OSI flags are initialized to their values in the parent of the new tentative node.

5,251,205

27

This is done so later comparisons can determine whether the "last capable router along the path" has been located. First, the loop checks 252 if the ER field is set to "?". If not, then the "last capable router along the path" has already been located, and there is no need for further analysis, so the loop skips to step 262. However, if the ER field is set to "?", then the loop analyzes if the "last capable router along the path" has now been located.

To determine if the "last capable router along the path" has been located, the loop first checks 254 if the IP flag is set. If the IP flag is set and the ER field is "?", it indicates that all of the routers along the path from the router generating the tree to the router which is currently being added to the tree are IP-capable routers. This continuous chain of IP-capable routers will be broken only if the router currently being added to the tree is not IP-capable. Therefore, if the IP flag is set, the loop checks 256 if the neighbor currently being added to the tree is IP-capable—if it is, then the chain of IP-capable routers remains unbroken, and the loop skips to step 262. However, if the router currently being added to the tree does not support IP, the chain of IP-capable routers has been broken, and the "last capable router along the path" is the parent of the new tentative node (i.e., the node most recently made permanent in step 184, FIG. 4A). Therefore, the ER field is set 258 to the name of the parent of the new tentative node.

Similarly, if the IP flag is cleared, then the OSI flag must be set (because the IP flag will only be cleared if the first router along the path was OSI-only). If the IP flag is cleared and the ER field is "?", it indicates that all of the routers along the path from the router generating the tree to the router which is currently being added to the tree are OSI-capable routers. This continuous chain of OSI-capable routers will be broken only if the router currently being added to the tree is not OSI-capable. Therefore, if the IP flag is cleared, the loop checks 260 if the neighbor currently being added to the tree is OSI-capable—if it is, then the chain of OSI-capable routers remains unbroken, and the loop skips to step 262. However, if the router currently being added to the tree does not support OSI, the chain of OSI-capable routers has been broken, and the "last capable router along the path" is the parent of the new tentative node (i.e., the node most recently made permanent in step 184, FIG. 4A). Therefore, the ER field is set 258 to the name of the parent of the new tentative node.

Note that, if the first router along the path is a dual-protocol router, no encapsulation is necessary, so both the OSI and IP flags will be set. However, the above algorithm will treat this case as if the first router along the path were IP-only; i.e., the algorithm will set the ER field to the last IP-capable router on the path. However, as encapsulation will not be done, this value will never be used, and it is merely an artifact of the algorithm's implementation. Alternative algorithms could avoid determining a value for ER when the first router on the path is dual-protocol. For example, a "dual" flag, indicating whether the first router on the path was dual-protocol, could be added to the node data structure—this flag could then be checked before any other tests were made, and the tests skipped if the flag is set. The same function could be achieved without storing an additional flag by simply checking if both the IP and OSI flags are set, and skipping the rest of the operations if they are. However, these alternative algorithms in-

28

volve data storage and true/false comparisons not required by the algorithm presented.

After the ER field is modified as appropriate, a new tentative node for the neighbor is added 262 to the routing tree. Then (or after it is determined in either steps 242 or 246 that a better path to the neighbor is already known) the algorithm checks 264 whether there are additional neighbors that may be added to the tree. If not, the algorithm ends 265, otherwise, the algorithm moves 266 to the next neighbor and returns to step 242.

The above algorithms are used by the dual-protocol routers of FIG. 3 to generate their routing trees. The single protocol routers of FIG. 3 do not encapsulate user data packets, and thus do not include the fields 200 (FIG. 5A) in their routing tree, and do not perform the more complex algorithms of FIGS. 5B and 5C to form their routing trees.

The single-protocol routers of FIG. 3 receive and forward user data packets in accordance with the algorithms of FIG. 1B and 1C. The dual-protocol routers of FIG. 3 receive user data packets in accordance with the algorithm of FIG. 2B, and forward user data packets (step 126, FIG. 2B) in accordance with the algorithm of FIG. 6.

Referring to FIG. 6, when a user data packet is to be forwarded from a dual-protocol router, the router first determines 270 if the user data packet is OSI. If the user data packet is OSI, the OSI flag of the node in the routing tree which represents router A is checked 272. If the user data packet is not OSI, the IP flag of the node in the routing tree which represents router A is checked 274. If the respective flag is set at step 272 or step 274, then the first router along the path to router A is capable in the protocol of the user data packet, and that the user data packet is forwarded unencapsulated at step 276.

However, if the respective flag is not set at step 272 or 274, then the first router along the path to router A is not capable in the protocol of the user data packet. Therefore the user data packet must be encapsulated.

If the user data packet is OSI and router A's OSI flag is not set, then the algorithm checks 278 if router A's ER is set to "?". If ER is "?", then there is no encapsulation router (as discussed above), and the user data packet can be encapsulated directly to router A. Therefore, if ER is "?" an IP encapsulation header addressed to router A is generated 280. Otherwise, an IP encapsulation header addressed to the encapsulation router is generated 282.

Similarly, if the user data packet is IP and router A's IP flag is not set, then the algorithm checks 284 if router A's ER is set to "?". If ER is "?", then there is no encapsulation router (as discussed above), and the user data packet can be encapsulated directly to router A. Therefore, if ER is "?" an OSI encapsulation header addressed to router A is generated 280. Otherwise, an OSI encapsulation header addressed to the encapsulation router is generated 282.

After the encapsulation header is generated, the user data packet is encapsulated 290 in the header, and the encapsulated user data packet is forwarded on the next link to router A.

As described above, if an inconsistent tiebreaking mechanism (such as a random mechanism) is used in generating the network's routing trees, there is the possibility that user data packets gain multiple encapsulation headers as they are forwarded through the network.

5,251,205

29 30

One way to avoid this situation is to modify the forwarding algorithm of FIG. 6 so that, before user data packets are encapsulated, the algorithm checks whether the user data packet is already encapsulated. If there is already an encapsulation header on the user data packet, and the encapsulation header is incompatible with the next router's protocol, the user data packet can be made compatible by simply removing the previous encapsulating header, instead of adding a second header. In this way, multiple encapsulations can be avoided even where inconsistent tiebreaking mechanisms are used.

For this scheme to be feasible, there must be a mechanism for marking user data packets so that they can be recognized as encapsulated user data packets.

One way this can be done is to check if the user data packet is addressed to a "dummy address". (The dummy address appears in a predetermined position of the LSPs, and thus can be distinguished from real addresses.)

Another way this can be done is by marking all encapsulated user data packets so they may be immediately recognized as such. User data packets can be marked in several ways, depending on the encapsulating protocol. OSI user data packets can be marked by reserving one of the possible values of the 8473 select field ("SEL"). When the SEL field is set to this reserved value, it is an indication that the OSI header is encapsulating another user data packet. TCP/IP user data packets can be marked by reserving one of the possible values of the IP "User Protocol" field, which appears in an IP user data packet header. Again, when the User Protocol field is set to this reserved value, it is an indication that the IP header is encapsulating another user data packet.

The routing trees in the network may disagree even if a consistent tiebreaking algorithm is used. For example, the network topology (particularly the location or cost of links) may change, and while the changes are being propagated (via new LSPs) to all of the routers in the network, the routing trees of the various routers will be inconsistent. As a result, user data packets may temporarily follow loops in the network, and may accumulate extra encapsulation headers. Temporary packet looping is a well-known side effect of topological changes, and will occur regardless of whether the network uses dual protocols. However, the accumulation of extra encapsulation headers is an effect peculiar to dual-protocol networks, and can be avoided by the modification of the FIG. 6 algorithm described above.

The above embodiments, which support two protocols, may be enhanced to support three or more protocols. Because of their topological restrictions and resulting simplicity, it is most straightforward to add a third protocol (which will be referred to as "P3") to the per-area embodiments of FIGS. 1A and 2A. However, it is more complex to add a third protocol to the less restricted embodiment of FIG. 3.

To adapt the FIG. 1A embodiment for a third protocol, areas routing in the third protocol may simply be added to the network, and the Level-2 backbone reconfigured to support all three protocols (if routing in the third protocol is not allowed outside of the local areas, this latter step is not necessary). Note that, with three protocols, there are four possible types of multiprotocol routers: OSI-IP dual-protocol routers, OSI-P3 dual-protocol routers, IP-P3 dual-protocol routers, and OSI-IP-P3 triple-protocol routers. However, as in the two protocol embodiment illustrated in FIG. 1A, all

routers in a given area must have the same capabilities—thus an area having an OSI-P3 dual-protocol router cannot also have an IP-P3 dual-protocol router, because their capabilities are not the same, even though both are dual-protocol.

Subject to the above, a third protocol may be easily added to the FIG. 1A architecture. Encapsulation is not required, for the same reasons as set forth in the discussion of FIG. 1A, and thus all of the multi-protocol routers are "simple". The algorithms described by the flow charts of FIGS. 1B and 1C are implemented by each of the routers in the network to receive and forward user data packets.

The embodiment illustrated in FIG. 2A may also be adapted for a third protocol. In FIG. 2A, all routers in a local area must be capable in at least one common protocol. Thus, the FIG. 2A network may be adapted for a third protocol by adding IP-P3 dual-protocol routers to the existing IP areas (e.g., area 139), by adding OSI-P3 dual-protocol routers to the existing OSI areas (e.g., area and/or by adding new P3 areas, which may have P3-only routers and/or any other P3-capable routers. In either embodiment, the Level-2 backbone may support all three protocols, or may support only one or two of the protocols if the unsupported protocols is not allowed outside of the local areas. Furthermore, the Level-2 backbone may be a mixture of triple-protocol, dual-protocol and single-protocol routers, as long as the Level-2 routers can correctly receive user data packets from their local areas and forward them appropriately. Furthermore, as encapsulation is required in the FIG. 2A architecture, all multi-protocol routers are "enhanced".

In a three protocol embodiment of the FIG. 2A network, the single-protocol routers use the routing and forwarding algorithms of FIGS. 1B and 1C, and the multi-protocol routers (e.g., IP-OSI, IP-P3, OSI-P3, and IP-OSI-P3 routers) use the receiving and forwarding algorithms of FIGS. 2B and 2C. If the network has P3 areas (i.e., areas where all routers must support P3), then step 134 of FIG. 2C is modified to check if the area is a P3 area; subsequent additional steps check if the user data packet is a P3 user data packet (by operations analogous to those of steps 136 and 142) and, if not, encapsulate the user data packet in a P3 header (by operations analogous to those of steps 138 and 144).

The topological restrictions of the above three protocol embodiments simplify the receiving and forwarding algorithms. However, they also make the network less flexible. Therefore, in another embodiment, a three protocol network is formed with fewer topological restrictions. The legend of FIG. 7A illustrates the icons used to represent routers in these three protocol networks. Triangles are used to represent P3 routers and end systems. The icons for the 7 different router types are illustrated in the legend, namely: IP-only, OSI-only, P3-only, IP-OSI dual-protocol, P3-OSI dual-protocol, P3-IP dual-protocol, and P3-IP-OSI all-protocol.

In the embodiment illustrated in FIG. 3, routing was performed in a two protocol network having no topological restrictions (with the exception that two incompatible single-protocol routers could not be connected together, a restriction which applies to every multiprotocol network, and is enforced by implementing one of the link initialization processes as described above). However, the algorithms used to route in FIG. 3 do not support routing in three protocol networks. The reasons

EXHIBIT 1B

5,251,205

31

are for this are clarified in the discussion of FIG. 7A below.

The embodiment of FIG. 7A is a three protocol network having no topological restrictions. Each router has a common protocol with its neighboring routers, and thus the links between the routers initialize. Routing in this network is quite complex.

Consider an IP user data packet which is to be routed from IP end system 300 to IP end system 302 via the network of routers 304, 306, and 308. The IP user data packet is first forwarded from end system 300 to router 304. Router 304 must then forward the user data packet to router 306. However, router 306 is not IP-capable. The only protocol supported by both routers 304 and 306 is P3, therefore, the user data packet must be encapsulated in a P3 header before it is forwarded to router 306.

The P3 encapsulation header must be addressed to a P3 address. However, only P3-capable routers, i.e., routers 304 and 306, have P3 addresses. Thus, the P3 encapsulation header must be addressed to either router 304 or router 306. Clearly, the header should not be addressed to router 304, as router 306 would then simply return the user data packet to router 304, and no progress will be made. The only other choice is to address the header to router 306.

Therefore, the P3 header is addressed to router 306, and the user data packet is forwarded to router 306. However, on receiving the encapsulated user data packet, router 306 has no information on how to forward the user data packet. When router 306 receives the user data packet, router 306 recognizes it as an encapsulated user data packet, because it is addressed to the dummy P3 address advertised by router 306. Therefore, router 306 removes the user data packet's header and attempts to interpret its contents. However, because router 306 does not support IP, it cannot interpret the encapsulated contents (i.e., the IP user data packet), and therefore has no idea how to forward them.

One possible solution to the above problem is to program all routers so that, if a user data packet is decapsulated and the contents are found to be unintelligible, the contents of are blindly forwarded on one of the links connected to the router, preferably on a link other than the one on which the user data packet was received. If router 306 used such a strategy, it would choose at random between the link to router 308, the link to router 310, and the link to router 312, and forward the contents. Using such a strategy, in the architecture of FIG. 7A, there is a 67% probability that the user data packet will arrive at the IP end system 302, because there is a 33% chance that it will be forwarded to router 308, which can deliver it to end system 302, and there is a 33% chance that it will be forwarded to router 312, which is IP-capable, and can interpret the user data packet and to forward it to router 308. However, there also is a 33% probability that the user data packet would be lost, because if the user data packet is forwarded to OSI-only router 310, it will not be recognized, and will be simply discarded.

Note that, depending on the information available from the common LSP format, router 306 may be able to determine that routers 308 and 312 support protocols not supported by router 306 (and conversely know that router 310 does not support any other protocols). Router 306 can make use of this type of information by choosing to send the unknown encapsulated user data packet to either router 308 or 312, and not to router 312.

32

The logic for this is as follows: routers 308 and 310 at least understand a protocol not understood by router 306, therefore, they have a chance of understanding a user data packet which is unintelligible to router 306. However, router 310 does not understand any protocols not understood by router 306, and thus does not have any chance of understanding the user data packet. Using this type of elimination process, the reliability of a three-protocol networks having no topological restrictions can approach 100%.

The above mechanism is less useful for four- or more protocol networks. In a three-protocol network, there is only one protocol not known by the dual-protocol routers from the perspective of the dual routers, if another router supports an "unknown" protocol, this unknown protocol must be the same protocol as that of an unintelligible user data packet. However, this reasoning only applies to four- or more protocol networks if all of the multi-protocol routers support all but one of the protocols. For example, in a four-protocol network, a user data packet that is unintelligible to a triple-protocol router must be in the one protocol not supported by the triple-protocol router. However, a user data packet that is unintelligible to a dual-protocol router may be in one of two protocols.

Another mechanism for dealing with the user data packet forwarding problems of FIG. 7A is to program all routers so that, if a user data packet is decapsulated and its contents are unintelligible, the contents are blindly forwarded on all of the links connected to the router (except the link on which the user data packet was received). Using this strategy, there is a 100% probability that the user data packet will arrive at its destination. However, there is also a probability that the user data packet will arrive more than once. For example, if the IP user data packet was sent to router 308 and router 312, both would be able to interpret its contents, and both copies would eventually be forwarded to end system 302. Such multiplicity of user data packets is likely to be undesirable.

To avoid the above difficulties, the embodiment of FIG. 7B establishes one topological restriction: there must be at least one all-protocol router in each area. When a user data packet needs to be encapsulated, it is addressed to one of the all-protocol routers in the area (the all-protocol router has an address in all of the protocols).

On receipt of an encapsulated user data packet, the all-protocol router removes the encapsulation header(s) from the user data packet, and determines which encapsulation headers should be added for the user data packet to arrive at its destination.

This procedure may best be explained by example. Consider an IP user data packet sent from IP end system 312 to IP end system 314. The user data packet is first forwarded from IP end system 312 to router 316. Router 316 uses its routing tree to determine that the user data packet should be forwarded to router 318. However, router 318 is not IP-capable. Therefore, router 316 encapsulates the user data packet in a P3 header (P3 being the common protocol between router 316 and router 318), addresses the header to all-protocol router 322, and forwards the encapsulated user data packet to router 318.

When it receives the user data packet, router 318 uses its routing tree to determine that the user data packet (which is addressed to the OSI address of all-protocol router 322) should be forwarded to router 320. How-

5,251,205

33                                                                34

ever, router 320 is not P3-capable. Therefore, router 318 encapsulates the user data packet in an OSI header (OSI being the common protocol between router 318 and router 320), addresses the header to all-protocol router 322, and forwards the encapsulated user data packet to router 320.

Similarly, when router 320 receives the user data packet, it uses its routing tree to determine that the user data packet (which is addressed to the OSI address of all-protocol router 322) should be forwarded to router 322. Router 322 is OSI-capable, therefore, router 320 forwards the user data packet to router 322.

When router 322 receives the user data packet, it first interprets the OSI header, and determines that it is addressed to the dummy OSI address of router 322, i.e., to itself. Therefore, it removes the OSI header, and interprets the contents (which is a P3 header). It then determines that this header is similarly addressed to the dummy P3 address of router 322. Therefore, it removes the P3 header, and interprets the contents (which is the original IP user data packet).

The original IP user data packet is addressed to end system 314. Router 322 reviews its recently-received link state packets, and determines that to reach end system 314, the user data packet should be forwarded to router 328. Next, router 322 reviews the path that the user data packet will follow to router 328, and determines that OSI and P3 encapsulation headers need to be added to the user data packet. Therefore, router 322 generates an OSI encapsulation header, addressed to router 328, and adds this to the user data packet. Next, router 322 generates a P3 encapsulation header, addressed to router 326, and adds this to the user data packet. The doubly encapsulated user data packet is then forwarded to router 324.

When it receives the user data packet, router 324 uses its routing tree to determine that the user data packet (which is addressed to the P3 address of router 326) should be forwarded to router 326. Router 326 is P3-capable, therefore, router 324 forwards the user data packet to router 326.

When router 326 receives the user data packet, it first interprets the P3 header, and determines that it is addressed to the dummy P3 address of router 326, i.e., itself. Therefore, it removes the P3 header, and interprets the contents (which is an OSI header). Router 326 then uses its routing tree to determine that the user data packet (which is addressed to the OSI address of router 328) should be forwarded to router 328. Router 328 is OSI-capable, therefore, router 326 forwards the user data packet to router 328.

When router 328 receives the user data packet, it first interprets the OSI header, and determines that it is addressed to the dummy OSI address of router 328, i.e., to itself. Therefore, it removes the OSI header, and interprets the contents (which is the original IP user data packet). Router 328 then determines that the IP user data packet is addressed to end system 314, which is attached to router 328. Therefore, router 328 delivers the user data packet to end system 314.

To implement the above strategy, the information stored by the routers is somewhat different than that stored by the routers of FIG. 3. In particular, referring to FIG. 8A, the additional fields 200 in the nodes of the routing trees in the dual-protocol routers are somewhat different from those of FIG. 4B. In particular, each node includes an OSI flag 330, an IP flag 332, and a P3 flag 334.

If the OSI flag 330 is set in a particular node, it indicates that there is an unbroken chain of OSI-capable routers between the router storing the routing tree and the router represented by the node. If the OSI flag is cleared, this is not the case. The IP flag 332 and P3 flag 334 indicate similar conditions relative to IP-capable and P3-capable routers.

These flags are set or cleared as appropriate as the routing tree is generated. In step 182 of FIG. 4A, the neighbors of the router forming the routing tree are placed below the root node. Referring to FIG. 8B, this operation is performed by a loop, which is initialized at the first neighbor (step 340) and sequences to each new neighbor (step 362) until all of the neighbors have been processed (step 360), at which point the loop terminates (step 364).

Each neighbor is checked to see if a tentative node for the neighbor already exists (step 342). If not, a new node is added by sequencing to step 348. If a tentative node already exists, then the cost of the existing path is compared to the new path (step 344). If the new path is shorter, the old tentative is deleted (step 346) and the new tentative is added by sequencing to step 348. If the new path is longer, the new path is ignored by sequencing to step 360.

As in FIG. 5B, any tiebreaking mechanism may be used in step 344, as all of the nodes added in FIG. 8B represent routers which are the immediate neighbors of the router that is generating the routing tree.

Three tests are made in the main portion of the loop of FIG. 8B. First, if (step 348) the new neighbor supports OSI, the OSI flag in the neighbor's node is set (step 350), otherwise it is cleared (step 349). Second, if (step 352) the new neighbor supports IP, the IP flag in the neighbor's node is set (step 354), otherwise it is cleared (step 353). Third, if (step 356) the new neighbor supports P3, the P3 flag in the neighbor's node is set (step 358), otherwise it is cleared (step 357).

Thus, each neighbor of the router generating the routing tree is added to the routing tree with an indication of the protocols it supports.

Referring to FIG. 5C, as additional neighbors are added to the routing tree in step 186 of FIG. 5C, the OSI, IP, and P3 flags are updated. The operations of step 186 form a loop, which is initialized at the first neighbor (step 370) and sequences to each new neighbor (step 406) until all of the neighbors have been processed (step 402), at which point the loop terminates (step 404).

For each neighbor, the algorithm determines whether a permanent node for the neighbor already exists in the routing tree (step 372); if so, the neighbor is skipped by sequencing to step 402. Otherwise, the algorithm determines whether a tentative node for the neighbor already exists (step 374). If not, a new node is added by sequencing to step 380. If a tentative node already exists, then the cost of the existing path is compared to the new path (step 376). If the new path is shorter, the old tentative is deleted (step 378) and the new tentative is added by sequencing to step 380. If the new path is longer, the new path is ignored by sequencing to step 402.

As in FIG. 5C, a consistent tiebreaking mechanism must be used in step 376.

The flags in the new node for the neighbor are initially set to the values in the node's parent (step 380). However, the values of the flags are adjusted by three tests. In the first test, the algorithm checks if the OSI flag is set (step 382). If the OSI flag is set, it indicates that all of the routers on the path from the router gener-

5,251,205

35                                                                                                    36

ating the tree to the new neighbor are OSI-capable. In this case, the algorithm determines whether the chain of OSI-capable routers ends at the new neighbor, by determining whether the new neighbor supports OSI (step 384). If the new neighbor does not support OSI, the chain has broken, and the OSI flag is cleared (step 386). Otherwise, the chain remains intact, and the algorithm performs similar operations to determine the settings of the IP flag (steps 388, 390, 392) and the P3 flag (steps 394, 396, 398).

As a result of the operations described above, the OSI, IP, and P3 flags in each node of the routing tree indicate whether all of the routers leading to that node support OSI, IP, and P3, respectively. This information is used by the routers when forwarding user data packets, as illustrated in FIG. 9. (Note that algorithm of FIG. 9 includes tests which relate to all three of the protocols. However, routers which do not support one of the protocols will never forward user data packets in the unsupported protocol, and thus may eliminate the tests and results that relate to the protocol they do not support.)

When a user data packet is to be forwarded toward a router A (step 126, FIG. 2B), the dual-protocol routers of FIG. 7B first check the data packet type. If (step 408) the user data packet is OSI, the algorithm checks if the OSI flag of the node for router A is set (step 410). That is, it checks if all of the routers on the path to router A support OSI. If this is the case, the user data packet does not need to be encapsulated, and may be sent directly on the next link to router A (step 412). However, if the OSI flag is not set, it indicates that the user data packet will have to be encapsulated. Therefore, the algorithm proceeds to send the user data packet to an all-protocol router, by sequencing to step 424.

If the user data packet is not OSI, similar steps are performed to determine whether the user data packet is IP (step 414), and if so, whether (step 416) it is to be encapsulated, or sent directly (step 418). If the user data packet is not OSI or IP, the algorithm assumes that it is P3, and checks if (step 420) it is to be encapsulated, or sent directly (step 422).

As described above, user data packets that must be encapsulated are sent to an all-protocol router. To accomplish this, the user data packet is enclosed in an encapsulation header addressed to one of the all-protocol routers in the network. The encapsulation header must be included even if it is not necessary for protocol compatibility, because the encapsulation header effectively changes the address of the user data packet to that of the all-protocol router.

The protocol of the encapsulation header is chosen so that the encapsulated user data packet travels as far as possible before it needs to be encapsulated again. To accomplish this, the algorithm first retrieves the OSI, IP, and P3 flags of the desired all-protocol router (step 424). (In one embodiment, the closest all-protocol router is used; the closest all-protocol router may be located during the creation of the routing tree.)

If (step 426) the OSI flag of the desired all-protocol router is set (indicating that all of the routers on the path to the desired all-protocol router support OSI), an OSI encapsulation header is used (step 430). However, If the OSI flag is not set, then the IP flag is checked (step 430). If the IP flag is set (indicating that all of the routers on the path to the all-protocol router support IP), an IP encapsulation header is used (step 432). Finally, if (step 434) the P3 flag is set, a P3 encapsulation header is used (step 436).

If none of the flags of the node representing the desired all-protocol router are set, it indicates that no protocol is supported by all of the routers on the path to the all-protocol router. Thus, the user data packet will have to be encapsulated again before it arrives at the all-protocol router. To determine which protocol to use for the encapsulation header, the algorithm retrieves the OSI, IP, and P3 flags of the parent of the node representing the desired all-protocol router, i.e., the flags of the router which is one step closer along the path to the all-protocol router. If any of the flags of this node are set (steps 426, 430, 434), the user data packet is encapsulated in the appropriate protocol. If none of the flags are set, the algorithm steps to the next closer node (step 438). This process continues until a node with at least one flag set is located, at which point the encapsulation protocol is determined, and the user data packet is forwarded.

The data structure of FIG. 8A, and the algorithms of FIGS. 8B, 8C, and 9 are used by the dual-protocol routers of FIG. 7B in generating routing trees and forwarding user data packets. However, at least one all-protocol router in the local area must be capable of performing more complex operations. In particular, the all-protocol router must be capable of adding a sequence of encapsulation headers to a user data packet to allow the user data packet to travel to its destination. The enhancements of the above algorithms necessary to allow this functionality are described below.

In one embodiment, more than one all-protocol router perform the functions described below (i.e., receives user data packets from other routers and adds the appropriate encapsulation headers). In this embodiment, the dual-protocol routers forward user data packets to the nearest all-protocol router, as discussed above.

In another embodiment, some all-protocol routers may choose not to perform the functions described below; those all-protocol routers which do not perform the functions described below use the data structures and algorithms of FIGS. 8A through 9 to forward user data packets. In this embodiment, a notification mechanism (or an election, such as on a LAN) may be used to indicate which of the all-protocol routers are currently "on duty," i.e., providing the functions described below.

Referring to FIG. 10A, to provide additional functionality, the routing database of an "on duty" all-protocol router includes an additional field, and the OSI, IP, and P3 flags are used in a slightly different manner, as discussed below.

The additional field is the encapsulation string field (ES) 440, which stores a list of the protocols and router addresses to be used in encapsulation headers to be added to a user data packet before it is forwarded toward its destination. As illustrated by the above example, these headers are exactly those needed to allow the user data packet to reach its destination without further encapsulation. The algorithm described below attempts to locate the longest possible chains of routers which support one of the protocols, thereby minimizing the number of encapsulating headers to be added to the user data packet.

To obtain the encapsulation string, the algorithms which generate the routing tree are slightly modified. The modifications to the algorithm of FIG. 8B (i.e., the

5,251,205

37

algorithm of step 182, FIG. 4A, which places the neighbors of the router generating the tree (on the tree) are illustrated in FIG. 10B. The flow control of the main loop, and the initialization of the OSI, IP, and P3 flags is identical to that of FIG. 8B, and will not be described again. The only modification is that the ES field is initialized to a null value for each node (step 442).

The algorithm of FIG. 8C (i.e., the algorithm of step 186, FIG. 4A, which places the neighbors of a newly permanent node on the tree) is also slightly modified, as illustrated in FIG. 10C. The flow control of the main loop, and tests performed on the OSI, IP, and P3 flags, are identical to those of FIG. 8C, and will not be described again. However, there are several modifications to the actions performed within the loop.

First, when a node is added to the tree, the values of the flags and of the encapsulation string field are copied from the parent node (step 444).

Second, when the algorithm discovers a break in a continuous chain of routers supporting a given protocol, additional operations are performed. For example, in step 382, the algorithm checks if the OSI flag is set, i.e., if there has been a continuous chain of OSI-capable routers thus far. If this is the case, the algorithm then checks (step 384) if the chain has not been broken, i.e., if the new neighbor supports OSI. If the chain is broken, the OSI flag is cleared (step 446). However, unlike step 386 of FIG. 8C, the algorithm also indicates the identity of the protocol of the broken chain, by setting a variable EP (encapsulation protocol) to the value OSI. This variable is used later in the loop, as discussed below. Similar operations are performed for the other protocols in steps 388, 390, and 448, and steps 394, 396, and 450.

Thus, when the algorithm reaches step 452, the flags have been appropriately modified. At this point, the algorithm checks (step 452) if any of the flags remain set, i.e., if there are any protocols supported by all of the routers thus far. If so, the algorithm proceeds to step 400, adding the node for the new neighbor to the tree.

However, if all of the flags are cleared, then the algorithm sequences to step 454. When the algorithm reaches step 454, the end of a continuous chain of routers which support a given protocol has been reached. In fact, because all of the flags have been cleared, the end of the longest such chain has been reached. The last router in this chain was the router immediately prior to the router whose node is currently being added to the tree, i.e., the parent node on the tree. Furthermore, the protocol of the chain was the protocol of the last flag to be cleared, which is stored in the EP variable.

The goal of the FIG. 10C algorithm is to store in the encapsulation string the list of protocols and addresses which collectively represents the longest chain of routers which lead to the destination. Thus, once the end of such a chain is reached, the name of the last router in the chain, and the protocol of the chain, are stored in the encapsulation string. Therefore, in step 454, the value of the encapsulation protocol variable, and the name of the parent of the node currently being added, are added to the end of the encapsulation string.

At this point, the algorithm begins to search for a second such chain of routers. This is done by setting all of the flags, and returning to step 382. The algorithm then passes through steps 382 through 452 a second time for the same neighbor. When the algorithm reaches step 452 the second time, the flags for the protocols not supported by the new neighbor will be cleared—in this

38

way, the algorithm has re-initialized the flags to search for the next continuous chain of protocols.

The algorithm used by all-protocol routers to forward received user data packets is illustrated in FIG. 11. This operation primarily involves generating encapsulation headers having the protocols and addresses specified in the encapsulation string (step 478), and forwarding the thus encapsulated user data packet to the first router on the route to its destination (step 480).

However, before the headers from the encapsulation string are added, the algorithm determines if an innermost encapsulation header is required. To make this determination, the algorithm first determines if the user data packet is OSI (step 456) or IP (step 458); failing these tests, the user data packet is assumed to be P3.

If the user data packet is OSI, the OSI flag of the destination router is checked (step 468). As described above, the OSI flag of the destination router indicates whether all the routers after the last router specified in the encapsulation string support OSI. Therefore, if the user data packet is OSI, and the OSI flag is set, no encapsulation header is required, and the algorithm sequences directly to step 478.

Similarly, if the user data packet is IP, the IP flag of the destination router is checked (step 464). If the IP flag is set, no encapsulation is required, and the algorithm sequences directly to step 478. Also, if the user data packet is P3, the P3 flag of the destination router is checked (step 460). If the P3 flag is set, the algorithm sequences directly to step 478.

If the appropriate flag is not set in steps 460, 464, or 468, then an innermost encapsulation header is required. The protocol of this header may be OSI (in which case the algorithm sequences to step 472), IP (in which case the algorithm sequences to step 474), or P3 (in which case the algorithm sequences to step 476). To determine which header to use, the other flags are tested. For example, if the user data packet is OSI and the OSI flag is not set, the algorithm checks the IP flag (step 470). If the IP flag is set, then an IP header is used, otherwise, a P3 header is used. Similarly, if the user data packet is IP and the IP flag is not set, the algorithm checks the OSI flag (step 466). If the OSI flag is set, then an OSI header is used, otherwise, a P3 header is used. Finally, if the user data packet is P3 and the P3 flag is not set, the algorithm checks the OSI flag (step 462). If the OSI flag is set, then an OSI header is used, otherwise, an IP header is used.

Using the algorithms and data structures described in FIGS. 8A through 11, the dual-protocol routers can recognize the need for encapsulation, and forward user data packets that require encapsulation to an "on duty" all-protocol router; the "on duty" all-protocol router may then use the algorithms to correctly encapsulate user data packets so that they may be transmitted to their destinations.

It is important to note that, if the tiebreaking mechanism used by different routers is inconsistent, or if changes to LSPs are not propagated to all routers, routing loops may form. This effect also occurs in known networks under these conditions, but is more prevalent using the algorithms described above because user data packets to be encapsulated are always forwarded to the all-protocol router.

As an example, consider the case where the all-protocol router has placed a sequence of encapsulation headers on a user data packet to allow the user data packet to be forwarded along a particular path to its

5,251,205

destination. If one of the routers along the path disagrees on the path, then the user data packet may need to obtain an additional encapsulation header. In this case, the disagreeing router sends the user data packet back to the all-protocol router. The all-protocol router will then re-encapsulate the user data packet for the same path it previously encapsulated it for, and send it back toward the disagreeing router. In this way, the user data packet will loop to and from the all-protocol router and the disagreeing router, until the routers reach a consensus on the correct path, at which time the user data packet will reach its destination.

## DETAILED DESCRIPTION

The following describes in detail one method for configuring a single network to run in the OSI and TCP/IP protocol suites. In this proposal, IP-only, OSI-only, and dual-protocol routers exist and can be mixed within a single area.

## CONTROL PACKET FORMATS

As discussed above, where the invention is applied to routing in the TCP/IP and OSI protocols, the formats of the hello, LSP, and sequence number packets are normalized. In particular, the formats are substantially similar to the 10589 formats currently in use, but additional optional fields are added.

The approach described below does not change the way that OSI user data packets are handled. There are no changes to the contents or handling of ISO 8473 user data packets and error reports, nor to ISO 9542 Redirects, end system hello packets, and intermediate system hello packets. The approach described below does not change the way that OSI user data packets are handled. Specifically, there are no changes to the contents nor to the handling of ISO 8473 user data packets and error reports. Similarly, ISO 9542 Redirects and End System Hello packets are unchanged. ISO 9542 Intermediate System Hello packets do "double duty" and are used both for communication from routers to end systems, and for communications between routers on point-to-point links. The ISO 9542 Intermediate System Hello packets are modified by the addition of IP information in a way which OSI-only end systems will ignore. Other control packets (those associated with ISO 10589) remain unchanged except for the addition of IP information.

To allow easy parsing of the control packets, the optional fields are encoded in type-length-value (TLV) format. For example, the first octet indicates the type of the field, the second octet indicates the length of the field's value, and the third and following octets contain the value. The first two octets are read by a router before the contents of the field are interpreted. If the field type is recognized by the router, the contents of the fields are interpreted appropriately. However, if the field type is not recognized by a router, the entire field is ignored (by skipping the number of octets indicated in the length field). Regardless of whether the field was interpreted or ignored, if the control packet is forwarded to another router (as is the case with LSPs) it is passed on unchanged, i.e., including any ignored fields.

## Hello Packets

Three additional fields are added to the 10589 hello packet format:

A "Protocols Supported" field identifies the protocols which are supported by the router generating the

hello packet. This field must be included in all hello packets transmitted by IP-capable routers. If the field is omitted, it is assumed that the router transmitting the hello packet is OSI-only. The data protocols supported can be indicated by one-octet Network Layer Protocol Identifiers (NLPIDs) (as assigned by ISO/TR 9577).

An "IP Interface Address" field is included in all hello packets transmitted by IP-only and dual-protocol routers. This field contains the IP address of the interface on which the hello packet is transmitted. The address is formatted in four octets.

An "Authentication" field may be included to error-check the hello packet.

## Link State Packets

Six additional fields are added to the 10589 link state packet format. A "Protocols Supported" field identifies the protocols which are supported by the router generating the LSP. This field must be included in all LSPs transmitted by IP-capable routers. If the field is omitted, it is assumed that the router transmitting the link state packet is OSI-only. The data protocols supported can be indicated by one-octet NLPIDs (as assigned by ISO/TR 9577, available from BSi standards at the above address).

One or more "IP Interface Address" field are included in all LSPs transmitted by IP-only and dual-protocol routers. These fields contain a list of one or more of the IP addresses of the interfaces of the router which originates the LSP. The address is formatted in four octets.

An "IP Internal Reachability Information" field may be included in LSPs transmitted by IP-capable routers. If present, this field identifies a list of zero or more entries of the format [metrics, IP address, subnet mask] which identify addresses reachable by the router which originated the LSP. Each entry must contain a default metric, and may contain delay, expense, and error metrics. If an IP-capable router does not directly reach any IP addresses, then it may omit this field, or may include the field with zero entries. In Level-1 LSPs, this field includes only entries directly reachable (via one of its interfaces) by the router originating the LSP. If included in a Level-2 LSP, this field includes entries reachable by the router which originates the LSP either via one of its interfaces, or indirectly via Level-1 routing. The metrics are preferably formatted as six bit fields, with the most significant bits used to indicate whether the metric is supported by the originating router. The IP address and subnet mask are both formatted as four octets.

An "IP External Reachability Information" field may be included in Level-2 LSPs transmitted by Level-2 IP-capable routers. If present, this field identifies a list of zero or more entries of the format [IP address, subnet mask, metrics] which identify addresses reachable, via a direct link to an external router, by the router which originated the LSP. Each entry must contain a default metric, and may contain delay, expense, and error metrics. If a Level-2 router does not have any external routes (via neighboring routers in other routing domains), it may omit this field, or may include the field with zero entries. The metrics are preferably formatted as six bit fields, with the most significant bits used to indicate whether the metric is supported by the originating router. The IP address and subnet mask are both formatted as four octets.

5,251,205

**41**

External routes may make use of "internal" or "external" metrics. Internal metrics are comparable with the metrics used for internal routes. Thus in choosing between and internal route and an external route using internal metrics, the metric values may be directly compared. In contrast, external metrics cannot be directly compared with internal metrics. Any route defined solely using internal metrics is always preferred to any route defined using external metrics, but when an external route using external metrics must be used, the lowest values of the external metric is preferred regardless of the internal cost to reach the appropriate exit point. (To identify whether a metric is internal or external, an extra bit may be added to the fields described in the previous paragraph. In one embodiment, this bit may be placed in one of the reserved bit positions of TCP/IP metric fields.)

It is useful, in the operation of external routing protocols, to provide a mechanism for border routers (i.e., routers in the same routing domain, which have the ability to route externally to other domains) to determine each other's existence, and to exchange external information (in a form understood only by the border gateways themselves). This is made possible by inclusion of an "Inter-Domain routing protocol Information" field, which may be present in Level-2 LSPs transmitted by Level-2 IP-capable routers. This field is transmitted for the convenience of the external routing protocol, and is not used by internal protocols.

An "Authentication" field may be included to error-check the hello packet.

### Sequence Number packets

Sequence number packets (which list the names of the network's routers and the sequence numbers of the most recently received LSPs from those routers) are exchanged between routers to verify that all routers have the most recent version of the link state packets from the other routers.

An "Authentication" field may be included in these control packets for the purpose of error-checking.

### Distinguishing Protocols

Dual-protocol routers may receive a combination of OSI control and user data packets and IP control and user data packets. It is necessary for the dual-protocol routers to be able to clearly and unambiguously distinguish the two protocol suites. This fact is complicated by the fact that the two protocols were developed independently, with no explicit effort to have the two protocol suites use different protocol type fields, or to otherwise distinguish the two.

There are several different cases which need to be handled separately. The first case is on LANs, or over other underlying sub-networks and links which provide a link level demultiplexing function (such as Ethernet, FDDI, all 802.x sub-networks, and the IETF point-to-point protocol PPP). In these cases, the underlying demultiplexing function is used. OSI and IP packets are encapsulated in underlying subnet headers without any intervening demultiplexing protocol.

On HDLC lines there is no link layer demultiplexing function. Similarly, on X.25 virtual circuits, to mix both OSI and TCP/IP packets on the same virtual circuit, there is no way to demultiplex. Therefore, in these cases the network level demultiplexing is used. The network layer protocol ID field, which comprises the first octet of 8473 packets, is used to perform the demultiplexing.

**42**

OSI packets are encapsulated in link level packets without additional headers. IP packets are pre-appended with a single octet using a special value chosen from the ISO network protocol ID space, which indicates that the packet is IP. (When dual-protocol routers encapsulate IP user data packets in OSI user data packets, no additional IP demultiplexing field is necessary, as other mechanism are used to recognize encapsulated user data packets.)

### Other Issues

Several other issues relating to an implementation of a dual-protocol network are discussed below.

### Area Structure

A two level hierarchical approach is used to route OSI and IP traffic. Both protocols make use of a common area structure. Similarly, the amount of knowledge maintained by routers about specific IP destinations is as similar as possible to that for OSI. For example, IP-capable Level-1 routers are not expected to know the location of IP destinations outside of their area.

IP uses a very different addressing scheme from OSI. OSI addressing explicitly identifies the area. This makes it very easy for OSI Level-1 routers to identify user data packets going to destinations outside of their area, which need to be forwarded to Level-2 routers. However, IP addressing does not identify the area. For an IP Level-1 router to determine that given a particular IP destination address, a user data packet must be forwarded to a Level-2 router, the router must determine that the address is not reachable via any Level-1 router in its area.

Generally, the IP addresses that are reachable by a particular interface of an IP-capable router can be described by a single [IP address, subnet mask] pair. Here both the IP address and subnet mask are 32 bits long. Any addresses which match the specified address in the bits specified in the mask must be reachable directly via that interface, i.e., without going through other IP routers.

The OSI addressing scheme is used for OSI traffic, and the area structure is strongly linked to the OSI addresses, as in known OSI networks. In IP, there are several considerations. First, it is important to be flexible with the limited IP address space in order to cope with the anticipated growth of IP environments. Furthermore, dual-protocol routers may be installed in existing environments, which already have assigned IP and/or OSI addresses. Also, even if IP addresses are not already pre-assigned, the address limitations of IP will constrain what addresses may be assigned. Therefore, no specific relationship between IP addresses and the area structure is required.

As will be described below, greater efficiency and scaling of the routing algorithm can be achieved if there is some correspondence between the IP address assignment structure and the area structure.

To allow the area structure to be used for IP traffic, Level-2 routers include in their Level-2 LSPs a list of all [IP address, subnet mask] pairs reachable in their area. In general, this information may be determined from the Level-1 LSPs from all routers in the area.

Ignoring resource constraints, it would be permissible for a Level-2 router to simply duplicate all [IP address, subnet mask] entries from all Level-1 routers in its local area, for inclusion in its Level-2 LSP. However, in order for hierarchical routing to scale to large routing

5,251,205

**43**

domain sizes, it is highly desired to abbreviate the reachable address information.

This is accomplished by manual configuration of summary address entries. Each Level-2 router is configured with a set of [IP address, subnet mask] pairs for announcement in its Level-2 LSPs. In one embodiment, Level-2 routers are always required to announce these in Level-2 LSPs; alternatively, Level-2 routers may be allowed to leave out the summary addresses if there are no corresponding reachable Level-1 addresses in the area.

When the Level-2 LSP is generated, the set of reachable addresses for the Level-2 router's area (obtained from Level-1 LSPs from the area) is compared with the configured reachable addresses. Redundant information obtained from Level-1 LSPs is not included in Level-2 LSPs. Generally it is expected that the Level-2 configured information will include more inclusive addresses (corresponding to a subnet mask with less bits set to "1"). This will therefore allow one configured address-/subnet mask pair to hierarchically supersede the information corresponding to multiple entries in the Level-1 LSPs.

However, any addresses obtained from the Level-1 LSPs which is not superseded by the manually configured information are included in the Level-2 LSPs. In this case, the metric values announced in the Level-2 LSPs are calculated from the sum of the metric values announced in the corresponding Level-1 LSP, plus the distance from the Level-2 router to the appropriate Level-1 router. If this sum results in a metric value greater than the maximum value that can be reported in Level-2 LSPs, then the maximum value is reported.

In some cases, a configured internal reachable address may announce reachability to an address which does not correspond to any Level-1 reachable address information. This may be normal during startup, but if it persists it represents an error condition. This error can only be rectified by human intervention; network management must be aware of the possibility of this error condition and correct it if it occurs.

The reachable IP addresses obtained by a Level-2 router from Level-1 LSPs include addresses that it can reach directly via its own interfaces (i.e., those it would report in its own Level-1 LSPs). Similarly, addresses of Level-1 routers (determined from the IP Interface Address field in the corresponding Level-1 LSPs) also represent addresses which are reachable via Level-1 routing in the area, and therefore need to be announced as Reachable address entries in the Level-2 LSPs.

In general, the same [IP address, subnet mask]entry may be announced in the Level-1 LSPs sent by multiple Level-1 routers in the same area. In this case (assuming the entries are not superseded by a manually configured entry), then only one corresponding entry shall be included in the Level-2 LSP. The metric values announced in Level-2 LSPs correspond to the minimum of the metric value(s) that would be calculated for each of the Level-1 LSP entries.

There may be some IP addresses which match the manually configured summary address entries, but which are not reachable via Level-1 routing. If a Level-2 router receives an IP packet whose IP address matches a manually configured address which it is including in its Level-2 LSP, but which is not reachable via Level-1 routing in the area, then the packet must be discarded. In this case, an error report may be returned

**44**

with the reason for discard specifying destination unreachable.

An example of the above scheme follows:

Referring to FIG. 12, assume that the network number for the entire TCP/IP domain **490** is "17" (a class A network). Also, assume each area is assigned a subnet number consisting of the next 8 bits. Each LAN in an area is assigned a subnet number consisting of 16 bits, giving each a 24 bit subnet mask. Finally 8 bits are left for the host field.

Now assume that area **492** (having subnet number "17.133") has a number of IP capable Level-1 routers **493, 494, 495** announcing (in the special IP entry in their Level-1 LSPs) sub-nets "17.133.5" (for **494**), "17.133.43" (for **493**) and "17.133.57" (for **495**). In this example, in order to save space in its Level-2 LSPs, the Level-2 router **496** of area **492** would be configured to announce subnet 17.133. Only this one address needs to be announced in Level-2 LSPs. Thus any IP user data packet destined for an address in subnet "17.133.5", "17.133.43", or "17.133.57" will be passed to this area by the other Level-2 routers. The inclusion of "17.133" in Level-2 LSPs means that the four subnet addresses starting with "**17.133**" do not all have to be listed separately in Level-2 LSPs.

If there is any traffic for an unreachable address, for example the address "17.133.124.7", this traffic will also be routed to area **492**, because all Level-2 routers in domain **490** will incorrectly believe that area **492** can handle it. (This may happen if management makes a gross configuration error, or a system tries to send traffic to an address which doesn't exist.) Area **492** will have to discard this traffic.

However, suppose that subnet number "17.133.125" was actually reachable via some other area (for example, area **497**). In this case, the Level-2 router **498** in area **497** would be announcing (in its Level-2 LSPs -according to information taken from its received Level-1 LSPs), reachability to subnet "17.133.125". Due to the use of "best match" routing, this works correctly. All traffic from other areas destined to subnet "17.133.125" would be sent to Level-2 router **498**, and all other traffic to subnet "17.133" (i.e., traffic to any IP address starting with "17.133", but not starting with "17.133.125") would be sent to Level-2 router **496**.

### External Links

External links may be IP-only, or dual-protocol. In addition, in some cases it may be desirable to run encapsulated OSI over IP-only external links (because there may be a remote router which is ready to receive and decapsulate such OSI user data packets).

In general, which user data packets are sent in which manner over external links is highly dependent on both policy issues, and on the specific implementations in the remote external routers. It is therefore necessary to make use of considerable configuration information in controlling the use of such external links.

Encapsulated user data packets, if received at a Level-2 router to be forwarded outside of the domain, are first decapsulated. They are therefore treated just like unencapsulated IP user data packets which arrive at the same Level-2 router. If necessary, encapsulation of user data packets for transmission on links outside of the domain is independent of encapsulation of user data packets within the domain.

Currently there is no OSI standard for inter-domain routing. (However, it is expected that a protocol will be

5,251,205

**45**

defined.) At the present time, manual configuration is used. The link is statically configured with the set of address prefixes reachable via that link, and with the method by which they can be reached (such as the DTE address to be dialed to reach that address, or the fact that the DTE address should be extracted from the Initial Domain Part (IDP) of the ISO address). Therefore fixed (manually updated) tables are used for ISO inter-domain routing. This will be done only by Level-2 routers.

### External links

IP will be run over external IP links only by Level-2 routers. This will make use normal IP external connectivity functions, for example as explained in RFC 1009 "Requirements for Internet Gateways".

There will be circumstances where it is necessary to interconnect different OSI domains using TCP/IP links. Architecturally this will be modelled as a normal external OSI connectivity, which just happens to use IP as the underlying subnet service. Regular external OSI links are manually configured. Therefore the same approach is used for TCP/IP links. No dynamic routing protocol will be run for the OSI link, and the availability of the remote OSI router will be assumed unless manually changed.

In order to reach the remote OSI router, it is necessary to know the IP address of the decapsulating router (i.e., of the OSI router which will remove the IP header). For this external link, it will therefore be necessary to manually configure the fact that this particular external OSI link makes use of an underlying IP service, and the IP address of the remote OSI router.

Note that, given the IP address to which the (encapsulated OSI) user data packet is to be sent, the resulting IP user data packet is forwarded externally just like any other IP user data packet. Thus, it will make use of the external IP information obtained as explained above.

There may be circumstances where it is necessary to interconnect different IP domains using external OSI links. Architecturally this will be modelled as a normal external IP connectivity, which just happens to use OSI as the underlying subnet service.

External IP reachability is determined by using EGP, RIP, BGP, or some other protocol. The same approach is used here. Part of the manual configuration of how to get to the remote IP gateway will include the underlying subnet address of the remote IP gateway. Since this is done in this case by encapsulating the user data packet in 8473, this address will simply be the OSI address.

Note that, given the OSI address to which the (encapsulated IP) user data packet is to be sent, the resulting 8473 user data packet is forwarded externally just like any other 8473 user data packet. Thus, it will make use of the external OSI information obtained as explained above.

### TOS Routing

IP Type of Service (TOS) routing is provided through use of the Quality of Service (QOS) feature of 10589. Routing is done on the basis of throughput (the default metric), delay, expense, or residual error probability. Note that any particular user data packet may be routed on the basis of any one of these four metrics. Routing on the basis of general combinations of metrics is not supported.

The support for TOS is optional. If a particular user data packet calls for a specific TOS, and the correct

**46**

path from the source to the destination is made up of routers all of which support that particular TOS, then the user data packet will be routed on the optimal path. However, if there is no path from the source to destination made up of routers which support the desired service, then the user data packet is forwarded using the default metric instead. This allows for QOS service in those environments where it is needed, while still providing acceptable service in the case where an unsupported QOS is requested.

The IP TOS field is mapped into the four QOS metrics as follows. The first two ("precedence") bits are not used to choose the route. The value of the last three bits (respectively, the "low delay", "throughput", and "reliability" bits) used to choose routes by mapping the following values to the indicated QOS metrics:
100: The QOS delay metric is used.
010: The default (throughput) QOS metric is used.
001: The QOS reliability metric is used.

All other combinations: The default metric is used. Note: The IETF Router Requirements Working Group is considering assigning one of the unused bits in the TOS field in the IP header to correspond to minimum cost routing. In this case, the type of service for a packet with the minimum cost bit set to 1, and the other three TOS bits set to 0, will be mapped onto the cost metric of 10589.

### Order of Preference of Routes

In order to ensure correct interoperation of routers, it is necessary to clearly and unambiguously specify the order of preference of routes in the routing algorithm. In general, there are several ways in which this order may be specified. What is necessary is that all router implementations agree to use the same precise order. In the preferred embodiment, the following order is used:

Among routes in an area, if the specified destination address matches more than one [IP address, subnet mask] pair, then the more specific address (i.e., the one with more bits in the mask set to "1") is preferred.

Among routes in an area to equally specific address matches, routes on which the requested TOS (if any) is supported are always preferred to routes on which the requested TOS is not supported.

Among routes in the area of the same TOS to equally specific addresses, the shortest route is preferred. For determination of the shortest path, if a route on which the specified TOS is supported is available, then the specified TOS metric is used, otherwise the default metric is used. Among routes of equal cost, loadsplitting may be performed as specified in 10589.

If a given destination is reachable within an area, then the path within the area is preferred to the path outside of the area (via Level-2 routing). If a given destination is not reachable, then the user data packet is routed to a Level-2 router using the following criteria.

Among routes to Level-2 routers, routes on which the requested TOS (if any) is supported are preferred to routes on which the requested TOS is not supported.

Among routes to Level-2 routers having the same TOS, the shortest routes are preferred. For determination of the shortest path, if a route on which the specified TOS is supported is available, then the specified TOS metric is used; otherwise, the default metric is used. Among routes of equal cost, loadsplitting may be performed as specified in 10589.

5,251,205

47

48

In Level-2 routers, routes via Level-1 routing are always preferred to routes via Level-2 routing. Level-2 routes are chosen under the following criteria.

Routes using internal metrics are always preferred to routes using external metrics.

Among internal routes, the route with the most specific [IP address, subnet mask] pair is preferred. Among routes with equally specific address matches, routes on which the requested TOS (if any) are preferred. Among routes of the same TOS to equally specific addresses, the shortest route is preferred. The determination of the shortest path uses the requested TOS first (as described above), with loadsplitting among equal cost routes in accordance with 10589. (Note that internal routes and external routes are treated identically for the purposes of the Dijkstra calculation).

Among external routes, the route with the most specific matching [IP address, subnet mask] pair is preferred. (Note that, for external routes, the subnet mask will normally correspond precisely to the network number. This implies that there will always be equal length matching strings. However, this test is included to allow future, more general handling of external addresses.) Among routes with equally specific address matches, routes on which the requested TOS (if any) are preferred. (External routes are considered to support the requested TOS only if the internal route to the appropriate border gateway supports the requested TOS, and the external route reported by the border gateway also supports the requested TOS.) Among routes of the same TOS to equally specific addresses, the shortest route is preferred. In determining the shortest path, routes with a smaller announced external metric are preferred, and among routes with equal external metrics, routes with a shorter internal metric are preferred. Among routes of equal cost, loadsplitting is performed in accordance with 10589.

Where Level-2 routers are announcing manually configured summary addresses in the Level-2 LSPs, there will be IP addresses which match the manually configured addresses, but which do not match any addresses which are actually reachable via Level-1 routing in the area. The above scheme will handle user data packets addressed to such addresses as follows. If the specified destination is reachable via Level-1 routing, then in accordance with the above criteria, the packet will be delivered via Level-1 routing. If the specified destination is not reachable via Level-1 routing, but is reachable via Level-2 routing, and thera are other Level-2 routers which offer more desreiable routes according to the above rules (e.g., a route with a more specific match, or a route which has an equally specific match but supports the correct TOS), then the user data packet will be forwarded along the more desreiable route. However, if the address cannot be reached via Level-1 routing, and the manually configured summary address is the most desreiable Level-2 route, the address is unreachable and the user data packet must be discarded.

Encapsulation

IP user data packets are encapsulated directly in 8473 user data packets with a one-octet prepended NLPID value identifying that the encapsulated packet is IP. Inclusion of the NLPID allows encapsulated IP packets to be distinguished from encapsulated 8473 packets. The 8473 destination address indicates the address of the router to which the user data packet is being for-

warded. The address to use (including SEL value) is included in the LSPs sent by dual-protocol routers.

The 8473 source address indicates the address of the router which does the encapsulation. When the destination 8473 address needs to be changed (such as when a Level-1 dual-protocol router encapsulates the user data packet with the address of a Level-2 router in its area, and the Level-2 router then needs to re-encapsulate with the address of a Level-2 router in the destination area), this is considered to be a new encapsulation and the source address is changed.

The SEL value used for the 8473 source address is left to each individual router. However, it is useful to use a different value from that to be used for the destination address. Use of a different SEL value here assures that, if an 8473 error report is returned to a router by a remote OSI router, such error reports will be very easy to distinguish from encapsulated IP user data packets.

An OSI user data packet is encapsulated directly in an IP user data packet with no intervening protocol. The IP destination address indicates the address of the router to which the user data packet is being forwarded. In this case, the user protocol field specifies that the contents of the data portion of the IP user data packet contains an encapsulated OSI user data packet. Here the IP source address indicates the address of the router which does the encapsulation.

Fragmentation, Segmentation, and Reassembly

Generally, data communications links have a "Maximum Transmission Unit" (MTU) which specifies the largest packet that can be transmitted on that link. In some cases, it may be necessary to transmit over a link a packet which is too large for that link (i.e., the length of the packet is larger than the MTU for that link). Many user data packet formats (including IP and 8473) provide for user data packets to be split into multiple packets for transmission over such links. DoD IP calls this function "fragmentation". OSI 8473 offers the same function, but calls it "segmentation". With either protocol, the destination for the user data packet is required to reassemble the packet before performing further processing of it.

When packets are encapsulated, we specify the address of a router as the destination in the encapsulating header. In one embodiment, the specified router is required to reassemble the encapsulated packet before performing decapsulation and forwarding the user data packet contained therein.

However, it is desirable (for performance and resource utilization reasons) to eliminate the need for reassembly of user data packets at routers. In another embodiment (applicable when only one encapsulating header will be required at any one time, such as the environment illustrated in FIG. 2A), the need for possible fragmentation or segmentation of the encapsulating packet is eliminated by performing fragmentation or segmentation of the original user data packet before encapsulation.

Where IP user data packets are to be encapsulated in OSI 8473 packets, manually configured information "MAX_IP_FRAGMENT_SIZE_IN_L1_AREA" for each area, and "MAX_IP_FRAGMEN-T_SIZE_IN_L2_BACKBONE" for the Level-2 backbone, specify the maximum IP fragment size which can be carried without requiring OSI segmentation. If an IP user data packet larger than this size is to be encapsulated, it must be fragmented before encapsulation,

5,251,205

49

and the resulting OSI 8473 packets must specify "don't segment".

Similarly, where OSI 8473 user data packets are to be encapsulated in IP packets. Manually configured information "MAX_OSI_SEGMENT_SIZE_IN_L-1_AREA" for each area, and "MAX_OSI_SEGMENT_SIZE_IN_L2_BACKBONE" for the Level-2 backbone, specify the maximum OSI segment size which can be carried without requiring IP fragmentation. If an OSI user data packet larger than this size is to be encapsulated, it must be segmented before encapsulation, and the resulting IP packets must specify "don't fragment".

### OSI 8473 and ICMP Error Messages

Dual-protocol routers, when operating as IP gateways, must be able to send ICMP error messages (as specified in RFC 1009 "Requirements for Internet Gateways"; and RFC 792 "Internet Control Message Protocol", available from SRI International at the above address).

In addition, when a dual-protocol router encapsulates an IP user data packet in an 8473 header, it puts its own OSI address (including a special architectural constant SEL value) as the source address. In some error conditions, it therefore may receive an 8473 error report in response to the encapsulated user data packet. In some cases receipt of such 8473 error reports by an encapsulating router may require the sending of ICMP error reports, in other cases receipt of such 8473 error reports may signal the existence of an error condition, which is made available to network management. Similar situations occur where and OSI packet is encapsulated in and IP packet, and an ICMP error report is received.

### Lifetime Control

For unencapsulated OSI 8473 and IP user data packets, lifetime is decremented exactly as if the user data packet was being forward by a pure OSI or pure IP router (respectively).

For IP user data packets which are encapsulated in OSI 8473 user data packets, we must consider the relationship between the lifetime field in each of the two packet headers.

The most straightforward approach would be to have the encapsulating router use an 8473 TTL value which is based on its notion of the "distance" to the decapsulating router. This would imply that the two lifetime fields are pretty much independent. However, there are several disadvantages of this approach: (i) this approach makes it possible for the encapsulated user data packet to loop for an extended period of time; (ii) it is not clear how the encapsulating router would pick the value; (iii) this approach defeats the intent that the lifetime field is measured in units of time (seconds or half seconds).

There is an alternate approach: In the encapsulation of an IP user data packet, the router will copy the value from the IP TTL field to the 8473 lifetime field. The field in the 8473 header will then be decremented by OSI routers in the normal manner. When the user data packet is decapsulated, the value of the lifetime field will be copied back from the 8473 header to the IP header. This approach allows the meaning and functionality of the lifetime field to be preserved between protocols.

Note that IP measures lifetime in seconds, where OSI measures lifetime in half seconds. In most cases, each hop will take less than a half second, and the same result

50

(decrementing by one) will occur with either interpretation. In some cases, with encapsulated IP user data packets, this may result in over-decrementing (which is permissible), whereas with encapsulated OSI user data packets, this could result in underdecrementing by a factor of two. However, hops rarely take longer than a half second, this error condition is not likely to cause problems.

### Error Reports

It is possible that, due to configuration errors, there may be times when a dual-protocol router forwards an IP packet to an OSI-only router, or forwards an OSI packet to an IP-only router. (Similarly, an IP-only router may forward an IP packet to an OSI-only router, or vice versa.) In this case, the packet must be discarded. An error report may be transmitted, in accordance with the IP or OSI 8473 specification (respectively). The reason for discard specified in the error report should specify "destination host unreachable" (for IP) or "destination unreachable" (for OSI). The number of packets discarded for this reason may be maintained as a network variable.

### Congestion

One would like to avoid congesting dual-protocol routers as much as possible. For OSI packets, a congestion avoidance scheme is used to set the congestion indication bit in the network layer header when the router is "congested". The DoD TCP/IP protocol suite has, at this time, weaker congestion avoidance mechanisms (based on source quench, and packet dropping). This leads to the possibility that in the event of congestion, the ("better behaved") OSI end systems could suffer with respect to the ("less well behaved") TCP/IP end systems.

However, this is simply a special case of a more general problem: Since congestion avoidance is optional in 8473, even in a pure OSI system there will be some OSI end systems which implement congestion avoidance (and are therefore well behaved), and others which implement only congestion recovery (and are therefore moderately badly behaved), or implement no congestion backoff at all.

To harmonize these approaches, the following mechanism may be used: each router (i) may ignore the congestion avoidance mechanism altogether, and never set the congestion experienced bit; (ii) may provide a functional equivalent of dual queues, with those OSI packets making use of the congestion experienced field being queued separately from all other packets (i.e., OSI packets without this field, and all IP packets). Whether or not the congestion experienced bit is set on any particular packet depends only upon the level of traffic in the appropriate queue.

### Brouters

Referring to FIG. 13, a so-called brouter 502 is a device which operates as both a bridge and a router. Suppose that two routers 504 and 506 are respectively connected to two Ethernets 508, 510, and brouter 502 is connected between the two Ethernets. Assume that the two routers implement the OSI (IS-IS) protocol and are both level 1 routers in the same domain. Also assume that brouter 502 is arranged to treat TCP/IP packets as if the brouter were a normal IP router and to treat all other packets as if the brouter were a bridge.

5,251,205

**51**

IS-IS hello packets sent by routers **504**, **506** are received and forwarded by brouter **502** using normal bridge functions. Routers **504**, **506** also receive each other's link state packets. Thus, it appears to brouter **502** that routers **504**, **506** are exchanging OSI packets and they are forwarded using normal bridge functions. It appears to routers **504**, that they are on the same local area network so they learn each other's 48-bit Ethernet addresses and exchange routing information.

Now suppose that brouter **504** receives an IP packet which it needs to forward via brouter **506**. Because router **504** thinks that it and router **506** are on the same Ethernet, router **504** simply forwards the IP packet directly, using normal Ethernet encapsulation and using the **48**-bit Ethernet address of router **506** in the Ethernet header. Then brouter **502**, thinking as a bridge, would say "This is an IP packet. I don't forward this as a bridge". Then brouter **502**, thinking as a router says, "This is an IP packet. I know how to forward IP packets. However, this packet is sent to an Ethernet address which is not me, thus I will ignore it." The result is that the IP packet does not get forwarded as it should.

One solution to this problem is to have the brouter follow these rules:

1. For packets which are not IP packets, act as a bridge (as before).

2. For IP packets sent to an Ethernet broadcast or multicast address, act as an IP router (as before).

3. For IP packets went to the brouter's Ethernet 48-bit address, act as an IP router (as before).

4. For IP packets sent to a single station 48-bit address which is not the brouter's address, act as a bridge (unlike before).

### Other Embodiments

The invention may be practiced with protocol suites other than OSI and TCP/IP.

Other embodiments are within the scope of the following claims.

### ANNEX A;DIJKSTRA CALCULATION AND FORWARDING

Annex C.2 of ISO 10589 specifies the SPF (Diksk-stra) algorithm for calculating routes with the IS-IS routing protocol. This annex specifies modifications to the SPF algorithm for supporting IP and dual routing, and specifies a compatible method for forwarding IP packets. This will result in a suitable order of preference of routes.

### A.-1 SPF Algorithm for IP and Dual Use

This section specifies an SPF Algorithm for calculating routes with the IS-IS routing protocol, for support of both TCP/IP and OSI. This is based on an extention to the algorithm specified in annex C.2 of ISO 10589.

An algorithm invented by Dijkstra known as shortest path first (SPF) is used as the basis for the route calculation. It has a computational complexity of the square of the number of nodes, which can be decreased to the number of links in the domain times the log of the number of nodes for sparse networks (networks which are not highly connected).

A number of additional optimizations are possible:

1) If the routing metric is defined over a small finite field (as in this document), the factor of log n may be removed by using data structures which maintain a separate list of systems for each value of the metric rather than sorting the systems by logical distance.

**52**

2) Updates can be performed incrementally without requiring a complete recalculation. However, a full update must be done periodically to ensure recovery from data corruption, and studies suggest that with a very small number of link changes (perhaps 2) the expected computation complexity of the incremental update exceeds the complete recalculation. Thus, this annex specifies the algorithm only for the full update.

3) If only End System LSP information has changed, it is not necessary to re-compute the entire Dijkstra tree. If the proper data structures are used, End Systems (including IP reachability entries) may be attached and detached as leaves of the tree and their forwarding information base entries altered as appropriate.

The original SPF algorithm does not support load splitting over multiple paths. The algorithm in this annex does permit load splitting (in 2 protocol environments) by identifying a set of equal cost paths to each destination rather than a single least cost path.

### A.1.1 Databases

PATHS—This represents an acyclic directed graph of shortest paths from the system S performing the calculation. It is stored as a set of triples of the form $<N,d(N), \{Adj(N)\}>$, where:

N is a system identifier. In the level 1 algorithm, N is a 6 octet ID for OSI end systems, a 7 octet ID for routers, or an 8 octet IP Internal Reachability Information entry. For a router which is not a pseudonode, it is the 6 octet system ID, with a 0 appended octet. For a pseudonode it is a true 7 octet quantity, comprised of the 6 octet Designated Intermediate System ID and the extra octet assigned by the Destinated Router. The IP Internal Reachability Information entries consist of a 4 octet IP address plus a 4 octet subnet mask.

In the level 2 algorithm, is either a 7 octet router or pseudonode ID (as in the level 1 algorithm); a variable length OSI address prefix; an 8 octet IP Internal Reachability Information Entry, or an 8 octet IP External Reachability Information entry. The variable length OSI address prefixes, and 8 octet IP Reachability Information entries will always be a leaf, i.e., "End System" in PATHS. As above, the IP Reachability Information entries consist of an [IP address, subnet mask] combination.

d(N; is N's distance from S (i.e., the total metric value from N to S).

$\{Adj(N)\}$ is a set of valid adjacencies that S may use for forwarding to N.

When a system is placed on PATHS, the path(s) designated by its position in the graph is guaranteed to be a shortest path.

TENT—This is a list of triples of the form $<N,d(N)-,\{Adj(N)\}>$, where N, d(N), and $(\{Adj(N)\})$ are as defined above for PATHS.

TENT can intuitively be thought of as a tentative placement of a system in PATHS. In other words, the triple $<N,x,\{A\}>$ in TENT means that if N were placed in PATHS, d(N) would be x, but N cannot be placed on PATHS until is is guaranteed that no path shorter than x exists.

Similarly, the triple $<N,x,\{A,B\}>$ in TENT means that if N were placed in PATHS, then d(N) would be x via either adjacency A or B.

Note: It is suggested that the implementation maintain the database TENT as a set of list of triples of the form $<*,Dist,*>$, sorted by distance Dist. In addition, it is necessary to be able to process those systems which

5,251,205

53

are pseudonodes before any non-pseudonodes at the same distance Dist.

The 8 octet system identifiers which specify IP reachability entries must always be distinguishable from other system identifiers. As specified above, two IP reachability entries which differ only in the subnet mask are still considered to be separate, and will therefore have distinct system identifiers N. The SPF algorithm will therefore calculate routes to each such entry, and the correct entry will be selected in the forwarding process.

A.1.2 Use of Metrics in the SPF Algorithm

Internal metrics are not comparable to external metrics. For external routes (routes to destinations outside of the routing domain), the cost d(N) of the path from N to S may include both internal and external metrics. d(N) may therefore be maintained as a two-dimensioned vector quantity (specifying internal and external metric values).

d(N) is initialized to [internal metric=0, external metric=0].

In incrementing d(N) by 1, if the internal metric value is less than the maximum value MaxPathMetric, then the internal metric value is incremented by one and the external metric value left unchanged; if the internal metric value is equal to the maximum value MaxPathMetric, then the internal metric value is set to 0 and the external metric value is incremented by 1. Note that this can be implemented in a straightforward manner by maintaining the external metric as the high order bits of the distance.

In the code of the algorithm below, the current path length is held in the variable "tentlength". This variable is a two-dimensional quantity tentlength=[internal metric, external metric], and is used for comparing the current path length with d(N) as described above. Tentlength is incremented in the same manner as d(N).

A.1.3 Overview of the Algorithm

The basic algorithm, which builds PATHS from scratch, starts out by putting the system doing the computation on PATHS (no shorter path to SELF can possibly exist). TENT is then pre-loaded from the local adjacency database.

Note that a system is not placed on PATHS unless no shorter path to that system exists. When a system N is placed on PATHS, the path to each neighbor N of N, through N, is examined, as the path to N plus the link from N to M. If <M,*,*> is in PATHS, this new path will be longer, and thus ignored.

If <M,*,*> is in TENT, and the new path is shorter, the old entry is removed from TENT and the new path is placed in TENT. If the new path is the same length as the one in TENT, then the set of potential adjacencies {Adj(M)} is set to the union of the old set (in TENT) and the new set {Adj(N)}. If M is not in TENT, then the path is added to TENT.

Next the algorithm finds the triple <N,x,{Adj(N)}> in TENT, with minimal x. Note: This is done efficiently because of the optimization described above. When the list of triples for distance Dist is exhausted, the algorithm then increments Dist until it finds a list with a triple of the form <*,Dist,*>.

N is placed in PATHS. We know that no path to N can be shorter than x at this point because all paths through systems already in PATHS have already been considered, and paths through systems in TENT still have to be greater than x because x is minimal in TENT.

When TENT is empty, PATHS is complete.

54

Note that external metrics can only occur in "IP External Reachability Information" entries, which correspond to a leaf (i.e., End System in PATHS). Any route utilizing an entry with an external metric will always be considered to be less desireable than any entry which uses an internal metric. This implies that in the addition of systems to PATHS, all systems reachable via internal routes are always added before any system reachable via external routes.

A.1.4 The Algorithm

The Decision Process Algorithm must be run once for each supported routing metric (i.e., for each supported Type of Service). A level 1 router runs the algorithm using the level 1 LSP database to compute level 1 paths (for those level 1 routers which are not level 2 routers, this includes the path to the nearest attached level 2 router). Level 2 routers also separately run the algorithm using the level 2 LSP database to compute level 2 paths. IP-capable level 2 routers must keep level 2 internal IP routes separate from level 2 external IP routes.

Note that this implies that routers which are both level 1 and level 2 routers, and which support all four routing metrics, must run the SPF algorithm 8 times (assuming partition repair is not implemented).

If this system is a Level 2 Router which supports the partition repair optional function the Decision Process algorithm for computing Level 1 paths must be run twice for the default metric. This first execution is done to determine which of the area's manualAreaAddresses are reachable in this partition, and to elect a Partition Designated Level 2 Router for the partition. The partition Designated Level 2 Router will determine if the area is partitioned and will create virtual Level 1 links to the other Partition Designated Level 2 Routers in the area in order to repair the Level 1 partition. This is further described in section 7.2.10 of 10589.

The SPF algorithm specified here will calculate routes for both OSI and IP. In particular, routes are calculated to all system identifiers N, where N may specify an OSI End System, the OSI address of a router, or an IP reachability entry (including the "IP interface address" advertised by IP-capable routers in their LSPs). In computing the forwarding database, it is an implementation specific issue whether the IP forwarding database is kept separately from the OSI forwarding database. Where appropriate, this annex will refer separately to entries in these two forwarding databases. This is not meant to preclude any specific implementation method.

OSI and IP use separate mechanisms to determine whether a packet is in the area (in particular, OSI makes use of area addresses, and IP determines that a destination is not in an area by looking in the level 1 forwarding data-base and determining that no entry exists for that destination within the area). The route to the nearest level 2 router will result in separate entries in the forwarding database for OSI and IP. For IP, the route to the nearest attached level 2 router may be entered in the forwarding database as a default route (i.e., a route with a subnet mask of all 0).

One approach would be to put the results of each Dijkstra algorithm in a separate forwarding database. For a router which supports both level 1 and level 2 routing (including level 2 internal and level 2 external routes), and which supports all four types of service, this would result in twelve separate forwarding databases for IP. Implementations may choose to minimize

5,251,205

55 56

the number of forwarding data-bases by combining the information from the multiple Dijkstra calculations into a single database per supported TOS. This is discussed in section A.2 below.

The SPF algorithm specified in section C.2.3 of 10589 is amended to appear as follows:

Step 0: Initialize TENT and PATHS to empty. Initialize tentlength to [internalmetric=0, externalmetric=0] (tentlength is the pathlength of elements in TENT that we are examining).

1) Add <SELF,O,W> to PATHS, where W is a special value indicating traffic to SELF is passed up to internal processes (rather than forwarded).

2) Now pre-load TENT with the local adjacency database (Each entry made to TENT must be marked as being either an End System or a router to enable the check at the end of Step 2 to be made correctly—Note that each local IP reachability entry is included as an adjacency, and is marked as being an End System). For each adjacency Adj(N) (including 20 level 1 OSI Manual Adjacencies, or level 2 OSI enabled reachable addresses, and IP reachability entries) on enabled circuits, to system N of SELF in state "Up" compute:

p(N)=cost of the parent circuit of the adjacency (N), obtained from metric$_k$, where k=one of {default metric, delay metric, monetary metric, error metric}

Adj(N)=the adjacency number of the adjacency to N

3) If a triple <N,x,{Adj(M)}> is in TENT, then:
If x=d(N;, then {Adj(M)}←{Adj(M)}∪{Adj(N)}.

4) If N is a router or an OSI End System entry, and there are now more adjacencies in maximumPath-Splits, then remove excess adjacencies as described in Clause 7.2.7 of 10589. If N is an IP Reachability Entry, then excess adjacencies may be removed as desired. This will not effect the correctness of routing, but may eliminate the determinism for IP routes (i.e., IP packets still follow optimal routes within an area, but where multiple equally good routes exist, will not necessarily follow precisely the route that any one particular router would have anticipated.)

5) If x <d(N), do nothing.

6) If x>N,d(N), remove <N,x,{Adj(M)}> from TENT and add the triple <N,d(N),Adj(N)>.

7) If no triple >N,x,{Adj(M)}> is in TENT, then add <N,d(N),Adj(N)> to TENT.

8) Now add systems to which the local router does not have adjacencies, but which are mentioned in neighboring pseudonode LSPs. The adjacency for such systems is set to that of the designated router. Note that this does not include IP reachability entries from neighboring pseudonode LSPs. In particular, the pseudonode LSPs do not include IP reachability entries.

9) For all broadcast circuits in state "On", find the pseudonode LSP for that circuit (specifically, the LSP with number zero and with the first 7 octets of LSPID equal to L$_n$CircuitID for that circuit, where n is 1 (for level 1 routing) or 2 (level 2 routing)). If it is present, for all the neighbors reported in all the LSPs of this pseudonode which do not exist in TENT add an entry <N,d(N),Adj(N)> to TENT, where:
d(N)=metric$_k$ of the circuit.
Adj(N)=the adjacency number of the adjacency to the DR.

10) Go to Step 2.

Step 1: Examine the zeroeth link state PDU of P, the system just placed on PATHS (i.e., the LSP with the same first 7 octets of LSPID as P, and LSP number zero).

1) If this LSP is present, and the "Infinite Hippity Cost" bit is clear, then for each LSP of P (i.e., all LSPs with the same first 7 octets of LSPID and P, irrespective of the value of LSP number) compute:

dist(P,N)=d(P)+metric$_k$(P,N)

For each neighbor N (both End System and router) of the system P. If the "Infinite Hippity Cost" bit is set, only consider the End System neighbors of the system P. Note that the End Systems neighbors of the system P includes IP reachable address entries included in the LSPs from system P. Here, d(P) is the second element of the triple <P,d(P),(Adj(P)}>, and metric$_k$(P,N) is the cost of the link from P to N as reported in P's link state PDU.

2) If dist(P,N)>MaxPathMetric, then do nothing.

3) If <N,d(N),{Adj(N)}> is in PATHS, then do nothing. Note: d(N) must be less than dist(P,N), or else N would not have been put into PATHS. An additional sanity check may be done here to ensure that d(N) is in fact less than dist(P,N)

4) If a triple <N,x{Adj(N)}> is in TENT, then:
   a) If x=dist(P,N), then {Adj(N)}←(Adj(N)} ∪(Adj(P)}.
   b) If N is a router or an OSI end system, and there are now more adjacencies in {Adj(N)} than maximum-Path-Splits, then remove excess adjacencies, as described in clause 7.2.7 of 10589. For IP Reachability Entries, excess adjacencies may be removed as desired. This will not effect the determinism for IP routes (i.e., IP packets will still follow optimal routes within an area, but where multiple equally good routes exist, will not necessarily follow precisely the route that any one particular router would have anticipated).
   c) if x<dist(P,N), do nothing.
   d) if x dist(P,N), remove <N,x,Adj(N)> from TENT, and add <N,dist(P,N,(Adj(P)}>

5) if no triple <N,x,(Adj(N)}> is in TENT, then add <N,dist(P,N),{Adj(P)}> to TENT.

Step 2: If TENT is empty, stop. Else find the element <P,x,{Adj(P)}>, with minimal x as follows:

1) If an element <*,tentlength,*> remains in TENT in the list for tentlength, choose that element. If there are more than one elements in the list for tentlength, choose one of the elements (if any) for a system which is a pseudonode in preference to one for a non-pseudonode. If there are no more elements in the list for tentlength, increment tentlength and repeat Step 2.

2) Remove <P,tentlength,{Adj(P)}> from TENT.

3) Add <P,d(P),(Adj(P)}> to PATHS.

4) If this is the Level 2 Decision Process running, and the system just added to PATHS listed itself as Partition Designated Level 2 Intermediate system, then additionally add <AREA.P,d(P),{Adj(P)}> to PATHS, where AREA.P is the Network Entity Title of the other end of the Virtual Link, obtained by taking the first AREA listed in P's LSP and appending P's ID.

5) If the system just added to PATHS was an end system, go to step 2. Else go to Step 1.

5,251,205

57

NOTE—In the level 2 context, the "End Systems" are the set of Reachable Address Prefixes (for OSI), the set of Area Addresses with zero cost (again, for OSI), plus the set of IP reachability entries (including both internal and external).

### A.2 Forwarding of IP packets

The SPF algorithm specified in section A.1 may be used to calculate (logically) separate IP forwarding tables for each type of service, and for level 1, level 2 internal, and level 2 external routes. Section A.2.1 describes how to forward IP packets, based on these multiple forwarding data-bases. Section A.2.2 describes how the multiple forwarding databases can be combined into a single forwarding database per supported TOS.

### A.2.1 Basic Method for Forwarding IP packets

For level 1-only routers:

Determine if the IP destination address matches any entry in the level 1 forwarding table for the specified TOS.

Determine if the IP destination address matches any entry in the level 1 forwarding table for the default TOS.

If default TOS resulted in more specific entry, forward according to default TOS.

If equally specific entries found, forward according to specified TOS.

If no entry was found (which includes no default route entry), then destination is unreachable. Note: For level 1 only routers, the route to the nearest attached level 2 router will be entered into the forwarding database as a default route (i.e., a route with a subnet mask which is all 0). Thus this last event (no entry found) can occur only if there is no attached level 2 router reachable in the area.

For routers which are both level 1 and level 2 routers:

Determine if the IP destination address matches any entry in the level 1 forwarding table for the specified TOS.

Determine if the IP destination address matches any entry in the level 1 forwarding table for the default TOS.

If default TOS resulted in more specific entry (i.e., more bits in the subnet mask take the value 1), forward according to default TOS.

If equally specific entries found, forward according to specified TOS.

If no entry found:

Determine if the IP destination address matches any entry in the level 2 internal forwarding table for the specified TOS.

Determine if the IP destination address matches any entry in the level 2 internal forwarding table for the default TOS.

If default TOS resulted in more specific entry, forward according to default TOS.

If equally specific entries found, forward according to specified TOS.

If no entry found:

Determine if the IP destination address matches any entry in the level 2 external forwarding table for the specified TOS.

Determine if the IP destination address matches any entry in the level 2 external forwarding table for the default TOS.

If default TOS resulted in more specific entry, forward according to default TOS.

58

If equally specific entries found, forward according to specified TOS.

If no entry is found, then destination is unreachable.

For level 2-only routers, the above algorithm can be used, except since there is no level 1 forwarding data-base, the corresponding steps can be skipped.

As discussed earlier, for level 2 routers which are announcing manually configured summary addresses in their level 2 LSPs, in some cases there will exist IP addresses which match the manually configured addresses, but which do not match any addresses which are reachable via level 1 routing in the area. Packets to such addresses are handled according to the rules specified above. This may be accomplished by adding the manually configured [IP address, subnet mask] entry to the level 2 forwarding database (for the appropriate TOS), with a special "next hop" address which specifies that packets for which this entry is selected are to be discarded. This will work correctly because more desireable entries (such as delivering the packet via level 1 routing to the correct destination, or a more specific level 2 route) will automatically take precedence according to the forwarding rules specified above. Less desireable routes (such as using a level 2 external route to the "default route" entry) are not possible because other level 2 routers will believe the summary addresses advertised by this router.

### A.2.2 Reduction of IP Forwarding Databases

The multiple forwarding databases used in the basic forwarding method in section A.2.1 can be reduced, by combining the multiple databases into one database for each supported TOS.

For reduction of IP forwarding databases, it is assumed that for any two overlapping address entries, either the entries are identical, or one range contains the other. In other words, for any two [IP address, subnet mask] entries A and B, if there is at least one IP address which matches both entries, then either: (i) the two entries are identical; or (ii) entry A contains entry B (i.e., any IP address which matches entry also matches entry A); or (iii) entry B contains entry A (any IP address which matches entry A also matches entry B).

Non-contiguous subnet masks can be configured to violate this assumption. For example, consider the two entries:

A=[address="01010101-00000101-00000000-00000000",    mask="11111111-00001111-00000000-00000000"]

B=[address="01010101-01010000-00000000-00000000",    mask="11111111-11110000-00000000-00000000"]

In this case neither entry contains the other. Specifically;

there are IP addresses which match both A and B (e.g., "01010101-01010101-xxxxxxxx-xxxxxxxx"),

there are IP addresses which match A but not B (e.g., "01010101-11110101-xxxxxxxx-xxxxxxxx")

there are IP addresses which match B but not A (e.g., "01010101-01011111-xxxxxxxx-xxxxxxxx").

The reduction of the multiple forwarding databases for each TOS to a single database for each TOS is based on the use of "best match" routing, combined with reduction of the entries placed in the forwarding data-base in order to eliminate entries which are not to be selected (based on the order of preference of routes specified above). The specific algorithm for creation of the IP forwarding database can be described as follows:

5,251,205

59

1) Make use of the the Dijkstra algorithm described in section A.1 to create separate forwarding databases for each supported TOS for level 1 routes, level 2 internal routes, and level 2 external routes. (Note that each entry in the forwarding database will specify an [IP address, subnet mask] combination, as well as the next hop router for IP packets which match that entry).

2) For each level 1 route entry which has been placed in the level 1 IP forwarding database for a specific TOS, copy that entry into the overall IP forwarding database for that TOS.

2) For each route entry X which has been placed in the level 2 internal IP forwarding database for a specific TOS, search for overlapping entries in the level 1 IP forwarding database for the specific TOS, and also for the default TOS:

   a) If there is any overlapping entry Y in the level 1 forwarding database (for the specfic TOS, or for the default TOS) such that either (i) Y contains X; or (ii) Y is identically specific to X; then ignore entry X.

   b) Otherwise, copy entry X into the overall IP forwarding database for the specific TOS.

4) For each route entry X which has been placed in the level 2 external IP forwarding database for a specific TOS, search for overlapping entries in the level 1 IP forwarding database for the specific TOS, and for the default TOS, and the level 2 internal IP forwarding database for the specific TOS, and for the default TOS.

   a) If there is an overlapping entry Y such that either (i) Y contains X; or (ii) Y is identically specific to X; then ignore entry X.

   b) Otherwise, copy entry X into the overall IP forwarding database for the specific TOS.

This method will result in one forwarding database for each supported TOS. The forwarding of packets can then be simplified to be as follows:

1) For IP packets which map to the default TOS metric (or to an unsupported TOS metric), search the default TOS forwarding database and select the entry which has the most specific match. Forward the packet accordingly.

2) For packets which map to a specific (non-default) TOS metric, search the specific TOS forwarding database and select the entry j which has the most specific match. Also search the default TOS forwarding database and select the entry k which has the most specific match. Forward the packet as follows:

   a) If k is more specific than j, forward using entry k

   b) If j and k are equally specific, forward using entry j

   c) If j is more specific than k, forward using entry j

What is claimed is:

1. A method of calculating routes for sending user data packets via information handling devices which forward data packets through a communications network, comprising

   including in at least a first and a second user data packet, destination address information conforming to two or more different addressing conventions of two or more different independent protocol suites,

   determining routes for said first and said second user data packets using a route calculation algorithm corresponding to a single routing protocol, chosen from an arbitrary protocol suite, regardless of the

60

addressing convention to which the destination address information in said user data packet conforms,

   said route being determined using the destination address information in said user data packets without converting said destination address information from the addressing convention to which it forms to another addressing convention.

2. The method of claim 1 wherein there are exactly two said protocol suites.

3. The method of claim 1 or 2 further comprising

   sending to said information handling devices link state packets conforming to said routing protocol, and

   calculating said route based on information contained in said link state packets.

4. The method of claim 1 or 2 wherein said routing protocol comprises OSI IS-IS rotating protocol.

5. A method for calculating routes for sending user data packets via information handling devices which forward data packets through a communications network, said information handling devices including (a) single-protocol information handling devices capable of recognizing and forwardly only user data packets which conform to a single protocol suite, and (b) multi-protocol information handling devices capable of recognizing and forwarding user data packets which conform to any one of two or more protocol suites, comprising

   using a routing protocol to automatically predetermine whether to encapsulate a packet, at which information handling devices to encapsulate and to decapsulate said packet, and which protocol to use to encapsulate said packet, wherein

   said information handling devices are organized in areas and all of said information handling devices within a single said area are at least capable of recognizing and forwarding user data packets which conform to the same one of said protocol suites.

6. The method of claim 5 wherein the one of said protocol suites for which the information handling devices of one of said area are capable differs from the one of said protocol suites for which the information handling devices of another one of said areas are capable.

7. A method for calculating routes for sending user data packets via information handling devices which forward data packets through a communications network, said information handling devices including (a) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a single protocol suite, and (b) multi-protocol information handling devices capable of recognizing and forwarding user data packets which conform to any one of two or more protocol suites, comprising

   using a routing protocol to automatically predetermine whether to encapsulate a packet, at which information handling devices to encapsulate and to decapsulate said packet, and which protocol to use to encapsulate said packet, wherein

   said network includes (a) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a first protocol suite, (b) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a second different protocol suite, and (c) at least one

5,251,205

61

multi-protocol information handling device capable of recognizing and forwarding user data packets which conform to at least said first and second protocol suites.

8. The method of claim 7 wherein one of said multi-protocol information handling devices within a given area of said network is capable of recognizing and forwarding user data packets which conform to every protocol suite that is used by any other information handling device in said given area.

9. The method of claim 5, 6, 7 or 8 wherein one of said protocol suites comprises the TCP/IP protocol suite and another of said protocol suites comprises the OSI protocol suite.

10. The method of claim 9 further comprising
sending to said information handling devices, link state packets conforming to said one of said routing protocols, and
calculating said route based on information contained in said link state packets.

11. The method of claim 9 wherein said routing protocol used to automatically predetermine at which information handling devices to encapsulate and to decapsulate a given packet comprises OSI IS-IS routing protocol.

12. The method of claim 5, 6, 7 or 8 wherein there are exactly two of said protocol suites.

13. The method of claim 12 wherein one of said protocol suites comprises TCP/IP and the other of said protocol suites comprises OSI.

14. The method of claim 13 further comprising
sending to said information handling devices, link state packets conforming to said one of said routing protocols, and
calculating said route based on information contained in said link state packets.

15. The method of claim 13 wherein said routing protocol used to automatically predetermine at which information handling devices to encapsulate and to decapsulate a given packet comprises OSI IS-IS routing protocol.

16. The method of claim 12 further comprising
sending to said information handling devices, link state packets conforming to said one of said routing protocols, and
calculating said route based on information contained in said link state packets.

17. The method of claim 12 wherein said routing protocol used to automatically predetermine at which information handling devices to encapsulate and to decapsulate a given packet comprises OSI IS-IS routing protocol.

18. The method of claim 5, 6, 7 or 8 further comprising
sending to said information handling devices, link state packets conforming to said one of said routing protocols, and
calculating said route based on information contained in said link state packets.

19. The method of claim 5, 6, 7 or 8 wherein said routing protocol used to automatically predetermine at which information handling devices to encapsulate and to decapsulate a given packet comprises OSI IS-IS routing protocol.

20. A method for calculating routes for sending user data packets via information handling devices which forward data packets through a communications network, said information handling devices including (a) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a single protocol suite, and (b) multi-protocol information handling devices capable of rec-

62

ognizing and forwarding user data packets which conform to any one of two or more protocol suites, comprising
using a routing protocol to automatically predetermine whether to encapsulate a packet, at which information handling devices to encapsulate and to decapsulate said packet, and which protocol to use to encapsulate said packet, wherein
said routing protocol determines multiple routes from a starting information handling device to an ending information handling device, and
different protocols are recognized by corresponding devices on different routes,
such that the automatic predetermination depends upon the route used.

21. A network of information handling devices which forward user data packets through communications links each said packet including an address indicating the packet's destination, said network comprising
a first information handling device capable of interpreting addresses formatted in accordance with a first addressing scheme, said first addressing scheme defining one or more address fields that are assigned values to form an address,
a second information handling device capable of interpreting addresses formatted in accordance with a second addressing scheme, said second addressing scheme defining different address fields than said first addressing scheme, wherein
at least one address formatted in accordance with said first addressing scheme dose not identify the same destination as any address formatted in accordance with said second addressing scheme, and
said first and second devices exchange control packets which specify:
the links connected to the device which originates the control packet,
the addresses, formatted in accordance with said first addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said first addressing scheme, and
the addresses, formatted in accordance with said second addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said second addressing scheme.

22. The network of claim 21 wherein
said first device is capable of interpreting addresses formatted in accordance with said second addressing scheme, and
as part of forwarding at least one given packet addressed in accordance with said first addressing scheme, said first device encapsulates said given packet inside a header addressed in accordance with said second addressing scheme, and transmits the encapsulated packet to said second device.

23. The network of claim 22 wherein
said network is organized into areas comprising routers and links which connect said routers, and
every device in a given area is capable of interpreting addresses formatted in accordance with at least one common addressing scheme.

24. The network of claim 21, 22, or 23 wherein
said first and second devices are configured to transmit a hello packet on a link when the link is connected thereto, said hello packet identifying the device originating the hello packet and indicating the addressing schemes in which the originating device is capable of interpreting addresses.

* * * * *

EXHIBIT 2

US005390173A

# United States Patent [19]

## Spinney et al.

[11] **Patent Number:** **5,390,173**

[45] **Date of Patent:** **Feb. 14, 1995**

[54] **PACKET FORMAT IN HUB FOR PACKET DATA COMMUNICATIONS SYSTEM**

[75] Inventors: **Barry A. Spinney**, Wayland; **Robert J. Simcoe**, Westboro; **Robert E. Thomas**, Hudson; **George Varghese**, Bradford, all of Mass.

[73] Assignee: **Digital Equipment Corporation**, Maynard, Mass.

[21] Appl. No.: **965,651**

[22] Filed: **Oct. 22, 1992**

[51] Int. Cl.6 .......................... H04J 3/26; H04L 12/46
[52] U.S. Cl. ................................. 370/60; 370/85.13; 370/94.1
[58] Field of Search ...................... 370/60, 60.1, 85.9, 370/85.13, 85.14, 94.1, 94.2, 94.3, 85.6; 340/825.02, 825.03, 825.8, 825.52

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,706,081 | 11/1987 | Hart et al. | 370/85.13 X |
| 4,933,937 | 6/1990 | Konishi | 370/94.1 X |
| 5,020,020 | 5/1991 | Pomfret et al. | 370/94.1 X |
| 5,060,228 | 10/1991 | Tsutsui et al. | 370/85.9 X |
| 5,088,091 | 2/1992 | Schroeder et al. | 370/85.13 X |
| 5,115,432 | 5/1992 | Haas | 370/94.1 |
| 5,121,383 | 6/1992 | Golestani | 370/85.6 X |
| 5,220,562 | 6/1993 | Takada et al. | 370/85.13 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0281785 | 9/1988 | European Pat. Off. | H04L 11/16 |
| 0404337 | 12/1990 | European Pat. Off. | H04L 12/28 |
| 0473066 | 3/1992 | European Pat. Off. | H04L 12/46 |
| 4103888 | 8/1991 | Germany | H04L 12/28 |

*Primary Examiner*—Melvin Marcelo
*Attorney, Agent, or Firm*—Kenneth F. Kozik; A. Sidney Johnston

[57] **ABSTRACT**

A packet data communication network employs a local switch, router or bridge device functioning to transfer packets between segments of a larger network. When packets enter this device, an address translation is performed to generate local source and destination addresses which are much shorter than the globally-unique addresses contained in the packet as dictated by the protocol. These local addresses are inserted in a header that is added to the packet, in addition to any header already contained in the packet. This added header travels with the packet through the local switch, router or bridge device, but then is stripped off before the packet is sent out onto another network segment. The added header may also contain other information, such as a local name for the source and destination segment (link), as well as status information that is locally useful, but not part of the packet protocol and not necessary for transmission with the packet throughout the network. Local congestion information, results of address translations, and end-of-message information, are examples of such status information.

**24 Claims, 8 Drawing Sheets**





*FIG. 1*



FIG. 1A



FIG. 2



FIG. 3



FIG. 4



*FIG. 5*

*FIG. 6*



FIG. 7



*FIG. 8*

5,390,173

1

## PACKET FORMAT IN HUB FOR PACKET DATA COMMUNICATIONS SYSTEM

### RELATED CASES

The application discloses subject matter also disclosed in the following copending U.S. patent applications, all of which are assigned to Digital Equipment Corporation:

Ser. No. 07/964,791, filed Oct. 22, 1992, by Nigel Terence Poole, for "BACKPLANE WIRING FOR HUB IN PACKET DATA COMMUNICATIONS SYSTEM" (PD92-0558);

Ser. No. 07/964,792, filed Oct. 22, 1992, by Nigel Terence Poole, for "CROSSBAR SWITCH FOR SYNTHESIZING MULTIPLE BACKPLANE INTERCONNECT TOPOLOGIES IN COMMUNICATIONS SYSTEM" (PD92-0559);

Ser. No. 07/964,738, filed Oct. 22, 1992, by Bryan Alan Spinney, for "ADDRESS LOOKUP IN PACKET DATA COMMUNICATIONS LINK, USING HASHING AND CONTENT-ADDRESSABLE MEMORY" (PD93-0016); and

Ser. No. 07/965,121, filed Oct. 22, 1992, by Martin Edward Griesmer et al, for "APPARATUS AND METHOD FOR MAINTAINING FORWARDING INFORMATION IN A BRIDGE OR ROUTER" (PD93-0013).

### BACKGROUND OF THE INVENTION

This invention relates to packet data communication networks, and more particularly to a way of handling packets through a hub, switch or router for a network, using a special header attached to the packets.

Packet data communication networks of type using Ethernet, token ring, or FDDI technologies, or other network varieties, hubs are used for switching or routing, or for bridges to additional segments of the network. A bridge or router in a computer interconnect system is shown in U.S. Pat. No. 5,020,020, assigned to Digital Equipment Corporation. It is typical to use address translation in a bridge or router of this type, as shown, for example, in U.S. Pat. No. 4,933,937. The need to translate addresses is due to the address length. Some protocols or system specify a 48-bit source and destination address so that a globally unique address is provided. However, for efficient use of resources at a local segment of a large network (as within a bridge), it is advantageous to use smaller address fields instead of 48-bit addresses, for efficiency in bit-count of messages as well as efficiency in processing and storage. For this reason, while the 48-bit addresses are carried in the packet throughout its lifetime, shorter addresses are generated for local routing and processing. Thus, a translation mechanism is provided to allow switching between global and local addresses.

Various other information may be locally useful in a bridge or router that need not be carried by a packet throughout its lifetime. For example, the network segments (links) may be locally named (assigned an identifying number) so that packets may be routed by link number instead of or in addition to their local destination node address. The packets may be assigned a priority or "service class" for local use, aside from the priority attached to the packet by the protocol being implemented. Status information may be locally useful, but not part of the packet protocol and not necessary for transmission with the packet throughout the network.

2

For example, local congestion information, or results of address translations, or end-of-message information, are types of such status information.

### SUMMARY OF THE INVENTION

In accordance with one embodiment of the invention, a packet data communication network employs a local switch, router or bridge device functioning to transfer packets between segments of a larger network. When packets enter this device, an address translation is performed to generate local source and destination addresses which are much shorter than the globally-unique addresses contained in the packet as dictated by the protocol. These local addresses are inserted in a header that is added to the packet, in addition to any header already contained in the packet. This added header travels with the packet through the local switch, router or bridge device, but then is stripped off before the packet is sent out onto another network segment. The added header may also contain other information, such as a local name for the source and destination segment (link), as well as status information that is locally useful, but not part of the packet protocol and not necessary for transmission with the packet throughout the network. Local congestion information, results of address translations, and end-of-message information, are examples of such status information.

### BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the invention are set forth in the appended claims. The invention itself, however, as well as other features and advantages thereof, will be best understood by reference to the detailed description of a specific embodiment, when read in conjunction with the accompanying drawings, wherein:

FIG. 1 is a diagram in block form of a communications network which may use features according to one embodiment of the invention;

FIG. 1a is an electrical diagram in block form of a controller for the communications network of FIG. 1;

FIG. 2 is a diagram of the controller of FIG. 1 and 1a showing processes executed in the controller;

FIG. 3 is a diagram of a controller of FIG. 1 and 1a connected in a network;

FIG. 4 is a diagram of frame formats used in the network of FIGS. 1 or 3;

FIG. 5 is a diagram of the fields contained in an added header in the formats of FIG. 3;

FIG. 6 is a diagram of a data structure used for a hash table in the system of FIGS. 1 and 1a;

FIG. 7 is a diagram of breadth-first binary trees used in the method of the invention, to store translated addresses; and

FIG. 8 is a flow chart of address lookup procedures used in the embodiment of the invention of FIGS. 1 and 1a.

### DETAILED DESCRIPTION OF SPECIFIC EMBODIMENT

Referring to FIG. 1, a packet data communications network which may use the features of the invention includes a controller 10 for interface between an FDDI link 11 and a crossbar switch device 12. The crossbar switch device 12 has a number of input/output ports 13, and each one of these ports 13 may be connected by another controller 10 to another network segment 11

5,390,173

3                                                                              4

such as an FDDI link or a token ring or Ethernet bus, for example. The crossbar switch 10 ordinarily makes a direct point-to-point interconnect between one port 13 and another port 13, so that the crossbar acts as a bridge or router in the network, linking one network segment 5 to another. A station on a link 11 sends a packet onto its network segment with a destination address which is on another, different segment. The controller 10 for this segment detects the address as being that of a station on one of the remote segments, and generates local switch- 10 ing information to send to the crossbar 12 so that the appropriate interconnect can be made to send the packet to the proper port 13 and link 11, via another controller 10. As set forth in the above-mentioned co-pending applications, the crossbar switch device can 15 function as a flexible interconnect device to create a ring or bus using the ports 13, as well as functioning as a point-to-point connector as is the usual case for cross-bar switches.

Referring to a more detailed view of FIG. 1a, each 20 port 13 of the crossbar has a data-in path 14 and a sepa-rate data-out path 15. The interface between the con-troller 10 and the FDDI link 11 is by way of a media access control (MAC) device 16, functioning to convert the serial light transmission on the incoming fiber optic 25 cable 17 to electrical pulses, to recover the clock, con-vert the serial data on the optic loop to 6-bit parallel symbols, act as an elastic buffer to allow reclocking of data entering the controller 10, etc. Of course, all of these functions are reversed for outgoing data on the 30 cable 18. The interface between the controller 10 and the MAC device 16 is by an incoming 8-bit parallel data path 19a (with additional parity and control lines) and an outgoing 8-bit parallel path 19b.

The controller 10 contains a processor or state ma- 35 chine 20 to execute various processes as will be de-scribed, and accesses a packet memory 21 via an inter-face 22, as well as a content addressable memory (CAM) 23 via interface 24. The packet memory 21 is addressed by a 20-bit address bus, and data is transferred 40 by a 56-bit bidirectional data bus, included in the inter-face 22; various control lines are also in the interface 22. The CAM 23 is driven by a 14-bit bus and various con-trol lines in the interface 24. The packet memory 21 is a RAM which stores a number of queues for incoming 45 and outgoing data packets, as well as translation tables and hash tables as will be described. In addition, the packet memory stores certain data for which addresses are matched in the CAM 23.

The controller 10 also interfaces with a line card 50 processor 25 by bus 26. The line card processor 25 is used to execute some diagnostic and initialization func-tions, and does not operate in routine packet transfer.

Logically, the processor 20 in the controller 10 exe-cutes six independent processes. There are two for in- 55 bound packet processing, two for outbound packet processing, one for interfacing to the external packet memory, and one for line card processor access. Pack-ets inbound on FDDI line 17 and going through the controller 10 to the crossbar switch 12 are referred to as 60 "inbound." Likewise, packets going in the direction of crossbar switch 12 through the controller 10 to the FDDI output line 18 are referred to as "outbound." By having independent processes which can operate in parallel, the controller 10 can process inbound and out- 65 bound packets at full speed. Distributed among the processes are control, parameter and status registers that are used to define the operational modes and to

determine the internal state of the controller 10; these registers are accessed through the node processor inter-face 26.

Referring to FIG. 2, the inbound receive (IR) process 27 executed on the processor 20 receives packets from the interface 19a to the FDDI ring via the media access control device 16. The IR process 27 parses and de-codes each incoming packet from line 19a, places the packet data into an intermediate FIFO 28, and performs the necessary processing to determine if the packet is to be forwarded to the crossbar 12. For bridged packets, this decision is made by performing destination address, source address, and protocol field lookups, with the aid of the content addressable memory 23 and the internal hash function, according to the invention. The result of the lookup will determine where the packet is to go. The packet may have to be transmitted to another port 13 on the crossbar 12 to reach its destination, the packet may be destined for the line card processor 25, the packet may be destined for a processing engine 38 in the crossbar switch 12, or the packet may be filtered and discarded. When the IR process 27 decides a packet is to be forwarded to the crossbar 12, it uses the lookup results to generate the information in an added header as will be described. It will select an inbound queue to store the packet in the external packet memory 21 and will initiate memory requests to transfer the data from its intermediate FIFO 28 to the selected queue in the external packet memory 21. The processor 20 executing this IR process 27 performs this operation by generating IR requests that are sent to the packet memory 21.

The IR process 27 also handles a number of exception conditions. The forwarding of packets to processing engines in the switch 12 can be rate limited by software to prevent the traffic from a single port from over-whelming the shared processing resources of the switch 12. When these rate limits are exceeded the IR process 27 will discard these packets until the rate limit is re-plenished.

The inbound transmit (IT) process 29, again referring to FIG. 2, services the queues in packet memory 21 that contain packets to be transmitted to the crossbar switch 12. These packets are stored in queues in the external packet memory 21 of the controller 10. When an en-abled queue has a packet count greater than one, the IT process 29 will begin processing of the packet by initiat-ing packet memory requests to move data from the packet memory 21 to an internal FIFO 30. Part of the data transferred is the added header associated with the packet. The IT process 29 uses this added header field to request a connection on the crossbar 12 to the desired destination port 13; it requests this connection by send-ing information to the port interface 13 that indicates the destination port of the switch 12 and service class information describing how the connection is to be serviced. Prior to requesting the connection, the IT process 29 checks the timestamp stored with the packet and will discard the packet if it has expired. If the IT process 29 determines that a packet has expired after a connection has been requested but before the connec-tion is made, it will discard the packet, abort the re-quested connection and continue servicing the enabled queues.

When a connection is established, the IT process 29 transfers the data from its intermediate FIFO 30 to the crossbar 12 via path 14 and performs the proper packet formatting during transmission.

5,390,173

5

6

The outbound receive (OR) process **31** executing on the processor **20** receives packets from the crossbar switch **12** interface **15**, parses and decodes each packet, places the packet data into an intermediate FIFO **32** and performs the necessary validity checks of the packet's added header to determine if the packet should be received and placed at the tail of an enabled queue in packet memory **21**. Packet reception is established when the controller **38** for the crossbar indicates that this controller **10** is the desired destination port for a connection. The OR process **31** indicates its willingness to take part in a connection by asserting a "next" control signal in the interface **15** that the crossbar controller **38** samples. When this "next" signal is asserted, the crossbar controller may return a signal indicating that a connection between a source port and this destination port has been made on the crossbar **12**. The OR process **31** immediately monitors the outbound data received at the crossbar interface **15** to delimit a packet. It will also deassert the "next" signal and will not reassert it until it has determined that it is appropriate to establish a new connection.

The OR process **31** uses the service class field and one specific protocol class field value from the added header of the outbound packet to place the packet on a queue in external packet memory **21**. The OR process **31** also handles multiple exception conditions on the crossbar including parity errors in the symbols, and packets with bad delimiters.

The outbound transmit (OT) process **33** services the queues in packet memory **21** that contain packets to be transmitted to the FDDI line **18** via path **19***b* and device **16**. These packets are stored in the external packet memory **21** of the controller **10**. When an enabled queue has a packet count greater than one, the OT process **33** will begin processing the packet by initiating packet memory requests to move the data from the external memory **21** to an internal FIFO **34**. The OT process **33** will discard the packet if the time stamp stored with the packet has expired, otherwise it will request the MAC device **16** to begin a transmission to the FDDI line **18**. If the OT process **33** is operating in a bridge link mode, it will decapsulate the packet by removing the added header that was stored with the packet, prior to transmission on the path **19***b* to the FDDI link. If the OT process **33** is attached to a switch link, it will keep and update the appropriate fields of the added header during transmission to the path **19***b* and FDDI link.

The packet memory (PM) access process **35** controls the interface **22** to the external packet memory **21**. The packet memory **21** is used to hold the packet data of the multiple inbound and outbound queues and is also used to store the PC table, the hash table as described herein, and the translation database used for lookups. The PM process **35** controls access to the external packet memory **21** by arbitrating among all the processes requesting access to it. The PM process **35** will indicate to the requesting process when a cycle has been granted. The external packet memory is accessed via a 56-bit data bus in interface **22**. The PM process **35** can select up to 1-million 56-bit words over its 20-bit external packet memory address bus in interface **22**. Read or write cycles can be performed every 80-ns to provide 600-Mbps of packet memory bandwidth.

When a process **27, 29, 31,** or **33** requests a memory cycle via paths **36, 37, 38,** or **39,** respectively, it also indicates to the PM process **35** the desired queue that the cycle is associated with by driving the queue num-

ber. When the PM process **35** grants the cycle to the requesting process, it uses the queue number provided to simultaneously enable the pointers for the queue to the external memory **21**. The PM process **35** will drive the corresponding tail (write cycle) or head (read cycle) pointer onto the external address pins of interface **22** and will perform the necessary pointer maintenance when the cycle completes. The maintenance includes wrapping the head or tail pointer when the boundary of a queue is reached. The PM process **35** will also monitor the queue pointers to detect and signal when a queue is approaching an overflow condition.

Each queue in the external packet memory **21** must be defined before the PM process **35** can perform an access to it. To define a queue, the boundaries for the queue must be specified by programming the external memory block addresses that point to the beginning and end of each queue. A queue is programmable in size in increments of 256 56-bit word units (1792 bytes) which constitute a block. In addition to defining the size of the queue, the owners of the queue head and tail must be specified, to control the direction of packet flow. A separate queue enable is provided for each queue in order to turn each one on and off independently.

The line card processor (LCP) access process **40** provides the interface between the processor **25** and the command and status registers **41** within the controller **10**. Some of these registers are accessed directly by the processor **25** and some are accessed indirectly using the LCP process **40**. The registers **41** that are indirectly accessible are shared among the processes **27, 29, 31, 33,** and **35** of the controller **10** and must be arbitrated for. The indirect access interface of the LCP process **40** provides the mechanisms to select the desired indirect register and to trigger the desired read or write operation. Since the processor **25** does not have direct access to the external packet memory **21** of the controller **10**, it must also use the indirect access interface of the LCP process **40** to perform read and write cycles to the external memory **21**.

In addition to direct and indirect register **41** access, the LCP process **40** also maintains the traffic event counters and interrupt event registers. The LCP process **40** monitors the traffic events signaled by the processes **27, 29, 31, 33,** and **35** to update the corresponding counter. In addition to specified counters, the LCP process **40** provides two general purpose counters that can be programmed to count a particular traffic event. The LCP monitors events in the controller **10** and will set corresponding interrupts. These interrupts are categorized to be associated with inbound traffic, outbound traffic, or fatal interrupts. All interrupts, except fatal interrupts, are maskable. The presence of a non-masked interrupt will result in the assertion of an interrupt signal.

The operation of the processor **20** in controller **10** using the processes referred to includes a number of functions related to inbound and outbound packets. These include filtering, address lookup, address matching, rate limiting, parity checking, etc.

The controller **10** performs input port filtering to prevent undesired traffic from entering the net, and this filtering is based on certain addresses contained in a packet. A 48-bit destination address and a 48-bit source address in the packet can be filtered for a number of addresses, up to the size of the translation table in memory **21**. Certain addresses identified in the protocol as IEEE 802.2 LLC DSAP and IEEE 802.2 LLC SNAP

5,390,173

7                                                                8

can be filtered by checking against items stored in the CAM 23, e.g., 256 entries.

For address lookup, the controller 10 implements an optimized hash algorithm which can perform a 48-bit address lookup in at most four references to the external memory 21. The hash function is programmable, and is specified by a 48-bit value called the hash function. The lookup includes one memory reference to a hash table in memory 21, followed by at most three references to the translation database which contains a breadth-first binary tree in which hashed 48-bit addresses are stored, as will be explained.

The controller 10 supports exact matching of certain 48-bit destination addresses (group or individual), certain 48-bit source addresses, 8-bit DSAP and 40-bit PID 15 fields, by an interface to the external CAM 23. The controller 10 can obtain by interface 24 a 14-bit associated data field for each entry stored in the CAM 23. The ability to match data fields of varying byte widths is achieved by specifying a type code field driven by the controller 10 during the reception of packets. The bits of the type code indicate the size of the field to match in the CAM array 23 and the type of key data. A key can be from one to six bytes in length. When a 48-bit destination or 48-bit source address is found as an entry in the CAM 23, the controller inhibits the hash lookup for this value.

The controller 10 provides programmable rate limits to throttle the packet rate and limit the transmit queue length of excess packets that are destined for switch processing engines. For example, these rate limits would be applied to errored packets, monitor packets, or bridge learning packets with an unknown source address to be sent to the controller 38 for the switch 12.

The controller 10 performs output port filtering based on the added header protocol class, and performs parity checking of the crossbar data path.

The controller 10 can be used to attach a variety of links to the crossbar 12. The parameters that define the operation of controller 10 describe the type of link to which the controller 10 is attached through the MAC interface 19a, 19b, the type of inbound and outbound forwarding procedures it is to perform, and the format of the packets it is to handle.

All external links are attached to the controller 10 through the MAC interface 19a, 19b. Any physical channel can be attached to the controller 10 through a formatter that adheres to the specification of the MAC receive and transmit data paths 19a, 19b. The MAC interface 19a, 19b and the controller 10 can operate in either half or full duplex modes. The crossbar interface 14, 15 of the controller 10 is a full duplex interface that can establish connections and transmit to the crossbar 12 while simultaneously accepting connections and receiving frames from the crossbar.

In addition to the behavior of the links (i.e., data rate and duplex mode), the services that the controller 10 is to provide for the traffic on the attached link 11 must be specified. This aspect of link specification defines the controller 10 inbound and outbound forwarding/filtering procedures and additionally defines the format of the frames which the controller 10 will process. The controller 10 can attach to three types of links, particularly bridge links, internal switch links, and relay links.

A bridge link attaches a network segment 11 of an extended LAN to the net. That is, referring to FIG. 3, what may be thought of as a higher level network 50 (referred to also as the "GigaNet") contains the cross-

bar switch 12 as one of its elements, and the controller 10 is the bridge between the FDDI link 11 and the net 50. Of course, many other LANs such as the FDDI 11 or Ethernet LANs, etc., would be connected to the net 50 via other ports 13 of the crossbar switch 12, or through other crossbar switches 12 in the net 50 (using other controllers 10 or their equivalent). Within the net 50, the crossbar device 12 may function as classic point-to-point connector, or as set forth in the above-mentioned copending applications, may create a ring or bus, or may be create a mixed configuration of rings, buses and point-to-point connectors. The controller 10 will expect to receive and transmit frames in FDDI format at the MAC interface 19a, 19b, and will perform inbound lookups on the destination address, source address, and protocol fields, and translate the packet to switch frame format. The controller 10 will perform outbound checks and will perform protocol class lookup on the switch frames received from the crossbar 12 and translate the frames back to FDDI frame format prior to transmission to the MAC interface 19a, 19b.

An internal switch link connects switches in the net 50 together or attaches net end nodes to the net 50. Again, the controller 10 can operate in this switch link mode. In this mode, the controller 10 will expect to receive and transmit frames in switch frame format at its MAC interface 19a, 19b. It will perform inbound checks on the switch frame and transmit the packet to the crossbar 12. The controller 10 will perform outbound checks on the switch frame received from the crossbar and will transmit to the MAC interface 19a, 19b a switch frame.

A relay link uses a full duplex FDDI link to attach switches 12 in the net 50 together. The controller 10 functioning in this mode will expect to receive and transmit frames in a relay frame format at the MAC interface 19a, 19b, and here its operation is similar to switch link attachment and simply translates the packet format by adding or stripping a local packet header.

The type of link (bridge link, switch link, or relay link) that the controller 10 is attached to at the MAC interface 19a, 19b is specified by either decoding the frame control field of the received packet or by a type field in a control register 41 within the controller 10.

Once the link type that the controller 10 is attached to is specified, the inbound and outbound processes 27, 29, 31, and 33 know the format of the frames that will be processed and the forwarding procedures it is to perform.

Referring to FIG. 4, the three different frame formats that may exist at the MAC interface 19a, 19b are illustrated, including an FDDI frame format 54, a switch frame format 55 (which encapsulates the FDDI frame 54), and a relay frame format 56 (which encapsulates the switch format 55).

The original FDDI frame format 54 is of the form specified by the FDDI protocol, and will not be described in detail. Within the FDDI format 54 are an FDDI header 57, an 802.2 LLC header 58, an information field 59 (the payload), and an FDDI CRC field 60. Various other elements such as starting and ending delimiters are present. Within the header 57 are 48-bit source and destination addresses 61 and 62, and these are used in the address lookups as described herein. Other special addresses or identification specified in the protocol are contained in the LLC header 58, such as the ones mentioned above (DSAP and SNAP). Each of these addresses is extracted by the controller 10 and

5,390,173

9
10

used for lookups and filtering as described herein. The FDDI frame format 54 is found at the MAC interface 19a, 19b of the controller 10. When attached to bridge links, this will be the format of the frames received by the IR process 27 and will be the format of frames transmitted by the OT process 33.

The switch frame format 55 of FIG. 4 is seen to be merely the original FDDI frame 54 to which is attached at the beginning an added header 63, also referred to as the "gigaheader". This added header 63 is described in detail below and is an important feature of the invention. The switch frame format 55 can appear on both the MAC interface 19a, 19b and the crossbar interface 14, 15. At the crossbar interface 14, 15, this is the common packet format used by the switch ports 13. It is the 15 format transmitted by the IT process 29, and it is the format received by the OR process 31.

The relay frame format 56 of FIG. 4 consists of a switch frame format 55 (including FDDI format 54 and added header 63), to which is added a local FDDI 20 header 64 and a local FDDI CRC field 65. The local FDDI header 64 is of the same specification as the FDDI header 57, and is defined in the FDDI protocol. This type of frame 56 is found at the MAC interface 19a, 19b of the controller 10 when it is attached to a 25 relay link.

Referring to FIG. 5, the added header 63 (or "gigaheader") is a thirteen byte (104-bit) field that is present in switch frames 55 and relay frames 56. It contains information that is generated by the inbound receive 30 (IR) process 27 when a packet first enters the net 50 and is used to direct the packet to its destination within the net 50. This field 63 defines how the packet is to be serviced within the net 50. The packet processing within the net 50 is performed by examining the fields of 35 this added header 63. Each of the fields in the added header 63 will now be described.

The service class field 65 is a four-bit field that specifies the service class for the packet. For the receivers of the controller 10, the service class is used to determine 40 the queue number in memory 21 that a packet is to be placed on by doing a lookup using certain internal registers 41. On the crossbar 12, the service class is also used for connection queue servicing.

The destination switch field 66 is a 12-bit field representing the switch number (i.e., local address) of the final destination of the packet within the net 50. When a packet is received from an FDDI link 11, the IR process 27 performs a lookup operation to derive the destination switch value for the packet. A 12-bit address allows 50 4096 ports; a single crossbar 12 has only thirty-six ports in one embodiment, so the need for a 12-bit address is because a number of the crossbars 12 may be within a net 50, and to allow for expansion to larger crossbars and larger nets 50. Certain switch values are reserved: 55 $02_{hex}$ and $03_{hex}$ indicate that the final destination is unknown to the IR process 29, and $00_{hex}$ and $01_{hex}$ indicate that the final destination address is to be filtered at this port. Other values derived for this field will direct the packet to its destination within the switch. 60

The decapsulate bit 67, when set to one, indicates that this packet is to be decapsulated when it goes out onto a link that supports both relay and bridge frames. The outbound processes 31 and 33 of the controller 10 will sample this bit to make a determination of the transmission format to use. Usually this bit is set to zero.

The destination link 68 is a 7-bit field representing the logical link number of the final destination of the packet, except when switch field 66 equals $00_{hex}$, in which case this field 68 is the physical link number of the port that is to receive the message. The IR process 29 will generate this field when constructing the added header 63 for frames received from the FDDI interface 19a, 19b. When enabled, the OR process 31 will compare this field to its own logical link number to verify that the crossbar connection is established in the correct port. Logical link numbers 00-to-$07_{hex}$ are reserved for addressing the switch control processors x for switches 12 in the net 50.

The protocol class field 69 of FIG. 4 is an 8-bit field representing the protocol class assigned to the packet within the net 50. The IR process 29 will generate this field 69 when constructing the added header 63 for frames received from the FDDI interface 19a, 19b. The OR process 31 will sample this field 69 for frames received from the crossbar 12 to determine if the packet is enabled to be forwarded in the outbound direction. The values F0-to-$FD_{hex}$ of this field 69 are reserved for special net-wide protocols such as inter-switch control messages, initialization protocols, implementation of protocol trapping, and frames destined for a line control processor 25. The values FE and $FF_{hex}$ are used as filter protocol values. All other numbers are user-assignable.

The source link type field 70 is a four bit field representing the type of data link that sourced the packet that the current added header 63 is attached to. This field 70 can be used to specify additional translation processing during the forwarding of the frame. The controller 10 does not use this field during packet processing.

The source switch field 71 is a 12-bit field representing the switch number of the original source of this packet in the net 50. The values 00-to-$03_{hex}$ are illegal on all data links, and certain ones are reserved; all other numbers are user assignable.

The source link field 72 is a 7-bit field representing the logical link number of the original source of this packet in the net 50. The values 00-to-$07_{hex}$ are reserved for use by the switch control processor x.

The previous hop link field 73 is a 7-bit field representing the physical link number of the previous hop link. Thus it represents the link number that is currently sending the packet to the crossbar 12.

The translation status field 74 is a 4-bit field which stores the result of the automatic translation performed on the current packet. The status may indicate whether the frame is to be forwarded to its destination, monitored, trapped, logged, or whether the source address of the frame was "new."

The type of time field 75 of FIG. 4 is a 1-bit field representing the format for the timestamp in the current packet. When this bit is "0" the timestamp field represents absolute time, and when set to "1" the time stamp field is interpreted as a relative time to live.

The end-of-packet stream field 76 is a 1-bit field which, when set to one, indicates that this packet is the last packet in a packet stream. Otherwise, when set to zero, it indicates the first or a middle packet in a packet stream.

The system port field 77 is a 1-bit field which, when set to one, indicates that this packet is being sent from a system port (e.g., a switch control processor x port). This bit can be used during outbound packet processing to restrict certain types of packet to originate only from system ports.

The copied frame field 78 is a 1-bit field which, when set to one, indicates that a copy frame is being sent to

5,390,173

11
12

the crossbar 12. Copy frames are used to send exception traffic to engines within the switch 12.

The outbound congestion bit 79 is a 1-bit field that is used to associate outbound congestion information with the added header 12 of the current packet.

The inbound congestion bit 80 is a 1-bit field that is used to associate inbound congestion information with the added header 12 of the current packet.

The timestamp field 81 is a 16-bit field representing a value from 00 to 65535 which is either the lowest 16-bits of an absolute time that the packet must be destroyed, or the number of time units the packet has to live. One time unit is 10-milliseconds. The timestamp is generated by the inbound receive process 27.

Reserved field 82 represents 4-bits reserved for future specification. These should be sent as zeros and otherwise ignored.

The header check field 83 is an 8-bit CRC covering the previous 96-bits of the 104-bit added header 63 (the "gigaheader").

The frame translation performed within the controller 10 will now be described. The controller 10 forwards inbound and outbound frames and performs the necessary translation to generate the desired packet formats 54–56, e.g., adding the header 63 if necessary. The forwarding and translation procedures that are performed by the processes 27, 29, 31, and 33 of the controller 10 are a function of the link type that the controller 10 is attached to and of course a function of whether the packet is inbound or outbound.

For inbound processing of a packet received where the MAC link type is "bridge" and the MAC frame format is FDDI format 54, with the crossbar switch 12 frame format being "switch" format 55, the actions performed are:

Perform a lookup of the frame control field of the received packet. Process the destination address 61, source address 62, and protocol fields of the inbound FDDI frame 54. Determine if the packet is to be forwarded/monitored and if there are any exception conditions. Generate the service class field 65, the destination switch field 66, the destination link field 68, and the protocol class field 69. Add a timestamp field 82 and the remaining header 63 fields to form a switch frame 55. Queue the packet in memory 21.

For inbound processing of a packet received where the MAC link type is "bridge" and the MAC frame format is "bridge" format 55, with the crossbar switch 12 frame format being "switch" format 55, the actions performed are:

Perform a CAM lookup in CAM 23 using the protocol class field 69 of the received header 63. Check if the packet is to be monitored or trapped. Clear the system port bit 77 and check the timestamp 82 and checksum 83 for the header 63. Add the updated header 63 to the frame.

For inbound processing of a packet received where the MAC link type is "relay" format 56 and the MAC frame format is "relay" format 56, with the crossbar switch 12 frame format being "switch" format 55, the actions performed are:

Perform a lookup of the frame control field of the received packet. The local header 64 is checked and removed from the relay frame 56. The procedure then proceeds as specified by the switch link.

For outbound processing of a packet received where the MAC link type is "bridge," the crossbar switch 12 frame format is "switch" format 55, and the MAC frame format is FDDI format 54, the actions performed are:

Check added header 63 checksum 83 for the received frame. Check the fields of the header 63, including destination switch field 66, destination link field 68, and system port bit 77. Perform protocol class lookup for field 69. Verify that the timestamp 82 is still good, if not discard the frame. Strip header 63 from the packet to realize an FDDI frame format 54.

For outbound processing of a packet received where the MAC link type is "switch," the crossbar switch 12 frame format is "switch" format 55, and the MAC frame format is "switch" format 55, the actions performed are:

Check the added header 63 checksum 83 for the received frame. Check the fields of the header 63, including destination switch field 66, destination link field 68, and system port bit 77. Perform protocol class lookup for field 69. Verify that the timestamp 82 is still good, if not discard the frame.

For outbound processing of a packet received where the MAC link type is "relay," the crossbar switch 12 frame format is "switch" format 54, and the MAC frame format is "relay" format 56, the actions performed are:

The local header 64 is added to the switch frame 55. The procedures then proceed just as specified by the switch link, i.e., the frame is treated as if it were an FDDI frame 54.

During the frame forwarding procedure, the controller 10 makes use of several lookup mechanisms to process the fields of the frame. These include the CAM lookup, the hash lookup, a class specifier lookup, and a protocol class lookup.

The CAM lookup consists of applying an address or value to the CAM 23, and getting back an indication of whether or not a match is found in the CAM 23. The CAM 23 is of limited size due to the cost (number of transistors) inherent in constructing a CAM. In an example embodiment, the CAM 23 holds 256 entries. Thus, there can be 256 values (addresses, etc.) that are searched for in a CAM lookup. The IR process 27 uses the CAM lookup to perform matches using the various fields of the received frame 54, 55, or 56 as keys. Variable width key matching is provided, up to six bytes wide, and this is specified by the IR process 27 during the parse of the frame, and a match result return an associated data value that will be used by the IR process 27. This CAM match can be used to find the frame control, destination address, source address, DSAP and SNAP fields of bridge and relay link packets. It can also be used to find the protocol class field 69 of the added header 63 of the switch link packets 55.

A protocol class lookup is performed by the OR process 31 to determine if the protocol class field 69 in the added header 63 for a frame received from the crossbar switch 12 via line 15 indicates that this protocol class is enabled to be forwarded outbound.

The hash lookup is a feature of the invention disclosed in the above-mentioned copending application Ser. No. 07/964,738. A hash lookup is used by the IR process 27 (in conjunction with a CAM lookup) to process the 48-bit destination and source fields 61 and 62 of received frames. The 48-bit addresses 61 and 62 may be globally unique addresses, i.e., each station may have an address that is unique to that station. The ad-

5,390,173

13

dress range covers $2^{40}$ or approximately $3 \times 10^{14}$ (300 trillion) unique values, so an address may never need to be duplicated in any foreseeable systems. Within an extended network, however, the number of unique addresses needed is usually only a few thousands or at most tens of thousands. Therefore, a table of all of the addresses being used in a network at a given configuration only contains, for example, a maximum of 64K or $2^{16}$, entries, which would use merely a 16-bit address. For this reason, the 48-bit globally-unique address 61 or 62 is hashed, producing a 16-bit locally-unique address. An incoming address field 85 as seen in FIG. 5 is subjected to a hash function 86 to produce another 48-bit value 87, then a 16-bit part 88 of this 48-bit value 87 (the least significant 16-bit field) is used to index into a 64K-entry table in memory 21, this being referred to as the hash table 89. Each word of the memory 21 is 56-bits wide, so a word can contain three of these hash entries, in three "hash buckets" 90 for each word 91, as seen in FIG. 6. When a hashed address 87 is generated during the processing of packets, the 16-bit index 88 is used to select one of the 22K words 91 in the hash table 89 and one of the three hash buckets 90 at this index. Each bucket 90 is an 18-bit field containing a 3-bit value 92 indicating the bucket size, one to seven entries, and a 15-bit field 93 acting as a translation table pointer. The 16-bit input 88 indexes to a word 91 depending upon its lower order bits and one-of-three buckets 90 in a word 91 depending upon its higher ordered bits, indexed for one-of-22K selection of the word 91 in the table. The translation table pointer 93 returned by the hash bucket 90 in the hash table 89 is used to select a breadth-first balanced binary tree as illustrated in FIG. 7. The trees are stored in a translation table 94 in memory 21, and each tree has between one and seven entries, as indicated by the size field 92. The binary tree cannot cross a block boundary in the translation table 94 in memory 21. The ordering of entries 96 in a breadth-first balanced binary tree for various table sizes is illustrated in FIG. 7. Note that there are from one to seven entries (each entry a 48-bit address) in a tree, ordered such that

A<B<C<D<E<F<G

Each entry 96 contains 32-bit hash remainder field 97 that is left after using the low-order 16-bit value 88 from the hashed 48-bit address to store an address. To traverse the tree, the IR process fetches the first entry 96, and the 32-bit value 97 in this entry is compared to the upper 32-bit value 97 of the incoming hashed address 87 (from the packet being evaluated). If the two values match, the remaining fields of the entry 96 in the translation table 94 provide the IR process 27 with the information it needs for processing that field of the packet. Otherwise, the IR process will continue traversing the binary tree by selecting the next entry as a function of whether the has remainder is less than or greater than the current entry 96. The hash remainders 97 are compared, and if the incoming value 97 is less than the stored value 97 the left branch 98 is picked, while if greater than the right branch 99 is picked. The tree traversal will continue until a match is found until a match is found or the tree is exhausted. For each hash lookup and tree traversal, up to four memory requests to external memory 21 will be made by the IR process 27. One memory request is required to obtain the hash bucket 90, and then up to three more memory requests are needed to traverse the binary tree of FIG. 7 (e.g., D—B—C of the 7-entry tree). The arbiter of the PM

14

process 35 provides priority service for memory requests associated with this search process in the IR process 27, and will allocate up to every other memory cycle for the IR lookup during packet reception.

The address lookup procedure used by the IR process 27, as just described, is also illustrated in FIG. 8. The 48-bit destination address 61 from an incoming packet is simultaneously subjected to the hash function 86 and a CAM match; if a CAM match is found in CAM 23, an index into the translation table 94 is immediately generated as indicated by the line 100. If not, the 16-bit field 88 of the hashed address 87 is used to index into the hash table 89 to select a hash bucket 90, and this selected hash bucket contains a pointer 93 into the translation table 94. The binary tree found in the translation table 94 will have a size indicated by the 3-bit field 92. Each entry 96 in the tree has a 32-bit remainder field 97 which is compared at comparator 101 with the 32-bit remainder in the hashed address 87 to either find a match or progress through the tree from a maximum of three fetches.

When the hash function 86 is implemented to build the hash table 89 and translation table 94, as upon initialization of a network and whenever the network is reconfigured by adding stations or bridges, there is a small but finite probability that more than seven addresses will hash to the same bucket. If this occurs, the address producing the collision in trying to load the table will be stored in the CAM 23. Perhaps thirty-two or so of these collision addresses can be stored in the 256-entry CAM 23 without degrading its other functions. Thus, since every address is compared with the CAM entries anyway (to filter for multicast messages, SNAP filtering, etc.), and this compare in the CAM is done in parallel with the hash function, the CAM compare is without cost in time or new circuitry. Were this outlet not available, the occurrence of more than seven entries for a hash bucket would result in the necessity to chose a new hash function and recalculate all the addresses to rebuild the hash table 89 and the translation table 94; this would require a period of down time where the controller 10 could not respond to incoming traffic since the hash and translation tables would be unavailable, and processor time would be monopolized by the rebuild. The 48-bit source and destination addresses are often not randomly selected, but instead are assigned in blocks or patterns and otherwise increase the likelihood of hashing to the same bucket. Alternatively, one way of avoiding the consequences of having to rebuild the hash table 89 is to generate two hash tables in memory 21 using two different hash functions, so if the one being used generates a collision (more than seven in a hash bucket), processing switches to the alternate hash table where a collision is very unlikely; this requires extra size for memory 21, however. The availability of the CAM lookup for instances where there are a few collisions in loading the hash buckets has the advantage of not imposing any significant burden in time or in memory usage.

While the invention has been described with reference to a specific embodiment, the description is not meant to be construed in a limiting sense. Various modifications of the disclosed embodiment, as well as other embodiments of the invention, will be apparent to persons skilled in the art upon reference to this description. It is therefore contemplated that the appended claims will cover any such modifications or embodiments which fall within the true scope of the invention.

5,390,173

15

What is claimed is:

1. A packet data communications network comprising:

a first network segment having a plurality of stations, one of said stations sending a message packet onto said first network segment of a first format; said first format including a first header and a data field with network destination address in said communications network;

a first network transfer device having an input connected to said first network segment to receive said message packet and having an output; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header further including local status information and a plurality of status fields to indicate a message packet servicing;

a switching device having a plurality of ports, a first of said ports being connected to said output of said first network transfer device; the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and the plurality of status fields;

a second network transfer device having an input connected to said second of said ports of said switching device and having an output connected to a second network segment, the second network transfer device receiving said message packet via said switching device to forward to said second network segment; the second network transfer device removing said second header from said message packet.

2. A network according to claim 1 wherein said network has a plurality of links, and each of said links is assigned a link number, and said second header includes a link number for a source of said message packet and a link number for a destination of said message packet.

3. A network according to claim 1 wherein said destination address contains N bits, and said switch address contains M bits, where N and M are integers and N >>M.

4. A network according to claim 3 wherein said packet includes a network source address of N bits, and said added header contains a source switch address of M bits translated from said network source address.

5. A network according to claim 4 wherein said switching device is a crossbar switch.

6. A network according to claim 5 wherein said first network segment is a serial FDDI link, and said ports are parallel ports.

7. A network according to claim 6 wherein said added header contains a service class field, and said switching device processes said packet in response to said service class field.

8. A network according to claim 7 wherein said added header contains a protocol class field, and said switching device processes said packet in response to said protocol class field.

9. A network according to claim 8 wherein said added header contains a status field indicating local congestion, and said switching device processes said packet in response to said status field.

10. A method of operating a packet data communications network, the network including a first network segment having a plurality of stations and a second

16

network segment having a plurality of stations, and including a switching device interconnecting said first and second segments, comprising the steps of:

sending from one of said stations of said first network segment a message packet of a first format onto said first network segment; said first format including a first header and a data field with a network destination address in said communications network;

receiving said message packet at a first network transfer device having an input connected to said first network segment; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header further including local status information and a plurality of status fields to indicate a message packet servicing;

receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port of said switching device as selected by said switching address, and in response to said local status information and the plurality of status fields;

receiving said message packet at said second network transfer device via said switching device and forwarding said message packet to said second network segment; the second network transfer device removing said second header from said message packet.

11. A method according to claim 10 wherein said network has a plurality of links, and each of said links is assigned a link number, and inserting in said second header a link number for a source of said message packet and a link number for a destination of said message packet.

12. A method according to claim 10 wherein said destination address contains N bits, and said switch address contains M bits, where N and M are integers and N >>M.

13. A method according to claim 12 wherein said packet includes a network source address of N bits, and inserting in said added header a source switch address of M bits translated from said network source address.

14. A method according to claim 13 wherein said switching device is a crossbar switch.

15. A method according to claim 14 including transmitting on said first network segment by a serial FDDI method, and said port of said switching device being a parallel port.

16. A method according to claim 15 including inserting in said added header a service class field, and said switching device processes said packet in response to said service class field.

17. A method according to claim 16 including inserting in said added header a protocol class field, and said switching device processes said packet in response to said protocol class field.

18. A method according to claim 17 including inserting in said added header a status field indicating local congestion, and said switching device processes said packet in response to said status field.

19. A packet data communications network comprising:

a first network segment having a plurality of stations, one of said stations sending a message packet onto said first network segment of a first format; said first format including a first header and a data field

5,390,173

**17**

with network destination address in said communications network;

a first network transfer device having an input connected to said first network segment to receive said message packet and having an output; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a service class field;

a switching device having a plurality of ports, a first of said ports being connected to said output of said first network transfer device; the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said service class field;

a second network transfer device having an input connected to said second of said ports of said switching device and having an output connected to a second network segment, the second network transfer device receiving said message packet via said switching device to forward to said second network segment; the second network transfer device removing said second header from said message packet.

20. A packet data communications network comprising:

a first network segment having a plurality of stations, one of said stations sending a message packet onto said first network segment of a first format; said first format including a first header and a data field with network destination address in said communications network;

a first network transfer device having an input connected to said first network segment to receive said message packet and having an output; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a protocol class field;

a switching device having a plurality of ports, a first of said ports being connected to said output of said first network transfer device; the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said protocol class field;

a second network transfer device having an input connected to said second of said ports of said switching device and having an output connected to a second network segment, the second network transfer device receiving said message packet via said switching device to forward to said second network segment; the second network transfer device removing said second header from said message packet.

21. A packet data communications network comprising:

a first network segment having a plurality of stations, one of said stations sending a message packet onto said first network segment of a first format; said first format including a first header and a data field with network destination address in said communications network;

**18**

a first network transfer device having an input connected to said first network segment to receive said message packet and having an output; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a local congestion status field;

a switching device having a plurality of ports, a first of said ports being connected to said output of said first network transfer device; the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said local congestion status field;

a second network transfer device having an input connected to said second of said ports of said switching device and having an output connected to a second network segment, the second network transfer device receiving said message packet via said switching device to forward to said second network segment; the second network transfer device removing said second header from said message packet.

22. A method of operating a packet data communications network, the network including a first network segment having a plurality of stations and a second network segment having a plurality of stations, and including a switching device interconnecting said first and second segments, comprising the steps of:

sending from one of said stations of said first network segment a message packet of a first format onto said first network segment; said first format including a first header and a data field with a network destination address in said communications network;

receiving said message packet at a first network transfer device having an input connected to said first network segment; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a service class field;

receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port of said switching device as selected by said switching address, and in response to said local status information and said service class field;

receiving said message packet at said second network transfer device via said switching device and forwarding said message packet to said second network segment; the second network transfer device removing said second header from said message packet.

23. A method of operating a packet data communications network, the network including a first network segment having a plurality of stations and a second network segment having a plurality of stations, and including a switching device interconnecting said first and second segments, comprising the steps of:

sending from one of said stations of said first network segment a message packet of a first format onto said first network segment; said first format includ-

5,390,173

19

20

ing a first header and a data field with a network destination address in said communications network;

receiving said message packet at a first network transfer device having an input connected to said first network segment; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a protocol class field;

receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port of said switching device as selected by said switching address, and in response to said local status information and said protocol class field;

receiving said message packet at said second network transfer device via said switching device and forwarding said message packet to said second network segment; the second network transfer device removing said second header from said message packet.

24. A method of operating a packet data communications network, the network including a first network segment having a plurality of stations and a second network segment having a plurality of stations, and

including a switching device interconnecting said first and second segments, comprising the steps of:

sending from one of said stations of said first network segment a message packet of a first format onto said first network segment; said first format including a first header and a data field with a network destination address in said communications network;

receiving said message packet at a first network transfer device having an input connected to said first network segment; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a local congestion status field;

receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port of said switching device as selected by said switching address, and in response to said local status information and said local congestion field;

receiving said message packet at said second network transfer device via said switching device and forwarding said message packet to said second network segment; the second network transfer device removing said second header from said message packet.

* * * * *

EXHIBIT 3

US006128665A

# United States Patent [19]

## Iturralde

[11] **Patent Number:** 6,128,665

[45] **Date of Patent:** Oct. 3, 2000

[54] **SYSTEM FOR BROADCASTING MESSAGES TO EACH OF DEFAULT VLAN PORTS IN SUBSET OF PORTS DEFINED AS VLAN PORTS**

[75] Inventor: **Carol E. Iturralde**, Framingham, Mass.

[73] Assignee: **Cabletron Systems, Inc.**, Rochester, N.H.

[21] Appl. No.: **08/774,541**

[22] Filed: **Dec. 30, 1996**

[51] **Int. Cl.**[7] ...................................................... G06F 13/00
[52] **U.S. Cl.** ........................... **709/238;** 709/242; 709/244
[58] **Field of Search** ..................................... 370/401, 402; 395/500, 200.68, 200.72, 200.74

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,823,338 | 4/1989 | Chan et al. . |
| 5,394,402 | 2/1995 | Ross ................................ 370/402 |
| 5,613,069 | 3/1997 | Walker ............................ 395/200.68 |
| 5,684,800 | 11/1997 | Dobbins et al. ................ 370/401 |
| 5,734,865 | 3/1998 | Yu .................................. 395/500 |
| 5,740,171 | 4/1998 | Mazzola et al. ............... 370/401 |
| 5,742,604 | 4/1998 | Edsall et al. ................... 370/401 |
| 5,752,003 | 5/1998 | Hart ................................ 395/500 |

### OTHER PUBLICATIONS

Saunders, S., "Building Virtual LANS on a Real-World Budget Lanart's Segway Works with Ethernet Switches to Deliver Virtual LANS Powers at a Low Cost", Data Communications, vol. 24, No. 13, Sep. 21, 1995, pp. 39/40 XP000526194.

"Virtual LANS Get Real Ethernet Switch Makers are Taking the Lead in Deploying Virtual LANS Across Campus Networks," Data Communications, vol. 24, No. 3, Mar. 1, 1995.

Anderson, J. K., "Virtual LANS Take Network to Next Level", Computer Technology Review, vol. 16, No. 9, Sep. 1996, pP. 12, 14 XP00042987.

Morency et al., "VLANS: Can LaYer 3 Save the Day", Business Communications Review, vol. 26, No. 12, Dec. 1996, pp. 47–50 XP0020642987.

McGibbon, "Virtual LANS Come of Age" Telecommunications (International Edition), vol. 30, No. 6, Jun. 1996, pp. 48–52, XP002062191.

Networking Solutions Center, The Virtual LAN Technology Report, David Passmore and John Freeman. Dec. 9, 1996.

Strategic Directions, 3Com Transcend VLANS (Leveraging Virtual LAN Technology to Make Networking Easier), VLAN Strategic Directions Paper. Dec. 9, 1996.

Virtual LAN Communications (Statement of Direction: Cisco VLAN Roadmap, White Paper: Cisco IOS VLAN Services, Technology Brief: VLAN Interoperability). Dec. 9, 1996.

Cisco VLAN Roadmap (White Paper: Cisco IOS VLAN Services, White Paper: Virtual LAN Communications, Technology Brief: VLAN Interoperability). Dec. 9, 1996.

VLANs and Routers (Mixing routers, switches and VLANS) Dec. 9, 1996.

White Paper, Switching Paradigms (Everything Has Changed Except the Network) Dec. 9, 1996.

Fundamentals of Switching, Preface, Table of Contents, Chapters 1–5 (12 pages) Dec. 9, 1996.

Cisco Catalyst 5000 Modular Multilayer–Capable Switching System, Product Announcements.

Anderson, J.K. ("Virtual LANs Take To Next Level", Computer technology Review, vol. 16, No. 9, Sep. 1996, pp. 12–14.

Primary Examiner—Krisna Lim
Assistant Examiner—Philip B. Tran
Attorney, Agent, or Firm—Wolf, Greenfield & Sacks, P.C.

[57] **ABSTRACT**

A data transmission network having a port-based default VLAN that limits flooding to other VLANs. The default VLAN receives a data packet, ascertains the destination address of the packet, and then determines if the destination port is one of the default VLAN ports. The data packet is transmitted to the destination port if it is one of the default VLAN ports, or to each of the default VLAN ports if the destination port is not one of the default VLAN ports. The data packet is not transmitted to any other non-default VLAN port.

**8 Claims, 4 Drawing Sheets**





*FIG. 1*





*FIG. 2*

28

26



30

*FIG. 3*



*FIG. 4*

6,128,665

1

# SYSTEM FOR BROADCASTING MESSAGES TO EACH OF DEFAULT VLAN PORTS IN SUBSET OF PORTS DEFINED AS VLAN PORTS

## FIELD OF THE INVENTION

This invention generally relates to data transmission networks and, more particularly, to virtual local area networks.

## BACKGROUND OF THE INVENTION

A data network typically includes several nodes connected together by a data transport medium. One common method of transmitting data between the nodes is to break the data up into discrete "packets" of data. Packets can be transported over the medium by any one of a variety of transport techniques. In applications utilizing packetized data, data to be transported first is broken up into discrete packets of data, then transmitted through the network medium, and finally reassembled at a destination node. In accordance with current packet protocol, each packet generally comprises a header and an information field. The header contains the information used to transport the cell from one node to the next while the packet data is contained in the information field. Among other information in the header is the destination address of the data packet.

A local area network (i.e., "LAN") is a type of local data network commonly used in a single office or building. LANs are an efficient mechanism for maximizing use of network resources by members of the LAN. Simple LANs typically include two or more nodes (e.g., a server, computer, printer, or other resource) that are interconnected by a common physical connection such as, for example, a hub. Data switches also may be connected to the hub for directing data traffic and for connecting the LAN to other data networks.

LANs can be inconvenient and expensive to maintain. For example, moving a user to another location within a relatively large office building often requires that the LAN be rewired and reconfigured. This can be cumbersome and expensive. The art has responded to this problem by developing virtual local area networks (i.e. "VLANs").

A VLAN is generally defined as a group of nodes interconnected by software to form a single logical broadcast domain. VLANs may be connected to nodes that are members of any number of physical LAN segments. Among many advantages, VLANs enable network administrators to create logical groupings of users and network resources, thereby allowing remote users and resources to appear as if they are members of a single LAN. This enables companies and other organizations to build dynamic, flexible, and distributed LANs, thus simplifying physical moves of a user in a network.

VLANs may be formed by defining logical groups of users within the VLAN. One such VLAN, known as a "port-based" VLAN, defines the VLAN as a collection of switch ports on one or more switches across a hub. Users connected to those defined switch ports therefore are members of the defined VLAN. Broadcast messages directed to that VLAN may be transmitted through the defined switch ports only. Known port-based VLANs typically are implemented on a switch to include a default VLAN, in addition to other VLANs that may be formed on the switch. During manufacture, the default VLAN is defined as every port on a single switch. The number of switch ports defining the default VLAN decreases, however, as ports on the switch are used for defining other VLANs. Accordingly, on an exemplary eight-port switch having a first VLAN defined by ports

2

one and two, the default VLAN will be defined by remaining ports three through eight.

Known port-based default VLANs have data leakage problems that can compromise the security of data transmitted across a network. Specifically, port-based default VLANs transmit a data packet to every switch port when that packet is received by the default VLAN and is destined for a port that is not in the default VLAN. Continuing with the above example, a data packet received on a port defining the default VLAN (i.e., one of ports three through eight) and destined for another port also on the default VLAN will be transmitted to the destination port only. In the event that the data packet was destined for a port on the first VLAN (i.e., port one or two), however, the packet would be transmitted to all of the ports on the switch, thus creating the above mentioned security problem.

Accordingly, it would be desirable to provide a port-based default VLAN that prevents such leakage problems between VLANs. It is among the general objects of this invention to provide such a device and method.

## SUMMARY OF THE INVENTION

In accordance with the principles of the invention, a port-based default VLAN is provided that prevents leakage problems across VLANs. To that end, the default VLAN includes means for transmitting data received by the default VLAN to ports defining the default VLAN only. No other ports on the switch will receive a data packet that was received on a port defining the default VLAN.

In accordance with another aspect of the invention, each of the ports on a plurality of switches connected to a hub are configured, during manufacture, to define a default VLAN spanning the plurality of switches. To that end, the default VLAN includes a bus in the hub, an enable switch for electrically connecting each of switches to the bus, and means for defining each of the switch ports as the default VLAN.

It is among the objects of the invention to provide port-based default VLAN and method that prevents leakage across the ports of a switch.

It is another object of the invention to provide a port-based default VLAN that, is configured, during manufacture, to span a plurality of switches connected to a hub.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and further advantages of the invention may be better understood by referring to the following description in conjunction with the accompanying drawings and which:

FIG. 1 is a block schematic diagram of a partial data network assembly for implementation of the invention;

FIG. 2 is a block schematic diagram of a switch that forms a port-based, default VLAN;

FIG. 3 is a schematic diagram of a data packet; and

FIG. 4 is a flow chart that specifies the method used for preventing leakage from the default VLAN.

## DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

FIG. 1 shows a partial data network assembly 10 for implementation of the invention, comprising a hub 12 having hub ports 14, and switches 16 connected to the hub ports 14. The hub 12 may be a DEChub Multiswitch 900, available from Digital Equipment Corporation of Maynard,

6,128,665

**3**

Mass. Each of the switches 16 has a plurality of switch ports 18 (e.g., eight) connecting various network resources, such as servers, computers, and printers, to the network. A bus 20 spanning each of the hub ports 14 may be enabled by an enable switch 24 to interconnect each of the switches 16. This consequently interconnects each of the switch ports 18 across each of the interconnected switches 16. In the preferred embodiment, the bus 20 is enabled during manufacture, thus defining the default VLAN as all of the ports of the interconnected switches 16. The enable switch 24 may be implemented as firmware within the hub 12, or as a manually actuated switch on the hub 12.

New port-based VLANs may be formed across one or more of the switches 16 by selecting combinations of interconnected switch ports 18. Selected switch ports 18 for new VLANs consequently are removed from the default VLAN definition, thus reducing the size of the default VLAN. No data packets received on any one of the default VLAN ports may be transmitted to the ports that define other VLANs.

FIG. 2 shows an exemplary eight port switch 16 forming a default VLAN, VLAN 2, and VLAN 3. Ports one and two define the default VLAN, ports three to five define VLAN 2, and ports six to eight define VLAN 3. Data packets received on switch ports one or two may be transmitted to either or both of those switch ports 18 only, thus preventing leakage to VLAN 2 and VLAN 3. For example, a data packet received on port two having a destination address of port four will be transmitted to both ports one and two only. Similarly, a data packet received on port two having a destination address of port one will be transmitted to port one only. VLAN 2 and VLAN 3 limit leakage in like fashion.

FIG. 3 shows a data packet 26, comprising a header 28 and an information field 30. The destination address of the data packet 26 is stored in the header 28 of the data packet 26. The switch port 18 associated with the destination address is ascertained by conventional means within the switch 16 receiving the data packet 26. This information is used by the method shown in FIG. 4.

FIG. 4 shows a flow chart that specifies the method used for preventing leakage from the default VLAN. More particularly, the destination port address is ascertained from the header 28 of a data packet received on one of the default VLAN ports (step 400). At step 402, it is determined if the destination port is one of the default VLAN ports. If the destination port is one of the default VLAN ports, that data packet is transmitted to the destination port only (step 404). If the destination port is not one of the default VLAN ports, the data packet is transmitted to all of the default VLAN ports only (step 406). The data packet is transmitted to no other switch ports 18.

The default VLAN may be assigned a default VLAN tag that is assigned to a data packet when it enters through one of the default VLAN ports. The switch 16 then may be configured to prevent transmission of any data packet, having an associated default VLAN tag, through any of the other, non-default VLAN ports.

The invention may be implemented by means of a programmable logic chip within the one or more switches 16 used for the invention. The invention may also be implemented as firmware stored within those switches 16. Both implementations may be programmed by conventional methods.

In an alternative embodiment, the invention may be implemented as a computer program product for use with a computer system. Such implementation may include a series

**4**

of computer instructions fixed either on a tangible medium, such as a computer readable media (e.g. diskette, CD-ROM, ROM, or fixed disk) or transmittable to a computer system, via a modem or other interface device, such as communications adapter connected to the network over a medium. The medium may be either a tangible medium (e.g., optical or analog communications lines) or a medium implemented with wireless techniques (e.g., microwave, infrared or other transmission techniques). The series of computer instructions embodies all or part of the functionality previously described herein with respect to the invention. Those skilled in the art should appreciate that such computer instructions can be written in a number of programming languages for use with many computer architectures or operating systems. Furthermore, such instructions may be stored in any memory device, such as semiconductor, magnetic, optical or other memory devices, and may be transmitted using any communications technology, such as optical, infrared, microwave, or other transmission technologies. It is expected that such a computer program product may be distributed as a removable media with accompanying printed or electronic documentation (e.g., shrink wrapped software), preloaded with a computer system (e.g., on system ROM or fixed disk), or distributed from a server or electronic bulletin board over a network (e.g., the Internet or World Wide Web).

The inventive default VLAN thus prevents leakage to other VLANs by transmitting received data packets to default VLAN ports only. Security thus is ensured for data packets transmitted to the default VLAN. Furthermore, the initial size and scope of the default VLAN is increased by enabling the enable switch 24, during manufacture, to interconnect each of the switches 16 connected to the hub 12.

While the invention has been shown and described above with respect to various preferred embodiments, it will apparent that the foregoing and other changes of the form and detail may be made therein by one skilled in the art without departing from the spirit and scope of the invention. These and other obvious modifications are intended to be covered by the following claims.

What is claimed is:

1. A port based default VLAN formed on one or more interconnected networking switches, each switch having one or more switch ports, all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by one or more of the plurality of switch ports, the one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports defining a second VLAN, the default VLAN comprising:

means for receiving a data packet through one of the default VLAN ports;

means for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

means for determining whether the destination port is one of the default VLAN ports;

first means, responsive to the determining means, for transmitting the data packet to the destination port if the determining means determines that the destination port is one of the default VLAN ports; and

second means, responsive to the determining means, for transmitting the data packet to each of the default VLAN ports if the determining means determines that the destination port is not one of the default VLAN ports,

the at least one switch port defining the second VLAN being free from transmission, from the default VLAN, of the data packet.

6,128,665

5                                                         6

**2**. The default VLAN as defined by claim **1** wherein the data packet includes a header and the ascertaining means ascertains the destination port from the packet header.

**3**. The default VLAN as defined by claim **1** further including means for tagging the data packet.

**4**. A method of limiting broadcast messages from a port based default VLAN, the default VLAN formed on one or more interconnected networking switches, each switch having one or more switch ports, all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by one or more of the plurality of switch ports, the one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports defining a second VLAN, the method comprising the steps of:

A. receiving a data packet through one of the default VLAN ports;

B. ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

C. determining whether the destination port is one of the default VLAN ports;

D. transmitting the data packet to the destination port if the destination port is one of the default VLAN ports;

E. transmitting the data packet to each of the default VLAN ports if the destination port is not one of the default VLAN ports; and

F. preventing transmission, from the default VLAN, of the data packet to the at least one switch port defining the second VLAN.

**5**. The method as defined by claim **4** further including the step of:

G. tagging the data packet.

**6**. A computer program product for use with a switching device, the computer program product limiting broadcast messages from a port based default VLAN, the default VLAN formed on one or more interconnected networking switches, each switch having one or more switch ports, all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by one or more of the plurality of switch ports, the one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports defining a second VLAN, the computer program product comprising a computer usable medium having computer readable program code thereon, including:

program code for receiving a data packet through one of the default VLAN ports;

program code for ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

program code for determining whether the destination port is one of the default VLAN ports;

program code for transmitting the data packet to the destination port if the program code for determining determines that the destination port is one of the default VLAN ports; and

program code for transmitting the data packet to each of the default VLAN ports if the destination port is not one of the default VLAN ports,

program code for preventing transmission, from the default VLAN, of the data packet to the at least one switch port defining the second VLAN.

**7**. The computer program product as defined by claim **6** further including program code for tagging the data packet.

**8**. A port based default VLAN formed on a hub having at least two networking switches connected thereto, each switch having one or more switch ports, the port based default VLAN comprising:

a bus in the hub;

an enable switch for electrically connecting each of the VLAN ports to the bus;

means for defining a subset of the one or more switch ports of each switch as default VLAN ports;

means for receiving, at least one of the default VLAN ports, a packet destined for a port that is not defined as one of the default VLAN ports, including means for broadcasting the received packet to each of the default VLAN ports in the subset of ports defined as default VLAN ports.

\*    \*    \*    \*    \*

EXHIBIT 4

US006147995A

# United States Patent [19]

## Dobbins et al.

[11] **Patent Number:** **6,147,995**

[45] **Date of Patent:** *Nov. 14, 2000

[54] **METHOD FOR ESTABLISHING RESTRICTED BROADCAST GROUPS IN A SWITCHED NETWORK**

[75] Inventors: **Kurt Dobbins**, Bedford; **Phil Andlauer**, Londonderry; **Michael Skubisz**, Durham, all of N.H.

[73] Assignee: **Cabletron Systems, Inc.**, Rochester, N.H.

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **09/387,317**

[22] Filed: **Aug. 31, 1999**

### Related U.S. Application Data

[63] Continuation of application No. 08/960,919, Oct. 30, 1997, Pat. No. 5,946,308, which is a continuation of application No. 08/559,738, Nov. 15, 1995, Pat. No. 5,684,800.

[51] Int. Cl.[7] .............................. H04L 12/28; H04L 12/56
[52] U.S. Cl. ............................................. 370/392; 370/400
[58] Field of Search .................................... 370/392, 390, 370/396, 389, 400, 401, 402, 403, 404, 432, 469, 474, 386, 388, 395, 397, 398, 399, 405, 406, 409, 420, 422, 437

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,823,338 | 4/1989 | Chan et al. | 370/85.1 |
| 5,140,585 | 8/1992 | Tomikawa | 370/60.1 |
| 5,208,811 | 5/1993 | Kashio et al. | 370/94.1 |
| 5,394,402 | 2/1995 | Ross | 370/402 |
| 5,444,702 | 8/1995 | Burnett et al. | 370/254 |
| 5,485,455 | 1/1996 | Dobbins et al. | 370/60 |
| 5,684,800 | 11/1997 | Dobbins et al. | 370/401 |
| 5,740,171 | 4/1998 | Mazzola et al. | 370/401 |

(List continued on next page.)

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO 95/01023 | 5/1995 | WIPO . |
| WO 95/04420 | 9/1995 | WIPO . |

### OTHER PUBLICATIONS

Cheriton, David R. et al., "Host Groups: A Multicast Extension For Datagram Internetworks", *Computer Systems Laboratory Stanford University* , pp. 172–179, 1985.

Paliwoda, K. "Transactions Involving Multicast", *Computer Communications* , vol. 11, pp. 313–318, Dec. 11, 1988.

Truong, Hong Linh, "LAN Emulation on an ATM Network", *IEEE Communications Magazine* , pp. 70–85, May 1995.

Lin, Tzung–Pao, "A Platform For Seamless Interworking Among Conventional LANs and ATM Networks", *IEEE Communications* , pp. 296–301, Nov. 28, 1994.

Biagioni, Edoardo, "Designing a Practical ATM LAN", *IEEE Network* , pp. 32–39, Mar. 1993.

Catania, Vincenzo et al., "A Routing Strategy For Man Interconnection", *IEEE Communications Magazine* , pp. 608–615, 1991.

Newman, Peter, "ATM Local Area Network", *IEEE Communications Magazine* , pp. 86–98, Mar. 1994.

Asoh, J. et al. "Virtual LAN Realization on an ATM Connectionless Public Network", 2nd Asia Pacific Conference on Communications, vol. 2, pp. 516–520, Jun. 1995.

*Primary Examiner*—Dang Ton
*Assistant Examiner*—Phirin Sam
*Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

[57] **ABSTRACT**

Method and apparatus for establishing restricted broadcast groups in a switched network. The method assigns different virtual LAN identifiers (VLAN-IDs) to different subsets of associated end systems or access ports. Tables are maintained for mapping the VLAN-IDs with associated end systems and access ports. When a broadcast packet is received at a first switch, it is encapsulated with a VLAN header, including the VLAN-IDs, and sent out a multicast channel to all other switches in the network (domain). The original packet is sent out the other access ports of the receiving switch for the designated VLAN-IDs. The switches receiving the VLAN packet remove the header and send the original packet out access ports associated with the VLAN-IDs extracted from the header. The method provides a mechanism for forwarding broadcast packets of a protocol not supported by the switching mechanism, as well as multicast packets and unicast packets from undiscovered end systems.

**35 Claims, 11 Drawing Sheets**



**6,147,995**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,742,604 | 4/1998 | Edsall et al. | 370/401 |
| 5,751,967 | 5/1998 | Raab et al. | 709/228 |
| 5,752,003 | 5/1998 | Hart | 709/223 |
| 5,818,842 | 10/1998 | Burwell et al. | 370/397 |
| 5,920,705 | 7/1999 | Lyon et al. | 709/240 |
| 5,963,556 | 10/1999 | Varghese et al. | 370/401 |
| 6,005,864 | 12/1999 | Krause | 370/395 |



*FIG. 1*



FIG. 2



FIG. 3



FIG. 4-A

**U.S. Patent**     Nov. 14, 2000     Sheet 4 of 11     **6,147,995**



*FIG. 4-B*



*FIG. 5*

TABLE 1 : END SYSTEM / VLAN MAPPING FOR SWITCH 11

| ACCESS PORT | END SYSTEMS HEARD | VLAN ID |
|:---:|:---:|:---:|
| 1 | 20A | VLAN 100 |
| 2 | 20B | VLAN 100 |
|  |  | VLAN 20 |
| 3 | 20C | VLAN 20 |
| • | • | • |
| • | • | • |
| • | • | • |

## FIG. 6

TABLE 2 : VLAN / ACCESS PORT MAPPING FOR SWITCH 11

| VLAN ID | ACCESS PORT |
|:---|:---:|
| VLAN 100 | 1 |
|  | 2 |
|  |  |
| VLAN 20 | 2 |
|  | 3 |
| • | • |
| • | • |
| • | • |

## FIG. 7

VLAN PACKET

| VLAN HEADER | BROADCAST PACKET |
|:---:|:---:|

## FIG. 8



*FIG. 9*



*FIG. 10*



*FIG. 11*



*FIG. 12*



FIG. 13

6,147,995

1

# METHOD FOR ESTABLISHING RESTRICTED BROADCAST GROUPS IN A SWITCHED NETWORK

This application is a continuation of application Ser. No. 08/960,919 filed on Oct. 30, 1997 which issued as U.S. Pat. No. 5,946,308 on Aug. 31, 1999: which is a continuation of application Ser. No. 08/559,738 filed Nov. 15, 1995 and which issued as U.S. Pat. No. 5,684,800 on Nov. 4, 1997.

## FIELD OF THE INVENTION

This invention relates to packet switched data communications networks, and more particularly to an apparatus and method for establishing restricted broadcast groups known as virtual LANs (VLANS) which provide a simple but robust mechanism that allows broadcast and/or multicast packets to be "flooded" through a switched domain and transmitted only to those users or ports defined for a particular VLAN.

## RELATED APPLICATIONS

The subject matter of the above application may be advantageously combined with the subject matters of the following copending and commonly owned applications, which are hereby incorporated by reference in their entirety:

U.S. Ser. No. 08/188,238 entitled "Network Having Secure Fast Packet Switching And Guaranteed Quality Of Service," filed Jan. 28, 1994 by Kurt Dobbins et al.; and

U.S. Ser. No. 08/187,856 entitled "Distributed Chassis Agent For Network Management," filed Jan. 28, 1994 by Brendan Fee et al.

## BACKGROUND OF THE INVENTION

Most data communications networks today rely heavily on shared medium, packet-based LAN technologies for both access and backbone connections. These networks use bridges and routers to connect multiple LANs to global internets. An internet router must be capable of processing packets based on many different protocols, such as IP, IPX, DECNET, AppleTALK, OSI, SNA and others. The complexities of building networks capable of routing packets on the global internet using different protocols is a challenge for both vendors and users.

In U.S. Ser. No. 08/188,238 to Dobbins (see related applications above), there is described a new secure fast packet switching (SFPS) technology which provides the same or better reliability and security as routers, but with much greater performance and without an increase in cost. The SFPS system avoids the complexities and costs of providing multi-protocol routers. Also, the SFPS system provides capabilities which routers do not, such as the ability to create separate logical work group LANs on the same physical network and the ability to guarantee a quality of service (QOS) by providing dedicated switched paths through the network.

SFPS provides high performance packet switching based on physical layer addresses such as source and destination MAC IDs—the unique medium access control (MAC) address assigned to each end system by the IEEE. End-to-end connections are determined by a network management application that provides security and best path routing determinations based on a number of constraints. By switching packets based only on MAC layer information, network infrastructure remains protocol insensitive.

2

More specifically, SFPS uses source and destination MAC addresses which alone, or in combination with an input port on a switch, form a unique "connection identifier" for any communication exchange between designated end systems. As an example:

    input port=2
    source MAC address=00:00:1D:01:02:03
    destination MAC address=00:00:1D:11:22:33

together form a "tuple" bound to a specific unidirectional flow from a source address to a destination address. All packets that have this tuple are automatically switched according to the operation of the SFPS.

Network infrastructures are built around a core switching fabric, which provides the physical paths or routes that allow users to send information to one another. Access to the switching fabric is gained through an access port. Access ports provide several functions—most importantly, they provide security and accounting services. End systems such as personal computers (PCs), workstations and servers connect to an access port using one or more access technologies such as Ethernet, Token Ring, FDDI, or ATM.

In traditional bridge and router devices, each packet is treated as an independent unit of data which is individually processed by application of access and security constraints, as well as path determination. In contrast, with SFPS this processing is done only on initial probe packets which are decoded, and through use of a central directory of end system constraints policy, call attributes, location, paths, quality of service, etc., the connection is either rejected or accepted. If accepted, the path is determined and switches along the path are "programmed" to allow subsequent packets on this "connection" to be switched. In either case, subsequent datagrams are either switched or discarded without having to reapply all of the security and access control and path determination logic.

The SFPS switching technology may be constructed as: software objects which exist in embedded devices as firmware; software objects which are part of an application on a commercial computer system; application specific integrated circuits (ASIC); or functionally equivalent hardware components.

It is common for internetworking devices to "route" the protocols that a device supports, and "bridge" the protocols that are not supported for routing. In addition, some protocol frames (such as DECs LAT) are actually unroutable. In SFPS switches, there are protocol-specific call processors to route protocol-specific broadcast frames (note that unicast frames can be processed by a "generic" call processor that does not decode or translate the frame at all, but instead makes the connection request based on the source and destination unicast MAC addresses in the frame). However, a problem arises in that an SFPS switch has nothing equivalent to bridging of multicast and broadcast packets for non-supported protocols. Thus, until a protocol-specific call processor is implemented in a switch, the switch must discard any broadcast or multicast frames it does not understand.

## SUMMARY OF THE INVENTION

A method and apparatus are provided for establishing restricted broadcast groups within a switching fabric, known as virtual LANs (VLANs). The VLANs provide a simple but robust mechanism for allowing broadcast and multicast packets to be "flooded" through the switching fabric and transmitted only to those users or ports defined for a particular VLAN.

6,147,995

3

More specifically, the switched network includes a plurality of end systems and switches connected by links. The switches have access ports connected to end systems and network ports connected to other switches. Each end system has a unique physical layer address, e.g., MAC address. In accordance with this invention, different virtual LAN identifiers (known as VLAN-IDs) are assigned to different subsets of associated end systems or access ports. Each access switch maintains a first table for mapping VLAN-IDs to associated end systems and/or access ports (the End System/VLAN table). Each access switch also maintains a second table for mapping access ports (of associated end systems) to associated VLAN-IDs (the VLAN/Access Port table).

According to a first embodiment, the restricted V-LAN flooding is used for broadcast packets of a protocol not supported by the switches. When an original broadcast packet (of an unsupported protocol) is received by a first access switch from a first end system, the first switch determines and adds a VLAN header to the original data packet to create a VLAN packet. The VLAN header includes designated VLAN-IDs from the first table. The designated VLAN-IDs are assigned based on the physical source address of the first end system. The first access switch then forwards the VLAN packet to all other switches on a multicast channel of point-to-point connections between the switches. The first switch also forwards the original broadcast packet out the access ports identified in the second table for the designated VLANS (except the originating port).

The other switches receive the VLAN packet and extract the designated VLAN-IDs from the VLAN header and then forward the original packet out the access ports, defined in the other switch's second table, for the designated VLAN-IDs.

Other embodiments include the designation of a default VLAN-ID which maps to all access ports, a reserved VLAN-ID for use with multicast packets, and restricted flooding for packets directed to an undiscovered end system. Still another embodiment provides a single or distributed network server on the multicast channel (between switches) to handle broadcast and multicast packets, which embodiment scales better for larger networks.

More specific methods and a particular apparatus for implementing the present invention are described in the following detailed description and drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic illustration of a network topology built with SFPS switches.

FIG. 2 is a schematic illustration of an SFPS switch.

FIG. 3 is a logical view of an SFPS switch.

FIG. 4, combining FIGS. 4-A and 4-B, is a flowchart showing processing of a data packet by an SFPS switch.

FIG. 5 is a schematic illustration of a network topology including three virtual networks (VLAN 100, VLAN 5, and VLAN 20) according to the present invention.

FIG. 6 shows an end system table for mapping VLAN-IDs to associated end systems.

FIG. 7 shows a port table for mapping access ports (of associated end systems) to associated VLAN-IDs.

FIG. 8 shows one embodiment of a VLAN packet, in which a VLAN header is appended to an original data packet.

FIG. 9 is a schematic illustration of a network topology utilizing a default VLAN according to the present invention.

4

FIG. 10 is a schematic illustration of a network topology utilizing a distributed VBUS server according to an alternative embodiment of the present invention.

FIG. 11 is a flow chart showing the redirected flow of a broadcast or multicast packet to the VBUS service.

FIG. 12 is a flow chart showing the call processing performed by the VBUS service.

FIG. 13 is a flow chart showing the channel listening process of the VBUS service.

DETAIL DESCRIPTION
The SFPS Network—Switching of Unicast Packet with Generic Call Processor and Switching of Protocol-supported Broadcast Packets

According to one embodiment, the establishment of VLANs for transmitting broadcast/multicast packets of non-supported protocols is intended for use in the SFPS switched network described in U.S. Ser. No. 08/188,238. The following is a general description of the operation of switching "unicast" packets on that network, as illustrated in FIGS. 1–4.

FIG. 1 shows a representative network topology built with six secure fast packet switches (SFPS) labeled S1–S6 connected by links L. Each switch has for example four ports; some ports are labeled A for access and some are labeled N for network. The end systems are connected to the access ports by links L and are labeled "M_". One end system is a network management station or server (NMS) M10, which includes a connection server.

FIG. 2 is a schematic illustration of an SFPS switch 91 having a plurality of ports 92. A host port 93 connects the switch to its host CPU 90, which may be an i960 microprocessor sold by Intel Corporation. The host CPU is connected to a system management bus (SMB) for receipt and transmission of discovery and other control messages.

FIG. 3 illustrates the internal operation of the switch. The SFPS switch 86 includes in ports 80, out ports 81, a connection database 82, a look-up engine 83, and a multilevel programmable arbiter MPA 84. The switch 86 sends and receives messages from the host agent 85, which includes a management agent 87, a discovery agent 88, and a call processing agent 89.

The management agent 87 provides external control of the configuration and operation of the SFPS switch, through the network management system.

The discovery agent 88 provides a mapping of end systems to switching ports through a passive listening (snooping) capability and a registering of end system addresses and port locations of the host switch with a common external directory. Adjacent switches are also discovered and mapped, but this may be done with an explicit switch-to-switch protocol (nonpassive).

The call processor 89 provides a means for requesting connections to be established between two end systems. Unicast frames are handled by a "generic" call processor which programs the switches based on the source and destination MAC addresses. In a case where the source and destination MAC addresses are not in the packet frame, i.e., usually in a frame that has a broadcast—all hosts—MAC address, a "protocol-specific" call processor (if available) will decode the packet to find source or destination network addresses and use these to map back to the physical addresses via the external directory. Once the end system MAC addresses are known, the protocol-specific call processor will then request the connection between the end systems. If the broadcast frame was a probe or address resolution packet (i.e., an implied connection request), the

6,147,995

5

call processor will return a probe reply as a "proxy" which gives the destination end system MAC addresses. Subsequently, the source end system can then send packets directly to the destination based on its MAC address.

FIG. 4 is a flow chart illustrating what happens from the time a data packet is received on an in port of the switch, until it is sent on the correct out port.

Referring to FIG. 4-A, in step 300 the host CPU 90 is initialized. The host programs the connection database 82 to send any "unknown" or "broadcast" connections to the host port (step 301). The switch then waits for a packet to arrive (step 302). Once a packet has arrived (step 303), the switch extracts the source MAC address, destination MAC address, and identifies the inbound port on which the packet was received (step 304). The look-up engine 83 checks to see whether this source-destination pair is already located in the connection database 82 (step 305). If it is not found, the packet is given to the host agent 85 (step 308). The call processor and the host agent determine whether it is a broadcast destination (step 309). If the answer is yes, a protocol-specific call processor (if available) decodes the packet to find the network protocol source and destination addresses (steps 310–311). A different protocol decode logic would be provided for each network protocol. For example, in the IP protocol, if an ARP request is received, the call processor would get the target IP address (step 312). It would then ask the external directory for the MAC address of the destination IP (step 313). In the next step 314, the directory sends the MAC destination address back to the call processor. The call processor 89 then asks the connection server (SCS) to set up a connection between the source MAC and destination MAC (step 315). The call processor 89 forms an ARP reply packet by putting the destination MAC address inside the packet (step 316), and the call processor sends a reply to the source address (step 317). It should be noted that this reply allows the source end system to update its private mapping of the destination IP address to a nonbroadcast MAC address. All subsequent packets to this destination IP address will be properly framed with the source and destination MAC address for which connections will now exist.

Note that if no call processor exists which supports the relevant protocol, the broadcast packet is dropped (step 321). The present invention is a method of handling such packets.

If the packet is not a broadcast packet, it is given to the "generic" call processor (treated as an unknown SA-DA connection—step 318), which asks the connection server to set up a connection and forward the packet (step 319); the call processor then discards the packet (step 320).

Returning to step 305, if the source and destination MAC pair are found in the connection database 82, the data packet is sent to the switch outport(s) 81 defined in the database (step 306). In next step 307, the management agent 87 collects statistics regarding transmissions through the switch and sends them to the SCS (connection server).

Restricted Broadcast Groups for Non-supported Broadcast, MultiCast and Unknown Unicast Packets

FIG. 5 illustrates generally a logical view of the present invention for establishing restricted broadcast groups or virtual LANs (VLANs) within a switched network. The representative network 10 has four SFPS switches 11–14, all of the switches being connected by physical links forming point-to-point connections 15, and which physical connections together form a logical multicast channel 16. The multicast channel 16 connects the network ports of all switches. A plurality of end systems 20A–20L extend from

6

access ports on the various switches 11–14. The end systems are shown grouped into different subsets known as virtual LANs 17, 18 and 19, which are given VLAN identifiers VLAN 100, VLAN 5, and VLAN 20, respectively. As shown 30 in FIG. 5, "VLAN 20" includes end systems 20B, 20C, 20J and 20K. "VLAN 5" includes end systems 20D, 20G, 20H and 20L. "VLAN 100" includes end systems 20A, 20B, 20D, 20F, 20H and 20I.

During a discovery time, as each switch 11–14 is discovered, it is put in a point-to-point connection that connects all SFPS switches. This forms the multicast channel 16 which all switches use between themselves.

Also during the discovery time, each switch 11–14 discovers its associated end systems (i.e., switch 11 discovers end systems 20A, 20B, 20C) and enters these end systems in a common directory which assigns VLAN-IDs to the end systems. The directory returns a mapping of VLAN-IDs and associated end systems, which mapping each switch uses to build two internal tables: a first table that lists the VLAN-ID for each end system (the End System/VLAN Table—see FIG. 6), and a second table that defines a port mask for each VLAN-ID (the VLAN/Access Port Table—see FIG. 7).

During real time operation of the system, a first switch (for example switch 11) receives a broadcast or multicast packet that it cannot process with a protocol-specific call processor. The switch will encapsulate the original packet and insert a VLAN header containing a list of VLAN-IDs for the source end system (see FIG. 8), before flooding the encapsulated (VLAN) packet out the multicast channel 16 to all other switches. For example, if first switch 11 receives a broadcast packet from first end system 20B, switch 11 returns from its end system table (FIG. 6) that VLAN 100 and VLAN 20 are associated with source end system 20B. First switch 11 will insert VLAN 100 and VLAN 20 into the VLAN header (FIG. 8). In addition, first switch 11 determines the port masks for VLAN 100 and VLAN 20 from its port table (FIG. 7), and then sends the original broadcast packet out all access ports of the first switch in VLAN 100 or VLAN 20 (except for the source port 2); in this case, the original packet is sent out access port 1, which connects to end system 20A, also in VLAN 100, and out access port 3, which connects to end system 20C, also in VLAN 20.

As each of switches 12, 13 and 14 receive the VLAN packet on multicast channel 16, they strip off the encapsulated VLAN header and look up in their respective VLAN/Access Port table for any associate mapping to VLAN 100 and VLAN 20. Switch 12 determines in its port table that it has associated access ports to end systems 20D and 20F designated for VLAN 100. Similarly, switch 13 determines from its port table that it has associated access ports to end systems 20H and 20I for VLAN 100. Switch 14 determines from its port table that it has associated access ports to end systems 20J and 20K for VLAN 20. The original packet is thus transmitted out the access ports to end systems 20D, 20F, 20H, 20I, 20J and 20K.

The following describes the changes and additional functionality required of the SFPS access switches to support the establishment of VLANs for multicast and broadcast packets. Switches with only network ports continue to function as described in prior U.S. Ser. No. 08/188,238 to Dobbins et al.

The Switch-to-switch Multicast Channel

Each SFPS switch supports the multicast channel 16 by having a connection in each switch that connects it to all other switches in the network (or within a subsection of the network, such as a domain). This is in essence a point-to-multipoint connection in each switch. It should be noted that

6,147,995

7

this multipoint connection is only between the switches themselves, which scales better than having a multipoint connection between all users (end systems).

A connection server (i.e., M10 in FIG. 1), which includes a common directory of all switches, has the responsibility to program the multicast channel connection each time a new switch joins or leaves the topology, i.e., such a change may be detected by neighbor advertisement signals sent by the switches.

The End System/VLAN Table (FIG. 6)

Each switch that has an access port maintains a table of end systems heard on each access port, and a list of VLANs to which each end system belongs. An end system can belong to more than one VLAN at any given time.

The assignment of VLAN-IDs may be accomplished in several ways. First, the VLAN-IDs may be maintained by a common directory. For example, as each end system is discovered by an access switch, it is registered with a common directory of end systems for the entire network, and the directory then returns a list of VLAN-IDs to the access switch with the "End System Discovery Message ACK." Alternatively, a management application may administratively assign the VLAN-IDs, and manage the end system and port tables in the switch. As a further alternative, an access switch may send a Resolve signal to a directory, which directory then returns a mapping of VLAN-IDs for an associated end system.

The VLAN/Access Port Table (FIG. 7)

Each switch having an access port maintains a port table which maps VLANs to associated access ports. This table may be filled in dynamically through the implicit mapping of VLANs to end systems. Each time a VLAN is mapped to an end system, it is automatically inserted in a port-mapping entry for the source port on which the end system is located. Ports, like end systems, can belong to more than one VLAN at any given time; the port's VLAN mapping strictly depends upon the VLAN of the end systems on it. The out ports for each VLAN entry in the table essentially define the flood mask for the access ports.

The Default VLAN-ID

A default VLAN-ID (VLAN-ID=1) may be used to map an end system to a VLAN when no VLAN-ID had been administratively assigned. The default VLAN is a special case which maps to all access ports. This allows flooding out all ports when no VLAN is defined. For example, FIG. 9 illustrates a network of four switches 30, 31, 32, 33, connected by multicast channel 35, prior to assignment of any specific VLAN-IDs such that all end systems fall within a default VLAN 36.

The VLAN Call Processor

The VLAN call processor is essentially a default call processor for broadcast/multicast packets for which no protocol-specific call processor exists. For example, an ARP call processor would be able to decode an ARP broadcast message.

The VLAN call processor would take any packet it receives and then encapsulate the broadcast/multicast packet in a header, the header containing a list of VLAN-IDs on which the packet belongs. The VLAN-ID list may be determined by using the source MAC address of the original packet and doing a look-up in the end system table. In this example, VLAN-IDs are determined based on the source rather than the destination. Once this encapsulated packet is formed, it is then forwarded on the multicast channel to all other switches. The original packet would also be given to the local forwarder.

8

The Local Forwarder

Each switch has a process that listens on the multicast channel 16. This process is responsible for processing any encapsulated frames (VLAN packets) sent from other switches. When the VLAN packet is received, it is stripped of its VLAN-ID list in the header. For every entry in the VLAN-ID list, the local port table is searched for a matching entry. The local forwarder then forwards the original data packet out any ports that are mapped to the VLAN-ID. If the VLAN-ID is the default VLAN-ID (=1), then the original packet is flooded out all access ports on the switch. If no VLAN-IDs match, then the packet is discarded.

The Central Connection Server and Common Directory

A central connection server programs the point-to-multipoint connections between all of the SFPS switches, as there is no provision in each switch to do so (see M10 in FIG. 1). Thus, any time the connection server "discovers" a change in a switched topology, it has to reprogram the multicast channel between the switches.

The server accesses a common directory for mapping end systems to VLAN-IDs. A management application may provide this on the front end, and in addition provide for changes to the mapping in the directory itself and in any switches that have been informed of the mapping. Any end system not defined with a VLAN would default to VLAN-1.

If the VLAN assignment is done inside an End System Discovery Message ACK, then a new TLV list is added to the message. This functions similar to an "alias" field in which more than one are allowed since multiple VLANs could be returned. If the VLAN assignment is done with Resolve messages, then only a new TAG type has to be assigned since the message supports returning multiple resolutions. The semantics would be "resolve this end system to its VLAN-IDs." If the assignment was done completely out of band, then no signalling changes would be required.

Reserved VLAN-IDs

In the previous embodiment, broadcast and multicast packets are propagated through the switches based on the VLAN-IDs to which the source belongs. In some cases, mostly with multicast frames, it may be desirable to map a VLAN to the destination, e.g., OSPF packets.

This may be accomplished by allowing the switches to support "well-known" VLANs without any run-time assignment. If a switch receives a packet destined for a reserved VLAN, it would encapsulate it and set the VLAN list without mapping it to the end system table. The packet would then be forwarded out the multicast channel and any switches supporting the reserved VLAN (or having heard a reserved VLAN-type packet), would flood the original packet out.

Unicast Flooding

VLANs may be supported for unicast frames, for example if a call processor has not yet discovered the end system. This works similar to the broadcast/multicast operation except that instead of mapping the outports at each flooding switch, each switch would look up the destination unicast address in the end system table and send the original packet out the port on which the end system belongs.

VBUS Service

Since point-to-point connections between switches does not scale well, in an alternative embodiment each switch has a connection to a single (or distributed) server in the network which will forward broadcast and multicast packets. This service, referred to as the Virtual Broadcast/Unknown Service (VBUS), is distributed into all SFPS switches in a first implementation as illustrated in FIG. 10. Switches 61, 62,

6,147,995

9

10

63, 64 are connected by multicast channel 66, and each switch includes the distributed VBUS service 65.

FIG. 11 illustrates the redirected flow of data packets for the VBUS service. When a first switch receives a broadcast or multicast packet (step 40), it first determines whether the packet was received on an access port (step 41). If no, the packet is discarded (step 47). If yes, the packet is passed to a redirector queue (step 42), and if a call processor supports the packet type (step 43), the redirector delivers the packet to the protocol-specific call processor (step 44). If not, the packet is passed to the VBUS call processor (step 45). The redirector queue then handles the next packet on the queue (step 46).

FIG. 12 illustrates the operation of the VBUS call processor. Each switch listens for source addresses heard on each access port (step 48). The call processor then updates the End System/VLAN table with the access port and end systems heard (step 49). The call processor then creates a signal entry (step 50) which is sent to the connection server (step 51), which formats a response to the signal (step 52). The connection server returns a signal with the associated VLAN list, which is received by the call processor (step 53). The call processor gets the associated access ports from the VLAN/Access Port Table (step 54) and sends out the original packet on the associated access ports (step 55). The call processor gets the network ports from the switch's connection table (step 56), encapsulates the packet with the VLAN header (step 57), and sends the encapsulated packet out the network ports to the other switches (step 58). The call processor then deletes the signal entry (step 59) and returns to start (step 60).

FIG. 13 illustrates the operation of the VBUS channel listener. When a packet is received on a network port (step 70), it first determines whether there is a known connection in the connection database 82 (step 71), and if so, it forwards the packet out the appropriate outport (step 72). If there is no connection, it determines whether this is a VBUS packet (step 73). If no, it returns to the beginning. If it is a VBUS packet, the packet is handed to a VBUS port (step 74) and the VLAN list is extracted from the header (step 75). The access ports are obtained from the VLAN/Access Port Table (step 76), and the encapsulation header removed from the packet (step 77). The original packet is then sent out the associated access ports defined in the table (step 78).

In one embodiment, the switch provides a MIB interface to allow an external application to assign VLAN-IDs to access ports and/or end systems. The simplest model is to progam VLAN-IDs to the switched ports only; under this model, the administration is simpler and the VLAN assignment to end systems is implied by the switched port to which the end systems are physically connected. A more robust model would map the VLAN-IDs from policy work group definitions.

The application interface may be provided with an SNMP (Simple Network Management Protocol) MIB (management information base) which allows a simple interface to program connections via a single SNMP set message. The MIB interface provides the following semantics:

(map, unmap)[SFPS VLAN-ID][inPort][userMAC] This verb set assigns (and removes) a user MAC address and switch port to (or from) a specific VLAN.

(map-port, unmap-port)[SFPS VLAN-ID][inPort] This verb set assigns (and removes) a switch port to (or from) a specific VLAN. The switches provide managed objects accessible by the MIB which are all accessed with standard SNMP get, get next, and set messages.

In one embodiment, a VLAN status table is provided. This table allows an entire VLAN to be enable or disabled

regardless of the number of user or switch ports assigned to the VLAN in the switch. Thus, it is possible to shut off a particular VLAN inside a particular switch without having to administer each individual switch port or end system.

One goal of the VBUS service is to require minimal support from the network server. The only server requirement is providing each switch with a connection to all other switches in the network (domain), which in effect provides the multicast channel for flooding VLAN packets.

While there have been shown and described several embodiments of the present invention, it will be obvious to those skilled in the art that various changes and modifications may be made therein without departing from the scope of the invention as defined by the appending claims.

What is claimed is:

1. A computer-readable storage medium comprising program instructions for restricting flooding of a data packet, of one of a broadcast, multicast and unknown destination type, in a switched data communications network, the network including a plurality of end systems and switches connected by links, the switches having access ports connected to end systems and network ports connected to other switches, the program instructions causing the network to:

a. assign at least one identifier to a respective subset of end systems;

b. map the at least one assigned identifier to an access port attached to at least one end system in the respective subset of end systems; and

c. when the data packet is received from a source end system at a receiving access port of a first switch:

i) determine one or more identifiers associated with the source end system;

ii) encapsulate the data packet by adding a header with the one or more determined identifiers;

iii) forward the encapsulated data packet to all or a subset of other switches in the network; and

iv) determine if at least one access port other than the receiving access port on the first switch is associated with the one or more determined identifiers and forward the data packet out the at least one determined access port.

2. The computer-readable storage medium as recited in claim 1, further comprising instructions to cause the network to:

d. when the encapsulated data packet is received at a second switch with access ports:

i) strip the header from the encapsulated data packet and to determine the one or more encapsulated identifiers in the header of the encapsulated data packet;

ii) determine if at least one access port of the second switch is associated with the one or more encapsulated identifiers; and

iii) forward the data packet out the at least one determined access port of the second switch.

3. The computer-readable storage medium as recited in claim 2, further comprising instructions to cause the network to:

listen to end systems heard on respective access ports at each switch and to maintain the end systems heard and their respective access ports in a mapping table at the respective switch; and

upon receipt of a unicast packet for a destination end system unknown to the first switch, complete step c for the unicast packet and then at the next switch review the mapping table for the respective access port for the

6,147,995

**11**

destination end system and forward the packet out the respective access port.

**4**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to, if in step c(iv) no other access port is determined, discard the data packet.

**5**. The computer-readable storage medium as recited in claim **1**, further comprising, in step b, instructions to cause the network to:

maintain a first table in each switch to relate the at least one assigned identifier to the end systems or access ports of the respective switch; and

maintain a second table in each switch to relate the access ports of the respective switch to assigned identifiers.

**6**. The computer-readable storage medium as recited in claim **5**, further comprising, in step c.i), instructions to cause the network to:

review the first table for the one or more identifiers associated with the source end system or the receiving access port.

**7**. The computer-readable storage medium as recited in claim **6**, further comprising, in step c.iv), instructions to cause the network to:

review the second table for an access port associated with the one or more determined identifiers.

**8**. The computer-readable storage medium as recited in claim **7**, wherein the assigned identifier is a virtual LAN identifier.

**9**. The computer-readable storage medium as recited in claim **1**,wherein the received data packet is of a protocol not supported by a protocol-specific call processor in the first switch.

**10**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to:

maintain a common registry of assigned identifiers.

**11**. The computer-readable storage medium as recited in claim **10**, further comprising instructions to cause the network to:

register each end system or access port with the common registry, and

return a list of assigned identifiers from the common registry to each switch for the end systems or access ports of the respective switch.

**12**. The computer-readable storage medium as recited in claim **10**, further comprising instructions to cause the network to:

send a signal from the first switch to the common registry to resolve an end system or access port to its assigned identifiers.

**13**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to:

maintain the mapping at each switch for the end system or access ports of the respective switch.

**14**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to:

prior to assigning an identifier to a specific end system or access port, maintain a default identifier for that specific end system or access port which maps to predetermined access ports.

**15**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to:

**12**

maintain a multicast channel of connections between all or a subset of switches and wherein step c(iii) comprises forwarding the encapsulated packet on the multicast channel.

**16**. The computer-readable storage medium as recited in claim **15**, wherein the channel includes:

a point-to-multipoint connection from each switch to all other switches in the network.

**17**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network, at step c(iii), to provide a distributed service in the switches for forwarding the encapsulated data packet.

**18**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to assign the identifier based on a policy work group definition.

**19**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to:

maintain at least one mapping table at each switch for performing the mapping step.

**20**. The computer-readable storage medium as recited in claim **19**, further comprising instructions to cause the network to:

listen to end systems heard on respective access ports at each switch and maintain the end systems heard and their respective access ports in the mapping table at the respective switch.

**21**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to:

assign a reserved identifier without limitation as to end system and access port.

**22**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to:

maintain a Management Information Base (MIB) interface at each switch for programming at least one mapping table, the mapping table being used to perform the mapping step.

**23**. The computer-readable storage medium as recited in claim **22**, further comprising instructions to cause the network to:

use a Simple Network Management Protocol (SNMP) set message to maintain the mapping table at each switch.

**24**. The computer-readable storage medium as recited in claim **1**, further comprising instructions to cause the network to:

maintain a status table at each switch to enable and disable a respective subset.

**25**. A computer-readable storage medium comprising program instructions for restricting flooding of a data packet, of one of a broadcast, multicast and unknown destination type, in a switch to be used in a switched data communications network, the network to include end systems and switches connected by links, the switches having access ports connected to end systems and network ports connected to other switches, the program instructions causing the switch to:

a. assign at least one identifier to a respective subset of end systems;

b. map the at least one assigned identifier to an access port attached to at least one end system in the respective subset of end systems; and

c. when the data packet is received from a source end system at a receiving access port of the switch:

6,147,995

13

i) determine one or more identifiers associated with the source end system;

ii) encapsulate the data packet by adding a header with the one or more determined identifiers;

iii) forward the encapsulated data packet to all or a subset of other switches in the network; and

iv) determine if at least one access port other than the receiving access port on the switch is associated with the one or more determined identifiers and forward the data packet out the at least one determined access port.

**26**. The computer-readable storage medium as recited in claim **25**, further comprising instructions to cause the switch to:

d. when an encapsulated data packet is received:

i) strip the header from the encapsulated data packet and determine the one or more encapsulated identifiers in the header of the encapsulated data packet;

ii) determine if at least one access port of the switch is associated with the one or more encapsulated identifiers; and

iii) forward the data packet out the at least one determined access port of the switch.

**27**. The computer-readable storage medium as recited in claim **26**, further comprising instructions to cause the switch to:

listen to end systems heard on the access ports and to maintain the end systems heard and their respective access ports in a mapping table.

**28**. The computer-readable storage medium as recited in claim **25**, further comprising instructions to cause the switch to, if in step c(iv) no other access port is determined, discard the data packet.

**29**. The computer-readable storage medium as recited in claim **25**, further comprising, in step b, instructions to cause the switch to:

maintain a first table to relate the at least one assigned identifier to the end systems or access ports of the switch; and

14

maintain a second table to relate the access ports of the switch to assigned identifiers.

**30**. The computer-readable storage medium as recited in claim **29**, further comprising, in step c.i), instructions to cause the switch to:

review the first table for the one or more identifiers associated with the source end system or the receiving access port.

**31**. The computer-readable storage medium as recited in claim **30**, further comprising, in step c.iv), instructions to cause the switch to:

review the second table for an access port associated with the one or more determined identifiers.

**32**. The computer-readable storage medium as recited in claim **25**, further comprising instructions to cause the switch to:

prior to assigning an identifier to a specific end system or access port, maintain a default identifier for that specific end system or access port which maps to predetermined access ports.

**33**. The computer-readable storage medium as recited in claim **25**, further comprising instructions to cause the switch to:

maintain a Management Information Base (MIB) interface.

**34**. The computer-readable storage medium as recited in claim **33**, further comprising instructions to cause the switch to:

use a Simple Network Management Protocol (SNMP) message to maintain a mapping table.

**35**. The computer-readable storage medium as recited in claim **25**, further comprising instructions to cause the switch to:

maintain a status table to enable and disable a respective subset.

\*    \*    \*    \*    \*

EXHIBIT 5

US006539022B1

(12) **United States Patent**

Virgile

(10) Patent No.: **US 6,539,022 B1**

(45) Date of Patent: *\*Mar. 25, 2003

(54) **NETWORK DEVICE WITH MULTICAST FORWARDING DATA**

(75) Inventor: **Kenneth Virgile**, Lexington, MA (US)

(73) Assignee: **Enterasys Networks, Inc.**, Rochester, NH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/299,970**

(22) Filed: **Apr. 26, 1999**

**Related U.S. Application Data**

(63) Continuation of application No. 08/766,784, filed on Dec. 13, 1996, now Pat. No. 5,898,686, and a continuation of application No. 08/428,403, filed on Apr. 25, 1995, now Pat. No. 5,608,726.

(51) Int. Cl.[7] .......................................... **H04L 12/54**

(52) U.S. Cl. ....................................... **370/401**; 370/432

(58) Field of Search ........................... 370/254, 235, 370/389, 390, 392, 395.2, 395.3, 395.31, 401, 428, 429, 432, 463; 709/249, 250

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,627,052 A | * | 12/1986 | Hoare et al. ................. | 370/402 |
| 5,136,580 A | * | 8/1992 | Videlock et al. ............ | 370/403 |
| 5,331,637 A | | 7/1994 | Francis et al. ............... | 370/54 |
| 5,355,375 A | | 10/1994 | Christensen ................. | 370/85.2 |
| 5,361,256 A | * | 11/1994 | Doeringer et al. .......... | 370/390 |
| 5,396,493 A | | 3/1995 | Sugiyama | |
| 5,400,326 A | | 3/1995 | Smith | |
| 5,428,615 A | | 6/1995 | Backes et al. | |
| 5,434,855 A | | 7/1995 | Perlman et al. | |
| 5,448,565 A | | 9/1995 | Chang et al. | |
| 5,481,540 A | | 1/1996 | Huang | |
| 5,500,860 A | | 3/1996 | Perlman et al. | |
| 5,511,168 A | | 4/1996 | Perlman et al. ............. | 709/243 |
| 5,517,494 A | | 5/1996 | Green | |
| 5,517,620 A | * | 5/1996 | Hashimoto et al. ......... | 709/242 |
| 5,530,703 A | * | 6/1996 | Liu et al. .................... | 370/255 |
| 5,608,726 A | | 3/1997 | Virgile | |

FOREIGN PATENT DOCUMENTS

WO        WO 95/01023        1/1995

OTHER PUBLICATIONS

D.R. cheriton and S.E. Deering, "Host Groups: A Multicast Extension for Datagram Internetworks", *Proceedings Ninth Data Communications Symposium*, Whistler Mountain, British Columbia, pp. 172–179, (Sep. 10–13, 1985).

Ninth Data Communications Symposium, (Sep. 1985), USA, pp. 172–179, D.R. et al.: "Host groups: a internetworks".

Symposium on Communication Architectures and Protocols, (Aug. 1988), USA, pp. 55–64, S.E. Deering: "Multicast routing in internetworks and extended LANS" cited in the application.

S. Deering, *Multicast Routing in Internetworks and Extended LANs*, ACM Symposium on Communication Architectures and Protocols, ACM SIGCOMM, pp. 55–64, (Aug. 1988).

Cisco Systems Inc., *I.P. Multicast Streamlines Delivery of Multicast Applications*, The Packet: CISCO Systems Use Magazine, vol. 7, No. 1, pp. 7–9 (1995).

* cited by examiner

*Primary Examiner*—Kwang Bin Yao

(74) *Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

(57) **ABSTRACT**

A system and method are disclosed for routing multicast packets in a subnetwork so as to conserve bandwidth in at least some of the network segments or collision domains of the subnetwork. In particular, multicast packets are only retransmitted in the network segments that are on a path to a host that is a member of the multicast group of hosts to which the multicast packet is destined.

**20 Claims, 4 Drawing Sheets**





## FIG. 1
(PRIOR ART)



## FIG. 2
(PRIOR ART)



LEGEND:
rx=router
bx=bridge
hx=host

*FIG. 3*



| MULTICAST FORWARDING TABLE | | | |
|---|---|---|---|
| INDEX FIELD | I/O INTERFACE FIELD | LIST FIELD | |
| 210 ⌇ | A1    212 | 142,143,144,141    214 | h108,h109,h110    216 |
| 220 ⌇ | A2    222 | 144,141    224 | h112    226 |
| 230 ⌇ | AV1    232 | 143,144,141    234 | h109,h114,h117,h119    236 |
| 240 ⌇ | AV2    242 | 142,144,141    244 | h101,h102,h103,h113,h114    246 |
| 250 ⌇ | V1    252 | 142,141    254 | h107    256 |
| 260 ⌇ | V2    262 | 142,143,141    264 | h104,h109    266 |
| 270 ⌇ | V3    272 | 143,141    274 | h109    276 |
| 280 ⌇ | A3    282 | 142,141    284 | h100    286 |

*FIG. 4*          ↘ *200*

START

MULTICAST MESSAGE PACKET ?    *S16*    —NO→    UNICAST ROUTING    *S17*    →    RETURN

↓ YES

TABLE ENTRY FOR THE MULTICAST DESTINATION ADDRESS ?    *S18*    —NO→    DISCARD OR RETRANSMIT FROM ALL I/O INTERFACES EXCEPT FOR THE I/O INTERFACE FROM WHICH THE PACKET WAS RECEIVED    *S19*    →    RETURN

↓ YES    *S20*

RETRANSMIT FROM ONLY THOSE I/O INTERFACES INDICATED IN THE CORRESPONDING TABLE ENTRY EXCEPT THE I/O INTERFACE FROM WHICH THE PACKET WAS RECEIVED    →    RETURN

*FIG. 6*



*FIG. 5*

US 6,539,022 B1

1

# NETWORK DEVICE WITH MULTICAST FORWARDING DATA

## CROSS REFERENCE TO RELATED APPLICATION

This patent application is a continuation of U.S. patent application Ser. No. 08/766,784, filed Dec. 13, 1996 now U.S. Pat. No. 5,898,686, and also a continuation of U.S. patent application Ser. No. 08/428,403, filed Apr. 25, 1995 now U.S. Pat. No. 5,608,726.

## FIELD OF THE INVENTION

The present invention relates to a communications network that transmits messages therein. The present invention especially relates to the transmission of multicast packets in such a network.

## BACKGROUND OF THE INVENTION

FIG. 1 shows a conventional hierarchically organized communications network 10. In particular, the communications network has a wide area network (WAN), such as the Internet, at the highest level of the hierarchy. A campus network 15 is interconnected to the WAN by a router r1. The campus network 15 is so called because it is typically located at a single geographic campus of several buildings. The interconnections may include any combination of wires, coaxial cables, optical fibers, circuit switches, packet switches, etc. The router r1 interconnects a backbone network of the campus network 15 to the WAN. Connected to the backbone network are additional routers r2, r3 and r4. Each additional router r2, r3 and r4 connects a respective subnetwork A, B or C to the backbone network. The campus network 15 is at a middle level of the hierarchy and subnetworks A, B and C of the campus network 15 are at a lower level in the hierarchy. The subnetworks A, B, C are typically isolated to a single, small geographic area such as an office building or floor of an office building. The WAN, on the other hand, typically sprawls from geographic area to geographic area. The WAN itself typically includes a number of routers (not shown) for routing communications from campus network to campus network.

The communication between routers on the WAN and on the backbone network is illustratively achieved according to the Internet protocol (IP). (Herein, protocol means a collection of semantic and syntactic rules obeyed by the devices which communicate according to the protocol).

The router r2 is connected to bridges b1 and b2 of the subnetwork A, the router r3 is connected to bridge b3 of the subnetwork C. Each bridge b1–b4 is connected to one or more network segments or collision domains which illustratively are local area networks (LANs). The bridge b1 is connected to network segments L1 and L2, the bridge b2 is connected to network segments L2, L3 and L4, the bridge b3 is connected to network segments L5, L6 and L7 and the bridge b4 is connected to network segment L8. Each network segment L1–L8 comprises one or more interconnected host computers h1–h17. The network segment L1 includes hosts h1, h2 and h3, the network segment L2 includes the host h4, the network segment L3 includes the hosts h5, h6 and h7, the network segment L4 includes the host h8, the network segment L5 includes the host h9, the network segment L6 includes the hosts h10 and h11, the network segment L7 includes the hosts h12, h13 and h14 and the network segment L8 includes the hosts h15, h16 and h17. The network segments L1–L8 may be Ethernet LANs, token ring LANs or FDDI LANs, for example.

2

Communication may be achieved locally within each network segment L1–L8 according to one of a number of protocols. Since most deployed network segments L1–L8 are Ethernet LANs, the Ethernet protocol for communication is used to illustrate the invention. According to the Ethernet protocol, each host computer is connected via an I/O interface to a common broadcast medium which broadcast medium may be carried by a coaxial cable, unshielded twisted pairs of wires, etc. A host communicates on the medium by transmitting a bitstream organized into packets. FIG. 2 illustrates an illustrative packet 20, which comprises a header section 22 and a payload section 24. A host which desires to communicate writes data in the payload section 24, and an address of the intended recipient host in the header section 22. (Illustratively, all hosts on a network segment are assigned a unique identifier or address). If the common broadcast medium is not currently being used, then the host transmits its packet 20 from an I/O interface connected to the host onto the common broadcast medium. If the common broadcast medium is currently being used by another host to transmit a packet, then the host waits until the common broadcast medium is available. The transmitted packet 20 is received at the I/O interface of each other host on the network segment. Each host then examines the destination address written in the header section 22 of the packet 20. If the destination address matches the destination address of the host, the host accepts the packet 20 and may examine the contents of the payload section 24. If the destination address does not match, the host discards the packet 20.

It is possible that two hosts of the same network segment may attempt to transmit a packet concurrently. If this happens, a collision is said to occur. According to the Carrier Sense Multiple Access with Collision Detection (CSMA/CD) protocol, in the event of a collision, each host transmits a jamming signal for a specified period of time and waits a variable amount of time before reattempting transmission of its packet. See U.S. Pat. No. 5,355,375. Collisions are only possible within an individual collision domain or network segment. For instance, the communication amongst the hosts h1–h3 and bridge b1 in the network segment L1 does not effect the communication amongst the host h4 and bridge b1 in the network segment L2. The delay incurred in transmitting a packet on a network segment (as caused by collisions or otherwise) increases with the increase of communications traffic on each segment.

Sometimes it is desirable to communicate from a host in one network segment to a host in another network segment of the same subnetwork. Such communication may be achieved using the bridges b1–b4. The bridge enables inter-segment communication while isolating the two network segments so that they operate as independent collision domains. The bridges b1–b4 also can enable communication between network segments that communicate according to different protocols. For instance, the bridge b1 can enable communication by the host h4 in the network segment L2, which is a Token Ring LAN, with the host h2 in the network segment L1, which is an Ethernet LAN.

The bridges within a subnetwork (e.g., the bridges b1–b2 in the subnetwork A) pass control packets between each other to determine the best route for reaching each host in each attached network segment. Thereafter, each bridge receives each packet transmitted on its attached network segments. If the bridge (e.g., bridge b1) receives a packet from one network segment (e.g., L1) containing a destination address of a host in another network segment, (e.g., the host h8 in network segment L4) the bridge transmits the

US 6,539,022 B1

3

packet in another attached network segment on a route to the network segment that contains the destination host. For instance, the route from host h1 in network segment L1 to the host h8 in the network segment L4 illustratively comprises: h1-L1-b1-L2-b2-L4-h8. Thus, the bridge b1 retransmits a packet received from host h1 destined to host h8 on network segment L2.

In addition to enabling inter-segment communication within a subnetwork, the bridges enable the hosts in one subnetwork to communicate with the hosts in other subnetworks. To that end, IP (Internet protocol) addresses may be assigned to each host which includes the destination host's address in the particular subnetwork concatenated to at least a unique address that is assigned to the subnetwork in which the destination host is located. As an example, suppose the host h1 in the subnetwork A wishes to communicate to the host h15 in the subnetwork C. The host h1 writes the IP address of the node h15 (which includes at least the destination address of the subnetwork C concatenated to the destination address of the host h15) in a packet and transmits the packet on its network segment L1. The packet is received at, amongst other places, the bridge b1. If a bridge (e.g., the bridge b1) in a particular subnetwork receives a packet with a destination address that is foreign to the particular subnetwork, the bridge transmits the packet to its attached router (e.g., r2). The packet is then transmitted via the backbone network to the router that connects to the subnetwork containing the destination host. For instance, the packet may be transmitted from the router r2 via the backbone network to the router r4. To that end, each router which receives a packet illustratively uses the destination address (or a portion thereof) to index a routing table stored at the router. The indexed router table entry indicates the next router to which the packet must be transmitted. When the packet reaches the router (e.g., router r4) that attaches the subnetwork (e.g., subnetwork C) containing the destination host (e.g., host h15), the router transfers the packet to the attached bridge (e.g., b4). The bridge then transmits the packet to the destination host.

The discussion above has been limited to unicast packet communication wherein a packet is transmitted from a single source host to a single destination host. The network 10 also supports multicast communication, wherein a packet is transmitted from a single source host to multiple hosts. U.S. Pat. No. 5,331,637 describes multicast routing and, in particular, how to implement multicast routing at the WAN level of the hierarchy. Illustratively, multicast communication of packets is supported in the communications network 10 at the network level of communications according to the Internet Group Management Protocol (IGMP), IETF RFC 112, *Host Extensions for IP Multicasting* According to this protocol, multicast groups of hosts are identified, wherein each group is a collection of destination hosts for packets for a particular communication. Each multicast group is assigned a special multicast address which bears no relation to any single host of the multicast group.

Each router which connects a campus network 15 to the WAN (e.g., the router r1) periodically transmits a "Host Membership Query" multicast control packet with a destination address that specifies all of the hosts of the campus network 15. In response, each host transmits back to the router (e.g., the router r1) a "Host Membership Report" multicast control packet that indicates all of the groups to which the host belongs. Furthermore, a host can transmit a "Join Host Group" or "Leave Host Group" multicast control packet to the router (e.g., the router r1) at any time to join or leave a multicast group. The router receives these messages and updates its routing tables accordingly.

4

When a host, e.g., the host h1, desires to transmit a multicast packet, it writes a multicast address of an appropriate multicast group in the destination field. The host then transmits the packet to its attached bridge, e.g., the bridge b1 (via the subnetwork L1). The bridge has no way of knowing the location of the destination host. (Because the multicast destination address bears no relationship to the destination address of a single host). Thus, the bridge retransmits the multicast packet to each attached subnetwork and router, other than the subnetwork or router from which the packet originated, e.g., the subnetworks L2, L3 and the router r2. The attached router, e.g., the router r2, accesses its routing table using the multicast destination address. However, unlike before, the accessed routing table entry may indicate more than one next router to which the packet must be transmitted, e.g., the router r1 and the router r3. The router transmits a copy of the packet to each indicated next router. Thus, the packet is selectively routed and replicated in route. Each router that receives a copy of the multicast packet performs the same table access procedure. Eventually, a router, e.g., the router r4, receives a packet that must be transmitted to an attached subnetwork, e.g., the subnetwork C.

When a multicast packet is received at a bridge of the subnetwork, e.g., the bridge b4 of the subnetwork C, the bridge has no way of knowing to which attached network segment (or router) the packet is destined. This is because the packet has a multicast address which bears no relationship to any individual host. Furthermore, the multicast packet can be destined to more than one host in more than one attached network segment and or router. Thus, the bridge retransmits the multicast packet in each attached network segment and to each attached router. The packets transmitted in the network segments are received by each host. Each host then compares the multicast destination address to the multicast destination addresses of the groups of which it is a member. If the host is a member of the same group as indicated in the packet, the host receives the packet. Otherwise, the host discards the packet.

The problem with the above noted multicast communication scheme is that it wastes bandwidth in the subnetworks. In particular, a bridge retransmits a received multicast packet in each attached network segment even if one of the attached network segments is devoid of destination hosts of the multicast packet (i.e., even if the network segment does not have any hosts that are members of the multicast group of the multicast packet). This results in unnecessary bandwidth reduction in some attached network segments that are devoid of destination hosts. Considering that much multicast traffic in the future is intended to be bandwidth intensive multimedia traffic, i.e., video and/or audio, the wasted bandwidth can be very high and can noticeably degrade performance on a network segment. In the past, the solution to improving network segment performance is to reconfigure the campus network by increasing the number of routers and redistributing (i.e., reconnecting) the network segments or hosts amongst the routers. However, this solution is disadvantageous because routers are relatively expensive and difficult to manage.

S. Deering, *Multicast Routing in Internetworks and Extended LANs,* ACM SYMPOSIUM ON COMMUNICATION ARCHITECTURES AND PROTOCOLS, ACM SIG-COMM pp. 55–64 August 1988 proposes an alternative solution. According to the Deering reference, bridges only retransmit multicast packets over "links" on routes to a destination host of the multicast packets (wherein a "link" is a communication connection). To that end, each bridge

US 6,539,022 B1

5

constructs a multicast forwarding table which is maintained at the bridge. The bridge accesses the multicast forwarding table using the multicast group as an address to determine onto which links a received multicast packet must be retransmitted. The Deering reference teaches that the hosts transmit special control packets that are destined to all bridges of the campus network indicating to which multicast group the host belongs. The bridges compile such information, in order to construct the multicast forwarding table and to determine when entries of the multicast forwarding table have become stale and therefore must be discarded.

There are two problems with the proposed Deering solution. First, extra control packets must be transmitted between the hosts and the bridges in order to construct the multicast forwarding tables. This increases traffic on the network segments. Second, and more importantly, all hosts are specially adapted in accordance with the Deering scheme so that they periodically transmit the special multicast control packets in order to maintain their memberships. The solution is therefore not entirely "plug-and-play" from the perspective of the hosts. It is therefore an object of the present invention to overcome the disadvantages of the prior art. It is a particular object of the present invention to prevent multicast communication traffic that originates from, or is destined to, outside of a subnetwork from degrading the communication performance within the subnetwork.

SUMMARY OF THE INVENTION

According to a first embodiment, a network device for reducing multicast communications in a network includes at least two I/O interfaces to each receive and transmit data packets and also includes multicast forwarding data. The device includes means for determining, by examining data in a first portion of a first packet, whether the first packet is a control packet destined for a device other than the network device; means for identifying a multicast group from the received first packet when the first packet is a control packet type; and means for updating the multicast forwarding data according to the identified multicast group received from the multicast group identifying means and the data in the first portion of the first packet.

According to a second embodiment, a method of reducing multicast communications in a network device, the device including multicast communications forwarding data and at least two I/O interfaces to each receive and transmit data packets, comprises: determining the I/O interface on which a first packet arrived; and determining, by examining data in a first portion of the first packet, whether the first packet is a control packet addressed to a device other than the network device. When the first packet is determined to be a control packet addressed to a device other than the network device: determining a multicast group from the first portion of the control packet; and updating the multicast forwarding data as a function of data in the first portion of the control packet.

According to a third embodiment, a method of reducing multicast communications in a network, the network including a network device, the network device having at least two I/O interfaces to each receive and transmit data packets and the network device including multicast forwarding data, includes (a) determining, by examining data in a first portion of a first packet, whether the first packet is a control packet destined for a device other than the network device; and when the first packet has been determined to be a control packet: (b) identifying a multicast group from the data in the first portion of the first packet; and (c) updating the multicast forwarding data according to the data in the first portion of the first packet.

6

According to yet another embodiment, a method of conserving bandwidth in a communications network by reducing transmission of unneeded multicast messages comprises: monitoring, at a first location, control packets destined for another location other than the first location; from each monitored control packet, identifying a multicast group, a source of the each monitored control packet and an interface on which the each monitored control packet arrived; maintaining an association of the identified multicast group with the identified interface; and for any multicast message, received at the first location and destined for the identified multicast group, transmitting the received multicast message on any interface associated with the multicast group identified in the multicast message.

This provides a robust solution for preventing multicast packets from flooding all attached network segments without requiring that the individual hosts be adapted in any special fashion. In short, an apparatus and method are provided for controlling the retransmission of multicast packets within a subnetwork to conserve bandwidth. Thus, multicast packets originating from, or destined to, outside the subnetwork do not interfere with the network segments that do not contain any hosts that belong to the multicast group of the multicast packets.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a conventional communications network.

FIG. 2 shows a conventional packet.

FIG. 3 shows a subnetwork including a bridge according to the present invention.

FIG. 4 shows an illustrative forwarding table according to an embodiment of the present invention.

FIG. 5 is a flowchart which schematically illustrates a multicast forwarding table maintenance process according to an embodiment of the present invention.

FIG. 6 is a flowchart which schematically illustrates a multicast message packet routing process according to an embodiment of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

FIG. 3 shows a subnetwork 100 according to the present invention. As shown, the subnetwork 100 is connected to a router r100 of a campus network or directly to a WAN. The subnetwork 100 includes a bridge b100 connected to three network segments, namely, L100, L101 and L102. The network segment L100 includes a number of hosts h100, h101, h102, h103, h104, h105, h106, h107 and h108 interconnected to form a LAN such as an Ethernet LAN. Likewise, the network segment 102 includes a number of hosts h110, h111, h112, h113, h114, h115, h116, h117, h118, h119 connected to form a LAN. The network segment L101 only includes the host h109 which is also connected to form a LAN.

As shown, the bridge b100 includes a bus 110, a processor 120, a memory 130 and four I/O interfaces 141, 142, 143 and 144. However, this is illustrative. Any arbitrary number of I/O interfaces may be provided to support each router and network segment attached to the bridge b100. The I/O interface 141 is connected to the router r100. The I/O interface 142 is connected to the network segment L100. The I/O interface 143 is connected to the network segment L101. The I/O interface 144 is connected to the network segment L102. Each I/O interface 141–144 is capable of receiving packets and transmitting packets according to the

US 6,539,022 B1

7

protocol of the router or network segment to which the I/O interface is attached. For instance, the I/O interface **142** can transmit packets, receive all packets, detect a collision on the network segment L**100** and transmit a jamming signal, if necessary, as per the Ethernet and CSMA/CD protocols. Thus, the I/O interfaces **141–144** enable the bridge b**100** to receive packets from the router r**100** and network segments L**100**, L**101** and L**102** and to transmit packets thereto.

Packets may be received via the I/O interfaces **141–144** may be transferred via the bus **110** to the processor **120** or memory **130**. Illustratively, the memory **130** is for, amongst other things, temporarily buffering received packets. The processor **120** can access the packets in the memory **130**, for example, to read or write data in the header portions of the packets for purposes of translating a packet from one protocol to another protocol. The processor **120** can also examine the address of the packet header to determine from which I/O interface **141–144** the packet should be retransmitted. By selectively retransmitting unicast packets from only the I/O interfaces **141–144** connected to a network segment (or router) containing the destination host of the packet, the bridge b**100** conserves the bandwidth of the other network segments (or routers) which do not contain the destination host of the packet.

According to an embodiment of the present invention, multicast packets received at the bridge b**100** (from the router r**100** or from a host h**100**–h**119** in an attached network segment L**100**, L**101** or L**102**) are only retransmitted onto the network segments L**100**, L**101** or L**102** that contain destination hosts of the multicast packets. Stated another way, the bridge b**100** refrains from retransmitting multicast packets onto those attached network segments L**100**, L**101** or L**102** that are devoid of destination hosts of the multicast packets. To that end, the processor **120** maintains a forwarding table with entries corresponding to multicast addresses. Alternatively, additional forwarding table entries as described below may be added to a forwarding table already maintained by the bridge b**100**.

An illustrative forwarding table **200** is shown in FIG. **4**. As shown, each table entry **210**, **220**, **230**, **240**, **250**, **260**, **270**, and **280** includes a multicast destination address index field **212**, **222**, **232**, **242**, **252**, **262**, **272**, and **282**. The multicast destination address index field contains a multicast destination address of a particular multicast group. This field is used by the processor **120** for retrieving a multicast forwarding table entry **210**–**280** that corresponds to a particular multicast group. The table entry also includes an I/O interface field **214**, **224**, **234**, **244**, **254**, **264**, **274** and **284**. This field is for storing indications of only those I/O interfaces **142**–**144** that connect the bridge b**100** to a network segment that contains a destination host of the multicast address. This field **214**–**284** also stores indications of I/O interfaces **141** that connect the bridge b**100** to a router r**100** that provides communication access external to the network segment **100**. Furthermore, each table entry **210**–**280** includes a list field **216**, **226**, **236**, **246**, **256**, **266**, **276** or **286** for storing a list of the hosts which are members of the multicast group corresponding to the table entry. For example, the multicast forwarding table entry **230** corresponds to the multicast group for an audio-video teleconference which has the address AV**1** stored in the multicast destination address index field **232**. The multicast forwarding table entry **230** also includes the indications of the I/O interfaces **143**, **144** and **141** (from which the packets must be retransmitted) stored in the I/O interface field **234**. Furthermore, the multicast forwarding table entry **230** includes a list of the hosts h**109**, h**114**, h**117** and h**119** which are members of the multicast group AV**1** stored in the host list field **236**.

8

FIG. **5** is a flowchart that illustrates a process executed by the bridge b**100** in constructing and modifying the multicast forwarding table entries **210**–**280** of FIG. **4**. In a first step S**1**, the processor **120** determines if a received packet is a multicast control packet. Examples of such packets according to the IGMP protocol are Host Membership Query packets, Host Membership Report packets, Join Host Group packets and Leave Host Group packets. Such packets have a well defined and easily identifiable form. If the received packet is not a multicast control packet, the processor executes a routing process (step S**2**) described below. If the received packet is a multicast control packet, the processor **120** executes step S**3**. In step S**3**, the processor **120** determines if the packet contains an instruction from the attached router to each host h**101**–h**119** to report all of its current multicast group memberships (e.g ., a Host Membership Query packet). If so, then the processor **120** keeps track of from which router and via which I/O interface **141–144** the packet was received, e.g., by temporarily storing this information in the memory **130**. As discussed in greater detail below, the processor **120** uses such information in the construction of forwarding table entries corresponding to multicast groups. In particular, such information is used to update the forwarding tables to ensure that multicast packets originating in the subnetwork **100**, and destined outside the subnetwork **100**, are transmitted from the bridge b**100** to the routers r**1**–r**4** that can deliver multicast packets to such destinations external to the subnetwork **100**. If the packet is not a Host Membership Query packet, the processor **120** proceeds to step S**5**. In step S**5**, the processor determines if the packet contains a report from a host of all of its current multicast group memberships (e.g., a Host Membership Report packet). Such a packet contains the multicast destination address of each multicast group of which the host wishes to be a member. If a Host Membership Report packet is received, then, in accordance with step S**6**, the processor **120** executes steps S**13**–S**15** for each multicast destination address (of each multicast group) specified in the packet. If the packet is not a Host Membership Report packet then the processor **120** proceeds to step S**7**.

In step S**7**, the processor **120** determines if the packet contains an indication that a host is leaving a multicast group (e.g., is a Leave Host Group packet). If not, the processor **120** executes step S**11**. If the packet does contain an indication that the host is leaving a multicast group, the processor **120** executes steps S**8**–S**10**. In step S**8**, the processor **120** retrieves the multicast forwarding table entry corresponding to the destination address of the multicast group designated in the received packet. For example, suppose the packet contained an indication that host h**109** desired to leave the multicast group AV**1**. The processor **120** would thus retrieve from the memory **130** the forwarding table entry **230** that has the multicast destination address AV**1** stored in the multicast destination address index field **232**. Next, in step S**9**, the processor **120** deletes the indication of the host which transmitted the packet from the list of hosts contained in the entry. For instance, the processor **120** would delete the indication for h**109** from the host list field **236** of the multicast forwarding table entry **230**. Thereafter, the processor **120** executes step S**10**, wherein the processor **120** updates the indicators stored in the I/O interface field **234** of the I/O interfaces from which the packet must be transmitted. In particular, the processor **120** examines each remaining host indication contained in the host list field **236**. If necessary, the processor **120** deletes an indicator for an I/O interface from the I/O interface field **234** if none of the remaining hosts in the host list are connected via that I/O

US 6,539,022 B1

9

10

interface. Such would be the case if the host which transmitted the multicast control packet was formerly the only host on a particular network segment that belonged to that multicast group. Continuing with the above example, the host h109 was formerly the only host of the list 236 connected to the bridge b100 by the I/O interface 143. Thus, the indication for the I/O interface 143 is deleted from the I/O interface field 234.

In step S11, the processor 120 determines if the received packet contains an indication that a host wishes to join a particular multicast group (e.g., a Join Host Group packet). If not, then the packet must be some unidentifiable multicast control packet. In such a case, in step S12, the processor executes the routing process described below. If a multicast control packet for joining a multicast group was received, the processor 120 executes steps S13–S15. In step S13, the processor 120 first attempts to retrieve a multicast forwarding table entry using, as an index, the multicast forwarding address of the group that the host wishes to join. If the processor 120 is able to retrieve a corresponding multicast forwarding table entry from the memory 130, the processor 120 then executes step S14.

However, it is possible that the host which transmitted the packet wishes to join a multicast group for which no multicast forwarding table entry exists at the bridge b100. Such is the case if the multicast forwarding table was recently flushed or if this host is the first host in the subnetwork 100 (FIG. 3) to join this particular multicast group. If no multicast forwarding table entry exists for the multicast group, then the processor 120 generates one in the memory 130. In so doing, the processor 120 writes the multicast destination address for the group in the multicast destination address index field. The processor 120 also writes the indication of the I/O interface S141–144 connected to one or more routers, i.e., the interface 141, that can deliver multicast traffic to destinations external to the subnetwork 100, in the I/O interface field. This is so the bridge b100 will retransmit multicast packets that are locally generated in the subnetwork 100 to other subnetworks via the router r100. As noted above, the processor 120 can determine which I/O interfaces 141 are connected to such routers r100 in response to receiving Host Membership Query Packets (steps S3–S4). The processor 120 can thus use the previously stored indication of the host interface 141 of the router r100 which issues such multicast query packets to construct the table entry. The processor 120 then executes step S14.

In step S14, the processor 120 adds the destination address of the host which transmitted the control packet to the host list field of the multicast forwarding table entry. Next, in step S15, the processor 120 updates the I/O interface indications in the I/O interface field of the multicast forwarding table entry in accordance with the revised host list. That is, suppose the newly added host is connected to the bridge b100 via an I/O interface not already indicated in the I/O interface field. Such would be the case if the newly added host is the only multicast group member on a particular network segment. If such is the case, then an indicator for the I/O interface which connects the network segment of the newly added host must be added to the I/O interface field of the table entry.

After each of the steps S4, S6, S10 and S15, the bridge also routes the received packet towards its intended destination. In the case of step S4, the multicast packet contains an "all hosts" address. This packet is thus retransmitted on every network segment on a route to a host of the subnetwork 100. In the cases of steps S6, S10 and S15, such multicast control packets are destined to an attached router, such as the router r100. The bridge b100 retransmits such packets on a route to that router. The router in turn updates its internal routing tables in response to receiving such packets in a well known manner.

In any event, it should be noted that the hosts need not transmit special packets to the bridges. Rather, the bridges b100 according to the present invention "eavesdrop" on the very same packets used to change host membership on the WAN or campus network level according to, for instance, the IGMP protocol. Thus, network segment bandwidth is conserved since a single multicast control packet serves two purposes. Moreover, neither the hosts nor routers need to be specially adapted to implement the invention. Rather, only the bridges need be adapted.

While not shown, the processor 120 also performs an "aging out" process. Generally speaking, the forwarding table 200 is only accurate for a limited period of time. This is due to various reasons, such as the turning on and off of hosts, the reconfiguration (the changing of the interconnection of routers, bridges and hosts) of the network 100, the failing of a router, bridge, etc. Thus, the forwarding table 100 is presumed to be stale or inaccurate after a fixed period of time, e.g., every five minutes. At each such regular interval, the processor 120 flushes or discards the forwarding table 200 in the memory 130 and begins constructing a new forwarding table 200 as per the above-described process. See S. Deering, *Multicast Routing in Internetworks and Extended LANs, ACM* Symposium On Communication-Architectures and Protocols, ACM SIGCOMM pp. 55–64, August, 1988 for an exemplary "aging-out" process.

FIG. 6 shows a process executed by the bridge b100 in routing, i.e., retransmitting received packets. In step S16, the processor 120 examines the received packet in the memory to determine if it is a multicast message packet (i.e., a packet for delivering data to multiple destinations). If not, the processor 120 executes step S17 wherein the processor routes the packet using conventional unicast routing (described above). If the packet is a multicast message packet, the processor 120 executes step S18. In step S18, the processor 120 uses the multicast destination address as an index to retrieve a corresponding entry from the multicast forwarding table 200 (FIG. 4). If the table does not have an entry corresponding to the multicast destination address of the received packet then the processor 120 executes step S19.

This may occur for various reasons including:

(a) a multicast message packet was received destined to a multicast group not known by the bridge b100,

(b) the processor 120 aged out the forwarding table 200,

(c) the bridge b100 was recently installed and has not yet determined all of the multicast groups,

(d) the bridge b100 did not receive all of the multicast control packets, and

(e) the memory 130 ran out of storage locations and therefore could not complete the forwarding table 200.

In step 19, the processor 120 discards or retransmits the received packets depending on why the multicast destination group is not contained in the forwarding table 200. For example, in the event of conditions (a)–(b), the received packet is discarded. On the other hand, in the event of conditions (c)–(e) the processor 120 retransmits the received packet in a conventional fashion, namely, the processor 120 retransmits the received packet from each I/O interface 142–144 other than the I/O interface 141 from which the packet was received.

US 6,539,022 B1

11

12

If, on the other hand, the multicast forwarding table has an entry corresponding to the multicast address of the packet, the processor **120** executes step S20. In step **S20**, the processor **120** retrieves the indications of the I/O interfaces stored in the I/O interface field of the retrieved multicast forwarding table entry. The processor **120** then retransmits the received multicast packet only from the I/O interfaces **141–144** indicated in the I/O interface field except for the I/O interface from which the packet was received. For example, suppose the bridge b**100** receives a multicast packet from the router r**100** destined to the multicast group V**1**. This packet is received via I/O interface **141** and temporarily stored in the memory **130**. Using V**1** as an index, the processor **120** retrieves the table entry **250** corresponding to the multicast group of the address V**1**. The processor then retrieves all of the I/O interface indications from the I/O interface field **254**. The only indicated I/O interfaces are **141** and **142**. However, the packet was received from I/O interface **141**. Thus, the received multicast packet is only retransmitted from the I/O interface **142**. As such, the received multicast packet is retransmitted on the segment L**100** but not on the attached network segments L**101**, L**102**.

Consider now a second example, where the host h**101** wishes to transmit a multicast message packet to the multicast group AV**2**. The host **101** writes the multicast destination address AV**2** into the packet header and transmits the multicast message packet in the network segment L**100**. This packet is received at hosts h**102**–h**103** which accept the packet. The packet is also received at the I/O interface **142** of the bridge b**100**. The received packet is temporarily stored in the memory **130**. The processor **120** retrieves the multicast forwarding table entry **240**. The indicated I/O interfaces are **142**, **144**, and **141**. However, because the packet was received from I/O interface **142**, the processor **130** only retransmits the packet from I/O interfaces **144** and **141**. Thus, the packet is transmitted to the router r**100** (from which the packet may be transmitted to a host external to the subnetwork **100**) and to the hosts h**113**, h**114** via the network segment L**102**. However, the packet is not retransmitted on the network segment L**101**.

Note the improvement over the conventional multicast routing system wherein a conventional bridge simply retransmits all received multicast packets over each network segment (other than the network segment from which the packet was received). In contrast, according to the present invention, the received multicast packets are retransmitted from the bridge onto only those network segments containing hosts that are members of the pertinent multicast group. This is especially important in the context of multimedia, i.e., audio-video multicast packet communication traffic. Such traffic tends to be continuous rather than bursty and tends to require a high bandwidth.

The invention has been described so far with reference to only a single internetworking device (e.g., bridge) subnetwork. However, the invention is also equally applicable to a multiple internetworking device (e.g., multi-bridge) subnetwork.

In such a case, it is possible that some network segments are not directly connected to all of the bridges. For instance, consider the topology of the subnetwork A of FIG. 1. As shown, the network segment L**1** is directly connected to bridge b**1** but not to bridge b**2**. Likewise, the network segments L**3** and L**4** are directly connected to the bridge b**2** but not the bridge b**1**. As noted above, the bridges b**1** and b**2** self configure routes to the hosts of subnetworks to which they are not directly attached by passing control packets

back and forth to each other. For instance, the bridge b**1** may determine that packets destined to hosts in the subnetworks L**3** and L**4** may be transmitted thereto via the intervening network segment L**2** and the bridge b**2**.

Thus, in the multiple internetworking device topology, consideration must be made for routing to multicast destination hosts via intervening subnetworks. This can be achieved by modifying steps S**10** and S**15**. In particular, when the processor **120** updates the I/O interface field, the processor **120** ensures that only I/O interfaces that attach network segments on a route to a host of the host list are included therein. Such I/O interfaces include those that attach network segments which contain multicast destination hosts and those which attach intervening network segments on a route to multicast destination hosts.

In short, a system and method are disclosed for routing multicast packets in a subnetwork so as to conserve bandwidth in at least some of the network segments or collision domains of the subnetwork. In particular, multicast packets are only retransmitted in the network segments that are on a path to a host that is a member of the multicast group of hosts to which the multicast packet is destined.

Finally, the invention has been described above with reference to illustrative embodiments. Numerous alternative embodiments may be devised by those having ordinary skill in the art without departing from the spirit and scope of the following claims.

What is claimed is:

1. A network bridge for reducing multicast communications in a network, the network bridge including at least two I/O interfaces to each receive and transmit data packets and also including multicast forwarding data, the device comprising:

    means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge;

    means for identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge; and

    means for updating the multicast forwarding data according to the identified multicast group and the data in the first portion of the first packet.

2. The network bridge as recited in claim 1, further comprising:

    means for identifying the I/O interface on which the first packet arrived,

    wherein the updating means include means for cross-referencing the identified I/O interface to the identified multicast group in the multicast forwarding data.

3. The network bridge as recited in claim 1, further comprising:

    means for identifying a source of the first data packet,

    wherein the updating means include means for cross-referencing the identified source to the identified multicast group in the multicast forwarding data.

4. The network bridge as recited in claim 1, further comprising:

    means for identifying the I/O interface on which the first packet arrived; and

    means for identifying a source of the packet,

    wherein the updating means include means for cross-referencing the identified multicast group with the identified source and the identified I/O interface in the multicast forwarding data.

US 6,539,022 B1

13

**5**. The network bridge as recited in claim **1**, further comprising:

means for determining, when the first packet is not a control packet, whether the first packet is a message packet having a multicast group as a destination address; and

means for identifying, when the first packet is determined to be a multicast message packet, the destination multicast group;

the destination multicast group identifying means further comprising:

means for retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface; and

means for sending the multicast message packet out each at least one cross-referenced I/O interface in the first data other than the identified I/O interface.

**6**. A method of reducing multicast communications in a network, the network including a network device having multicast communications forwarding data and at least two I/O interfaces to each receive and transmit data packets, the method comprising:

determining an I/O interface on which a first packet arrived;

determining, by examining data in a first portion of the first packet, whether the first packet is a multicast control packet addressed to a device other than the network device;

when the first packet is determined to be a multicast control packet addressed to a device other than the network device:

determining a multicast group from the first portion of the multicast control packet; and

updating the multicast forwarding data as a function of data in the first portion of the multicast control packet.

**7**. The method as recited in claim **6**, wherein the step of updating the multicast forwarding data comprises:

cross-referencing the identified multicast group with the determined I/O interface.

**8**. The method as recited in claim **6**, wherein the step of updating the multicast forwarding data comprises:

updating the multicast forwarding data by removing any cross-reference between the identified multicast group and the identified I/O interface.

**9**. The method as recited in claim **8**, further including a step of:

updating the multicast forwarding data for the identified destination multicast group by deleting any cross-referenced I/O interface that is not connected to a device that is a member of the identified multicast group.

**10**. The method as recited in claim **6**, wherein:

when the first packet is not a multicast control packet:

determining whether the first packet is a message packet having a multicast group as a destination; and

when the first packet is determined to be a multicast message packet:

identifying a destination multicast group from the multicast message packet;

retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface; and

14

sending the multicast message packet out each at least one cross-referenced I/O interface in the retrieved first data other than the identified I/O interface.

**11**. The method as recited in claim **10**, further comprising a step of:

when there is no data associated with the identified destination multicast group in the multicast forwarding data, transmitting the multicast message packet out all I/O interfaces other than the identified I/O interface.

**12**. The method as recited in claim **6**, wherein the control packet is defined according to an Internet Group Management Protocol (IGMP) standard.

**13**. The method as recited in claim **12**, wherein the multicast control packet is one of:

a host membership query packet;

a host membership report packet;

a join host group packet; and

a leave host group packet.

**14**. A method of reducing multicast communications in a network, the network including a network bridge, the network bridge having at least two I/O interfaces to each receive and transmit data packets and the network bridge including multicast forwarding data, the method including:

(a) determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge; and

when the first packet has been determined to be a multicast control packet destined for a device other than the network bridge:

(b) identifying a multicast group from the data in the first portion of the first packet; and

(c) updating the multicast forwarding data according to the data in the first portion of the first packet.

**15**. The method as recited in claim **14**, further comprising:

identifying the one I/O interface on which the first packet arrived;

wherein, step (c) includes a step of updating the multicast forwarding data so as to cross-reference the identified I/O interface with the identified multicast group.

**16**. The method as recited in claim **14**, further comprising:

identifying a source of the first packet;

wherein, step (c) includes a step of updating the multicast forwarding table so as to cross-reference the identified source to the identified multicast group.

**17**. The method as recited in claim **14**, further comprising:

identifying the one I/O interface on which the first packet arrived; and

identifying a source of the first packet;

wherein, step (c) includes a step of updating the multicast forwarding data so as to cross-reference the identified multicast group with the identified I/O interface and the identified source.

**18**. The method as recited in claim **14**, wherein:

when the first packet is not a multicast control packet:

determining whether the first packet is a message packet having a multicast group as a destination; and

when the first packet is determined to be a multicast message packet:

identifying a destination multicast group from the multicast message packet;

US 6,539,022 B1

15

retrieving first data from the multicast forwarding data according to the identified destination multicast group, the retrieved first data including at least one cross-referenced I/O interface; and

sending the multicast message packet out each at least one cross-referenced I/O interface in the first data other than the identified I/O interface.

**19**. The method of claim **14**, wherein the network includes at least one host and at least one router that exchange multicast control packets to maintain multicast routing information, and wherein the first packet is a multicast control packet destined for a host or a router.

**20**. A method of conserving bandwidth in a communications network by reducing transmission of unneeded multicast messages, the method comprising:

16

monitoring, at a first location, multicast control packets destined for a location other than the first location;

from each monitored multicast control packet, identifying a multicast group, a source of the monitored multicast control packet and an interface on which the monitored multicast control packet arrived;

maintaining an association of the identified multicast group with the identified interface; and

for any multicast message received at the first location and destined for the identified multicast group, transmitting the received multicast message on any interface associated with the multicast group identified in the multicast message.

*     *     *     *     *

# EXHIBIT 6

US006560236B1

(12) **United States Patent**   (10) Patent No.:    **US 6,560,236 B1**
Varghese et al.                  (45) Date of Patent:       **May 6, 2003**

(54) **VIRTUAL LANS**

(75) Inventors: **George Varghese**, Bradford, MA (US);
**John Bassett**, Reading (GB); **Robert Eugene Thomas**, Hudson, MA (US);
**Peter Higginson**, Herts (GB); **Graham Cobb**, Farnham (GB); **Barry A. Spinney**, Wayland, MA (US); **Robert Simcoe**, Westboro, MA (US)

(73) Assignee: **Enterasys Networks, Inc.**, Rochester, NH (US)

( * ) Notice:   Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/411,773**

(22) Filed:   **Oct. 4, 1999**

**Related U.S. Application Data**

(63) Continuation of application No. 08/731,905, filed on Oct. 22, 1996, now Pat. No. 5,963,556, which is a continuation of application No. 08/081,622, filed on Jun. 23, 1993, now abandoned.

(51) **Int. Cl.**[7] .......................... **H04L 12/28**; H04L 12/56
(52) **U.S. Cl.** ....................................... **370/401**; 370/432
(58) **Field of Search** ................................. 370/254, 259, 370/260, 261, 262, 263, 264, 265, 270, 351, 389, 390, 431, 432, 908, 911, 912, 312, 401; 379/156, 157, 158, 202.01, 221.15, 901

(56)                **References Cited**

U.S. PATENT DOCUMENTS

4,460,807 A  *  7/1984  Kerr et al. .............. 179/18 BC

| | | | |
|---|---|---|---|
| 4,713,806 A | | 12/1987 | Oberlander et al. |
| 4,893,307 A | | 1/1990 | McKay et al. |
| 4,937,856 A | * | 6/1990 | Natarajan ................... 379/158 |
| 5,311,593 A | | 5/1994 | Carmi |
| 5,313,465 A | | 5/1994 | Perlman et al. |
| 5,341,372 A | | 8/1994 | Kirkham |
| 5,343,471 A | | 8/1994 | Cardagnol |
| 5,361,256 A | | 11/1994 | Doeringer et al. |
| 5,371,852 A | | 12/1994 | Attanasio et al. |
| 5,379,296 A | | 1/1995 | Johnson et al. |
| 5,430,726 A | | 7/1995 | Moorwood et al. |
| 5,483,587 A | * | 1/1996 | Hogan et al. ............... 379/202 |
| 5,638,434 A | * | 6/1997 | Gottlieb et al. ............. 379/203 |
| 5,850,606 A | * | 12/1998 | Bedingfield, Sr. et al. .. 455/439 |
| 5,991,385 A | * | 11/1999 | Dunn et al. .................. 379/202 |
| 6,163,692 A | * | 12/2000 | Chakrabarti et al. ........ 455/416 |
| 6,219,412 B1 | * | 4/2001 | Wellner et al. ............. 379/202 |
| 6,236,644 B1 | * | 5/2001 | Shuman et al. ............. 370/261 |

* cited by examiner

*Primary Examiner*—Ajit Patel
(74) *Attorney, Agent, or Firm*—Wolf, Greenfield & Sacks, P.C.

(57)                **ABSTRACT**

A network device for interconnecting computer networks, the device including a bridge having a plurality of ports through which network communications pass to and from the bridge, the bridge also including a first interface enabling a user to partition the plurality of bridge ports into a plurality of groups, wherein each group represents a different virtual network, wherein the bridge treats all ports within a given group as part of the virtual network corresponding to that group and the bridge isolates the virtual networks from each other, whereby any communications received at a first port of the bridge are directly sent by the bridge to another bridge port only if the other bridge port and the first bridge port are part of the same group.

**18 Claims, 6 Drawing Sheets**





*Figure 1*



*Figure 2*

**U.S. Patent**      May 6, 2003      Sheet 2 of 6      US 6,560,236 B1

**130—CREATE VLAN**
       **Name: VLAN 1**
       **VlanId: 1**
       **VlanLinks: 8, 12**
       **Type: Integrated Routing**



**132—CREATE VML CLIENTS**
       **Links: 6, 17**



**134—CREATE VML SERVER**
       **Name: VlanServer 1**
       **Links: 19, 23**



**136—CREATE VLAN**
       **Name: VLAN FOO**
       **VlanId: 1**
       **Server: VlanServer 1**
       **Type: Integrated Routing**



**138—CREATE VML CIRCUIT (. . . , VLAN FOO, . .)**

## *Figure 3*



*Figure 4*



*Figure 5*



VlanRecord
VlanId–210(1)
Name–210(2)
Type–210(3)
VlanLinks–210(4)
ClientLinks–210(5)
Status 210(6)
210
ClientLinks–212
ClientRecord
ClientId
LiveLinks
209
BRIDGE (SERVER) STRUCTURES
214
LinkRecord
ClientId–214(1)
ConnectId–214(2)
State–214(3)
Sequence Number
214(4)
Buffer–214(5)
Retransmits–214(6)
Other Info–214(7)
Vlans–214(8)
VlanId
Type
LinkRecord
LINK
LINK
206
SOURCE
Vlan
TABLE
204
Link Record
ServerId–204(1)
ConnectId 204(2)
State–204(3)
Sequence Number
204(4)
ClientAddress
204(6)
204
LinkRecord
204(5)
202
ServerRecord
Name–202(1)
Links–202(2)
LiveLinks–202(3)
Status–202(4)
VlanRecord
VlanId–200(1)
Name–200(2)
Type–200(3)
ServerName–200(4)
Status–200(5)
AssignedLink–200(6)
200
ROUTER (CLIENT) DATA STRUCTURES

*Figure 6*



Figure 7b



Figure 7a

US 6,560,236 B1

1

# VIRTUAL LANS

This application is a continuation application of prior application Ser. No. of prior application Ser. No. 08/731,905 filed Oct. 22, 1996 which issued as U.S. Pat. No. 5,963,556 on Oct. 5, 1999; which claimed priority and is a continuation to application Ser. No. 08/081,622, filed Jun. 23, 1993, now abandoned.

## BACKGROUND OF THE INVENTION

The invention relates to Local Area Networks (LANs) and to bridges and routers that are used on such networks.

Bridges are devices that connect local area networks (LANs) together to form what are referred to as Extended LANs. Large Extended LANs have proven to be difficult to manage because of fault-isolation and addressing problems. The present invention enables a LAN manager to divide a large Extended LAN into smaller virtual LANs that have less overhead and are easier to manage. It further allows the LAN manager to interconnect the virtual LANs with a router.

The recent emergence of large multiport bridges, such as GIGAswitch from Digital Equipment Corporation, which can bridge up to 22 FDDI LANs, enable users to create a large extended LAN. That is, logically it appears that all stations that are bridged together by the switch are on a single LAN. This large configuration is reasonable if the bridge is at the periphery of the extended network and is responsible for bridging together a small number (say 100–250) of stations. However, there are two disadvantages if the bridge is used as the backbone of a large extended LAN. First, implementation and addressing limitations may limit the number of stations that can be present on a single Extended LAN. For example, it is well-known that broadcast traffic used in a LAN does not scale well as the number of LAN stations increases. The second problem is the lack of "firewalls" between the individual LANs that are bridged together by the bridge. An error on one LAN caused by a particular protocol failure can cause all other protocols on the LAN to fail. For example, if a set of stations on a particular LAN get stuck in a loop when they keep generating broadcast traffic, then the entire Extended LAN can fail. Thus some users choose to use a device called a router (as opposed to a bridge) to interconnect LANs.

There are several well-known differences between bridges and routers which make interconnecting LANs with routers more flexible and easier to manage. Routers allow users to construct extremely large and yet manageable networks. Some reasons for this are as follows. First, routers typically do not allow broadcast traffic; if they do, the broadcast traffic can be carefully controlled. By contrast, bridges must allow broadcast to allow LAN protocols to work correctly. Second, routers can be used to break up networks into a hierarchy of manageable subnetworks; bridges cannot. Third, routers have access to more information fields in messages than do bridges; this allows routers to have more discrimination in enforcing security and performance policies.

## SUMMARY OF THE INVENTION

This invention provides a way of dividing a large Extended LAN up into multiple "Virtual" LANs (Vlans), which are interconnected by routers. The division is flexible and can be controlled by the manager. The division of the bridge ports into virtual LANs can also be done differently for different protocols.

2

In general, in one aspect, the invention features a a network device for interconnecting computer networks. The network device includes a bridge having a plurality of ports through which network communications pass to and from said bridge, and it also includes a first interface enabling a user to partition the plurality of bridge ports into a plurality of groups, wherein each group represents a different virtual network. The bridge treats all ports within a given group as part of the virtual network corresponding to that group and the bridge isolates the virtual networks from each other, whereby any communications received at a first bridge port are directly sent by the bridge to another bridge port only if the other bridge port and the first bridge port are part of the same group.

Preferred embodiments include the following features. The bridge also includes a second interface for enabling the user to designate one or more of the plurality of bridge ports as client ports, wherein the bridge sends to the client ports communications that are received from a station on one of said virtual networks and ultimately destined for a station on another of said virtual networks. The network device also includes a router connected to the bridge through the one or more client ports. The router includes a plurality of ports through which network communications pass to and from the router. The router includes an interface enabling the user to designate which one or more of the router ports are connected to the bridge. The router also includes a source table that contains a mapping of source addresses to the virtual networks, the source addresses representing locations of stations that are connected to the virtual networks and that send communications to the bridge. Upon receiving a unicast packet from the bridge, the router uses the source table to identify the virtual network from which the unicast packet came.

Alternatively, in preferred embodiments, the router is assigned a different router address for each of the virtual networks. The router includes a table assigning a different router address to the router for each of the virtual networks. When a unicast packet is sent from a first station on a first virtual network and destined for a second station on a second virtual network, it contains the router address corresponding to the first virtual network. The router identifies the virtual network from which the unicast packet originated by detecting the router address in the unicast packet and through the table determining that the router address corresponds to the first virtual network.

Also in preferred embodiments, the router includes a database identifying each of the virtual networks by a different network identifier. When the router sends to the bridge a multicast packet that is intended for one of the virtual networks, the router adds a network identifier to the multicast packet, the added network identifier being obtained from the database and identifying the virtual network for which the multicast packet is intended. The bridge, upon receipt of the multicast packet sent, removes the network identifier from the multicast packet and then forwards the modified multicast packet to the virtual network identified by the network identifier. The bridge also includes a database mapping the bridge ports to the virtual networks and the bridge uses that database to identify the bridge ports to which the bridge forwards the modified multicast packet. Upon receipt of a multicast packet from any of the virtual networks, the bridge adds source information to the received multicast packet and forwards the resulting multicast packet through one of the client ports to the router. The bridge uses the database to obtain the source information that is added to the multicast packet and it identifies the virtual network from which the multicast packet received.

US 6,560,236 B1

3

Preferred embodiments also include the following additional features. The bridge includes a forwarding table which maps addresses of stations to bridge ports. Upon receipt at the bridge of a unicast packet sent by the router and having a destination address located on one of the virtual networks, the bridge determines from the forwarding table through which bridge port that destination address is reachable and then forwards the unicast packet through the identified bridge port. The router includes a memory storing a server record that identifies the bridge to the router, that identifies the one or more designated router ports, and that identifies which of the one or more designated router ports is operational. The router memory also stores a virtual network record for each of the virtual networks. Each of the virtual network records identifies the virtual network with which it is associated and it also identifies a particular one of the one or more designated router ports as the port through which the router sends communications to the virtual network associated with that virtual network record. The bridge also includes a memory storing a virtual network record for each of the virtual networks. Each of the virtual network records in bridge memory identifies the virtual network with which it is associated and it identifies a particular one of the one or more client ports as the client port through which the bridge sends communications to the virtual network associated with that virtual network record.

The invention enables the manager to reconfigure Vlans easily as the needs of the network changes. Reconfiguration of the network is done by setting parameters and not by redeploying cables or boxes. It is also possible to set up Vlans differently for different protocols, thus creating multiple logical networks from the same physical network.

The invention does not rely on any special features of particular embodiments though some hardware support can improve efficiency. Thus, the invention can be used with any router and bridge; and it can also be retrofitted into existing routers and bridges, thus preserving user investment.

The bridge forwarding code for unicast packets is not affected by adding Vlan support; whereas the multicast code is increased only slightly to add and remove VlanIds. The router forwarding code for sending packets is only marginally impacted (to add VlanIds for multicast packets). The router forwarding code for receiving packets is only marginally impacted under one approach. Under an alternative approach, a source lookup must be added to the code path, but this can be done efficiently with simple hardware support of the kind used in bridges.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a router and a bridge which implement virtual LANs;

FIG. 2 is a block diagram of the invention showing port identification numbers on the router and the bridge;

FIG. 3 shows the interfaces for setting up a virtual LAN in the configuration illustrated by FIG. 2;

FIG. 4 shows a bridge/router configuration that is used to illustrate alternative methods of addressing;

FIG. 5 is a model of a virtual LAN multiplexing protocol;

FIG. 6 shows the data structures at the server and at the client; and

FIGS. 7a and 7b show the client and server state machines, respectively;

The appendices at the end of the specification include the following:

4

Appendix I contains a formal description of the data structures that are stored at a client;

Appendix II contains a formal description of the data structures that are stored at a server;

Appendix III lists the basic data types that are used;

Appendix IV presents a logical view of the protocol messaging formats;

Appendix V describes the timers and macros that are used for the transport protocol at the server;

Appendix VI describes the macros that are used to assign Vlans and addresses at the server;

Appendix VII describes the server protocol actions to send and receive hellos;

Appendix VIII describes the client macros for setting up Vlans and transport connections;

Appendix IX describes the client protocol code used to set up Vlans and transport connections;

Appendix X describes the server protocol actions to send updates and receive acks;

Appendix XI describes the code to receive updates and send acks at the client;

Appendix XII describes the server macros for forwarding packets to and from Vlans;

Appendix XIII describes server code for forwarding multicast and unknown destination packets to and from Vlans;

Appendix XIV describes the macros used by the client for forwarding packets to and from Vlans; and

Appendix XV describes the client protocol actions for forwarding packets to and from Vlans.

DESCRIPTION OF THE PREFERRED
EMBODIMENTS

In FIG. 1 a router 100 and a bridge 102 are used to create four virtual LANS (identified as Vlan1 through Vlan4) from 12 individual LANS, each represented by a single line on the right of the figure. Router 100 is referred to herein as a VML client and bridge 102 is referred to as a VML server. Bridge 102 is a large switch, such as DEC's GIGAswitch, which has been modified to appear as four virtual bridges 104(1) through 104(4). Virtual bridges 104(1)–104(4) communicate with each other through router 100. In the described embodiment, the packets sent to router 100 by virtual bridges 104(1)–104(4) are multiplexed over a single line 106 that connects router 100 to bridge 102.

Filters internal to bridge 102 are used to make the bridge appear as a plurality of virtual bridges. And the multiplexing of packet traffic over the single line connecting bridge 102 to router 100 is accomplished by an extra protocol between a VML client layer at router 100 and a VML server layer at bridge 102. The following describes both the required bridge filters and the protocol between VML clients and servers in greater detail.

I. Setting up Vlans

The configuration in FIG. 2 of a router 110 and a bridge 112 connected by two links 114(1) and 114(2) will be used to illustrate the interfaces that are used to set up a virtual LAN. In that configuration two Vlans are shown, namely Vlan 1 and Vlan 2. The interfaces used to set up these Vlans are shown in FIG. 3.

A Vlan is set up using five steps. First, the user uses a management interface at bridge 112 to create Vlan 1 by declaring which bridge ports belong to this Vlan (i.e., ports

US 6,560,236 B1

5
6

8 and 12 in the FIGURE) and giving the Vlan a name, which has purely local significance (step 130). During this first step, the manager also gives the Vlan a VlanId (which in this case is 1). The VlanId is used to coordinate Vlan set up at router 110 and bridge 112. A similar procedure is used to set up Vlan 2 at the bridge.

Also note that each Vlan is given a type which represents the protocols that this Vlan serves. In other words, bridge 112 can appear to be divided into different Vlans for different protocol types. This allows protocols that cannot be connected through a router to be set up so that such protocols "see" bridge 112 as a single LAN. However, any two Vlans with the same type cannot have a common bridge port.

In the next step, the manager specifies the bridge ports that are connected to VML clients (i.e., routers) (step 132). In the illustrated example, bridge ports 17 and 6 are connected to a client router. Note that the manager does not specify which client ports are connected to the same router. The protocol figures this out by receiving "hellos" (to be described later) from client routers.

After the clients have been defined, the next few steps occur at the router. The user creates a VML Server at router 110 by specifying which router ports are connected to the same bridge (in this case, ports 23 and 19) (step 134). If router 110 was connected to another bridge, then the manager would create another VML server for the second bridge. The server is also given a local name.

Next, the user creates Vlans at router 110 by specifying the local name of the server, the routing type, and the VlanId used to identify the Vlan at the server end (step 136). FIG. 3 shows the creation of a Vlan locally called "FOO" at the router and which corresponds to Vlan 1 at bridge 112. The correspondence is made because they both use a common VlanId of 1. The user creates a second Vlan at router 110 corresponding to Vlan 2 at bridge 112.

Finally, for each routing type that is supported, the user creates a circuit corresponding to each Vlan. Thus, for example, a circuit is created corresponding to Vlan 1 and a second circuit can be created corresponding to Vlan 2. The net result is that the router has circuits for each Vlan.

Creating Vlans at both bridge 112 and router 110 is necessary because current router interfaces require all router circuits to be declared in advance (although their status can change to reflect whether the circuit is up or down). Also, an alternative would have been to put all the details of creating a Vlan (i.e., which server, which VlanId etc.) in the circuit creation call at router 110. However, it seemed more desirable to provide a routing layer with a clean abstraction (i.e. a Vlan) that looks very much like a LAN. It also seemed desirable that the routing layer interfaces required to create a Vlan circuit be similar to the interfaces needed to create a LAN circuit. The details of mapping Vlans are present in the VML layer.

II. Multiplexing and Demultiplexing Vlans

When packets arrive at the router from the bridge, the router must be able to tell which Vlan the packet was sent on. Similarly when packets are sent by the router to the bridge on a specific Vlan, the bridge must be able to tell which Vlan the packet was sent on. These capabilities are provided through a mechanism by which information about a Vlan (specifically the VlanId described in the previous section) is embedded in a packet. First, the mechanism will be described and then the manner by which the mechanism is used to provide the capabilities will be described.

A. Encoding a VlanId Field in a Packet:

Consider a data packet P. The system provides a function that adds to P some information (e.g. the VlanId of the Vlan) that describes the Vlan on which P was sent. The system also provides a second function that removes the VlanId field from P.

There are two simple methods by which the VlanId can be added to packet P. The simplest method is to embed P in another packet Q and to add a specially created VlanId field to the header of packet Q. To remove the VlanId field, the system simply extracts P from Q. Another method is to use a redundant field in P. If there is some field in P that contains redundant information that can be derived from other fields in P, then that field can be used to encode the VlanId field. For example, there is a redundant field called the SSAP field in the Data Link Headers of most data packets on a LAN. This field is almost always equal to another field called the DSAP field. Thus, to add the VlanId, the SSAP can be set equal to the VlanId; and to remove the VlanId, the SSAP field can be set equal to the DSAP field.

The first method is more general but the second is more efficient as it does not require the addition of headers to the original packet P.

B. Distinguishing Packets Sent from Router to Bridge:

Referring to FIG. 2, consider a packet P sent from router 110 to bridge 112 on Vlan 1. Two cases must be distinguished, namely, P is either (1) a multicast packet or a unicast packet destined to another router or (2) a unicast packet other than one destined to another router. A multicast packet is defined as a message that is sent on a LAN to a group of stations. The destination address in a multicast packet is a group or multicast address. A unicast packet is a message sent on a LAN to a single station. The destination address in a unicast packet is an individual address.

If P is a multicast packet, P has a destination address that is a group address which identifies a set of stations. In this case, it is crucial that P be sent only to bridge ports corresponding to Vlan 1. Failure to do so can cause routing protocols to break because they use multicast packets to determine which stations are present on a LAN. Thus, multicast packet P sent by router 110 must carry some information so that the bridge can identify which Vlan packet P is to be sent on. Router 110 supplies this information by adding a VlanId field to multicast packets which it sends. The VlanId field identifies the Vlan, in this case Vlan 1.

In a previous section, two options were described for adding a VlanId field to a packet. Both options for adding a VlanId require changing the normal forwarding process of a bridge. However, most bridges process multicast packets in software; thus, the required changes to the forwarding process can easily be made in software.

When bridge 112 receives multicast packet P, it reads the VlanId field in P to find which Vlan P is to be sent on. It then sends P to only the bridge ports corresponding to Vlan 1. Thus in FIG. 2, P is only sent on ports 8 and 12. P is not sent on ports 9 and 15 as these correspond to Vlan 2. However, before bridge 112 sends P on ports 8 and 12, it removes the VlanId field because LAN stations may detect an error if they receive a packet with a VlanId field.

If P is a unicast packet destined for another router 111 (also designated R2 in FIG. 2), then the VlanId field is added to P before it is sent to the router. Once again, although this is a non-standard packet format, the router is able to receive such packets with an encoded VlanId.

If P is a unicast packet, P has a destination address that is an individual address which identifies a single station.

US 6,560,236 B1

7

8

Router **110** could add a VlanId field to P as was done for multicast packets. However, many bridges forward unicast packets in hardware. Thus, it is hard to add the changes required for VlanId processing without redesigning the hardware. Another solution is to send a unicast packet P from the router without a VlanId field. When the packet P arrives at the bridge there are two possibilities. If the Destination Address DA in packet P is known to the bridge, packet P is sent to the bridge port corresponding to DA. If the Destination Address DA in P is unknown to the bridge, the packet P is sent on all bridge ports. For example, if packet P was destined to a Station A on Vlan **1**, but the address of Station A has not been "learned" by bridge **112**, then P will be sent on all ports, including that of Vlan **2**. Since Station A is only on one bridge port, the other copies will be ignored. Thus, until bridge **112** learns of Station A, packets sent from router **110** to Station A will cause redundant copies to be sent on all ports. This is much the same as normal bridge operation.

C. Distinguishing Packets Sent from Bridge to Router:

Referring again to FIG. 2, suppose Station A on Vlan **1** sends a packet P that is destined to router **110**. Bridge **112** forwards packet P to router **110**. When packet P arrives at router **110**, router **110** determines which Vlan the packet was sent on. Again, the two cases can be distinguished, one involving the handling of multicast packets and the other involving the handling of unicast packets. If the packet is a multicast packet, as noted above, bridge **112** adds a VlanId field before forwarding the packet. Thus, when router **110** receives the packet, it decodes the VlanId field to yield the Vlan the packet was sent on. If the packet is a unicast packet sent by a bridge, it will not carry a VlanId. Thus, a different approach is necessary. There are at least two different solutions, which shall be referred to as method **1** and method **2**.

According to method **1**, the router uses distinct source addresses for each Vlan. The router is assigned a unique source address for each Vlan it connects to. Thus, for example, referring to FIG. **4**, if a router **140** has two Vlans, Vlan **1** and Vlan **2**, the router is assigned an address X for Vlan **1** and an address Y for Vlan **2**. When router **140** sends any packet P on Vlan **1** to bridge **142**, it uses X as the source address (in the Data Link header of packet P). Similarly, when router **140** sends any packet Q on Vlan **2** to bridge **142** it uses Y as the source address. A station such Station A on Vlan **1** learns the address of router **140** from the source address of packets sent by router **140** to Station A. Thus, stations on Vlan **1**, like Station A and Station B, will learn the router's address as being X. Similarly, stations on Vlan **2**, like Station C and Station D, will learn the router's address as being Y. All unicast packets sent from Vlan **1** to router **140** will be sent to X; similarly all unicast packets sent from Vlan **2** to router **140** will be sent to Y. Router **140** is thus able to distinguish the Vlan on which a packet is sent by looking at the destination address. In the example, packets sent to X are for Vlan **1**, while packets sent to Y are for Vlan **2**.

Method **1** is elegant but has two drawbacks. First, some routing protocols insist that the router uses the same source address on all LANs that the router connects to, making this method inapplicable for such protocols. Second, this method requires that there be multiple addresses for each Vlan. This may be a problem for some implementations.

Method **2** avoids these drawbacks. Referring again to FIG. **4**, according to method **2** the router keeps a Source Vlan Table **144** that associates 48-bit source addresses with Vlans. Received packets are distinguished by finding the Vlan associated with the Source Address of a received packet. For example, the router's table maps the address of Station A to Vlan **1** and the address of Station C to Vlan **2**. Thus, any packet with source address of Station A that is received at the router is assumed to have been sent on Vlan **1**.

Source Vlan Table **144** at router **140** is updated by bridge **142** using the following mechanism. Bridge **142** eventually learns the bridge port corresponding to each source address and enters this information into its forwarding database **146**. Thus, bridge **142** will learn that Station A belongs to bridge port **8** and Station C belongs to bridge port **9**. Whenever there is a change to forwarding database **146**, e.g. either a new entry is learned or a "timed out" entry is deleted, bridge **142** sends this information to router **140** using a reliable transport protocol. Each update sent to router **140** also carries the mapping of ports to Vlans, i.e., bridge **142** also indicates that bridge ports **8** and **12** belong to Vlan **1**, while bridge ports **9** and **15** belong to Vlan **2**. On receiving such an update, router **140** has enough information to update its Source Vlan Table **144**.

Method **2** is general but it requires extra processing for look-up in the Source Vlan table and for updating this table. However, most routers today are brouters, i.e., they implement the bridge forwarding algorithm as well as the normal forwarding code. Since a lookup of the source address is part of the bridge forwarding algorithm, the router often has hardware support for this operation, which makes the operation quite inexpensive. In sum, Method **2** works for all routing protocols and can be efficient with a small amount of hardware support.

D. Other Functions of VML Protocol:

In the description thus far, only LANs have been connected to the bridge. However, there could also be wide area links connected to the bridge. The VML layer makes it appear that the wide-area link is directly connected to one particular router. In other words, if the router does not have an ATM or SONET interface but the bridge does, then the VML layer can provide a LAN "pipe" between the ATM line on the bridge and the router. Conceptually, this is no different from providing virtual LANs except that these lines are typically point-to-point wide area links running protocols like HDLC and SMDS (as opposed to a LAN which has multiple stations whose addresses are unknown). Thus the Source Vlan table required for this kind of "Vlan" is quite small and static, and hence can even be updated manually.

III. The Model of a Virtual LAN Multiplexing Protocol

A model implementation is shown in FIG. 5. A client **150** (i.e., a router) and a server **152** (i.e., a bridge) are each connected to a link **154** through respective Data Link layers **157** and **159**. In the figure, the solid lines denote the flow of packets (data flow) and the dotted lines denote the major control flow. Thus, an arrow from a process to a database indicate that the process writes the database; an arrow from the database to the process indicates that the process reads the database.

A. Clients

Each client has a single Client Vlan Multiplexing Layer (VML Client Layer) **156** which is responsible for multiplexing Vlans on to physical links to servers. The multiplexing at the client is controlled by two data structures, namely, a ServerList **158** and a VlanList **160**, that are set up by management. Briefly, ServerList **158** contains an entry for every server the client is connected to, and lists the router links that are physically connected to the server. Vlanlist **160**

US 6,560,236 B1

9

10

contains an entry for every Vlan that the client wishes to connect to and lists information like the server on which this Vlan belongs and the VlanId which helps identify the Vlan at the server.

Client VML layer 156 reads ServerList 158 and VlanList 160 and uses this and other state information to multiplex and demultiplex packets. Client VML Layer 156 offers the illusion of multiple Vlans to routing protocols. The routing protocols interface to the Vlans exactly as they do to LANS, i.e., they begin by opening a port, identifying which protocol types they wish to receive, and finally sending and receiving packets on the opened port.

A routing protocol can also (optionally) open a port on what is referred to as an "unknown" Vlan. Suppose a packet is received by Client VML Layer 156 with a protocol type specified by the routing protocol. Suppose also that Client VML layer 156 is unable to decide which Vlan the packet arrived on. Then, Client VML Layer 156 queues the packet on the unknown Vlan port. The routing protocol can then optionally decide to forward or discard the packet. Forwarding packets received on unknown Vlans can help data packets to be forwarded even during periods when Client VML Layer 156 is still learning the information needed to demultiplex packets. Opening a port to the "unknown" Vlan is just a way to model this mechanism.

B. Servers

At the server end, there is a corresponding VML Server Layer 164. Unlike VML Client Layer 156 at client 150, VML Server Layer 164 is only involved in setting up Vlans at the server and not in the actual forwarding of data packets. All packets received by Data Link 159 are handed to a Bridge Forwarding Layer 166. Bridge Forwarding Layer 166 forwards unicast packets to known destinations much as they would be handled in a normal bridge; however, the handling of multicast and unicast packets to an unknown destination is quite different. Bridge Forwarding Layer 166 consults a VlanList 168 at server 152 which contains a record for every Vlan declared at the server. VlanList 168 is used to forward multicast packets received on a Vlan only to the bridge ports corresponding to that Vlan. VlanList 168 is written by management, represented in FIG. 5 by management interface 170.

VML Server Layer 164 sends Hello messages on every link that is declared to be a link to a client/router. The hellos sent on a link 154 are used to set up a transport connection to the VML Client Layer at the other end of link 154. If VML Client Layer 156 replies, a transport connection is set up. VML Server Layer 164 then begins to send updates reliably to VML Client Layer 156 on link 154.

As indicated in FIG. 5, Bridge Forwarding Layer 166 consults a Forwarding Database 172, which models the standard forwarding database on a bridge. The learning process in the bridge is modelled by a Learning Process 174 which writes information to Forwarding Database 172. There is also an interface between Learning Process 14 and VML Server 164.

Learning Process 174 sends to all VML Clients all updates that it has used to update Bridge Forwarding Database 172. When a new line to a VML Client comes up, VML Server 164 informs Learning Process 174. Learning Process 174 then begins sending learning updates (corresponding to the current state of Forwarding Database 172) to VML Server 164. VML Server 164 packages this information and sends it to VML client 156. Finally, VML Client 156 uses the updates to build a Source Vlan Table. Recall that the Source Vlan Table, described in connection with FIG. 4, is used by VML Client Layer 156 to demultiplex received packets.

As Learning Process 174 gets new information it does not send a complete copy of the new database; instead it only sends incremental updates. Thus, a complete set of updates is only sent when a line to a VML Client first comes up. Later changes are sent as incremental updates. However, the use of incremental updates requires a reliable transport protocol between the server and client on each line. The transport protocol is responsible for retransmitting each update until an ACK is received from the client.

C. Relationship to Bridge Architecture

For the described embodiment, it is assumed that all VML servers are IEEE 802.1 compliant spanning tree bridges. Thus, there are two ways the Spanning Tree protocol can interact with the VML protocol. VML server 164 can implement a single spanning tree for all Vlans or a separate spanning tree for each Vlan.

In the described embodiment, every VML server 164 implements a single spanning protocol for all Vlans. In other words, each VML server implements the spanning tree protocol on all its links. Once the spanning tree has stabilized, the Vlan ports specified by management will define the breakup of the Extended LAN into Vlans. Similarly, VML server 164 builds a single learning database for the entire bridge and not a separate learning database for each Vlan. As in the bridge architecture, the station addresses are unique over the entire Extended LAN (as opposed to only requiring unique addresses for each Vlan).

IV. A More Detailed Protocol Specification

A. The Client Data Structures

The principle data structures stored in memory at both client and server are shown in FIG. 6. Considering first the data structures at the client end, there is a VlanRecord 200 for each Vlan declared at the client and there is a Server-Record 202 for each server that the client knows about. Each VlanRecord 200 points to the Server Record 202 corresponding to the server on which this Vlan belongs. Each ServerRecord 202 points to a set of physical link interfaces that connect the client to the server. Each such link interface has a LinkRecord 204 which contains variables required to implement a reliable transport protocol. The transport protocol is used to send information (from the server to the client) that maps source addresses to Vlans. This mapping information is stored in a SourceVlanTable 206 at the client end. There is one SourceVlanTable 206 per link at the client and it is pointed to by the corresponding LinkRecord 204.

Note that one may use multiple links between the router and the bridge as described in the U.S. Patent Application entitled "SYSTEM FOR ACHIEVING SCALABLE ROUTER PERFORMANCE", by George Varghese, David R. Oran, and Robert E. Thomas, filed on an even date herewith, and which issued as U.S. Pat. No. 5,905,723 on May 18, 1999 and incorporated herein by reference. In that case, there would be multiple LinkRecords.

VlanRecords 200 are linked together in a VlanList. ServerRecords 202 are linked together in a ServerList. And LinkRecords 204 are stored in an array indexed by the link number.

Each of the three records will now be described in greater detail.

1. VlanRecord

Each VlanRecord 200 contains a VlanId 200(1), which identifies the corresponding Vlan at the server; a Name 200(2), which only has local significance and is set according to the manager's convenience; a type 200(3), which identifies the routing type of the Vlan; and a ServerName 200(4), which identifies the name of the server on which this Vlan belongs. These variables are set by management. Each

US 6,560,236 B1

11

VlanRecord 200 also has two other variables, both of which are set by the protocol, namely, a Status variable 200(5) and an As signedLink variable 200(6).

Status variable 200(5) indicates if the Vlan is correctly set up and if not, gives an indication of the type of error. The three possible errors are TypeMismatch, if the Vlan type at the client does not match the Vlan type of the corresponding Vlan at the server; IdMismatch, if there is no Vlan at the server with a VlanId equal to that declared at the client end; and ServerFailure, if none of the links to the server are considered operational. AssignedLink variable 200(6) describes the physical interface assigned to this Vlan at the client.

2. ServerRecord

ServerRecord 202 contains two variables that are set by management. The first is a Name variable 202(1) that is a local name assigned by management to this server. A Vlan-Record V is made to point to a ServerRecord S by setting V.ServerName=S.Name. The second variable set by management is Links 202(2), a variable that identifies the set of physical interfaces that connect the client to this particular server. FIG. 6 shows two links between the client and the server. Thus, ServerRecord 202 at the client points to the two corresponding link records.

ServerRecord 202 also contains two other variables that are set by the protocol. First, there is a LiveLinks variable 202(3) which is the subset of physical links declared in Links that are operational. The traffic from the client to the server must only be split among the set of LiveLinks. As links fail and recover LiveLinks is updated by the protocol. Finally, there is a State variable 202(4) which describes error conditions. The two possible errors are MultipleServers, if any two links in Links are connected to two distinct servers, and Broadcast, if any link to Links is not a point-to-point link to the server.

3. LinkRecord

Each LinkRecord 204 contains variables required to implement a reliable transport connection with a corresponding link at the server end. Note that if there are multiple links between a client and a server, separate transport connections on each link are set up. ServerId 204(1) is a 48-bit unique Id of the remote server and ConnectId 204(2) is a 32 bit connection identifier. State 204(3) is the state of the connection; the link is considered to be operational when the connection state is ON. SequenceNumber 204(4) is the number of the last update successfully received from the server. Each LinkRecord contains a pointer to a SourceVlanTable 206 that is used to map source addresses of received unicast packets to the Vlan on which the packet was sent. Finally, a ClientAddresses variable 204(6) is a list of addresses used by all VML clients on the same server, as reported by the server.

A more comprehensive description of the client data structures can be found in the pseudocode that is presented in Appendix I, attached hereto. The description uses the simple data types that are described Appendix III, also attached hereto.

B. Server Data Structures

As at the client, the server keeps a VlanRecord 210 for every Vlan declared at the server. The server also has a variable called ClientLinks 212 that lists the set of server links that are connected to clients. For each such link, the server keeps a LinkRecord 214 that has more fields than the corresponding LinkRecord 204 kept at the client. Finally, just as the client keeps a ServerRecord 202 for each server, the server keeps a ClientRecord 209 for each client it knows about. The ClientRecord information is useful in implement-

12

ing hunt groups at the server. For further discussion of hunt groups as they apply to the bridge see U.S. patent application Ser. No. 07/542,856, entitled Fast Arbiter Having Easy Scaling for Large Numbers of Requesters, Large Numbers of Resource Types with Multiple Instances of Each Type, and Selectable Queuing Disciplines, incorporated herein by reference).

These data structures will now be described in greater detail.

1. VlanRecord:

VlanRecord 210 includes VlanId, Name, and Type fields 210(1), 210(2), and 210(3) the contents of which are declared by management just as at the client end. However, at the server end, management also specifies VlanLinks 210(4) which is the set of bridge links that belong to this Vlan. There are also two variables set by the protocol, namely, a ClientLinks variable 210(5) and a Status variable 210(6). ClientLinks 210(5) is a subset of the server variable ClientLinks that represents the client links to which this Vlan has been assigned. If there are multiple links between a server and a client, the client assigns each Vlan to exactly one operational link. Each client reports the link to which it assigns Vlan V to the server, and the server stores the set of assigned links to ClientLinks 210(5). Status variable 210(6) is identical to Status variable 210(5) found in a client VlanRecord 200.

2. LinkRecord

LinkRecord 214 includes a ClientId variable 214(1), a ConnectId variable 214(2), a State variable 214(3), a SequenceNumber variable 214(4), all corresponding to previously described similar variables in the client LinkRecord. Server LinkRecord 214 also includes additional variables. First, there is a Buffer variable 214(5) which is a buffer that stores the current update being transmitted on the link to the server. There is a Retransmits variable 214(6) that counts the number of times the update stored in Buffer variable 214(5) has been retransmitted to the client without receiving an acknowledgement. There is an Other Info field 214(7) that contains various 48-bit addresses that are used by the client. Finally, there is a Vlans variable 214(8) that identifies the Vlans that are assigned to the link.

3. ClientRecord

Just as in a ServerRecord at the client, each ClientRecord 209 stores a ClientId and a LiveLinks variable which represents the set of links to this client that are considered to be operational.

A formal description of the server data structures can be found in Appendix II, attached hereto.

C. Message Formats

There are four basic types of messages used by the VML protocol. First, servers send ServerHello messages and clients respond with ClientHello messages. These messages are used to set up the transport connections on links and also to coordinate Vlan information between client and server. Next, servers send update messages to clients containing mapping information that is used by clients to update information in the SourceVlanTable of each link. Each Update message is numbered with a sequence number and clients respond to Updates by sending an ACK.

The relevant fields in each message are shown in Appendix IV, which presents only a logical view of the message formats. For example, in order to encode a variable length sequence (such as a set of VlanRecords), a length field is also needed.

For the most part, the fields of the messages shown in Appendix IV correspond to fields of similar names in the link records at client and server. The relevant state variables

US 6,560,236 B1

13

14

are copied into fields of the same name in the protocol message. Thus, all fields in the client hello (except the PhaseIV Address in the case of the DECnet Phase IV communication protocol) are copied from fields of the same name in the corresponding link record at the client. The PhaseIV Address is copied from a global client variable that represents the 48-bit address corresponding to the PhaseIV address of the client (i.e., Phase IV address prefixed by HI-ORD). If the client has no Phase IV address, this field is set to all 0's.

Similarly, all fields except ClientAddresses in the server hello are copied from fields of the same name in the corresponding link record at the client. The ClientAddresses field is copied from a global server variable that represents all the 48-bit addresses reported by clients.

Each update carries the Server Id, the connection identifier, a sequence number and the actual data. The ACK has the same fields except for the data field.

V. A Protocol for Controlling Vlans

A. Setting Up Transport Protocol Connections Using Hellos

The state machine used for the transport protocol is shown in FIGS. 7a–b. State machines attempt to set up a transport connection on each link between a client and a server. Once management declares a ClientLink at the server, the server creates a LinkRecord for the link. On creation and on power up or reset of the link, the LinkRecord is reset by setting the State of the link to INIT 300. The INIT state causes a wait for a timeout period that is sufficiently long such that by the time the server link exits INIT state: (1) all old control messages sent by the server and the client on this link will have disappeared (any control messages received by the server on a link in INIT state are ignored); and (2) the client will have timed out all old state information it had.

Thus, the timer in INIT state (called ConnectTimer) is set to be large enough to "flush" all old messages and state information. On expiry of the ConnectTimer, the server sets the state of the link to REQ 302 (i.e., requesting a connection) and sends a server hello periodically to the client. All hellos sent by the server list the Vlan Id and type of all Vlans known to the server. All hellos (sent by either the client or server) carry the state of the sender; a Hello with state REQ is called a RequestHello; a Hello with state ON is called an OnHello.

If the client receives a RequestHello while in REQ state, the client transitions to an ON state 304 and sends back an OnHello. While the server periodically sends hellos in the REQ and ON state, the client only sends hellos in response to server hellos. The client is responsible for distributing the Vlans heard from a server among the multiple lines going to the server that are ON. It is also useful for deciding which links multicast traffic for a Vlan will flow on. The client distributes Vlans by setting the variable AssignedLink in a VlanRecord to point to the assigned link. A simple policy would be to distribute the Vlans in roughly equal fashion among all links to the server that are ON.

Having distributed the Vlans among links to the server, the client sends back a hello to the server on the link it received a hello. The client hello lists all Vlans assigned by the client to this link. Notice that the server lists all its Vlans in its hellos, while the client lists the Vlans assigned to the line on which the hello is sent.

Suppose an OnHello comes back on link L to the server. Suppose the hello is received while the server link record is in REQ state and the connection Id in the hello matches the server connectionId. Then the two way handshake to set up the connection is considered to be complete, and the server changes the state of the link to ON state 304. Also if a Vlan

V is mentioned in the hello sent by the client, then the server updates the VlanRecord for V to include L in its list of ClientLinks. The ClientLinks for a Vlan is a subset of the ClientLinks of the server. Basically, when a server has multiple links to a client, the server selects exactly one of these links for each Vlan based on hellos sent by the client. The selected link is used by the server to send multicast traffic for the Vlan to the client.

In normal operation, once both client and server have turned a link ON, the server periodically sends hellos to the client and the client responds with a hello. However, if the client does not hear a hello from the server for a timeout period, the client transitions the link to REQ state 310. The default value of the timer in INIT state at the server is chosen to be three times as large as the client timeout.

Besides the normal operation, there are two other interesting cases. First, if the client receives a Hello from the server with a new connection Id or server Id (i.e., if the old server is disconnected and a new server plugged in) while in ON state, the client remains in ON state but essentially starts a new connection. If the client crashes and comes up, the client starts the link in REQ state. However, the client will not leave REQ state until the server sends an OnHello to the client and the client responds with a RequestHello. Receipt of the RequestHello causes the server to go into REQ state and restart the connection. This is important because when the client crashed it may have lost all previous updates; thus it must force the server to send it all updates by restarting the connection.

B. Mapping Client 48-bit Addresses

The hellos sent by the client also lists the 48-bit addresses used by the client on the link, including any address derived from the client address. When the server gets the hello it sets up all bridge forwarding Databases such that the address listed in the hello point to the link the hello was received on.

The VMLServer also builds up a list of all client addresses (using a variable ClientAddresses) that it reports back to clients in its server hellos. Note that if a client R sends a packet to another VML Client router S, client R then includes a VlanId in the packet. Client R can distinguish packets sent to other VML Clients by consulting a list of client addresses sent to R by the server.

C. Consistency Checking

Recall that the manager enters information at both client and server to set up Vlans. The code has a few consistency checks on this information.

Recall that the server sends a list of all its Vlans in its hellos with VlanId and Type. Consider a Vlan V declared at the client with VlanId=I. The client will not assign Vlan V to a line unless it finds that the server reports some Vlan with VlanId=I in its hello. Thus, if the manager incorrectly enters the VlanId field for a Vlan at the server and client, the client will not "bring up" the Vlan. Instead the State of Vlan V is reported as IdMismatch.

Suppose by accident, the manager connects a client to two different servers using links L1 and L2 but declares L1 and L2 to be part of one server record at the client. The client will detect this since it receives hellos with two different Server Ids on both links. The State of the corresponding server record is set to MultipleServers and all Vlans that belong to this server have their State changed to ServerFailure.

If the State of a Vlan is anything other than ON, the client will not send any traffic on this Vlan and will not assign this Vlan to any link.

D. Formal Code for Controlling Vlans at Server

The formal code used by the server to control Vlans is presented in Appendices V, VI, and VII. Appendix V shows

US 6,560,236 B1

15

the timers, constants, and macros used by the server transport protocol on each link. The code describes the timers as constants.

When a client hello is received on a link, the information in the link record for that link may change and the macros shown in Appendix VI are used to update information about Vlans, Clients, and addresses. The first macro UpdateClientList keeps track of the client links associated with each distinct client (some clients may be connected to the server with multiple links); if hunt groups are implemented, this information is used to create a single hunt group for all the ON links connected to each client. UpdateVlanStatus is used to choose at most one assigned link per client for each Vlan; the assigned link is the link on which the client reports the Vlan. This information is gathered into a set of client links for each Vlan that is used to forward multicast traffic. (Exactly one copy of a multicast packet sent on a Vlan is sent to each client by sending the packet to the assigned link for that client.)

Finally, UpdateAddresses (in Appendix VI) updates the set of 48-bit addresses reported by clients. It also makes forwarding database entries for these addresses.

In the formal code for the server transport protocol (Appendix VII), when some action on a link L is executed, it typically begins by obtaining the LinkRecord by looking up LinkArray[L]. It is, of course, assumed that there is a check as to whether L is a ClientPort and if L is not, the routine is not executed.

The server code describes actions taken when a hello is received and transport timers expire. It follows the state transitions described earlier.

E. Formal Code for Controlling Vlans at Client

The client code to control Vlans is described in Appendices VIII and IX. Appendix VIII contains a set of useful macros that are called by the client transport protocol. InitializeConnection is called when a connection first begins at a client and initializes transport variables. UpdateServerRecord and UpdateVlanStatus are called whenever the client receives a new server hello.

UpdateServerRecord checks for server errors (such as being connected to two different servers on two links that were declared to be part of one server record) and updates the concerned server record. UpdateVlanStatus similarly checks for Vlan errors (i.e., a Vlan declared at the client does not have a matching Vlan at the server) and also distributes client Vlans among all the ON lines that connect the client and the server.

Finally, the main client code is described in Appendix IX. It has routines to process a received server hello and for handling transport timer expiry. It follows the state machine described earlier.

F. Sending Updates Reliably Over Transport Connections

This section describes how the forwarding tables at the server are sent reliably to the client using the transport connections set up on links.

As was previously described, when the server turns a link ON, the server initializes the SequenceNumber field (for the link) to 1. Similarly when the client starts a connection, the client initializes the SequenceNumber field to 0. The client also initializes its SourceVlanTable to be empty.

In normal operation, the server will send its forwarding table suitable encoded to the client on each line. The client will send ACKs backs separately on each line. This is redundant because if a client has multiple lines to the server it really only needs one copy of the Forwarding table. However, by sending multiple copies parallel processing is possible.

16

When a connection starts at the server, the server informs the Update Process using a routine called InformUpdateProcess together with a status variable that is set to "new". It is assumed that the Update Process keeps track of the outstanding updates on each client link. When the Update Process gets a status of new for a line, it begins to send the entire Forwarding Database to the client as a sequence of updates. However, the update process sends only one update at a time. Each update is numbered with the server sequence number; when the client receives the update, the client incrementally updates its SourceVlanTable using the update and sends back an ACK. When the ACK is received at the server, the server informs the Update Process using the routine InformUpdateProcess together with a status variable that is set to free. When this happens the Update Process sends the next outstanding update. If the forwarding database changes while the client is being loaded, the UpdateProcess must keep track of the outstanding updates for each client link.

The current update being sent to a client is stored in a variable called Buffer. If an ACK is not received before a RetransmitTimer expires, the update is retransmitted from Buffer. If more than a certain number of retransmissions takes place, the server starts a new connection by going into REQ state and incrementing the connection identifier.

The net result is that on each line, the client will build up a SourceVlanTable that maps source 48-bit addresses to Vlans.

1. Code for Sending Updates Reliably at the Server

The server code for sending updates reliably is described in Appendix X. It uses a macro that is an interface to the update process. It has routines to send a new update, to retransmit an update, and to receive an ACK from the server.

2. Code for Sending Updates Reliably at the Client

The client code for receiving updates reliably and sending updates is described in Appendix XI. It uses a macro that encapsulates the implementation specific method used to update the SourceVlanTable when a new update arrives. The code has only one routine, a routine that receives an update, checks whether it is a duplicate, and sends an ACK back to the server.

G. Forwarding Packets Between Vlans

1. Client Forwarding

Normally the interface to a Data Link is via a port. According to a simplified view of a port interface, a client opens a port and is given a descriptor (much like a Unix file descriptor). The client then enables a certain protocol specifier (includes information on SAPs, Protocol Types, multicast etc.) on the port. The specifier describes the kinds of packets the client wants to receive. Finally, clients can transmit packets to the port; these packets are then sent out on the link. Also received packets of the specified type are queued to the port.

The actual DNA Data Link specifications are slightly different; for instance, the client does not give the port a single protocol specifier but instead separately enables each SAP, protocol type, etc. Also, the interface to receive a packet is typically a polling interface. However, these are just details.

One object is to make a Vlan look just like a LAN to clients and a similar port interface is offered to Vlans except that the ports on a Vlan are called VlanPorts to avoid confusion. Thus a routing protocol (e.g. Phase V DECNET) begins by opening a virtual port on a specified Vlan. Then the routing protocol enables a single protocol specifier on the virtual port which describes all the kinds of packets that the routing protocol wishes to receive. Finally, the routing

US 6,560,236 B1

17

protocol transmits to the VlanPort and received packets are queued to the VlanPort.

When a virtual port is opened and given a protocol specifier, the VML layer at the client attempts to open up corresponding ports on all the physical links associated with this Vlan. Thus each Vlan has a server and each server has a set of physical links. The Client VML Layer opens up Data Link ports on each such link and enables each such Data Link port with the specifier of the VlanPort. The client stores the mapping between VlanPorts and Data Link ports in the PortMappingList. This list consists of a record for each association between a VlanPort and a Data Link port. Thus each VlanPort has multiple records in the PortMappingList, one for each Data Link port it is associated with.

The routing protocol can choose to open a port to the unknown Vlan. In this case, the client opens associated physical ports on all server links.

When forwarding a packet sent on VlanPort VP on Vlan V, the client first picks a link L among all the "live" links associated with Vlan V. These are the links associated with V's server that are in ON state. Next, the client searches the PortMapping list to find the Data Link port LP associated with L. If the packet is multicast or is destined to another VML client, a VlanId field is added to the packet. Finally the packet is queued to Data link port LP.

When a packet is received on link L with protocol specifier S, the client attempts to find the Vlan V the packet was sent on by first looking for a VlanId field (if it exists) and then consulting the SourceVlanTable (if packet is unicast). If such a V is found, the client searches the PortMappingList to find the VlanPort VP associated with Vlan V and specifier S; the client then queues the packet to VP. If no such V is found, the client searches the PortMappingList to find the VlanPort VP associated with the "unknown" Vlan and specifier S. If such a port exists, the client queues the packet to VP.

2. Server Forwarding

The server forwarding algorithm is essentially the bridge forwarding algorithm except for small changes to the way a server forwards: a) multicast packets and b) packets sent to an unknown destination address.

The Vlan associated with a received multicast packet P is determined by the type of link P was received on. If P was received on a client link, the Vlan is determined from the VlanId field in P. If P was received on a client link, the Vlan is determined from the VlanId field in P. If P was received on a Vlan link L, the Vlan is determined from the Vlan that link L has been declared to be part of.

Multicast packets sent on a Vlan V are forwarded only to Vlan links associated with V and to client links that report Vlan V in their client hellos. Before a multicast packet is sent on a client link, a VlanId field is added; similarly when a multicast packet is received from a client link, the VlanId field is removed before the packet is sent to Vlan links.

Packets with unknown destination address that are received on client links are sent to all Vlan links that are turned on in the spanning tree. Packets with unknown destination address that are received on a Vlan link are sent only on the Vlan associated with that link. Packets with unknown destination address are never sent on client links. This is because client hellos list all addresses of clients; hence client destination addresses should be unknown only during the (hopefully brief) period when the protocol initializes.

18

3. Server Code for Forwarding

The server code for forwarding packets is formally described in Appendices XII and XIII. The main server forwarding routines are in Appendix XIII. The two main routines are MULTICAST_FORWARD (which describes how multicast packets are forwarded) and UNKNOWN_FORWARD (which describes how packets with unknown destination addresses are forwarded). Appendix XII describes the macros used by the main code in Appendix XIII. The macros are mostly used to find the links associated with Vlans and to add and remove the VlanId field in the packet.

4. Client Forwarding Protocol

The formal code for the client forwarding protocol is described in Appendices XIV and XV. The major routines in Appendix XV are the TRANSMIT routine (to transmit packets on a Vlan, possibly adding a VlanId to a packet) and the RECEIVE routine (to demultiplex a received Data Link packet using either a VlanId field or the source mapping table). Appendix XIV describes the macros used by the main code in Appendix XV. The macros are mostly used to search the PortMappingList.for mappings between virtual ports, link ports, and protocol specifiers.

The SourceLookup macro finds the Vlan associated with a source address. It uses two architectural constants, UnknownVlanId (VlanId of the unknown Vlan) and VML-RouterId (a second VlanId reserved to denote that this Source Address is a VML Router).

The RECEIVE macro finds the Vlan associated with a packet as follows:

If the packet is multicast, obtain Vlan from the VlanId field in packet.

If not multicast:

Look up the source address in SourceVlanTable.

If the result indicates the packet is from a VML Router then find the Vlan from the VlanId field in the packet.

Otherwise use the Vlan returned by the source lookup.

Other embodiments are within the following claims.

What is claimed is:

1. A method of operating a network bridge having a first plurality of ports through which network communications pass to and from the bridge, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

receiving a communication on a first port of the bridge; and

if the first port is one of the first plurality of ports and the communication is a multicast packet having a multicast destination address, sending the communication out of the bridge on all other ports of the first plurality of ports having the same assigned group identifier as the first port.

2. The method of claim 1, further comprising:

identifying a source of the communication received on the first port of the bridge.

3. The method of claim 2, further comprising:

identifying a destination of the communication;

determining a group identifier assigned to the destination; and

if the group identifier assigned to the destination and the group identifier assigned to the source are different, sending the communication out a client port not within the first plurality of ports.

US 6,560,236 B1

19

20

**4**. The method of claim **1**, wherein the bridge includes a client port not included within the first plurality of ports and the communication is a multicast packet, the method comprising:

receiving the multicast packet on the client port;

identifying a group identifier within the multicast packet; and

sending the multicast packet out on those ports having the same group identifier as the group identifier within the received multicast packet.

**5**. The method of claim **4**, wherein:

the group identifier is removed from the multicast packet before sending the multicast packet out from the bridge.

**6**. The method of claim **1**, further comprising:

assigning a protocol type to each group identifier;

wherein, for each port of first plurality of ports, the protocol type identifies a communication protocol used by a station connected to the port.

**7**. The method of claim **6**, wherein no two distinct group identifiers having a same protocol type are assigned to a same port.

**8**. The method of claim **1**, wherein a port may have more than one group identifier assigned to it.

**9**. A method of operating a network bridge having a first plurality of ports through which network communications pass to and from the bridge, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

receiving a communication on a first port of the bridge;

if the first port is one of the first plurality of ports, sending the communication out of the bridge on all other ports of the first plurality of ports having the same assigned group identifier as the first port;

identifying a source of the communication received on the first port of the bridge;

identifying a destination of the communication;

determining a group identifier assigned to the destination; and

if the group identifier assigned to the destination and the group identifier assigned to the source are different, sending the communication out a client port not included within the first plurality of ports and indicating the group identifier assigned to the first port within the communication sent out the client port.

**10**. The method of claim **9**, wherein the step of indicating the group identifier comprises:

replacing a redundant field within the communication with the group identifier.

**11**. A method of operating a network bridge having a first plurality of ports through which network communications pass to and from the bridge, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

connecting a router to a client port of the bridge not within the first plurality of ports;

identifying the ports on the router connected to the network bridge;

defining, on the router, a correspondence between the identified ports connected to the network bridge and each distinct group identifier;

receiving a communication on a first port of the bridge;

if the first port is one of the first plurality of ports, sending the communication out of the bridge on all other ports of the bridge having the same assigned group identifier as the first port;

identifying a source of the communication received on the first port of the bridge;

identifying a destination of the communication;

determining a group identifier assigned to the destination; and

if the group identifier assigned to the destination and the group identifier assigned to the source are different, sending the communication out the client port.

**12**. The method of claim **11**, further comprising:

receiving a second communication from the bridge at the router; and

determining a group identifier of the second communication.

**13**. The method of claim **11**, further comprising:

sending a second communication from the router to the bridge,

wherein the second communication comprises a first group identifier, and

wherein the second communication comprises a source address of the router assigned to the first group identifier.

**14**. The method of claim **11**, further comprising:

maintaining, at the router, a record of a source address of each communication from the bridge and a respective group identifier.

**15**. A computer program product for use with a network device having a computer and a first plurality of ports on which network communications pass to and from the network device, wherein the network device includes a client port not within the first plurality of ports, and the computer program product comprises computer program instructions that when executed by the computer direct the computer to perform a method of directing the network communications, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

receiving a communication on a first port of the network device;

if the first port is one of the first plurality of ports, sending the communication out of the network device on all other ports of the first plurality of ports having the same assigned group identifier as the first port;

receiving a multicast packet having a multicast destination address on the client port;

identifying a group identifier within the multicast packet; and

sending the multicast packet out on those ports having the same group identifier as the group identifier within the received multicast packet,

wherein the group identifier is removed from the multicast packet before sending the multicast packet out from the network device.

**16**. The computer program product of claim **15**, wherein the method further comprises:

identifying a source of the communication received on the first port.

**17**. The computer program product of claim **16**, wherein the method further comprises:

identifying a destination of the communication;

US 6,560,236 B1

21

determining a group identifier assigned to the destination; and

if the group identifier assigned to the destination and a group identifier assigned to the source are different, sending the communication out a client port not within the first plurality of ports.

**18**. A computer program product for use with a network device having a computer and a first plurality of ports on which network communications pass to and from the network device, the computer program product comprising computer program instructions that when executed by the computer direct the computer to perform a method of directing the network communications, the method comprising:

assigning a group identifier to each port of the first plurality of ports, wherein all ports with a same assigned group identifier are in a same group;

receiving a communication on a first port of the network device;

22

if the first port is one of the first plurality of ports, sending the communication out of the network device on all of the ports of the first plurality of ports having the same assigned group identifier as the first port;

identifying a source of the communication received on the first port;

identifying a destination of the communication;

determining a group identifier assigned to the destination; and

if the group identifier assigns to the destination and the group identifier assigned to the source are different, sending the communication out a client port not within the first plurality of ports, indicating the group identifier of the first port within the communication sent out the client port and replacing a redundant field within the communication with the group identifier.

* * * * *

EXHIBIT 7



# Interconnections

## Bridges and Routers

Radia Perlman



ADDISON-WESLEY PROFESSIONAL COMPUTING SERIES

The publisher offers discounts on this book when ordered in quantity for special sales.
For more information please contact:

    Corporate & Professional Publishing Group
    Addison-Wesley Publishing Company
    One Jacob Way
    Reading, Massachusetts 01867

**Library of Congress Cataloging-in-Publication Data**

Perlman, Radia.
    Interconnections : bridges and routers / Radia Perlman.
        p.  cm. — (Addison-Wesley professional computing series)
    Includes index.
    ISBN 0-201-56332-0 (hardback)
    1. Computer network protocols.  2. Local area networks (Computer networks)
I. Title.  II. Series.
TK5105.5P474  1992
004.6'2—dc20

                                         91-37493
                                       CIP

Copyright © 1992 by Addison-Wesley Publishing Company
All rights reserved. No part of this publication may be reproduced, stored in a retrieval
system, or transmitted, in any form, or by any means, electronic, mechanical,
photocopying, recording, or otherwise, without the prior written consent of the publisher.
Printed in the United States of America. Published simultaneously in Canada.

Cover design by Joyce C. Weston
Text design by Webster Design, Marblehead, MA
Set in 11 point Times by Gex, Inc.

ISBN 0-201-56332-0
Text printed on recycled and acid-free paper.
8 9 10 11 12-CRW-98979695
Eighth printing, June 1995

**DCE** (data circuit-terminating equipment) — The X.25 term for the device to which an endnode attaches.

**DDCMP** (Digital data communication message protocol) — A data link protocol developed by Digital Equipment Corporation.

**distance vector routing** — A type of routing protocol in which each router tells its neighbors its distances to all destinations.

**DLS** — A Vitalink proprietary enhancement to the transparent bridge standard that in some cases, allows point-to-point links that are not in the spanning tree to be used by bridges for forwarding packets.

**DTE** (data terminal equipment) — The X.25 term for an endnode.

**EGP** (exterior gateway protocol) — A term used in the IP community in two different ways: (1) a class of routing protocol for routing between ASs; (2) the specific protocol documented in RFC 827.

**encapsulation** — Handling protocol A's packets, complete with A's header information, as data carried by protocol B. Encapsulated protocol A packets have a B header, followed by an A header, followed by the information that protocol A is carrying as its own data.

**ES-IS** (end system to intermediate system protocol) — ISO's protocol, as specified in 9542, for handshaking between routers and endnodes and for mapping network layer addresses to data link layer addresses.

**Ethernet** — The original CSMA/CD LAN as invented by Xerox and standardized by Digital, Intel, and Xerox.

**FCS** (frame check sequence) — A quantity transmitted along with a packet to enable the receiver to detect data corruption.

**FDDI** (fiber distributed data interface) — A 100-Mb token ring being standardized by the American National Standards Institute (ANSI).

**filter** — To selectively discard packets of a certain type.

**functional address** — A severely restricted form of multicast addressing implemented by some 802.5 chip sets.

**group address** — An address to which are sent transmissions intended for receipt by a set of recipients.

**HDLC** (high-level data link control) — A data link layer protocol.

**hop** — Forwarding by a packet switch.

**IDPR** (interdomain policy routing) — A link state interdomain routing protocol being worked on in the IETF community.

**IDRP** (interdomain routing protocol) — A distance vector interdomain routing protocol derived from BGP and adapted for ISO.

**IETF** (Internet Engineering Task Force) — An organization, open to anyone who wishes to participate, that helps define the protocols used in the Internet.

**IGP** (interior gateway protocol) — The IP community's term for the routing protocol used within an AS. The ISO's synonym is *intradomain routing protocol.*

**individual address** — An address that is intended to correspond to a specific recipient.

**IS-IS** (intermediate system to intermediate system protocol) — The ISO standard intradomain routing protocol, documented in ISO 10589.

**LAN** (local area network) — Usually a shared medium with broadcast capability providing logical full connectivity, typically over a limited geographic area the size of a building or perhaps a campus.

**link state routing** — A type of routing protocol in which each router constructs an LSP listing its neighbors and the LSP is then broadcast to all the routers.

EXHIBIT 8



*72-102   GAu*
*140 - 103   260*

PATENT
ATTORNEY DOCKET NO. 02042/100001

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant : Ross W. Callon et al.                    Art Unit: 260G
Serial No.: 07/577,437                               Examiner: M. Jung
Filed     : September 4, 1990
For       : MULTIPLE PROTOCOL ROUTING

Commissioner of Patents and Trademarks
Washington, DC  20231

<u>RESPONSE TO OFFICE ACTION</u>

In response to the office action dated November 22,
1991, please amend the claims as follows:

1.  (amended) A method of calculating routes for
sending user data packets via information handling devices which
<u>forward data packets through</u> [are interconnected in] a
communications network, comprising

including in <u>at least a first and a second</u> [each of]
said] user data [packets] <u>packet</u>, destination address information
conforming to [an] <u>two or more different</u> addressing [convention]
<u>conventions</u> [of any one] of two or more different independent
protocol suites,

<u>determining</u> [always calculating said route] <u>routes</u>
for <u>said first and said second</u> [a] user data [packet] <u>packets</u>
using a route calculation algorithm corresponding to [the same] <u>a</u>
<u>single</u> routing protocol, chosen from an arbitrary protocol suite,
regardless of the addressing convention to which the <u>destination</u>
<u>address information in said</u> user data packet conforms,

Date of Deposit February 18, 1992
I hereby certify under 37 CFR 1.8(a) that this
correspondence is being deposited with the United
States Postal Service as first class mail with
090 MS 02/28/92 07577437sufficient postage on the date indicated above and is
addressed to the Commissioner of Patents and

ETS0001484

said route being [calculated] determined using the destination address information in said user data packets without converting [the] said destination address information from the addressing convention to which it conforms to another addressing convention.

5.    (amended) A method for calculating routes for sending user data packets via information handling devices which forward data packets through [are interconnected in] a communications network, said information handling devices including (a) single-protocol information handling devices capable of recognizing and forwarding only user data packets which conform to a single protocol suite, and (b) multi-protocol information handling devices capable of recognizing and forwarding user data packets which conform to any one of two or more protocol suites, comprising

using a routing protocol to automatically predetermine whether to encapsulate a packet, at which information handling devices to encapsulate and to decapsulate [a given] said packet, and which protocol to use to encapsulate said packet.

21.    (amended) A method of enabling user data packets to be forwarded from one local area network to another by a router/bridge device which is capable of acting as a router to recognize and forward user data packets which conform to a first

ETS0001485

header and is capable of acting as a bridge to recognize and
forward user data packets which conform to at least a second
protocol suite and are encapsulated within a data link protocol
header, said method comprising

13
    for a user data packet which conforms to said first
protocol suite and is encapsulated within a data link protocol
header which is addressed to a single address which is not an
address of the device, determining whether the device should act
as a bridge or a router based on the destination device addressed
by said data link header [causing the device to act as a bridge
rather than as a router].

        Please add the following new claims:

        -c22. The method of claim 5 wherein

B3    said routing protocol determines multiple routes from
a starting information handling device to an ending information
handling device, and

14    different protocols are recognized by corresponding
devices on different routes,
        such that the automatic predetermination depends upon
the route used.

        21
        23. A network of information handling devices which
forward user data packets through communications links, each said
packet including an address indicating the packet's destination,
said network comprising

3

ETS0001486

a first information handling device capable of interpreting addresses formatted in accordance with a first addressing scheme, said first addressing scheme defining one or more address fields that are assigned values to form an address,

a second information handling device capable of interpreting addresses formatted in accordance with a second addressing scheme, said second addressing scheme defining different address fields than said first addressing scheme, wherein



at least one address formatted in accordance with said first addressing scheme does not identify the same destination as any address formatted in accordance with said second addressing scheme, and

said first and second devices exchange control packets which specify:

the links connected to the device which originates the control packet,

the addresses, formatted in accordance with said first addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said first addressing scheme, and

the addresses, formatted in accordance with said second addressing scheme, of those destinations that are attached to the originating device and have an address corresponding to said second addressing scheme.

ETS0001487

24. The network of claim 21 wherein

said first device is capable of interpreting addresses formatted in accordance with said second addressing scheme, and

as part of forwarding at least one given packet addressed in accordance with said first addressing scheme, said first device encapsulates said given packet inside a header addressed in accordance with said second addressing scheme, and transmits the encapsulated packet to said second device.

25. The network of claim 24 wherein

said network is organized into areas comprising routers and links which connect said routers, and

every device in a given area is capable of interpreting addresses formatted in accordance with at least one common addressing scheme.

26. The network of claim 21, 22, or 23 wherein

said first and second devices are configured to transmit a hello packet on a link when the link is connected thereto, said hello packet identifying the device originating the hello packet and indicating the addressing schemes in which the originating device is capable of interpreting addresses.--

5

ETS0001488

<u>Remarks</u>

Applicant submits that the above amendments overcome the examiner's objections under 35 U.S.C. §112(2).

The examiner has rejected each of the claims as obvious in light of Hart et al. But Hart merely shows that packets using different higher-level addressing conventions can be forwarded by encapsulating the packets in a common lower level protocol (e.g., Ethernet or IEEE 802.3), mapping the higher-level address to a data link address, and then forwarding the packet based on the lower level data link address. Thus, unlike the present invention, Hart's scheme ignores the different protocol addresses when doing the actual forwarding. Hart doesn't perform multiple protocol routing any more than a copper wire carrying data formatted in two protocols performs multiple protocol routing.

The claims require more. In claim 1, packets which include "address information conforming to two different addressing conventions" are routed "using the addresses in the user data packets", <u>not</u> (as in Hart) by converting the addresses to a different addressing convention and then forwarding based on the new addresses. In fact, the last paragraph of claim 1 explicitly eliminates the possibility of address mapping.

Claim 5 discusses the use of encapsulation, a concept which appears in Hart. But unlike the Hart scheme, in claim 5 the routing protocol determines whether to encapsulate a packet, where to perform the encapsulation, and which protocol suite to encapsulate in. In contrast, Hart's scheme <u>always</u> encapsulates

packets in the <u>same</u> protocol suite, and always at the <u>same</u>
location(s).  Thus Hart neither teaches or suggests automatically
determining when, where, and how to encapsulate.

Claim 21 describes a technique by which a
router/bridge (a device capable of acting as a bridge or a
router) can determine whether to act as a bridge or a router when
forwarding a particular packet.  Hart is clearly irrelevant to
this claim since Hart does not even approach the problem of
determining when such a device should act as a bridge or a
router.

Finally, claim 23 describes a network in which
routers which handle two different addressing schemes exchange
common control packets.  Clearly, Hart's scheme does not exchange
control packets of this type.

<u>Drawing Objection</u>

Although the examiner has indicated a general
objection to the drawings, applicant is unable to determine which
drawing is objectionable or which requirement of MPEP 608.02 or
37 C.F.R. has been transgressed, and so applicant is unable to
comply at this time.

In light of the foregoing, it is submitted that all
claims are allowable, and a notice of allowability is requested.
If, on examining this application, the examiner feels that a
TELEPHONE CONFERENCE would helpfully advance prosecution, the
examiner is invited to telephone the undersigned at the number
provided.

Applicant is enclosing a check for $212.00 for the 7 excess claims and 1 excess independent claim added by the above amendment.  Please apply any charges not covered by this communication, or any credits, to Deposit Account 06-1050.

Respectfully submitted,

Date: _2/17/92_

Thomas W. Humphrey
Reg. No. 34,353

Fish & Richardson
225 Franklin Street
Boston, MA  02110-2804

Telephone: 617-542-5070
Facsimile: 617-542-8906
PTOS1174.BOS

ETS0001491

EXHIBIT 9

1

1   UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF MASSACHUSETTS

3   NO. 05-CV-11298 (DPW)

4

5   COPY

6

7   _____

8   ENTERASYS NETWORKS, INC.,          )

9                 Plaintiff,           )

10                                      )

11          vs.                         )

12                                      )

13   FOUNDRY NETWORKS, INC., and        )

14   EXTREME NETWORKS, INC.,            )

15                 Defendants,          )

16   _____)

17

18

19                 VOLUME I

20            PAGES 1 - 191

21

22

23   VIDEOTAPED DEPOSITION OF DR. ERIC C. ROSEN

24        WEDNESDAY, 14 MARCH, 2007

25             9:14 AM

8

1              VIDEO OPERATOR:  Good morning.  We are now

2    recording and on the record.  My name is Ralph

3    Scopa.  I'm a legal video specialist working for

4    Veritext Court Reporting Services.  Today's date is

5    March 14th, 2007, and the time is 9:14 a.m.

6              This is the deposition of Dr. Eric Rosen

7    in the matter of Enterasys Networks, Incorporated

8    versus Foundry Networks, US District Court,

9    Massachusetts, Civil Action No. 05 CV 11298.

10             This deposition is being taken at

11   Proskauer Rose, One International Place, Boston.

12   The court reporter is Jodi Ohnemus.  Counsel will

13   state their appearances, and the court reporter

14   will administer the oath.

15             MR. CHATTERJEE:  This is Neel Chatterjee,

16   prime examiner today, representing Foundry

17   Networks, one of the Defendants in the action.

18             MR. KOHEN:  Stephen Kohen with Proskauer

19   Rose for Foundry.

20             MS. SMITH-LEE:  Emily Smith-Lee, McDermott

21   Will & Emery, for Extreme Networks.

22             MR. HENSCHKE:  Good morning.  I'm Mark

23   Henschke on behalf of the Plaintiff, Enterasys

24   Networks.

25             MR. KOHM:  Brian Kohm of Fenwick & West,

9

1    representing the witness.

2                DR. ERIC C. ROSEN, having

3                satisfactorily been identified by

4                the production of a driver's license,

5                and being first duly sworn by the

6                Notary Public, was examined and testified

7                as follows to interrogatories

8    BY MR. CHATTERJEE:

9        Q.    Doctor Rosen, thank you for coming today.

10   Just -- even though I just said your name, could

11   you please say your name for the record.

12       A.    My name is Eric Rosen.

13       Q.    My name is Neel Chatterjee, and I

14   represent Foundry Networks in a patent infringement

15   dispute with Enterasys Networks.  The reason for

16   your deposition today is you're listed as an

17   inventor on one of the patents in suit.  Do you

18   understand that's why you were subpoenaed for a

19   deposition today?

20       A.    Yes.

21       Q.    And you understand you are testifying

22   today pursuant to a subpoena that was served on

23   you?

24       A.    Yes.

25                MR. CHATTERJEE:  Let's mark this as

126

1           When you were discussing adding these

2   extensions to the control packets that would have

3   IP information, did you have any view as to where

4   in the packet those fields should be so that the

5   router could know what it was it was looking at?

6       A.    No, I don't think I had any -- any

7   opinions, really, as to how the -- how the packet

8   would be constructed.

9       Q.    Yeah, was there -- was there any

10  discussion about -- about the need to adjust the

11  packet structure?

12      A.    Probably, but I'm not really -- really

13  remember -- some of the other people were -- had

14  done more work on the actual packet structure of

15  IS-IS and probably found it interesting.  Didn't --

16  it didn't really interest me, because I hadn't done

17  a lot of IS-IS work before.

18      Q.    Uh-huh.  Is it a requirement for -- for

19  this architecture that you -- that you came up with

20  for the -- like the IS-IS protocol -- if -- for it

21  to be expandable in order to implement your idea?

22      A.    Well, yes, if the packet formats are not

23  expandable -- the whole idea -- the whole notion

24  that it's easy to add a few extra fields really

25  presupposes that the packet's already expandable.

EXHIBIT 10

MAIL ROOM  5-30-95
10  JUN  Cajman
2
1995
PAT THE TRADEMARK

RECEIVED

ATTORNEY DOCKET NO. 02042/263001

PATENT

THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant : George Varghese et al.
Serial No.: 08/081,622
Filed    : June 23, 1993
Title    : VIRTUAL LANS

Art Unit: 2603
Examiner: S. Hom

Commissioner of Patents and Trademarks
Washington, DC  20231

RESPONSE

In response to the Examiner's action dated January 30,

1995, applicants amend the application as follows:

In the Title:

Please substitute the following title:

--DEVICE FOR PARTITIONING PORTS OF A BRIDGE INTO GROUPS

OF DIFFERENT VIRTUAL LOCAL AREA NETWORKS--.

In the Specification:

Page 38, after line 3 and before line 4, insert pages

1-27 of the Appendices submitted herewith.

In the Claims:

Please amend the claims as follows:

-1. (Once Amended)  A network device for

interconnecting computer networks, said device comprising:

a bridge having a plurality of ports through which

network communications pass to and from said bridge, said bridge

comprising a first interface enabling a user to partition the

plurality of ports of said bridge into a plurality of groups,

Date of Deposit  MAY 30, 1995
I hereby certify under 37 CFR 1.8(a) that this correspondence is being
deposited with the United States Postal Service as first class mail with
sufficient postage on the date indicated above and is addressed to the
Commissioner of Patents and Trademarks, Washington, D.C. 20231.

LINDA VEGA
Linda Vega

~~wherein each group~~ represents a different ~~one of a plurality of~~
virtual network*s*, wherein said bridge treats all ~~ports within a~~
given group as part of the virtual ~~network corresponding~~ to that
group and said bridge ~~isolates the virtual networks of~~ said
~~plurality of~~ virtual ~~networks~~ from each other, whereby any
communications received at a first port of said bridge are
directly sent by said bridge to another port of said bridge only
if said other port and said first port are part of the same
~~group.~~

2.   (Once Amended)  The network device as defined in
claim 1 wherein said bridge further comprises a second interface
for enabling the user to designate one or more of said plurality
of [bridge] ports as client ports, wherein said bridge sends to
said client ports communications that are received from a station
on one virtual network of said plurality of virtual networks and
ultimately destined for a station on another virtual network of
said plurality of virtual networks.

~~3.   (Once Amended)  The network device as defined in~~
claim 2 further comprising a router ~~connected~~ to said bridge
through [said] one ~~or more said~~ client ports, said router
including a plurality of router ports through which network
~~communications pass to and from said router.~~

6.   (Once Amended)  The network device of claim ~~5~~ 4
wherein upon receipt of a unicast packet from a first station on

2

47

a first one of said virtual networks and destined for a second
station on a second one of said virtual networks, said bridge
forwards said unicast packet to said router, said forwarded
unicast packet containing a source address identifying the first
station, and wherein said router upon receipt of the forwarded
unicast packet from said bridge learns the source address in the
forwarded unicast packet and through said source table determines
that said source address corresponds to said first one of said
virtual [network] networks.

7. (Once Amended) The network device of claim 3
wherein said router is assigned a different router address for
each of said virtual networks and wherein a unicast packet from a
first station on a first one of said virtual networks and
destined for a second station on a second one of said virtual
networks contains the router address corresponding to said first
one of said virtual [network] networks.

8. (Once Amended) The network device of claim 3
wherein said router comprises a table assigning a different
router address to the router for each of the virtual networks and
wherein a unicast packet sent to said router by said bridge
contains a router address corresponding to a first one of said
virtual networks and wherein upon receipt of said unicast packet
from said bridge, said router identifies the router address in
said unicast packet and through said table determines that the

3

48

router address in said unicast packet corresponds to said first
one of said virtual [network] networks.

8. (Once Amended)  The network device of claim 3
wherein said router includes a database identifying each of the
virtual networks by a different network identifier and wherein
when said router sends to said bridge a multicast packet that is
intended for one of said virtual networks, said router adds a
network identifier to said multicast packet, [said added] the
network identifier added to said multicast packet being obtained
from said database and identifying the virtual network for which
said multicast packet is intended.

11. (Once Amended)  The network device of claim 9
wherein said bridge further comprises a database mapping said
plurality of [bridge] ports on said bridge to said virtual
networks and wherein said bridge uses said database to identify
the [bridge] ports on said bridge to which said bridge forwards
the modified multicast packet.

12. (Once Amended)  The network device of claim 3
wherein said bridge includes a database mapping [bridge] ports on
said bridge to the virtual networks of said plurality of virtual
networks and wherein said bridge upon receipt of a multicast
packet from any of said virtual networks adds source information
to the received multicast packet to produce a modified multicast
packet and then forwards said modified multicast packet through

4

one of said one or more client ports to said router, [said added] the source information added to the received multicast packet being obtained from said database and identifying the virtual network from which said multicast packet was received.

13
14. (Once Amended) The network device of claim 3 wherein said router includes a memory storing a server record that identifies the bridge to the router and that also identifies [said] one or more said server ports.

17
18. (Once Amended) The network device of claim 3 wherein said bridge includes a memory storing a virtual network record for each of said virtual networks, wherein each [of said] virtual network record[s] stored in said memory identifies [the] a virtual network with which it is associated.

20. (Once Amended) A network device for interconnecting computer networks, said device comprising:

a bridge having a plurality of bridge ports through which network communications pass to and from said bridge, said bridge comprising a first interface enabling a user to partition the plurality of ports of said bridge into a plurality of groups, wherein each group represents a different virtual network of a plurality of virtual networks, and a second interface for enabling [the] said user to designate a selected one or more of said plurality of bridge ports as client ports, wherein said bridge sends to said client ports communications that are

5

received from a station on one virtual network of said plurality
of virtual networks and are addressed to a station on another
virtual network of said plurality of virtual networks;

one or more links for carrying network communications;
and

a router having a plurality of router ports through
which network communications pass to and from said router, each
[of said one or more] of said plurality of router ports being
connected to said bridge by a different one of said one or more
links, said router also including a first interface enabling said
user to designate one or more of said router ports as server
ports, said server ports being the router ports through which the
router is connected to said bridge.

## REMARKS

The Examiner objected to the informality of Appendix I-
XV.  In response, we are submitting herewith a reformatted
version of Appendix I through Appendix XV having proper margins
and line spacing.

We have also amended claims 1-3, 6-9, 11-12, 14, 18 and
20 to resolve the Examiner's § 112 concerns.

The Examiner rejected claims 1-8 and 13-20 under 35
U.S.C. § 103 as being unpatentable over McKay et al. in view of
Doeringer et al.  The Examiner also rejected claims 9-12 under 35
U.S.C. § 103 as being unpatentable over McKay et al. in view of
Doeringer et al. as applied to claims 1-4, and further in view of
Perlman et al.

6

The Examiner argues that McKay et al. discloses nearly all the subject matter claimed. The Examiner does admit, however, that:

> McKay et al. did not teach partitioning the plurality of ports into groups to isolate the virtual networks from each other, whereby communications received at a first port only if said other port are part of the same group.

The Examiner relies instead on Doeringer et al. to supply the teaching regarding the partitioning of ports to form isolated virtual networks.

As pointed out by the Examiner, Doeringer et al. describes routing multicasting messages in a complex network (see e.g, Col. 1, lines 5-23). According to the Examiner, this anticipates partitioning the plurality of ports into a plurality of groups. We note, however, that this relates to how messages are routed in a network and has nothing to do with partitioning ports into groups, as recited in claims 1 and 20. Moreover, it in no way teaches or suggests isolating the groups "whereby any communications received at a first port of said bridge are directly sent by said bridge to another port of said bridge only if said other port and said first port are part of the same group," as recited in claim 1.

Further, the Examiner points out that Doeringer et al. recite restricting the distribution of multicast traffic and discarding the multicast if a particular group does not lie on a particular branch of the multicast tree, and argues that this anticipates isolating virtual networks from each other. However, this has nothing to do with isolating networks from each other;

7

it only relates to preventing individual messages from being sent from one particular network to another network, depending on whether the group members specified to receive the multicast message are on that network. If the group members that are specified to receive the multicast message are on that network, then the multicast packet will be sent to that network.

In the system described by Doeringer et al., routers that receive a multicast message for a particular group that does not lie on a branch leading to any members of that group discard the message, and report that to the predecessor of the router in the network. The routing limitations described by Doeringer et al. relate to filtering and in no way teach or suggest defining isolated virtual networks, as recited in claim 1. In addition, routing limitations in the system described by Doeringer et al. are accomplished by the routers not by the bridge  In claim 1, we note that the bridge containing the ports isolates the virtual networks from each; the router (see dependent claim 2) serves a different function.

Therefore, we believe that claims 1 and 20 are patentable over the cited art. In addition, since claims 2-19 depend from claim 1, the reasons for the patentability of claim 1 also apply to claims 2-19. Thus, it is not necessary at this time to address the Examiner's other arguments regarding the dependent claims, and this should in no way be interpreted as an agreement with the arguments that the Examiner has offered regarding the dependent claims.

<div align="center">8</div>

For the above reasons, we believe that the claims are not in condition for allowance and ask the Examiner to allow them to issue.

Please allow any charges not covered, or any credits, to Deposit Account No. 06-1050.

Date: May 30,1995

Fish & Richardson P.C.
225 Franklin Street
Boston, MA 02110-2804

Telephone: 617/542-5070
Facsimile: 617/542-8906

127025.B11

Respectfully submitted,

Eric L. Prahl
Reg. No. 32,590

9

EXHIBIT 11

CONFIDENTIAL

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4

   ENTERASYS NETWORKS, INC.,        )
5                                    )
                   Plaintiff,        )
6                                    )
   vs.                               )   Case No. 05-11298 DPW
7                                    )
   FOUNDRY NETWORKS, INC.            )
8                                    )
   and                              )
9                                    )
   EXTREME NETWORKS, INC.,          )
10                                   )
                   Defendants.       )
11 _____)

12

13

14  *** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER ***

15    VIDEOTAPED DEPOSITION OF GEORGE VARGHESE, Ph.D.

16              San Diego, California

17              Friday, April 13, 2007

18

19

20

21  REPORTED BY: DEBBY M. GLADISH, CSR NO. 9803
    Registered Professional Reporter
22  Certified LiveNote Reporter
    Job No. 74118
23

24

25
```

CONFIDENTIAL

```
 1          SAN DIEGO, CALIFORNIA; FRIDAY, APRIL 13, 2007

 2                        9:19 A.M.

 3                        --oOo--

 4          THE VIDEOGRAPHER:  Good morning.  Here

 5   begins Videotape No. 1 in the deposition of Dr.

 6   George Varghese in the matter of Enterasys

 7   Networking [sic], Incorporated vs. Foundry

 8   Networking [sic], Incorporated and Extreme Networks,

 9   Incorporated.  This is in the United States District

10   Court, District of Massachusetts, the case number is

11   05-11298 DPW.

12          Today's date is April 13th, 2007, and the

13   time is 9:19 -- excuse me -- 9:19 a.m.  This

14   deposition is being taken at 4370 La Jolla Village

15   Drive, San Diego, California.

16          My name is Daniel Becerra.  I'm the legal

17   videographer, here along with court reporter Debby

18   Gladish on behalf of Esquire Deposition Services,

19   San Diego.

20          Would counsel and all present identify

21   yourselves and state whom you represent.

22          MR. MARINO:  Fabio Marino with Orrick,

23   Herrington & Sutcliffe, and I'm representing Foundry

24   Networks.

25          MR. AUCHTER:  Robert Auchter with Robins,
```

CONFIDENTIAL

1    Kaplan, Miller & Ciresi representing the Plaintiff,

2    Enterasys Networks.

3            MR. KOHM:  Bryan Kohm, Fenwick & West,

4    representing the witness.

5            THE VIDEOGRAPHER:  And will the court

6    reporter please swear in the witness.

7

8            GEORGE VARGHESE, Ph.D.,

9        having been sworn, testified as follows:

10

11                    EXAMINATION

12

13   BY MR. MARINO:

14       Q.    Good morning, Dr. Varghese.

15       A.    Good morning.

16       Q.    Could you state your full name for the

17   record, please.

18       A.    George Varghese.

19       Q.    Okay.  And where do you reside?

20       A.    Currently?

21       Q.    Currently, yes.

22       A.    In San Diego, California.

23       Q.    Okay.  Have you -- have you ever had your

24   deposition taken before today?

25       A.    Never.

Esquire Deposition Services
800.770.3363

CONFIDENTIAL

```
 1        A.     Where is that?  Where are you referring
 2   to?
 3        Q.     In the definition of multicast packet, "A
 4   message sent on a LAN to a group of stations."
 5        A.     Okay.
 6        Q.     What does that mean, "a group of
 7   stations."
 8        A.     Just a set of stations.  I believe
 9   lawyers use the word "plurality."  So just a group
10   or a set, more than one.
11        Q.     Okay.  And stations would be --
12        A.     Stations would be any -- any -- any
13   computing device, including routers, bridges or
14   computers that are connected to the local area
15   network or LAN.
16        Q.     Okay.  And keeping -- I guess the
17   definition of unicast packet, which I believe is, "A
18   message sent on a LAN to a single station"; is that
19   correct?
20        A.     That's correct.
21        Q.     And I believe it explains the differences
22   between multicast and unicast addresses?
23        A.     Right, right.
24        Q.     Now, the next definition source address,
25   what is a source address?
```

57

CONFIDENTIAL

1     A.      "The address of the station that sends a

2  packet."

3     Q.      Okay.  So that would be the transmitting

4  station?

5     A.      Yes.

6     Q.      And then the bridge receives that packet;

7  correct?

8     A.      Right.

9     Q.      And next is the definition of bridge.

10  What is a bridge?

11     A.      It's a device that interconnects local

12  area networks to form a so-called extended LAN.  The

13  bridge makes the stations on the extended LAN think

14  they are on a single local area network.

15     Q.      Okay.  How does a bridge do that?

16     A.      Okay.  Okay.  Let me -- it does that by

17  forwarding based on the destination address and

18  learning based on the source address and using a

19  mechanism called flooding as a backup.

20     Q.      Okay.  And what is flooding?

21     A.      Flooding is when you don't know where a

22  destination address is.  You send on all ports

23  except the one you received it on.

24     Q.      Okay.  And then you also provided a

25  definition of a router.  What is a router?

CONFIDENTIAL

1       A.      A router is a device that interconnects

2   local area networks to form a routing network.

3   Routers work at the so-called routing LAN.  They use

4   routing addresses like Internet addresses, while

5   bridges tend to use just the Ethernet -- the

6   Ethernet addresses.  So they are very different

7   devices.  They use different interconnection

8   strategies.

9       Q.      Okay.  And for purposes of your

10  invention, do bridges and routers mean two different

11  things?

12      A.      They do.

13      Q.      They were not interchangeable?

14      A.      Absolutely not.

15      Q.      Okay.  And then I guess the last

16  definition is for VLAN and it says it's "a term

17  defined below."

18          Can you go to the next page and tell me

19  what a VLAN was in this context?

20      A.      The -- the definition of VLANs in the

21  context of this patent is a way of dividing the

22  bridge into arbitrary sets corresponding to what --

23  and that is what we use to define the term "VLAN" in

24  this -- in this -- in this patent application.

25          So a way of dividing a bridge, right,

59

CONFIDENTIAL

1    which has a number of ports, right, into sets or

2    groups -- I use the word "group," I think,

3    interchangeably with "sets" -- and each such set is

4    called a virtual LAN.

5        Q.    So are those groups of ports or groups of

6    stations?

7        A.    Groups of ports.

8        Q.    Okay.  Okay.  So now we're on the second

9    page in the section entitled, "ABSTRACT," and it

10   states in the second sentence, "This patent

11   describes how a large Extended LAN can be divided up

12   into multiple 'Virtual' LANs, which are

13   interconnected by routers."

14           Is that an accurate description of what

15   the patent describes?

16       A.    Yeah, I think what is -- what is always

17   confusing is the definition of the word "virtual

18   LANs," but in this case it really is -- perhaps the

19   more accurate term given to this context would be

20   multiple virtual bridges which are interconnected by

21   routers.

22       Q.    Okay.

23       A.    But -- so the term and codes was

24   deliberately used because, you know, we were just

25   introducing that term, but I think it -- there is --

Esquire Deposition Services
800.770.3363

IEEE Std 100-1992

# The New IEEE Standard Dictionary of Electrical and Electronics Terms
## [Including Abstracts of All Current IEEE Standards]

## Fifth Edition

**Gediminas P. Kurpis, Chair**

**Christopher J. Booth, Editor**

The Institute of Electrical and Electronics Engineers, Inc.
345 East 47th Street, New York, NY 10017-2394, USA

Copyright © 1993 by the
Institute of Electrical and Electronics Engineers, Inc.
All rights reserved. Published 1993
Printed in the United States of America

ISBN 1-55937-240-0

*No part of this publication may be reproduced in any form,*
*in an electronic retrieval system or otherwise,*
*without the prior written permission of the publisher.*

protective screen    prototype standard

lines or apparatus or other power system conditions of an abnormal or dangerous nature and to initiate appropriate control action.
858-1987

**(2) (power switchgear).** A relay whose function is to detect defective lines or apparatus or other power system conditions of an abnormal or dangerous nature and to initiate appropriate control circuit action. *Note:* A protective relay may be classified according to its input quantities, operating principal, or performance characteristics.    C37.100-1981, C37.90-1978

**(3) (seismic testing of relays).** A relay whose function is to detect defective lines or apparatus or other power system conditions of an abnormal or dangerous nature and to initiate appropriate control circuit action. *Note:* A protective relay may be classified according to its operating quantities, operating principle, or performance characteristics.    C37.98-1977

**protective screen (burglar-alarm system).** A lightweight barrier of either solid strip or lattice construction, carrying electric protection circuits, and barring access through a normal opening to protected premises. *See:* **protective signaling.**    [119]

**protective signaling.** Protective signaling comprises the initiation, transmission, and reception of signals involved in the detection and prevention of property loss or damage due to fire, burglary, robbery, and other destructive conditions, and in the supervision of persons and of equipment concerned with such detection and prevention.    [119]

**protective system (1) (class 1E power systems for nuclear power generating stations).** The electrical and mechanical devices (from measured process variables to protective action system input terminals) involved in generating those signals associated with the protective functions. These signals include those that initiate reactor trip, engineered safety features (for example, containment isolation, core spray, safety injection, pressure reduction, and air cleaning) and auxiliary supporting features.    308-1980

**(2) (nuclear power generating station safety systems).** The part of the sense and command features involved in generating those signals used primarily for the reactor trip system and engineered safety features.    379-1988

**protective system false operation rate.** Protective system false operation rate = number of false operations/exposure time.    859-1987

**protector tube (1) (surge arresters).** An expulsion arrester used primarily for the protection of line ard switch insulation.    28-1974, [8]

**(2) (electron-tube type).** A glow-discharge cold-cathode tube that employs a low-voltage breakdown between two or more electrodes to protect circuits against overvoltage.    [45]

**protocol (1) (supervisory control, data acquisition, and automatic control).** A strict procedure required to initiate and maintain communication.    C37.1-1987

**(2) (data communication).** A formal set of conventions governing the format and relative timing of message exchange between two communications terminals. *See:* **control procedure.**    168-1956w

**(3) (software).** A set of conventions that govern the interaction of processes, devices, and other components within a system.    610.12-1990

**(4) (STEbus).** The signaling rules used to convey information or commands between boards connected to the bus.    1000-1987

**(5) (MULTIBUS II®).** The set of signaling rules used to convey information between agents.    1296-1987

®MULTIBUS is a registered trademark of Intel Corporation.

**protocol control information (computer graphics).** Information exchanged between entities to coordinate their joint operation.    802.6-1990

**protocol data unit (PDU) (1) (logical link control).** The sequence of contiguous octets delivered as a unit from or to the medium access control (MAC) sublayer. A valid logical link control (LLC) PDU is at least 3 octets in length, and contains two address fields and a control field. A PDU may or may not include an information field in addition.    799-1987

**(2) (token ring access method).** Information delivered as a unit between peer entities that contain control information and, optionally, data.    802.5-1989

**(3) (local and metropolitan area networks).** Information that is delivered as a unit between peer entities of a local area network (LAN) or metropolitan area network (MAN) and that contains control information, address information, and may contain user data.    802.6-1990

**(4) (local area networks).** The sequence of contiguous octets delivered as a unit from or to the MAC sublayer. A valid LLC PDU is at least 3 octets in length, and contains two address fields and a control field. A PDU may or may not include an information field in addition.    8802-2:1989

**proton microscope.** A device similar to the electron microscope but in which the charged particles are protons. *See:* **electron optics.**    [45], [84]

**proton range (solar cells).** The maximum distance traversed through a material by a proton of a given energy.    307-1969w

**prototype (modeling and simulation) (software).** A preliminary type, form, or instance of a system that serves as a model for later stages or for the final, complete version of the system.    610.3-1989, 610.12-1990

**prototype standard.** A concrete embodiment of a physical quantity having arbitrarily assigned magnitude, or a replica of such embodiment.

EXHIBIT 13

# The Concise Oxford Dictionary

TENTH EDITION

*Edited by*

Judy Pearsall

**OXFORD**
UNIVERSITY PRESS

# OXFORD

UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford  New York

Athens  Auckland  Bangkok  Bogotá  Buenos Aires  Calcutta
Cape Town  Chennai  Dar es Salaam  Delhi  Florence  Hong Kong  Istanbul
Karachi  Kuala Lumpur  Madrid  Melbourne  Mexico City  Mumbai
Nairobi  Paris  São Paulo  Singapore  Taipei  Tokyo  Toronto  Warsaw

with associated companies in  Berlin  Ibadan

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

© Oxford University Press 1999

Database right Oxford University Press (makers)

First published 1999

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose this same condition on any acquirer

British Library Cataloguing in Publication Data
Data available

Library of Congress Cataloging in Publication Data
The concise Oxford dictionary.—10th ed./edited by Judy Pearsall.
p.  cm.  Rev. ed. of: The concise Oxford dictionary of current English.
9th ed. 1995
1. English language—20th century–Dictionaries.  2. English language—
New words—Dictionaries.  I. Pearsall, Judy.  II. Concise Oxford dictionary
of current English.
PE1628.C68  1999  423—dc21  99-20834
ISBN 0-19-860259-6
ISBN 0-19-860287-1  (thumb index)

10 9 8 7 6 5 4 3 2 1

Typeset in Arial, Nimrod, and Minion
by Interactive Sciences Ltd, Gloucester
Printed in the United States of America

448

# Ee

**E¹** (also **e**) ● n. (pl. **Es** or **E's**) **1** the fifth letter of the alphabet. **2** denoting the fifth in a set. **3** Music the third note of the diatonic scale of C major.

**E²** ● abbrev. **1** East or Eastern. **2** informal the drug Ecstasy or a tablet of Ecstasy. **3** denoting products, in particular food additives, which comply with EU regulations. See also **E-NUMBER**. **4** exa- (10¹⁸). **5** Spain (international vehicle registration). [from Sp. *España*.] ● symb. Physics **1** electric field strength. **2** energy.

**e** ● symb. **1** (also **e**⁻) Chemistry an electron. **2** (**e**) Mathematics the transcendental number that is the base of Napierian or natural logarithms, approximately equal to 2.71828.

**e-¹** ● prefix variant spelling of **EX-¹** (as in *elect*, *emit*).

**e-²** ● prefix denoting the use of electronic data transfer, especially through the Internet: *e-cash*.
– ORIGIN from **ELECTRONIC**, on the pattern of *email*.

**ea.** ● abbrev. each.

**each** ● det. & pron. every one of two or more people or things, regarded and identified separately. ● adv. to, for, or by every one of a group.
– PHRASES **each and every** every single.
– ORIGIN OE *ǣlc*, based on a W. Gmc phr. meaning 'ever alike' (see **AYE²**, **ALIKE**).

**each other** ● pron. the other one or ones.

**each-way** ● adj. & adv. Brit. (of a bet) backing a horse or other competitor either to win or to finish in the first three.

**eager** ● adj. strongly wanting to do or have. ➤ keenly expectant or interested.
– DERIVATIVES **eagerly** adv. **eagerness** n.
– ORIGIN ME (also in the sense 'pungent, sour'): from OFr. *aigre* 'keen', from L. *acer*, *acr-* 'sharp, pungent'.

**eagle** ● n. **1** a large bird of prey with a massive hooked bill and long broad wings, renowned for its keen sight and powerful soaring flight. [*Aquila* and other genera.] **2** Golf a score of two strokes under par at a hole. **3** US a former gold coin worth ten dollars. ● v. Golf play (a hole) in two strokes under par.
– DERIVATIVES **eaglet** n.
– ORIGIN ME: from OFr. *aigle*, from L. *aquila*. The golf term was suggested by **BIRDIE**.

**eagle eye** ● n. a close watch.
– DERIVATIVES **eagle-eyed** adj.

**eagle owl** ● n. a very large owl with ear tufts and a deep hoot. [*Bubo bubo* (Eurasia) and related species.]

**eagle ray** ● n. a large ray with long pointed pectoral fins, a long tail, and a distinct head. [Genera *Myliobatis* and *Aetobatus*; several species.]

**eagre** /ˈeɪɡə, ˈiː-/ ● n. dialect term for **BORE³**.
– ORIGIN C17: of unknown origin.

**EAK** ● abbrev. Kenya (international vehicle registration).
– ORIGIN from *East Africa Kenya*.

**-ean** ● suffix forming adjectives and nouns such as *Antipodean*.
– ORIGIN from L. *-aeus*, *-eus* or Gk *-aios*, *-eios*, + **-AN**.

**ear¹** ● n. **1** the organ of hearing and balance in humans and other vertebrates, especially the external part of this. ➤ (in other animals) an organ sensitive to sound. **2** an ability to recognize and appreciate sounds. **3** willingness to listen and pay attention: *a sympathetic ear*.
– PHRASES **be all ears** informal be listening attentively. **one's ears are burning** informal be subconsciously aware of being talked about. **have someone's ear** have access to and influence with someone. **have** (or **keep**) **an ear to the ground** be well informed about events and trends. **be out on one's ear** informal be dismissed ignominiously.

**up to one's ears** informal very busy with.
– DERIVATIVES **-eared** adj. **earless** adj.
– ORIGIN OE *ēare*, of Gmc origin.

**ear²** ● n. the seed-bearing head or spike of a cereal plant.
– ORIGIN OE *ēar*, of Gmc origin.

**earache** ● n. pain inside the ear.

**earbashing** ● n. informal a lengthy and reproachful speech.
– DERIVATIVES **earbasher** n.

**eardrum** ● n. the membrane of the middle ear, which vibrates in response to sound waves.

**eared seal** ● n. see **SEAL²**.

**earful** ● n. informal a prolonged reprimand.

**earhole** ● n. the external opening of the ear.

**earl** ● n. a British nobleman ranking above a viscount and below a marquess.
– DERIVATIVES **earldom** n.
– ORIGIN OE *eorl*, of Gmc origin.

**Earl Grey** ● n. a kind of China tea flavoured with bergamot.
– ORIGIN prob. named after the 2nd *Earl Grey* (1764–1845), said to have been given the recipe by a Chin. mandarin.

**Earl Marshal** ● n. (in the UK) the officer presiding over the College of Arms, with ceremonial duties on various royal occasions.

**ear lobe** ● n. a soft, rounded fleshy part hanging from the lower margin of the ear.

**Earl Palatine** ● n. historical an earl having royal authority within his country or domain.

**early** ● adj. (**-ier**, **-iest**) & adv. **1** before the usual or expected time. **2** of, at, or near the beginning of a particular time, period, or sequence. ● n. (**earlies**) **1** potatoes ready to be harvested before the main crop. **2** informal early shifts.
– PHRASES **at the earliest** not before the time or date specified. **early bird** humorous a person who rises or arrives early. **early** (or **earlier**) **on** at an early (or earlier) stage. **it's** (or **these are**) **early days** informal, chiefly Brit. it is too soon to be sure how a situation will develop.
– DERIVATIVES **earliness** n.
– ORIGIN OE (as adv.) *ǣrlīce* (see **ERE**, **-LY¹**), influenced by ON *árliga*.

**early closing** ● n. Brit. the practice of shutting business premises on a particular afternoon every week.

**Early English** ● adj. denoting a style of English Gothic architecture typical of the late 12th and 13th centuries, characterized by pointed arches and simple lancet windows.

**early music** ● n. medieval, Renaissance, and early baroque music, especially as revived and played on period instruments.

**earmark** ● n. a mark on the ear of a domesticated animal indicating ownership or identity. ➤ an identifying feature. ● v. **1** (usu. **be earmarked**) designate for a particular purpose. **2** mark (an animal) with an earmark.

**earmuffs** ● pl. n. a pair of soft fabric coverings, connected by a band, worn over the ears to protect them from cold or noise.

**earn** ● v. obtain (money) in return for labour or services. ➤ (of capital invested) gain (money) as interest or profit. ➤ gain as the reward for hard work or merit.
– ORIGIN OE *earnian*, of W. Gmc origin.

**earned income** ● n. money derived from paid work as opposed to profit from investments.

**earned run** ● n. Baseball a run that is not the result of an

ʊ *put* | uː **too** | ʌɪ **my** | aʊ **how** | eɪ **day** | əʊ **no** | ɪə **near** | ɔɪ **boy** | ʊə **poor** | ʌɪə **fire** | aʊə **sour**

EXHIBIT 14

# ENCARTA®
## WORLD ENGLISH
# DICTIONARY

ST. MARTIN'S PRESS

*Microsoft®*
ENCARTA®

A BLOOMSBURY REFERENCE BOOK
Created from the Bloomsbury Database of World English

First published in the United States of America in 1999 by
St. Martin's Press
175 Fifth Avenue
New York, NY 10010

This Dictionary includes words on the basis of their usage in the
English language today. Some words are identified as being
trademarks or service marks, but no attempt has been made to
identify all of the words in which proprietary rights might exist.
Neither the presence nor absence of any such identification in this
Dictionary is to be regarded as affecting in any way, or expressing
a judgment on, the validity or legal status of any trademark,
service mark or other proprietary rights anywhere in the world.

© Bloomsbury Publishing Plc 1999

All rights reserved, no part of this publication may be
reproduced, stored in a retrieval system, or transmitted by any
means, electronic, mechanical, photocopying, or otherwise,
without the prior written permission of the Publishers.
Address all inquiries to Permissions, St. Martin's Press,
175 Fifth Avenue, New York, NY 10010

Library of Congress Cataloging-in-Publication Data

Soukhanov, Anne H., 1943-
   Encarta world English dictionary.
     p.  cm.
   The symbol for registered trademark follows "Encarta" in title.
   ISBN 0-312-22222-X
   1. English language-Dictionaries.   I. Title.
PE1628.S5824     1999
423 - - dc21                    99-15350
                           CIP

Typeset by Selwood Systems, Midsomer Norton, Bath, United Kingdom
Printed in the United States of America



# E e

**e¹** /ee/ (*plural* **e's**), **E** (*plural* **E's** *or* **Es**) *n.* **1. 5TH LETTER OF THE ENGLISH ALPHABET** the fifth letter of the modern English alphabet **2. SPEECH SOUND CORRESPONDING TO THE LETTER "E"** the speech sound that corresponds to the letter "E" **3. LETTER "E" WRITTEN** a written representation of the letter "E"

**e²** *symbol.* **1. MATH** the transcendental number 2.718 282... **2. CHESS** the fifth vertical row of squares from the left on a chessboard **3. PHYS** electron

**e³** *abbr.* **BASEBALL** error

**E¹** *symbol.* **1. PHYS** energy **2. PHYS** electric field strength **3. PHYS** electromotive force (*usually written italicized*) **4. LOGIC** negative categorical proposition **5. PHYS** minimary energy **6. MEASURE** exa- **7. energy** *n.* **s.**

**E²** /ee/ (*plural* **Es** *or* **E's**) *n.* **1. MUSIC 3RD NOTE OF SCALE IN C** the third note of a scale in C major **2. MUSIC SOMETHING THAT PRODUCES AN E** a string, key, or pipe tuned to produce the note E **3. MUSIC SCALE BEGINNING ON E** a scale or key that starts on the note E **4. MUSIC WRITTEN SYMBOL OF E** a graphic representation of the tone of E **5. DRUGS ECSTASY** the drug ecstasy or a tablet of the drug (*slang*)

**E³** *abbr.* **1. east 2. eastern 3. ELEC earth 4. English**

**e.** *abbr.* **1. engineer 2. engineering 3. BASEBALL error**

**E.** *abbr.* **earl**

**e-** *prefix.* **1. electronic** ○ *e-mail* **2. electronic data transfer via the internet** ○ *e-commerce* [Shortening]

**ea.** *abbr.* **each**

**EAC** *abbr.* East African Community

**eace-worm** /ees wûrm/ *n.* an earthworm (*regional*) [Eace- ultimately from Old English *æs* "bait," related to Latin *esca* "food, bait" and English *eat*]

──────── **WORD KEY: REGIONAL NOTE** ────────
Often thought of as typical of a Northern or New England term, *eaceworm* most clearly marks northern Rhode Island speech. Other forms are *easterworm* and *eastworm.*

**each** /eech/ *adj., pron., adv.* used to refer to every member of a group of people or things, considered individually ○ *With each victory we get closer to the championship.* ○ *Is a VCR that can be connected to more than one TV better than buying one for each?* ○ *Environmental health officers were supervising an average of 40 cases each.* [Old English *ǽlc.* From a prehistoric Germanic compound meaning "ever alike."]

──────── **WORD KEY: USAGE** ────────
**each** *or* **every?** In some contexts these two words are nearly interchangeable, as in *I adore each puppy in the litter* and *I adore every puppy.* Here the only difference is a slight shift in perspective from considering the animals individually, with **each,** to considering them collectively, with **every.** Either of the words, placed before the noun, requires the noun and the verb to be singular: *each puppy is affectionate every puppy is affectionate:* **Each,** though not **every,** may also be placed after a plural noun, and then the plural governs the verb: *The puppies each have their own toys.* Also **each** can refer to two or more, whereas **every** must refer to three or more. **Each** can be an adjective (*each puppy*), a pronoun (*each of them*), and an adverb (*Give them a bowlful each*), whereas **every** is an adjective only.

**each oth-er** *pron.* each one of two or more persons or things reciprocally

──────── **WORD KEY: USAGE** ────────
**each other** *or* **one another?** The traditional rule is that **each other** refers to two items and **one another** refers to

more than two: *Joe and Lee respect each other deeply. All the people at the party knew one another already.* However, this distinction is not supported by the weight of usage, and there is no good reason to reject the alternatives *Joe and Lee respect one another deeply* and *All the people at the party knew each other already,* although the last example sounds somewhat less natural than the others.

**EACSO** *abbr.* East African Common Services Organization

**ea-ger** /eegar/ *adj.* **1. ENTHUSIASTIC AND EXCITED ABOUT DOING SOMETHING** enthusiastic and excited about something and impatiently waiting to do or get it ○ *eager to help* ○ *eager for praise* **2. FULL OF ENTHUSIASM AND IMPATIENCE** expressing enthusiastic interest and expectation or an impatient desire to do something ○ *eager face* [13thC. Via Anglo-Norman *egre* from, ultimately, Latin *acer* "sharp" (source of English *acrid* and *vinegar*).] ── **ea-ger-ly** *adv.* ──**ea-ger-ness** *n.*

**ea-ger bea-ver** *n.* somebody who is exceptionally, or even excessively, ready and willing to work hard, carry out tasks, or volunteer (*informal*) [From the perceived industriousness of beavers. Originally a World War II expression in the United States for an overzealous recruit.]

**ea-gle** /eegʼl/ *n.* **1. BIRDS LARGE BIRD OF PREY** a large and powerful bird of prey with a hooked bill and broad wingspan that hunts by day and is noted for its keen eyesight and majestic soaring flight. Subfamily: Buteoninae. **2. FIGURE OF AN EAGLE AS A SYMBOL** the figure of an eagle used as a symbol of military or political power, e.g. on the standards carried by the Roman legions **3. GOLF SCORE OF 2 UNDER PAR** a score of two under par for a single hole in golf **4. COINS FORMER U.S. 10-DOLLAR GOLD COIN** a gold coin worth ten dollars, current in the United States until 1934 ■ *vti.* (**-gled, -gling, -gles**) **GOLF SCORE 2 UNDER PAR** to complete a hole in two strokes under par in golf [14thC. Via Anglo-Norman *egle* from Latin *aquila.*]

**ea-gle eye** *n.* extremely keen eyesight, especially over long distances, or the ability to notice what other people might miss ──**ea-gle-eyed** *adj.*

**ea-gle owl** *n.* a large Eurasian owl, the largest species of owl in the world, with brownish plumage and tufts of feathers on its head that look like horns. Latin name: *Bubo bubo.*

**ea-gle ray** *n.* a large ray found in tropical and subtropical seas that has a projecting snout, massive jaws, and pectoral fins shaped like wings that propel it with a soaring motion. Family: Myliobatidae.

**Ea-gle Scout** *n.* a Boy Scout who has reached the highest level of attainment in the various tests of skill and endurance set by the Boy Scout movement [*Eagle* with reference to the hierarchy of birds]

**ea-glet** /eeglət/ *n.* a young eagle, especially before it leaves the nest

**ea-gre** /eegər/ *n.* GEOG = **bore³** *n.* [Early 17thC. Origin unknown.]

**Ea-kins** /áykinz/, **Thomas** (1844–1916) U.S. artist. He is known for his realist paintings drawn from life, such as *The Gross Clinic* (1875).

**eal-dor-man** /áwldərman/ (*plural* **-men** /-mən/) *n.* the principal magistrate and commander of the military forces of a shire in Anglo-Saxon England [Old English *ealdormann,* from *ealdor* "an elder" + **MAN**]

**Eames** /eemz/ *tdmk.* a trademark for chairs, especially and originally ones of molded plywood, whose seats and backs are shaped to accommodate human body contours

**Eames** /eemz/, **Charles** (1907–78) U.S. designer. He is known for the prototype of the molded plywood chair that bears his name.

**E. & O.E.** *abbr.* errors and omissions excepted (*used on invoices*)



Ear

**ear¹** /eer/ *n.* **1. BIOL ORGAN OF HEARING** the organ of hearing and balance in vertebrates that, in mammals, is divided into three parts, the external, middle, and inner ear. The external ear collects sound, the middle ear contains small bones that amplify and transmit it, while the inner ear maintains balance and contains sensory nerve endings for detecting sound. **2. BIOL EXTERNAL PART OF HEARING ORGAN** the external part of an ear, visible in humans and most mammals on each side of the head as a flap of cartilage with skin surrounding or covering it **3. BIOL INVERTEBRATE SENSORY ORGAN SIMILAR TO AN EAR** any sensory organ in invertebrates that is able to sense vibrations and perform a similar function to a vertebrate ear **4. BIRDS = ear tuft 5. EAR SHAPE** something shaped like an ear, especially a handle on a jug or jar **6. ABILITY TO TELL SOUNDS APART** the ability to distinguish accurately between different sounds, e.g., in speech or music ○ *She has an ear for other languages.* **7. ATTENTION** somebody's attention, especially somebody's sympathetic or favorable attention **8. PRESS SECTION AT TOP CORNER OF NEWSPAPER** a small section at the top corner of the front page of a newspaper for advertising or a weather forecast [Old English *éare.* Ultimately from an Indo-European word meaning "ear," which is also the ancestor of English *aural.*] ◇ **all ears** listening, or ready to listen, attentively or enthusiastically to something (*informal*) ◇ **go in one ear and out the other** to be forgotten as soon as heard and so have absolutely no effect on somebody ◇ **have somebody's ear** to be a trusted adviser to somebody, especially somebody powerful or influential ◇ **have** *or* **keep your ear to the ground** to remain continuously alert to discover new developments or information ◇ **out on your ear** unceremoniously thrown out or dismissed from a place or position you previously occupied (*informal*) ○ *You'll be out on your ear if you're late again.* ◇ **play it by ear** to improvise or adapt your response to a situation as it occurs rather than make plans in advance ◇ **set something** *or* **somebody on its** *or* **somebody's ear** to send something or somebody into a state of excited agitation, shock, or confusion ◇ **wet behind the ears** very inexperienced or naive

**ear²** /eer/ *n.* **BOT PLANT PART CONTAINING GRAIN** the grain-bearing part at the top of the stalk of a cereal plant such as wheat or corn, or the grain-bearing part of corn ■ *vi.* (**eared, ear-ing, ears**) **BOT FORM EARS** to form the part of a corn plant that contains the grains [Old

**th vision** In foreign words: **kh** German Bach; **aN** French vin; **aaN** French blanc; **ö** German schön, French feu; **oN** French bon; **öN** French un; **u** as in French rue  Stress marks: ´ as in secret \séékrət\ ` as in secretary \séekrə tèree\

EXHIBIT 15



| An das Europäische Patentamt | To the European Patent Office | A l'Office européen des brevets |
|---|---|---|

Zur Kasse

| **Eintritt in die regionale Phase vor dem EPA als Bestimmungsamt oder ausgewähltem Amt** | **Entry into the regional phase before the EPO as designated or elected Office** | **Entrée dans la phase régionale devant l'OEB agissant en qualité d'Office désigné ou élu** |
|---|---|---|

| Europäische Anmeldenummer oder, falls nicht bekannt, PCT-Aktenzeichen oder PCT-Veröffentlichungsnummer | European application number, or, if not known, PCT application or publication number | Numéro de dépôt de la demande de brevet européen ou, à défaut numéro de dépôt PCT ou de publication PCT |
|---|---|---|
| 97953551.5 | PCT/US97/24180 | |

| Zeichen des Anmelders oder Vertreters (max 15 Positionen) | Applicant's or representative's reference (max. 15 spaces) | Référence du demandeur ou du mandataire (15 caractères ou espaces au maximum) |
|---|---|---|
| | 92263/VRD | |

---

**1. Anmelder**
☒ Die Angaben über den (die) Anmelder sind in der internationalen Veröffentlichung enthalten oder vom Internationalen Büro nach der internationalen Veröffentlichung vermerkt werden.

☐ Änderungen, die das internationale Büro noch nicht vermerkt hat, sind auf einem Zusatzblatt angegeben.

**Zustellanschrift**
*(siehe Merkblatt II, 1)*

**1. Applicant**
Indications concerning the applicant(s) are contained in the international publication or recorded by the International Bureau after the international publication.

Changes which have not yet been recorded by the International Bureau are set out on an additional sheet.

**Address for correspondence**
*(see Notes II, 1)*

**1. Demandeur**
Les indications concernant le(s) demandeur(s) figurent dans la publication internationale ou ont été enregistrées par le Bureau international après la publication internationale

Les changements qui n'ont pas encore été enregistrés par le Bureau international sont indiqués sur une feuille additionnelle.

**Adresse pour la correspondance**
*(voir notice II, 1)*

---

**2. Vertreter**
**Name (Nur einen** Vertreter angeben, der in das europäische Patentregister eingetragen und an den zugestellt wird)

**Geschäftsanschrift**

58902.8

**Telefon**

**Telefax          Telex**

☒ Weitere(r) Vertreter auf Zusatzblatt

**2. Representative**
**Name** (Name **only one** representative who is to be listed in the Register of European Patents and to whom notification is to be made)

DRIVER, Virginia Rozanne
**Address of place of business**
Page White & Farrer
54 Doughty Street
London WC1N 2LS

**Telephone**
0171 831 7929

**Fax          Telex**
0171 831 8040     8955681

Additional representative(s) on additional sheet

**2. Mandataire**
**Nom** (N'indiquer qu' un seul mandataire, qui sera inscrit au Registre européen des brevets et auquel signification sera faite)

**Adresse professionnelle**

**Téléphone**

**Téléfax          Télex**

Autre(s) mandataire(s) sur feuille additionnelle

---

**3. Vollmacht**
☐ Einzelvollmacht ist beigefügt.

☐ Allgemeine Vollmacht ist registriert unter Nummer:

☐ Allgemeine Vollmacht ist eingereicht, aber noch nicht registriert

☐ Die beim EPA als PCT-Anmeldeamt eingereichte Vollmacht schließt ausdrücklich die regionale Phase ein

**3. Authorisation**
Individual authorisation is attached

General authorisation has been registered under No

A general authorisation has been filed, but not yet registered

The authorisation filed with the EPO as PCT receiving Office expressly includes the regional phase

**3. Pouvoir**
Un pouvoir spécial est joint.

Un pouvoir général a été enregistré sous le n°

Un pouvoir général a été déposé mais n'est pas encore enregistré

Le pouvoir général tel que déposé à l'OEB agissant en qualité d'office récepteur au titre du PCT s'applique expressément à la phase régionale

---

**4.** ☒ **Prüfungsantrag**
Hiermit wird die Prüfung der Anmeldung gemäß Art. 94 EPÜ beantragt. Die Prüfungsgebühr wird (wurde) entrichtet.

Prüfungsantrag in einer zugelassenen Nichtamtssprache
(siehe Merkblatt III, 6 2) .

**4.** **Request for examination**
Examination of the application under Art. 94 EPC is hereby requested. The examination fee is being (has been, will be) paid

Request for examination in an admissible non-EPO language
(see Notes III, 6.2) :

**4.** **Requête en examen**
Il est demandé que la demande de brevet soit examinée, conformément à l'art. 94 CBE Il est (a été, sera) procédé au paiement de la taxe d'examen.

Requête en examen dans une langue non officielle autorisée
(voir notice III, 6 2) .

---

**5.** ☐ **Abschriften**
Zusätzliche Abschrift(en) der im ergänzenden europäischen Recherchenbericht angeführten Schriftstücke wird (werden) beantragt

Anzahl der **zusätzlichen** Sätze von Abschriften

**5.** **Copies**
Additional copy (copies) of the documents cited in the supplementary European search report is (are) requested

Number of **additional** sets of copies

**5.** **Copies**
Prière de fournir une (des) copie(s) supplémentaire(s) des documents cités dans le rapport complémentaire de recherche européenne.

Nombre de jeux **supplémentaires** de copies

---

**6.** **Für das Verfahren vor dem EPA bestimmte Unterlagen**

6 1 Dem Verfahren vor dem EPA als **Bestimmungsamt** (PCT I) sind folgende Unterlagen zugrunde zu legen

☒ die vom Internationalen Büro **veröffentlichten Anmeldungsunterlagen** (mit **allen** Ansprüchen, Beschreibung und Zeichnungen), gegebenenfalls mit den geänderten Ansprüchen nach Art. 19 PCT

☐ soweit sie nicht ersetzt werden durch die **in drei Stücken** beigefügten **Änderungen.**

Falls nötig, sind Klarstellungen auf einem Zusatzblatt einzureichen¹

**6.** **Documents intended for proceedings before the EPO**

6.1 Proceedings before the EPO as **designated Office** (PCT I) are to be based on the following documents·

the **application documents published** by the International Bureau (with **all** claims, description and drawings), where applicable with amended claims under Art. 19 PCT

unless replaced by the **amendments** enclosed **in triplicate.**

Where necessary, clarifications must be submitted on a separate sheet¹

**6.** **Pièces destinées à la procédure devant l'OEB**

6 1 La procédure devant l'OEB agissant en qualité **d'office désigné** (PCT I) doit se fonder sur les pièces suivantes :

les **pièces de la demande publiée** par le Bureau international avec **toutes** les revendications, la description et les dessins), éventuellement avec les revendications modifiées conformément à l'article 19 du PCT

dans la mesure où elles ne sont pas remplacées par les **modifications** jointes **en trois exemplaires.**

Le cas échéant, des explications doivent être jointes sur une feuille additionnelle¹

6.2 Dem Verfahren vor dem EPA als **ausgewähltem Amt** (PCT II) sind folgende Unterlagen zugrunde zu legen.

☒ die dem **internationalen vorläufigen Prüfungsbericht** zugrunde gelegten Unterlagen, einschließlich seiner eventuellen **Anlagen**
(Solche Anlagen müssen immer in drei Stücken beigefügt werden)

☒ soweit sie nicht ersetzt werden durch die **in drei Stücken** beigefügten **Änderungen.**

Falls nötig, sind Klarstellungen auf einem Zusatzblatt einzureichen¹

6.2 Proceedings before the EPO as **elected Office** (PCT II) are to be based on the following documents

the **documents on which the international preliminary examination report is based**, including its possible **annexes**
(Such annexes must always be filed in triplicate)

unless replaced by the **amendments** enclosed **in triplicate**

Where necessary, clarifications must be submitted on a separate sheet¹

6 2 La procédure devant l'OEB **agissant en qualité d'office élu** (PCT II) doit se fonder sur les pièces suivantes .

les **pièces sur lesquelles se fonde le rapport d'examen préliminaire international**, y compris ses **annexes** éventuelles
(De telles annexes sout toujours à joindre en trois exemplaires)

dans la mesure où elles ne sont pas remplacées par les **modifications** jointes **en trois exemplaires.**

Le cas échéant, des explications doivent être jointes sur une feuille additionnelle¹

☒ Sind dem EPA als mit der internationalen vorläufigen Prüfung beauftragten Behörde **Versuchsberichte** zugegangen, dürfen diese dem Verfahren vor dem EPA zugrunde gelegt werden

If the EPO as International Preliminary Examining Authority has received **test reports**, these may be used as the basis of proceedings before the EPO.

Si l'OEB, agissant en qualité d'administration chargée de l'examen préliminaire international, a reçu des **rapports d'essais**, ils peuvent constituer la base de la procédure devant l'OEB.

**7. Übersetzungen**

Beigefügt sind die nachfolgend angekreuzten Übersetzungen in einer der Amtssprachen des EPA (Deutsch, Englisch, Französisch):

- *Im Verfahren vor dem EPA als **Bestimmungsamt oder ausgewähltem Amt** (PCT I + II)·*

  ☐ Übersetzung der **ursprünglich eingereichten internationalen Anmeldung** (Beschreibung, Ansprüche, etwaige Textbestandteile in den Zeichnungen), der veröffentlichten Zusammenfassung, und etwaiger Angaben über Mikroorganismen nach Regel 13bis.3 und 13bis.4 PCT, **in drei Stücken**

  ☐ Übersetzung der **prioritätsbegründenden Anmeldung(en), in einem Stück**

- *Zusätzlich im Verfahren vor dem EPA als **Bestimmungsamt** (PCT I)·*

  ☐ Übersetzung der nach Art 19 PCT **geänderten Ansprüche** nebst Erklärung, falls diese dem Verfahren vor dem EPA zugrunde gelegt werden sollen (siehe Feld 6), **in drei Stücken**

- *Zusätzlich im Verfahren vor dem EPA als **ausgewähltem Amt** (PCT II)*

  Übersetzung der **Anlagen zum internationalen vorläufigen Prüfungsbericht, in drei Stücken**

**8. Biologisches Material**

Die Erfindung betrifft biologisches Material oder seine Verwendung, das nach Regel 28 EPÜ hinterlegt worden ist.

☐ Die **Angaben nach Regel 28(1)c) EPÜ** sind in der internationalen Veröffentlichung oder in der gemäß Feld 7 eingereichten Übersetzung enthalten auf:

Seite(n) / Zeile(n)

Die **Empfangsbescheinigung(en)** der Hinterlegungsstelle

☐ ist (sind) beigefügt

☐ wird (werden) nachgereicht

☐ Verzicht auf die Verpflichtung des Antragstellers nach Regel 28(3) auf gesondertem Schriftstück

---

**7. Translations**

Translations in one of the official languages of the EPO (English, French, German) are enclosed as crossed below:

- *In proceedings before the EPO as **designated or elected Office** (PCT I + II)·*

  ☐ Translation of the **international application** (description, claims, any text in the drawings) **as originally filed**, of the abstract as published and of any indication under Rule 13bis.3 and 13bis.4 PCT regarding micro-organisms, **in triplicate**

  ☐ Translation of **the priority application(s), in one copy**

- *In addition, in proceedings before the EPO as **designated Office** (PCT I):*

  ☐ Translation of **amended claims** and any statement under Art 19 PCT, if the claims as amended are to form the basis for the proceedings before the EPO (see Section 6), **in triplicate**

- *In addition, in proceedings before the EPO as **elected Office** (PCT II).*

  Translation of any **annexes to the international preliminary examination report, in triplicate**

**8. Biological material**

The invention relates to and/or uses biological material deposited under Rule 28 EPC.

☐ The **particulars referred to in Rule 28(1)(c) EPC** are given in the international publication or in the translation submitted under Section 7 on:

page(s) / line(s)

The **receipt(s) of deposit** issued by the depositary institution

☐ is (are) enclosed

☐ will be filed at a later date

☐ Waiver of the right to an undertaking from the requester pursuant to Rule 28(3) attached.

---

**7. Traductions**

Vous trouverez ci-jointes les traductions cochées ci-après dans l'une des langues officielles de l'OEB (allemand, anglais, français) :

- *Dans la procédure devant l'OEB agissant en qualité d'**Office désigné ou élu** (PCT I + II):*

  ☐ Traduction de la **demande internationale telle que déposée initialement** (description, revendications, textes figurant éventuellement dans les dessins), de l'abrégé publié, et de toutes indications visées aux règles 13bis.3 et 13bis.4 du PCT concernant les micro-organismes, **en trois exemplaires**

  ☐ Traduction de la (des) **demande(s) ouvrant le droit de priorité, en un exemplaire**

- *De plus, dans la procédure devant l'OEB agissant en qualité d'**office désigné** (PCT I) :*

  ☐ Traduction des **revendications modifiées** et de la déclaration faite conformément à l'article 19 du PCT, si la procédure devant l'OEB doit être fondée sur les revendications modifiées (cf rubrique 6), **en trois exemplaires**

- *De plus, dans la procédure devant l'OEB agissant en qualité d'**office élu** (PCT II) :*

  Traduction des **annexes du rapport d'examen préliminaire international, en trois exemplaires**

**8. Matière biologique**

L'invention concerne et/ou utilise la matière biologique, déposée conformément à la règle 28 CBE.

☐ Les **indications visées à la règle 28(1)c) CBE** figurent dans la publication internationale ou dans une traduction produite conformément à la rubrique 7 à la / aux:

page(s) / ligne(s)

Le(s) **récépissé(s) de dépôt** délivré(s) par l'autorité de dépôt

☐ est (sont) joint(s)

☐ sera (seront) produit(s) ultérieurement

☐ Renonciation, sur document distinct, à l'engagement du requérant au titre de la règle 28(3)

---

| 9. Nucleotid- und Aminosäure-sequenzen | 9. Nucleotide and amino acid sequences | 9. Séquences de nucléotides et d'acides aminés |
|---|---|---|
| ☐ Die nach Regeln 5.2 und 13ter PCT sowie Regel 104b (3a) EPÜ erforderlichen Unterlagen liegen dem EPA bereits vor. | The items necessary in accordance with Rules 5.2 and 13ter PCT and Rule 104b (3a) EPC have already been furnished to the EPO. | Les pièces requises selon les règles 5.2 et 13ter PCT et la règle 104ter (3bis) CBE ont déjà été déposées auprès de l'OEB. |
| ☐ Das schriftliche Sequenzprotokoll wird anliegend in einer Amtssprache des EPA nachgereicht. | The written sequence listing is furnished herewith in an official language of the EPO. | La liste de séquences écrite est produite ci-joint dans une des langues officielles de l'OEB. |
| ☐ Das Sequenzprotokoll geht nicht über den Inhalt der Anmeldung in der ursprünglich eingereichten Fassung hinaus | The sequence listing does not include matter which goes beyond the content of the application as filed. | La liste de séquences ne contient pas d'éléments s'étendant au-delà du contenu de la demande telle qu'elle a été déposée. |
| ☐ Der vorgeschriebene maschinenlesbare Datenträger ist beigefügt | The prescribed machine-readable data carrier is enclosed. | Le support de données prescrit, déchiffrable par machine, est annexé. |
| ☐ Die auf dem Datenträger gespeicherte Information stimmt mit dem schriftlichen Sequenzprotokoll überein | The information recorded on the data carrier is identical to the written sequence listing. | L'information figurant sur le support de données est identique à celle que contient la liste de séquences écrite. |

**10. Benennungsgebühren**
10.1 Benennungsgebühren werden für nachstehende **in der internationalen Anmeldung bestimmte Vertragsstaaten** des EPÜ entrichtet.

**10. Designation fees**
10.1 Designation fees are paid in respect of the following EPC **Contracting States designated in the international application** for a European patent:

**10. Taxes de désignation**
10.1 Les taxes de désignation sont acquittées pour ceux des **Etats contractants** de la CBE **désignés dans la demande internationale** qui sont indiqués ci-après.

| | | Deutsch | English | Français |
|---|---|---|---|---|
| ☐ | AT | Österreich | Austria | Autriche |
| ☐ | BE | Belgien | Belgium | Belgique |
| ☐ | CH/LI | Schweiz und Liechtenstein | Switzerland and Liechtenstein | Suisse et Liechtenstein |
| ☒ | DE | Deutschland | Germany | Allemagne |
| ☐ | DK | Dänemark | Denmark | Danemark |
| ☐ | ES | Spanien | Spain | Espagne |
| ☐ | FI | Finnland | Finland | Finlande |
| ☒ | FR | Frankreich | France | France |
| ☒ | GB | Vereinigtes Königreich | United Kingdom | Royaume-Uni |
| ☐ | GR | Griechenland | Greece | Grèce |
| ☐ | IE | Irland | Ireland | Irlande |
| ☐ | IT | Italien | Italy | Italie |
| ☐ | LU | Luxemburg | Luxembourg | Luxembourg |
| ☐ | MC | Monaco | Monaco | Monaco |
| ☐ | NL | Niederlande | Netherlands | Pays-Bas |
| ☐ | PT | Portugal | Portugal | Portugal |
| ☐ | SE | Schweden | Sweden | Suède |
| ☐ | _____ | _____ [1] | _____ [1] | _____ [1] |
| ☐ | _____ | _____ [1] | _____ [1] | _____ [1] |

☒ 10.2 Derzeit ist nicht beabsichtigt, Benennungsgebühren für die in Feld 10 1 nicht angekreuzten, aber in der internationalen Anmeldung bestimmten Vertragsstaaten des EPÜ zu entrichten. Insoweit wird auf die Zustellung einer Mitteilung nach Regel 85a(1) EPÜ verzichtet. Sofern diese Benennungsgebühren nicht bis zum Ablauf der in Regel 85a(2) EPÜ vorgesehenen Nachfrist entrichtet werden, wird beantragt, von einer Mitteilung nach Regel 69(1) EPÜ abzusehen.

10 2 At present it is not intended to pay designation fees for the EPC Contracting States not marked with a cross under 10 1 but designated in the international application. No communication under Rule 85a(1) EPC in respect of these designation fees need be notified If they have not been paid by the time the period of grace allowed in Rule 85a(2) EPC expires, it is requested that no communication be sent under Rule 69(1) EPC.

10.2 Il n'est pas actuellement envisagé d'acquitter les taxes de désignation pour les Etats contractants de la CBE qui ne sont pas cochés sous la rubrique 10 1, mais qui sont désignés dans la demande internationale. Le demandeur renonce ainsi à la notification prévue à la règle 85bis(1) CBE. Si ces taxes de désignation ne sont pas acquittées à l'expiration du délai supplémentaire prévu à la règle 85bis(2) CBE, il est demandé de s'abstenir d'envoyer une notification, établie conformément à la règle 69(1) CBE.

[1] Vorgesehen für die Eintragung weiterer Vertragsstaaten des EPÜ, für die der PCT oder das EPÜ nach Drucklegung dieses Formblatts in Kraft tritt, und die in der internationalen Anmeldung für ein europäisches Patent bestimmt waren

[1] Space for any other EPC Contracting States which may become PCT or EPC Contracting States after this form has been printed and which were designated for a European patent in the international application

[1] Prévu pour l'inscription d'autres Etats contractants de la CBE à l'égard desquels le PCT ou la CBE entrera en vigueur après l'impression du présent formulaire et qui ont été désignés dans la demande internationale pour un brevet européen

☒ **11. Erstreckung des europäischen Patents**
Diese Anmeldung gilt auch als Erstreckungsantrag hinsichtlich aller **in der Internationalen Anmeldung bestimmten Nicht-Vertragsstaaten** des EPÜ, mit denen bei Einreichung der internationalen Anmeldung »Erstreckungsabkommen« in Kraft waren*
**Die Erstreckung wird jedoch nur wirksam, wenn die vorgeschriebene Erstreckungsgebühr entrichtet wird.**
Der Anmelder beabsichtigt, die Erstreckungsgebühr für die nachfolgend angekreuzten Staaten zu entrichten:

**11. Extension of the European patent**
This application is also considered as being a request for extension to all the **non-Contracting States** to the EPC **designated in the international application** with which "extension agreements" were in force on the date of filing the international application*.
**However, the extension only takes effect if the prescribed extension fee is paid.**
The applicant intends to pay the extension fee for the States marked with a cross below·

**11. Extension des effets du brevet européen**
La présente demande est également réputée demande d'extension à tous les **Etats non adhérents** à la CBE **désignés dans la demande internationale**, avec lesquels existaient, lors du dépôt de la demande, des «accords d'extension»*. **Toutefois l'extension ne produit ses effets que si la taxe d'extension prescrite est acquittée.**
Le demandeur se propose actuellement d'acquitter la taxe d'extension pour les Etats dont le nom est coché ci-après:

| | | |
|---|---|---|---|
| ☐ SI | Slowenien (* ab 1. März 1994) | Slovenia (* as of 1 March 1994) | Slovénie (* à compter du 1er mars 1994) |
| ☐ LT | Litauen (* ab 5. Juli 1994) | Lithuania (* as of 5 July 1994) | Lituanie (* à compter du 5 juillet 1994) |
| ☐ LV | Lettland (* ab 1. Mai 1995) | Latvia (* as of 1 May 1995) | Lettonie (* à compter du 1er mai 1995) |
| ☐ AL | Albanien (* ab 1. Februar 1996) | Albania (* as of 1 February 1996) | Albanie (* à compter du 1er fevrier 1996) |
| ☐ RO | Rumänien (* ab 15. Oktober 1996) | Romania (* as of 15 October 1996) | Roumanie (* à compter du 15 octobre 1996) |

| 1) | 1) | 1) |
|---|---|---|
| Platz für Staaten, mit denen »Erstreckungsabkommen« nach Drucklegung dieses Formblatts in Kraft treten und die in der internationalen Anmeldung bestimmt waren | Space for States with which "extension agreements" enter into force after this form has been printed and which were designated in the international application | Prévu pour des Etats à l'égard desquels des «accords d'extension» entreront en vigueur après l'impression du présent formulaire et qui ont été désignés dans la demande internationale |

**12. Automatischer Abbuchungsauftrag**
*(Nur möglich für Inhaber von beim EPA geführten laufenden Konten)*
☐ Das EPA wird beauftragt, nach Maßgabe der Vorschriften über das automatische Abbuchungsverfahren fällige Gebühren und Auslagen vom untenstehenden laufenden Konto abzubuchen.

Nummer des laufenden Kontos / Name des Kontoinhabers

**12. Automatic debit order**
*(for EPO deposit account holders only)*
The EPO is hereby authorised, under the Arrangements for the automatic debiting procedure, to debit from the deposit account below any fees and costs falling due

Deposit account number / Account holder's name

**12. Ordre de prélèvement automatique**
*(uniquement possible pour les titulaires de comptes courants ouverts auprès de l'OEB)*
Par la présente, il est demandé à l'OEB de prélever du compte courant ci-dessous les taxes et frais venant à échéance, conformément à la réglementation relative au prélèvement automatique.

N° du compte courant / Nom du titulaire du compte

**13.** Eventuelle **Rückzahlungen** auf das beim EPA geführte laufende Konto Nummer

Name des Kontoinhabers

**13. Reimbursement**, if any, to EPO deposit account number

2805.0076

Account holder's name

Page White & Farrer

**13** **Remboursements** éventuels à effectuer sur le compte courant ouvert auprès de l'OEB numéro

Nom du titulaire du compte

**14. Unterschrift(en)** des (der) Anmelder(s) oder Vertreters

**Ort / Datum**

**14. Signature(s)** of applicant(s) or representative

**Place / Date**
LONDON, 24th June 1999

**14. Signature(s)** du (des) demandeur(s) ou mandataire

**Lieu / Date**

**Für Angestellte (Art. 133(3) EPÜ) mit allgemeiner Vollmacht:**

Nr. _____

Name(n) des (der) Unterzeichneten bitte mit Schreibmaschine wiederholen. Bei juristischen Personen bitte auch die Stellung des (der) Unterzeichneten innerhalb der Gesellschaft eintragen

**For employees (Art. 133(3) EPC) having a general authorisation:**

No. _____

Please type name(s) under signature(s). In the case of legal persons, the position of the signatory within the company should also be typed

**Pour les employés (art. 133(3) CBE) disposant d'un pouvoir général :**

N° _____

Veuillez faire figurer le nom dactylographié sous la signature. Si ce nom désigne une personne morale, ajouter la mention dactylographiée de la position occupée par le signataire au sein de la société

PAGE WHITE FARRER

*European Patent Attorneys*
*Chartered Patent Attorneys*
*Trade Mark Agents*

*Page White & Farrer*
*54 Doughty Street*
*London WC1N 2LS*
*Telephone 0171 831 7929*
*Facsimile 0171 831 8040*
*Telex 8955681*
*email@pagewhite.co.uk*

Our ref:  92263/VRD/pkh                                24 June 1999

Your ref:

The European Patent Office
P.B. 5818 Patentlaan 2
2280 HV Rijswijk (ZH)
Netherlands

Dear Sirs

**European Regional Phase of PCT/US97/24180**
**Cabletron Systems, Inc.**

We enclose a completed EPO Form 1200 for the above-mentioned application and hereby request Regional (European) processing of the application.

We also enclose a fee voucher for EUR 1070.50 in respect of the national fee, designation fees and examination fee, these fees being due in connection with the above-mentioned European patent application.

Please note that no search fee is being paid in view of the fact that the International Search Report was prepared by the European Patent Office in its capacity as International Searching Authority. Please also note that the examination fee being paid is reduced by 50% in view of the fact that the International Preliminary Examination Report was prepared by the European Patent Office in its capacity as International Preliminary Examining Authority.

Please acknowledge receipt of this letter and the enclosures by returning the top copy of the accompanying Form 1037.

Yours faithfully

DRIVER, Virginia Rozanne
Authorised Representative

*Directors*
*R Palmer*
*D J Richards*
*P D Jenkins*
*Mrs V R Driver*
*J N Daniels*
*Miss K C Style*
*Ms N Shackleton*
*P R Slingsby*

*Associate Directors*
*W J Neobard*
*J P Cornish*
*C M Hill*

*J P Ruuskanen*

*Consultant*
*A Pendlebury*

*Registered at the above*
*London address No. 1319458*



-1-

# PORT BASED DEFAULT VIRTUAL LOCAL AREA NETWORK

### Field of the Invention

This invention generally relates to data transmission networks and, more
5     particularly, to virtual local area networks.

### Background of the Invention

A data network typically includes several nodes connected together by a data
transport medium. One common method of transmitting data between the nodes is to
10     break the data up into discrete "packets" of data. Packets can be transported over the
medium by any one of a variety of transport techniques. In applications utilizing
packetized data, data to be transported first is broken up into discrete packets of data,
then transmitted through the network medium, and finally reassembled at a destination
node. In accordance with current packet protocol, each packet generally comprises a
15     header and an information field. The header contains the information used to transport
the cell from one node to the next while the packet data is contained in the information
field. Among other information in the header is the destination address of the data
packet.

A local area network (i.e., "LAN") is a type of local data network commonly
20     used in a single office or building. LANs are an efficient mechanism for maximizing
use of network resources by members of the LAN. Simple LANs typically include two
or more nodes (e.g., a server, computer, printer, or other resource) that are
interconnected by a common physical connection such as, for example, a hub. Data
switches also may be connected to the hub for directing data traffic and for connecting
25     the LAN to other data networks.

LANs can be inconvenient and expensive to maintain. For example, moving a
user to another location within a relatively large office building often requires that the
LAN be rewired and reconfigured. This can be cumbersome and expensive. The art
has responded to this problem by developing virtual local area networks (i.e.,
30     "VLANs").

For example, "Virtual LANs Get Real", Data Communications vol. 24 no. 3, pp.
87-99, describes the general characteristics and considerations that should be taken

AMENDED SHEET



-1/*a*

when building a VLAN. As described in "Virtual LANs Get Real", a VLAN is
generally defined as a group of nodes interconnected by software to form a single
logical broadcast domain. VLANs may be connected to nodes that are members of any
number of physical LAN segments. Among many advantages, VLANs enable network
5    administrators to create logical groupings of users and network resources, thereby
allowing

AMENDED SHEET



-2-

remote users and resources to appear as if they are members of a single LAN. This
enables companies and other organizations to build dynamic, flexible, and distributed
LANs, thus simplifying physical moves of a user in a network. By way of background,
for example, a description of how a VLAN may be used to facilitate communication
within a company may be found in "Virtual LANs Take Network to Next Level",
Computer Technology Review, Vol. 16, no. 9, September 1996, page 12-14.
Background information regarding VLANs may additionally be found in "VLANs" Can
Layer 3 Save the Day?", Business Communications Review, Vol. 26, no. 12, December
1996, pages 47-50 and "Virtual LANs Come of Age", Telecommunications Vol. 30, no.
6, June 1996, pages 48-52.

Examples of virtual LAN networks are described in "Building Virtual LANs on
a real-World Budget Lanart's Segway Works with Ethernet Switches to Deliver Virtual
LANs Powers at a Low Cost", Data Communications, Vol. 24, no 13 , pp. 39-40. The
Segway system. described in Data Communications Vol. 24. no. 13, provides a twenty-
four port module for coupling workstations to a LAN switch. Up to five of the modules
may be interconnected to provide a virtual LAN of 120 network connections.

As described in the above references. VLANs may be formed by defining
logical groups of users within the VLAN. One such VLAN. known as a "port-based"
VLAN, defines the VLAN as a collection of switch ports on one or more switches
across a hub. Users connected to those defined switch ports therefore are members of
the defined VLAN. Broadcast messages directed to that VLAN may be transmitted
through the defined switch ports only. Known port-based VLANs typically are
implemented on a switch to include a default VLAN, in addition to other VLANs that
may be formed on the switch. During manufacture, the default VLAN is defined as
every port on a single switch. The number of switch ports defining the default VLAN
decreases, however, as ports on the switch are used for defining other VLANs.
Accordingly, on an exemplary eight-port switch having a first VLAN defined by ports
one and two, the default VLAN will be defined by remaining ports three through eight.

However, port-based default VLANs may have data leakage problems that can
compromise the security of data transmitted across the network. Specifically, port-
based default VLANs transmit a data packet to every switch port when that packet is
received by the default VLAN and is destined for a port that is not in the default VLAN.

AMENDED SHEET



-2/ℓ a

Continuing with the above example, a data packet received on a port defining the
default VLAN (i.e., one of ports three through eight) and destined for another port also
on the default VLAN will be transmitted to the destination port only.  In the event that
the data packet was destined for a port on the first VLAN (i.e., port one or two),
5    however, the packet would be transmitted to all of the ports on the switch, thus creating
the above mentioned security problem.

Accordingly, it would be desirable to provide a port-based default VLAN that
prevents such leakage problems between VLANs.  It is among the general objects of
this invention to provide such a device and method.

10

### Summary of The Invention

In accordance with the principles of the invention, a port-based default VLAN is
provided that prevents leakage problems across VLANs.  To that end, the default
VLAN includes means for transmitting data received by the default VLAN to ports
15    defining the

AMENDED SHEET



-6-

While the invention has been shown and described above with respect to various preferred embodiments, it will be apparent that the foregoing and other changes of the form and detail may be made therein by one skilled in the art without departing from the scope of the invention. These and other obvious modifications are intended to be covered by the following claims.

What is claimed is:

AMENDED SHEET

-7-

1.  A system to implement a port-based default VLAN formed on one or more
    interconnected networking switches (16), each switch (16) having one or more
    switch ports (18), all of the switch ports collectively being a plurality of switch
    ports, the default VLAN being defined by a first subset comprising one or more
    of the plurality of switch ports, the defined subset of the one or more of the
    plurality of switch ports being default VLAN ports, at least one of the plurality
    of switch ports not in the first subset of switch ports defining a second VLAN,
    the system comprising:

        means for receiving a data packet (26) through one of the default VLAN
        ports (1,2);
        means for ascertaining a destination port from the received data packet,
    the destination port being one of the plurality of switch ports;
        means for determining whether the destination port is one of the default
    VLAN ports:
        first means, responsive to the determining means, for transmitting the
    data packet to the destination port when the determining means determines that
    the destination port is one of the default VLAN ports; and
        second means, responsive to the determining means, for transmitting the
    data packet only to each of the other default VLAN ports when the determining
    means determines that the destination port is not one of the default VLAN ports,
        wherein the at least one switch port defining the second VLAN is free
    from receiving the data packet.

2.  The system as defined by claim 1 wherein the data packet (26) includes a header
    (28) and the ascertaining means ascertains the destination port from the packet
    header.

3.  The system as defined in claim 1 further including means for tagging the data
    packet as being in the default VLAN.

4.  A method of limiting broadcast messages from a port-based default VLAN, the
    default VLAN formed on one or more interconnected networking switches (16),

AMENDED SHEET

H 29.06.99

-8-

each switch having one or more switch ports (18), all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by a first subset comprising one or more of the plurality of switch ports, the defined first subset of one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports not in the first subset of switch ports defining a second VLAN, the method comprising:

   receiving a data packet through one of the default VLAN ports;

   ascertaining (400) a destination port from the data packet, the destination port being one of the plurality of switch ports;

   determining (402) whether the ascertained destination port is one of the default VLAN ports;

   transmitting (404) the data packet to the destination port when the destination port is one of the default VLAN ports; and

   only transmitting (406) the data packet to each of the other default VLAN ports when the destination port is not one of the default VLAN ports.

5.   The method as defined by claim 4 further including:

   tagging the data packet as being in the default VLAN. .

6.   A data network assembly (10) comprising:

   a hub (12) having at least two networking switches (16) connected thereto, each switch having one or more switch ports (18);

   a bus (20) in the hub;

   an enable switch (24) to electrically connect each of the switch ports to the bus;

   means for defining a subset of the switch ports as a default VLAN; and

   means for transmitting packets received on one of the switch ports of the defined subset only to the other switch ports of the defined subset so as to prevent transmission to switch ports that are not in the default VLAN.

EXHIBIT 16



O P I C
OFFICE DE LA PROPRIÉTÉ
INTELLECTUELLE DU CANADA

C I P O
CANADIAN INTELLECTUAL
PROPERTY OFFICE

(12) (19) (CA) **Demande-Application**

(21) (A1) **2,276,206**

(86) 1997/12/30
(87) 1998/07/09

(72) ITURRALDE, CAROL E., US

(71) CABLETRON SYSTEMS, INC., US

(51) Int.Cl.$^6$ H04L 12/46, H04L 12/44

(30) 1996/12/30 (08/774,541) US

(54) **RESEAU LOCAL VIRTUEL PAR DEFAUT A POINTS D'ACCES**

(54) **PORT BASED DEFAULT VIRTUAL LOCAL AREA NETWORK**



(57) L'invention concerne un réseau de transmission de données comportant un réseau local virtuel (VLAN) par défaut à points d'accès, qui permet de limiter un effet de submersion vers d'autres VLAN. Le VLAN par défaut permet de recevoir un paquet de données, d'établir l'adresse de destination du paquet, et de déterminer ensuite si le point d'accès destinataire est l'un des points d'accès du VLAN par défaut. Le paquet de données est transmis au point d'accès destinataire s'il s'agit de l'un des points d'accès du VLAN par défaut, ou à tous les points d'accès du VLAN par défaut si le point d'accès destinataire ne correspond pas à l'un des points d'accès du VLAN par défaut. Le paquet de données n'est transmis à aucun autre point d'accès de VLAN qui n'est pas par défaut.

(57) A data transmission network having a port-based default VLAN that limits flooding to other VLANs. The default VLAN receives a data packet, ascertains the destination address of the packet, and then determines if the destination port is one of the default VLAN ports. The data packet is transmitted to the destination port if it is one of the default VLAN ports, or to each of the default VLAN ports if the destination port is not one of the default VLAN ports. The data packet is not transmitted to any other non-default VLAN port.

Industrie Canada    Industry Canada

CA 02276206 1999-06-25

# PCT

WORLD INTELLECTUAL PROPERTY ORGANIZATION
International Bureau



## INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

| (51) International Patent Classification 6 : | | (11) International Publication Number: | WO 98/29985 |
|---|---|---|---|
| H04L 12/46, 12/44 | A1 | (43) International Publication Date: | 9 July 1998 (09.07.98) |

(21) International Application Number: PCT/US97/24180

(22) International Filing Date: 30 December 1997 (30.12.97)

(30) Priority Data:
08/774,541    30 December 1996 (30.12.96)    US

(71) Applicant: CABLETRON SYSTEMS, INC. [US/US]; 35 Industrial Way, Rochester, NH 03867 (US).

(72) Inventor: ITURRALDE, Carol, E.; 19 Mirna Road, Framingham, MA 01701 (US).

(74) Agent: HENDRICKS, Therese, A.; Wolf, Greenfield & Sacks, P.C., 600 Atlantic Avenue, Boston, MA 02210 (US).

(81) Designated States: AL, AM, AT, AU, AZ, BA, BB, BG, BR, BY, CA, CH, CN, CU, CZ, DE, DK, EE, ES, FI, GB, GE, GH, GM, GW, HU, ID, IL, IS, JP, KE, KG, KP, KR, KZ, LC, LK, LR, LS, LT, LU, LV, MD, MG, MK, MN, MW, MX, NO, NZ, PL, PT, RO, RU, SD, SE, SG, SI, SK, SL, TJ, TM, TR, TT, UA, UG, UZ, VN, YU, ZW, ARIPO patent (GH, GM, KE, LS, MW, SD, SZ, UG, ZW), Eurasian patent (AM, AZ, BY, KG, KZ, MD, RU, TJ, TM), European patent (AT, BE, CH, DE, DK, ES, FI, FR, GB, GR, IE, IT, LU, MC, NL, PT, SE), OAPI patent (BF, BJ, CF, CG, CI, CM, GA, GN, ML, MR, NE, SN, TD, TG).

Published
*With international search report.*
*Before the expiration of the time limit for amending the claims and to be republished in the event of the receipt of amendments.*

(54) Title: PORT BASED DEFAULT VIRTUAL LOCAL AREA NETWORK

(57) Abstract

A data transmission network having port-based default VLAN that limits flooding to other VLANs. The default VLAN receives a data packet, ascertains a destination address of the packet, and then determines if the destination port is one of the default VLAN ports. The data packet is transmitted to the destination port if it is one of the default VLAN ports, to each of the default VLAN ports if the destination port is not one of the default VLAN ports. The data packet is not transmitted to any other non-default VLAN port.



CA 02276206 1999-06-25



-1-

# PORT BASED DEFAULT VIRTUAL LOCAL AREA NETWORK

## Field of the Invention

This invention generally relates to data transmission networks and, more
particularly, to virtual local area networks.

## Background of the Invention

A data network typically includes several nodes connected together by a data
transport medium. One common method of transmitting data between the nodes is to
break the data up into discrete "packets" of data. Packets can be transported over the
medium by any one of a variety of transport techniques. In applications utilizing
packetized data, data to be transported first is broken up into discrete packets of data,
then transmitted through the network medium, and finally reassembled at a destination
node. In accordance with current packet protocol, each packet generally comprises a
header and an information field. The header contains the information used to transport
the cell from one node to the next while the packet data is contained in the information
field. Among other information in the header is the destination address of the data
packet.

A local area network (i.e., "LAN") is a type of local data network commonly
used in a single office or building. LANs are an efficient mechanism for maximizing
use of network resources by members of the LAN. Simple LANs typically include two
or more nodes (e.g., a server, computer, printer, or other resource) that are
interconnected by a common physical connection such as, for example, a hub. Data
switches also may be connected to the hub for directing data traffic and for connecting
the LAN to other data networks.

LANs can be inconvenient and expensive to maintain. For example, moving a
user to another location within a relatively large office building often requires that the
LAN be rewired and reconfigured. This can be cumbersome and expensive. The art
has responded to this problem by developing virtual local area networks (i.e.,
"VLANs").

For example, "Virtual LANs Get Real", Data Communications vol. 24 no. 3, pp.
87-99, describes the general characteristics and considerations that should be taken

AMENDED SHEET

CA 02276206 1999-06-25



-1/𝟝a

when building a VLAN. As described in "Virtual LANs Get Real", a VLAN is
generally defined as a group of nodes interconnected by software to form a single
logical broadcast domain. VLANs may be connected to nodes that are members of any
number of physical LAN segments. Among many advantages, VLANs enable network
administrators to create logical groupings of users and network resources, thereby
allowing

5

AMENDED SHEET

CA 02276206 1999-06-25

-2-

remote users and resources to appear as if they are members of a single LAN. This
enables companies and other organizations to build dynamic, flexible, and distributed
LANs, thus simplifying physical moves of a user in a network. By way of background,
for example, a description of how a VLAN may be used to facilitate communication
5    within a company may be found in "Virtual LANs Take Network to Next Level",
Computer Technology Review, Vol. 16, no. 9, September 1996, page 12-14.
Background information regarding VLANs may additionally be found in "VLANs" Can
Layer 3 Save the Day?", Business Communications Review, Vol. 26, no. 12, December
1996, pages 47-50 and "Virtual LANs Come of Age", Telecommunications Vol. 30, no.
10    6, June 1996, pages 48-52.

Examples of virtual LAN networks are described in "Building Virtual LANs on
a real-World Budget Lanart's Segway Works with Ethernet Switches to Deliver Virtual
LANs Powers at a Low Cost", Data Communications, Vol. 24, no 13 , pp. 39-40. The
Segway system, described in Data Communications Vol. 24, no. 13, provides a twenty-
15    four port module for coupling workstations to a LAN switch. Up to five of the modules
may be interconnected to provide a virtual LAN of 120 network connections.

As described in the above references, VLANs may be formed by defining
logical groups of users within the VLAN. One such VLAN, known as a "port-based"
VLAN, defines the VLAN as a collection of switch ports on one or more switches
20    across a hub. Users connected to those defined switch ports therefore are members of
the defined VLAN. Broadcast messages directed to that VLAN may be transmitted
through the defined switch ports only. Known port-based VLANs typically are
implemented on a switch to include a default VLAN, in addition to other VLANs that
may be formed on the switch. During manufacture, the default VLAN is defined as
25    every port on a single switch. The number of switch ports defining the default VLAN
decreases, however, as ports on the switch are used for defining other VLANs.
Accordingly, on an exemplary eight-port switch having a first VLAN defined by ports
one and two, the default VLAN will be defined by remaining ports three through eight.

However, port-based default VLANs may have data leakage problems that can
30    compromise the security of data transmitted across the network. Specifically, port-
based default VLANs transmit a data packet to every switch port when that packet is
received by the default VLAN and is destined for a port that is not in the default VLAN.

AMENDED SHEET

CA 02276206 1999-06-25

-2/7-a

Continuing with the above example, a data packet received on a port defining the
default VLAN (i.e., one of ports three through eight) and destined for another port also
on the default VLAN will be transmitted to the destination port only.  In the event that
the data packet was destined for a port on the first VLAN (i.e., port one or two),
however, the packet would be transmitted to all of the ports on the switch, thus creating
the above mentioned security problem.

Accordingly, it would be desirable to provide a port-based default VLAN that
prevents such leakage problems between VLANs.  It is among the general objects of
this invention to provide such a device and method.

## Summary of The Invention

In accordance with the principles of the invention, a port-based default VLAN is
provided that prevents leakage problems across VLANs.  To that end, the default
VLAN includes means for transmitting data received by the default VLAN to ports
defining the

AMENDED SHEET

CA 02276206 1999-06-25

- 3 -

default VLAN only.  No other ports on the switch will receive a data packet that was received on a port defining the default VLAN.

In accordance with another aspect of the invention, each of the ports on a plurality of switches connected to a hub are configured, during manufacture, to define a default VLAN spanning the plurality of switches.  To that end, the default VLAN includes a bus in the hub, an enable switch for electrically connecting each of switches to the bus, and means for defining each of the switch ports as the default VLAN.

It is among the objects of the invention to provide port-based default VLAN and method that prevents leakage across the ports of a switch.

It is another object of the invention to provide a port-based default VLAN that, is configured, during manufacture, to span a plurality of switches connected to a hub.

## Brief Description Of The Drawings

The above and further advantages of the invention may be better understood by referring to the following description in conjunction with the accompanying drawings and which:

Figure 1 is a block schematic diagram of a partial data network assembly for implementation of the invention;

Figure 2 is a block schematic diagram of a switch that forms a port-based, default VLAN;

Figure 3 is a schematic diagram of a data packet; and

Figure 4 is a flow chart that specifies the method used for preventing leakage from the default VLAN.

## Detailed Description Of A Preferred Embodiment

Figure 1 shows a partial data network assembly 10 for implementation of the invention, comprising a hub 12 having hub ports 14, and switches 16 connected to the hub ports 14.  The hub 12 may be a DEChub Multiswitch 900, available from Digital Equipment Corporation of Maynard, Massachusetts.  Each of the switches 16 has a plurality of switch ports 18 (e.g., eight) connecting various network resources, such as servers, computers, and

CA 02276206 1999-06-25

- 4 -

printers, to the network.  A bus 20 spanning each of the hub ports 14 may be enabled by an
enable switch 24 to interconnect each of the switches 16.  This consequently interconnects
each of the switch ports 18 across each of the interconnected switches 16.  In the preferred
embodiment, the bus 20 is enabled during manufacture, thus defining the default VLAN as all

5    of the ports of the interconnected switches 16.  The enable switch 24 may be implemented as
firmware within the hub 12, or as a manually actuated switch on the hub 12.

New port-based VLANs may be formed across one or more of the switches 16 by
selecting combinations of interconnected switch ports 18.  Selected switch ports 18 for new
VLANs consequently are removed from the default VLAN definition, thus reducing the size

10   of the default VLAN.  No data packets received on any one of the default VLAN ports may
be transmitted to the ports that define other VLANs.

Figure 2 shows an exemplary eight port switch 16 forming a default VLAN, VLAN 2,
and VLAN 3.  Ports one and two define the default VLAN, ports three to five define VLAN
2, and ports six to eight define VLAN 3.  Data packets received on switch ports one or two

15   may be transmitted to either or both of those switch ports 18 only, thus preventing leakage to
VLAN 2 and VLAN 3.   For example, a data packet received on port two having a destination
address of port four will be transmitted to both ports one and two only.  Similarly, a data
packet received on port two having a destination address of port one will be transmitted to
port one only.  VLAN 2 and VLAN 3 limit leakage in like fashion.

20   Figure 3 shows a data packet 26, comprising a header 28 and an information field 30.
The destination address of the data packet 26 is stored in the header 28 of the data packet 26.
The switch port 18 associated with the destination address is ascertained by conventional
means within the switch 16 receiving the data packet 26.  This information is used by the
method shown in figure 4.

25   Figure 4 shows a flow chart that specifies the method used for preventing leakage
from the default VLAN.  More particularly, the destination port address is ascertained from
the header 28 of a data packet received on one of the default VLAN ports (step 400).  At step
402, it is determined if the destination port is one of the default VLAN ports.  If the
destination port is one of the default VLAN ports, that data packet is transmitted to the

30   destination port only (step 404).  If the destination port is not one of the default VLAN ports,
the data packet is transmitted to all of the default VLAN ports only (step 406).  The data
packet is transmitted to no other switch ports 18.

CA 02276206 1999-06-25

- 5 -

The default VLAN may be assigned a default VLAN tag that is assigned to a data packet when it enters through one of the default VLAN ports. The switch 16 then may be configured to prevent transmission of any data packet, having an associated default VLAN tag, through any of the other, non-default VLAN ports.

The invention may be implemented by means of a programmable logic chip within the one or more switches 16 used for the invention. The invention may also be implemented as firmware stored within those switches 16. Both implementations may be programmed by conventional methods.

In an alternative embodiment, the invention may be implemented as a computer program product for use with a computer system. Such implementation may include a series of computer instructions fixed either on a tangible medium, such as a computer readable media (e.g. diskette, CD-ROM, ROM, or fixed disk) or transmittable to a computer system, via a modem or other interface device, such as communications adapter connected to the network over a medium. The medium may be either a tangible medium (e.g., optical or analog communications lines) or a medium implemented with wireless techniques (e.g., microwave, infrared or other transmission techniques). The series of computer instructions embodies all or part of the functionality previously described herein with respect to the invention. Those skilled in the art should appreciate that such computer instructions can be written in a number of programming languages for use with many computer architectures or operating systems. Furthermore, such instructions may be stored in any memory device, such as semiconductor, magnetic, optical or other memory devices, and may be transmitted using any communications technology, such as optical, infrared, microwave, or other transmission technologies. It is expected that such a computer program product may be distributed as a removable media with accompanying printed or electronic documentation (e.g., shrink wrapped software), preloaded with a computer system (e.g., on system ROM or fixed disk), or distributed from a server or electronic bulletin board over a network (e.g., the Internet or World Wide Web).

The inventive default VLAN thus prevents leakage to other VLANs by transmitting received data packets to default VLAN ports only. Security thus is ensured for data packets transmitted to the default VLAN. Furthermore, the initial size and scope of the default VLAN is increased by enabling the enable switch 24, during manufacture, to interconnect each of the switches 16 connected to the hub 12.

CA 02276206 1999-06-25

-6-

While the invention has been shown and described above with respect to various preferred embodiments, it will be apparent that the foregoing and other changes of the form and detail may be made therein by one skilled in the art without departing from the scope of the invention.  These and other obvious modifications are intended to be covered by the following claims.

What is claimed is:

AMENDED SHEET

CA 02276206 1999-06-25

-7-

1. A system to implement a port-based default VLAN formed on one or more
interconnected networking switches (16), each switch (16) having one or more
switch ports (18), all of the switch ports collectively being a plurality of switch
ports, the default VLAN being defined by a first subset comprising one or more
5     of the plurality of switch ports, the defined subset of the one or more of the
plurality of switch ports being default VLAN ports, at least one of the plurality
of switch ports not in the first subset of switch ports defining a second VLAN,
the system comprising:

        means for receiving a data packet (26) through one of the default VLAN
10            ports (1,2);
        means for ascertaining a destination port from the received data packet,
the destination port being one of the plurality of switch ports;
        means for determining whether the destination port is one of the default
VLAN ports;
15            first means, responsive to the determining means, for transmitting the
data packet to the destination port when the determining means determines that
the destination port is one of the default VLAN ports; and
        second means, responsive to the determining means, for transmitting the
data packet only to each of the other default VLAN ports when the determining
20     means determines that the destination port is not one of the default VLAN ports,
        wherein the at least one switch port defining the second VLAN is free
from receiving the data packet.

2. The system as defined by claim 1 wherein the data packet (26) includes a header
25     (28) and the ascertaining means ascertains the destination port from the packet
header.

3. The system as defined in claim 1 further including means for tagging the data
packet as being in the default VLAN.

30

4. A method of limiting broadcast messages from a port-based default VLAN, the
default VLAN formed on one or more interconnected networking switches (16),

AMENDED SHEET

CA 02276206 1999-06-25

-8-

each switch having one or more switch ports (18), all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by a first subset comprising one or more of the plurality of switch ports, the defined first subset of one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports not in the first subset of switch ports defining a second VLAN, the method comprising:

      receiving a data packet through one of the default VLAN ports;

      ascertaining (400) a destination port from the data packet, the destination port being one of the plurality of switch ports;

      determining (402) whether the ascertained destination port is one of the default VLAN ports;

      transmitting (404) the data packet to the destination port when the destination port is one of the default VLAN ports; and

      only transmitting (406) the data packet to each of the other default VLAN ports when the destination port is not one of the default VLAN ports.

5.      The method as defined by claim 4 further including:

      tagging the data packet as being in the default VLAN. .

6.      A data network assembly (10) comprising:

      a hub (12) having at least two networking switches (16) connected thereto, each switch having one or more switch ports (18);

      a bus (20) in the hub;

      an enable switch (24) to electrically connect each of the switch ports to the bus;

      means for defining a subset of the switch ports as a default VLAN; and

      means for transmitting packets received on one of the switch ports of the defined subset only to the other switch ports of the defined subset so as to prevent transmission to switch ports that are not in the default VLAN.

CA 02276206 1999-06-25

WO 98/29985                                          PCT/US97/24180

1/4



*FIG. 1*

CA 02276206 1999-06-25



*FIG. 2*

CA 02276206 1999-06-25

28

26

30

**FIG. 3**

CA 02276206 1999-06-25

WO 98/29985                                          PCT/US97/24180

4/4



*FIG. 4*

EXHIBIT 17

$\mathcal{8}$

| To: | **The Commissioner of Patents**<br>PO Box 200<br>WODEN  ACT  2606 | From: | **PHILLIPS ORMONDE & FITZPATRICK**<br>367 Collins Street<br>Melbourne  Victoria<br>Telephone:  (03) 9614 1944 |

Date              :    10 December, 1999
Our Reference     :    IRN 587980
Telephone Contact :    George A. Biernacki
Speed Dial 527

Sir

Re:    **CABLETRON SYSTEMS INC.**
       **Australian Patent Application No. 57276/98**

Further to the request for examination dated 18 June 1999 we lodge herewith a Statement of
Proposed Amendments.

It will be appreciated if the amendments may be considered during examination with a view to
incorporating the amendments in the application at the appropriate time.

Early consideration of the application is respectfully requested.

Respectfully,

PHILLIPS ORMONDE & FITZPATRICK                    *14 pages*

*David β Fitzpatrick*

(GAB:MJP)
Enc.

IP AUSTRALIA
RECEIVED

1 0 DEC 1999

MELBOURNE

MP C:\My Documents\MARIE\GAB\57276c.doc

10 December, 1999

**Statement of Proposed Amendments**

Re:    **CABLETRON SYSTEMS INC.**
       **Australian Patent Application No. 57276/98**

1/     Delete pages 2a and 3 presently on file and insert new pages 3, 3a and 3b filed herewith in triplicate.

2/     Delete the claims presently on file and insert new claims 1-11 filed herewith in triplicate.

Respectfully
PHILLIPS ORMONDE & FITZPATRICK

*David β Fitzpatrick*

GAB:MJP

IP AUSTRALIA
RECEIVED

1 0 DEC 1999

MELBOURNE

- 3 -

Continuing with the above example, a data packet received on a port defining the default VLAN (i.e., one of ports three through eight) and destined for another port also on the default VLAN will be transmitted to the destination port only. In the event that the data packet was destined for a port on the first VLAN
5 (i.e., port one or two), however, the packet would be transmitted to all of the ports on the switch, thus creating the above mentioned security problem.

Accordingly, it would be desirable to provide a port-based default VLAN that prevents such leakage problems between VLANs. It is among the general objects of this invention to provide such a device and method.

10 According to one aspect of the present invention there is provided a system to implement a port-based default VLAN formed on one or more interconnected networking switches each switch having one or more switch ports all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by a first subset including one or more of the
15 plurality of switch ports, the defined subset of the one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports not in the first subset of switch ports defining a second VLAN, the system including:

means for receiving a data packet through one of the default VLAN ports;
20 means for ascertaining a destination port from the received data packet, the destination port being one of the plurality of switch ports;

means for determining whether the destination port is one of the default VLAN ports;

first means, responsive to the determining means, for transmitting the
25 data packet to the destination port when the determining means determines that the destination port is one of the default VLAN ports; and

second means, responsive to the determining means, for transmitting the data packet only to each of the other default VLAN ports when the determining means determines that the destination port is not one of the default VLAN ports,
30 wherein the at least one switch port defining the second VLAN is free from receiving the data packet.

According to a further aspect of the present invention there is provided a method of limiting broadcast messages from a port-based default VLAN, the default VLAN formed on one or more interconnected networking switches, each

- 3a -

switch having one or more switch ports all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by a first subset including one or more of the plurality of switch ports, the defined first subset of one or more of the plurality of switch ports being default VLAN ports, at least

5      one of the plurality of switch ports not in the first subset of switch ports defining a second VLAN, the method including:

receiving a data packet through one of the default VLAN ports;

ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

10      determining whether the ascertained destination port is one of the default VLAN ports;

transmitting the data packet to the destination port when the destination port is one of the default VLAN ports; and

only transmitting the data packet to each of the other default VLAN ports

15      when the destination port is not one of the default VLAN ports.

According to a still further aspect of the present invention there is provided a data network assembly including:

a hub having at least two networking switches connected thereto, each switch having one or more switch ports;

20      a bus in the hub;

an enable switch to electrically connect each of the switch ports to the bus;

means for defining a subset of the switch ports as a default VLAN; and

means for transmitting packets received on one of the switch ports of the

25      defined subset only to the other switch ports of the defined subset so as to prevent transmission to switch ports that are not in the default VLAN.

According to a still further aspect of the present invention there is provided a port based default VLAN formed on a hub having at least two networking switches connected thereto, each switch having one or more switch

30      ports, the port based default VLAN including:

a bus in the hub;

an enable switch for electrically connecting each of the VLAN ports to the bus;



- 3b -

means for defining a subset of the one or more switch ports of each switch as default VLAN ports;

means for receiving, at least one of the default VLAN ports, a packet destined for a port that is not defined as one of the default VLAN ports,
5    including means for broadcasting the received packet to each of the default VLAN ports in the subset of ports defined as default VLAN ports.

A Preferred embodiment of the present invention will now be described with reference to the accompanying drawings wherein:

Figure 1 is a block schematic diagram of a partial data network assembly
10    for implementation of the invention;

Figure 2 is a block schematic diagram of a switch that forms a port-based, default VLAN;

Figure 3 is a schematic diagram of a data packet; and

Figure 4 is a flow chart that specifies the method used for preventing
15    leakage from the default VLAN.


Detailed Description Of A Preferred Embodiment


Figure 1 shows a partial data network assembly 10 for implementation of
20    the invention, comprising a hub 12 having hub ports 14, and switches 16 connected to the hub ports 14. The hub 12 may be a DEChub Multiswitch 900, available from Digital Equipment Corporation of Maynard, Massachusetts. Each of the switches 16 has a plurality of switch ports 18 (e.g., eight) connecting various network resources, such as servers, computers, and
25

- 7 -

THE CLAIMS DEFINING THE INVENTION ARE AS FOLLOWS:

1.     A system to implement a port-based default VLAN formed on one or more interconnected networking switches each switch having one or more
5     switch ports all of the switch ports collectively being a plurality of switch ports, the default VLAN being defined by a first subset including one or more of the plurality of switch ports, the defined subset of the one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports not in the first subset of switch ports defining a second VLAN, the system
10     including:

means for receiving a data packet through one of the default VLAN ports;

means for ascertaining a destination port from the received data packet, the destination port being one of the plurality of switch ports;

means for determining whether the destination port is one of the default
15     VLAN ports;

first means, responsive to the determining means, for transmitting the data packet to the destination port when the determining means determines that the destination port is one of the default VLAN ports; and

second means, responsive to the determining means, for transmitting the
20     data packet only to each of the other default VLAN ports when the determining means determines that the destination port is not one of the default VLAN ports,

wherein the at least one switch port defining the second VLAN is free from receiving the data packet.

25     2.     The system as defined by claim 1 wherein the data packet includes a header and the ascertaining means ascertains the destination port from the packet header.

3.     The system as defined in claim 1 further including means for tagging the
30     data packet as being in the default VLAN.

4.     A method of limiting broadcast messages from a port-based default VLAN, the default VLAN formed on one or more interconnected networking switches, each switch having one or more switch ports all of the switch ports

- 8 -

collectively being a plurality of switch ports, the default VLAN being defined by a first subset including one or more of the plurality of switch ports, the defined first subset of one or more of the plurality of switch ports being default VLAN ports, at least one of the plurality of switch ports not in the first subset of switch ports

5    defining a second VLAN, the method including:

receiving a data packet through one of the default VLAN ports;

ascertaining a destination port from the data packet, the destination port being one of the plurality of switch ports;

determining whether the ascertained destination port is one of the default

10    VLAN ports;

transmitting the data packet to the destination port when the destination port is one of the default VLAN ports; and

only transmitting the data packet to each of the other default VLAN ports when the destination port is not one of the default VLAN ports.

15

5.    The method as defined by claim 4 further including:

tagging the data packet as being in the default VLAN.

6.    A data network assembly including:



20    a hub having at least two networking switches connected thereto, each switch having one or more switch ports;

a bus in the hub;

an enable switch to electrically connect each of the switch ports to the bus;



25    means for defining a subset of the switch ports as a default VLAN; and

means for transmitting packets received on one of the switch ports of the defined subset only to the other switch ports of the defined subset so as to prevent transmission to switch ports that are not in the default VLAN.

30    7.    A port based default VLAN formed on a hub having at least two networking switches connected thereto, each switch having one or more switch ports, the port based default VLAN including:

a bus in the hub;

- 9 -

an enable switch for electrically connecting each of the VLAN ports to the bus;

means for defining a subset of the one or more switch ports of each switch as default VLAN ports;

5      means for receiving, at least one of the default VLAN ports, a packet destined for a port that is not defined as one of the default VLAN ports, including means for broadcasting the received packet to each of the default VLAN ports in the subset of ports defined as default VLAN ports.

10    8.    A system to implement a port-based default virtual local area network substantially as herein described with reference to the accompanying drawings.

9.    A method of limiting broadcast messages from a port-based default virtual local area network substantially as herein described with reference to the

15    accompanying drawings.

10.    A data network assembly substantially as herein described with reference to the accompanying drawings.

20    11.    A port based default virtual local area network substantially as herein described with reference to the accompanying drawings.

DATED: 9 December, 1999

25    PHILLIPS ORMONDE & FITZPATRICK
Attorneys for:
CABLETRON SYSTEM INC.

EXHIBIT 18



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 08/774,541 | 12/30/96 | ITURRALDE | C    10 | |

LM02/0921

THERESE A. HENDRICKS
WOLF, GREENFIELD & SACKS, PC
FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE
BOSTON, MA 02210-2211

| | EXAMINER |
|---|---|
| TRAN, P. | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2758 | 8 |

DATE MAILED: 09/21/98

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

| *Office Action Summary* | Application No. 08/774,541 | Applicant(s) Iturralde |
|---|---|---|
| | Examiner Philip B. Tran | Group Art Unit 2758 |

☒ Responsive to communication(s) filed on *Jun 1, 1998*

☐ This action is FINAL.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire ___*three*___ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) *1-8* _____ is/are pending in the application.

   Of the above, claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☒ Claim(s) *1-8* _____ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☒ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is  ☐approved  ☐disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

   ☐ All ☐ Some* ☐ None   of the CERTIFIED copies of the priority documents have been

      ☐ received.

      ☐ received in Application No. (Series Code/Serial Number) _____.

      ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

   *Certified copies not received: _____

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☒ Notice of References Cited, PTO-892

☒ Information Disclosure Statement(s), PTO-1449, Paper No(s). *4 and 5*

☐ Interview Summary, PTO-413

☒ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

--- SEE OFFICE ACTION ON THE FOLLOWING PAGES ---

Serial Number: 08/774541
Art Unit: 2758

Page 2
Paper No. 5

## DETAILED ACTION

### Claim Rejections - 35 USC § 112

1.    The following is a quotation of the second paragraph of 35 U.S.C. § 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

2.    Claims 1, 4 and 8 are rejected under second paragraph of 35 U.S.C. § 112 as being failing to particularly point out and distinctly claiming the subject matter which the application regards as his invention.

In claims 1 and 4, it is not clear as to what is meant by "transmitting the data packet to each of default VLAN ports if the destination port is not one of the default VLAN ports". The examiner assumes that the phrase is meant by "transmitting the data packet to each of default VLAN ports if the destination port is unknown (i.e., not defined) at the time of transmission".

In claim 8, it is not clear as to what is meant by "means for defining each of the switch ports as the default VLAN". The examiner assumes that the phrase is meant by "means for defining each of the switch ports as of the default VLAN ports".

### Claim Rejections - 35 USC § 103

3.    The following is a quotation of 35 U.S.C. § 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Serial Number: 08/774541                                              Page 3
Art Unit: 2758                                                       Paper No. 5

4.      Claims 1-8 are rejected under 35 U.S.C.103(a) as being unpatentable over Edsall et. al.

(Hereafter, Edsall), U.S. Pat. No. 5,742,604 and in view of Anderson, J.K. ("Virtual LANS Take

Network to Next Level", Computer Technology Review, Vol. 16, No. 9, Sept 1996, Pages 12-

14)

5.      As to claim 1, Edsall discloses a port based default VLAN formed on one or more

interconnected networking switches (502s and 502d, Fig. 5), each switch having one or more

switch ports (520s and 520d, Fig. 5) all of the switch ports collectively being a plurality of switch

ports, the default VLAN (B(Blue) VLAN or R(Red) VLAN, Fig. 7) being defined by one or

more of the plurality of switch ports, the one or more of the plurality of switch ports being default

VLAN ports, at least one of the plurality of switch ports defining a second VLAN, the default

VLAN comprising :

        means for receiving a data packet (i.e., SAINT circuit - Synchronous Advanced Interface

Network Termination) through one of the default VLAN ports (see Col. 4, Lines 40-50 and

Fig.1&2);

        means for ascertaining a destination port from the data packet (i.e., destination address

means in the data packet format), the destination port being one of the plurality of switch ports

(see Fig. 3);

        means for determining whether the destination port is one of the default VLAN ports (i.e.,

VLAN identifier or header information) (see Col. 5, Lines 9-12 and Col. 8, Lines 53-60 and Fig.

3);

Serial Number: 08/774541
Art Unit: 2758

Page 4
Paper No. 5

first means, responsive to the determining means, for transmitting the data packet to the destination port if the determining means determines that the destination port is one of the default VLAN ports, i.e., if the destination port (blue (**B**) VLAN port) is one of the default VLAN (blue (**B**) VLAN) ports, then data packet (received on a blue (**B**) VLAN port of switch 1) is transmitted to the destination port only (a blue (**B**) VLAN port of switch 3) (see Col. 9, Lines 16-29); and

Edsall does not clearly teach sending the data packet to the default VLAN ports only in case the destination port is not defined. However, Anderson teaches the following :

second means, responsive to the determining means, for transmitting the data packet to each of the default VLAN ports if the determining means determines that the destination port is not one of the default VLAN ports,

the at least one switch port defining the second VLAN being free from transmission, from the default VLAN, of the data packet. That is, data packet will be broadcasted to all ports of the default VLAN only and not to other ports if the destination port is not defined (see Col. 2, Lines 36-56 and the Figure next to Col.1).

It would have been obvious to one of ordinary skill in the art at the time of the invention to modify Edsall's teaching by Anderson's teaching because it would have allowed Edsall to reduce data exchanging traffic in the network and prevent data leakage to other VLANs.

Serial Number: 08/774541                                    Page 5
Art Unit: 2758                                              Paper No. 5

As to claim 2, Edsall further teaches the data packet including a header and means for ascertaining the destination port from the packet header (see Col. 5, Lines 1-12 and Fig. 3).

As to claim 3, Edsall further teaches the default VLAN as defined by claim 1 including means for tagging the data packet (see Col. 6, Lines 15-27 and Col. 7, Lines 33-44).

6.      Claim 4 and 6 are similar in scope as that of claim 1 and therefore are rejected for the same reasons set forth above for claim 1.

7.      As to claim 5, Edsall further teaches a method as defined by claim 4 including the step of :

G. Tagging the data packet (see Col. 6, Lines 15-27 and Col. 7, Lines 33-44).

8.      Claim 7 is similar in scope as that of claim 5 and therefore is rejected for the same reasons set forth above for claim 5.

9.      As to claim 8, Edsall teaches a port based default VLAN having at least two networking switches connected thereto, each switch having one or more switch ports, the port based default VLAN comprising :

a bus in the hub ( i.e., in the switch);

means for connecting each of the VLAN ports to the bus; and

means for defining each of the switch ports as of the default VLAN ports (see Fig. 1 and Fig. 3).

Serial Number: 08/774541
Art Unit: 2758

Page 6
Paper No. 5

However, Edsall does not particularly teach the VLAN formed on the hub as disclosed by Anderson (see the Figure next to Col. 1). Also, Edsall does not particularly teach the use of a specific enable switch. But, it is merely a matter of engineering choice to have means for connecting each of the VLAN ports to the bus regardless of methodological implementation of the switch by any mechanism while not changing the data packet transmission method of the invention. It would have been obvious to one of ordinary skill in the art at the time of the invention to modify Edsall's teaching by Anderson's teaching because it would enable Edsall to interconnect multiple VLAN ports by a suitable backbone transmission network.

### Other References Cited

10.    The following references cited by the examiner but not relied upon are considered pertinent to applicant's disclosure.

A) Dobbins et. al., U.S. Pat. No. 5,684,800 : Method for establishing restricted broadcast groups in a switched network.

B) Ross, U.S. Pat. No. 5,394,402 : Hub for segmented virtual local area network with shared media access.

C) Mazzola et. al., U.S. Pat. No. 5,740,171 : Address translation mechanism for a high-performance network switch.

D) Yu, U.S. Pat. No. 5,734,865 : Virtual local area network well-known port routing mechanism for mult-emulators in an open system environment.

Serial Number: 08/774541
Art Unit: 2758

Page 7
Paper No. 5

   E) Hart, U.S. Pat. No. 5,752,003 : Architecture for managing traffic in a virtual LAN

       environment.

   F) Walker, U.S. Pat. No. 5,613,069 : Non-blocking packet switching network with dynamic

       routing codes having incoming packets diverted and temporarily stored in processor inputs

       when network output is not available.

11.    Any inquiry concerning this communication or earlier communications from the examiner

should be directed to Philip Tran whose telephone number is (703) 308-8767. The examiner can

normally be reached on Monday through Friday from 8:00am to 5:00pm.

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Parsh Lall, can be reached on (703) 305-9715. The fax phone number for this Group

is  (703) 308-5356.

    Any inquiry of a general nature or relating to the status of this application should be

directed to the Group receptionist whose telephone number is (703) 305-3900.

PBT

Philip Tran
Art unit 2758
Sept  09,98

PARSHOTAM S. LALL
SUPERVISORY PATENT EXAMINER

EXHIBIT 19

Serial No. 08/774,541

Attorney's Docket No.: C0441/7868

10/G
pub
12-28

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:      Iturralde
Serial No.:     08/774,541
Filed:          December 30, 1996
For:            PORT BASED DEFAULT VIRTUAL LOCAL AREA NETWORK
Art Unit:       2758
Examiner:       Tran, P.

---

CERTIFICATE OF MAILING UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being placed in the United States mail with first-class postage attached, addressed to BOX AMENDMENT, Assistant Commissioner for Patents, Washington, D.C., 20231, on the 18th day of December, 1998.

_Lindsay G. McGuinness_
Lindsay G. McGuinness
Reg. No. 38,549

---

## AMENDMENT

BOX AMENDMENT
Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

      Please enter the below amendments and remarks in response to the Office Action dated September 21, 1998.

IN THE CLAIMS:

8. (Amended)  A port based default VLAN formed on a hub having at least two networking switches connected thereto, each switch having one or more switch ports, the port based default VLAN comprising:

a bus in the hub;

an enable switch for electrically connecting each of the VLAN ports to the bus; [and]

means for defining a subset of the one or more switch ports of each switch [each of the switch ports] as [the] default VLAN ports;

means for receiving, at at least one of the default VLAN ports, a packet destined for a port that is not defined as one of the default VLAN ports, including means for broadcasting the received packet to each of the default VLAN ports in the subset of ports defined as default VLAN ports.

## REMARKS

In response to the Office Action mailed on September 21, 1998, Applicants respectfully request reconsideration of the above identified application.  To further the prosecution of this application, Applicant submits the following remarks.

Claims 1-8 are currently pending in this application.  Claim 8 has been amended.

## Rejections Under 35 U.S.C. §112

Claim 1, 4 and 8 were rejected under 35 U.S.C. §112.  In particular, claims 1 and 3 were rejected because it was unclear to the Examiner what was meant by "transmitting the data packet to each of the default VLAN ports if the destination port is not one of the default VLAN ports".  The Examiner suggests that the claim should be re-worded to state "transmitting the data packet to each of the default VLAN ports if the destination port is unknown (i.e., no defined) at the time of transmission.  However, it is not necessary that the destination port be unknown, rather just that the destination port not be a recognized default VLAN port in order for this forwarding to occur.

2

For example, as described on page 5 of the specification:

"... Figure 2 shows an exemplary eight port switch 16 forming a default VLAN, VLAN 2 and VLAN 3. Ports one and two define the default VLAN, ports three and five define VLAN 2, and ports six to eight define VLAN 3. For example, a data packet received on port two having a destination address of port four will be transmitted to both ports one and two only..."

Thus, in the example of page 5, while the destination port of four is known, because it is received on the default VLAN, it is only forwarded to other ports on the default VLAN. As explained in the specification, limiting the forwarding of packets received on the default VLAN only to default VLAN ports precludes the leakage of packets to other ports in the network.

Therefore, Applicants believe that the language of claims 1 and 4, which describes "transmitting the data packet to each of the default VLAN ports if the determining means determines that the destination port is not one of the VLAN ports..." is clear and concise. Thus, the rejection under 35 U.S.C. §112, second paragraph with regard to claims 1 and 4 is improper and should be withdrawn.

With regard to claim 8, Applicants have amended claim 8 to recite "... means for defining a subset of the one or more switch ports of each as default VLAN ports..." in conformance with the suggestion of the Examiner. Accordingly, in view of this amendment, the rejection under 35 U.S.C. §112 has been overcome and should be withdrawn.

### Rejections Under 35 U.S.C. §103

Claims 1-8 were rejected under 35 U.S.C. §103 as being unpatentable over Edsall et al, U.S. Pat. No. 5,742,604 and in view of Anderson, J., (Virtual LANs Take Network to the Next Level", Computer Technology Review, Vol. 16, no. 9, Sept. 1996, Pages 12-14.

Edsall describes an encapsulation mechanism for efficiently transporting packets between ports of different switches in a network on the basis of VLAN associations among the ports. (see abstract) A VLAN identifier is associated with each port of the switch to facilitate segregating of communication among network entities coupled to the switch. (col. 5, lines 10-11) Multiple switches may be interconnected using a interswitch

3

link (ISL) (col. 6, lines 15-20). The ISL keeps the VLAN associations of the packets intact as they are transported over the link.

Anderson describes the general operation of virtual LANs. In particular, in the section identified by the Examiner, Anderson describes that each virtual LAN in a network is a collection of ports. All computers connected to the ports appear to be users on the same physical LAN, even though they may actually be connected to different hubs. Messages broadcast on a virtual LAN are only sent to those ports on the LAN. In particular, Anderson states, at column 2, lines 54-56 "Messages for other ports, even those on the same hub, would not be received..."

The Examiner states, at pages 4-5 of the office action:

"... It would have been obvious ... to modify Edsall's teaching by Anderson's teaching because it would have allowed Edsall to reduce data exchanging traffic in the network and prevent data leakage to other VLANs.

Applicant traverses the Examiners rejection for the following reasons.

1. Combination neither describes nor suggests the claimed invention

A. Neither Edsall nor Anderson describe or suggest a default VLAN

Neither Edsall nor Anderson describe or suggest a default VLAN, to which the claimed invention is directed. Rather, Edsall describes only, at column 5, "The VLAN identifier is associated with each port of the switch..." Similarly, Anderson describes an example wherein each port of a hub is assigned to a particular VLAN (Virtual LAN #, Virtual LAN #2, or Virtual LAN #3 in Figure on page 1). There is no description or suggestion, in either Edsall, Anderson, or the combination thereof, of the operation of a default VLAN. Accordingly, because Edsall and Anderson deal only with the transmission of defined VLAN links in a network, as opposed to the default VLAN, the claims are patentably distinct over this combination.

B. Combination neither describes nor suggests receiving, at the default VLAN a message for a port that is not in the default VLAN, and transmitting the message only to ports of the default VLAN.

4

The Examiner admits, at page 4 of the Office Action that" "...Edsall does not teach sending the data packet to the default VLAN ports only in case the destination port is not defined..." The Examiner relies on Anderson for this teaching.

However, Anderson directly teaches away from such a limitation at column 2, lines 54-56 when it states "Messages for other ports, even those on the same hub, would not be received...." Thus, Anderson teaches that only those messages received that are destined for ports defined by the virtual LAN are received at the respective VLAN and forwarded to ports of the virtual LAN (lines 52-54).

In contrast, the claimed invention clearly states that messages that are not necessarily destined for the default VLAN but are received at the default VLAN may be forwarded only to those ports of the default VLAN. Such a limitation is neither described nor suggested by the combination of Edsall and Anderson.

Accordingly, for at least the reasons put forth above, independent claims 1, 4, 6 and 8 are patentably distinct over the combination of Edsall and Anderson; and the rejection under 35 U.S.C. §103 should be withdrawn. Dependent claims 2-3, 5 and 7 serve to add further patentable limitations to their parent claims, and also are patentable for at least the reasons put forth with regard to the parent claims.

<u>Conclusion</u>

Accordingly, in view of the foregoing amendments and remarks, it is believed that this application is now in condition for allowance. A notice to this effect is respectfully requested. Should further questions arise concerning this application, the Examiner is invited to call Applicant's attorney at the number listed below.

If any fee is due for this amendment, please charge to the fee to the Deposit Account No. 23/2825.

Respectfully Submitted,

Lindsay G. McGuinness
Reg. No. 38,549
Paul D. Sorkin
Reg. No. 39,039
Attorney for Applicants
Wolf, Greenfield & Sacks P.c.
600 Atlantic Avenue
Boston Massachusetts 02210
(617) 720-3500

ATTORNEY DOCKET NO.: C0441/7868
<u>September 21, 1998</u>

6

EXHIBIT 20

US005331637A

# United States Patent [19]

## Francis et al.

[11] Patent Number: 5,331,637

[45] Date of Patent: Jul. 19, 1994

[54] **MULTICAST ROUTING USING CORE BASED TREES**

[75] Inventors: **Paul T. Francis**, Morristown, N.J.; **Anthony J. Ballardie**, Alstonefield; **Jonathan A. Crowcroft**, London, both of England

[73] Assignee: **Bell Communications Research, Inc.**, Livingston, N.J.

[21] Appl. No.: **100,634**

[22] Filed: **Jul. 30, 1993**

[51] Int. Cl.⁵ .......................... H04L 12/44; H04J 3/08

[52] U.S. Cl. ........................................ 370/54; 370/60; 370/94.3

[58] Field of Search ........................ 370/94.1, 94.3, 60, 370/54, 16; 340/827

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,740,954 | 4/1988 | Cotton et al. | 370/60 |
| 5,095,480 | 3/1992 | Fenner | 370/94.1 |
| 5,103,444 | 4/1992 | Leung et al. | 370/60 |

### OTHER PUBLICATIONS

Deering, S., "Multicast Routing in Internetworks and Extended LANs" ACM Symposium on Communication Architectures and Protocols, ACM SIGCOMM, pp. 55–64 Aug. 1988.

Wall, D., "Mechanism for Broadcast and Selective Broadcast," Jun. 1980 (PhD) thesis, Stamford University.

*Primary Examiner*—Douglas W. Olms
*Assistant Examiner*—Min Jung
*Attorney, Agent, or Firm*—Leonard C. Suchyta; James W. Falk

[57] **ABSTRACT**

A method for routing multicast packets in a network is disclosed. A node s101 wishing to join a particular multicast group transmits a packet via a sequence of nodes (r101, r102, r104, r107) including a core node r107 on the multicast tree corresponding to the particular multicast group which the node wishes to join. The packet contains a request to join the particular multicast group and the multicast address of the core node r107 of the multicast tree corresponding to the particular multicast group. The packet is received at each node r101, r102, r104, r107 of the sequence of nodes. Each node r101, r102, r104, r107 which receives the packet writes an address of the node s101, r101, r102, r104 from which the packet was received in an entry of a multicast forwarding table maintained thereat which entry is indexed by the multicast address of the core node r107. If the node r101, r102, r104 which received the packet is not on the multicast tree of the particular multicast group, the node r101, r102, r104 writes an address of the next node r102, r104, r107 of the sequence of nodes in the multicast forwarding table entry indexed by the multicast address of the core node r107. The packet is then retransmitted to the next node r102, r104, r107 of the sequence of nodes.

**16 Claims, 8 Drawing Sheets**





FIG. 1
(PRIOR ART)



*FIG. 2*
(PRIOR ART)

*FIG. 3*
(PRIOR ART)

*FIG. 4*
(PRIOR ART)

| INDEX | NEXT NODE |
|-------|-----------|
| w | c |
| x | b |
| y | b |
| v | b |
| z | b |
| u | c |



FIG. 5
(PRIOR ART)



FIG. 6

## FIG. 7



| INDEX | NEXT NODES |
|-------|------------|
|       |            |
|       |            |
| r107  | s101,r102  |
|       |            |
|       |            |
|       |            |

101-50

101-51

## FIG. 8



| INDEX | NEXT NODES |
|-------|------------|
|       |            |
|       |            |
| r107  | r101,r104  |
|       |            |
|       |            |
|       |            |

102-50

102-51

## FIG. 9



| INDEX | NEXT NODES |
|-------|------------|
|       |            |
|       |            |
| r107  | r102,r107  |
|       |            |
|       |            |
|       |            |

104-50

104-51

## FIG. 10



| INDEX | NEXT NODES |
|-------|------------|
|       |            |
|       |            |
| r107  | r104       |
|       |            |
|       |            |
|       |            |

107-50

107-51

## FIG. 11



| INDEX | NEXT NODES |
|-------|------------|
|       |            |
|       |            |
| r107  | d106,r102  |
|       |            |
|       |            |
|       |            |

103-50

103-51

## FIG. 12



| INDEX | NEXT NODES      |
|-------|-----------------|
|       |                 |
|       |                 |
| r107  | r101,r103,r104  |
|       |                 |
|       |                 |

102-50

102-51

## FIG. 14

| INDEX | NEXT NODES  |
|-------|-------------|
|       |             |
|       |             |
| r106  | d101,r105   |
|       |             |
|       |             |
|       |             |

106-50

106-51



FIG. 13

5,331,637

1

# MULTICAST ROUTING USING CORE BASED TREES

## RELATED APPLICATIONS

The following patent applications are assigned to the same assignee of the present patent application:
1. U.S. patent application Ser. No. 08/069,275 entitled "General Internet Method for Routing Packets in a Communications Network" filed May 28, 1993 for Paul Tsuchiya, and
2. U.S. patent application Ser. No. 08/033,638 entitled "Method and System for Shortcut Routing over Public Data Networks" filed Mar. 16, 1993 for Paul Tsuchiya.

The above listed patent applications contain subject matter related to the subject matter of this patent application and are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention relates to transmitting information organized into packets between nodes of a communications network. In particular, the present invention relates to multicast routing, or transmitting a single packet to each node of a distinct group of one or more destination nodes called a multicast group. The present invention provides a novel, low-overhead method for constructing and storing one multi-destination delivery route for each distinct multicast group of nodes.

## BACKGROUND OF THE INVENTION

An internet communications network 80 is depicted in FIG. 1 including five transit or backbone networks A, B, C, D, and E and three stub networks R, Y, and Z. A "backbone" network is an intermediary network which conveys communicated data from one network to another network. A "stub" network is a terminal or endpoint network from which communicated data may only initially originate or ultimately be received. Each network, such as the stub network R, includes one or more interconnected subnetworks such as I, J, L and M. As used herein, the term "subnetwork" refers to a collection of one or more nodes, e.g., (d), (a) (b, x, y), (q, v) (r, z), (s, u), (e, f, g), (h, i), (j, k, l), (m, n), and (o, p), interconnected by wires and switches for local internodal communication. Each subnetwork may be a local area network or LAN. Each subnetwork has one or more interconnected nodes which may be host computers ("hosts") u, v, w, x, y, z (shown as triangles in FIG. 1) or routers a, b, c, d, e, f, g, h, i, j, k, l, m, n, o, p, q, r, s (shown as squares in FIG. 1). A host is an endpoint node from which communicated data may initially originate or ultimately be received. A router is a node which serves solely as an intermediary node between two other nodes; the router receives communicated data from one node and retransmits the data to another node.

FIG. 2 shows a block diagram of a host or router node 10. As shown, the node may include a CPU 11, a memory 12 and one or more I/O ports 13-1, 13-2, . . . , 13-N connected to a bus 14. Illustratively, each I/O port 13-1, 13-2, . . . , 13-N is connected by wires, optical fibers, and/or switches to the I/O port of another node. The I/O ports 13-1, 13-2, . . . , 13-N are for transmitting communicated data in the form of a bitstream organized into one or more packets to another node and for receiving a packet from another node. An exemplary packet 40 is shown in FIG. 3 having a payload 41 which

2

contains communicated data and one or more headers 42 which contain control and/or address information.

A host which initially generates a packet for transmission to another node is called the source node and a host which ultimately receives the packet is called a destination node. Communication may be achieved between a single source node and a single destination node using a process called unicast routing. In unicast routing, packets are transferred via a sequence of nodes including the source node, zero or more intermediary nodes, and the destination node, in a bucket brigade fashion. For example, a packet may be communicated from the node w to the node x by transferring the packet from the node w to the node c, to the node d, to the node b, and to the node x. The particular sequence of nodes via which a packet is transmitted is also referred to as a "path". In the above example, one path from the source node w to the destination node x includes the nodes (w,c,d,b, and x).

When a source node transmits a packet to a single destination node, the source node writes the destination address of the packet in a destination address field 43 (FIG. 3) of the header 42. Illustratively, each node of the internet 80 is assigned a unique internet address which is used for identifying the node for purposes of transmitting a packet thereto. The source node then retrieves an entry from a forwarding table, such as the entry 51 of the table 50 shown in FIG. 4, which entry is indexed by the destination address of the packet. (Illustratively, the particular forwarding table 50 shown in FIG. 4 is stored at the node a.) The forwarding table stores a number of entries which entries each contains information for routing a received packet to its ultimate destination. Each indexed entry of the forwarding table indicates the next node on the path to the destination node (where the address of the destination node is used as the index to retrieve the entry). For example, at the node a, the entry 51 indicates that the next node on the path to the node y is the node b. The source node then transmits the packet to the next node on the path indicated by the retrieved entry. This process is repeated at each intermediary node until the packet arrives at the destination node.

Sometimes a source node has a packet to transmit to more than one destination node. For example, the packet may contain an electronic mail or E-mail letter to be delivered to each user of a particular mail group which users are each located at different destination nodes. Alternatively, the packet may contain voice data of a speaking teleconference participant at a source node to be simultaneously delivered to a number of listening teleconference participants located at different destination nodes. Such packets may be transmitted from the source node to each destination node according to a routing procedure depicted in FIG. 5.

FIG. 5 depicts a portion 75 of an internet. As shown in FIG. 5, a packet to be transmitted to a particular group of destination nodes d1, d2, d3, d4, d5, and d6 is transmitted from a source s1 to a first router r1. Illustratively, the router r1 connects the stub containing the source node s1 to the internet 75. The router r1 transmits the packet to the node r2. At the node r2, the packet is transmitted to the node d6 via the router r3. In addition, the router r2 transmits a copy of the packet to the router r4. The router r4 receives the copy of the packet and transmits a copy of the received packet to the destination node d1 via the nodes r5 and

5,331,637

3

r6. In addition, the router r4 transmits a copy of the received packet to the router r7. The router r7, transmits a copy of the received packet to the destination node d2 via the router r8. The router r7 transmits a copy of the received packet to the destination node d3 via the routers r9 and r10. In addition, the router r7 transmits a copy of the received packet to the router r11. The router r11 receives the packet and transmits a copy of the received packet to the destination node d4 via the router r12 and a copy of the received packet to the destination node d5 via the router r13.

The packet delivery process shown in FIG. 5 is referred to as multicast routing. In multicast routing, as a packet propagates from router to router, the packet is selectively replicated at certain routers so that sufficient copies of the packet are generated and transmitted to each destination node of a multicast group. Collectively, the paths shown in FIG. 5, i.e., the sequences of nodes which interconnect all of the nodes of a particular group form a tree called a multicast tree. A path of the multicast tree between any two nodes, e.g., the path from the node r2 to the node r11 including the nodes (r2, r4, r7, and r11) is referred to as a branch. There is only one branch on the multicast tree between any two nodes.

There are several conventional methods for implementing multicast routing, in particular, for constructing and maintaining multicast trees. See S. Deering, "Multicast Routing in Internetworks and Extended LANs," ACM Symposium on Communication Architectures and Protocols, ACM SIGCOMM, pp. 55–64, Aug., 1988. Conventionally, multicast tree construction is sender based. That is, for each multicast group, one multicast tree is constructed between each potential source node, i.e., each node that can potentially transmit multicast packets, and the corresponding destination nodes which receive packets from the source node. Appropriate routing information for each pair of a multicast group and a source node is stored at each router on each multicast tree.

In multicast tree construction, the Internet Group Management Protocol ("IGMP") may be utilized for purposes of determining which host nodes in each subnetwork desire to join which multicast groups. According to IGMP, a router node is designated as an interrogator for a subnetwork. The interrogator transmits a query packet over the associated subnetwork to each host. The hosts which receive this query packet respond by indicating of which multicast groups the hosts are members. The interrogator subsequently performs steps according to a multicast tree construction method for attaching itself to each appropriate multicast tree depending on which multicast groups were indicated by the responding host nodes of the subnetwork.

Most nodes are able to distinguish between unicast and multicast packets based on their addresses. In the Internet Protocol ("IP"), the address space is partitioned into unicast addresses and multicast addresses. Each multicast group is assigned one of the multicast addresses. A source node desiring to transmit a packet writes the multicast address of the multicast group and the unicast address of the source node in the packet header. When a node receives a packet with a multicast address, the receiving node utilizes the unicast source address of the source node and the multicast address of the multicast group contained in the packet header to retrieve the set of nodes to which the packet must be transmitted.

4

One conventional multicast tree construction method is provided in a multicast routing method called Distance-Vector Multicast Routing Protocol ("DVMRP"). This multicast tree construction method uses a modified reverse path forwarding algorithm to construct shortest path, sender-based multicast trees. A multicast tree is constructed according to DVMRP as follows. Initially, a source node transmits the first few multicast packets without using a multicast tree. Instead, the source node transmits the multicast packets in a manner such that a copy of each multicast packet is transmitted via each backbone network. For example, each router which receives one of the first few multicast packets transmits a copy of the packet to each other router attached thereto. Routers which receive these packets may indicate that they are not on a path to a destination node of the multicast group by transmitting a packet containing a special "prune" message to the router from which the multicast packet was received. A particular router may transmit a prune message if:

(1) the particular router is not directly connected to any stub networks containing a node which is a member of the multicast group of the packet, (IGMP may be utilized to determine that each stub has no member nodes of the multicast group) and

(2) the particular router is not an intermediary node on a path to a stub network containing a node which is a member of the multicast group of the packet. Such is the case if the particular router receives a prune message from each router to which the particular router transmitted a multicast packet.

For each source node-multicast group pair, each router keeps track of from which routers prune messages have been received. When a router subsequently receives packets transmitted from the same source node to the same multicast group, the router retransmits copies of the packet to only those routers which did not transmit a prune message in previous multicast communications between this source node and multicast group.

Another conventional multicast tree construction method is provided in a multicast routing method called the Link-State Multicast Routing Protocol. According to this multicast tree construction method, each router maintains information regarding each link or each direct connection to another node. In addition, for each link, each router maintains a list of each multicast group having one or more member nodes on that link, i.e., having one or more member nodes connected to the router via that link. Each router disseminates these lists for each multicast group to the other routers of the internet. Furthermore, whenever a new multicast group is added to, or an old multicast group is deleted from a link, (or the nodes interconnected via particular link changes) a designated router on that link transmits a message packet to each other router in the internet indicating the change. Because each router possesses full knowledge of which members of each group are on each link, any router receiving a multicast packet can compute an optimal multicast tree to all routers possessing links with member nodes of the multicast group of the packet. For example, if a router receives a packet from a host, the router will selectively transmit copies of the packet to other routers. Each router which receives a copy of the packet performs a consistent calculation for determining to which routers copies of the packet must be retransmitted therefrom. Invariably, the copies of the packets are received at routers having

5,331,637

5

links with member nodes of the multicast group of the packet. The copies of the packet are then transmitted via the appropriate links to the member nodes.

The conventional methods for constructing multicast trees are disadvantageous in that each utilizes a vast amount of storage space. This is because the conventional methods construct multicast trees which are source node based, i.e., a distinct multicast tree is constructed from each potential source node to the rest of the destination nodes of each multicast group. If there are N groups and S potential source nodes for each multicast group then the storage space requirement at each node is on the order of S×N. In addition, the above-mentioned conventional methods have certain specific disadvantages. In DVMRP, all routers must participate in constructing a multicast tree, even if they do not wish to be part of any multicast tree. Furthermore, the routers in DVMRP utilize a vast amount of processing resources in constructing a tree initially or modifying a tree in the event the internet is reconfigured. Likewise, in Link-State Multicast Routing, each router consumes a large amount of processing resources whenever a designated router transmits a packet to each other router of the internet which packet indicates a change in the internet or group membership. Moreover, in Link-State Multicast Routing, each router must store membership information over the entire internet.

It is an object of the present invention to overcome the disadvantages of the prior art.

## SUMMARY OF THE INVENTION

This and other objects are achieved by the present invention which provides a multicast routing method including a core based or central node based multicast tree construction method. In this approach, only one multicast tree is constructed for each multicast group no matter how many potential source nodes exist for the multicast group.

According to one embodiment, one node called the core node is designated for each multicast group. A multicast tree for each multicast group is defined to initially contain only the corresponding core node as the root of the multicast tree. As nodes join the multicast group, branches are constructed from nodes on the tree to the nodes joining the multicast group. Each core node is assigned one unicast address for designating the core node as an ordinary destination of a packet. The core node is also assigned, from the same address space as the unicast addresses, one multicast address for each multicast group for which it is designated the core node. The multicast addresses are used by nodes not on the multicast tree for routing packets the same way as unicast addresses.

The method according to this embodiment enables a particular node to join a particular multicast group as follows. A node that wishes to join a particular multicast group transmits a control packet containing a join request message and the multicast address of the core node corresponding to the particular multicast group. Illustratively, the join request control packet is transmitted towards the core node via zero or more intermediary nodes not already on the multicast tree to a node on the multicast tree according to an existing unicast routing method in the network. Each node which receives the packet writes the address of the node from which the packet was received in an entry of a forwarding table, e.g., the unicast forwarding table, maintained

6

at the receiving node. This entry of the unicast forwarding table is indexed by the multicast address of the core node contained in the packet. If the receiving node is already on the multicast tree, no steps other than the above-mentioned step need be taken. If the receiving node is not already on the multicast tree, then the receiving node also writes the address of the next node of the sequence of nodes in the same forwarding table entry indexed by the multicast address of the core node. (Illustratively, the next node may be determined according to a conventional unicast routing method. That is, the node at which the packet is located retrieves an entry from a unicast forwarding table which entry is indexed by the multicast address of the core node. The retrieved entry indicates the next node on the path to the core node.) The receiving node then retransmits the packet to the next node of the sequence of nodes.

In this process, each node of the sequence not already on the multicast tree of the particular multicast group successively attaches itself to the preceding and next nodes of the sequence thereby forming a branch. Finally, when the packet reaches a node already on the multicast tree, the branch is attached to the multicast tree.

Any source node, whether or not the source node is part of the multicast group, can transmit a data packet to each node that is a member of a particular multicast group as follows. The source node writes the multicast address of the core node corresponding to the particular multicast group in the data packet. The source node then transmits the packet. If the packet is received by a node on the multicast tree, the receiving node retrieves the forwarding table entry indexed by the destination address of the packet, i.e., indexed by the multicast address of the core node. The retrieved entry indicates one or more other nodes on the multicast tree to which copies of the received packet are to be transmitted. The receiving node transmits a copy of the received packet to each node indicated by the retrieved entry, except the node from which the packet was received. This process is repeated at each node of the multicast tree at which each of these copies of the packet is received until each packet arrives at a destination node (which destination nodes are members of the multicast group).

Illustratively, if the packet transmitted by the source node is received at a node which is not part of the multicast tree, the receiving node simply treats the packet as an ordinary unicast packet. That is, the receiving node attempts to route the packet in a conventional fashion to the core node using the destination address of the packet (the multicast address of the core node) as a unicast address. Invariably, the packet arrives at a node on the multicast tree which node transmits the packet as described above.

In short, a core based multicast routing method is disclosed in which one or more core nodes are designated as a reference for constructing one multicast tree for each multicast group. The multicast routing method according to the invention conserves storage space and processing resources at each node.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 depicts a conventional internet communications network.

FIG. 2 depicts a conventional node.

FIG. 3 depicts a conventional packet.

FIG. 4 depicts a conventional forwarding table.

FIG. 5 illustrates a multicast tree.

5,331,637

7

FIG. 6 depicts an internet according to the present invention.

FIG. 7 depicts a forwarding table at a node of the internet of FIG. 6 in the process of being added to a multicast tree.

FIG. 8 depicts a forwarding table at another node of the internet of FIG. 6 in the process of being added to a multicast tree.

FIG. 9 depicts a forwarding table at yet another node of the internet of FIG. 6 in the process of being added to a multicast tree.

FIG. 10 depicts a forwarding table at a core node of a multicast tree in the internet of FIG. 6.

FIG. 11 depicts a forwarding table at a node of the internet of FIG. 6 in the process of being added to a multicast tree.

FIG. 12 depicts a forwarding table of a node on a multicast tree to which the node having the forwarding table depicted in FIG. 11 is being added.

FIG. 13 illustrates the routing of a multicast packet using a multicast tree in an internet according to the present invention.

FIG. 14 depicts a forwarding table at a node of the internet depicted in FIG. 13 in the process of routing a multicast packet.

## DETAILED DESCRIPTION OF THE INVENTION

According to the present invention, a single multicast tree is constructed for each multicast group. Each multicast group is initially assigned a core node which serves as the root of the corresponding multicast tree. This multicast tree design philosophy parallels an analogous approach studied for low-delay broadcasting and selective broadcasting. See D. Wall, "Mechanism for Broadcast and Selective Broadcast," June 1980 (PhD thesis, Stanford University).

FIG. 6 depicts an internet 100 according to the present invention including a number of router nodes r101, r102, r103, r104, r105, r106, r107, r108, r109, r110, r111, r112, r113, r114, r115, r116, r117, r118, r119, and r120 and a number of host nodes d101, d102, d103, d104, d105, d106, s101, s102, and s103. Illustratively, a particular multicast group is formed for which the node r107 is designated the core node. The core node may be selected to be centrally located with respect to the anticipated member nodes of the multicast group although this is not necessary. The node r107 is assigned two addresses from the unicast address space. One address is used for unicast routing, the other for multicast routing. If the core node r107 receives a packet containing the unicast address of the core node r107 in the destination address field of the header of the packet, the packet is simply received as per conventional unicast routing.

Initially, the core node r107 is the only node on the multicast tree of the associated multicast group. All nodes according to the invention maintain a state indicating whether or not they are on a particular multicast tree of each multicast group. Thus, initially, the node r107 is the only node with a state indicating that it is on the multicast tree associated with the aforementioned particular multicast group. As nodes join the multicast group, branches are formed leading from a node currently on the multicast tree to each node joining the group.

The formation of these branches is now discussed by way of example. Suppose the node s101 wishes to join the particular multicast group for which the node r107

8

has been designated the core node. Illustratively, the node s101 is a host node. A host node illustratively communicates a request to join the particular multicast group to a designated router. Suppose the router r101 is the designated router for the node s101. In response to detecting a request by the source node s101 to join a particular multicast group, the router r101 illustratively generates a join request control packet containing the multicast address of the node r107 in the destination address field of the packet and a join request message. The node r101 may illustratively consult a directory to determine the multicast address of the node r107 if not already known.

The node r101 is not yet on the multicast tree of the multicast group which the node s101 wishes to join. Thus, the node r101 illustratively changes its state to indicate that it is in the process of being added to a multicast tree of the multicast group that the node s101 wishes to join. The node r101 determines the next node on the path to the core node r107, e.g., by retrieving from a unicast forwarding table (not shown) maintained at the node r101 the entry indexed by the multicast address of the core node r107. As depicted in FIG. 7, the node r101 then writes the address of the node s101 and the next node, e.g., the node r102, in a forwarding table entry 101-51 indexed by the multicast address of the core node contained in the join request control packet. Illustratively, the forwarding table 101-50 may be the same unicast forwarding table in which unicast addresses are maintained or a separate multicast forwarding table maintained at the node r101. The node r101 then transmits the join request control packet to the node r102.

Like the node r101, the node r102 is not yet on the multicast tree of the multicast group which the node s101 wishes to join. Thus, when the join request control packet is received at the node r102, the node r102 executes a similar sequence of steps as executed by the node r101. The node r102, changes its state to indicate that it is in the process of being added to the multicast tree of the particular multicast group that the node s101 wishes to join. The node r102 determines the next node on the path to the core node 107, e.g., the node r104. As depicted in FIG. 8, the node r102 then writes the addresses of the nodes r101 and the next node r104 in the entry 102-51 indexed by the multicast address of the core node 107 of a forwarding table 102-50 maintained at the node r102. The node r102 then transmits the join request control packet to the node r104.

As with the nodes r101 and r102, the node r104, is not yet on the multicast tree of the multicast group which the node s101 wishes to join. Thus, when the join request control packet is received at the node r104, the node r104 changes its state to indicate that it is in the process of being added to the multicast tree for this multicast group. The node r104 determines the next node on the path to the core node r107 which is the core node 107 itself. As depicted in FIG. 9, the node r104 then writes the addresses of the node r102 and the next node r107 in an entry 104-51 of a forwarding table 104-50 maintained at the node r104 which entry 104-51 is indexed by the multicast address of the core node 107. The node r104 then transmits the join request control packet to the core node r107.

The core node r107 is on the multicast tree of the multicast group which the node s101 wishes to join. The core node r107 maintains a "core node" status for this multicast group indicating, among other things, that

5,331,637

9                                                                                                    10

the core node r107 is on the appropriate multicast tree. As depicted in FIG. 10, upon receiving the join request control packet, the core node r107 writes the address of the node from which the packet was received, i.e., the node r104, in an entry 107-51 of a forwarding table 107-50 maintained at the node r107 which entry 107-51 is indexed by the multicast address of the core node r107. Furthermore, because the core node r107 is on the multicast tree, the core node r107 responds to the join request control packet by transmitting a join acknowledgement control packet. That is, the core node r107 generates a join acknowledgement control packet containing a join acknowledge message and transmits this packet to the node from which the join request control packet was received, i.e., the node r104.

The node r104 receives the join acknowledgement control packet and changes its state to indicate that it is on the multicast tree for the multicast group corresponding to the core node r107. The node r104 then transmits the join acknowledgement control packet to the node from which it had received the join request control packet, i.e., the node r102. Likewise, upon receiving the join acknowledgement control packet, the node r102 changes its state to indicate that it is on the multicast tree for the multicast group corresponding to the core node r107. The node r102 also transmits the join acknowledgement control packet to the node from which it received the join request control packet, namely, the node r101. The node r101 then changes its state to indicate that it is on the multicast tree corresponding to the particular multicast group. At this point, the branch is completed. The multicast delivery tree for the group containing the node s101 includes the nodes r101, r102, r104, and r107.

Suppose that after the node s101 joins the multicast group corresponding to the core node r107, the node d106 decides to join the multicast group. As above, the node d106 communicates a request to join a particular multicast group to a designated router. Illustratively, the node r107 serves as the designated node for maintaining multicast group memberships of the nodes in a stub network including the host d106. The node r107 detects a request by the node d106 to join the multicast group corresponding to the core node r107. The node r103 is not yet on the multicast tree for this multicast group. Thus, the node r103 changes its state to indicate that it is in the process of being added to the multicast tree of the particular multicast group that the node d106 wishes to join. As before, the node r103 generates a join request control packet containing the multicast address of the core node r107. The node r103 determines the next node on the path to the core node 107, e.g., the node r102. As shown in FIG. 11, the node r103 writes the address of the node d106 and the next node r102 in the entry 103-51 of a forwarding table 103-50 maintained at the node r103 which entry is indexed by the multicast address of the core node r107. The node r103 then transmits the join request control packet to the node r102.

The node r102 is already on the multicast tree for this multicast group (the node r102 maintains a state indicating that it is on the multicast tree for this multicast group). Thus, as shown in FIG. 12, the node r102 merely adds the address of the node from which the join request control packet was received (i.e., the node r103) to the entry 102-51 of the forwarding table 102-50 indexed by the multicast address of the core node 107. The node r102 then generates a join acknowledgement

control packet containing a join acknowledge message and transmits this packet to the node r103. The node r103 receives the join acknowledgement control packet and changes its state to indicate that it is on the multicast tree for the multicast group corresponding to the core node r107.

Referring to FIG. 13, the multicast routing of data packets in the internet packet is now discussed by way of example. The multicast routing method according to the present invention is very similar to the conventional multicast routing method. Only a single multicast tree is used for each multicast group of nodes regardless of which node or nodes serves as the source node of the multicast data packets.

Suppose that the aforementioned multicast group includes the nodes s101, d101, d102, d103, d104, d105, and d106. Also, suppose that the multicast tree 200, having the core node r107, is constructed for delivering packets to each of these nodes. Furthermore, suppose the node d101 wishes to transmit a multicast data packet to the multicast group of the multicast tree 200. The node d101 generates a data packet containing the data the node d101 wishes to send and also containing the multicast address of the core node r107 in the destination field of the packet. The node d101 then transmits this data packet to the node r106. Illustratively, the node d101 is part of a stub network connected to the internet via the node r106 and thus, transmits all packets destined to nodes outside the stub in which the node d101 is contained via the node r106.

As shown in FIG. 14, when the node r106 receives the data packet from the node d101, the node r106 retrieves the entry 106-51 in a forwarding table 106-50 maintained thereat indexed by the address contained in the destination address field of the data packet (the multicast address of the core node r107). As shown, this retrieved entry contains the address of the nodes d101 and r105. The node r106 then transmits a copy of the data packet to each node indicated by the retrieved entry except the node from which the packet was received. Thus, the node r106 transmits a copy of the data packet to the node r105.

When the data packet is received at the node r105, the node r105 carries out similar steps. The node r105 retrieves the entry of a forwarding table maintained at the node r105 which entry is indexed by the multicast address of the core node r107 (contained in the destination address field of the received data packet). The retrieved entry illustratively contains the addresses of the nodes r106 and the node r104. The node r105 then transmits a copy of the data packet to each of these nodes except the node from which the data packet was received, i.e., to the node r104.

When the data packet is received at the node r104, the node r104 retrieves the entry indexed by the multicast address of the core node r107 from a forwarding table maintained thereat. This retrieved entry contains the addresses of three nodes r102, r107, and r105. The node r104 then transmits a copy of the data packet to each of these nodes except the node from which the data packet was received. That is, the node r104 transmits a copy of the data packet to the node r102 and a copy of the data packet to the node r107.

The node r102 receives a copy of the data packet and transmits a copy of the received data packet to the node r103 and a copy of the received data packet to the node r101. The copy of the data packet transmitted to the node r101 is transmitted to the node s101 and the copy

5,331,637

11

of the data packet transmitted to the node r103 is transmitted to the node d106. The core node r107 receives a copy of the data packet and transmits a copy of the received data packet to the node r108, a copy to the node r109 and a copy to the node r111. The copy of the data packet transmitted to the node r108 is retransmitted to the node d102 and the copy of the data packet transmitted to the node r109 is retransmitted to the node r110 and then retransmitted again to the node d103. The node r111 retransmits a copy of the received data packet to the node r112 (which is retransmitted to the node d104) and a copy of the data packet to the node r113 (which is retransmitted to the node d105).

It is also possible for a source node that is not a member of the multicast group to transmit a data packet to each member of the multicast group. For example, suppose the node s103 wishes to transmit a data packet to the multicast group corresponding to the multicast tree **200**. The node s103 generates a data packet containing the multicast address of the core node r107 in the destination address field of the data packet. The node s103 then transmits the data packet to the node r117. Illustratively, the node s103 is in a stub network which is connected to the internet packet only by the node r117. Thus, the node s103 transmits all nodes destined to nodes outside this stub network to the node r117.

Illustratively, the node r117 is not on the multicast tree associated with the multicast group to which the data packet transmitted from the node s103 is destined. It is possible that the node r117 is adapted according to the invention (i.e., is capable of joining a multicast tree) but never received a join request control packet. Alternatively, the node r117 is not adapted according to the present invention. Nevertheless, the node r117 can forward the data packet. The node r117 treats the data packet as an ordinary unicast packet and attempts to retransmit the data packet according to some conventional unicast routing method. This is possible because the multicast addresses are drawn from the same address space as the unicast addresses. For example, the node r117 retrieves an entry from a (unicast) forwarding table maintained thereat which entry is indexed by the destination address of the data packet (which is the multicast address of the core node r107). The node r117 then retransmits the data packet to the node indicated by the retrieved entry. For example, the retrieved entry may indicate the node r115. This indicated node r115 is the next node on a unicast path to the core node r107.

The node r115 is also not on the multicast tree **200**. Like the node r117, the node r115 routes the data packet according to a conventional unicast algorithm. Illustratively, the node r115 retrieves the entry of a forwarding table maintained at the node r115 indexed by the destination address of the data packet. Illustratively, this entry indicates the node r103. The node r115 then transmits the data packet to the node r103.

The node r103 is on the multicast tree **200** of the multicast group to which the data packet is destined. Thus, the node r103 carries out similar steps described above. That is, the node r103 retrieves the entry from its forwarding table indexed by the multicast address of the core node r107 stored in the destination address field of the packet. The node r103 then transmits a copy of the data packet to each node indicated in the retrieved entry except a node from which the packet was received. In this case, the retrieved entry indicates the nodes d106 and r102. The data packet was not received from either of these nodes. Thus, the node r103 trans-

12

mits a copy of the data packet to the node d106 and a copy of the data packet to the node r102. The data packet is then transmitted via the multicast tree **200** to the other nodes s101, d101, d102, d103, d104, and d105 which are members of the multicast group in the above described fashion.

As discussed below, a node may desire to remove itself from the multicast tree. Illustratively, a particular node may remove itself from a multicast tree of a particular multicast group if and only if:

(1) the particular node is not directly connected to any nodes that are members of the particular multicast group, and

(2) the particular node has received a quit request message from each node directly connected thereto except the next node on the branch from the particular node to the core node. (As stated above, there is only one branch, i.e., path on the multicast tree, between any two nodes on the multicast tree)

A node which satisfies the above criteria may generate a quit request control packet containing the multicast address and a "quit-request" message. The node transmits the quit request control packet to the next node on the branch to the core node. The quit request control packet is received at the next node which deletes the address of the requesting node from the forwarding table entry indexed by the multicast address of the core node. Furthermore, the next node transmits a quit acknowledgement control packet containing a "quit-acknowledge" message and the multicast address of the core node to the node requesting to be removed from the tree. Upon receiving the quit acknowledgement control packet, the node desiring removal from the multicast tree may delete the entry indexed by the multicast address of the core node from its forwarding table.

At times, a non-core node on a branch of the multicast tree may fail. Another node connected to the failed node which other node is not on the branch between the failed node and the core node may detect the failure. This other node may transmit a flush tree control packet containing a "flush-tree" message and the multicast address of the core node to each node connected to the node which detected the failure (except the failed node). Nodes which receive such a flush tree control packet may reattempt to attach themselves to the multicast tree in the above described manner.

Alternatively, auxiliary core nodes are provided in the event of a failure. Illustratively, in this arrangement a single core based multicast tree may initially have a primary core node and one or more auxiliary core nodes. Each auxiliary core node is assigned a unicast address and a unique multicast address. Furthermore, the auxiliary core nodes are assigned a priority in decreasing order. Initially each auxiliary core node attempts to establish a path to the primary core node, e.g., by transmitting a join request control packet as described above. If a particular auxiliary core node is unsuccessful in establishing a path to the primary core node, the particular auxiliary core node attempts to establish a path to each auxiliary core node in decreasing order of priority until a path is established to another auxiliary core node. While attempting to form such a path, an auxiliary core node may receive a join request control packet generated by some other node. In such a case, the auxiliary core node transmits a redirect control packet to the node which initially gener-

5,331,637

13                                                                14

ated the received join request control packet. The redirect control packet transmitted from the auxiliary core node contains a message indicating that no packets should be transmitted to this auxiliary core node.

If auxiliary core nodes are provided, the particular node connected to a failed node may elect not to inform each other node of the failure. Instead, the particular node may attempt to rejoin the multicast tree by transmitting a join request control packet to each auxiliary core node in descending priority until the particular node successfully rejoins the multicast tree.

In the multicast tree construction process described above, a branch is formed by transmitting a "join request" control packet from a node that wishes to join a multicast group to the multicast tree and by transmitting a "join acknowledgement" control packet in the other direction. It is also possible to transmit only the join request control packet. Each intermediary node not already on the multicast tree which receives the join request control packet changes directly to a state indicating that it is on the multicast tree for the particular multicast group. However, the request-acknowledgement process described above provides the ability to prevent loops from occurring amongst the nodes which deliver the multicast packets. A loop is a circular path which causes a packet to return to node on the path from which node the packet has already been transmitted. Generally, most unicast algorithms provide for loop prevention in forming the unicast routing paths between each node (which paths are stored in the forwarding tables of the nodes). Occasionally, the interconnection of nodes in the internet packet is modified after these paths are determined so that a loop is created. Most unicast algorithms eventually detect and remove such loops by revising the paths containing these loops. Because such loops are short lived, they are referred to as transient loops.

Such transient loops can disrupt the construction of multicast trees by introducing loops in the multicast delivery paths. There are three cases to consider:

(1) A join request control packet is transmitted via a transient loop containing only nodes not on the multicast tree. In this case, the join request control packet never arrives at a node already on the multicast tree and thus no join acknowledge message is sent.

(2) A join request control packet is transmitted from a node not on the multicast tree nor attempting to rejoin the multicast tree (for example, as a result of a node failure) via a transient loop including some nodes already on the multicast tree and at least one node not already on the multicast tree. In this case, the node of the multicast tree which receives the join request control packet transmits a join acknowledgement control packet back to the node wishing to join the multicast tree. No further action is required because a loop free path exists from the node wishing to join the multicast tree to the multicast tree.

(3) A join request control packet is transmitted from a node attempting to rejoin a tree via a transient loop including only nodes already on the multicast tree. If a node on the multicast tree responded to such a packet, a loop would form. Thus, a loop detection mechanism is required for this specific case.

Illustratively, loop detection is achieved as follows. A join request control packet illustratively also has an active flag and a rejoin flag. The purpose of the active flag is to indicate whether or not the join request control packet has been received by a node on the multicast tree. A node not already on the multicast tree which generates a join request control packet sets the active flag to indicate that the join request control packet has not yet been received by a node on the multicast tree. The active flag is cleared when the join request control packet arrives at a node already on the multicast tree.

The purpose of the rejoin flag is to indicate that the node which generated the join request control packet is attempting to rejoin the multicast tree, for example, to circumvent a failed node on the branch to the core node. When a node rejoins the multicast tree, the node transmits a join request control packet with the rejoin flag set to indicate that the node is attempting to rejoin the multicast tree (and the active flag cleared to indicate that the join request control packet has not yet been received by a node on the multicast tree). If a node on the multicast tree receives a join request control packet with a cleared active flag and a set rejoin flag, the node retransmits the join request control packet to each node on the multicast tree connected thereto except the node from which the packet was received.

Thus, when a node attempts to rejoin a multicast tree, the node generates a join request control packet with a set active flag and a set rejoin flag. When the packet is received at a node on the multicast tree, the receiving node clears the active flag and transmits a join acknowledgement control packet back to the node which generated the join request control packet. Furthermore, because the rejoin flag is set, the receiving node retransmits a copy of the join request control packet to each node on the multicast tree connected thereto. Each node on the multicast tree which receives a copy of the join request control packet retransmits a copy of the received packet to each node on the multicast tree connected thereto (except the node from which the packet was received).

If the join request control packet returns to the node wishing to rejoin the multicast tree (which originally generated and transmitted the join request control packet) then a loop exists including only nodes on the multicast tree. In such a case, the node wishing to rejoin the tree must transmit a quit request control packet. After the passage of time, the transient loop may be removed from the internet. Thus, the node wishing to rejoin the multicast tree may reattempt to rejoin the multicast tree after waiting some period of time.

In the above examples, only one core is designated as the primary core of each multicast tree. It is also possible to designate several primary cores, particularly if many of the member nodes of the multicast group are separated by many intervening nodes in the internet. Illustratively, each primary core node is strategically placed in the vicinity of dense populations of multicast group members. Each primary core must be connected to at least one other primary core and elaborate connection maintenance protocols may be provided for detecting and repairing connection failures. However, because complex failure scenarios are possible, it is more desirable to provide single core node trees.

In another embodiment, only a unicast address is assigned to the core node from the single address space. A multicast address is assigned to the multicast group from another address space. In this embodiment, the multicast address is not initially written in the destination address field of a multicast control or data packet.

5,331,637

**15**

This is because not every node of the internet (in particular, nodes not adapted according to this embodiment of the present invention) will be able to route the packet using the multicast address of the multicast group. Instead, the node generating the packet writes the unicast address of the core node in the destination address field and the multicast address in an options field of the packet header. Thus, the data packet initially contains two addresses. When the packet is received at a node already on the multicast tree, the receiving node writes the multicast address (contained in the options field of the packet) in the destination address field of the packet. The nodes on the multicast tree then use the multicast address to route the packet. Otherwise, the above multicast tree construction and multicast routing processes are the same as discussed above.

In short, a core based multicast routing method is disclosed in which a single multicast tree is constructed for each multicast group of nodes. Initially, the multicast tree includes only a single core node which is assigned a unicast address and a multicast address. A branch to a node wishing to join the multicast group is formed by transmitting a join request control packet containing a join request message and the multicast address of the core node via a sequence of nodes. Each node of this sequence writes the address of the previous and next nodes of the sequence in an entry of a multicast forwarding table maintained thereat indexed by the multicast address of the core node. A multicast data packet can then be routed using the multicast tree by transmitting the data packet to the multicast tree containing the multicast address of the packet. Each node on the multicast tree then retransmits a copy of the data packet to each node indicated by the entry in the forwarding table thereat indexed by the multicast address of the packet. The multicast routing method according to the present invention greatly reduces the storage requirements at each node.

Finally, the present invention has been described above with reference to illustrative embodiments. Numerous other embodiments may be devised by those having ordinary skill in the art without departing from the spirit and scope of the following claims.

We claim:

1. A method for enabling a particular node to join a particular multicast group of nodes in a network comprising a plurality of nodes, said method comprising the steps of:

transmitting from said particular node a join request control packet indicating a multicast address of a core node on a multicast tree corresponding to said multicast group,

receiving said join request control packet at another node,

writing an address of the node from which said join request control packet was received in an entry of a forwarding table maintained at said other node, which entry is indexed by said multicast address of said core node, and

if said other node is not already on said multicast tree of said particular multicast group, writing an address of a next node on a path to said core node in said forwarding table entry indexed by said multicast address of said core node and retransmitting said packet from said other node to said next node.

2. The method of claim 1 further comprising the step of:

**16**

retrieving an entry from a unicast forwarding table maintained at said other node, which entry is indexed by said multicast address of said core node, wherein said retrieved entry indicates said next node on said path to said core node.

3. The method of claim 1 further comprising the step of:

deleting a specific node on said multicast tree by transmitting from said specific node to an adjacent node on a branch to said core node a quit request control packet requesting to be deleted from said multicast tree.

4. The method of claim 3 wherein said specific node requests to be deleted from said multicast tree if said specific node is not directly connected to any nodes which are members of said particular multicast group, and if said specific node is not on a path between a member of said particular multicast group and said core node.

5. The method of claim 3 further comprising the step of:

at said adjacent node, deleting an address of said specific node from an entry of a forwarding table maintained at said adjacent node.

6. The method of claim 1 wherein said multicast tree includes one or more interconnected auxiliary core nodes connected to said core node, said auxiliary core nodes being assigned a priority in descending order, said method further comprising the step of:

(a) if a specific node on said multicast tree detects a failed node on a branch to said core node, transmitting from said specific node a join request control packet to said auxiliary core node having the highest priority, and p1 repeating step (a) for each auxiliary core node in descending priority until said specific node rejoins said multicast tree.

7. The method of claim 1 further comprising the step of:

if a specific node on said multicast tree detects a failure on a branch to said core node, transmitting a flush tree control packet to each other node on said multicast tree connected to said specific node to cause said other nodes to rejoin said multicast tree.

8. The method of claim 1 wherein said packet transmitted from said particular node indicates that said particular node is rejoining said multicast tree and said method further comprises the steps of:

detecting at said particular node wishing to rejoin said multicast tree, a loop including only nodes on said multicast tree, and

transmitting to a next node on a branch to said core node a quit request control packet to eliminate said loop.

9. The method of claim 8 further comprising the step of:

if said join request control packet transmitted from said particular node returns to said particular node, determining that a loop exists including only nodes on said multicast tree.

10. The method of claim 8 further comprising the steps of:

receiving said join request control packet at said other node already on said multicast tree, and

retransmitting a copy of said received join request control packet to each other node on said multicast tree connected to said other node.

5,331,637

**17**

11. The method of claim 1 wherein said multicast tree comprises a plurality of core nodes which each have a unique multicast address.

12. A method for enabling a particular node to join a particular multicast group of nodes in a network, said multicast group having a multicast tree including a core node, said method comprising the steps of:

transmitting a join request control packet containing a multicast address of said core node from said particular node to a node already on said multicast tree using unicast routing,

at said node already on said multicast tree, writing an address of the node from which said join request control packet was received in an entry of a forwarding table maintained at said node already on said multicast tree, which entry is indexed by said multicast address of said core node, and

transmitting a join acknowledgement control packet to said particular node.

13. The method of claim 12 further comprising the step of:

prior to receiving said join request control packet at said node already on said multicast tree, receiving said packet at a node not yet on said multicast tree,

writing in an entry of a forwarding table maintained at said node not yet on said multicast tree, which entry is indexed by said multicast address of said core node, an address of the node from which said join request control packet was received and an address of a next node on a path to said node already on said multicast tree, and

transmitting said join request control packet to said next node.

14. The method of claim 13 further comprising the steps of:

receiving said join acknowledgement control packet at said node not yet on said multicast tree,

maintaining a state indicating that said node not yet on said multicast tree is on said multicast tree, and

retransmitting said join acknowledgement packet to said particular node.

15. A method for transmitting a data packet to a multicast group of nodes in a network using a multicast tree of nodes associated with said group comprising the steps of:

**18**

at each node on a multicast tree corresponding to said multicast group, retrieving an entry from a forwarding table maintained at each node and indexed by a multicast address of a core node indicated by said data packet, and transmitting a copy of said data packet to each node indicated by said retrieved entry except a node from which said packet was received.,

said multicast tree having been constructed by the steps of:

transmitting from a particular node wishing to join said particular multicast group a join request control packet indicating a multicast address of said core node, receiving said join request control packet at another node, writing an address of the node from which said join request was received in an entry of a forwarding table maintained at said other node, which entry is indexed by said multicast address of said core node, and if said other node is not already on said multicast tree of said particular multicast group, writing an address of a next node on a path to said core node in said forwarding table entry indexed by said multicast address of said core node and retransmitting said packet form said other node to said next node.

16. A method for transmitting a data packet from a source node which is not a member of a multicast group of nodes to a multicast group of nodes in a network using a multicast tree of nodes associated with said group comprising the steps of:

transmitting said data packet containing a multicast address of a core node on said multicast tree from said source node to a node on said multicast tree using unicast routing,

said packet being transmitted on said multicast tree by the steps of:

at each node on a multicast tree corresponding to said multicast group, retrieving an entry from a forwarding table maintained at each node and indexed by said multicast address of a core node indicated by said data packet, and transmitting a copy of said data packet to each node indicated by said retrieved entry except a node from which said packet was received.

*  *  *  *  *

EXHIBIT 21

# Multicast Routing in Internetworks and Extended LANs

Stephen E. Deering
Computer Systems Laboratory
Stanford University

## Abstract

Multicasting is used within local-area networks to make distributed applications more robust and more efficient. The growing need to distribute applications across multiple, interconnected networks, and the increasing availability of high-performance, high-capacity switching nodes and networks, lead us to consider providing LAN-style multicasting across an internetwork. In this paper, we propose extensions to two common internetwork routing algorithms—distance-vector routing and link-state routing—to support low-delay datagram multicasting. We also suggest modifications to the single-spanning-tree routing algorithm, commonly used by link-layer bridges, to reduce the costs of multicasting in large extended LANs. Finally, we show how different link-layer and network-layer multicast routing algorithms can be combined hierarchically to support multicasting across large, heterogeneous internetworks.

## 1 Introduction

The multicast capability of local-area networks such as Ethernet [8] provides two important benefits to distributed applications:

1. When an application must send the same information to more than one destination, multicasting is more efficient than unicasting: it reduces the transmission overhead on the sender and the network, and it reduces the time it takes for all destinations to receive the information.

2. When an application must locate, query, or send information to one or more hosts whose addresses are unknown or changeable, multicasting serves as a simple, robust alternative to configuration files, name servers, or other binding mechanisms.

Multicasting applications have proliferated in those environments in which the multicast capability has been made available to application programmers, whether in the form of process groups in the V System [5], UDP broadcast sockets in Berkeley UNIX [20], or NetBIOS multicast datagrams in MS-DOS [16]. In some cases, multicasting has played an important role in organizing the underlying operating systems and protocols themselves, as well

as being offered as a service for applications.[1]

For networks in which all hosts share a common transmission channel, such as bus, ring, or satellite networks, the multicast capability is provided trivially and at the same cost to the network as unicasting. When such networks are interconnected by store-and-forward packet switches, multicasting across the resulting internetwork often requires the commitment of additional switching and transmission resources, beyond those required for unicasting. However, as those resources become more abundant, in the form of fast packet switches, cheap memories, and high-bandwidth local and long-haul communication links, an economic argument for denying users the benefits of an internetwork multicast capability becomes harder to sustain.

Link-layer bridges, such as the DEC LANBridge 100 [12] and the Vitalink TransLAN [11], have taken advantage of the improving economics of communication to extend LAN performance and LAN functionality—including multicast—across multiple networks. That is not yet the case with network-layer routers, such as DoD IP Gateways [14] or ISO Intermediate Systems [18]. Therefore, when moving multicast-based applications to an environment that includes network-layer routers, it is currently necessary to give up the efficiency of multicasting and to replace the flexible binding capability of multicasting with more complicated or fragile mechanisms. This paper addresses that problem by proposing extensions to two common routing algorithms used by network-layer routers—distance-vector routing and link-state routing—to provide LAN-style multicasting across datagram-based internetworks. We also suggest modifications to link-layer bridge routing to improve the efficiency of multicasting in large extended LANs.

In the next section of this paper we define what we mean by "LAN-style multicasting." In Section 3 we describe the environment in which multicast routing is to take place. Then follow three sections, describing specific multicast extensions to the single-spanning-tree, distance-vector, and link-state routing algorithms. In Section 7, we describe how a variety of link-layer and network-layer multicast routing schemes may be combined to support multicasting in a large, heterogeneous internetwork. In Section 8 we call attention to other work in the same area, and in the concluding section we summarize our results and point the way to further work.

---

[1] Some of these systems have implemented multicasting by using the local-area network's *broadcast* facility, relying on software filtering in the receiving hosts. This approach incurs undesirable overhead on those hosts that must receive and discard unwanted packets, overhead that gets worse as more and more applications use multicasting. Fortunately, this problem can be avoided in modern LANs, such as Ethernet and other networks conforming to the IEEE 802.15 standards, which provide multicast addresses that can be recognized and filtered by host interface hardware.

Permission to copy without fee all or part of this material is granted provided that the copies are not made or distributed for direct commercial advantage, the ACM copyright notice and the title of the publication and its date appear, and notice is given that copying is by permission of the Association for Computing Machinery. To copy otherwise, or to republish, requires a fee and/or specific permission.

© 1988 ACM 0-89791-279-9/88/008/0055    $1.50

## 2 Desired Properties for Internetwork Multicasting

Existing multicast-based distributed applications have been developed in the LAN environment. To support the migration of such applications to an internetwork environment, it is desirable to retain, to the degree possible, the following important properties of LAN multicasting:

- *Group addressing.* In a LAN, a multicast packet is sent to a group address which identifies a set of destination hosts. The sender need not know the membership of the group and need not itself be a member of the group. There is no restriction on the number or location of hosts in a group. Hosts can join and leave groups at will, with no need to synchronize or negotiate with other members of the group or with potential senders to the group.

  With such group addressing, multicasting can be used for such purposes as locating a resource or a server when its specific address is unknown, searching for information among a dynamically-changing set of information providers, or distributing information to an arbitrarily-large, self-selected set of information consumers.

- *High probability of delivery.* In a LAN, the probability that a member of a group successfully receives a multicast packet sent to the group is usually the same as the probability that the member successfully receives a unicast packet sent to its individual address. Furthermore, that probability of successful reception by every member is very high, in the absence of partitioning. This property allows the designers of end-to-end reliable multicast protocols to assume that a small number of retransmissions of a multicast packet will result in successful delivery to all destination group members that are up and reachable. The probability of damage, duplication, or misordering of multicast packets in a LAN is very low, but not necessarily zero; recovery from such events is also the responsibility of end-to-end protocols, to the extent required by particular applications.

  The probability of successful multicast delivery in an internetwork may well decrease as the distance between sender and group members increases, but it must stay within bounds that allow successful recovery by end-to-end protocols.

- *Low delay.* LANs impose very little delay on the delivery of multicast packets. This is an important property for a number of multicast applications, such as distributed conferencing, parallel computing, and resource location. Also, the delay between when a host decides to join a group and when it can start receiving packets addressed to that group, called the *join latency*, is very low in a LAN, usually just the time required to update a local address filter. Low join latency is important for certain applications, such as those that use multicasting to communicate with migrating processes or mobile hosts.

  The delay properties of large internetworks are, inevitably, worse than LANs because of their greater geographic extent and their greater number of links and switches. However, the use of high-speed packet switches and low-delay long distance communication links such as optical fibers has the potential to significantly reduce the gap between local-area network and internetwork delay characteristics. In order to

exploit that potential, it is important that internetwork multicast routing algorithms produce low-delay routes, in preference to routes that maximize bandwidth or minimize network resource consumption. The availability of bandwidth and other network resources keeps improving; delay is the limiting factor for wide-area communication.

The large scale and multi-hop nature of internetworks motivates a simple extension to LAN multicasting semantics to allow senders to limit the distance a multicast packet may travel. Internetwork datagram protocols, such as DoD IP [24] and ISO CLNP [17], include a *time-to-live* (TTL) field in the packet header for the purpose of bounding the amount of time a packet may be in transit. By using a very small TTL value, a sender may limit the "scope" of a multicast packet to reach nearby group members only.[2] This can be of benefit to the internetwork, by reducing the amount of multicast traffic that has to be carried long distances, and it can be of benefit to the sender, by reducing the number of responders when querying a large group. Even when it is desired to reach an entire group, if the sender knows that all the members are nearby, use of a small TTL can help to reduce the delivery costs incurred under some multicast routing schemes.

## 3 Assumed Environment for Internetwork Multicasting

We assume an environment of multi-access networks (LANs and, possibly, satellite networks) interconnected in an arbitrary topology by packet switching nodes (bridges and/or routers). Point-to-point links (both physical links such as fiber-optic circuits and virtual links such as X.25 virtual circuits) may provide additional connections between the switching nodes, or from switching nodes to isolated hosts, but almost all hosts are directly connected to LANs.

The LANs are assumed to support *intra*network multicasting. The hosts have address filters in their LAN interfaces which can recognize and discard packets destined to groups in which the hosts have no interest, without interrupting host processing. Bridges and routers attached to LANs are capable of receiving *all* multicast packets carried by the LAN, regardless of destination address.

Link-layer bridges perform their routing function based on LAN addresses that are unique across the collection of interconnected LANs. Network-layer routers perform routing based on globally-unique internetwork addresses which are mapped to locally-unique LAN addresses for transmission across particular LANs. We assume that globally-unique internetwork *multicast* addresses can be mapped to corresponding LAN multicast addresses according to LAN-specific mapping algorithms. Ideally, each internetwork multicast address maps to a different LAN address; in cases where address-space constraints on a particular LAN force a many-to-one mapping of internetwork to LAN multicast addresses, the hosts' address filters may be less effective, and additional filtering must be provided in host software.

---

[2]An interesting and useful application of TTL scope control is "expanding ring searching", a concept described by Boggs in his dissertation on internetwork broadcasting [3]. An example of its use is searching for the nearest name server: a host multicasts a name server query, starting with a TTL that reaches only its immediate neighborhood, and incrementing the TTL on each retransmission to reach further and further afield, until it receives a reply.

## 4   Single-Spanning-Tree Multicast Routing

Link-layer bridges [11, 12] transparently extend LAN function-
ality across multiple interconnected LANs, possibly separated
by long distances. To maintain transparency, bridges normally
propagate every multicast and broadcast packet across every seg-
ment of the extended LAN. This is considered by some to be a
*disadvantage* of bridges, because it exposes the hosts on each
segment to the total broadcast and multicast traffic of all the seg-
ments. However, it is the misguided use of broadcast packets,
rather than multicast packets, that is the threat to host resources;
multicast packets can be filtered out by host interface hardware.
Therefore, the solution to the host exposure problem is to convert
broadcasting applications into multicasting applications, each us-
ing a different multicast address.

Once applications have been converted to use multicast, it
is possible to consider conserving bridge and link resources by
conveying multicast packets across only those links necessary to
reach their target membership. In small bridged LANs, bridge
and link resources are usually abundant; however, in large ex-
tended LANs that include lower-bandwidth long-haul links or
that have a lot of multicast traffic for groups that reside in small
sub-regions of the extended LAN, it may be of great benefit not
to send multicast packets everywhere.

Bridges typically restrict all packet traffic to a single spanning
tree, either by forbidding loops in the physical topology or by
running a distributed algorithm among the bridges to compute
a spanning tree [23]. When a bridge receives a multicast or
broadcast packet, it simply forwards it onto every incident branch
of the tree except the one on which it arrived. Because the tree
spans all segments and has no loops, the packet is delivered
exactly once (in the absence of errors) to every segment.

If bridges knew which of their incident branches led to mem-
bers of a given multicast group, they could forward packets des-
tined to that group out those branches only. Bridges are able to
learn which branches lead to *individual* hosts by observing the
source addresses of incoming packets. If group members were to
periodically issue packets with their group address as the source,
the bridges could apply the same learning algorithm to group
addresses.

For example, assume that there is an *all-bridges* group B to
which all bridges belong. Each host that is a member of a group
G may then inform the bridges of its membership by periodically
transmitting a packet with source address G, destination address
B, packet type *membership-report*, and no user data.

Figure 1 shows how this works in a simple bridged LAN with
a single group member. LANs a, b, and c are bridged to a
backbone LAN d. Any membership report issued by the one
group member on LAN a is forwarded to the backbone LAN d
by the bridge attached to a, to reach the rest of the *all-bridges*
group. There is no need to forward the membership report to
LANs b or c because they are leaves of the spanning tree which
do not reach any additional bridges. (Bridges are able to identify
leaf LANs either as a result of their tree-building algorithm or
by periodically issuing reports of their own membership in the
the *all-bridges* group.)

After the membership report has reached all bridges, they each
know which direction leads to the member of G, as illustrated
by the arrows in Figure 1. Subsequent transmission of multicast
packets destined to G are forwarded only in the direction of that
membership. For example, a multicast packet to G originating



Figure 1: Bridged LAN with One Group Member



Figure 2: Bridged LAN with Two Group Members

on LAN b will traverse d and a, but not c. A multicast to G
originating on a will not be forwarded at all.

Figure 2 shows the state of bridge knowledge after a second
member joins the group on LAN b. Now multicast packets to G
will be conveyed towards LANs a and b, but not towards c.

This multicast routing algorithm requires little extra work or
extra space in the bridges. Typical learning bridges maintain a
table of *unicast* addresses. Each table entry is a triple:

(*address, outgoing-branch, age*)

where the *age* field is used to detect stale data. The source
address and source branch of each incoming packet is installed
in the table, and the destination address of each arriving unicast
packet is looked-up in the table to determine an outgoing branch.
To support multicasting, the table must also hold multicast ad-
dresses. As seen in Figure 2, a single multicast address may have
multiple outgoing branches (and *age* fields, as discussed below),
so the table entries become variable-length records of the form:[3]

(*address, (outgoing-branch, age),*
     (*outgoing-branch, age*), ...)

An arriving group membership report causes a table entry for
its source address to be installed or updated. The destination
address of an arriving multicast packet is looked-up in the table
to determine the set of outgoing branches. The branch over
which the multicast packet arrived is always deleted from the set
of outgoing branches before forwarding.

The *age* field in table entries for multicast addresses is handled
somewhat differently than for unicast addresses. When a bridge
receives a unicast packet, if its destination address is absent from
the table, or if its table entry has expired (i.e., its *age* exceeds
some threshold), the packet is forwarded out *all* branches except
the incoming one. It is expected that responding traffic from
the destination will later allow the bridge to learn its location.
When a bridge receives a multicast packet, on the other hand,
it forwards the packet over only those branches that are identi-
fied by non-expired table entries. Expired entries are treated as
evidence that there are no longer any members reachable over
that branch. Therefore, group members must regularly report
their memberships at intervals less than the membership expiry
threshold.

---

[3]Many bridges are designed to connect only two, or some other small number,
of links; for them, it may be acceptable to use fixed, maximum-sized records, in
order to simplify memory management.

The overhead of membership reporting traffic is determined by the choice of reporting interval $T_{report}$—the larger $T_{report}$, the less the reporting overhead. On the other hand, choosing a large $T_{report}$ has the following drawbacks:

- The expiry threshold $T_{expire}$ for bridge table entries should be a multiple of $T_{report}$ in order to tolerate occasional loss of membership reports. The larger $T_{expire}$, the longer a bridge will continue to forward multicast packets onto a particular branch after there are no longer any members reachable along that branch. This is not particularly serious, given that hosts are protected from unwanted traffic by their address filters.

- If a host is the first member of a group on a particular LAN and its first one or two membership reports are lost due to transmission errors, the bridges will be unaware of its membership until one or two times $T_{report}$ has passed. This fails to meet the goal of low join latency, stated in Section 2. It can be avoided by having hosts issue several membership reports in close succession when they first join a group.

- If the spanning tree changes due to a bridge or LAN coming up or going down, the multicast entries in the bridge tables may become invalid for as long as $T_{expire}$. This problem can be avoided by having the bridges revert to broadcast-style forwarding for a period of $T_{expire}$ after any topology change.

Therefore, none of these drawbacks is serious enough to prevent the use of a relatively large $T_{report}$, say on the order of minutes rather than seconds.

There is another technique that can be used to reduce the reporting traffic, apart from increasing $T_{report}$. When issuing a membership report for group $G$, a host initializes the destination address field to $G$, rather than the *all-bridges* address. The bridge(s) directly attached to the reporting member's LAN then replace the $G$ with the *all-bridges* address before forwarding to the other bridges. (A bridge can recognize such reports by the fact that the source and destination are the same group address.) This allows other members of the same group on the same LAN to overhear the membership report and suppress their own, superfluous reports. In order to avoid unwanted synchronization of membership reports, whenever such a report is transmitted on a LAN all members of the reported group on that LAN set their next report timer to a random value in a range around $T_{report}$. The next report for that group is issued by whichever member times out first, at which time new random timeouts are again chosen. Thus, the reporting traffic originating on each LAN is reduced to one report per group present, rather than one report from *every member* of every group present, in every $T_{report}$ period. This is a significant reduction in the common case where a single group has more than one member on a single LAN.

To get a feeling for the costs of this algorithm, assume that a typical extended LAN consists of 10 segments, on which each host belongs to 5 groups, each segment has members of 20 different groups, there are 50 groups in total, and the membership reporting interval $T_{report}$ is 200 seconds. Then:

- The overhead on hosts is the transmission or reception of one membership report packet every 40 seconds.

- The overhead on leaf segments and on bridge interfaces to leaf segments is one membership report packet every 10 seconds.

- The overhead on non-leaf segments and on bridge interfaces to non-leaf segments is the sum of the reporting traffic from each segment, that is one membership report packet every second.

- The storage overhead in each bridge is 50 group address entries.

Such costs are insignificant compared to the available bandwidth and bridge capacity in current extended LAN installations. Furthermore, the overheads on hosts and leaf segments are independent of the total number of segments; extended LANs with hundreds of segments would see greater overheads only on the "backbone" segments, not on the (presumably) more numerous leaf segments to which most hosts would be connected.

The bridge multicast routing algorithm as described requires that hosts be modified to issue membership reports for those groups they belong to. This compromises the transparency property that is one of the important features of link-layer bridges. However, if hosts are to be modified anyway to use multicast rather than broadcast, the membership reporting protocol might reasonably be implemented at the same time. The reporting is best handled at the lowest level in the host operating system, such as the LAN device driver, in order to minimize host overhead. Future LAN interfaces might well provide the membership reporting service automatically, without host involvement, as a side-effect of setting the multicast address filter. Conversely, non-conforming hosts might be accommodated by allowing manual insertion of membership information into individual bridge tables.

## 5 Distance-Vector Multicast Routing

The distance-vector routing algorithm, also known as the Ford-Fulkerson [9] or Bellman-Ford [2] algorithm, has been used for many years in many networks and internetworks. For example, the original Arpanet routing protocol [22] was based on distance-vector routing, as was the Xerox PUP Internet [4] routing protocol. It is currently in use by Xerox Network Systems internetwork routers [27], some DARPA Internet core gateways [14], and numerous UNIX systems running Berkeley's *routed* internetwork routing process [13], to name only a few.

Routers that use the distance-vector algorithm maintain a routing table which contains an entry for every reachable destination in the internetwork. A "destination" may be a single host, a single subnetwork, or a cluster of subnetworks. A routing entry typically looks like:

$$(destination, distance, next\text{-}hop\text{-}address,$$
$$next\text{-}hop\text{-}link, age)$$

*Distance* is the distance to the destination, typically measured in hops or some other unit of delay. *Next-hop-address* is the address of the next router on the path towards the destination, or the address of the destination itself if it shares a link with this router. *Next-hop-link* is a local identifier of the link used to reach *next-hop-address*. *Age* is the age of the entry, used to time out destinations that become unreachable.

Periodically, every router sends a routing packet out each of its incident links. For LAN links, the routing packet is usually sent as a local broadcast or multicast in order to reach all neighboring routers. The packet contains a list of $(destination, distance)$ pairs

(a "distance vector") taken from the sender's routing table. On receiving a routing packet from a neighboring router, the receiving router may update its own table if the neighbor offers a new, shorter route to a given destination, or if the neighbor no longer offers a route that the receiving router had been using. By this interaction, routers are able to compute shortest-path routes to all internetwork destinations. (This brief description leaves out several details of the distance-vector routing algorithm which are important, but not relevant to this presentation. Further information can be found in the references cited above.)

One straightforward way to support multicast routing in a distance-vector routing environment would be to compute a single spanning-tree across all of the links and then use the multicast routing algorithm described in the previous section. The spanning tree could be computed using the same algorithm as link layer bridges or, perhaps, using one of Wall's algorithms [26] for building a single tree with low average delay. However, in a general topology that provides alternate paths, no single spanning tree will provide minimum-delay routes from all senders to all sets of receivers. In order to meet our goal of low-delay multicasting, and to provide reasonable semantics for TTL scope control, we require that a multicast packet be delivered along a shortest-path (or an almost-shortest-path) tree from the sender to the members of the multicast group.

There is potentially a different shortest-path tree from every sender to every multicast group. However, every shortest-path multicast tree rooted at a given sender is a subtree of a single shortest-path *broadcast* tree rooted at that sender. In this section, we use that observation as the basis for a number of refinements to Dalal and Metcalfe's *reverse path forwarding* broadcast algorithm [6] which take advantage of the distance-vector routing environment to provide low-delay, low-overhead multicast routing.

## 5.1    Reverse Path Flooding (RPF)

In the basic reverse path forwarding algorithm, a router forwards a broadcast packet originating at source $S$ if and only if it arrives via the shortest path from the router back to $S$ (i.e., the "reverse path"). The router forwards the packet out all incident links except the one on which the packet arrived. In networks where the "length" of each path is the same in both directions, for example when using hop counts to measure path length, this algorithm results in a shortest-path broadcast to all links.

To implement the basic reverse path forwarding algorithm, a router must be able to identify the shortest path from the router back to any host. In internetworks that use distance-vector routing for unicast traffic, that information is precisely what is stored in the routing tables in every router. Furthermore, most implementations of distance-vector routing use hop counts as their distance measure. Thus, reverse path forwarding is easily implemented and effective at providing shortest-path broadcasting in most distance-vector routing environments. (Distance metrics other than hop counts may also support shortest-path or almost-shortest-path broadcasting, as long as the resulting path lengths are the same or almost the same in both directions.)

As described, reverse path forwarding accomplishes a *broadcast*. To use the algorithm for multicasting, it is enough simply to specify a set of internetwork multicast addresses that can be used as packet destinations, and perform reverse path forwarding on all packets destined to such addresses. Hosts choose which

groups they wish to belong to, and simply discard all arriving packets addressed to any other group.

The reverse path forwarding algorithm as originally specified in [6] assumes an environment of point-to-point links between routers, with each host attached to its own router. In the internetwork environment of interest here, routers may be joined by multi-access links as well point-to-point links, and the majority of hosts reside on multi-access links (LANs). It is possible and desirable to exploit the multicast capability of those multi-access links to reduce delay and network overhead, and to allow host interface hardware to filter out unwanted packets. To accomplish this, whenever a router (or an originating host) forwards a multicast packet onto a multi-access link, it sends it as a local multicast, using an address derived from the internetwork multicast destination address. In this way, a single packet transmission can reach all member hosts that may be present on the link. Routers are assumed to be able to hear all multicasts on their incident links, so the single transmission also reaches any other routers on that link. Following the reverse path algorithm, a receiving router forwards the packet further only if it considers the sending router to be on the shortest path, i.e., if the sending router is the *next-hop-address* to the originator of the multicast.

The major drawback of the basic reverse path forwarding algorithm (as a broadcast mechanism) is that any single broadcast packet may be transmitted more than once across any link, up to the number of routers that share the link. This is due to the forwarding strategy of flooding a packet out all links other than its arriving link, whether or not all the links are part of the shortest-path tree rooted at the sender. This problem is addressed in [6] and also in the following subsection. To distinguish the basic flooding form of reverse path forwarding from later refinements, we refer to it as *reverse path flooding* or *RPF*.

## 5.2    Reverse Path Broadcasting (RPB)

To eliminate the duplicate broadcast packets generated by the RPF algorithm, it is necessary for each router to identify which of its links are "child" links in the shortest reverse-path tree rooted at any given source $S$. Then, when a broadcast packet originating at $S$ arrives via the shortest path back to $S$, the router can forward it out only the child links for $S$.

In [6], Dalal and Metcalfe propose a method for discovering child links which involves each router periodically sending a packet to each of its neighbors, saying, "You are my next hop to these destinations." We propose a different technique for identifying child links which uses only the information contained in the distance-vector routing packets normally exchanged between routers.

The technique involves identifying a single "parent" router for each link, relative to each possible source $S$. The parent is the one with the minimum distance to $S$. In case of a tie, the router with the lowest address (arbitrarily) wins. Over each of its links, a particular router learns each neighbor's distance to every $S$— that is the information conveyed in the periodic routing packets. Therefore, each router can independently decide whether or not it is the parent of a particular link, relative to each $S$. (This is the same technique as used to select "designated bridges" in Perlman's spanning tree algorithm for LAN bridges [23], except that we build multiple trees, one for each possible source.)

How this works can be seen in the internetwork fragment illustrated in Figure 3. In this example, three routers $x$, $y$ and $z$



Figure 3: Reverse Path Forwarding Example

are attached to a LAN $a$. Router $z$ is also connected to a leaf LAN $b$. The dashed lines represent the shortest paths from $x$ and from $y$ to a particular source of broadcast packets $S$, somewhere in the internetwork. The distance from $x$ to $S$ is 5 hops and the distance from $y$ to $S$ is 6 hops. Router $z$ is also 6 hops from $S$, via $x$.

To understand the problem being solved, first consider what happens under the basic RPF algorithm. Both $x$ and $y$ receive a broadcast from $S$ over their shortest-path links to $S$, and both of them forward a copy onto LAN $a$. Therefore, any hosts attached to $a$ receive duplicate copies of all packets broadcast from $S$. Router $z$, however, will forward only one of the copies, the one from $x$, onto LAN $b$, because $x$ is $z$'s next-hop-address for $S$.

Now consider how the parent-selection technique solves the problem. All three routers, $x$, $y$, and $z$, periodically send distance-vector routing packets across LAN $a$, reporting their distance to every destination. From these packets, each of them learns that $x$ has the shortest distance to $S$. Therefore, only $x$ adopts LAN $a$ as a child link, relative to $S$; $y$ no longer forwards superfluous broadcasts from $S$ onto LAN $a$.

If both $x$ and $y$ had a distance of 5 hops to $S$, the one with the lowest address (say $x$) would be the parent of LAN $a$. Note that, in this case, $z$ might choose either $x$ or $y$ as its next-hop-address to $S$. In some implementations of distance-vector routing, $z$ might even alternate between using $x$ and using $y$ to reach $S$, in order to spread packet traffic over multiple, equally-short paths. However, for the purpose of reverse-path forwarding, every router has to choose a single shortest reverse path for each source $S$. The tie-breaking scheme for parent selection implies that a router with multiple shortest-path routes to $S$ should use the one whose next-hop-address is the lowest when deciding whether or not to forward a broadcast from $S$. Thus, in the example, $z$ forwards broadcasts onto LAN $b$ only if they come from $x$.

The parent-selection technique for eliminating duplicates requires that one additional field, children, be added to each routing table entry. Children is a bit-map with one bit for each incident link. The bit for link $l$ in the entry for destination is set if $l$ is a child link of this router for broadcasts originating at destination.

We call this variant of the algorithm reverse path broadcasting or RPB because it provides a clean (i.e., no duplicates) broadcast to every link in the internetwork, assuming no transmission errors or topology disruptions.

## 5.3 Truncated Reverse Path Broadcasting (TRPB)

The RPF and RPB algorithms implement shortest-path broadcasting. They can be used to carry a multicast packet to all links in an internetwork, relying on host address filters to protect the hosts from receiving unwanted multicasts. In a small internetwork with infrequent multicasting, this may be an acceptable approach, just as link-layer bridges that send multicast packets everywhere are acceptable to some. However, as in the case of large extended LANs, it is desirable in large internetworks to conserve network and router resources by sending multicast packets only where they are wanted. This requires that hosts inform the routers of their group memberships.

To provide shortest-path multicast delivery from source $S$ to members of group $G$, the shortest-path broadcast tree rooted at $S$ must be pruned back to reach only as far as those links that have members of $G$. This could be accomplished by requiring members of $G$ to send membership reports back up the broadcast tree towards $S$, periodically; branches over which no membership reports were received would be deleted from the tree. Unfortunately, this would have to be done separately for every group, over every broadcast tree, resulting in reporting bandwidth and router memory requirements on the order of the total number of groups times the total number of possible sources.

In this subsection, we describe an alternative in which only non-member leaf networks are deleted from each broadcast tree. It has modest bandwidth and memory requirements and is suitable for internetworks in which leaf network bandwidth is a critical resource. The next subsection addresses the problem of more radical pruning.

For a router to forgo forwarding a multicast packet over a leaf link that has no group members, the router must be able to (1) identify leaves and (2) detect group membership. Using the algorithm of the previous subsection, a router can identify which of its links are child links, relative to a given source $S$. Leaf links are simply those child links that no other router uses to reach $S$. (Referring back to Figure 3, LAN $b$ is an example of a leaf link for the broadcast tree rooted at $S$.) If we have every router periodically send a packet on each of its links, saying, "This link is my next hop to these destinations," then the parent routers of those links can tell whether or not the links are leaves, for each possible destination. In the example, router $z$ would periodically send such a packet on LAN $a$, saying, "This link is my next hop to $S$". Hence, router $x$, the parent of LAN $a$, would learn that LAN $a$ is not a leaf, relative to $S$.

Some implementations of distance-vector routing already implicitly convey this next hop information in their normal routing packets, by claiming a distance of infinity for all destinations reached over the link carrying the routing packet. This is done as part of a technique known as split horizon which helps to reduce route convergence time when the topology changes [13]. In those cases where the next hop information is not already present, it is necessary only to add one extra bit to each of the (destination, distance) pairs in the routing packets. The bits identify which destinations are reached via the link on which the routing packet is being sent.

In the routing tables, another bit-map field, leaves, is added to each entry, identifying which of the children links are leaf links.

Now that we can identify leaves, it remains for us to detect whether or not members of a given group exist on those leaves.

To do this, we have the hosts periodically report their memberships. We can use the membership reporting algorithm described in Section 4, in which each report is locally multicast to the group that is being reported. Other members of the same group on the link overhear the report and suppress their own. Consequently, only one report per group present on the link is issued every reporting interval. There is no need for a very small reporting interval, because it is generally not important to quickly detect when all the members of a group on a link have departed from the group; it just means that packets addressed to that group may be delivered to the link for some time after all the members have left.

The routers then keep a list, for each incident link, of which groups are present on that link. If the lists are stored as hash tables, indexed by group address, the presence or absence of a group may be determined quickly, regardless of the number of groups present. The reverse path forwarding algorithm now becomes: if a multicast packet from $S$ to $G$ arrives from the *next-hop-address* for $S$, forward a copy out all child links for $S$ except leaf links which have no members of $G$.

To summarize the costs of this algorithm, which we call *truncated reverse path broadcasting* or *TRPB*:

- It has a storage cost in each router of a few bits added to every routing table entry plus a group list for each of the router's links. The group lists should be sized to accommodate the maximum number of groups expected to be present on a single link (although temporary overflows of a group list may safely be handled by temporarily treating the corresponding link as a non-leaf, forwarding *all* multicast packets onto the link).

- It has a bandwidth cost on each link of one membership report per group present per reporting interval. The membership reports are very small, fixed-length packets, and the reporting interval may reasonably be on the order of minutes.

- The bandwidth cost of conveying next hop information in the routing packets is typically zero, either because the split horizon technique is used, or because an unused bit can be stolen from the existing (*destination, distance*) pairs to carry that information.

## 5.4   Reverse Path Multicasting (RPM)

As mentioned in the previous subsection, pruning the shortest-path broadcast trees by sending membership reports towards each multicast source results in an explosion of reporting traffic and router memory requirements. In a large internetwork, we would not expect every possible source to send multicast packets to every existing group, so the great expense of pruning every possible multicast tree would be wasted. We would prefer, then, to prune only those multicast trees that are actually in use.

Our final variation on the reverse path forwarding strategy provides *on-demand pruning* of shortest-path multicast trees, as follows. When a source *first* sends a multicast packet to a group, it is delivered along the shortest path broadcast tree to all links except non-member leaves, according to the TRPB algorithm. When the packet reaches a router for whom all of the child links are leaves and none of them have members of the destination group, a *non*-membership report (NMR) for that (*source, group*) pair is generated and sent back to the router that is one hop towards the source. If the one-hop-back router receives NMRs

from all of its child routers (that is, all routers on its child links that use those links to reach the source of the multicast), and if its child links also have no members, it in turn sends an NMR back to its predecessor. In this way, information about the absence of members propagates back up the tree along all branches that do not lead to members. Subsequent multicast packets from the same source to the same group are blocked from travelling down the unnecessary branches by the NMRs sitting in intermediate routers.

A non-membership report includes an *age* field, initialized by the router that generates the report, and counted up by the router that receives the report. When the age of an NMR reaches a threshold, $T_{maxage}$, it is discarded. The NMRs generated at the leaves start with age zero; NMRs generated by intermediate routers, as a consequence of receiving NMRs from routers nearer the leaves, start with the maximum age of all of the subordinate NMRs. Thus, any path that is pruned by an NMR will rejoin the multicast tree after a period of $T_{maxage}$. If, at that time, there is still traffic from the same source to the same group, the next multicast packet will trigger the generation of a new NMR, assuming there is still a member on that path.

When a member of a new group on a particular link appears, it is desirable that that link immediately be included in the trees of any sources that are actively sending to that group. This is done by having routers remember which NMRs they have sent and, if necessary, send out cancellation messages to undo the effect of the NMRs.

If an NMR is lost in transit, a subtree will remain in the multicast tree unnecessarily, but that will last only until the next multicast packet stimulates generation of another NMR. Loss of a cancellation message is more serious, because a new path will fail to join the tree when it should, and group members on that path will fail to receive multicast packets from that tree for a period of up to up to $T_{maxage}$. If we require that cancellation messages be positively acknowledged by their receivers, we can afford to have a very long $T_{maxage}$, which reduces the amount of multicast traffic down unnecessary branches.

This algorithm, which we call *reverse path multicasting* or *RPM*, has the same costs as the TRPB algorithm, plus the costs of transmitting, storing, and processing NMRs and cancellation messages. Those extra costs depend greatly on such factors as the number and locations of multicast sources and of group members, the multicast traffic distributions, the frequency of membership changes, and the internetwork topology. In the worst case, the number of NMRs that a router must store is on the order of the number of multicast sources active within a $T_{maxage}$ period, times the average number of groups they each send to in that period, times the number of adjacent routers. There are a couple of factors that can alleviate these storage requirements:

- All hosts attached to the same link may be treated as a single source of multicasts, as long as a router is able to identify the source link from the source addresses of datagrams, as is the case, for example, with DoD IP addresses [24].

- Multicast datagrams sent with a small time-to-live may expire before reaching many routers, thus avoiding the generation of NMRs in those routers.

We believe that many applications of internetwork multicasting will be able to use TTL scope control effectively, either because they require communication with only a nearby subset of a large group (e.g., when looking for a nearby name server), or

61

because all group members are known to be close to the senders (e.g., when a parallel computation is distributed across computers at a single site). If that is so, and the cost of memory keeps falling, storage space for NMRs should not be a limiting factor in typical distance-vector routing environments (fewer than a hundred links). Bandwidth can also be expended to recover memory, by reducing $T_{message}$. However, experience with real multicast traffic in real internetworks will be needed before recommendations can be made as to router memory sizes, timeout values, or even whether the greater "precision" of the RPM algorithm is worth the extra complexity and overhead, as compared to the simpler TRPB algorithm.

One issue that has not yet been mentioned in this discussion of reverse path forwarding schemes is the effect of topology changes. As explained in [6], reverse path forwarding can cause packets to be duplicated or lost if routing tables change while the packets are in transit. Since we require only datagram reliability, occasional packet loss or duplication is acceptable; hosts are assumed to provide their own end-to-end recovery mechanisms to the degree they require them. Implementations of the RPM algorithm, however, must be careful to take into account any topology changes that might modify the pruned multicast trees. For example, when a router gains a new child link or a new child router, relative to a given multicast source, it must send out cancellation messages for any outstanding NMRs it has for that source, to ensure that the new link or router is included in future multicast transmissions from that source.

# 6  Link-State Multicast Routing

The third major routing style to be considered is that of link-state routing, also known as "New Arpanet" or "Shortest-Path-First" routing [21]. As well as being used in the Arpanet, the link-state algorithm has been proposed by ANSI as an ISO standard for intra-domain routing [18].

Under the link-state routing algorithm, every router monitors the state of each of its incident links (e.g., up/down status, possibly traffic load). Whenever the state of a link changes, the routers attached to that link broadcast the new state to every other router in the internetwork. The broadcast is accomplished by a special-purpose, high-priority flooding protocol that ensures that every router quickly learns of the new state. Consequently, every router receives information about all links and all routers, from which they can each determine the complete topology of the internetwork. Given the complete topology, each router independently computes the shortest-path spanning tree rooted at itself, using Dijkstra's algorithm [1]. From this tree, it determines the shortest path from itself to any destination, to be used when forwarding packets.

It is straightforward to extend the link-state routing algorithm to support shortest-path multicast routing. Simply have routers include as part of the "state" of a link, a list of groups that have members on that link. Whenever a new group appears, or an old group disappears, from a link, the routers attached to that link flood the new state to all other routers. Given full knowledge of which groups have members on which links, any router can compute the shortest-path multicast tree from any source to any group, using Dijkstra's algorithm. If the router doing the computation falls within the computed tree, it can determine which links it must use to forward copies of multicast packets from the given source to the given group.

To enable routers to monitor group membership on a link, we again use the technique, introduced in Section 4, of having hosts periodically issue membership reports. Each membership report is transmitted as a local multicast to the group being reported, so that any other members of the same group on the same link can overhear the report and suppress their own. Routers monitoring a link detect the departure of a group by noting when the membership reports for that group stop arriving. This technique generates, on each link, one packet per group present per reporting interval.

It is preferable for only one of the routers attached to a link to monitor the membership of that link, thereby reducing the number of routers that can flood membership information about the link. In the link-state routing architecture proposed in [18], this job would fall to the "LAN Designated Router", which already performs the task of monitoring the presence of individual hosts.

As pointed out in Section 5, there is potentially a separate shortest-path multicast tree from every sender to every group, so it would be very expensive in space and processing time for every router to compute and store all possible multicast trees. Instead, we borrow from Section 5.4 the idea of only building trees on demand. Each router keeps a cache of multicast routing records of the form:

$$(source, subtree, (group, link\text{-}ttls),$$
$$(group, link\text{-}ttls), \ldots)$$

Source is the address of a multicast source. Subtree is a list of all descendent links of this router, in the shortest-path spanning tree rooted at source. Group is a multicast group address. Link-ttls is a vector of time-to-live values, one for each incident link, specifying the minimum TTL required to reach the nearest descendent member of the group via that link; a special TTL value for infinity identifies links that do not lead to any descendent members.

When a router receives a multicast packet, it looks up the source of the packet in its multicast routing cache. If it finds a record, it looks for the destination group in the (group, link-ttls) fields. If the group is found, the router forwards the packet out all links for which the minimum required TTL in link-ttls is less than or equal to the TTL in the packet header.

If the source record is found, but the destination group is not in the record, the router must compute the outgoing links and corresponding TTLs. To do this, it scans through the links in subtree, looking for links that have members of the destination group, and computing the minimum TTLs required to reach any member links found. The new group and link-ttls are added to the record and used in the forwarding decision.

Finally, if a record is not found for the source of an incoming multicast packet, the complete shortest-path spanning tree for that source must be computed. From the tree, the subtree of descendents of the router can be identified. The source and subtree are then installed as a new record in the multicast routing cache. The link-ttls for the destination group are also computed as part of computing the full tree, added to the record, and used in the forwarding decision. (A router for whom memory is scarcer than processing power might choose not to store the subtrees in the multicast routing cache, and simply recompute the full tree whenever a new group for a particular source is encountered.)

Cache records need not be timed out. When the cache is full, old records may be discarded on a least-recently-used basis. Whenever the topology changes, all cache records are discarded. Whenever a new group appears, or an old group disappears, on a

link, all (*group*, *link-ttls*) fields identifying that group are removed from the cache.

Like the RPM algorithm described in the previous section, the costs of this algorithm are very dependent on the internetwork multicast traffic patterns. Assuming that there are generally fewer groups present on a single LAN than there are individual hosts, the bandwidth required for group link state packets should be no more than that required for "End System" link state packets, in the proposed ANSI routing scheme [18]. The same is true of the memory needed in the routers to hold the link state membership information. The major costs of the algorithm are in the memory required to store the multicast routing cache records and the processing requirements of computing the multicast trees. Assuming that most multicast packets are required to traverse a small percentage of the routers in the internetwork, this algorithm requires less storage space than the RPM algorithm, because storage is consumed only in those routers that must be traversed, rather than in those that must *not* be traversed.

One possible drawback of this algorithm is the additional delay that may be imposed on the first multicast packet transmitted from a given source—at each hop, the routers must compute the full tree for that source before they can forward the packet. The complexity of the tree computation is of the order of the number of the links in the internetwork (for sparsely-connected interworks); decomposing a large internetwork into routing subdomains, as proposed in the ANSI scheme, is an effective way of controlling the number of links within any domain.

## 7 Hierarchical Multicast Routing

All of the algorithms discussed so far are appropriate for a single routing domain, in which all routers are running the same algorithm. Large internetworks often span *multiple* routing domains. For example, a LAN that is part of a distance-vector routing environment may actually be an extended LAN containing spanning-tree bridges, or one "link" in a link-state routing environment may actually be an entire internetwork using distance-vector routing. Such hierarchical composition—treating one routing domain as a single link in a higher-level routing domain—has many advantages. It reduces the amount of topology information any one router has to maintain, thereby improving scaleability [19]; it accommodates different technologies for which different routing strategies are appropriate; and it allows different organizations to choose the routing style that best fits their needs, while still interoperating with other organizations.

All of the multicast routing algorithms we have proposed may be used to route multicast packets between "links" that happen to be entire routing subdomains, provided that those subdomains meet our requirements for links. Section 3 identifies the two generic types of links assumed by the multicast algorithms: point-to-point links and multi-access links. A subdomain may be treated as a point-to-point link if it used only for pairwise communication between two routers or between a router and a single host. Alternatively, a subdomain may be treated as a multi-access link if it satisfies the following property:

- If any host or superdomain router attached to the subdomain sends a multicast packet addressed to group $G$ into the subdomain, it is delivered (with high probability) to all hosts that are members of $G$ plus all superdomain routers attached to the subdomain, subject to the packet's time-to-live (TTL).

In addition, if the superdomain multicast routing protocol does *not* use the approach of delivering every multicast packet to every link, it must be possible for the superdomain routers to monitor the group membership of hosts attached to the subdomain. This may be done using the membership reporting protocol described in the previous sections, or via some other, subdomain-specific, method.

The above property is required of a subdomain when using our algorithms as superdomain multicast routing protocols. Looking at it from the other side, when using our algorithms as *subdomain* multicast routing protocols beneath an arbitrary superdomain protocol, we find that we do not quite satisfy the above property for subdomains. We must extend our algorithms to include all superdomain routers as members of every group, so that they may receive all multicast packets sent within the subdomain. This is accomplished simply by defining within the subdomain a special "wild-card" group that all superdomain routers may join; the changes to each algorithm to support wild-card groups are straightforward.

## 8 Related Work

A variety of algorithms for multicast routing in store-and-forward networks are described by Wall [26], with emphasis on algorithms for constructing a single spanning tree that provides low average delay, thereby striking a balance between opposing goals of low delay and low network cost.

Frank, Wittie and Bernstein [10] provide a good survey of multicast routing techniques that can be used in internetworks, rating each according to such factors as delay, bandwidth, and scaleability.

Sincoskie and Cotton [25] propose a multicast routing algorithm for link-layer bridges which supports a type of group in which all senders must also be members of the group. Such groups are acceptable for some applications, such as computer conferencing, but are not well suited to the common client/server type of communication where the (client) senders are generally not members of the (server) group and should not receive packets sent to the group.

## 9 Conclusions

We have proposed a number of algorithms for routing multicast datagrams in internetworks and extended LANs. The goal of each algorithm is to provide a multicast service that is as similar as possible to LAN multicasting, so that applications that currently benefit from LAN multicasting may be moved to a multiple-network environment with little or no change. In particular, we have concentrated on *low delay* multicasting, in order to minimize the effect of going from the LAN environment to a store-and-forward environment.

Different multicast routing algorithms were developed as extensions to three different styles of *unicast* routing: the single-spanning-tree routing of extended LAN bridges, and the distance-vector and link-state routing commonly used in internetworks. These different routing styles lead to significantly different multicast routing strategies, each exploiting the particular protocols and data structures already present.

For most of the algorithms, the additional bandwidth, memory and processing requirements are not much greater than those of

the underlying unicast routing algorithm. In the case of distance-vector routing, we presented a range of multicast routing algorithms based on Dalal and Metcalfe's reverse path forwarding scheme, providing increasing "precision" of delivery (flooding, broadcasting, truncated broadcasting and multicasting) at a cost of increasing amounts of routing overhead.

In spite of the wide difference in multicast routing strategies, all except the flooding and broadcasting variants impose the same requirement on hosts: a simple membership reporting protocol which takes good advantage of multicasting to eliminate redundant reports. Thus, the same host protocol implementation may be used without change in a variety of different multicast routing environments.

Finally, we have shown how different routing domains using these or other multicast routing protocols may be combined to extend multicasting across a large, hierarchical internetwork.

We have implemented the host membership reporting protocol in the 4.3BSD UNIX kernel as the first step in an experiment with internetwork multicasting of DoD IP datagrams [7], and implementations of both the reverse path multicast (RPM) and the link-state multicast routing algorithms are under way. From these implementations, we plan to derive detailed specifications for each of the multicast routing algorithms, and to start gathering measurements of multicast traffic patterns and their effect on routing overhead, for a variety of distributed multicast applications, such as computer conferencing, name binding, and network management. Once we get a better idea of multicast "workloads", we hope to provide stronger criteria for choosing among the various multicast routing algorithms.

## Acknowledgements

The idea of applying the membership reporting strategy to the extended LAN environment was suggested by David Cheriton. David Waitzman pointed out how the link-state multicasting algorithm could take into account TTL scope control. They, as well as Bruce Hitson, Cary Gray, and an anonymous reviewer, provided many other helpful comments on an earlier draft of this paper. The DARPA Internet task force on end-to-end protocols, chaired by Bob Braden, has encouraged and contributed to the development of these ideas.

This work was sponsored in part by the Defense Advanced Research Projects Agency under contract N00039-84-C-0211, and by Digital Equipment Corporation.

## References

[1] A. V. Aho, J. E. Hopcroft, and J. D. Ullman. *Data Structures and Algorithms*. Addison-Wesley, Reading, Mass., 1983. Dijkstra's algorithm.

[2] R. E. Bellman. *Dynamic Programming*. Princeton University Press, Princeton, N.J., 1957.

[3] D. R. Boggs. *Internet Broadcasting*. PhD thesis, Electrical Engineering Dept., Stanford University, January 1982. Also Tech. Rep. CSL-83-3, Xerox PARC, Palo Alto, Calif.

[4] D. R. Boggs, J. F. Shoch, E. A. Taft, and R. M. Metcalfe. PUP: an internetwork architecture. *IEEE Transactions on Communications*, COM-28(4):612–624, April 1980.

[5] D. R. Cheriton and W. Zwaenepoel. Distributed process groups in the V kernel. *ACM Transactions on Computer Systems*, 3(2):77–107, May 1985.

[6] Y. K. Dalal and R. M. Metcalfe. Reverse path forwarding of broadcast packets. *Communications of the ACM*, 21(12):1040–1048, December 1978.

[7] S. E. Deering. *Host Extensions for IP Multicasting*. RFC 1054, SRI Network Information Center, May 1988.

[8] Digital Equipment Corporation, Intel Corporation, and Xerox Corporation. The Ethernet: a local area network; data link layer and physical layer specifications, version 1.0. *Computer Communications Review*, 11(3):20–66, September 1980.

[9] L. R. Ford Jr. and D. R. Fulkerson. *Flows in Networks*. Princeton University Press, Princeton, N.J., 1962.

[10] A. J. Frank, L. D. Wittie, and A. J. Bernstein. Multicast communication on network computers. *IEEE Software*, 2(3):49–61, May 1985.

[11] J. Hart. Extending the IEEE 802.1 MAC bridge standard to remote bridges. *IEEE Network*, 2(1):10–25, January 1988.

[12] W. R. Hawe, M. F. Kempf, and A. J. Kirby. The extended local area network architecture and LANBridge 100. *Digital Technical Journal*, (3):54–72, September 1986.

[13] C. Hedrick. *Routing Information Protocol*. RFC (in preparation), SRI Network Information Center, November 1987.

[14] R. Hinden and A. Sheltzer. *The DARPA Internet Gateway*. RFC 823, SRI Network Information Center, September 1982.

[15] IEEE Computer Society. Standards for local area networks: logical link control. ANSI/IEEE Standard 802.2-1985 (ISO/DIS 8802/2), 1985.

[16] International Business Machines Corporation. *Technical Reference PC Network*. document 6322916.

[17] International Organization for Standardization (ISO). *Draft International Standard 8473, Protocol for Providing the Connectionless-Mode Network Service*. March 1986.

[18] Secretariat USA (ANSI) ISO TC97 SC6. *Intermediate System to Intermediate System Intra-Domain Routing Exchange Protocol*. November 1987.

[19] L. Kleinrock and F. Kamoun. Hierarchical routing for large networks; performance evaluation and optimization. *Computer Networks*, 1:155–174, 1977.

[20] S. J. Leffler, R. S. Fabry, W. N. Joy, P. Lapsley, S. Miller, and C. Torek. An advanced 4.3BSD interprocess communication tutorial. In *Unix Programmer Supplementary Documents, Part 2*, University of California, Berkeley, Ca., April 1986.

[21] J. M. McQuillan, I. Richer, and E. C. Rosen. The new routing algorithm for the ARPANET. *IEEE Transactions on Communications*, COM-28(5):711–719, May 1980.

[22] J. M. McQuillan and D. C. Walden. The ARPANET design decisions. *Computer Networks*, 1, August 1977.

[23] R. Perlman. An algorithm for distributed computation of a spanning tree in an extended LAN. In *Proc. 9th Data Communications Symposium*, pages 44–53, ACM/IEEE, September 1985.

[24] J. Postel. *Internet Protocol*. RFC 791, SRI Network Information Center, September 1981.

[25] W. D. Sincoskie and C. J. Cotton. Extended bridge algorithms for large networks. *IEEE Network*, 2(1):16–24, January 1988.

[26] D. W. Wall. *Mechanisms for Broadcast and Selective Broadcast*. PhD thesis, Electrical Engineering Dept., Stanford University, June 1980. Also Tech. Rep. 190, Computer Systems Lab., Stanford.

[27] Xerox Corporation. *Internet Transport Protocols*. XSIS 028112, Xerox, Stamford, Connecticut, December 1981.

EXHIBIT 22

*# 9/a*
*8.3nd*
*9/16/96*

ATTORNEY'S DOCKET NO.: **C0441/7079**

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:      Kenneth VIRGILE
Serial No.:     08/428,403
Filing Date:    April 25, 1995
For:            MULTIMEDIA BANDWIDTH ACCELERATOR
Examiner:       Blum, R.
Art Unit:       2603

---

CERTIFICATE OF MAILING UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being placed in the United States mail with first-class postage attached, addressed to Commissioner of Patents and Trademarks, Washington, D.C. 20231, on the ___7___ day of September, 1996

Therese A.  Hendricks

---

BOX NON-FEE AMENDMENT
THE COMMISSIONER OF PATENTS AND TRADEMARKS
WASHINGTON, D.C.  20231

Sir:

## AMENDMENT

Responsive to the Office Action of June 13, 1996, (Paper No. 4) please amend the above-identified application as follows:

In the Title:

Please change the title of the present invention to "A Network Bridge with Multicast Forwarding Table."

72692.1                              1

Serial No. 08/428,403
Amendment

Art Unit: 2603

<u>In the Figures</u>:

By separate letter to the Official Draftsperson, Applicant is submitting proposed drawing corrections to Figs. 1, 3 and 4 marked in red ink. The Examiner is respectfully requested to approve these proposed changes.

<u>In the Specification</u>:

Page 2, line 14, after "segments" insert --L2,--;

Line 20, delete "host" (second occurrence) and insert --hosts--.

Page 13, line 4, delete "drawing" and insert --drawings--.

Page 14, line 1, delete "102" and insert --L102--;

Line 15, after "interfaces" insert --141-144--.

Page 15, line 4, after "to" insert --the--.

Page 17, line 14, delete "routers" and insert --router--.

Page 24, line 4, delete "101" and insert --h101--;

Line 13, after "to" (first occurrence) insert --a--.

<u>In the Claims</u>:

Please amend claims 1-9 as follows:

1. (Amended) In a hierarchical communications network comprising:

a plurality of interconnected routers and

a plurality of subnetworks connected to said routers, wherein each of said subnetworks comprises:

one or more network segments, and

one or more bridges interconnecting said network segments and

72692.1

2

Serial No. 08/428,403                                    Art Unit: 2603
Amendment

connecting each said subnetwork to one or more of said routers, and

wherein each network segment comprises one or more hosts, a process for providing

multicast communication comprising the steps of: *a destination*

transmitting from a selected one of said hosts on a route to one of said routers a [host
membership] multicast control packet indicating a multicast group to which said host belongs,

receiving said [host membership] multicast control packet at a bridge on [a] said route to
said *destination* one router,

using said [host membership] multicast control packet, updating a multicast forwarding
table entry in a multicast forwarding table corresponding to said multicast group at said bridge,

retransmitting said [host membership] multicast control packet from said bridge on said
route to said *destination* one router,

using said [membership] multicast control packet, updating a routing table at said *destination* one router,
and

at said bridge, retransmitting multicast message packets destined to said [at least one]
indicated multicast group according to said updated multicast forwarding table maintained at said
bridge.


2. (Amended) The process of claim 1, further comprising the step of:

in response to receiving [a] the multicast control packet [from a host of said subnetwork
reporting each multicast group of which said host is a member], updating said multicast forwarding
table [entries] entry corresponding to [each of] said indicated multicast group[s] to indicate [said]
a network segment of said host from which said multicast control packet was received.


3. (Amended) The process of claim [1] 2, further comprising the step of:

in response to receiving [a] the multicast control packet [from a host of said subnetwork
indicating that said host wishes to join a particular multicast group], updating said multicast
forwarding table entry corresponding to said particular multicast group [to indicate said] by adding

72692.1                                    3

Serial No. 08/428,403                                                      Art Unit: 2603
Amendment

a network segment of said host from which said multicast control packet was received.


4. (Amended) The process of claim [1] 2, further comprising the step of:

in response to receiving [a] the multicast control packet [from a host of said subnetwork indicating that said host wishes to leave a particular multicast group], updating said multicast forwarding table entry corresponding to said particular multicast group [to remove] by removing an indication [for said] of a network segment of said host from which said multicast control packet was received,[ if ] when said host was formerly the only host contained in said network segment that was also a member of said particular multicast group.


5. (Amended) The process of claim 1, further comprising the steps of:

receiving a multicast message packet at said bridge via one of a plurality of I/O interfaces of said bridge,

using a destination address of [a] the received multicast message packet as an index, retrieving a corresponding entry from said multicast forwarding table maintained at said bridge, and

retransmitting said multicast message packet from each I/O interface associated with the retrieved corresponding entry from said multicast forwarding table, other then said one I/O interface of said plurality of I/O interfaces via which said multicast message packet was received; and

[if] when no entry exists for said destination address, retransmitting said received multicast message packet from each I/O interface of said plurality of I/O interfaces except for said one I/O interface via which said multicast message packet was received.


Claim 6, line 1, after "1" insert --,--;
line 1, delete "the" (second occurrence) and insert --a--.

Claim 7, line 1, after "1" insert --,--.

8. (Amended) A bridge in a hierarchical communications network comprising:

[72692.1]

4

Serial No. 08/428,403                                    Art Unit: 2603
Amendment

a plurality of I/O interfaces for transmitting packets to, and for receiving packets from, routers and network segments attached to said bridge, said plurality of I/O interfaces including one I/O interface connected to each of said routers and one I/O interface connected to each of said network segments, and

a processor connected to said I/O interfaces, for receiving a [host membership] <u>multicast control</u> packet transmitted from a host of one of said network segments to one <u>destination router</u> of said routers via a route including said bridge, for updating a multicast forwarding table entry <u>in a multicast forwarding table in said bridge</u> corresponding to a multicast group of said [host membership] <u>multicast control</u> packet, for causing said I/O interface connected to said destination router of said [host membership] <u>multicast control</u> packet to retransmit said [host membership] <u>multicast control</u> packet, and for causing said I/O interfaces to retransmit multicast message packets destined to said multicast group according to said multicast forwarding table. `

9.  (Amended) The [communications network] <u>bridge</u> of claim 8, [wherein said bridge] further [comprises] <u>comprising</u>:

   <u>a</u> bus interconnecting said I/O interfaces and said processor, and

   <u>a</u> memory connected to said bus for storing said multicast forwarding table.

Please add the following new claims:

10.  A network bridge, comprising:

   at least two I/O interfaces to each receive and transmit data packets; and

   a processor operatively coupled to the at least two I/O interfaces;

   wherein the processor comprises:

   means for receiving any data packet received by any of the at least two I/O interfaces;

   means for identifying the received data packet as a multicast control packet destined for a device other than the network bridge;

72692.1

5

Serial No. 08/428,403                                                Art Unit: 2603
Amendment

means for identifying the I/O interface on which the identified multicast control packet arrived;

means for identifying a multicast group from the multicast control packet; and

means for updating a multicast forwarding table entry associated with the determined multicast group.

11. The network bridge as recited in claim 10, wherein the processor further comprises:

means for determining a source of the identified multicast control packet; and

the updating means further comprises:

means for associating the determined source with the determined multicast group and the I/O interface on which the multicast control packet arrived.

12. The network bridge as recited in claim 11, further comprising a memory operatively coupled to the processor for storing the updated multicast forwarding table.

13. The network bridge as recited in claim 10, further comprising:

means for retrieving the multicast forwarding table entry as a function of the determined multicast group;

whereby a multicast message destined for the determined multicast group will be retransmitted according to the multicast forwarding table entry associated with the determined multicast group.


## REMARKS

In response to the Office Action dated June 13, 1996 (Paper No. 4) Applicant respectfully requests reconsideration.

72692.1                                     6

Serial No. 08/428,403                                             Art Unit: 2603
Amendment

Correction to the Title

The Office Action indicates that the title needs to be corrected. Applicant has amended the title of this application to now be "A Network Bridge with Multicast Forwarding Table." The Examiner is respectfully requested to indicate his approval of this title.

Proposed Corrections to the Figures

The Office Action indicates that Figures 1, 3 and 4 lack descriptive labels for each element. Applicant has submitted proposed drawing corrections for these figures. Specifically, in each of Figs. 1 and 3, Applicant has added a legend indicating that elements "rx" are routers, "hx" are hosts and "bx" are bridges. In Fig. 4, Applicant proposes to add column headings and a title to the table. In addition, with regard to the entry for multicast group "AV1," Applicant has proposed a correction to place Fig. 4 in compliance with the specification at page 16, lines 15-16. No new matter has been added. The Examiner is respectfully requested to approve these proposed drawing corrections.

Rejections under 35 U.S.C. §102

Claims 1-4, 6 and 7 stand rejected under §102(b) as being anticipated by Deering, "Multicast Routing in Internetwork and Extended LANs." Applicant respectfully submits that Deering does not anticipate that which is recited in independent claim 1.

Deering was reported by the Applicant in the Background section of the present application. Deering discusses multicasting as used within local-area networks and suggests modifications to known router algorithms in order to support multicasting across large heterogenous internetworks. As discussed in this reference, extensions to two common routing algorithms used by network-layer routers are proposed, distance-vecter routing and link-state routing, to provide LAN-style multicasting across datagram-based internetworks. Deering discloses that it may be possible to conserve bridge and link resources by conveying multicast packets across only those links necessary to reach their target membership. It would be

72692.1                                    7

Serial No. 08/428,403                                               Art Unit: 2603
Amendment

advantageous, therefore, for bridges to know which of their incident branches led to members of a given multicast group. In this way the bridges could forward packets destined to that group at those branches only.

Deering suggests that since bridges are able to learn which branches lead to individual hosts by observing the source addresses of incoming packets, if multicast group members were to periodically issue packets with their group address as the source, the bridges could apply the same learning algorithm to the multicast group addresses. Effectively, Deering teaches that the modifications to the known protocol would include modifying the hosts so as to send membership reports to the bridges in order to identify the multicast groups to which each host belongs. Deering acknowledges, however, that such modification to the hosts would compromise the transparency property that is one of the important features of link-layer bridges.

As discussed in the Background section of the present application, Deering's proposed modification to an established protocol would have the hosts operate in a nonstandard mode. This would be disadvantageous with regard to implementing devices which adhere to the protocol. Deering, therefore, does not teach or suggest a bridge which complies with the known standard and which would be able to determine the locations of hosts in a particular multicast group.

Independent claim 1, as amended, is directed to a process for providing multicast · communication in a hierarchal communications network. The communications network includes a plurality of interconnected routers and a plurality of subnetworks connected to the routers. Each subnetwork includes one or more network segments and one or more bridges interconnecting the network segments and connecting each subnetwork to one or more of the routers where each network segment includes one or more hosts. The process includes the steps of transmitting from a selected one of the hosts, on a route to one of the routers, a multicast control packet indicating a multicast group to which the host belongs. Further, at a bridge on the route to the one router, receiving the multicast control packet and, using the multicast control packet, updating a multicast forwarding table entry in a multicast forwarding table corresponding

72692.1                                        8

Serial No. 08/428,403                                                    Art Unit: 2603
Amendment

to the multicast group at the bridge. In addition, the multicast control packet is retransmitted from the bridge on the route to the one router. Further, a routing table at the one router is updated using the multicast control packet and, at the bridge, multicast message packets destined to the identified multicast group are retransmitted according to the updated multicast forwarding table maintained at the bridge.

In order for a reference to anticipate a claim, each and every limitation in the claim must be disclosed in the reference. Deering, however, does not disclose each and every limitation as recited in claim 1. Specifically, Deering does not disclose a bridge which receives a multicast control packet destined from a host to a router where the bridge then uses the multicast control packet to update a multicast forwarding table entry in a multicast forwarding table which corresponds to the multicast group in the bridge. As discussed above, Deering specifically requires a message sent directly from a host to the bridge, which, as a result, results in an operation which compromises the transparency property of the link-layer bridges. The process as recited in claim 1 uses a bridge which does not require the host to operate in a non-standard mode since the bridge is able to "eavesdrop" on the packet from the host as destined to the router. For at least this reason, Applicant maintains that independent claim 1 is not anticipated by Deering. As claims 2-4, 6 and 7 depend from independent claim 1, these claims are also not anticipated by the Deering reference.

Rejections under 35 U.S.C. §103

Claim 5 stands rejected under 35 U.S.C. §103 as being unpatentable over Deering in view of Francis. As claim 5 depends from independent claim 1, it incorporates all of the limitations of independent claim 1. Applicant maintains that the combination of Deering and Francis does not teach or suggest that which is recited in claim 1.

Francis is directed to a method for routing multicast packets in a network. Francis teaches an Internet communications network 80, as shown in Fig. 1, which includes transit or backbone networks and stub networks. (Col. 1, lines 32-34). Francis also discusses unicast and

72692.1

9

Serial No. 08/428,403                                                    Art Unit: 2603
Amendment

multicast routing with regard to packet propagation from router to router. Appropriate routing

information for each pair consisting of a multicast group and a source node is stored at each

router on each multicast tree. (Col. 3, lines 38-40). As disclosed by Francis, for each link, each

router maintains a list of each multicast group having one or more member nodes on the link, i.e.,

having one or more member nodes connected to the router via that link. (Col. 4, lines 46-50).

Francis, however, does not remedy the deficiencies of Deering with regard to disclosing a

bridge which receives multicast control packets destined for a router from a host and which

updates a multicast forwarding table using the multicast control packet destined for the router. In

fact, Francis does not even discuss bridges and/or their functions. As a result, the combination of

Deering in view of Francis does not render obvious that which is recited in independent claim 1.

As claim 5 depends from independent claim 1, it cannot be rendered obvious by this cited

combination.

Claims 8 and 9 stand rejected under §103 as being unpatentable over Deering in view of

any one of Sugiyama, Smith, Chang or Huang. Applicant submits the following in traversing the

rejection of independent claim 8.

Sugiyama is directed to a local area network bridge apparatus which is capable of

carrying out address learning and package filtering at a high speed without requiring program

execution on a microprocessor. (Col. 1, lines 63-66). The bridge of Sugiyama uses a filtering

address table memory means and an address learning means for discriminating between packets

of information which are destined for other local area networks as opposed to the local area

network to which the bridge is connected. Sugiyama does not teach or suggest how this bridge

operates with multicast messages and merely teaches an efficient way for not sending out

messages which are not external to the associated network.

Smith, similar to Sugiyama, is directed to a bridge for receiving data packets from a first

network and transmitting them onto a second network. (Col. 1, lines 50-52). The bridge, as

discussed by Smith, includes a first adaptor connected to the first network for receiving and

examining at least a portion of the packet to determine if the packet is to be transferred to the

Serial No. 08/428,403                                                        Art Unit: 2603
Amendment

second network. (Col. 1, lines 52-55).  Smith, again similar to Sugiyama, is silent as to how to handle multicast messages.

Chang is directed to a multiport LAN bridge which provides a connection between Data Terminal Equipment using both source routing and transparent bridging architectures. (Col. 3, lines 59-62).  The bridge performs frame filtering, copying, forwarding and header conversion in a relatively short time interval. (Col. 3, lines 63-66).  Chang, however, similar to Sugiyama and Smith, does not teach or suggest operation with multicast messages.  In this regard, Chang is cumulative to the functions of a bridge as already described in Deering.

Huang is directed to a FDDI bridge which uses a hardware-based arrangement in which a source address database is maintained in a content addressable memory. (Col. 2, lines 1-5).  Messages only pass to a buffer memory if a destination address is different from the source addresses stored in the content addressable memory which indicates that message is to be forwarded through the bridge to the second network. (Col. 2, lines 11-14).  Huang, again similar to Sugiyama, Smith and Chang, is silent as to the transmission of a multicast message.

Independent claim 8, as amended, is directed to a bridge in a hierarchical communications network including a plurality of I/O interfaces for transmitting packets to and for receiving packets from routers and network segments attached to the bridge.  The plurality of I/O interfaces include one I/O interface connected to each of the routers and one I/O interface connected to each of the network segments.  A processor is connected to the I/O interfaces and receives a multicast control packet transmitted from a host of one of the network segments to one of the routers via a route including the bridge.  The processor updates a multicast forwarding table entry in a multicast forwarding table in the bridge corresponding to a multicast group of the multicast control packet.  The processor causes the I/O interface connected to the destination router of the multicast control packet to retransmit the multicast control packet and to cause the I/O interfaces to retransmit multicast message packets destined to the multicast group according to the multicast forwarding table.

The combination of Deering and any one of Sugiyama, Smith, Chang or Huang does not

render obvious that which is recited in independent claim 8. Specifically, none of the combinations results in a bridge which receives a multicast control packet sent from a host and destined to a router where the multicast control packet is used by the bridge to update a multicast forwarding table entry in a multicast forwarding table in the bridge. Similar to the argument submitted above with regard to independent claim 1, Deering requires that a bridge receive a message destined for the bridge from a host in order to determine multicast groups to which the host belongs.

In the present invention, as recited in claim 8, the bridge uses a multicast control packet destined for a router to update the multicast forwarding table. None of the other references provides any motivation for a bridge to use a message destined for a router in order to update a table in the bridge. Each of the other references requires a message to be sent directly to a router. For at least these reasons, therefore, Applicant maintains that independent claim 8 is not rendered obvious by any of the cited combinations. As claim 9 depends from independent claim 8, it also is not rendered obvious by the cited combinations.

Newly added independent claim 10 is directed to a network bridge including at least two I/O interfaces to each receive and transmit data packets and a processor operatively coupled to the at least two I/O interfaces. The processor includes means for receiving any data packet received by any of the at least two I/O interfaces and means for identifying the received data packet as a multicast control packet destined for a device other than the network bridge. Further included is means for identifying the I/O interface on which the identified multicast control packet arrived, means for identifying a multicast group from the multicast control packet and means for updating a multicast forwarding table entry associated with the determined multicast group.

Similar to the remarks submitted above with regard to independent claims 1 and 8, Applicant maintains that new independent claim 10 is allowable over the cited references. Specifically, neither Deering alone or in combination with any of the other references, discloses or suggests means for identifying the received data packet as a multicast control packet destined

72692.1                              12

Serial No. 08/428,403                                      Art Unit: 2603
Amendment

for a device other than the network bridge and means for updating the multicast forwarding table entry associated with the determined multicast group. Deering, as above, relies on a message from a host directly to the bridge as the destination whereas the present invention, as recited in claim 10, uses a data packet destined for a device other than the network bridge. As above, none of the other references remedy this deficiency of Deering. For at least this reason, Applicant maintains that independent claim 10 is allowable over the cited references. As claims 11-13 depend on independent claim 10, these claims are also allowable over the cited references.

In view of the foregoing amendments and remarks, this application should now be in condition for allowance. A notice to this effect is respectfully requested. If the Examiner believes after this amendment, that the application is not in condition for allowance, the Examiner is requested to call the Applicant's attorney at the number listed below.

If this response is not considered timely filed and if a request for an extension of time is otherwise absent, Applicant hereby requests any necessary extension of time. If there is a fee occasioned by this response, including an extension fee, that is not covered by an enclosed check, please charge any deficiency to Deposit Account No. 232825.

Respectfully submitted ,

Kenneth Virgile, Applicant

Therese A. Hendricks
Reg. No. 30,389
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210-2211
(617)720-3500
Attorneys of Record

Attorney's Docket No. C0441/7079 .
September _____, 1996
X09/13/96

72692.1                               13

# EXHIBIT 23



#72

EXPEDITED PROCEDURE
AMENDMENT UNDER 37 C.F.R. §1.116
ART UNIT: 2731
ATTORNEY'S DOCKET NO.: C0441/7111

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:     Kenneth VIRGILE
Serial No.:    08/766,784
Filing Date:   December 13, 1996
For:           A NETWORK BRIDGE WITH MULTICAST FORWARDING TABLE
Examiner:      Yao, K.
Art Unit:      2731

**BOX AF**
THE ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

Sir:

Certificate of Mailing Under 37 C.F.R §1.8

I hereby certify that this correspondence is being
deposited with the United States Postal Service as
first class mail in an envelope addressed to:
Assistant Commissioner for Patents, Washington,
DC 20231, on

June 24, 1998
Date

Paul D. Serlin
Signature

Do not Enter
KBJ

AMENDMENT UNDER 37 C.F.R. §1.116

In response to the Office Action dated March 27, 1998, (Paper No. 11), Applicant
amends the above-identified application as follows:

99 JUL -6 AM10:37 RECEIVED

In the Claims:

Please cancel claims 14, 19, 20, 24-26, and 28-30 without prejudice or disclaimer.

Please amend claims 10, 12, 15, 21, 23 and 27 as follows:

10.     (Amended) A method of providing multicast communications in a network bridge
having a multicast forwarding table and including at least two I/O interfaces to each receive
and transmit data packets [and a multicast forwarding table], the method comprising steps of:

        (a)     retrieving a data packet received on any of the at least two I/O interfaces;

5       (a1)    determining a source of the retrieved data packet;

        (b)     identifying the I/O interface on which the retrieved data packet arrived;

        (c)     determining whether the retrieved data packet is a multicast control packet
                destined for a device other than the network bridge;

173302.1

Serial No. 08/766,784
Amendment Under 37 C.F.R. §1.116

Art Unit: 2731

(d)     when the retrieved data packet is determined to be a multicast control packet
10          destined for a device other than the network bridge:

    (e)     identifying a multicast group from the multicast control packet; and

    (f)     updating the multicast forwarding table to cross-reference the identified
multicast group with the identified I/O interface and the determined source of the
multicast control packet.

12.     (Amended) The method as recited in claim 10, [further comprising a step of
determining a source of the multicast control packet;]

wherein step (f) further comprises:

[updating an entry for the identified multicast group to include the identified I/O
5     interface and the determined source of the multicast control packet; and]

when no entry exists in the multicast forwarding table for the identified multicast
group, adding a new entry for the identified multicast group to the multicast forwarding
table, wherein the new entry cross-references the identified multicast group to the
identified I/O interface and to the determined source of the multicast control packet.

Claim 15, delete "14" and insert --10--.

Claim 21, line 1, delete "19" and insert --10--.

5     23.  (Amended) A network bridge for providing multicast communications, the bridge
including a multicast forwarding table and at least two I/O interfaces to each receive and
transmit data packets [and a multicast forwarding table], the bridge comprising:

means for determining whether a [specific] received data packet is of a multicast
control packet type destined for a device other than the network bridge;

10          means for determining a source of the received data packet;

means for determining the I/O interface on which the received data packet
arrived;

173302.1                                    - 2 -

means for identifying a multicast group from the [specific] received data packet when the received data packet is determined to be of the multicast control packet type; and

means for updating the multicast forwarding table [according] to cross-reference the identified multicast group [received from the multicast group identifying means] with the identified I/O interface and the determined source of the received data packet.

27. (Amended) A method of providing multicast communications in a network bridge including a multicast forwarding table and at least two I/O interfaces to each receive and transmit data packets [and including a multicast forwarding table], the method including the steps of:

(a)    determining whether a [specific] received data packet is of a multicast control packet type destined for a device other than the network bridge; and

when the [specific] received data packet has been determined to be of a multicast control packet type:

(b)    identifying a multicast group from the [specific] received data packet;

(b1)    identifying the one I/O interface on which the received data packet arrived;

(b2)    identifying a source of the received data packet; and

(c)    updating the multicast forwarding table to cross-reference the identified multicast group with the identified I/O interface and the identified source.

## REMARKS

In response to the Office Action dated March 27, 1998 (Paper No. 11), Applicant respectfully requests reconsideration. This amendment is meant to place the application in condition for allowance by amending claims and canceling finally rejected claims.

Claims 10-30 have been examined. By this amendment, Applicant has canceled claims 14, 19, 20, 24-26 and 28-30 and amended claims 10, 12, 15, 21, 23 and 27. As a result, claims 10-13, 15-18, 21-23 and 27 remain in the application with claims 10, 23 and 27 being independent claims.

173302.1                                    - 3 -

Serial No. 08/766,784                                        Art Unit: 2731
Amendment Under 37 C.F.R. §1.116

Allowable claims

Claims 12, 15-17 and 20 stand objected to as being dependent upon a rejected base
claim, but would be allowable if rewritten in independent form.

Rejections Under 35 USC §103

Claims 10, 11, 13, 14, 18, 19 and 21-30 stand rejected under §103(a) as being
unpatentable over Videlock in view of Hoare. This is the same rejection as was presented in the
Office Action of October 3, 1997, (Paper No. 9).

Applicant wishes to thank the Examiner for the courtesies extended to Applicant's
attorney in the phone interview conducted on April 8, 1998. In that conversation, Applicant
presented his position as to the distinctions of the claims over the cited references. Possible
amendments to the claims were generally discussed although specific examples were not
presented to the Examiner.

Claim 10 has been amended to incorporate limitations of dependent claims 12 and 14
and, as amended, is patentable over the cited references. Claim 10 has also been amended to
recite a network bridge "having a multicast forwarding table" and at least two I/O interfaces.
Applicant merely wanted to make it clear that the invention does not require that the multicast
forwarding table be transmitted or received by the I/O interface. This change does not add new
matter nor is it made to distinguish over the cited art.

In regard to the §102 rejection, the Examiner is respectfully requested to consider the
following:

Independent claim 10 is directed to a method of providing multicast communications in
a network bridge having a multicast forwarding table, including steps of retrieving a data
packet, determining a source of the retrieved data packet and identifying the I/O interface on
which the data packet arrived. When the retrieved data packet is determined to be a multicast
control packet destined for a device other than the network bridge, a multicast group is
identified from the multicast control packet and the multicast forwarding table is updated "to
cross-reference the identified multicast group with the identified I/O interface and the
determined source of the retrieved data packet."

173302.1                          - 4 -

Serial No. 08/766,784                                                Art Unit: 2731
Amendment Under 37 C.F.R. §1.116

Preliminarily, Applicant would like to reiterate his position discussed in the telephone conversation with the Examiner. Specifically, a "multicast control packet," as recited in claim 10 is a "type" of control packet and not necessarily a packet sent by multicasting transmission. As is known, multicasting is the transmission of a packet to a "host group," i.e., a set of hosts identified by a single destination address. A multicast packet is delivered to all members of the destination host group. As recited in claim 10, the multicast control packet is "destined for a device other than the network bridge." The Examiner's attention is directed to the specification page 16, line 20 - page 17, line 3 for examples of multicast control packets.

The cited combination of Videlock and Hoare would not have rendered obvious that which is recited in independent claim 10. Each of Videlock and Hoare only updates a list of addresses used to determine whether or not a packet will be forwarded out of the bridge. Neither Hoare nor Videlock determines the port on which a packet arrived. If the destination address of a packet is found in the list, the bridge does not forward the packet. In order to keep the list updated, each of the cited bridges determines the source address of a packet and if that source address is not in the list then it is added to it. Thus, the lists are kept up-to-date.

As acknowledged in the Office Action, Videlock does not identify a multicast group from a multicast control packet. Hoare, as Applicant has already submitted, implements multicast addressing by requiring operator intervention so as to update the table. The combination of Videlock and Hoare, however, does not teach or suggest updating the table to cross-reference the identified multicast group with the identified I/O interface and the determined source of the multicast control packet, as is recited in claim 10. Certainly, the cited combination cannot cross-reference to an identified I/O interface when neither reference teaches or suggests such an identification.

Applicant submits that, at most, the combination of Videlock and Hoare results in a table that includes a multicast address that applies to end stations in one network only so as to ensure that packets with that address are kept to the one network. (See Hoare, Col. 5, lines 31-38). There is no teaching or suggestion that the table would cross-reference the multicast group with the identified I/O interface and the source of the multicast control packet. This is true because

173302.1                               - 5 -

Serial No. 08/766,784                                          Art Unit: 2731
Amendment Under 37 C.F.R. §1.116

the entry of the multicast information into the table of Hoare is separate from the retrieval of information from a multicast control packet. For at least these reasons, Applicant submits that independent claim 10 is patentable over the cited references. Claims 11-13, 15-18, 21 and 22 depend from independent claim 10, and for at least the same reasons as submitted above, also would not have been rendered obvious by the cited combination.

Independent claim 23 has been amended to incorporate the limitations of dependent claim 26, i.e., to include means for identifying a source of the specific received data packet, means for identifying the I/O interface on which the specific received data packet arrived and to include means for updating the multicast forwarding table to cross-reference the identified multicast group with the identified I/O interface and the identified source of the specific received data packet.

Similarly, independent claim 27 has been amended to incorporate the limitations of dependent claim 30, i.e., to include the steps of identifying the one I/O interface on which the received data packet arrived, identifying a source of the received data packet and updating the multicast forwarding table to cross-reference the identified multicast group with the identified I/O interface and the identified source.

It should be noted that claims 23 and 28 have each been amended to clarify the relationship of the multicast forwarding table and the I/O interfaces. These changes to claim 23 and 27 do not add new matter and are not being made to distinguish over the cited references.

Applicant respectfully submits that, for at least the same reasons as submitted above with regard to independent claim 10, neither of independent claims 23 nor 27 would have been rendered obvious by the cited combination. Specifically, the cited combination does not teach or suggest identifying a source of a packet, identifying an I/O interface on which the packet arrived and determining a multicast group from the packet when it has been determined to be a multicast control packet. Further, the cited combination does not teach or suggest updating a table to cross-reference the identified multicast group with the identified I/O interface and the determined source of the data packet. For at least the foregoing reasons, Applicant maintains

173302.1                                     - 6 -

Serial No. 08/766,784                                         Art Unit: 2731
Amendment Under 37 C.F.R. §1.116

that these claims would not have been rendered obvious by the cited combination and thus are allowable.

In view of the foregoing amendments and remarks, this application should now be in condition for allowance. A notice to this effect is respectfully requested. If the Examiner believes that, after this amendment, the application is not in condition for allowance, the Examiner is requested to call the Applicant's attorney at the number listed below.

If this response is not considered timely filed and if a request for an extension of time is otherwise absent, Applicant hereby requests any necessary extension of time. If there is a fee occasioned by this response, including an extension fee, that is not covered by an enclosed check, please charge any deficiency to Deposit Account No. 23/2825.

Respectfully submitted,
*Kenneth Virgile, Applicant*

Paul D. Sorkin, Reg. No. 39,039
Therese A. Hendricks, Reg. No. 30,389
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210-2211
(617)720-3500
Attorneys of Record

Attorney's Docket No. C0441/7111
June __, 1998
**x06/29/98**

173302.1                                - 7 -

EXHIBIT 24

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/299,970 | 04/26/1999 | KENNETH VIRGILE | C0441/7135 | 3912 |

23628        7590        05/21/2002

WOLF GREENFIELD & SACKS, PC
FEDERAL RESERVE PLAZA
600 ATLANTIC AVENUE
BOSTON, MA 02210-2211

| EXAMINER |
|---|
| YAO, KWANG BIN |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2664 | |

DATE MAILED: 05/21/2002

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 07-01)

| Office Action Summary | Application No. | Applicant(s) |
|---|---|---|
| | 09/299,970 | VIRGILE, KENNETH |
| | Examiner | Art Unit |
| | Kwang B. Yao | 2664 |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTH(S) FROM
THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed
  after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any
  earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on 01 June 1999 .

2a)☐ This action is FINAL.          2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is
    closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) 1-19 is/are pending in the application.

4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) 1-19 is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.

Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

11)☐ The proposed drawing correction filed on _____ is: a)☐ approved b)☐ disapproved by the Examiner.

If approved, corrected drawings are required in reply to this Office action.

12)☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. §§ 119 and 120**

13)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

a)☐ All  b)☐ Some * c)☐ None of:

1.☐ Certified copies of the priority documents have been received.

2.☐ Certified copies of the priority documents have been received in Application No. _____ .

3.☐ Copies of the certified copies of the priority documents have been received in this National Stage
    application from the International Bureau (PCT Rule 17.2(a)).

* See the attached detailed Office action for a list of the certified copies not received.

14)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e) (to a provisional application).

a) ☐ The translation of the foreign language provisional application has been received.

15)☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. §§ 120 and/or 121.

**Attachment(s)**

| | |
|---|---|
| 1) ☒ Notice of References Cited (PTO-892) | 4) ☐ Interview Summary (PTO-413) Paper No(s). _____ . |
| 2) ☒ Notice of Draftsperson's Patent Drawing Review (PTO-948) | 5) ☐ Notice of Informal Patent Application (PTO-152) |
| 3) ☐ Information Disclosure Statement(s) (PTO-1449) Paper No(s) _____ . | 6) ☐ Other: |

Application/Control Number: 09/299,970                                         Page 2
Art Unit: 2664

## DETAILED ACTION

### *Double Patenting*

1.    The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees.  See *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970);and, *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

      A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent is shown to be commonly owned with this application.  See 37 CFR 1.130(b).

      Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer.  A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

2.    Claims 1-19 are rejected under the judicially created doctrine of obviousness-type double patenting as being unpatentable over claims 1-25 of U.S. Patent No. 5,898,686.  Although the conflicting claims are not identical, they are not patentably distinct from each other because the application's claims merely broaden the scope of the patented claims by not claiming some elements (i.e., retrieving a data packet received on any of the at least two I/O interfaces).  The

Application/Control Number: 09/299,970                                          Page 3
Art Unit: 2664

application's claims are nearly identical in every other respect to the patent claims. Therefore,

the application's claims are simply broader versions of the patented claims. It is the examiner's

position that broadening the patented claims by not claiming some of claim elements (i.e.,

retrieving a data packet received on any of the at least two I/O interfaces) of the patented claims

would have been obvious to one of the ordinary skill in the art in view of the patented claims. It

is important to note that the instant application is a continuation of the application which yielded

the patent (US Pat. 5,898,686) used herein as the basis for the obviousness type of double

patenting rejection. The application is attempting to broaden the parent application's claim by

eliminating some of the claim elements in the continuation at issue here.


### Claim Rejections - 35 USC § 102

3.        The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –
>
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on
> sale in this country, more than one year prior to the date of application for patent in the United States.

4.        Claims 1-19 are rejected under 35 U.S.C. 102(b) as being clearly anticipated by Liu et al.

(US 5,530,703).

Liu et al. discloses a remote communication server with automatic filtering comprising

the following features: as depicted in Fig. 2, learner 104 for determining, by examining network

protocol identifiers of a packet transmitted from remote node 101, whether the packet is a control

packet; learned protocol table 106 and classifier 107 for identifying a multicast group associated

with the determined network protocol identifiers; filter 110 for updating the multicast forwarding

Application/Control Number: 09/299,970                                   Page 4
Art Unit: 2664

data according to the multicast group identified by learned protocol table 106 and classifier 107,

and the network protocol identifiers of the packet transmitted from remote node 101. See

column 5-6.


*Conclusion*

5.      The prior art made of record and not relied upon is considered pertinent to applicant's

disclosure.

        Hashimoto et al. (US 5,157,620) discloses a dynamic updating routing information

method.

        Perlman et al. (US 5,511,168) discloses a multicast connection arrangement.

        Doeringer et al. (US 5,361,256) discloses a system for inter-domain multicast routing.

        Videlock et al. (US 5,136,580) discloses an apparatus for learning and filtering packets.

        Hoare et al. (US 4,627,052) discloses a communication network.


6.      Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Kwang B. Yao whose telephone number is 703-308-7583. The

examiner can normally be reached on M-F.

        If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Wellington Chin can be reached on 703-305-4366. The fax phone numbers for the

organization where this application or proceeding is assigned are 703-872-9314 for regular

communications and 703-872-9314 for After Final communications.

Application/Control Number: 09/299,970                                   Page 5
Art Unit: 2664

    Any inquiry of a general nature or relating to the status of this application or proceeding

should be directed to the receptionist whose telephone number is 703-305-3900.

    **KWANG BIN YAO**
    **PRIMARY EXAMINER**

Kwang B. Yao
May 15, 2002

EXHIBIT 25



ATTORNEY'S DOCKET N\_\_ 300378.70135/JNA/DPM

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:        Kenneth Virgile
Serial No:        09/299,970
Filed:            April 26, 1999
For:              A NETWORK DEVICE WITH MULTICAST FORWARDING DATA
Confirmation No.: 3912
Examiner:         Yao, Kwang Bin
Art Unit:         2665

CERTIFICATE OF MAILING UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being placed in the United States mail with first-class postage attached, addressed to Commissioner for Patents, Washington, D.C. 20231, on August 2 1, 2002.

_____
Signature

Commissioner for Patents
Washington, D.C. 20231

**RECEIVED**
AUG 3 0 2002
Technology Center 2600

**AMENDMENT**

Sir:

   In response to the Office Action mailed May 21, 2002 please amend the above-identified application as follows:

IN THE CLAIMS

Please amend claims 1, 6, 10, 14, 18 and 19 to read as follows:

   1. (Amended)  A network bridge for reducing multicast communications in a network, the network bridge including at least two I/O interfaces to each receive and transmit data packets and also including multicast forwarding data, the device comprising:

       means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge;



       means for identifying a multicast group from the first packet when the first packet is a multicast control packet destined for a device other than the network bridge

       means for updating the multicast forwarding data according to the identified multicast group and the data in the first portion of the first packet.

   2. (Amended)  The network bridge as recited in claim 1, further comprising:

625494.1                       Page 1 of 9



means for identifying the I/O interface on which the first packet arrived,

wherein the updating means include means for cross-referencing the identified I/O
interface to the identified multicast group in the multicast forwarding data.

3. (Amended)  The network bridge as recited in claim 1, further comprising:

means for identifying a source of the first data packet,

wherein the updating means include means for cross-referencing the identified source to
the identified multicast group in the multicast forwarding data.

4. (Amended)  The network bridge as recited in claim 1, further comprising:

means for identifying the I/O interface on which the first packet arrived; and

means for identifying a source of the packet,

wherein the updating means include means for cross-referencing the identified multicast
group with the identified source and the identified I/O interface in the multicast forwarding data.

5. (Amended)  The network bridge as recited in claim 1, further comprising:

means for determining, when the first packet is not a control packet, whether the first
packet is a message packet having a multicast group as a destination address; and

means for identifying, when the first packet is determined to be a multicast message
packet, the destination multicast group;

the destination multicast group identifying means further comprising:

means for retrieving first data from the multicast forwarding data  according to the
identified destination multicast group, the retrieved first data including at least one cross-
referenced I/O interface; and

means for sending the multicast message packet out each at least one cross-
referenced I/O interface in the first data other than the identified I/O interface.

6. (Amended)  A method of reducing multicast communications in a network, the network
including a network device having multicast communications forwarding data and at least two
I/O interfaces to each receive and transmit data packets, the method comprising:

determining an I/O interface on which a first packet arrived;





Serial No.: 09/299,970                                    Art Unit: 2664

determining, by examining data in a first portion of the first packet, whether the first

packet is a multicast control packet addressed to a device other than the network device;

when the first packet is determined to be a multicast control packet addressed to a device

other than the network device:

determining a multicast group from the first portion of the multicast control packet;
and

updating the multicast forwarding data as a function of data in the first portion of
the multicast control packet.

10. (Amended)  The method as recited in claim 6, wherein:

when the first packet is not a multicast control packet:

determining whether the first packet is a message packet having a multicast group

as a destination; and

when the first packet is determined to be a multicast message packet:

identifying a destination multicast group from the multicast message packet;

retrieving first data from the multicast forwarding data according to the

identified destination multicast group, the retrieved first data including at least one

cross-referenced I/O interface; and

sending the multicast message packet out each at least one cross-referenced

I/O interface in the retrieved first data other than the identified I/O interface.

14. (Amended)  A method of reducing multicast communications in a network, the network

including a network bridge, the network bridge having at least two I/O interfaces to each receive

and transmit data packets and the network bridge including multicast forwarding data, the

method including:

(a)  determining, by examining data in a first portion of a first packet received at the

network bridge, whether the first packet is a multicast control packet destined for a device other

than the network bridge; and

when the first packet has been determined to be a multicast control packet destined for a

device other than the network bridge:

(b) identifying a multicast group from the data in the first portion of the first

packet; and

625494.1                        Page 3 of 9

24



Serial No.: 09/299,970                                    Art Unit: 2664

(c) updating the multicast forwarding data according to the data in the first
portion of the first packet.

18. (Amended)  The method as recited in claim 14, wherein:

when the first packet is not a multicast control packet:

determining whether the first packet is a message packet having a multicast group
as a destination; and

when the first packet is determined to be a multicast message packet:

identifying a destination multicast group from the multicast message packet;

retrieving first data from the multicast forwarding data according to the
identified destination multicast group, the retrieved first data including at least one
cross-referenced I/O interface; and

sending the multicast message packet out each at least one cross-referenced
I/O interface in the first data other than the identified I/O interface.

19. (Amended)  A method of conserving bandwidth in a communications network by reducing
transmission of unneeded multicast messages, the method comprising:

monitoring, at a first location, multicast control packets destined for a location other than
the first location;

from each monitored multicast control packet, identifying a multicast group, a source of
the monitored multicast control packet and an interface on which the monitored multicast control
packet arrived;

maintaining an association of the identified multicast group with the identified interface;
and

for any multicast message received at the first location and destined for the identified multicast
group, transmitting the received multicast message on any interface associated with the multicast
group identified in the multicast message.

Please add the following claim 20.

20.  (New)  The method of claim 14, wherein the network includes at least one host and
at least one router that exchange multicast control packets to maintain multicast routing

625494.1                          Page 4 of 9

Serial No.: 09/299,970                                    Art Unit: 2664

information, and wherein the first packet is a multicast control packet destined for a host or a router.

## REMARKS

In response to the final Office Action mailed May 21, 2002, the Applicant respectfully requests reconsideration. To further the prosecution of this application, amendments have been made in the claims, as illustrated in the document submitted herewith entitled "Marked-up Claims."

Claims 1-19 were previously pending in this application. To further the prosecution of this application, claims 1-6, 10, 14, 18 and 19 have been amended for clarification. Claim 20 has been added. As a result, claims 1-20 remain pending for examination, of which claims 1, 6, 14, and 19 are independent.

Claim 1 stands rejected under 35 USC § 102(b) as being clearly anticipated by U.S. Patent No. 5,530,703 (Liu). Applicant respectfully traverses this rejection for the reasons set forth below.

### 1.    The Rejection of Claims 1-19 Under 102(b) Is Improper

As evidenced by Section 17 of the Utility Patent Application Transmittal filed with this application on April 26, 1999, this application is a divisional of application serial no. 08/766,784, filed December 13, 1996, which is a continuation of serial no. 08/428,403, filed April 25, 1995. Accordingly, this application has a filing date of April 25, 1995. Liu issued as U.S. Patent No. 5,530,703 on June 25, 1996.

Accordingly, the rejection of claim 1-19 under §102(b) is improper because Liu was not patented more than one year prior to the priority date of this application. Accordingly, Applicant respectfully requests that the rejection of claims 1-19 under 35 USC §102(b) be withdrawn.

### 2.    Claims 1-5 and 20 Patentably Distinguish Over Liu

Even if Liu were properly asserted under §102, claim 1 still distinguishes over Liu for at least the following reasons.

#### 2.1  Discussion Of Liu

U.S. Patent No. 5,530,703 (Liu) is directed to reducing unneeded broadcast and multicast packets passed through a private or switched circuit communication link to a remote node of a

625494.1                           Page 5 of 9





corporate LAN from a remote access server connected to the LAN. The remote access server includes logic that automatically learns the protocols that the remote node is relying upon, and configures filtering logic for the multi-destination packets in response to the learned protocol. A protocol used by the remote node may be learned in response to a packet transmitted to the network (through the remote access server) by the remote node as part of normal traffic from the remote node, and an identifier of the learned protocol may be stored. Multi-destination packets received at the remote access server then may be filtered based on the learned protocols before sending any multidestination packets to the remote node. (Col. 2, lines 24-47; Col. 3, lines 23-25).

Liu also discloses that the system may include a multicast address register 111 that receives multicast addresses supplied by a remote node 101. These addresses are stored in a multicast address table 112. Multicast packets received at the remote access server then are filtered against such multicast address table. (Col. 5, lines 48-58; Fig. 2). Multicast packets originating from a corporate LAN 10 are forwarded to a remote node if the multicast packet has a multicast address stored in the multicast address table. This provides a technique for bypassing the automatically learned protocol-specific filtering. (Col. 5, lines 12-18; Figs. 1 and 2).

Thus, Liu discloses that protocols used by the remote node are learned by the remote access server by examining normal traffic. Liu is silent, however, about *how* the remote node supplies the multicast addresses to the multicast address table of the remote access server.

## 2.2  Claim 1

Claim 1 has been amended as shown in the document enclosed herewith titled "Marked-Up Claims." Claim 1 was <u>not</u> amended to distinguish over Liu, as claim 1 before the amendment distinguishes over Liu for reasons set forth below. In contract, claim 1 was amended to clarify the claimed subject matter.

Claim 1 as amended recites:

> "A network bridge for reducing multicast communications in a network, the network bridge including at least two I/O interfaces to each receive and transmit data packets and also including multicast forwarding data, the network bridge comprising:
>
> **means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge;**



Serial No.: 09/299,970                                    Art Unit: 2664

> means for identifying a multicast group from the
> first packet **when the first packet is a multicast control
> packet**; and
>     means for updating the multicast forwarding data
> according to the identified multicast group and the data in
> the first portion of the first packet." [emphasis added]

### 2.3. Claim 1 is Not Anticipated by Liu

Claim 1 is not anticipated by Liu because Liu fails to disclose all of the limitations of claim 1. As stated above, although Liu discloses that a remote node supplies multicast addresses to a multicast address table residing on a remote access server, Liu is silent about *how* the remote access server is supplied such addresses by the remote node. Liu does not even disclose the use of multicast control packets, let alone determining whether a multicast control packet is destined for another device on a network. Consequently, Liu clearly does not disclose determining whether a packet received at the remote access server is a multicast control packet destined for a device other than the remote access server, nor identifying a multicast group in the packet when the first packet is a multicast control packet destined for a device other than the network bridge.

Therefore, claim 1 is not anticipated by Liu because Liu does not disclose a network bridge for reducing multicast communications in a network, the network bridge comprising, *inter alia*, "means for determining, by examining data in a first portion of a first packet received at the network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge," and "means for identifying a multicast group from the received first packet when the first packet is a multicast control packet destined for a device other than the network bridge", as recited in claim 1. Further, Liu does not disclose a network bridge for reducing multicast communications in a network as recited in claim 1 but, in contrast, discloses a remote access server for such use.

For at least these reasons, claim 1 is not anticipated by Liu. Claims 2-5 and 20, which each depends directly or indirectly from independent claim 1, are patentable over Liu for at least the same reasons as set forth above with respect to claim 1.

### 3.    Claim 6-13 Patentably Distinguish Over Liu

Claim 6 patentably distinguishes over Liu for at least similar reasons to those set forth above with respect to claim 1. Specifically, claim 6 is not anticipated by Liu because Liu does not disclose a method of reducing multicast communications in a network, the method

625494.1                          Page 7 of 9



Serial No.: 09/299,970                                      Art Unit: 2664

comprising, *inter alia*, "determining, by examining data in a first portion of the first packet, whether the first packet is a multicast control packet addressed to a device other than the network device," and, "when the first packet is determined to be a multicast control packet addressed to a device other than the network device, determining a multicast group from the first portion of the multicast control packet," as recited in claim 6. Further, Liu fails to disclose that such method comprises "determining an I/O interface on which a first packet arrived," as recited in claim 6.

For at least these reasons, Liu does not anticipate claim 6. Claim 7-13, which each depends directly or indirectly from independent claim 6, are patentable over Liu for at least the same reasons at set forth above with respect to claim 6.

4.    **Claim 14-18 Patentably Distinguishes Over Liu**

Claim 14 patentably distinguishes over Liu for similar reasons to those set forth above with respect to claim 1. Specifically, claim 14 is not anticipated by Liu because Liu does not disclose a method of reducing multicast communications in a network, the method comprising *inter alia*, "determining, by examining data in a first portion of a first packet received at a network bridge, whether the first packet is a multicast control packet destined for a device other than the network bridge," and, "when the first packet has been determined to be a multicast control packet destined for a device other than the network bridge, identifying a multicast group from the data in the first portion of the first packet," as recited in claim 14.

For at least these reasons, Liu does not anticipate claim 14. Claims 15-18, which each depends from claim 14, are patentable over Liu for at least the same reasons as those set forth above with respect to claim 14.

5.    **Claim 19 Patentably Distinguishes Over Liu**

Claim 19 patentably distinguishes over Liu for at least similar reasons to those set forth above with respect to claim 1. Specifically, claim 19 is not anticipated by Liu because Liu does not disclose a method of conserving bandwidth in a communications network, the method comprising, *inter alia*, "monitoring, at a first location, multicast control packets destined for another location other than the first location," and, "from each monitored multicast control packet, identifying a multicast group, a source of the monitored multicast control packet and an interface on which the monitored multicast control packet arrived," as recited in claim 19.

625494.1                      Page 8 of 9



Serial No.: 09/299,970                                             Art Unit: 2664

Further, Liu does not disclose "maintaining an association of the identified multicast group with the identified interface," as recited in claim 19.

For at least these reasons, Liu does not anticipate claim 19.

## CONCLUSION

In view of the foregoing amendments and remarks, this application should now be in condition for allowance. A notice to this effect is respectfully requested. If the Examiner believes, after this amendment, that the application is not in condition for allowance, the Examiner is requested to call the Applicant's attorney at the telephone number listed below.

If this response is not considered timely filed and if a request for an extension of time is otherwise absent, Applicant hereby requests any necessary extension of time. If there is a fee occasioned by this response, including an extension fee that is not covered by an enclosed check, please charge any deficiency to Deposit Account No. 50/1127.

Respectfully submitted
*Kenneth Virgile, Applicant*

By:    Daniel P. McLoughlin, Reg. No. 46, 066
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, Massachusetts 02210-2211
Tel. No.: (617) 720-3500
Attorney for Applicant

Docket No.: E00378.70135/JNA/DPM
Date: August 21, 2002
**x08/21/02**

625494.1                    Page 9 of 9



EXHIBIT 26

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL                                    1

1          UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3             NO. 05-CV-11298 (DPW)

4                                          COPY

5

6

7     _____

8     ENTERASYS NETWORKS, INC.,          )

9                 Plaintiff,             )

10                                        )

11         vs.                            )

12                                        )

13    FOUNDRY NETWORKS, INC., and         )

14    EXTREME NETWORKS, INC.,             )

15                 Defendants,           )

16    _____)

17

18

19                VOLUME I

20            PAGES 1 - 297

21

22          HIGHLY CONFIDENTIAL

23    VIDEOTAPED DEPOSITION OF ROBERT J. SIMCOE

24       WEDNESDAY, 21 FEBRUARY, 2007

25               9:15 AM

HIGHLY CONFIDENTIAL

8

1          VIDEO OPERATOR:  Good morning.  We are

2    recording and are now on the record.  Today's date

3    is February the 21st, 2007, and the time is 9:21

4    a.m.  My name is George Dobrentey.  I'm a legal

5    videographer for G&M Court Reporters in Boston,

6    Massachusetts.

7          This is the deposition of Robert J. Simcoe

8    in the matter of Enterasys Networks versus Foundry

9    Networks and Extreme Networks in the United States

10   District Court for the District of Massachusetts,

11   Eastern Division, CA No. 05-CV-11298.

12          This deposition is being taken at 800

13   Boylston Street in Boston, Massachusetts.  The

14   court reporter is Jodi Ohnemus.  The counsel will

15   state their appearances, and the court reporter

16   will administer the oath.

17          MS. BUTLER:  This is Marla Butler for

18   Enterasys, along with Marc Henschke.  We are both

19   of the firm of Robins, Kaplan, Miller & Ciresi.

20          MR. MARINO:  Fabio Marino.  With me are

21   William Anthony and Sanjeet Dutta from Orrick,

22   Herrington & Sutcliffe, and also co-counsel,

23   Stephen Kohen from Proskauer Rose.

24          MS. SMITH:  Emily Smith, McDermott, Will &

25   Emery, for Extreme Networks.

HIGHLY CONFIDENTIAL

9

1           MR. MARINO:  And I forgot to mention, I

2    represent Foundry.

3           Good morning, Mr. Simcoe.

4           MR. SIMCOE:  Good morning.

5           ROBERT M. SIMCOE, having

6           satisfactorily been identified by

7           the production of a driver's license,

8           and being first duly sworn by the

9           Notary Public, was examined and testified

10          as follows to interrogatories

11   BY MR. MARINO:

12      Q.   Could you state your full name for the

13   record, please.

14      A.   Robert J. Simcoe, S-i-m-c-o-e.

15      Q.   And Mr. Simcoe, have you been deposed

16   before today?

17      A.   Yes, yeah.

18      Q.   How many times?

19      A.   Once.

20      Q.   Do you remember what that case was about?

21      A.   Yes.

22      Q.   What was that case about?

23      A.   I had a suit against Lucent Technologies.

24      Q.   Was it a personal lawsuit?

25      A.   Yes, it was.

HIGHLY CONFIDENTIAL

135

1          MS. BUTLER:  Objection.  Vague.  You mean

2     in these 15 lines?

3          MR. MARINO:  In the same --

4     A.    In these few lines, that's correct, at

5     least not that I see.

6     Q.    Okay.  Now, going back to Figure 5, and

7     again, deferring to any description you need in the

8     patent for support, besides the destination switch

9     field 66, are there any other fields in the added

10    header that would constitute a local address?

11         MS. BUTLER:  You're talking about as

12    described in the patent.

13         MR. MARINO:  Again, in the patent.

14    A.    (Witness reviews document.)  I'll have to

15    look through them --

16    Q.    Yeah, please.

17    A.    -- 'cause these are --

18    Q.    It's in Column --

19    A.    Where was it?  Where did that description

20    start?

21    Q.    Yeah, it starts on Column 9, Line 44.

22    Actually, I take it back.  Line 27.  It goes all

23    the way through Column 11, Line 20.

24    A.    (Witness reviews document.)

25         MS. BUTLER:  Can you read back the

HIGHLY CONFIDENTIAL

136

1    question, please.

2            THE WITNESS:  Can I borrow a pen.

3            (Question read back.)

4            MS. BUTLER:  So with you having pointed

5    him to those column and line numbers, is your

6    question asking him to determine whether or not

7    that description can be found within those column

8    and line numbers, or are you asking him whether

9    that description can be found anywhere in the

10   patent?

11           MR. MARINO:  Actually, the question is

12   very simple.

13       Q.   It is, of these fields that are described

14   in this figure -- and as far as I can tell, this

15   figure is only described on those columns and line

16   numbers -- which fields, as they are described in

17   the patent, constitute local addresses, as you have

18   used that term before?

19       A.   Local address meaning a network address

20   or --

21       Q.   Meaning what the abstract call -- calls a

22   local address.

23           MS. BUTLER:  Object.  The question is

24   vague.

25       A.   (Witness reviews document.)  Okay.  I'll

HIGHLY CONFIDENTIAL

137

1    -- perhaps the simplest thing is sort of go down

2    through this, and I can see immediately that I

3    hadn't read enough of this to -- to establish

4    things correctly.  So the first field listed is

5    "Service class."  It says it's a 4-bit field.  It

6    identifies that -- that's -- that is a -- in a

7    sense, a local thing which is used to queue the

8    packet locally.  So that's -- you could consider

9    that sort of a local address but -- but only within

10   the hardware.

11          The next field it says was a switch

12   number, and -- and it -- (Witness reviews

13   document).  And its use of ports there -- (Witness

14   reviews document.)  It is at the moment a little

15   confusing to me.

16          So I'll -- let me go onto the next.  The

17   destination link 68 is a 7-bit field representing

18   the logical link number at the final destination of

19   the packet.  This looks like it was the link output

20   of the -- from a switch.  So as I -- as I remember,

21   you know, what we had and -- and the way things

22   worked for the local address, was there was a

23   portion of it associated with the switch and a

24   portion associated with the port on the final

25   switch that things went out.

HIGHLY CONFIDENTIAL

138

1    And with the gigaswitch FDDI, how things

2  worked were the -- as a packet went through the

3  network, the switch would first have to only

4  examine the switch number -- and if it -- if the

5  switch number was different than its own number,

6  then it would have to forward the packet, based

7  only on switch number.

8    If the switch number was identical to its

9  own switch number, then it would look at the

10  destination link to indicate a specific link -- I

11  use port and link interchangeably and I probably

12  shouldn't, because they seem like they distinguish

13  them in this document, but you'll have to excuse me

14  if I do that.  It's -- it's just sort of how I

15  think about things.

16    So it would appear that the 7-bit

17  destination link represents the output link on the

18  final switch at -- at -- or final destination.  So

19  that would be a -- what would you call a local

20  address.

21    (Witness reviews document.)  The protocol

22  class field, the next thing, is -- is more network

23  oriented and not necessarily a -- a local address.

24    (Witness reviews document.)  The source

25  link pipe field 70 is information that's not a

HIGHLY CONFIDENTIAL

183

1    second header as Claim 1 is using that term?

2            MS. BUTLER:  Objection.  Foundation.

3        A.   I don't believe that it did.  It was a

4    different kind of switch.

5        Q.   Okay.  I was just trying to clarify when

6    precisely the ATM --

7        A.   Uhm.

8        Q.   Yeah.  And then the second header,

9    according to Claim 1, has to comprise, "Local

10   status information and a plurality of status fields

11   to indicate a message packet servicing."  Do you

12   see that?

13       A.   Uh-huh.

14       Q.   Okay.  Now, in the examples that are given

15   in the patent, what would be the local status

16   information and what would be the plurality of

17   status fields that indicate a message packet

18   servicing?

19       A.   I have to go back and reference the

20   drawing that had various fields in it.  Figure 5.

21       Q.   Uh-huh.

22       A.   So an example of local status information

23   might be, say, a time stamp.

24       Q.   Okay.  Are there any others?

25       A.   Well, I won't try to go through and

HIGHLY CONFIDENTIAL

184

1    identify which of these are -- are or aren't local

2    status.   (Witness reviews document.)   And source --

3    this source switch and link would be known only

4    locally.   So you could consider that local status

5    being added in.   The -- the service class -- well,

6    actually, that might go through.   So that -- that's

7    probably an example of message packet servicing

8    through the network under the service class.

9              (Witness reviews document.)

10       Q.   Actually, can you just clarify the last

11   thing you said was -- I thought was a little bit

12   different than what I understood, so I want to make

13   sure I understand it correctly.   You said that the

14   service status field -- not --

15       A.   Service class.

16       Q.   -- service class field goes through the

17   network, is that correct --

18       A.   (Witness nods.)

19       Q.   -- and it indicates message packet

20   servicing.

21            MS. BUTLER:   Objection.

22       Q.   What did you mean by that?

23            MS. BUTLER:   Objection.   Vague.   I don't

24   know if we're still talking about the claims in the

25   patent?

HIGHLY CONFIDENTIAL

185

1          MR. MARINO:  Yeah, we're talking about the

2    language of Claim 1.

3      A.   He's trying to distinguish local status

4    versus things which indicate message packet

5    servicing.

6      Q.   Right, and I'm trying to understand what

7    that language is referring to in the patent.

8      A.   And I said, the service class would be an

9    example of message packet servicing --

10     Q.   Okay.

11     A.    -- because it might be used throughout the

12   network to give priority or whatever, through --

13   through different queuing mechanisms.

14     Q.   Okay.  Besides the service class field 65,

15   are there any other examples given in the patent of

16   something -- of a status field that indicates a

17   message packet servicing?

18          MS. BUTLER:  Are you asking for an

19   exhaustive list?

20          MR. MARINO:  Yes.

21     Q.   Well, I'm asking for, you know, what you

22   can find.

23     A.   (Witness reviews document.)  Well, by this

24   -- by that definition, perhaps the -- the

25   encapsulation/decapsulation, arguably, would happen

HIGHLY CONFIDENTIAL

296

1   Commonwealth of Massachusetts

2   Middlesex, ss.

3

4

            I, P. Jodi Ohnemus, Notary Public
5   in and for the Commonwealth of Massachusetts,
    do hereby certify that there came before me
6   on the 21st day of February, 2007, the deponent
    herein, who was duly sworn by me; that the ensuing
7   examination upon oath of the said deponent was
    reported stenographically by me and transcribed
8   into typewriting under my direction and control;
    and that the within transcript is a true record of
9   the questions asked and answers given at said
    deposition.

10

11           I FURTHER CERTIFY that I am neither
    attorney nor counsel for, nor related to or
12  employed by any of the parties to the action
    in which this deposition is taken; and, further,
13  that I am not a relative or employee of any
    attorney or financially interested in the outcome
14  of the action.

15

            IN WITNESS WHEREOF I have hereunto set my
16  hand and affixed my seal of office this
    24th day of February, 2007, at Waltham.

17

18  *P. Jodi Ohnemus*

19  _____

20           P. Jodi Ohnemus, RPR, RMR, CRR
            Notary Public,
21          Commonwealth
            of Massachusetts
22          My Commission Expires:
            4/21/2007

23

24

25

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

EXHIBIT 27

GP263

**PATENT**

RECEIVED

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

94 APR 13 PM 2: 28

GROUP 260

Applicant: Spinney et al.                Attorney Docket: PD93-0012

Serial No.: 07/965,651                    Group Art Unit: 2603

Filed: October 22, 1992                   Examiner: Marcelo, M.

Title:  PACKET FORMAT IN HUB FOR PACKET DATA
        COMMUNICATIONS SYSTEM

Hon. Commissioner of Patents
      and Trademarks
Washington, D.C. 20231

> I hereby certify that this correspondence is being deposited
> with the United States Postal Service as FIRST CLASS MAIL
> in an envelope addressed to: Commissioner of Patents and
> Trademarks, Washington, D.C. 20231, on:
>
> April 6, 1994
> _____
> Date of mailing
>
> _____
> Signature    LILA T. TOKLA

## AMENDMENT

Sir:

In response to the Examiner's Action dated March 11, 1994, please

amend the above-captioned Application in the following manner.

## IN THE CLAIMS

Please amend the Claims as follows.

1. (Two Times Amended)  A packet data communications network

comprising:

- 1 -

a first network segment having a plurality of stations, one of said stations sending a message packet onto said first network segment of a first format; said first format including a first header and a data field with network destination address in said communications network;

a first network transfer device having an input connected to said first network segment to receive said message packet and having an output; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header further including local status information and a plurality of status fields to indicate [said] a message packet servicing;



a switching device having a plurality of ports, a first of said ports being connected to said output of said first network transfer device; the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and the plurality of status fields;

a second network transfer device having an input connected to said second of said ports of said switching device and having an output connected to a second network segment, the second network transfer device receiving said message packet via said switching device to forward to said second network segment; the second network transfer device removing said second header from said message packet.

- 2 -

4/4

10. (Two Times Amended)    A method of operating a packet data communications network, the network including a first network segment having a plurality of stations and a second network segment having a plurality of stations, and including a switching device interconnecting said first and second segments, comprising the steps of:

sending from one of said stations of said first network segment a message packet of a first format onto said first network segment; said first format including a first header and a data field with a network destination address in said communications network;

receiving said message packet at a first network transfer device having an input connected to said first network segment; the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address , said second header further including local status information and a plurality of status fields to indicate [said] a message packet servicing;

receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port of said switching device as selected by said switching address, and in response to said local status information and the plurality of status fields;

receiving said message packet at said second network transfer device via said switching device and forwarding said message packet to said second network segment; the second network transfer device removing said second header from said message packet.

- 3 -

## REMARKS

The above identified patent application has been amended and reconsideration and reexamination are hereby requested. No additional fee is required.

The Examiner has rejected Claims 1-18 under 35 U.S.C. §112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which the Applicants regard as the Invention.

Applicants have amended Claim 1 and Claim 10 to more clearly point out and distinctly claim the Invention. As amended, Applicants have provided clear antecedent basis for all elements in each of the Claims. Accordingly, Applicants submit that Claims 1-18 are now proper under 35 U.S.C. §112, second paragraph.

The Examiner rejected Claims 1, 3, 4, 10, 12, 13, 20, 21, 23, and 24 under 35 U.S.C. §103 as being unpatentable over Tsutsui et al (U.S. Patent No. 5,060,228) in view of Haas (U.S. Patent No. 5,115,532).

Applicants' Claim 1 calls for "...a first network segment..., a first network transfer device..., the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header further including local status information and a plurality of status fields to indicate a message packet servicing, a switching device..., the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port



- 4 -

as selected by said switching address, and in response to said local status information and the plurality of status fields, and a second network transfer device..."

Tsutsui et al discloses a bridge communication system in which a learning table is search using a destination address.

Haas discloses a communication architecture for high speed networking. Specifically, at Col. 9, lines 19-23, Haas discloses ...the current values of parameters in the specified protocol are communicated throughout the network. This communication of parameters may be done by using special option fields 801 in an example packet format, as sohn in FIG. 8. The value of the parameters are employed by independent horizontal functions 402 through 410, i.e., placed into a polynomial.

Tsutsui et al in view of Haas neither describes nor suggest the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and the plurality of status fields.

Moreover, there is no suggestion in Tsutsui in view of Haas that would lead one skilled in the art to provide a switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and the plurality of status fields. Accordingly, Claim 1 is patentably distinct over Tsutsui in view of Haas.

- 5 -

Applicants' Claim 10 calls for the steps of "...sending... a message packet of a first format..., receiving said message packet at a first network transfer device..., ...said second header including a switching address translated from said destination address, said second header further including local status information and a plurality of status fields to indicate a message packet servicing, receiving at said switching device said message packet..., ...in response to said local status information and the plurality of status fields, receiving said message packet..."

Tsutsui et al in view of Haas neither describes nor suggest the step of said second header further including local status information and a plurality of status fields to indicate a message packet servicing, receiving at said switching device said message packet..., ...in response to said local status information and the plurality of status fields.

Moreover, there is no suggestion in Tsutsui in view of Haas that would lead one skilled in the art to provide the step of said second header further including local status information and a plurality of status fields to indicate a message packet servicing, receiving at said switching device said message packet..., ...in response to said local status information and the plurality of status fields. Accordingly, Claim 10 is patentably distinct over Tsutsui in view of Haas.

Applicants' Claim 20 calls for "... a first network segment..., a first network transfer device..., ...the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second

- 6 -

header including local status information and a protocol class field, a switching device..., ...the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said protocol class field, and a second network transfer device..."

Tsutsui et al in view of Haas neither describes nor suggest the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said protocol class field.

Moreover, there is no suggestion in Tsutsui in view of Haas that would lead one skilled in the art to provide the switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said protocol class field. Accordingly, Claim 20 is patentably distinct over Tsutsui in view of Haas.

Applicants' Claim 21 calls for "...a first network segment..., a first network transfer device..., ...the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a local congestion status field, a switching device..., ...switching device receiving said message packet with

- 7 -

said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said local congestion status field, and a second network transfer device..."

Tsutsui et al in view of Haas neither describes nor suggest said second header including a switching address translated from said destination address, said second header including local status information and a local congestion status field, a switching device..., ...switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said local congestion status field.

Moreover, there is no suggestion in Tsutsui in view of Haas that would lead one skilled in the art to provide said second header including a switching address translated from said destination address, said second header including local status information and a local congestion status field, a switching device..., ...switching device receiving said message packet with said second header and sending said message packet with said second header to a second port as selected by said switching address, and in response to said local status information and said local congestion status field. Accordingly, Claim 21 is patentably distinct over Tsutsui in view of Haas.

Applicants' Claim 23 calls for the steps of "...sending from one of said stations of said first network segment a message packet..., receiving said

- 8 -

message packet at a first network transfer device..., the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a protocol class field, receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port of said switching device as selected by said switching address, and in response to said local status information and said protocol class field, receiving said message packet at said second network transfer device via said switching device and forwarding said message packet..."

Tsutsui et al in view of Haas neither describes nor suggest the steps of said second header including a switching address translated from said destination address, said second header including local status information and a protocol class field, receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port of said switching device as selected by said switching address, and in response to said local status information and said protocol class field.

Moreover, there is no suggestion in Tsutsui in view of Haas that would lead one skilled in the art to provide the steps of said second header including a switching address translated from said destination address, said second header including local status information and a protocol class field, receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port

- 9 -

of said switching device as selected by said switching address, and in response to said local status information and said protocol class field. Accordingly, Claim 23 is patentably distinct over Tsutsui in view of Haas.

Applicants' Claim 24 calls for the steps of "...sending from one of said stations of said first network segment a message packet..., receiving said message packet at a first network transfer device..., ...the first network transfer device applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a local congestion status field, receiving at said switching device said message packet...,...in response to said local status information and said local congestion field, and receiving said message packet at said second network transfer device via said switching device and forwarding said message packet to said second network segment..."

Tsutsui et al in view of Haas neither describes nor suggest the steps of said second header including local status information and a local congestion status field, receiving at said switching device said message packet...,...in response to said local status information and said local congestion field.

Moreover, there is no suggestion in Tsutsui in view of Haas that would lead one skilled in the art to provide the steps of said second header including local status information and a local congestion status field, receiving at said switching device said message packet...,...in response to

- 10 -

said local status information and said local congestion field. Accordingly, Claim 24 is patentably distinct over Tsutsui in view of Haas.

The Examiner rejected Claims 2, 5, 11 and 14 under 35 U.S.C. §103 as being unpatentable over Tsutsui and Haas in view of Schroeder et al (U.S. Patent No. 5,088,091).

Applicants note that Claims 2 and 5 depend on Claim 1, and that Claims 11 and 14 depend on Claim 10. Claim 1 and 10 being patentable over Tsutsui in view of Haas, Applicants respectfully urge that Claims 2, 5, 11, and 14 are also patentable over Tsutsui in view of Haas.

The Examiner rejected Claims 6 and 15 under 35 U.S.C. §103 as being unpatentable over Tsutsui, Haas, and Schroeder, and further in view of Takada et al (U.S. Patent No. 5,220,562).

Applicants note that Claims 6 depends on Claim 1, and that Claim 15 depends on Claim 10. Claim 1 and 10 being patentable over Tsutsui, Haas, and Schroeder in view of Takada, Applicants respectfully urge that Claims 6 and 15 are also patentable over Tsutsui, Haas, and Schroeder in view of Takada.

The Examiner rejected Claims 7-9 and 16-18 under 35 U.S.C. §103 as being unpatentable over Tsutsui, Haas, Schroeder, and Takada, and further in view of Golestani (U.S. Patent No. 5,121,383).

Applicants note that Claims 7-9 depend on Claim 1, and that Claims 16-18 depend on Claim 10. Claim 1 and 10 being patentable over Tsutsui, Haas, Schroeder, and Takada, and further in view of Golestani, Applicants

- 11 -

respectfully urge that Claims 7-9 and 16-18 are also patentable over Tsutsui, Haas, Schroeder, and Takada, and further in view of Golestani.

The Examiner rejected Claims 19 and 22 under 35 U.S.C. §103 as being unpatentable over Tsutsui in view of Golestani.

Golestani discloses duration limited statistical multiplexing in packet networks. Specifically, at Col. 4, lines 22-23, Golestani discloses that each packet includes a loss priority class indicator p.

Applicants' Claim 19 calls for "...a first network segment..., a first network transfer device...applying a second header to said message packet, said second header including a switching address translated from said destination address, said second header including local status information and a service class field, a switching device...receiving ...and sending said message packet... and in response to said local status information and said service class field, and a second network transfer device..."

Tsutsui in view of Golestani neither describes nor suggests said second header including local status information and a service class field, a switching device...receiving ...and sending said message packet... and in response to said local status information and said service class field, and a second network transfer device.

Moreover, there is no suggestion in Tsutsui in view of Haas that would lead one skilled in the art to provide said second header including local status information and a service class field, a switching device...receiving ...and sending said message packet... and in response to said local status information and said service class field, and a second

- 12 -

network transfer device.  Accordingly, Claim 19 is patentably distinct over
Tsutsui in view of Golestani.

Applicants' Claim 22 calls for the steps of "...sending from one of said
stations of said first network segment a message packet..., receiving said
message packet at a first network transfer device... applying a second
header to said message packet, said second header including a switching
address translated from said destination address, said second header
including local status information and a service class field, receiving at said
switching device said message packet with said second header and sending
said message packet with said second header to a port of said switching
device as selected by said switching address, and in response to said local
status information and said service class field, receiving said message
packet at said second network transfer device via said switching device..."

Tsutsui in view of Golestani neither describes nor suggests the steps
of applying a second header to said message packet, said second header
including a switching address translated from said destination address, said
second header including local status information and a service class field,
receiving at said switching device said message packet with said second
header and sending said message packet with said second header to a port
of said switching device as selected by said switching address, and in
response to said local status information and said service class field.

Moreover, there is no suggestion in Tsutsui in view of Haas that
would lead one skilled in the art to provide the steps of applying a second
header to said message packet, said second header including a switching

- 13 -

address translated from said destination address, said second header including local status information and a service class field, receiving at said switching device said message packet with said second header and sending said message packet with said second header to a port of said switching device as selected by said switching address, and in response to said local status information and said service class field. Accordingly, Claim 22 is patentably distinct over Tsutsui in view of Golestani.

In view of the above amendments and arguments, it is submitted that Claims 1-24 are patentably distinct over Tsutsui, Haas, Schroeder, Takada, and Golestani, whether taken separately or in combination, and are proper under 35 U.S.C. §112, second paragraph. Accordingly, reconsideration and reexamination are hereby requested.

Respectfully submitted,

Kenneth F. Kozik
Reg. No. 36,572

Digital Equipment Corporation
Patent Law Group
111 Powdermill Road, MSO2-3/G3
Maynard, Massachusetts 01754-1499
(508) 493-5287

kfk-asj/kfk

- 14 -

EXHIBIT 28

ATTORNEY'S DOCKET NO: C0441/7120

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:        Dobbins et al.
Serial No:        08/960,919
Filed:            October 30, 1997
For:              METHOD FOR ESTABLISHING RESTRICTED BROADCAST
                  GROUPS IN A SWITCHED NETWORK

Examiner:         C. Nguyen
Art Unit:         2732

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C. 20231

Sir:

## AMENDMENT

Responsive to the Office Action of June 9, 1998 (Paper No 5), please amend the above-identified application as follows:

In the Claims :

Please amend claims 18, 42 and 44 as follows:

18.    (Amended)  A method of restricted flooding of a data packet, of one of a broadcast, multicast and unknown destination type, in a switched data communications network, the network including a plurality of end systems and switches connected by links, the switches having access ports connected to end systems and network ports connected to other switches, the method including steps of:

a.     assigning at least one identifier to a respective subset of end systems [or access ports];

b.     mapping the at least one assigned identifier to [the respective subset of end systems or] an access port[s] attached to at least one end system in the respective subset of end systems; and

c.     when the data packet is received from a source end system at a receiving access port of a first switch:

209142.1

Serial No.: 08/960,919                    - 2 -                    Art Unit: 2732

i) determining one or more identifiers associated with the source end system [or the receiving access port of the first switch];

ii) encapsulating the data packet by adding a header with the one or more determined identifiers;

iii) forwarding the encapsulated data packet to all or a subset of other switches in the network; and

iv) determining if at least one access port other than the receiving access port on the first switch is associated with the one or more determined identifiers and forwarding the data packet out the at least one determined access port.

25

32. (Amended) A switch for restricted flooding of a data packet, of one of a broadcast, multicast and unknown destination type, in a switched data communications network, the network including a plurality of end systems and switches connected by links, the switch having access ports connected to end systems and network ports connected to other switches, the switch comprising:

means for assigning at least one identifier to a respective subset of end systems [or access ports];

means for mapping the at least one assigned identifier to [the respective subset of end systems or] an access port[s] atached to at least one end system in the respective subset of end systems;

means for receiving the data packet from a source end system at a receiving access port;

means for determining one or more identifiers associated with the source end system [or the receiving access port];

means for encapsulating the data packet by adding a header with the one or more determined identifiers;

means for forwarding the encapsulated data packet to all or a subset of other switches in the network;

209142.1

Serial No.: 08/960,919                    - 3 -                    Art Unit: 2732

means for determining if at least one access port on the switch is associated with the one or more determined identifiers; and

means for forwarding the data packet out the at least one determined access port other than the receiving access port.

27.    (Amended)  In a switched communications network including a plurality of end systems, a method of restrictive flooding of a data packet selected from the group consisting of a broadcast packet, a multicast packet, and an unknown destination packet of a protocol not supported by a call processor in an access switch which receives the data packet, the method comprising:

assigning at least one identifier to a respective subset of end systems [or access ports];

mapping the at least one assigned identifier to an access port of the access switch attached to at least one end system in the respective subset of end systems;

10          upon receipt of the data packet at the access switch, encapsulating the data packet with the at least one indentifier assigned to a source end system of the data packet and forwarding the encapsulated packet to all or a subset of other switches in the network, and sending the original data packet to access ports [or end systems] having the at least one identifier; and

15          upon receipt of the encapsulated packet at a receiving switch, de-encapsulating the packet and forwarding the de-encapsulated packet to the [subset of end systems or] access ports having the at least one identifier.

## REMARKS

In response to the Office Action dated June 9, 1998 (Paper No. 5), Applicant respectfully requests reconsideration.

Claims 18-44 have been examined.  By this amendment, Applicant is amending claims 18, 42 and 44.  As a result, claims 18-44 remain in the application with claims 18, 42 and 44 being independent claims.

209142.1



Serial No.: 08/960,919                     - 4 -                     Art Unit: 2732

Rejections Under 35 U.S.C. §112

Claims 18-44 stand rejected under §112, first paragraph, as containing subject matter which was not described in the specification. Applicant respectfully submits the following in response.

The Office Action maintains that there is no support in the disclosure for the step of, or means for, forwarding the encapsulated data packet "to all or a subset of other switches in the network," as recited in independent claims 18, 42 and 44.

The original specification discloses a network 10 having four SFPS switches 11-14, all the switches being connected by physical links forming a point-to-point connection 15 and which connect together to form a logical multicast channel 16. (Page 12, lines 8-12; Fig. 5). As disclosed, each SFPS switch supports the multicast channel 16 by having a connection that connects it to all other switches in the network (or within a subsection of the network, such as a domain). In essence, a point-to-multipoint connection in each switch is established. (Page 14, lines 19-23). Further, a connection server includes a common directory of all switches and has the responsibility to program the multicast channel connection each time a new switch joins or leaves the topology. (Page 15, lines 3-6).

As is known in the art, "multicast" refers to the transmission of information to a group of recipients via a single transmission by the source. (See, Interconnections, Bridges and Routers, Radia Perlman, 1992, page 371, copy provided). Since a multicast channel 16, by definition, allows a single message to be sent to more than one destination, one of ordinary skill in the art would understand that any message sent by any one SFPS switch could be addressed to either all of the other switches or less than all of the other switches. This would depend upon the multicast address chosen by the sending switch.

Significantly, Applicant discloses that the central connection server must reprogram the multicast channel between the switches anytime a change in the switched topology occurs. (Page 18, lines 6-8). If all the multicast channel did was to forward any encapsulated packet sent by a switch to all other switches, this reprogramming of the multicast channel would not be necessary. Applicant maintains that one of ordinary skill

209142.1

in the art would understand that the encapsulated data packet sent by a switch is to be sent either to all of the other switches or to some set consisting of less than all of the other switches. Accordingly, Applicant maintains that all claims are in compliance with §112 and respectfully requests that this rejection be withdrawn.

## Non-Statutory Double Patenting Rejection

Claims 1-44 stand rejected under the judicially-created doctrine of double patenting over claim 1 of U.S. Patent 5,684,800. Applicant submits herewith a timely-filed Terminal Disclaimer terminally disclaiming any patent term that may extend beyond that of U.S. Patent 5,684,800. The Examiner is respectfully requested to withdraw the double patenting rejection.

## Rejections Under 35 U.S.C. §103(a)

Claims 18-20, 25, 26, 28-38 and 42-44 stand rejected under §103 as being unpatentable over Ross. Applicant submits that the claims, as amended, are patentable over the cited reference.

Ross is directed to a hub for establishing a segmented Virtual Local Area Network (VLAN) within a larger Local Area Network (LAN), using a shared transmission media to form a backbone network. (Col. 2, lines 46-50). As shown in Fig. 3, three hubs 10, 110, 210 are connected to one another via a backbone network 76. Each hub includes internal ports connected to respective end stations and an external port connected to the backbone network 76.

These VLANs are established, according to Ross, in order to enhance message security and more efficiently use the backbone network transmission bandwidth. (Col. 2, lines 50-52). Each hub assigns one or more VLAN designations to each internal and external port. (Col. 5, line 67 - Col. 6, line 3). When a message is transmitted from any of the internal ports, a stored VLAN designation for that internal port is associated with that message. (Col. 6, lines 10-17). Every time a message is received by a hub on an internal port, the VLAN designations of that port are then associated with the message. (Col. 8, lines 35-37). An objective of Ross in providing these VLAN

Serial No.: 08/960,919              - 6 -              Art Unit: 2732

designations is to allow all parts of the network, i.e., end stations and/or internal ports of hubs having the same VLAN designations, to exchange messages solely with one another. (Col. 7, line 67 - Col. 8, line 3). This, according to Ross, prevents message exchanges between parts of the network having different VLAN designations. (Col. 8, lines 3-5).

Ross suggests that by associating VLAN designations with each message based on the internal port on which the message was received, a message may then only be delivered (1) to an end station that is connected to an internal port having a matching VLAN designation, (2) to an internal port that has a matching VLAN designation, or (3) to an external port connected to a hub having a port with a matching VLAN designation. (Col. 8, lines 11-18).

Ross discusses that an internal port of a hub may have multiple VLAN designations assigned to it. As a result, a message originating from one of the end stations attached to that internal port may have more than one VLAN associated with it by the hub. (Col. 11, lines 1-5). In operation, the message is forwarded to all internal ports that have a VLAN designation that matches one of the VLAN designations associated with the message. (Col. 11, lines 14-18).

Independent claim 18, as amended, is directed to a method of restricted flooding of a data packet of one of a broadcast, multicast and unknown destination type, in a switched data communications network including a plurality of end systems and switches connected by links. The switches have access ports connected to end systems and network ports connected to other switches. The method includes assigning at least one identifier to a respective subset of end systems and mapping the at least one assigned identifier to an access port attached to at least one end system in the respective subset of end systems. When the data packet is received from a source end system at a receiving access port of a first switch, one or more identifiers associated with the source end system are determined, the data packet is encapsulated by adding a header with the one or more determined identifiers and the encapsulated data packet is forwarded to all or a subset of other switches in the network. Additionally, it is determined if at least one access port other than the receiving access port on the first switch is associated with one

209142.1

Serial No.: 08/960,919                    - 7 -                    Art Unit: 2732

or more determined identifiers and the data packet is forwarded to the at least one determined access port.

Applicant maintains that Ross does not teach or suggest each of the limitations as found in claim 18. Specifically, Ross does not teach or suggest that one or more identifiers associated with the source end system of a data packet received on a receiving access port of a first switch is determined. As above, Ross assigns the VLAN designations to the received message based upon the VLAN designations assigned to the internal port. Ross does not base this VLAN determination upon the source end system of the received message, as is recited in claim 18.

As described above, Ross appends all VLAN designations for a particular internal port to any message received on that internal port. Thus, an end system on an internal port of the Ross hub that is in a different VLAN than the other end systems attached to that same internal port will have the other VLAN designation appended to any message it sends. This is an unacceptable result, especially when a broadcast message is being sent.

As acknowledged in the Office Action, Ross is silent as to broadcast or multicast messages. The Office Action, however, concludes that it is common practice in the art to broadcast or multicast a message from a station to other stations so as to inquire or share information among a number of users. (Office Action, page 4). With regard to broadcast messages, however, Ross does not maintain the security that it desires. Specifically, when an end station in a particular VLAN sends a broadcast message, it is intended to only go to the other end stations in that VLAN.

In the Ross system, however, in the case where an end station is in a VLAN different from other end stations connected to the same internal port, a broadcast message sent by that end station would be received at the internal port of the hub and would have all of the VLAN designations for that internal port appended to it. Thus, a broadcast message intended for only one VLAN would be sent by the Ross hub to all other VLANs that are defined for that particular internal port.

To the contrary, the method as recited in claim 1 determines the VLANs for the end station that is the source of the broadcast data packet. Only these determined VLANs are encapsulated. This assures that the broadcast message only goes to the VLANs of which the source end station is a member. For at least the foregoing reason,

209142.1

Serial No.: 08/960,919                - 8 -                Art Unit: 2732

Applicant maintains that independent claim 18 is patentable over the Ross reference. As claims 19-41 depend from independent claim 18, these claims are also patentable over the cited reference.

Independent claim 42 is directed to a switch for restricted flooding of a data packet of one of a broadcast, multicast and unknown destination type and recites in means-plus-function form essentially that which is recited in independent claim 18. Claim 42 comprises means for assigning at least one identifier to a respective subset of end systems, means for mapping the at least one assigned identifier to an access port attached to at least one end system in the respective subset of end systems, means for receiving the data packet from a source end system at a receiving access port and means for determining one or more identifiers associated with the source end system. Further recited are means for encapsulating the data packet by adding a header with the one or more determined identifiers.

Independent claim 44 is directed to a method in a switched communications network including a plurality of end systems where the method includes assigning at least one identifier to a respective subset of end systems, mapping the at least one assigned identifier to an access port of the access switch attached to at least one end system in the respective subset of end systems and upon receipt of the data packet at the access switch, encapsulating the data packet with the at least one identifier assigned to a source end system of the data packet and forwarding the encapsulated packet to all or a subset of other switches in the network.

For at least the reason submitted above with regard to independent claim 18, Applicant maintains that independent claims 42 and 44, along with their dependent claims would not have been rendered obvious by Ross. As above, Ross does not teach or suggest that a VLAN of an incoming message is identified according to the VLAN or VLANs assigned to the source of the message. Ross merely appends the VLANs assigned to the internal port to any message received. As above, this can result in a message destined for only one VLAN being directed to other VLANs where end stations which are not to receive the message actually do. Applicant respectfully submits that these claims are allowable over the cited reference and requests that the §103 rejection be withdrawn.

209142.1

Serial No.: 08/960,919                - 9 -                Art Unit: 2732

 In view of the foregoing amendments and remarks, this application should now be in condition for allowance.  A notice to this effect is respectfully requested.  If the Examiner believes, after this amendment, that the application is not in condition for allowance, the Examiner is requested to call the Applicant's attorney at the number listed below.

 If this response is not considered timely filed and if a request for an extension of time is otherwise absent, Applicant hereby requests any necessary extension of time.  If there is a fee occasioned by this response, including an extension fee, that is not covered by an enclosed check, please charge any deficiency to Deposit Account No. 23/2825.

Respectfully submitted,
*Dobbins et al., Applicants*

Paul D. Sorkin, Reg. No. 39,039
Therese A. Hendricks, Reg. No. 30,389
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210-2211
Tel. No. (617) 720-3500
Attorneys of Record

Attorney's Docket No.  C0441/7120
Dated: October 9, 1998
x 10/09/98

209142.1

EXHIBIT 29

Virtual LANs take network to next level
Anderson, Jens Kristian
Computer Technology Review; Sep 1996; 16, 9; ABI/INFORM Global
pg. 12

Case 1:03-cv-11298-DPW     Document 132-31     Filed 08/17/2007     Page 2 of 3

## Integrating For The LAN

VOLUME XVI
Number 9

# Virtual LANs Take Network To Next Level

by Jens Kristian Andersen

Local Area Networks have changed the way organizations do business. They have brought instantaneous communication to people throughout an enterprise and given remote locations the same level of access to databases that local users enjoy. LANs reduce costs, increase efficiency and productivity, and upgrade customer service. But the proliferation of LANs, combined with today's more streamlined and mobile organizations bring a new set of requirements to data communications.

This comes at a crucial time in the evolution of networking technology. Today's enterprise-wide networks are becoming more and more complex, and they are carrying increasing amounts of mission-critical data. At the same time, businesses have become leaner and more flexible. That leads many to form *ad hoc*, cross-functional teams of people who might be located in the next office, the next floor, or anywhere else on a campus. These people have to share information and computer resources.

Traditional LANs are not always the most efficient way to do this. For example, they offer no easy way to manage the moves, adds, and changes brought about by the 20-40 percent of employees who relocate every year, either within a building or to another geographical location. Another shortcoming is that traditional switched networks make no provision for controlling traffic by screening broadcast activity in an enterprise: one part of the network can see the broadcasts of another part. This also makes security difficult.

### Virtual LANs

Virtual Local Area Networks, or Virtual LANs, will help take organizations to the next level. Simply stated, a Virtual LAN lets groups of users in a switched network, no matter where they are located, communicate as if they were located on the same LAN segment. This enables organizations to group users by community of interest rather than physical proximity, and connect them using a single switching technology, rather than a combination of



Fig. In a port-based scenario each VLAN is a collection of ports in the physical network.

**LEGEND**
● Virtual LAN #1    ▲ Virtual LAN #2    ■ Virtual LAN #3

bridging, routing, and switching. Ultimately, they help reduce the cost of network ownership.

There are two ways to define Virtual LANs: port-based, and address-based.

In a port-based scenario, each Virtual LAN is a collection of ports in the physical network. That means, for example, if the physical network consists of two hubs (see Fig), Virtual LAN #1 can be defined as Ports 1 and 3 on Hub A, plus Port 3 on Hub B. Virtual LAN #2 would be defined as Port 4 on Hub A and Ports 2 and 4 on Hub B, and Virtual LAN #3 would be defined as Port 2 on Hub A and Port 1 on Hub B. All computers connected to these ports appear to the users to be on the same physical LAN, but broadcast messages on this Virtual LAN would be sent only to these ports. Messages for other ports, even those on the same hub, would not be received.

An address-based Virtual LAN is a collection of users who are identified by a network address. This provides more flexibility than a port-based Virtual LAN, because users can change location, but still stay part of the same Virtual LAN. So if a user has been assigned to the "Engineering Virtual LAN," the user will remain in this Virtual LAN when moving to another office, even if the new office previously had been used by someone in, say, the "Accounting Virtual LAN."

### Physical Changes

In a traditional LAN, the changes were made by physically moving the user's workstation to the new location, or transferring the network interface card from the old workstation to the new one. In a Virtual LAN, these changes are done by software. In the next year, communication

equipment suppliers will offer software that automatically configures Virtual LANs.

There are different ways to define the address used in an address-based Virtual LAN. Some use the network equipment's MAC address to identify each user. Others use the address defined by higher-level network protocols. In the case of TCP/IP, for example, each user is identified by an IP address, and all the users in the same IP subnet can then form a single Virtual LAN.

Today, all Virtual LAN implementations require that all users

be on the same site. That means Virtual LANs are now being used to subdivide large LANs, in much the same way LAN backbone routers have been used to segment large networks into manageable pieces. The result is to limit the amount of network traffic and provide "firewalls" between separate parts of the network.

Dealing with moves, adds, and changes is generally thought of as the primary benefit of Virtual LANs. While it's true that is a significant benefit—estimates are that up to 10 percent of an organization's MIS budget is devoted to moves, adds, and changes—Virtual LANs have other important benefits. These include improved security, tighter management of bandwidth by controlling broadcast activity, the ability to segment the network, distributing traffic around hot spots in the network, and the relocating workgroup servers into secure, centralized locations.

### Moves, Adds, Changes

Organizations are always reorganizing as they seek to increase their efficiency. On average, between 20 and 40 percent of the workforce is physically moved every year. These moves, adds, and changes are one of a network manager's biggest headaches, and one of the largest expenses relative to the network. Many moves require recabling, and almost all moves require new station addressing and reconfiguring hubs and routers.

Virtual LANs can control these changes and reduce much of the cost associated with hub and router reconfiguration. That's because users in a Virtual LAN can share the same network address space, regardless of their location. So if they move, users' network addresses won't change, as long as they remain within the same Virtual LAN and are connected to a switch port. Changing locations can be as straightforward as plugging a user into a port on a Virtual LAN-capable switch, or simply configuring the port on the switch to that Virtual LAN. This simplifies the rewiring, reconfiguring, and debugging necessary to get the user back online. And, router con-

> "On average, between 20 and 40 percent of the workforce is physically moved every year. These moves, adds, and changes are one of a network manager's biggest headaches."

See LAN page 14

12

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# Integrating For The LAN

Computer Technology Review September 1996

# LAN

Continued from page 12

figuration doesn't change, because just moving a user from one location to another does not create any configuration modifications in the router as long as the user stays in the same Virtual LAN.

## Controlling Broadcast Activity

Broadcast traffic works like a radio station's signal. It is information sent from one user to all workstations and devices on a network. Although some applications, such as updating software or addresses, broadcast messages as a matter of course, newer applications typically are designed to reduce the number of broadcasts they send out. But networks still are subjected to occasional broadcast storms, a chain reaction that brings a network to its knees by broadcasting a large number of packets across the enterprise by mistake.

One of the best ways to protect against excessive broadcast messages has been to use a router to provide a firewall that insulates problems on one network segment from other segments. But as more networks migrate to a switched architecture, there tend to be fewer routers between switches, and broadcasts are sent to every switch.

Fortunately, Virtual LAN users can set up firewalls that protect the network against broadcast problems. It's done by assigning a switch port or MAC address to a specific Virtual LAN. That isolates broadcast traffic to one Virtual LAN. This cuts down broadcast traffic and decreases the possibility of broadcast storms, so users have more bandwidth available for their applications.

A network administrator can further increase the effective bandwidth within a Virtual LAN simply by controlling the number of ports and users in it. Keeping Virtual LANs small means broadcast activity in one is less likely to affect others. Administrators also can group applications that generate high broadcast traffic on one Virtual LAN segment, making more bandwidth available for other, less broadcast-intensive applications.

## Enhanced Security

Today, traditional LANs carry all types of sensitive information: personal data, financial transactions, trade secrets, new product designs, national defense information. Because they are geographically dispersed, it is relatively easy for an intruder to get onto a traditional LAN than onto a traditional LAN. And the larger the

LAN, the more live ports there are for intruders to break into.

Data communications security measures can range from physical isolation to passwords and data encryption, but switched Virtual LANs give network an architectural way to enhance security.

Switched Virtual LANs let administrators divide a network

> To reach their full potential, it is crucial for VLANs to be managed from commonly used network management systems. So far, vendors have been hesitant to come forward with their vision of how to manage VLANs.

into well-defined groups, restrict the number of users in the group, and control the addition of new users. In addition, an administrator can cluster sensitive applications into a secure Virtual LAN, and put in place alarms that go off if unauthorized users try to access it.

## Scalability

Switched VLANs give network administrators a degree of scalability they don't have now.

Most LANs in place today are shared LANs, where users on a hub contend for the available bandwidth. These networks do not scale gracefully, because they are close to the limit of their ability to provide bandwidth to users. And adding users increases network congestion, which further degrades performance. Switched Virtual LANs scale their network administrators scale their networks more smoothly, by increasing the available bandwidth to users and preserving some of the existing equipment.

## The Management Challenge

To reach their full potential, it is crucial for VLANs to be managed from commonly used network management systems. So far, vendors have been hesitant to come forward with their vision of how to manage VLANs.

A network management system for a VLAN must address three key tasks facing network operators:

1. Setting up VLAN definitions;

2. Moving users from one group to another; and

3. Detecting whether a user has changed physical connection.

In a VLAN, each of these tasks poses some challenges.

## Setting Up VLAN Definitions

The management system must guarantee that definitions made on one station will automatically propagate through the entire network. For virtual networks spanning a large corporation, configuration information must propagate even when the network is not working properly. In the event of problems, the system must have recovery procedures that can quickly restore the network after link failures.

One solution that simplifies definition is to link VLANs to existing logical groups of users. For example, the most common method is to use the TCP/IP addressing scheme or the "IP subnet number." Note however, that extending this principle to virtual networks spanning wide area links will mean a radical departure from today's use of IP addresses. Today, users in different geographic locations by definition are on different subnets, as this is how TCP/IP is used to route data across a wide area network.

## Move Users In One Group To Another

It must be possible to move users, or groups of users, from one VLAN to another while the network is operational and even while users are using network services.

Again, network consistency plays a major role, especially if VLAN information is replicated throughout the network.

## Automatic Detection

This is only relevant for address-based virtual networks.

When a user moves to a different location, the network management system must do three things automatically:

1. Detect that the user has changed location;

2. Update the current VLAN's definition to accommodate the new physical port connection; and

3. Make sure that all broadcast traffic in the VLAN is directed to the new port.

To do this, the management system must offer an easy-to-use graphical user interface, called a "mapper." The mapper must be able to illustrate the physical and logical network connections, and have management tools to automate network configurations and updates. The network management system must rapidly update the mapper to reflect new groupings of users, and if necessary, raise alarms to make sure that the network manager is aware of which changes are taking place.

Today, no network manager has an elegant way of doing this.

## Summary

Virtual LANs offer significant cost and performance benefits for a majority of the LANs installed today.

Virtual LANs reduce the overhead of moves, adds, and changes. Network administrators can create ad hoc workgroups using software, rather than changing NIC's and updating tables.

LAN configurations become straightforward and logical. Virtual LAN segments can be configured to reflect how users work, rather than where they work.

Virtual LANs simplify management by letting network administrators control data communications equipment from one management station, using one network management application.

The switched architecture enables Virtual LANs to scale easily from the workgroup level to enterprise-wide virtual networking by adding ATM switches. As ATM becomes more widely accepted, Virtual LANs can support bringing ATM capabilities directly to the desktop, without sacrificing existing equipment. ■

*Jens Kristian Andersen is a research and development manager at Cray Communications (Herlev, Denmark).*

FOR MORE INFO CIRCLE 116

FacetCorp (Plano, TX). ☎
214/985-9901. FOR MORE INFO
CIRCLE 152

## FacetWin Unites '95, NT & UNIX

FacetCorp has introduced FacetWin, a comprehensive software product that enables the seamless integration of Windows 95 and Windows NT clients with UNIX-based servers. It allows the users to transparently access and use any UNIX-based network resources (e.g., files, disks, applications, and printers). Following is a summary of all the features:

• **Transparent File Services**—Users can view, access and save files, as well as launch Windows applications located on a Unix server, without the hassle of copying files back and forth.

• **Transparent Print Services**—Windows users can access any UNIX printer directly from their Windows application. The product also lets UNIX users print to the PC printers.

• **Terminal Emulation**—Support is provided for the most widely used terminal emulation families including Digital's VT series, SCO/ANSI color console, Wyse, and IBM. This feature allows PC users to work with UNIX-based applications by emulating a UNIX work environment and includes the unique Window Watch and QuickLaunch features.

• **PC Backup**—System administrators can schedule and perform routine backups of networked PCs to a UNIX tape drive.

• **Modem Server**—PC users can access a pool of modems connected to a UNIX host from anywhere on the network. The server effectively provides modem access to users without requiring them to be physically wired to a modem and phone line.

• **Email Server**—A POP3 server is included which allows email to be moved between UNIX and Windows mail systems. This means users can use any POP3 compliant mail client they prefer.

• **Remote Computing Support**—All features included in FacetWin may also be utilized from a PC connected over a dial-in modem. This makes it possible for a user working at home or on the road to access and/or print files located anywhere on the network.

FacetWin is now available for ordering and shipment. A single user license is priced at $195 with discounts for multi-user licenses. FacetCorp is offering free 30-day evaluation copies of the product through their established channel of worldwide distributors.

14

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.